**CASE NO. 22-1750**

**IN THE**

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

GARY NESTLER, on behalf of themselves and all others similarly situated;VIEWED STUDENT FEMALE 200, on behalf of themselves and all others similarly situated; VIEWED STUDENT MALE 300, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

v.

HE  BISHOP OF CHARLESTON, a Corporation Sole;
BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS, 1 - 10;
THE  BISHOP OF THE DIOCESE OF CHARLESTON, in his official capacity; ROBERT GUGLIELMONE, individually*,*

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT ABINGDON

**JOINT APPENDIX - VOLUME I OF III**
**(Pages 1 - 572)**

David K. Lietz
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
5335 Wisconsin Avenue NW, Suite 440
Washington, D.C. 20015-2052
866-252-0878
dlietz@milberg.com

Lawrence E. Richter, Jr.
RICHTER FIRM, LLC
622 Johnnie Dodds Boulevard
Mt. Pleasant, SC 29464
843-849-6000
lrichter@richterfirm.com

*Counsel for Plaintiffs-Appellants*          *Counsel for Plaintiffs-Appellants*

Additional Counsel Listed on Inside Cover

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477

Richard S. Dukes, Jr.
TURNER, PADGET, GRAHAM & LANEY, PA
P. O. Box 22129
Charleston, SC 29413
843-576-2810
rdukes@turnerpadget.com

Carmelo B. Sammataro
TURNER, PADGET, GRAHAM & LANEY, PA
1901 Main Street, 17th Floor
Columbia, SC 29201
803-227-4253
ssammataro@turnerpadget.com

*Counsel for Defendants-Appellees*

# **TABLE OF CONTENTS**

## **VOLUME I OF III**

<div align="right">Page</div>

District Court Docket Sheet [2:21-cv-00613-RMG] .................................................... 1

Notice of Removal
    Filed March 3, 2021 [ECF1]..................................................................... 19

Defendants' Rule 26.01 Disclosures
    Filed March 3, 2021 [ECF2]..................................................................... 24

Answer of Defendants
    Filed March 4, 2021 [ECF4]..................................................................... 27

Plaintiffs' Answer to Interrogatories
    Filed March 17, 2021 [ECF5]................................................................... 44

Defendants' Rule 26.03 Disclosures
    Filed June 7, 2021 [ECF15]..................................................................... 48

Amended Consolidated Class Action Complaint
    Filed August 13, 2021 [ECF35]............................................................... 60

Answer of Defendants to Amended Complaint
    Filed August 26, 2021 [ECF36]............................................................... 87

Plaintiffs' Motion for Class Certification with Exhibits
    Filed December 13, 2021 [ECF67]......................................................... 104

        Ex. 1:    Transcript of Mary Anne Tucker Deposition
                     taken on 10/5/2021 [ECF67-1] ................................... 139

        Ex. 2:    Transcript of Roger M. Attanasio Deposition
                     taken on 8/20/ 2021 [ECF67-2] ................................. 231

        Ex. 3:    Transcript of Patrick Finneran Deposition
                     taken on 10/5/2021 [ECF67-3] ................................... 451

## **VOLUME II OF III**

Ex. 4:   Transcript of Amanda Salas, M.D. Deposition
         taken on 11/10/2021 [ECF67-4] .................................................. 573

Ex. 5:   Transcript of Patrick Finneran Deposition
         taken on 10/22/2021 [ECF67-5] .................................................. 668

Ex. 6:   Diocese of Charleston Media Statement
         dated 2/4/2021 [ECF67-6] ......................................................... 752

Ex. 7:   Transcript of Eric Aichele Deposition
         taken on 10/13/2021 [ECF67-7] .................................................. 754

Ex. 8:   Defendant Bishop England High School's Answers
         to Plaintiffs' First Interrogatories [ECF67-8] ............................ 879

Ex. 9:   Transcript of Continuation of Maria Aselage Deposition
         taken on 12/1/2021 [ECF67-9] ................................................... 890

Ex. 10:  Plaintiffs' First Set of Requests for Admission to
         Bishop England High School [ECF67-10] ................................. 985

Ex. 11, Part 1:  Bishop England High School Faculty Handbook
                 2019-19 [ECF67-11].......................................................... 991

Ex. 11, Part 2:  Bishop England High School Faculty Handbook
                 2019-19 [ECF67-12]......................................................... 1021

Ex. 12:  Transcript of Nathaniel Person Deposition
         taken on 10/25/2021 [ECF67-13] ............................................. 1051

Ex. 13:  Transcript of Jeremy J. Carrick Deposition
         taken on 10/25/2021 [ECF67-14] ............................................. 1073

Ex. 14:  Transcript of Deon Richardson Deposition
         taken on 10/25/2021 [ECF67-15] ............................................. 1097

## VOLUME III OF III

Ex. 15:   Transcript of Maria Y. Williams Deposition
          taken on 10/25/2021 [ECF67-16] ............................................... 1111

Ex. 16:   Defendant Bishop England High School's Supplemental
          Answers to Plaintiffs' First Interrogatories [ECF67-17] .......... 1128

Ex. 17:   Transcript of Male Student Deposition
          taken on 10/4/2021 [ECF67-18] ................................................. 1133

Ex. 18:   Transcript of Female Student Deposition
          taken on 10/4/2021 [ECF67-19] ................................................. 1174

Ex. 19:   Bishop England High School Website [ECF67-20] ................. 1229

Ex. 20:   Transcript of Gary Nestler Deposition
          taken on 10/1/2021 [ECF67-21] ................................................. 1236

Ex. 21:   Statement of Qualifications of Proposed Class Counsel
          [ECF67-22] ................................................................................ 1329

Defendants' Opposition to Plaintiffs'
Motion for Class Certification with Exhibits
    Filed January 19, 2022 [ECF75] ...................................................... 1335

Ex. 1:    LS3P Locker Room Design Drawing [ECF75-1] ..................... 1362

Ex. 2:    Amanda Salas, M.D. Deposition Excerpts [ECF75-2] ............. 1363

Ex. 3:    Glick Report [ECF75-3] ............................................................ 1374

Ex. 4:    Runyon Report [ECF75-4] ........................................................ 1379

Ex. 5:    Male Student Deposition Excerpts [ECF75-5] ......................... 1392

Ex. 6:    Female Student Deposition Excerpts [ECF75-6] ...................... 1404

Ex. 7:    Eric Aichele Deposition Excerpts [ECF75-7] ........................... 1414

iii

Ex. 8:    Gary Nestler Deposition Excerpts [ECF75-8] .......................... 1425

Ex. 9:    Mary Anne Tucker Deposition Excerpt [ECF75-9]................. 1431

Ex. 10:   Patrick Finneran Deposition Excerpts [ECF75-10] ................ 1434

Ex. 11:   Roger M. Attanasio Deposition Vol. II Excerpts
          [ECF75-11]................................................................ 1438

Ex. 12:   Bigelow v. Syneos Health, LLC (Decision) [ECF75-12]......... 1447

Plaintiffs' Reply to Defendants' Objection to
Plaintiff' Motion for Class Certification
      Filed January 26, 2022 [ECF78].................................................... 1454

Defendants' Surreply Regarding Class Certification
      Filed February 1, 2022 [ECF83].................................................... 1469

Order and Opinion (Denying Motion for Class Certification)
      Entered March 24, 2022 [ECF84] ................................................ 1471

Defendants' Motion for Summary Judgment
      Filed April 8, 2022 [ECF85]......................................................... 1491

Plaintiffs' Motion for Reconsideration Pursuant to Fed. R. Civ. P. 59(e)
      Filed April 21, 2022 [ECF88]....................................................... 1493

Plaintiffs' Motion to Certify Question to The
Supreme Court of South Carolina with Attachment and Exhibit
      Filed April 21, 2022 [ECF89] ......................................................1513

      Att. 1:   Plaintiffs' Memorandum in Support of Their
                Motion to Certify Question to The Supreme Court
                of South Carolina [ECF89-1].................................... 1516

      Ex. A:    Transcript of Record dated June 9, 2020 [ECF89-2]............... 1528

Response by Defendants in Opposition to Plaintiffs'
Motion for Reconsideration Pursuant to Fed. R. Civ. P. 59(e)
      Filed May 4, 2022 [ECF90].......................................................... 1546

Response by Defendants in Opposition to Plaintiffs' Motion
to Certify Question to The Supreme Court of South Carolina
    Filed May 4, 2022 [ECF91]............................................................. 1556

Plaintiffs' Reply Memorandum in Support of Their Motion
to Certify Question to The Supreme Court of South Carolina
    Filed May 11, 2022 [ECF92]......................................................... 1560

Plaintiffs' Reply to Response in Opposition ([ECF 90) to
Motion for Reconsideration Pursuant to Fed. R. Civ. P. 59(e)
    Filed May 11, 2022 [ECF93]......................................................... 1564

Order (Denying Motion to Reconsider and Motion to Certify Question)
    Entered May 24, 2022 [ECF95].................................................... 1570

Plaintiffs' Response and Memorandum in Opposition to
Defendants' Motion for Summary Judgment with Exhibits
    Filed 2022.06.06 [ECF98] ............................................................ 1574

        Ex. 1:    Press Release from the Diocese of Charleston 2/4/21
                  [ECF98-1].................................................................... 1584

        Ex. 2:    Patrick Finneran Deposition Excerpt [ECF98-2]..................... 1586

        Ex. 3:    Defendant Bishop England High School's Answers to
                  Plaintiffs' First Interrogatories [ECF98-3] ............................. 1590

        Ex. 4:    Photograph of Athletic Directo/Coach Runey's Office
                  Desk Arrangement and the Window Looking directly
                  into a Locker Room [ECF98-4] ................................................ 1601

        Ex. 5:    Transcript of Record dated June 9, 2020 [ECF98-5]............... 1603

        Ex. 6:    Spoliation Notice [ECF98-6] .................................................... 1621

        Ex. 7:    Patrick Finneran Deposition Excerpts [ECF98-7] ................... 1625

        Ex. 8:    Diocese Defendants' Responses to
                  Plaintiffs' First Requests for Production [ECF98-8] ............... 1640

v

Ex. 9:    Transcript of Amanda Salas, M.D. Deposition
          taken on 11/10/2021 [ECF98-9]
          *(To Avoid Duplication Deposition Located at JA Pg. 573)*

Defendants' Reply in Support of
Their Motion for Summary Judgment
    Filed June 13, 2022 [ECF99]........................................................... 1652

Order (Granting Defendant's Motion for Summary Judgment)
    Entered June 17, 2022 [ECF100]................................................... 1654

Notice of Appeal
    Filed July 12, 2022 [ECF101] ....................................................... 1657

CM/ECF - scd                                  https://ecf.scd.uscourts.gov/cgi-bin/DktRpt.pl?836628050738842-L_1_0-1

**Query    Reports    Utilities    Help    Log Out**

<span style="color:green">APPEAL</span>,<span style="color:red">CLOSED</span>,JURY

## U.S. District Court
## District of South Carolina (Charleston)
## CIVIL DOCKET FOR CASE #: 2:21-cv-00613-RMG

| | |
|---|---|
| Nestler et al v. Bishop of Charleston, The et al | Date Filed: 03/03/2021 |
| Assigned to: Honorable Richard M Gergel | Date Terminated: 06/17/2022 |
| Case in other court: Berkeley County Court of Common Pleas, | Jury Demand: Plaintiff |
| 2021-CP-08-00256 | Nature of Suit: 360 P.I.: Other |
| 4CCA, 22-01750 | Jurisdiction: Diversity |
| Cause: 28:1332 Diversity-Personal Injury | |

**Plaintiff**

**Gary Nestler**
*on behalf of themselves and all others
similarly situated*

represented by **Anna Elizabeth Richter**
Slotchiver & Slotchiver, L.L.P.
751 Johnnie Dodds Blvd.
Suite 100
Mt. Pleasant, SC 29464
843-577-6531
Email: arichter@slotchiverlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brent Souther Halversen**
Halversen and Associates
1037 Chuck Dawley Boulevard
Building G
Suite 200
Mt Pleasant, SC 29464
843-284-5790
Email: brent@halversenlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carl Lewis Solomon**
Solomon Law Group LLC
PO Box 1866
Columbia, SC 29203
803-391-3120
Fax: 803-509-5033
Email: carl@solomonlawsc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Scott Slotchiver**

**JA1**

Slotchiver and Slotchiver LLP
751 Johnnie Dodds Boulevard
Suite 100
Mount Pleasant, SC 29464
843-577-6531
Fax: 843-577-0261
Email: dan@slotchiverlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence Edward Richter , Jr**
Richter Firm
622 Johnnie Dodds Boulevard
Mt Pleasant, SC 29464
843-849-6000
Fax: 843-881-1400
Email: lrichter@richterfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M Slotchiver**
Slotchiver and Slotchiver LLP
751 Johnnie Dodds Boulevard
Suite 100
Mount Pleasant, SC 29464
843-577-6531
Fax: 843-577-0261
Email: steve@slotchiverlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Viewed Student Female 200**
*on behalf of themselves and all others
similarly situated*

represented by **Anna Elizabeth Richter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brent Souther Halversen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carl Lewis Solomon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Scott Slotchiver**
(See above for address)
*LEAD ATTORNEY*

**JA2**

*ATTORNEY TO BE NOTICED*

**Lawrence Edward Richter , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M Slotchiver**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Viewed Student Male 300**          represented by   **Anna Elizabeth Richter**
*on behalf of themselves and all others*                      (See above for address)
*similarly situated*                                          *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                      **Brent Souther Halversen**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Carl Lewis Solomon**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Daniel Scott Slotchiver**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Lawrence Edward Richter , Jr**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Stephen M Slotchiver**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

V.

**Movant**

**LS3P Associates LTD**               represented by   **Kent T Stair**
                                                      Copeland Stair Valz and Lovell LLP
                                                      40 Calhoun Street
                                                      Suite 400

**JA3**

Charleston, SC 29401
843-266-8224
Fax: 843-727-2995
Email: kstair@csvl.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Maria Aselage**                    represented by    **Albert Peter Shahid , Jr**
                                                        Shahid Law Office LLC
                                                        145 King Street
                                                        Suite 309
                                                        Charleston, SC 29401
                                                        843-853-4500
                                                        Fax: 843-722-1119
                                                        Email: peter@shahidlawoffice.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bishop of Charleston, The**         represented by    **Carmelo B Sammataro**
*a Corporation Sole*                                    Turner Padget Graham and Laney (Col)
                                                        PO Box 1473
                                                        1901 Main Street
                                                        17th Floor
                                                        Columbia, SC 29202
                                                        803-227-4253
                                                        Fax: 803-400-1532
                                                        Email: ssammataro@turnerpadget.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Megan Ashley Rushton**
                                                        Turner Padget Graham and Laney (Gre)
                                                        200 East Broad Street
                                                        Suite 250
                                                        Greenville, SC 29601
                                                        Email: mrudd@turnerpadget.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Richard S Dukes , Jr**
                                                        Turner Padget Graham and Laney (Cha)
                                                        PO Box 22129
                                                        40 Calhoun Street
                                                        Suite 200
                                                        Charleston, SC 29413-2129
                                                        843-576-2810

**JA4**

Fax: 843-577-1646
Email: rdukes@turnerpadget.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bishop England High School**                 represented by **Carmelo B Sammataro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Ashley Rushton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard S Dukes , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tortfeasors 1-10**                 represented by **Richard S Dukes , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bishop of the Diocese of Charleston, The**     represented by **Albert Peter Shahid , Jr**
*in his official capacity*                       (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carmelo B Sammataro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Ashley Rushton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard S Dukes , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JA5**

CM/ECF - scd          https://ecf.scd.uscourts.gov/cgi-bin/DktRpt.pl?836628050738842-L_1_0-1

**Robert Guglielmone**          represented by   **Carmelo B Sammataro**
*individually*                                       (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                         **Megan Ashley Rushton**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Richard S Dukes , Jr**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/03/2021 | 1 | NOTICE OF REMOVAL from Berkeley County Court of Common Pleas, case number 2021-CP-08-00256. (Filing fee $ 402 receipt number 0420-9684459), filed by Robert Guglielmone, Bishop of Charleston, The, Bishop England High School, Bishop of the Diocese of Charleston, The. (Attachments: # 1 State Court Documents, # 2 Exhibit B Decl. of Patrick Finneran)(sshe, ) (Entered: 03/03/2021) |
| 03/03/2021 | 2 | Local Rule 26.01 Answers to Interrogatories by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone. (sshe, ) (Entered: 03/03/2021) |
| 03/04/2021 | 4 | ANSWER to Complaint by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone.(Dukes, Richard) (Entered: 03/04/2021) |
| 03/17/2021 | 5 | Local Rule 26.01 Answers to Interrogatories by Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300.(Richter, Lawrence) (Entered: 03/17/2021) |
| 03/30/2021 | 6 | DELETION OF DOCKET ENTRY NUMBER 6 (original) Reason: Motion from 2:21-cv-20-RMG spread incorrectly inadvertently per filing user Filing date of original filing: 3/30/2021 (sshe, ) (Entered: 03/30/2021) |
| 05/10/2021 | 7 | NOTICE of Request for Protection from Court Appearance by Richard S Dukes, Jr for Aug 1 - Aug 8, 2021; and Dec 21, 2021 - Jan 2, 2022 (Attachments: # 1 Proposed Order Protection from Court Appearance - Richard S. Dukes, Jr.)(Dukes, Richard) (Entered: 05/10/2021) |

**JA6**

CM/ECF - scd                                          https://ecf.scd.uscourts.gov/cgi-bin/DktRpt.pl?836628050738842-L_1_0-1

| 05/12/2021 | 8 | **SCHEDULING ORDER Rule 26(f) Conference Deadline 5/30/2021, 26(a) Initial Disclosures due by 6/5/2021, Rule 26 Report due by 6/5/2021, Motions to Amend Pleadings due by 6/21/2021, Plaintiffs ID of Expert Witness due by 7/21/2021, Defendants ID of Expert Witnesses Due by 8/20/2021, Records Custodian Affidavit due by 8/27/2021, Discovery due by 9/20/2021, Motion in Limine due by 15 business days prior to jury selection, Motions due by 10/4/2021, Rule 26(a)(3) Disclosures due by 21 business days prior to jury selection, Pretrial Briefs due by 5 business days prior to jury selection, Case ready for jury selection and/or trial on or after 1/1/2022 Signed by Honorable Richard M Gergel on 5/12/2021. (sshe, )** (Entered: 05/12/2021) |
| --- | --- | --- |
| 05/12/2021 | 9 | **ORDER TO CONDUCT MEDIATION Mediation Due by 10/20/2021 Signed by Honorable Richard M Gergel on 5/12/2021. (sshe, )** (Entered: 05/12/2021) |
| 06/04/2021 | 10 | Rule 26 Outline of Discovery Plan by Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300.(Richter, Lawrence) (Entered: 06/04/2021) |
| 06/04/2021 | 11 | Rule 26(f) Report by Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300. (Attachments: # 1 Exhibit Meditation Form)(Richter, Lawrence) (Entered: 06/04/2021) |
| 06/04/2021 | 12 | Rule 26 Outline of Discovery Plan *Local Rule 26.03 Answers to Interrogatories* by Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300.(Richter, Lawrence) Modified on 6/7/2021 to edit docket text(sshe, ). (Entered: 06/04/2021) |
| 06/07/2021 | 13 | *Defendants'* Rule 26 Outline of Discovery Plan by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10.(Dukes, Richard) (Entered: 06/07/2021) |
| 06/07/2021 | 14 | Rule 26(f) Report by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10. (Attachments: # 1 Exhibit Meditation Form)(Dukes, Richard) (Entered: 06/07/2021) |
| 06/07/2021 | 15 | *Defendants'* Local Rule 26.03 Answers to Interrogatories by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10.(Dukes, Richard) (Entered: 06/07/2021) |
| 06/09/2021 | 16 | NOTICE of Hearing: Telephone Status Conference set for 6/18/2021 at 9:30 AM before Honorable Richard M Gergel. Court staff needed. The Court will provide call-in instructions.(ltap, ) (Entered: 06/09/2021) |
| 06/16/2021 | 17 | *Second Amended* Rule 26 Outline of Discovery Plan by Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300.(Richter, Lawrence) (Entered: 06/16/2021) |
| 06/17/2021 | 18 | NOTICE OF RESCHEDULED HEARING Telephone Status Conference set for 6/18/2021 at 9:30 AM cancelled and rescheduled to: Telephone Conference set for 6/22/2021 10:00 AM before Honorable Richard M Gergel. (Dial in instructions remain the same)(cper, ) (Entered: 06/17/2021) |
| 06/21/2021 | 19 | MOTION for Extension of Time by Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 7/6/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Proposed Consent Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Richter, Lawrence) |

| | | |
|---|---|---|
| | | (Entered: 06/21/2021) |
| 06/22/2021 | 20 | **Minute Entry. Proceedings held before Honorable Richard M Gergel: Telephone Conference held on 6/22/2021. All parties are represented on the call. Court to issue order re: core class discovery issues. Court Reporter Karen Martin. (cper, )** (Entered: 06/22/2021) |
| 06/22/2021 | 21 | **AMENDED DISCOVERY AND SCHEDULING ORDER See Order for details re: Class Discovery, Numbers of Depositions and Interrogatories allowed, Counsel to meet and confer as to proposed Confidentiality Order, Defendants directed to file a motion on the matter of Anonymity of Named Parties within 15 days of this order, Motions to Amend Pleadings due by 7/6/2021,, Plaintiffs ID of Expert Witness due by 8/15/2021,, Defendants ID of Expert Witnesses Due by 9/14/2021,, Records Custodian Affidavit due by 9/22/2021,, Class Certification Discovery due by 10/15/2021,, Class Certification Motion due by 10/29/2021, Counsel to meet and confer within 10 days after the Court rules on the motion for class certification as to proposed revised scheduling order to address other issues and deadlines of Dkt. No. 8 (Motion granted: 19 MOTION for Extension of Time *for Amendment of Pleadings* filed by Tuition Payer 100, Viewed Student Male 300, Viewed Student Female 200). AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 6/22/2021. (sshe, )** (Entered: 06/22/2021) |
| 07/02/2021 | 22 | MOTION for Confidentiality Order by Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 7/16/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Redlined version, # 2 Proposed Order Clean version, # 3 Exhibit Form Attachments to Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Richter, Lawrence) (Entered: 07/02/2021) |
| 07/06/2021 | 23 | **CONFIDENTIALITY ORDER granting 22 Motion for Confidentiality Order Signed by Honorable Richard M Gergel on 7/6/2021.(sshe, )** (Entered: 07/06/2021) |
| 07/07/2021 | 24 | First MOTION to Compel *Plaintiffs to Comply with Fed. R. Civ. P. 17* by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone. Response to Motion due by 7/21/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Dukes, Richard) (Entered: 07/07/2021) |
| 07/15/2021 | 25 | MOTION for Protective Order by LS3P Associates LTD. Response to Motion due by 7/29/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Notice of Deposition of 30(B)(6) Witness for LS3P, # 2 Exhibit Subpoena to Testify at a Deposition to LS3P, # 3 Exhibit June 18, 2021 email to Plaintiffs counsel, # 4 Exhibit July 2, 2021 letter to Plaintiffs counsel, # 5 Exhibit July 6, 2021 email to Plaintiffs Counsel, # 6 Exhibit July 7, 2021 email to Plaintiffs counsel, # 7 Exhibit July 7, 2021 email to LS3Ps counsel from Plaintiffs counsel, # 8 Exhibit July 7, 2021 email to Plaintiffs counsel, # 9 Exhibit Deposition Transcript, # 10 Exhibit Letter to LS3P's counsel)No proposed order.(Stair, Kent) (Entered: 07/15/2021) |
| 07/21/2021 | 26 | RESPONSE in Opposition re 24 First MOTION to Compel *Plaintiffs to Comply with Fed. R. Civ. P. 17* Response filed by Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300.Reply to Response to Motion due by 7/28/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. |

| | | (Richter, Lawrence) (Entered: 07/21/2021) |
|---|---|---|
| 07/28/2021 | 27 | RESPONSE in Opposition re 25 MOTION for Protective Order Response filed by Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300.Reply to Response to Motion due by 8/4/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Richter, Lawrence) (Entered: 07/28/2021) |
| 07/28/2021 | 28 | REPLY to Response to Motion re 24 First MOTION to Compel *Plaintiffs to Comply with Fed. R. Civ. P. 17* Response filed by Bishop of the Diocese of Charleston, The, Bishop England High School, Bishop of Charleston, The, Robert Guglielmone. (Rushton, Megan) Modified on 7/29/2021 to add filers as listed on document(sshe, ). (Entered: 07/28/2021) |
| 08/04/2021 | 29 | **ORDER AND OPINION: Defendants motion to compel Plaintiffs to comply with Fed.R. Civ. P. 10 and 17 (Dkt. No. 24) is GRANTED IN PART AND DENIED IN PART.Defendants motion is GRANTED to the extent that Plaintiffs are directed to file an amended complaint which identifies the named plaintiffs representing the Tuition Class on or before August 13, 2021. Defendants motion is otherwise DENIED. AND IT SO ORDERED. Signed by Honorable Richard M Gergel on 8/4/21.(ltap, )** Modified document type (Opinion) on 8/5/2021 (sshe, ). (Entered: 08/04/2021) |
| 08/04/2021 | 30 | REPLY to Response to Motion re 25 MOTION for Protective Order Response filed by LS3P Associates LTD. (Attachments: # 1 Exhibit A July 7 email to LS3Ps counsel, # 2 Exhibit B Deposition Q&A Chart)(Stair, Kent) Modified on 8/5/2021 to add descriptions to exhibits(sshe, ). (Entered: 08/04/2021) |
| 08/10/2021 | 31 | **ORDER AND OPINION: The Court DENIES Defendants motion for a protective order to terminate or limit the deposition of LS3P (Dkt. No. 25). The Court further ORDERS Plaintiffs and LS3P to, by August 30, 2021, meet and confer, schedule, reconvene and complete the Rule 30(b)(6) deposition of LS3P in accordance with this Order. AND IT SO ORDERED. Signed by Honorable Richard M Gergel on 8/9/21.(ltap, )** Modified document type (Opinion) on 8/11/2021 (sshe, ). (Entered: 08/10/2021) |
| 08/11/2021 | 32 | **AMENDED ORDER AND OPINION: The Court DENIES LS3Ps motion for a protective order to terminate or limit the deposition of LS3P (Dkt. No. 25). The Court further ORDERS Plaintiffs and LS3P to, by August 30, 2021, meet and confer, schedule, reconvene and complete the Rule 30(b)(6) deposition of LS3P in accordance with this Order. AND IT SO ORDERED. Signed by Honorable Richard M Gergel on 8/11/21. (ltap, )** Modified document type (Opinion) on 8/11/2021 (sshe, ). (Entered: 08/11/2021) |
| 08/12/2021 | 33 | Joint MOTION for Extension of Time by Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 8/26/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Proposed Consent Order)Proposed order is being emailed to chambers with copy to opposing counsel. (Richter, Lawrence) (Entered: 08/12/2021) |
| 08/12/2021 | 34 | **TEXT ORDER For good cause shown and with the consent of all parties, the joint motion to extend the time for Plaintiffs to identify their experts and provide written reports until 9/14/21 and for Defendants to identify their experts and** |

**JA9**

| | | |
|---|---|---|
| | | **provide written reports until 10/14/21 (Dkt. No. 33 ) is granted. AND IT IS SO ORDERED. Entered at the Direction of Honorable Richard M Gergel on 8/12/2021.(sshe, )** (Entered: 08/12/2021) |
| 08/13/2021 | 35 | AMENDED COMPLAINT against All Defendants, filed by Viewed Student Female 200, Gary Nestler, Viewed Student Male 300. Service due by 11/12/2021 (Attachments: # 1 Exhibit Locker Room Photo, # 2 Exhibit Indictments and sentencing sheet, # 3 Exhibit Finneran letter 5.7.19, # 4 Exhibit Finneran letter July 2019, # 5 Exhibit BEHS v. Hudson, # 6 Exhibit Affidavit of John Barker, # 7 Exhibit Excerpts from 7.17.19 Transcript of Record and pleading excerpts) (Richter, Lawrence) Modified docket text re party name on 8/16/2021 (sshe, ). (Entered: 08/13/2021) |
| 08/26/2021 | 36 | ANSWER to 35 Amended Complaint,, by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone. (Dukes, Richard) (Entered: 08/26/2021) |
| 08/30/2021 | 37 | NOTICE of Request for Protection from Court Appearance by Richard S Dukes, Jr for 09/13/2021 - 09/21/2021 (Dukes, Richard) (Entered: 08/30/2021) |
| 08/31/2021 | 38 | **TEXT ORDER re 37 Notice of Request for Protection from Court Appearance filed by Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Bishop England High School. Counsel should please know the protection request is duly noted and take under advisement. Entered at the Direction of Honorable Richard M Gergel on 8/31/2021. (sshe, )** (Entered: 08/31/2021) |
| 09/08/2021 | 39 | Joint MOTION for Extension of Time *for Parties to Identify Their Respective Experts and Other Deadlines* by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 9/22/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Proposed Consent Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Richter, Lawrence) (Entered: 09/08/2021) |
| 09/08/2021 | 40 | **THIRD AMENDED SCHEDULING ORDER Plaintiffs ID of Expert Witness due by 9/28/2021,, Defendants ID of Expert Witnesses Due by 10/28/2021,, Records Custodian Affidavit due by 10/6/2021,, Class Certification Discovery due by 10/29/2021,, Class Certification Motions due by 11/12/2021 (Motion re: 39 Joint MOTION for Extension of Time *for Parties to Identify Their Respective Experts and Other Deadlines* filed by Gary Nestler, Viewed Student Male 300, Viewed Student Female 200). Signed by Honorable Richard M Gergel on 9/8/2021. (sshe, )** (Entered: 09/08/2021) |
| 09/28/2021 | 41 | PLAINTIFF'S ID OF EXPERT WITNESSES by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. (Attachments: # 1 Exhibit Expert Report of Dr. Amanda Salas, # 2 Exhibit Expert Report of Ken Richardson)(Richter, Lawrence) (Entered: 09/28/2021) |
| 10/13/2021 | 42 | First MOTION for Protective Order *Regarding Testimony of Maria Aselage* by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone. Response to Motion due by 10/27/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Dukes, Richard) (Entered: 10/13/2021) |

**JA10**

CM/ECF - scd                                    https://ecf.scd.uscourts.gov/cgi-bin/DktRpt.pl?836628050738842-L_1_0-1

| | | |
|---|---|---|
| 10/14/2021 | 43 | MOTION for Protective Order , First MOTION to Quash ( Response to Motion due by 10/28/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. ) by Bishop of the Diocese of Charleston, The. (Attachments: # 1 Exhibit A subpoena, # 2 Exhibit B amended subpoena to produce documents)No proposed order.(Shahid, Albert) Modified on 10/15/2021 to add descriptions to exhibits(sshe, ). (Entered: 10/14/2021) |
| 10/19/2021 | 44 | First MOTION for Protective Order *and to Terminate, Limit Deposition of Bishop Robert Guglielmone* by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone. Response to Motion due by 11/2/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Notice of Deposition, Subpoena, # 2 Exhibit B - Deposition Transcript)No proposed order.(Dukes, Richard) (Entered: 10/19/2021) |
| 10/25/2021 | 45 | RESPONSE in Opposition re 42 First MOTION for Protective Order *Regarding Testimony of Maria Aselage*, 43 MOTION for Protective Order First MOTION to Quash Response filed by Gary Nestler.Reply to Response to Motion due by 11/1/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Dep. R. Attansio Vol. II, # 2 Exhibit Dep. P. Finneran, # 3 Exhibit Exhibit to Aselage Dep., # 4 Exhibit Dep. M. Aselage) (Halversen, Brent) (Entered: 10/25/2021) |
| 10/26/2021 | 46 | Joint MOTION for Extension of Time *for Plaintiffs to file Motion for Protective Order regarding deposition of Mrs. Doe* by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 11/9/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Proposed Consent Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Richter, Lawrence) (Entered: 10/26/2021) |
| 10/27/2021 | 47 | **TEXT ORDER granting 46 Motion for Extension of Time until 10/29/21 for Plaintiffs to file a Motion for Protective Order Regarding the Deposition of Mrs. Doe. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard Mark Gergel on 10/27/21.(ltap, )** (Entered: 10/27/2021) |
| 10/28/2021 | 48 | MOTION for Protective Order by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 11/12/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Deposition Excerpts)No proposed order.(Richter, Lawrence) (Entered: 10/28/2021) |
| 10/28/2021 | 49 | DEFENDANT'S ID OF EXPERT WITNESSES by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10. (Attachments: # 1 Exhibit 1-Myles Glick, # 2 Exhibit 2- William Runyon)(Dukes, Richard) (Entered: 10/28/2021) |
| 11/02/2021 | 50 | RESPONSE in Opposition re 44 First MOTION for Protective Order *and to Terminate, Limit Deposition of Bishop Robert Guglielmone Plaintiffs'* Response filed by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300.Reply to Response to Motion due by 11/9/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Transcript of Bishop Guglielmone's deposition, # 2 Exhibit Defendants' Interrogatories to Plaintiff Tuition Payer 100, # 3 Exhibit Defendants' Interrogatories to Viewed Student Female |

| | | |
|---|---|---|
| | | 200, # 4 Exhibit Defendants' Interrogatories to Viewed Student Male 300, # 5 Exhibit Plaintiff Tuition Payer 100 Answers to Defendants' Interrogatories, # 6 Exhibit Plaintiff Viewed Student Female 200 Answers to Interrogatories, # 7 Exhibit Plaintiff Viewed Student Male 300 Answers to Defendants' Interrogatories, # 8 Exhibit Plaintiffs' First Set of Interrogatories to Bishop Guglielmone, individually, # 9 Exhibit Defendant Bishop Guglielmone's Answers to Interrogatories)(Richter, Lawrence) (Entered: 11/02/2021) |
| 11/03/2021 | 51 | **ORDER AND OPINION: The Court DENIES Defendants motion for protective order regarding the testimony of Maria Aselage (Dkt. No. 42). The Court also DENIES Aselages motion for order of protection and to quash subpoena. (Dkt. No. 43). The Court further ORDERS Plaintiffs and Defendants to, by November 12, 2021, meet and confer, schedule, reconvene and complete the deposition of Aselage in accordance with this Order. By this date, Aselage shall also respond to Plaintiffs October 13, 2021 document request to Aselage and Hearsay Communications.AND IT SO ORDERED. Signed by Honorable Richard M Gergel on 11/3/21.(ltap, )** Modified document type (opinion) on 11/4/2021 (sshe, ). (Entered: 11/03/2021) |
| 11/05/2021 | 52 | Joint MOTION for Extension of Time by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 11/19/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Proposed Consent Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Richter, Lawrence) (Entered: 11/05/2021) |
| 11/09/2021 | 53 | REPLY to Response to Motion re 44 First MOTION for Protective Order *and to Terminate, Limit Deposition of Bishop Robert Guglielmone* Response filed by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10.(Dukes, Richard) Filing corrected for event type (sshe, ) (Entered: 11/10/2021) |
| 11/10/2021 | 54 | **Fourth Amended Scheduling Order: Class certification discovery is due by 12/3/21. Motions for Class Certification are due by 12/13/21. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 11/10/21.(ltap, )** (Entered: 11/10/2021) |
| 11/12/2021 | 55 | MOTION for Protective Order *Regarding Redacted Portions of Maria Aselage Emails* by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10. Response to Motion due by 11/29/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Exhibit A-Redaction Log)No proposed order.(Dukes, Richard) (Entered: 11/12/2021) |
| 11/12/2021 | 56 | **ORDER: For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART Defendants motion to terminate or limit the deposition of Bishop Robert Guglielmone and motion for protective order (Dkt. No. 44). In accordance with this Order, on or before November 22, 2021, the parties shall meet and confer, schedule, reconvene, and complete Deponents deposition.AND IT SO ORDERED. Signed by Honorable Richard M Gergel on 11/12/21.(ltap, )** (Entered: 11/12/2021) |

9/30/2022, 2:55 PM

**JA12**

| 11/12/2021 | 57 | **TEXT ORDER re 55 MOTION for Protective Order. The time to file a response to motion is shortened to 11/19/21. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 11/12/21. (ltap, )** (Entered: 11/12/2021) |
| --- | --- | --- |
| 11/17/2021 | 58 | **ORDER: Having reviewed Plaintiffs motion, the deposition excerpts attached, and the lack of opposition from Defendants, the Court GRANTS Plaintiffs motion for protective order regarding testimony of Mrs. Doe. (Dkt. No. 48).AND IT SO ORDERED. Signed by Honorable Richard M Gergel on 11/17/21.(ltap, )** (Entered: 11/17/2021) |
| 11/18/2021 | 59 | RESPONSE in Opposition re 55 MOTION for Protective Order *Regarding Redacted Portions of Maria Aselage Emails* Response filed by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300.Reply to Response to Motion due by 11/29/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 11/4/21 email from Brent Halversen to Peter Shahid, # 2 Exhibit Emails, # 3 Exhibit 11/9/21 email from Peter Shahid to Dan Slotchiver, # 4 Exhibit Deposition transcript of Maria Aselage 11/12/21)(Richter, Lawrence) (Entered: 11/18/2021) |
| 11/23/2021 | 61 | MOTION for Protective Order by Maria Aselage. Response to Motion due by 12/7/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A re production of privilege log of redacted documents to Plaintiff's counsel)No proposed order.(Shahid, Albert) Modified on 11/29/2021 to add description(s) for exhibit(s)(sshe, ). (Entered: 11/23/2021) |
| 11/29/2021 | 62 | MOTION for Protective Order *Regarding Reconvened Deposition of Bishop Guglielmone* by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10. Response to Motion due by 12/13/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Exhibit 1: Deposition Transcript of Bishop Robert Guglielmone)No proposed order.(Dukes, Richard) (Entered: 11/29/2021) |
| 12/01/2021 | 63 | **TEXT ORDER re 62 MOTION for Protective Order. The time to file a Response to Motion is shortened to 12/7/21. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 12/1/21. (ltap, )** (Entered: 12/01/2021) |
| 12/02/2021 | 64 | **ORDER AND OPINION The Court DENIES Defendants motion for protective order. (Dkt. No. 55 ). Aselage must produce all subpoenaed documents in unredacted form on or before November 26, 2021. Further, on or before December 3, 2021, Aselage's deposition must be reconvened so that Plaintiffs may question her regarding the documents she was ordered to but did not produce. AND IT SO ORDERED. Signed by Honorable Richard M Gergel on 12/2/2021. (sshe, )** (Entered: 12/02/2021) |
| 12/02/2021 | 65 | DELETION OF DOCKET ENTRY NUMBER 60 Reason: Order vacated per chambers, revised Order filed Corrected Filing Document Number 64 (sshe, ) (Entered: 12/02/2021) |

| | | |
|---|---|---|
| 12/07/2021 | 66 | RESPONSE in Opposition re 62 MOTION for Protective Order *Regarding Reconvened Deposition of Bishop Guglielmone* Response filed by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300.Reply to Response to Motion due by 12/14/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Email from Court Reporter, # 2 Exhibit Diocese sex abuse policy, # 3 Exhibit Excerpts of Bishop's deposition from state cases re always a priest, # 4 Exhibit Excerpts of Bishop's deposition from state cases - sex abuse policy, # 5 Exhibit Deposition transcript of Bishop Guglielmone 11/22/21, # 6 Exhibit 2017-2018 BEHS Faculty Handbook excerpts, # 7 Exhibit 2018-2019 BEHS Faculty Handbook excerpts, # 8 Exhibit Spoliation letter, # 9 Exhibit BEHS Answer to Interrogatory #20, # 10 Exhibit Excerpts of Bishop's deposition from state cases - sex abuse advisory board, # 11 Exhibit Defendants' Updated Fifth Supplemental Answers to Interrogatories)(Richter, Lawrence) (Entered: 12/07/2021) |
| 12/13/2021 | 67 | MOTION to Certify Class by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 12/29/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Deposition transcript Mary Anne Tucker, # 2 Exhibit Deposition transcript Roger Attanasio Vol. II, # 3 Exhibit Deposition transcript Patrick Finneran, # 4 Exhibit Deposition transcript Dr. Amanda Salas, # 5 Exhibit Deposition transcript 30b6 BEHS Patrick Finneran, # 6 Exhibit Exhibit 1 to Maria Aselage deposition, # 7 Exhibit Deposition transcript Eric Aichele, # 8 Exhibit BEHS's Answers to Plaintiffs' First Interrogatories, # 9 Exhibit Deposition transcript Maria Aselage Vol. III, # 10 Exhibit Plaintiffs' First Requests for Admission to BEHS, # 11 Exhibit Part 1 of Exhibit 3 to Patrick Finneran deposition, # 12 Exhibit Part 2 of Exhibit 3 to Patrick Finneran deposition, # 13 Exhibit Deposition transcript Nathaniel Pearson, # 14 Exhibit Deposition transcript Jeremy Carrick, # 15 Exhibit Deposition transcript Deon Richardson, # 16 Exhibit Deposition transcript Maria Williams, # 17 Exhibit BEHS's Supplemental Answers to Plaintiffs' First Interrogatories, # 18 Exhibit Deposition Transcript Male Student, # 19 Exhibit Deposition Transcript Female Student, # 20 Exhibit BEHS website, # 21 Exhibit Deposition transcript Gary Nestler, # 22 Exhibit Statement of Qualifications of Proposed Class Counsel)No proposed order.(Richter, Lawrence) (Entered: 12/13/2021) |
| 12/13/2021 | 68 | REPLY to Response to Motion re 62 MOTION for Protective Order *Regarding Reconvened Deposition of Bishop Guglielmone* Response filed by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10. (Dukes, Richard) (Entered: 12/13/2021) |
| 12/14/2021 | 69 | **ORDER: The Court GRANTS IN PART AND DENIES IN PART Defendants motion for protective order regarding reconvened deposition of Bishop Guglielmone (Dkt. No. 62).AND IT SO ORDERED. Signed by Honorable Richard M Gergel on 12/14/21.(ltap, )** (Entered: 12/14/2021) |
| 12/14/2021 | 70 | **TEXT ORDER: Before the Court is nonparty Maria Aselages motion for protective order. (Dkt. No. 61). Plaintiffs do not oppose the motion. The motion is granted as to questions regarding the production of documents on November 12, 2021. (Id. at 4). The remainder of the motion is denied as moot in light of (Dkt. No. 64). AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 12/14/21.(ltap, )** (Entered: 12/14/2021) |

**JA14**

| 12/14/2021 | 71 | MOTION for Extension of Time to File Response/Reply as to 67 MOTION to Certify Class by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10. Response to Motion due by 12/29/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Proposed Order Granting Defendants' Motion for Extension of Time to File a Response to Motion for Class Certification)Proposed order is being emailed to chambers with copy to opposing counsel.(Dukes, Richard) (Entered: 12/14/2021) |
|---|---|---|
| 12/15/2021 | 72 | **TEXT ORDER re 71 MOTION for Extension of Time to File Response/Reply as to 67 MOTION to Certify Class. The time to file a response to this motion is shortened to 12:00 noon on December 17, 2021. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 12/15/21. (ltap, )** (Entered: 12/15/2021) |
| 12/15/2021 | 73 | REPLY to Response to Motion re 71 MOTION for Extension of Time to File Response/Reply as to 67 MOTION to Certify Class Response filed by Gary Nestler. (Slotchiver, Daniel) (Entered: 12/15/2021) |
| 12/16/2021 | 74 | **TEXT ORDER: Defendants have moved for an extension until 1/19/22 to respond to Plaintiffs motion for class certification. (Dkt. No. 71). Plaintiffs consent to an extension of time for Defendants to respond to 1/12/22. (Dkt. No. 73). For good cause shown, the Defendants motion for an extension of time until 1/19/22 is granted. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 12/16/21.(ltap, )** (Entered: 12/16/2021) |
| 01/19/2022 | 75 | RESPONSE in Opposition re 67 MOTION to Certify Class Response filed by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10.Reply to Response to Motion due by 1/26/2022 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Exhibit 1- LS3P locker room design drawing, # 2 Exhibit Exhibit 2- Excerpts from Amanda Salas, M.D's Deposition Transcript, # 3 Exhibit Exhibit 3- Miles Glick's Report, # 4 Exhibit Exhibit 4- William Runyon's Report, # 5 Exhibit Exhibit 5-Excerpts from Male Student's Deposition Transcript, # 6 Exhibit Exhibit 6- Excerpts from Female Student's Deposition Transcript, # 7 Exhibit Exhibit 7- Excerpts from Eric Aichele's Deposition Transcript, # 8 Exhibit Exhibit 8- Excerpts from Gary Nestler's Deposition Transcript, # 9 Exhibit Exhibit 9- Excerpts from Mary Anne Tucker's Deposition Transcript, # 10 Exhibit Exhibit 10- Excerpts from Patrick Finneran's Deposition Transcript, # 11 Exhibit Exhibit 11- Excerpts from LS3P 30(b)(6)'s Deposition Transcript; session two, # 12 Exhibit Exhibit 12- Bigelow v. Syneos Health, LLC)(Dukes, Richard) (Entered: 01/19/2022) |
| 01/20/2022 | 76 | NOTICE of Request for Protection from Court Appearance by Daniel Scott Slotchiver for April 28, 2022 - May 3, 2022 Associated Cases: 2:21-cv-00613-RMG, 2:21-cv-00020-RMG(Slotchiver, Daniel) (Entered: 01/20/2022) |
| 01/25/2022 | 77 | NOTICE of Request for Protection from Court Appearance by Richard S Dukes, Jr for March 5, 2022 through March 11, 2022 & May 6, 2022 through May 18, 2022 (Dukes, Richard) (Entered: 01/25/2022) |
| 01/26/2022 | 78 | REPLY to Response to Motion re 67 MOTION to Certify Class *PLAINTIFFS REPLY TO DEFENDANTS OBJECTION TO PLAINTIFF MOTION FOR CLASS CERTIFICATION* Response filed by Gary Nestler. (Slotchiver, Daniel) (Entered: |

| | | 01/26/2022) |
|---|---|---|
| 01/26/2022 | 79 | **TEXT ORDER re 77 Notice of Request for Protection from Court Appearance filed by Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Bishop England High School, Tortfeasors 1-10, 76 Notice of Request for Protection from Court Appearance filed by Gary Nestler. Counsel should please know the protection requests are duly noted and take under advisement. Entered at the Direction of Honorable Richard M Gergel on 1/26/2022. (sshe, )** (Entered: 01/26/2022) |
| 01/28/2022 | 80 | MOTION for Leave to File *Surreply Regarding Class Certification* by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10. Response to Motion due by 2/11/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Exhibit 1- Proposed surreply regarding class certification, # 2 Exhibit Exhibit A- Deposition of Statement of Counsel, # 3 Exhibit Exhibit B- Correspondence to Dan Slotchiver on 11-09-21, # 4 Exhibit Exhibit C- Correspondence to Dan Slotchiver on 01-05-22)No proposed order.(Dukes, Richard) (Entered: 01/28/2022) |
| 01/31/2022 | 81 | REPLY to Response to Motion re 80 MOTION for Leave to File *Surreply Regarding Class Certification* Response filed by Gary Nestler. (Slotchiver, Daniel) (Entered: 01/31/2022) |
| 02/01/2022 | 82 | **TEXT ORDER For good cause shown, the motion of Defendant to file a sur-reply brief is granted. (Dkt. No. 80 ). AND IT IS SO ORDERED. Entered at the Direction of Honorable Richard M Gergel on 1/31/2022.(sshe, )** (Entered: 02/01/2022) |
| 02/01/2022 | 83 | SUR REPLY to REPLY to Response to Motion re 67 MOTION to Certify Class Response filed by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10. (Attachments: # 1 Exhibit Exhibit A- Deposition Transcript of Statement of Counsel, # 2 Exhibit Exhibit B- RSD letter to Dan Slotchiver regarding expert depositions on 11-09-2021, # 3 Exhibit Exhibit C- RSD follow up letter to Dan Slotchiver regarding expert depositions on 01-05-2022)(Dukes, Richard) (Entered: 02/01/2022) |
| 03/24/2022 | 84 | **ORDER AND OPINION denying 67 Motion to Certify Class. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 3/24/22.(ltap, )** Modified document type on 3/25/2022 (sshe, ). (Entered: 03/24/2022) |
| 04/08/2022 | 85 | MOTION for Summary Judgment by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10. Response to Motion due by 4/22/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Dukes, Richard) (Entered: 04/08/2022) |
| 04/19/2022 | 86 | Joint MOTION for Extension of Time to File Response/Reply as to 85 MOTION for Summary Judgment by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 5/3/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Proposed Order granting extension of time)Proposed order is being emailed to chambers with copy to opposing counsel. (Richter, Lawrence) (Entered: 04/19/2022) |

CM/ECF - scd                                    https://ecf.scd.uscourts.gov/cgi-bin/DktRpt.pl?836628050738842-L_1_0-1

| | | |
|---|---|---|
| 04/19/2022 | 87 | **ORDER granting 86 Joint MOTION for Extension of Time to File Response/Reply as to 85 MOTION for Summary Judgment. Response to Motion due by 5/22/2022. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 4/19/22.(ltap, )** (Entered: 04/19/2022) |
| 04/21/2022 | 88 | MOTION for Reconsideration re 84 Order on Motion to Certify Class by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 5/5/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Richter, Lawrence) (Entered: 04/21/2022) |
| 04/21/2022 | 89 | MOTION To Certify Question to the Supreme Court of South Carolina by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 5/5/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit Transcript of Record 6/9/20)No proposed order.(Richter, Lawrence) (Entered: 04/21/2022) |
| 05/04/2022 | 90 | RESPONSE in Opposition re 88 MOTION for Reconsideration re 84 Order on Motion to Certify Class Response filed by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10.Reply to Response to Motion due by 5/11/2022 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Dukes, Richard) (Entered: 05/04/2022) |
| 05/04/2022 | 91 | RESPONSE in Opposition re 89 MOTION To Certify Question to the Supreme Court of South Carolina Response filed by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10.Reply to Response to Motion due by 5/11/2022 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Dukes, Richard) (Entered: 05/04/2022) |
| 05/11/2022 | 92 | REPLY to Response to Motion re 89 MOTION To Certify Question to the Supreme Court of South Carolina Response filed by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. (Richter, Lawrence) (Entered: 05/11/2022) |
| 05/11/2022 | 93 | REPLY to Response to Motion re 88 MOTION for Reconsideration re 84 Order on Motion to Certify Class Response filed by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. (Attachments: # 1 Exhibit Press Release, # 2 Exhibit Finneran depo excerpts 10.5.21, # 3 Exhibit Defendant BEHS Answers to Interrogatories, # 4 Exhibit Finneran depo excerpts 10.22.21, # 5 Exhibit Finneran correspondence)(Richter, Lawrence) (Entered: 05/11/2022) |
| 05/19/2022 | 94 | MOTION for Extension of Time to File Response/Reply as to 85 MOTION for Summary Judgment by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. Response to Motion due by 6/2/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Correspondence with opposing counsel, # 2 Proposed Order Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Richter, Lawrence) (Entered: 05/19/2022) |
| 05/24/2022 | 95 | **ORDER : Plaintiffs' motion for reconsideration (Dkt. No. 88) and Plaintiff's motion to certify question (Dkt. No. 89) are DENIED. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 5/24/22.(ltap, )** (Entered: 05/24/2022) |

**JA17**

CM/ECF - scd                                                    https://ecf.scd.uscourts.gov/cgi-bin/DktRpt.pl?836628050738842-L_1_0-1

| 05/24/2022 | 96 | **TEXT ORDER granting 94 Motion for Extension of Time to File Response/Reply to to 85 MOTION for Summary Judgment to the extent that Plaintiffs have until 6/6/22 to file a response. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 5/24/22.(ltap, )** (Entered: 05/24/2022) |
|---|---|---|
| 06/06/2022 | 98 | RESPONSE in Opposition re 85 MOTION for Summary Judgment Response filed by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300.Reply to Response to Motion due by 6/13/2022 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Press Release, # 2 Exhibit Finneran depo excerpts 10.5.21, # 3 Exhibit BEHS Answers to Interrogatories, # 4 Exhibit Photograph, # 5 Exhibit Transcript of record 6.9.20, # 6 Exhibit Spoliation letter, # 7 Exhibit Finneran depo excerpts 10.5.21 re spoliation, # 8 Exhibit Diocese Defendants' Responses to Requests for Production, # 9 Exhibit Dr. Amanda Salas deposition transcript)(Richter, Lawrence) (Entered: 06/06/2022) |
| 06/13/2022 | 99 | RESPONSE in Support re 85 MOTION for Summary Judgment Response filed by Bishop England High School, Bishop of Charleston, The, Bishop of the Diocese of Charleston, The, Robert Guglielmone, Tortfeasors 1-10. (Dukes, Richard) (Entered: 06/13/2022) |
| 06/17/2022 | 100 | **ORDER: Defendants motion for summary judgment (Dkt. No. 85) is granted. The Clerk is directed to close this case. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 6/17/22.(ltap, )** (Entered: 06/17/2022) |
| 07/12/2022 | 101 | NOTICE OF APPEAL as to 100 Order on Motion for Summary Judgment by Gary Nestler, Viewed Student Female 200, Viewed Student Male 300. - Filing fee $ 505, receipt number ASCDC-10587544. The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Richter, Lawrence) (Entered: 07/12/2022) |
| 07/13/2022 | 102 | Transmittal Sheet for Notice of Appeal to USCA re 101 Notice of Appeal, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (sshe, ) (Entered: 07/13/2022) |
| 07/20/2022 | 104 | ORDER of USCA denying the petition for permission to appeal as to 101 Notice of Appeal, filed by Gary Nestler, Viewed Student Male 300, Viewed Student Female 200 (sshe, ) (Entered: 07/20/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/30/2022 14:53:43 | | |
| **PACER Login:** | Lantagne92 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-00613-RMG |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

**JA18**

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated, | C/A No. _2:21-cv-613_-RMG |
| Plaintiffs, | |
| vs. | **NOTICE OF REMOVAL** |
| The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, | |
| Defendants. | |

**TO:   THE HONORABLE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA, CHARLESTON DIVISION; THE COURT OF COMMON PLEAS FOR THE NINTH JUDICIAL CIRCUIT, BERKELEY COUNTY, SOUTH CAROLINA; AND ALL PARTIES AND ATTORNEYS OF RECORD:**

YOU WILL PLEASE TAKE NOTICE that Defendants, The Bishop of Charleston, a Corporation Sole, Bishop England High School, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, hereby invoke the removal jurisdiction of the United States District Court for the District of South Carolina, Charleston Division pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1446, 1453(b), and Local Civil Rules 83.IV.01 and 83.IV.02, based upon the following:

1.      Plaintiffs commenced this action by filing the Summons and Complaint with the South Carolina Court of Common Pleas for Berkeley County on February 3, 2021.  *See* Civil

Action No.: 2021-CP-08-00256. A copy of all process, if any, and pleadings filed in the state court action is attached hereto as Exhibit A.

2.    This action is currently pending in the Court of Common Pleas for Berkeley County, South Carolina, located within the Charleston Division of this Court. The named Defendants were served on February 4, 2021; thus, this removal is timely. The identities of fictitious parties may be ignored.

3.    This action is removable to this Court pursuant to 28 U.S.C. § 1453(b) as a class action. Removal pursuant to Section 1453(b) is without regard to whether any defendant is a citizen of the State in which the action is brought, and such action may be removed by any defendant without consent of all defendants. Accordingly, no joinder or consent by any other defendant, including the as yet unnamed Tortfeasors 1-10 Defendants named in this action, is required for this removal.

4.    This action is removable to this Court pursuant to 28 U.S.C. § 1332(d)(2) as a class action. Congress conferred subject matter jurisdiction upon federal courts over class actions in which there are more than 100 putative class members who seek to recover in excess of Five Million and 00/100 Dollars ($5,000,000.00) in the aggregate, and in which "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). The citizenship of a corporation is determined by the State in which it is incorporated and the State in which it has its principal place of business. *See id.*, 28 U.S.C. § 1331(c)(1).

5.    At the time of the commencement of this action and of the filing of this Notice of Removal, the Bishop of South Carolina, a Corporation Sole, is organized and exists pursuant to the laws of the State of South Carolina and has its principal place of business in this State.

6.      At the time of the commencement of this action and of the filing of this Notice of Removal, the Bishop of the Diocese of Charleston is an individual who is a resident and citizen of the State of South Carolina.

7.      At the time of the commencement of this action and of the filing of this Notice of Removal, Bishop England High School is an operation of Bishop of Charleston, a Corporation Sole, and has no separate legal existence.

8.      At the time of the commencement of this action and of the filing of this Notice of Removal, Robert Guglielmone is an individual who is a resident and citizen of the State of South Carolina.

9.      At the time of the commencement of this action and of the filing of this Notice of Removal, one or more members of the putative classes identified in Plaintiffs' Complaint are citizens of a State or States other than South Carolina. *See* Decl. of Patrick Finneran attached hereto as Exhibit B.  According to Plaintiffs' Complaint, the allegedly tortious conduct occurred for at least two decades, at least since 1998.  Pls.' Compl. ¶ 1.  Moreover, Plaintiff's Complaint lists Tuition Payer 100, Viewed Student Female 200, and Viewed Student Male 300 as "named" Plaintiffs.  Further, Plaintiffs allege "the number of members of each Class is likely to exceed 100 persons, perhaps several hundreds or even a thousand or more individuals. . . ." *Id.* at ¶ 62.  Thus, a fair reading of Plaintiffs' Complaint is that the members of each of the proposed classes of Plaintiffs exceed 100.  *See* U.S.C. § 1332(d)(5).

10.      Inasmuch as Defendants are South Carolina citizens and at least one putative class member is a citizen of a State other than South Carolina, the minimal diversity requirement of 28 U.S.C. § 1332(d)(2)(A) is satisfied.

11.    The amount in controversy required by 28 U.S.C. § 1332(d)(2) also is met. Pursuant to 28 U.S.C. § 1332(d)(6), claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs. Based upon the allegations contained in the Complaint, which Defendants deny, the amount in controversy clearly exceeds $5,000,000.00. Specifically, Plaintiffs seek to certify a "tuition class" that claims damages of One Hundred Fifty Million and 00/100 Dollars ($150,000,000.00) and a "viewed class" that also claims damages of One Hundred Fifty Million and 00/100 Dollars ($150,000,000.00). *See* Compl. ¶¶ 21-22.

12.    The United States District Court for the District of South Carolina, Charleston Division, encompasses the place where this action is pending in state court and is, therefore, an appropriate venue pursuant to 28 U.S.C. § 1391(a)(2) and 28 U.S.C. § 95(a)(2).

13.    As required by 28 U.S.C. § 1446(d), written Notice of Removal is being given to all adverse parties and a copy of the Notice is being filed with the Clerk of the South Carolina Court of Common Pleas for Berkeley County.

14.    In accordance with 28 U.S.C. § 1446(d), the Clerk of Court from which this action is removed has been served with a copy of the Notice of Removal.

WHEREFORE, the Defendants, by counsel, give notice that the within civil action, previously pending in the South Carolina Court of Common Pleas for Berkeley County has been removed to the United States District Court for District of South Carolina, Charleston Division.

(Signature page to follow)

Respectfully submitted,

**TURNER, PADGET, GRAHAM & LANEY, P.A.**

March 3, 2021                    By:    s/ Carmelo B. Sammataro

Richard S. Dukes, Jr., Federal ID No.  7340
40 Calhoun Street, Suite 200
Charleston, SC 29401
Phone: (843) 576-2810
Fax: (843) 577-1646
Email:  rdukes@turnerpadget.com

Carmelo B. Sammataro, Federal ID No. 9174
Post Office Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Meghan A. Rudd, Federal ID No. 13303
Post Office Box 1509
Greenville, SC 29602
Phone: (864) 552-4600
Fax: (864) 552-4620
Email:  mrudd@turnerpadget.com

**ATTORNEYS FOR DIOCESE DEFENDANTS**

5

**JA23**

# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH CAROLINA

# CHARLESTON DIVISION

| | |
|---|---|
| Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>          vs.<br><br>The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually,<br><br>          Defendants. | C/A NO.  2:21-cv-613-RMG<br><br><br><br>**DEFENDANTS' RULE 26.01 DISCLOSURES** |

Defendants The Bishop of Charleston, a Corporation Sole, Bishop England High School,

Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert

Guglielmone, individually (hereinafter "Diocese") submit the following Disclosures pursuant to

Local Rule 26.01:

(A)    State the full name, address and telephone number of all persons or legal entities who may have a subrogation interest in each claim and state the basis and extent of said interest.

**ANSWER:    None at this time.**

(B)    As to each claim, state whether it should be tried jury or nonjury and why.

**ANSWER:    Plaintiffs have demanded a jury trial.**

(C)    State whether the party submitting these responses is a publicly owned company and separately identify: (1) each publicly owned company of which it is a parent, subsidiary, partier, or affiliate; (2) each publicly owned company which owns ten percent or more of the

1

**JA24**

outstanding shares or other indicia of ownership of the party; and (3) each publicly owned company in which the party owns ten percent or more of the outstanding shares.

**ANSWER:     No defendant is publicly held.**

(D)     State the basis for asserting the claim in the division in which it was filed (or the basis of any challenge to the appropriateness of the division).

**ANSWER:     Bishop England High School is located in the Charleston Division.**

(E)     Is this action related in whole or in part to any other matter filed in this District, whether civil or criminal? If so, provide:  (1) a short caption and the full case number of the related action; (2) an explanation of how the matters are related; and (3) a statement of the status of the related action.  Counsel should disclose any cases which may be related such that they should be assigned to a single judge will be determined by the Clerk of Court based on determination of whether the cases; arise from the same or identical transaction, happenings or events; involve the identical parties or property; or for any other reason would entail substantial duplication of labor if heard by different judges.

**ANSWER:     No.**

(F)     If the Defendant is improperly identified, give the proper identification and state whether counsel will accept service of an amended summons and pleading reflecting the correct identification.

**ANSWER:     Bishop of Charleston, a Corporation Sole is the correct identity of the civil law presence and existence of the Roman Catholic Diocese of Charleston.  The Diocese is formed pursuant to Canon Law and has no civil law presence aside from the Corporation Sole.**

**Bishop England High School is a ministry, mission, and operation of the Diocese of Charleston, which itself is the ecclesiastical presence of the Roman Catholic Church in the State of South Carolina.  BEHS is not a separate legal entity, but rather is subject to the authority of the Bishop of Charleston.  BEHS exists solely as part of the Corporation Sole.**

**Most Rev. Robert Guglielmone is the Bishop of Charleston.**

**The ecclesiastical office of Bishop of Charleston is a canonical and ecclesiastical office and is not a civil law entity.**

(G)     If you contend that some other person or legal entity is, in whole or in part, liable to you or the party asserting a claim against you in this matter, identify such person or entity and describe the basis of said liability.

2

**JA25**

**ANSWER:     The Diocese is not aware of any person or legal entity that is liable to it or who is asserting a claim against the Plaintiffs at this time.**

**TURNER, PADGET, GRAHAM & LANEY, P.A.**

March 3, 2021                    By:     s/ Carmelo B. Sammataro

Richard S. Dukes, Jr., Federal ID No. 7340
40 Calhoun Street, Suite 200
Charleston, SC 29401
Phone: (843) 576-2810
Fax: (843) 577-1646
Email:  rdukes@turnerpadget.com

Carmelo B. Sammataro, Federal ID No. 9174
Post Office Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Meghan A. Rudd, Federal ID No. 13303
Post Office Box 1509
Greenville, SC 29602
Phone: (864) 552-4600
Fax: (864) 552-4620
Email:  mrudd@turnerpadget.com

**ATTORNEYS FOR DIOCESE DEFENDANTS**

## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually,<br><br>Defendants. | C/A: 2-21-cv-00613-RMG<br><br><br><br>**ANSWER OF DEFENDANTS** |

Now come Defendants, the Bishop of Charleston, a Corporation Sole, Bishop England High School, the Bishop of the Diocese of Charleston, in his official capacity, and Most. Rev. Robert Guiglielmone, (collectively referred to as "the Diocese" unless the context indicates otherwise) who answer Plaintiffs' Complaint as follows:

The Defendants deny the unnumbered preamble of the Complaint.

### FOR A FIRST DEFENSE

### I.    OVERVIEW OF THIS ACTION

1.    The Diocese admits only that Bishop England was designed with the safety of students and visitors in mind and that the locker room windows were a safety feature to allow adults to monitor the changing areas for bullying, fighting, or other misbehavior. The Diocese relied on the advice of professionals regarding the design and construction of Bishop England High School. The design complied with the relevant standard of care and comported with safeguarding

**JA27**

the safety of those using the locker rooms.   All remaining allegations contained in Paragraph 1 are denied.

2.    Denied.

3.    Admitted upon information and belief.

4.    Defendants admit only that, in May, 2019, the Diocese reported Jeffrey Scofield to City of Charleston Police.   Scofield was arrested immediately and terminated from his employment.  All remaining allegations contained in Paragraph 4 are denied.

5.    The Diocese is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 5 and, on that basis, denies same.

6.    The Diocese admits only that it is a leading moral and religious institution that has, as one of its primary missions, evangelization through education of young people.  The Diocese and BEHS strive to provide a safe, moral, and nurturing educational environment based on the teachings of the Catholic Church.  All remaining allegations contained in Paragraph 6 are denied.

7.    Denied as pleaded.

8.    The Diocese admits only that Bishop England was designed with the safety of students and visitors in mind and that the locker room windows were a safety feature to allow adults to monitor the changing areas for bullying, fighting, or other misbehavior.  The Diocese also admits that students are required to take physical education classes and that student athletes regularly change in the locker rooms.  All remaining allegations in Paragraph 8 are denied.

9.    The Diocese admits only that there is a small window in the doors of the coaches' offices, which could allow someone to look in the office.  All remaining allegations contained in Paragraph 9 are denied.

10.    Admitted upon information and belief.

11.     The Diocese admits only that there is a small window in the doors of the coaches' offices, which could allow someone to look in the office.  All remaining allegations contained in Paragraph 11 are denied.

12.     Denied.

13.     Denied as pleaded.

14.     Denied.

15.     By way of answer to the allegations contained in Paragraph 15, the Diocese admits only that the documents attached to the Complaint as Exhibits 3 and 4 say what they say.  Any further allegation contained in Paragraph 15 is denied.

16.     By way of answer to the allegations contained in Paragraph 16, the Diocese relied on the advice of professionals regarding the design and construction of Bishop England High School.  The design complied with the relevant standard of care and comported with safeguarding the safety of those using the locker rooms.  The Diocese admits that blinds were installed in the coaches' offices.  All remaining allegations contained in Paragraph 16 are denied.

17.     The Diocese is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 17 and, on that basis, denies same.

18.     The Diocese is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 18 and, on that basis, denies same.

19.     By way of answer to Paragraph 19, the Diocese denies that class treatment is appropriate in any respect.  All remaining allegations are denied.

20.     Denied.

21.     Denied.

22.     Denied.

## II.     JURISDICTION

23.     The Diocese admits only that the civil law presence of the ecclesiastical body of the Roman Catholic Church in the State of South Carolina is though Bishop of Charleston, a Corporation Sole.  The authority of the person holding the office of Bishop is established under the Catholic Church's Code of Canon Law.  All remaining allegations contained in Paragraph 23 are denied.

24.     Bishop of Charleston, a Corporation Sole, and Bishop Guglielmone admit the allegations contained in Paragraph 24.  The remaining Defendants are without sufficient knowledge or information to form a belief as to the allegations and, on that basis, deny same.

25.     Bishop of Charleston, a Corporation Sole, and Bishop Guglielmone admit the allegations contained in Paragraph 25.  The remaining Defendants are without sufficient knowledge or information to form a belief as to the allegations and, on that basis, deny same.

26.     Bishop England High School is an operation, ministry, and mission of Bishop of Charleston, a Corporation Sole.  The school is located in Berkeley County.

27.     Bishop England High School is an operation, ministry, and mission of Bishop of Charleston, a Corporation Sole.  The Diocese admits the accuracy of Exhibits 5, 6, and 7 to the Complaint.  All remaining allegations contained in Paragraph 27 are denied.

28.     The Diocese admits only that BEHS is a Diocesan high school and ministry of the Roman Catholic Diocese of Charleston whose formal presence in civil law is Bishop of Charleston, a Corporation Sole.  All remaining allegations contained in Paragraph 28 are denied.

29.     The Diocese admits only that BEHS is a Diocesan high school and ministry of the Roman Catholic Diocese of Charleston whose formal presence in civil law is Bishop of Charleston, a Corporation Sole.  All remaining allegations contained in Paragraph 29 are denied.

30.     The Diocese admits only that BEHS is a Diocesan high school and ministry of the Roman Catholic Diocese of Charleston whose formal presence in civil law is Bishop of Charleston, a Corporation Sole.  All remaining allegations contained in Paragraph 30 are denied.

31.     The Diocese admits only that BEHS is a Diocesan high school and ministry of the Roman Catholic Diocese of Charleston whose formal presence in civil law is Bishop of Charleston, a Corporation Sole.  The Diocese has offices in Charleston County and has a superintendent of education whose offices are in Charleston County.  All remaining allegations contained in Paragraph 31 are denied.

32.     The Diocese is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 32 and, on that basis, denies same.

33.     Admitted upon information and belief.

34.     Admitted.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Admitted.  The Diocese further asserts that jurisdiction and venue are proper in the District of South Carolina, Charleston Division.

### **FACTUAL SUMMARY OF KNOWN VOYEURISM**

41.     Admitted upon information and belief.

42.     Admitted.

5

**JA31**

43.    The Diocese admits only that Scofield used one of the coaches' offices that had a window overlooking the boys' locker room.  The Diocese relied on professionals to design appropriate facilities and safety features in the building and the structure was built to those specifications.  All remaining allegations contained in Paragraph 43 are denied.

44.    The Diocese admits only that students used the locker rooms at BEHS.  The toilet and shower areas are not visible from the coaches' offices.  All remaining allegations contained in Paragraph 44 are denied.

45.    Admitted.

46.    The Diocese admits only that it complied with South Carolina law and reported Scofield to appropriate authorities, after which he was arrested and charged.  All remaining allegations contained in Paragraph 46 are denied.

47.    The Diocese admits only that the parents of the boys whom Scofield taped were notified of the incident.  All remaining allegations contained in Paragraph 47 are denied.

48.    The Diocese admits that the news media covered the incident.  All remaining allegations in Paragraph 48 are denied.

49.    The Diocese is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 49 and, on that basis, denies same.

50.    The Diocese admits that Scofield took photographs using his personal iPhone and that those images were synced to an iPad owned by the school.  All remaining allegations contained in Paragraph 50 are denied.

51.    By way of answer to the allegations in Paragraph 51, the Diocese admits that law enforcement investigated Scofield for his criminal activity.  All remaining allegations are denied.

52.    Denied.

53.    The Diocese admits only that it relied on professionals to design appropriate facilities and safety features in the BEHS building and the structure was built to those specifications.  All remaining allegations contained in Paragraph 53 are denied.

54.    By way of answer to the allegations contained in Paragraph 54, the Diocese admits that Scofield was employed at BEHS in some capacity for some period of time.  At some point Scofield engaged in criminal misconduct outside the scope of that employment.  All remaining allegations contained in Paragraph 54 are denied.

55.    The Diocese admits only that it relied on professionals to design appropriate facilities and safety features in the BEHS building and the structure was built to those specifications.  All remaining allegations contained in Paragraph 55 are denied.

56.    The Diocese admits that Scofield was terminated immediately and that the subject windows were covered.  All remaining allegations contained in Paragraph 56 are denied.

## CLASS ALLEGATIONS AGAINST BISHOP ENGLAND, THE DIOCESE OF CHARLESTON, AND THE BISHOP

57.    By way of answer to the allegations contained in Paragraph 57, the Diocese incorporates by reference Paragraphs 1 through 56 above as if restated fully herein.

58.    The Diocese denies that class treatment is appropriate in this case.  All allegations contained in Paragraph 58 are denied.

59.    The Diocese denies that class treatment is appropriate in this case.  All allegations contained in Paragraph 59 are denied.

60.    Denied.

61.    Denied.

62.    Denied.

63.    The Diocese denies the allegations contained in Paragraph 63 together with all subparts thereto.

64.    Denied.

65.    Denied.

66.    Denied.

67.    Denied.

## COUNT I

**VIEWED CLASS WRONGRUL INTRUSION INTO PRIVATE AFFAIRS AGAINST THE DEFENDANTS**

68.    By way of answer to the allegations contained in Paragraph 68, the Diocese incorporates by reference Paragraphs 1 through 67 above as if restated fully herein.

69.    Denied.

70.    Denied.

71.    Denied.

72.    Denied.

73.    Denied.

## COUNT II

74.    By way of answer to the allegations contained in Paragraph 74, the Diocese incorporates by reference Paragraphs 1 through 73 above as if restated fully herein.

75.    Denied.

76.    The Diocese admits only that BEHS is an operation, ministry, and mission of the Diocese.  All remaining allegations contained in Paragraph 76 are denied.

77.    The Diocese and BEHS strive to provide its students with an excellent education and to support concepts of Catholic teaching on morality and respect for all individuals.  All remaining allegations contained in Paragraph 77 are denied.

78.    The Diocese and BEHS strive to provide its students with an excellent education and to support concepts of Catholic teaching on morality and respect for all individuals.  All remaining allegations contained in Paragraph 78 are denied.

79.    Denied as pleaded.

80.    The Diocese admits only that it relied on professionals to design appropriate facilities and safety features in the BEHS building and the structure was built to those specifications.  All remaining allegations contained in Paragraph 80 are denied.

81.    Denied.

82.    Denied.

## COUNT III

**TUITION CLASS UNJUST ENRICHMENT AGAINST THE DEFENDANTS**

83.    By way of answer to the allegations contained in Paragraph 83, the Diocese incorporates by reference Paragraphs 1 through 82 above as if restated fully herein.

84.    The Diocese admits only that BEHS charges tuition for the educational services it provides to students.  The Diocese and BEHS strive to provide its students with an excellent education and to support concepts of Catholic teaching on morality and respect for all individuals.  All remaining allegations contained in Paragraph 84 are denied.

85.    The Diocese admits only that students would be monitored for safety reasons.  All remaining allegations contained in Paragraph 85 are denied.

86.    Denied.

87. Denied.

88. Denied.

89. Denied.

90. Denied.

91. Denied.

## COUNT IV

### TUITION CLASS BREACH OF WARRANTY AGAINST THE DEFENDANTS

92. By way of answer to the allegations contained in Paragraph 92, the Diocese incorporates by reference Paragraphs 1 through 91 above as if restated fully herein.

93. By way of answer to the allegations contained in Paragraph 93, the Diocese admits that Scofield was employed at BEHS in some capacity for some period of time. At some point Scofield engaged in criminal misconduct outside the scope of that employment. All remaining allegations contained in Paragraph 93 are denied.

94. By way of answer to the allegations contained in Paragraph 94, the Diocese admits that Scofield was employed at BEHS in some capacity for some period of time. At some point Scofield engaged in criminal misconduct outside the scope of that employment. All remaining allegations contained in Paragraph 94 are denied.

95. Denied.

96. The Diocese admits only that BEHS charges tuition for the educational services it provides to students. All remaining allegations contained in Paragraph 96 are denied.

97. Denied.

98. Denied.

99. Denied.

10
**JA36**

100.    Admitted on information and belief.

101.    The Diocese admits only that students changed clothes in the locker rooms.  All remaining allegations contained in Paragraph 101 are denied.

102.    The Diocese admits only that students changed clothes in the locker rooms.  All remaining allegations contained in Paragraph 102 are denied.

103.    Denied.

## COUNT V

**TUITION CLASS AND VIEWED CLASS NEGLIGENT HIRING, SUPERVISION AND RETENTION
AGAINST THE DEFENDANTS**

104.    By way of answer to the allegations contained in Paragraph 104, the Diocese incorporates by reference Paragraphs 1 through 103 above as if restated fully herein.

105.    By way of answer to the allegations contained in Paragraph 105, the Diocese admits that Scofield was employed at BEHS in some capacity for some period of time.  At some point Scofield engaged in criminal misconduct outside the scope of that employment.  All remaining allegations contained in Paragraph 105 are denied.

106.    By way of answer to the allegations contained in Paragraph 106, the Diocese admits that Scofield was employed at BEHS in some capacity for some period of time.  At some point Scofield engaged in criminal misconduct outside the scope of that employment.  All remaining allegations contained in Paragraph 106 are denied.

107.    Denied.

108.    Denied.

109.    Denied.

110.    Denied.

111.    Denied.

## COUNT VI

### VIEWED CLASS NEGLIGENCE AGAINST ALL DEFENDANTS

112.    By way of answer to the allegations contained in Paragraph 112, the Diocese

incorporates by reference Paragraphs 1 through 111 above as if restated fully herein.

113.    Denied.

114.    Denied.

115.    Denied.

116.    Denied.

117.    Denied.

118.    Denied.

119.    Denied.

120.    Denied.

### PRAYER FOR RELIEF

Defendants deny the WHEREFORE paragraph together with all subparts and denies that

Plaintiffs are entitled to any relief whatsoever.

### FOR A SECOND DEFENSE

Plaintiffs have failed to state a cause of action for which relief may be granted.

**FOR A THIRD DEFENSE**

Plaintiffs' claims are barred by the applicable statute of limitations or statute of repose.

**FOR A FOURTH DEFENSE**

Plaintiffs' claims are barred by the doctrines of *res judicata*, collateral estoppel, or the settlement of the class action brought on behalf of <u>all</u> victims of sexual abuse by the Diocese in 2007.

**FOR A FIFTH DEFENSE**

Plaintiffs' claims, or any of them, are barred by the Free Exercise Clause and the Establishment Clause of the First Amendment to the Constitution as incorporated under the Fourteenth Amendment.

**FOR A SIXTH DEFENSE**

Plaintiffs' claims for punitive damages violate both the Fifth and Fourteenth Amendments of the United States Constitution and Section III of the South Carolina Constitution in that the jury's discretion to award punitive damages in any amount which it chooses is wholly devoid of any meaningful standard and is inconsistent with due process guarantees.

**FOR A SEVENTH DEFENSE**

Plaintiffs are not entitled to recover punitive damages because the Diocese did not act with malice or reckless indifference to the rights of others.

**FOR AN EIGHTH DEFENSE**

The Diocese submits that the injuries and damages for which Plaintiff seeks recovery were due to, and proximately caused by, the intervening negligence, recklessness, willfulness, wantonness, criminal acts, and fault of a third party or parties other than the Diocese. Such intervening negligence, recklessness, willfulness, wantonness, criminal acts, and fault are the sole

cause of the injuries and damages for which Plaintiff seeks recovery, and, therefore, Plaintiff may not recover against the Diocese.

## FOR A NINTH DEFENSE

The Diocese is not liable for the actions of any agent who acted outside the scope of his/her authority.

## FOR A TENTH DEFENSE

Plaintiffs' claims are barred under the doctrines of waiver, estoppel or laches.

## FOR AN ELEVENTH DEFENSE

Plaintiffs' claims are barred or limited under South Carolina Charitable Immunity Doctrine or their damages, which are denied, are limited by the statutory caps on liability for charitable entities.

## FOR A TWELFTH DEFENSE

To the extent Plaintiffs seek a double recovery for any alleged single wrong, they must elect his remedy.

## FOR A THIRTEENTH DEFENSE

The Diocese denies of any conduct on its part was the proximate cause of the Plaintiffs' claimed injuries and damages, which injuries and damages are specifically denied.

## FOR A FOURTEENTH DEFENSE

Plaintiffs' warranty claims must fail for lack of any actionable warranty.

## FOR A FIFTEENTH DEFENSE

Plaintiffs' contract-based claims must fail based upon the lack of any actionable contract with these Diocese.

## FOR A SIXTEENTH DEFENSE

Defendant pleads the recovery limits of <u>S.C. Code Ann.</u> § 15-32-530 and any other limitation on punitive damages allowed by Federal or State law..

### FOR A SEVENTEENTH DEFENSE

All allegations not specifically admitted are denied.

### FOR A EIGHTEENTH DEFENSE

Any contract-based claims are barred by lack of privity of contract.

### FOR A NINETEENTH DEFENSE

Suit against the "Bishop of Charleston, in his official capacity" is improper, and that party is due to be dismissed inasmuch as the Corporation Sole is the civil law presence of the Diocese of Charleston and its Bishop.  Further, the Court is precluded from engaging in an unconstitutional scrutiny or inquiry into the manner in which the ecclesiastical office of Bishop determines to interact with the civil law realm as such inquiry is prohibited under the Free Exercise and Establishment clauses of the First Amendment.

## FOR A TWENTIETH DEFENSE

Plaintiffs have failed to allege any required elements that would permit the Court to certify a class of plaintiffs under Rule 23, Fed.R.Civ.P.

### FOR A TWENTY-FIRST DEFENSE

Plaintiffs' proposed classes cannot be certified because the claims asserted are not typical; are not common to the class; and the purported class representatives cannot adequately represent the absent class members.

### FOR A TWENTY-SECOND DEFENSE

Plaintiffs' proposed classes must fail because of the speculative nature of the allegations would require individual inquiries to determine membership in the class.

### FOR A TWENTY-THIRD DEFENSE

Plaintiffs and the class they purport to represent have not been damaged.

### FOR A TWENTY-FOURTH DEFENSE

The actions taken by the Diocese were justifiable, reasonable, done in good faith, and were without improper purpose.

### FOR A TWENTY-FIFTH DEFENSE

Plaintiffs' claims, and those of the purported classes, are barred for lack of a justiciable controversy.

### FOR A TWENTY-SIXTH DEFENSE

Plaintiffs' warranty claims must fail for lack of an actionable warranty.

### FOR A TWENTY-SEVENTH DEFENSE

Discovery is just beginning in this case. The Diocese specifically reserves the right to assert additional defenses, including counter claims, cross claims, and third party claims, as may become available or apparent.

### RELIEF REQUESTED

WHEREFORE, Defendant prays for the dismissal of the Complaint with prejudice in its entirety for an award of attorney's fees, expenses, and costs and for such other and further relief as may be just and appropriate under the circumstances.

**TURNER, PADGET, GRAHAM & LANEY, P.A.**

March 4, 2021                    By:  /s/ Richard S. Dukes, Jr.

Richard S. Dukes, Jr., Federal ID No.:  7340
40 Calhoun Street, Suite 200
Charleston, South Carolina 29401
Phone: (843) 576-2810
Fax: (843) 577-1646
Email:  rdukes@turnerpadget.com

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Megan Ashely Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

**ATTORNEYS FOR DIOCESE DEFENDANTS**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

CIVIL ACTION NUMBER: 2:21-cv-613-RMG

| | |
|---|---|
| Tuition Payer 100,<br>Viewed Student Female 200,<br>Viewed Student Male 300,<br>on behalf of themselves and all others<br>Similarly situated,<br><br><br>Plaintiffs,<br><br>vs.<br><br><br>The Bishop of Charleston, a Corporation<br>Sole, Bishop England High School,<br>Tortfeasors 1-10, The Bishop of the Diocese<br>of Charleston, in his official capacity, and<br>Robert Guglielmone, individually,<br><br>Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' ANSWERS TO
RULE 26.01 INTERROGATORIES**

(A) State the full names, address, and telephone number of all persons or legal entities who may have a subrogation interest in each claim and state the basis and extent of said interest.

**Answer:** **Upon information and belief, Plaintiffs are unaware of any persons or legal entities that have any subrogation interest in any claim asserted by Plaintiffs.**

(B) As to each claim, state whether it should be tried jury or nonjury and why.

**Answer:** **Certification of two classes has been sought by Plaintiffs; a "Tuition Class" and a "Viewed Class". The latter seeks compensation for persons who as high school students were made to dress and undress in front of 4' by 4' viewing windows by the defendants. There were other viewers and filmers or photographers who looked at the students and in some instances recorded student images. Damages are sought arising from the aforesaid activities grounded in South Carolina tort law, requiring jury trial.**

**As to the "Tuition Class", both legal and equitable claims have been lodged, entitling Plaintiffs to a jury trial.**

1

**JA44**

(C) State whether the party submitting these responses is a publicly owned company and separately identify: (1) any parent corporation and any publicly-held corporation owning ten percent (10%) or more of the party's stock; (2) each publicly-owned company of which it is a parent; and (3) each publicly-owned company in which the party owns ten percent (10%) or more of the outstanding shares.

**Answer:**   **Plaintiffs are not a publicly owned company, and therefore interrogatory (C) is inapplicable.**

(D) State the basis for asserting the claim in the division in which it was filed (or the basis of any challenge to the appropriateness of the division). *See* Local Civil Rule 3.01 (D.S.C.).

**Answer:**   **Plaintiff originally filed this suit in the State of South Carolina, Court of Common Pleas, Ninth Judicial Circuit, Berkeley County. Thereafter, Defendants sought removal to the United States District Court District of South Carolina, Charleston Division. The Defendants' basis for removal and rationale for jurisdiction is stated in their filings.**

(E) Is this action related in whole or in part to any other matter filed in this District, whether civil or criminal? If so, provide: (1) a short caption and the full case number of the related action; (2) and explanation of how the matters are related; and (3) a statement of the status of the related action. Counsel should disclose any cases which *may* be related regardless of whether they are still pending. Whether cases *are* related such that they should be assigned to a single judge will be determined by the Clerk of Court bases on a determination of whether the cases; arise from the same or identical transactions, happenings, or events; involve the identical parties or property, or for any other reason would entail substantial duplication of labor if hear by different judges.

**Answer:**   **Yes. Mary Roe 1818 v. The Bishop of Charleston, a Corporation Sole, and The Bishop of the diocese of Charleston, in His Official Capacity, Civil Action Number: 2:21-cv-20-RMG. The matters are related as both cases involve The Bishop of Charleston, a Corporation Sole, and The Bishop of the diocese of Charleston, in His Official Capacity as parties defendant. Additionally, both cases relate to the sexual abuse and/or sexual exploitation of minor children at the hands of the Catholic Church. Finally, both cases are assigned to The Honorable Richard M. Gergel. Mary Roe 1818 v. The Bishop of Charleston, et al was removed to this Court on January 5, 2021. Judge Gergel denied Defendants' Motions to Dismiss by Orders dated March 1, 2021, and March 3, 2021. A Scheduling Order has not yet been entered in Mary Roe 1818 v. The Bishop of Charleston, et al.**

Respectfully submitted this 17th of March, 2021.

2

**JA45**

Respectfully submitted,


THE RICHTER FIRM, LLC


s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (Dist. Ct. ID. 3460)
Anna E. Richter (Dist. Ct. ID. 13333)
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC  29464
Phone: 843-849-6000
LRichter@RichterFirm.com
Anna@RichterFirm.com

-AND-

s/Carl L. Solomon
Carl L. Solomon (Dist. Ct. ID. 6684)
Solomon Law Group, LLC
P.O. Box 1866
Columbia, SC  29202
Phone: 803-391-3120
carl@solomonlawsc.com


-AND-

s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (Dist. Ct. ID. 6106)
Stephen Slotchiver (Dist. Ct. ID. 6648)
Slotchiver & Slotchiver LLP
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com


-AND-

s/Brent S. Halversen
Brent S. Halversen (Dist. Ct. ID. 10474)
Brent Souther Halversen, LLC

3

**JA46**

751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com

*Attorneys for Plaintiffs*

**JA47**

## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

### C/A No.: 2:21-cv-00613-RMG

| | |
|---|---|
| Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually,<br><br>Defendants. | **DEFENDANTS' RULE 26.03 DISCLOSURES** |

Defendants, by and through undersigned counsel, make the following disclosures pursuant to Fed.R.Civ.P. Rule 26.03:

(1)    A short statement of the case:

**This case involves allegations that students <u>may</u> have been observed changing clothes in the locker rooms at Bishop England High School.  The Tuition Payer class representative seeks a refund of all tuition and fees paid for any and all students who attended Bishop England from 1998 to the present because the students <u>may</u> have been observed changing clothes in the locker rooms.  The Viewed Student class representatives seek $300 million in damages for all persons who <u>may</u> have been observed changing clothes in the locker rooms at the school.**

**JA48**

(2)    The names of fact witnesses likely to be called by the party and a brief summary of their

expected testimony.

**RESPONSE:**

At this point, the Defendants believe the following may be called:

a)    Representatives of Bishop of Charleston, a Corporation Sole. These witnesses are anticipated to testify regarding the civil law presence of the ecclesiastical entity known as the Diocese of Charleston; the lack of juridical presence of the Diocese's ministry, Bishop England High School; the Diocese's knowledge of the design and construction of the school.

b)    Past and present faculty and staff of Bishop England who may testify regarding school operations and policies.

c)    Representatives of LS3P who are expected to testify regarding the architectural design of the school and the design features to enhance safety of students.

d)    Representatives of Gulf Stream Construction Company who are expected to testify regarding the construction of the school.

e)    Athletic directors and coaches from comparator schools who are expected to testify regarding facilities with similar design features.

f)    Alumni of Bishop England and parents of alumni who will testify regarding their knowledge (if any) of the matters pleaded in the complaint.

g)    Health care providers or counselors who have treated members of the putative classes.

(3)    The names and subject matter of expert witnesses (if no witnesses have been identified, the

subject matter and field of expertise should be given as to experts likely to be offered);

**RESPONSE:**

Defendants have not yet determined which retained experts, if any, will testify on their behalf at trial. Defendants will disclose their experts, if any, at the appropriate time pursuant to the Court's operative Scheduling Order. In the meantime, Defendants anticipate the following topics will require expert testimony:

      **a)**    **School design and safety features.**

      **b)**    **Standards for school construction of public and private schools.**

      **c)**    **Psychiatric and/or psychological professionals who will address Plaintiffs' claims of the emotional damages asserted in Plaintiffs' Complaint.**

(4)    A summary of the claims or defenses with statutory and/or case citations supporting the same:

    **<u>Class certification:</u>**   Plaintiffs must prove their compliance with Rule 23's requirements – numerosity, commonality, typicality, and adequacy of representation with respect to each claim they assert. Rule 23 does not set forth a mere pleading standard. Plaintiffs are not permitted to satisfy their burden with conclusory allegations or "boiler plate memoranda laden with self-serving conclusions."[1] Plaintiffs must present <u>evidence</u> and affirmatively <u>*prove*</u> each required element of class certification.[2] Actual, not presumed, conformance with Rule 23(a) remains indispensable, and the required rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim.[3] Only if Plaintiffs have proven each element of Rule 23(a) may the Court turn to Rule 23(b)(3)'s more onerous requirements that Plaintiffs also <u>*prove*</u> that common issues predominate over individual issues.[4]

    Plaintiff has asserted the following causes of action:

**1.**    **Wrongful intrusion into private affairs:** Wrongful intrusion is a species of invasion of privacy. The South Carolina Supreme Court recognized that the right to privacy is not

---

[1] *Wheeler v. Anchor Cont'l, Inc.*, 80 F.R.D. 93, 96 (D.S.C. 1978) *quoting Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312 (4th Cir. 1978).

[2] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).

[3] *Id.*

[4] *See Comcast*, 133 S.Ct. at 1432 and *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-624, (1997).

3

**JA50**

absolute.[5] The elements of a claim for wrongful intrusion are as follows: (1) An intrusion may consist of watching, spying, prying, besetting, overhearing, or other similar conduct. (2) Into that which is private. The intrusion on the plaintiff must concern those aspects of himself, his home, his family, his personal relationships, and his communications which one normally expects will be free from exposure to the defendant. (3) Substantial and unreasonable enough to be legally cognizable. "The law does not provide a remedy for every annoyance that occurs in everyday life."[6] In order to constitute an invasion of privacy, the defendant's conduct must be of a nature that would cause mental injury to a person of ordinary feelings and intelligence in the same circumstances.[7] The law protects normal sensibilities, not heightened sensitivity, however genuine.[8] Whether the conduct in question meets this test is, in the first instance, a question of law for the court.[9] (4) The defendant's act or course of conduct must be intentional.[10]

2.  **Negligence**:  Plaintiff is required to prove that (1) the defendant owed a duty of care to each of them individually; (2) the defendant breached that duty by a negligent act or omission; and (3) that plaintiff suffered damage as a proximate result of the negligent act.[11] "If any of these elements is absent, a negligence claim is not stated."[12] The existence of a legal duty of care is a question of law for the Court.[13] The Supreme Court of South

---

[5] *Meetze v. Associated Press*, 230 S.C. 330, 337, 95 S.E.2d 606, 609
[6] *Kelley v. Post Publishing Company*, 98 N.E.2d 286, 287 (Mass. 1951).
[7] *Meetze v. Associated Press, supra*.
[8] *Id; Rycroft v. Gaddy, supra* (plaintiff must show a blatant and shocking disregard of his rights and serious mental injury or humiliation to himself as a result thereof).
[9] *Id*.
[10] *Snakenberg v. Hartford Cas. Ins. Co.*, 299 S.C. 164, 171-72, 383 S.E.2d 2, 6 (Ct. App. 1989)
[11] *See Carolina Chloride, Inc. v. Richland Cty.*, 394 S.C. 154, 163-164 714 S.E.2d 869, 873 (2011).
[12] *Summers v. Harrison Constr.*, 298 S.C. 451, 455, 381 S.E.2d 493, 495 (Ct. App. 1989).
[13] *See Johnson v. Robert E. Lee Academy, Inc.*, 401 S.C. 500, 506-507, 737 S.E.2d 512, 515 (Ct. App. 2012).

Carolina and the courts of this State "will not extend the concept of a legal duty of care beyond reasonable limits."[14]    In general, there is no common law duty to act, and foreseeability of injury, standing alone, does not give rise to a duty to act.[15]    South Carolina has never recognized a duty of care to prevent acts of a third person without concrete evidence of a specific danger to *specific* persons.[16]

3.    **Unjust enrichment:**   To recover on a claim of unjust enrichment, the plaintiff must show: (1) he conferred a non-gratuitous benefit on the defendant; (2) the defendant realized some value from the benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value.[17]

4.    **Breach of warranty:** The South Carolina Uniform Commercial Code ("UCC") governs breach of warranty causes of action as well as related remedies. Significantly, Article II of the South Carolina applies to transactions of goods.[18]    Under South Carolina law, there are three different types of warranties: express warranty, implied warranty of merchantability, and implied warranty of fitness for a particular purpose.[19]

---

[14] *Colleton Preparatory Academy, Inc. v. Hoover Universal, Inc.*, 379 S.C. 181, 190, 666 S.E.2d 247, 248 (2008) (overruled on other grounds); *Huggins v. Citibank, N.A.*, 355 S.C. 329, 333, 585 S.E.2d 275, 277 (2003).

[15] *See Chakrabati v. City of Orangeburg*, 403 S.C. 308, 314, 743 S.E.2d 109, 112 (Ct. App. 2013) *and Oblachinki v. Reynolds*, 391 S.C. 557, 561, 706 S.E.2d 844, 846 (2011).

[16] *Roe v. Bibby*, 410 S.C. 287, 763 S.E.2d 645 (Ct. App. 2014), *cert. dismissed as improvidently granted*.

[17] *Campbell v. Robinson*, 398 S.C. 12, 24, 726 S.E.2d 221, 228 (Ct.App. 2012); *Niggel Assocs., Inc. v. Polo's of N. Myrtle Beach, Inc.*, 296 S.C. 530, 532, 374 S.E.2d 507, 509 (Ct.App. 1988).

[18] *See In re Breast Implant Product Liability Litigation,* 331 S.C. 540, 503 S.E.2d 445 (S.C. 1998) (Service providers not liable under U.C.C. provisions pertaining to express warranty, implied warranty of merchantability, and implied warranty of fitness for a particular purpose).

[19] Plaintiff's Complaint does not specify the type of warranty Defendant BEHS allegedly breached, and as such, out of an abundance of caution, Defendant BEHS has provided an overview of each type recognized under South Carolina law; *See* S.C. Code § 36-2-313; S.C. Code § 36-2-314; S.C. Code § 36-2-315.

To establish a cause of action for breach of an express warranty, Plaintiff must prove: (1) existence of express warranty; (2) breach of express warranty; and (3) damages proximately caused by breach.[20]

To recover for a breach of the implied warranty of merchantability under South Carolina law, Plaintiff must prove: (1) a merchant sold goods; (2) the goods were not merchantable at the time of the sale; (3) the plaintiff or his property were injured by such goods; (4) the defect or other condition amounting to a breach of the implied warranty of merchantability proximately caused the injury; and (5) the plaintiff so injured gave timely notice to the seller.[21]

A cause of action for a breach of an implied warranty of fitness for a particular purpose arises when the vendor knows when the contract is formed that the purchaser is relying on the vendor's skill or judgment in furnishing the goods.[22]

5. **Negligent hiring, supervision, and retention:** In order to establish a claim for negligent supervision, a plaintiff must prove that: (1) [the employee] intentionally harms another when he is on the employer's premises, is on premises he is privileged to enter only as employee, or is using the employer's chattel; (2) the employer knows or has reason to know he has the ability to control the employee; and (3) the employer knows or has reason to know of the necessity and opportunity to exercise such control.[23]

---

[20] *Thomas v. Louisiana-Pacific Corp.,* 2007, 246 F.R.D. 505 (S.C.D.C. July 5, 2007).

[21] *Brooks v. GAF Materials Corp.,* 2014, 41 F.Supp.3d 474 (S.C.D.C. July 9, 2014).

[22] *Id.*

[23] *Degenhart v. Knights of Columbus*, 309 S.C. 114, 117, 420 S.E.2d 495, 496 (1992) *citing Restatement (Second) of Torts § 317. See also Doe by Doe v. Greenville Hosp. System*, 323 S.C. 33, 448 S.E.2d 564 (Ct.App. 1994); *Brockington v. Pee Dee Mental Health*, 315 S.C. 214, 433 S.E.2d 16 (Ct.App. 1993); *and Moore by Moore v. Berkeley Cty. S.D.*, 326 S.C. 584, 486 S.E.2d 9 (Ct App. 1997)

### Defenses pleaded by Defendants

**Defendant's summary:**

**A.    Failure to State a Cause of Action:** To survive Rule 12(b)(6) scrutiny, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," and the movant must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[24]

**B.    Statute of Limitations or Statute of Repose:** Section 15–3–530 of the South Carolina Code (Supp.2003) sets forth a three-year statute of limitations for the actions at law in this matter. Under the discovery rule, the statutory period begins to run from the date when the injury resulting from the wrongful conduct either is discovered or may be discovered by the exercise of reasonable diligence.[25]  Under this objective test, one is charged with discovery when the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some claim might exist.[26]

**C.    Res Judicata or Collateral Estoppel:** *Res judicata* is also known as claim preclusion, and bars relitigation of claims that were or could have been raised in a prior proceeding between the same parties. Collateral estoppel, or issue preclusion, bars the relitigation of specific issues that were actually determined in a prior action.[27]

---

[24] *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *accord Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (holding that granting a 12(b)(6) motion is appropriate where "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief").

[25] *Smith v. Smith,* 291 S.C. 420, 426, 354 S.E.2d 36, 40 (1987).

[26] *Austin v. Conway Hosp., Inc.,* 292 S.C. 334, 339, 356 S.E.2d 153, 156 (Ct.App.1987).

[27] *Sartin v. Macik*, 535 F.3d 284, 287 (4th Cir. 2008).

**D.    Claims are Barred by Free Exercise Clause and Establishment Clause:**
The Free Exercise Clause prohibits governmental authorities from exerting of any restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions there by civil authority. It bars "governmental regulation of religious beliefs as such," prohibiting misuse of secular governmental programs "to impede the observance of one or all religions or ... to discriminate invidiously between religions ... even though the burden may be characterized as being only indirect."[28] The Establishment Clause of the First Amendment provides: "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause."[29]

Indeed, "there is room for play in the joints between" the Free Exercise and Establishment Clauses, such that government can accommodate religion beyond what the Free Exercise Clause mandates, without violating the Establishment Clause.[30] In analyzing alleged violations of the Establishment Clause, the Fourth Circuit applies the test first set forth by the Supreme Court in *Lemon v. Kurtzman*.[31] Under *Lemon,* in order to withstand a challenge under the Establishment Clause a policy must (1) have a secular purpose; (2) have the principal or primary effect of neither advancing nor inhibiting religion; and (3) not foster excessive governmental entanglement with religion.[32]

---

[28] *See e.g. Braunfeld v. Brown,* 366 U.S. 599, 607 (1961).
[29] *Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 144-45 (1987).
[30] *Locke v. Davey,* 540 U.S. 712, 718-719 (2004) (quoting *Walzv. Tax Comm'n,* 397 U.S. 664, 669 (1970)).
[31] *Lemon v. Kurtzman,* 403 U.S. 602, (1971). *See Ehlers–Renzi v. Connelly Sch. of the Holy Child, Inc.,* 224 F.3d 283, 288 (4th 2000).
[32] *Lemon,* 403 U.S. at 612–13.

**E.    Award of Punitive Damages violates Fifth and Fourteenth Amendments:** Any award of punitive damages against the Diocese would violate the constitutional safeguards provided under the Constitution of the United States of America and the Constitution of the State of South Carolina in that punitive damages violate the due process and equal protection guarantees, place an undue burden on interstate commerce, violate the right to assembly and petition the government, and violate the prescription against excessive fines.[33]

**F.    Punitive Damages Barred Due to Lack of Evidence of Recklessness or Malice:** Diocese denies that punitive or exemplary damages are warranted because at no time did the Diocese act wrongfully or with malice or reckless indifference toward Plaintiffs' rights under the law.[34]

**G.    Intervening Negligence, Recklessness, Willfulness, Wantonness, Criminal Acts, and Fault of Third Party:** The injuries and damages for which Plaintiffs seek recovery were due to, and proximately caused by, the intervening negligence, recklessness, willfulness, wantonness, criminal acts, and fault of a party or parties other than the Diocese. Such intervening negligence, recklessness, willfulness, wantonness, criminal acts, and fault are the sole cause of the injuries and damages for which Plaintiff seeks recovery, and therefore, Plaintiff may not recover against the Diocese.[35] The injuries and damages for which Plaintiffs seek recovery were due to, and proximately caused by, the sole negligence, recklessness, willfulness, wantonness, criminal acts, and fault of third parties for whom the Diocese is not liable. Therefore, the acts or fault of

---

[33] *BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996); *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991).
[34] *Kolstad v. American Dental Ass'n,* 527 U.S. 526 (1999); *Duncan v. Ford Motor Co.,* 385 S.C. 119, 142, 682 S.E.2d 877, 889 (Ct.App. 2009); *Lowery v. Circuit City Stores, Inc.,* 206 F.3d 431 (4th Cir. 2000).
[35] *Jackson v. Bermuda Sands, Inc.,* 383 S.C. 11, 677 S.E.2d 612 (Ct.App. 2009); *Rife v. Hitachi Const. Machinery Co., Ltd.,* 363 S.C. 209, 609 S.E.2d 565 (Ct.App. 2005); *Bishop v. S.C. Dep't of Mental Health,* 331 S.C. 79, 502 S.E.2d 78 (1998); *Young v. Tide Craft, Inc.,* 270 S.C. 453, 242 S.E.2d 671 (1978).

third parties are the real, efficient, direct, and proximate cause of the injuries for which Plaintiffs seek recovery, and therefore, Plaintiffs cannot recover against the Diocese.[36]

**H.    Defendants are Not Liable for Agent Who Acted Outside Scope of Their Authority:** A principal cannot be held liable in damages for the tort of his agent unless the agent was acting within the actual scope of his agency.[37]

**I.    Waiver, Estoppel, and Laches:** Under South Carolina law, "[a] waiver is a voluntary and intentional abandonment or relinquishment of a known right."[38] "Generally, the party claiming waiver must show that the party against whom waiver is asserted possessed, at the time, actual or constructive knowledge of his rights or of all material facts upon which they depended."[39] Equitable estoppel is "the inhibition to assert such right by reason of mischief following one's own fault and may arise even though there was no intention on the part of the party estopped to relinquish or change any existing right. Prejudice to the other party is an essential element of equitable estoppel."[40] As with waiver, laches arises upon the failure to assert a known right under circumstances indicating that the lached party has abandoned or surrendered the right."[41]

**J.    South Carolina Charitable Immunity/Limitation of Liability for Charitable Organizations is governed South Carolina Code Ann. § 33-56-180(A).**

---

[36] *O'Neal v. Carolina Farm Supply of Johnston, Inc.,* 279 S.C. 490, 309 S.E.2d 776 (Ct.App. 1983); *Funderburke v. Johnson,* 253 S.C. 430, 171 S.E.2d 597 (1969).
[37] *Goble v. American R. Express Co.,* 124 S.C. 19, 115 S.E. 900 (1923); *See also Doe by Doe v. Greenville Hosp. System,* 448 S.E.2d 564 (Ct.App. 1994); *Brockington v. Pee Dee Mental Health,* 433 S.E.2d 16 (Ct.App. 1993); *Moore by Moore v. Berkeley Cty. S.D.*, 486 S.E.2d 9 (Ct.App. 1997) *and Anderson v. U.S.*, 2016 U.S.Dist. LEXIS 9225, 2016 WL 320076 (D.S.C. 2016)(Cain, DJ.).
[38] *Janasik v. Fairway Oaks Villas Horizontal Property Regime,* 307 S.C. 339, 415 S.E.2d 384, 387-88 (1992).
[39] *Id.*
[40] Id.
[41] *Provident Life & Accident Ins. Co. v. Driver,* 317 S.C. 471, 479, 451 S.E.2d 924, 929 (Ct.App.1994).

**K.    Double Recovery:** Plaintiffs' causes of action seek relief based on the same alleged underlying injury and, although the Diocese specifically denies that Plaintiffs are entitled to any recovery whatsoever, should Plaintiffs succeed on more than one ground for relief, Plaintiffs must elect their remedy so as to prevent a double recovery for a single purported wrong.[42]

**L.    Proximate Cause:** "Negligence is not actionable unless it is a proximate cause of the injuries, and it may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided."[43] Proximate cause is the efficient or direct cause; the thing that brings about the complained of injuries.[44] "Proximate cause requires proof of (1) causation in fact and (2) legal cause."[45]

(5)    Absent special instructions from the assigned judge, the parties shall propose dates for the following deadlines listed in Local Civil Rule 16.02:

**RESPONSE:**

**Defendants have submitted a proposed scheduling order related to class issues.**

(6)    The parties shall inform the Court whether there are any special circumstances which would affect the time frames applied in preparing the scheduling order**.**

**RESPONSE:**

**The case involves class allegations. As such, the scheduling order should be modified to confine discovery to issues of class certification first, so that the Court can determine certification as soon as practicable.**

---

[42] *Cowart v. Poore,* 337 S.C. 359, 523 S.E.2d 807 (1981).
[43] *Hanselmann v. McCardle,* 275 S.C. 46, 48–49, 275 S.E.2d 531, 533 (1980) (quoting *Hughes v. Children's Clinic, P.A.,* 269 S.C. 389, 398, 237 S.E.2d 753, 757 (1977)).
[44] *Platt,* 379 S.C. 249, 266, 665 S.E.2d 631, 640 (Ct.App. 2008).
[45] *Bramlette v. Charter–Medical–Columbia,* 302 S.C. 68, 72, 393 S.E.2d 914, 916 (1990).

**Defendants are not aware of any authority supporting a departure from Rule 17,**

**Fed.R.Civ.P. with respect to the identities of any adult plaintiff under the facts alleged.**

(7)    The parties shall provide any additional information requested in the Pre-Scheduling Order

or otherwise requested by the assigned judge.

**RESPONSE:**

**None at this time.**

**TURNER, PADGET, GRAHAM & LANEY, P.A.**

By:    _s/Richard S. Dukes, Jr._

June 7, 2021        Richard S. Dukes, Jr., Federal ID No.:  7340
40 Calhoun Street, Suite 200
Charleston, South Carolina 29401
Phone: (843) 576-2810
Fax: (843) 577-1646
Email:  rdukes@turnerpadget.com

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Megan Ashley Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

**ATTORNEYS FOR DIOCESE DEFENDANTS**

**United States District Court**
**District of South Carolina**
**Charleston Division**

| | | |
|---|---|---|
| Gary Nestler,<br>Viewed Student Female 200,<br>Viewed Student Male 300,<br>on behalf of themselves and all others<br>similarly situated,<br><br>        Plaintiffs,<br><br><br><br>    vs.<br><br><br><br>The Bishop of Charleston, a Corporation<br>Sole, Bishop England High School,<br>Tortfeasors 1-10, The Bishop of the Diocese<br>of Charleston, in his official capacity, and<br>Robert Guglielmone, individually,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C/A: 2-21-cv-00613-RMG<br><br><br><br><br><br><br><br><br><br>**AMENDED CONSOLIDATED**<br>**CLASS ACTION COMPLAINT** |

Plaintiffs, by and through their undersigned counsel, bring this action in their individual

capacities and on behalf of the class of persons defined below against Defendants The Bishop of

Charleston, a Corporation Sole, ("Diocese"), Bishop England High School ("BEHS"),

Tortfeasors 1-10 whose identity is unknown/not sufficiently known, nor formally or specifically

known because of the dishonest, deceptive, deceitful conduct of Defendants herein and/or others,

but whose identity and specific acts Plaintiffs will seek to learn in discovery in this case, and

who may be added as additional parties Defendant, and Robert Guglielmone, individually, in

addition to his official role as Bishop, head, of the Diocese of Charleston, who has sought to alter

truth and/or impede and/or avoid and cover up Defendants' actions related to sexual and/or other abuse of children, and who acted improperly, illegally, and conspiratorially to the detriment of Plaintiffs herein and for the benefit of Defendants herein, all improperly and impermissibly so (collectively "Defendants"). This action is based upon Plaintiffs' personal knowledge, except as to any allegations on information and belief, and as to any such, Plaintiffs believe them to be true.

I.    **OVERVIEW OF THIS ACTION**

1.    This class action lawsuit arises from egregious acts of BEHS by and through its employees, agents and/or servants and by the Diocese which governs the same and its Bishop. For at least two decades (since 1998) BEHS students were made and required to disrobe partially or fully, exposing themselves in locker rooms controlled by Defendants BEHS and the Diocese. Each of the locker rooms (boys and girls) were subject to viewing through a large glass window, positioned at desktop height as shown on **Exhibit 1**, while students were using the dressing room/locker room/shower room/toilet room facilities at Bishop England High School. At some times the referenced students were completely clothed. At times the students were partially or completely nude.

2.    Defendants acted together with, in the name of, for their mutual benefit, on behalf of, by, through, for, and in conjunction with, each other.

3.    BEHS students are and were during the relevant time period required to take physical education classes and to use the referenced dressing rooms for purposes of changing clothes and/or putting on various forms of equipment and cleaning themselves.

4.    The confirmed exposure of BEHS students became public knowledge in May of 2019 when an employee of BEHS was found to have made video recordings of BEHS students

who were either partially or entirely unclothed while using the described facilities.  That individual was arrested, criminally charged with voyeurism, subsequently entered a plea of guilty in the Berkeley County Court of General Sessions, and was sentenced.  A copy of the Indictments and Sentencing Sheet are attached hereto as **Exhibit 2**.

5.    Until this matter became public as described above, the parents, guardians, and/or tuition payers for the viewed students were not aware of the existence of the viewing windows referenced herein nor that they were being utilized by BEHS employees and agents or others to view BEHS students. At this same time period the subject students, Plaintiffs/the VIEWED CLASS, learned, understood, realized, came to know the use of the windows, and that those, almost entirely minor students had been objectified, their privacy invaded and compromised, and they were sickened, betrayed, embarrassed, fearful, and sad; they still are today and will continue to suffer. Named Plaintiffs and all class members, in both classes, have damages far in excess of the South Carolina required minimum amount. All students in the VIEWED CLASS were trained, taught, and accepted that they were subject to the rules and conditions established and imposed by Defendants.

6.    Defendants have long held themselves out to be leading, moral, religious, and educational authorities, even after expressly stating publicly the kind and manner of education it would provide for the students for whom the subject tuition was paid.   Defendants promised to provide this kind of education which had previously been so broadly described, and failed to do so but it kept the tuition money paid by TUITION CLASS and kept hiding their deplorable conduct from the class.  Defendants boasted that BEHS provided a safe, moral, respectful, environment based on the teachings of the Catholic Church. Such was represented to Plaintiffs herein by Defendants.

7.      Defendants never revealed to the TUITION CLASS that children, students, were subject to viewing and were actually viewed during their use of the dressing rooms/locker room facilities; and that the very purpose of the subject windows was to facilitate viewing of persons using the locker room dressing room facilities, whether such persons were naked or fully clothed.

8.      Dressing rooms/locker rooms are reasonably expected to be private, safe, personal spaces, just as are the bathroom facilities in the school. At all times since its opening on Daniel Island in 1998, BEHS has required male and female students, almost entirely minor children, and any others using such school facilities, to disrobe in view of the large plate glass windows which are in the shared walls of the dressing rooms/locker room and the offices of the BEHS athletic department and/or other school personnel.

9.      All users of the BEHS dressing rooms /locker room were subject to viewing by any persons who were in the viewing rooms or in any position to look through the clear glass window, for example when the door to the office space or viewing room was open or when entering the viewing area for some legitimate purpose.

10.      The viewing windows were each almost exactly four feet by four feet in size and, as stated previously, the bottom of each window was at desktop height.

11.      Access to the viewing room was also available to persons making deliveries, visiting, cleaning, and/or replacing or servicing equipment therein as wells as those referenced in paragraph 9 above.

12.      All Defendants knew or should have known of the danger and the propensity of persons to view students changing clothes in the dressing/locker room.

13.    Defendants knew or should have known that many persons associated with Catholic schools and churches had viewed and abused minor children, and that the Diocese has been ridden with priests who were sexual predators of children.

14.    The many misdeeds of a sexual nature perpetrated by the clergy or other agents of the Diocese of Charleston, BEHS, and/or Bishop Robert Guglielmone in his official capacity and/or personal capacities, are well known to and have been many times admitted by Defendants. Because of this history, it should have been reasonably foreseeable that BEHS and all Defendants should have been sensitive to not creating an environment where such abuse and objectification would be able to develop, thrive, and prosper.

15.    Similar sentiments have been expressed by at least one Diocese official. Principal Finneran has made at least two writings so stating, attached hereto as **Exhibits 3 and 4**.

16.    Defendants had the authority to never have installed the windows or even make them, so that viewing students in the dressing/locker room was not even possible.  Instead, the windows were covered with blinds that could be and were controlled and/or manipulated from within the viewing rooms; of course, without warning or knowledge to students or tuition payers.

17.    The unlawful and improper acts heretofore and hereafter referenced were committed and done without the knowledge or consent of the tuition payers or of the victims of such viewings, as is illustrated by indictments and guilty plea to the criminal charge brought against the BEHS employee referenced above. Further, the children victims did not and could not consent to such acts, criminal acts.  After the window and viewing information became public, Defendants covered them with plywood within a matter of hours, this after being in place and used to view nude and/or partially nude children for more than twenty years.

18.    In addition, the persons who agreed to and paid tuition to BEHS for a certain class, quality, level of education, personal development, safety, and protection for each respective student, and the VIEWED CLASS students themselves, were never aware of such viewing facilities until the matter became publicly known.

19.    Plaintiffs/class representatives bring this action on behalf of themselves and all persons paying tuition and/or fees or costs to BEHS for the purpose of obtaining for the respective student for whom such tuition was paid, the quality and kind of safe environment and education which Defendants BEHS and the Diocese publicly proclaimed would be afforded to the minor students who were all victims of the illicit activity heretofore referenced, and the same for all VIEWED CLASS Plaintiffs and members.

20.    Defendants failed and/or refused to take steps to protect the students from an obvious and foreseeable danger for more than twenty years.

21.    The relevant time period is the entire existence of the Daniel Island campus of BEHS during which time thousands of students, mostly children, were actual victims of voyeurism, invasion of privacy, objectification, shame, and other harms, or were susceptible, and at least hundreds, if not thousands, of tuition payers received what was not represented to them by Defendants: an unsafe environment for the child students. By this action the TUITION CLASS seeks damages of approximately One Hundred Fifty Million and 00/100 Dollars ($150,000,000.00) together with costs and attorneys fees, and with such additional relief and items of recovery as may be permissible for a class of tuition payers as referenced.

22.    Also sought is a class of those subjected to exposing their bodies, fully or partially unclothed, to various persons for viewing. By this action the VIEWED CLASS seeks damages of $150,000,000.00 together with costs and attorneys fees.

## II.    <u>JURISDICTION AND PARTIES</u>

23.     The Diocese is a corporation sole and the governance and organization of the Catholic Church throughout the entire state of South Carolina. It does business in all counties of the state and the Bishop of the Diocese of Charleston is the ultimate authority for diocesan matters everywhere in the state.

24.     The Diocese has been sued many times in the state courts of South Carolina including in Charleston, Berkeley, and Dorchester counties, and has routinely been found subject to the jurisdiction of the presiding Court of Common Pleas.

25.     The Diocese has also brought suit in the state of South Carolina and alleged it is subject to jurisdiction of the presiding Court of Common Pleas.

26.     BEHS is a private school whose principal place of business is located in Berkeley County, South Carolina, at 363 Seven Farms Drive, Charleston, South Carolina 29492.

27.     BEHS and the Diocese of Charleston utilize aliases when transacting their business. It is difficult for someone wronged by the Diocese of Charleston, and/or its agents, or BEHS, and/or its agents, to know what name, for subterfuge or otherwise, each of these Defendants is operating under at a given point in time.  For example, attached hereto as **Exhibit 5**, is *Bishop England High School v. George Hudson and Eun-Hee Hudson, Civil Action Number 2011-CP-10-5391*, whereby BEHS, in that name, is suing to collect claimed due tuition payments.  Also **Exhibit 6** is an Affidavit of John Barker, whereby he, an official of the Diocese, swears under oath that BEHS is not a separate entity and states that BEHS "does not exist as a separate juridic person apart from the Diocese. Therefore, its assets are entirely owned by the Diocese, and its civil law presence in the Corporation Sole." There are numerous other such examples in the permanent public records found in the counties of Charleston, Berkeley, and

other counties in the state. See **Exhibit 7**, excerpts from the July 17, 2019 Transcript of Record in *John Doe v. The Bishop of Charleston, a Corporation Sole, et al, Civil Action Number 2018-CP-10-03929* and *Richard Roe v. The Bishop of Charleston, a Corporation Sole, et al, Civil Action Number 2018-CP-10-04206* where counsel for the Defendants stated the Bishop of Charleston "has no presence in civil law" and copies of other pleading excerpts showing the Diocese Defendants being sued and suing in that name with the lawyer addressing the court and disavowing the very existence of a party being the same lawyer who represented the "non existing party" suing for money damages as a Plaintiff.

28.     BEHS is not incorporated.

29.     BEHS is not a partnership.

30.     BEHS is an unincorporated association.

31.     BEHS is an education facility operated by the Diocese and under the full and final authority of the Diocese of Charleston through its Bishop. In addition, the Diocese has a superintendent of education, whose office and activities are directed out of the diocesan offices in Charleston, South Carolina.

32.     Plaintiff Gary Nestler (hereinafter "Tuition Payer" or "Nestler") is a resident of the state of South Carolina, County of Charleston, who has paid tuition for another person for a certain promised education in a certain promised form, substance, manner, and style, which was not delivered as promised by BEHS and/or the Diocese of Charleston and Plaintiffs Viewed Student Female 200 and Viewed Student Male 300 are residents of the state of South Carolina, County of Charleston, who are victims of the illegal and illicit practices of Defendants herein described and have been proximately damaged as a result.

33.    Over the time that BEHS has been located in its current physical campus, including buildings and grounds, a student body of approximately seven hundred students has been maintained annually.

34.    On information and belief, the current BEHS campus was constructed in the late 1990's and opened for student occupancy in August or September of 1998.

35.    To Plaintiffs' knowledge Vicars General and/or other officials of the Diocese did nothing to prevent students from being viewed by school authorities and others while the students were partly or fully nude in the locker room and perhaps otherwise, or to see that Defendants provided the things promised to tuition payers.

36.    To Plaintiffs' knowledge Patrick Finneran, now BEHS principal, did nothing to prevent students from being viewed by school authorities and others while the students were partly or fully nude in the locker room and perhaps otherwise, or to see that Defendants provided the things promised to tuition payers.

37.    To Plaintiffs' knowledge Paul Runey, coach and Athletic Director of BEHS, did nothing to prevent students from being viewed by school authorities and others while the students were partly or fully nude in the locker room and perhaps otherwise, or to see that Defendants provided the things promised to tuition payers.

38.    Robert Guglielmone, individually, in addition to his official role as Bishop, head, of the Diocese of Charleston, did nothing to prevent students from being viewed by school authorities and others while the students were partly or fully nude in the locker room and perhaps otherwise, and allowed the windows, the viewing, and the non disclosure of same to remain in place for approximately ten years of his term as Bishop. At the time of discovery of the events here condemned, the Bishop had held his position for some nine or ten years, and approved

and/or allowed the viewing of the young students under his authority, control, and care partially or completely nude for that entire time.

39.    Tortfeasors 1-10 are not fully known to Plaintiffs at this time. Upon fuller discovery of their identities and acts Plaintiffs reserve the right to add them to this litigation.

40.    This Court has jurisdiction over the parties hereto and the subject matter hereof, and venue is proper.

## FACTUAL SUMMARY OF KNOWN VOYERISM

41.    Upon information and belief, Jeffrey Alan Scofield is a graduate of BEHS who was later hired to serve as the school's Director of Sports Information.  Scofield at all times was an actual and/or apparent agent, servant, and/or employee of the Defendants.

### A.    SCOFIELD USES HIS OFFICE AS A "WINDOW" FOR SEXUAL EXPLOITATION OF YOUNG STUDENTS

42.    The locker rooms are used by male and female BEHS students and athletes who use the locker room in connection with athletic activities.

43.    Scofield's office at BEHS was one of three athletic offices that had a vantage or viewing point into the school's dressing rooms / locker rooms. The current campus of BEHS was constructed approximately twenty years ago and windows were intentionally designed and installed in three athletic offices to view into the various boys and girls dressing/locker rooms. Scofield's office in particular contained a window looking directly into the corridor of lockers and dressing area of each locker room.

44.    Plaintiffs, students at BEHS, routinely used the locker rooms for showering, changing clothes, and using the toilets and urinals during the course of their academic and athletic programs. Due to placement of windows in the athletic offices overviewing the corridor of lockers and dressing areas, including the window in Scofield's office, the children regularly engaged in

private activities, including, but not limited to, changing clothes, disrobing, using the bathroom, and showering and drying in view of others including adult coaches, officials, staff, and unknown persons.

### B.    SCOFIELD'S ILLICIT VOYEURISM AND SURVEILLANCE COMES TO LIGHT

45.    Upon information and belief, at some time on or about to May 1, 2019, the Defendants learned that Scofield had surreptitiously filmed students while they used a BEHS locker room, through the window viewing the locker room, and had stored recordings on an electronic device believed to be a computer belonging to BEHS.

46.    Breaking from their normal practice, some Defendant reported the above to law enforcement authorities. A perpetrator, an agent of the Diocese, was arrested by the City of Charleston Police Department ("CPD") on voyeurism related charges on the same day.

47.    On or around May 1, 2019, the parents of some victims were notified that their child/children had been recorded by Scofield, without consent or knowledge, in the locker room while partially and/or fully nude.

48.    News accounts indicate that images were taken by Scofield in February 2019 through one of the referenced viewing windows or otherwise peering into the locker room for the illicit purpose of surreptitiously observing, recording, and storing video, audio, and still images of victims while they undressed and/or were partly or fully nude.

49.    Upon information and belief, Scofield's illicit acts were motivated by: (i) his sexual orientation and/or experimentation (according to Scofield's arrest affidavit, the reason Scofield made and retained the victim videos was because they "piqued his interest"); (ii) his social media involvement with sites such as "Grindr" (advertised as "the world's largest social networking app for gay, bi, trans and queer people"); and (iii) his fondness for young boys (according to Scofield's

arrest affidavit, Scofield admitted to police he "liked younger guys" and thought it was "hot" that his victims were 15 years old).

50.     Upon further information and belief, Scofield used equipment owned and/or controlled, albeit improperly so, by the Defendants to capture, upload, and/or store the videos, audio-recordings, and/or photographs depicting victim(s) naked or partially clothed.

51.     On further information and belief, CPD, SLED, the Special Victims Unit, Internet Crimes Against Children Task Force, the South Carolina Attorney General's Office and others are or have been conducting investigations into Defendants' and/or the recorder's activities.

52.     The Defendants were at all relevant times familiar with the activity of nude or partially nude photo making by agents of the Diocese having previously dealt with such sexual abuse acts, and many others, by priests working at churches and/or teaching school in the Diocese.

## C.    INVASION OF PRIVACY OF BEHS STUDENTS

53.     For approximately twenty years, juvenile students, athletes, guests and others using BEHS's locker rooms have been viewed partially clothed, disrobing, showering, drying off, and fully nude by adult coaches, athletic officials, other agents, employees, and/or servants of the Defendants, and possibly others, due to the deliberate design of the athletic offices and locker rooms at BEHS, which were created for that very purpose.

54.     Scofield was only one such agent, employee, and/or servant of the Defendants, who had routine opportunity to observe BEHS students engaged in locker room activities (dressing/undressing, bathing/showering, using the facilities). Scofield had served as BEHS's Director of Sports Information for approximately five years, and, upon information and belief, during the same period Scofield had access to the window locations from which he watched, recorded, and/or took sexual pleasure from watching and recording students engaging in routine,

innocent, and what Plaintiffs believed to be protected and private locker room activities. As detailed herein, it is known (at least to some degree) how Scofield used his position, office, and view of the young students that undressed in his plain view; that is, as access to a steady, replenishing stream of unassuming and trusting victims, child students, who Scofield used to gain sexual pleasure and pornographic material for Scofield's personal use and potential and/or actual distribution and exposure to others.

55.    It is not yet fully known who, to what extent, or over what span of time he and others who had similar access to victims, used the opportunity for perverse personal pleasure; however, the fact that adult coaches, athletic officials, and other agents, employees, and/or servants of the Defendants and even strangers had routine, unfettered view of students in a locker room is intolerable and an invasion of privacy; and this arrangement has been in place for some twenty (20) years with the full knowledge, approval, utilization and control of Defendants.

56.    Upon information and belief, BEHS administrators, by and through the Diocese of Charleston and the Bishop, have terminated the known voyeur and obstructed the view of the locker rooms from the subject athletic offices by quickly placing plywood over the office windows as a measure to prevent further viewing. If this type of fix can be implemented in just a day or two it is absolutely mind boggling and completely intolerable that Defendants let this activity go unchecked for twenty years because it proves Defendants' ability to easily control the subject premises and the safety of the children they were entrusted with. Furthermore, it proves there was no compelling need for the viewing windows in the first place, ownership, control and the right to control being with Defendants, and capable of easy and inexpensive modification in short order without any threat to the integrity of the building itself.

## CLASS ALLEGATIONS AGAINST BISHOP ENGLAND, THE DIOCESE OF CHARLESTON, AND THE BISHOP

A.    **MAINTAINABILITY OF CLASS ACTION**

57.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein and seek the formation of two classes, approval of class representatives and class counsel for each class as front end matters.

58.    The TUITION CLASS consists of all persons who paid tuition for BEHS student(s) – male and female – who at any time from the opening of the school year in 1998 through May 10, 2019 have been subjected to the use of BEHS's dressing rooms /locker rooms to undress and/or dress, shower, or for any other activity that would cause the student to be partially or fully nude, exposed to the viewing windows., Defendants' representatives or others, for photographing, recording, viewing, or otherwise intruded upon, subjected to, and exposed to people, employees of any Defendant, coaches, athletic officials or other agents, employees, servants, and invitees or permittees of the Defendants, or other persons; such students not being provided the safe, moral, respectful and private the manner Defendants represented they would be.   The Class is maintainable under Rule 23(a) of the South Carolina Rules of Civil Procedure for the reasons set forth previously herein and that follow.  Tuition Plaintiff is representative of the Class.  Hereinafter this class may be referred to as the "TUITION CLASS."

59.    Also, Plaintiffs seek a second class made up of students who during the relevant time period as set forth above were required by Defendants to robe and/or disrobe in the view of third parties. This class will be referred to as the VIEWED CLASS.

60.    The precise identities of the members of the Classes will be readily ascertainable through the records of Defendants.

61.    The VIEWED CLASS seeks damages for injuries to the members proximately and directly resulting from Defendants' wrongful conduct.

62.     The number of members of each Class is likely to well exceed 100 persons, perhaps several hundred or even a thousand or more individuals, and, therefore, are so numerous that joinder of all members is impracticable; the BEHS average student population being some seven hundred persons over each of the years since 1998.

63.     The questions of law and fact in this action are common to the respective Classes and predominate over any question affecting only individual Class members.  They include, among others, questions as to:

a.      Tuition payment and the basis for same.

b.      Whether the Defendants are directly liable to the Class members for negligently designing, constructing, and maintaining and supervising or failing to supervise, the athletic offices and locker rooms at BEHS in a manner which exposed the using minors to be viewable partially or fully nude;

c.      Whether the Class members had a reasonable expectation of privacy in the dressing rooms / locker rooms;

d.      Whether Defendants' employees, coaches, athletic officials, or other agents, employees, and/or servants, invitees or permittees of the Defendants' observation, viewing, watching, or objectification of the students was an intrusion or invasion of privacy or other improper action by Defendants or any of them;

e.      Whether the students undressing, dressing, disrobing, and other similar locker room acts is a private matter;

f.      Whether Class members were or should have been warned that the students may be viewed by third parties, including officials/agents, invitees, permittees, and others, while such class members were naked or less than fully clothed;

g.      Whether the Class members may reasonably expect the students undressing, dressing, disrobing, and other similar locker room acts would be free from exposure to adults, such as Scofield and/or any other persons, including the making available of images of Plaintiffs to other persons;

h.      Whether Defendants' type of conduct was of a nature that would create an unsafe environment that could cause mental and/or physical injury to a person of ordinary sensibilities and intelligence in the same or similar circumstances as the students as a matter of law, and ultimately, as a matter of fact,

and be detrimental to the environment represented by the Defendants;

i.    Whether the viewing activities of agents, employees, servants of the Defendants, observation, viewing, or watching of the students was intentional by Defendants, was done willingly, and the result of such conduct was desired by the actor(s) and/or the actors knew or ought to have known that injurious results would flow from their conduct; and

j.    Whether Scofield or the other coaches, athletic officials or other agents, employees, and/or servants, invitees and/or permittees and/or others subject to the Diocese Defendants' control or right to control, observation, viewing, or watching of the students was enabled by their employment by the Defendants or the placing of the windows and requiring student use of dressing/locker room facilities for their intended and usual purpose.

k.    Whether it is proper for Defendants herein to require students to disrobe in an area viewable by others.

64.    Plaintiffs' claims are typical of the claims of the Class members, and the defenses relied upon by Defendants are typical of the defenses likely to be asserted to the claims asserted by members of each respective class.

65.    Plaintiffs share legal interests identical to those of the Class members, therefore, Plaintiffs will fairly and adequately represent and protect the interests of the Classes and are fully able to do so.

66.    Counsel bringing this action are fully able to conduct these claims and this litigation.

67.    The amount in controversy with respect to each member of each of the two classes exceeds one hundred dollars.

## COUNT I

### VIEWED CLASS WRONGFUL INTRUSION INTO PRIVATE AFFAIRS AGAINST THE DEFENDANTS

68.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.  The allegations which follow apply as to each class.

69.    The VIEWED CLASS has a reasonable expectation of privacy when disrobing in the Dressing Rooms / Locker Rooms at BEHS.

70.    Adult coaches, athletic officials, and other agents, employees, and/or servants of the Defendants and even strangers had routine, unfettered view of students in a locker room constituted an intrusion into the dignity and privacy of the VIEWED CLASS. In particular, the children regularly engaged in private activities, including, but not limited to, changing clothes, disrobing, using the bathroom, and showering and drying in view of such persons.

71.    The intrusion into the VIEWED CLASS' privacy was substantial and unreasonable such that it would cause mental injury to a person of ordinary feelings and intelligence in the same circumstances. Without limitation, there was- and is- no justification for the Defendants to have viewed naked children.

72.    The intrusion into the VIEWED CLASS' privacy was also intentional, as the windows were intentionally designed and installed in three athletic offices to view into the various boys and girls dressing/locker rooms for the specific purpose of intruding upon the VIEWED CLASS' seclusion and dignity. Moreover, the Defendants knew or should have known that , knew many persons associated with Catholic schools and churches had viewed and abused minor children, creating an environment where such abuse and objectification would be able to develop, thrive, and prosper.

73.    The Defendants' wrongful intrusion upon the private affairs of the VIEWED CLASS as alleged herein, establishes as a matter of law, the fact of damages to be determined by the trier of fact such trier of fact able to consider their invaded privacy and dignity to which the VIEWED CLASS seeks damages of approximately One Hundred Fifty Million and 00/100 Dollars ($150,000,000.00) together with costs and attorney's fees, and  with such additional relief and

items of recovery as may be permissible for a class of tuition payers as referenced.

## COUNT II

### TUITION CLASS DIRECT NEGLIGENCE AGAINST THE DEFENDANTS

74.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.  The allegations which follow apply as to each class.

75.    Plaintiffs assert these claims against Defendants BEHS, the Diocese of Charleston, and/or the Bishop personally and in his official capacity, individually and on behalf of the TUITION CLASS.

76.    At all relevant times, Defendants owned, supervised, directed, operated and controlled BEHS or claimed the right to do so; although at various times when it suited their interests some or all Defendants have claimed BEHS was a separate entity from the Diocese of Charleston.

77.    At all relevant times, Defendants owed a special and continuing duty of care to maintain the safety and privacy of their students and athletes and other users of the facilities of the school, and to provide a moral, safe, and respectful environment for all students.

78.    At all relevant times, Defendants made assertions directly and indirectly to the TUITION CLASS that they would maintain the safety and privacy and morality of their students and athletes and other users of the facilities of the school and would treat students in a respectful and proper way.

79.    At all relevant times, Defendants owed a duty of care to those paying the tuition of students to maintain the safety and privacy and moral atmosphere of their students and athletes and other users of the facilities of the school.

80.    At all relevant times, Defendants appointed, engaged, employed, and/or contracted with architects, engineers, general contractors, builders, lawyers, insurers, and other professionals to design, build, update, upgrade, up-fit, remodel, revise, and maintain the premises, including the athletic offices and locker rooms.

81.    Defendants breached their duties to the TUITION CLASS members by designing, constructing, and maintaining the BEHS locker rooms and athletic offices in a way that adult athletic officials or their other agents, employees, and/or servants and others would have unfettered, open, and intrusive view of the students while they engaged in private activities such as dressing, undressing, being nude, disrobing, showering and drying, and an opportunity for actors and perpetrators to derive sexual pleasure from such observation and recorded material. They further breached their duties to the TUITION CLASS s by failing to update, upgrade, up-fit, remodel, modify, and/or revise the configuration of the boys' and girls' locker rooms at any point over the past twenty plus years prior to May 1, 2019, in a way that would remove, obstruct, or otherwise block the subject windows and protect the students.

82.    As a direct, proximate, immediate, and foreseeable result of BEHS, the Diocese of Charleston, and/or the Bishop's conduct, the TUITION CLASS has suffered permanent economic damages and members of the TUITION CLASS all have been proximately damaged by Defendants' conduct and seek damages of approximately One Hundred Fifty Million and 00/100 Dollars ($150,000,000.00) together with costs and attorneys fees, and  with such additional relief and items of recovery as may be permissible for a class of tuition payers as referenced.

## COUNT III

**TUITION CLASS UNJUST ENRICHMENT AGAINST THE DEFENDANTS**

83.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if

fully set forth herein.

84.    Defendants were paid tuition in exchange for providing students an excellent educational experience and a safe, trusting, moral, caring, and respectful environment.

85.    Defendants knew or should have known, and intended, that students could and would be viewed from the viewing rooms.

86.    Defendants failed to take adequate steps to prevent students from being viewed from the viewing areas.

87.    Defendants failed to fulfill their duty to provide a safe environment.

88.    Defendants were unjustly enriched through the payments of tuition for a safe environment that was not provided.

89.    Defendants' unjust enrichment flows from the conduct described in this Complaint.

90.    Under common law principles the Defendants should not be permitted to retain the benefits conferred (tuition paid).

91.    Plaintiffs seek disgorgement of all tuition payments and establishment of a constructive trust from which the TUITION CLASS may obtain restitution of approximately One Hundred Fifty Million and 00/100 Dollars ($150,000,000.00) together with costs and attorneys fees, and with such additional relief and items of recovery as may be permissible for a class of tuition payers as referenced


**COUNT IV**

**TUITION CLASS BREACH OF WARRANTY AGAINST THE DEFENDANTS**

92.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

93.     At all relevant times, the Defendants appointed, engaged, employed, and/or contracted with Scofield to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Scofield to remain as such for many years.

94.     At all relevant times, the Defendants granted access to BEHS to Scofield, including, but not limited to, viewing rooms and placed him in a position of trust and authority over the students.

95.     Students were to be provided an excellent educational experience and safe, trusting, moral, caring, and respectful environment, but were not.

96.     In consideration for these representations, the TUITION CLASS paid tuition and various fees.

97.     By viewing students, using photography, video, and/or audio recording equipment in or near the changing room, as well as by actually recording students, and/or by failing to prevent the same, the Defendants breached the above warranties and/or caused breaches of the above warranties made by Defendants.

98.     Each Defendant is liable individually, by virtue of warranties they themselves made. Furthermore, each Defendant is liable for each other's warranties.

99.     The Defendants are furthermore liable by virtue of the fact that they are each responsible for the others' conduct and that of their employees, agents, representatives, permittees and those within the course and scope of their agency.

100.    All BEHS students were required to take physical education classes.

101.    All students were required to use the subject locker rooms.

102.    All students were required to dress and undress in front of plate glass windows in the view of various BEHS faculty and staff members and others. The preserved recordings of student images on an instrument or instruments enabled others to view them.

103.    As a direct, foreseeable, and proximate result of Defendants' conduct, the TUITION CLASS has been proximately and directly harmed and damaged by Defendants in the amount of approximately One Hundred Fifty Million and 00/100 Dollars ($150,000,000.00) together with costs and attorneys fees, and with such additional relief and items of recovery as may be permissible for a class of tuition payers as referenced.

## **<u>COUNT V</u>**

**TUITION CLASS AND VIEWED CLASS NEGELEGENT HIRING, SUPERVISION AND RETENTION
AGAINST THE DEFENDANTS**

104.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

105.    At all relevant times, the Defendants appointed, engaged, employed and/or contracted with Scofield and others to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted him to remain as such for all of the employment periods.

106.    At all relevant times, the Defendants granted privileges to Scofield and others to practice as an administrator, athletic director, coach, teacher, spiritual advisor, role model, and/or counselor and, thereby, render educational, athletic, spiritual, and personal services and guidance to their students, other youth, congregants, and/or community members.

107.    At all relevant times, the Defendants acted by and through Scofield and others – their agents, employees, and/or servants – acting within the scope and course of his agency and/or employment.

108.    At all relevant times, the Defendants owed a continuing duty to: reasonably, carefully, conscientiously secure the services of qualified and well-trained agents, servants, and/or employees; to properly investigate, credential, qualify, select, monitor, and supervise their agents, servants, and/or employees; to promulgate and enforce proper and effective standards, procedures, protocols, systems, and rules to ensure quality care, safety, and privacy of the students; and to otherwise assure and maintain the safety and privacy of the students.

109.    The Defendants negligently breached the above-mentioned duties by hiring, retaining, failing to properly train, and failing to properly supervise Scofield and others, despite any reputation for improper, unlawful, inappropriate, lewd, and unprofessional conduct.

110.    The Defendants knew or should have known that Scofield engaged in improper, unlawful, inappropriate, lewd, illegal, and unprofessional conduct, including, but not limited to, photographing and/or videotaping students while naked and without consent or authorization and taking perverse pleasure in observing students innocently taking part in locker room acts, or otherwise viewing them.

111.    As a direct and proximate result of the Defendants' negligent hiring, training, retention, and supervision of Scofield and others, the TUITION CLASS and the VIEWED CLASS have suffered permanent damages and pecuniary losses to be established at trial.


## COUNT VI
## VIEWED CLASS NEGLIGENCE AGAINST ALL DEFENDANTS

112.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if

fully set forth herein.

113.    Defendants are vicariously liable for all of their actions related to the matters addressed in this lawsuit.

114.    Plaintiffs further assert this claim against Defendants in all of their various capacities.

115.    At all relevant times, Defendants directed, allowed, and/or encouraged adult athletic officials or others, including all their agents, employees, and/or servants, to observe, watch, monitor, spy, or otherwise view the VIEWED CLASS members in the subject locker rooms (male and female).

116.    Dressing rooms /Locker rooms are areas objectively and subjectively private, secure, and intimate places, and the VIEWED CLASS reasonably expected that they would have privacy in the subject locker rooms because, among other reasons, the male and female students and athletes, guests and others routinely undress, dress, shower, dry, and change clothes in these areas, which involves the participants being less than fully clothed and naked at times.

117.    Defendants and their agents or employees and adult athletic officials or other agents, employees, and/or servants of the Defendants who had access to the athletic offices with windows into the locker rooms invaded the privacy of the students by observing, watching, spying, or otherwise viewing them in the process of undressing, being nude, disrobing, and/or showering as well as performing acts of personal hygiene.  This conduct is and would be highly offensive to any ordinary, reasonably prudent person.

118.    Defendants' employees, agents, and others invaded the privacy of students by doing these things, and by viewing, photographing, videotaping, recording, and/or otherwise sexually exploiting the VIEWED CLASS while they were in the locker room for school and/or athletic

and/or other proper activities without victims' knowledge or consent.

119.    As a direct and proximate result of the Defendants' negligent hiring, training, retention, and supervision of agents and/or employees, the VIEWED CLASS has suffered damages and pecuniary losses to be established at trial.

120.    As the principals, masters, religious leaders, and/or employers of agents and various employees/servants and the other adult athletic officials or other agents, employees, and/or servants and/or others who had access to the athletic offices with windows or view corridors and invaded the students' privacy, the Defendants are liable for all the injuries and damages proximately and directly suffered by the VIEWED CLASS caused by the acts committed by Scofield and others, and seeks damages of approximately One Hundred Fifty Million and 00/100 Dollars ($150,000,000.00) together with costs and attorneys fees, and  with such additional relief and items of recovery as may be permissible for a class of tuition payers as referenced.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

a.    That the court determine that the claims alleged herein be maintained as Class actions under Rule 23 of the South Carolina Rules of Civil Procedure.

b.    That Plaintiffs and Class members be awarded damages for each class (TUITION and VIEWED), including disgorgement of ill gotten gains tuition related, and personal injury or tort damages against Defendants to members of the VIEWED CLASS against Defendants in an amount to be proven at trial;

c.    Establishment of the classes sought, all as to the TUITION CLASS and the VIEWED CLASS.

d.    Appointment of Plaintiffs as class representatives as sought, all as to the TUITION

CLASS and VIEWED CLASS.

      e.      Approval of class counsel as sought, all as to the TUITION CLASS and VIEWED CLASS.

      f.      Awarding Plaintiffs and the Class members actual damages in an amount to be proven at trial;

      g.      Awarding Plaintiffs and the Class members punitive damages in an amount to be proven at trial;

      h.      Awarding Plaintiffs and the Class members such other relief as may be appropriate; and

      i.      Granting Plaintiffs and the Class members prejudgment interest, costs, and reasonable attorneys' fees.

## **JURY TRIAL DEMAND**

Plaintiffs demand that this case be tried by a jury on all counts.

Respectfully submitted,

THE RICHTER FIRM, LLC

s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (SC Bar No. 4724)
Anna E. Richter (SC Bar No. 100787)
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC  29464
Phone: 843-849-6000
LRichter@RichterFirm.com
Anna@RichterFirm.com

-AND-

**JA85**

s/Carl L. Solomon
Carl L. Solomon (SC Bar No. 7306)
Solomon Law Group, LLC
P.O. Box 1866
Columbia, SC  29202
Phone: 803-391-3120
carl@solomonlawsc.com


-AND-

s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (SC Bar No. 15129)
Stephen Slotchiver (SC Bar No. 65477)
Slotchiver & Slotchiver LLP
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com


-AND-

s/Brent S. Halversen
Brent S. Halversen (SC Bar No. 76495)
Brent Souther Halversen, LLC
751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com

*Attorneys for Plaintiffs*


August 13, 2021
Mount Pleasant, South Carolina

## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually,<br><br>Defendants. | C/A: 2-21-cv-00613-RMG<br><br><br><br>**ANSWER OF DEFENDANTS TO AMENDED COMPLAINT** |

Now come Defendants, the Bishop of Charleston, a Corporation Sole, Bishop England High School, the Bishop of the Diocese of Charleston, in his official capacity, and Most. Rev. Robert Guglielmone, (collectively referred to as "the Diocese" unless the context indicates otherwise) who answer Plaintiffs' Amended Complaint as follows:

The Defendants deny the unnumbered preamble of the Amended Complaint.

### FOR A FIRST DEFENSE

**I.    OVERVIEW OF THIS ACTION**

1.    The Diocese admits only that Bishop England was designed with the safety of students and visitors in mind and that the locker room windows were a safety feature to allow adults to monitor the changing areas for bullying, fighting, or other misbehavior. The Diocese relied on the advice of professionals regarding the design and construction of Bishop England High School. The design complied with the relevant standard of care and comported with safeguarding

**JA87**

the safety of those using the locker rooms.   All remaining allegations contained in Paragraph 1 are denied.

2.    Denied.

3.    Admitted upon information and belief.

4.    Defendants admit only that, in May, 2019, the Diocese reported Jeffrey Scofield to City of Charleston Police.   Scofield was arrested immediately and terminated from his employment.  All remaining allegations contained in Paragraph 4 are denied.

5.    The Diocese is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 5 and, on that basis, denies same.

6.    The Diocese admits only that it is a leading moral and religious institution that has, as one of its primary missions, evangelization through education of young people.  The Diocese and BEHS strive to provide a safe, moral, and nurturing educational environment based on the teachings of the Catholic Church.  All remaining allegations contained in Paragraph 6 are denied.

7.    Denied.

8.    The Diocese admits only that Bishop England was designed with the safety of students and visitors in mind and that the locker room windows were a safety feature to allow adults to monitor the changing areas for bullying, fighting, or other misbehavior.  The Diocese also admits that students are required to take physical education classes and that student athletes regularly change in the locker rooms.  All remaining allegations in Paragraph 8 are denied.

9.    The Diocese admits only that there is a small window in the doors of the coaches' offices, which could allow someone to look in the office.  All remaining allegations contained in Paragraph 9 are denied.

10.    Admitted upon information and belief.

2

**JA88**

11.    The Diocese admits only that there is a small window in the doors of the coaches' offices, which could allow someone to look in the office. All remaining allegations contained in Paragraph 11 are denied.

12.    Denied.

13.    Denied as pleaded.

14.    Denied.

15.    By way of answer to the allegations contained in Paragraph 15, the Diocese admits only that the documents attached to the Complaint as Exhibits 3 and 4 say what they say. Any further allegation contained in Paragraph 15 is denied.

16.    By way of answer to the allegations contained in Paragraph 16, the Diocese relied on the advice of professionals regarding the design and construction of Bishop England High School. The design complied with the relevant standard of care and comported with safeguarding the safety of those using the locker rooms. The Diocese admits that blinds were installed in the coaches' offices. All remaining allegations contained in Paragraph 16 are denied.

17.    The Diocese is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 17 and, on that basis, denies same.

18.    The Diocese is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 18 and, on that basis, denies same.

19.    By way of answer to Paragraph 19, the Diocese denies that class treatment is appropriate in any respect. All remaining allegations are denied.

20.    Denied.

21.    Denied.

22.    Denied.

## II.    JURISDICTION

23.    The Diocese admits only that the civil law presence of the ecclesiastical body of the Roman Catholic Church in the State of South Carolina is though Bishop of Charleston, a Corporation Sole.  The authority of the person holding the office of Bishop is established under the Catholic Church's Code of Canon Law.  All remaining allegations contained in Paragraph 23 are denied.

24.    Bishop of Charleston, a Corporation Sole, and Bishop Guglielmone admit the allegations contained in Paragraph 24.  The remaining Defendants are without sufficient knowledge or information to form a belief as to the allegations and, on that basis, deny same.

25.    Bishop of Charleston, a Corporation Sole, and Bishop Guglielmone admit the allegations contained in Paragraph 25.  The remaining Defendants are without sufficient knowledge or information to form a belief as to the allegations and, on that basis, deny same.

26.    Bishop England High School is an operation, ministry, and mission of Bishop of Charleston, a Corporation Sole.  The school is located in Berkeley County.

27.    Bishop England High School is an operation, ministry, and mission of Bishop of Charleston, a Corporation Sole.  The Diocese admits the accuracy of Exhibits 5,  6, and 7 to the Complaint.  All remaining allegations contained in Paragraph 27 are denied.

28.    The Diocese admits only that BEHS is a Diocesan high school and ministry of the Roman Catholic Diocese of Charleston whose formal presence in civil law is Bishop of Charleston, a Corporation Sole.  All remaining allegations contained in Paragraph 28 are denied.

29.    The Diocese admits only that BEHS is a Diocesan high school and ministry of the Roman Catholic Diocese of Charleston whose formal presence in civil law is Bishop of Charleston, a Corporation Sole.  All remaining allegations contained in Paragraph 29 are denied.

**JA90**

30.     The Diocese admits only that BEHS is a Diocesan high school and ministry of the Roman Catholic Diocese of Charleston whose formal presence in civil law is Bishop of Charleston, a Corporation Sole.  All remaining allegations contained in Paragraph 30 are denied.

31.     The Diocese admits only that BEHS is a Diocesan high school and ministry of the Roman Catholic Diocese of Charleston whose formal presence in civil law is Bishop of Charleston, a Corporation Sole.  The Diocese has offices in Charleston County and has a superintendent of education whose offices are in Charleston County.   All remaining allegations contained in Paragraph 31 are denied.

32.     The Diocese is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 32 and, on that basis, denies same.

33.     Admitted upon information and belief.

34.     Admitted.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Admitted.  The Diocese further asserts that jurisdiction and venue are proper in the District of South Carolina, Charleston Division.

**FACTUAL SUMMARY OF KNOWN VOYEURISM**

41.     Admitted upon information and belief.

42.     Admitted.

43.     The Diocese admits only that Scofield used one of the coaches' offices that had a window overlooking the boys' locker room.  The Diocese relied on professionals to design appropriate facilities and safety features in the building and the structure was built to those specifications.  All remaining allegations contained in Paragraph 43 are denied.

44.     The Diocese admits only that students used the locker rooms at BEHS.  The toilet and shower areas are not visible from the coaches' offices.  All remaining allegations contained in Paragraph 44 are denied.

45.     Admitted.

46.     The Diocese admits only that it complied with South Carolina law and reported Scofield to appropriate authorities, after which he was arrested and charged.  All remaining allegations contained in Paragraph 46 are denied.

47.     The Diocese admits only that the parents of the boys whom Scofield taped were notified of the incident.  All remaining allegations contained in Paragraph 47 are denied.

48.     The Diocese admits that the news media covered the incident.  All remaining allegations in Paragraph 48 are denied.

49.     The Diocese is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 49 and, on that basis, denies same.

50.     The Diocese admits that Scofield took photographs using his personal iPhone and that those images were synced to an iPad owned by the school.  All remaining allegations contained in Paragraph 50 are denied.

51.     By way of answer to the allegations in Paragraph 51, the Diocese admits that law enforcement investigated Scofield for his criminal activity.  All remaining allegations are denied.

52.     Denied.

53.    The Diocese admits only that it relied on professionals to design appropriate facilities and safety features in the BEHS building and the structure was built to those specifications.  All remaining allegations contained in Paragraph 53 are denied.

54.    By way of answer to the allegations contained in Paragraph 54, the Diocese admits that Scofield was employed at BEHS in some capacity for some period of time.  At some point Scofield engaged in criminal misconduct outside the scope of that employment.  All remaining allegations contained in Paragraph 54 are denied.

55.    The Diocese admits only that it relied on professionals to design appropriate facilities and safety features in the BEHS building and the structure was built to those specifications.  All remaining allegations contained in Paragraph 55 are denied.

56.    The Diocese admits that Scofield was terminated immediately and that the subject windows were covered.  All remaining allegations contained in Paragraph 56 are denied.

## CLASS ALLEGATIONS AGAINST BISHOP ENGLAND, THE DIOCESE OF CHARLESTON, AND THE BISHOP

57.    By way of answer to the allegations contained in Paragraph 57, the Diocese incorporates by reference Paragraphs 1 through 56 above as if restated fully herein.

58.    The Diocese denies that class treatment is appropriate in this case.  All allegations contained in Paragraph 58 are denied.

59.    The Diocese denies that class treatment is appropriate in this case.  All allegations contained in Paragraph 59 are denied.

60.    Denied.

61.    Denied.

62.    Denied.

7

**JA93**

63.     The Diocese denies the allegations contained in Paragraph 63 together with all subparts thereto.

64.     Denied.

65.     Denied.

66.     Denied.

67.     Denied.

## COUNT I

### VIEWED CLASS WRONGRUL INTRUSION INTO PRIVATE AFFAIRS AGAINST THE DEFENDANTS

68.     By way of answer to the allegations contained in Paragraph 68, the Diocese incorporates by reference Paragraphs 1 through 67 above as if restated fully herein.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

73.     Denied.

## COUNT II

### TUITION CLASS DIRECT NEGLIGENCE AGAINST THE DEFENDANTS

74.     By way of answer to the allegations contained in Paragraph 74, the Diocese incorporates by reference Paragraphs 1 through 73 above as if restated fully herein.

75.     Denied.

76.     The Diocese admits only that BEHS is an operation, ministry, and mission of the Diocese.  All remaining allegations contained in Paragraph 76 are denied.

77.    The Diocese and BEHS strive to provide its students with an excellent education and to support concepts of Catholic teaching on morality and respect for all individuals.   All remaining allegations contained in Paragraph 77 are denied.

78.    The Diocese and BEHS strive to provide its students with an excellent education and to support concepts of Catholic teaching on morality and respect for all individuals.   All remaining allegations contained in Paragraph 78 are denied.

79.    Denied as pleaded.

80.    The Diocese admits only that it relied on professionals to design appropriate facilities and safety features in the BEHS building and the structure was built to those specifications.  All remaining allegations contained in Paragraph 80 are denied.

81.    Denied.

82.    Denied.

## COUNT III

**TUITION CLASS UNJUST ENRICHMENT AGAINST THE DEFENDANTS**

83.    By way of answer to the allegations contained in Paragraph 83, the Diocese incorporates by reference Paragraphs 1 through 82 above as if restated fully herein.

84.    The Diocese admits only that BEHS charges tuition for the educational services it provides to students.  The Diocese and BEHS strive to provide its students with an excellent education and to support concepts of Catholic teaching on morality and respect for all individuals. All remaining allegations contained in Paragraph 84 are denied.

85.    The Diocese admits only that students would be monitored for safety reasons.  All remaining allegations contained in Paragraph 85 are denied.

86.    Denied.

9

**JA95**

87.     Denied.

88.     Denied.

89.     Denied.

90.     Denied.

91.     Denied.

## **COUNT IV**

### **TUITION CLASS BREACH OF WARRANTY AGAINST THE DEFENDANTS**

92.     By way of answer to the allegations contained in Paragraph 92, the Diocese incorporates by reference Paragraphs 1 through 91 above as if restated fully herein.

93.     By way of answer to the allegations contained in Paragraph 93, the Diocese admits that Scofield was employed at BEHS in some capacity for some period of time.  At some point Scofield engaged in criminal misconduct outside the scope of that employment.  All remaining allegations contained in Paragraph 93 are denied.

94.     By way of answer to the allegations contained in Paragraph 94, the Diocese admits that Scofield was employed at BEHS in some capacity for some period of time.  At some point Scofield engaged in criminal misconduct outside the scope of that employment.  All remaining allegations contained in Paragraph 94 are denied.

95.     Denied.

96.     The Diocese admits only that BEHS charges tuition for the educational services it provides to students.  All remaining allegations contained in Paragraph 96 are denied.

97.     Denied.

98.     Denied.

99.     Denied.

100.    Admitted on information and belief.

101.    The Diocese admits only that students changed clothes in the locker rooms.  All remaining allegations contained in Paragraph 101 are denied.

102.    The Diocese admits only that students changed clothes in the locker rooms.  All remaining allegations contained in Paragraph 102 are denied.

103.    Denied.

<u>**COUNT V**</u>

**TUITION CLASS AND VIEWED CLASS NEGLIGENT HIRING, SUPERVISION AND RETENTION AGAINST THE DEFENDANTS**

104.    By way of answer to the allegations contained in Paragraph 104, the Diocese incorporates by reference Paragraphs 1 through 103 above as if restated fully herein.

105.    By way of answer to the allegations contained in Paragraph 105, the Diocese admits that Scofield was employed at BEHS in some capacity for some period of time.  At some point Scofield engaged in criminal misconduct outside the scope of that employment.  All remaining allegations contained in Paragraph 105 are denied.

106.    By way of answer to the allegations contained in Paragraph 106, the Diocese admits that Scofield was employed at BEHS in some capacity for some period of time.  At some point Scofield engaged in criminal misconduct outside the scope of that employment.  All remaining allegations contained in Paragraph 106 are denied.

107.    Denied.

108.    Denied.

109.    Denied.

110.    Denied.

111.    Denied.

## COUNT VI

### VIEWED CLASS NEGLIGENCE AGAINST ALL DEFENDANTS

112.    By way of answer to the allegations contained in Paragraph 112, the Diocese incorporates by reference Paragraphs 1 through 111 above as if restated fully herein.

113.    Denied.

114.    Denied.

115.    Denied.

116.    Denied.

117.    Denied.

118.    Denied.

119.    Denied.

120.    Denied.

### PRAYER FOR RELIEF

Defendants deny the WHEREFORE paragraph together with all subparts and denies that Plaintiffs are entitled to any relief whatsoever.

### FOR A SECOND DEFENSE

Plaintiffs have failed to state a cause of action for which relief may be granted.

### FOR A THIRD DEFENSE

Plaintiffs' claims are barred by the applicable statute of limitations or statute of repose.

### FOR A FOURTH DEFENSE

Plaintiffs' claims are barred by the doctrines of *res judicata*, collateral estoppel, or the settlement of the class action brought on behalf of <u>all</u> victims of sexual abuse by the Diocese in 2007.

### FOR A FIFTH DEFENSE

Plaintiffs' claims, or any of them, are barred by the Free Exercise Clause and the Establishment Clause of the First Amendment to the Constitution as incorporated under the Fourteenth Amendment.

### FOR A SIXTH DEFENSE

Plaintiffs' claims for punitive damages violate both the Fifth and Fourteenth Amendments of the United States Constitution and Section III of the South Carolina Constitution in that the jury's discretion to award punitive damages in any amount which it chooses is wholly devoid of any meaningful standard and is inconsistent with due process guarantees.

### FOR A SEVENTH DEFENSE

Plaintiffs are not entitled to recover punitive damages because the Diocese did not act with malice or reckless indifference to the rights of others.

### FOR AN EIGHTH DEFENSE

The Diocese submits that the injuries and damages for which Plaintiff seeks recovery were due to, and proximately caused by, the intervening negligence, recklessness, willfulness, wantonness, criminal acts, and fault of a third party or parties other than the Diocese. Such intervening negligence, recklessness, willfulness, wantonness, criminal acts, and fault are the sole

cause of the injuries and damages for which Plaintiff seeks recovery, and, therefore, Plaintiff may not recover against the Diocese.

### FOR A NINTH DEFENSE

The Diocese is not liable for the actions of any agent who acted outside the scope of his/her authority.

### FOR A TENTH DEFENSE

Plaintiffs' claims are barred under the doctrines of waiver, estoppel or laches.

### FOR AN ELEVENTH DEFENSE

Plaintiffs' claims are barred or limited under South Carolina Charitable Immunity Doctrine or their damages, which are denied, are limited by the statutory caps on liability for charitable entities.

### FOR A TWELFTH DEFENSE

To the extent Plaintiffs seek a double recovery for any alleged single wrong, they must elect their remedy.

### FOR A THIRTEENTH DEFENSE

The Diocese denies of any conduct on its part was the proximate cause of the Plaintiffs' claimed injuries and damages, which injuries and damages are specifically denied.

### FOR A FOURTEENTH DEFENSE

Plaintiffs' warranty claims must fail for lack of any actionable warranty.

### FOR A FIFTEENTH DEFENSE

Plaintiffs' contract-based claims must fail based upon the lack of any actionable contract with these Diocese.

**FOR A SIXTEENTH DEFENSE**

Defendant pleads the recovery limits of S.C. Code Ann. § 15-32-530 and any other limitation on punitive damages allowed by Federal or State law.

**FOR A SEVENTEENTH DEFENSE**

All allegations not specifically admitted are denied.

**FOR A EIGHTEENTH DEFENSE**

Any contract-based claims are barred by lack of privity of contract.

**FOR A NINETEENTH DEFENSE**

Suit against the "Bishop of Charleston, in his official capacity" is improper, and that party is due to be dismissed inasmuch as the Corporation Sole is the civil law presence of the Diocese of Charleston and its Bishop. Further, the Court is precluded from engaging in an unconstitutional scrutiny or inquiry into the manner in which the ecclesiastical office of Bishop determines to interact with the civil law realm as such inquiry is prohibited under the Free Exercise and Establishment clauses of the First Amendment.

**FOR A TWENTIETH DEFENSE**

Plaintiffs have failed to allege any required elements that would permit the Court to certify a class of plaintiffs under Rule 23, Fed.R.Civ.P.

**FOR A TWENTY-FIRST DEFENSE**

Plaintiffs' proposed classes cannot be certified because the claims asserted are not typical; are not common to the class; and the purported class representatives cannot adequately represent the absent class members.

### FOR A TWENTY-SECOND DEFENSE

Plaintiffs' proposed classes must fail because of the speculative nature of the allegations would require individual inquiries to determine membership in the class.

### FOR A TWENTY-THIRD DEFENSE

Plaintiffs and the class they purport to represent have not been damaged.

### FOR A TWENTY-FOURTH DEFENSE

The actions taken by the Diocese were justifiable, reasonable, done in good faith, and were without improper purpose.

### FOR A TWENTY-FIFTH DEFENSE

Plaintiffs' claims, and those of the purported classes, are barred for lack of a justiciable controversy.

### FOR A TWENTY-SIXTH DEFENSE

Plaintiffs' warranty claims must fail for lack of an actionable warranty.

### FOR A TWENTY-SEVENTH DEFENSE

Discovery is just beginning in this case. The Diocese specifically reserves the right to assert additional defenses, including counter claims, cross claims, and third party claims, as may become available or apparent.

### RELIEF REQUESTED

WHEREFORE, Defendant prays for the dismissal of the Complaint with prejudice in its entirety for an award of attorney's fees, expenses, and costs and for such other and further relief as may be just and appropriate under the circumstances.

Respectfully submitted,

**TURNER, PADGET, GRAHAM & LANEY, P.A.**

August 26, 2021                    By:    s/Richard S. Dukes, Jr.
Richard S. Dukes, Jr., Federal ID No.:  7340
40 Calhoun Street, Suite 200
Charleston, South Carolina 29401
Phone: (843) 576-2810
Fax: (843) 577-1646
Email:  rdukes@turnerpadget.com

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Megan Ashley Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

**ATTORNEYS FOR DIOCESE DEFENDANTS**

**United States District Court**
**District of South Carolina**
**Charleston Division**

| | |
|---|---|
| Gary Nestler,<br>Viewed Student Female 200,<br>Viewed Student Male 300,<br>on behalf of themselves and all others<br>similarly situated,<br><br>     Plaintiffs,<br><br>  vs.<br><br>The Bishop of Charleston, a Corporation<br>Sole, Bishop England High School,<br>Tortfeasors 1-10, The Bishop of the Diocese<br>of Charleston, in his official capacity, and<br>Robert Guglielmone, individually,<br><br>    Defendants. | C/A: 2-21-cv-00613-RMG<br><br><br><br><br><br>**PLAINTIFFS' MOTION FOR CLASS**<br>**CERTIFICATION** |

Come now Plaintiffs by and through their undersigned attorneys, and file this their Motion for Class Certification, and state the following in support thereof:

**I.**  **Factual Background.**

As the Court is aware, the Plaintiffs filed this lawsuit seeking class action status on behalf of current and past Bishop England High School (hereinafter, "BEHS") students who were made and required to disrobe, partially or fully, in each of three dressing room / locker rooms, thereby exposing themselves in the locker rooms controlled by Defendants Bishop England High School, The Bishop of Charleston, a Corporation Sole, The Bishop of Charleston, in his official capacity, Robert Guglielmone, individually, and Tortfeasors 1-10. Each of the locker rooms (boys and girls) were subject to viewing through a large 4' by 4' plate glass window, positioned at desktop height, while students were using the dressing room / locker room facilities at BEHS since the opening of the school building on Daniel Island in the City of Charleston (approximately September 1, 1998)

until May of 2019. The windows were covered with blinds that could be and were controlled and/or manipulated from within the viewing rooms; of course, without warning or knowledge to students or tuition payers. (Amended Complaint, ¶ 16). Plaintiffs herein allege that the BEHS students, children, using the locker rooms had a reasonable expectation of privacy in the locker rooms, were unaware that they were being viewed, and that there was no legitimate purpose for use of the windows (Amended Complaint, ¶¶ 5, 16, 17, 18, 55, 68-73, 115-120, Dkt. #35). After the window and viewing information became public as a result of a Defendant employee voyeur, Jeffrey Scofield, Defendants covered the windows with plywood within a matter of hours, this after being in place and surreptitiously used to view nude and/or partially nude children for more than twenty years. (Amended Complaint, ¶ 17). At some point, the temporary plywood coverings were removed and the viewing portals were permanently bricked in with cement blocks and painted to match the existing walls. (Dep. Mary Tucker, P. 30, L. 18 -P. 31, L. 19, **Exhibit #1**). The Plaintiffs have made the following claims against the Defendants.

- <u>Viewed Class</u>: Wrongful Intrusion into Private Affairs, Negligence, Negligent Hiring Supervision and Retention.
- <u>Tuition Class</u>: Negligence, Unjust Enrichment, Breach of Warranty, Negligent Hiring Supervision and Retention.

The school's use of the viewing windows to monitor students in the locker rooms invaded their privacy. The use of the viewing windows was common to all students that attended Bishop England High School since 1998 when the school was constructed. All students had to use the locker rooms. All students had a reasonable expectation of privacy in the locker rooms. The students' privacy was violated through the use of the windows. There were no safety concerns at Bishop England- ever- to warrant the installation of the windows or their use. Further, as learned

through discovery, there were never any incidents of safety captured through the monitoring of the children, from the time of installation of the windows through the removal. Even if the windows were justified at the time of the installation- which is denied- the decades long "monitoring" of naked children, under the guise of "safety" is disgusting and reprehensible, and is outrageous. The Plaintiffs' Complaint, Paragraph 63, incorporated by reference here, alleged questions of law and fact in this action that are common to the respective Classes and predominate over any question affecting only individual Class members.

II.  <u>**Consideration of Merits in Relation to Rule 23: All Students at Bishop England had their Privacy Violated by Defendants Implementation and Use of the Viewing Portals: A Violation in Common to all Bishop England Students Until the Windows were Removed**</u>.

While the likelihood of the plaintiffs' success on the merits is not a relevant consideration, [citation omitted] the Court is not limited to the pleadings. Rather, it must "take a close look at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." (quotations omitted). In taking this close look, it is appropriate for the Court to "consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." <u>In re Sci.-Atlanta, Inc. Sec. Litig.</u>, 571 F. Supp. 2d 1315, 1324 (N.D. Ga. 2007).

A.  <u>**The Defendants Use of the Viewing Portals Was Without Any Justification and Was an Invasion of the Class Members' Reasonable Expectation of Privacy in a Locker Room Setting.**</u>

LS3P, the architect and the designer of the school, testified that the configuration of the coaches' offices and the windows at BEHS made it such that the students may not be aware that they were being viewed, and that if they were viewed, it would be an invasion of their privacy:

Q. And do you understand that a student can be mislead [sic] to think that "I am safe from uninvited viewing, that my privacy is not going to be invaded 'cause it

looks like the blinds are closed, and my nudity is not going to be exposed to persons who want to look at me"? Do you understand that or not?

A. **It's possible, yes, sir.**

(Dep. R. Attansio, Vol. II, Rule 30(b)(6) LS3P, P. 155, L. 7-15, **Exhibit #2**).

* * *

Q. And the children in those locker rooms have their privacy invaded if someone looks at them nude. Do you agree with that?

A. **Yes.**

Q. And in the bathroom -- Bishop England also has bathrooms, and those children in the bathrooms have their privacy invaded if someone looked at them in the bathroom.

Q. Do you agree with that or not?

A. **Yes, sir.**

(Dep. R. Attansio, Vol. II, Rule 30(b)(6) LS3P, P. 287, L. 6-21, **Exhibit #2**).

The architect acknowledged that the blinds on the viewing windows operated as a peephole into

the locker rooms:

Q. From what I hear you saying, that [sic] Bishop England High School, the blinds are controllable. They can be opened. They can be closed. They can be cracked. They can be broadly opened. Am I understanding you correctly?

A. I think blinds have the ability to vary the position, that is correct.

Q. Now, that's like a peephole, isn't it?

A. I don't know that I would say it's like a peephole. **I guess one could make that argument, yes, sir**.

(Dep. R. Attansio, Vol. II, Rule 30(b)(6) LS3P, P. 163, L. 8-21, **Exhibit #2**).

In this litigation, the principal of the school, Mr. Patrick Finneran, likewise acknowledged that

the student users of the locker rooms at BEHS should have a reasonable expectation of privacy.

(Dep. of P. Finneran, P. 37, L. 16- P. 38, L. 6, **Exhibit #3**)

The Principal conceded that if students were not aware that they were being viewed, it would be a violation of their privacy:

> Q.  If they were viewed and did not know they were being looked at, they didn't realize the windows were open in a manner that they could be viewed but they were viewed, would that be a violation of their privacy?
>
> A. **Yes. Yes.**

(Dep. of P. Finneran, P. 40, L. 15-21, **Exhibit #3**)

The Principal also testified that the if the students were viewed without their knowledge by school staff, it would not be a safe, nor moral or nurturing environment.(Dep of P. Finneran, P. 64, L. 12-P. 65, L. 4, **Exhibit #3**).Dr. Salas, the Plaintiffs' expert psychiatrist addressed the school's environment this way:

> Q. Okay. You saying in your report that the viewing windows in the dressing rooms are a breach of privacy. What do you base that opinion on?
>
> A. Well, my experience is, is that we teach children that your body is private and we clothe them and send them out robed in some form or fashion. And there comes a time in a child's life, usually around four or five, where they become aware of everyone's wearing clothes and so they wear clothes. They're not as likely to run out in their diaper or naked on the porch or something. So that's private. And when you have somebody who is now in a situation where these are the facilities that you're expected to use and this is what we have available for your use and we're gonna have a window and the expectation is you're gonna undress in front of that window, to me, that's a violation of privacy.

(Dep. A. Salas, P. 69, L. 11 – P. 70, L. 5, **Exhibit #4**)

*The architect testified that the design of the windows allowed students in the locker rooms to have a false sense of privacy, and, that the use of the windows in this matter is an invasion of their privacy.* "[e]ven in locker rooms, students retain "a significant privacy interest in their unclothed bodies. <u>Brannum v. Overton Cty. Sch. Bd.</u>, 516 F.3d 489, 496 (6th Cir. 2008). In <u>Brannum</u>, the Sixth Circuit Court of Appeals held:

> Given the universal understanding among middle school age children in this country that a school locker room is a place of heightened privacy, we believe placing cameras in such a way so as to view the children dressing and undressing in a locker room is incongruent to any demonstrated necessity, and wholly disproportionate to the claimed policy goal of assuring increased school security, especially when there is no history of any threat to security in the locker rooms.

Brannum, 516 F.3d at 498.

Although it may not be known how many students Jeffrey Scofield actually video recorded while at BEHS, and notwithstanding and irrespective of such video recording, the Defendants in this case have admitted to installing the viewing windows for monitoring the students for "safety reasons" without the use of video cameras. This viewing, regardless of the act of recordation, is an invasion of the students' privacy. "[t]he mere fact that the observation is accomplished by a video camera rather than the naked eye does not alter the privacy expectations of that area." Acosta v. Scott Lab. LLC, 377 F. Supp. 2d 647, 650 (N.D. Ill. 2005).

As is clear from the Defendants' filed Answer, as well as their press release, the ostensible and claimed purpose of the viewing windows was purportedly for safety. Regardless of the stated purpose, in this case, BEHS was unable to testify that there were any previous safety incidents at BEHS in the locker rooms before the new school was built in 1998 (Dep. Finneran R. 30(b)(6), P. 19, L. 12-23, **Exhibit #5**). The BEHS Principal further testified and conceded that the use of the viewing windows had no effect on preventing the three previous safety/disciplinary incidents[1] at the school that occurred in the locker rooms since the school was built in 1998 until the windows were boarded up in 2019:

> Q. So these were events that were realized that -- that took place, regardless of the fact that you had this viewing window for safety purposes; correct?

---

[1] "One was a wallet that was stolen, another one was a video of a student in the boys locker room saying inappropriate things, and the other one was a video in the girls locker room of a student who was getting changed, but was being made fun of in that video by the person taking the video." (Dep. P. Finneran R. 30(b)(6), P. 21, L. 5-14, **Exhibit #5**).

A. **Yes.**

Q. So the safety purpose of the window was ineffective as it applied to those incidents?

A. **Yes.**

(Dep. P. Finneran, P. 43, L. 2-9, **Exhibit #3**)

The Brannum Court makes clear that *surveillance of the students in a locker room setting* would need to be reasonably related to security issues in order to surveil students. In Brannum, like in this case, there has been no such history as is evident by the Principal's above cited testimony.

As it pertains to safety, the Brannum Court observed:

> There is nothing whatsoever in this record to indicate that the defendants entertained any concerns about student safety or security in the locker rooms that would reasonably justify the installation of the cameras to record all the activities there. The defendants do not claim that any misconduct occurred in these areas in the past or that the plan to install the surveillance equipment in the school locker rooms was adopted because of any reasonable suspicion of wrongful activity or injurious behavior in the future.

Brannum, 516 F.3d at 498.

***

> While at a hypothetical level there might exist a heightened concern for student safety in the "privacy" of student locker rooms, that does not render any and all means of detection and deterrence reasonable.

Brannum, 516 F.3d at 498.

Accordingly, to use safety as a justification for surveillance of a locker room, the Defendants would need to establish either a past problem of misbehavior in the locker rooms, or a reasonable suspicion of wrongful activity or injurious behavior in the future: Defendants could not establish either. Ironically, the implementation of the viewing portals did not prevent or detect a safety event in the locker rooms, instead, it actually *created* one:

> Q. You would agree with me that on the one hand the windows did not ever from the time they were built prevent a safety incident or help detect a safety incident; correct?

A. There is no record that they prevented anything.

Q. That's not the question.

A. Yes. To my knowledge they did not prevent anything.

Q. But they were utilized by a perpetrator to create a safety incident?

A. Yes, Mr. Scofield used the windows.

Q. Had the windows not been there, Scofield could not have used the windows to violate the privacy of the children.

Q. Correct?

A. That would be correct, yes.

(Dep. P. Finneran, R. 30(b)(6) P. 24, L. 23- P. 25, L. 16, **Exhibit #5**).

Dr. Salas, the Plaintiffs' expert psychiatrist testified that the existence of the viewing windows

and the blinds created a "pedophile's playground":

> Q. Okay. So you're saying that Bishop England should -- the architects who designed Bishop England should not have put a window in that -- from a coaches' office looking into the locker room?
>
> THE DEPONENT: I don't know about window placement in schools, so I can't tell an architect or a school where to place windows. But the privacy concern that I have for this situation is if you have a transparent window, whether it's in the coaches' office, a hallway, a cafeteria, or whatever, and it is a four-by-four peep hole, if you will, for whoever's on the other side where I understand the blinds to be, that the person who is disrobing, that is a pedophile's playground, if you will. That's an opportunity for compromise of safety.

(Dep. A. Salas, P. 72, L. 22- P. 73, L. 18, **Exhibit #4**)

In Johnson v. Allen, 272 Ga.App. 861, 613 S.E.2d 657 (2005), an employer installed a camera

behind a ceiling tile above a stall in the women's bathroom. Johnson, 613 S.E.2d at 659. The

manager testified he installed the camera after he had heard rumors of employees using and selling

drugs on the premises. Id. In addressing the invasion-of-privacy claim brought by the female

employees who discovered the hidden camera, the court first noted the use of a bathroom is "an

immensely intimate act." Id. at 660. However, the court continued by noting that, when a private

place is not used for its intended purposes, the employer's right to prevent illegal activity must be weighed against the right to seclusion. See id. Yet, there was no evidence the surveillance was conducted as an immediate follow-up to a tip that drugs were being sold or used in the bathroom. Id. Instead, the court reasoned the camera was positioned to view the women in the bathroom continuously, without reasonable limitation. Id. Most notably, the court determined under its standard of review that, although there was no conclusive evidence that the camera was operational at any point in time, the plaintiffs must be afforded all reasonable inferences from the record. Id. at 661. As a result, the court found the **mere presence** of the camera in the women's restroom constituted sufficient evidence to allow the plaintiffs' claims to survive summary judgment. Id.(Emphasis added).

In this case, the Defendants have admitted to actually using the device of the viewing windows in the name of safety. After the lawsuit was announced, Maria Aselage, a spokesperson for the Diocese of Charleston, released the following media statement, which stated in pertinent part:

> **The windows between the athletics coaches' offices and the boys' and girls' locker rooms were included in the plans and installed in the building in the 1990's for safety reasons. Their purpose was to allow coaches to monitor for fights, bullying, smoking, or any type of inappropriate activity that might occur within the locker rooms.**

(Ex. 1, Dep. of M. Aselage, Vol. I, attached hereto as **Exhibit #6**)

Principal Finneran conceded that smoking could not be detected having blinds on the windows. (Dep. P. Finneran, P. 66, L. 3-14, **Exhibit #3**). Eric Aichele, the main architect who designed the school, testified that if the blinds were drawn closed, then it was not possible to monitor the locker rooms. (Dep. E. Aichele, P. 51, L. 20-25, **Exhibit #7**). In deposition testimony, Ms. Aselage admitted the words used in the media statement were chosen carefully, and conceded the word

"monitoring" as used in her media statement is different than the word "reacting" to a situation[2] (Dep. M. Aselage, Vol. III, P.23, L. 6-20, **Exhibit #9**). Ms. Aselage, to her credit, testified that she would not have prepared her media statement the way she wrote it (above) **if** she had been told there were no safety incidents at the school in the locker rooms that the windows had been used to prevent or detect. (Dep. M. Aselage, Vol. III, P. 32, L. 12- P. 34, L. 13, **Exhibit #9**). At the time, Ms. Aselage took it for granted that there must have been safety incidents (Dep M. Aselage, Vol. III, P. 31, L. 21- P. 32, L. 1, **Exhibit #9**). Ms. Aselage conceded that viewing of children nude or partially nude without their knowledge is an invasion of their privacy (Dep. M. Aselage, Vol. III, P. 67, L. 17-22, **Exhibit #9**). Ms. Aselage conceded that violation of the children's privacy was entirely preventable:

> Q All right. And what I'm asking you about is the conversations and knowledge you've gleaned from talking to Ms. Fowler, Ms. Tucker, Mr. Finneran, Mr. Acquilano and the Vicar General.
>
> A Uh-huh.
>
> Q Okay. So would you agree with me that the viewing of children an invasion of their privacy was, in fact, completely preventable: Just take out the windows?
>
> A **Yes.**

(Dep. M. Aselage, Vol. III, P. 79, L. 18 – P. 80, L. 2, **Exhibit #9**)(Emphasis added).

Ms. Aselage, in her conversations with Diocese personnel, was told that safety issues override concerns about privacy and that safety trumped privacy since 1998 until the windows were boarded up in 2019:

---

[2] The Defendants have attempted to distance themselves from the use of the viewing windows in this litigation, by claiming that they were not actively used, or only used reactively if there was a situation in the locker rooms. *See* e.g., BEHS Answer to Interrogatory #11, July 12, 2021, **Exhibit #8**, "There was no active monitoring responsibility for the adults in the offices, but they would intercede if there was an issue like bullying, fighting, or other discipline issues."

Q Do you remember earlier testifying that looking at children through windows when they don't know they're being looked at and they're –

A Yes.

Q -- in partial or full nudity, that is an invasion of privacy?

A **Yes.**

Q Okay. So we know that in 1998, when they were installed, the idea of safety trumped privacy; correct?

A **Yes.**

Q Okay. And we know that at the end of the first calendar year, there had been no safety events, but, yet, the privacy was still being invaded; correct?

Q Okay. And the same thing true in 1999, 2000, 2001, all the way up until the windows were blocked; correct?

A **Yes.**

Q Okay. At what point is it that it's no longer about safety?

A I can't make that call.

(Dep. M. Aselage, Vol. III, P. 67, L. 16 – P. 68, L. 19, **Exhibit #9**).

Furthermore, the Defendants have admitted that the posting of surveillance signs outside the locker rooms, as well as plywooding / bricking up the viewing windows (as is the present situation at BEHS) were alternatives to monitoring student safety in the locker rooms in lieu of the viewing windows. (See Requests for Admissions un-responded to and deemed admitted pursuant to F.R.C.P 36(3), **Exhibit #10**.). The feasibility of these alternative precautionary measures will allow evidence of the plywooding / bricking up the viewing windows to be shown to the jury. *See* Fed. R. Evid. 407. There may be other adverse consequences to Defendants springing from their acts of spoliation of important evidence.

Not only were alternatives available to the school to monitor students in lieu of viewing

portals, the Defendants themselves actually implemented an alternative policy for safety in the locker rooms *that did not involve use of the viewing windows*. In 2018-2019, the school implemented a new written policy specifically in the "Supervision of Students" section of the Faculty Handbook. (See Ex. 3, Dep. P. Finneran, P. 40, **Exhibit #11**). In this section, there is a sub-section denominated, "Policy for Monitoring School Restrooms and Locker Rooms." The policy states that, "[t]he Diocese also recognizes that in order schools to provide an environment that is as safe as possible, restrooms and locker rooms must be monitored for inappropriate student activity. Therefore the following protocol will be followed:"

- Coaches and PE teachers also should exercise due diligence when their players/students are using the locker rooms.
    a. As players/students are preparing for class or practice, the teacher/coach (it is always preferable to have at least two of the same sex available) may open the locker room door, without entering, and announce that students have _____ seconds to finish and exit. The teacher/coach should ALWAYS be immediately outside the locker room door.
    b. The same should be true after class or practice – students/players should be given a reasonable amount of time to change out of practice clothes. The teacher/coach should open the locker room door, without entering, and announce that students have _____ seconds to finish and exit. The teacher/coach should ALWAYS be immediately outside the locker room door in order to be able to listen for any inappropriate behavior.
    c. Students/players should NEVER be in the locker room unless a teacher/coach (it is always preferable to have at least two of the same sex available) is outside the door so that should a situation arise (perhaps a scuffle, an argument, a fight) the teacher/coach should immediately call for help, have students/players exit the locker room, and turn the situation over to the appropriate

Approved by the Vicar General of the Diocese of Charleston on July 19, 2018

(**Exhibit #11**).

This policy is a written acknowledgment by the Defendants of the children's right to privacy and that safety can be ensured without school personnel monitoring children nude or partially nude. Principal Finneran admitted that the above policy to knock and announce yourself provides safety and  privacy to the students, and is a reasonable and good rule, although he could not articulate why the policy had not been in place before 2018. (Dep. P. Finneran, P. 57, L. 3-16, **Exhibit #3**). Also noteworthy is the Principal Finneran's testimony that vaping sensors had been installed in

the locker rooms in 2017 or 2018 to detect smoking, around the same time that the school changed the rules for monitoring the locker rooms. (Dep. P. Finneran, R. 30(b)(6), P. 72, L. 8-23, **Exhibit #5**). **Principal Finneran testified that the school's locker rooms are presently safe without the viewing windows and having the above cited new policy in place for monitoring**. (Dep. P. Finneran, R. 30(b)(6), P. 80, L. 16 – P. 82, L. 9, **Exhibit #5**).

## B. The Defendants' Litigation Defense that Other Schools have Viewing Windows is not a Defense to the Torts Alleged.

Setting aside the evidentiary issues for purposes of this motion, the Defendants' basis for justification that other schools have viewing windows is analogous to pointing to the fact that others fail to use reasonable care while operating a motor vehicle. Although the implementation of the viewing windows is not condonable or justified- *unless* there is a reasonable justification for them based upon past safety incidents or likelihood of future events as stated in <u>Brannum</u>- a majority of the four Charleston County School District schools subpoenaed by the Defendants for inspection and photography of their locker rooms demonstrated a concerted effort to obscure or cover the viewing windows. After observing that many of the viewing windows were obscured at the four CCSD school inspections, the undersigned noticed the four schools for Rule 30(b)(6) depositions. Notably, none of the four schools utilized manipulable blinds as did BEHS. And, the CCSD schools testified as to not needing the viewing windows to ensure their students' safety- **unlike BEHS**. The schools testified as follows:

- <u>North Charleston High School</u>: The Assistant Principal testified he is able to account for the safety of the students even though the windows were covered. (Dep. N. Pearson R. 30(b)(6), P. 9, L. 17 – P. 10, L. 5, **Exhibit #12**). He never saw blinds in the locker rooms. (Dep. N. Pearson, R. 30(b)(6), P. 16, L. 2-4, **Exhibit #12**). The windows are either covered with newspaper, paper, a cloth sheet, or a white board. (Dep. N. Pearson, P. 7, L. 3-10, P.

11, L. 1-5, **Exhibit #12**). The covering of the sheet was for the privacy of both the student and the coach. (Dep. N. Pearson, R. 30(b)(6), P. 18, L. 7-11, **Exhibit #12**).

\*\*\*

- <u>RB Stall High School</u>: The girl's coaches' office window was covered with paper since the school was constructed in 2010. (Dep. J. Carrick R. 30(b)(6), P. 5, L. 10 – P. 7, L. 7, **Exhibit #13**). There is a boys PE locker room, where it is possible to view students from the coaches' office, however, it is not possible to view the students without them knowing they are being watched. (Dep. J. Carrick, R. 30(b)(6), P. 5, L. 19-22 **Exhibit #13**). There are other locker rooms at the school that do not have viewing windows and the school is still able to ensure the students' safety without them. (Dep. J. Carrick, R. 30(b)(6), P. 19, L. 18-22 **Exhibit #13**).

\*\*\*

- <u>Burke High School</u>: Burke High School has retractable monolithic screens that cover the viewing windows since before 2010. The school is able to ensure the students safety with the full screens drawn down and are able to, "supervise the kids without sitting in the office looking through the windows." (Dep. N. Richardson, R. 30(b)(6), P. 7, L. 11-18, **Exhibit #14**). There have been no real safety incidents at Burke, but if there is horseplay or bullying, they are able to intercede without pulling up the screens and, "if something is going on, usually a kid will say it or you just hear the commotion, and the coaches go in." (Dep. N. Richardson, R. 30(b)(6), P. 7, L. 24, P. 8, L. 17, **Exhibit #14**). They do not do active supervision through use of the windows. (Dep. N. Richardson, R. 30(b)(6), P. 9, L. 4-7, **Exhibit #14**).

\*\*\*

- <u>West Ashley High School</u>: Maria Williams is the social studies teacher and girls' volleyball coach who has been at the school since it opened in 2000. (Dep. M. Williams, R. 30(b)(6), P. 5, L. 1- P. 6, L. 8, **Exhibit #15**). In the girls' locker rooms the windows have been obscured since she took over in 2004. (Dep. M. Williams, R. 30(b)(6), P. 9, L. 14-22, **Exhibit #15**). She was able to secure the safety of her students with the windows covered. (Dep. M. Williams, R. 30(b)(6), P. 11, L. 10-21, **Exhibit #15**). She made sure the widows were covered at the start of each season for privacy. (Dep. M. Williams, R. 30(b)(6), P. 12, L. 14 – P. 13, L. 6, **Exhibit #15**). In her locker room, it was not possible to view the students without them knowing. (Dep. M. Williams, R. 30(b)(6), P. 13, L. 7-13, **Exhibit #15**).

Accordingly, these schools that were constructed with the viewing windows have found them unnecessary to ensure safety and have each made efforts to obscure them to afford their students the privacy they reasonably expect. This is consistent with the testimony of Dr. Salas:

> Q. Would it surprise you to know that Whale Branch High School up the street here has exactly that same configuration on what we've heard?
>
> THE DEPONENT: I don't know. I don't know what schools have what setup. But it would not surprise me that maybe what was done in the past when buildings were constructed have needed to make changes and modifications to them.

(Dep. A. Salas, P. 70, L. 9-20, **Exhibit #4**)

Moreover, BEHS cannot demonstrate it ever relied on other schools. Use of other school's windows was not something known or something that was ever discussed by BEHS until after the lawsuit was filed (Dep. M. Aselage, Vol. III, P.86 L. 8 – P. 87, L. 6, **Exhibit #9**). In summary, the design and use of the viewing windows and blinds at BEHS allowed for the students to be monitored while they were not aware they were being viewed. This was an invasion of their privacy. There were alternative means to ensure their safety <u>and</u> their privacy. This has been admitted by BEHS and is consistent with other schools' non-use of the viewing windows.

Confronted with whether the viewing windows is a good idea, Eric Aichele, the designer of the

school testified:

> Q. . . .Do you still think it's a good idea to put these viewing windows such as we
> have been discussing here today in offices of athletic staff or other school staff to
> view students who change, disrobe, in front of those windows?
>
> A. All I can say is it seems to me to have been a fairly common practice going back
> to the 1970s and even to current schools that have been built. I would have to
> discuss it with my client to understand their motivation and explain to them what
> we have discussed today.
>
> Q. In an ongoing way that's what you would intend to do?
>
> A. Correct.
>
> Q. I understand. Let me see if I can help you in that analysis a little bit by asking
> you this question: Do you remember when you used to be in a department store
> perhaps and you needed to urinate and you walked over to the restroom area and it
> said colored on one door and white on the other? That went on for a long time,
> didn't it?
>
> A. I don't remember seeing signs like that.
>
> Q. You may be too young to have seen those. I certainly remember them, and these
> fellows I think remember them, too, and I'm confident the jury will remember them.
> Are you aware that that existed or not?
>
> A. I've seen photos of signage such as that.
>
> Q. That was a bad idea, wasn't it?
>
> A. Looking at it in today's light, yes.
>
> Q. What is it that made it a good idea looking at it in the light of the time that those
> signs were erected on the bathroom doors?
>
> A. I do not have any idea why it was a good idea.
>
> Q. But you're not prepared to say it was across the board wrong?
>
> A. I have no real opinion on whether it was wrong or right. It was done for reasons
> that predated my time, so I don't know.

(Dep. E. Aichele, P. 115, L. 24- P. 117, L. 23, **Exhibit #7**).

What Mr. Aichele testified to is telling. What Mr. Aichele could not admit in his deposition was that segregated bathrooms were wrong now **and** were wrong at the time they were designed and implemented. Similarly, Mr. Aichele conceded reservations about using the viewing windows in in the future, although he could not admit that the windows he designed to invade children's privacy were wrong at the time he designed them.

### III.    Standard Applicable to Motion for Class Certifiaction.

F. R. Civ. P. 23 standards are well known, and have commonly been referred to as numerosity, commonality, typicality, and adequacy.

### A. Numerosity.

The Putative Class consists of thousands of identifiable Class Members retrievable through the Defendants' alumni records and easily satisfies the Numerosity Requirement of Rule 23. In applying the requirement that the putative class must be "so numerous that joinder of all members is impracticable," the Fourth Circuit has held that no specified number is needed and that application of the rule is to be considered in light of the particular circumstances of the case. Brady v. Thurston Motor Lines, 726 F.2d 136, 145 (4th Cir.1984). "To satisfy the numerosity requirement of Rule 23(a), plaintiff must show that joinder is impracticable. Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 147 (4th Cir.2001). No specific number is needed to satisfy this requirement. Brady v. Thurston Motor Lines, 726 F.2d 136, 145 (4th Cir.1984). The "practicability of joinder depends on many factors, including, for example, the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion." Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 878 (11th Cir.1986); Garcia v. Gloor, 618 F.2d 264, 267 (5th Cir.1980); see also Christman v. American Cyanamid Co., 92

F.R.D. 441, 451 (D.C.W.Va.1981)." <u>George v. Duke Energy Retirement Cash Balance Plan</u>, 259 F.R.D. 225, (D.S.C.2009).

Defendants themselves answered in discovery that "several thousand, perhaps as many as 7,500, who have attended the school at some time between 1998 and 2021 and some or all would have had at least one parent or guardian who paid their tuition."[3]  Further, yearly tuition is required to be paid to BEHS on behalf of each student. The significant number of students, and for each student, a tuition payer, evidences that joinder of all class members would be impracticable. On a yearly basis, the enrollment at BEHS from 1998 through 2019 has been 669 on the low end to 910 on the high end. (**Exhibit #16**) Thus, numerosity is clearly met for both the VIEWED STUDENT class and the TUITION PAYER class.

    B.  <u>**Commonality.**</u>

        1.  <u>**The Legal Standard for Commonality is well known,**</u>
           <u>**and Presents a Low Threshold for Plaintiffs to Meet.**</u>

"The commonality requirement of Rule 23 is not a stringent requirement. A single common question may be sufficient to satisfy the commonality requirement for class certification; critical inquiry is whether the common questions are the core of the cause of action alleged."  <u>In re Initial Public Offering Securities Litigation</u>, S.D.N.Y. 2007, 243 F.R.D. 79, adhered to on reconsideration 2007 WL 844710; "Commonality requirement for class certification is a low hurdle and can be met by demonstrating even a single common legal or factual issue." <u>O'Donnell v. Robert Half Intern., Inc.</u>, D.Mass.2008,250 F.R.D. 77; "Commonality requirement for class certification is satisfied when questions of law and fact linking the class members are substantially related to the resolution of the litigation, even though the individuals are not identically situated." <u>Jacobs v. Osmose, Inc.</u> S.D.Fla.2003,F.R.D.607;  "<u>Bussian v. DaimlerChrysler Corp. No.</u>

---

[3] Defendant Bishop England High School's Answers to Plaintiffs' First Interrogatories, at # 20-21, **Exhibit #8**.

1:04CV00387,2007 WL 1752059, at *5 (M.D.N.Y.) June 18,2007) (explaining that the test for commonality "is not demanding, and is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members"). In fact, "[t]the commonality requirement is relatively easy to satisfy." Buchanan v. Consolidated Stores Corp., 217 F.R.D. 178,187 (D.Md.2003).

> **2. All Bishop England Students from 1998 through 2019 used the Locker Rooms and all Locker Rooms had Viewing Windows**.

All students used the locker rooms either through Sports or Physical Education. Physical Education was mandatory for every student. (Dep. Male Student, P. 8, L. 12-15, **Exhibit #17**). Viewed Female Student 200 testified she undressed in the locker room. (Dep. Female Student, P. 7, L. 20-21, **Exhibit #18**). Male Student 300 changed clothes in the locker room when he took Physical Education. (Dep. Male Student, P. 9, L. 10-18, **Exhibit #17**). Male Student 300 did not know of anyone at the school that did not change clothes in the locker room. (Dep. Male Student, P. 35, L. 2-4, **Exhibit #17**). Principal Finneran testified that 75% of the student body dating back to 1998 participated in athletics, and 25% participate in Physical Education class. (Dep. P. Finneran, R. 30(b)(6) P. 62, L. 21-25, P.63, L. 12-15, P. 67, L. 5-11, P. 68, L. 9-19, **Exhibit #5**). Accordingly, all students since 1998 either through sports or physical education had to use the Locker Rooms to undress and change. Ms. Aselage agreed that of the percentage of students in the locker room made them susceptible to being monitored. (Dep. M. Aselage, Vol. III, P. 73, L. 6-11, **Exhibit #9**).

> **3. All students were Exposed through the Use of the Viewing Windows.**

Consistent with Ms. Aselage's media statement, Principal Finneran testified that the windows were created for the purposes of monitoring the children in the locker room for such

things as harassment, bullying and smoking. (Dep. P. Finneran, R. 30(b)(6), P. 78, L. 3-8, **Exhibit #5**). Principal Finneran admitted there was monitoring done through use of the windows, but could not testify as to how frequently they were used. (Dep. P. Finneran, R. 30(b)(6), P. 76, L. 1-9, **Exhibit #5**). Principal Finneran testified that there were no official rules or policies given to the different coaches or staff members as to how or when or how often to monitor the children in the locker room, and that this was true from the time the windows were created until they were boarded up. (Dep. P. Finneran, R. 30(b)(6), P. 78, L. 9-18, **Exhibit #5**).

Female Student 200 testified it is not necessary to ask each student to know that they did not give their consent to be viewed by adults, and that she had no reason to suspect adults were viewing her while she was changing her clothes. She testified you would not have to ask individual students to know that this was wrong. (Dep. Female Student, P. 49, L. 13- P. 50 , L. 3, **Exhibit #18**). Ms. Aselage admitted that the students are being looked at is a fact. (Dep. M. Aselage, Vol. III, P. 84, L. 5-7, **Exhibit #9**). Ms. Aselage admitted that the school used the windows to view the students, but that the Diocese felt that it was not actionable:

> Q Nobody's ever denied the fact that they were monitoring the children and looking at the children. They deny that it's an actionable cause of action.
>
> A **Yes.**
>
> Q Is that correct?
>
> A **Yes.**
>
> Q They are being monitored, in the locker room, in various states of dress and
>
> undress. That's a fact; correct?
>
> Q That's not an allegation; correct?
>
> A **Yes.**

(Dep. M. Aselage, Vol. III, P. 82, L. 23- P. 83, L. 5; P. 84, L. 8-14, **Exhibit #9**)(Emphasis added).

4. **Class Representatives Viewed Student Female 200 and Viewed Student Male 300 Suffered Verified Mental Damages upon Learning that the Viewing Windows had been Utilized by Mr. Scofield, a Fact of Damage Common to the Class**

Dr. Amanda Salas is a board-certified psychiatrist who personally interviewed and evaluated Class Representatives Viewed Female Student 200 and Viewed Male Student 300. She has offered her medical opinion that the Class Representatives suffered a negative psychological impact upon learning that they could have been viewed while undressing. Dr. Salas' full opinion is reprinted here, below:

> Proffered Professional Opinions
>
> The transparent viewing windows into the dressing rooms at Bishop England are a breach of privacy that was not known, recognized, appreciated, or expected by the interviewed users of these facilities. Undressing can be uncomfortable and may be associated with embarrassment. Shame, fear, and nervousness are feelings that one may experience with the process of undressing. The perception of privacy invasion surrounding an undressing experience can bring up these feelings.
>
> Each of the interviewed class representatives articulated an expectation of privacy and respect for their personal space within the Bishop England changing rooms. Upon learning of the natures and risks associated with the viewing window, the interviewed class representatives experienced a negative shift in their emotional state. Both described concerns related to the possibility of having been viewed, photographed, videoed, or made an unknown victim to one's voyeuristic sexual pleasures. Both expressed concern of not knowing, and not being able to know within a degree of certainty, the extent of personal violation to which they were subjected when utilizing the dressing rooms at Bishop England High School. Although neither were aware of having been photographed or recorded from the viewing windows, each expressed thoughts of worry as to whether they may face future embarrassment or humiliation from what could have been photographed or recorded during their use of the changing facilities at Bishop England High School.

Every student who was subjected to undressing before the viewing windows is expected to be impacted. Those persons can have a range of emotions and psychological impacts by having been exposed to the viewing windows, whether exposed by perception or reality. The degree by which an individual is affected hinges on factors unique to each. Impact by the invasion of privacy to which students were subjected while in the dressing rooms at Bishop England High School is clearly directed to the negative.

The opinions included in this report are my professional medical opinions offered to a reasonable degree of medical certainty based on the available information. I reserve the right to supplement this opinion should additional information come forth.

Dr. Salas Report (Dkt. #41-1).

The Defendants have not named a medical expert in this case and as such, the testimony of Plaintiffs' expert, Dr. Salas, is uncontested by a medical expert.

The Defendants in this case deposed the Male and Female Class Representatives. Their testimony is evidence of mental damages. Female Student 200 testified that the news about Scofield taking pictures was a "huge ordeal going throughout the school" and Female Student 200 learned about it from friends. (Dep. Female Student, P. 15, L. 16-24, **Exhibit #18**). Female Student 200 testified to having sustain mental damages from learning that school personnel used the windows to view and photograph students. (Dep. Female Student, P. 26, L. 24 – P. 27, L. 25, **Exhibit #18**). When Male Student 300 learned about Scofield, he felt frustration, anxiety and was upset. He felt bad for those that were photographed as well as for those who were not, stating, "Because they are living in a world of they don't know, which, in some cases, can be worse than knowing." (Dep. Male Student, P. 15, L. 15- P. 16, L. 4, **Exhibit #17**).

Importantly, and for purposes of this motion, **Dr. Salas has given a medical opinion that, "Every student who was subjected to undressing before the viewing windows is expected to be impacted."** Dr. Salas testified at her deposition that every alumnus of BEHS will be impacted,

but that they all will be affected differently. (Dep. A. Salas, P. 67, L. 24 – P. P. 68, L. 10 **(Exhibit # 4)**. "The 'commonality requirement is met if Plaintiffs' grievances share a common question of law or of a fact.' [internal citation omitted]. "Plaintiffs argue that they are challenging systematic policies at SLS, which raise many common issues of law and fact. Defendants argue that each of the putative class members would have suffered injuries in a different way. However, the grievances of the Plaintiffs need not be identical. Where, as here, a plaintiff alleges injury from a common policy, the commonality requirement is met." Romano v SLS Residential Inc., 246 F.R.D. 432,444 (S.D.N.Y.2007). Female Student 200, Class Representative in this matter, testified regarding how learning that the viewing windows were used impacted her:

> Q. And not everybody who over the 30 --nearly 30 years that Bishop England's [sic] been on Daniel Island, not everybody's affected the same way by the fact that there are windows in the locker rooms, right?
>
> A. **I think everyone's entitled to their own emotions, but when a huge event happens, it can impact each person, and as a whole, it has impacted all of them.**
>
> Q. How has it impacted all of them?
>
> A. **Because you trust that you're in your school and that you're in a safe environment to keep you safe and then out of nowhere, you receive this information that completely tears down all of that trust and innocence and safety you thought you once had.**

(Dep. Female Student, P. 30, L. 15 – P. 31, L. 5, **Exhibit #18**)(Emphasis added).

Dr. Salas also observed in her deposition testimony that the Defendants sending a letter to all students offering counseling was a recognition that this was a wide reaching and impactful event upon the entirety of the student body. (Dep. A. Salas, P. 79, L. 9-19, **Exhibit #4**). And, from the point of view of the students, the Class Members, Dr. Salas described the realization that their privacy was invaded as:

But that is something that upon learning, wow, I was in that space that was utilized just as it was when I was in it, it's going to have that kind of impact in someone's psyche. But the degree and the nature and what one person experiences versus another, that's not necessarily the same.

(Dep. A. Salas, P. 83, L. 19-25, **Exhibit #4**).

South Carolina's state substantive law for invasion of privacy provides a remedy and recourse

for the Plaintiffs' mental damages and Dr. Salas' medical confirmation of same:

> In an action for wrongful intrusion into private affairs, the damage consists of **the unwanted exposure** resulting from the intrusion. Thus, if the plaintiff proves the four elements needed to establish his cause of action, **the fact of damage is established as a matter of law**. The amount of damage is then to be assessed by the trier of fact. In assessing the damage, the trier of fact may consider the shame, humiliation, and emotional distress suffered by the plaintiff as compensable elements of damage.

Snakenberg v. Hartford Cas. Ins. Co., 299 S.C. 164, 171–72, 383 S.E.2d 2, 6 (Ct. App. 1989)(Emphasis added).

All Plaintiffs need prove in this case is the four elements of the invasion of privacy tort, and then, "the fact of damage is established as a matter of law." Accordingly, assuming the Plaintiffs prove that their privacy was invaded by use of the viewing portals (and as set forth above, the Plaintiffs believe they have already shown that they have more than enough evidence to present such a showing to a jury), then the "fact of damage is established" for the Class- and then the jury may then consider the shame, humiliation, and emotional distress suffered by the Class Members as compensable elements of damage, and assess damages as they see fit.

Applying the law, it is clear that the tort is designed to compensate for "the unwanted exposure," assuming the elements of the tort are met. Importantly, it is not necessary for the Class Representatives to "prove" that they were actually viewed or monitored- as Defendants have contended. Viewed Male Student 300 knew of the presence of the windows but never "connected the dots that someone would be videotaping me as the blinds were closed or the possibility that

someone would be videotaping me." (Dep. Male Student, P. 31, L. 16-23, **Exhibit #17**). Male

Student was then asked:

> Q. So you're suing because of something that might have happened, but you don't know whether it did or not?
>
> A. I think that's worse than knowing.

(Dep. Male Student, L. 32, L. 3-6, **Exhibit #17**).

The above question posed by the Defendants underscores the Defendants being tone deaf to the

gravity of what happened and the actionability of the tort: all that is required is an "**unwanted**

**exposure**" under <u>Snakenburg</u> and not actual proof of viewing. Although a dearth of caselaw on

the tort in South Carolina, the <u>Snakenburg's</u> analysis of an unwanted exposure is consistent with

the invasion of privacy law of other jurisdictions[4].

---

[4] *See* <u>Friedman v. Martinez</u>, 242 N.J. 449, 455–56, 231 A.3d 719, 723 (2020)("We find that an intrusion on privacy occurs when someone uses a private space where a spying device has been concealed and "the intrusion would be highly offensive to a reasonable person." *456 Restatement (Second) of Torts § 652B. To bring a claim, the victim does not have to present direct evidence that she was secretly recorded.); <u>Koeppel v. Speirs</u>, 808 N.W.2d 177, 182–85 (Iowa 2011)("In deciding a standard for Iowa, we think it is important to keep in mind that the tort protects against acts that interfere with a person's mental well-being by intentionally exposing the person in an area cloaked with privacy. See William L. Prosser, Privacy, 48 Cal. L. Rev. 383, 392 (1960) [hereinafter Prosser]... Additionally, the comments and illustrations contained in the Restatement (Second) of Torts make no suggestion that the intrusion into solitude or seclusion requires someone to actually see or hear the private information. See Restatement (Second) of Torts § 652B illus. 3, at 379. Indeed, the very purpose of the tort is to protect the opening up of a private place where the plaintiff seeks seclusion. Prosser, 48 Cal. L. Rev. at 392. If the fact finder finds from the evidence that the device could not have intruded into the privacy of the plaintiff in any manner, the tort of invasion of privacy has not been committed. Yet, if the fact finder finds from the evidence that the device could have intruded into the privacy of the plaintiff, the element of intrusion is satisfied."); <u>Hernandez v. Hillsides, Inc.</u>, 47 Cal.4th 272, 97 Cal.Rptr.3d 274, 211 P.3d 1063, 1078 (2009) (holding a hidden video camera in plaintiffs' office that was capable of being operated by the employer established an intrusion); <u>Kohler v. City of Wapakoneta</u>, 381 F.Supp.2d 692, 704 (N.D.Ohio 2005) (noting the installation of a hidden listening device or camera is enough to establish an intrusion, regardless of whether the devices were actually used, because an invasion consists of an intentional interference with a person's interest in solitude); <u>Amati v. City of Woodstock</u>, 829 F.Supp. 998 (N.D.Ill.1993)(Court found the defendant's act of placing a recording device on a private telephone line in a police station was intrusive and disruptive and that "it ruins [one's] privacy" because a person "would never obtain the full benefits accorded to a private place if he or she reasonably believed someone would or could be listening." <u>Amati</u>, 829 F.Supp. at 1010. While the court only decided the tort does not require an allegation that someone actually listened, the rationale it employed emphasized that the full benefits of privacy protected by the tort are diminished when a reasonable person believes someone could have listened.); <u>Harkey v. Abate</u>, 131 Mich.App. 177, 346 N.W.2d 74, 76 (1983) ("In our opinion, the installation of the hidden viewing devices alone constitutes an interference with that privacy which a reasonable person would find highly offensive. And though the absence of proof that the devices were utilized is

**5.   The Tuition Class Bargained for a Safe Environment and It**
**Was Not Provided One.**

BEHS held itself out to the Tuition Class payers as a moral, caring and safe environment to send one's child or children for school and that it would, "seriously curb the possibility of child sexual abuse happening in our parishes and schools." (See BEHS website, **Exhibit #19**). As stated above, **the Principal conceded that viewing children without their knowledge would not be a safe, moral or nurturing environment**. (Dep of P. Finneran, P. 64, L. 12- P. 65, L. 4, **Exhibit #3**) Although common sense and intuitive, one of the top five reasons a parent chooses a private school setting such as Bishop England is improved student safety[5]. Based upon this submission to the Court on the evidence adduced thus far into this litigation, the Defendants failed to deliver upon their representations of safety. It is for the trier of fact to determine how much the Tuition paying Class is entitled to, taking into account that the school did deliver to the Class a quality education notwithstanding the environment in which it is was delivered.

**C.   Typicality.**

Typicality requires the class representatives' claims to be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied if the plaintiff's claim is not "so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim. That is not to say that typicality requires that the

---

relevant to the question of damages, it is not fatal to plaintiff's case."); Hamberger v. Eastman, 106 N.H. 107, 206 A.2d 239 (1964)(Court held the plaintiffs were not required to prove the defendant actually overheard or viewed the activities in a secluded place to show an intrusion occurred. Instead, it found an intrusion occurs when the defendant performs an act that had the potential to impair a person's peace of mind and comfort associated with the expectation of privacy).

[5] The top five reasons why parents chose a private school for their children are all related to school climate and classroom management, including "better student discipline" (50.9 percent), "better learning environment" (50.8 percent), "smaller class sizes" (48.9 percent), "improved student safety" (46.8 percent), and "more individual attention for my child" (39.3 percent)., MORE THAN SCORES An Analysis of Why and How Parents Choose Private Schools, James P. Kelly, III, J.D. and Benjamin Scafidi, Ph.D., November, 2013; http://www.edchoice.org/wp-content/uploads/2015/07/More-Than-Scores.pdf

plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." <u>Deiter v. Microsoft Corp.</u>, 436 F.3d 461, 466–67 (4th Cir. 2006).

Here, there is a link between Plaintiff's claims and those of absent class members. Plaintiffs and the Class Member's claims arise out of the same alleged course of conduct by the Defendants and are based on the same legal theories. Accordingly, the typicality requirement is met. *Deiter*, 436 F.3d at 466 ("The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so goes the claims of the class'."). In <u>DG ex rel. Stricklin v. Devaughn</u>, 594 F.3d 1188 (10th Cir. 2010), the Tenth Circuit Court of Appeals affirmed a District Court's approval of class certification case where it was alleged that the Oklahoma Department of Human Services had a policy or practice of failing to adequately monitor the safety of children causing significant harm and risk of harm to their safety, health and wellbeing presented an issue of fact common to the entire class. In affirming the district court's decision on commonality, the Court found that:

> All class members, by virtue of being in OKDHS's foster care, are subject to the purportedly faulty monitoring policies of OKDHS, regardless of their individual differences; therefore, all members of the class are allegedly exposed to the same unreasonable risk of harm as a result of Defendants' unlawful practices. Though each class member may not have actually suffered abuse, neglect, or the risk of such harm, Defendants' conduct allegedly poses a risk of impermissible harm to all children in OKDHS custody. Thus, we conclude the district court did not abuse its discretion in finding the requirement of commonality satisfied.

<u>Id</u>. at 1196.

The Court also found typicality because all children that were in the department's custody were exposed to the same harm:

> The shared risk of being subjected to the purportedly unconstitutional practices justified certification. We did not require the named plaintiffs in *Milonas* to prove either every class member had actually been subjected to the controverted practices or every class member had actually suffered constitutionally-cognizable harm as a result of the practices. Similarly, in this case, every class member, by virtue of being

in OKDHS's custody, is subject to OKDHS's monitoring practices or lack thereof and, therefore, "the issue of whether the monitoring practices compromise the safety of foster children is an issue common to the entire proposed class."

Id. 1197 (10th Cir. 2010)

***

And, like commonality, typicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances. *See Milonas,* 691 F.2d at 938 (finding commonality and typicality where all members of class were in danger of being subjected to certain disciplinary practices regardless of their individual differences). The harm and threat of harm suffered by the Named Plaintiffs as a result of OKDHS's allegedly deficient monitoring practices is typical of the harm and threat of harm suffered by all children in the class because all foster children are subject to OKDHS's challenged, agency-wide monitoring policies. Additionally, Named Plaintiffs allege OKDHS's monitoring policies violate their substantive due process rights to be free from harm while in state custody, the same legal theory that underlies class members' corresponding claims. Due to the common risk of harm and the common underlying legal theory for asserting that risk, the district court acted within its discretion to find that typicality was satisfied.

Id. at 1199.

The same facts are present in this case, where the claims of monitoring the Plaintiffs are typical of the claims of the absent class members and that Class Members were exposed to the same harm.

## D.  **Adequacy.**

The adequacy of representation inquiry involves two issues: (1) whether the plaintiff has any interest antagonistic to the rest of the class, and (2) whether plaintiff's counsel is qualified, experienced, and generally able to conduct the proposed litigation. South Carolina Nat. Bank v. Stone, 139 F.R.D. 325, 330–31 (D.S.C.1991). In deciding if the named Class Representatives will adequately represent the interests of the class the court must consider whether the plaintiff "has common interests with the unnamed members of the class" and will "vigorously prosecute the interests of the class." *See* Runion v. U.S. Shelter, 98 F.R.D. 313, 317 (D.S.C. 1983); Waller v. Seabrook Island Property Owners Ass'n, 300 S.C. 465, 388 S.E.2d 799 (1990) (citing *Runion* as a

decision which "sets forth all criteria to be considered in determining whether a named plaintiff will adequately represent a proposed class.")(emphasis added).

### 1.  Class Representatives Viewed Student Female 200 and Viewed Student Male 300 Have No Interests Antagonistic to the Rest of The Class.

The Plaintiffs have certainly demonstrated absolute fidelity to his or her respective class and have vigorously prosecuted this case since inception.  Female Student filed the lawsuit to "stand up and give a voice for those who were wrongfully abused in the locker rooms." (Dep. Female Student, P. 18, L. 21-25, **Exhibit #18**). And, that she is suing on behalf of "my student body, to stand up for a wrong situation that was committed in the school of Bishop England." (Dep. Female Student, P. 19, L. 18-22, **Exhibit #18**). When questioned by defense counsel as to what she wanted to accomplish with this lawsuit, Female Student testified:

Q. What is it that you want to accomplish with this lawsuit?

A. I want all corresponding factors to be held accountable for what happened in May of 2019.

Q. Okay. So what -- you want other people to be held accountable for what Jeffrey Scofield may have done or did?

A. No, I want to represent my student body council and me, as well, in making sure that what happened never happens again.

(Dep. Female Student, P. 24, L. 3-13, **Exhibit #18**).

Upon being asked by defense counsel, "Why do you believe you're entitled to any money?" Female Student testified she was "not sure if I'm entitled to any money." When asked why, Female Student clarified her response by stating, "I'm here to stand up for my student body council and raise a voice for those who are not brave enough to do it and to put down my foot and make sure this never happens again." (Dep. Female Student, P. 25, L. 13-24, **Exhibit #18**). Obviously,

Female Student's role is to testify as to the damages she sustained, and it is for others to decide what she may be entitled to – monetary or otherwise. When asked if Female Student could fairly and adequately represent the interests of former students she testified, "I think I'm going to do as best as I can to represent those that aren't brave enough to have their own voice." (Dep. Female Student, P. 42, L. 20-25, **Exhibit #18**). When Male Student was asked why he filed the lawsuit, he testified:

> Q. Why did you decide to file this lawsuit?
>
> A. Because it was imperative that people like me and my fellow classmates have someone stand up for actions like this that happen quite often, as we can see, in environments that it shouldn't, like private institutions where we confide our trust and especially religious institutions where we pay a good sum of money to go.

(Dep. Male Student, P. 17, L. 11-20, **Exhibit #17**).

When Male Student was asked what he wanted to accomplish with the lawsuit, he stated, "I want things like this to never happen again. I think I have had damages done to me and I'm sure my fellow classmates have had damages done to them mentally and maybe physically for all, I can't speak on behalf of them." (Dep. Male Student, P. 17, L. 24 – P. 18, L. 6, **Exhibit #17**). When asked what he was seeking in the lawsuit Male Student said compensation for their damages and loss. (Dep. Male Student, P. 28, L. 7- 16, **Exhibit #17**). During his deposition, the Tuition Payer Class Representative Gary Nestler testified as follows:

> Q. Well, how were the people in the class you purport to represent injured?
>
> A. The same way that I feel that I was injured.
>
> Q. That their kids weren't provided a safe environment to go to school ?
>
> A. That is correct.

(Dep. Tuition Payer Gary Nestler, P. 53, L. 7-13, **Exhibit #20**).

When asked what resolution he wants from the lawsuit, Tuition Payer Nestler stated:

A. For those who committed what I would say is egregious, to face whatever penalties, if you will, and then for the school to provide me with financial compensation for my tuition plus what I would think is my duress and my family's duress.

(Dep. Tuition Payer Gary Nestler, P. 68, L. 17-21, **Exhibit #20**).

The Tuition Payer Nestler further testified:

Q. On behalf of the parents, do you believe that providing a viewing window into the locker room where the students could be seen and were seen without knowing that they were seen, is that a safe environment?

THE DEPONENT: It's not only not safe, it's reprehensible behavior. It's disgusting, it's despicable, and it goes against the grain of what we were told, what the teaching, and morality, and the policy of the Catholic church.

(Dep., Tuition Payer Gary Nestler, P. 80, L. 7-18, **Exhibit #20**).

The Tuition Payer also was clear that he would never had sent his child to BEHS and paid the

tuition for the same had he known his child would be exploited and viewed when utilizing the

locker rooms:

Q. Would any of the parents that you are standing to support in this tuition paying class, have sent their children to that school if they had known—

Q. –that their children would be objectified or viewed?

A. One hundred percent not.

Q. And would you have ever paid a dollar to have that invasion of privacy extended to your child?

A. Unequivocally not.

(Dep., Tuition Payer Gary Nestler, P. 85, L.23 – P. 86, L. 12, **Exhibit #20**)

### 2.   <u>**Plaintiff's Counsel is Qualified, Experienced, and Generally Able to Conduct the Proposed Litigation .**</u>

"The adequacy of plaintiffs' counsel ... is presumed in the absence of specific proof to the

contrary." <u>George v. Duke Energy Retirement Cash Balance Plan</u>, 259 F.R.D. 225, (D.S.C.2009).

Plaintiffs' counsel is well known to the Court and has experience in handling complex and class action litigation in South Carolina. **(Exhibit #21**, Statement of Qualifications of Proposed Class Counsel.) The Court has no reason to question their credentials and ability to litigate this matter to conclusion, and has thus far tenaciously and competently pursued the Plaintiffs' claims before this Court.

IV.     **Application of Rule 23(b) Factors to Facts of this Case.**

In addition to Rule 23(a), the Plaintiffs must satisfy at least one of the Rule 23(b) factors. "The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.' [citations omitted]. The predominance requirement ensures that "common questions present a significant aspect of the case" such that "there is clear justification"—in terms of efficiency and judicial economy—for resolving those questions in a single adjudication. [citation omitted]. This requirement is satisfied when a common nucleus of facts and law is the central feature of the litigation, and when the "[p]laintiffs have shown that there are plausible classwide methods of proof available to prove their claims." citation omitted]. Romero v. Securus Techs., Inc., 331 F.R.D. 391, 410 (S.D. Cal. 2018).

Applying the above law to the facts of this case, adjudication by representation is preferable as the issue of unwanted to exposure is common to all students that attended Bishop England High School from 1998 to 2019. All students used the locker rooms, and all had their privacy invaded, without any justification, causing mental damages to a person of ordinary sensibilities as testified to by Dr. Salas. The only question to be resolved is the amount of damages to be assessed by the trier of fact. In contrast to these numerous common issues, the individual questions are few,

and generally only concern issues of the individual damage assessments and calculations. Indeed, differences that "go primarily to damages . . . cannot destroy predominance." Ambriz v. Coca Cola Co., No. CV 14-00715 SVW, 2015 WL 12683823, at *4 (C.D. Cal. Mar. 11, 2015) *citing* Leyva v. Medline Indus. Inc., 716 F.3d 510, 513–14 (9th Cir. 2013)("In almost every class action, factual determinations of damages to individual class members must be made. Still we know of no case where this has prevented a court from aiding the class to obtain its just restitution. Indeed, to decertify a class on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device.") (internal citation and quotation marks omitted). Thus, "[t]he amount of damages is invariably an individual question and does not defeat class action treatment." *Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir.1975); *see also Yokoyama,* 594 F.3d at 1089 ("The potential existence of individualized damage assessments ... does not detract from the action's suitability for class certification.").Accordingly, the predominance test is satisfied here. Of course, should any Class member decide to opt out and pursue their claim individually, Rule 23(b)(3) allows for that as well. For the tuition class, all tuition payers lost the same benefit of the bargain for a safe environment.

As Rule 23(a) and (b) are easily met in this case, the Plaintiffs request the following Certification Order from the Court to define the Class as follows:

1. An Order that this Court certify the *Viewed Class*, consists of all those persons, or such persons' personal representatives, heirs or assigns, wherever located, who have or in the future may have any claim against Defendants The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, arising out of, based upon, or in any way related to, or involving injuries or damages claimed as a result of Jeffrey Scofield or any other Bishop England High School employee or agent monitoring, watching, viewing, spying, prying, besetting, photographing or videotaping them, or other such similar type conduct, through the viewing windows of the coaches' or

other BEHS officials' offices into the locker rooms while attending Bishop England High School from 1998 at least through 2019.

2.  An Order that this Court certify the *Tuition Class*, consists of all those persons, or such persons' personal representatives, heirs or assigns, wherever located, who have or in the future may have any claim against Defendants The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually,  arising out of, based upon, or in any way related to, or involving claims for reimbursement of tuition paid to Defendants as a result of Jeffrey Scofield or any other Bishop England High School employee or agent monitoring, watching, viewing, spying, prying, besetting, photographing or videotaping them, or other such similar type conduct, through the viewing windows of the coaches' office into the locker rooms while attending Bishop England High School from 1998 through 2019.

3.  An Order that based upon the submissions of the Plaintiffs, that the Court finds that:
    a.  The Viewed Class and Tuition Class is so numerous that joinder of all members is impracticable;
    b.  There are questions of law or fact common to the Viewed Class and Tuition Class;
    c.  The Representative Plaintiffs will fairly and adequately represent the interests of the Viewed Class and Tuition Class and Plaintiffs' counsel is qualified to represent the Viewed Class and Tuition Class;
    d.  The prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

4.  Appoint the Undersigned as Class Counsel.

                    Respectfully submitted,

                    THE RICHTER FIRM, LLC

                    s/Lawrence E. Richter, Jr.
                    Lawrence E. Richter, Jr. (Fed. Bar: 3460)
                    Anna E. Richter (Fed. Bar: 13333)
                    622 Johnnie Dodds Blvd.
                    Mt. Pleasant, SC  29464
                    Phone: 843-849-6000
                    LRichter@RichterFirm.com
                    Anna@RichterFirm.com

-AND-

s/Carl L. Solomon
Carl L. Solomon (Fed. Bar: 6684)
Solomon Law Group, LLC
P.O. Box 1866
Columbia, SC  29202
Phone: 803-391-3120
carl@solomonlawsc.com

-AND-

s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (Fed. Bar: 6106)
Stephen Slotchiver (Fed. Bar: 6648)
Slotchiver & Slotchiver LLP
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com

-AND-

s/Brent S. Halversen
Brent S. Halversen (Fed. Bar: 10474)
Brent Souther Halversen, LLC
751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com

*Attorneys for Plaintiffs*

December 13, 2021
Mount Pleasant, South Carolina

**JA138**

# EXHIBIT 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
 2                    CHARLESTON DIVISION

 3
                DEPOSITION OF MARY ANNE TUCKER
 4
                     OCTOBER 5, 2021
 5

 6   GARY NESTLER, VIEWED STUDENT FEMALE 200, VIEWED
     STUDENT MALE 300, on behalf of themselves and all
 7   others similarly situated,

 8              Plaintiffs,

 9    vs.                  CASE NO. 2:21-cv-0613-RMG

10   THE BISHOP OF CHARLESTON, A CORPORATION SOLE;
     BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS 1-10; THE
11   BISHOP OF THE DIOCESE OF CHARLESTON, in his
     official capacity; and ROBERT GUGLIELMONE,
12   Individually,

13              Defendants.
     _____
14

15   TIME:            12:51 PM

16

17   LOCATION:        THE RICHTER LAW FIRM
                      MOUNT PLEASANT, SOUTH CAROLINA
18

19

20   REPORTED BY:     RONDA K. BLANTON, RPR
                      CLARK & ASSOCIATES, INC.
21                    CHARLESTON, SC 29422
                      843-762-6294
22                    WWW.CLARK-ASSOCIATES.COM

23

24

25
```

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFF:
             THE RICHTER FIRM
 3           BY:  LAWRENCE E. RICHTER, JR., ESQ.
                  ANNA RICHTER, ESQ.
 4           622 Johnnie Dodds Boulevard
             Mount Pleasant, SC 29465
 5
             HALVERSEN & ASSOCIATES
 6           BY:   BRENT S. HALVERSEN, ESQ.
             751 Johnnie Dodds Boulevard, Suite 200
 7           Mount Pleasant, SC 29464

 8   ON BEHALF OF THE DEFENDANTS THE BISHOP OF
     CHARLESTON, BISHOP ENGLAND HIGH SCHOOL, THE
 9   BISHOP OF THE DIOCESE OF CHARLESTON, AND ROBERT
     GUGLIELMONE:
10
             TURNER PADGET GRAHAM & LANEY
11           BY:   RICHARD S. DUKES, ESQ.
             40 Calhoun Street, Suite 200
12           Charleston, SC 29401

13                    - - -

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         INDEX

 2    EXAMINATION

 3     BY MR. RICHTER                              4

 4     CERTIFICATE OF REPORTER                    90
       DEPONENT CORRECTION SHEET                  91
 5

 6
       EXHIBITS
 7
        Exhibit No. 01   Incident Reports         78
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    MARY ANNE TUCKER,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                    EXAMINATION
 5   BY MR. RICHTER:
 6       Q.  Good morning.  Would you state your
 7   name, please.  Your full name into the record.
 8       A.  Mary Anne Tucker.
 9       Q.  And what was your maiden name?
10       A.  Bolchoz, B-O-L-C-H-O-Z.
11       Q.  I need to ask you a couple of questions
12   about the process today and explain a couple
13   things to you about the process.  I'm actually
14   required to do that.
15            First of all, this is a deposition.  So
16   you're now under oath, which means you're now a
17   testifying witness in this proceeding, which
18   restricts you in certain ways.  Mostly, you can't
19   talk about your testimony while you are a
20   testifying witness.
21            As we -- the way it'll go is:  Have you
22   ever been through this before?
23       A.  I have.
24       Q.  Oh, okay.  Well, shoot.  I can save a
25   little time here then.  Was it -- were you
```

1  deposed -- what kind of case was it that you were

2  deposed in?

3      A.  I don't know the answer to that.  What

4  are my choices?

5      Q.  Big case.  Old case.

6      A.  Yeah, exactly.

7      Q.  No.  We're just kidding.

8          You know, it may have been a personal

9  injury case.  It may have been a business

10 dispute, that kind of thing.  Domestic cases,

11 sometimes people get deposed in those.

12     A.  I don't know what category it would fall

13 in, to be honest with you.

14     Q.  What was the issue in the case?

15     A.  It was related to the school.

16     Q.  To Bishop England?

17     A.  Uh-huh.

18     Q.  And it was an injury case of some type?

19     A.  I mean, it was over someone who we

20 fired.

21     Q.  Okay.  Okay.  Well, then that -- it's a

22 civil deposition, and process is going to be the

23 same.

24     A.  Okay.

25     Q.  I pose questions to you, and you give

1  answers back to me.  We have to be careful about

2  how we do that.  I'll try to pose narrow, clear

3  questions to you so that you can easily

4  understand them; and if you can respond in the

5  same way.  You can explain your response as fully

6  as you want to.

7        But if we can fall in the track of doing

8  that, letting each of us speak and not

9  interrupting each other, it goes a lot faster if

10 we fall in that track.  So that's what I hope we

11 have luck with today.

12       Some things you can't do is you can't

13 nod or make gestures as an answer.

14     A.  Right.

15     Q.  Because the reporter can't get that.

16 You're being recorded by audio.  You're also

17 being recorded by a stenotype method.

18     A.  Okay.

19     Q.  So that's what's going on.  If you need

20 anything, just say so.

21     A.  All right.

22     Q.  Are you impeded in any way from being

23 able to give your deposition this afternoon?

24     A.  I am not.

25     Q.  Okay.  Thank you.

1          What is your address, please?

2     A.   My home address is 50 Lord Calvert

3 Drive, Charleston, South Carolina 29407.

4     Q.   That's West Ashley?

5     A.   It is.

6     Q.   And you are married?

7     A.   I am.

8     Q.   And who's your husband?

9     A.   Joel Tucker.

10    Q.   And how long have you -- this is a lead-

11 in for me to brag about how long I've been

12 married.  Rich doesn't like that, but correct me.

13 How long have you been married?

14    A.   It'll be 30 years in November.

15    Q.   53 for me.

16          MR. DUKES:  54.

17    Q.   We, once in a while, try to break the

18 atmosphere a little and get through these things.

19          Now, what is your -- you've been married

20 for 30 years.  First marriage?

21    A.   Yes.

22    Q.   And do you have children?

23    A.   I do.

24    Q.   How many?

25    A.   Four.

1      Q.   How old are they?

2      A.   22, 24, 26, and 28.

3      Q.   Oh, boy.  Are they near Charleston?

4      A.   Two of them are and two of them are

5   away.

6      Q.   And are you employed currently?

7      A.   I am.

8      Q.   And please state your place of

9   employment.

10      A.   I'm employed at Bishop England High

11   School.

12      Q.   In what capacity?

13      A.   Associate principal.

14      Q.   I'm sorry.  I said vice -- maybe I

15   said --

16      A.   Assistant.

17      Q.   Assistant principal.  Associate

18   principal is the proper nomenclature.  I

19   understand now.

20           How long have you been at BE?

21      A.   Started this go-around in 2005; and then

22   prior to that, I taught in -- let me think.  '89

23   and '90, those two school years.

24      Q.   When did -- did you go to Bishop

25   England?

1      A.  Oh, absolutely.

2      Q.  And when did you finish?

3      A.  '84.

4      Q.  I know your mother.

5      A.  Uh-huh.

6      Q.  Everybody who's passed those halls knows

7  your mom.  Maybe one day, they'll all know you;

8  but everybody knows your mother and has asked for

9  some kind of, you know, courtesy from us or help

10  from us.  She always gives it.

11          And what is your educational background

12  beyond high school?

13      A.  Graduated from Clemson in 1988, and I am

14  currently working on a Master's at Loyola

15  Marymount University in California.

16      Q.  Do you do that --

17      A.  Online, uh-huh.

18      Q.  Can you do the whole program online?

19      A.  You can.

20      Q.  Wow.  Have you ever been involved in

21  litigation, first of all, as a party?

22      A.  You're going to have to explain that.

23  Like I said, I've been deposed before.

24      Q.  No.  I know that.  I'm asking you if --

25  that's as a party in a lawsuit.

1        A.   Have I ever sued anyone?

2        Q.   Or been sued by anyone.

3        A.   No.

4        Q.   But you have been a witness, apparently,

5   in some kind of litigation?

6        A.   I was deposed, but that was as far as --

7        Q.   Oh, you didn't testify beyond that?

8        A.   No.

9        Q.   So you were a deponent in some kind of

10  litigation.

11       A.   Uh-huh.

12       Q.   Well, if you don't understand anything,

13  just say so.

14       A.   I will.

15       Q.   If you need anything, just say so.  Your

16  needs will be met.  I don't anticipate this

17  taking a great amount of time.

18            What does your husband do?

19       A.   He works at Total Wine.

20       Q.   Oh, yeah.  Okay.  Is that the one over

21  here?

22       A.   It's the one in West Ashley.

23            MR. RICHTER:  Isn't there one over

24  here?

25            MS. RICHTER:  There is now.

1    Q.  And how long has he been -- you say in
2  the wine business or in the retail business?
3  What do you say?
4    A.  Wine business for about four years.
5  Retail business since he went into the working
6  world.
7    Q.  When did you say you finished BE?
8    A.  '84.
9    Q.  '84.  And y'all had those at that time
10 I -- I've had children who went through similar
11 times.  But when you went through, y'all had
12 those nice, sort of, plaid uniforms?
13   A.  We did.
14   Q.  Did you save yours?
15   A.  It's hanging on the wall of my office.
16   Q.  Good for you.
17   A.  Uh-huh, uh-huh.
18   Q.  Good for you.
19        Can you tell me, please, about your
20 family here?  One of the things we have to be
21 concerned about is drawing a jury when we try
22 this case, and so I'm interested whether you have
23 relatives with a last name other than Bolchoz or
24 Tucker.
25   A.  Yes.  My -- I have cousins that are

```
1   Runeys.  Not Paul and his siblings but Billy
2   Runey was my uncle.  Corbett.  My sister was
3   married to a Corbett before Michael died.  She is
4   now Kennerty.  That's all that I can think of.
5   Tucker, obviously.  Those are all boys.  So
6   they're all Tuckers.  I think that's all that I
7   can call to mind.
8        Q.  Are you -- do you have any military
9   background?
10       A.  I do not.
11       Q.  Any criminal background?
12       A.  I do not.
13       Q.  Do you have any kind of disabilities?
14       A.  None that I know of.
15       Q.  Are you -- do you have any history of
16   disciplinary action by way of honor code
17   violations that got you suspended from school or
18   anything like that?
19       A.  No, I do not.
20       Q.  Now, can you describe your duties
21   generally at first for your current position; and
22   then we may break that down a little bit.
23       A.  Okay.  I work with students.  I work
24   with faculty members.  I work with things like
25   scheduling and calendars at the school in terms
```

1  of the administrative side of things.

2        If we have a student who's gotten into a

3  significant amount of trouble, that's when I,

4  typically, get involved.  My Dean of Students

5  deals with things and the other disciplinarians

6  deal with initial disciplinary issues; but if it

7  becomes, say, an academic integrity situation or

8  a suspension situation, then I get involved with

9  those.

10        With faculty, same sort of setup.  My

11  Academic Dean deals with most of the observations

12  and things of the faculty members.  If we have a

13  teacher that is not performing the duties that we

14  would hope that they would, if they're just not,

15  you know, doing as good a job as we would hope,

16  then -- then I will get involved, sit down, and

17  have a conversation with the Academic Dean and

18  the teacher, deal with evaluations of the

19  teachers at the end of the year.

20        Again, set up things like calendars and

21  schedules and things like that for both teachers

22  and students.

23     Q.  Are you a disciplinarian or the

24  disciplinarian?

25     A.  No.  I am involved in discipline, again,

1   once it gets to a higher level; but my Dean of

2   Students is really the main -- the primary

3   disciplinarian, and then there are also three

4   other disciplinarians as well.

5       Q.  Do you have responsibilities for

6   retaining records of the school?

7       A.  Only things that I'm involved with.  So,

8   again, if we have a child that's being suspended,

9   I keep that notification along with the

10  disciplinary probation information.

11          If we have a teacher that, you know,

12  needs to make changes in their scope of work; and

13  if there's a performance -- like a performance

14  plan that we put them on, then I keep those,

15  yeah.

16      Q.  Do you keep those in your own office, or

17  are they stored elsewhere?

18      A.  I keep those in my own office.

19      Q.  Somebody -- we -- we got documents

20  produced by the school, and somebody produced

21  three reports of activities in the --

22      A.  Right.  The lockers.

23      Q.  I don't know whether someone said this

24  or not; but I had on my mind that you had been

25  the one that, sort of, put your hand on that or

1    put your finger on those.

2         A.  I actually did reach out to my Dean of

3    Students to -- she really keeps those kinds of

4    records because those -- there's a summary, I

5    think, of the -- the wallet issue that -- that

6    she -- I believe she had that summary.

7              And then the two other issues with the

8    videoing or photographing of the two students, I

9    think -- I think I had one of the summaries, and

10   I think she had the other.  I'd have to check.  I

11   don't remember.

12        Q.  Other than those three, are there any

13   other such records?

14        A.  No.

15        Q.  Okay.  Thank you.

16             Can you explain to me, we asked for

17   those in June.

18        A.  Uh-huh.

19        Q.  And we were sent -- well, we asked

20   for -- well, we asked for a lot of stuff in June;

21   but we didn't get -- well, we asked for things

22   which would have included the faculty handbooks.

23   We got one, and then yesterday we got a bunch

24   more.

25        A.  Uh-huh.

1     Q.  Do you have any explanation for what the
2  delay was in us getting those?
3     A.  Those I don't keep on my computer.  My
4  Academic Dean keeps those 'cause she's the one
5  that makes adjustments and changes them as we go
6  from one year to the next.
7         Rich asked me to get those; and it
8  probably was, I don't know.  A month, six weeks
9  ago.  Could have been longer.  I have no idea.
10 And it was in a host of conversation about many
11 other things, and I forgot to go back to the Dean
12 and ask for those copies from her.
13        And then it occurred to me again -- I
14 think it was last week.  And so she sent all, you
15 know.  I don't know if she had 10 or 15 of them
16 on her computer that she forwarded to me, and
17 then I forwarded to Rich the next week.  Nothing
18 nefarious.  Just so --
19     Q.  No.  I understand what you're saying.
20        What I'm trying to understand is why you
21 weren't -- why there was a delay in asking y'all
22 to gather them up and find them.
23     A.  Right.
24     Q.  Mr. Finneran was very confident about
25 your time.  He said, "Oh, she can do that in a

1   day or so."

2        A.   Uh-huh.   But, again, those are not ones

3   that I keep.   Those are ones that Nancy keeps.

4   So I totally forgot to --

5        Q.   I heard what you said.   Excuse me.   I'm

6   talking over you.

7             Do you have any policy-making authority

8   at the high school?

9        A.   Singularly, no.   We have an

10  administrative team that, if there's going to be

11  a change of policy, that we discuss -- a lot of

12  policies that we deal with come straight from the

13  Diocese; but singularly, I don't make policy.

14       Q.   Do they come from the Superintendant of

15  Education or from someone else?

16       A.   I would say they come from the Catholic

17  Schools Office, and he is part of that office.

18  He is relatively new.   He started about a year --

19  maybe I guess a year, maybe not quite a year-and-

20  a-half ago.

21       Q.   Bill --

22       A.   Bill Ryan is his name.

23       Q.   Ryan?   I'm sorry.

24       A.   Prior to Bill it was Sandra Leatherwood.

25       Q.   Is she retired?

1        A.   No.   She's still there.   She just works
2   with accreditation business now; and Jackie
3   Zebrowski, who was the associate superintendent
4   for secondary schools, I believe, was her title.
5   And now she has a different title as well, but
6   they all work in conjunction with Bill in that
7   office.
8        Q.   We deposed Mrs. -- you said her name.
9        A.   Zebrowski?
10       Q.   No.
11       A.   Leatherwood?
12       Q.   Leatherwood.   And we deposed
13   Miss Leatherwood, and at that time -- this has
14   been a couple years ago.   At that time, I think
15   she had been 44 years or something --
16       A.   Uh-huh.
17       Q.   -- in the education system --
18       A.   And she's still there.
19       Q.   -- of the Diocese.
20       A.   Uh-huh.
21       Q.   When are disciplinary records of
22   students destroyed?
23       A.   Typically -- I know we're talking about
24   just the hard copy version of them.   Within a
25   year of graduation.

```
 1        Q.   After graduation?

 2        A.   Uh-huh, oh, yeah.

 3        Q.   So does that mean that if a student is a

 4   freshman, starts accumulating a record -- if I

 5   can say it that way -- you'd maintain that

 6   freshman, sophomore, junior, senior, and then a

 7   year after that even?

 8        A.   Right.

 9        Q.   Do you retain paper hard copies, or are

10   those electronically maintained?

11        A.   The -- the paper copy, when a -- when a

12   teacher writes a referral, it's on a triplicate

13   form; and one of those forms is retained by the

14   disciplinarian.  So that's what I'm talking about

15   being, you know, destroyed within after a year of

16   graduation.

17             The electronic file is kept -- to be

18   honest, we have changed student information

19   systems so many times over the last couple of

20   years that, you know, just because of different

21   inadequacies on the parts of different systems

22   that we've tried.  But that information does not

23   roll over; and so the system that we're using

24   now, which is Facts SIS -- it used to be RenWeb.

25   We have been using that for two years.
```

1          So we have that information on these
2   current kids in the system now, but it doesn't --
3   it doesn't pull over from, I think, MNS was the
4   system before that.
5          Q.  So you missed all that part of several
6   systems?
7          A.  Uh-huh, uh-huh, yes.
8          Q.  I see.  There's no paper records?
9          A.  From the -- like I said, the triplicate
10  form is the paper form.
11         Q.  For the write-up initially.
12         A.  Right, right.
13         Q.  And that would be true in every incident
14  of the four years of this guy's unglamorous
15  career that we've been talking about awhile ago?
16         A.  Yes.  So if he starts as a freshman and
17  continues through his senior year, there's a
18  freshman disciplinarian.  Typically, we have four
19  different disciplinarians, one for each year.  So
20  the freshman disciplinarian deals with those
21  discipline issues that year.  He files them in an
22  accordion file alphabetically.  Those paper
23  copies in those get passed to the sophomore
24  disciplinarian and then to the junior, then to
25  the senior.

1    Q.  Why were the parents and/or tuition

2  payers of Bishop England students -- from the

3  beginning of the new school over here on Daniel

4  Island, why were they not notified that there

5  were viewing windows in each of three locker

6  rooms?

7    A.  I don't know.

8    Q.  Did you ever discuss that with anybody?

9    A.  No, I don't.

10    Q.  If you had children who were made to

11  change clothing and you knew, perhaps, in front

12  of a 4 foot x 4 foot window at school and people

13  could see them, would you not want to know that?

14    A.   I do have children that went through

15  Bishop England on the current campus and -- and

16  it has never even crossed my mind.

17    Q.  Does that mean you would not have cared

18  that people could look at your naked children --

19  let me get the question out.  That people could

20  look at your children naked through a 4 foot x

21  4 foot viewing window --

22            MR. DUKES:  Object to the form.

23    Q.  -- in the locker room?

24    A.  Could you repeat that?

25            MR. RICHTER:  Sure.  Would you mind

1 reading that back, Madam.

2          (The pending question was read back by

3 the reporter.)

4     A.  No, I wouldn't say that.  If I knew that

5 someone was looking at them, I would certainly be

6 concerned.

7     Q.  How about is it not enough to know that

8 they're subject to be looked at through a 4 foot

9 viewing window?

10     A.  Like I said, my student -- my children

11 did go through there and played sports; and so,

12 again, knowing that they were in those locker

13 rooms and knowing that those windows were there

14 as a parent, I was aware of it, yes.

15     Q.  And so are you saying it was okay with

16 you that your children were made to --

17     A.  What I'm saying -- I'm sorry.  Go ahead.

18     Q.  Let me just get the question out.

19          Are you saying that you had no objection

20 to your children, while students at Bishop

21 England High School, being made to disrobe in

22 front of a window through which someone can look

23 at them?

24     A.  Trying to see if that's a yes or a no

25 answer.  I know that my children used those

1  locker rooms and that there were windows there.

2  That's --

3      Q.  I'm trying to -- I asked more than --

4  that was not the question.  I can just read it

5  back to you.

6      A.  Okay.

7      Q.  Are you saying that you had no objection

8  to your children, while students at Bishop

9  England High School, being made to disrobe in

10  front of a window through which someone can look

11  at them?

12      A.  They weren't made to disrobe.

13      Q.  They were not in the -- that's not what

14  the locker room's for?

15      A.  No.  But your -- sounds as though you're

16  suggesting that someone made them disrobe in

17  front of a window intentionally so that they

18  could be viewed.

19      Q.  I'm suggesting that basic hygiene would

20  dictate that if your children are going in that

21  dressing room for PE class, let's say, and it's

22  hot and they're going to go outside and run a

23  mile, that they change their clothes into

24  something they could run in.

25      A.  Right.

1    Q.  And then come back and clean up after

2    that and re-dress.

3    A.  Right, uh-huh.

4    Q.  That's what I'm saying.

5    A.  Right.

6    Q.  That's all I'm saying.

7    A.  Okay.

8    Q.  Not that anybody took a whip to them or

9    anything else.  I'm just trying to understand

10   you, not the children, why that's okay with you.

11   A.  Well, they're in there with their

12   classmates; and they're all -- all in there

13   together changing their clothes.  So they know

14   what they're doing.

15        Do I -- would I condone someone looking

16   at them?  You know, I guess I can't understand

17   where you're going with the question.

18        I know my kids were in there.  I know

19   they were changing clothes, and I know there was

20   a window in the coaches' office.

21   Q.  And you're satisfied to expose your

22   children to that?

23   A.  I am satisfied?  Yes.

24   Q.  Now, were your children viewed?

25   A.  Not to my knowledge.

1    Q.  Do you understand they might have been

2    and you not know it?

3                  MR. DUKES:  Object to the form.

4    A.  I know that there's a window in the

5    locker rooms, yes.

6    Q.  Do you not know that they may have been

7    viewed and you not be aware of that?

8                  MR. DUKES:  Object to the form.

9    A.  And so what is the question?

10   Q.  That's the question.  Do you not know

11   that they may have been viewed and you not be

12   aware of that?

13   A.  Do I not know?  Say it again.

14   Q.  The question was:  Do you not know that

15   they may -- your children may have been viewed

16   and you not be aware of that?

17   A.  Yes.

18   Q.  You do know that?

19   A.  I -- I know that they were in the locker

20   rooms, and there are windows in the locker rooms.

21   Q.  Through which they may have been viewed?

22   A.  Yes.

23   Q.  Now, what can you tell me are the

24   protocols about the people who sit in their

25   coaches' offices -- some of them are close in

1  distance to those windows that we're talking

2  about.  What is the protocol concerning viewing

3  of the children in the locker room?

4       A.  I don't know.

5       Q.  There's 700 children there; right?

6       A.  About 725.

7       Q.  Yeah.  And you may not care whether your

8  children get looked at nude.  Does it occur to

9  you that the other 724 sets of parents may very

10 much be concerned that their children are exposed

11 to being viewed nude in a Bishop England High

12 School locker room?

13            MR. DUKES:  Object to the form.

14      A.  Okay.  So what is the question?

15            MR. RICHTER:  Read it back, please,

16 Madam Reporter.  I was wrong about how long this

17 is going to take.  It's going to take a lot

18 longer than what I said a while ago.

19            (The pending question was read back by

20 the reporter.)

21      A.  It does occur to me.

22      Q.  And do you not feel that you have a

23 responsibility, as the second in command at

24 Bishop England High School, to insulate those

25 children from the indignity of being made to get

1    nude in front of a window?

2              MR. DUKES:  Object to the form.

3         A.  There were blinds in front of those

4    windows --

5         Q.  So what?

6         A.  Can I finish my statement?

7         Q.  Oh, I'm sorry.  I thought you were --

8    yes.

9         A.  There were blinds in front of those

10   windows that were closed.

11        Q.  How do you know they were closed?

12        A.  Every time I saw those windows, those

13   blinds were closed.

14        Q.  How many times did you see the windows?

15        A.  I have no idea.

16        Q.  Did you see them every day?

17        A.  No.

18        Q.  Did you see them every week?

19        A.  Yes.  Probably.

20        Q.  By going in the coaches' offices?

21        A.  Right.

22        Q.  What do you go in the coaches' offices

23   for?

24        A.  Any one of a number of things.  To talk

25   to a -- to talk to coach.

1          Q.   We get as much time --

2          A.   Right.

3          Q.   Start at the top and go to the bottom.

4    Why do you go in coaches' offices?

5          A.   To talk to a coach.

6          Q.   About what?

7          A.   I don't remember.

8          Q.   And how frequently do you do that?

9          A.   It just depends on the business of the

10   day.

11         Q.   And if a guy is delivering a birthday

12   cake to a coach, delivering it --

13         A.   It goes to the main office.

14         Q.   And if the electrician goes into the

15   coaches' office to fix a faulty light switch, can

16   he not see through those windows?

17              MR. DUKES:   Objection.

18         A.   He would -- he would be accompanied by

19   our Director of Maintenance.

20         Q.   So when the janitor comes in every

21   afternoon, who accompanies him?

22         A.   He goes by himself because he's an

23   employee.

24         Q.   And why is he not accompanied?

25         A.   Because he's an employee.

1      Q.   Well --

2      A.   Into the coaches' office?

3      Q.   Yeah.

4      A.   He goes by himself.

5      Q.   So anybody who's an employee does not

6   get accompanied?

7      A.   No.

8      Q.   They do not get accompanied?

9      A.   They do not get accompanied.

10     Q.   Thank you.  Like Scofield, for example,

11  he didn't get accompanied, did he?

12     A.   Right.

13     Q.   And he looked through the windows,

14  didn't he?

15     A.   He did.

16     Q.   And you don't know who else looked

17  through the windows, do you?

18     A.   I do not.

19     Q.   And the fact of the matter is:  Someone

20  can stand in the hall and look through the

21  coaches' door window, small window, over the

22  coaches' head and through the blinds into the

23  locker room?

24     A.   No.  I do not know that to be a fact.  I

25  just stated it was a fact of the matter.  No, I

1  do not believe that.

2      Q.   What would prevent it?

3      A.   The blinds being closed.

4      Q.   Suppose they're not closed.

5      A.   I don't -- I have never seen the blinds

6  not closed.

7      Q.   But you don't see the blinds every day,

8  do you?

9      A.   I -- all I can answer is to what I know,

10 and I've never seen --

11     Q.   And you know whether you've seen the

12 blinds every day, and you must answer that

13 question.

14     A.   I do not see the blinds every day.  All

15 I'm telling you is what, in my experience, when I

16 have seen those windows, those blinds have been

17 closed.

18     Q.   Why were the windows taken out in

19 these -- each of these three locker rooms?

20     A.   As best I recall on my dates, the

21 Jeffrey Scofield situation happened in May of

22 2019.  You had come and taken pictures of the

23 windows.  I don't remember when that was.  I feel

24 like it was the summer.  June or July maybe of

25 2019.

1        Q.  It was May.

2        A.  It was May?

3        Q.  Wasn't the summer.  I think it was May.

4   I'm not sure.

5            MS. RICHTER:  It was May.  I think

6   it was the 14th.

7        Q.  May.  Fairly shortly after the event.

8        A.  Okay.  And we waited until it was August

9   of 2020.  We had plywood that had been put up in

10  the windows immediately after the situation

11  happened.  We had parents, obviously, immediately

12  were concerned over the whole situation and were

13  upset about it, which was understandable.

14           So we initially covered them with

15  plywood.  The plywood did not look great.  We

16  left it there for the 15, 16, 15 months,

17  something like that, and then determined that it

18  was time to take the windows out and simply cover

19  them completely.

20       Q.  And, of course -- I don't remember the

21  date of the spoliation letter.  Mr. Finneran --

22  I'm not going to -- we're going to try to avoid

23  duplicating work that we've already done the best

24  we can.

25           On May the 7th.  I knew that was a date.

1  Are you aware that I wrote this letter to

2  Mr. Finneran and Bishop Guglielmone saying,

3  "Don't tamper with the evidence.  You're required

4  to preserve it"?

5       A.  So am I aware that you sent this?  I am

6  now that I read it.

7       Q.  Till today you were not aware of?

8       A.  I don't know.  Two years is a long time.

9  I may have seen it before, but I don't recall

10 having seen it.

11      Q.  It wasn't sent -- it wasn't emailed

12 directly to you.

13      A.  Okay.

14      Q.  It was emailed directly to other people,

15 but not to you.

16      A.  Uh-huh.

17      Q.  But my question, what I'm trying to find

18 out is:  Who made the decision to take the

19 windows out?

20      A.  I guess I'm not seeing in here anything

21 about not taking out the windows.

22      Q.  Did you have a chance at lunchtime to

23 discuss that with anybody?

24      A.  I can read the --

25           MR. DUKES:  I'm going to instruct

1  her not to answer that question.  It's covered by

2  attorney-client privilege.

3       Q.  I'm not asking you about your lawyer.  I

4  don't want to know what your lawyer said to you.

5  I know the kind of things he says to people.

6       A.  That seems, sort of, threatening.

7       Q.  Don't feel threatened.  I'm simply

8  asking you a question.

9       A.  Okay.  Which is?

10      Q.  Which is, did you discuss this before

11 coming into this deposition with anybody where

12 you -- this issue that you just raised in this

13 somehow doesn't use the word "window" or whatever

14 it is that you said a moment ago?

15           MR. DUKES:  To the extent he is

16 inquiring into anything that you and I discussed,

17 I'm instructing you not to answer that question.

18      Q.  Are you refusing to answer that

19 question?

20      A.  I am.

21      Q.  Thank you.  Let me get this back,

22 please.

23           Do you -- has anybody ever explained to

24 you the consequence that can come to those who

25 violate spoliation --

1      A.  No.

2      Q.  -- letters?  Okay.

3           And to the parties in this litigation --
4  I don't remember the names of all the parties --
5  but the parties in the litigation, did anybody
6  explain to you that they can incur consequences
7  at the hand of the federal judge once he learns
8  that this has been disregarded?

9      A.  No.

10     Q.  Well, I represent to you that that's the
11  truth.

12          MR. DUKES:  Object to the form.

13          MR. RICHTER:  That's not a
14  question.  It's a representation.

15     Q.  Now, have your children ever been looked
16  at by persons other than their care providers in
17  their homes in a state of nudity --

18          MR. DUKES:  Object to the form.

19     Q.  -- to your knowledge?

20     A.  Not to my knowledge.

21     Q.  And is there any circumstance, other
22  than medical care and that sort of thing, any
23  circumstance in which you can testify, as you are
24  doing under oath here today, that it's okay to
25  look at children who are disrobed?

1      A.  No.

2      Q.  And why did you do it?

3      A.  I didn't do it.

4      Q.  You didn't do it.  You're not a

5  representative of Bishop England High School?

6      A.  I am a representative of Bishop England

7  High School.  I didn't look at anyone nude.

8      Q.  I understand what you're saying.

9      A.  Okay.

10     Q.  Why did Bishop England High School do

11  it --

12          MR. DUKES:  Object to the form.

13     Q.  -- Madam Representative of Bishop

14  England High School?

15     A.  I don't know.

16     Q.  Did you ever ask anybody?

17     A.  Ask anybody what?

18     Q.  Why did you do that?

19     A.  No, I did not ask anybody that.

20     Q.  It was clearly a bad idea, wasn't it?

21          MR. DUKES:  Object to the form.

22     A.  What are we talking about?  Could you be

23  more specific?

24     Q.  In viewing windows and looking through

25  them.

1     A.   Oh, I don't know.

2     Q.   You don't know whether it was a bad idea

3 or no?

4     A.   No.  I don't know why it was done.

5     Q.   That was not my question.  That was my

6 earlier question.

7     A.   Okay.

8     Q.   The last question was:  I asked you,

9 "Did you ask anybody about that?  Why it was

10 done?"  And then I asked you, "Did you ever ask

11 anybody about that?"  "No, I did not ask anybody

12 about that."  That was your answer.

13          Then we -- then I said, "It was clearly

14 a bad idea, wasn't it?"  That's what the question

15 was --

16     A.   What is the "it"?  What is the "it"?

17     Q.   What we're talking about here.

18     A.   Which is what?

19     Q.   You want me to read this to you again?

20     A.   That's fine.

21     Q.   What is your degree in from college?

22     A.   Why?

23     Q.   'Cause you're under oath and have to

24 answer under oath right now.

25     A.   Political science and French.

1    Q.   Not English.

2    A.   Not English.  Political science and

3 French.  "It" as a pronoun is very amorphus.

4    Q.   Here's what we're talking about,

5 beginning with this question:  Why did Bishop

6 England High School -- I asked if there was any

7 circumstance under which it was acceptable to

8 look at children, other than medical treatment

9 and care and that sort of thing.

10    A.   Uh-huh.

11    Q.   Any circumstance in which it was okay to

12 look at children nude.  You said no.

13         Do you recall that?

14    A.   I do recall that.

15    Q.   Then I said, "Then why did you do it?"

16 And you said, "I didn't do it."  By that you

17 meant -- you clarified I didn't -- I was not a

18 viewer.

19    A.   Right.

20    Q.   And we talked about the fact that you're

21 a representative of Bishop England High School,

22 but you didn't look at anybody nude.

23         Why didn't -- here comes the meaningful

24 exchange.

25         Question, why did Bishop England High

1    School do it?

2         Mr. Dukes objected to that.  He doesn't

3    want you to answer that, but you have to.

4         And your answer was, I don't know.

5         And then the next question was:  Did you

6    ever ask anybody?

7         Your answer was, ask anybody what?

8         And I said -- repeated the question.

9    Why did you do that?

10        And you said, no, I didn't ask anybody

11   that.

12        And then I said, it was clearly a bad

13   idea, wasn't it?

14        And you said, what are we talking about?

15   Could you be more specific?

16        A.  So it was clearly about an idea not to

17   ask anyone that?

18        Q.  No.  To look at children through 4 foot

19   viewing windows in a locker room.

20        A.  Yes.

21        Q.  And it took y'all how long to figure

22   out -- after the Scofield incident was

23   discovered, how long did it take you after that

24   to realize that those viewing windows were a bad

25   idea?

1          MR. DUKES:  Object to the form.

2      A.  We took -- we covered the windows

3  immediately, as soon as we found out about

4  Jeffrey Scofield.

5      Q.  That's what I thought you said.  Close

6  to that a while ago, I think you said.

7          And they had been put in in 1998;

8  correct?

9      A.  I assume so when the building was built.

10     Q.  We've have documentation about all that.

11     A.  Uh-huh.

12     Q.  What I guess I'm trying to ask you is:

13 If it was a good idea from 1998 through early May

14 of 2019, which is 21 years, if it was a good idea

15 for that period of time, why was it all of a

16 sudden a bad idea to have those windows?

17     A.  Because it was brought to our attention

18 they were misused.

19     Q.  So nobody at the school ever made an

20 effort to figure out are these necessary to run

21 our school?  4 foot viewing windows in three

22 dressing rooms?

23     A.  I don't know.

24     Q.  You never thought of it?

25     A.  No.

1        Q.   And you never were a part of any
2    conversation about it?
3        A.   No.
4        Q.   Now, do you know -- you've never
5    discussed this with the principal, Mr. Finneran?
6        A.   Discussed what?
7        Q.   The viewing windows in Bishop England
8    High School, three bathrooms, 4 foot x 4 foot
9    viewing windows, students naked on the other
10   side, staff members or coaches on the other?
11       A.   We discussed it at length as soon as the
12   Jeffrey Scofield issue was brought to our
13   attention.
14       Q.   And what did he say made it okay?
15       A.   He didn't say it was okay.
16       Q.   What did he say?
17       A.   We talked about covering windows, which
18   we did.
19       Q.   Does "covering windows" mean something
20   other than getting rid of this viewing portal?
21       A.   Well, initially we covered the windows
22   with plywood; and then 15 months later, we had
23   the windows taken out and bricked over.
24       Q.   You lost the utility of the windows when
25   you put plywood over it; right?

1          A.   Yes.

2          Q.   Couldn't look through those windows

3    anymore because they're blocked by plywood?

4          A.   Unless the plywood came down, yes.

5          Q.   But it didn't come down.  Y'all left it

6    up to obscure the view into the locker rooms.

7          A.   Yes.

8          Q.   That's what I'm asking about.

9          A.   Okay.

10         Q.   What -- did Finneran ever express that

11   this was okay because of whatever reason he gave

12   you?  I don't know that reason, if he gave one;

13   but that's what I'm asking you about.

14              Did he ever make such an expression?

15         A.   I'm sorry.  Did he make an expression

16   that what?

17         Q.   Give us the question.

18              What did Finneran ever express that

19   this -- that this is okay -- was okay because of

20   whatever reason he gave you?  And, again, I don't

21   know what -- if he gave a reason, what the reason

22   was.

23              I don't know that reason if he gave one,

24   but that's what I'm asking you about.  Did he

25   ever make such an expression, say that these

1   viewing windows were okay?

2       A.   Not to my knowledge, no.

3       Q.   Did he ever express that they're not

4   okay, we need to cover these up?

5       A.   Once the Jeffrey Scofield situation

6   happened, yes.

7       Q.   What did he say?

8       A.   I don't remember exactly.

9       Q.   Who did he say it to?

10      A.   I don't remember.

11      Q.   Where did this conversation take place?

12      A.   I don't know.

13      Q.   You may be able to answer that.  I'm not

14  sure.  We'll see.

15          Is it okay with your husband that his

16  children are viewed nude?

17      A.   I can't answer that for him.

18      Q.   You don't know that.

19      A.   I -- I'm sure I do; but that's a

20  question for him, not for me.

21      Q.   Well, no, it's to you.  I pose that to

22  you.  If you don't know, you can say "I don't

23  know."  But you just said you do know.  That

24  means you have to answer the question.

25      A.   I would think that he would not be okay

1    with that.

2        Q.  And that's not new knowledge to you,

3    that understanding?

4        A.  That's not.

5        Q.  I mean, that's from 30 years married

6    now.

7        A.  Right.

8        Q.  I'm going to assume a courtship before

9    that.  You know him.

10       A.  I do.

11       Q.  Did he ask you why did y'all have those

12   windows in there?

13       A.  He did not.

14       Q.  And what is the policy at Bishop England

15   High School today about monitoring locker rooms?

16   First monitoring them.  And then we'll go on to

17   some other stuff.

18       A.  You know, the expectation is that, for

19   example, our PE teachers stand close to the doors

20   so they can hear if there's anything going on

21   that, you know, if you could hear if a fight is

22   happening or something like that.  They stand at

23   the doors to remind the kids to hurry up and

24   holler in there and things like that.  Is that

25   what you're looking for?  Is that --

1      Q.   I'm just looking for the truth.

2  Whatever you --

3      A.   That's the truth.

4      Q.   That's what I want.  I want to know what

5  the policy is of Bishop England.

6      A.   That's the policy.

7      Q.   And then I want to ask you where I can

8  go to read it.

9      A.   The faculty staff handbook has all of

10  that type of information in it.  Those ones that

11  you got.

12      Q.   Page 42.

13      A.   I don't know the pages.

14      Q.   And who promulgated that policy?

15      A.   Who created it?  That's relatively new

16  policy in terms of having two, you know, male

17  faculty members at the male PE door, two female

18  faculty members at the PE door if there's a -- if

19  there's an issue.

20           So I would -- and I'm -- I would have to

21  check this to be sure, but the Diocese originally

22  came up with that wording within the last handful

23  of years.  I don't know exactly when it was.

24      Q.   July of 2018 --

25      A.   Okay.

1      Q.   -- is the answer.

2      A.   Okay.   Thank you.

3      Q.   And do you know who promulgated that

4   policy?  What individual, if it was an

5   individual?

6      A.   I -- when you say "promulgated," who

7   actually typed it in?  Wrote it down?  Probably

8   Jackie Zebrowski but --

9      Q.   I'm not asking who did the staff's

10  stenographic work on it.

11     A.   Okay.

12     Q.   I'm asking who promulgated with it?

13  Came up with it, articulated it.  Says, "This is

14  our policy.  I have the right to make it."

15     A.   That policy came from the Diocese.  The

16  one specifically you're talking about.

17     Q.   The Diocese is not a who.  Who in the

18  Diocese came up with it?

19     A.   That's what I say.  Jackie Zebrowski, I

20  think, was still associate superintendent for

21  schools, secondary schools; but anything she

22  would have done would have gone through Sandra

23  Leatherwood at that point and would have gone

24  through the Vicars General at that point.

25     Q.   How many Vicars General were there at

1  that time, July of 2018?

2      A.  Two.  I -- I know there was at least one

3  because that was Monsignor Harris.  Monsignor

4  Groves was promoted to Vicars General, but I

5  don't know when that was.

6      Q.  But maybe those two?

7      A.  Uh-huh, yes.

8      Q.  And does a Vicar General have the

9  ability to promulgate policy for the Diocese of

10  Charleston?

11      A.  That I don't know.

12      Q.  Do you understand the concept of

13  invasion of privacy or usurpation of privacy?

14          MR. DUKES:  Objection to form.

15      A.  I believe that I do.

16      Q.  You have a right to your privacy.  I'm

17  sure you must understand that.

18      A.  I do.

19      Q.  And if I do something to invade that

20  privacy, do you understand that I commit a wrong

21  against you?

22      A.  I do.

23      Q.  And do you understand that you're

24  entitled to be compensated for that wrong being

25  committed against you?

 1               MR. DUKES:  Object to the form.

 2      A.   I don't know that to be the case but --

 3      Q.   Well, if I look at you changing your

 4  clothing, do you think that I should not

 5  compensate you for doing that?

 6      A.   I don't know.

 7      Q.   I wonder if you can answer this, please.

 8           Is it a part, at least, of your job to

 9  ensure the safety and welfare of the students who

10  were entrusted to you and others at Bishop

11  England High School?

12      A.   Yes.

13      Q.   And, in fact, Bishop England publicly

14  touts that it has many beneficial things for its

15  students; right?

16      A.   Right.

17      Q.   One of those things is that -- Bishop

18  England has a mission statement, doesn't it?

19      A.   It does.

20      Q.   I'm going to read to you from that

21  mission statement.  Then I want to ask you a

22  question too about it.

23           "The school endeavors to promote the

24  spiritual, intellectual, and physical growth of

25  the individual through the combined efforts of

1  parents, guardians, and faculty by establishing

2  the best possible environment for learning, a

3  climate of safety, trust, respect for the

4  individual, and an appreciation for the

5  acquisition of learning."

6          I'd like for you to tell me how looking

7  at students being less than fully clothed creates

8  respect for that individual.

9          MR. DUKES:  Object to the form.

10    A.  I -- I don't know the answer to that.

11    Q.  Well, how can it?  Can it -- does it

12  speak respect for the individual student?

13    A.  I -- again, I don't know the answer to

14  that.

15    Q.  Well, what do you do there?  I mean,

16  you're vice principal, aren't you?

17    A.  Associate principal.

18          MR. DUKES:  Object to the form.

19    Q.  If you see people looking through a

20  window watching students changing clothes, do you

21  stop that?

22    A.  I have never seen that.

23    Q.  That's not my question.  If you do see

24  that, is that a thing you stop?

25          MR. DUKES:  Object to the form.

1       A.   So you're saying, hypothetically, if I

2   saw someone looking through a window, which I

3   have never done, at students that were nude, yes,

4   I would stop that.

5       Q.   Why?

6       A.   Because it's not the right thing to do.

7       Q.   It's reprehensible, isn't it?

8       A.   I don't know.

9       Q.   You don't know whether that's

10  reprehensible?

11      A.   No.

12      Q.   If that's your testimony under oath

13  today, so be it.

14           Now, have you ever taught your children

15  that someone violating their privacy by viewing

16  them surreptitiously -- or directly not

17  surreptitiously -- nude is a reprehensible thing?

18              MR. DUKES:  Object to the form.

19      A.   Have I ever directly taught my children

20  that?

21      Q.   Yeah.

22      A.   I don't know if I've ever used the word

23  "reprehensible" with them.

24      Q.   I'm not asking you if you quoted to them

25  the same language that I just stated to you.

1      A.   Okay.

2      Q.   I guess we can go back to Square No. 1.

3  We'll just walk through the whole thing.

4           You have four children.

5      A.   I do.

6      Q.   Who taught them morals?

7      A.   My husband and I.

8      Q.   You were intimately involved in that,

9  weren't you?

10     A.   My husband and I, yes.

11     Q.   That's not my question.  You were

12  intimately involved in that, weren't you?

13     A.   Absolutely.  Absolutely.

14     Q.   Now, did you teach your children to

15  respect the privacy of others?

16     A.   I assume so.  I -- I -- yes.  I don't

17  know what we're getting at.

18     Q.   We're getting at a truthful answer to

19  each question --

20     A.   Uh-huh, right.

21     Q.   -- as it's posed.

22     A.   Right.

23     Q.   And I want to know if you taught your

24  children to respect the privacy of others?

25     A.   I -- I don't know.  I guess it depends

1  on what your definition of "explain to them the

2  privacy of others" is.

3        Q.  Well, what did you tell them about

4  looking at others when those others were in a

5  private place or engaged in a private --

6        A.  I did not tell them anything about that.

7        Q.  -- or engaged in a private activity?

8        A.  I did not tell them anything about that.

9        Q.  So as far as your children know, walking

10  in a bathroom that somebody's using is an okay

11  thing.  Is that a fair statement?

12        A.  No.  I think it's common sense they

13  would know not to do that.

14        Q.  Even at Bishop England, it would be

15  common sense.  Fair enough?

16        A.  Not to walk into a bathroom when

17  someone's using it?

18        Q.  Yes.

19        A.  Yes.

20        Q.  Why is that?  Why is that any different

21  than a locker room?

22              MR. DUKES:  Object to the form.

23        A.  Why is using the restroom different from

24  using --

25        Q.  No.  Going in and seeing people in the

1   restroom, why is that different from seeing

2   people in the locker room?

3        A.  I don't know.

4        Q.  Do you think it's a safe environment for

5   children to have to change before a viewing

6   window?

7        A.  I think that having the viewing windows

8   there in case of a situation that was a fight,

9   something like that, that's where there's safety

10  in having those windows there.

11       Q.  Are you today -- is Bishop England, not

12  you -- but as Bishop England today protecting the

13  students and providing them a safe place to be?

14       A.  Yes.  We do everything that we can to

15  provide them a safe place to be.

16       Q.  And while the windows were in place, was

17  Bishop England providing the students a safe

18  place to be?

19       A.  Yes.

20       Q.  Then why did you change them?

21       A.  Because once we found out about the

22  Jeffrey Scofield issue, we determined that those

23  windows were not the -- were not necessary and

24  needed to be covered up.

25       Q.  Were not necessary?

1      A.   Uh-huh.

2      Q.   What is it about the Scofield incident

3  that is any different from the fact that every

4  single day since 1998, the beginning of school in

5  1998, children had to parade before those windows

6  in various states of nudity?

7           MR. DUKES:  Object to the form.

8      Q.  What's the difference that made you

9  realize you had to get rid of these windows?

10     A.   Because he -- he did what he did.  He

11  viewed the kids with, you know.  I don't know

12  what his purpose was, but in the way that he

13  recorded the kids.  We determined that was --

14  they were not -- they shouldn't be there any

15  longer.

16     Q.   He put that recordation on a Bishop

17  England device, didn't he?

18     A.   He -- no.  He put it on his phone; and

19  when he set up the iPad, he used his personal

20  Gmail account.  I don't know anything about

21  setting up iPads and such, but he used his

22  personal Gmail account to set up the iPad.  I

23  guess when this happened, his phone and

24  everything on it dumped onto that iPad.

25     Q.   Say that last part again.  I'm sorry.  I

1    missed every word.

2        A.  I guess they synced.  His phone and the

3    iPad synced because he used his personal Gmail

4    account to set up that iPad; and so whatever was

5    on his phone, then, carried over to the iPad.

6        Q.  Because it was plugged into his phone?

7        A.  I don't think so.  I think it just -- I

8    don't know.  I'm not that technologically savvy;

9    but because the same email address was used to

10   set up the iPad and was used, I guess, on his

11   phone, pictures, videos then that were on his

12   phone were also viewable on the iPad.

13             MR. DUKES:  We just need to bring

14   in a 10-year-old to explain it to us all.

15             MR. RICHTER:  They can do it.

16             MR. DUKES:  Can we take two

17   minutes?

18             MR. RICHTER:  Yeah, sure.  You

19   can't -- I think I told you this.  I'm required

20   to.  You're not allowed to speak about your

21   testimony on breaks.

22             (Recess taken 1:48 p.m. to 1:57 p.m.)

23   BY MR. RICHTER:

24       Q.  The windows at Bishop England are now

25   actually cement blocked up, aren't they?

1      A.  Cinder blocked.

2      Q.  Cinder blocked.  Whatever you call it

3   now.

4          Are the students safe in there now, in

5   the dressing rooms now?

6      A.  I believe they are safe.

7      Q.  Then why did you need windows there?

8      A.  I don't know why the windows were put

9   in.

10     Q.  I'm asking you why the school needed

11  windows there if the children are safe in the

12  locker rooms without there being windows?

13     A.  I don't know.  I don't know.

14     Q.  Do you agree that the windows were

15  unnecessary as is evidenced by the fact that

16  children are safe in there now, or you wouldn't

17  put them there behind --

18              MR. DUKES:  Object to the form.

19     Q.  -- a solid wall?

20              MR. DUKES:  Object to the form.

21     A.  No.  I agree that we took the windows

22  out because of what Jeffrey Scofield did.

23     Q.  That's not the question.

24     A.  Okay.

25     Q.  Do you agree that the windows were

1  unnecessary as evidenced by the fact that

2  children are safe in there now, or you wouldn't

3  put them there?

4      A.  No, I don't agree with that.

5      Q.  Behind it -- may I finish the sentence?

6  Behind a solid wall.  You don't agree with that?

7      A.  I don't agree with that.

8      Q.  What is it you disagree with?

9      A.  Let me see.  So I don't agree that

10 they -- I agree that they are safe now.  Yes.

11 But do I agree that the windows were unnecessary?

12 I can't -- I can't answer that because I don't

13 know what the rationale was to put them in there.

14 I didn't make the decision to put the windows in

15 when the school was built.

16     Q.  So what did the windows provide to

17 enhance the safety of the children that --

18     A.  If there was a fight -- sorry.

19     Q.  Let me just finish the question.  Let me

20 get the question on the record.

21         What did the windows provide by way of

22 enhancing the safety of the children that is not

23 provided by the solid brick or block wall that's

24 in place now?

25     A.  Right.

1              MR. DUKES:  Object to the form.

2       A.  You know, if there was -- I mean, I

3  would assume that you would be able to hear

4  better through -- through glass than a cinder

5  block wall, perhaps.  If there was a fight going

6  on or some sort of bullying going on that could

7  then be addressed because somebody could see it

8  through the window.

9       Q.  Then if you lessened the safety of the

10  children by blocking up the wall, taking away the

11  window that you could see the fight you just

12  referenced as it began, why would you do that?

13       A.  Because of what Jeffrey did.  Scofield.

14       Q.  So you -- okay.  Now, you can't testify,

15  can you, that nobody before Jeffrey Scofield

16  videoed nude children in the dressing room?

17       A.  Can I testify --

18              MR. DUKES:  Object to the form.

19       A.  No, I can't testify that anybody did or

20  did not.

21       Q.  That's what I was trying to say.

22       A.  Uh-huh.

23       Q.  Now, what -- when you get a report of

24  some sexual transgression against one of your

25  students at BE, what do you do?  What happens at

1  that point?

2      A.  All right.  So what do you mean by

3  "sexual transgression"?

4      Q.  The worst case scenario is rape.

5      A.  No.  That's never happened.

6      Q.  Well, what kind of sexual events get --

7  have been reported to you concerning students at

8  Bishop England High?

9      A.  The most -- the most recent thing that's

10 probably the only thing I can think of in terms

11 of a sexual nature is, unfortunately, students

12 sexting, sending pictures, you know, nude,

13 partially nude pictures of themselves to another

14 student.

15     Q.  In the school?

16     A.  I don't know.  No.  The --

17 unfortunately, the ones that I've seen, the

18 pictures are not taken at school; but they're

19 brought to our attention at school, and we dealt

20 with it at school.

21         But, no, it was -- if -- if one student

22 sent something to another student or one student

23 requested, "send me nudes," that sort of thing,

24 that's the type of thing that we have had to deal

25 with.

1       Q.   How do you learn of that?

2       A.   Sometimes a parent will intercept a -- a

3  text message or something like that.  Sometimes

4  parents have the capability to, you know,

5  surreptitiously view what the child is sending

6  through their phone, whatever.

7            So it'll be a parent saying, "This child

8  is asking my child for nude pictures."  Sometimes

9  it'll be another student.  Sometimes kids are

10 brilliant enough to put things up on Snapchat

11 which, you know, is supposed to go away rather

12 quickly; but somebody can screenshot something.

13 So there again, far more savvy technologically

14 than we are.

15      Q.   I think I understand what you're saying.

16           What I'm trying to stammer out -- and

17 I'm not sure -- I just want to make the record

18 complete.  I'm not sure I got this out.

19           Have you ever had reported to you a

20 sexual assault of a Bishop England student?

21      A.   I just want to make sure I get this

22 right.

23           So you're talking about, like, a student

24 sexually assaulting another student?  Is that

25 what you're --

1      Q.   No.  I didn't say that.  I said a Bishop

2   England student being sexually assaulted.

3      A.   And you mean rape --

4      Q.   I mean -- I don't mind doing it that

5   way, if that is helpful to you.  Yeah, an alleged

6   rape, yeah.  That's a good place to start.

7      A.   No.  I --

8      Q.   Assume that that -- that you get that,

9   that that comes in to you.  Some student has been

10  raped.  What is it that you would do?  What would

11  be kicked into place, sort of, protocol?

12     A.   We are mandatory reporters.  So we would

13  have to report that to the authorities, report it

14  to the Diocese.  Obviously, have -- who gets the

15  report, if it's Patrick, if it's me, whatever.

16  We're mandatory reporters so we have to do that.

17     Q.   And how quickly do you report those

18  things?

19     A.   As soon as it happens.

20     Q.   But you've got -- had no experience of

21  having to do that?

22     A.   For a rape, no.

23     Q.   Do you conduct an investigation before

24  you report the event that's been reported to you,

25  or do you pick up the phone and call the

1    authorities?

2        A.   This is, again, a hypothetical situation

3    because we're -- we haven't had to deal with a

4    rape situation, thankfully.

5             No.   I mean, if someone -- if a child

6    has come forth to say, "I have been raped," we're

7    immediately calling the authorities.

8        Q.   You're not -- well, I don't want to put

9    words in your mouth.   I guess I want to ask you,

10   are y'all geared up to do anything other than

11   call the authorities?

12       A.   I mean, we have a counseling office that

13   certainly, you know.   We have a mental health

14   counselor in our office now as of this year, but

15   what do you mean -- when you say "geared up,"

16   what do you mean exactly?

17       Q.   Well, you're not in the business of

18   preserving semen, for example.

19       A.   No, no, we are not.

20       Q.   I don't mean to --

21       A.   No.   I agree.   No.

22       Q.   -- be gross in any way.   That's a

23   critical part of maintaining the evidence, you

24   know.

25       A.   Uh-huh.

1      Q.   That's what I was trying to ask you.

2   Okay.   Thank you.

3           Now, how about we talked in terms of a

4   rape; and I realize what -- where that is on the

5   scale.

6      A.   Right.

7      Q.   But other places on the scale, non-

8   penetration sexual assault, have you had to deal

9   with reports of those kinds of things?

10     A.   I have had a parent tell me something

11  about a child that, you know, that they dealt

12  with the authorities; but from the perspective of

13  I just want you to know that my child has been

14  through this sort of thing, but not something

15  that we had to report because it's already been

16  reported.

17     Q.   I think I understand.

18          When the windows were taken out of the

19  coaches' offices connecting to the dressing

20  rooms/locker rooms, what -- did you observe that

21  pursuit?  Were you on the scene when it happened?

22     A.   No, I was not.

23     Q.   Do you know what happened to the

24  materials?  The windows themselves, for example?

25     A.   No, I don't.

1          Q.   And you haven't seen them since then,

2     since they were removed?

3          A.   The materials?  No.

4          Q.   We came over -- Rich, you were -- you

5     would have been there.  We came over the second

6     time about measurements or photographs or

7     something.  And someone -- and I think it was

8     Patrick Finneran.  I think he said they were

9     thrown away, but I don't remember who said it.

10         A.   I think that I actually reached out to

11    Mike Darnell, who's our Director of Operations

12    and such; and he was the one -- I think he told

13    me 'cause I think you asked that question while

14    we were there.

15         Q.   That's right.  In the hallway.

16         A.   Uh-huh.  And I don't remember if he

17    was -- if Mike was there or if I texted Mike to

18    ask him that question, and he said that they were

19    disposed of.

20         Q.   You may have passed that on.

21         A.   Uh-huh, uh-huh.

22         Q.   But you don't remember specifically, but

23    they're gone is the point?

24         A.   They're gone.

25         Q.   They're not -- what I'm trying to

1  establish is:  We don't have the ability to test

2  those windows in any way ourselves if they're in

3  the trash.  A year ago in the trash.

4       A.  Right, right.

5       Q.  Wherever they went.

6           Now, were you part of any meetings

7  deciding whether or not to remove those windows

8  and block the walls, the openings up?

9       A.  I was part of a phone conversation about

10  the windows being bricked over.

11      Q.  With whom?

12      A.  Jackie Zebrowski.

13      Q.  Just the two of y'all?

14      A.  I don't know, you know, to whom Jackie

15  spoke about it; but I spoke directly to Jackie.

16      Q.  No.  But I mean on the phone call.

17      A.  Yes.  It was just Jackie.

18      Q.  Do you know anything about priests of

19  the Diocese of Charleston sexually molesting

20  priests or seminarians of the Diocese?

21      A.  I do not.

22      Q.  Would you be surprised to learn that?

23      A.  I would be disappointed to learn that.

24      Q.  Me too.  And it's happened, and I

25  learned it; and I'm glad to spare you from that

1  discussion, if you don't know anything about it.

2      A.  Good.

3      Q.  We can go on.

4      A.  Good.

5      Q.  I would like to ask you about hiring

6  people at the school.

7          What is the process for being hired at

8  the school?  If somebody wants -- sends in a

9  letter, says, "I want a job.  I'm a great"

10  whatever.  "I'm a great basketball coach" or "I'm

11  a great physics teacher," what happens?

12     A.  Typically, they send in a resumé.  We

13  determine if we want to interview them.  If we

14  interview them, if we entertain the notion of

15  hiring them, then there's the process of, you

16  know, the background screen, going through the

17  Safe Haven training, boundary training business.

18  And there's, you know, obviously, paperwork that

19  has to be filled out and things like that.  But

20  that's -- is that --

21     Q.  Yeah.  Where does it go?  Who gets it

22  and who makes the call?

23     A.  Mike Darnell, who is, again, our

24  Director of Operations, handles the background

25  screening and, I guess, the request once, you

1    know, they've signed off saying they can be

2    background screened, he takes care of that.

3            He takes care of having them -- he,

4    basically, provides the information they have to

5    fill out, whether it's with regards to signing

6    off on a background screen, the Safe Haven

7    business.  There's a statement from the Diocese

8    about the protection of minors.  That statement

9    that has to be signed.

10           So he -- he provides all of that to the

11   candidate; and then once the candidate, you know,

12   passes all that, is hired, then that information

13   goes to Cindy Hart, who's our Director of

14   Finances and Human Resources.  She houses that

15   information.

16       Q.  And she sets up the payroll method and

17   all of that kind of thing?

18       A.  Uh-huh, uh-huh.

19       Q.  Now, as to the background checks, you

20   had -- I say you.  Bishop England -- had a fellow

21   named McClellan, whose function was a volleyball

22   coach.

23       A.  He was an assistant, uh-huh.

24       Q.  And I'd like to know whether you did a

25   background check on him.

1       A.  I don't know.  I wasn't involved with

2   his hiring.

3       Q.  So where would that record reside?

4   Because I'm going to subpoena it or ask for it to

5   be produced.

6       A.  If it exists -- and I just wasn't

7   involved in his hiring; but it would go to Cindy

8   Hart is where all of those personnel files are

9   kept, to my knowledge.

10      Q.  I understand.  But he was clearly there

11  for some period of time.

12      A.  He was, yes.

13      Q.  So why would it not exist?

14      A.  Well, he was, as I recall, an assistant

15  volleyball coach.  He wasn't the head volleyball

16  coach.

17      Q.  I think you're correct.

18      A.  So I just don't know.  I don't know

19  if -- I don't know how -- I don't know the

20  particulars about his hiring.  I simply don't

21  know.  So I'm not trying to be evasive.  I don't

22  know.

23      Q.  If a kid is -- I shouldn't say that.  We

24  say the word "child" in my family.  Now I just

25  transgressed.

1      A.  Right.

2      Q.  If a child, a female volleyball player,

3  is fondled by a volleyball coach, does it make

4  any difference whether he's an assistant coach --

5      A.  It does not.

6      Q.  Is she any less fondled than if he were

7  the head coach?

8      A.  Certainly not.

9      Q.  So he couldn't have become that coach

10  without having a background check.  You agree

11  with that, don't you?

12      A.  I would say that that should be the

13  case.  He should have been background checked.

14      Q.  And what about Scofield?  Was a

15  background check done on him?

16      A.  I wasn't involved with his hiring

17  either.  I would assume so but I -- I just don't

18  know.  Cindy Hart would, again, be the repository

19  for all of that.  I don't know.

20      Q.  Where is she physically?

21      A.  Cindy?  She's in that main building.

22      Q.  On the campus?

23      A.  Oh, yes, absolutely.  If you know where

24  the teachers' lounge is, she's in the book

25  office, if that helps at all; but she's right

1   across from the teachers' lounge.

2        Q.   But she -- if anybody's going to be able

3   to answer me, she's the one that talks to the

4   candidate, it sounds like.

5        A.   Thank you.

6        Q.   Book office.  I was kidding you earlier

7   about those plaid uniforms, and you said you

8   still got it on the wall.

9        A.   I do.

10       Q.   I don't know when you were there exactly

11  how it was conducted; but as I say, we've put

12  three daughters through Bishop England, and we

13  didn't have uniforms when I was there.  We got --

14  we were the first ones to have neck ties, as a

15  matter of fact.

16            In any event, as I understand it and as

17  I remember from our own children passing through

18  and friends' children passing through, there

19  would be, for example, a book night where your

20  child may have studied geometry this year and

21  biology this year and have two textbooks that you

22  may have paid $50 a piece for.

23       A.   Uh-huh.

24       Q.   And you can utilize this book night that

25  the school puts on to let, now my child coming

1  behind him, purchase those books; and it won't be

2  $50 a piece.  Maybe it'll be $20 a piece.  I'm

3  just making all of this up, of course.

4          Does that still go on?  Or something

5  like that go on?

6      A.  Something like that, but we don't run it

7  as a school.  I think maybe the parents guild

8  sets up a day in, you know, mid July, once kids

9  know what the courses are that they're going to

10  be taking, that they set up in the parking lot if

11  you want to come sell books or buy books, they do

12  that in the -- through the --

13      Q.  And does the school get any kind of an

14  override or fee for that?

15      A.  No, no.

16      Q.  Did it ever?

17      A.  I have no idea.  What we do as a school,

18  we provide an online book store that families can

19  purchase their books through that online book

20  store; and they can sell the books back at the

21  end of the year and get, you know, percentage of

22  the money back directly from that book store but

23  that's not --

24      Q.  But the school does that function?

25      A.  The school does that.

1      Q.  So instead of taking your son's book, in

2  my example, to the parking lot, he can take it

3  now to the book store?

4      A.  If you bought it from the MBS -- I think

5  is the name of it.  If you bought it from that

6  online book store, then you can sell it back to

7  the online book store.

8      Q.  And MBS is the school or some arm?

9      A.  It's not us, no.  It's a totally

10 separate entity that we contracted with, I guess,

11 is -- is the best way to put it.

12     Q.  I'm sorry.  I misunderstood you.

13     A.  And we do, I think, get a percentage of

14 that.  I don't know what it is.

15     Q.  I want to ask you the same thing about

16 the uniforms.  That's where I was going.  One of

17 my children -- one of those plaid, you know.

18     A.  Yeah.  It's a collector's item, now, the

19 plaid so --

20     Q.  They used to have to be bought from

21 Shades.

22     A.  Shades, uh-huh, uh-huh.

23     Q.  Well, let me ask you:  What retains

24 about the uniforms?  Do you have a similar

25 exchange method in the parking lot or somewhere

1  else?

2      A.  Yeah.  The same thing.  The parents can

3  sell uniforms.  A lot of times parents will just

4  bring back used uniforms.  If their kids have

5  graduated, they'll return uniforms to us to keep

6  on hand if somebody comes to school and has

7  forgotten, you know, whatever they might forget.

8  We have, sort of, a holding area of some uniforms

9  we can pass out, if we need to.

10     Q.  But that is not a profit center for the

11 school?

12     A.  No, no.

13     Q.  That's a service.  If I can call it

14 that.  It's a service.

15     A.  Right.

16     Q.  Now, I'm told -- I can't -- I don't know

17 this.  I'm told this.  That now the uniforms are

18 all handled no more at Shades.  So now they're

19 handled by --

20     A.  Stagecoach.

21     Q.  -- Stagecoach.  Right.

22         And what was the -- if you know, what

23 was the arrangement with Shades; and what's the

24 arrangement with Stagecoach?

25     A.  Like do we get a percentage or

1    something?

2        Q.  Override or something, some control.

3    Anything.

4        A.  I have no idea what it was with Shades.

5    With Stagecoach, it's Bill Loon (phonetic) is the

6    owner of that; and he was a parent, and he had

7    this business and so -- and I don't remember the

8    year that Shades, you know, completely shut down,

9    quit doing it.  But that's when Bill took it over

10   at Stagecoach.  I don't know if he, you know,

11   gives us any sort of a percentage of that, those

12   sales.  I have no idea.

13       Q.  Would it show in the budget if --

14       A.  I don't know.  I really don't.

15       Q.  That was an adventure going to Shades,

16   for whatever purpose, not just uniforms.

17       A.  Uh-huh, uh-huh.

18       Q.  That's a step back in time.

19       A.  It certainly is, uh-huh.

20       Q.  Now, does the school provide -- in an

21   appropriate situation, if a family needs

22   assistance, let's say, with the uniforms or with

23   the books or whatever, does the school make

24   provision for that?

25       A.  I have -- I have personally called Bill

1   Loon myself to ask if he could -- if I sent a
2   family to him, if he could, you know, take care
3   of or send us the bill.  And he actually is very
4   good about just taking care of whatever they
5   need.
6       Q.  And I'm guessing that the book people
7   are less nice about that, but I don't know.
8       A.  I don't know.  Cindy says they're great.
9   Cindy Hart also deals with them with the MBS.
10      Q.  I'll talk to her.
11      A.  Uh-huh.
12          MR. DUKES:  It's 2:20.  Do you want
13  me to call Bryan Fahey and tell him to come
14  later?
15          MR. RICHTER:  Come on.
16          MS. RICHTER:  He's scheduled for
17  three.  I think we'll be fine for three.
18          MR. RICHTER:  Oh, we're fine for
19  three.
20          MR. DUKES:  Okay.  Then we'll let
21  it go.
22          MR. RICHTER:  As Rich said
23  yesterday, he was going to take us Hall's
24  Steakhouse.  He didn't take us to Hall's
25  Steakhouse, but he did say that or something like

1  that.  All of us heard it.

2              MR. DUKES:  I couldn't hear what

3  Larry was saying.

4              THE WITNESS:  That you said you

5  were taking us to Hall's steakhouse.

6              MR. DUKES:  Oh.

7              THE WITNESS:  I think it's in the

8  record.

9  BY MR. RICHTER:

10     Q.  What does the school do when a family

11 has whatever adverse occurrence which impacts

12 their financial ability, for example, to pay

13 tuition at the high school?  Is there some

14 program or routine of either forgiving payment,

15 some alternate source of payment, or, you know,

16 some long-term payout method or anything like

17 that?

18     A.  Honestly, I don't deal with any of

19 the -- the budgetary, tuition type things.  So

20 that would really be a question for Patrick and

21 for Cindy.

22     Q.  Okay.

23     A.  It's just not my purview.

24     Q.  I understand that.  I just wondered.

25              I guess what I'm really wanting to ask,

1    I was trying to ask more gracefully.  Does anyone

2    get turned away because they fall on hard

3    economic times through no fault of their own?

4    It's happened to a lot of people, you know, here

5    recently in history.  That's what I was trying to

6    ask you.

7         A.  And I don't know because -- just because

8    they don't come to me.  They would go to Patrick

9    and then Cindy, and that's where that would go.

10        Q.  And what does the school do about fund-

11   raising events?  I'm assuming the school

12   conducts -- I know I went through 12 years of

13   parochial education.  I know something about

14   selling lottery tickets and, you know, Bingos and

15   whatever.  Paddlewheels.

16            Does it -- what does the school do about

17   fund-raising now?

18        A.  That's, typically, handled by our

19   development office, also by our, like the parent

20   guild.  They will do fund-raisers.  Like we've

21   had a gala in the past.

22        Q.  You've had what in the past?

23        A.  A gala, a --

24        Q.  A gala.  I'm sorry.  Missed the word.

25        A.  The development office does, you know,

1  campaigns to raise money, you know, for

2  different -- whether it's tuition assistance or

3  what have you.

4       Q.  Right.

5       A.  That's -- is that what you're looking

6  for?

7       Q.  Yes, just generally.  I didn't know how

8  to form the question.  Just looking for that

9  general information.

10      A.  Right.

11      Q.  I've got a view of my time and how

12  everything was done.  It may be different than

13  how it's done now.

14          One thing we did in my time was we had

15  raffles and drawings and -- I don't remember the

16  names of all the -- games of chance is what it

17  was, and I just wondered if that still goes on.

18      A.  The school doesn't do anything like

19  that.

20      Q.  Does the school benefit from any of that

21  type of activity?

22      A.  I'm not trying to be evasive, Larry; but

23  I don't -- I don't deal with any of that but --

24      Q.  So you don't know whether --

25      A.  I don't.  I don't.

```
 1        Q.  I understand.

 2             MR. RICHTER:  Y'all need anything

 3   else?

 4        Q.  I'm going to hand you up a document that

 5   is marked --

 6             (Exhibit No. 01 was marked for

 7   identification.)

 8        Q.  Did you have anything to do with the

 9   prior class action matter which we settled with

10   the Diocese for $12 million?  Were you involved

11   in that in any way?

12        A.  Not at all.

13        Q.  Do you know of it?

14        A.  I know of it minimally.

15        Q.  Do you know why so many children are

16   sexually molested by priests in the Diocese of

17   Charleston?

18        A.  I don't know -- have any answer to that,

19   no, no, sir.

20        Q.  Well, I'm -- I started to say to you

21   count yourself lucky, but I'm not going to say

22   anything.  You know about that.

23             Let me give you -- I hand to you now

24   what is marked the Plaintiff's Exhibit No. 01 to

25   your deposition; and it consists of Bates stamp
```

1    numbered pages 4469, 4470, and 4471.  You'll see

2    those in the bottom right hand.

3         A.  I do.

4         Q.  This is a composite exhibit because it's

5    more than one page, referring to some different

6    event on the respective pages.

7         A.  Right.

8         Q.  I just want to make sure you are

9    familiar with these.  And if you're not, please

10   take whatever time you need to familiarize

11   yourself; and then I'd like to just walk through

12   them with you.  Ask you to walk me through them.

13        A.  (Complies with request.)

14             MS. RICHTER:  I think you misspoke.

15   You said it only goes through 71.  It goes

16   through 72, I think.

17             MR. RICHTER:  It does go through

18   72.  So it's 469 -- through 4469 through 4472.

19             MS. RICHTER:  What would y'all do

20   without me?

21             MR. DUKES:  This doesn't have to be

22   on the record.

23        (Off-the-record discussion.)

24   BY MR. RICHTER:

25        Q.  You set to go on?

1      A.   I am.

2      Q.   Would you begin with page No. 4469,

3   please, of the Plaintiff's Exhibit No. 01 to your

4   deposition and tell us what this is?

5      A.   We had a student who realized that his

6   wallet had gone missing from one of the locker

7   rooms at the school, and then one of our

8   maintenance workers said that he -- somebody had

9   given it to him; and so he, then, returned it to

10  the boy.  And it was never determined who this

11  other child was that reportedly had the wallet.

12  If that person existed, we don't know.

13     Q.   Yeah.  Is it fair to assume there was no

14  money in the wallet when it came back?

15     A.   I don't know.  I really don't know.

16     Q.   Well, why isn't there a date on this

17  thing?  When did this happen?

18     A.   It's Tuesday, August 28; but it was 2018

19  was the year that it happened, if that's -- is

20  that what you --

21     Q.   Yeah, if you know that.

22     A.   Uh-huh, it is.

23     Q.   That's fine.

24          Who is the author of it?

25     A.   Dean of Students, Julie Rosebrock.

1        Q.   Say her name again, please.

2        A.   Julie Rosebrock.

3        Q.   Julie Rosebrock.   How do you know that?

4   There's no signature or initial or anything on

5   here.

6        A.   Because when Rich asked me to get the --

7   any information on cases or incidents or whatever

8   in the lockers rooms, I knew that she had written

9   this.   So I asked her to give it to me.

10       Q.   And when was that in point of time?

11       A.   When was -- when did I ask her to give

12  it to me?

13       Q.   When did you ask her, yeah.

14       A.   I'm going to say a month or so ago.   I

15  don't know.   I'd have to go back and look.   I

16  think somewhere in that sort of a time frame.

17  Maybe a month.   Maybe two.

18       Q.   Let's go to 4470, please.   I want to ask

19  you the same thing, if you can give us a quick

20  summary of what this is.

21       A.   We have options students at Bishop

22  England that are special needs kids with, you

23  know, could be Downs Syndrome.

24       Q.   I've heard of that program.   I've heard

25  nice things of that program.

```
1       A.  It's a fantastic program, and they
2  participate in a lot of our mainstream classes.
3  PE is one of them.
4       We got word that one of our options
5  students had been videoed in the locker room,
6  completely clothed, but videoed in the locker
7  room by another student rapping, you know.
8  Singing a song that had profane lyrics in it and,
9  in particular, the use of the "N" word.
10      And that video -- I think it was a
11 Snapchat video that he made of it and sent it to
12 somebody else.  So word got back to us, and we
13 got involved from a disciplinary perspective.
14      Q.  And was the -- was this a viewing case
15 of the student, or was this a misbehavior by
16 the --
17      A.  No.  Absolutely, it was misbehavior.
18 And he's an options student, and so there is --
19 the concern that, you know.  He does know right
20 from wrong.  So it's not a situation where he
21 doesn't know right from wrong.  He knows that he
22 shouldn't be doing that.
23      But I think he was cajoled into it by
24 other students, and then the video of him singing
25 the song and using the "N" word was then sent to
```

1    other people; and I don't -- I don't know how.

2    It doesn't say in here.

3            But somehow one of our -- another one of

4    our maintenance workers -- I think it was maybe a

5    relative of hers that got the video, was one of

6    the ones on the receiving end of it who goes to a

7    different school.  So she was the one that

8    brought it to us to show us, you know.

9        Q.  Now, was the -- I'm going to say

10   perpetrator.  I don't mean that as a sex abuse

11   perpetrator in this context.  We talk a lot about

12   that.

13           Was the perpetrator, the guy who's

14   singing and dancing and jumping around, is he a

15   minority student or not?

16       A.  No, he's not.

17       Q.  And the options student, is that person

18   a minority student?

19       A.  The options student is the perpetrator.

20   The options student is the one doing the singing,

21   and he was videoed doing the singing.

22       Q.  I got you.  Yeah.  And same thing about

23   the date and the author of this page, please.

24       A.  This was also Julie Rosebrock.  This

25   would have been March 5 of 2020 because she's in

1  it, and she's written it.  It's in third person.

2  I don't know.  I know that I got this from Julie.

3  I'm assuming she's the one that wrote it.  I've

4  done that myself as I refer to myself as

5  Mrs. Tucker as I wrote something up, but I can't

6  explain that.

7      Q.  And that was figured out, and everybody

8  moved on?

9      A.  Yes, yes, yes.

10      Q.  Thank you.  And page 71, please.  4471.

11      A.  (Complies with request.)

12      Q.  What is that one about?

13      A.  This -- let me make sure before I say

14  this.  This is the one that I wrote.  So I'm the

15  author of this.

16      Q.  It's a long one.

17      A.  I'm rather verbose, and the date is

18  there in its entirety.  This was a situation

19  that, again, another options student, different

20  PE class, obviously, it's a girls' PE class.

21          I guess at some point before the

22  beginning or the end of PE class when they were

23  changing clothes, the options student was

24  standing there in a sports bra and underpants;

25  and there were two other girls there.

1          One of the girls took a picture of the
2    options student who was standing there, you know,
3    in her bra and in her pants; and the other girl
4    was also in the picture, but that girl was
5    completely clothed and --
6          Q.   The options student?
7          A.   No.   The options student was in the bra
8    and underpants.   The other girl was completely
9    clothed.   I think -- I don't know if in her PE
10   uniform or if she was, you know, in her skirt and
11   blouse.
12         And the girl that took the picture sent
13   it to the other girl, you know, digitally,
14   whatever.   Sent it to the other girl, you know,
15   in effect making fun of the options student
16   because she's standing there having a
17   conversation in her bra and underpants when the
18   other girl was completely clothed.
19         So then the other girl who was the one
20   that was completely clothed, took that picture
21   and, you know, edited the photo with, like, a
22   green marker to, like, color over the options
23   student so you really couldn't see -- you really
24   couldn't see what she was wearing but, you know,
25   she definitely was not clothed and in uniform or

1  anything like that.  And then captioned it.

2          I think the caption is in here.  "Live,

3  love the Bishop life" and then "photo taken by."

4  So, in effect, what she was doing is she was

5  chastising the first girl for having taken the

6  picture to begin with, if that makes sense.

7          She was saying -- 'cause where she says,

8  "photo taken by whomever," she's fussing at

9  that -- that other girl for taking this picture

10 and making fun of the options student.  I know

11 that's convoluted, but that's what was going on.

12      Q.  So the options student was the victim of

13 this --

14      A.  Uh-huh, uh-huh.  She was not even aware

15 the picture was being taken, and certainly didn't

16 know she was being made fun of.

17      Q.  And is that -- was that resolved in some

18 way?

19      A.  It was.  All that's in there.

20      Q.  Okay.

21      A.  Talking to the parents and the Diocese

22 and the whole shooting match.

23      Q.  So let's do the last page, please.

24      A.  (Complies with request.)  That's the

25 same thing.  That's the same case.

1      Q.  Oh, it's --

2      A.  It's just the --

3      Q.  Oh, it's just -- I see it.

4          Now, how many options students do y'all

5   have over there at Bishop England?

6      A.  Typically, it's 16.  Typically, it's

7   four per grade level.  Right now one of the

8   classes only has two, and the freshman class has

9   five.  So it may not be 16 right now, but it's --

10  generally speaking, it's a max of 16.

11     Q.  How long have y'all -- has that existed?

12     A.  I believe the year was 2007 when we

13  started that program.

14     Q.  So it's an established program?

15     A.  Uh-huh, it is.

16     Q.  You are the one who wrote that "on first

17  view of this photo, the lady looks nude"?

18     A.  Yes, uh-huh.  Because when -- when -- I

19  guess it was the second girl colored over her

20  with green, you know.  The sports bra was, sort

21  of, a flesh-colored sports bra so you really

22  couldn't see, you know, that there were straps.

23          And so you could see just flesh colored

24  and then -- but on closer inspection when you --

25  which you don't really want to do.  But, you

1  know, when you get closer to it, you could see

2  that there was actual material there; and it was

3  not the same exact color of her skin.  And so,

4  yeah, it was --

5      Q.  We asked Mr. Finneran this.  Let me just

6  ask the same question to you.

7          We asked him about persons, staff people

8  at Bishop England of one sex entering an office

9  with a viewing window of persons of another sex.

10 So men going into the female dressing room

11 office, coach office --

12     A.  Right.

13     Q.  -- area and vice versa.  Women going

14 into the men's.

15         Is there a policy about that or any

16 prohibition about it?

17     A.  No.

18     Q.  And how frequently does that occur?

19 Does it occur, first?

20     A.  Does, like, a male coach go into the

21 female PE coaches' office?

22     Q.  Yes.

23     A.  I don't know how often it happens.  I'm

24 sure it does happens, but I don't have any idea

25 how often it happens.

1      Q.  What about coaches bringing students

2   into their offices?  Is there a policy about

3   that?

4      A.  I mean, the policy is that all those

5   doors have windows.  I mean, that's one of the

6   policies from the Diocese.

7      Q.  From the hallway?

8      A.  Uh-huh, yes, uh-huh.  But nothing other

9   than that that I can think of.

10     Q.  And to your knowledge, has there been

11  any difficulty involving students being

12  inappropriately touched, photographed, anything

13  else by adult staff members, other than the guy

14  you mentioned earlier?

15     A.  Jeffrey Scofield?

16     Q.  Yes.

17     A.  None that -- none that I can think of.

18          MR. RICHTER:  That's it.  I think

19  we can quit.

20          MR. DUKES:  I'd like her to read

21  and sign.  I don't have any questions, obviously;

22  and I'd like her to read and sign, please.

23          (The deposition concluded at 2:44 p.m.)

24                  - - -

25

1 CERTIFICATE OF REPORTER
STATE OF SOUTH CAROLINA
2 COUNTY OF HORRY

3      I, Ronda K. Blanton, a Registered
Professional Reporter and Notary Public for the
4 State of South Carolina at Large, do hereby
certify that the witness in the foregoing
5 deposition was by me duly sworn to testify to the
truth, the whole truth, and nothing but the truth
6 in the within-entitled cause; that said
deposition was taken at the time and location
7 therein stated; that the testimony of the witness
and all objections made at the time of the
8 examination were recorded stenographically by me
and were thereafter transcribed by computer-aided
9 transcription; that the foregoing is a full,
complete, and true record of the testimony of the
10 witness and of all objections made at the time of
the examination; and that the witness was given
11 an opportunity to read and correct said
deposition and to subscribe the same.
12      Should the signature of the witness not be
affixed to the deposition, the witness shall not
13 have availed himself/herself of the opportunity
to sign or the signature has been waived.
14      I further certify that I am neither related
to nor counsel for any party to the cause pending
15 or interested in the events thereof.
     Witness my hand, I have hereunto affixed my
16 official seal on October 15, 2021, at Myrtle
Beach, Horry County, South Carolina.

17

18

19

20              Ronda K. Blanton
                NCRA REGISTERED PROFESSIONAL
21              REPORTER, RPR
                Notary Public,
22              State of South Carolina at Large
                My Commission expires:
23              May 15, 2028.

24

25

```
1              DEPONENT CORRECTION SHEET
    I, the undersigned, MARY ANNE TUCKER, do hereby
2   certify that I have read the foregoing deposition
    and wish to make the following clarifications
3   and/or corrections, if any.

4   PAGE  LINE          CHANGE            REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20      MARY ANNE TUCKER                    Date

21
    RB
22

23

24

25
```

# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE STATE OF SOUTH CAROLINA
 2                     CHARLESTON DIVISION

 3
                DEPOSITION OF ROGER M. ATTANASIO
 4                 30(b)(6) LS3P ARCHITECTS
                         VOLUME 2
 5
                       AUGUST 20, 2021
 6

 7  GARY NESTLER, VIEWED STUDENT FEMALE 200, VIEWED
    STUDENT MALE 300, on behalf of themselves and all
 8  others similarly situated,

 9           Plaintiffs,

10   vs.                   CASE NO. 2:21-cv-0613-RMG

11  THE BISHOP OF CHARLESTON, A CORPORATION SOLE;
    BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS 1-10; THE
12  BISHOP OF THE DIOCESE OF CHARLESTON, in his
    official capacity; and ROBERT GUGLIELMONE,
13  Individually,

14           Defendants.
    _____
15

16  TIME:             9:44 AM

17
    LOCATION:         RICHTER LAW FIRM
18                    MOUNT PLEASANT, SOUTH CAROLINA

19

20  REPORTED BY:      RONDA K. BLANTON, RPR
                      CLARK & ASSOCIATES, INC.
21                    CHARLESTON, SC 29422
                      843-762-6294
22                    WWW.CLARK-ASSOCIATES.COM

23

24

25
```

```
 1                A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFFS:

 3             THE RICHTER FIRM
              BY:  LAWRENCE E. RICHTER, JR., ESQ.
 4                 ANNA RICHTER, ESQ.
              622 Johnnie Dodds Boulevard
 5            Mount Pleasant, SC 29465

 6             SLOTCHIVER & SLOTCHIVER
              BY:  DANIEL SLOTCHIVER, ESQ.
 7            751 Johnnie Dodds Boulevard, Suite 100
              Mount Pleasant, SC 29464
 8
              HALVERSEN & ASSOCIATES
 9            BY:  BRENT S. HALVERSEN, ESQ.
              751 Johnnie Dodds Boulevard, Suite 200
10            Mount Pleasant, SC 29464

11   ON BEHALF OF THE DEFENDANTS THE BISHOP OF
     CHARLESTON, BISHOP ENGLAND HIGH SCHOOL, THE
12   BISHOP OF THE DIOCESE OF CHARLESTON, AND ROBERT
     GUGLIELMONE:
13
              TURNER PADGET GRAHAM & LANEY
14            BY:  RICHARD S. DUKES, ESQ.
              40 Calhoun Street, Suite 200
15            Charleston, SC 29401

16   ON BEHALF OF LS3P AND THE WITNESS:

17            COPELAND STAIR KINGMA & LOVELL
              BY:  KENT STAIR, ESQ.
18            40 Calhoun Street, Suite 400
              Charleston, SC 29401
19
                        - - -
20

21

22

23

24

25
```

```
1                          INDEX

2    EXAMINATION

3    BY MR. RICHTER                                82
     BY MR. RICHTER                                94
4    BY MR. DUKES                                 290
     BY MR. STAIR                                 291
5    BY MR. RICHTER                               292

6    CERTIFICATE OF REPORTER                      296
     DEPONENT CORRECTION SHEET                    297
7

8

     EXHIBITS
9
     Exhibit No. 05    8/9/21 Judger Gergel        94
10                     Order
     Exhibit No. 06    8/9/21 Judge Gergel         94
11                     Amended Order
     Exhibit No. 07    Defendant BEHS's Answers   181
12                     to Plaintiffs' First Set
                       of Interrogatories
13   Exhibit No. 08    Defendant Guglielmone's    184
                       Answer to Plaintiff's
14                     First Set of
                       Interrogatories
15   Exhibit No. 09    Defendants' Answer         184
     Exhibit No. 10    7/11/21 Stair Email to     191
16                     Richter
     Exhibit No. 11    Volume 1 of Attanasio      200
17                     Deposition Transcript
     Exhibit No. 12    LS3P High School           221
18                     Projects
     Exhibit No. 13    Intent to Inspect          224
19                     Premises
     Exhibit No. 14    Photos                     243
20   Exhibit No. 15    Photos                     243
     Exhibit No. 16    Photos                     243
21

22

23

24

25
```

```
 1                    ROGER M. ATTANASIO,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                    EXAMINATION
 5   BY MR. RICHTER:
 6       Q.  Would you state your name fully, please,
 7   again, into the record.
 8       A.  Roger Michael Attanasio.
 9       Q.  Attanasio.  I'll try to say it right,
10   but I can't promise anything.
11                MR. STAIR:  Before he begins, can
12   we have a conversation with him out of the room?
13                    MR. RICHTER:  With --
14                MR. STAIR:  I mean, on the record.
15   I want to be on the record, but I'm happy to
16   invite him out.  He can stay.  Either way.
17                MR. RICHTER:  In other words, you
18   want him to step out?
19                MR. STAIR:  I think it would be
20   appropriate.
21                MR. RICHTER:  Yeah, that's fine.
22           (Witness departs the conference room at
23   9:44 a.m.)
24                MR. STAIR:  Look, I just wanted to
25   note, in accordance with the local rules, that
```

1    there were a series of conversations that we had

2    with Mr. Attanasio the day of the deposition

3    where after the record --

4                    MR. RICHTER:  Wait a minute.  Who's

5    "we"?

6                    MR. STAIR:  John Works and I.  I

7    wrote you an email about it.

8                    MR. RICHTER:  You did.

9                    MR. STAIR:  Right.

10                   MR. RICHTER:  And I said I

11   object --

12                   MR. STAIR:  Right.

13                   MR. RICHTER:  -- to that email

14   being a part of this record, either -- so that

15   you're completely clear -- either by attachment

16   to the record, as you asked, or by your stating

17   the contents of that email that I object to in

18   the record.

19                   MR. STAIR:  All right.

20                   MR. RICHTER:  That's you

21   testifying, not somebody else.

22                   MR. STAIR:  Okay.  All right.

23   And --

24                   MR. RICHTER:  But now you want to

25   do that?

```
 1              MR. STAIR:  No.  According to the
 2    local rule, it says, "The party having the
 3    conversation should note it on the record"; and I
 4    want to note it on the record.  It says, "The
 5    purpose and the outcome of the conference shall
 6    be noted on the record."
 7              The purpose, as I stated in the
 8    email that I'm certainly not going to repeat
 9    subject to your concerns and thoughts in
10    accordance with them; but I will tell you the
11    purpose was to advise him that we could not speak
12    and explain the rules to him as to why we could
13    not speak.  And the outcome is that we have not
14    spoken about substance or any subject matter of
15    the deposition so --
16              MR. RICHTER:  Yeah.  And I
17    acknowledge getting such an email from you.
18              MR. STAIR:  Okay.  That's fine.  I
19    just want to note that on the record and so --
20              MR. RICHTER:  I thank you.  I thank
21    you for writing.
22              I also -- while we're putting
23    things on the record by way of note, I think it
24    was -- I don't remember what time; but I think it
25    was on Wednesday, you sent us some additional
```

1    documentation and -- you sent a long email --

2                  MR. STAIR:  Right.

3                  MR. RICHTER:  -- and you sent some

4    additional documentation --

5                  MR. STAIR:  Right.

6                  MR. RICHTER:  -- including a couple

7    of additional disks of information.

8                  Yesterday I was in court -- we

9    weren't in court for a very long time, although

10   we prepared all week long to be in court for at

11   least a day, a half a day at least.  In any

12   event, Anna and I both were in court and out of

13   here.  I'm not sure what court you had -- you had

14   a --

15                 MR. SLOTCHIVER:  I had court in the

16   morning and then depositions in the afternoon.

17                 MR. RICHTER:  And, Brent, you had

18   some conflict.

19                 MR. SLOTCHIVER:  Right.  He was

20   with me on both of those cases.

21                 MR. RICHTER:  So in terms of

22   looking at those discovery documents -- and I

23   don't know that it's acceptable -- if it is

24   acceptable to the six-word explanation that you

25   did there, just so everybody -- I sent everybody,

1    you know, a copy of everything; but none of us

2    have read any of it because we haven't been able

3    to read it.

4                MR. STAIR:  Okay.

5                MR. RICHTER:  Is it -- can you --

6    can you, by some condensed statement, say,

7    "Here's what is in it," what you understand?

8                MR. STAIR:  Well, I think I tried

9    to do that in the deposition.

10               MR. RICHTER:  You did in the

11   letter.

12               MR. STAIR:  In the email.  And,

13   frankly, I don't have that email in front of me.

14   I don't have it, but I will tell you what I

15   recall.  If somebody's got the email --

16               MR. RICHTER:  I do.

17               MS. RICHTER:  Do we?

18               MR. RICHTER:  Yeah.  It's the

19   one --

20               MR. STAIR:  I know that two or

21   three of them -- okay.  Tell me how I describe

22   it, and I'll tell you what they are.  I know that

23   a couple of them are some electrical drawings

24   that have nothing at all --

25               MR. RICHTER:  This is the email

1    you're referring to.  (Indicating.)

2              MR. STAIR:  As they say, refresh my

3    recollection.  One second.

4              We had sent you, in response to

5    your subpoena, a set of plans that we -- well,

6    actually they were all of the plans that we had

7    in our possession; and so we wanted you to have

8    those.  And we've discovered that there were two

9    sheets that somehow, I think, were not scanned

10   and sent for reasons I have no reason why; but we

11   discovered that.

12             And they appear to relate to

13   electrical issues and I don't think have anything

14   whatsoever to do with this case, but I just

15   attached them just to make the production of our

16   plans as complete as we could.

17             And then the second item was, we

18   came across three disks that contain

19   specifications that we found; and we think they

20   are the same specifications.  We have no reason

21   to believe they're not the same specifications

22   that we had previously presented and that you've

23   otherwise, I think, seen through probably the

24   production of the subpoena.

25             But -- and I think you've had them

1  in multiple ways, but we just wanted to make sure

2  there was no oversights; and since we found these

3  disks, we included them.  So I don't think they

4  are anything that either relates to the issues

5  involved or is not redundant to what we had

6  already produced.  So you didn't miss much.

7              MR. RICHTER:  Well, thank you.

8  Sounds like scintillating reading.  Can't wait

9  for the weekend.

10             MR. STAIR:  Yeah.

11             MR. RICHTER:  And I will look at

12  all of that this weekend.

13             Let me just for now say that in the

14  event that I have a different view of the

15  documents than you, I'm going to reserve my right

16  to ask the Court to let us come back and deal

17  with -- be back here again.  I'm not looking to

18  do that.

19             MR. STAIR:  If you can find

20  anything that's new and different in those, I'll

21  either be impressed or concerned for your sanity,

22  one or the other; but let me know if you do find

23  that to be the case.

24             Larry, on the issue of objections,

25  I know that, obviously, there's been quite the

1  discussion and dispute and debate over that.  I'm

2  going to continue to object to issues that are

3  what I consider to be outside the scope of the

4  six items that we indicated we were going to

5  testify about.

6              And I'm happy to just say

7  "objection" if you agree that within that

8  objection is stated the basis as being scope, but

9  the rules require me to state the objection but

10  also the basis of it.  And so if scope is the

11  basis, I'm happy to say "objection scope."  Or if

12  we can agree to shorten the thing and stay out of

13  the way as much as possible, I'm happy to just

14  say "objection."  Your preference on that.

15              MR. RICHTER:  My preference is that

16  I don't have any right to change the rule.  So

17  say whatever you want to say on your objections.

18              MR. STAIR:  Right.

19              MR. RICHTER:  Is that it?

20              MR. STAIR:  Yeah.  And I -- I will

21  say I intend to tell him that he needs to answer

22  the question subject to my objections so we

23  should not have the issue we had last time.

24  So --

25              MR. HALVERSEN:  I would just say

```
1   for the record -- and this is Brent Halversen,

2   for the record -- that any comment that's

3   suggesting what the deponent is going to be

4   answering, how to answer it, whether that's scope

5   or foundation, or what whatever commentary, I

6   think an objection to the form is the substance

7   of the rule and the purpose of the rule so --

8               MR. STAIR:  Okay.  Well, if we --

9               MR. HALVERSEN:  You can explain it

10  as scope later on.

11              MR. STAIR:  Okay.  If you're

12  satisfied that scope is within the objection

13  statement to the form, then I'll just say

14  "objection to the form."

15              MR. HALVERSEN:  However you want to

16  rephrase or recast what's the purpose of your

17  objection.  I don't think you have to state.  I

18  think "object to the form" covers you for

19  everything.

20              MR. STAIR:  Okay.  So you want me

21  to say "objection to the form" or just

22  "objection"?

23              MR. HALVERSEN:  I think "object to

24  the form."

25              MR. STAIR:  Okay.  That's fine.
```

```
1   I'll just say "object to the form" then, and that
2   will include the issues that I have concerning
3   scope.
4               MR. HALVERSEN:  Do you agree with
5   that Larry?
6               MR. RICHTER:  I don't mind that.  I
7   want to do it the easiest way.
8               MR. STAIR:  Yeah, that's why
9   "objection" to me is easier than "objection to
10  the form."  And I'm happy to say it either way as
11  long as we understand that the essence of it is
12  certainly going to be the scope so --
13              MR. RICHTER:  One of the things
14  that does concern me about utilizing that method
15  that you described, Brent, is should we end up,
16  for example, back before the Court on these kinds
17  of issues, again, this leaves you in a position
18  to say, "Well, as to that objection, I didn't
19  mean scope."  I didn't say --
20              MR. STAIR:  Well, I considered that
21  and don't want to put you there.  So I'm happy to
22  say just "objection"; and then if it is something
23  other than the form and whatever the form might
24  be, or scope as it relates to that topic.  If
25  it's something else like -- that's not either
```

```
1   form or scope, I'm happy to add that on --

2              MR. RICHTER:  Okay.

3              MR. STAIR:  -- if that's all right.

4              MR. RICHTER:  What does "form"

5   mean?

6              MR. STAIR:  Well, you know, leading

7   I guess.  Maybe it's got assumptions in it or

8   something.  I don't know.  You know, you have

9   more experience on the bench than I do.  I'll

10  advise you to tell me.

11             MR. DUKES:  Well, Larry, given the

12  confusing nature of so many of your questions, it

13  could really just be the form.

14             MR. STAIR:  The form, right.

15             MR. RICHTER:  Rich and I have done

16  so many of these now, he's got those little

17  cards, like the fans you use in church.  You hold

18  it up.  That's a 13.  This one's a 4.

19             MR. DUKES:  Well, you don't know

20  that I'm playing Larry Richter Bingo over here.

21  I'm going to stand up and go "Bingo."

22             MR. STAIR:  I have the right of

23  dissertation on what "objection to the form"

24  really accomplishes.  But anyway, I'm happy to

25  say and however you guys want to do it.  I want
```

1  to do it like you say, as simple as --

2            MR. RICHTER:  Well, I want to get

3  the question right.  So probably it helps me best

4  if a question is defective for you to say

5  whatever you're going to say.  I object because

6  you left half of the facts out or whatever it is.

7  And if I did that, of course, I'll put -- I don't

8  mean to do that.  I'll put the facts in.  So

9  let's do it that way.

10           MR. STAIR:  Okay.  So if I just say

11 "objection," it will include scope just by saying

12 "objection."  But if I have something different

13 than scope to say, to let you know that.

14           MR. RICHTER:  That's --

15           MR. DUKES:  Of course, if you need

16 explanation of an objection, ask the witness to

17 step out and then put it on the record and

18 correct it.  That's bulky and it takes forever,

19 but that's one solution.

20           MR. RICHTER:  Oh, I know.  I don't

21 really care, Kent.  You're saying that every time

22 you say "objection" that you include in that

23 scope, and that's fine.

24           MR. STAIR:  That's okay with you?

25           MR. RICHTER:  That's the ground

```
1    rule.
2              MR. STAIR:  Okay.  Then that's
3    fine; and if I have some other particular bone to
4    pick with it, I'll wave a hand and say something.
5              MR. RICHTER:  I'm just going to
6    wave him in.
7         (Witness is returned to the conference
8    room at 9:55 a.m.)
9         (Exhibit No. 05 and Exhibit No. 06 were
10   marked for identification.)
11   BY MR. RICHTER:
12      Q.  Okay.  Let's begin.
13          Sorry to ask you this, but would you
14   mind telling me again your preferred
15   pronunciation of your last name?
16      A.  Attanasio.
17      Q.  Attanasio.  Okay.  Long A.
18          I'm going to ask you if you're aware
19   that, subject to your last deposition, we went to
20   court and had a proceeding.  We had a court
21   proceeding.  We didn't have to travel to do it.
22   In which Judge Gergel has required that you come
23   back here and that we resume the deposition and
24   push on today.
25              You're aware of that?
```

1        A.   I was not.

2        Q.   You were not aware of that?

3             MR. RICHTER:  Okay.  Well, I'm

4   going to put into the record -- a part of the

5   record in this case -- by "record" I mean the

6   Court and public record indicates what is marked

7   as No. 05 and No. 06 being the order originally

8   and the amended order, which properly identifies

9   LS3P, as I'm remembering in the amended order.

10            Anybody have any trouble with

11  these?  Any objections?

12            Okay.  No. 05 and No. 06 is in.

13       Q.   Well, I'm going to give you

14  Judge Gergel's order --

15            MR. STAIR:  Larry, let me say,

16  before we begin, I'd like to step out and discuss

17  this with the witness.  He's not seen it; and

18  under the local rules, I'm entitled to do that.

19            MR. RICHTER:  Has not seen what?

20  These orders?

21            MR. STAIR:  These records, right.

22  And there was no notification to him or us that

23  they'd be shown and so --

24       Q.   Yeah.  I'm going to -- we're going to

25  spend some time with you reading every word of

1   this so you can testify about it.

2        A.  I'm sorry.  Will you repeat that?

3        Q.  Yes.  We're going to -- Mr. Stair wants

4   to take a break to get with you to tell you what

5   these orders are.  If you haven't seen these, I'm

6   amazed.

7             MR. STAIR:  He's not.

8        Q.  But you have the right to see them,

9   certainly.

10             MR. STAIR:  Larry, we have

11   judiciously followed the rules about no

12   discussion about what has happened since.  That's

13   why he's not seen them.

14             MR. RICHTER:  I understand.  I

15   read -- you sent me an email about that.

16             MR. STAIR:  Yeah.  But, I mean, we

17   have not shown him this or any other thing like

18   this.

19             Roger, if you would come here,

20   please.

21     (A recess was taken 10:00 a.m. to 10:11 a.m.)

22             MR. RICHTER:  Back on the record,

23   Madam Reporter.

24

25   BY MR. RICHTER:

```
 1        Q.   Are you now set to go forward?

 2        A.   Yes, sir.

 3        Q.   Thank you.

 4             Now, I'd like to make sure I understand

 5   what you said just before you left the room.  I

 6   asked you had you seen No. 05 or number --

 7   Exhibits No. 05 or No. 06.

 8             And were you aware that you were

 9   required to come back here today?  And you said,

10   no, you were not aware of that.

11             Do you recall that?

12        A.   I do.

13        Q.   Why are you here?

14        A.   Because I was asked to come back.

15        Q.   By whom?

16        A.   Mr. Stair.

17        Q.   Did he say why?

18        A.   No.  Because when I left, you told me,

19   "You'll be back."

20        Q.   Yeah.  Welcome back.

21        A.   Thank you.

22        Q.   I'd like to -- whether your lawyers have

23   a copy, let me give you this copy.  I'm going to

24   hand you Exhibits No. 05 and No. 06 to your

25   deposition.  You'll see one is titled "Order and
```

1  Opinion."  The second one is titled "Amended

2  Order and Opinion."

3          I'll tell you -- and I think everybody

4  will join me in saying this to you -- that the

5  only amendment is that, I think, a clerical error

6  in the first order.  The judge who issued it,

7  Judge Richard Gergel, referred to LS3P as being a

8  party.  LS3P was not then a party.  Really still

9  today is not a party.

10          And so he amended the order, I think,

11 only making that change to say -- to not name

12 them as a party 'cause they weren't.  They

13 were -- you were here as a witness.  You weren't

14 here as a representative of a party in the

15 litigation at that time.

16          So that being said, let me hand them

17 both to you; and I need to ask you before I ask

18 substantive questions about these -- and I'm

19 going to.  I need to ask you if you discussed

20 your testimony with your lawyer during this

21 break?

22     A.  I did not.

23     Q.  Did you get a chance to read these

24 orders that you've never seen before?

25     A.  I have not.

1      Q.  Well, you probably need to.  You want to

2  read them now, you're certainly welcome to.  You

3  don't know what these orders said about you?

4      A.  I do not.

5      Q.  You ought to read them.

6           MR. STAIR:  Can he just read the

7  amended order since the --

8           MR. RICHTER:  Yeah, yeah.  And he

9  doesn't have to read anything, if he doesn't want

10 to.

11          MR. STAIR:  Yeah.  Take the time to

12 read No. 06, which is the amended order, which is

13 the final order.

14          MR. RICHTER:  I might can help a

15 little time wise with that, Kent.  If I can just

16 see my highlighted --

17          MR. STAIR:  Probably just be good

18 for him to read the whole thing.

19          MR. RICHTER:  Yeah.  Fine with me.

20          MR. STAIR:  Read it just top to

21 bottom.

22          THE WITNESS:  (Complies with

23 request.)

24          MR. RICHTER:  Kent, your client,

25 the witness, lives in North Carolina.  So he

1   already knows this.  You may, just from having

2   read and heard and observed.  He knows what a

3   four-corners offense is.  It's a clock-killing

4   device, and I'm sure you would not do that; but

5   let me just -- so let me be completely clear as

6   to the futility of that effort, if that's what

7   you have in mind ever.  A four-corners offense

8   won't work here.  Just letting you know.

9               MR. STAIR:  I am bothered by that

10  suggestion because, I can assure you, it's not

11  true.  You've handed the witness a document.

12              THE WITNESS:  May I step out and

13  read this outside?  Because the conversation

14  you're carrying on is disturbing me from reading

15  it.

16              MR. RICHTER:  Yeah.  I can give

17  you -- I can actually give you a room, if you'd

18  like a room --

19              THE WITNESS:  That would be fine,

20  yes, sir.

21              MR. RICHTER:  -- With a door on it.

22  BY MR. RICHTER:

23      Q.  Before you go, let me ask you this:  You

24  arrived for a good ten minutes with Mr. Stair;

25  and you didn't discuss your testimony, you've

1    said now under oath, you didn't discuss your

2    testimony.  And you said under oath you didn't

3    see these orders during that ten -- what did

4    y'all talk about?

5            MR. STAIR:  No, no.  He didn't say

6    he didn't see the orders during those ten

7    minutes.  He said he hadn't seen it beforehand,

8    and I objected to your asking him -- I object to

9    your asking him what we discussed, the substance

10   of our conversation out there; and I object to

11   you asking him that.

12           MS. RICHTER:  "Did you get a chance

13   to review the orders that you've never seen

14   before."  "I have not."  (Indicating.)

15       Q.  Do you remember testifying to that just

16   a few moments ago?

17       A.  Yes, I do.

18       Q.  That doesn't change because Mr. Stair

19   says you didn't say that.  That's his matter to

20   explain to whoever he needs to explain it.  The

21   truth is:  You said that.  And you remember that,

22   don't you?

23       A.  Yes, sir.

24       Q.  Yeah.  If you need a room or whatever

25   you need, it's 10:20 now; and I'll get you in

1  someplace.

2         (Witness departs the conference room at

3  10:17 p.m.)

4         MR. STAIR:  May I continue on with

5  what I was saying?  This is not --

6         MR. RICHTER:  If it's truthful, go

7  ahead.  If it's not, don't go ahead.

8         MR. STAIR:  Larry, don't say those

9  kinds of things.

10        MR. RICHTER:  You said that he

11  didn't say that, and it's in the --

12        MR. STAIR:  Larry, it's quite clear

13  he was talking about before you showed them to

14  him.

15        MR. RICHTER:  That's not -- that's

16  as inaccurate as what you said before.

17        MR. STAIR:  Okay.

18        MR. RICHTER:  But that's fine.

19        MR. STAIR:  I'm not going to sit

20  and argue with you.  This is not a four-corners

21  offense.  You asked him to read it.  He's reading

22  it.

23        MR. RICHTER:  I'm really most

24  anxious to know why somebody who is named in

25  an -- why would you keep somebody whose named --

1    this is not examination.  We're just talking.

2              Why would you keep from a client

3    who was found to have violated the rules the

4    order that says he violated the rules?

5              MR. STAIR:  I can assure you the

6    client saw it.

7              MR. RICHTER:  This guy's not your

8    client?

9              MR. STAIR:  He is the 30(b)(6)

10   witness; and because of his deposition being

11   pending, as I told you, we've not talked about

12   it -- his testimony or this order with him.  I

13   think that is a following of the rule, and that's

14   what we intended to do.

15             MR. RICHTER:  Good.  Maybe you can

16   sell that.  I'm just going to sit here and reread

17   these lines then.

18             MR. STAIR:  Okay.

19        (Witness returns to the conference room

20   at 10:27 a.m.)

21   BY MR. RICHTER:

22        Q.  Now that you've had an opportunity to

23   read the order of Judge Gergel -- the amended

24   order of Judge Gergel and familiarize yourself

25   with it, is this the first time you've seen that?

1          A.   Yes, sir.  May I say there's a mistake

2     in it?

3          Q.   A mistake in the order?

4          A.   Uh-huh.   In the amended order.

5          Q.   I don't know.  I don't know if there is

6     or not.

7          A.   I do.

8          Q.   Okay.  If you want to criticize him,

9     sure.

10         A.   My name is not Roger A. Attanasio.  My

11    name is Roger M. Attanasio.

12         Q.   Okay.

13         A.   On page 4.

14         Q.   Let me just catch up with you.

15         A.   Third line.

16         Q.   I see it.  Yeah.  It says A.  Okay.

17    What did it say in the original one?

18         A.   Same thing.

19         Q.   Same error?

20         A.   (Nods head.)

21         Q.   Well, are you saying you would like that

22    called to the judge's attention or not?  Or do

23    you want me to do something about that?

24         A.   No, sir.

25         Q.   Well, here's what I -- I don't want

```
 1   to -- did you have --
 2            (Off-the-record discussion was held.)
 3        Q.   During the first break that you and
 4   Mr. Stair utilized out of the room, as you just
 5   heard, the reporter calculated the time; and it
 6   was 11 minutes.  And you said a while ago -- I
 7   just want to make sure we get this straight for
 8   the record.
 9            You said a while ago that you didn't
10   discuss your testimony with Mr. Stair at that
11   time, didn't you?
12        A.   Yes.
13        Q.   And that you didn't see this
14   Judge Gergel's order until I put it before you in
15   here as Exhibits No. 05 and No. 06; isn't that
16   correct?
17        A.   Yes, sir.
18        Q.   So you didn't see it during that
19   11-minute break?
20        A.   Mr. Stair was holding it; and I could
21   see Mr. Stair was holding it, but I did not read
22   it.
23        Q.   Did you know what it was?
24        A.   The order 'cause you said it was the
25   amended order.
```

1      Q.   No.   No.   No.   How did you know what it
2  was that Mr. Stair was holding?
3      A.   Because he said it was the amended
4  order.
5      Q.   And did you ask, "What does it say?"
6      A.    Mr. Stair gave me his interpretation of
7  what it said.
8      Q.   And did you -- now you've read it.  Did
9  you interpret the order the same way that
10 Mr. Stair interpreted it?
11     A.   Yes.
12     Q.   And do you interpret that order as
13 finding that you violated the Federal Rules of
14 Civil Procedure?
15              MR. STAIR:  Objection to form.
16              MR. DUKES:  Same objection.
17     A.   Yes.
18     Q.   Did Mr. Stair explain that to you or did
19 you learn that from reading the order itself?
20              MR. STAIR:  Object to the form.
21     A.   Reading.
22     Q.   So you've never been told before you
23 read the order that you have been found by the
24 Federal Court in Charleston, South Carolina, to
25 have violated the Rules of Civil Procedure and

1    that you must now come back and comply with those

2    rules and comply with the rules of the

3    deposition?

4              MR. STAIR:  Object to the form.

5      A.   Correct.

6      Q.   What did you think about that?

7              MR. STAIR:  Object.

8              MR. DUKES:  Same objection.

9      A.   I don't have any thoughts about it.

10     Q.   Now, I'd like to call your attention in

11   that order -- because I want to make sure you

12   understand this, and you'll see why in just a

13   minute.  I'd like to call your attention,

14   please -- I'd like to call your attention,

15   please, to page 6.

16     A.   (Complies with request.)

17     Q.   Are you up with me?  This on the Amended

18   Order and Opinion of the Honorable Richard Gergel

19   dated August 9, 2021.  We're looking at the same

20   thing?

21     A.   Yes, sir.

22     Q.   Thank you.

23              Do you -- did you read the following

24   language in the first full paragraph -- beginning

25   in the first full paragraph -- well, beginning

1  with the first full paragraph, "The Court further

2  denies LS3P's requests to terminate the Rule

3  30(b)(6) deposition of LS3P and, instead, orders

4  that said disposition be reconvened."

5          Do you understand that that is what has

6  brought us back together?

7              MR. STAIR:  I think you meant to

8  say "deposition."

9      Q.  Said deposition to be reconvened.  Do

10  you understand that's what -- that order is what

11  has brought us back together here today?

12     A.  Yes.

13     Q.  It goes on in that same paragraph, "The

14  Court has reviewed the entire transcript of

15  LS3P's deposition."

16          Do you understand that that means the

17  judge sat down and read every question and every

18  answer and every objection that was made at your

19  first appearance here?

20     A.  Yes, sir.

21     Q.  "The Court finds problematic the conduct

22  of LS3P's representative Attanasio."  You say

23  Attanasio, don't you, because you -- I remember

24  the long vowel.

25          "The Court finds problematic the conduct

1    of LS3P's representative Attanasio and, to a

2    lesser degree, LS3P's counsel?"

3            Do you understand that that says that

4    you were worse even than your counsel was?

5                    MR. DUKES:  Object to the form.

6                    MR. STAIR:  Object to the form.

7        Q.  Do you understand that that says that

8    your behavior at the deposition was even worse

9    than that of your lawyer, Mr. Stair?

10                   MR. STAIR:  Object to the form.

11       A.  I read it to say that it finds my -- it

12   finds problematic my conduct, yes, sir.

13       Q.  And it goes on to say too, "and to a

14   lesser degree, LS3P's counsel."  That's

15   Mr. Stair; right?

16       A.  Yes, sir.

17       Q.  That's just like saying, but he wasn't

18   as bad as Mr. -- but Mr. Stair wasn't as bad as

19   you were --

20                   MR. STAIR:  Object to the form.

21       Q.  -- in his offensive activities.

22                   MR. STAIR:  Object to the form.

23                   MR. DUKES:  Same objection.

24       Q.  Do you understand that or not?

25       A.  I understand the Court finds Mr. Stair's

1    conduct less problematic than mine, yes, sir.

2        Q.   And do you agree with that assessment?

3             MR. STAIR:  Object to the form.

4             MR. DUKES:  Same objection.

5        A.   Do I agree with that assessment?  I

6    mean, the judge is entitled to his opinion.

7        Q.   I'm just asking what your opinion is.

8    Do you agree with his assessment?

9        A.   No.

10       Q.   You think Mr. Stair was more violative

11   of the rules than you were?

12       A.   No.

13            MR. STAIR:  Object.

14       Q.   Well, what is it that you think?  If the

15   judge was wrong in saying what he said here, I

16   want to understand what he said is wrong, in your

17   opinion.

18            MR. STAIR:  Object.

19            MR. DUKES:  Object to the form.

20       A.   Well, first, I didn't understand I was

21   violating any rules.  Okay.  So I -- I didn't

22   understand that when I left here.  I came to

23   speak about three items:  Planning, design, and

24   building.

25            And that's what I thought this -- you

1  were limited to asking me questions about.  So

2  that's why I answered the way I answered in the

3  manner that I answered.  I didn't know I was

4  violating any rule.

5        The judge has said I violated a rule,

6  and my conduct was problematic.  I now have an

7  opportunity to correct that conduct.  That's what

8  I believe.  The judge is entitled to say what the

9  judge wants to say.

10       Q.  But you disagree with it.

11            MR. STAIR:  Object to the form.

12       Q.  And I'm trying to understand what it is

13  that he has said in that sentence.  The Court

14  finds problematic conduct of you and, to a lesser

15  degree, LS3P's counsel, which would be Mr. Stair;

16  and you said you disagree with that.  I'm trying

17  to understand what it is that you disagree --

18       A.  I don't know what the rule means and how

19  that is interpreted.  So I can't have an opinion

20  on whether or not the judge is correct, the judge

21  is not correct.  I mean, if I violated the

22  conduct, I will correct my conduct.

23       Q.  Now, we went to the next sentence, which

24  says, "The Court has reviewed the entire

25  transcript of LS3P's deposition."  I think I

1  asked you, do you understand that means he

2  literally sat down and read every question, every

3  answer, every objection in the transcript of that

4  deposition.

5          Do you understand that?

6      A.  Yes, sir.

7      Q.  Next sentence, contrary to plaintiff's

8  characterization otherwise, you, sir, did respond

9  to most questions of the plaintiff.  And then he

10  goes -- you'll see at the bottom.  I don't want

11  to take the time to go through all the

12  illustrations that he makes in that footnote.

13          But you see the footnote down there, a

14  good size footnote.  Text says, "Problematically,

15  however, Attanasio often answered questions only

16  after stating that he believed" -- and you notice

17  that's in italics.  "He" is emphasized.  He

18  believed a question was, quote, outside the scope

19  of Plaintiff's 30(b)(6) notice.

20          Do you understand what he's saying

21  there?

22      A.  Yes, sir.

23      Q.  You did that, didn't you?

24      A.  I did.

25      Q.  And you don't -- if I remember your

1  testimony, you didn't have any legal training to

2  base that on whatsoever, did you?

3      A.   That's correct.

4      Q.   And next sentence says, "Plaintiffs

5  argue that Attanasio testified in this manner at

6  the prompting of LS3P's counsel."  That would be

7  Mr. Stair.  "Who frequently objected to scope."

8          Do you understand what that means?

9      A.   I believe I understood what the judge

10 was trying to say, yes, sir.

11     Q.   Well, what do you think he was trying to

12 say there?

13     A.   I think the judge is saying that I

14 answered in the manner that it was outside the

15 scope because Mr. Stair frequently objected to

16 the scope of the question.

17         I don't find that to be accurate.

18 That's not why I did what I did.  Mr. Stair

19 didn't encourage me to answer or not answer a

20 question.  He just said, "Object to the form."

21     Q.   Well, that's not what he said, is it?

22     A.   That's what I recall Mr. Stair saying.

23     Q.   You're under oath today.  You say what

24 you think you --

25     A.   I recall Mr. Stair -- when you asked a

114

1    question, Mr. Stair would say, "Object to the

2    form."

3         Q.   Would you like to see the transcript of

4    that deposition?

5         A.   No, sir, I do not.

6         Q.   I've counted the questions and read it

7    over and over, and Judge Gergel has read it.

8    Let's go down to the footnote.  Then we'll come

9    back up to the body.  Footnote said -- I didn't

10   want to have to take the time to do.

11        The Court notes, the footnote says,

12   Footnote No. 1 on page 6 that "as LS3P's counsel

13   objected to various topics as outside the

14   scope" -- and he quotes it, that word "scope,"

15   "of plaintiff's notice despite the fact that

16   these subjects were clearly proper."

17        Do you understand that the Court finds

18   that the objections Mr. Stair made were to

19   questions that were clearly proper questions?  Do

20   you understand that?

21             MR. STAIR:  Object to the form.

22        A.   I understand what this says, yes, sir.

23        Q.   Yeah.  And it doesn't say, "I object to

24   the form of the question," does it?  It quotes

25   the word "scope," doesn't it?

1         A.   Excuse me?  Say that again.

2         Q.   This footnote -- you testified under

3    oath one minute ago that Mr. Stair objected to

4    the form of the question.  And I said, "That's

5    not what he did, is it?"  And you said, "Well,

6    yes, it is."  And I said, "You want to read the

7    deposition?"  I've got all the questions.  All

8    the answers.  I got them lined out.  Got tabs on

9    each one, and I've got even calculation of how

10   many there were and the time that was expended on

11   doing all of that.

12        If you want to read all that, I can make

13   it available to you.  All I'm trying to get you

14   to do here with this last question --

15             MR. DUKES:  This is off the record.

16             (Off-the-record discussion.)

17   BY MR. RICHTER:

18        Q.   In other words, the Court found here

19   that the questions I was posing -- I think he

20   said in many instances, the subjects were clearly

21   proper is what he said.

22        And you understand that to mean, I take

23   it, I think what you said is:  Judge Gergel could

24   say what he wants to say, or he can think what he

25   wants to think.

1           Was that your response or not?

2                 MR. STAIR:  Object to the form.

3                 MR. DUKES:  Same objection.

4      A.  I don't recall exactly what I said,

5  Mr. Richter.

6      Q.  And he cites as an example in brackets

7  at the end of the third sentence of the footnote,

8  objecting to the question of whether LS3P, quote,

9  knew and drew the plan for construction of the

10  school, that on one side of that window would be

11  children in various states of dress.

12           Do you understand what the -- what that

13  reference is to?

14                 MR. STAIR:  Object to the form.

15      A.  Yes, sir.

16      Q.  Now, let's go back to the place where

17  Footnote 1 is shown on page 6 in the body of

18  Judge Gergel's order because I want to ask you

19  what you understand the following to mean.

20      A.  (Complies with request.)

21      Q.  It -- well, the sentence before that.

22  "The plaintiffs argue that Mr. Attanasio

23  testified in this manner at the prompting of

24  LS3P's counsel, who frequently objected as to

25  scope."  Then there's Footnote 1, and then

1    there's several examples of Footnote 1 of

2    Mr. Stair objecting about scope.

3            Do you recall -- I mean, do you agree

4    with that characterization?

5                    MR. STAIR:  Object to the form.

6        A.  I agree that's what this states, yes,

7    sir.

8        Q.  Do you agree with the characterization

9    that that's what the footnote says?

10       A.  Yes, sir.

11       Q.  And do you agree that, in fact, that's

12   what happened?

13                   MR. STAIR:  Object to the form.

14       A.  Without -- without reading the entire

15   deposition, I can't say for sure yes or no.  But

16   if that's what it says, that's what it says.

17       Q.  Well, the Court then goes on to say,

18   "This may be so."  A full sentence, "This may be

19   so.  Period."

20            What do you understand that to mean?

21                   MR. STAIR:  Where is that one,

22   Larry?

23                   MR. RICHTER:  Right after the one

24   for the footnote.  One, two, three, four, five

25   lines up from the bottom on page 6 in the body.

1          MR. STAIR:  Object to the form.

2     Q.   What do you understand that to mean?

3     A.   I understand that to mean that the Court

4  interprets my response to saying "beyond the

5  scope of the deposition" was a direct -- was done

6  so because of Mr. Stair said it was beyond the

7  scope of the deposition.

8     Q.   Then let's go forward and get to the end

9  of this.

10         The order continues, "In sum,

11  Attanasio's and LS3P's counsel's behavior was

12  inappropriate and violated Federal Rules of Civil

13  Procedure 30(c)(2) and Local Civil Rule 30.04

14  (c), Federal Rule of Civil Procedure 30(c)(2)

15  noting counsel, not the deponent, should state on

16  the record objections in a non-argumentative and

17  non-suggestive manner."

18         Do you understand what that means?

19     A.   Yes, sir.

20     Q.   And do you understand that this is in

21  the record now for all of time that you've been

22  found to have violated those rules?

23     A.   Yes, sir.

24          MR. STAIR:  Object to the form.

25     Q.   Now, I'd like to go on through the

1   sentence that begins "Local Civil Rule 30.04"

2   where the parentheses begin noting that, quote,

3   counsel shall have an affirmative duty --

4           MR. STAIR:  Where is that, Larry?

5   Okay.  I see it.  I see it.

6       Q.  -- to inform their clients that

7   unless -- brackets -- an objection regarding

8   privilege or a court-ordered limitation, closed

9   bracket -- is made, the question must be

10  answered.  And that's in, again, italics.  So it

11  is highlighted or emphasized.

12          Do you understand that?

13      A.  Yes, sir.

14      Q.  Now, that didn't happen in the

15  deposition, did it?

16          MR. STAIR:  Object to the form.

17          MR. DUKES:  Same objection.

18      A.  On some questions.

19      Q.  You think it did happen on some

20  questions?  How many times were you instructed

21  not to answer?

22      A.  I was never instructed not to answer,

23  that I recall.

24      Q.  "Considering the above, the Court finds

25  LS3P and its counsel failed to comply with the

1  rules governing the conduct of oral

2  depositions" -- Federal Rules of Civil Procedure

3  30(c) -- 30(c) and local Rule 30.04.  "The Court,

4  therefore, directs LS3P to make Attanasio

5  available to the plaintiffs to complete in its

6  entirety the Rule 30(b)(6) deposition of LS3P."

7        Do you understand what that means?

8     A.  Yes, sir.

9     Q.  That's what -- why you're here today,

10  isn't it?

11    A.  Yes, sir.

12    Q.  Now, I want to use this as a point of

13  demarcation so that we can identify a time frame.

14  There came a time when LS3P got a letter from me

15  saying, "Want to take some depositions."  I

16  didn't say it in those words.  I'm paraphrasing,

17  as you, I'm certain, recognize.

18        From that point in time until the day of

19  the deposition, the beginning of this deposition,

20  that point of time, who did you talk to about

21  this matter?

22    A.  John Works, Eric Aichele, Kent Stair --

23    Q.  Let's start --

24    A.  -- Marc Marchant.

25    Q.  Oh, I'm sorry.  I didn't mean to cut you

121

1    off.

2         A.   Four people.

3         Q.   Who is Marc Marchant?

4         A.   CEO of LS3P.

5         Q.   Let's start with him.  We'll go

6    backwards on this.

7              What was your conversation with Marc

8    Marchant about the 30(b)(6) notification that I

9    sent?

10        A.   How to deal with the request for a

11   30(b)(6) witness.

12        Q.   And who initiated that conversation?

13        A.   I don't recall.

14        Q.   Where did it occur?

15        A.   Over the phone.

16        Q.   Was it recorded?

17        A.   No.

18        Q.   What phone were you on?

19        A.   Probably my cell phone.

20        Q.   What's the number of the cell phone?

21        A.   704-301-7463.

22        Q.   And where was Mr. Marchant?

23        A.   I do not know.

24        Q.   You initiated the call?

25        A.   I don't recall.

1    Q.  And you haven't changed cell phones or

2    numbers.  I think we discussed that previously.

3    A.  Right.

4    Q.  Please don't until we get past what

5    we're going to have to get past in this case.

6         Now, what was Mr. Marchant's instruction

7    to you in that phone call?

8    A.  I don't recall.

9    Q.  And you initiated the call?

10   A.  I don't -- I don't recall that.

11   Q.  Oh, you don't recall that.

12   A.  I don't recall who initiated the call.

13   Q.  I'm sorry.  I think you said that, that

14   you don't recall that.

15        What is it that you learned in that

16   conversation?

17   A.  I don't remember exactly what was

18   discussed.  So I -- I can't remember what -- how

19   to answer that question.

20   Q.  Were you told that you would be a

21   30(b)(6) designee of LS3P?

22   A.  I don't know if I was told or how we

23   came about to determining that I would be the

24   30(b)(6) designation -- designee.

25   Q.  Do you know where you were when that

```
1   happened?

2         A.   I do not.

3         Q.   Likely in your office or your home in

4   Charlotte?  Charlotte area?

5         A.   Probably likely at home because I

6   haven't been in my office for many months.

7         Q.   Yeah.  You said that when we were here

8   earlier.  I see that you have two shoes on --

9         A.   Yes, sir.

10        Q.   -- today.  Looks like you're making

11  progress in that regard.

12             Did you express your opinion of who

13  would be the best 30(b)(6) witness for LS3P in

14  the sense of broadest knowledge base?

15        A.   You know, I don't recall the specifics

16  of the conversation.

17        Q.   What do you recall about the

18  conversation?

19        A.   I -- I think the conversation was about

20  the fact that you had asked to come speak to Marc

21  Marchant, I think.  And I think we -- we

22  discussed who the 30(b)(6) was going to be and

23  the fact that we would prefer not to talk to you

24  because we had outside counsel, and you should be

25  talking to outside counsel.
```

1      Q.   And did -- to your knowledge, did LS3P

2  write back and say that; or did it just go engage

3  Mr. Stair?

4      A.   I don't know how -- I don't know if

5  Mr. Stair got back to you with that or not.  I

6  don't know how that went from there.  Don't

7  recall.

8      Q.   In any event, you've now summarized that

9  conversation as best you can.  Is that fair?

10     A.   Yes, sir.

11     Q.   Thank you.

12          Who's the next person that you spoke to?

13  Aichele you said you spoke to?

14     A.   Yes, sir.

15     Q.   And when was that conversation in

16  relation to your conversation with Marchant?

17     A.   I don't recall.  I don't remember if it

18  was before or after.

19     Q.   And do you remember the substance of

20  your conversation with Aichele?

21     A.   The subject -- the -- I vaguely remember

22  the conversation with Aichele dealing more about

23  the -- the project, the Bishop England High

24  School project.

25     Q.   In what aspect?

1    A.   The design of the project.

2    Q.   And what did y'all discuss about the

3 design?   You and Aichele about the design?

4    A.   The window that was in question.

5    Q.   And what did y'all say to each other

6 about the window?

7    A.   Do you remember this, or do you remember

8 that about the window.

9    Q.   That's what I want to know.   Do you

10 remember what -- or do you remember what else

11 about the window?

12    A.   That -- that was the conversation.

13 Probably the majority of the conversation.

14    Q.   Yeah.   What did you ask him if he

15 remembered about the window?

16    A.   I think we talked about did they ask for

17 it?   Did we do it?   Did we do it on most schools?

18 I mean, questions about the design of that window

19 and why it was there.

20    Q.   With you propounding those questions to

21 him?

22    A.   It's a back and forth probably.

23    Q.   And what did you learn?

24    A.   He didn't recall many of the questions

25 that we had.

1     Q.   So did you get an answer or did you give

2  an answer to the inquiry whose idea was it to put

3  in the window?

4     A.   I think the answer was I don't recall.

5     Q.   That was Aichele's answer to you?

6     A.   I don't remember who asked for it.

7     Q.   But if he asked you that, you'd say, "I

8  don't recall."  You would have said --

9     A.   Yeah, I -- I -- correct.

10     Q.   Thank you.

11          And if you asked him, he either did say

12  or you think he would have said, "I don't

13  recall"?

14     A.   Correct.

15     Q.   Thank you.

16          Now, have you pursued that issue, whose

17  idea it was to put in the window to view students

18  that are naked or partially naked?

19     A.   No.

20     Q.   You never asked anybody else why that

21  happened?

22     A.   Have I pursued the answer to the

23  question --

24     Q.   Yeah.

25     A.   -- about -- no, I have not.

```
 1         Q.  So you didn't ask anybody else where
 2    this window came from?  Whose idea this was?
 3         A.  Correct.
 4         Q.  Did you ask them did they know that
 5    naked children would be on one side of the window
 6    and an adult or some adults or some students or
 7    some passersby would be outside looking through
 8    the window?
 9                   MR. STAIR:  Object to the form.
10                   MR. DUKES:  Objection.
11         A.  No.
12         Q.  Can you tell me why you would not have
13    posed -- why you did not pose those questions?
14                   MR. DUKES:  Object to the form.
15                   MR. STAIR:  Object.
16         A.  Because the question was:  "Who asked
17    for the window?"  Or "who decided on the window?"
18    And when it was answered, "I don't know," there
19    was nobody else to ask for Bishop England High
20    School.  There was nobody else to ask.
21         Q.  What do you mean by --
22         A.  Eric is the only one there who worked on
23    the project.
24         Q.  And why --
25         A.  Being LS3P.
```

```
1        Q.   Then why is he not --

2        A.   Because I was determined to be the

3    30(b)(6) designee, not Eric.

4        Q.   And who made that determination?

5        A.   I don't recall who made the final

6    decision.

7        Q.   And they decided to use someone who was

8    not the person who was there at the relevant

9    times and on the relevant issues?

10       A.   Correct.

11            MR. STAIR:  Object to the form.

12            MR. DUKES:  Object to the form.

13       Q.   Have you asked anybody, "Why would you

14   send me as opposed to Aichele when he knows more

15   than I do?"

16            MR. STAIR:  Object to the form.

17       A.   I have not.

18       Q.   Do you understand that a jury is going

19   to look at you testifying and pass upon the

20   believability of what you say?

21            MR. STAIR:  Object to the form.

22       A.   I haven't given that any thought.

23       Q.   Well, let me tell you, I think that's

24   what will happen.

25            MR. DUKES:  Object to the form.
```

1      Q.  Just so you can know where the case goes

2   and how it flows.

3              MR. STAIR:  Object to the form.

4      Q.  So your response as a 30(b)(6)

5   representative to the question whose idea was it

6   to put the window in -- windows plural in -- what

7   is your answer to that?

8      A.  I do not know.

9      Q.  And you've told us everything that

10  you've done to determine that; is that correct?

11     A.  Well, I have looked at how many other

12  schools have windows between locker rooms and

13  coach's offices because I've been doing this for

14  35 years; and I recall the majority of those

15  locations have a window for security reasons.

16     Q.  Majority of which locations?

17     A.  Locker rooms and coach's office adjacent

18  to those lockers rooms.

19     Q.  And you said for security purposes?

20     A.  Yes, sir.

21     Q.  And what is -- did those windows that

22  you're referring to -- you used the word

23  "majority."  Do those windows that you're

24  referring to have blinds on them?

25     A.  Sometimes, yes, sir.

1    Q.   What are the blinds there for?

2    A.   I'm not sure why we put blinds there.

3    Q.   Well, does LS3P do that; or does the

4    school?

5    A.   The blinds are usually specified for

6    those locations.

7    Q.   At Bishop England were the blinds so

8    specified?

9    A.   I believe so.

10    Q.   And does that mean that LS3P would have

11    made that specification or that the school would

12    have directed y'all to put one --

13    A.   I'm not sure.  I don't know.

14    Q.   And you haven't made any inquiry to find

15    out?

16    A.   I have not looked at that, yes, sir.

17    Q.   What are the blinds designed to do?

18    A.   Well, I guess limit view.

19    Q.   And why would you want to limit view if

20    you -- as you said a while ago -- were creating a

21    view portal in the corridor for the security of

22    the students?  Why would you want to limit that?

23                MR. DUKES:  Object to the form.

24                MR. STAIR:  Object.

25    A.   There may be an occasion for someone in

```
1   the office to limit view back into the office.
2        Q.  So it's for the sake of the person who
3   is --
4        A.  That's one thought that comes to mind,
5   yes, sir.
6        Q.  Any others?
7        A.  No, not to mind.
8        Q.  In this case there was a window looking
9   into each of the three large dressing rooms.
10        Do you agree with that?
11        A.  Yes, sir.
12        Q.  And on each door to the office which
13   adjoined the locker room, except for that glass
14   window being between the two, was there a window
15   in the door of each of those offices?
16        A.  I don't recall not looking at the plans.
17        Q.  I can make that available to you and
18   we'll -- and what is it that kept people from
19   looking through the office door if it had a
20   viewing window in it?  Or any kind of window in
21   it?  What kept people from looking through that
22   and looking through the blinds at the naked
23   children who are just finished with, let's say,
24   PE class and wiping the sweat off themselves and
25   getting ready to go back to class?
```

 1                    MR. STAIR:  Object to the form.

 2                    MR. DUKES:  Same objection.

 3        A.   I'm not sure I understand your question.

 4   I heard you say what -- what prevented someone

 5   from looking through a -- possibly a window in a

 6   door through the glass between the dressing room

 7   and the office and into the dressing room?

 8        Q.   Yeah.

 9        A.   I suspect that if the blinds were open

10   and there was a door in that window, nothing.

11        Q.   Why would you design such an arrangement

12   so that someone in the hallway, anybody in the

13   hallway, could look standing in the hallway

14   through the office door window, through the

15   window on the other side of the office into the

16   locker room, and see children naked?

17        A.   I don't think that's the way it was

18   designed.

19                    MR. DUKES:  Object to the form.

20        Q.   You don't think that was the way it was

21   designed?

22        A.   No, sir, I don't believe that --

23        Q.   Has that changed?

24        A.   I don't think so.

25        Q.   Have you ever been there?

1          A.   Not in Bishop England High School.

2          Q.   You never have?

3          A.   I think you had to go into a door

4    leading to the dressing room.  I don't think the

5    window -- I don't think the coach's office opens

6    directly off a corridor outside the dressing

7    room.  I'd have to look at the plans to be able

8    to determine that.

9          Q.   I've got the plans.

10         A.   Okay.

11         Q.   Of course, I have the plans.  I

12   represent to you that it did.

13         A.   Okay.

14         Q.   It does.  And I want to make sure I

15   understand.  You have never set foot in Bishop

16   England High School?

17              MR. STAIR:  Object to the form.

18         A.   Oh, yes, sir.  I've been to Bishop

19   England High School, yes, sir.

20         Q.   How many times?

21         A.   I do not know.

22         Q.   How recently?

23         A.   At least 20 years because I've been in

24   Charleston -- I've been in Fort Mill for 20

25   years.  So over 20 years.

134

1      Q.   The last time you were there was 20 over

2  years ago?

3      A.   Yes.

4      Q.   Have you been in the locker rooms?

5      A.   I don't recall.

6      Q.   Do you agree that the viewing windows

7  I've been questioning you about afforded persons

8  who looked through those windows a view of the

9  students -- who I've referred to earlier being

10 naked sometimes, sometimes fully clothed --

11 sometimes fully clothed -- provided a view of

12 those students without the students knowing that

13 they were being viewed by somebody?

14              MR. DUKES:  Object to the form.

15     A.   There is a potential for that.

16     Q.   Yeah.  Why didn't you guard against

17 that?

18              MR. STAIR:  Object to the form.

19     A.   The design for placing the window there

20 was for security reasons, to be able to

21 potentially prevent or to stop an incident of

22 misbehavior.

23              When someone enters the dressing room, a

24 student, a student would understand if they're

25 going to change from street clothes to gym

135

```
1   clothes, have gym class, when they come back,
2   change from gym clothes back to street clothes,
3   when they enter the locker room, they have to
4   pass by that window.  So they know the window's
5   there.
6        Q.  So do they agree -- those students agree
7   and consent to being viewed naked?
8                MR. DUKES:  Object to the form.
9                MR. STAIR:  Object to the form.
10       A.  I can't answer that.
11       Q.  Then what are you saying?  I don't
12   understand.
13       A.  I don't know that they consent to
14   changing.  I mean, when they go in there, they
15   expect to change from street clothes to gym
16   clothes and then back to street clothes.
17       Q.  You indicated you had two children.  One
18   is now deceased; correct?
19       A.  Correct.
20       Q.  Did your children -- did you put them in
21   a school where they were made to take their
22   clothes off and get naked in front of a viewing
23   window?
24                MR. DUKES:  Object to the form.
25       A.  My children went to a public school
```

1   which had a similar condition, yes, sir.

2        Q.   Had a similar viewing condition?

3        A.   Yes, sir.

4        Q.   What school is that?

5        A.   Fort Mill High School, I believe.

6        Q.   And when did you learn of those windows

7   in Fort Mill High School?

8        A.   Well, I can't say for sure because I

9   didn't go into Fort Mill; but, again, I've been

10  doing this for 35 years, and schools are designed

11  with the viewing window for security purposes.

12       Q.   Who told you that?

13       A.   It's just what we do.  I mean, I -- I've

14  been on construction administration facilities

15  from middle schools and high schools where that

16  is a component of the design.

17       Q.   It was here, wasn't it?

18       A.   It was.

19       Q.   And y'all made it up; and you put it in

20  the plans, didn't you?

21       A.   Yes, sir.

22       Q.   You thought it up; correct?  You, LS3P,

23  thought it up?

24            MR. STAIR:  Object to the form.

25       A.   I don't know if that particular item was

1    discussed in the planning of the Bishop England

2    school.

3          Q.   You don't know if it was discussed

4    amongst whom?

5          A.   The designers of LS3P and the people

6    representing Bishop England at the time.

7          Q.   And who were the designers of LS3P that

8    drew the design at Bishop England High School?

9          A.   Eric was probably one of them.  But who

10   are the others?  I'm not sure.

11         Q.   And are those the same people who

12   decided not to warn these children, these minors,

13   that they would be viewed naked, if they were

14   naked, half clothed if they were half clothed, or

15   fully clothed if they were fully clothed?

16               MR. DUKES:  Object to the form.

17               MR. STAIR:  Object to the form.

18         A.   I don't believe so.

19         Q.   Who decided, then, not to warn these

20   children, these minors, that they may be viewed

21   naked if they were naked, half clothed if they

22   were half clothed, or fully clothed if they were

23   fully clothed?

24               MR. STAIR:  Object.

25         A.   I do not know.

```
1        Q.  Well, then how do you know it was not
2    these design people?
3        A.  I don't know.  I said I don't know.
4        Q.  You didn't say you don't know.  What you
5    said was "I don't believe so."  That's the truth
6    of what you said, isn't it?
7        A.  Yes, sir.
8              MR. STAIR:  Object to the form.
9        Q.  Then why did you --
10             MR. DUKES:  Same objection.
11       Q.  -- then say, "I said I don't know."
12       A.  To me, I don't believe so, I don't
13   know -- I don't know who -- your question was did
14   the designers tell the students that they might
15   be viewed, as you say clothed, partially clothed,
16   naked.
17             I don't believe the designers did
18   because designers don't generally talk to the
19   students.  The designers design the building.
20   It's then drawn.  It's then constructed.  Many of
21   the designers don't have anything to do with the
22   school once it's open, other than going to visit
23   the school to see how it's working.
24       Q.  I'll be glad to read the question back
25   to you if you'd like to --
```

 1          A.  Please do.

 2          Q.  Question I asked you was:  Who were -- I

 3     asked you about who the designers were.  You said

 4     Eric would have been one of whoever else helped

 5     him, but Eric would have been in the mix doing

 6     that.  Then we went to the next question, which

 7     is this:

 8              "And are those the same people who

 9     decided not to warn these children, these minors,

10     that they would be viewed naked if they were

11     naked, half clothed if they were half clothed, or

12     fully clothed if they were fully clothed?"

13              And you said:  Answer, "I don't believe

14     so."

15              Now, you were asked, then, if these same

16     designers you had referenced just in the question

17     preceding, if those were the same people who made

18     that decision not to tell the children that they

19     were going to be viewed naked if they were naked.

20              MR. DUKES:  Object to the form.

21          Q.  And all the rest that was in the

22     question.

23              And you said, "I don't believe so."  And

24     who do you believe made that decision?

25              MR. STAIR:  Object to the form.

140

```
 1                 MR. DUKES:  Same objection.
 2        A.  I want to make sure I understand.  Made
 3   the decision to inform the students?
 4        Q.  No.
 5        A.  Made the decision --
 6        Q.  Not to inform the students.
 7        A.  Made the decision not to inform the
 8   students?
 9        Q.  That's right.
10        A.  Again, the typical process is the
11   designers are usually not speaking with students
12   during the use of the building.  I mean, the
13   decision was made way before a student occupied
14   that facility.
15        Q.  What decision?
16        A.  To put a window there.
17        Q.  That's not what I'm asking you.
18             I asked you who made the decision not to
19   tell the students who were nude on the other side
20   of that 4-foot glass window?
21        A.  And I don't know --
22                 MR. STAIR:  Object to the form.
23                 MR. DUKES:  Same objection.
24        A.  -- if -- if anybody made a decision not
25   to tell a student.  I'm not aware of anybody.
```

141

```
1        Q.  Who told students that?
2             MR. STAIR:  Object to the form.
3             MR. DUKES:  Object to form.
4        A.  You're confusing me.  Who told the
5   students what?  That they would be viewed?
6        Q.  That they may be viewed naked if they
7   were naked, half clothed if they were half
8   clothed, or fully clothed if they were fully
9   clothed.
10            MR. STAIR:  Object to the form.
11            Roger, let me object first.  Then
12  answer.  So I can make the objection, please.
13            Object to the form.
14       A.  I don't know if anybody informed the
15  students.
16       Q.  We have no evidence that anybody
17  informed.  We have seen -- I have seen as lead
18  counsel in this case, seen no evidence of anybody
19  informing the students.
20            MR. DUKES:  Object to the form.
21       Q.  You testified previously that there were
22  no signs warning anybody of anything.  Do you
23  remember that?
24            MR. STAIR:  Object to the form.
25       A.  Yes, I do.
```

1    Q.   And now you're saying you don't have any

2    evidence that anybody ever warned anybody that

3    students who were naked in the dressing room

4    could be seen and viewed by whoever looked

5    through the window at them?

6              MR. STAIR:   Object to the form.

7    A.   Correct.

8    Q.   Why would that be?

9              MR. STAIR:   Object to the form.

10   A.   Well, I would assume that when a student

11   enters a locker room, they understand the concept

12   of changing from street clothes to gym clothes,

13   have gym class, and then change from gym clothes

14   to street clothes.

15          And when they bypass a window that's

16   going from the locker room, they would understand

17   that there's a window there; and if they would

18   have an objection to undressing, they should

19   bring that to the attention of the coach, the

20   teacher, whomever.

21   Q.   So you -- are you saying that the burden

22   is on the children to prevent themselves from

23   being viewed as opposed to upon the school or the

24   staff or the adults or whoever else may view them

25   through the window that LS3P drew in these plans?

1            MR. STAIR:  Object to the form.

2      A.  No.

3      Q.  I'm sorry?

4      A.  No.

5      Q.  You're not saying that?

6      A.  Correct.

7      Q.  What are you saying?  I don't

8  understand.  I'm sorry.

9      A.  I'm saying that a student understands

10  when they go into a dressing room that they're

11  going to be changing from street clothes to gym

12  clothes and then back to street clothes.  They

13  understand that concept.  They know that before

14  they go into the dressing room.

15      Q.  So what?  I'm sorry.  I'm not

16  understanding what you're saying.

17      A.  That's part of the dressing room.  When

18  you go into a dressing room, you know that's

19  what's going to happen.

20      Q.  And do you think that a student who goes

21  into the dressing room consents to someone

22  viewing them naked?

23            MR. DUKES:  Object to the form.

24            MR. STAIR:  Object to the form.

25      A.  No.  I would say no.

```
 1        Q.  Are you aware that we have asked Bishop
 2   England for various documents, including
 3   documents of incidents, for example, that they
 4   would respond to?  You talk about security and
 5   safety purposes.  They have -- that they in their
 6   pleading said, "That's what we were trying to do,
 7   just keep everybody safe."  We wanted to know if
 8   something happened in there, but they don't have
 9   any documents --
10             MR. DUKES:  Object to the form.
11        Q.  -- of even one incident in 21 years
12   taking place in the dressing rooms.
13             MR. STAIR:  Object to the form.
14             MR. DUKES:  Object to the form.
15        Q.  Do you understand?
16             MR. STAIR:  Object.
17        A.  I understand your statement.
18        Q.  Do you know of any such document?
19        A.  I'm not aware of any, no, sir.
20        Q.  Do you know that we asked Bishop
21   England -- and they're required to give us these
22   things, unless they are going to live with
23   breaking the rules, like you have.
24             MR. DUKES:  Object to the form.
25             MR. STAIR:  Objection.
```

1       Q.   And Mr. Stair.  I didn't mean to leave

2   him out.  You and Mr. Stair have been found to

3   have done.

4             MR. STAIR:  Object.

5       Q.  We have asked them for copies of the

6   disclosure to the parent or tuition payer that

7   the children would be viewed naked, and they

8   haven't provided us one piece of paper because

9   they don't have any --

10            MR. DUKES:  Object to the form.

11      Q.   -- that show -- we believe they don't

12  have any that show any notice to the parents that

13  their children are going to be viewed naked.

14            Do you have any knowledge of any such

15  notification to parents or tuition payers?

16            MR. STAIR:  Object to the form.

17            MR. DUKES:  Object to the form.

18      A.  I do not.

19      Q.  Well, let me see if you know this:  Most

20  children in high school are not adults.  Do you

21  realize that and agree with that?

22      A.  Yes, sir.

23      Q.  And do you know that a child cannot

24  consent to being viewed naked?

25            MR. DUKES:  Object to the form.

```
 1                    MR. STAIR:  Object to the form.
 2         Q.  Are you aware of that?
 3                    MR. STAIR:  Object.
 4         A.  Yes, sir.
 5         Q.  Then how could these children be charged
 6    with the responsibility you're trying to lay on
 7    them now of going into a dressing room
 8    undressing, getting naked, changing clothing to
 9    gym clothing, as you talked about -- physical
10    education type clothes, as you talked about a
11    moment ago -- then coming back and cleaning up
12    and doing the same process in reverse in front of
13    a 4-foot by 4-foot glass window?
14                    MR. STAIR:  Object to the form.
15                    MR. DUKES:  Object to the form.
16                    THE WITNESS:  I'm sorry.  Could you
17    repeat the first part of his question?  Because I
18    want to make sure what he asked me.
19                    MR. RICHTER:  I'll be glad to read
20    it back, if it'll help you.
21                    MR. STAIR:  Subject to the
22    objection.
23                    MR. DUKES:  Same objection.
24         Q.  How could these children be charged with
25    the responsibility you're trying to lay on them
```

1  now of going into the dressing room, undressing,

2  getting naked, changing clothing to gym type

3  clothing, as you talked about -- physical

4  education type clothing, as you talked about a

5  moment ago -- and then coming back and cleaning

6  up in front of a 4-foot by 4-foot glass window?

7          Then they interrupted with objections.

8  Both counsel, Mr. Stair and Mr. Dukes did at that

9  point.  And you did -- you then said, you got to

10 say it again 'cause you couldn't get it all.

11         All I'm trying to ask you is:  If

12 children can't consent to that and parents aren't

13 notified of it or tuition payers for the children

14 are not notified of it, what is it you're saying?

15 Whose responsibility is it that these children

16 were viewed naked?

17              MR. DUKES:  Object to the form.

18              MR. STAIR:  Object to the form.

19     A.  I'm not saying whose responsibility it

20 was to -- for children to be viewed naked.  My --

21 my statement was:  When a student goes into the

22 dressing room, they understand that they're going

23 to be changing clothes.  Street clothes to gym

24 clothes back to street clothes.

25         They're going to bypass this window.  So

1  they're going to know the window's there.  I

2  mean, they have some idea that they're going to

3  be changing clothes; and there's a window there.

4  Whether they think about it or not, I don't know.

5          I'm not saying -- I said if they were

6  uncomfortable with doing that, they had the

7  opportunity to go talk to a teacher, coach,

8  supervisor, whoever was inside that office or

9  directing them to go into the dressing room to

10 change clothes to say, "I'm uncomfortable."

11      Q.  Who told you --

12      A.  That's what I was saying.

13      Q.  I didn't mean to interrupt you.  I'm

14 sorry.

15      A.  That's what I was implying.

16      Q.  Who told you that the students have such

17 a responsibility?

18      A.  I didn't say that students had a

19 responsibility.

20              MR. STAIR:  Object to the form.

21      A.  I said they had an opportunity.

22      Q.  Who told you that students have such an

23 opportunity?

24              MR. STAIR:  Object to the form.

25      A.  That's what I assume by going in there.

1  By them going into there, they have an

2  opportunity to say something, if they so desire,

3  if they're so uncomfortable.

4      Q.  To who?

5      A.  To the teacher.  To the person in the

6  room.  To the coach, whoever is running the

7  class.

8      Q.  How do they get that opportunity?  Can

9  they just walk out of that PE class?

10         MR. STAIR:  Object to the form.

11     A.  They can say something before they go

12  in.  They can say something once they get in

13  there.  They can say something before they change

14  clothes.

15     Q.  Now, when they go in, are the blinds

16  open or closed?

17     A.  I do not know.

18     Q.  Then how could they know, for example,

19  if the blinds were closed or apparently closed?

20  How could they know that someone or some group of

21  people may be looking through the window at them?

22  Maybe even photographing them?

23         MR. DUKES:  Object to the form.

24         MR. STAIR:  Object to the form.

25     A.  I do not know how -- I don't think they

```
1    can know.
2         Q.  Well, then how could they complain about
3    that?
4              MR. DUKES:  Object to the form.
5              MR. STAIR:  Object to the form.
6         A.  I was saying if they were uncomfortable
7    with changing clothes in front of a window, they
8    had an opportunity to say something to a coach, a
9    teacher, an instructor, whoever was there.
10   That's what I was saying.
11        Q.  And I asked you who told you that?  And
12   you said --
13        A.  Nobody told me that.  That's just --
14        Q.  So that when they go to your house --
15   your next-door neighbor comes over and goes to
16   your house and goes to the bathroom, that person
17   closes the door behind them and goes in the
18   bathroom; right?
19        A.  Generally, yes, sir.
20        Q.  You do that yourself, don't you?  I
21   mean, if you went to your neighbor's house, you
22   had to go to the restroom, you'd go in there,
23   close the door, and perhaps urinate if that's
24   what you needed to do at that moment.  Right?
25        A.  Yes, sir.
```

1       Q.  And do you think it's your

2  responsibility at that point to say, "Look,

3  there's a door here.  Somebody can open that door

4  and look at me while I'm urinating.  I don't like

5  that.  I want you to not -- I want somebody to

6  stand guard at this door and not allow people to

7  look at me while I urinate."

8         Is that what you're saying?

9         MR. STAIR:  Object to the form.

10        MR. DUKES:  Same objection.

11     A.  No, sir.

12        MR. RICHTER:  All right.  Let's

13  take a break.

14       Q.  Before we do -- before we do, what are

15  the blinds intended to impart to the students?

16        MR. DUKES:  Object to the form.

17        MR. STAIR:  Object to the form.

18        MR. RICHTER:  Now, Rich, are you

19  also saying outside of scope as Mr. Stair is?

20        MR. DUKES:  That's not my role.

21  I'm just objecting to the form of the question.

22        MR. RICHTER:  That's what I asked.

23  Are you saying it's outside the scope, or are you

24  simply stating you object to the form of the

25  question?

1          MR. DUKES:  Simply stating that I

2    object to the form of the question.

3          MR. RICHTER:  Correct.

4          MR. DUKES:  Yeah.

5      A.  You're going to have to repeat the

6    question again.  I'm sorry.  I got distracted by

7    your comment.

8      Q.  Question that I asked was this:  "What

9    are the blinds intended to impart to the

10   students?"

11         MR. DUKES:  Object to the form.

12         MR. STAIR:  Object to the form.

13     A.  Limiting view.

14     Q.  So what are the students, then, to

15   believe when they go into the dressing room as

16   they must do for the PE transition that you've

17   talked about earlier?  What are the students to

18   understand by the fact that the blinds appear

19   closed?

20         MR. STAIR:  Object to the form.

21         MR. DUKES:  Object to the form.

22     A.  Our intent for the window was to allow a

23   supervisor to attempt to break up an activity

24   that was not supposed to occur in the dressing

25   room between students.

1          I would think that the window would let

2      the students know that I shouldn't be doing

3      anything other than changing clothes, getting to

4      class, and come back and change my clothes, get

5      back in my street clothes, and go.  No horseplay.

6      The window was supposed to, maybe, give somebody

7      a -- an idea that I shouldn't -- shouldn't do

8      horseplay in this space.

9          Q.  We're talking about the blind right now.

10     I asked you what the blinds were designed to say

11     to the students or impart to the students.

12         A.  I don't -- I don't know if the -- I

13     don't know if there's an intent for what a

14     student should say about blinds.  I don't -- I

15     don't recall.  I don't know how to answer that

16     question.

17         Q.  Well, what are blinds for?

18         A.  Limiting view.  Protecting from sun.

19         Q.  Or obstructing view; correct?

20         A.  Could be.

21         Q.  You are not certain that blinds are

22     intended to obstruct view?

23         A.  They could be used for that, yes, sir.

24              MR. DUKES:  Object to the form.

25         Q.  I just asked if you are saying that you

1   agree or you don't agree that blinds are intended

2   to obstruct view?  That's all I'm trying to ask

3   you.

4            MR. STAIR:  Object to the form.

5       A.  And my answer is, yes, they could be,

6   yes, sir.

7       Q.  And they could be used, couldn't they,

8   to lure a student into thinking, "Nobody can see

9   me.  The blinds are closed"?

10           MR. DUKES:  Object to the form.

11           MR. STAIR:  Object to the form.

12      Q.  They could have that effect, couldn't

13  they?

14           MR. STAIR:  Object to the form.

15      A.  Could, yes, sir.

16      Q.  And do you agree that there is a place

17  in the opening or closure of blinds where it

18  looks like -- from the inside, let's say, or from

19  the -- from the other side of the blind -- I

20  don't know how you describe one side versus the

21  other, but from the dressing room side of the

22  blind, where it can look like it's a solid bar to

23  view.  But, in fact, you can see out.

24           These blinds in this room, if you'd like

25  to look at them, you'll see they're all three --

1   the three blinds are all at three different

2   levels of closure, which changes their look from

3   the other side of the blind, doesn't it?

4               MR. STAIR:  Object to the form.

5               MR. DUKES:  Object to the form.

6       A.  Yes, sir.

7       Q.  And do you understand that a student can

8   be mislead to think that "I am safe from

9   uninvited viewing, that my privacy is not going

10  to be invaded 'cause it looks like the blinds are

11  closed, and my nudity is not going to be exposed

12  to persons who want to look at me"?

13              Do you understand that or not?

14              MR. STAIR:  Object to the form.

15      A.  It's possible, yes, sir.

16      Q.  Do you think a jury will understand

17  that?

18              MR. STAIR:  Object to the form.

19              MR. DUKES:  Object to form.

20              MR. RICHTER:  I'll withdraw it.

21  You don't need to answer.

22              Okay.  Break time as we went a long

23  time, actually.

24              (Recess taken 11:27 a.m. to 11:43 a.m.)

25              MR. RICHTER:  Let's to back on,

1  please.

2  BY MR. RICHTER:

3      Q.  During this break did you discuss your

4  testimony with anyone?

5      A.  No.

6      Q.  Thank you.

7          I want to try to close -- start to say

8  close this blind discussion.  I didn't mean to

9  make a play on words.

10         I'd like to try to close some circles

11  with you, please.  We can tell better where we

12  are and what we need to do, make a reasonable

13  prediction.

14         Now, I'd like to clarify this, if we

15  can, if you can for us, please.  Why do -- you

16  said some schools have windows.  Some don't have

17  windows similar to the kind of thing that existed

18  at Bishop England.  I take it that's what you

19  mean.

20         Is that what you mean?

21     A.  I said all the schools that I've been

22  involved with have the window.

23     Q.  All the schools that you've been

24  involved with have windows.  Okay.  And do they

25  all have blinds?

157

1      A.   I don't recall that.

2      Q.   Why would -- assume for the moment that

3    some had blinds.  Some don't have blinds.  Why

4    would some have blinds and some not?

5                MR. DUKES:  Object to the form.

6                MR. STAIR:  Object to the form.

7      A.   I don't know.  I don't know if some

8    districts ask for it or we just put on there as a

9    standard procedure.  I can't answer that for

10   sure.

11     Q.   You also said earlier before we took the

12   break that the blinds -- I think you said -- were

13   specified in the Bishop England High School

14   instance that we're discussing.

15               Did I hear that correctly?

16     A.   I believe that to be correct.

17     Q.   Now, where can I see that in the

18   specifications?

19     A.   There's probably a blinds specification

20   section, and it may have a statement in it that

21   says where the blinds are to be installed.  I'd

22   have to look at the contract documents to be able

23   to answer that fully.

24     Q.   When you say "the contract documents,"

25   does that mean --

1      A.   The specs, drawings.

2      Q.   And have y'all produced those to us?

3      A.   I'm not sure.  Produced all we had.

4      Q.   So that if I hand you whatever it is

5  that y'all gave us and I say to you, "Show me on

6  the specifications where it calls for blinds in

7  the locker room windows or on the locker room

8  windows" -- viewing windows we were calling them

9  in the reference work, it seemed like.  So

10 viewing windows.  Could you, then, turn in the

11 specifications to that and show it to me?

12     A.   If it was there, yes, sir.

13     Q.   If it was there.

14          Why would you put in a window and not --

15 put in a viewing window and not put in a method

16 to block the view?

17          MR. STAIR:  Object to the form.

18          MR. DUKES:  Same objection.

19     A.   You know, I'm not sure, Mr. Richter.

20     Q.   Let's go back to this little example we

21 used about going to the restroom in your own

22 home.  Let's say I was your next-door neighbor.

23 I come over to your home to visit your family.  I

24 want to go to the restroom while I'm there, and

25 you point it out to me.  Off I go.

1        And there's a door, of course, as we

2   talked about earlier, on the restroom.  Now, in

3   that door, is there a window?

4        A.  Generally not.

5        Q.  Why?

6        A.  Activities in the restroom are one

7   that one doesn't need to view.

8        Q.  And if blinds were present on the door

9   in your house to your restroom when I'm

10  urinating, would those blinds be on the inside of

11  the window so that I, the urinator, would control

12  them?  Or on the outside in the hallway so that

13  you or anybody else who came down the hallway

14  could control them?

15            MR. STAIR:  Object to the form.

16            MR. DUKES:  Object to the form.

17       A.  I would -- I would -- first off, there

18  wouldn't be a window in the restroom door.

19  Secondly, I would suspect they would be on the

20  inside given your --

21       Q.  Then why -- I'm sorry.  I thought you

22  were finished.  Excuse me.

23       A.  You, the urinator, to use your term,

24  would control it.

25       Q.  Then why would it not be the student

1  who's getting naked who would have the control

2  right of the blind?

3              MR. STAIR:  Object to the form.

4      A.  I would think there would, you know.  In

5  the design there would have to be a decision.  Is

6  it -- is it the -- trying to provide limiting

7  view from one direction or the other?  And the

8  decision was made to put it on the inside for the

9  coach or supervisor or the occupant of the

10  coach's office over the students in the locker

11  room.

12     Q.  And you said there would not be a window

13  in the bathroom, the example we were talking

14  about a moment ago.  What is the reason for that?

15  That there would not be a window?

16              MR. DUKES:  Object to the form.

17              MR. STAIR:  Object to the form.

18     A.  In my opinion, there's no activity that

19  is occurring inside that bathroom that someone

20  from the outside would need to view or prevent

21  from happening.

22     Q.  Let me change the facts just a little

23  bit.

24              When I and my wife, your next-door

25  neighbors, come over to your house for the visit

1   of the dinner, or whatever we're invited for, we

2   bring with us our two children, both sophomores

3   in high school at Bishop England High School, and

4   their two friends who are all having a sleep-over

5   at our house, and those two are juniors at Bishop

6   England High School.

7          Now we got four children present.  Do

8   you agree with that?

9      A.  Yes, sir.

10     Q.  And all four of them go into the

11  bathroom at the same time.  Do you need a window

12  to see what they're doing in there?

13             MR. STAIR:  Object to the form.

14             MR. DUKES:  Object to the form.

15     A.  I don't believe so.

16     Q.  Then why do you need one at Bishop

17  England High School?

18             MR. STAIR:  Object to the form.

19             MR. DUKES:  Same objection.

20     A.  I don't have a window into the bathroom

21  at the Bishop England High School.

22     Q.  You have a window into an area where

23  someone's nude body may be exposed, don't you?

24             MR. DUKES:  Object to the form.

25     A.  I have a window that allows viewing of

1  activities that could be detrimental to the

2  students, and we're trying -- the window's there

3  for security to try and prevent those unwanted

4  activities.

5      Q.  And how many unwanted activities have

6  there been in the 21 years since Bishop England

7  opened its doors?

8              MR. DUKES:  Object to the form.

9              MR. STAIR:  Object to the form.

10     A.  According to you, none.

11     Q.  Whatever your source of information is,

12 you could have learned it from the Pope in Rome

13 as far as I'm concerned.  How many are there?

14             MR. DUKES:  Object to the form.

15             MR. STAIR:  Object to the form.

16     A.  I am not aware of any.  I have not

17 searched for any.  One could argue the window has

18 prevented it from occurring.

19     Q.  One could argue that there had been none

20 because Bishop England either hasn't made any

21 record of any because they haven't occurred or

22 because the records are so horrible as to what

23 does occur in that bathroom.

24             MR. DUKES:  Object to the form.

25     Q.  That dressing room that they don't want

1  to give them up.

2              MR. DUKES:  Object to the form.

3      Q.  They're going to have to, if they exist.

4  They may have to fabricate it, but they're going

5  to have to do something to answer the inquiry.

6              MR. DUKES:  Object to the form.

7              MR. STAIR:  Object to the form.

8      Q.  From what I hear you saying, that Bishop

9  England High School, the blinds are controllable.

10 They can be opened.  They can be closed.  They

11 can be cracked.  They can be broadly opened.  Am

12 I understanding you correctly?

13             MR. STAIR:  Object to the form.

14     A.  I think blinds have the ability to vary

15 the position, that is correct.

16     Q.  Now, that's like a peephole, isn't it?

17             MR. DUKES:  Object to the form.

18             MR. STAIR:  Object to the form.

19     A.  I don't know that I would say it's like

20 a peephole.  I guess one could make that

21 argument, yes, sir.

22     Q.  Well, when you go to the hotel/motel,

23 whatever it is, it's not infrequent that you see

24 instances where people scratch through the back

25 of the mirror and arrange a view portal --

```
 1   peephole -- behind a mirror, for example.  Or

 2   that they plant a camera or do various things

 3   that are not large in size, but they can be of

 4   different sizes.  You may make one size peephole.

 5   The next fellow makes another size peephole.

 6           Do you understand what I'm saying?

 7               MR. STAIR:  Object to the form.

 8               MR. DUKES:  Object to the form.

 9   A.   Yes, sir.

10   Q.   That's what I'm trying to get to.

11           Why are these any different than a

12   peephole, these blinds at Bishop England High

13   School?

14               MR. STAIR:  Object to the form.

15               MR. DUKES:  Same objection.

16   A.   Well, why are blinds any different than

17   a peephole?

18   Q.   No.  No.  That's not the question.

19           The question is:  Why are these blinds

20   at Bishop England High School on the viewing

21   windows into the children's dressing areas, why

22   are those any different than a peephole?

23               MR. STAIR:  Object to the form.

24               MR. DUKES:  Same objection.

25   A.   There's nothing special about the blinds
```

1  at Bishop England High School.  It is a mini

2  blind with varying degrees of control, and I

3  believe it's the individual inside the office who

4  has the ability to control the blinds.  So I

5  don't know.

6           Again, I don't call it a peephole.  It's

7  a blind for some -- for the ability to see

8  through and -- and observe any activity that's

9  not wanted going on in the -- in the dressing

10 room.  I -- I don't know that I can answer your

11 question.  I don't know how to answer your

12 question.

13    Q.  Or to observe activity that the viewer

14 does want to see is going on in the dressing

15 room.  Used for that too?

16           MR. DUKES:  Object to the form.

17           MR. STAIR:  Object to the form.

18    A.  The potential exists, yes, sir.

19    Q.  Do you know anything about the Catholic

20 church and its institutions record about sexual

21 abuse of children?

22           MR. STAIR:  Object to the form.

23           MR. DUKES:  Object to the form.

24    A.  Yes.

25    Q.  What is it that you know about that?

166

```
 1        A.   What I've heard --
 2             MR. STAIR:  Object to the form.
 3             MR. DUKES:  Same objection.
 4        A.   What I've heard through the years being
 5   in the news.
 6        Q.   Tell me what it is.
 7        A.   Being in the news.
 8             MR. STAIR:  Object to the form.
 9             MR. DUKES:  Same objection.
10        A.   Child abuse.
11        Q.   What does that mean?  "Child abuse"?
12             MR. STAIR:  Object to the form.
13             MR. DUKES:  Same objection.
14        A.   To me it means an adult doing things
15   with a child that is unwarranted.
16        Q.   Do you mean an adult performing sexual
17   acts on a child?  Is that what you're referring
18   to?
19             MR. STAIR:  Object to the form.
20             MR. DUKES:  Same objection.
21        A.   Could be one of them.
22        Q.   Now, when I posed the question to you
23   just a half a minute ago, you chuckled.  I want
24   to know why that is.
25        A.   What was the question?
```

1          MR. STAIR:  Object to the form.

2     Q.  "Do you know anything about the Catholic

3 church and its institutions about sexual abuse of

4 children?"  They both objected.  You chuckled.  I

5 want to know why.

6     A.  I was raised Catholic.

7          MR. STAIR:  Object to the form.

8     A.  I was raised Catholic and, you know.

9 I guess I anticipated you asking that question,

10 and there are thoughts that went through my head

11 how I might answer that question.  So that's why

12 I chuckled.

13     Q.  What is it that you chuckled at?

14     A.  Thoughts of what I might say in response

15 to that question that I anticipated you asking.

16     Q.  Well, what you have to say, of course,

17 is the truth, whatever the true answer is.  Yes,

18 that's what you have to say.

19          MR. DUKES:  Object to the form.

20     Q.  So have you not done that?

21     A.  I have done that, yes, sir.

22     Q.  You said you were raised Catholic.  Is

23 that where you learned about the Catholic church?

24 We talked about its history and activities for

25 the moment -- a moment ago.  You might remember,

1    and they are your child sexual abuse.

2        And I just wondered what it is about

3    that area, child sexual abuse, that brings a

4    chuckle.  And I think I hear you saying, "I'm

5    chuckling because I thought you might ask -- you

6    might ask me that question."

7        Well, I did ask you that question.  But

8    I'm asking you what's funny about that?

9            MR. STAIR:  Object to the form.

10           MR. DUKES:  Object to the form.

11    A.   There's nothing funny about that.

12    There's nothing funny about child abuse.

13    Q.   No, there's not.

14    A.   Nothing funny.

15    Q.   What about lying?  Is there anything

16    funny about lying?

17    A.   No, sir.

18           MR. STAIR:  Object to the form.

19           MR. DUKES:  Object to the form.

20    Q.   Do you know what the church does, and

21    it's lawyers, about child sex abuse?

22    A.   No.

23           MR. DUKES:  Object to the form.

24           MR. STAIR:  Object to the form.

25    Q.   It and they lie.

**169**

1          MR. STAIR:  Object to the form.

2          MR. DUKES:  Object to the form.

3      Q.  I represent that to you.  I'll show you

4  a hundred examples, if you'd like to take the

5  time to see it.

6          MR. DUKES:  Object to form.

7          MR. STAIR:  Object to the form.

8      Q.  When did you first learn that the

9  defendants in this lawsuit that we have brought

10 claim that they relied on the advice of

11 professionals regarding the design and

12 construction of Bishop England High School?

13          MR. STAIR:  Object to the form.

14     A.  I don't recall when I first learned that

15 the defendants made a statement that they relied

16 on the advice of professionals.  I don't know.

17     Q.  You came to learn that, didn't you?

18     A.  Yes, sir.

19     Q.  So I need to ask the now direct

20 question, which is a real time saver, if you can

21 answer it.

22          Did LS3P advise the Diocese/Bishop

23 England High School and its an entity of the

24 Diocese of Charleston -- I think you know that --

25 as to the design and construction of viewing

1  windows in the student locker rooms there?

2       A.  I believe the design documents included

3  the window, the symbol for a window; and that

4  window would have been part of a set of documents

5  that those responsible for would -- reviewing the

6  documents at Bishop England would have had access

7  to.  So they would have seen that window.

8       Q.  And is it fair to say that if Bishop

9  England didn't sign off on whatever that design

10 sheet and all the design sheets were presented to

11 them, that y'all, LS3P -- 'cause that's you --

12 understand that's who you're speaking for here,

13 would not have gone forward with the construction

14 of those windows?  Is that accurate?

15      A.  If there would have been a -- an

16 objection to the window, the window would

17 probably have been removed, yes, sir.

18      Q.  Well, how could it not -- what do you

19 mean "would probably have been removed"?  Is it

20 your window?  Is it Bishop England's window?

21                MR. DUKES:  Object to the form.

22                MR. STAIR:  Object to the form.

23      A.  It was LS3P's documents that indicated

24 the window.  After it was constructed, it's

25 Bishop England's window.

1     Q.  And Bishop England didn't have the right

2  to say, "Here where you show double doors

3  opening, we want sliding doors."  Is that what

4  your testimony is?

5     A.  They could have said that, yes.

6     Q.  Certainly.  It's their -- it's Bishop

7  England's project; correct?

8     A.  Right.

9     Q.  It's their dollars that built it; right?

10     A.  Correct.

11     Q.  And their desires that built it the way

12  it is; right?

13         MR. DUKES:  Object to the form.

14     A.  So there's a program generally

15  generated, then, yeah.  Bishop England has their

16  desires for that school and that program, yes,

17  sir.  And we try to comply with that as much as

18  we can to be code compliant, yes, sir.

19     Q.  I'm not questioning you about any code

20  compliance.  Let's assume for the sake of this

21  argument that there is nothing that you built

22  that is prohibited by a building code.  Now, I'm

23  not excluding a moral code.  That's another

24  matter that we'll talk about maybe another day.

25         But as to the client coming to you and

1  hiring you to design something, if I want a boat

2  shed; and I hire you to do that for me, and you

3  draw it and bring it to me on a plan and it shows

4  a 10-foot wide boat shed.  And I say, "Oh, no.

5  It's permissible where I live to build a 20-foot

6  wide boat shed.  I don't want a 10-foot wide boat

7  shed.  I want 20 feet," are you saying that's

8  LS3P's call or my call?

9          MR. STAIR:  Object to the form.

10     A.  It's your call.

11     Q.  Certainly.

12          And if you want to bill me for your

13  services, you're going to have to render the

14  services I want or refuse to do that and not

15  build it; correct?

16          MR. STAIR:  Object to the form.

17     A.  Correct.

18     Q.  So had Bishop England called you up and

19  said, "Take these viewing windows out.  These

20  children are going to be naked in this room,"

21  would you have taken them out of the design?

22     A.  Most likely, yes, sir.

23     Q.  Well, I mean, how -- okay.  You can't

24  say it any more definitively than that?  "Most

25  likely"?

1      A.  If they asked specifically to take the
2  window out, the answer is, yes, the window would
3  have come out.
4      Q.  Either that or you're going to lose -- I
5  don't know what it was -- $12 million project or
6  something -- however it was a lot.  To me.  To me
7  it's a lot.
8              MR. STAIR:  Object to the form.
9              MR. DUKES:  Same objection.
10     Q.  Yeah.  To Mr. Stair, that's not a lot,
11 perhaps.  But, to me, it seems like a lot.
12             MR. STAIR:  If you don't mind my
13 intruding into the deposition, that is a lot to
14 me too, sir.  And let the record reflect we've
15 all smiled and grinned on that one.
16     Q.  Who picked the type of blind that would
17 go on these windows?
18     A.  Specifically who, I can't answer.  I'm
19 not sure.
20     Q.  Did LS3P select that or did Bishop
21 England select that, the Diocese select that?
22     A.  Generally, what blinds go in school or
23 mini blinds -- and this is just, kind of, a
24 standard blind that goes in a window.
25     Q.  So who chose it?

1      A.  Probably LS3P.

2      Q.  And did Bishop England have to sign off

3 on your selection as opposed to putting a

4 shade -- solid shade controlled by those rope-

5 like things on the side?  Did they have to

6 approve the selection of the blind that you

7 chose?

8      A.  Yes.

9      Q.  Yeah.  Okay.  Now, have you talked to

10 anybody at or representing any of the defendants

11 named in the caption here, those -- we refer to

12 them as the "Diocese defendants" just among us,

13 either the Diocese or the high school itself,

14 which is a part of the Diocese?

15      A.  No.

16      Q.  And has anybody at LS3P had such

17 conversations?

18      A.  I'm not aware of any.

19          MR. STAIR:  Object to the form.

20      Q.  And your friend, Mr. Aichele, does he

21 still live just down the street here where he

22 lived the last time you were here?

23      A.  I believe so.

24      Q.  Do you know how far that is from this

25 office?

1       A.   I do not.

2       Q.   Back at your house again.  Are you aware

3  or have you ever seen or been told that Bishop

4  England High School answered our

5  interrogatories -- in a part of their answers to

6  our interrogatories naming LS3P as the architects

7  and the primary contractor being Gulf Stream

8  Construction?  Are you aware they did that?

9       A.   No, sir.

10      Q.   They begin that answer by saying, "The

11 Diocese relied on the expertise of architects,

12 builders, and others."  They don't identify the

13 others, and they'll get a chance to.

14           But I just wondered if you have dealt

15 with the people at Gulf Stream Construction at

16 all about this litigation and the issues

17 concerning the windows?

18      A.   No, sir.

19      Q.   Gulf Stream Construction was the general

20 contractor, wasn't it?

21      A.   I believe so, yes, sir.

22      Q.   So it would have been Gulf Stream's

23 responsibility, wouldn't it, to locate the

24 windows or engage a subcontractor or a provider

25 of windows, purveyor of windows, to supply the

176

1    windows for this project; correct?

2         A.  Correct.

3         Q.  And y'all -- did y'all sign off on that

4    kind of stuff?  Who's selected as a general,

5    who's selected as a subcontractor?

6         A.  I don't believe that's LS3P's

7    responsibility, no, sir.

8         Q.  Yeah.  That's the person who's hiring,

9    the entity who's hiring you.  I think I hear --

10   is what I hear you saying; is that right?

11        A.  That was between the Diocese and Gulf

12   Stream.

13        Q.  Yeah.  Okay.

14            Now, I'd like to -- do you -- are you

15   familiar with the term "throwing somebody under

16   the bus"?  Have you ever used that term?

17        A.  I'm familiar with it, yes, sir.

18        Q.  What do you understand it to mean?

19        A.  Blaming somebody else.

20        Q.  And you have any opinion as to whether

21   the Diocese is trying to throw LS3P -- the

22   Diocese and all of the defendants in the case --

23   are trying to blame LS3P for this problem?

24        A.  I do not.

25            MR. STAIR:  Object to the form.

1      Q.   You don't have that opinion?

2            MR. STAIR:  Object to the form.

3      A.   I don't have an opinion.  You asked if I

4 have an opinion they're trying to do that, and I

5 don't have an opinion on that.

6      Q.   Any opinion on that?

7            MR. STAIR:  Object to the form.

8      Q.   Is that what you're saying?  You don't

9 have any opinion on that?

10           MR. STAIR:  Object.

11     A.   And the way, the manner I understood you

12 to ask the question, my response is I don't have

13 an any opinion on that.

14     Q.   I have to make sure we're communicating

15 in an understandable way with each other.  So let

16 me drop back, and I'll try to word it as

17 absolutely clearly as possible.

18           Just a moment ago I discussed with you

19 the fact that, in their responses, they have --

20 and in their answer -- they have identified

21 relying upon the advice of professionals

22 regarding what?  Regarding the design and

23 construction of Bishop England High School.

24           And then I further discussed with you

25 their writing where they say specifically --

1    'cause I wanted names.  I can't go shooting in

2    the dark.  I wanted names where they specifically

3    identified LS3P as being the architects and Gulf

4    Stream Construction as being the construction

5    professionals they're -- they relied on, and they

6    used the word "and others."  That lets them think

7    of somebody else somewhere down the line.  They

8    might want to add somebody else.

9            But you and I were discussing the term

10   "throwing someone under the bus," and you said

11   you understand that to mean putting the blame or

12   trying to put the blame for some act on someone

13   else; correct?

14       A.  Correct.

15            MR. STAIR:  Object to the form.

16            MR. DUKES:  Object to the form.

17       Q.  I asked you if you felt that's what the

18   defendants were doing to LS3P in their written

19   responses, and you said you didn't have an

20   opinion about that.

21            MR. STAIR:  Object to the form.

22            MR. DUKES:  Same objection.

23       A.  I think you asked it differently the

24   first time.  You asked me if I had an opinion as

25   to whether the Diocese was trying to do that to

1  LS3P.

2      Q.  Yeah.

3      A.  And my response was I don't have an

4  opinion.  Now, if you're asking do I understand

5  that's what they're trying to do?  The way you

6  have worded the question, the answer would be

7  yes.

8      Q.  The last wording was more clear to you?

9      A.  Well, it's a different meaning than what

10  you asked the first time.

11              MR. STAIR:  Object to the form.

12      A.  You've asked two different questions.

13      Q.  I understand exactly what you're saying.

14      I just need you to be clear in your

15  answer that you're answering that question that

16  you do think -- if you do, you do think that's

17  what Bishop England and the Diocese defendants in

18  this case is undertaking, trying to do.

19              MR. STAIR:  Object to the form.

20      A.  I have not read the responses of Bishop

21  England.  So Bishop England is saying they relied

22  on professionals to design and construct their

23  school, which I would agree with.  Yes, they

24  have.

25      Q.  Okay.

1      A.   That's why you hire an architect.

2    That's why you hire a contractor.  Because if

3    Bishop England had all those services in-house,

4    they would not need LS3P.  They would not need

5    Gulf Stream Construction.

6      Q.   And they don't -- the Diocese knows a

7    lot about how to abuse children, but they

8    wouldn't have had to ask LS3P.

9           MR. DUKES:  Object to the form.

10     Q.   But that's what you're --

11     A.   That's not even close to what I'm

12   saying.

13          MR. DUKES:  Object to the form.

14     Q.   And are you or not of the opinion that

15   the defendants in this case are trying to

16   defect -- deflect blame to, in your particular

17   case, LS3P, the architects on the project?

18          MR. STAIR:  Object to the form.

19          MR. DUKES:  Same objection.

20     A.   I understand that's what you are trying

21   to interpret what that answer to that

22   interrogatory is trying to say.  That's what you

23   have explained to me.

24          I have not read that.  I do not have the

25   ability to make an opinion as to -- about what

1   Bishop England is trying to do.  You probably

2   need to ask Bishop England or the Diocese.

3        Q.  Any particular person you think I should

4   ask?

5             MR. STAIR:  Object to the form.

6        A.  I don't have any clue who you should

7   ask.

8        Q.  Do you have any opinion about who the

9   most truthful person is there?

10             MR. STAIR:  Object to the form.

11             MR. DUKES:  Object to the form.

12        A.  I do not.

13        Q.  Let me just -- do you know Robert

14   Guglielmone, the Bishop of Charleston?

15        A.  I do not.

16        Q.  Let me show you --

17             MR. RICHTER:  Y'all want another

18   copy of the answers of the interrogatories --

19   first set of interrogatories?

20             MR. DUKES:  Unnecessary for me.

21             MR. STAIR:  It is necessary for me,

22   yes.

23             MS. RICHTER:  There you go.

24             MR. RICHTER:  Next in line, please.

25             (Exhibit No. 07 was marked for

**182**

1  identification.)

2      Q.  Let me hand you, please, what's been

3  marked as Plaintiff's Exhibit No. 07 to your

4  deposition, please, and ask you if you recognize

5  that as being a copy of the Defendant Bishop

6  England High School's answers to the plaintiff's

7  first interrogatories.

8              MR. STAIR:  Larry, he has not seen

9  this.  We've not been notified this will be a

10  subject of conversation.  So I want to --

11             MR. RICHTER:  Take as much time as

12  you need.

13             MR. STAIR:  Yeah, well --

14             MR. RICHTER:  Sure.

15             MR. STAIR:  -- you want to tell me

16  which numbers you want to talk about to expedite

17  the --

18             MR. RICHTER:  Well, I'm going to

19  talk about as many as I need to; but I'm going to

20  start with No. 1.  And hopefully we can limit

21  ourselves to No. 1.

22             MR. STAIR:  I mean, do we need to

23  look at the rest of them?

24             MR. RICHTER:  I don't think so

25  but --

1          MR. STAIR:  Well, I don't want to

2    spend time doing it if I don't need to, if you're

3    going to ask about No. 1.  If you're going to ask

4    about the others, then tell me that; and we'll

5    step back out.

6          MR. RICHTER:  Yeah, I'm going to

7    look through these -- please let me just answer

8    your question, please.

9          I'm going to look through this --

10   the others while you are discussing that No. 1

11   with this witness; and I will probably ask him as

12   many as is required to get him to a point that he

13   has a full enough knowledge base to be able to

14   say, "Oh, yes, I recognize they're trying to

15   throw us under the bus."  Or, "No, they're not

16   trying that" --

17         MR. DUKES:  Object to the form.

18         MR. RICHTER:  That's what I hope to

19   get to.

20         MR. STAIR:  I'm aware of our time

21   desires here, and I want to be as efficient as I

22   can; but I don't want to look at these

23   unnecessarily but --

24         MR. RICHTER:  I hope it's not

25   necessary.  I hope it's just that No. 1.

1          MR. STAIR:  Okay.  We'll look at

2    No. 1; and if, while we're out, you determine

3    there are others --

4          MR. RICHTER:  I'll let you know.

5          MR. STAIR:  -- let me know what

6    they are.  We'll look at those too.

7          MR. RICHTER:  I'll let you know

8    that.

9          MR. STAIR:  We can discuss those.

10         MR. RICHTER:  Uh-huh.

11      (Recess taken 12:18 p.m. to 12:34 p.m.)

12      (Exhibit No. 08 and Exhibit No. 09 were

13    marked for identification.)

14         MR. RICHTER:  Let's go back on the

15    record here.

16    BY MR. RICHTER:

17      Q.  I am going to hand back to you Exhibit

18    No. 07 to your deposition, which the reporter has

19    marked, and ask you if you've had an opportunity

20    to review that.

21      A.  I read Question 1.

22      Q.  Yeah.  And I want to ask you about

23    Question 1.  Can you identify what that document

24    is, please?

25      A.  Bishop England High School's Answers to

```
 1   the Plaintiffs' First Interrogatories.
 2        Q.   Now, Interrogatory No. 1 --
 3   Interrogatory No. 1, I'd like to call your
 4   attention, please, to the answer to Interrogatory
 5   No. 1.  I'll read the interrogatory and ask you
 6   to read the answer.  Maybe that's an easy way to
 7   get it into the record.
 8            Question, interrogatory, "Whose idea was
 9   it to install the windows between the coaches' or
10   athletic department offices and the various
11   locker rooms and dressing rooms at Bishop England
12   High School and any other window capable of being
13   used to view less than fully clothed persons when
14   the school was constructed on Daniel Island?"
15   Then they answered that.
16            Would you mind publishing their --
17            MR. DUKES:  Object to the form.
18        Q.   -- answer, please?
19            MR. DUKES:  Object to the form.
20        A.   "The Diocese relied on the expertise of
21   architects, builders, and others for the design
22   and construction of the building and the
23   installation of certain measures to ensure the
24   safety of students.  The architects were LS3P.
25   The primary contractor was Gulf Stream
```

186

```
 1   Construction."
 2        Q.   Thank you.   That's all for seven.
 3             Now I'm going to hand over to you,
 4   please, sir, what has been marked by the reporter
 5   as Exhibit No. 08 to your deposition and ask you
 6   if you could tell us, please, what that purports
 7   to be or what it is?
 8        A.   Robert -- I don't know how you pronounce
 9   his last name.
10             MR. DUKES:   Guglielmone.
11             THE WITNESS:   Guglielmone.
12             MR. DUKES:   Guglielmone.
13        A.   Guglielmone.   Okay.   Individual's
14   Answers to the Plaintiff's First Interrogatories.
15        Q.   The first one of those that I want to
16   ask you about is a portion, actually, of No. 1.
17   The question to No. 1, as we did a moment ago,
18   Mr. Guglielmone, "Give the names, addresses, and
19   telephone numbers, and emails addresses of
20   persons known to responding defendant or
21   defendant's counsel to be witnesses concerning
22   the facts of the case and indicate whether or not
23   written or recorded statements have been taken
24   from the witnesses and indicate who has
25   possession of such statements."
```

187

1          And now if you'll give us the answer, at

2     least down through B, on page 2, please.

3          A.   "Bishop Guglielmone objects to the

4     Interrogatory No. 1 to the extent plaintiff seeks

5     information that is beyond that which is required

6     for the Court to determine issues related to

7     class certification under Rule 23 Federal R Civ.

8     P.  Subject to the objection, the Bishop believes

9     the following individuals and companies may have

10    knowledge regarding Bishop England High School.

11    LS3P Architects designed the Bishop England High

12    School building and may have managed the

13    construction process.  Employees of LS3P may have

14    knowledge regarding the company's activities

15    related to the design and construction.  Gulf

16    Stream Construction built the structure."

17         Q.   Thank you.

18              Now, I want to go on with that for just

19    a moment, please, and ask you:  Do you see in

20    their answer a response to the address of LS3P or

21    Gulf Stream --

22              MR. DUKES:  Object to the form.

23         A.   In Question No. 1 you're asking?

24         Q.   Yes.

25         A.   I do not.

1      Q.   And do you see a telephone number or

2   numbers for anybody named by the responding party

3   to No. 1?

4      A.   I do not.

5      Q.   And do you see an email address of

6   persons known to the responding defendant or

7   defendant's counsel to be witnesses concerning

8   the facts of the case?

9      A.   No.

10     Q.   And do you see any indication of whether

11  or not a written or recorded statement has been

12  taken from the witnesses and indicate who has

13  possession of such statements?

14          MR. DUKES:  Object to the form.

15     A.   No.

16     Q.   Do you know of any reason why the Bishop

17  of Charleston has the right to ignore the Federal

18  Rules of Civil Procedure which require him to

19  answer under oath interrogatories?

20          MR. STAIR:  Object to the form.

21          MR. DUKES:  Object to the form.

22     A.   No.

23     Q.   Thank you.  That's the end for that one.

24          And then I'd like to call your attention

25  to what's marked as No. 09, please, and tell you

1    that that is the answer of the defendants as it

2    is labeled on the front.

3              Do you see that?

4        A.  I do.

5        Q.  That answer means that's their response

6    to our complaint by which we brought this

7    lawsuit.

8              And I call your attention to what the

9    defense has captioned -- the first defense

10   they -- the defendants describe as -- looks like

11   Roman Numeral I or I, capital, overview of this

12   action.  And then they say paragraph No. 1.

13             Do you see that on the first page?

14       A.  Yes.

15       Q.  And let's ask you, please, to publish

16   their paragraph 1 of their answer to our

17   complaint.

18             MR. DUKES:  Object to the form.

19       Q.  Do you see where it says "Diocese admits

20   only"?

21       A.  You're asking me to read it?

22       Q.  Yeah, if you can.  I can read it, if you

23   want.

24             MR. STAIR:  I don't think he

25   understands what "publish" is.  He doesn't

1  understand what your question -- what "publish"

2  means.  Yes, he wants you to read it.

3       Q.  Yeah, yeah, please.

4            MR. DUKES:  Object to the form.

5       A.  "The Diocese admits only that Bishop

6  England was designed with the safety of students

7  and visitors in mind and that the locker room

8  windows were a safety feature to allow adults to

9  monitor the changing areas for bullying,

10 fighting, or other misbehavior.  The Diocese

11 relied on the advice of professionals regarding

12 the design and construction of Bishop England

13 High School.  The design complied with the

14 relevant standard of care and comported with

15 safeguarding the safety of those using the locker

16 rooms.  All remaining allegations contained in

17 paragraph 1 are denied."

18      Q.  Thank you.

19           Let me ask you this:  Do you remember

20 the tobacco litigation?

21           MR. DUKES:  Object to the form.

22      Q.  The suit against the tobacco industry?

23           MR. DUKES:  Object to the form.

24      A.  No, sir.  I -- that was before I even

25 thought about doing legal issues or being

1  involved in legal issues.  No, I didn't pay any

2  attention to tobacco.

3      Q.  Are you aware that the tobacco companies

4  denied inducing people to ingest the smoke,

5  certain substances, nicotine included?

6          MR. DUKES:  Object to the form.

7      A.  I have not read information that would

8  lead me to have an opinion or understanding of

9  what the tobacco companies did or didn't do, but

10  I believe what you said to be -- 'cause I have no

11  reason to doubt what you said.

12      Q.  Thank you.

13          MR. DUKES:  Object to the form.

14      Q.  And -- well, that's all for that.

15          Now, let's go on to some --

16          (Exhibit No. 10 was marked for

17  identification.)

18      Q.  I'm going to hand over to you what the

19  reporter has marked as Exhibit No. 10 to your

20  deposition and ask you to look at the top and see

21  if you can recognize this as an email from Kent

22  Stair, who's seated to your right, to me.  And

23  there's a date on it.  If you'll publish the date

24  too, please.

25          MR. STAIR:  Before you answer, he's

1  not seen that.  So I want to go out and discuss

2  it with him.

3             MR. RICHTER:  You want to do what?

4             MR. STAIR:  He's not seen it.  So I

5  want to go out and discuss it.  We weren't

6  notified about it.  Come on, Roger.

7             MR. RICHTER:  Okay.  That's fine.

8  Please read it.

9         (Recess taken 12:48 p.m. to 12:56 p.m.)

10            MR. RICHTER:  Let's go back on the

11 record, please, madam reporter.

12 BY MR. RICHTER:

13    Q.  You have before you what has been marked

14 as Plaintiff's Exhibit No. 10 to your deposition;

15 and you have, I believe, now read it cover to

16 cover, so to speak.

17    A.  Correct.

18    Q.  Had a chance to discuss it with your

19 lawyer.  And what -- did you discuss it with

20 anyone else, first of all?

21    A.  This email?

22    Q.  Yeah.

23    A.  No.  This is the first time I've seen

24 this email.

25    Q.  Even -- you've never seen this before?

193

1    A.   I have not.  When you handed it to me is

2  the first time I've seen this email.

3    Q.   Do you know why that is?  Why you didn't

4  previously have a copy of it?

5    A.   No, sir.  No, sir.

6    Q.   Did you see your name throughout this

7  email?

8    A.   Yes.

9    Q.   And would you tell us, please, what the

10 email purports to discuss?  Let me make the

11 record right first.  Anna's reminding me.

12        Is this an email, Exhibit No. 10, from

13 Kent Stair on Sunday, July the 11th.  It's

14 dated -- 2021 at 12:44 p.m. to me and copying a

15 number of people but not copying you; correct?

16   A.   Yes.

17   Q.   And the subject matter is LS3P 30(b)(6)

18 deposition and number for the case is involved.

19        Now, would you tell us, please, what you

20 understand this email to say?

21   A.   This is an email, I think, explaining to

22 you what transpired on my ride home from the

23 deposition that occurred whenever our first

24 deposition was 'cause I -- when I left the

25 deposition, I called John Works to tell John

1  Works what had just transpired.

2       Q.  And say, again, in the record, please,

3  who John Works is.

4       A.  John Works is our in-house.

5       Q.  He's in North Carolina?

6       A.  He's in Charleston.

7       Q.  Charlotte?

8       A.  Charleston.

9       Q.  Charleston.  I'm sorry.  He is a South

10 Carolina lawyer?

11      A.  Yes, sir, he is.

12      Q.  Okay.

13      A.  And John asked if the deposition had

14 ended.  I said, "Well, I'm not real sure."  Kent

15 had asked you if the deposition had been

16 terminated, to which you never responded.  You

17 had told me that I will be back again.

18           And that's when John said to me, "We

19 can't talk about it.  We can't talk about the

20 deposition.  It's still ongoing.  The

21 deposition's still -- it's not ended.  We can't

22 talk."  I said, "Okay."  So that ended.

23           So I called Kent on the ride home to try

24 to understand why.  What's -- what's the rule

25 about not being able to talk to someone until the

1  deposition is over?  And Kent eventually told me

2  it's called coaching.  "In South Carolina there's

3  a rule about you can't coach a witness during the

4  deposition.  So you and I can't speak, and you

5  can't speak to anybody about this deposition

6  until it ends."

7          And I was trying to understand why, and

8  that's what this -- this -- those phone calls

9  were for that I made.  Trying to understand what

10 it was I could and couldn't do and why I

11 couldn't -- I couldn't do that.  So that's what

12 this is about.

13     Q.  And under the entry Thursday, July 8,

14 Mr. Stair summarizes to me or describes to me in

15 this email your various -- or his various

16 contacts back and forth with you subsequent to us

17 leaving the deposition room on that -- the day of

18 your deposition.

19          And he says to me in this email, "I told

20 him that you were going to file some motion with

21 the Court."  Do you see that?  And do you

22 understand that?

23     A.  Paragraph 3?

24     Q.  No.  2.

25     A.  Paragraph 2?

1     Q.  Yeah.

2     A.  Yes.

3     Q.  He says, "On Thursday, July the 8th" --

4     A.  Yeah.

5     Q.  -- "I told him that you were going to

6  file some motion with the Court."

7          Is that what Mr. Stair told you in that

8  conversation?

9     A.  That's what you told me before we left

10  the deposition.  You made that statement standing

11  right over there.  By the lion.  (Indicating.)

12     Q.  In this email that Kent Stair wrote to

13  me, do you not understand this to say, "These

14  communications were as follows:  Thursday,

15  July 8, as you, Mr. Attanasio, and I, Kent Stair,

16  were leaving your offices shortly before noon" --

17  so he's given us a date.  He's given us a time.

18  He's identified who was part of the conversation,

19  and who he's identified is you and him having a

20  conversation.

21          Do you understand that?

22     A.  Yes, sir.

23     Q.  And what he says is:  "I," Kent Stair,

24  the author of this writing, "told him that you,"

25  me, the recipient of the writing, "were going to

1  file some motion with the Court."

2        Do you not understand that that's what

3  it says?

4     A.  I do understand that's what it says,

5  yes.

6     Q.  And that we would be returning to

7  complete the deposition some time in the future.

8        Do you understand what that means?

9     A.  Yes, sir.

10    Q.  "I told him that if the Court provided

11 further/different instructions as to his

12 testimony, he would presumably be advised of that

13 in some appropriate way but that, in the

14 meantime, we cannot discuss his testimony."

15       Do you agree that that is an accurate

16 summary of your conversation as Mr. Stair has

17 described it as you were leaving this building?

18    A.  Yes, sir.

19    Q.  And he characterizes it being a short

20 conversation.  No more than a couple of minutes.

21       Do you agree with that characterization

22 as well?

23    A.  Yes, sir.

24    Q.  Thank you.

25       The next paragraph deals with Thursday,

1   same day, July the 8th, at 11:59 a.m. to

2   12:01 p.m.  Do you see that?

3       A.  Yes, sir.

4       Q.  And the email says that you, Attanasio,

5   "telephoned Works and said the deposition was

6   done.  Attanasio then told Works examples of

7   questions by Richter."

8           Did that happen?

9       A.  Yes, sir.

10      Q.  Do you remember what those examples

11  were?

12      A.  No, sir.

13      Q.  "Attanasio's response to those

14  questions" -- you told him how you responded to

15  those questions as well, didn't you?

16      A.  I may have, yes, sir.  I don't recall

17  exactly what I said to John.

18      Q.  "And Stair's objections."  You told him

19  what Mr. Stair did by way of objection; correct?

20      A.  Yes, sir.

21      Q.  "Attanasio followed with comments by

22  Richter about why Aichele was not the witness."

23  You went on speaking to Mr. Works and apparently

24  said something to him that you had understood me

25  to say why Aichele was not there or why was he

```
1    not there; right?  Is that what that means?
2         A.  Well, you asked me why Eric was not here
3    as a 30(b)(6) witness, like you did today.
4         Q.  Yeah.  I don't think I asked you that
5    today, did I?
6         A.  (Nods head.)
7         Q.  "Attanasio, then, told Works that
8    Richter would speak with the judge and would
9    speak with Attanasio again."
10        Where did you get that understanding
11   from?
12        A.  From you.
13        Q.  "And without having offered any
14   substantive comment to what Attanasio had said --
15   Works asked Attanasio if deposition -- if the
16   deposition was over or suspended for the day."
17        Did you understand what that meant?
18        A.  Yes, sir.
19        Q.  And what was your understanding?
20        A.  I wasn't sure, to be honest with you,
21   because, again, Kent asked you a couple of times,
22   "Are you terminating the deposition?"  And you
23   never responded.  So I didn't know the difference
24   between us "leaving" the deposition and what
25   "termination" meant.
```

**200**

1    Q.  I'm going to hand you a copy of the

2    transcript of your deposition before that was

3    asked the last time -- the first time you were

4    here, and it's marked as No. 11 to your

5    deposition.

6          (Exhibit No. 11 was marked for

7    identification.)

8    Q.  Thank you.

9          MR. STAIR:  Larry, he has not seen

10   this either; and I want to talk to him about it.

11   But, obviously, it's a long document.  Is there

12   any portion that we should discuss so we can save

13   some time?

14         MR. RICHTER:  Yeah.  I think

15   that -- I think that he was the deponent in this,

16   first of all, in terms of him not being familiar

17   with it.  He made it.

18         Where did Rich go?

19         MR. HALVERSEN:  He said to keep

20   going.

21         MR. RICHTER:  Okay.  He made the

22   deposition.  So, No. 1, the idea that he's not

23   familiar with it, we do not agree with; but if

24   you want to take a break to help him along or to

25   look at the document with him or whatever you

1  want to do with him, I don't mind certainly you

2  doing that.

3           Same thing's happening that

4  happened before though.  A lot of time is being

5  expended because of -- previously objections, now

6  discussions with the witness, who I have to show

7  documents to to extract a truthful answer and an

8  accurate answer; but that's fine.

9           MR. STAIR:  I object as to what you

10  just said; but under the local rules concerning

11  discovery, if you're going to show him an exhibit

12  and he hasn't seen it before, I get a right to

13  ask him about it, talk to him about it.  So

14  that's what we're going to do.

15          MR. RICHTER:  Have at it.

16          MR. STAIR:  Okay.  What section do

17  you want to talk about?

18          MR. RICHTER:  Whatever you want to

19  go over with him.  You're free to do that.

20          MR. STAIR:  Again, it's a lengthy

21  document.

22          MR. RICHTER:  Yeah.

23          MR. STAIR:  I'm trying to save

24  time, not waste time.

25          MR. RICHTER:  Well, I'm going to --

1  I'm only going to go over, actually, I hope, very

2  little bit of it, assuming I get ---

3          MR. STAIR:  I guess we'll focus on

4  that, and then we'll come back.

5          MR. RICHTER:  -- an accurate answer

6  from the witness.

7          MR. STAIR:  Okay.

8          MR. RICHTER:  And that will be

9  70 -- page 75 through the end.

10          MR. STAIR:  Okay.

11          MR. RICHTER:  And we'll cool our

12  heels till you do get back.

13          (Recess taken 1:09 p.m. to 1:13 p.m.)

14  BY MR. RICHTER:

15      Q.  You have before you now what has been

16  marked as Plaintiff's Exhibit No. 11 -- Exhibit

17  No. 11 to your deposition, which has, you'll see,

18  on the first page is the transcript of the

19  partial deposition that was given by you back

20  on -- I don't know the date.

21          MS. RICHTER:  I think it was

22  July 8.

23      A.  July 8.

24      Q.  July 8.  I see it right there in front.

25          Now, a moment ago you said that I never

1  responded to a statement or a question, "Are you

2  terminating the deposition?"

3        Do you recall saying that?

4    A.  I do.

5    Q.  And do you still stand on that testimony

6  given under oath?

7    A.  This record of my deposition says you

8  responded to Mr. Stair asking, are you

9  terminating it by saying, "He is terminating it

10  by refusing to answer the question."  That's what

11  it says.

12    Q.  That's not what you said.  You said --

13  you -- "and you never responded."

14    A.  That's what I said 'cause I -- I didn't

15  recall that 'cause you stood there when he asked,

16  "Are you terminating it?"  And you didn't look at

17  Mr. Stair and respond.  I don't remember you

18  saying, "He's terminating it by refusing to

19  answer the questions."

20    Q.  Do you agree that your statement "and

21  you never responded" is not truthful?

22        MR. STAIR:  Objection to form.

23        MR. DUKES:  Object to the form.

24    A.  It's not accurate based on my reading of

25  this transcript.

204

1      Q.  You want to correct it?

2      A.  You responded to Mr. Stair -- yes, I

3  want to correct it.  You did respond by saying,

4  "He is terminating it."  And I assume by "he,"

5  you mean Roger Attanasio.  "Is terminating it by

6  refusing to answer the question."

7      Q.  And that is on page 75 line what?

8  Line -- around line 13, let's say.

9      A.  18.

10      Q.  Well, Mr. Dukes says at line 13.  So

11  you're terminating his deposition is the

12  question.  Do you see that?

13      A.  Yes, sir.

14      Q.  And I respond to that, do I not, in your

15  presence?

16      A.  You did, but that doesn't answer the

17  question.

18      Q.  Was that response to Mr. Dukes'

19  statement -- "so you're terminating the

20  deposition" -- was that made in your presence

21  that day?

22      A.  Yes.  But my understanding was that was

23  not a response to the question asked by

24  Mr. Dukes.  You didn't -- you didn't say yes or

25  no to terminating the deposition.

```
1        Q.  What did I say?  I said you were
2   terminating --
3        A.  You said, "I can't go forward.  He won't
4   answer the question."
5        Q.  That's right.
6        A.  And Mr. Stair said, "You're terminating
7   it?"  And you said, "He is terminating it by
8   refusing to answer the question."
9        Q.  Yeah.  But you testified under oath
10  today that I didn't respond when Mr. Stair --
11       A.  That's what I recall, Mr. Richter.
12       Q.  But you corrected that now?
13       A.  I did, by reading the transcript.
14       Q.  How many times has that happened today?
15            MR. STAIR:  Object to the form.
16            MR. DUKES:  Object to the form.
17       A.  Correcting it by reading the transcript?
18  Once.
19       Q.  No.  Misstating things.
20            MR. STAIR:  Object to the form.
21            MR. DUKES:  Object to the form.
22       A.  I don't recall.
23       Q.  Are you prepared now to say that I, in
24  fact, did respond to Mr. Dukes' and Mr. Stair's
25  statement concerning terminating the deposition?
```

1      A.  Not directly.

2      Q.  Did you -- by the way, since we referred

3  to Judge Gergel's order earlier and he said he

4  read the whole transcript, this is what he's

5  talking about, just for your clarification.

6          MR. DUKES:  Object to the form.

7      Q.  So you can know what that reference

8  meant in his order.

9          MR. STAIR:  Object to the form.

10     Q.  And we went on and had a more full

11  discussion concerning your failure to respond in

12  a responsive way and your refusal -- and either

13  directly or by your counsel -- to answer various

14  questions.

15         MR. STAIR:  Object to the form.

16     Q.  And your, as a witness, somehow asking

17  questions and making legal statements that the

18  question was an improper question.

19         Do you remember all that or not?

20         MR. STAIR:  Object to the form.

21         MR. DUKES:  Object to the form.

22     A.  I'm -- I'm not following what you're

23  asking me.  Did I make comments -- I made

24  comments that I thought it was beyond the scope

25  of the deposition, and then we got to the end

1  and -- and you said, as it says here, that I

2  can't go on because he's not answering my

3  questions.

4         And you said to me -- oh, I recall you

5  saying to me.  "I'll see you again.  You'll be

6  back."

7     Q.  Can you show me here --

8     A.  That's what I recall you saying.  That's

9  what I remember, but I don't see that.

10    Q.  So did you imagine that or what?

11         MR. STAIR:  Object to the form.

12    A.  Maybe I did.  Maybe that's what I

13  understood you to say.

14    Q.  But you agree now that the transcript of

15  the deposition does not reflect that?

16         MR. STAIR:  Object to the form.

17         MR. DUKES:  Same objection.

18    A.  Yes, sir.

19    Q.  Thank you.  Now --

20    A.  Although, it's quite possible it

21  occurred because on line -- page 76 line 21, you

22  wrote -- you said, "The deposition is" -- and it

23  said, "More than one person spoke at the same

24  time."  So I don't know what you said.  Again,

25  what I heard could have been said.  The court

1   reporter may not have heard it.

2        Q.  Or it could have been somebody else?

3        A.  Quite possibly.  Yes, sir.

4        Q.  Thank you.

5             I want to go on through this email

6   'cause I want to understand clearly about the

7   conversations you've had or attempts to have

8   conversations about your testimony with your

9   lawyer while you were still a deponent in this

10  matter.

11            When you made comments to Mr. Works on

12  July the 8th at 11:59 to 12:01 p.m., did you --

13  do you remember what you said to him about what

14  Mr. Stair refers to as -- and I'm quoting --

15  comments by Richter about why Aichele is not the

16  witness?

17       A.  I do not.

18       Q.  Do you remember what Mr. Works said in

19  that regard?

20       A.  Mr. Works didn't say much.  Mr. Works

21  did a lot of listening.

22       Q.  Can you answer my question, please?

23       A.  Repeat your question again.

24       Q.  Question is:  When you made comments to

25  Mr. Works on July 8th at 11:59 to 12:01 p.m., did

1  you -- do you remember what you said to him about

2  what Mr. Stair's referred to as -- and I'm

3  quoting -- comments by Richter about why Aichele

4  was not -- it says the answer but the witness is

5  the proper --

6       A.  No, sir, I don't.

7            MR. STAIR:  Object to the form.

8       A.  I don't recall exactly the conversation

9  you had with John that day.

10      Q.  And it goes on to say that Attanasio --

11      A.  Attanasio.

12      Q.  Attanasio.  Attanasio.

13           MR. STAIR:  Long A.

14           MR. RICHTER:  It's like

15  Guglielmone.  It's hard to -- somebody doesn't

16  know you well will use that a lot to fall into

17  getting that out of your -- out of that person's

18  mouth.

19           MR. STAIR:  Think long A.

20           MR. RICHTER:  Yeah.  Well, at the

21  end it does; but following vowels clearly make

22  the A --

23           MR. STAIR:  Whatever is something

24  opposite.  Long is the first two and long is

25  next.

1      Q.  "Attanasio then told Works that Richter

2  would speak to the judge and would speak with

3  Attanasio again.  Without having offered any

4  substantive comment as to what Attanasio had

5  said, Works asked if the deposition was over or

6  suspended for the day."

7          Do you recall that part of that

8  conversation?

9      A.  Uh-huh.  (Nods head.)

10     Q.  Is that accurate what happened?

11     A.  Uh-huh.  (Nods head.)

12     Q.  Attanasio then -- I'm sorry.  "Attanasio

13 said the deposition was terminated and would be

14 continued after Richter spoke with the judge."

15         Did you say that?

16     A.  I don't recall but -- but something to

17 that effect.  You know, to me, I was puzzled by

18 why Kent asked, "Is the deposition terminated?"

19 What's the difference between "terminated" and

20 what happened in the manner that it ended?

21         I didn't understand there are different

22 meanings, which allowed you to talk to people

23 about it and different meanings where you're not

24 allowed to talk people.  That's what I was trying

25 to understand.  And Works was explaining to me,

1    "If it's not terminated, we can't talk.  You
2    can't talk to anybody."
3            So I was trying to understand that.
4    That's what I was trying to comprehend.
5        Q.  And that's what he told you?
6        A.  Yes.
7        Q.  I'm asking you -- I'm interested in this
8    because you have said -- or Mr. Stair says that
9    you have said certain things.  And earlier
10   Mr. Stair said in the first paragraph we talked
11   about -- referring to July the 8th -- Mr. Stair
12   says, "I told him that you were going to file
13   some motion with the court."
14           Do you recall discussing that one?
15       A.  Yes.
16       Q.  "And that we would be returning to
17   complete the deposition some time in the future."
18   Do you remember Mr. Stair saying that in his
19   email?
20       A.  I remember Mr. Stair saying that out the
21   front door, yes, sir.
22       Q.  And clearly he said it here in the
23   email?
24       A.  Yes, sir.
25              MR. STAIR:  Object to the form.

1    Q.   That means, don't you think, that

2   Mr. Stair knew that the deposition was going to

3   be reconvened, which conversely means that

4   Mr. Stair knew that his activities in the

5   deposition were violative of the rules and that

6   we would be sent back here to finish with you?

7             MR. STAIR:  Object to the form.

8    Q.   Do you understand that?

9    A.   I understand it today based on what the

10  judge wrote, but I didn't understand it then.

11   Q.   Okay.

12   A.   May I also add?

13   Q.   Sure.

14   A.   You made the same statement to me

15  standing over there.  (Indicating.)

16   Q.   What statement is that?

17   A.   "You will be back.  I will see you

18  again."

19   Q.   I think we probably said that before we

20  said good-bye, yeah.

21   A.   No.  This deposition -- I will be back.

22  We will continue -- you said --

23   Q.   Yeah.  At the end of the deposition --

24  right.  We parted.  And -- and that was correct,

25  was it not?

1      A.   Yes, sir.  Here we are.

2           MR. STAIR:  Object to the form.

3      Q.   Yeah.  Which is the same thing Mr. Stair

4  said.

5      A.   Yes.

6      Q.   We'll be back another day?

7           MR. STAIR:  Object to the form.

8      A.   Yes.

9      Q.   Now, if you look down to the next

10  paragraph, Thursday, July 8, he's reciting

11  contact with you 12/22 at 12:30.  Well, contact

12  with Mr. Works.

13          I called -- "I," Kent Stair, "called

14  Mr. Works to tell him about the deposition

15  generally, and during the conversation he told me

16  about his brief conversation with Mr. Attanasio

17  and then told me that Mr. -- that Attanasio was

18  calling him again as we were speaking."

19          Do you see that?

20     A.   I do, yes, sir.

21     Q.   And do you understand the next sentence

22  to recite what Kent Stair, then, told Mr. Works?

23  "I told him not to answer and that I would call

24  Mr. Attanasio back immediately to tell him that

25  the rule against conversation applied to Works

1    also and to clarify that he should not speak with

2    anyone about his testimony during the break in

3    the action."

4         Did you get that call and that advice?

5    A.  Yes, sir.  There was several calls that

6    went back and forth because I was driving back to

7    Fort Mill.

8    Q.  And that one, is that accurate -- an

9    accurate recitation of your call from Kent Stair

10   at approximately the time set forth there?

11   A.  Yes, sir.

12   Q.  Thank you.

13        Now, let's go to the next paragraph,

14   which deals with Thursday, July the 8th, at 12:30

15   to 12:33.  And that says, "I," Kent Stair,

16   "called you," the witness, "back and told him of

17   my conversation with Works.  I reiterated the

18   rule and clarified that it included Works as well

19   as everyone else; and I, again, told him we could

20   not discuss the deposition before it was

21   concluded.  He asked for and I gave him a further

22   explanation of that rule."

23        Is that what happened?

24   A.  Yes, sir.

25   Q.  And what was the explanation you got

**215**

1  about the rule?

2      A.  Coaching.  I wanted to know why and the

3  rule about coaching.

4      Q.  And that's what Mr. Stair --

5      A.  Told me.  It's about coaching.  I wanted

6  to understand.

7      Q.  I understand.

8          And it then says that you -- a few

9  moments later that same day, July 8 email,

10  "Mr. Works asking about the logic behind the rule

11  against attorney-client conferences during a

12  deposition which said nothing about the substance

13  of the deposition."

14          Is that accurate?  That you called

15  Mr. Works at about 12:41 --

16      A.  I don't know about the time.

17              MR. STAIR:  Object to the form.

18      A.  But, again, I was trying to understand

19  the logic behind the rule.

20      Q.  I see.

21      A.  I didn't understand it.

22      Q.  And is it accurate that you said nothing

23  about the substance of the deposition to

24  Mr. Works in that telephone call?

25      A.  That is accurate.

1          MR. STAIR:  Object to the form.

2      Q.  And Works did not respond to you.  He

3  just was a dead telephone line or what?

4          MR. STAIR:  Object to the form.

5      A.  Mr. Works is -- Mr. Works is a rule

6  abider.  So he knows he can't talk about the

7  deposition so he -- he doesn't respond to me.

8  It's easier not to respond than to try to explain

9  to me what was going on.

10         Again, I was trying to understand what

11  had just transpired.  We'd left.  It was kind of,

12  we'll say, not amicable that we left; and I was

13  trying to understand what's going on.  That was

14  the whole purpose of these calls.

15     Q.  And were you upset in some way?

16     A.  No.  I just wanted to understand.

17  Nobody can talk to me.  I can't talk to anybody

18  else.  Why?  Well, what's going on?  Tell me --

19  tell me the -- I don't do this for a living.  I

20  don't understand.  So I wanted to understand.

21     Q.  You then, again, that same day at

22  12:58 p.m., 17 minutes later, Mr. Dukes -- I

23  mean, Mr. Stair says you called Works; but Works

24  did not answer or respond in any other way.

25         Does that mean he didn't answer the

1    phone?

2         A.  I'm in my car driving home so trying not

3    to text.  I'm trying to call somebody to get an

4    answer to my question.  "Tell me.  Please explain

5    to me what's going on, why I can't do this, why I

6    can't do that, why somebody can't talk to me, why

7    I can't talk to somebody else.  What's happening?

8    What's the logic behind it?"

9              I wanted to understand the logic.  I

10   wanted to understand the rule.  Why?

11        Q.  Did Works answer the phone when you

12   called him or not?

13        A.  I don't think so.

14        Q.  So does that -- you understand this

15   entry for 12:58 p.m. July the 8th to mean that he

16   didn't answer the phone or he just sat mute and

17   wouldn't answer your --

18        A.  I don't think he answered the phone.

19        Q.  Then at 12:58 on that same date to

20   1:03 p.m., Mr. Stair in his next paragraph says

21   that you called him and that he, Mr. Stair,

22   immediately told him we could not talk about his

23   deposition and that you said you understood.

24              Is that accurate or not?

25        A.  Yeah.  I mean, the next sentence says,

1   "Explained that the -- strict rules prohibit

2   coaching the witness during the course" -- that's

3   what I wanted to understand.  What was the logic

4   behind not being able to talk?

5        Q.  And is this the first explanation that

6   you got as to why you couldn't speak to someone

7   else?

8        A.  I think so, yes, sir.

9        Q.  Do you remember the beginning of the

10  deposition I said, "Look, you're now a testifying

11  witness.  You can't talk to anybody"?

12       A.  That's correct.

13       Q.  That's your testimony in this

14  deposition?

15       A.  That's correct.

16       Q.  But you tried to disregard that and talk

17  about your deposition?

18       A.  No.  I tried to understand the logic to

19  why I couldn't talk to him.

20            MR. STAIR:  Object to the form.

21       A.  That's what this conversation was all

22  about.  Why can't you talk to somebody?  I don't

23  understand the definition between "suspended" and

24  "termination" and what those meant in terms of

25  the deposition.

1          And then as a result of that, why?

2    What's the logic for this in South Carolina?

3    Please explain it to me.  That's what these phone

4    calls were about.

5          Q.  The first conversation that you had with

6    Mr. Stair, as I understood it, took place just

7    outside my front door; is that correct?  After

8    the deposition --

9          A.  Yes.

10         Q.  -- was recessed for that day?

11         A.  Yes, sir.

12         Q.  And that's when Mr. Stair told you that

13   I was going to be filing some motion with the

14   court and that we would be returning to complete

15   the deposition some time in the future; is that

16   right?

17         A.  Yes, sir.

18         Q.  And then he went on to say, "We cannot

19   discuss your testimony."  That lasted, as

20   Mr. Stair characterized it here, just a couple of

21   minutes.  But let's go on and get to the end of

22   this so we can move on to some other stuff that

23   we need to cover.

24         On Friday, July the 9th, Mr. Stair

25   memorializes that "Works returned a Teams call

1  from Attanasio.  At the conclusion of the call

2  with Attanasio about a totally unrelated project

3  matter, Attanasio asked Works the purpose of the

4  rule against speaking about the deposition during

5  a break.  Works responded that they could not

6  discuss the deposition during the break.

7  Attanasio would need to speak to Stair about

8  particulars of the rule; but, generally, the rule

9  prohibited witness coaching."

10        Is that the first time you heard the

11  word "coaching"?

12     A.  Other than when Kent told me the day

13  before.

14     Q.  Now, this next paragraph doesn't recite

15  a call that you -- this is just Mr. Stair stating

16  that he'd never in 45 years had a deposition

17  break up in the manner that this one did.

18        And that's the end of the -- that's the

19  end of the communication, other than him saying

20  that he trusted the court reporter to append this

21  explanatory email to the deposition she is

22  preparing; and that was the email.  Thank you for

23  covering that?

24            MS. RICHTER:  And now can we go to

25  lunch?

```
 1                    MR. RICHTER:  Is it here?

 2                    MS. RICHTER:  Yes.

 3                    MR. RICHTER:  Well, help

 4     yourselves, please.

 5            (Recess taken 1:36 p.m. to 2:18 p.m.)

 6            (Exhibit No. 12 was marked for

 7     identification.)

 8     BY MR. RICHTER:

 9        Q.  If you're ready to go, let me ask you,

10     again, as we resume, over the lunch break, did

11     you discuss your testimony with anyone?

12        A.  No.

13        Q.  Thank you.

14            Now, before you now is what has been

15     marked as Plaintiff's Exhibit No. 12 to your

16     deposition.  I'm going to ask you to look at

17     that, please, and see if you can identify it as

18     being a brochure or packet from LS3P about high

19     school projects that LS3P has been involved in

20     one way or another?

21        A.  Yes, sir.  I would term it "marketing

22     material."

23        Q.  "Marketing material" is probably the

24     professional reference to it.

25            And what's it -- what's its purpose?
```

1       A.   Most of the time it's in response to an

2  RFP where it talks about LS3P's experience with,

3  in this case, new schools; and it says "additions

4  and renovations," I believe.

5       Q.   Yes.  It says -- first category says new

6  schools.  Second category on the front says

7  additions and renovations.

8            We received notification from Mr. Dukes

9  that he wants to take some photographs of a

10  number of schools.  All those are public, aren't

11  they?

12            MR. DUKES:  Uh-huh.

13       Q.   All public schools here in the

14  Charleston County area, and I want to ask you if

15  you all --

16            MR. RICHTER:  Rich, do you

17  remember?  I can turn to the pages, and I can

18  find it.  What I'd like to do is put in the names

19  of the school and ask you if you remember if that

20  is --

21            MR. STAIR:  Which document are you

22  looking at, Larry?

23            MS. RICHTER:  He hasn't entered it.

24            MR. RICHTER:  It's a notice that

25  Rich sent out.  You wouldn't have been provided

```
1   with a copy because you're not a party, but it's
2   various schools.
3       Q.  Let me ask you, please, about the
4   following schools.  Wando High School, West
5   Ashley High School, R.B. Stall High School, North
6   Charleston High School, Burke High School,
7   Charleston County School District 4 stadium.
8           Are all of those structures that were --
9   in which the architectural work, design, and
10  drafting were done by LS3P?
11      A.  I can't --
12          MR. STAIR:  Object to the form.
13          MR. DUKES:  Same objection.
14      Q.  What did you say?
15      A.  I can't confirm that all of those that
16  you read were.  Some of them I am confident of.
17  Others I am not.
18      Q.  Tell me the ones you're confident about,
19  please.
20      A.  West Ashley, Wando.  If you go on to
21  another one, I'll answer yes or no whether I'm
22  confident or not confident.
23      Q.  You can -- I'll share this with you.
24  It's just the list there on the front.
25  (Indicating.)
```

224

```
1          A.   Those are the only ones I'm confident

2    of.

3               (Exhibit No. 13 was marked for

4    identification.)

5          Q.   Before you now is what has been marked

6    by the court reporter as Exhibit No. 13 to your

7    deposition.  I tell you that, that is a notice of

8    the defendants' intent to inspect premises in the

9    Federal Court case that we are now examining you

10   in.

11         A.   Yes, sir.

12         Q.   And you've had an opportunity to review

13   the schools listed on the cover page of this

14   notice.  And I hope you can tell us which ones

15   you either were involved in or were not involved

16   in.  "You're" being LS3P.

17              MR. STAIR:  Object to the form.

18         A.   I'm confident of West Ashley.  I'm

19   confident of Wando.

20         Q.   Okay.

21         A.   The rest of them I'm not confident of.

22   I can't tell you.  They're not -- I'm not

23   familiar.

24              MR. DUKES:  And I'll object to the

25   form as outside.
```

```
 1                     MR. RICHTER:  Well, it probably
 2    isn't.  I don't have to -- I'm just trying to
 3    cover in a quick way the ground that we're trying
 4    to do.  If you don't --
 5                     MR. DUKES:  I understand.
 6                     MR. RICHTER:  But if you really do
 7    object to it, I think you --
 8                     MR. STAIR:  I think it is outside
 9    the scope, but I don't mind you --
10                     MR. RICHTER:  It's easier.
11                     MR. STAIR:  I'm happy to say we're
12    in agreement on that, Larry.
13                     MR. RICHTER:  Rich --
14                     MR. DUKES:  I just want to be sure
15    that LS3P is not precluded from coming forward
16    with evidence that somebody who does know, 'cause
17    knowledge of other schools was not on the topics
18    you designated.
19                     MR. STAIR:  Yeah, I mean, I object
20    to the form because he had not reviewed this to
21    say --
22                     MR. RICHTER:  All right.  I
23    understand.
24                     MR. STAIR:  All right.  Good
25    enough.
```

```
 1                    MR. RICHTER:  And I don't have

 2  to -- I'll refrain from examining him about it

 3  right now --

 4                    MR. DUKES:  Okay.

 5                    MR. RICHTER:  -- to the extent that

 6  he's not familiar with some of the structures

 7  involved on your notice, Rich.

 8      Q.  I would ask you this:  Have you -- when

 9  you deal with the public schools, whatever county

10  or state you're in, do you get -- do you deal

11  with some governing body when you do that?  Or do

12  you -- do they designate some individual?  How

13  does it get accomplished?

14                    MR. STAIR:  Object to the form.

15      A.  How does what get accomplished?

16      Q.  The point of y'all getting to a

17  contract, you see a request for qualifications or

18  a request for proposals --

19      A.  Correct.

20      Q.  -- and y'all are interested.  It's a

21  thing that y'all -- y'all bid on these things,

22  and so you want to do that.  There will be

23  instructions with that, won't there, that says,

24  "Contact Mr. Stair.  He's in charge of accepting

25  these RFQs and RFPs.  And that's -- when you've
```

1    got questions, that's who you call."

2         Is that the way it, generally, happens?

3         A.  Generally, there's an RFP or an RFQ sent

4    out; and then you will respond to that RFP based

5    on the information that's requested in that RFP

6    or RFQ.

7         Q.  And then --

8         A.  You'll submit it.  And then the --

9    generally, what happens is the school district

10   has a selection committee.  And they read all of

11   them, and then they do what's called a short

12   list.  And then once you have a short list, you,

13   generally, get invited to an interview; and then

14   you present your qualifications, which sometimes

15   might include that.  (Indicating.)

16        Q.  Right.

17        A.  And then you have a time to present

18   LS3P.  And then you have a question-and-answer

19   period, and they can ask whatever they want.

20   Then you go away, and then they rate everybody

21   and then make a decision -- if they make a

22   decision about who they're going to offer it.

23   One, two, three, four, five, if there's five

24   people.

25        And then if you are the first one, then

1  you are notified; and then you begin the process

2  of negotiating the agreement to design whatever

3  school you were going after.

4      Q.  And the project gets defined in a more

5  detailed and sophisticated way so you're not

6  designing cattle stalls.  You know that you're

7  designing classrooms and --

8      A.  20-foot boathouse instead of a 10-foot

9  boathouse.

10     Q.  Okay.  I understand that.

11         At the end of that, you hope that you're

12  the last guy standing.  You've got the award, and

13  you build it or you concede that it gets built;

14  and then you sign off on it and go to the next

15  one.

16     A.  That's a pretty condensed version of

17  what happens, yes.

18     Q.  Just for your information, it's not

19  questioning you.  I served on the Aviation

20  Authority here for a number of years; and every

21  time we expanded or did something, you know, we

22  had that same process, in a general, way that

23  you've just outlined.

24         If you'd go back, please, to that

25  exhibit in your hand.  What's the number on that?

1    A.   No. 12.

2    Q.   No. 12 is part of what you've -- in a

3 more sophisticated way than I did -- referred to

4 as marketing materials.  And I think you said you

5 recognize it as an LS3P piece.  Is that accurate?

6    A.   Correct.

7    Q.   And LS3P's named on the front of it.

8         Now, it shows in here specifically in

9 what we call the new Bishop England High School

10 is, I guess, to the point of not being the new

11 Bishop England High School anymore.

12         In doing that I'd like you to turn to

13 the one, two, three, fourth page of that exhibit.

14    A.   (Complies with request.)

15    Q.   And you'll see that there's a

16 handwritten entry at the bottom of that page.

17 Can you read that to us, please?

18              MR. DUKES:  Object to the form.

19    A.   It appears to say Rick Alexander &

20 Associates, Incorporated, Bishop England High

21 School, 6170-12.

22    Q.   Do you know what that entry means?

23    A.   I do not.

24    Q.   Do you know who Rick Alexander &

25 Associates is?

1          A.   I do not.

2          Q.   If you turn the page, then, you should

3     see a plan of the building, floor plan; correct?

4          A.   Yes, sir.

5          Q.   And this is labeled, isn't it, first

6     floor plan?

7          A.   It is.

8          Q.   I want to ask you, please, to look at it

9     for a moment; and I've got a magnifying glass, if

10    you need it.  You may not.  I do.  And I'd be

11    glad to share it around with those who are in

12    about the same class I was in when we finished

13    high school.

14          If you'll go to the bottom right-hand

15    side, please, and start coming up where it

16    says -- there's a column called "Physical

17    Education Center."  Then it lists a lot of

18    component parts of that.

19          Do you see it?

20          A.   Yes, sir.

21          Q.   I'd like you to come up, please, to

22    where it shows the coach's office; and we'll

23    start with boys coach's office and the athletic

24    director's office.

25                    MR. RICHTER:  And I realize how

```
1   small this is; but, y'all, this is how it was

2   produced to us.  And we may be able -- I don't

3   know if you know this either, Kent, to have it

4   bigger, you know, easier to read, bigger foldout

5   thing in the disk that you now sent us, Kent.

6              MR. STAIR:  But I don't think the

7   disk is going to have anything related to this

8   so --

9              MR. RICHTER:  Okay.  Okay.

10      Q.  Well, does that area show the

11  dressing -- does this rendering show the dressing

12  rooms --

13             MR. DUKES:  Larry, I'm going to

14  object to form; and I need to ask the witness to

15  step out of the room, please.

16             MR. RICHTER:  Okay.

17      (Witness departs the conference room at

18  2:33 p.m.)

19             MR. DUKES:  I asked the witness to

20  step out because this is not the design plan for

21  Bishop England High School.

22             MR. RICHTER:  I didn't say it was.

23             MR. DUKES:  I know, but you're

24  asking questions as if it is.  But I'm looking at

25  the actual plan, which we've produced; and it's
```

1  different.

2          MR. RICHTER:  What number is your

3  production?  I'll pull that up.

4          MR. DUKES:  I know I produced it.

5  I'm certain I produced it in the first set; but

6  this one doesn't have a Bates number on it, but I

7  can show you.

8          MR. RICHTER:  If you'll tell me the

9  Bates number of yours that you produced, I'll be

10 glad to pull it up and bring it in.

11         MR. DUKES:  Okay.  We'll see.

12         MR. RICHTER:  And tell me yours is

13 bigger than this would be nice to hear.

14         MR. DUKES:  At least on my iPad it

15 is.  I'm certain it was in our first document

16 production.

17         MR. RICHTER:  Okay.

18         MR. DUKES:  It's downloading for me

19 now but --

20         MR. RICHTER:  Let me get Larkin.

21         MS. RICHTER:  I mean, is it one of

22 these basically?  (Indicating.)

23         MR. RICHTER:  No.  Their production

24 will be Bates stamped.

25         MR. DUKES:  This is in our initial

233

```
1   production.  You can see --
2                 MS. RICHTER:  What's in the corner?
3   GI partial first floor plan.  Yeah.
4                 MR. DUKES:  The one that's in that
5   diagram, if you look, it has -- up here it has
6   this office, which is not in this diagram.
7                 MR. RICHTER:  This is off the
8   record.
9          (Off-the-record discussion.)
10         (Witness is returned to the conference
11  room at 2:42 p.m.)
12      A.  May I go back and clarify a response?
13      Q.  Sure.
14      A.  You asked me if I knew who this was, and
15  I said I don't.  But is it -- it may be possible
16  that this is the photographer's name.
17      Q.  Oh, for the photo --
18      A.  The photographs that follow.
19      Q.  That are in the book, yeah.
20      A.  Are you going to ask any more questions
21  about this one?  (Indicating.)
22      Q.  I don't think so.  What did you call it?
23  Marketing material?
24                 MR. RICHTER:  Rich, if you can look
25  at the -- where's the Bates stamp number, please?
```

234

1           MR. DUKES:  The Wi-Fi says slow.  I

2  could not download it; but it's 472, I believe.

3           MS. RICHTER:  Oh, here we go.

4           MR. RICHTER:  Do you see that one?

5           MS. RICHTER:  Yeah.  It's down

6  here.  472.  This is the -- I guess, the right

7  one.

8           MR. RICHTER:  472 seems to show

9  the -- among other things, I guess, but it shows

10  the gym area.

11           MS. RICHTER:  He's never seen this,

12  I don't think, has he?  Have you seen this?

13           MR. STAIR:  Yeah.  Might need to

14  just take him out and look at it real quick just

15  to familiarize him with it.

16           (Recess taken 2:46 p.m. is to 2:49 p.m.)

17  BY MR. RICHTER:

18     Q.  Just so you know what to focus in on,

19  I'm going to ask you to show us where the

20  washrooms are, where the offices are with the

21  viewing windows, and two are going to be on one

22  end, as you know, for the male; and then the

23  females are on the other side or is on the other

24  side of the basketball court down the other end

25  of the long hallway.

```
 1                    MR. STAIR:  Does anyone know if
 2    this is the final sealed --
 3                    MR. DUKES:  I've never seen a
 4    sealed one.
 5                    MR. STAIR:  Okay.  I don't see the
 6    seal on this, but okay.
 7         Q.  You got yourself oriented?
 8         A.  Yes.
 9         Q.  I'm going to come around and look over
10    your shoulder, if you don't mind.  Let's go on
11    now and we're -- we have shown you on a computer
12    screen before you a document produced by Bishop
13    England or the Diocese defendants which bears the
14    Bates Stamp No. 00472 in a series of documents
15    ending with --
16                    MR. RICHTER:  What is the number?
17    491?
18                    MS. RICHTER:  472 through 493.
19         Q.  Through 493.  Presently you're looking
20    at 472.
21                    THE WITNESS:  I don't see a Bates
22    stamp.
23                    MS. RICHTER:  Yeah.  It's tiny on
24    there.
25                    THE WITNESS:  I'm looking at a
```

floor plan.

MS. RICHTER: Let me show you. See right here. 472. (Indicating.) And then you can just use this bar to --

THE WITNESS: I got that. I just have to find the --

Q. Dressing rooms?

A. No. I want to see the Bates stamp. 000472. Okay. So, yes, is the answer to your question. It appears to be Bates stamped document 472.

Q. Now if you'll pull back, please, and show us, please, the dressing rooms, two male and then in a moment the one female dressing room.

A. (Complies with request.) Boys varsity locker room. Right there. Right there. Coach's office right there. (Indicating.)

Q. Okay.

A. AD office right there. Boys PE locker room. Right there. (Indicating.)

Q. Okay.

A. Girls coach's office right there. (Indicating.)

Q. Clearly labeled. You can see.

A. And it doesn't have a name; but it's

1  girls PE locker room, I think, is what it is.

2  It's right there.  (Indicating.)

3      Q.  There's only one.

4      A.  There's girls PE.  There is a girls

5  varsity locker right, which is right there.

6  (Indicating.)  But there's an electric room

7  there.  There's no office overlooking that girls

8  varsity room.  There's two toilets, men and

9  women's toilets.

10     Q.  Outside of that?

11     A.  Yeah.  You enter from the hallway here.

12 (Indicating.)

13     Q.  So it's not in the -- what you refer to

14 the girls --

15     A.  Varsity locker room, correct.

16     Q.  As to the girls varsity locker, can you

17 show me where the entrance is to that, please?

18     A.  Right there.  (Indicating.)

19     Q.  I see it.  Yeah.

20         And where is the coach's --

21     A.  And there's another one right there.

22 (Indicating.)

23     Q.  Where is the coach's office or athletic

24 department or other school personnel official

25 office that looks into the girls -- what you

1    refer to as the girls varsity locker?

2         A.  There's not one.

3         Q.  And do you know that this is as built?

4         A.  I do not.

5         Q.  So if there are only -- okay.  You do

6    not know whether it's as built.  I understand.

7              Now, let's go to the boys, please, the

8    boys side, if you would.

9         A.  (Complies with request.)

10        Q.  Thank you.

11             Now, I'd like you to show me, please, in

12   the athletic director's office -- is that as

13   built?  Do you know?

14        A.  I do not.

15        Q.  And we're -- is there a corridor on this

16   end and a corridor on this end?  (Indicating.)

17        A.  There is a vestibule on what I'm going

18   to call plan south end.

19        Q.  Okay.

20        A.  Okay?  There is a -- I'm going to call

21   this an entry vestibule to the locker room.  This

22   is a -- a way you make yourself -- here's the

23   corridor right here.  (Indicating.)  Hall.  It

24   says hall.  That's what I would deem the

25   corridor.  This is the beginning of the entry to

1    the locker room.

2              This is a door to the locker room.

3    (Indicating.)  You go in.  You go.  You walk

4    past.  There's the window right there that we've

5    been referring to.  Here are the lockers, and you

6    can exit out the bottom plan south of that locker

7    room.  (Indicating.)

8              So this is the varsity.  Here is, you

9    know, an entry from the gymnasium into what I'm

10   going to call the vestibule entry into the locker

11   room, the PE locker.  You enter the door here.

12   You walk past the window right there.  There's

13   the AD's office.  (Indicating.)

14             I mean, that's just the name.  It could

15   be a PE instructor.  There's the lockers, and you

16   can keep going south; and you can exit out the

17   plan south of that boys PE locker right there,

18   out of that door.  (Indicating.)

19        Q.  And do you think this is an as-built

20   rendition?

21        A.  I can't -- I can't answer that,

22   Mr. Richter.  I do not know.

23        Q.  And can you show me, please, where the

24   door is to get into the coach's office from the

25   hallway?

1     A.  Right here.  (Indicating.)

2     Q.  And same thing for the AD's office.

3     A.  Right there is the door into the AD's

4  office right there.  (Indicating.)

5     Q.  And each of those have a private

6  bathroom, both of those offices; correct?

7     A.  They do.

8     Q.  Is that a shower in each one?

9     A.  That's a shower and a closet and a

10  toilet and a sink.

11     Q.  And a view window?

12     A.  There's no viewing window on the toilet.

13  The viewing window is right there in the office

14  of the coach's office.  It is right there in the

15  AD's office; and if we go over to the women's

16  side, it is right there in the girls coach's

17  office.  It's right there.  (Indicating.)

18     Q.  And where are the naked children?

19         MR. DUKES:  Object to the form.

20     A.  The partially-clothed children are in

21  this area.  (Indicating.)

22     Q.  How do you know they're partially

23  clothed?

24     A.  Same way you know they're naked.

25     Q.  You can't answer that.  It got you in

1    trouble before.  Do you understand that?

2              MR. STAIR:  Object to the form.

3              MR. DUKES:  Object to the form.

4        A.  The children are in this area right

5    here.  I don't know if they're -- to what degree

6    they are clothed.

7        Q.  So can we disregard your comment about

8    the partially clothed?

9        A.  You can, yes, sir.  Yes, sir.

10       Q.  Thank you.

11           Now you testified earlier there's no

12   door -- I mean, no window in this door, didn't

13   you?

14       A.  I testified I did not know if there was

15   a window in that door.  I believe that's what I

16   testified.  I'm not sure without looking at the

17   plans and the -- in this case there's no door

18   number.  So I can't tell you which door that is,

19   and you take it from a door number to a door

20   schedule; and that would show you more

21   information about what's in that door or not in

22   that door.

23       Q.  Can you walk from this point -- the door

24   at the coach's office -- all the way down this

25   passageway, across the basketball -- well, out-

1  of-bounds portion of the basketball court over to

2  the girls side on that long hallway passageway,

3  whatever you call it?  (Indicating.)

4           MR. DUKES:  Object to the form.

5     A.  If there -- see my cursor?

6  (Indicating.)

7     Q.  I do.

8     A.  Right here.  (Indicating.)  You can

9  walk.  I don't know how this door is controlled;

10  but if you walk through that door, you can walk

11  through -- down this entry vestibule into the

12  gymnasium, across the gymnasium through this --

13  I'm assuming it's a cased opening into this entry

14  vestibule past the girls coach's office entry

15  door, through another door, and get into the

16  girls locker.  (Indicating.)

17     Q.  And do you think this is as built?

18     A.  I do not know.  I can't --

19     Q.  For any of it, you don't know whether --

20     A.  I can't answer that.

21     Q.  I got you.  If you don't mind, go back

22  to the boys side, please.

23     A.  (Complies with request.)

24     Q.  Thank you.

25           Now, I want to go look at your testimony

 1    earlier about the doors -- in the window in the

 2    doors.

 3              MR. RICHTER:  If you'll mark that

 4    as the next in order, please.

 5              (Exhibit No. 14 was marked for

 6    identification.)

 7         Q.   Let me give you that, please.

 8              MR. STAIR:  I'm going to step out a

 9    moment to talk about this.  Do you have any more

10    you want so we kill it with one stone?

11              (Exhibit No. 15 and Exhibit No. 16 were

12    marked for identification.)

13              (Recess taken 3:03 p.m. to 3:05 p.m.)

14              MR. RICHTER:  You had -- we'll go

15    back on the record.

16    BY MR. RICHTER:

17         Q.   Now, I'd like you to show me, please, if

18    you can, where this door is located on that

19    drawing, which is on your computer screen.

20    (Indicating.)

21              MR. STAIR:  "This door" being

22    Exhibit No. 14?

23              MR. RICHTER:  Yes.

24              MR. STAIR:  Okay.

25         A.   I believe it's right here.

1  (Indicating.)  What is identified -- could be AD

2  office.

3       Q.  And of these, is that the viewing

4  window?  (Indicating.)

5       A.  There's the window right there, yes.

6  (Indicating.)

7       Q.  And these lockers coming down this way?

8  (Indicating.)

9       A.  Yes, sir.

10      Q.  Now, as to what you've identified as the

11 AD's office, that is -- is that Room 144?

12      A.  I can't answer that.  I -- I don't -- I

13 don't see a number on the plan.  It could be.  It

14 could be.

15      Q.  And can you tell me, please, whether

16 there's a window in the door to the AD's office

17 adjoining it to the hallway?

18                 MR. STAIR:  Object to the form.

19      A.  Let's say this.  Exhibit No. 14 shows a

20 door with a window in it.  I believe.  But I

21 can't confirm for sure -- because I don't have

22 numbers on the plans -- that this is that door.

23 (Indicating.)

24                 If this picture is of that door, there

25 is a window in that door but I -- I can't say

1    with 100 degree -- 100 percent degree of

2    certainty because there are no numbers on the

3    plans that would identify that office as office

4    C144.

5        Q.   So someone in this hallway -- assuming

6    that C144 is this office and that the door in

7    Exhibit No. 14 is the -- is a depiction of the

8    door to the AD's office, Room 144, and it has a

9    window in it, as you can see, can somebody stand

10   in the hallway, look through the AD's office

11   through the viewing window into the locker room

12   and see naked students?

13               MR. STAIR:  Object to the form.

14               MR. DUKES:  Object to the form.

15       A.   The potential exists, yes, sir.

16       Q.   Why would you design such a piece of

17   work?

18               MR. STAIR:  Object to the form.

19       A.   Security.

20       Q.   So you intended someone to stand in the

21   hall and look through the coach's office through

22   the viewing window into the dressing room where

23   the students are, see them naked, half naked,

24   fully clothed, whatever they were, are located.

25   Is that what you're saying?

1                    MR. STAIR:  Object to the form.

2        A.  No.

3        Q.  What are you saying?

4        A.  Security.

5        Q.  Explain that.  I don't understand.

6        A.  The window is in the office for security

7   reasons.  The window is in the door on the -- now

8   I'm making a supposition -- to see if anybody was

9   in the office.  Somebody could look in and see if

10  there was a coach in the office.  There's a --

11  there's a blind on that window is what it appears

12  to me.

13       Q.  Blind on all the windows.

14       A.  Well, it looks -- and I can't tell for

15  sure -- but it looks like it could be wire glass

16  too.  I can't tell for sure.

17       Q.  Assume there is a blind on the window.

18       A.  Okay.

19       Q.  Blinds open and blinds close, don't

20  they?

21       A.  They do.

22       Q.  That's the way you designed the viewing

23  window looking at the students in the dressing

24  room.

25       A.  Correct.

1          Q.   So what are you saying?  I don't
2     understand what you're saying.
3                    MR. STAIR:  Object to the form.
4          A.   You asked me if the -- if it was our
5     intent to design to have the ability to look
6     through the door into the locker room, and the
7     answer to that is no.
8          Q.   I didn't ask you that.
9          A.   That's what I heard you say.
10         Q.   Well, you misheard.  I'll read it back
11    to you though.
12         A.   Thank you, sir.
13         Q.   Can you just give me the last question?
14    You might can shortcut this.
15              Do you agree with me somebody can stand
16    in the hallway, look through the window in the
17    coach's door, which is the office door, whoever's
18    office door it is, all the way through to the
19    viewing window; and on the other side of the
20    viewing window would be students, some clothed,
21    some unclothed, some fully unclothed, some fully
22    unclothed, some in street clothes, whatever state
23    of attire they were in, and -- and view those
24    people --
25                    MR. STAIR:  Object to the form.

1    Q.   -- from the hallway?   Couldn't that

2  happen?

3                MR. STAIR:   Object to the form.

4                MR. DUKES:   Object to form.

5    A.   If the moon and the stars align just

6  right with the blinds in the position, it is

7  possible to do that, yes, sir.

8    Q.   So that's what I'm asking you.   Why

9  would you design a building that allows that to

10  happen to children?

11                MR. STAIR:   Object to the form.

12    A.   The design was not intended to do that.

13    Q.   But it does it, doesn't it?

14    A.   It allows it if the moon and stars

15  are -- are aligned, all conditions being perfect,

16  that could happen.   The design was not intended

17  to do that.

18    Q.   And who is it that did not intend to

19  design to do that?

20    A.   LS3P.

21    Q.   How do you know that?

22    A.   Because I represent LS3P.   Your question

23  was why did you design -- let me see.   The

24  question I heard was why did you design something

25  that would allow that to happen?   And my response

1   is:  The intent was not to design it to allow

2   that to happen.  That was not the intent of the

3   design.

4        Q.  But you said it can happen.

5        A.  It could if -- again, if the blinds are

6   in the right position, everything was just lined

7   up perfect, it could happen, yes, sir.

8        Q.  And you didn't warn the students of that

9   in any way at all, did you?

10               MR. DUKES:  Object to the form.

11               MR. STAIR:  Object to the form.

12       A.  No, sir.

13       Q.  And you say that LS3P intended not for

14  that to occur.  Isn't that what you said?

15               MR. STAIR:  Object to the form.

16       A.  I said the design was not intended for

17  that to occur.

18       Q.  That's what I want to know.

19       A.  Yes, sir.

20       Q.  Who told you that?

21       A.  That's the statement Roger Attanasio's

22  making as the 30(b)(6) witness of LS3P.  Nobody

23  told me that.

24       Q.  And how do you know it?

25       A.  I'm just making an assumption as an

1   architect working for LS3P.

2       Q.   That somebody wouldn't do something that

3   crazy.  Is that what you're assuming?

4            MR. STAIR:  Object to the form.

5            MR. DUKES:  Object to the form.

6       A.   No, sir.  That's not what I'm saying.

7       Q.   Now, are you of any -- are you aware of

8   any project manuals or guidelines, ASTM

9   standards, planning or construction guides which

10  specify whether or not it is appropriate to have

11  windows in gymnasium dressing/locker rooms?

12           MR. STAIR:  Object to the form.

13           MR. DUKES:  Same objection.

14      A.   I would have to research some of the --

15  the guidelines that we use, but I can't quote you

16  chapter and verse of a specific guideline that

17  says you must put this in here or you must not

18  put that in there.

19      Q.   Have you ever seen it?

20      A.   I've probably read a guideline or two

21  across my time, but I don't -- as I sit here

22  today, I can't quote you which guidebook, which

23  design manual would speak to that.

24      Q.   I'm only asking, you understand, a

25  narrow question exactly as I framed it.  Project

1  manuals, guidelines, ASTM standards, planning or

2  construction guides which specify whether or not

3  it is appropriate to have windows in gymnasium

4  dressing/locker rooms.

5       That's the question to you.  Are you

6  aware of any of those?

7            MR. STAIR:  Object to the form.

8            MR. DUKES:  Same objection.

9  A.  I'm aware of -- of design guidelines,

10 Mr. Richter.  But, again, I can't speak with a

11 degree of certainty -- 100 percent certainty of

12 what they say about windows in locker rooms.

13 Q.  If they say no, don't put windows in

14 locker rooms, you -- "you" being LS3P -- wouldn't

15 have put windows in the locker rooms.  Is that

16 accurate or not?

17           MR. STAIR:  Object to the form.

18           MR. DUKES:  Object to the form.

19 A.  I would like to think that would -- is a

20 correct statement, yes, sir.

21 Q.  How about if the owner, person employing

22 you, writing your check says, "I want them.  I

23 want viewing windows into these children's locker

24 rooms"?

25 A.  And the guidelines said not to?

```
1          Q.   And the guidelines that say don't do it.

2          A.   I think that would be a point of

3     discussion with the owner for clarification.

4          Q.   Well, would your -- LS3P's position be?

5          A.   They would have a point of clarification

6     saying, "The guidelines says don't put it in.

7     You're asking me to put it in.  You're asking me

8     to do something other than what the guideline

9     says."  We would have to document that so that we

10    would know that we were directed to do something

11    that was not recommended.

12         Q.   And you would do it, would you not?

13         A.   If requested --

14              MR. STAIR:  Object to the form.

15         A.   If asked by the owner and that's what

16    they wanted, yes, sir.

17         Q.   Did the children want that?

18              MR. STAIR:  Object to the form.

19              MR. DUKES:  Object to form.

20         A.   I cannot answer that.

21         Q.   But you would do whatever somebody who

22    was giving you money told you to do, wouldn't

23    you?

24              MR. STAIR:  Object to the form.

25              MR. DUKES:  Object to the form.
```

1      A.   Not always, no, sir.

2      Q.   In that instance.

3      A.   There's a limit -- there's a limit to

4   what we would do.  If you asked me to violate a

5   code because you want it that way because it was

6   easier to use but it was against the building

7   code, I would not do that.

8      Q.   Building code as opposed to all of these

9   categories that I asked you about?

10      A.   Design guidelines, yes, sir.

11           MR. STAIR:  Object to the form.

12      A.   Building code different than a design

13   guideline.

14      Q.   So you would violate a design guideline,

15   but you wouldn't violate a building code?  Is

16   that your testimony?

17           MR. DUKES:  Object to the form.

18           MR. STAIR:  Object to the form.

19      A.   I don't know that I would use the word

20   "violated" a design guideline.  A "design

21   guideline" is something that you design to and

22   try to accomplish a program that was requested by

23   the owner.  And if a design guideline said,

24   "Don't put a window in" and somebody said "you

25   want a window in," you'd have to discuss it with

1  him, as I said, as to why you do it, why you

2  don't do it.  Then you would have to make a

3  decision.

4      Q.  What if it is -- enables the violation

5  of a law?  Would you make a deal with an owner to

6  put in something that enabled them, in this

7  instance, to view naked children?

8              MR. STAIR:  Object to the form.

9              MR. DUKES:  Object to the form.

10     A.  I don't think we would do something

11  knowingly to violate a law, no, sir.

12     Q.  Well, you do know, don't you, that it's

13  against the law to view naked children in this

14  example?

15             MR. STAIR:  Object to the form.

16             MR. DUKES:  Object to the form.

17     A.  Yes, sir.

18     Q.  Well, would you do that or not?

19             MR. STAIR:  Object to the form.

20             MR. DUKES:  Object to the form.

21     A.  I'm, again, going to say, I would not

22  knowingly violate the law.  Design something that

23  violates a law.

24     Q.  I thought you said you knew it was

25  against the law to look at naked children.

```
 1                    MR. STAIR:  Object to the form.

 2                    MR. DUKES:  Object to the form.

 3        A.  I mean, I -- that, to me, is kind of

 4   common sense.  I mean, I, you know.  I can't tell

 5   you, "Please quote to me what chapter and verse

 6   of the law requires you not to look" -- I don't

 7   know.  I can't do that.  So I don't know.

 8        Q.  And -- but that's the dividing line for

 9   you.

10        A.  It's one of them.  I mean --

11                    MR. STAIR:  Object to the form.

12        A.  -- it's not all of it but -- all of them

13   but --

14        Q.  Well, I guess what I'm -- one of the

15   things I'm asking is:  Do you understand that

16   you, you individually or LS3P or individuals at

17   LS3P, would have gotten with somebody else --

18   that is, the owner, the person who's writing a

19   check to you -- to draw this thing that they want

20   and that the two of you together would have

21   agreed to produce such a design?

22                    MR. STAIR:  Object to the form.

23                    MR. DUKES:  Object to form.

24        A.  I'm not -- I didn't hear the question.

25   What's the question?
```

1          MR. STAIR:  Subject to my objection

2   so you can go on with it.

3      Q.  Here's what I'm asking you.

4          Do you understand that you

5   individually -- or LS3P or individuals at LS3P if

6   it's not you being that individual that's making

7   this agreement -- would then have agreed -- you

8   and this other person from the Diocese who

9   insisted on the viewing windows -- would then

10  have to --

11         MR. DUKES:  Object to the form.

12         MR. RICHTER:  I can't let you

13  interrupt the questions, Mr. Dukes.  I'm going to

14  have to ask you not to do that anymore.

15         MR. STAIR:  It's sometimes hard to

16  say when you're through.  So let him finish his

17  question --

18         MR. RICHTER:  He didn't interrupt.

19  He didn't interrupt.

20         MR. STAIR:  I know that.  But what

21  I'm saying is the problem is:  Sometimes we don't

22  know you're through with your question.  Wait so

23  you give us time to object.  Then you can answer

24  subject to the objection.  Go on.

25      Q.  I want to ask you, again, do you

1   understand that you, you individually or LS3P or

2   individuals at LS3P, assuming you had this

3   discussion with the builder or with an owner who

4   insisted upon these kinds of viewing windows of

5   children who would some of the time be completely

6   naked, that you would have gotten with somebody

7   else, whoever that person, that representative

8   from the other side of the contract was, but the

9   owner or designee of the owner, person who is

10  writing you a check is who I'm referring to --

11  y'all would have gotten together and you would

12  have agreed to draw what they want.  They would

13  describe it to you, and you agreed to draw it;

14  and that the two of you together, then, would

15  have agreed to produce such a design.

16               MR. STAIR:  Object to the form.

17               MR. DUKES:  Same objection.

18       A.  In a manner, a program is developed; and

19  a program describes what the owner desires for

20  this -- in this case high school.  The architect,

21  then, comes up with a design that responds to the

22  program requirements developed between the owner

23  and the architect.

24               The architect draws -- and in this case

25  a two-dimensional means -- their understanding of

1    the program and the responses to that program.

2    The owner would, then, review that design, these

3    plans, and approve it; and in those plans would

4    be that window, that door with that window.

5         So in a sense, there is a development of

6    an understanding of what you want, the desires.

7    There is the development of the design.  There is

8    the creation of the documents.  There is a review

9    of the documents; and there is approval by both

10   entities that, yes, what you have designed and

11   drawn responds to what we had asked for in the

12   program.

13   Q.  Do people from time to time change their

14   minds and say, for example, rather than having

15   six-over-six lights in these windows on the front

16   of my house, I want eight over eight?  That

17   happens, doesn't it?

18   A.  Yes.

19   Q.  Routine, isn't it?

20   A.  Changes in design happen, yes, sir.

21   Q.  Routinely?

22   A.  Routinely.

23        MR. DUKES:  Object to the form.

24   Q.  And you didn't sit down one day and draw

25   the plans and give them to Bishop England and

1  then say, "These are the plans for your school"

2  without going to them and saying, "Well, this

3  needs to be moved over here" or "that office

4  needs two doors and this one needs only one" or

5  that kind of exchange is what I'm referring to.

6      A.   I'm sure that kind of exchange -- review

7  of the plans and discussing adjacencies and

8  materials -- a lot of things happen during the

9  course of the design and production of the

10 drawings.

11     Q.   I understand.

12     A.   Many of it happens through construction.

13     Q.   Sure.  I understand that.

14          And you agree that that would have

15 involved two parts.  Two representatives.  LS3P

16 here or -- or you if you were the individual here

17 and the school, Diocese, or the person designated

18 by them here; and you'd have to gotten the

19 message.  "We want a viewing window where we can

20 see these children," whatever their state of

21 dress is.  It's a dressing room, for goodness

22 sakes.  And that would involve two people doing

23 that.

24          Do you agree with that, don't you?

25               MR. STAIR:  Object to the form.

```
1              MR. DUKES:  Object to the form.
2       A.  At least two people, Mr. Richter.
3  There's probably more.
4       Q.  Maybe four from each side.  I don't know
5  how y'all staff those meetings up.  But two sides
6  is what I'm trying to say.
7       A.  Yes, sir.  Owner-architect.
8       Q.  At least an individual on this side and
9  at least an individual -- maybe four on this side
10 and four on the other side as well.  Okay.
11             Do we follow each other?
12      A.  Yes, sir.
13      Q.  Thank you.
14             And so if what you did, then -- well, I
15 don't need to ask you that.
16             I want to be sure that we're straight
17 and clear on these doors entering the hallway and
18 having windows that you can see through in them.
19             If you look at -- I think you just did
20 No. 14.  If you don't mind, let's do No. 15.
21 Exhibit No. 15 which says "men's basketball
22 office."  Do you see that?
23      A.  Yes, sir.
24      Q.  And in looking at that copy of
25 photographs that Mr. Dukes and I and some other
```

1   people one day went over there and took, do you

2   agree that you can see through that door to the

3   men's basketball office and -- well, can you

4   agree with that much first?

5       A.   I can see through the window at the

6   men's basketball office door, yes, sir.

7       Q.   And that door opens onto the corridor,

8   or does it open back into the coach's -- by the

9   men's basketball office?

10      A.   It opens into the office.

11      Q.   And you can tell that by the way it's

12  framed around it, can't you?

13      A.   I can tell by the -- the handle on the

14  door, yes, sir.  The lever handle --

15      Q.   Right.

16      A.   -- and where the door is in the frame.

17  It's on the inside of the frame and not on the

18  outside of the frame.

19      Q.   Right.  That's what I was trying to -- I

20  don't know how to say that exactly.  You do.  But

21  when I said, "but you can tell that by the

22  framing," that's what I'm trying to say in a more

23  architectural way.

24          All right.  And then in this basketball

25  office, you agree, don't you, that there is a

1   4-foot by 4-foot plate glass window looking into

2   the locker room/dressing room facility?

3               MR. STAIR:  Object to the form.

4       A.  I see a window on the plan that you --

5   we've looked at.  I don't see a size of the

6   window.  So I can't confirm that it's 4-foot by

7   4-foot.

8       Q.  Well, how big does it show on the plan?

9       A.  It doesn't show a dimension.

10      Q.  Well, the good news is, we can certainly

11  ascertain that.  Here's how.

12          The defendants bricked the windows up

13  and threw the windows away.  So somebody will

14  have billed them or somebody would have taken a

15  part with them in doing something with evidence

16  in the case.  So we're going to -- we'll know all

17  of that at the end of the day.

18              MR. DUKES:  Object to the form.

19      Q.  I don't know how many people we have

20  sitting at the tables by that time; but we'll

21  know it, at least.

22              MR. STAIR:  If that was a question,

23  I object to the form.

24      Q.  Do you understand that?

25              MR. STAIR:  Object to the form.

1      Q.   That's the question.

2                MR. STAIR:  Object to the form.

3                MR. DUKES:  Object to the form.

4      A.   Well, first off, do I understand what

5   you just stated?  I understand what you just

6   stated, but there was no question in there for

7   me.

8      Q.   The question is:  Do you understand

9   that?

10               MR. STAIR:  Object to the form.

11               MR. DUKES:  Object to the form.

12     A.   Yes, sir.

13     Q.   Thank you.

14          Now -- so what is your answer to the

15  direct question:  Can somebody going -- walking

16  down the hall look through the door -- the window

17  and the door in the coach's office from the

18  hallway through the window which we've been

19  referring to as the "viewing window," in the

20  back -- in this case a basketball office, I think

21  it was called -- and see through it to the

22  dressing room?

23               MR. STAIR:  Object to the form.

24               MR. DUKES:  Object to the form.

25     Q.   And I'm not asking you about sun, moon,

```
1   and stars and all of that.  I'm asking you about
2   a window on one side of which is a staff person
3   from Bishop England and/or other people and on
4   the other side are children who are either
5   totally nude, fully clothed, or partially
6   clothed.
7                MR. STAIR:  Object to the form.
8                MR. DUKES:  Object to the form.
9        Q.  That's what I'm asking you.
10               MR. STAIR:  Object to the form.
11               MR. DUKES:  Same objection.
12       A.  And I think I answered it previously by
13  saying it is possible.
14       Q.  Sure.
15           And it's possible because you designed
16  it that way; isn't that correct?
17               MR. STAIR:  Object to the form.
18               MR. DUKES:  Same objection.
19       A.  It is possible, yes, sir.
20       Q.  That's not the question.  Do you want me
21  to have the question read back to you?
22       A.  No.  You said it was possible because
23  you designed it that way.
24       Q.  That's right.
25       A.  And my answer is, yes, it is possible.
```

1          Q.  No.  That's not the question.  You're

2     asking -- you're answering is it possible and I

3     asked you specifically -- and we'll -- if you --

4     you're entitled to go as carefully and slowly as

5     you want to, and I'm -- and I can't -- can't and

6     won't stop you from doing that.

7               But the question was:  It is possible,

8     isn't it, because you designed it that way?

9          A.  Yes.

10               MR. STAIR:  Object to the form.

11          Q.  Thank you.

12               Can you tell whether the sizes of the

13     windows in the three -- what we call the three

14     viewing windows -- girls locker room, boys locker

15     room, boys locker room -- whether those are the

16     same size on your plans?

17          A.  They appear to be, yes, sir.

18          Q.  And do you know anything about who

19     manufactured or provided those?

20          A.  I do not.

21          Q.  Would that be a thing that we'd need to

22     learn really from the contractor instead of

23     from -- you wouldn't have bought them, would you?

24          A.  No, sir.

25          Q.  Contractor would have, wouldn't he?

```
 1        A.   Correct.
 2        Q.   So I hear you're saying -- and if I'm
 3   wrong, please tell me.  But I hear you saying you
 4   need to look to the contractor to answer that
 5   information for you?
 6        A.   Who bought the windows?
 7        Q.   Yeah.
 8        A.   Yes, sir.
 9        Q.   Thank you.  I understand it.
10             Now, what about what you're looking at
11   on the screen?  Do you need that before you
12   anymore?
13        A.   Depends on the question you ask me.
14        Q.   That's fair.
15             Question I'm going to ask you next is:
16   Do you agree that, assuming each of these doors
17   are just like the one that you looked at, the two
18   that you looked at here in No. 14, No. 15, and
19   No. 16, do you agree that those are all
20   accessible through this corridor that has the
21   word "Bishops" written on it there?
22                  MR. STAIR:  Object to the form.
23                  MR. DUKES:  Object to form.
24        A.   I'm not sure I'm following what you're
25   trying to ask me.  Let's -- let's say it this
```

1    way.  This area is the gymnasium, right.  All of

2    this is the gymnasium.  (Indicating.)

3         You have to cross through a -- you

4    didn't shoot it from that direction.  You have to

5    cross through what I think is a cased opening

6    here to get from this room -- I'll call an entry

7    vestibule -- into the locker room.  You call it a

8    hallway.

9         Q.  When you say a cased --

10        A.  See that opening right there?

11   (Indicating.)

12        Q.  Yeah.  I just wanted you to define that.

13        A.  There's no door shown in that opening.

14   So I call that a cased opening, okay, as opposed

15   to a doorway where there's a door swinging.

16        Q.  I understand.

17        A.  So if you get into this entry vestibule

18   and you pass by heading into the locker room, you

19   can see into that office through that window in

20   the door.  There's the window, and you can see

21   into the locker room.  It's possible.

22        Q.  When you say if you get into that

23   hallway, there's no door there to keep you out of

24   that.

25        A.  From the locker room -- from the

1   gymnasium.  There is right there.  (Indicating.)

2   There's no door to keep you out of there; but if

3   you're coming from this hallway, you can't get to

4   this hallway without going through a door.

5        Q.  Okay.

6        A.  Similarly, you can't get into -- on the

7   girls side, you can come from the locker room --

8   from the gymnasium through that cased opening

9   into that entry vestibule, but you can't come

10  from the hallway into this entry locker room --

11  entry vestibule and into this one without going

12  through that door.  You have to cross through a

13  door to get from here to here.  (Indicating.)

14  You don't have to cross through a door to get

15  from here to here, but there's no office there.

16          On this side -- on the boys side, you

17  can come from this hallway into this secondary

18  entry, pass by this coach's office, and see

19  directly through there; but you have to enter a

20  door to get into this hallway.  (Indicating.)

21  You can't go from here to there without going

22  through a doorway.

23       Q.  A doorway?

24       A.  A door.  Right there.  (Indicating.)

25       Q.  Well, it may be open.  It may be closed.

1    If it was open, it would be a doorway, wouldn't

2    it?

3                    MR. DUKES:  Object to the form.

4        A.  It would be an open doorway, yeah.

5    Here --

6        Q.  From way down in this hallway, you came

7    out of the restroom.  Let's say you can come

8    down, walk down this hallway and look straight in

9    this coach's office, straight through this door,

10   the viewing window, and see whoever's in there

11   doing whatever it is they're doing at the -- at

12   that moment?  (Indicating.)

13       A.  It is possible, yes, sir.  It is

14   possible to do that.

15                   MR. DUKES:  Object to the form.

16       Q.  Now, you don't like to use the word

17   "hallway" here.  (Indicating.)

18       A.  That's not a hallway.  That's part of

19   the gymnasium.  That is not a hallway.  That --

20   that word is -- the word "Bishops" is graphics on

21   the floor, which is painted.

22       Q.  Okay.

23       A.  So the gym -- let me shrink it down a

24   bit.  To enter the gym, you come into these

25   doors; and this whole space here -- well,

1  actually all the way over here because that's

2  bleachers.  That is the gymnasium.  (Indicating.)

3           That's separate from the -- the locker

4  rooms.  So I -- the reason I don't call this a

5  hallway is 'cause it's not a hallway.  It's part

6  of the gymnasium.  The hallway is above the

7  gymnasium.

8           There's the hallway.  (Indicating.)  You

9  enter into the vestibule, enter into the gym.  On

10 the bottom side you're outside.  You go to the

11 outside.  So that's part of the gymnasium.

12 That's not a hallway.

13          Does that make sense?  Am I -- am I

14 answering your question?

15     Q.   I just want you to tell me where the

16 hallway begins and where whatever you call this

17 ends.  (Indicating.)

18     A.   Well, I call this the hall.  That --

19 that right there is the corridor, the hallway.

20 (Indicating.)  This space on this side is the

21 hallway.

22          This, to me, is the entrance -- the

23 beginning of the entrance to the locker room

24 'cause you got to go in here and into that door;

25 and then you go all the way and go out the bottom

1  side if you were to go down, go out that door.

2  (Indicating.)

3         Vestibule, you enter in the locker room,

4  you go through it.  You come out.  Again, I'm --

5  I'm titling this, kind of, the entry vestibule,

6  locker room.  There's the hallway.  (Indicating.)

7         On the other side of the hallway, this

8  goes to the outside.  This is the hallway.

9  (Indicating.)  Entry vestibule to the boys

10  varsity locker, into the locker, through that

11  door, you can enter into the PE locker.

12  (Indicating.)

13         So I don't know if that answers your

14  question.

15     Q.  I hear everything that you're saying.

16         Here's where I wanted to ask you.  These

17  are bleachers, aren't they?  (Indicating.)

18     A.  Yes, sir.

19     Q.  Let's assume you're sitting on Row 2 of

20  the bleachers down here where you have just

21  finished eating a sandwich.

22     A.  Okay.

23     Q.  You've taken a break.  You're eating a

24  sandwich.  While you're eating the sandwich,

25  you're thinking, "I'd like to go look at some

1   naked children."

2           What prevents you from getting up,

3   climbing down Row 1, walking straight down the

4   opening.  Nothing blocking your access

5   whatsoever.  And going and looking in this

6   athletic director's office straight down the line

7   of lockers and viewing your naked boys?

8                   MR. STAIR:  Object to the form.

9                   MR. DUKES:  Object to the form.

10      A.   Nothing.

11      Q.   Pardon me?

12      A.   Nothing.

13                  MR. STAIR:  Object to the form.

14      Q.   Thank you.

15           And the same thing.  We can do it on the

16   other side, if you want to move this.

17                  MR. DUKES:  Object to the form.

18      Q.   Unless you just agree with that.

19                  MR. STAIR:  Object to the form.

20      Q.   Same thing would happen on the -- could

21   happen on the girls' side; correct?

22                  MR. STAIR:  Object to the form.

23                  MR. DUKES:  Object to the form.

24      A.   Yes.

25      Q.   So without ever going in the girls

1  coach's office, could you not stand at the girls

2  coach's office door, look through the window, and

3  look into the locker room at the two ladies who

4  are changing clothes right in front of those two

5  lockers which are two removed from the window?

6           MR. STAIR:  Object to the form.

7           MR. DUKES:  Object to the form.

8      A.  It is possible.

9      Q.  And it's possible, isn't it, because

10 LS3P made it possible?

11          MR. STAIR:  Object to the form.

12          MR. DUKES:  Same objection.

13     A.  The design made it possible, yes, sir.

14     Q.  Thank you.

15          MR. STAIR:  I can't quite tell

16 where you are; but if you've got much more to go,

17 a comfort break would sure be good.

18          MR. RICHTER:  Yeah, if you need

19 one.

20          (Recess taken 3:40 p.m. to 3:45 p.m.)

21 BY MR. RICHTER:

22     Q.  I'd like to call your attention to

23 Exhibit No. 16.

24     A.  (Complies with request.)

25     Q.  Which is marked by the court reporter

```
1   and is in your hand and ask you, please, if that

2   is another view of what I refer to as a hallway?

3   And you said --

4               MR. DUKES:  Can I have a copy of

5   it, please?

6               MS. RICHTER:  You don't have a

7   copy?  I thought I gave it to you.  I'm sorry.

8   I'll make you a copy real quick.

9               MR. DUKES:  Thank you.

10              (Pause in proceedings.)

11  BY MR. RICHTER:

12      Q.  What I want to ask you is about No. 16.

13  Does that show a doorway to the woman's school

14  official's office?

15      A.  It appears to, yes, sir.

16      Q.  And that window to her office is in the

17  door to her office, isn't it?

18      A.  I believe so, yes, sir.

19      Q.  And what is it that prevents somebody

20  from walking down the hall, looking through that

21  window, never entering her office, and looking

22  straight through her office, which is not -- none

23  of these are that you know -- through the glass

24  window that views the -- views the dressing room?

25              MR. STAIR:  Object to the form.
```

```
 1                   MR. DUKES:  Object to the form.
 2        A.  If you had access to that -- what I call
 3   entry vestibule -- and, again, if things were
 4   aligned just right, it is possible to look
 5   through that window in that door, through that
 6   window in the women's coach's office, into the
 7   dressing room, yes, sir.
 8        Q.  You said if you had access.  What would
 9   keep anybody from having access to that hallway?
10        A.  Well, in this case --
11                   MR. DUKES:  Object to the form.
12        A.  -- that particular door would have --
13   would prevent somebody from having access to it.
14   (Indicating.)
15        Q.  How does it do that?
16        A.  It's open.  If it was closed, you
17   wouldn't have access to it.
18        Q.  Well, that's different.  It was closed
19   and secured.
20        A.  You asked me what would prevent
21   somebody?
22        Q.  Yeah.
23        A.  A closed door.
24        Q.  A closed door and locked door.
25                   MR. STAIR:  Object to the form.
```

1          MR. DUKES:  Object to the form.

2     A.  A closed and locked door, yes, sir.

3     Q.  And what are the fire requirements about

4  that?

5          MR. STAIR:  Object to the form.

6     A.  Well, it's an exit.  So the lever handle

7  would have to be that you could exit through

8  there without being locked.  You couldn't lock

9  it.

10    Q.  And be in compliance with fire safety

11 requirements.

12    A.  Correct.

13    Q.  You could lock it, but you couldn't --

14    A.  You could, that's right.

15    Q.  I think that's it for No. 16.

16         Now, next, please, I want to ask you

17 this:  You testified earlier that the windows

18 were put in for security purposes.

19         Is that the way you said it?

20    A.  Yes, sir.

21    Q.  And would you agree with me that it's

22 possible to design a dressing room with security

23 features that are less intrusive on the privacy

24 and dignity of the persons changing clothes in

25 that dressing room facility than the viewing

1  windows?

2          MR. STAIR:  Object to the form.

3          MR. DUKES:  Object to the form.

4      A.  It may be possible, yes, sir.  I would

5  agree with it may be possible.

6      Q.  And are you -- I don't understand your

7  answer.  If you could tell me your degree of

8  confidence that that could be done, I'd

9  appreciate it.

10          MR. STAIR:  Object to the form.

11          MR. DUKES:  Object to form.

12     A.  I'm not sure.  I'm not sure what's

13  available.  I mean, there's -- there may be -- I

14  hate to use the word "cameras" because cameras

15  would be just as intrusive, maybe more so, than

16  viewing windows.  I'm not sure about audio.  I'm

17  not sure if audio would work.  So I -- is it

18  possible?  It might be, but I'm not sure.

19     Q.  But it wasn't -- whatever, it wasn't

20  done in the Bishop England instance.

21          MR. STAIR:  Object to the form.

22     A.  Correct.

23     Q.  I understand.

24          Now, you just used a word I wanted to

25  ask you about.  You used the word "intrusive."

1    Do you agree that looking at unclothed students,

2    minors, high school age people, is intrusive as

3    to that?

4                MR. DUKES:  Object to the form.

5                MR. STAIR:  Object to the form.

6         (Interruption.)

7         Q.  Did you get the --

8         A.  No.  You're going to have to repeat

9    that.  Or read it.

10        Q.  I will.

11             You used the word "intrusive."  I want

12   to ask you about that.  Do you agree that looking

13   at unclothed students, minors, high school age

14   people, is intrusive as to that?

15                MR. STAIR:  Object to the form.

16                MR. DUKES:  Object to the form.

17        A.  Could be.

18        Q.  What is your opinion as to whether it's

19   intrusive or not?

20                MR. STAIR:  Object to the form.

21                MR. DUKES:  Object to the form.

22        A.  I suppose if there was an intentional

23   reason for doing so, other than security reasons,

24   one might consider that intrusive.

25        Q.  How about the person viewed?  Would it

```
1   have to be the same circumstance limited that you

2   just described?

3              MR. DUKES:  Object to the form.

4              MR. STAIR:  Object to the form.

5       A.  I'm not following your question.

6       Q.  Yeah.

7       A.  Person who --

8       Q.  When is it okay to look at naked

9   children?

10             MR. DUKES:  Object to the form.

11             MR. STAIR:  Object to the form.

12      A.  I'm not sure I can give you an answer to

13  when it's okay to look at naked children.

14      Q.  Well, you just said --

15      A.  When you're giving them a bath maybe.

16      Q.  Maybe.  Let's clarify it.  This will

17  take a little while.

18             When is it okay to look at high school

19  students who are minors, for the most part,

20  almost -- almost entirely but who are teenagers

21  and are using a dressing room/locker room

22  facility for purposes of dressing or undressing

23  or changing their dressing and are, therefore,

24  sometimes completely clothed, sometimes partially

25  clothed, and sometimes completely naked?  When is
```

1    it okay to look at those children?

2                MR. STAIR:  Object to the form.

3       A.  I guess the process of changing from

4    street clothes to gym clothes in the attempt to

5    prevent fighting, horseplay, one student injuring

6    another would be -- it's okay to -- to view

7    through that window to make sure that doesn't

8    occur.  That -- that, to me, is why I think

9    it's -- the window was put there.

10               And so when is it okay to look through

11   it?  When they're changing the clothes to make

12   sure that no horseplay, fighting, activities that

13   could injure somebody.  That's why the window's

14   there.  That's when it's okay to look through the

15   window.

16      Q.  Change the example from a locker room

17   window to a bathroom.  When is it okay to look at

18   those same class of students that I just went

19   through with you in a bathroom?

20               MR. DUKES:  Object to the form.

21               MR. STAIR:  Object to the form.

22      A.  As -- as you said to me earlier, I don't

23   know that I can say there's any time to look

24   through -- look through a window at somebody in

25   the bathroom because the activities that go on in

1  the bathroom are different than the activities

2  that go on when you're changing your clothes from

3  your street clothes to your gym clothes in

4  preparation for gym class.

5         So I can't think of any time that it

6  would be okay to look through a bathroom window

7  at somebody using the bathroom.  Different --

8  different circumstances.

9     Q.  I didn't ask you about using the

10  bathroom.  I asked you about somebody being in

11  the bathroom, and you can suppose for the

12  purposes of this question that that person is

13  changing clothes in the bathroom.  It's okay to

14  look through the bathroom window at that person?

15            MR. DUKES:  Object to the form.

16            MR. STAIR:  Object to the form.

17     A.  No, sir.

18     Q.  What's the dividing line, then, between

19  changing clothes in the bathroom and changing

20  clothes in the locker room?

21            MR. DUKES:  Object to the form.

22            MR. STAIR:  Object to the form.

23     A.  Again, the dividing line for me is there

24  was an anticipation that there might be horseplay

25  in a dressing room.  There are multiple students

1    at the same time going through the activity of

2    changing from street clothes to gym clothes.  So

3    the chances of horseplay, fighting, bullying

4    exist.  The window was placed there in an attempt

5    to prevent that.  You don't anticipate that in a

6    bathroom.

7         Q.  Who told you that?

8         A.  People go into a bathroom usually to use

9    the bathroom.  Occasionally, you might change

10   your clothes in the bathroom; but most of the

11   time, people go into a bathroom to use the

12   facilities.  So you don't put windows in a place

13   where somebody uses the -- the toilet facilities.

14        In this case, it was an activity of

15   changing clothes to prepare for a gym class or a

16   football practice or baseball practice or

17   whatever it was.  And the potential exists for

18   those children to bully one another, to tease one

19   another, to fight with one another, to slam

20   somebody into a locker room -- a locker, to do

21   things that the supervisors, the teachers, the

22   parents don't want.

23        And so that's why the window was placed

24   in that.  So the difference is there -- a

25   potential exists, and so you're trying to prevent

**283**

```
1   from that potential activity happening.
2        Q.  Now, do you think that things don't
3   happen in a bathroom facility, other than
4   utilizing the toilet or urinal and washing your
5   face and hands?
6                MR. STAIR:  Object to the form.
7                MR. DUKES:  Object to the form.
8        A.  No, sir.  I think it's possible, yes,
9   sir.
10       Q.  Where do children -- you can narrow it
11  down as far as you feel like you can at Bishop
12  England High School.  Where do they smoke in the
13  middle of the day?  Do you know that?
14               MR. DUKES:  Object to the form.
15               MR. STAIR:  Object to the form.
16       A.  I do not.
17       Q.  Do you know that they smoke in the
18  bathroom?
19               MR. STAIR:  Object to the form.
20       A.  I do not.
21       Q.  Do you know that they smoke in the
22  locker room?
23               MR. STAIR:  Object to the form.
24               MR. DUKES:  Object to form.
25       A.  I do not.
```

```
 1        Q.  And one of the things earlier, I think
 2   you said they wanted to guard against was smoking
 3   or maybe it's not actually written, then put it
 4   in paren.
 5             Let's assume for the sake of this
 6   question that the children from time to time
 7   smoke illegal drugs in the bathroom.  Do you
 8   think that happens from time to time?
 9                  MR. STAIR:  Object to the form.
10                  MR. DUKES:  Object to the form.
11        A.  It's possible, yes, sir.
12        Q.  I know it's possible.  I just asked you
13   if you think that it happens?
14        A.  I don't think about that.
15                  MR. STAIR:  Object to the form.
16                  MR. DUKES:  Object to the form.
17        Q.  Have to now because I posed the question
18   to you.
19        A.  Do I think it happens?  It could happen,
20   yes, sir.
21        Q.  I didn't ask if it could.  I asked you
22   if you think it happens?
23        A.  Yes, sir.
24                  MR. STAIR:  Object to the form.
25                  MR. DUKES:  Object to the form.
```

**285**

1    Q.  It does happen, doesn't it?

2              MR. STAIR:  Object to the form.

3    A.  I don't know for an absolute fact that

4    it happens at Bishop England High School.  I

5    can't answer that.

6    Q.  I didn't ask you Bishop England High

7    School specifically.  I just asked you if

8    children smoke drugs in bathrooms.

9              MR. STAIR:  Object to the form.

10   Q.  High schools.

11             MR. STAIR:  Object to the form.

12   A.  Yes.

13   Q.  And do they swap drugs in bathrooms?

14             MR. STAIR:  Object to the form.

15             MR. DUKES:  Object to the form.

16   A.  I don't know.

17   Q.  And is there a reason why there would be

18   swapping drugs, for example, in a locker room as

19   opposed to a bathroom?

20             MR. STAIR:  Object to the form.

21             MR. DUKES:  Object to the form.

22   A.  I don't know.  You'd have to ask the

23   people swapping the drugs.

24   Q.  But you know in your own mind that it's

25   okay to look at naked children in a locker room

1  but not in a bathroom?

2              MR. STAIR:  Object to the form.

3              MR. DUKES:  Object to the form.

4       Q.  Isn't that what you testified to?

5              MR. STAIR:  Object to the form.

6              MR. DUKES:  Object to the form.

7       A.  That's not what I testified to.

8       Q.  I'm sorry.

9       A.  Your question was to me when is it okay

10  to do one or the other?  And I gave you my

11  thoughts on when it's okay to do one or the

12  other.

13      Q.  And your thoughts are that you can never

14  look at students in a bathroom.  Is that what --

15             MR. STAIR:  Object to the form.

16             MR. DUKES:  Object to the form.

17      Q.  -- where you came down ultimately?

18             MR. STAIR:  Object to the form.

19      A.  No, sir.

20      Q.  Would you say, again, please?  Because

21  I'm confused about your answer.  When is it okay

22  to view children -- high school students -- in a

23  bathroom?

24      A.  I didn't say it was okay.

25             MR. STAIR:  Object to the form.

```
1                    MR. DUKES:  Object to the form.
2        Q.  Well, we'll just have to go back.  This
3    is confusing.  Bishop England High School has
4    locker rooms; correct?
5        A.  Yes, sir.
6        Q.  And the children in those locker rooms
7    have their privacy invaded if someone looks at
8    them nude.
9            Do you agree with that?
10                   MR. STAIR:  Object to the form.
11                   MR. DUKES:  Object to the form.
12       A.  Yes.
13       Q.  And in the bathroom -- Bishop England
14   also has bathrooms, and those children in the
15   bathrooms have their privacy invaded if someone
16   looked at them in the bathroom.
17                   MR. STAIR:  Object to the form.
18                   MR. DUKES:  Object to the form.
19       Q.  Do you agree with that or not?
20                   MR. STAIR:  Object to the form.
21       A.  Yes, sir.
22       Q.  And can you tell me what the
23   disciplinary policy, if you know this -- I don't
24   know whether you've seen this or not.  We have.
25           Can you tell me what the disciplinary
```

1   policy is?  For what events merit what level of

2   attention?  Do you happen to know that?

3        A.  I cannot.

4            MR. STAIR:  Object to the form.

5            MR. DUKES:  Object to the form.

6        Q.  Okay.  All right.

7            MR. RICHTER:  Well, time for a

8   comfort break, for sure.  Okay.  I'm not going to

9   be quite as fast as you are -- as you were, I

10  should say, Kent, but I will be fast.

11           (Recess taken 4:03 p.m. to 4:15 p.m.)

12           MR. RICHTER:  I think we can close

13  up.  Let me just close some ends quickly.

14  BY MR. RICHTER:

15       Q.  I'm not sure we ever got to the end of

16  this.  You may have, and I may have just missed

17  it.  I was asking you about the word "intrusive."

18  And we talked about that, I think, through a

19  series of a few questions.

20           And would it be -- is there any

21  reason -- well, do you agree that not looking at

22  the students but going to the dressing room door

23  and announcing yourself, making them empty the

24  dressing room, you going in the dressing room

25  after announcing yourself as an official, would

**289**

1 that be less intrusive on the students if you --

2     MR. DUKES:  Object to the form.

3     MR. STAIR:  Object to the form.

4  A.  Less intrusive than viewing the students

5 through a window?

6  Q.  Yeah.

7  A.  Yes, sir.

8  Q.  Thank you.

9     MR. RICHTER:  I think I can quit at

10 that point.

11     What happens is we always remember,

12 as you will remember some thing that you will

13 say, "I wish I would have remembered earlier."

14 We do the same thing.

15     These fellows have the right to

16 examine you; and you are representing him, Kent.

17 Do you -- would you like to explain to him his

18 right to read and sign?

19     MR. STAIR: Yeah.  Yeah.  You do

20 have a right to read and sign the deposition.

21 We'll take that opportunity.  So you can just

22 send it to me.  We'll take care of that, yeah.

23     MR. RICHTER:  You understand?

24     THE WITNESS:  I do.  And I do not

25 want to read and sign.

1          MR. RICHTER:  Off the record.

2          MR. STAIR:  We'll make that

3   decision and let you know, but it may not happen.

4   It may; but we'll reserve the right.  So send it

5   to me to sign.

6          MR. DUKES:  Do you want to go?

7          MR. STAIR:  Probably it's your

8   turn.

9                  EXAMINATION

10  BY MR. DUKES:

11      Q.  Roger, I just have a blessed few

12  questions.  Promise.

13          I just want to confirm that it's LS3P's

14  position that the design of Bishop England High

15  School complied with the applicable standard of

16  care in every respect.

17          MR. RICHTER:  Object to the form of

18  the question.

19      A.  Yes, sir.  I believe it did, yes, sir.

20      Q.  And I think you testified in the

21  beginning of today that, in your experience,

22  Roger Attanasio's experience -- Attanasio.

23  Sorry.  Experience, locker room -- windows from a

24  coach's office into the locker room is an

25  extremely common feature; is that correct?

```
 1        A.  Yes.

 2        Q.  Every school you've ever done in 30

 3   years has had windows into the locker room?

 4        A.  Yes.

 5             MR. DUKES:  That's all I have.  I'm

 6   going to stop there.

 7             MR. STAIR:  I have just a couple.

 8                    EXAMINATION

 9   BY MR. STAIR:

10        Q.  Mr. Attanasio, you mentioned some people

11   with LS3P that you spoke with in preparation for

12   this deposition.  You did not mention Mark

13   Clancy.

14             Did you also speak with him prior to the

15   first deposition?

16        A.  I believe I did, yes.  That's -- that is

17   correct.  I think I did, but I'm not sure.  I

18   don't recall if Mr. Clancy was about Bishop

19   England High School or Bishop England Auditorium.

20   My mind is not clear on that.

21             MR. STAIR:  Thank you.

22             MR. RICHTER:  That's the only

23   questions.

24             MR. STAIR:  Yeah.

25
```

```
 1                    REEXAMINATION
 2  BY MR. RICHTER:
 3      Q.  I just want to make sure we leave here
 4  with a clear understanding 'cause I don't have
 5  one yet; and if you've answered this clearly, I'm
 6  going to have to ask you to say it again so I can
 7  leave here with a clear understanding.
 8           The viewing windows in the three locker
 9  rooms at Bishop England High School that we've
10  been discussing here today and started when you
11  were last here -- started or trying to start a
12  discussion about that same three windows, can you
13  tell me, please, whose idea it was to place those
14  viewing windows where they were placed looking
15  into three locker rooms/dressing room facilities?
16      A.  I cannot.
17      Q.  Was it LS3P's idea, or was it the idea
18  of the owner of -- or person who hired LS3P?  The
19  Diocese?
20      A.  I cannot answer that with 100 percent
21  degree of certainty.
22      Q.  Well, whatever degree of certainty.
23      A.  I do not know who.  I can't answer that
24  question.  I do not know.
25      Q.  Yet you're the person who LS3P has
```

1  designated to tell us about planning, design, all

2  of the things that we --

3              MR. DUKES:  Objection.

4     Q.  -- have been going through, and you

5  don't know whose idea it was to put viewing

6  windows to view thousands of children?

7              MR. DUKES:  Object to form.

8              MR. STAIR:  Object to the form.

9     A.  I can tell you placing the window

10  between a coach's office and a locker room is a

11  common practice.  So this school was designed

12  just like we have designed many other schools

13  with that same window.

14         If there was a desire not to have it, I

15  don't -- I have not found any documentation that

16  said, "Please don't put it there."  So the window

17  was placed there.

18         I'm sure there were meetings that

19  discussed the window or discussed the design of

20  the school, and I can find no objections to

21  having the window there.  But to answer the

22  question, who made the decision?  I'm sorry,

23  Mr. Richter, but I can't do that today.

24     Q.  Well, what does that mean today?  When

25  can you do it?

1      A.  I can't.  I don't know when I'll be able

2  to do it.  I don't know if there's anybody I

3  could ask that can refer back to a set of meeting

4  minutes that I've not been able to see that said,

5  "Yes, put a window there" or "no, don't put a

6  window there."  I haven't seen that.

7      Q.  And how many meeting minutes have you

8  reviewed?

9      A.  Whatever we presented to you.  I don't

10  know how many I looked at.  It was in that set of

11  documents 'cause I looked at those documents.

12      Q.  And -- but it happened, and it

13  happened --

14      A.  There -- there was a window placed

15  there, yes, sir.

16      Q.  It was placed pursuant to a design that

17  LS3P made?

18      A.  Correct.  The window was installed by

19  someone with Gulf Stream or a subcontractor of

20  Gulf Stream in accordance with the contract

21  documents, yes, sir.

22      Q.  And the contract documents included the

23  plans and specifications that LS3P drew; correct?

24      A.  Correct.

25      Q.  And what --

```
 1                   MR. RICHTER:   Okay.   That's all I

 2    need.   Thank you.

 3                (The deposition concluded at 4:23 p.m.)

 4                          -  -  -

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   CERTIFICATE OF REPORTER
    STATE OF SOUTH CAROLINA
2   COUNTY OF HORRY

3       I, Ronda K. Blanton, a Registered
   Professional Reporter and Notary Public for the
4   State of South Carolina at Large, do hereby
   certify that the witness in the foregoing
5   deposition was by me duly sworn to testify to the
   truth, the whole truth, and nothing but the truth
6   in the within-entitled cause; that said
   deposition was taken at the time and location
7   therein stated; that the testimony of the witness
   and all objections made at the time of the
8   examination were recorded stenographically by me
   and were thereafter transcribed by computer-aided
9   transcription; that the foregoing is a full,
   complete, and true record of the testimony of the
10  witness and of all objections made at the time of
   the examination; and that the witness was given
11  an opportunity to read and correct said
   deposition and to subscribe the same.
12      Should the signature of the witness not be
   affixed to the deposition, the witness shall not
13  have availed himself/herself of the opportunity
   to sign or the signature has been waived.
14      I further certify that I am neither related
   to nor counsel for any party to the cause pending
15  or interested in the events thereof.
       Witness my hand, I have hereunto affixed my
16  official seal on August 30, 2021, at Myrtle
   Beach, Horry County, South Carolina.

17

18

19

20           Ronda K. Blanton
           NCRA REGISTERED PROFESSIONAL
21         REPORTER, RPR
           Notary Public,
22         State of South Carolina at Large
           My Commission expires:
23         May 15, 2028.

24

25

1               DEPONENT CORRECTION SHEET
    I, the undersigned, ROGER M. ATTANASIO, do hereby
2  certify that I have read the foregoing deposition
    and wish to make the following clarifications
3  and/or corrections, if any.

4  PAGE  LINE         CHANGE         REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20     ROGER M. ATTANASIO          Date

21

  RB
22

23

24

25

# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF SOUTH CAROLINA
 2                    CHARLESTON DIVISION

 3

               DEPOSITION OF PATRICK FINNERAN
 4
                    OCTOBER 5, 2021
 5

 6  GARY NESTLER, VIEWED STUDENT FEMALE 200, VIEWED
    STUDENT MALE 300, on behalf of themselves and all
 7  others similarly situated,

 8          Plaintiffs,

 9   vs.               CASE NO. 2:21-cv-0613-RMG

10  THE BISHOP OF CHARLESTON, A CORPORATION SOLE;
    BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS 1-10; THE
11  BISHOP OF THE DIOCESE OF CHARLESTON, in his
    official capacity; and ROBERT GUGLIELMONE,
12  Individually,

13          Defendants.
    _____
14

15  TIME:            9:10 AM

16

    LOCATION:        THE RICHTER LAW FIRM
17                   MOUNT PLEASANT, SOUTH CAROLINA

18

19

20  REPORTED BY:     RONDA K. BLANTON, RPR
                     CLARK & ASSOCIATES, INC.
21                   CHARLESTON, SC 29422
                     843-762-6294
22                   WWW.CLARK-ASSOCIATES.COM

23

24

25
```

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFFS:

 3           THE RICHTER FIRM
             BY:  LAWRENCE E. RICHTER, JR., ESQ.
 4               ANNA RICHTER, ESQ.
             622 Johnnie Dodds Boulevard
 5           Mount Pleasant, SC 29465

 6           SLOTCHIVER & SLOTCHIVER
             BY:  DANIEL SLOTCHIVER, ESQ.
 7           751 Johnnie Dodds Boulevard, Suite 100
             Mount Pleasant, SC 29464
 8
             HALVERSEN & ASSOCIATES
 9           BY:  BRENT S. HALVERSEN, ESQ.
             751 Johnnie Dodds Boulevard, Suite 200
10           Mount Pleasant, SC 29464

11   ON BEHALF OF THE DEFENDANTS THE BISHOP OF
     CHARLESTON, BISHOP ENGLAND HIGH SCHOOL, THE
12   BISHOP OF THE DIOCESE OF CHARLESTON, AND ROBERT
     GUGLIELMONE:
13
             TURNER PADGET GRAHAM & LANEY
14           BY:  RICHARD S. DUKES, ESQ.
             40 Calhoun Street, Suite 200
15           Charleston, SC 29401

16                    - - -

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2    EXAMINATION

 3     BY MR. SLOTCHIVER                          4

 4     CERTIFICATE OF REPORTER                  120
       DEPONENT CORRECTION SHEET                121
 5

 6
       EXHIBITS
 7
       Exhibit No. 01    Press Release            8
 8     Exhibit No. 02    Spoliation Letter       17
       Exhibit No. 03    Faculty Handbook        56
 9     Exhibit No. 04    Privacy Statement       75
       Exhibit No. 05    Bishop England News     75
10                       Website Mission
                         Statement
11     Exhibit No. 06    Excerpt of LS3P         96
                         Deposition
12     Exhibit No. 07    Faculty Handbooks      119
       Exhibit No. 08    Defendant BEHS Answers 119
13                       to Plaintiffs'
                         Interrogatories
14

15

16

17

18

19

20

21

22

23

24

25
```

1                    PATRICK FINNERAN,

2    having been first duly sworn, was examined and

3    testified as follows:

4                    EXAMINATION

5    BY MR. SLOTCHIVER:

6         Q.   Could you state your full name for the

7    record?

8         A.   Patrick Finneran, F-I-N-N-E-R-A-N.

9         Q.   Mr. Finneran, we met a few minutes ago.

10   I'm Dan Slotchiver; and I'm one of the lawyers

11   involved in the case captioned Tuition Payer 100,

12   Viewed Student Female 200, Viewed Student Male

13   300 on behalf of themselves and all similarly

14   situated versus the Bishop of Charleston, a

15   corporation sole; Bishop England High School;

16   Tortfeasors 1 - 10; the Diocese of Charleston in

17   its official capacity, and Robert Guglielmone,

18   individually.

19             MR. DUKES:  Guglielmone.

20             MR. SLOTCHIVER:  I'll get that.

21             MR. DUKES:  And it's not captioned

22   that anymore.  Because you all --

23             MR. SLOTCHIVER:  Understood.

24        Q.   And I'm going to take your testimony

25   with reference to knowledge that you have to the

1    pertinent place we are at this stage in

2    litigation.

3              Have you given your deposition before?

4        A.   Yes, sir.

5        Q.   In what scenario have you given a

6    deposition before?

7        A.   A different lawsuit.

8        Q.   What was -- what kind of lawsuit was

9    that?

10       A.   It was an employee, former employee.

11       Q.   Is that the only time that you've given

12   your deposition?

13       A.   Yes, sir.

14       Q.   Who was that former employee?

15       A.   Elizabeth Cox.

16       Q.   Today I'm going to ask you a series of

17   questions, and it's probably nothing different

18   than what happened last time.  The facts are

19   different, but I'm going to ask you to answer to

20   the best of your ability.

21       A.   Yes, sir.

22       Q.   I'm going to ask you to answer orally.

23       A.   Yes, sir.

24       Q.   If you nod your head or if you say

25   uh-huh or huh-uh, the problem is that the court

1   reporter can't take it down.  So I'm not going to

2   be trying to chastise you.  I'm going to remind

3   you if you do that so we have an accurate record.

4        A.  Yes, sir.

5        Q.  Fair enough?

6        A.  Yes, sir.

7        Q.  Is there any reason why today would not

8   be the ideal day for you to give your deposition?

9        A.  No, sir.

10       Q.  And as I understand it, you are the

11  principal at Bishop England High School?

12       A.  Yes, sir.

13       Q.  I'm going to jump ahead for a moment.

14  Then I'm going to backtrack because I think it

15  may help us move quicker in addressing the issues

16  that I want to cover today.

17            I'm going to show you a document marked

18  "press release" and ask if you've seen this

19  document before.  Take the time and read it all,

20  if you want.

21       A.  Yes, sir.  (Complies with request.)

22  Yes, sir.  I've seen this before.

23       Q.  And are the facts stated in this press

24  release, to your knowledge, accurate?

25       A.  To my knowledge, yes.

1      Q.   And Maria -- and I may -- is it Aselage?

2      A.   Aselage.

3      Q.   She is the Director of Media Relations

4  for the Diocese; is that correct?

5      A.   Yes, sir.

6      Q.   And the Diocese owns Bishop England;

7  correct?

8      A.   Yes.

9      Q.   And she's been -- to your knowledge, she

10 was involved prior to your tenure at Bishop

11 England?

12     A.   Yes, sir.

13     Q.   And you've been at Bishop England for

14 how long?

15     A.   This is my ninth school year.

16     Q.   Were you involved in any way with the

17 creation of this press release?

18     A.   A little.  Not a lot.  Just -- just -- I

19 read through it after they had set it up and said

20 it was accurate.

21     Q.   I didn't mean did you write it.

22     A.   Yeah.

23     Q.   But the content of it, you were involved

24 in discussing it or reviewing it -- or I'll say

25 it differently.

1          I believe what you're saying is that you

2     were involved in agreeing that it was correct?

3          A.  Yes.

4               MR. SLOTCHIVER:  Can we mark that

5     as an exhibit, please.

6               (Exhibit No. 01 was marked for

7     identification.)

8          Q.  And we're going to come back to this a

9     little bit later.  I'm just trying to dot some

10    I's and cross some T's.  That might help us.

11         The next one I wanted to jump into

12    before we back up and talk more about yourself

13    and your involvement is the windows that are in

14    the locker rooms.

15         Do you recall receiving correspondence

16    advising you not to alter the windows?

17         A.  I do not.

18         Q.  I'm going to hand you a copy of --

19              MR. SLOTCHIVER:  And if I need

20    more -- I did not make extra copies.  Do you

21    mind?

22              MS. RICHTER:  Yeah.

23              MR. SLOTCHIVER:  Give us one

24    second.  I think that's the only thing I didn't

25    make extra copies of, but I think this will help

1   us in moving forward.

2   BY MR. SLOTCHIVER:

3       Q.  Well, let me ask you first.  Is your

4   email PFinneran@BEHS.com?

5       A.  Yes.

6       Q.  Let me hand you a copy of a letter

7   that's addressed to that email and ask if you

8   recall or if this -- seeing this document

9   refreshes your recollection as to having seen --

10              MR. DUKES:  And I'm going to ask

11  the witness to step outside with me, and we're

12  going to go over this document.

13              MR. SLOTCHIVER:  You're welcome to

14  do it.

15      (A recess was taken 9:19 a.m. to 9:20 a.m.)

16  BY MR. SLOTCHIVER:

17      Q.  So, Mr. Finneran, did you have an

18  opportunity to speak to your counsel about this

19  letter?

20      A.  Yes.

21      Q.  And this letter is dated May 7 of 2019?

22      A.  Yes.  It's on the top.

23      Q.  And it's sent to your email from the

24  Richter Firm?

25      A.  I would -- I don't know if it was in my

1  email.  I couldn't tell you.  I don't remember

2  getting it; but if it says it was, I don't know.

3      Q.  Well, if -- there may be opportunities

4  where you'll have an opportunity to speak out

5  and -- to step out and speak with your lawyer if

6  a document comes up you haven't seen.  I don't

7  think there will be another one.  But if it does,

8  you understand you're limited to conversations

9  about the document that you're going to be asked

10 about?

11     A.  Yes.

12     Q.  Have you had a chance to read this

13 document?

14     A.  I have not.

15     Q.  Why don't you take a moment to -- what

16 were you doing when you went outside if you

17 weren't reading the document?

18            MR. DUKES:  He doesn't have to

19 answer that question.

20            MR. RICHTER:  Well, that's not

21 true.  He didn't ask to -- answer and he didn't

22 ask him about the substance of conversations

23 between you and him.  I don't have a right to say

24 that.

25     Q.  I was just asking you what were you

1  doing outside?

2       A.  We were talking.

3       Q.  So just -- you went outside regarding

4  this letter that's in front of you?

5       A.  Uh-huh.

6       Q.  You were outside for a few minutes.  You

7  came back in.  You were talking, but you haven't

8  read the letter?

9       A.  No.

10       Q.  Why don't you take the time now to read

11  the letter.

12       A.  (Complies with request.)  Okay.

13       Q.  You've had a chance to read it?

14       A.  Yes.

15       Q.  Mr. Finneran, can you tell me why,

16  despite this spoliation letter, that evidence was

17  not preserved?

18       A.  I don't understand your question.

19       Q.  This letter is called a spoliation of

20  evidence letter.

21       A.  Yes.

22       Q.  And basically it means we're giving you

23  an instruction not to spoil the evidence, not to

24  alter it, change, redact, lose evidence.  Okay?

25       A.  Yes, sir.

1        Q.  And do you understand that one of the
2    pieces of evidence that this letter is referring
3    to in particular pertains to the windows in the
4    locker rooms which look -- the windows in the
5    coaches' offices which look into the locker room?
6        A.  Can you show me where in the letter it
7    says that?
8        Q.  Paragraph -- first page.  "A, documents,
9    data, intangible things, evidence in the child
10   sex abuse/voyeurism, and any and all illegal acts
11   of Jeffrey Alan Scofield and/or other employees
12   or agents of the Diocese who have committed
13   similar acts in, on, or around Diocese facilities
14   or involving students of Diocese and schools,
15   including but not limited to schools and
16   facilities that are specifically designed and
17   configured to provide viewing areas of less than
18   fully-clothed minors."
19           Would you agree that -- with me that the
20   school was designed in a manner where there were
21   viewing areas available of less than fully-
22   clothed minors?
23       A.  Can -- can I go back to the question?  I
24   understand what A says, but then the paragraph
25   on -- the second to last paragraph on page 2, for

1  the purpose of notice, documents, data, and

2  intangible things include --

3           MR. RICHTER:  I'm sorry.  I

4  couldn't understand you.

5      A.  The second to last paragraph on page 2,

6  "For the purpose of this notice, documents, data,

7  and intangible things include but is not limited

8  to records, files, correspondence, reports,

9  memoranda, calendars, diaries, minutes,

10 electronic messages, voicemails, emails,

11 telephone message records or logs, computer

12 network activity logs, hard drives, backup data,

13 removable computer storage data such as tapes,

14 disks and cards, documents in the files, web

15 pages, database, spreadsheets, software, books,

16 ledgers, journals, orders, invoices, bills,

17 vouchers, checks, statements, worksheets,

18 summaries, compilations, computations charged,

19 diagrams, graphic presentations, drawings, films,

20 charts, digital or chemical process, video,

21 phonographic tape, or digital records or

22 transcript thereof, drafts, jottings, and notes."

23 So I don't --

24      Q.  So I think what you're reading to me --

25 you're -- stating on page 2 is a list that is

1  different than the list on page 1 under

2  subcategory A?

3       A.  But it says "for the purpose of this

4  notice," that's what those things are.

5       Q.  Right.  Well, let's look at the first

6  page.  The documents, data, intangible things

7  subject to this notice include but are not

8  limited to the following.  On the first page.

9            So have you decided that you would

10 follow the -- that you would interpret this

11 letter to mean that we can disregard everything

12 on page 1 Subsection A and instead replace it

13 with the paragraph on the second page?

14      A.  I -- I mean, I guess I just -- the

15 confusion is, is it does not say "windows."  And

16 that's where I asked where it says "windows" in

17 there.

18      Q.  On the very first page of the document,

19 Subsection A.

20      A.  Okay.  So we'll agree to disagree, I

21 guess, on that part of it.

22      Q.  Are we disagreeing that the document

23 refers to windows in Subsection A?

24      A.  Well, if you read further on that second

25 paragraph, it doesn't mention -- it talks all

1   about documents but not actually physically the

2   building itself.

3        Q.  So in one part of the letter, it talks

4   about the documents include the windows and

5   another part of the letter it doesn't include the

6   windows.  Is that where the hang-up is?  Trying

7   to reconcile the difference?

8        A.  Yes.

9        Q.  It doesn't mean that the document

10  doesn't -- okay.  Is there a reason why the

11  windows were altered despite having received this

12  letter?

13       A.  So at this time the windows were boarded

14  up because we had some concerns from parents; and

15  so after a year of them being boarded and having

16  the boards on the windows, we decided to go ahead

17  and brick them in because it was a -- somewhat of

18  an eyesore.

19       Q.  What parents gave you concerns?

20       A.  Just feedback that I get from parents.

21  I could not tell you their names at this point.

22       Q.  When did that feedback come in?

23       A.  After the original statement was made.

24       Q.  All right.  After which --

25       A.  The original statement -- not this one,

1   but a statement about Mr. Scofield's arrest.

2       Q.   So after Mr. Scofield's arrest took

3   place is when parents learned about the fact

4   there are windows in the coaches' office looking

5   into the locker rooms?

6               MR. DUKES:   Object to the form.

7       A.   I don't know if that's when they learned

8   about it, but there were some concerns about it

9   at that point.

10      Q.   Do you have knowledge that the parents

11  were aware of the fact windows were in the

12  coaches' office looking into the locker rooms

13  before that?

14      A.   I do not.

15      Q.   This isn't the only letter that you

16  received, which I'll call -- which is called a

17  spoliation letter.  You've received other

18  correspondence advising you not to destroy or

19  alter the windows; isn't that correct?

20      A.   I -- I don't remember.

21      Q.   I'll represent to you that in a -- in a

22  different meeting, there was communications given

23  between your lawyer --

24               MR. DUKES:   Object to the form.

25      Q.   -- and this is -- between your lawyer

1  and the counsel in this case addressing the fact

2  that he himself had written a letter --

3          MR. DUKES:  That's not what I said,

4  and that's --

5      Q.  -- advising not to alter.  Is that not

6  correct?

7          MR. DUKES:  I'm going to instruct

8  him not to answer that question because it's

9  covered by the attorney-client privilege.

10     Q.  Do you dispute having received any other

11 letters regarding not altering windows?

12     A.  I just don't recall.

13     Q.  Fair enough.

14         MR. SLOTCHIVER:  Let's mark this as

15 an exhibit, please.

16         (Exhibit No. 02 was marked for

17 identification.)

18     Q.  Was the decision to board up the windows

19 based solely on the parents' concerns?

20     A.  Yes.

21     Q.  It had nothing to do with meetings with

22 the superintendent?

23     A.  I mean, it -- it was probably part of

24 discussion with them, the concerns from parents.

25 We were not instructed to board the windows up,

1  no.  That decision was made to -- 'cause our

2  parents were concerned.

3      Q.  And you don't recall which parents came

4  and addressed any concerns with you?

5      A.  I don't.

6      Q.  Do you have notes to reference that

7  anywhere?

8      A.  I do not.

9      Q.  When you -- who did the parents complain

10  to that they were concerned?

11      A.  Some came to myself.  Some came to

12  Miss Tucker, who is the associate principal.

13  Some came to Miss Aselage, who at that time gave

14  a press release on the Scofield arrest.

15      Q.  And what did they say to you?

16      A.  Just that they're concerned of how many

17  kids and -- and where it was and it just -- they

18  were worried about the window so we --

19      Q.  Well, let's back it up a minute.

20          About how many kids?  How many kids

21  what?

22      A.  So there was a concern.  When

23  Mr. Scofield was arrested, we contacted the

24  parents that we knew that students were on the

25  iPad; and so there was some concern or some

1  confusion in our press release.  We said we

2  contacted those families.  So families were

3  calling in, wanted to know if their child was;

4  and they were not.

5      Q.  So because parents were calling in

6  wondering if their child was filmed, you decided

7  to board up the windows?

8      A.  They were concerned.  I mean, it was

9  just their concern of having the windows in

10  there.  They didn't serve a purpose.  The blinds

11  were always closed.  So we boarded them up.

12      Q.  We'll come back to that in a moment.

13          Give me your background, if you will.

14  Where are you from?

15      A.  I grew up in Wheeling, West Virginia.

16  Actually, I was born in Sandusky, Ohio.  Grew up

17  in Wheeling, West Virginia.  Graduated from

18  St. Francis University in Pennsylvania.  Worked

19  in insurance for five years and then left that

20  and spent a year of discernment for the

21  priesthood and taught and coached during that

22  time at Madonna High School.

23          And then from there I went to

24  St. Joseph's Central Catholic in Huntington and

25  then Springfield central catholic -- Catholic

1    Central as principal, another school, and then

2    down here as principal of Bishop England High

3    School.

4        Q.   So when you came here, you were hired as

5    principal?

6        A.   Yes, sir.

7        Q.   And in any of your historical jobs, have

8    you had any involvement in construction?

9        A.   No.

10       Q.   Or design?

11       A.   No.

12       Q.   In any of the other schools you've been

13   involved with, had you ever been in a gym or in a

14   locker room where the coaches' offices overlooked

15   the inside of a locker room?

16       A.   Yes.

17       Q.   Were there blinds?

18       A.   In some, yes.  In some, no.  I coach

19   girls' basketball as well.

20       Q.   Were there instructions in those areas

21   that the school -- where the school authorized

22   and instructed teachers to monitor the inside of

23   the locker room?

24       A.   I mean, there were never in my school.

25   So we never had a coach observation in my school.

1  So I don't know what the visiting teams -- what
2  schools we went to had locker rooms, I don't know
3  what their instruction would be.
4      Q.  And what year did you come to Bishop
5  England?
6      A.  2013.
7      Q.  When you came to the school, did you
8  have an opportunity to walk through the entire
9  campus?
10      A.  Yes, sir.
11      Q.  Did you walk into the locker rooms?
12      A.  I'm sure eventually but not initially,
13  no.
14      Q.  When you walked into the -- did you have
15  an opportunity to walk into the locker rooms
16  before the Scofield arrest took place?
17      A.  Yes, sir.
18      Q.  And before the Scofield information
19  became public?
20      A.  Yes, sir.
21      Q.  When you went into the locker rooms or
22  into the coach -- you went in the coaches' office
23  also.  Is that fair to say?
24      A.  Yes, sir.
25      Q.  Did you ever have an opportunity or did

1    you ever notice the fact there were blinds on the

2    windows looking into the locker room?

3          A.   Yes, sir.

4          Q.   Was that shocking to you?

5          A.   No, sir.

6          Q.   Did you ever ask anybody why there were

7    blinds looking into the locker rooms?

8          A.   No, sir.

9          Q.   Did you ever think anything about it?

10         A.   No, sir.

11         Q.   Did it -- when I said was it shocking to

12   you, you said no.  Did it -- did you pay any

13   attention to it, or was that just something you

14   saw and didn't think about until after the

15   Scofield event took place?

16         A.   It was a common thing for -- most high

17   schools will have a locker room where the

18   coaches' office, if there are blinds -- or

19   windows into it.

20         Q.   What is the basis of your giving an

21   opinion that it was a common thing?

22         A.   'Cause a lot of locker rooms I'd been in

23   from coaching girls' basketball have those in

24   them.  The school I went to had windows.

25         Q.   Had windows looking from the coaches'

1    office directly into the locker room?

2        A.    With blinds as well.

3        Q.    What kind of blinds?

4        A.    The louver blinds like we had at Bishop

5    England.

6        Q.    Why were those windows there in the

7    other locker rooms at the schools you went into?

8        A.    I don't know.

9        Q.    Do you know what the policies were about

10   coaches or staff being able to look into the

11   locker rooms?

12       A.    I don't know.

13       Q.    Do you know if those -- do you recall if

14   any of those locker rooms were accessible --

15   excuse me.  If any of the coaches' offices were

16   accessible through the hallway as opposed to

17   through a separate entrance into the locker room?

18       A.    I don't know.  I don't remember.

19       Q.    At Bishop England those coaches' offices

20   were accessible through the hallway?

21       A.    Yes, sir.

22       Q.    Have you ever viewed any students

23   through locker room windows?

24       A.    No.

25       Q.    In any of the schools you were in -- I

1   think you may have answered this.  If you did, I

2   apologize.

3           But have you ever -- are you aware -- at

4   any of the schools that you have seen windows

5   that looked from the coaches' office into the

6   locker rooms, are you aware of the policies set

7   forth in those schools as to when or if you could

8   ever look through the blinds?

9       A.  No, sir.  I don't know what their

10  policies would be.

11      Q.  You only know as to Bishop England?

12      A.  Yes.

13      Q.  The -- did you ever think about -- did

14  you ever question why it was that the windows

15  were in place in the locker room?

16      A.  No, sir.

17      Q.  Were you ever told when you came to the

18  school why the windows were placed into the

19  locker room?

20      A.  No, sir.

21      Q.  Did you ever consider the fact that

22  maybe the type of blinds that were used in the

23  locker rooms weren't the best kind of blinds to

24  be used?

25      A.  No, sir.

1      Q.  Would you agree with me that certain
2  blinds provide the ability to look without
3  anybody knowing you're looking and otherwise
4  don't?
5      A.  I wouldn't know that.  I mean, I -- I --
6      Q.  Are you familiar with -- LS3P, the
7  architectural firm, has testified that the type
8  of blinds that were used in the coaches' office
9  at Bishop England provided the ability for people
10  in the coaches' office to look at the students in
11  the locker room in various states of dress or
12  undress without those students knowing they're
13  being looked at?
14      A.  No, I don't know that.  That was never
15  communicated to me.
16      Q.  Would that surprise you?
17      A.  That would surprise me, yes.
18      Q.  If you had known that that was the fact,
19  would you have considered putting up different
20  type of blinds into the locker room so that you
21  could still effectuate the same safety that was
22  referenced in the press release but not give the
23  coaches or people in the coaches' office the
24  opportunity to look at the children without the
25  children knowing that they're being looked at?

1       A.  Can you rephrase that for me?  The

2  question?

3       Q.  Sure.

4           Had it dawned on you that the type of

5  blinds that were being utilized at Bishop England

6  provided the ability of any person in the

7  coaching office to look at the children in the

8  locker room in various stages of dress or nude

9  without the children in the locker room knowing

10 they were being looked at?  Would you have

11 altered the type of blinds in order to put a

12 different type of blind in the coaches' office

13 which would still provide the same safety without

14 providing that viewing ability?

15          MR. DUKES:  Object to the form.

16      A.  So I guess correct me in my

17 interpretation by trying to ask you this.  If I

18 knew the blinds were an issue, would I have

19 changed them?

20      Q.  No, not if you knew the blinds were an

21 issue.  If you knew the blinds provided the

22 ability for the people to control the blinds to

23 look at the people on the other side of the

24 window without those people knowing they're being

25 looked at, would you have switched out the blinds

1   to be a different type of blind that wouldn't

2   provide that ability but would still provide the

3   same type of safety that the school wanted to

4   provide?

5              MR. DUKES:  Object to the form.

6       A.  I guess I wouldn't.  As I said before, I

7   don't think those blinds were an issue.  So I

8   don't know if they're changing or --

9       Q.  That's not the question, sir.

10              I think I've asked it twice now.

11      A.  I understand but I -- I guess I -- I

12   don't fully understand what you're asking because

13   you're asking hypothetical.  And so --

14      Q.  Well, let's ask it differently.

15      A.  Okay.

16      Q.  Instead of the type of blinds that were

17   used, which allow you to have a -- you have a

18   piece you can turn and they go up and down and

19   you can twist them and you can turn them.  If

20   there was a pull-down blind, just a black pull-

21   down blind that would come and cover the whole

22   window.  Okay?

23      A.  Yeah.

24      Q.  Where no -- you couldn't look in and

25   they couldn't see you.

```
 1       A.  Right.
 2       Q.  But you had a blind, you could still
 3  hear whatever you could hear; but it took away
 4  the ability for people in the coaches' office to
 5  look at the children without the children knowing
 6  they're being looked at, would you agree with me
 7  that would have been a better type of blind to
 8  use?
 9            MR. DUKES:  Object to the form.
10       A.  I don't know if it would change kind of
11  the -- those blinds were always closed.  You
12  couldn't -- I mean, even with adjusting the
13  blinds, you'd notice that they were turned.  So I
14  don't know if it would change.
15       Q.  And this brings us back to my earlier
16  statement, and I believe you testified you
17  weren't aware of it; but I will represent to you
18  that at the deposition of LS3P, the architectural
19  firm, they acknowledged that the type of blinds
20  that were installed at the Bishop England locker
21  room were such that you could turn them where you
22  could see the students and the students would not
23  know they're being seen.
24            MR. DUKES:  Object to the form.
25       A.  I don't know that.  I mean, I wasn't in
```

1    that deposition.

2        Q.  I understand you weren't.

3            Understanding that to be the fact, would

4    you agree with me that the choice of blinds that

5    were used was not necessarily the right type of

6    blind?

7                MR. DUKES:  Object to the form.

8        A.  I didn't make the choice.

9        Q.  That wasn't my question, sir.

10       A.  I -- I don't know --

11       Q.  We can go around this.  I'm asking a

12   question --

13       A.  I answered the same question for you

14   three times now, is I don't know of any blind

15   that would change that part of it.  I mean, the

16   blinds were always closed; and so even the louver

17   blinds you would see someone turn them and would

18   have more light coming through them.

19       Q.  How often were you in the locker rooms?

20       A.  Very rarely.

21       Q.  How often were you in the coaches'

22   office?

23       A.  Probably weekly.

24       Q.  How often?  Once a week?

25       A.  Probably once a week.

1        Q.  Were you in the girls' locker room as

2    well as the male locker room?

3        A.  No, not the locker room.  You asked the

4    offices.

5        Q.  Offices.  Were you in the female

6    coaches' office?

7        A.  No.  No.  Coach Runey's office once a

8    week.

9        Q.  So you were in one of the three offices?

10       A.  Yes.

11       Q.  And based on your interaction once a

12   week in one of the three offices, it's your

13   testimony that all of the blinds were always

14   closed?

15       A.  As far as I know.

16       Q.  Well, that's different.  Okay.  Now

17   you're telling me as far as you know.

18       A.  Well, every time I had been in his

19   office, they were always closed.

20       Q.  You never went into the female coaches'

21   office; correct?

22       A.  No.  I went into the female coaches'

23   office to talk to the PE teacher.

24       Q.  How often?

25       A.  I don't know.  But rarely.

1       Q.   Once a year?

2       A.   No.   Probably more than that.

3       Q.   Five times a year?

4       A.   More than that.   I would say probably

5    once every month maybe.

6       Q.   So based on your going in there once

7    every month, is it your testimony that those

8    blinds -- that you know for sure those blinds

9    were always closed?

10      A.   Yes.

11      Q.   Would it be a fairer statement, more

12   accurate statement, to say that on the limited

13   times that you were -- that you entered into any

14   of the coaches' offices, you knew the blinds --

15   or you saw the blinds were closed?

16      A.   Yes.

17      Q.   Would it be fair to say that you cannot

18   testify as to whether or not they were open or

19   closed on the days that you would not have had an

20   opportunity to see them?

21      A.   No.   'Cause I was not there.

22      Q.   So you would agree with that statement?

23   I believe you said -- I think what you meant to

24   say was yes, but you said no.   And I want to make

25   sure we're on the same page.   It's not a trick

 1    question.

 2         A.  I was not in his office.  So I couldn't

 3    tell you if they were open or closed.

 4         Q.  So your testimony -- just to be sure and

 5    we'll move along -- is that on the days or

 6    opportunities that you have to enter into the

 7    coaches' offices, whichever coaches' office it

 8    was, one of the three, that the blinds were

 9    always closed?

10         A.  Yes.

11         Q.  Fair enough.

12             What training did the coaches or other

13    people who entered into or had access to the

14    coaches' offices, what training were they given?

15         A.  Everyone who works or is a volunteer at

16    Bishop England goes through state safety

17    training.

18         Q.  What is that?

19         A.  It's child protection training.  So

20    the -- it's how to make sure our children are

21    safe.

22         Q.  Why were they given that training?

23         A.  That's a Diocese policy.  They use Safe

24    Haven in South Carolina.  Some Diocese -- the

25    Diocese of Charleston uses Veritas.

1        Q.  And tell me about that training.  How --
2    is it an hour?  Is it online?
3        A.  So it is not online.  It is in person;
4    and it takes, I think, about an hour, hour-and-a-
5    half.  I can't remember.  It's been nine years
6    since I've been through it.
7        Q.  It's a one-time training?
8        A.  Well, there's -- so every five years you
9    have another background check, and now we just
10   went through training again with our staff
11   through a new video and a questionnaire online.
12       Q.  Do you keep data as to when each member
13   of staff is trained?
14       A.  Yes.
15       Q.  And do you keep data as to when and how
16   often you do give background checks, background
17   screening?
18       A.  Yes.
19       Q.  How often do you do the background
20   screening?
21       A.  I would have to look at that.  I -- I
22   don't know the answer to that question.
23       Q.  Do you know what the training was back
24   in 1998?
25       A.  I do not.

1    Q.  Do you know what the training was prior

2  to the time that you started working at the

3  school?

4    A.  I do not.

5    Q.  What's the category of people who would

6  have access to the coaches' office?

7    A.  So who's in there or has access to?

8    Q.  Who -- what type of -- who has access?

9  Who could go in and out of the coaches' office,

10 either by invitation or at will?

11   A.  From -- most part it's coaches --

12   Q.  Okay.

13   A.  -- that would go in and out of there but

14 it -- it is a -- the office or -- is held by

15 master keys so any master key that would work

16 would go in there.

17   Q.  Who has a master key?

18   A.  I don't know who all has master key.

19   Q.  Do volunteers have access?

20   A.  No.  They wouldn't have access.

21   Q.  Do volunteers ever go into it?

22   A.  They probably do, yes.  I don't know for

23 a fact.

24   Q.  How about janitors?  Do janitors have

25 access to it?

1          A.   Janitors have access too, yes.

2          Q.   Does anybody keep a log as to who goes

3     in or when they go in?

4          A.   To the coaches' office?

5          Q.   Yes, sir.

6          A.   No.

7          Q.   Are the coaches' offices locked or not

8     locked in the daytime?

9          A.   It's locked if no one's in there.  If a

10    coach is in there, then it's open.

11         Q.   How do you know that?

12         A.   From my experience of going over there.

13         Q.   Is that a written rule over there, or is

14    that just your experience?

15         A.   That is not a written rule.  It is my

16    experience.

17         Q.   And is that mostly with Runey's office

18    or with all the offices?

19         A.   All the offices.

20         Q.   So when you've gone to the offices,

21    someone's in there; or it's locked?

22         A.   Yes.

23         Q.   But there's no rule that says they must

24    lock the office during the daytime?

25         A.   No.

1    Q.  Is it true that the coach, depending on

2  what he's doing at any given time, he could be in

3  and out all day long doing different things?

4    A.  That's possible, yes.

5    Q.  Are there any restrictions in the

6  guidelines about who is allowed to visit the

7  coach in his office or her office?

8    A.  Restrictions as far as students or

9  volunteers?

10   Q.  Students, volunteers, friends, other

11 teachers, anybody.

12   A.  No, there's no restrictions on that.

13   Q.  Is there any restriction as to sex --

14 not the act of sex, but the sex of the person

15 that goes into a particular office?  For example,

16 can a male coach go into the female coaches'

17 office, or can a female coach or teacher go into

18 the male coaches' office?

19   A.  To see a coach or just --

20   Q.  For whatever reason.

21   A.  Yes, they could.

22   Q.  And you understand that anybody who

23 enters into the coaches' office, the male or

24 female coaches' office, any of the three offices

25 would potentially be able to see students on the

1  other side of the window if they were to turn the
2  blinds?
3      A.  Yes.
4      Q.  I'm assuming the answer is no, but I'm
5  going to ask you.  You can just say no if it's
6  no.
7          Were you involved in the decision
8  making, or do you have direct knowledge as to
9  what decision making was placed behind putting
10  those windows into the coaches' offices?
11      A.  No.
12      Q.  And the same thing with reference to
13  putting blinds.
14      A.  No, I wasn't.  I wasn't employed at the
15  time.
16      Q.  Would you agree that the children on the
17  other side of those blinds -- students at Bishop
18  England High School -- they're entitled to a
19  reasonable expectation of privacy?
20              MR. DUKES:  Object to the form.
21      A.  I mean, they -- the windows were not
22  hidden.  They were visible.
23      Q.  That's not the question, sir.
24      A.  So I guess can you rephrase the question
25  then?

1      Q.   I'm -- I'll have the court reporter read

2    it back.

3      A.   Okay.

4           (The pending question was read back by

5    the reporter.)

6      A.   Yes.

7      Q.   And if they are viewed -- would you

8    agree with me that if those children are viewed

9    by people on the other side of the blinds who are

10   in the coaches' office, that's a violation of

11   their expectation of privacy?

12              MR. DUKES:  Object to the form.

13     A.   As I mentioned before, the blinds would

14   have to be opened so that the students would then

15   know that there was -- someone was watching and

16   from my experience are always closed.

17     Q.   I heard that, but that wasn't my

18   question.

19              MR. SLOTCHIVER:  Would you read the

20   question back, please.

21           (The pending question was read back by

22   the reporter.)

23              MR. DUKES:  Object to the form.

24     A.   I guess it's a yes-or-no answer because

25   in order to view, you have to open the blinds;

1   and the students knew the blinds were there.

2        Q.   Mr. Finneran, my question was if they

3   were, in fact, viewed.   I'm not asking, you know.

4   You've told me that you only can testify as to

5   what you saw when you were there.

6             My question to you is:   If they were, in

7   fact, viewed while in the locker room by people

8   in the coaches' office, whoever those people

9   were, would you agree with me that that would be

10  a violation of their expectation of privacy?

11             MR. DUKES:   Object to the form.

12       A.   I would guess a no.   Because the

13  windows -- they would know the windows are there,

14  and they're there for whatever purpose they were

15  put in for; but the blinds would have to be open

16  so they would know someone was viewing them.

17       Q.   Are you refusing to answer my question?

18       A.   No.   I answered the question.

19       Q.   My question is very straight.   I'll ask

20  it one more time.

21       A.   Answer was no.

22       Q.   So if they were viewed by people in the

23  coaches' office, that that did not violate the

24  privacy?   That's your testimony?

25       A.   Yes.

1      Q.  So based on that, there's nothing wrong

2   with viewing people that think they have

3   privacy --

4      A.  That's not what I said.

5      Q.  Well, you said, I thought, was that if

6   those people were, in fact, viewed, that it would

7   not be a violation of the privacy.

8      A.  That's what I said; but I also said that

9   the windows are there, and they knew they were

10  there.  So if the blinds were opened to view

11  them, they would know that the windows were

12  there.

13     Q.  Well, let's go the next step, make sure

14  we're clear and on the same page.

15         If they were viewed and did not know

16  they were being looked at, they didn't realize

17  the windows were open in a manner that they could

18  be viewed but they were viewed, would that be a

19  violation of their privacy?

20             MR. DUKES:  Object to the form.

21     A.  Yes.  Yes.

22     Q.  Are you privy to how many safety issues,

23  safety violations there were in the locker rooms

24  in the year 1998 when it was built?

25     A.  I am not.

1      Q.  Do you have any knowledge as to the

2  amount of safety violations there were in the

3  locker room prior to the time that you took your

4  job as a principal of Bishop England High School?

5      A.  I am not.

6      Q.  Was it anything that you ever asked

7  about when you came?

8      A.  No.

9      Q.  Did you understand that the reason and

10  rationale stated for the installation of the

11  windows and the blinds was for safety?

12      A.  That's what I was told, yes.

13      Q.  Did you ever check to make sure that

14  there was a basis for it because there was a

15  safety issue?

16      A.  Like I said, it was a common thing in a

17  lot of locker rooms.

18      Q.  Well, I understand you say it was a

19  common thing; but you've also testified, sir,

20  that the procedures and the protocols and the

21  reasons and what people could do at different

22  schools may have been very different.  You don't

23  know; correct?

24      A.  No, I don't know.

25      Q.  The only thing common was that you saw

1  other high schools with windows, some with

2  blinds, some without blinds?

3      A.  Yes.

4      Q.  The other factors, you don't know about.

5      A.  Right.

6      Q.  You don't know if there were -- there

7  was comments or drugs or problems or arrests.

8  You don't know any of those things, correct, as

9  to the other high school?

10     A.  No.

11     Q.  With Bishop England, there was virtually

12 never an incident that took place in the locker

13 room?

14     A.  I don't know in 1998.  Since I've been

15 there, there were three incidents that were a

16 concern.

17     Q.  What kind type of incidents were they?

18     A.  One was a theft of a wallet, and two

19 were videos or pictures taken by fellow students

20 of another student.

21     Q.  And how were those incidents realized?

22 Did the coach see that through his office?

23     A.  No.

24     Q.  Did a member of the staff see it through

25 the coaches' office?

1      A.   No.

2      Q.   So these were events that were realized

3  that -- that took place, regardless of the fact

4  that you had this viewing window for safety

5  purposes; correct?

6      A.   Yes.

7      Q.   So the safety purpose of the window was

8  ineffective as it applied to those incidents?

9      A.   Yes.

10     Q.   Would you agree with me that one of the

11 duties is to continually look at what takes place

12 in the school and what makes sense; correct?

13     A.   Yes.

14     Q.   And as the principal, your job is to

15 look at what's transpired and to decide if it's a

16 good policy or bad policy; correct?

17     A.   Yes.

18     Q.   Understanding that, there were no safety

19 incidents that you are aware of for which the

20 windows were effective; correct?

21          MR. DUKES:  Object to the form.

22     A.   I -- I don't know before I arrived.

23     Q.   From the time that you arrived in 2013

24 forward.

25     A.   Not -- not to my knowledge, no.

1        Q.  So the sole basis for having the windows

2   installed or not installed -- because you weren't

3   involved in the installment, the sole purpose for

4   having windows looking from the coaches' offices

5   into the locker rooms with blinds was

6   ineffective, to your knowledge?

7                MR. DUKES:  Object to the form.

8        A.  I -- I would say I don't know that

9   because if the students knew the window was

10  there, that that might have stopped some

11  behavior.

12       Q.  Because if the students knew the window

13  was there, they would have known the coaches were

14  looking at them?

15       A.  No.  But they would know that the coach

16  could hear what was happening in the locker room.

17       Q.  My understanding is that the distance

18  from the coaches' office into the locker room is

19  a matter of feet; correct?

20       A.  From the window to the locker room or

21  from the door to the locker room?

22       Q.  From the coaches' office, from his

23  office to get into the locker room.

24       A.  Yeah.  I don't know how long it would

25  be.

1      Q.  Were you a principal at the school when

2  a policy was made setting forth requirements that

3  must be followed before a -- an adult could enter

4  the locker room?

5      A.  Can you rephrase that?  I mean, I

6  don't -- I don't understand what you're

7  referencing there.

8      Q.  I'd be happy to.

9          Were you the principal at the school

10  when a policy was set forth as to what procedures

11  an adult had to follow before he could enter a

12  locker room?

13      A.  So we had a procedure where two adults

14  of the same sex need to go into the locker room

15  together.

16      Q.  Was that for the safety and privacy of

17  the children?

18      A.  That was for the safety of the children

19  and for the safety of the staff.

20      Q.  But it was also for the safety of the

21  children?

22      A.  Yes.

23      Q.  And it was because of their privacy

24  rights?

25              MR. DUKES:  Object to the form.

1        A.   I don't know what the policy -- why the
2   policy was created.
3        Q.   You were principal at the time, weren't
4   you?
5        A.   Yes.  But that's --
6        Q.   What was the safety of the children?  I
7   didn't mean to cut you off.  Go ahead and finish
8   your answer.
9        A.   That was a Diocese policy.
10       Q.   Did you just do whatever you were told,
11  or were you involved in that policy?
12       A.   I was not involved in the discussion,
13  no.
14       Q.   But you said it was also for the safety
15  of the children.
16       A.   That is what the discussion was, yes.
17       Q.   I'm assuming the -- what else could it
18  be, other than privacy, that would have applied
19  to the children?
20       A.   I don't know.
21       Q.   So the adult would have to knock on the
22  door, announce himself, and then wait 10 seconds;
23  correct?
24       A.   That was not the policy.
25       Q.   What was the policy?

1      A.   That they would not go in.  They would

2  knock on the door and then announce themselves

3  and two to go in.

4      Q.   So they have to tell the children

5  they're coming in before they went in?

6      A.   Yes.

7      Q.   Now -- and then there was -- so there

8  was some time period that was taking place

9  between the time they knock on the door and they

10 enter?

11     A.   Not necessarily knock on the door.  They

12 would open it and tell them they were coming in.

13     Q.   Let me read you something and see if

14 this sounds familiar to you.

15          "Coaches and PE teachers also should

16 exercise due diligence when the players/students

17 are using the locker rooms.  As players/students

18 are preparing for class or practice, the teacher/

19 coach -- there's always preferable to have two of

20 the same sex available -- may open the locker

21 room door without entering and announce that the

22 students have blank seconds to finish and exit.

23 The teacher/coach should always be immediately

24 outside the locker room door."

25     A.   I do not -- that doesn't -- I mean --

1      Q.   That does not sound familiar to you?

2      A.   I mean, it does sound familiar; but I

3  don't know where it's from.

4      Q.   I'll hand you a copy.

5      A.   Okay.

6      Q.   This is something we received in

7  discovery.  It is labeled Academic Excellence in

8  a Caring Environment Faculty Handbook 2018-2019.

9           Do you recognize this?

10      A.   Yes.

11      Q.   Were you the principal at the time this

12  was created?

13      A.   Yes.

14      Q.   Would you please turn to -- we have

15  Bates labels at the bottom.  It'll say BEHS.

16  It'll have a number.  I'm looking at 000535.

17      A.   Okay.  (Complies with request.)

18      Q.   And if you'll look to the section that

19  starts, as I read, "coaches and PE teachers."

20      A.   Yeah.

21      Q.   Do you see that section?

22      A.   Yes, sir.

23      Q.   Let's -- I'll read A.  You tell me if I

24  read it correctly.

25           "As players/students are preparing for

1  class or practice, the teacher/coach -- it is

2  always preferable to have at least two of the

3  same sex available -- may open the locker room

4  door without entering and announce that students

5  have blank seconds to finish and exit.  The

6  teacher/coach should always be immediately

7  outside the locker room door."

8        Did I read that correctly?

9   A.   Yes.

10  Q.   Is that the policy --

11  A.   Yes.

12  Q.   -- that was in the place at the time?

13  A.   That's in our handbook, yes.

14  Q.   B, "The same would be true after class

15 or practice.  Students/players should be given a

16 reasonable amount of time to change out of

17 practice clothes.  The teacher/coach should open

18 the locker room door without entering and

19 announce that students have blank seconds to

20 finish and exit.  The teacher/coach should always

21 be immediately outside the locker room door in

22 order to be able to listen for any inappropriate

23 behavior."

24        Do you see that?  Did I read that

25 correctly?

Deposition of Patrick Finneran                                    50

```
 1        A.  Yes, sir.

 2        Q.  So is the purpose of this to provide the

 3   students some privacy but to still allow the

 4   teachers to listen in case something wrong is

 5   taking place?

 6        A.  That would appear to be that way, yes.

 7        Q.  And there is going to be -- based on the

 8   rules that are promulgated here, there would be

 9   some type of a gap between when they knocked on

10   the door and announced and the time they would

11   enter the door, if they were to enter; correct?

12        A.  When they open the door, yes, announce.

13   They would knock, yes, sir.

14        Q.  Where's the written policy as to when

15   they would open the windows or the blinds in the

16   locker room to look at the students?

17        A.  There is no policy.

18        Q.  What is the training?  What is the

19   written manual as to the training the teachers or

20   coaches would receive about what they would do

21   before they would open the windows and look at

22   the students?

23        A.  There is no written.  We come through

24   Safe Haven.

25        Q.  I'm sorry?
```

1    A.  It would come through their Safe Haven

2  training.

3    Q.  What Safe Haven training would they have

4  with reference to windows in the locker room from

5  the coaches -- excuse me.  Windows that they

6  could look into the locker room from the coaches'

7  office?

8    A.  I don't recall any of that.

9    Q.  Well, you said it would come from the

10  Safe Haven training.  If there's no training

11  applicable to it, then there would be no

12  training; correct?

13    A.  There would be training, yes.  It would

14  be overall training of what the expectations

15  were.

16    Q.  If they would hear the noise from

17  outside of the door by knocking and announcing,

18  wouldn't that accomplish the safety concerns that

19  were set forth and the basis for creating the

20  windows to begin with?

21    A.  In those scenarios, the coaches or the

22  PE room is outside, yes.  The door's open.

23    Q.  What's the difference in noise of joking

24  and laughing around and noise of a bully?  How

25  does it sound different?

 1        A.   That's a hard one to answer.  You just,
 2   kind of, know the difference.
 3        Q.   How do you know?  What training do you
 4   have to know?
 5        A.   It's mostly common sense in a sense of
 6   you can tell the difference.
 7        Q.   Is that you or do you pass that judgment
 8   on to everybody that works at the school?
 9        A.   That would be me.
10        Q.   How about your staff that you're in
11   charge of hiring and making sure they're
12   adequately trained?  How do they know?
13        A.   I don't know.  That would be a question
14   for them.
15        Q.   But you're the one who hires or
16   maintains them as employees; correct?
17        A.   Yes, sir.
18        Q.   How were the children protected from
19   them not improperly abusing the windows?
20        A.   Can you rephrase that question?
21        Q.   How were the children protected from
22   them not improperly -- from them not improperly
23   abusing the windows and looking when they
24   shouldn't be looking at the children?
25             MR. DUKES:  Object to the form.

1      A.  Can I rephrase what you said so I can
2  make sure I understand what you're trying to say?
3      Q.  Absolutely.
4      A.  From my understanding what you're trying
5  to tell me is:  How can I guarantee that an
6  employee would not open the window blinds and
7  look at students?
8      Q.  Correct.
9      A.  I can't guarantee that.
10      Q.  Only way to guarantee it would be to
11  remove the windows; correct?
12      A.  I mean, if it -- the windows were not
13  there, they would not have an opportunity, yes.
14      Q.  And if there was a blackout shade as
15  opposed to the type of blinds that were used,
16  that would also preclude them from looking at the
17  kids without the kids knowing they're being
18  looked at; correct?
19          MR. DUKES:  Object to the form.
20      A.  I don't know that.
21      Q.  What type of window treatment are you
22  aware of in your experience?
23      A.  Most locker rooms I've seen have the
24  same blinds.
25      Q.  Not talking locker rooms.  Talking

1  houses, hotels, anywhere you go, what type of

2  window treatment are you aware of as an

3  experience as an adult?

4          MR. DUKES:  Object to the form.

5     A.  There's a variety of them.

6     Q.  Give me some examples.

7     A.  You have those louver blinds.  You have

8  ones that go vertically as well.  You have a

9  shade you pull down.

10    Q.  If a shade pulls down, it accomplishes

11 blocking out light; correct?

12    A.  Not necessarily.  Depends on how it's

13 installed.

14    Q.  If a shade pulls down -- and you're

15 talking about just descriptive wise because I

16 know we're on the deposition transcript.

17    A.  Sure.

18    Q.  You talk about the shade that you grab

19 the top, and you pull it down to the bottom of

20 the window; correct?

21    A.  Yes.  Yes.

22    Q.  And in order to look through that

23 shade -- to look through the window, you've got

24 to lift up the shade; correct?

25    A.  Not always necessarily.  Depends on

1  how -- where it is installed and how it's

2  installed.

3       Q.  Can it be effectively installed so that

4  you can't look without --

5       A.  It could be, yes.

6       Q.  -- lifting it up?

7       A.  Yes.

8       Q.  Would you agree with me that the type of

9  windows that were used cannot be effectively

10 installed so that you -- so that you can't look

11 without people on the other side knowing that

12 they're being looked at?

13            MR. DUKES:  Object to the form.

14      A.  I don't.

15      Q.  You don't know?

16      A.  I don't.

17      Q.  Fair enough.

18            What instructions did you give the

19 coaches or other people who had access to the

20 locker rooms about when it was that they could or

21 couldn't utilize the blinds to look into the

22 locker room?

23      A.  I never gave instructions.

24      Q.  Did anybody -- are you aware of anybody

25 else that would have given them instructions?

1     A.   No.

2     Q.   We've been going about an hour-and-a-

3   half.  I'm happy to keep going.  If you want

4   to take a short break, I'm happy to.  It's up to

5   you.

6     A.   No.  Keep going.

7     Q.   Okay.

8          MR. SLOTCHIVER:  Let's mark the

9   Academic Excellence in Caring Environment Faculty

10  Handbook as the third exhibit, please.

11         (Exhibit No. 03 was marked for

12  identification.)

13    Q.   Mr. Finneran, anywhere in the handbook

14  that it references rules or regulations with

15  reference to the windows that are in the coaches'

16  offices that look into the locker rooms?

17    A.   Not that I know of, without reading the

18  whole thing.

19    Q.   I believe you stated that you were not

20  involved in the promulgating of the rules set

21  forth in the handbook; is that correct?

22    A.   No.  I was involved in the promulgating

23  to our staff, on that part of it.  The creation

24  of it and the Diocese, I was not.

25    Q.   Do you know what the rule was with

1  regard to entering the locker room before 2018?

2      A.  I do not.

3      Q.  Do you believe that the rule providing

4  privacy to the children by knocking and

5  announcing first is a good rule?

6      A.  Yes.

7      Q.  Do you believe that it's a rule that's

8  reasonable and makes sense?

9      A.  Yes.

10     Q.  Do you believe that it's a rule that --

11 that has made sense, not only for 2018, but it

12 would make sense for the last 20 to 30 years?

13          MR. DUKES:  Object to the form.

14     A.  I'm not -- I would say where we are when

15 it was created, it was a reasonable rule.  I

16 don't know beforehand.

17     Q.  In your experience as a principal and as

18 a teacher at different schools throughout the

19 country, do you believe that it's a customary

20 rule to announce yourself before you walk into a

21 children's locker room?

22     A.  Yes.  It's a reasonable rule.

23     Q.  And not to do that would be subjecting

24 children to an invasion of privacy?

25          MR. DUKES:  Object to the form.

1      A.   Not necessarily.  If an issue was going

2  on in the locker room, you would not have time to

3  announce yourself.

4      Q.   If an urgent issue, which you knew of,

5  was going on in the locker room?

6      A.   Yes.

7      Q.   What would be an example of that?  A

8  gunshot?

9      A.   A fight.

10      Q.   An obvious fight that you can hear?

11      A.   Yeah.

12      Q.   And would you agree with me that the

13  historical data of the type of problems that

14  would happen at a school would also have an

15  effect on what rules would be necessary to create

16  safety?

17           MR. DUKES:  Object to the form.

18      A.   I don't agree with that.

19      Q.   You don't agree that a history of safety

20  at a school would deem rules and requirements

21  different than a -- than the history of a school

22  that had daily or weekly violence?

23      A.   I disagree.

24      Q.   So you believe that you treat all the

25  schools the same, regardless of whether you have

1    incidents in the locker room or no incidents in

2    the locker room?

3        A.   I would say that all schools have the

4    opportunity for -- for issues in the locker room,

5    for violence or whatever.  No school is immune to

6    that.

7        Q.   Knowledge of problems creates urgency;

8    correct?

9        A.   Yes.

10       Q.   And without urgency -- well, I'll leave

11   it like that.

12            Bishop England, to my understanding, has

13   a rather successful athletic program.

14       A.   Yes, sir.

15       Q.   It's a very involved athletic program.

16       A.   About 75 percent of our students

17   participate in athletics.

18            MR. RICHTER:  75?

19            THE WITNESS:  75.

20       Q.   And as I understand it, anybody who

21   would be involved in athletics at the school

22   would have access to or the need to use a locker

23   room at the school, it would be available to

24   them; is that correct?

25       A.   Not necessarily anybody who was involved

1   with the school would have access --

2        Q.   In sports.  Sorry.  Maybe I misspoke.  I

3   meant people who were involved in the athletic

4   programs who were students who were playing a

5   sport of some sort, they would be the ones who

6   would regularly use the locker rooms.

7        A.   Yes.

8        Q.   And in addition to those people, it

9   would be anybody who was involved in physical ed?

10       A.   Yes.

11       Q.   And physical ed would be students who --

12  who were -- would be all students who are

13  required to have a physical ed degree or physical

14  ed class before they graduated Bishop England?

15       A.   Yes, sir.

16       Q.   So if I was to transfer to Bishop

17  England in my junior year and if I had not had a

18  PE class, would I be required to take PE in my

19  junior year?

20       A.   Yes.

21       Q.   Same for --

22       A.   Junior or senior year.

23       Q.   Junior or senior year.  Okay.

24            Were teachers instructed per -- what I

25  believe the handbook suggests, that part of their

```
 1   job was to monitor the locker rooms?

 2        A.   The -- the PE teachers, yes.

 3        Q.   And was there a log kept as to when they

 4   would do it or how often they would do it or the

 5   hours they would do it?

 6        A.   No, sir.

 7        Q.   Do you know if they did it?

 8        A.   If they did it?

 9        Q.   Yes, sir.

10        A.   No.  I'm not --

11        Q.   Was that something that was in place

12   from the time that you came to the school all the

13   way through present?

14        A.   Yes.

15        Q.   And was it successful?

16        A.   I mean --

17             MR. DUKES:  Object to the form.

18        Q.   You've got three incidents in the time

19   that you've been at the school for eight years;

20   correct?

21        A.   Yes.

22        Q.   One of them was shoplifting of a wallet,

23   and two of them were videos taken; correct?

24        A.   Yes.

25        Q.   That's all the incidents you have?
```

```
1        A.  Yes.
2        Q.  Eight years, tons of time in the locker
3   room.  That seems like a successful program.
4   Would you agree that's successful?
5        A.  I -- I would say no incidents would be
6   successful.
7        Q.  It certainly could have been a lot
8   worse; correct?
9        A.  Yes.
10       Q.  Did you -- is -- is -- we'll come back
11   to it.
12            Is the safety of the school one of the
13   most important jobs that you oversee?
14            MR. DUKES:  Object to the form.
15       A.  Is the safety of the school?
16       Q.  Excuse me.  Of the students.
17            MR. DUKES:  Object to the form.
18       Q.  Is that an important role that you hold?
19       A.  It is an important role, yes.
20       Q.  And would you agree with me that the
21   children are entitled to a safe environment?
22            MR. DUKES:  Object to the form.
23       A.  Yes.
24       Q.  A moral environment?
25       A.  That is the Catholic school way, yes.
```

1  Morals.

2      Q.  And in a nurturing environment?

3      A.  Yes, sir.

4      Q.  Would you agree with me that if they are

5  viewed without knowing, they're being viewed in

6  the locker room, that that's not a safe

7  environment for them?

8          MR. DUKES:  Object to the form.

9      A.  I don't know if necessarily it's -- it's

10  the environment if one person does something.

11     Q.  I'm not talking one person.  If they can

12  be viewed by numerous people without knowing

13  they're being viewed, would you agree with me

14  that that's not a safe environment?

15         MR. DUKES:  Object to the form.

16     A.  I think our school is a very safe

17  environment, as you mentioned before, about only

18  so many instances in the locker room.  So I would

19  say it's a safe environment.

20     Q.  With the amount of reported -- that

21  wasn't my question though.

22         My question is:  If students in a locker

23  room in various states of dress and undress can

24  be viewed without knowing they're being viewed

25  and they're minors, would you agree with me

1    that's not a safe environment?

2              MR. DUKES:  Object to the form.

3         A.  I guess I -- I disagree in how you're

4    asking the question in that --

5         Q.  I understand you --

6         A.  -- you're making a generalization of

7    safety and by one thing so --

8         Q.  I am.  And I'm asking you, is that a

9    safe environment?  I'm not asking you to decide

10   if they are or are not viewed.  I'm -- my

11   question is:  Assuming they are viewed without

12   knowing they're being viewed while they're in the

13   locker room through windows that are installed by

14   members of the staff of the school, would you

15   agree with me that is not a safe environment?

16             MR. DUKES:  Object to the form.

17        A.  Without them knowing?

18        Q.  Without them knowing, yes, sir.

19        A.  It's not a safe environment, no.

20        Q.  Would you agree that would not be a

21   moral environment?

22             MR. DUKES:  Object to the form.

23        A.  Morality's more of an act.  So I don't

24   know if the presence of the -- I mean, I said

25   yes, that that would not be moral, right.

1      Q.   And it would not be a nurturing

2   environment; correct?

3                MR. DUKES:  Object to the form.

4      A.   Yes, it would not be.

5      Q.   I'm going to take a break in just a

6   moment.  I wanted to ask you a couple things;

7   and, hopefully, we'll be able to wrap this up.

8   And I think we -- we've gotten to this.

9           Would you agree with me that a common

10  thing for students at Bishop England is to use

11  and access the locker rooms?

12     A.   Of all students or --

13     Q.   Students in general.

14     A.   If they were in physical education class

15  or they're a student athlete, yes, they would be

16  in the locker room.

17     Q.   And 75 percent of the students are

18  involved in athletic activities are then -- so

19  every student, at one point another, if they're

20  at Bishop England will have PE; correct?

21     A.   Unless they have that credit from

22  somewhere else, yes.

23     Q.   And it would be typical of students to

24  use the locker room to change and to be in

25  various states of dress and undress?

1      A.   That is what they do in the locker room,
2   yes.
3      Q.   Mr. Finneran, can you hear smoking?
4      A.   No.
5      Q.   Is it audible?
6      A.   Smoking?
7      Q.   Yes, sir.
8      A.   No.  Not that I've been aware of, no.
9      Q.   Can you tell me how smoking can be
10  determined by the use of windows with blinds on
11  them in the coaches' office?
12     A.   No.
13     Q.   It couldn't be, could it?
14     A.   No.
15          MR. SLOTCHIVER:  Okay.  Give me
16  just a moment.  Okay.  Could we take five
17  minutes, guys?  Is that okay?
18          MR. DUKES:  Please.
19     (A recess taken 10:25 a.m. to 10:44 a.m.)
20  BY MR. SLOTCHIVER:
21     Q.   In my continued, for whatever reason,
22  out-of-order context of questions, let me back
23  you up a little bit.
24          Who lives in South Carolina that you're
25  related to?

1        A.   Nobody.

2        Q.   Are you married?

3        A.   Yes.  Well, my wife, yes.  I'm sorry.  I

4   thought you meant family beyond -- yes, I am

5   married.  Yes.

6        Q.   Who is your wife?

7        A.   Myra, M-Y-R-A, Finneran.

8        Q.   Where is she from?

9        A.   She is from Huntington, West Virginia.

10       Q.   What does she do for a living?

11       A.   She is the Director of Curriculum

12  Instruction, Palmetto Christian Academy.

13       Q.   And do you have children?

14       A.   No.

15       Q.   Do you belong to -- Bishop England is

16  probably your largest civic organization.

17  Between that and the church, I'm assuming you

18  belong to the church?

19       A.   Yes.  I belong to the cathedral.

20       Q.   Any other civic organizations that

21  you're involved with?

22       A.   I am a lapsed Knight, Kinghts of

23  Columbus; and I am a lapsed Hibernian, glorified

24  Hibernian.

25       Q.   Okay.  Fair enough.

1            And where do you live?

2       A.   Live at 109 Sandshell Drive, which is

3    off of Clements Ferry.

4       Q.   And how old are you?

5       A.   I am 49.

6       Q.   I had to ask now that it came up.

7            MR. DUKES:  Closing in on that AARP

8    card.

9       Q.   We talked earlier about privacy of the

10   children.  I'd asked you questions about

11   expectations of privacy.

12      A.   Yes.

13      Q.   Bishop England actually has a privacy

14   policy, doesn't it?

15      A.   I'm -- yes.

16      Q.   Okay.

17      A.   I mean, I don't know what you're

18   referring to.  So I'd have to, kind of, see what

19   you're talking about.

20      Q.   Is there a written privacy policy, to

21   your knowledge, at Bishop England?

22      A.   I don't recall.  I don't remember, but I

23   could look at it.

24      Q.   Let me show you a document and ask if

25   you've seen this document before.

1     A.  (Complies with request.)  This is from

2  our -- our --

3     Q.  From your website?

4     A.  Website, yes.

5     Q.  Yes, sir.  And under "privacy policy" on

6  the first page, I see it says, "Bishop England

7  High School respects and is committed to

8  protecting your privacy."  Is that --

9     A.  That is the first line, yes.

10     Q.  Is that an accurate statement?

11     A.  Yes.

12     Q.  And not only is it an accurate statement

13  of what the document reflects; but is that an

14  accurate reflection of what Bishop England

15  promulgates, what they set forth?

16     A.  In -- in the context of this policy

17  or --

18     Q.  Outside of the policy, just in general,

19  the way that Bishop England acts as a school

20  since you've been employed there --

21     A.  So we -- can you rephrase that for me?

22     Q.  Sure.

23         Does Bishop England, since you've been

24  at school there, does it, in fact, make an effort

25  or does it -- is it -- does it hold itself out as

1  respecting and being committed to the protection

2  of the privacy of its students and community?

3          MR. DUKES:  Object to the form.

4      A.  We're committed to the safety of our

5  students, but the policy referenced here is

6  collection of information from technology.

7      Q.  So does it not -- even outside of the

8  policy that I've handed you, does it not hold

9  itself out as being -- as extending privacy

10 rights to its students and community?

11         MR. DUKES:  Object to the form.

12     A.  I -- I guess we don't put ourselves out

13 there as privacy.

14     Q.  As the principal of the school, do you

15 believe it's important and a requirement to

16 protect the privacy of its students and

17 community?  By "community" I'm talking about

18 parents and alumni.

19     A.  I would say safety is the most important

20 thing we do.  I mean, privacy is -- is --

21     Q.  Is privacy included on that list, or is

22 privacy not as important as safety; or is privacy

23 not even included in it?

24     A.  Well, it depends on what you mean by

25 "privacy."  I mean, if you're talking about

1    privacy as far as technology, yes.  Privacy in

2    the sense of, you know, students doing something

3    wrong in school as far as having something in the

4    bookbag that's illegal or in the locker room

5    that's illegal, then they don't have a right to

6    privacy for that.  They bring something illegal

7    on our campus, they don't have a right to

8    privacy.

9        Q.  I'm not asking about bringing something

10   illegal on campus.  I'm asking more about the

11   fact that students are monitored; correct?

12       A.  Yes.

13       Q.  And there are certain things intrinsic

14   in our world that are private, whatever they may

15   be.  It may be your state of dress or undress.

16   That's a private issue; correct?

17            MR. DUKES:  Object to the form.

18       A.  Yeah.  Unless the parents put it out on

19   their -- for the other parents to see.

20       Q.  But the school itself doesn't take the

21   position that they're going to invade the privacy

22   rights of children.

23            MR. DUKES:  Object to the form.

24       A.  Like I said, safety is more important on

25   that part of it.

1      Q.  Well, let's talk, then, about the

2  mission.  Does Bishop England have a mission?

3      A.  Yes.

4      Q.  Let me show you a document that I

5  believe adequately -- or we've -- not

6  adequately -- reflects the mission of Bishop

7  England.  And this is out of a publication called

8  "Bishop England News" on the front page.  I'm

9  sorry.  I turned it to the second page where it

10  referenced mission.

11      A.  This is our website.

12      Q.  Yes, sir.  And you oversee this?

13      A.  I -- we have someone who does it.  I

14  oversee her, yes.

15      Q.  So in the world of the buck stops here,

16  it goes up to you.  You're the principal of the

17  school?

18      A.  Yes, sir.

19      Q.  And the mission I'm reading on page 2 of

20  this document -- and I'm reading toward the third

21  line -- "Establishing the best possible

22  environment for learning, the climate of safety,

23  trust, respect for the individual, and an

24  appreciation for the acquisition of learning."

25          Is that a fair statement?

1      A.  That is the mission -- this mission

2   statement says.  Our mission statement has

3   changed.  It has not been changed on our website.

4      Q.  So is the mission statement no longer to

5   provide a -- the best possible environment for

6   learning?

7      A.  I do not recall what the new mission

8   statement says.

9      Q.  I'm not asking in particular.  I'm

10  asking you:  Is the mission of Bishop England no

11  longer to provide the best possible environment

12  for learning, to your knowledge as the principal?

13     A.  That is one of our missions, yes.  But I

14  don't know if it's in our mission statement.

15     Q.  I know the mission statement is going to

16  be maybe different and may have added some more

17  things; but I'm asking you, is it still your

18  understanding as the principal that certainly at

19  the time since you became employed -- when did

20  the mission statement change, by the way?

21     A.  Last year.  School year.

22     Q.  From the time you became employed until

23  the last year's school year, would you agree that

24  the mission statement was, in fact, to provide

25  the best possible environment for learning?

1     A.   Yes.

2     Q.   And in a climate of safety?

3     A.   That's what it says, yes.

4     Q.   Not asking what it says.  I'm asking,

5  also is that a true statement?  Is that accurate?

6     A.   Yes.

7     Q.   And an environment of trust?

8     A.   Yes.

9     Q.   And respect?

10    A.   Yes.

11    Q.   Respect for the individual as an

12 appreciation for the acquisition of -- and an

13 appreciation for the acquisition of learning?

14    A.   Yes.

15    Q.   So regardless of what it says, it is, in

16 fact, what the mission is; correct?

17    A.    It's intrinsic to what we do as a

18 school, yes.

19              MR. SLOTCHIVER:  Let's mark this as

20 an exhibit.

21              THE WITNESS:  This one?

22              MR. SLOTCHIVER:  Yes.  We can mark

23 both of them, the privacy document and the --

24 let's mark this one first, the privacy document.

25 (Indicating.)

1              (Exhibit No. 04 and Exhibit No. 05 were
2    marked for identification.)
3         Q.  And if I were to call up Bishop England
4    and ask for a copy of -- or a list of all the
5    students' names, would you provide it to me?
6         A.  No.
7         Q.  Why is that?
8         A.  Because we wouldn't know the intent of
9    what you're trying to do.
10        Q.  Is it a privacy issue?
11        A.  There is privacy to that, yes, if the
12   parents don't want that information out.
13        Q.  So would it be the school's position
14   that they need to protect the privacy of the
15   parents and the students?
16        A.  Yes.  Unless they give us permission to
17   post that.
18        Q.  So the parents are part of the community
19   as well as the students being part of the
20   community of the school?
21        A.  Yes.
22        Q.  A couple of cleanup questions.
23              You had mentioned training that's given.
24   I believe you -- you said you had the training
25   nine years ago?

1        A.   When I first arrived.  So it would have

2    been nine years, yes.  And then we had training

3    again this past year.  Another video we had to

4    watch.

5        Q.   So --

6        A.   And answer questions.

7        Q.   -- in nine years you've had training

8    twice?

9        A.   No.  We've had other safe environment

10   trainings or discussions.

11       Q.   Do volunteers get training?

12       A.   Yes.  They have to go to the safe

13   environment.

14       Q.   Do you keep records of the training

15   that's provided to the volunteers?

16       A.   Yes.

17       Q.   So if I was to give you the name of a

18   particular volunteer who was at the school, you'd

19   be able to confirm through your counsel what

20   training records you have on that person?

21       A.   Yes.

22       Q.   And it would tell me the type of

23   training and the dates that the training was

24   given?

25       A.   Our training is the Safe Haven training.

1  It would give you the date, yes.

2      Q.  Is there a pass/fail?

3      A.  No.

4      Q.  Is it a live instructor?

5      A.  When I did it, it was a live instructor.

6  I don't know if it's that way anymore.

7      Q.  What would the alternative be if it's

8  not a live instructor?

9      A.  Videos that we would watch.  It would

10  come from --

11      Q.  How many people are in the training at

12  the time?

13      A.  When I went through it, there were eight

14  of us.

15      Q.  So the training is something that's --

16  that the person must sit and listen to.  The

17  effectiveness of it, we don't know; correct?

18      A.  I wouldn't know, no.

19      Q.  A test would show you if it was

20  effective; correct?

21      A.  They have to answer questions.  They

22  would have to have those correct, yes.

23      Q.  You work in a teaching environment;

24  correct?

25      A.  Yes.  Yes.

1      Q.   And does Bishop England, as a regular

2  course with its students, require them to take

3  tests to confirm that, not only did they sit in

4  the classroom, but that they actually learned

5  something from it?

6      A.   Yes.

7      Q.   And you want to make sure that the

8  knowledge that was imparted was actually received

9  by them?

10     A.   Yes.

11     Q.   Because if it wasn't, they would just,

12  you know.  Then their being there didn't --

13  didn't matter from the purposes of learning.  It

14  just meant they were physically there.

15          MR. DUKES:  Object to the form.

16     A.   I would disagree with that part of it.

17     Q.   You're aware --

18     A.   So -- let me finish my answer here.

19     Q.   Sure.

20     A.   Because not all students test well.  So

21  testing physical, pen and paper test, is not

22  always an accurate example of understanding.

23     Q.   What does Bishop England do when a

24  student doesn't test well with a pen and paper?

25  Do you ever have the teacher talk with them

1  separately?

2      A.  We do give accommodations to students.

3      Q.  Do you ever give an oral exam to a

4  student?

5      A.  I can't tell you whether we have or not.

6  I don't know.

7      Q.  Does Bishop England strive to make sure

8  that the student learns the material even in

9  scenarios where the student is not a great pen

10  and paper test taker?

11     A.  Yes.

12     Q.  What verification was done with

13  reference to the teachers or the volunteers or

14  the coaches or the staff members at Bishop

15  England to make sure that they actually learn

16  something from the Safe Haven?

17         MR. DUKES:  Object to the form.

18     A.  I don't -- I'm not in charge of that

19  program so I couldn't give you that answer.

20     Q.  Do you know?

21     A.  For -- for me it was a discussion and

22  answering of questions.

23     Q.  So you paid attention.  You listened to

24  what they had to say, and you tried to learn from

25  it?

1    A.  Always.

2    Q.  Whether or not that's true for other

3  people, you can't attest to that?

4    A.  I cannot.

5    Q.  And there's no test to validate whether

6  or not they did or didn't learn from it?  You

7  just know that they went to the class?

8    A.  From my remembrance, there is actually

9  something they have to take -- not necessarily a

10  test but kind of understanding of what they've

11  learned, yes.

12    Q.  Will that be documented in whatever

13  materials the school gets?

14    A.  No.

15    Q.  Has anybody ever failed the Safe Haven

16  test, to your knowledge?

17    A.  Not to my knowledge, no.

18    Q.  Is it possible to fail the Safe Haven

19  test?

20    A.  I don't know.

21    Q.  Or is it just something you must say, "I

22  went to it and I -- therefore, I pass"?

23    A.  No.  The expectation is that they pay

24  attention.

25    Q.  That's the expectation of the school?

1       A.   Yes.

2       Q.   But it's not verified --

3       A.   And the -- and the Diocese.

4       Q.   But it's not verified in any way?

5       A.   It's verified by their attendance.  I

6   don't know how else they verify it.

7       Q.   The -- so the only thing that you're

8   sure of is that they attended?

9       A.   Yes.

10      Q.   That's the only thing you could be sure

11  of with reference to the impart of knowledge that

12  they were provided?

13      A.   Yes.

14      Q.   You testified, I believe, there were

15  three incidents that you're aware of that have

16  occurred in the locker room during your tenure at

17  Bishop England?

18      A.   There's actually four, but the three I

19  mentioned earlier and then Mr. Scofield's issue.

20      Q.   Fair enough.  We'll come to that in a

21  moment.

22           What were the dates of the other

23  incidents?  Not Mr. Scofield.  We all know that

24  date.  What about the other ones?

25      A.   I don't know.  I don't have them.

1        Q.   Do you have calendar years?

2        A.   I don't.

3        Q.   Were they documented anywhere?

4        A.   They were, yes.

5        Q.   Where would they be documented?

6        A.   At the disciplinarian.

7        Q.   Who's the disciplinarian?

8        A.   At that time I believe it was

9    Miss Tucker.

10       Q.   Who's the disciplinarian now?

11       A.   Miss Rosebrock.

12       Q.   If you wanted to access to verify these

13   three incidents and when they took place, where

14   would you go?

15       A.   Mrs. Tucker.

16       Q.   Where would she go?

17       A.   She would have that information.

18       Q.   So if we were to ask Miss Tucker in her

19   deposition the dates of these incidents, she

20   would know them or have access to them?

21       A.   I don't know if she would know them, but

22   she would have access to the notes from that

23   time.

24       Q.   They haven't been destroyed; correct?

25       A.   No.

1      Q.  Assuming that she doesn't have it on her
2  at the time of her deposition, how long would it
3  take for her to access it?

4      A.  I don't know.

5      Q.  Probably a matter of minutes when she's
6  in her office?

7      A.  I think that information's already been
8  provided to Mr. Dukes.

9      Q.  I'm not aware of the dates.

10     A.  Okay.

11     Q.  I'm only aware of the fact there were
12  three incidents.  We've asked for the dates.
13  That's why I'm asking you.

14     A.  I don't know if -- she would have the
15  dates in her notes.  So I don't know if she would
16  have the dates.  It would take her -- I don't
17  know how long it would take her to get that
18  information.

19     Q.  Probably moments?

20     A.  I would say within a day or so,
21  depending on what's going on.

22     Q.  Fair enough.

23         Were the students notified that there
24  were windows in the locker room from which they
25  could be viewed?

1    A.  Not to my knowledge, no.

2    Q.  Were the parents notified that there

3  were windows in the locker rooms from which they

4  could be viewed?

5    A.  Not to my knowledge.

6    Q.  So the first time that it became public,

7  then, would have been -- and it became

8  ascertainable would have been after Scofield was

9  arrested?

10    MR. DUKES:  Object to the form.

11    A.  I don't know that.  I don't -- as the

12  answer, I don't know if they knew or not.

13    Q.  To your knowledge, the first time that

14  you had ever heard of a complaint or a comment or

15  a concern -- we talked about complaints and

16  comments and concerns.  Do you remember that

17  earlier today?

18    A.  Yes.

19    Q.  The first time you had ever heard of a

20  complaint or a comment or a concern would have

21  been after Scofield's arrest; correct?

22    A.  That is the first time I had heard it.

23    Q.  Were there any signs or warnings or

24  postings in the locker rooms advising students

25  that they could be monitored in the locker rooms?

1        A.   Not that I recall.

2        Q.   Were there any letters or communications

3   or announcements provided to the parents or

4   students giving them notice that the students

5   could be monitored in the locker rooms?

6        A.   Not that I remember, no.

7        Q.   Anything preventing the school from

8   putting a warning or a notice or sending

9   communication to the parents saying, "Hey, one of

10  the things you need to know of is that if there's

11  an incident in the locker room that we hear or

12  that gives us some concern, we reserve the right

13  and we may enter the locker room or look through

14  a window in the locker room and see your

15  children; and they may or may not be dressed"?

16       A.   So your question is anything preventing

17  us from saying that?

18       Q.   In saying that or having done that.

19            MR. DUKES:  Object to the form.

20       A.   No.  There's nothing to prevent us from

21  informing the parents that there are windows.

22       Q.   Do you believe that the students are

23  safe now in the locker rooms?

24       A.   I mean, I -- they were safe before.  So

25  I don't know if that safety's changed.

1       Q.   You took the windows out; right?

2       A.   We did out of concerns from parents.

3       Q.   If it wasn't for the parents, you would

4    still have the windows in the locker room right

5    now?

6       A.   If there wasn't concerns about it, yeah.

7       Q.   That wasn't my question.  If it wasn't

8    for did the -- I'll say it differently.

9            If it wasn't for the parents expressing

10   their concerns and complaints, would you still

11   have the windows in the locker room now?

12      A.   Yes.

13      Q.   Despite the fact that Scofield utilized

14   those windows without anybody knowing and filmed

15   people in various states of dress and undress?

16      A.   We would probably have kept them boarded

17   up or changed --

18      Q.   Or maybe changed the type of blinds that

19   were available?

20      A.   Maybe.

21           MR. DUKES:  Object to the form.

22      A.   I don't know.

23      Q.   I'm going to read to you some testimony

24   that was provided to us in deposition from LS3P.

25      A.   Okay.

1        Q.  And ask if you have any knowledge of
2   this.
3        A.  Okay.
4        Q.  I'm doing it for two purposes.  No. 1,
5   to ask you questions.  No. 2, so that you know
6   that when I asked you the question, I wasn't
7   making it up.
8              MR. DUKES:  Dan, for my ease, can
9   you tell me the page?
10             MR. SLOTCHIVER:  I will.  I will.
11  Give me one second, make sure I -- page 154.
12             MR. DUKES:  Thank you.
13             MR. SLOTCHIVER:  And 155.
14             MR. DUKES:  Section 2?
15             MS. RICHTER:  You have copies.
16             MR. SLOTCHIVER:  I'm going to hand
17  you a copy to make it easier.  Thank you, Anna.
18             MS. RICHTER:  Uh-huh.
19       Q.  To the extent that the context may not
20  be obvious, I'm going to read with you and ask
21  you questions on page 154 and 155.  Okay?
22       A.  Yes, sir.
23       Q.  And starting on line 7.
24             "And they could be used?
25             couldn't they, to lure a student

```
 1              into thinking nobody can see me.
 2              The blinds are closed."
 3                   Then I'm moving to line 12.  I'm
 4    going to skip the objections.
 5              "They could have that effect,
 6              couldn't they?"
 7              "Could, yes, sir."
 8                   Is the response.  Do you see that?
 9        A.  Yes, I see it.
10        Q.  "And do you agree with me that
11              there is a place in the opening
12              or closure of blinds where it
13              looks like from the inside that
14              say -- or from this -- the other side
15              of the blind.  I don't know how
16              you describe one side versus the
17              other; but from the dressing room
18              side of the blind where it can
19              look like it's a solid bar to
20              view, but, in fact, you can see
21              out."
22                   Do you see that?
23        A.  Yes, I see that.
24        Q.  "These blinds in this room, if
25              you'd like to look at these,
```

1    you'll see they're all three the
2    blinds -- the three blinds are all
3    at three different levels of
4    closure, which changes the look
5    from the other side of the blind,
6    doesn't it?"
7        "Yes, sir."
8        Now we're on page 155.
9    "And do you understand that a
10    student can be mislead to think
11    that I am safe from uninvited
12    viewing, that my privacy is not
13    going to be invaded 'cause it
14    looks like the blinds are closed;
15    and my nudity is going to be
16    exposed to persons who want to
17    look at me."
18        Do you understand that?
19        MR. RICHTER:  You left the word
20  "not" out.
21    Q.  I'm sorry?
22    A.  Line 119.  You left "not" out.
23    Q.  "And my nudity is not going to be
24    exposed to persons who want to
25    look at me."

1          "It's possible, yes, sir."

2          So do you see, this is from the

3    LS3P.  Do you know who LS3P is?

4       A.  Yes.

5       Q.  Do you understand that they're the

6    architectural firm that built the building?

7       A.  They're the ones that designed the

8    building, yes.

9       Q.  And their testimony is that these --

10   these types of blinds that were used are such

11   that the students can, in fact, think they're not

12   being looked at when the person on the other side

13   can be looking at them?

14          MR. DUKES:  Object to the form.

15      Q.  Do you understand that testimony that's

16   been provided?

17      A.  I -- I understand what's on this paper,

18   yes.

19      Q.  Does this help you understand the

20   concern about the fact that the blinds do -- that

21   the types of blinds used here, you know, can

22   create a safe haven, to an extent, to the

23   students where they think that they're safe; but

24   they're really not safe from being viewed?

25          MR. DUKES:  Object to the form.

1      A.  I don't see where you said a type of
2  blind.
3      Q.  Well, he's referring to the blinds that
4  were used.  He doesn't say the type.  He's
5  referring to the blinds that are used.
6      A.  Okay.
7      Q.  And the blinds that are used are the
8  ones we've been talking about today; correct?
9      A.  Yes, sir.
10     Q.  Which now makes -- maybe gives you
11 more -- makes more sense to you when I was asking
12 you about the fact that there were other types of
13 blinds that would not afford the ability to
14 believe that you're not being looked at and still
15 being looked at.
16          MR. DUKES:  Object to the form.
17     A.  I -- I can't tell you if either type of
18 blind would provide the same thing.  I don't
19 know.
20     Q.  If you had known that these blinds that
21 were being used at the school when you arrived
22 there afforded a person in the coaches' office to
23 look at the students without the students knowing
24 they're being looked at, would you, in fact, have
25 changed the blinds?

1          MR. DUKES:  Object to the form.

2     Q.  Or boarded up the window completely?

3     A.  I don't know.  I mean, I -- I don't know

4  the answer to that question.

5     Q.  Why?

6     A.  Because there was never an issue until

7  Mr. Scofield did what he did.

8     Q.  There was never an issue you knew about;

9  correct?

10    A.  Never an issue brought to my attention.

11    Q.  But the fact that it wasn't brought to

12 your attention doesn't mean that it didn't take

13 place; correct?

14         MR. DUKES:  Object to the form.

15    A.  Yes.  That's true.

16    Q.  And understanding that these types of

17 blinds, based on the testimony of the architect,

18 created an ability to view students without the

19 students knowing they're being viewed, would you

20 agree with me that's not a safe mechanism to have

21 in the school?

22         MR. DUKES:  Object to the form.

23    A.  Again, it's -- he's not talking about

24 the type of blind generally.  He's talking

25 about --

1        Q.   The blinds.

2        A.   -- the space.

3        Q.   He's talking about the blinds that were

4   used.  He's not talking about the windows.

5        A.   I understand that.

6        Q.   He's talking about the types of blinds

7   that were used here, the blinds that were used in

8   this case.

9        A.   Yes.

10       Q.   So if there were other blinds that

11  could -- that would not afford the ability, that

12  would be a safer type of blind to put in for the

13  effect of the children; correct?  Or for the

14  safety of the children?

15            MR. DUKES:  Object to the form.

16       A.   And if there were some other way to --

17  yes.  I guess the answer is yes.  But it's also

18  in that testimony, it doesn't necessarily -- it

19  more talks about where the student from the

20  inside doesn't realize he's looking.  So any

21  different type of blind could have done the same

22  thing.  I don't know.  I don't know the answer to

23  that question because those were the blinds that

24  were in there.

25       Q.   If it was a wooden shutter that blocked

1  out the entire window, it would not necessarily

2  do the same type of thing; correct?

3       A.  When we had the plywood up there, you

4  would not see it.

5       Q.  And we talked earlier about the fact

6  there could be a pull-down blind.  Your testimony

7  was it could be installed in a way where it would

8  block you from looking to the other side without

9  lifting up the blinds.

10      Do you remember that testimony earlier?

11      A.  Yes.  Yes.

12      Q.  So there were other blinds that could

13  have been utilized that would have been safer for

14  the children?

15          MR. DUKES:  Object to the form.

16      A.  Possibly, yes.

17      Q.  Not your area of expertise?

18      A.  Not my area of expertise.

19      Q.  Nothing that you were aware of at the

20  time?

21      A.  No.

22      Q.  Have you been involved in any meetings

23  with any representatives from LS3P?

24      A.  No.  We had a former parent who was a

25  member of LS3P but never official meetings.

1        Q.   Have you been involved in any meetings

2   with anybody, outside of your counsel, about the

3   windows?

4        A.   No.

5        Q.   How about Gulf Stream?

6        A.   I'm sorry?

7        Q.   How about Gulf Stream?  Do you know who

8   Gulf Stream is?

9        A.   Yes.

10       Q.   Have you had any meetings with anybody

11   from Gulf Stream about these windows?

12       A.   No.

13       Q.   Any conversations with anybody from Gulf

14   Stream about these windows?

15       A.   No.

16       Q.   In their individual capacity or in their

17   business capacity?

18       A.   Yes.  I haven't had any conversation.

19       Q.   The same thing with LS3P.

20       A.   Same thing with LS3P.

21       Q.   When you notified the parents of the

22   problem with their children, the parents of the

23   Scofield victims, was that notification in

24   writing?

25       A.   No.  It was a phone call.

1       Q.  You mentioned you did talk to a parent

2   from LS3P.  Who was that?

3       A.  I cannot remember.  I don't remember the

4   parent.  He just told me that's -- that's what he

5   did.  I don't remember his name.

6               MR. SLOTCHIVER:  Can we -- I know

7   it's part of the transcript; but just for clarity

8   can we admit this as an exhibit, please.

9               (Exhibit No. 06 was marked for

10  identification.)

11              MR. SLOTCHIVER:  Let's take a quick

12  break, and we're about done.

13    (A recess was taken 11:14 a.m. to 11:24 a.m.)

14  BY MR. SLOTCHIVER:

15      Q.  Mr. Finneran, thank you.  We're about

16  done.  Probably three minutes.

17              Where could I go to see the window and

18  blinds that were taken out of the school?

19      A.  I don't know.

20      Q.  Where would they have been -- were

21  they -- are they preserved in a storage facility

22  somewhere?

23      A.  I don't think so.

24      Q.  Well, was the evidence not saved?

25              MR. DUKES:  Object to the form.

1      A.   We saved the evidence that we had, yes.

2      Q.   So you would have -- I mean, knowing

3  that the window was part of the issue and having

4  received the spoliation letter, I'm assuming

5  somewhere you would have saved the windows and

6  the blinds; correct?

7      A.   Not that I know of, no.

8      Q.   Who made the decision not to save the

9  windows and the blinds that were in the coaches'

10 office looking into the locker rooms?

11     A.   The decision was to -- after boarding

12 them up after it happened was to brick them in.

13     Q.   I understand.

14          Who made the decision?  In light of the

15 spoliation letter, who made the decision not to

16 save them?

17     A.   There was no discussion about that.  So

18 the decision was to block them in.

19     Q.   I mean, we can, to some extent, you

20 know, look and understand some things; but we

21 don't have -- for example, do you have -- there's

22 nowhere that it's been saved?

23     A.   Not that I know of, no.

24     Q.   How -- what was the timeliness in

25 conjunction with the removing of the windows and

1    closing it up?  Not the boarding it up but the

2    closing them up.

3            When you actually took the windows and

4    the blinds out, what was the time between that

5    and when they would have been discarded?

6        A.  I don't know.  I mean, I don't know when

7    they were discarded.

8        Q.  Do you know if --

9        A.  I don't know that either.

10       Q.  Do you know who would know the answer to

11   whether or not they were discarded?

12       A.  I don't know.  We had a company come in

13   and replace the windows with block.

14       Q.  The company that came to replace the

15   window with blocks, that was a friend; correct?

16   Friend of the school?

17       A.  Well, he's a contractor, does work; but

18   his kids go to the school, yes.

19       Q.  Did he charge the school any money?

20       A.  He actually did, yes.

21       Q.  Do you have a copy of that paperwork

22   anywhere?

23       A.  I do not have it, no.

24       Q.  Who would have it?

25       A.  It would be with our bookkeeper.

1    Q.  So if we request it, you would have

2  saved that document?

3    A.  Yes.

4    Q.  Is it possible that the contractor --

5  who was the contractor, by the way?

6    A.  It's -- Mr. Dennis is -- is the

7  gentleman.  I cannot remember the name of his

8  company.

9    Q.  Is it possible that the company would

10  have preserved the windows and the blinds?

11    A.  I don't know.

12    Q.  Would you agree with me that the amount

13  of space taken to preserve the 4 x 4 windows and

14  the blinds would have been minimal?

15        MR. DUKES:  Object to the form.

16    A.  I don't know what space requirements

17  that you have as far as any warehouse for that

18  kind of stuff.

19    Q.  It's a 4 foot x 4 foot window; correct?

20    A.  I understand the size, yes.

21    Q.  There's three of them; correct?

22    A.  There were three of them, yes.

23    Q.  They purportedly could stack on top of

24  each other?

25    A.  You could, yes.

```
1        Q.  And then you had blinds in the windows
2   that are already in the windows; correct?
3        A.  I cannot remember where the blinds were
4   hung.  If they were inside, on the windows
5   themselves, or just inside the sill part of it.
6        Q.  Were they the same blinds from the time
7   you came to the school until the time the windows
8   came out?
9        A.  They haven't changed, no.  They were
10  still there.
11       Q.  Just to be clear, you don't know if the
12  windows or the glass was preserved.  But you can
13  try to find out; correct?
14       A.  I could ask, yes.
15       Q.  Would it have been -- in light of this
16  spoliation letter, would it have been the
17  instruction -- who would have had -- I'll ask it
18  differently because I'm jumping around.
19            Who made the decision to pull the
20  windows out?  Was that you, or was that the
21  Diocese?
22       A.  The request to take the windows out
23  would have been mine.
24       Q.  And who made the arrangements to pull
25  the windows out?
```

1    A.  So our Director of Operations, Mike

2  Darnell, spoke with Mr. Dennis about arranging

3  that part of it.

4    Q.  When you receive -- well, let's go back

5  to the spoliation letter.

6    When you receive communications such as

7  this one, do you file it; or do you share it with

8  other people?

9    A.  So you --

10    Q.  Let's pull the exhibit.  I think it's

11  Exhibit No. 01.

12    A.  It's Exhibit No. 02.

13    Q.  I think it was copied to somebody else

14  also.

15    A.  It was copied to the Bishop.

16    Q.  So when you received it, did you

17  communicate with anybody about this?

18    A.  Yes.

19    Q.  Who would you have spoken to?

20    A.  I spoke to Miss Tucker, who's the

21  associate principal.

22    Q.  And what did you and she talk about?

23    A.  To save all the emails, documents, that

24  kind of stuff.

25    Q.  Did you -- I'm not asking what you spoke

1  to a lawyer about, but did you consult with a

2  lawyer about this letter?

3      A.  We would have had discussion about it,

4  yes.

5      Q.  When you say "we," you mean you and

6  Miss Tucker; or you and a lawyer would have had

7  discussions?

8      A.  Mr. Dukes and I would have had

9  discussions.

10     Q.  You certainly got the letter.  You

11  talked to Miss Tucker about the letter; correct?

12     A.  What -- I don't remember getting the

13  letter; but if I could have, if I did get the

14  letter, I'm assuming we did because it's

15  addressed to me.  Then, yes, I would have talked

16  to Miss Tucker.

17     Q.  So we may be able to ask Miss Tucker

18  about the conversations.  Maybe she'll know.

19     A.  She might remember, yes.

20     Q.  Did you understand that the letter

21  wasn't written that would -- I'll say it

22  differently.

23         You understand the letter was written to

24  you, not Miss Tucker; correct?

25     A.  Yes.

1      Q.   And it was written to you and not to

2   Mr. Dukes, your lawyer; correct?

3      A.   Yes.

4      Q.   And the duty has been set forth on you

5   as the principal; correct?

6      A.   I understand that, yes.

7      Q.   Did you make any efforts to protect the

8   window?  It sounds like you may have because you

9   said you don't know where it is, but did you make

10  any effort to protect the window or the blinds

11  and to preserve them?

12     A.   No, not that I -- no.  I don't know what

13  they did with the windows when they took them

14  out.

15     Q.   Do you understand that without that

16  evidence, that can affect our investigation

17  'cause we don't have the actual windows or the

18  actual blinds to look at?  You understand why

19  it's important?

20          MR. DUKES:  Object to the form.

21     A.   That -- but you already came and took

22  pictures of all those things.  You had the -- you

23  looked at all those when they were still in

24  there.

25     Q.   So did you believe that by the fact that

1    we went there, that eradicated this letter?

2        A.   No.

3        Q.   You understand without looking --

4    without being able to look at it and to see it

5    and to bring an expert to actually look at it, we

6    don't have the opportunity to have a full

7    investigation as much as we might have liked to

8    have had?

9              MR. DUKES:   Object to the form.

10       A.   I don't know the answer to that

11   question.   I don't do those things.

12       Q.   Not what you do.   Okay.

13            Were the windows single glass, double

14   glass, compressed glass?

15       A.   I don't know.   I -- truthfully, I don't

16   remember.

17       Q.   I mean, those are things that wouldn't

18   necessarily show up on a photograph; correct?

19       A.   They may.   I don't know.

20       Q.   Those are things that if we had an

21   opportunity to look at it, we could tell;

22   correct?

23            MR. DUKES:   Object to the form.

24       A.   I guess so, yes.   I don't know.

25       Q.   And the same thing with the blinds.   You

1    know, how -- were the blinds relatively new?

2    Were they old?  Were they beat up?  Did they

3    work?

4        A.  They worked, yes.

5        Q.  How do you know they worked?  Did you

6    ever use the blinds?

7        A.  I never used them, but they were closed.

8    So they had to work.

9        Q.  Well, they were closed.  And I believe

10   your testimony was whenever you were in the

11   office, they were closed; correct?

12       A.  Yes.

13       Q.  Were they closed, or did they appear to

14   be closed?

15            MR. DUKES:  Object to the form.

16       Q.  Could you distinguish those two things?

17       A.  Yes.  They were closed.

18       Q.  When you were in the locker room, were

19   they closed; or did they appear to be closed?

20       A.  I don't ever remember looking at them

21   from the locker room.

22       Q.  Fair enough.

23            Was it -- are you the one that was --

24   that collected faculty handbooks for us?

25       A.  With the assistance of Miss Tucker, yes,

1    sir.

2        Q.   When was that that you started getting

3    together the faculty handbooks?

4        A.   I don't remember.

5        Q.   Was it in the last week?  Or last month?

6    Last couple of months?

7        A.   Last couple months.

8        Q.   Would you have provided those handbooks

9    to your counsel more than a week ago?

10       A.   I would think it might have been a week

11   ago.  I don't know.

12       Q.   Could it have been a month ago?

13            MR. DUKES:  Object to the form.

14       A.   I don't recall when it was given to him.

15       Q.   Is it at least more than 72 hours ago?

16       A.   Yes.  It was more than 72 hours ago,

17   yes.

18       Q.   I'll represent to you that some of the

19   handbooks that were referenced in the

20   communications were not included in the

21   communications.  Okay.  Or in the production.

22            For example, we received a letter

23   attaching to us the faculty handbooks from

24   2011-12 through 2021-22.  Is that what you

25   provided?

1      A.  I don't know.  I can't remember what

2   all -- how many handbooks were there.

3      Q.  Well, we weren't -- when we reviewed it,

4   we were missing 2013-14, 2015-16, 2016-17; and

5   we're also missing 65 pages of some Bates numbers

6   and 54 pages of other Bates numbers with regard

7   to different versions of the 2021-22 handbook.

8          But these things you could readily and

9   promptly get your hands on with the assistance of

10  somebody else and provide to us?

11     A.  I would have to see what was provided

12  already to Mr. Dukes.

13     Q.  Are there multiple handbooks for some

14  calendar years?

15     A.  No.

16     Q.  So if we received --

17     A.  Let me verify that.

18          There is a faculty handbook, and then

19  there's a parent-student handbook.  So I guess,

20  yes, there are multiple handbooks.

21     Q.  So if we received a faculty handbook

22  that references 65 pages and a different faculty

23  handbook for the same calendar that referenced 54

24  pages, that's not correct?

25     A.  I would have to see.  I don't know what

1  would not have been in there, if there would have

2  been an error in the document itself.

3       Q.  Is this something you could -- that you

4  could look into when you get back in the office?

5  We can send a note to your lawyer and ask him,

6  and something you could turn around pretty

7  quickly?

8       A.  It would take some time, yes.

9       Q.  Well, if he wasn't provided it, you

10 could find it 'cause you keep track of all those

11 things; correct?

12      A.  I do not, no.

13      Q.  School maintains them, no?

14      A.  Not necessarily, no.

15      Q.  School does not maintain old copies of

16 handbooks?

17      A.  No.

18      Q.  Does the school -- how far back does the

19 school go with maintaining --

20      A.  School was started in 1950.

21      Q.  But, I mean, if you've got calendar

22 years before 2013-14, is it just random the years

23 you happen to keep or the years that you don't

24 keep?

25      A.  There is no central place we keep those.

1      Q.   So what effort would have to be made in

2  order to obtain copies of them?

3      A.   We'd have to do some work and find out

4  where they are, if there are any copies

5  available.

6      Q.   So it could be that the ones that

7  weren't provided, you just don't have copies of

8  them?

9      A.   That's possible.

10      Q.   Is there a record keeper at Bishop

11  England who's charged with the responsibility of

12  keeping records?

13      A.   We have a Registrar For Student Records,

14  yes.

15      Q.   Does that include disciplinary records?

16      A.   No.

17      Q.   Where are they -- where are they

18  maintained?

19      A.   Disciplinary records are destroyed after

20  the student graduates.

21      Q.   How soon after?

22      A.   Within a year.

23      Q.   Did you as the principal have an

24  opportunity to view the responses to the

25  interrogatories prior to them being sent to us?

1       A.   Yes.

2       Q.   And I show you a copy and ask if you've

3  reviewed -- this is a copy of what you reviewed?

4       A.   (Complies with request.)   They appear to

5  be, yes.

6       Q.   And did you sign off on them as to the

7  accuracy of them before they were submitted to

8  us?

9       A.   I don't remember signing off but I --

10      Q.   If anything was inaccurate, would you

11 have pointed it out to your counsel?

12      A.   At the time we talked to him, yes.

13      Q.   Anything in here now that appears to be

14 inaccurate?

15      A.   The only one that jumped out at me was

16 the answer to No. 19 where main construction -- I

17 was mistaken.   I thought it was a service to the

18 school, but there was actually a payment to him.

19      Q.   I'm sorry?

20      A.   There was actually a payment for that,

21 for removal of the windows.

22      Q.   What changed your -- what is it that

23 refreshed your recollection from your testimony

24 45 minutes ago or less that it was for payment?

25 What changed of then reading this document?

1       A.   My recollection 45 minutes ago is the

2  same as it is now 'cause you said service at

3  school; and you asked if we paid for it.  I said,

4  "Yes, we did pay for it."  The difference of the

5  recollection between here and today is that I was

6  reminded by Mr. Darnell that we did pay for that,

7  and there is a record.

8       Q.   And who?

9       A.   Mr. Darnell, our Director of Operations,

10 who handles that information.

11      Q.   When were you reminded of that?

12      A.   I don't remember.

13      Q.   A month ago?

14      A.   No.  Less than that.

15      Q.   Two weeks ago?

16      A.   I don't -- I couldn't --

17      Q.   Do you understand that we, as counsel,

18 have to rely on the accuracy of documents that

19 are provided to us?

20      A.   I understand that.

21      Q.   And what was it that caused you and this

22 gentleman to have the conversation about the

23 windows to begin with?

24      A.   I don't recall.

25      Q.   Mr. Darnell you said?

1       A.   Yes.

2       Q.   Does he still work at Bishop England

3   now?

4       A.   Yes, sir.

5       Q.   What is his job?

6       A.   He is the Director of Operations.

7       Q.   Were you talking about -- were you

8   talking about the lawsuit with him?

9       A.   I was not talking about the lawsuit, no.

10      Q.   You just randomly started talking about

11  who paid for the windows to be replaced at the

12  time we pulled the windows out at the school?

13      A.   No.

14      Q.   What would have precipitated that

15  conversation?

16      A.   Mr. Maynard doing other work at the

17  school.

18      Q.   Okay.  And --

19      A.   My understanding is the conversation --

20  I don't remember exactly how it happened.

21      Q.   Who have you spoken to about this

22  lawsuit, other than your lawyers?

23      A.   Than my lawyers?

24      Q.   Other than -- I'm not asking for any

25  communication you had with your counsel.

1      A.   Okay.

2      Q.   That's privileged.

3      A.   Sure.

4      Q.   I'm just asking who else have you spoken

5  to about the lawsuit?

6      A.   Mrs. Tucker.  I have been asked about

7  it.  Never had a conversation about it.

8      Q.   Who have you been asked about it by?

9      A.   Variety of different people.

10     Q.   What kind of questions have they asked

11 you?

12     A.   Just how it was going, what it was

13 about; and I said I -- it is what it is.

14     Q.   What is your summation of what it's

15 about?

16     A.   I don't know.

17     Q.   You don't know what the lawsuit's about?

18     A.   Well, I understand what the lawsuit's

19 about.

20     Q.   What do you believe it's about?  What is

21 your general statement on what it's about?

22          MR. DUKES:  Object to the form.

23     A.   It's -- it's a class action lawsuit

24 against the school for what you all believe is

25 the windows, opportunity for people --

1    Q.  Which is what?  What is the assertion?

2  How would you assert it?

3                MR. DUKES:  Object to the form.

4    A.  I don't know what the intended -- what

5  you're trying to do.  I'm not a lawyer.  I don't

6  know, kind of, what you're looking for.

7    Q.  You don't understand that this is about

8  children who were viewed?  That's the allegation.

9                MR. DUKES:  Object to the form.

10   A.  I understand the assertion in what the

11  lawsuit is, yes.  I understand that part of it.

12   Q.  So you understand the assertion is that

13  the children were viewed without knowing they

14  were being viewed by people in the coaches' room;

15  correct?

16                MR. DUKES:  Object to the form.

17   A.  That's the assertion of your lawsuit.

18   Q.  And you have no basis to deny it, other

19  than you have no knowledge that it took place;

20  correct?

21   A.  I have no knowledge that -- outside

22  Mr. Scofield that there was an issue.

23   Q.  Right.  But that doesn't mean there

24  wasn't.  You don't have any knowledge there was

25  or wasn't, other than what you've been told;

1   correct?

2               MR. DUKES:  Object to the form.

3        A.  Yes.

4        Q.  Is that yes?

5        A.  Yes.

6        Q.  And what you didn't know when you walked

7   in here today is that the type of blinds that

8   were utilized in that -- in the coaches' office

9   were of such a type that it would allow coaches

10  and teachers or people in the coaches' locker

11  room to view people in the locker room without

12  them knowing they're being viewed.

13              You weren't aware of that before you

14  came here today?

15              MR. DUKES:  Object to the form.

16       Q.  Is that correct?

17       A.  I was not aware that, as you mentioned

18  to me, LS3P testified to that part of it.

19       Q.  Right.  That's -- but blinds are not

20  something that you had --

21       A.  I'm not a blinds person.

22       Q.  And I believe you testified that had you

23  known that was something, there were other

24  alternatives that could have been used that would

25  not have provided that same --

1          MR. DUKES:  Object to the form.

2      A.  I don't know what the --

3      Q.  That would not have necessarily afforded

4  that same opportunity.

5      A.  As, again, I don't know what other types

6  of blinds there would be that offer that part.

7      Q.  You are aware that abuse in schools is

8  something that is the duty of a school to be

9  cognizant of; correct?

10          MR. DUKES:  Object to the form.

11      A.  I don't understand what you're asking

12  me.

13      Q.  Well, did you read the paper this

14  morning about the Catholic Diocese in France?

15      A.  I did not.

16      Q.  Do you try to keep up with what is

17  happening around the world as it applies to

18  students and schools?

19      A.  As far as the academic part of it, yes.

20      Q.  Were you not aware that there was a

21  giant article on CNN about safety as it relates

22  to children, that over 216,000 children in the

23  French Catholic have been sexually abused by the

24  French Catholic clergy over the last seven

25  decades?

```
 1                    MR. DUKES:  Object to the form.
 2        A.  I am not aware of that.
 3        Q.  And that the number jumped to 330,000,
 4   if you take away the clergy?
 5                    MR. DUKES:  Object to the form.
 6        Q.  If it's not only the clergy, if it's
 7   other people as well.
 8        A.  I'm not aware of that, no.
 9        Q.  But it's a concern.  You understand
10   there are pedophiles that exist in our community,
11   as well as other communities throughout the
12   country; correct?
13                    MR. DUKES:  Object to the form.
14        A.  Sadly, yes.  It is in all communities.
15        Q.  You understand that part of your job and
16   part of the school's mission, part of the
17   school's job is to protect its community from
18   those types of people?
19        A.  Yes.
20        Q.  Would you agree with me that not
21   installing -- or that taking out those windows
22   would have been safer -- taking them out earlier
23   would have been safer than subjecting the kids to
24   someone looking at them, especially in light of
25   the fact that there have only been three
```

1   incidents --

2                    MR. DUKES:  Object to the form.

3        Q.  -- the entire time that you've been at

4   the school?

5        A.  I can't agree with that, no.

6        Q.  How many incidents must there be at the

7   school in order to justify subjecting children to

8   being viewed?

9                    MR. DUKES:  Object to the form.

10       A.  I don't have an answer for that

11  question.

12       Q.  Is there a number?

13       A.  I don't have a number, no.

14       Q.  Is it ten?

15                   MR. DUKES:  Object to the form.

16       A.  Again, I don't have a number.

17       Q.  Are you weighing the difference in the

18  abuse to the children versus the incidents at the

19  school?

20                   MR. DUKES:  Object to the form.

21       A.  No.

22       Q.  Would you agree with me that it's a very

23  risky benefits analysis when you're trying to

24  determine at what point am I going to let

25  children potentially be viewed versus protecting

```
1   them from something that could happen?
2              MR. DUKES:  Object to the form.
3       A.  I don't know how you do a benefit
4   analysis.  That's not my expertise.  I mean,
5   that's not what I do.
6              MR. SLOTCHIVER:  Mr. Finneran,
7   thank you very much.  I've got nothing further.
8              MR. DUKES:  I don't have any
9   questions.  We'll have him read and sign, please.
10              THE WITNESS:  Did you want this in?
11              MR. SLOTCHIVER:  Let's see.  Did we
12  put this in?  Let's go ahead and put these in and
13  mark them, and I think we came to them in the
14  email on the -- the email that we received first
15  on the handbooks, and then afterwards the
16  discovery.  So let's mark those.
17              (Exhibit No. 07 and Exhibit No. 08 were
18  marked for identification.)
19              (The deposition concluded at 11:49 a.m.)
20                      - - -
21
22
23
24
25
```

```
1   CERTIFICATE OF REPORTER
    STATE OF SOUTH CAROLINA
2   COUNTY OF HORRY

3        I, Ronda K. Blanton, a Registered
    Professional Reporter and Notary Public for the
4   State of South Carolina at Large, do hereby
    certify that the witness in the foregoing
5   deposition was by me duly sworn to testify to the
    truth, the whole truth, and nothing but the truth
6   in the within-entitled cause; that said
    deposition was taken at the time and location
7   therein stated; that the testimony of the witness
    and all objections made at the time of the
8   examination were recorded stenographically by me
    and were thereafter transcribed by computer-aided
9   transcription; that the foregoing is a full,
    complete, and true record of the testimony of the
10  witness and of all objections made at the time of
    the examination; and that the witness was given
11  an opportunity to read and correct said
    deposition and to subscribe the same.
12       Should the signature of the witness not be
    affixed to the deposition, the witness shall not
13  have availed himself/herself of the opportunity
    to sign or the signature has been waived.
14       I further certify that I am neither related
    to nor counsel for any party to the cause pending
15  or interested in the events thereof.
         Witness my hand, I have hereunto affixed my
16  official seal on October 15, 2021, at Myrtle
    Beach, Horry County, South Carolina.
17

18

19

20                  Ronda K. Blanton
                    NCRA REGISTERED PROFESSIONAL
21                  REPORTER, RPR
                    Notary Public,
22                  State of South Carolina at Large
                    My Commission expires:
23                  May 15, 2028.

24

25
```

1                     DEPONENT CORRECTION SHEET
      I, the undersigned, PATRICK FINNERAN, do hereby
2    certify that I have read the foregoing deposition
     and wish to make the following clarifications
3    and/or corrections, if any.

4    PAGE  LINE            CHANGE            REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20        PATRICK FINNERAN                        Date

21
     RB
22

23

24

25