CASE NO. 22-1750

**IN THE**

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

GARY NESTLER, on behalf of themselves and all others similarly situated;VIEWED STUDENT FEMALE 200, on behalf of themselves and all others similarly situated; VIEWED STUDENT MALE 300, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

v.

HE  BISHOP OF CHARLESTON, a Corporation Sole;
BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS, 1 - 10;
THE  BISHOP OF THE DIOCESE OF CHARLESTON, in his official capacity; ROBERT GUGLIELMONE, individually,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT ABINGDON

**JOINT APPENDIX - VOLUME II OF III**
**(Pages 573 - 1110)**

David K. Lietz
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
5335 Wisconsin Avenue NW, Suite 440
Washington, D.C. 20015-2052
866-252-0878
dlietz@milberg.com

Lawrence E. Richter, Jr.
RICHTER FIRM, LLC
622 Johnnie Dodds Boulevard
Mt. Pleasant, SC 29464
843-849-6000
lrichter@richterfirm.com

*Counsel for Plaintiffs-Appellants*          *Counsel for Plaintiffs-Appellants*

Additional Counsel Listed on Inside Cover

Richard S. Dukes, Jr.
TURNER, PADGET, GRAHAM & LANEY, PA
P. O. Box 22129
Charleston, SC 29413
843-576-2810
rdukes@turnerpadget.com

Carmelo B. Sammataro
TURNER, PADGET, GRAHAM & LANEY, PA
1901 Main Street, 17th Floor
Columbia, SC 29201
803-227-4253
ssammataro@turnerpadget.com

*Counsel for Defendants-Appellees*

# **TABLE OF CONTENTS**

## **VOLUME I OF III**

Page

District Court Docket Sheet [2:21-cv-00613-RMG] .................................................. 1

Notice of Removal
    Filed March 3, 2021 [ECF1] ................................................................... 19

Defendants' Rule 26.01 Disclosures
    Filed March 3, 2021 [ECF2] ................................................................... 24

Answer of Defendants
    Filed March 4, 2021 [ECF4] ................................................................... 27

Plaintiffs' Answer to Interrogatories
    Filed March 17, 2021 [ECF5] ................................................................. 44

Defendants' Rule 26.03 Disclosures
    Filed June 7, 2021 [ECF15] .................................................................... 48

Amended Consolidated Class Action Complaint
    Filed August 13, 2021 [ECF35] ............................................................. 60

Answer of Defendants to Amended Complaint
    Filed August 26, 2021 [ECF36] ............................................................. 87

Plaintiffs' Motion for Class Certification with Exhibits
    Filed December 13, 2021 [ECF67] ........................................................ 104

    Ex. 1:    Transcript of Mary Anne Tucker Deposition
               taken on 10/5/2021 [ECF67-1] .................................... 139

    Ex. 2:    Transcript of Roger M. Attanasio Deposition
               taken on 8/20/ 2021 [ECF67-2] .................................... 231

    Ex. 3:    Transcript of Patrick Finneran Deposition
               taken on 10/5/2021 [ECF67-3] .................................... 451

## VOLUME II OF III

Ex. 4:  Transcript of Amanda Salas, M.D. Deposition
        taken on 11/10/2021 [ECF67-4] ................................................. 573

Ex. 5:  Transcript of Patrick Finneran Deposition
        taken on 10/22/2021 [ECF67-5] ................................................. 668

Ex. 6:  Diocese of Charleston Media Statement
        dated 2/4/2021 [ECF67-6] ........................................................ 752

Ex. 7:  Transcript of Eric Aichele Deposition
        taken on 10/13/2021 [ECF67-7] ................................................. 754

Ex. 8:  Defendant Bishop England High School's Answers
        to Plaintiffs' First Interrogatories [ECF67-8] ............................. 879

Ex. 9:  Transcript of Continuation of Maria Aselage Deposition
        taken on 12/1/2021 [ECF67-9] ................................................... 890

Ex. 10: Plaintiffs' First Set of Requests for Admission to
        Bishop England High School [ECF67-10] ................................. 985

Ex. 11, Part 1:  Bishop England High School Faculty Handbook
                 2019-19 [ECF67-11].......................................................... 991

Ex. 11, Part 2:  Bishop England High School Faculty Handbook
                 2019-19 [ECF67-12]......................................................... 1021

Ex. 12: Transcript of Nathaniel Person Deposition
        taken on 10/25/2021 [ECF67-13] ............................................. 1051

Ex. 13: Transcript of Jeremy J. Carrick Deposition
        taken on 10/25/2021 [ECF67-14] ............................................. 1073

Ex. 14: Transcript of Deon Richardson Deposition
        taken on 10/25/2021 [ECF67-15] ............................................. 1097

## VOLUME III OF III

Ex. 15:   Transcript of Maria Y. Williams Deposition
          taken on 10/25/2021 [ECF67-16] ............................................... 1111

Ex. 16:   Defendant Bishop England High School's Supplemental
          Answers to Plaintiffs' First Interrogatories [ECF67-17] .......... 1128

Ex. 17:   Transcript of Male Student Deposition
          taken on 10/4/2021 [ECF67-18] ................................................ 1133

Ex. 18:   Transcript of Female Student Deposition
          taken on 10/4/2021 [ECF67-19] ................................................ 1174

Ex. 19:   Bishop England High School Website [ECF67-20] ................. 1229

Ex. 20:   Transcript of Gary Nestler Deposition
          taken on 10/1/2021 [ECF67-21] ................................................ 1236

Ex. 21:   Statement of Qualifications of Proposed Class Counsel
          [ECF67-22] ................................................................................ 1329

Defendants' Opposition to Plaintiffs'
Motion for Class Certification with Exhibits
   Filed January 19, 2022 [ECF75] ...................................................... 1335

Ex. 1:    LS3P Locker Room Design Drawing [ECF75-1] ..................... 1362

Ex. 2:    Amanda Salas, M.D. Deposition Excerpts [ECF75-2] ............. 1363

Ex. 3:    Glick Report [ECF75-3] ............................................................ 1374

Ex. 4:    Runyon Report [ECF75-4] ......................................................... 1379

Ex. 5:    Male Student Deposition Excerpts [ECF75-5] ......................... 1392

Ex. 6:    Female Student Deposition Excerpts [ECF75-6] ...................... 1404

Ex. 7:    Eric Aichele Deposition Excerpts [ECF75-7] ........................... 1414

Ex. 8:     Gary Nestler Deposition Excerpts [ECF75-8] ........................... 1425

Ex. 9:     Mary Anne Tucker Deposition Excerpt [ECF75-9].................. 1431

Ex. 10:    Patrick Finneran Deposition Excerpts [ECF75-10] ................. 1434

Ex. 11:    Roger M. Attanasio Deposition Vol. II Excerpts
           [ECF75-11]................................................................. 1438

Ex. 12:    Bigelow v. Syneos Health, LLC (Decision) [ECF75-12]......... 1447

Plaintiffs' Reply to Defendants' Objection to
Plaintiff' Motion for Class Certification
     Filed January 26, 2022 [ECF78].................................................... 1454

Defendants' Surreply Regarding Class Certification
     Filed February 1, 2022 [ECF83].................................................... 1469

Order and Opinion (Denying Motion for Class Certification)
     Entered March 24, 2022 [ECF84] ................................................. 1471

Defendants' Motion for Summary Judgment
     Filed April 8, 2022 [ECF85].......................................................... 1491

Plaintiffs' Motion for Reconsideration Pursuant to Fed. R. Civ. P. 59(e)
     Filed April 21, 2022 [ECF88]........................................................ 1493

Plaintiffs' Motion to Certify Question to The
Supreme Court of South Carolina with Attachment and Exhibit
     Filed April 21, 2022 [ECF89] .......................................................1513

Att. 1:    Plaintiffs' Memorandum in Support of Their
           Motion to Certify Question to The Supreme Court
           of South Carolina [ECF89-1]..................................... 1516

Ex. A:     Transcript of Record dated June 9, 2020 [ECF89-2]............... 1528

Response by Defendants in Opposition to Plaintiffs'
Motion for Reconsideration Pursuant to Fed. R. Civ. P. 59(e)
     Filed May 4, 2022 [ECF90]........................................................... 1546

Response by Defendants in Opposition to Plaintiffs' Motion
to Certify Question to The Supreme Court of South Carolina
    Filed May 4, 2022 [ECF91]........................................................... 1556

Plaintiffs' Reply Memorandum in Support of Their Motion
to Certify Question to The Supreme Court of South Carolina
    Filed May 11, 2022 [ECF92]......................................................... 1560

Plaintiffs' Reply to Response in Opposition ([ECF 90) to
Motion for Reconsideration Pursuant to Fed. R. Civ. P. 59(e)
    Filed May 11, 2022 [ECF93]......................................................... 1564

Order (Denying Motion to Reconsider and Motion to Certify Question)
    Entered May 24, 2022 [ECF95].................................................... 1570

Plaintiffs' Response and Memorandum in Opposition to
Defendants' Motion for Summary Judgment with Exhibits
    Filed 2022.06.06 [ECF98] ............................................................ 1574

        Ex. 1:    Press Release from the Diocese of Charleston 2/4/21
                 [ECF98-1]...................................................... 1584

        Ex. 2:    Patrick Finneran Deposition Excerpt [ECF98-2]...................... 1586

        Ex. 3:    Defendant Bishop England High School's Answers to
                 Plaintiffs' First Interrogatories [ECF98-3] ............................... 1590

        Ex. 4:    Photograph of Athletic Directo/Coach Runey's Office
                 Desk Arrangement and the Window Looking directly
                 into a Locker Room [ECF98-4] ................................................ 1601

        Ex. 5:    Transcript of Record dated June 9, 2020 [ECF98-5]............... 1603

        Ex. 6:    Spoliation Notice [ECF98-6] .................................................... 1621

        Ex. 7:    Patrick Finneran Deposition Excerpts [ECF98-7] .................... 1625

        Ex. 8:    Diocese Defendants' Responses to
                 Plaintiffs' First Requests for Production [ECF98-8] ............... 1640

Ex. 9:    Transcript of Amanda Salas, M.D. Deposition
            taken on 11/10/2021 [ECF98-9]
            *(To Avoid Duplication Deposition Located at JA Pg. 573)*

Defendants' Reply in Support of
Their Motion for Summary Judgment
        Filed June 13, 2022 [ECF99] ......................................................... 1652

Order (Granting Defendant's Motion for Summary Judgment)
        Entered June 17, 2022 [ECF100] ................................................... 1654

Notice of Appeal
        Filed July 12, 2022 [ECF101] ....................................................... 1657

# EXHIBIT 4

========================================================================

# Deposition of:

# Amanda Salas, MD

========================================================================

## Gary Nestler, et al
## v.
## The Bishop of Charleston, a Corporation Sole, Bishop England High School, et al

## Case #:  2:21-cv-00613-RMG

## November 10, 2021

========================================================================



## Magnolia Reporting, LLC
P.O. Box 61011
North Charleston, SC  29419
(843) 303-9141
www.MagnoliaReporting.com



Amanda Salas, MD - 11/10/2021

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Gary Nestler, Viewed        CASE NO. 2:21-cv-00613-RMG
Student Female 200,
Viewed Student Male
300, on behalf of
themselves and all
others similarly
situated,

        Plaintiff(s),

        -vs-

The Bishop of Charleston,
a Corporation Sole,
Bishop England High School,
Tortfeasors 1-10, The Bishop
of the Diocese of Charleston,
in his official capacity, and
Robert Guglielmone, individually,

        Defendant(s).
***************************************************

DEPOSITION OF:        AMANDA SALAS, M.D.

DATE TAKEN:           WEDNESDAY, NOVEMBER 10, 2021

TIME:                 10:13 A.M.

PLACE:                CARR LEGAL GROUP, LLC
                      1917 Lovejoy St.
                      Beaufort, SC  29902

REPORTED BY:          Nicole D. White
                      Certified Court Reporter
                      Notary Public

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 2

```
 1   A P P E A R A N C E S

 2

 3   REPRESENTING THE PLAINTIFF:

 4           By:  LAWRENCE E. RICHTER, JR., ESQUIRE

 5           The Richter Firm, LLC

 6           622 Johnnie Dodds Blvd.

 7           Mount Pleasant, SC  29464

 8           (843) 849-6000

 9           LRichter@richterfirm.com

10

11   REPRESENTING THE DEFENDANT:

12           By:  RICHARD S. DUKES, JR., ESQUIRE

13           Turner Padget Graham & Laney, P.A.

14           40 Calhoun Street, Suite 200

15           Charleston, SC  29401

16           (843) 576-2810

17           Rdukes@turnerpadget.com

18

19

20

21

22

23

24

25
```

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA576**

Amanda Salas, MD - 11/10/2021

Page 3

```
1                         I N D E X
2
3    Testimony of Amanda Salas, M.D.
4    Examination by Mr. Dukes......................04
5    Examination by Mr. Richter....................84
6
7    CERTIFICATE...................................91
8    ERRATA SHEET..................................92
9
10
11                   INDEX OF EXHIBITS
12
13   Defendant's Exhibit No. 1 - Palmetto
     Center of Psychiatry - Expert Report...........11
14
15
16
17
18                     STIPULATIONS
19        It is hereby stipulated and agreed by and
20   between the parties hereto, through their
21   respective counsel, that the reading and signing
22   of the transcript is reserved by the Deponent.
23
24
25
```

MAGNOLIA REPORTING, LLC   (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

```
                                              Page 4
 1          (AMANDA SALAS, M.D., having been first duly
 2   sworn, testified as follows:)
 3                  E-X-A-M-I-N-A-T-I-O-N
 4   BY MR. DUKES:
 5          Q.  Good morning, Amanda.
 6          A.  Hey.
 7          Q.  We've had a pleasant conversation
 8   about nothing before this, but as I told you, I'm
 9   Rich Dukes and I represent the Defendants in this
10   case that the two students or I'll call them
11   students, they're not students, the two young
12   people that you interviewed have brought against
13   the Diocese of Charleston and the school, high
14   school.
15          You've been designated as a potential
16   expert witness in this case to testify at trial;
17   are you aware of that?
18          A.  Yes.
19          Q.  How much work do you do as a retained
20   expert witness?
21          A.  I can't give you specifics.  So I can
22   explain to you a little bit of the work that I
23   do.
24          Q.  Okay.
25          A.  And that might shed light on the
```

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA578**

Amanda Salas, MD - 11/10/2021

Page 5

1  different dimensions and dynamics in my life.

2      Q.  Uh-huh.

3      A.  (Phone ringing.)  And my apologies,
4  let me turn that off.

5      Q.  That's okay.

6      A.  Okay.  My primary job that pays the
7  bills, gives my family healthcare insurance is
8  with Self Regional Healthcare.

9      Q.  Uh-huh.

10      A.  And I am a full-time psychiatrist and
11  I take call for them every single weekend from
12  Friday at 1:00 p.m. until Monday at 8 a.m. and
13  those are my full-time obligations and duties.

14          Separate from that work, I work at a
15  federally qualified healthcare center in Aiken
16  where I used to give them 24 hours per week, but
17  it's changed.  Now I work there eight hours per
18  week and I do it remote.

19          And then I also work at the Methadone
20  treatment center in Aiken and historically have
21  been their medical director and six shifts per
22  week, which is a morning shift.  And as of March
23  of this year they want as much of me as they can
24  get and that has been anywhere from up to

25  12 shifts and depending on the month, up to 15,

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA579**

Amanda Salas, MD - 11/10/2021

Page 6

1   noting that I did take time off for maternity

2   leave over the summer.

3           And separate from that is where I do

4   forensics, which is Palmetto Center of

5   Psychiatry.  It's an LLC that I have been the

6   sole provider for and I have seen private clients

7   through there.  Right now I have approximately

8   half a dozen or so clients that I have contact

9   with on a regular basis and provide diagnosis and

10  treatment to.

11          The Aiken Treatment Center --

12          Q.  Uh-huh.

13          A.  -- pays me through Palmetto Center of

14  Psychiatry and I also give a goal of ten hours

15  with the desire to even grow to 15 or 20 if I can

16  find that many hours in my life to do the

17  forensic work.

18          But despite the goals that I've had

19  for myself, it usually it's a little less than

20  ten hours per week on average.  Of course, there

21  are some weeks where there's more and some weeks

22  where there's less.

23          Q.  Uh-huh.  Okay.  What do you do when

24  you take -- what is your function when you're

25  taking call at Self Regional?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA580**

Amanda Salas, MD - 11/10/2021

Page 7

1        A.  Well, right now if there's anybody who
2   has to call for a consult, then they can call our
3   screening assessment team or they could call me.
4   That's a new system that's been in place probably
5   since 2013 --
6        Q.  Uh-huh.
7        A.  -- 2014, because it used to be they
8   only called me.  And I make rounds on everybody
9   that's on the in-patient unit.  It used to be a
10  geriatric and adult unit and since the pandemic
11  it's become just an adult unit.
12           I may see over video, is how we're
13  doing it now, clients that are in the emergency
14  department or in the hospital that need a
15  consultation completed that way.
16           We do not take call for their
17  out-patient clinic.  They have a separate
18  out-patient practice.
19       Q.  Okay.
20       A.  So it's in-patient work.
21       Q.  And the other facility in Aiken, and I
22  didn't write down the name of it --
23       A.  RHS is the abbreviation and it stands
24  for Rural Health Services.
25       Q.  Okay.  What do you do for them?

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA581**

Amanda Salas, MD - 11/10/2021

1          A.  I do diagnostic evaluations, follow-up

2     evaluations.  Some people who have refused to see

3     their counsellors will come see me for counseling

4     services.  It's a general psychiatry practice.

5               They -- it's a closed system, so in

6     order to be served by the psych services that I

7     provide, you have to be a client at Rural Health

8     Services.

9          Q.  Uh-huh.

10         A.  So you can't be seeing another

11    provider and then say, oh, I just want to come

12    and see Dr. Salas.  So they provide preventative

13    care and primary care to predominately indigent

14    and low-income population of individuals.  And

15    their primary care doctor has seen and assessed,

16    identified some symptoms and said, hey, I feel

17    like this rises to the threshold beyond my scope

18    of practice, I'm gonna refer them for psychiatric

19    care.  And so I see those clients for referral on

20    that closed system coming from primary care

21    provider.

22         Q.  Okay.  I see.  And then with the

23    Methadone clinic in Aiken, what is your role

24    there?  I know you said you're a medical director

25    and I'm a little bit familiar with how Methadone

Electronically signed by Nicole White (301-070-154-1752)                          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA582**

Amanda Salas, MD - 11/10/2021

1    clinics work, but --

2          A.  I see the clients.  If it's a

3    Methadone intake, I see them face to face.  I

4    have private Suboxone clients, there's about 30

5    of them that I provide treatment to every month.

6    I see them every single month.

7               And then the Methadone patients, they

8    are assessed by either myself or my colleague,

9    Dr. Ladd (ph), when they come in for evaluation.

10   And then we have ongoing contact and supervision

11   with their counsellors, sometimes with the

12   patients.

13              Prior to the pandemic, we were

14   supposed to see every single Methadone client at

15   least once per year, according to the federal

16   mandates, but in the state of emergency with the

17   pandemic, that has been put on hold.  So we see

18   them now kind of on an as-needed basis.

19         Q.  Okay.

20         A.  But if they request, we would see them

21   for follow-up, but we also have counsellors that

22   are over there that we rely heavily on to

23   maintain the relationship, therapeutic contact

24   with the individuals that are coming.

25         Q.  Okay.  And I forgot to -- have you

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 10

1    ever been deposed before?

2           A.   Yes.

3           Q.   So you're familiar with the rules and

4    I'm supposed to tell you, if you have a question,

5    you have to ask me to clarify.  If you answer one

6    of my questions, I'm gonna assume you understood

7    it; is that okay?

8           A.   Yes.

9           Q.   And now that you're under oath, you

10   can't talk to anybody about the substance of your

11   testimony until you're done.

12          A.   Yes.

13          Q.   And so what opinions were you asked to

14   provide in this case?

15          A.   I don't know that I was asked to

16   articulate a specific opinion, but I was asked to

17   give opinions related to is there an impact and

18   could there be a psychological impact for having

19   had a viewing window, is the terminology that's

20   been utilized, in the context of how the

21   construct of Bishop England High School on Daniel

22   Island campus was set up.  So in terms of what

23   impact, if any, would it have, could it have, and

24   how would that affect somebody.

25          Q.   Okay.  And you provided a report?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                              aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 11

1          A.   Yes.
2                    MR. DUKES:   Which I'm gonna mark
3        as Exhibit 1, please.
4                    (Defendant's Exhibit 1 was
5        marked for identification.)
6    BY MR. DUKES:
7          Q.   And I'm gonna hand you a copy of your
8    report.  Would you confirm for me that that is
9    the report you provided to the lawyers in this
10   case?
11         A.   It is.
12         Q.   Okay.  And that's your signature on
13   the last page?
14         A.   Yes.
15         Q.   Okay.  And we'll talk about your
16   methodology in evaluating this situation and your
17   opinions coming up.
18         A.   I just have one question.
19         Q.   Sure.
20         A.   I thought it was a six-page report.
21   Hold on, am I miscounting?  One, two, three,
22   four, five, six.  Why does it say seven of seven?
23   What did I miss?  Oh, I see what I missed.
24                    MR. RICHTER:   The first number
25        is two of seven on my copy.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                              aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 12

```
 1                    THE DEPONENT:  Okay.  So seven
 2        minus two is one, I got it.  So that's six
 3        pages.  That's my entire report.  I was
 4        looking up here (indicating).
 5    BY MR. DUKES:
 6        Q.  Yeah.  What probably there was a cover
 7    page that got filed in the court on top of that,
 8    just a one-page expert disclosure statement of
 9    who you are.  That's what my guess is.
10        A.  Understood.
11        Q.  Okay.  Were you provided with any
12    documents by Plaintiff's counsel?
13        A.  I was.
14        Q.  What did Plaintiff's counsel provide
15    you?
16        A.  They gave me copies of --
17                    MR. RICHTER:  I'm not sure how
18        to read this.
19                    THE DEPONENT:  Deposition by
20        Robert --
21                    MR. RICHTER:  Deposition of...
22                    THE DEPONENT:  Deposition of
23        Robert --
24                    MR. RICHTER:  Robert Atanacio
25        (ph).
```

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA586**

Amanda Salas, MD - 11/10/2021

Page 13

1                    THE DEPONENT:  30(b).

2                    MR. RICHTER:  30(b)(6) witness,

3       yes.

4                    THE DEPONENT:  30(b)(6).  Make

5       sure it's only -- let me reference my

6       report, too, because sometimes it's included

7       in there.  It usually is.  And this is --

8                    MR. DUKES:  Eric Aichele (ph)?

9                    MR. RICHTER:  No, this is

10      Atanacio.  Remember, we had to come back?

11  BY MR. DUKES:

12          Q.  Okay.

13          A.  Prior to writing my report, those were

14  the only depositions that I had.

15          Q.  Uh-huh.

16          A.  And then subsequent to that,

17  subsequent to issuing my report within the last

18  week, I think it came a few days before

19  Halloween, I had received the depositions of the

20  two students.

21          Q.  Uh-huh.

22          A.  And as of yesterday, I requested and

23  received the complaint and --

24          Q.  Why did you request a copy of the

25  complaint?

Electronically signed by Nicole White (301-070-154-1752)          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA587**

Amanda Salas, MD - 11/10/2021

Page 14

1          A.  -- answer to the complaint.  Because

2     it was referenced in the deposition of the

3     student.

4          Q.  Okay.  Did you read the depositions of

5     the two students?

6          A.  I did.

7          Q.  Okay.  Did their testimony alter your

8     opinions in any way or cause you to alter your

9     opinions?

10         A.  No.

11         Q.  Okay.  Did reading the complaint or

12    the answer to the complaint cause you to change

13    your opinions in any way?

14         A.  No.  It reinforced that I'm not a

15    lawyer.

16              MR. RICHTER:  That's not the

17         worst thing in the world.

18    BY MR. DUKES:

19         Q.  Now, I just need to confirm that your

20    report contains all the opinions you're going to

21    present when you testify at trial?

22         A.  Yes.

23              MR. RICHTER:  Object to form of

24         the question.

25    BY MR. DUKES:

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA588**

1        Q.  And Mr. Richter can object to the form

2   of the question, but you still have to answer.

3        A.  Yes.

4        Q.  Okay.  So you have not been -- you

5   don't -- aren't going to be expressing any

6   opinions regarding the parents or the tuition

7   payers?

8        A.  No.

9        Q.  All right.  In your -- how did

10  Plaintiff's counsel find you?

11       A.  I don't know.

12       Q.  Okay.  When did they first contact

13  you?

14       A.  I'm looking for the fee agreement.  So

15  it was sometime in August, because the fee

16  agreement was dated August 18th.  I believe I put

17  this together shortly after Mr. Slotchiver -- and

18  I don't even know if I'm saying his name right.

19       Q.  You are.

20       A.  So after he had called and screened

21  me, I guess, would be the best way to describe

22  it, figure out if I would have any potential

23  conflict of interest, then there was a telephone

24  conversation where he had Larry and Anna and Dan,

25  I guess, I don't know if that's an interview or I

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 16

1    don't know what that is, but talk together on the
2    telephone and they asked if I could put together
3    a fee agreement and that's when this was done.
4    So it had been sometime in August, but I don't
5    write those things down.
6           Q.   Okay.  Do you keep your -- a timesheet
7    of time spent on working on this case?
8           A.   I do the best that I can.
9           Q.   Okay.
10          A.   And for all my cases, keeping track of
11   time is one of the things that is not my forte,
12   but I do have recorded in our bookkeeping
13   system --
14          Q.   Uh-huh.
15          A.   -- the amount of time that I have
16   spent on the case up until now.  Well, not up
17   until now, because I haven't recorded any time
18   since the end of October and I've reviewed
19   materials that have come since then.
20          Q.   Okay.  And your report says you were
21   provided with an $8,000 retainer?
22          A.   That's correct.
23          Q.   Was that -- I'll refer to it as a flat
24   fee.  Was that retainer to cover everything or do
25   you bill against that and then --

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 17

1         A.  I bill against the retainer.

2         Q.  Uh-huh.

3         A.  And then when a balance comes, I tend

4    to send out invoices at what I perceive to be a

5    natural break in the case.  I don't send out

6    invoices every single month or anything like

7    that.  But at this point in time I know that I

8    have not utilized the entire retainer for the

9    last entry I put into QuickBooks.

10        Q.  Okay.  How much have you drawn on the

11   $8,000 retainer?

12        A.  At least half.

13        Q.  Okay.  So at least $4,000 of that has

14   been used?

15        A.  Yes.

16        Q.  And so you spent 16 hours or so?

17        A.  Yes.  That would -- that would have

18   included the work that was done up until

19   September 27th, when this report was issued.

20        Q.  Okay.  And you provided us with a list

21   of cases in which you've testified?

22        A.  Yes.

23        Q.  How many of those -- let's talk first

24   about civil litigation as opposed to criminal

25   litigation.  How many of those have you testified

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA591**

Amanda Salas, MD - 11/10/2021

Page 18

1   on behalf of a plaintiff?

2               MR. RICHTER:  Hang on just a

3       second.  Do you have -- I don't think I have

4       the listing.

5               MR. DUKES:  It's in the report.

6               THE DEPONENT:  It's in my

7       report.

8               MR. RICHTER:  Oh, yes, it is.  I

9       recall.

10              THE DEPONENT:  Normally I have

11      page numbers on them, but it's the third

12      page on this one.

13              MR. RICHTER:  Yep.  It's a chart

14      is my memory?

15              MR. DUKES:  Yeah.

16              THE DEPONENT:  Can we go down

17      the list, I can just point them out to you?

18              MR. DUKES:  Sure.

19              THE DEPONENT:  2021 deposition,

20      Perry Buckner.  That is a civil matter and

21      he is a Plaintiff's attorney, but actually

22      on the defense in that case.

23              MR. DUKES:  Okay.

24              THE DEPONENT:  2021 deposition,

25      Mark Tinsley.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 19

```
 1                    MR. DUKES:  Mark wouldn't know
 2        which -- where the Defendant's lawyers sit
 3        in a courtroom, I don't think.
 4                    THE DEPONENT:  Oh, I don't know
 5        that about him.  But that's a Plaintiff's
 6        case.
 7                    MR. DUKES:  Yeah.
 8                    THE DEPONENT:  2021 deposition,
 9        David Lail.  That is a Plaintiff's case.
10                    2021 deposition, David
11        Standeffer, K.I. versus Anderson.
12                    MR. DUKES:  Uh-huh.
13                    THE DEPONENT:  That's a
14        Plaintiff's case.
15                    2021 deposition, Clawson
16        Fargnoli.  Walker is a Plaintiff's case.
17                    Then we go down to 2019
18        deposition, Lee Cope, Estate of O. Hinton,
19        that was a Plaintiff's case.
20                    Where do you want me to put
21        workers' compensation?
22                    MR. DUKES:  Off in a box
23        somewhere where we never have to look at it
24        again.
25                    THE DEPONENT:  Okay.  Fair
```

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA593**

Amanda Salas, MD - 11/10/2021

Page 20

```
 1        enough.
 2   BY MR. DUKES:
 3        Q.  Is the Andrew Safran, is that the
 4   injured -- were you evaluating the injured
 5   worker?
 6        A.  Yes.  So Andrew Safran, he represents
 7   the injured person in the workers' compensation
 8   case.
 9        Q.  Uh-huh.
10        A.  And so I still don't really know where
11   to put that, but that's who I did the work for.
12        Q.  Okay.
13        A.  And then I got deposed.  Let's see.
14   That's a solicitor.  2018, David Williams, Pamela
15   Drain as representative.  That is a Plaintiff's
16   case.
17             2017 deposition, Steven Krause,
18   Cathryn Vaughter is a Plaintiff's case.
19             2017 deposition, Burl Williams, Jason
20   Roth is a Plaintiff's case.
21             There's another Andrew Safran workers'
22   comp.
23        Q.  And that's another one where you're
24   evaluating -- Andrew represents the injured
25   worker?
```

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA594**

Amanda Salas, MD - 11/10/2021

Page 21

1          A.   Correct.

2          Q.   And you're --

3          A.   So he represented Bobby Green.

4          Q.   Okay.

5          A.   2015 deposition, Ray Mansolillo and

6    Kristen Anderson, that's a Plaintiff's case.

7               And that gets us to 2014.  The only

8    other one I don't really know where to put it, I

9    guess it goes -- I don't know where it goes.

10   It's not a Plaintiff's case, I don't suppose, but

11   George Stinney.

12         Q.   Uh-huh.

13         A.   He's the youngest person executed in

14   modern day America.  And it was a case that I

15   testified on behalf of Mr. Stinney, the decedent.

16         Q.   Uh-huh.

17         A.   When it went for, I guess it was

18   appeals.  Appeals case.

19         Q.   On his competence to stand trial or

20   something like that?

21         A.   On his sentence, his death sentence.

22               MR. RICHTER:  I can't find that

23       entry on this page.

24               MR. DUKES:  It's the next page.

25               MR. RICHTER:  That's why I can't

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA595**

Amanda Salas, MD - 11/10/2021

Page 22

1          find it on this page.  I gotcha.  Okay.

2                    THE DEPONENT:  I guess general

3          sessions puts it somewhere not Plaintiff's,

4          so...

5    BY MR. DUKES:

6          Q.  That's in criminal work.

7          A.  Okay.  And then last week I need to

8    update this for last week.  That's the only other

9    deposition that I've done.  Who was that for?

10   I'll have to get you the information.  It would

11   have been a Plaintiff's case.  It will probably

12   hit me in a few minutes.

13         Q.  So other than the case with Perry

14   Buckner, all of your work in the civil side of

15   litigation has been for Plaintiffs, the 2021

16   deposition with Perry Buckner?

17         A.  Yes, to my knowledge, yes.

18         Q.  Okay.  Have you ever testified in a

19   case involving a church?

20         A.  No.

21         Q.  What about a school?

22         A.  Yes.

23         Q.  Okay.  Tell me about those.

24                    MR. RICHTER:  Object to form of

25          the question.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

                                                    Page 23

 1                    THE DEPONENT:  And you asked
 2        specifically via testimony?
 3                    MR. DUKES:  Yeah.
 4                    THE DEPONENT:  Okay.  So the
 5        2021 deposition, K.I. v. Anderson, that
 6        represents a school where Anderson County
 7        School District, a child with autism,
 8        approximately elementary age, was injured at
 9        school and developed PTSD.
10   BY MR. DUKES:
11        Q.  Uh-huh.
12        A.  I'll forewarn you, that's a 17-hour
13   deposition and I still don't know why.  But the
14   case has settled and so it won't go to trial.
15        Q.  Okay.  Who was the defense lawyer on
16   that case?
17        A.  The people that represented Anderson?
18        Q.  Yeah.
19        A.  That would have been -- his name is
20   Alex.  I can get it for you.
21        Q.  Okay.
22        A.  He works with a firm in Columbia where
23   their firm represents like 30 different school
24   districts.
25        Q.  Uh-huh.

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA597**

Amanda Salas, MD - 11/10/2021

Page 24

1          A.  And they represent -- the fact that
2    they represent Anderson, I guess that assignment
3    or something.
4          Q.  I see.  Okay.  And what were you asked
5    to opine about in that case?
6                    MR. RICHTER:  Hang on just a
7            second.  Maybe we can clear this up, so then
8            I won't have to interrupt you anymore.  I am
9            certainly gonna ask to our privileged
10           conversations, I'm certainly gonna express
11           myself, attorney/client communications.  I
12           don't want her --
13   BY MR. DUKES:
14         Q.  How about if I ask what opinions did
15   you render in that case?
16                   MR. RICHTER:  There you go.
17                   THE DEPONENT:  I can't recount
18           them exactly, but it would have been related
19           to the child having or developed or not
20           developed PTSD.  And in that case, I did
21           think that the child had developed PTSD from
22           the event that had happened.
23   BY MR. DUKES:
24         Q.  Okay.  And then I get is Walker versus
25   CCSD a school case?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 25

1          A.   Yes.

2          Q.   And tell me what that case involved?

3          A.   That's another child who had an event

4    at school and went home and tried to hang

5    himself.   Fortunately, it was an unsuccessful

6    hanging and I was to assess him for whether or

7    not he had mental illness components related.

8    And it was my opinion that he did have PTSD and

9    the child that also had intellectual deficits.

10         Q.   What was the incident at school?

11         A.   It related to bullying.

12         Q.   Is that -- is bullying something you

13   see a lot of complaints about?

14         A.   In terms of -- can you narrow that

15   down for me, because I don't really know how to

16   assess?

17         Q.   Yeah.   Is bullying at school something

18   that you see as a recurring theme in people

19   you've either counselled or treated?

20         A.   There are some people who, when we go

21   through a trauma history, they will say, you

22   know, I was bullied at school.   And sometimes it

23   rises to a threshold that needs to be addressed

24   and sometimes they have other events in their

25   life that are being addressed and that doesn't

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA599**

Amanda Salas, MD - 11/10/2021

1    relate.  But I have experience in treating people

2    who have been bullied.

3            Q.   Uh-huh.

4            A.   But I don't know how to quantify it in

5    terms of percentage of people.

6            Q.   Okay.

7            A.   With the use of the word "a lot".

8            Q.   Have you ever given an opinion that a

9    school was negligent for failing to prevent

10   bullying?

11           A.   I don't think that I have.  That is

12   not necessarily in my wheelhouse.

13           Q.   Uh-huh.

14           A.   For being able to say if a school

15   district followed whatever they would be doing as

16   a school district.  In the cases that I've been

17   involved with where an issue about bullying has

18   risen to that threshold, they sometimes hire

19   somebody else or they have a different lawyer way

20   of handling whatever that issue is.

21           Q.   Okay.  So that's not something you've

22   addressed?

23           A.   No.  Not --

24           Q.   Okay.

25                MR. RICHTER:  Let me just

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA600**

USCA4 Appeal: 22-1750    Doc: 19-2    Filed: 10/07/2022    Pg: 37 of 546

Page 27

1          interpose an objection to the form of the

2          question addressing a legal issue.  Go

3          ahead.

4     BY MR. DUKES:

5          Q.  That has not been part of your

6     expertise, rendering opinions regarding the

7     obligations of schools to supervise students in

8     order to prevent bullying?

9          A.  I haven't rendered an opinion about

10    that.  I'm somebody who is able to identify

11    bullying and treat somebody who has been bullied

12    and has psychological illness or symptoms from

13    that, but depending on how that question is

14    phrased to me, the idea of me being able to tell

15    a school, this is what you're supposed to do in

16    order to fulfill a legal criteria or what they

17    have done for their policies and procedures is --

18    I'm not your best expert for that.

19         Q.  Gotcha.  You interviewed and I'll use

20    their names now, female student and male student?

21         A.  Yes.

22         Q.  And that will go in the transcript

23    with just the student -- male student, female

24    student.

25                    MR. RICHTER:  We'll all make a

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA601**

Amanda Salas, MD - 11/10/2021

1       mistake about this before the day's over and

2       this lady will catch it and fix it.

3               MR. DUKES:  We're making every

4       effort to preserve their anonymity in this

5       litigation.

6    BY MR. DUKES:

7       Q.  When did you interview either or both

8    of them?  It looks like you interviewed the male

9    first and then the female?

10      A.  Correct.

11      Q.  All right.

12      A.  So viewed student male 300 was

13   interviewed on September 2nd, 2021.

14      Q.  Uh-huh.

15      A.  And viewed student female 200 was

16   interviewed on September 12th, 2021.

17      Q.  Okay.  Let's go through your interview

18   with the male student.  And walk me through your

19   interview of him and what you learned from him.

20   And I can give you a copy of your --

21      A.  I think I have the originals down

22   here.  You said male first?

23      Q.  Yeah.

24      A.  Okay.  So we attempted --

25      Q.  And I'm not gonna mark this as an

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA602**

Amanda Salas, MD - 11/10/2021

1    exhibit.  I'm gonna -- we're just gonna have

2    Amanda talk about what she learned if that's

3    okay.

4           A.  Easiest thing for me to do is just go

5    through my notes.

6           Q.  Yeah, that's what I was thinking you

7    would do.

8           A.  Okay.  So the via audio, we attempted

9    to do this via Zoom --

10          Q.  Uh-huh.

11          A.  -- but that was failed and so we

12   converted it to a telephone interview.

13          And at the beginning of the interview

14   I explained to him that I'm not his doctor and

15   that there are limits to confidentiality in doing

16   this type of interview different than if someone

17   were coming to see me as being their doctor.

18          Q.  And what were the limits of

19   confidentiality that you explained to him?

20          A.  So if you go and meet with your

21   doctor, it's private and confidential between you

22   and your doctor unless it hits a threshold of

23   being a mandated reporter.

24          But that in the nature of this being a

25   forensic issue, I'm hired and retained by his

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA603**

Amanda Salas, MD - 11/10/2021

Page 30

1    attorney.  The case would be able to be discussed

2    with his attorney and any information that would

3    be shared would be discoverable and up for

4    discussion, whether it was favorable for him or

5    not favorable for him.  Even if it's something

6    that he wanted to keep private, that I can't set

7    limits and parameters and keep things private

8    when it's handled in a legal fashion.

9         Q.   Okay.  Is that something you warn

10   people who you're hired to do a forensic

11   interview on --

12        A.   Yes.

13        Q.   -- typically?

14        A.   Whether it's a criminal matter or a

15   civil matter, they get the same warning.

16        Q.   Okay.  All right.  What else did you

17   and male student --

18        A.   So male student had graduated from

19   College of Charleston with a double manager in

20   political science and Spanish.  And he expressed

21   a desire to pursue a law degree.

22             He has been working in real estate and

23   the registry of deeds and two months as a bike

24   taxi in Charleston.

25             He took a gap year from college during

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA604**

Amanda Salas, MD - 11/10/2021

Page 31

1    which time he's planning to study for the L-sat.
2    He's from Argentina, but -- I'm sorry, his
3    parents are from Argentina, but he was born in
4    the states in Georgetown and moved to Charleston
5    when he was one year of age.
6              His parents had exiled and sought
7    political asylum over in the states.  And his
8    mother and father have been in the states for
9    25 years.  Somewhere along the way I guess his
10   dad had returned to Argentina and met his mom.
11             So there are three siblings whose ages
12   and names are outlined in the notes.
13        Q.  Uh-huh.
14        A.  His father is a manager of product
15   development at a lighting company and his
16   mother's a professor at College of Charleston in
17   Spanish and she has a history of teaching at
18   Bishop England.
19             He has an aunt who has a history of
20   teaching Spanish.  He received free tuition
21   because his parents worked there.  I'm sorry,
22   this is on the top of page 2.
23        Q.  Yeah, I was looking at the next --
24        A.  Started --
25        Q.  I turned -- I forgot to turn to the

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 32

1    back.

2         A.   My apologies.  I didn't get the copier

3    to do it the way I intended either, but I'll show

4    you at the bottom of each of the pages it's

5    actually numbered to make it a little bit easier.

6         Q.   Okay.

7         A.   He started out as a freshman and went

8    all four years of high school, graduating in 2016

9    and he took a gap year from 2016 to '17 in which

10   he spent eight months in Argentina where he took

11   some high school classes and he emersed himself

12   in the culture and got to know his family from

13   over there even better.

14           He went to College of Charleston from

15   2017 to 2021.  As a kid he had visited Argentina

16   over summer breaks, which apparently is winter

17   over there and he has dual citizenship.

18           He took -- well, I can't say he took.

19   I think he was telling me that typically students

20   at Bishop England take P.E. as a freshman and

21   sophomore and that sophomore year is when you're

22   going daily for P.E.  And he told -- and he was

23   talking about you'd be in the locker rooms and

24   they used the locker rooms for those purposes as

25   well as mostly for athletics.  But if it's in

Electronically signed by Nicole White (301-070-154-1752)                                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA606**

Amanda Salas, MD - 11/10/2021

Page 33

1  quotes in my notes, it's because I wrote down
2  specific words that would not have been my words,
3  but would have been male student's words.  So
4  he's the one who said, "it was there in front of
5  me every day" and he knew whose office it was,
6  which was Paul Rooney, which was not his P.E.
7  coach.
8         Q.  Okay.  And, "it was there in front of
9  me every day," that refers to the window from
10 Coach Rooney's office looking into the locker
11 room?
12        A.  Correct.
13        Q.  Did he or did -- were you aware that
14 there were blinds on those windows -- on that
15 window?
16        A.  I know that today.  I don't remember
17 if he told me or referenced the window having
18 blinds.
19        Q.  Okay.
20        A.  But I know that as part of the setup
21 of having a window, that it had blinds on it.
22        Q.  Okay.  Continue on?
23        A.  So you get approximately five minutes
24 before and after class to change and 45 minutes
25 total for P.E.  And the class was about

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA607**

Amanda Salas, MD - 11/10/2021

1   35 minutes, so that you would have the five

2   minutes before and the five minutes after.

3           Q.  Did he say how many students were in

4   his P.E. class?

5           A.  He did not.

6           Q.  Did he indicate how many students

7   would be in the locker room while he was changing

8   clothes, how many other students?

9           A.  No.

10          Q.  Okay.

11          A.  He knew someone could go in the other

12  side referencing --

13          Q.  The coaches office?

14          A.  -- into the coaches office.

15          Q.  Uh-huh.

16          A.  And he expressed his naivete regarding

17  the compromise it presented and the idea of

18  someone watching and taking video.

19              I asked him if his mom, because she

20  worked there, if she was familiar with that setup

21  of the window and he said he didn't think his mom

22  knew of it.

23          Q.  Did he say he ever complained about it

24  to his mother or to anyone?

25          A.  No.  He did not express like that.  He

Electronically signed by Nicole White (301-070-154-1752)                aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA608**

Amanda Salas, MD - 11/10/2021

Page 35

1  expressed having something that was, as he said,
2  I think, were so obvious.  Are those his words or
3  are those my words?  Those might be my words.
4  But he knew that the window was there in front of
5  him every day.  Those were his words.
6          But the appreciation of what that
7  window provided in compromising privacy and
8  safety was not something that he necessarily had
9  the gravity of that, as it came to him after he
10  learned that someone had come on the news and
11  been arrested and it became known in the media
12  that someone had used that window in order to
13  make video recordings of students.
14      Q.  Uh-huh.
15      A.  He said that Bishop England had a
16  strict cell phone policy and students couldn't be
17  on phones or have phones without being written
18  up.  He had no awareness of him personally being
19  photographed.  He said that Jeffrey F. got in
20  trouble for using the window.  He had everything
21  at his fingertips to use to his advantage.  Those
22  are not my words.  Those are me capitulating what
23  he had said.  And that Jeffrey was there two to
24  three years after male student graduated.
25          Asked him about what role Jeffrey had,

Electronically signed by Nicole White (301-070-154-1752)    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA609**

Amanda Salas, MD - 11/10/2021

1    I think that's where the arrow comes down.  And

2    male student's perspective was he had family at

3    the school.  He had an ambiguous position and he

4    thought he did something for sports media.  He

5    did not teach, but he did do some substitution.

6    And he was friends with Mr. Rooney and

7    weight-lifting coaches.

8              He described Jeffrey as, "just a

9    strange guy".  He said he was socially awkward,

10    but that he could shoot baskets at the basketball

11    gym.  He was not an athletic guy.  Jeffrey was

12    not an athletic guy, but apparently Jeffrey could

13    shoot three pointers and people would cheer his

14    name on at the school.  And he would shoot

15    three-pointer baskets, but he was weird enough he

16    postulated he had something like Asperger's.

17         Q.  And that's --

18         A.  Not my diagnosis.

19         Q.  Male student saying I think he was an

20    Asperger's?

21         A.  Correct.

22         Q.  Okay.

23         A.  Mom sent a text to the family group

24    regarding Jeffrey's arrest and male student saw

25    it on Live5 News.  Or I'm sorry, mom -- male

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA610**

Amanda Salas, MD - 11/10/2021

Page 37

1    student said that mom saw it on Live5 News and
2    then sent the text to the family.  And male
3    student was not shocked regarding Jeffrey's
4    affiliation with charges.
5           Q.  Did you explore that with him?
6           A.  It may be in here, but I don't think I
7    got much more out of that from him.
8           Q.  Uh-huh.
9           A.  The con -- let me express something.
10   The conduct of my interview, my style, we all
11   have different styles, so my style is to try to
12   promote someone to just sit and talk so that I
13   can get as much out of them without them having
14   been fed information from me as the clinician
15   evaluating.
16          Q.  Okay.  I can relate to that.
17          A.  So you I find sometimes get a lot of
18   information I wouldn't know to go get.
19          Q.  Uh-huh.
20          A.  I don't know how to refer to another
21   name in here, but...
22          Q.  Just call him the brother.
23          A.  The brother, thank you, knew the girl
24   who found the video that led to the cop
25   involvement.  So male student has a younger

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA611**

Amanda Salas, MD - 11/10/2021

Page 38

1   brother who is also a student at Bishop England

2   and he knew the girl and they knew that it was

3   found on the school iPad and the girl who found

4   the video on the iPad was a lacrosse player.

5          Q.  Okay.  And at this time the male

6   student had long since graduated from Bishop

7   England, right?

8          A.  Right, he was no longer a student.

9          Q.  Okay.  All right.  What else did he

10  tell you?

11         A.  He said that there was a rumor of guys

12  in underwear, but male student had never seen the

13  video first-hand.

14         Q.  Uh-huh.  Now I hear -- we can go off

15  for a second.

16             (Off-the-Record conversation.)

17  BY MR. DUKES:

18         Q.  Okay.  What else did male student have

19  to say to you?

20         A.  He described his feelings as,

21  "disgusted" in terms of how he felt after coming

22  to learn and realize of Jeffrey having been

23  arrested and the situation that led to Jeffrey's

24  arrest and the window being part of that.  But

25  that's how male student felt, was disgusted.  And

Electronically signed by Nicole White (301-070-154-1752)

**JA612**

aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 39

1  he talked about how he had had an ignorant or
2  naive point of view.  And I asked him if he had
3  any question related to could he have been on the
4  video that was related to the arrest of Jeffrey
5  and his response was he couldn't have video of
6  me.  But he felt, "pretty shitty" that some
7  creepy guy had a video and it made him postulate
8  ideas of where could it be, referring to the
9  videos that were taken, it being out on the dark
10  web.  It could have been used for the personal
11  viewing of the person who had taken the video.
12  And I was asking him about where all that was,
13  was it something that he knew and he says, "I
14  don't know.  No one knows."  But he finds this to
15  be, "gut wrenching".
16          Q.  Now did you, when you interviewed male
17  student, were you aware that Jeffrey and his
18  name's Scofield, Jeffrey Scofield's phone and the
19  iPad, his electronic devices had been seized by
20  the Attorney General's office?
21          A.  I did not know that at the time.
22          Q.  Okay.
23          A.  I know that now.
24          Q.  Okay.  And how do you know that?
25          A.  Through reading the depositions.

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA613**

Amanda Salas, MD - 11/10/2021

Page 40

1        Q.  Okay.  Okay.

2        A.  So this experience for him and the

3   experiences having learned that Jeffrey was

4   arrested and had this material, "it made me grow

5   up very quickly".  So one of the things that male

6   student struggles with is the loss of naivete.

7   And part of it is even questioning that even

8   though he wasn't somebody who would be on the

9   video taken by Jeffrey, he still recognizes in

10  hindsight that the window was there and it

11  presented the viewing opportunity.  And the

12  serious nature of having what if's related to I

13  changed in front of that window, it could have

14  been me, maybe it was me, maybe it was somebody

15  else.  There was a perpetrator, but the gravity

16  of him having been an individual that was in the

17  exact same situation as the students who did have

18  their video taken was a wake-up call and jerking

19  him out of the naivete that he had previously

20  lived under.

21        He had denied a personal history of

22  trauma, so that's reported in the margin.

23        Q.  Uh-huh.

24        A.  Male student played soccer.  He says

25  that this is in the back of his mind always and

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA614**

Amanda Salas, MD - 11/10/2021

Page 41

1  he will carry it with him for the rest of his
2  life.
3       Q.  Did you do any analysis on whether
4  that his fear that -- that some might have
5  happened, even though he knows he was not on any
6  of the illicit photographs taken by Jeffrey
7  Scofield, whether that fear was rational?
8       A.  It is a rational fear, in my opinion.
9  The setup of having a window where the -- some of
10 this comes out more in the interview with his
11 sister, but the setup of having the window there
12 for him was like -- and these are my words, these
13 are not his words, but just it could have been
14 me.  Well, yeah, it could have been you.  It
15 might not have been Jeffrey, but that same setup
16 that the other voyeuristic individual had
17 utilized was in the exact same setup when male
18 student was utilizing the facilities in the same
19 manner that those victims of Jeffrey had utilized
20 the same facility.
21      Q.  So his fear and his psychological
22 injury is that it could have been him?
23               MR. RICHTER:  I object to the
24      form of the question.
25 BY MR. DUKES:

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA615**

Amanda Salas, MD - 11/10/2021

1       Q.  Right?

2       A.  Yes.  For this individual --

3       Q.  Uh-huh.

4       A.  -- he doesn't have any way of knowing

5   whether it was somebody else.  But all of this

6   gets into the prior to learning that this had

7   actually happened and how he handles himself now

8   is a very realistic that could have been me.

9       Q.  Okay.  Okay.  And then over on page --

10  I guess we're now going to page 5?

11      A.  Yes.

12      Q.  Okay.

13      A.  His quote was, "it's transformed me".

14  He stopped thinking of the world as sunshine and

15  he became aware of bad things that can happen.

16  He doesn't want to think about it too much,

17  because he, "doesn't want to go into that loop

18  hole."  So he's made a conscious effort to try to

19  keep the what if's away.

20      Q.  Uh-huh.

21      A.  Some things such as just going to high

22  school could change my life.  He didn't realize

23  that just in the day-to-day normative process of

24  going to high school could affect him the way

25  that it has.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 43

1            And can go through process in order to
2    move on when you know.  I don't know what that
3    was.
4         Q.  Okay.
5         A.  But in buffer zone, I don't remember
6    what that related to either.  He noted that
7    Bishop England did not reach out.  He found out
8    via the news.  I think he was saying that Bishop
9    England had not made a statement to people and
10   that learning of this through the news was
11   something he wished that they would have done
12   differently.
13           No extension to care for their
14   students, even after you graduate.
15        Q.  What did he mean by that?
16        A.  I think he meant that -- I don't know
17   if he was saying it in specifics to this event or
18   if there was a blanket statement, but even after
19   you graduate and you become an alumni, that
20   Bishop England has not made an extension to
21   continue to show care and concern for the
22   students that are their alumni.
23        Q.  Okay.
24        A.  He told me that his mother had a
25   history of a lawsuit that was wrongfully

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

JA617

Amanda Salas, MD - 11/10/2021

Page 44

1   dismissed.  Oh, I'm sorry, that she was

2   wrongfully dismissed from employment at the

3   school and she lost that suit.

4        Q.  Uh-huh.

5        A.  And then brother of male student was

6   not very proactive and he said that going against

7   Bishop England is, "not the easiest thing," that

8   he's going against people that he would be in

9   high school, like he recognizes that not

10  everybody is going to jump on the bandwagon, if

11  you will and pat him on the back and say,

12  whatever, but that -- that there is opportunity

13  to be rejected by your high school peer group.

14  Those are my words.

15       Q.  Okay.

16       A.  But that's basically what he was

17  describing.  He said that you take theology class

18  every year, you go to mass weekly and monthly.

19  That he has doubts about religion and he had been

20  kind of on the fringes, but this experience has

21  reaffirmed the doubts he had about religion.

22       Q.  And that's not unusual among people in

23  their early twenties, is it?

24            MR. RICHTER:  Object to the form

25       of the question.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA618**

Amanda Salas, MD - 11/10/2021

Page 45

```
 1                    THE DEPONENT:  That --
 2   BY MR. DUKES:
 3         Q.  The question --
 4
 5         A.  -- people would have doubts about
 6   religion --
 7         Q.  Yeah?
 8         A.  -- or that this would reaffirm?
 9         Q.  That people will doubt their
10   religious -- their faith and their upbringing?
11                    MR. RICHTER:  Object to form.
12                    THE DEPONENT:  It's my clinical
13         experience that people across all ages can
14         have doubts about religion.  But he
15         acknowledged that for him, he already had
16         doubts about religion and he was on the
17         fringes of where he was in that process, but
18         that this learning about and recognizing
19         what could have happened to him has
20         reaffirmed the doubts that he had and he
21         said that this is, "not where I should be or
22         where I want my kids to go" in terms of did
23         he want his children -- I can't remember if
24         he's talking about going to Bishop England
25         specifically or religion.  I'd have to
```

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA619**

Amanda Salas, MD - 11/10/2021

Page 46

```
 1          clarify that again.  But apparently it's
 2          impacted him, whether it was the church or
 3          the school, that he also thinks in terms of
 4          a subsequent generation.
 5   BY MR. DUKES:
 6          Q.  Okay.  And you don't need to read his
 7   phone number into the transcript.  At the bottom
 8   of page 6 it says, "may call."  Is that male
 9   student may call you?
10          A.  No.
11          Q.  Okay.
12          A.  That is him saying it's okay for me to
13   call him.
14          Q.  I see.  Have you spoken with him since
15   this interview in September?
16          A.  No.
17          Q.  Did you make any recommendations to
18   him?
19          A.  I don't remember making a
20   recommendation.
21          Q.  Okay.  So you didn't say you should
22   contact a therapist or anything like that,
23   just --
24          A.  No.  So that sounds like a question
25   related to did I give him a treatment plan or
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 47

1  something, which we would do in a clinical realm?

2        Q.  Sure.

3        A.  And that is not what I do in this

4  dynamic.

5        Q.  Okay.  You're just there to make a

6  forensic analysis?

7        A.  Correct.

8        Q.  Okay.  We've been going about an hour.

9  We can take a break if you'd like or we can move

10  on to the female student.

11       A.  I say press on while it's quiet

12  outside.

13       Q.  Okay.  Don't mess with a sleeping

14  baby.

15       A.  Exactly.  Use your time wisely.

16       Q.  Okay.  Let's turn to your interview of

17  female student, the female student?

18       A.  I need to find where those went.

19            MR. RICHTER:  I've got a copy

20       here if you need it.

21            THE DEPONENT:  I might need

22       those.  I know that there's an original in

23       here.  I can work from that.  I just want to

24       find them before we leave today.  Those were

25       hard to find the first time.

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA621**

Amanda Salas, MD - 11/10/2021

Page 48

1   BY MR. DUKES:

2        Q.   Right.  So beginning with the female

3   student, you provided her the same warnings --

4        A.   Correct.

5        Q.   -- of the limits of confidentiality?

6        A.   Correct.  And so this was an interview

7   conducted on September 12th of 2021.  Again, we

8   attempted Webex.  That did not go through

9   successfully and so it got converted to audio.

10            This references her means of being

11  able to communicate with people via a WhatsApp

12  and an e-mail.  She said she was born in

13  Charleston.  She identified her mother and father

14  by name.  She identified her brothers.  She said

15  she grew up speaking English and that her primary

16  language at home is English, but in Argentina she

17  learned Spanish.

18            She grew up West Ashley.  I think

19  that's the area where she grew up.  And she

20  outlined the schools that she had attended.  She

21  went to Ashley River Creative Arts Elementary

22  School and her comment was "I loved it."

23            She went to School of the Arts for 6th

24  and 7th grade.  Daniel Island School for 8th

25  grade.  They moved to Daniel Island when she was

Electronically signed by Nicole White (301-070-154-1752)    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA622**

Amanda Salas, MD - 11/10/2021

Page 49

1  in 6th grade and her time at Daniel Island School

2  was "great".  She went to Bishop England High

3  School for 9th through 11th grades, which put her

4  from 2017 to 2019.  And she had summers in

5  Argentina, which apparently is winter down there.

6          She is now in college at the

7  University of that Navarra, N-A-V-A-R-R-A, in

8  Pamplona, Spain.  She denied a history of abuse

9  at home or outside of the home.

10         She said that her senior year over the

11  summer her mother was fired, so she had to go to

12  Bishop England and pay or find an alternative and

13  she said she finished online via South Carolina

14  Virtual Charter School getting her diploma in

15  2020 and then she was in Argentina with her

16  brother, the older brother.

17      Q.  Okay.

18      A.  But they lived in different

19  apartments.  And while she was in Argentina, she

20  -- her words were, "immersed myself" she was

21  referring to the culture.  She took classes

22  online from September to May and she was also

23  doing high school classes from September to

24  December in Argentina.  So she was at one point

25  it was almost like a dual enrollment for

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

1    completing the South Carolina virtual school and

2    the classes she was doing for Argentina.

3           Q.   Okay.

4           A.   Her past psychiatric history, she had

5    therapy in 9th grade.  She said high school girls

6    were bullying her.  That started as Bishop

7    England.  She had not experienced that before.

8    It affected her mental health.  She went to Emily

9    Evans, a therapist on Daniel Island, and she saw

10   other Bishop England students that were there,

11   too.  And she said that Emily Evans also saw her

12   siblings.

13           In 9th and 10th grade she was -- I

14   don't know if she was diagnosed with or treated

15   for, but obviously getting the counseling as part

16   of the treatment for depression, but there was a

17   component of depression that she was dealing

18   with.

19           She said that it was harder on her

20   because she was in a Latino family and in school

21   they would call her Mexican and she started to

22   doubt herself and not like where she comes from

23   in terms of her heritage and so she started to

24   divest from origins.  "Divest" would have been

25   her word.

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA624**

Amanda Salas, MD - 11/10/2021

Page 51

```
 1            The marginal comments say social
 2    ostracized, so she felt like she has been
 3    socially ostracized and that was the reason why
 4    she went to therapy, because she had gotten hate
 5    mail.  People talked about her behind her back
 6    and she was isolated to the point that she ate
 7    lunch in her mom's classroom.  And she identified
 8    the social ostracizing beginning because she had
 9    kissed a friend, a guy who was -- I don't know
10    how the teenage relationship works, but her
11    friend took offense to the kiss with the boy.
12    Let's say because I was one of those teenage
13    girls at one point in time, I suppose.
14            MR. RICHTER:  Doesn't seem that
15        long ago, does it?
16            THE DEPONENT:  Still that
17        removed from some of it, I suppose.
18            In popular group and boys in
19        competition.  She said she really fit in
20        when she was in Argentina and she found
21        herself again and she did not want to return
22        to Charleston.  She experienced sadness and
23        anxiety and that left when she went to
24        Argentina.
25            In her Junior year she said her
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 52

 1        whole friend group, "hated me."  And her
 2        approach to her thoughts that she would deal
 3        with were what wrong thing am I gonna do
 4        today.  And people would chant Trump around
 5        her.  They would insinuate and say things
 6        that they were gonna build -- needed to
 7        build a wall and go -- and send her back to
 8        Mexico, go back to Mexico.  She felt alone
 9        and not welcomed.  And "alone" and "not
10        welcomed" are her words.
11                  So she had experienced decreased
12        appetite.  She said that she had lost
13        weight.  The lowest she had weighed was 87
14        pounds, but her normal weight is 115 pounds.
15        She has problems sleeping.  She said that
16        she was more irritable.  She took it out on
17        her family.  She had a short fuse.  Her
18        younger brother was still in with the
19        popular group and so girls that talked to
20        him, talked to him about her and he would
21        hear what was being said negatively about
22        her.
23                  She said that she had many
24        thoughts about suicide, particularly in
25        January and February, and that she had some

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA626**

Amanda Salas, MD - 11/10/2021

Page 53

1      problems with her eating habits that led her

2      to go to her pediatrician at Parkwood

3      Pediatrics.

4  BY MR. DUKES:

5      Q.  And were those just suicidal ideations

6  or did she actually attempt suicide?

7      A.  We'll get into the one day that she

8  thought that she was making an attempt.

9      Q.  Okay.

10     A.  So I would rather get to my notes

11  where I put more down about that.

12     Q.  Okay.

13     A.  She said people said, "I look

14  anorexic."  And she genuinely tried to not look

15  anorexic and to eat.  She said she generally

16  tried to eat, "but I couldn't."

17       She said that she had two months of

18  taking a medicine she thought might have been

19  Prozac, but she quit taking it.  But people found

20  out she was in therapy and going, people said she

21  was psycho.  So she was criticized when she tried

22  to pursue help for her symptoms and issues that

23  she was dealing with.

24       She said she genuinely felt like

25  everyone hated her and she felt she didn't have

Electronically signed by Nicole White (301-070-154-1752)       aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA627**

Amanda Salas, MD - 11/10/2021

Page 54

1   friends and she tried to jump off the balcony,
2   but her older brother found her and intercepted.
3           So the intensification, there were a
4   lot of suicidal ideations and the intensification
5   culminated in that she seriously was at a point
6   where she thought she could just go off her
7   balcony and jump to the ground and that would be
8   the end of her life.  And then the older brother
9   had come into her room, not because it was a
10  planned thing or anything, but he came in and
11  found her in her state of contemplation and he's
12  the one who intervened.
13          She said she had had a huge argument
14  with her dad and I think that says, "sad".  She
15  had had a difficult day at school and I think
16  that's referencing back to the particular day
17  that she thought about jumping off the balcony.
18  I'd have to go back and clarify with her just to
19  be a hundred percent certain.  But she said she's
20  had two voices talk to her and she thought, "I
21  guess I'm going crazy."  Dad had tried to take
22  her to a mental institution.  This is after the
23  interception of the balcony event, and she begged
24  him to not and so dad turned around.
25          Went to -- and that's blank.  I don't

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

1    know what that was about.  She has had those two

2    voices, so the area references that those have

3    been going on throughout high school and teenage

4    years.  She has no confidence.  Think I'm being

5    mean to everyone and that's so "her name is a

6    bitch."

7              Q.  And those are her words?

8              A.  Yes.  Those were the thoughts that she

9    was having.

10             Q.  Uh-huh.

11             A.  And she finds that now she's always

12   apologizing and she's second guessing.

13             Q.  Did you attach any significance to the

14   statement that she had voices in her head or two

15   voices talking to her?

16             A.  No.  I don't think she has

17   schizophrenia or schizophrenia-type illness.

18             Q.  Okay.  Why not?

19             A.  Having two voices in your head by the

20   dialogue that she was having with me is more

21   indicative of mood symptoms.  It can be

22   indicative of character pathology.  It can be

23   transient and not diagnostic.  But the fact that

24   she was able to reflect and recognize that she

25   had these two voices and she's not lost

Electronically signed by Nicole White (301-070-154-1752)                          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA629**

Amanda Salas, MD - 11/10/2021

Page 56

1    functional capacity says that it's not

2    schizophrenia.

3            Q.   Okay.

4            A.   It's certainly something to be

5    processed in a therapeutic modality, but it does

6    not warrant pharmaceutical treatment with an

7    antipsychotic for what she had disclosed at that

8    time.

9            Q.   Okay.

10           A.   She said the other side feels, "I

11   don't care" and she doesn't want to lose more

12   friends.

13           She had great relationships at West

14   Ashley.  She said high school, "gave me a

15   resentment" to Daniel Island.  That she has no

16   interest in South Carolina schools for where she

17   wanted go to college.  She had applied to College

18   of Charleston and she said that was the least

19   amount of people.  So apparently not many people

20   from Bishop England go to College of Charleston

21   compared to some other schools.  That was her

22   perception.

23           She said that regarding the viewing

24   window, she recalls being at mass and what she

25   learned was that Jeffrey had an iPad and took

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA630**

Page 57

1  video of someone changing in the locker room.
2  And her words were related to that being "so
3  gross."  She described Bishop England as a very
4  toxic environment, "very sketchy".
5      Q.  Did you explore that segment with her
6  to find out what she meant by it being a toxic
7  environment?
8      A.  Some of that will come out as we go
9  through this, so yes.
10     Q.  Okay.
11     A.  Rooney family and legacy, I don't
12  remember what she was saying about that.  She
13  recalled Jeffrey as being, "so, so, so, so
14  creepy".  And I think I had asked her, I don't
15  know, I don't want to speculate, but her --
16  whatever I asked her, she said it could be.  And
17  something was "super easy".
18          And this would have all been in
19  relation to the viewing window.  Coach not in the
20  office and passerbyer had an opportunity.  At
21  16 years of age she found herself to trust too
22  much and in hindsight, she sees herself as really
23  naive.  She has no knowledge of whether or not
24  she has been captured on video or someone has,
25  you know, looking through the window, utilized

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA631**

Amanda Salas, MD - 11/10/2021

Page 58

1  her in a sexual connotation that she doesn't know
2  about.  She just doesn't know.  But if it had
3  happened, "I'd be so angry, so uncomfortable".
4  So this gets into some of the toxic environment
5  ideas from female student.  The freshman class --
6  so apparently everyone had a uniform that they
7  had to wear.  And everyone wears the same
8  uniform, but if you entered freshman class the
9  year that female student entered the freshman
10  class, that was the year that they implemented
11  new uniforms.
12       Q.  Uh-huh.
13       A.  But if you were in sophomore, junior
14  or senior year, you stayed with your old uniform
15  and you didn't get the new uniform.  So that
16  every year in sequence when her class went from
17  freshman to sophomore, then you had junior and
18  senior with the old uniform and now you had
19  freshman sophomore with the new uniform.  And
20  that continued to progress until you phased out
21  the old uniform.
22       Q.  Uh-huh.
23       A.  So her uniform was plaid green shirts
24  instead of green, which the other girls wore.  So
25  the freshman girls stood out like a sore thumb

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 59

1    and it made them easier to target.

2          Q.   Could that be skirts and not shirts?

3    Plaid green skirts?

4          A.   It probably is skirts.

5          Q.   Okay.

6          A.   Because she talks about having shorts

7    under them.  I think that is skirts.

8          Q.   Uh-huh.

9          A.   But it made the freshman girls stand

10   out and they were easier to target by upper

11   classman.  She said that there was a scandal of

12   someone taking pictures of girls under their

13   skirts while walking upstairs.

14              So you may find this referred to as

15   up-skirting, but it is when somebody has a means

16   of walking up to another person who's wearing a

17   skirt and viewing from underneath their skirt in

18   some form or fashion.

19         Q.   Uh-huh.

20         A.   Or in the medical literature it's also

21   referred to as down shirting and it usually

22   refers to females with somebody taking a viewing

23   equipment and looking down there shirts.

24         Q.   Okay.

25         A.   So there was this scandal that this

Electronically signed by Nicole White (301-070-154-1752)          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA633**

Amanda Salas, MD - 11/10/2021

Page 60

1    up-skirting had happened.  So these plaid green

2    skirts had shorts in them.  So she described the

3    shorts as being made of a very uncomfortable

4    material and so some people cut the material out

5    from under the skirts.  And they were so poorly

6    made, because of the shorts being made of this

7    basketball material.  So whatever material she

8    likened to be basketball short material is what

9    she said the shorts were made out of.

10        Q.  And did she believe that the change in

11   the uniforms was to prevent up-skirting?

12        A.  Yes.

13        Q.  She believed there was some

14   relationship between those?

15        A.  That's what she portrayed.

16        Q.  Okay.

17        A.  Was that the up-skirting had happened,

18   there was a scandal, and so in moving forward,

19   not remedying or correcting or preventing it with

20   upper classman, but from her grade and moving

21   forward, that's where we're gonna stop

22   up-shirting or up-skirting, because we are going

23   to have these shorts and you're gonna have the

24   plaid green skirts.

25        Q.  Okay.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA634**

Amanda Salas, MD - 11/10/2021

Page 61

1         A.  And the margin reflects that

2    description that I tried to outline already.

3    Skirts or shirts, shirts were men's button down.

4    I guess men don't wear skirts, so that's shirts.

5    Shirts were men's button downs and super thick.

6              The culmination of all of this for a

7    female student makes, "it makes me never want to

8    go back."  She does not associate with peer

9    groups for Bishop England and she would not

10   recommend Bishop England as a place for anyone to

11   go.

12             She said there -- they didn't talk

13   about mental health.  She felt very alone.  I

14   don't know what "no makeup" means.  I don't think

15   it refers to cosmetics, but she said she cried in

16   the bathroom.  She cried in the chapel and that

17   there was no teacher or adult who reached out to

18   help her, even though she thought that where she

19   had had her tears would have been audible or

20   discoverable and somebody could have, should have

21   and may have even been there, but nobody had

22   reached out to her.

23        Q.  Did she say whether she ever reported

24   her feelings about the school to her parents?

25        A.  I don't remember.  She had been going

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA635**

Amanda Salas, MD - 11/10/2021

Page 62

1    to therapy and the nature of the bullying and

2    issues with what her emotional state was, was

3    addressed in therapy.

4         Q.   Okay.

5         A.   So she described the structure of the

6    school and I don't think this is the physical

7    structure, this is just how she perceived Bishop

8    England.  Is that you are to be the perfect

9    children we raise you to be.  And she said that

10   people from Bishop England would check on the

11   social media.  She said that they were, "watching

12   us 24/7" and that she ended up feeling like not a

13   person anymore.

14              She said that she wasn't suspended,

15   but she did get detention.  It was a very

16   controlling environment and very punitive

17   environment.  I could not write fast enough, but

18   I remember her saying this.  It had something to

19   do with somebody driving a car and I don't know

20   if this was real or an example, but if you had

21   driven a car and conducted fast driving or turned

22   too sharply or whatever, that had nothing to do

23   with your driving skills on Bishop England

24   campus, that you could have been witnessed by

25   somebody who was on staff at Bishop England and

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA636**

Amanda Salas, MD - 11/10/2021

Page 63

1    they would address it as if it had happened at
2    Bishop England, because they are that in control
3    of wanting you to have the perfect children,
4    perfect behaviors, where ever you are, not just
5    on their campus.
6           It's the idea that you're a reflection
7    of Bishop England and she felt like she was just
8    supposed to wear this uniform, behave this way,
9    act like this, constrained, and she had to fit
10   into the mold.  And that was very hard for her
11   because she, by just her own ethnicity, she did
12   not fit into the mold.
13          And she described the impact that
14   being scrutinized and criticized for not looking
15   like and being like the other students, how that
16   had affected her and that's what had led her into
17   the process of seeing a therapist.
18          Q.  Okay.
19          A.  She sees that her character has
20   changed.  She's not as trusting.  She has a huge
21   wall up.  She's very selective with her friends.
22   She has cut off religion and she sees Catholicism
23   as, "an evil monster."
24          She has tried to run away from
25   Charleston.  That means that not like run away

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA637**

Amanda Salas, MD - 11/10/2021

Page 64

1    like a six-year-old's gonna pack their little

2    satchel and go and not come home.  But like she

3    doesn't want to go back to Charleston because her

4    experience has tainted her pleasure of just being

5    in Charleston in general.

6         Q.   Uh-huh.

7         A.   She enjoys her family, but she's very

8    anxious in the setting of that background.  And

9    that relates a lot to the scrutiny that she felt.

10   She said that she -- when she's back in

11   Charleston she does feel watched, but she's

12   gotten to a point where she just doesn't care

13   anymore.  She feels judged and she's tried to get

14   to where it's, "irrelevant" how she feels in

15   terms of how she has to live up to the

16   expectations that were set on her.

17            The viewing window for her, there was

18   no moment of privacy to yourself.  Like she was

19   -- she acknowledges she was at a stage where she

20   was just reaching puberty, you know, emerging

21   into high school and stuff.  And that even in the

22   privacy of being in the locker room and changing,

23   that there was so much scrutiny in the culture,

24   that you had no moment of privacy.  That's how

25   she had described her perception.  And, "I just

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA638**

Amanda Salas, MD - 11/10/2021

Page 65

1    can't" fathom having been viewed.  Like she just

2    can't even go there.  But the idea of striving to

3    be perfect follows her through this day.

4           She acknowledged that the lack of

5    tolerance for being a different person, you know,

6    she said, "everyone has to fit this model of

7    being this person."  And she was -- that was

8    referring to the people that Bishop England

9    wanted them to be.

10          Q.  Okay.  So clearly the female student

11   did not have a positive experience in high

12   school?

13          A.  That was a good summation.  Fair.

14          Q.  And that she had difficulties long

15   before Jeffrey Scofield was apprehended for

16   having videoed boys, right?

17          A.  She has strong --

18               MR. RICHTER:  Object to form of

19       the question.

20               THE DEPONENT:  She has strong

21       emotions of discord or not liking high

22       school even before the realization of what

23       had happened with Jeffrey Scofield.

24   BY MR. DUKES:

25          Q.  And she was always aware that the

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA639**

Amanda Salas, MD - 11/10/2021

Page 66
1   windows from the coaches offices were present in
2   the locker room, correct?
3                    MR. RICHTER:  Object to form of
4        the question.
5                    THE DEPONENT:  I didn't ask her
6        about her level of awareness about the
7        windows.
8   BY MR. DUKES:
9        Q.  Uh-huh.
10       A.  At least I don't remember that being
11  in there.  But in hindsight, neither of the two
12  students that I interviewed were not aware that
13  they were there.  It's kind of like, I'm aware
14  there's a door on the wall over here, but I don't
15  think twice about it or what's behind it or
16  something.  It's just a part of the environment.
17  It was accepted and for her, she had other things
18  that she was focused on dealing with.
19       Q.  Okay.  Okay.  Let's turn to your
20  report and having interviewed the two students,
21  who aren't students at Bishop England anymore,
22  but tell me what your professional opinions in
23  this case are.
24       A.  So the idea that a person in high
25  school has been in a locker room where that is

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 67

1   what they're provided with to change, undress,

2   disrobe, utilize the facilities for toileting and

3   showering, however normal use of a locker room

4   would be perceived, that having the transparent

5   window where people have access to and I

6   understand that it was by the design of the

7   building, was in place to prevent conflict

8   between students or --

9           Q.  Fights and bullying?

10          A.  -- fights and bullying, I think

11  smoking or something.

12          Q.  Hazing.

13          A.  But all of that, the nature of that

14  transparency into the privacy, once you have

15  somebody who rises to the occasion to recognize

16  that is not safe and they utilize it, what may

17  have been benign is now very malignant.  So that

18  makes it very concrete for the person who would

19  have been the student in the locker room.

20              They may have not thought about it,

21  because you don't know what you don't know.  And

22  it may have been tolerated, because people didn't

23  go against it.  It was there for the construct of

24  the building and forward.  But the nature of how

25  that affects an individual, it's gonna affect

Electronically signed by Nicole White (301-070-154-1752)     **JA641**     aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 68

1  individuals differently, but they're gonna be
2  affected.
3       Q.  Okay.  So every student who is --
4  every Bishop England alumnus who has since
5  learned that Jeffrey Scofield did bad things
6  would be affected by that differently, correct?
7                 MR. RICHTER:  Object to the -- I
8       object to the form of the question.
9                 THE DEPONENT:  That's a fair
10      assessment, yes.
11 BY MR. DUKES:
12      Q.  Okay.  What -- in your opinions you
13 say that the windows in the locker rooms -- and
14 have you ever seen the design drawings of that?
15      A.  I don't think I've seen the design
16 drawing.  There was a picture of the window --
17      Q.  Uh-huh.
18      A.  -- in the --
19                 MR. RICHTER:  Complaint.
20                 THE DEPONENT:  Complaint.  Thank
21      you.
22 BY MR. DUKES:
23      Q.  And you didn't read the deposition of
24 Ken Richardson, did you --
25      A.  No.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 69

1          Q.   -- who described the sight lines --

2          A.   No.

3          Q.   -- in there?  Would it surprise you to

4     know that he had testified that you couldn't see

5     into the bathroom areas or into the --

6                    MR. RICHTER:  Object to form of

7          the question.

8     BY MR. DUKES:

9          Q.   -- or into the shower areas?

10         A.   I don't know what he testified to.

11         Q.   Okay.  You saying in your report that

12    the viewing windows in the dressing rooms are a

13    breach of privacy.  What do you base that opinion

14    on?

15         A.   Well, my experience is, is that we

16    teach children that your body is private and we

17    clothe them and send them out robed in some form

18    or fashion.  And there comes a time in a child's

19    life, usually around four or five, where they

20    become aware of everyone's wearing clothes and so

21    they wear clothes.  They're not as likely to run

22    out in their diaper or naked on the porch or

23    something.  So that's private.

24                  And when you have somebody who is now

25    in a situation where these are the facilities

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 70

1    that you're expected to use and this is what we

2    have available for your use and we're gonna have

3    a window and the expectation is you're gonna

4    undress in front of that window, to me, that's a

5    violation of privacy.

6          Q.  Do you know how many schools have this

7    design feature or a very similar design feature?

8          A.  I don't know.

9          Q.  Would it surprise you to know that

10   Whale Branch High School up the street here has

11   exactly that same configuration on what we've

12   heard?

13                MR. RICHTER:  Object to form of

14        the question.

15                THE DEPONENT:  I don't know.  I

16        don't know what schools have what setup.

17        But it would not surprise me that maybe what

18        was done in the past when buildings were

19        constructed have needed to make changes and

20        modifications to them.

21                For example, in the hospital,

22        we have kind of a running joke that you

23        can't be a hospital unless you're under

24        construction and so things change.

25                So how things were designed

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 71

1          and the timing of when they were done, I
2          don't know.  That's not my area of
3          expertise.
4     BY MR. DUKES:
5          Q.  Okay.  You don't have any experience
6     in designing a school or what the safety
7     requirements are for a school?
8          A.  No.
9          Q.  And you are not going to opine that
10    that the people who have designed both public and
11    private schools in South Carolina that have
12    similar design features to Bishop England's, that
13    they were wrong in doing that, correct?
14                MR. RICHTER:  Object to the form
15        of the question.
16                THE DEPONENT:  That's outside my
17        area of expertise.
18    BY MR. DUKES:
19        Q.  You don't know what the architectural
20    standards regarding supervision of students while
21    in a locker room, do you?
22        A.  The architectural standards?
23        Q.  Uh-huh.
24        A.  No, that's outside of my scope.
25        Q.  And you don't know what the schools

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 72

1  require?

2        A.  That's outside of my scope.

3        Q.  Okay.

4              MR. RICHTER:  Object to form of

5        the question.

6  BY MR. DUKES:

7        Q.  And would you -- would your opinion

8  that this is a breach of privacy extend to all

9  the many high schools in Berkeley, Dorchester,

10 Charleston County or even Beaufort County that

11 have a similar feature?

12              MR. RICHTER:  Object to form of

13        the question.

14              THE DEPONENT:  I can't make my

15        opinion that global.  I can speak for the

16        context of this particular case.  And that's

17        where I restrict my opinion.  I'm not here

18        to make a statement of things that I'm not

19        involved in, but this matter is the matter I

20        speak to.

21 BY MR. DUKES:

22        Q.  Okay.  So you're saying that Bishop

23 England should -- the architects who designed

24 Bishop England should not have put a window in

25 that -- from a coaches' office looking into the

Electronically signed by Nicole White (301-070-154-1752)                          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA646**

Amanda Salas, MD - 11/10/2021

Page 73

1    locker room?
2                    MR. RICHTER:  I object to the
3          form of the question.
4                    THE DEPONENT:  I don't know
5          about window placement in schools, so I
6          can't tell an architect or a school where to
7          place windows.
8                    But the privacy concern that I
9          have for this situation is if you have a
10         transparent window, whether it's in the
11         coaches' office, a hallway, a cafeteria, or
12         whatever, and it is a four-by-four peep
13         hole, if you will, for whoever's on the
14         other side where I understand the blinds to
15         be, that the person who is disrobing, that
16         is a pedophile's playground, if you will.
17         That's an opportunity for compromise of
18         safety.
19   BY MR. DUKES:
20       Q.  Okay.  But so is a window looking into
21   the guidance counselor's office.
22                    MR. RICHTER:  Object as being
23         argumentative, so I object to the form of
24         the question.
25   BY MR. DUKES:

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

JA647

Amanda Salas, MD - 11/10/2021

Page 74

1          Q.  Right?

2          A.  So placement of windows around

3     therapeutic situations is something that I know

4     about and it may be there to protect not just

5     the student, but also the guidance counselor.

6     But a student is not expected to disrobe in a

7     guidance counselor's office.  And if they did,

8     we'd have a whole 'nother level of inappropriate

9     going on.

10         Q.  Okay.  You'll agree with me that in

11    schools, the adults in a room do have to

12    supervise the student to make sure they're not

13    doing dangerous things or forbidden things or --

14         A.  Adults provide supervision in schools,

15    yes.

16         Q.  And that's in all areas of the school,

17    right?

18         A.  It should be in all areas of the

19    school.

20         Q.  Now, when they were in the locker

21    room -- when the two students that you

22    interviewed were in the locker room, there were

23    other students in there changing clothes,

24    right?

25         A.  My understanding is that yes, it was

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA648**

Amanda Salas, MD - 11/10/2021

Page 75

1    done around that time that the class was coming

2    and going for P.E. and that was the same facility

3    available for all the students changing for P.E.

4    into and out of.

5         Q.   Now do you know whether or not there

6    were areas in the locker room where a student who

7    was shy or embarrassed could go and change that

8    nobody could see them?

9         A.   I don't know.

10        Q.   Okay.  The windows in the -- from the

11   coaches offices into the locker rooms, both of

12   the students you interviewed recognized they were

13   there?

14        A.   Yes.

15        Q.   So they were known, the fact that

16   there were windows was known and the fact that

17   there were windows -- on the other side of the

18   windows was an office, that was known, too,

19   right?

20             MR. RICHTER:  Object to form of

21        the question.

22             THE DEPONENT:  Yes, they both

23        appreciated that the window was connecting

24        the coaches' office and the locker room.

25   BY MR. DUKES:

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA649**

Amanda Salas, MD - 11/10/2021

Page 76

1          Q.   Okay.  Have you interviewed anybody
2    who was unaware that the windows were there?
3          A.   No.
4          Q.   Have you interviewed anybody who was
5    unaware that there was a coaches' office on the
6    other side?
7          A.   No.
8          Q.   When both female student and male
9    student were enrolled at Bishop England, did
10   they express that they were embarrassed or
11   uncomfortable changing clothes in the locker room
12   with everybody else?
13         A.   They did not share that information
14   with me.
15         Q.   Okay.  Can we agree that every
16   teenager will have a different level of comfort
17   changing clothes in a locker room?
18                   MR. RICHTER:  Object to the
19        form.
20   BY MR. DUKES:
21         Q.   You'd have to ask each one of them,
22   right?
23         A.   If you want to understand how somebody
24   feels when they're undressing, you would have to
25   ask that individual.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 77

1        Q.  You can't just make generalizations?

2        A.  Some people may feel so comfortable

3   undressing that they make other people feel

4   uncomfortable and there can be pathology related

5   to that, as well.

6        Q.  Okay.  And in your experience in this

7   -- in that respect, boys are different than

8   girls?

9        A.  You know, I don't want to align with

10  one gender or another, but yes, I think that

11  that's thought that boys are different than

12  girls.

13       Q.  That a boy might be less insecure

14  about changing clothes in a locker room than

15  perhaps a girl?

16       A.  I guess that can go either way.

17  People are gonna be different and I don't know

18  that this falls along solely gender lines.

19       Q.  Okay.

20       A.  But I think it's fair to say that -- I

21  know from when I was a kid, as girls going over

22  spending the night at somebody else's house we'd

23  sleep in the bed with each other, didn't think

24  anything about it, but brothers were not doing

25  the same thing.

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

JA651

Amanda Salas, MD - 11/10/2021

Page 78

1        Q.   Okay.   What is the basis for your
2   opinion that every student who has changed
3   clothes in the locker room at Bishop England is
4   expected to be impacted by the fact that there
5   was a window there?
6        A.   That this is -- this is a sensitive
7   situation.   This is disrobing, this is
8   undressing, that there's a lot of structure that
9   goes into Bishop England and as female student
10  conveyed more so than male student, the
11  perception is is that you're gonna go into the
12  mold and this is how you're gonna be.
13       Q.   Okay.   But that's just an atmosphere
14  that she perceived at Bishop England, no matter
15  what it was?
16            MR. RICHTER:   Object to the
17       form of the question.
18            THE DEPONENT:   That's how she
19       described it to me, so that is her
20       perception.   And that's her perception.
21  BY MR. DUKES:
22       Q.   But other students are gonna have
23  entirely different perceptions, right?
24            MR. RICHTER:   Object.   It's
25       calling for speculation.   Object to the

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA652**

Amanda Salas, MD - 11/10/2021

Page 79

```
 1        form of the question.
 2                  THE DEPONENT:  Other students
 3        are not gonna have had the same experience
 4        as the female student that has been
 5        interviewed.  But clearly, from what she
 6        told me, this is something that was talked
 7        about at mass amongst who ever she was with.
 8        I'm assuming other girls.  And it became a
 9        big deal.  And to me, when I -- I see also
10        in the discovery or not discovery, that
11        would have been the exhibit of the
12        complaint, a letter that came, I believe it
13        was from the principal, that this has
14        happened and we offer counseling services,
15        whether it's through the pastoral
16        counseling, whether it's professional
17        services, it seems to be well recognized
18        that this is impacting.  This does impact
19        other people.
20   BY MR. DUKES:
21        Q.  Okay.  But you didn't learn that until
22   after you had prepared your report, right?
23        A.  Right.  Which --
24        Q.  So that, the complaint and its
25   exhibits did not go into forming your opinion?
```

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA653**

Amanda Salas, MD - 11/10/2021

Page 80

1          A.  No.

2          Q.  Okay.  And that the degree to which

3    anyone is impacted by the windows in the locker

4    rooms, you would have to ask that person to

5    determine whether they were impacted or in what

6    way, correct?

7          A.  If you want to know how it impacts

8    each individual that ever disrobed in front of

9    it, absolutely, you would have to do it.

10         Q.  Okay.  You say in your report that the

11   psychological -- there were psychological impact

12   by having been exposed to the windows, whether

13   exposed by perception or by reality.  I think I

14   wrote that down right.  What's the basis for that

15   opinion?

16         A.  So it's kind of like male student, he

17   doesn't know, so the reality of I was a victim of

18   Jeffrey Scofield, he wasn't a victim.

19         Q.  Uh-huh.

20         A.  But the perception of it might not

21   have been Jeffrey Scofield, it might not have

22   been a video, it is a perception of the same

23   thing in the same setup for how it was utilized

24   that allowed Jeffrey Scofield to get the video

25   that he had, that male student is still impacted

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA654**

Amanda Salas, MD - 11/10/2021

Page 81

1   even though we don't have any factual knowledge

2   and he doesn't have any factual knowledge to say

3   this was videoed of me or somebody used that

4   setup against me.  The perception of it is

5   something that impacts individuals upon

6   learning of how right where they were on the

7   same playing field, if you will, it did impact

8   somebody else.

9        Q.  And your -- that conclusion, that

10  generalization applies to the male student, but

11  you can't say how every other student who's

12  walked through that locker room reacts to being

13  exposed to the windows from the coaches' office,

14  right?

15                MR. RICHTER:  Object to the form

16       of the question.

17                THE DEPONENT:  I can't say that

18       a student has depression or PTSD or fear or

19       anger or I don't care, whatever.  I can't

20       say and I'm not here to say that the two

21       people that were interviewed represent every

22       single person who was in the same situation

23       for being there.

24                But from what, you know,

25       methodology that is outlined that I

Electronically signed by Nicole White (301-070-154-1752)          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA655**

Amanda Salas, MD - 11/10/2021

Page 82

1          interviewed these two students and the idea
2          that that was an opportunity and it was an
3          opportunity that someone did have light shed
4          on the fact that they utilized it, it's
5          expected that that would give you some kind
6          of pause and psychological component to fit
7          into an individual's life like that could
8          have been me.
9    BY MR. DUKES:
10         Q.  But you have --
11         A.  It's kind of an idea of if I'm driving
12   across a bridge and the bridge collapses, but I
13   made it across the bridge, but the car behind me
14   almost didn't, and the car behind it didn't, I
15   might go on and be okay until I learned, wow, do
16   you realize just how close that was on that day
17   to ending my life.  And it's a moment where you
18   take pause.
19              And some people may take pause and
20   think about it, reconcile whatever the issue is,
21   and they may not rise to the threshold of coming
22   into a psychiatrist's office or a counselor's
23   office or they may not even go to their pastor
24   about it.  And there are other people who have
25   different psychological structure, different life

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA656**

Amanda Salas, MD - 11/10/2021

Page 83

1    experiences.

2            But this was a high school experience.

3    This high school's kind of a key component in

4    childhood develop.  And the idea that a person

5    who has been in that situation would be affected

6    and it would be negative on their psyche,

7    that's as -- that's as obvious in the world of

8    psychiatry as I'm not gonna find an article that

9    says it's this obvious, because you're also not

10   gonna find an article that says something along

11   the lines of people get pregnant by having

12   intercourse.  It's known.  It's like this is --

13   this is so obvious that the idea of a window

14   being present, I am following procedures and if I

15   don't follow the procedures, I can be disciplined

16   whether however that is.  I don't want to go on

17   that path, but you could be reprimanded for not

18   following the procedure.

19           But that is something that upon

20   learning, wow, I was in that space that was

21   utilized just as it was when I was in it, it's

22   going to have that kind of impact in someone's

23   psyche.  But the degree and the nature and what

24   one person experiences versus another, that's not

25   necessarily the same.

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA657**

Amanda Salas, MD - 11/10/2021

Page 84

```
 1          Q.   Okay.  So, and I like your analogy of
 2    driving across the bridge that then collapses.
 3          A.   We'll try to work with it then.
 4          Q.   That is the realization, oh, my, I
 5    could have been killed?
 6          A.   Yes.
 7          Q.   But you weren't?
 8          A.   Yes.
 9          Q.   And it's the same thing here, right?
10    I could have been photographed, I could have been
11    seen, but as far as I know, I wasn't?
12          A.   Well --
13                MR. RICHTER:  Object to the form
14        of the question.
15    BY MR. DUKES:
16          Q.   Correct?
17          A.   As far as I know, they weren't and it
18    still impacts them, yes.
19                MR. DUKES:  I think that's all I
20        have for you, ma'am.  Thank you.
21                THE DEPONENT:  Okay.  Can we
22        take a break?
23                (Whereupon, there was a short
24        break in the proceedings.)
25                E-X-A-M-I-N-A-T-I-O-N
```

Electronically signed by Nicole White (301-070-154-1752)            aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA658**

Amanda Salas, MD - 11/10/2021

Page 85

 1   BY MR. RICHTER:
 2        Q.  Let's go forward with just a couple of
 3   things and I'll have other occasions to speak
 4   with you, I'm sure.
 5             Now, the Stinney case that you talked
 6   about, was that the young black man who was
 7   executed pursuant to a confession, maybe out of
 8   Sumter County --
 9        A.  Yes.
10        Q.  -- many years ago?
11        A.  In the 1940s, yes.
12        Q.  Yes.  Okay.  I thought I knew which
13   case that was.  I just wanted to be sure.
14             And you were engaged by the persons
15   trying to have him heard on that issue of the
16   voluntariness of the confession; is that
17   correct?
18        A.  Yes.
19        Q.  Okay.
20        A.  And that attorney was Ray Chandler.
21        Q.  Yeah, who's my classmate in law
22   school.  And I thought Jack Sterling (ph) was
23   involved in that case, but I may be wrong.  Dear
24   friend of mine.
25             Can you offer me any explanation just

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA659**

Amanda Salas, MD - 11/10/2021

Page 86

1    to help me understand, what is it that goes

2    through a man's mind or a woman's mind that says

3    it's okay for 21 years to have a four-foot by

4    four-foot window through which we look at

5    children as they get nude, get bathed, get

6    whatever they get, get half dressed, undressed,

7    fully dressed, whatever condition they're in for

8    21 years?

9              MR. DUKES:  Object to form.

10             THE DEPONENT:  The best

11        explanation that I can give is that you have

12        to look at the culture of an institution or

13        whatever you're setting the culture of.  But

14        this is almost like The Emperor Has No

15        Clothes kind of parable.  I think that was a

16        parable.

17   BY MR. RICHTER:

18        Q.  Uh-huh.

19        A.  And it takes a little kid to be able

20   to point out and say he ain't got no clothes on

21   when everybody else is seeing him robed in

22   various degrees of beautiful threads.

23        Q.  Uh-huh.  So are you aware that there

24   were also viewing windows in the school

25   personnel, the office door that went to the

Electronically signed by Nicole White (301-070-154-1752)          aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA660**

Amanda Salas, MD - 11/10/2021

Page 87

1    hallway, it also has a viewing window.  It's

2    about 18 inches, I think.  I don't have a picture

3    of one.

4                    MR. DUKES:  Object to the

5            form.

6                    THE DEPONENT:  Yes, if you're

7            talking about not just the window that's

8            adjacent or shared between locker room and

9            coaches' office --

10   BY MR. RICHTER:

11        Q.  Right.

12        A.  -- but the door to the coaches' office

13   also had what I envisioned to be a paneled

14   window.

15        Q.  Yes.  You're aware of that?

16        A.  Yes.

17        Q.  All right.  And are you aware that

18   students, electricians, maintenance people,

19   termite inspectors, anybody, including fire

20   marshals for the town, may walk up and down that

21   hall at any time, look through the door, the

22   glass that's in the door, over the coaches head

23   or Mr. Rooney's head into the locker room and now

24   it's beyond school personnel viewing, it's

25   anybody viewing those students?

Electronically signed by Nicole White (301-070-154-1752)            aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA661**

Amanda Salas, MD - 11/10/2021

Page 88

 1                    MR. DUKES:  Object to the
 2        form.
 3    BY MR. RICHTER:
 4        Q.  Does that -- can you explain why that
 5    would be tolerated for 21 years?
 6                    MR. DUKES:  Object to the
 7        form.
 8                    THE DEPONENT:  The best of my
 9        ability is to say it gets back to the
10        cultural issue.
11    BY MR. RICHTER:
12        Q.  Okay.  And can you offer any
13    explanation as to why over these 21 years,
14    Bishop England High School, The Diocese of
15    Charleston, all the officials thereof including
16    the bishop, nobody ever told the parents or
17    tuition payers, these children who come here can
18    be viewed through these four-foot by four-foot
19    viewing windows, which we have in each of our
20    three locker rooms?
21                    MR. DUKES:  Object to the
22        form.
23                    THE DEPONENT:  I don't know why
24        they didn't disclose.
25    BY MR. RICHTER:

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

JA662

Amanda Salas, MD - 11/10/2021

Page 89

1          Q.  I can help you with that, but not

2     here.

3               You were asked a question, which

4     either in the form of the question itself or in

5     your response, some how the purpose for putting

6     the windows in the building in the first place

7     was referenced.  You don't know that purpose, do

8     you?

9          A.  I think it was in one of the

10    depositions.  The -- I don't know which one, but

11    I thought that they were cited as being put in

12    there for safety purposes of the list of ideas

13    that Mr. Dukes had presented.

14         Q.  Somebody on the defense, some witness

15    did say a thing like that, but all you know is

16    what somebody said in a deposition, you don't

17    know anything about what the purpose was, the

18    process to put it in place initially, do you?

19         A.  No, I can't speak.  I wasn't a part of

20    the development of the plans or can't speak to

21    that.

22              MR. RICHTER:  Yeah, that's all I

23         wanted to clarify.  And I don't think I have

24         anything else.  Thank you for coming and

25         thanks for being so patient with getting

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 90

1      through this thing.  We appreciate it.

2                  MR. DUKES:  Nothing more from

3      me.  You do have the right to read and sign

4      your deposition.  I'm sure you've been

5      through that process many times.  It's your

6      election.

7                  THE DEPONENT:  Yes.

8                  MR. DUKES:  Okay.  Fair enough.

9                  MR. RICHTER:  And that's fine.

10     Probably a good idea.

11                 MR. DUKES:  Okay.

12     (This deposition concluded at 12:09 p.m.)

13

14                 (Signature reserved.)

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA664**

Amanda Salas, MD - 11/10/2021

Page 91

1                C E R T I F I C A T E

2

3    STATE OF SOUTH CAROLINA   )

4    COUNTY OF BERKELEY         )

5

6            I, Nicole D. White, Certified Court

7    Reporter and Notary Public, State of South

8    Carolina at Large, certify that I was authorized

9    to and did stenographically report the foregoing

10   deposition of Amanda Salas, M.D.; and that the

11   transcript is a true record of the testimony given

12   by the witness, and was sworn as such.

13           I further certify that I am not a

14   relative, employee, attorney or counsel of any of

15   the parties, nor am I a relative or employee of

16   any of the parties' attorney or counsel connected

17   with the action, nor am I financially interested

18   in the action.

19           WITNESS MY HAND AND OFFICIAL SEAL this

20   20th day of November 2021.

21

22   _____

     Nicole D. White

23   Notary Public in and for the

     State of South Carolina

24

25   My Commission expires September 8, 2027

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

**JA665**

Page 92

1                E R R A T A   S H E E T

2

RE:  Nestler, et. al. -vs- The Bishop of
3  Charleston, et. al.

4  DEPOSITION OF:  Amanda Salas, M.D.

5        Please read this original deposition with

6  care, and if you find any corrections or changes

7  you wish made, list them by page and line number

8  below.  DO NOT WRITE IN THE DEPOSITION ITSELF.

9  Return the deposition to this office after it is

10  signed.  We would appreciate your prompt attention

11  to this matter.

12        To assist you in making any such

13  corrections, please use the form below.  If

14  supplemental or additional pages are necessary,

15  please furnish same and attach them to this errata

16  sheet.

17  Page _____ Line _____ Should read:_____

18  _____

19  Reason for change: _____

20  Page _____ Line _____ Should read:_____

21  _____

22  Reason for change: _____

23  Page _____ Line _____ Should read:_____

24  _____

25  Reason for change: _____

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

Amanda Salas, MD - 11/10/2021

Page 93

1    Page _____ Line _____ Should read:_____

2    _____

3    Reason for change: _____

4    Page _____ Line _____ Should read:_____

5    _____

6    Reason for change: _____

7    Page _____ Line _____ Should read:_____

8    _____

9    Reason for change: _____

10   Page _____ Line _____ Should read:_____

11   _____

12   Reason for change: _____

13

14                     _____

15                                   Signature

16

17         SUBSCRIBED and SWORN TO before me this

18   _____ day of _____ 2021.

19

20                     _____

21                               NOTARY PUBLIC

22

23   My Commission expires:_____

24

25

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

**JA667**

# EXHIBIT 5

```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF SOUTH CAROLINA
 2                      CHARLESTON DIVISION

 3
    GARY NESTLER,                        : C/A NO.
 4  VIEWED STUDENT FEMALE 200,             2-21-cv-00613-RMG
    VIEWED STUDENT MALE 300,
 5  on behalf of themselves and
    all others similarly situated,    :
 6
                    Plaintiffs
 7
              vs.                         :
 8
    THE BISHOP OF CHARLESTON, a
 9  Corporation Sole, BISHOP ENGLAND   :
    HIGH SCHOOL, TORTFEASORS 1-10,
10  THE BISHOP OF CHARLESTON, in his
    official capacity, and
11  ROBERT GUGLIELMONE, individually, :

12                  Defendants
    _____
13
    DEPONENT:  PATRICK FINNERAN
14
    DATE:  OCTOBER 22, 2021
15
    TIME:  10:00 a.m.
16
    LOCATION:  SLOTCHIVER & SLOTCHIVER, LLP
17
               751 JOHNNIE DODDS BOULEVARD, SUITE 100
18
               MT. PLEASANT, SC
19

20
    REPORTED BY:  CAROL T. LUCIC, RPR, RMR
21

22
     CLARK BOLEN COURT REPORTING & VIDEO CONFERENCING
23
                  CHARLESTON, SC  29405
24
                      843-762-6294
25
                WWW.CLARK-ASSOCIATES.COM
```

```
 1              A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFFS:

 4              THE RICHTER FIRM, LLC

 5              BY:  LAWRENCE E. RICHTER, JR., ESQ.

 6                   622 JOHNNIE DODDS BOULEVARD

 7                   MT. PLEASANT, SC  29464

 8                        and

 9              SLOTCHIVER & SLOTCHIVER

10              BY:  DANIEL S. SLOTCHIVER, ESQ.

11                   751 JOHNNIE DODDS BOULEVARD

12                   SUITE 100

13                   MT. PLEASANT, SC  29464

14                        and

15              BRENT SOUTHER HALVERSEN, LLC

16              BY:  BRENT S. HALVERSEN, ESQ.

17                    751 JOHNNIE DODDS BOULEVARD

18                    SUITE 200

19                    MT. PLEASANT, SC  29464

20

21

22

23

24

25
```

```
 1   ON BEHALF OF THE DEFENDANTS:

 2                TURNER PADGET

 3                BY:  RICHARD S. DUKES, ESQ.

 4                     40 CALHOUN STREET

 5                     SUITE 200

 6                      CHARLESTON, SC  29401

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2

 3                  PATRICK FINNERAN

 4                  OCTOBER 22, 2021

 5

 6    EXAMINATION                              PAGE

 7    BY MR. SLOTCHIVER                          5

 8

 9    CERTIFICATE OF REPORTER                    83

10

11                      EXHIBITS

12    NO.                                      PAGE

13    1         Notice of Deposition            6

14

15

16

17

18

19

20

21

22

23

24

25              (Exhibit attached.)
```

```
 1                PATRICK FINNERAN,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                  EXAMINATION
 5   BY MR. SLOTCHIVER:
 6      Q.    Mr. Finneran, you and I had an opportunity
 7   to meet several weeks ago, I believe, when I took
 8   your deposition more or less.
 9      A.    Yes.
10      Q.    So I'm going to through a very quick
11   refresher course on the rules because we're
12   required to, but if you have any questions or you
13   want to go into more detail, please let me know.
14      A.    Sure.
15      Q.    I'm going to ask you a series of
16   questions.  I'm going to ask you to answer to the
17   best of your ability.  Okay?
18      A.    Okay.
19      Q.    I'm going to ask you to answer orally.
20      A.    Yes.
21      Q.    If you nod your head or you say uh-huh or
22   unh-unh, the problem is that while I may understand
23   you, the court reporter won't take it down.
24      A.    Yes, sir.
25      Q.    Fair enough?
```

1      A.     Yes, sir.

2      Q.     If you deviate from that, I'm going to

3   correct you not to chastise you, but just so we

4   have a good record.

5      A.     Yes, sir.

6      Q.     I don't think this is going to take very

7   long today, but if you need a break at any time,

8   let me know.

9      A.     Okay.

10      Q.     The only rule is that once we start you

11   can't talk to your lawyer.

12      A.     Yes, sir.

13      Q.     Do you have any questions before we get

14   going?

15      A.     No.

16      Q.     Any reason why today would not be as good

17   a day as any day to take your deposition?

18      A.     No, sir.

19      Q.     Fair enough.

20           (Deposition Exhibit No. 1 was marked.)

21      Q.     I'm going to hand you what I've marked as

22   an exhibit, which is a copy of the Notice that

23   we've sent.  Have you seen this before?

24      A.     Yes, sir.

25      Q.     If you will turn to the exhibit, we have

1  listed Exhibits 1 through 16, and my understanding

2  is that you are the 30(b)(6) designee by the

3  Diocese, Bishop England to respond to these topics.

4      A.    Yes, sir.

5      Q.    You understand that a 30(b)(6) designee

6  means that you are speaking on behalf of the

7  defendant in this case?

8      A.    Yes, sir.

9      Q.    So this is not you speaking individually

10  of your own personal knowledge; it's you speaking

11  on behalf of that entity.

12      A.    Yes, sir.

13      Q.    Have you had an opportunity to read 1

14  through 16?

15      A.    Yes, sir.

16      Q.    Are you the person with the most knowledge

17  to talk about these subjects?

18      A.    Yes, sir.

19          MR. DUKES:   Object to the form.

20      Q.    As you know, we may hear object to form.

21  If we do, I may rephrase the question; I may not,

22  but you can still answer the question as Rich and I

23  a lot of limitations set on us by the Supreme Court

24  about what we can do in a deposition like it or not

25  for us, but it's where we are.

1      A.     Yes, sir.

2      Q.     We're going to through these in a moment.

3             Just for the record you are still the

4   principal of Bishop England?

5      A.     Yes, sir.

6      Q.     What have you done in preparation for

7   today's deposition?

8      A.     I have reviewed our policies, spoken with

9   other individuals who have been at the school

10  longer than I have, and looked through other files

11  that we have at the school.

12     Q.     Who did you speak to?

13     A.     Mr. Runey, who has been there for close to

14  50 years.  That's pretty much it.

15     Q.     Mr. Runey's capacity at the school?

16     A.     He is the athletic director.

17     Q.     Is he doing better?

18     A.     He has an appointment on Monday.  I think

19  he has surgery on Monday.

20     Q.     Oh, he does?  I thought he was

21  hospitalized for COVID.

22     A.     He was, and then he had --

23     Q.     Other issues?

24     A.     Yes.

25     Q.     I understand how health can lead to other

1    issues, but he's better from the COVID?

2        A.    Yes.

3        Q.    I'm glad to hear it.

4              What documents have you reviewed, if you

5    recall?

6        A.    Our handbooks, the child protection policy

7    of the Diocese, and I reviewed any personnel files

8    that we have on campus.

9        Q.    As to your handbooks and regulations, are

10   those the same documents that would have been

11   provided to us through discovery?

12       A.    Yes, sir.

13       Q.    The personnel files, those are not things

14   we've seen through discovery; correct?

15       A.    Not to my knowledge.

16       Q.    Whose personnel files did you review?

17       A.    I just went through current and past

18   employees, just kind of seeing if there were any

19   issues, red flags, that kind of stuff.

20       Q.    We'll come back to it.  Did you find any?

21       A.    No.

22       Q.    Today I'm going to ask you a series of

23   questions regarding these topics, and I'm going to

24   ask you to answer to the extent that you have an

25   answer.

1      A.    Yes, sir.

2      Q.    If it is going to be speculation and you

3   still want to answer, I'm going to ask you to tell

4   me this is pure speculation.

5      A.    Yes, sir.

6      Q.    Let's look at No. 1.  No. 1 refers to

7   rules, regulations, policies, procedures,

8   recommendations, or instructions given to staff

9   members regarding the windows in the locker room

10  and/or locker room safety which is the subject of

11  the lawsuit from the construction period through

12  when they were boarded up; correct?

13     A.    Yes.

14     Q.    Is it easier and better for me to break

15  this down into rules and then regulations and then

16  policies one at a time or is this something you can

17  speak about on a global response?

18     A.    On a global response.

19     Q.    When we talk about rules, regulations,

20  policies, procedures, and recommendations, the

21  first question I have for you is are any of these

22  written?

23     A.    Up until the windows were boarded there

24  were no written rules beyond the safe haven

25  policies of the Diocese.

1    Q.    We've spoken about the safe haven policies

2    during your deposition in your capacity as a

3    principal, and my understanding is that is a type

4    of program that you send different staff members to

5    to learn about safety.

6    A.    Any person who is employed or volunteers

7    at any of the schools or deals with children has to

8    go to the safe haven training, also review the

9    child protection policy, and sign off on a code of

10   conduct.

11   Q.    Was that safe haven program in effect in

12   1998?

13   A.    In '98?  No, it was not.  The Diocese had

14   a different policy that started in 1994.

15   Q.    That started in --

16   A.    1994.

17   Q.    1994.

18         Tell me about the different programs that

19   would have been in effect from the time the school

20   was opened on Daniel Island.

21   A.    So the Diocese of Charleston had their

22   stand-alone policy in 1994, which was set up prior

23   to.  In 2002 the USCCB created the policy for child

24   protection for all Dioceses in the United States,

25   and in that policy every Diocese has to have a

1  policy within their Diocese that requires

2  background checks, child protection training, and

3  continuation of that training going forward.

4     Q.    So to make sure I understand correctly,

5  between 1998 when the school was opened and 2004 --

6     A.    Let me correct that.  2003 is when the

7  Diocese of Charleston created theirs.

8     Q.    So for the first five years of the opening

9  of the school there were no policies, rules,

10  regulations, recommendations, or instructions given

11  to the staff members at Bishop England High School

12  regarding the windows in the locker room and/or the

13  locker room safety which is the subject of this

14  lawsuit.

15        MR. DUKES:  Object to the form.

16     Q.    Is that correct?

17     A.    That is not correct because in 1994 the

18  Diocese had their own policy that would have

19  covered that part of it.  There was never a policy

20  as far as using the windows for viewing, but

21  protection of children, that policy was in effect

22  in 1994.

23     Q.    What was that protection from 1994 until

24  it changed in 2003?

25     A.    So in 1994 -- forgive me; I don't know the

1  exact wording of it -- there were four parts of

2  that that required transparency, cooperation with

3  civil authorities, training for individuals, and I

4  can't remember the fourth one, but it was in effect

5  in 1994.

6      Q.    How did that apply to the windows in the

7  locker room?

8      A.    Your question is about child safety, so...

9      Q.    My question is about rules, regulations,

10  policies, procedures, recommendations, or

11  instructions given to any and all staff members

12  regarding the windows in the locker room or the

13  locker room safety.  How did that apply to that?

14     A.    Child protection goes across the board as

15  far as protecting children no matter what situation

16  they're in.  As far as your question, there were no

17  rules, regulations, or policies.

18     Q.    When you say "transparency," what does

19  that mean?  So that everybody knows what is going

20  on?

21           MR. DUKES:  Object to the form.

22     A.    I don't know what their intent of that

23  conversation was.

24     Q.    What does "transparent" mean to you?

25     A.    It means that you are open about what

1    happens.

2         Q.    Or open disclosure between the students

3    and the staff?

4              MR. DUKES:  Object to the form.

5         A.    What do you mean by that?

6         Q.    Once again, I can read the language, the

7    same rules, regulations, policies, procedures,

8    recommendations, or instructions, the same language

9    we read three times, how was that implemented --

10   how did they apply from 1998 until 2003?

11        A.    There were no specific rules, regulations,

12   policies, or procedures about the locker room

13   windows or locker room safety.

14        Q.    Fair enough.

15             Now we move to 2003.  Is that when there

16   were rules, regulations, policies, procedures, et

17   cetera, regarding locker room windows and locker

18   room safety?

19        A.    No.  2003 was the implementation of the

20   overall USCCB and Diocese policy for safe haven,

21   and that's when the training that everybody had to

22   go to was in effect.

23        Q.    But the training didn't apply particularly

24   to viewing windows; correct?

25        A.    No.

1      Q.     And it didn't apply particularly to the

2    locker rooms?

3      A.     No.

4      Q.     It was just general training that would

5    apply in the classrooms, in the hallways, just

6    training regarding safety?

7      A.     Yes.

8      Q.     When were rules, regulations, policies,

9    procedures, recommendations, or instructions

10   created for the purpose of giving it to the staff

11   members regarding the windows in the locker room or

12   locker room safety?

13     A.     There has never been a policy as far as

14   the windows in the locker room, but in 2018, July

15   of 2018, the Diocese created a policy regarding

16   staff members in the locker room and bathrooms.

17     Q.     You testified in your deposition to the

18   policies that were created in 2018.  That's the

19   same ones you're referring to now?

20     A.     Yes.

21     Q.     I'm just trying to make sure we're on the

22   same page.  So as it applies to Exhibit A, when I

23   ask about you rules, regulations, policies,

24   procedures, recommendations, or instructions given

25   to any and all staff members of Bishop England High

1    School regarding the windows in the locker room

2    and/or locker room safety which is the subject of

3    the lawsuit from the period of construction through

4    when the windows were boarded up, is it your

5    testimony that this did not exist until 2018 when

6    it was implemented?

7        A.    Yes.

8        Q.    We can go to No. 2.  No. 2 just for the

9    record, what changes were made and when were they

10   made to the rules, regulations, policies,

11   procedures, recommendations, or instructions given

12   to any and all staff members of Bishop England High

13   School regarding the windows in the locker room

14   and/or locker room safety which is the subject of

15   this lawsuit from the period of construction

16   through when the windows were boarded up.  I think

17   I know the answer.  I think the answer is there

18   were no changes because there were no policies or

19   rules or regulations.

20       A.    Well, the policy regarding locker room and

21   bathroom safety in 2018 would have come before the

22   windows were boarded up.

23       Q.    So in response to this topic then there

24   were no changes to this litany of items until --

25       A.    2018.

1    Q.    -- 2018, and then we discussed what
2  happened from 2018 forward in your deposition?
3    A.    Yes.
4    Q.    Are you adopting and agreeing that your
5  testimony in your deposition regarding the rules
6  created in 2018 and forward are correct, your
7  testimony is correct?
8         MR. DUKES:  Subject to his right to read
9  and sign regarding his deposition.
10        MR. SLOTCHIVER:  Has that not taken place?
11        MR. DUKES:  I think we've just received
12 it, and I've sent it to him.  I'm not making an
13 objection or a speaking objection.  I'm just
14 clarifying.
15        MR. SLOTCHIVER:  That's fine.  I just want
16 to make sure that we're all on the same page, and I
17 thought that would be your answer, but I wanted to
18 make sure.
19    Q.    Just to be abundantly clear, so there were
20 no instructions given to the staff members
21 regarding the windows in the locker room or locker
22 room safety, correct, during that time period until
23 2018?
24    A.    There were no policies regarding locker
25 room safety until 2018 when that policy came about.

1  There is no policy as far as locker room windows.

2      Q.      The question is not just locker room

3  safety.  It's also instructions given to any and

4  all staff members of Bishop England High School

5  regarding the windows in the locker room and/or

6  locker room safety.

7          So as to both of those items there were no

8  instructions given?

9      A.      No.

10     Q.      That is correct; right?

11     A.      Yes.

12     Q.      Let's go to No. 3.  What, if any, studies,

13 meetings, or discussions were had regarding rules,

14 regulations, policies, procedures, recommendations,

15 or instructions referenced in Nos. 1 and 2 above.

16          Did I read that correctly?

17     A.      Yes.

18     Q.      Were there any?

19     A.      When the new policy came in 2018, at the

20 opening faculty meeting it would have been

21 discussed, told what the new policies are as all

22 the other policies that had changed.

23     Q.      What about before 2018?

24     A.      There were no policies or rules, so there

25 was no discussion.

1      Q.    Were there any studies, meetings, or
2   discussions had regarding rules, regulations,
3   policies, procedures, recommendations, or
4   instructions?
5      A.    No.
6           (Brief recess)
7      Q.    If I'm not mistaken, we had just finished
8   No. 3; correct?
9      A.    Yes, sir.
10     Q.    Let's go to No. 4.
11     A.    Okay.
12     Q.    Safety incidents in the girls or boys
13  locker room before 1998.
14     A.    We have no record of any of those because
15  we don't keep student discipline records.
16     Q.    Is it fair to say that for the school or
17  the Diocese, if they were to testify about any
18  safety incidents in the girls or boys locker room
19  prior to 1998, it would be speculation?
20     A.    Yes.
21     Q.    And the official response is that you're
22  not aware of any?
23     A.    I'm not aware of any.
24     Q.    Is included in safety just to make sure
25  we're on the same page -- would that apply to

1  harassment, bullying?

2     A.    You're the one who wrote the question, so

3  I would ask you that.

4     Q.    I'm asking you.  Your response, does that

5  apply to harassment?

6     A.    Safety would probably be, yes, harassment,

7  bullying, anything that would affect a child.

8     Q.    Smoking?

9     A.    That would be a safety issue.

10    Q.    Hazing?

11    A.    That would be a safety issue.

12    Q.    And the same response; you're not aware of

13 any?

14    A.    I'm not aware of any.

15    Q.    You're speaking on behalf of the school?

16    A.    Yes.

17    Q.    And to testify about any would be pure

18 speculation?

19    A.    Yes, sir.

20    Q.    You are the person with the most knowledge

21 on that topic based on your designation; correct?

22         MR. DUKES:  Object to the form.

23    A.    I have the knowledge that there are no

24 records of anything.

25    Q.    I just want to make sure nobody comes in

1  tomorrow and says I have information.  You're

2  testifying for the Diocese.  They've designated you

3  on this topic; correct?

4     A.    Yes.

5     Q.    How about, No. 5, safety incidents in the

6  girls or boys locker rooms after 1998?

7     A.    I believe you were provided three

8  different incidents.  One was a wallet that was

9  stolen, another one was a video of a student in the

10  boys locker room saying inappropriate things, and

11  the other one was a video in the girls locker room

12  of a student who was getting changed, but was being

13  made fun of in that video by the person taking the

14  video.

15     Q.    Obviously there is a fourth one, which

16  would have been the Scofield incident.

17     A.    Yes.

18     Q.    Other than those four incidents, is it

19  your testimony as the designee that the school is

20  not aware of any other safety incidents that have

21  occurred in the girls or boys locker room after

22  1998?

23     A.    There is no record of any other incidents.

24     Q.    Does that include 1998?

25     A.    Yes.

1    Q.    Just to be clear, you said you're not

2  aware of any record.  Would that apply to the fact

3  that you're not aware of any events?

4    A.    That would be speculation on my end, so I

5  wouldn't know.  There is no record beyond the three

6  that we have.

7    Q.    I think that was just a miscommunication.

8         When you say there is no record, does that

9  also mean that you're not aware of any event?

10   A.    Yes.

11   Q.    And to be aware of an event would be

12 speculation?

13   A.    Yes.

14   Q.    For the record my recollection -- and I

15 want to make sure this is correct in today's

16 deposition -- my recollection is when you testified

17 in your prior deposition as the principal, your

18 testimony was that none of those three incidents or

19 even Scofield, his incidents, were detected by use

20 or utilization of the windows in front of the

21 coaches' office into the locker room?

22   A.    I would have to go back and read what I

23 said on that point.  If you're asking me what I

24 said in that deposition, I would have to go back

25 and read it.

1      Q.    I'm asking if that testimony is correct

2  regardless of whether you said it not.

3      A.    The windows were never used as far as

4  those three incidents.

5      Q.    So the windows did not assist in any way

6  in rendering those findings of those incidents?

7      A.    Of the three incidents we provided, yes.

8      Q.    Or any incidents ever?

9      A.    Yes.

10     Q.    The viewing windows from the coaches'

11  office into the locker room have never demonstrated

12  or showed or led to a finding of a safety incident;

13  correct?

14     A.    Not to my knowledge.

15     Q.    That said, you would agree with me they

16  did provide a mechanism for a safety violation,

17  correct, being Scofield?

18         MR. DUKES:   Object to the form.

19     A.    Can you rephrase that for me?

20     Q.    Sure.  You would agree with me that

21  Scofield utilized those windows in order to violate

22  safety procedures?

23     A.    Yes, he utilized the windows to do what he

24  did.

25     Q.    So on one hand the windows were never

1  successful in preventing a safety incident, and on

2  the other hand the windows were successful for a

3  perpetrator who wanted to violate safety.

4          MR. DUKES:  Object to the form.

5      Q.    Correct?

6      A.    Mr. Scofield did use the windows to do

7  what he did.

8      Q.    I understand he did, but that's not my

9  question.

10          On the one hand they were not successful

11  in preventing any safety problems, but they were

12  successful in allowing somebody a vehicle or a

13  mechanism to violate safety?

14          MR. DUKES:  Object to the form.

15      A.    I guess my answer to that would be I don't

16  know if the presence of the windows made the

17  children behave better, which made them safer.  I

18  don't know.

19      Q.    That would be speculation; right?

20      A.    That would be speculation on my part.

21      Q.    My question to you was not speculation.

22  My question was fact.

23          You would agree with me that on the one

24  hand the windows did not ever from the time they

25  were built prevent a safety incident or help detect

1    a safety incident; correct?

2              MR. DUKES:  Object to the form.

3        A.    There is no record that they prevented

4    anything.

5        Q.    That's not the question.

6        A.    Yes.  To my knowledge they did not prevent

7    anything.

8        Q.    But they were utilized by a perpetrator to

9    create a safety incident?

10       A.    Yes, Mr. Scofield used the windows.

11       Q.    Had the windows not been there, Scofield

12   could not have used the windows to violate the

13   privacy of the children.

14             MR. DUKES:  Object to the form.

15       Q.    Correct?

16       A.    That would be correct, yes.

17       Q.    Let's move on to No. 6:  Disposal of the

18   viewing windows which are the subject matter of

19   this lawsuit.  I read that correctly?

20       A.    Yes.

21       Q.    We had touched on this previously at your

22   deposition.  Have you learned anything new since

23   that time?

24       A.    Yes.

25       Q.    What can you tell us about the disposal of

1   the viewing windows?

2      A.    When the windows were removed, they were

3   taken to the dump.

4      Q.    When were they taken to the dump?  Do you

5   know the date?

6      A.    I don't know the exact date, no.

7      Q.    At whose instruction were they taken to

8   the dump?

9      A.    I don't know who gave the final

10  instruction as far as taking them to the dump.

11     Q.    Who gave any instruction to take them to

12  the dump?

13     A.    I don't know.  It was not a school

14  employee who did that.

15     Q.    We talked in your deposition, and I don't

16  want to rehash your testimony, about the spoliation

17  letter; correct?

18     A.    Yes.

19     Q.    Did the school take any effort as a result

20  of the spoliation to stop or limit or prohibit the

21  disposal of the viewing windows?

22           MR. DUKES:  Object to the form.

23     A.    No.

24     Q.    So it's fair to say that the school made

25  arrangements to have the windows boarded up after

1    Scofield; correct?

2        A.    Yes.

3        Q.    And then at some point the school made

4    arrangements to have the windows taken out?

5        A.    Yes.

6        Q.    When the windows were taken out, there was

7    no effort made to preserve those windows?

8        A.    No.

9        Q.    I think I know what you mean, but because

10   of the way I asked the question is that a yes,

11   there was no effort made to protect the windows?

12       A.    There was no effort made to save the

13   windows.

14       Q.    I knew what you meant.

15            Let's move on to No. 7:  History of Bishop

16   England High School staff that were accused of

17   sexual harassment and/or abuse before 1998.

18            I know you testified at the beginning of

19   this deposition that you have reviewed some

20   personnel files.  What information do you have in

21   response to No. 7?

22       A.    We have no record of any staff member who

23   was working at Bishop England who was accused of

24   sexual harassment or abuse.

25       Q.    Before 1998?

1      A.     Before 1998.

2      Q.     When you say "no record," do you have any

3  knowledge?

4      A.     No knowledge.

5      Q.     Before 1998 if I understood your testimony

6  correctly, you were not doing background checks of

7  teachers or people working at the school; correct?

8      A.     I don't know if they did background checks

9  at that point.  I don't know if that was part of

10  their policy in 1994.

11      Q.     You don't know one way or the other?

12      A.     I don't know.

13      Q.     When is the first time that you are aware

14  that background checks were implemented?  Was that

15  in 2003?

16      A.     2003, yes.

17      Q.     Were background checks also done on

18  nonemployees, but volunteers?

19      A.     Yes.

20      Q.     Scofield as I understand had been a

21  volunteer for some time before he was an employee;

22  is that correct?

23      A.     He was a volunteer and a part-time

24  employee, not a full-time employee.

25      Q.     How about No. 8:  History of the Bishop

1    England High School staff that were accused of

2    sexual harassment and/or abuse after 1998,

3    including, but not limited to, Scofield.  Let's

4    start with non-Scofield.

5        A.    There is no current employee who was

6    accused of sexual harassment or abuse.  We did have

7    a former employee who after he was separated from

8    employment was accused, and we cooperated with the

9    police to give them all the information they needed

10   to help investigate that issue.

11       Q.    Who was that?

12       A.    Jim McClellan.

13       Q.    How long had Jim McClellan been working at

14   Bishop England High School before he left?

15       A.    I don't know.  I couldn't tell you.

16       Q.    Was he terminated or did he leave

17   voluntarily?

18       A.    He was terminated.

19       Q.    So he was fired?

20       A.    He was relieved of his duties.  He was

21   assistant volleyball coach.

22       Q.    If he applied to work at a different

23   school, would his record say that he left or would

24   it show that he was fired?

25       A.    However he puts it down.  There was no

1  termination letter.

2     Q.    So if somebody contacted Bishop England

3  High School to get a reference on McClellan, would

4  Bishop England inform them that he had been

5  terminated or fired or would they say he just no

6  longer works there?

7     A.    We wouldn't provide a reference.  We would

8  recommend they contact the Diocese.

9     Q.    If the Diocese were contacted because

10  you're speaking on their behalf today also, would

11  you advise the new employer that he had been

12  terminated or fired or something else or would you

13  merely say he no longer works there?

14        MR. DUKES:  Object to the form.

15     A.    I don't know what they would say.  They

16  would probably give the dates of his employment,

17  when he started and when he ended.

18     Q.    Understanding that that would not give the

19  new employer or potential employer vital

20  information as to why this guy could be a problem

21  to hire.

22        MR. DUKES:  That's outside of the scope of

23  the exhibit.  Object to the form.

24     Q.    Correct?

25     A.    He was not terminated for the allegations

1    that came afterwards.

2        Q.    Well, why was he terminated?

3        A.    We have a policy where coaches and

4    employees cannot directly communicate via text with

5    students, and he violated that by texting with a

6    student, and when that came to light, he was let

7    go, relieved of his duties.

8        Q.    Let's walk the timetable.

9              So he violated the texting policy and was

10   discharged?

11       A.    Yes.

12       Q.    When was that?

13       A.    It would have been the fall of 2018.

14       Q.    What was the issue that came to light with

15   the investigation by the police?

16       A.    We were contacted by the police in the

17   summer of 2019 that a former player, a former

18   student from a conversation with the police in a

19   counseling setting said that Mr. McClellan either

20   acted inappropriately or did something

21   inappropriately.  They didn't go into the details

22   of it, but they asked us if we could provide

23   information on all the students who were on the

24   team at that point, and we provided that

25   information so they could investigate it.

1    Q.    Prior to the summer of 2019 when the
2  police came to see you about the incident they were
3  provided regarding the child who had discussed some
4  information at counseling was Bishop England or the
5  Diocese ever advised that there was inappropriate
6  conduct or were you ever apprised of allegations of
7  inappropriate conduct regarding McClellan?
8    A.    Not to my knowledge.
9    Q.    No parent had ever come and met with
10 anyone from the school and complained about conduct
11 by McClellan?
12   A.    Not conduct.  Language was one and playing
13 time was one, but never conduct.
14   Q.    What kind of language?
15   A.    Cursing.  I think they word they used was
16 either hell or shit.  I don't remember exactly
17 which one.
18   Q.    How about inappropriate touching?
19   A.    There was never a complaint -- well, there
20 was never a substantiated complaint of
21 inappropriate touching.  There was a student who
22 was not a Bishop England student who made an
23 allegation that it happened to him.  We
24 investigated, and the student said it never
25 happened.

1    Q.    Who said it never happened?

2    A.    The student who was the one who was

3  supposedly touched.

4    Q.    So the only incident was one that you were

5  alerted of having taken place, and the student

6  either recanted it or defended it and said that is

7  not what took place?

8    A.    The student never complained.  It was a

9  different student who said that happened, so when

10  we investigated, the student had no understanding

11  of why they would say that.

12    Q.    There was never anything else, any other

13  complaints about McClellan?

14    A.    Not to my knowledge, no.

15    Q.    Did you review the texts that led to him

16  being discharged?

17    A.    Yes.

18    Q.    What was the content of the texts?

19    A.    Most of the texts were trying to get the

20  student to go to extra time for volleyball.  There

21  were some inappropriate texts, I would say

22  inappropriate, or not necessary to have asking if

23  she was feeling okay and that kind of stuff, but in

24  general texting with students is against our

25  policy.

1    Q.    Have you maintained a copy of those texts?

2    A.    I believe that we do have them, yes.

3    Q.    If we were to send supplemental discovery,

4 assuming it doesn't fit into what we've already

5 sent, is that something you can provide to your

6 counsel?

7    A.    I would think we have those, but I would

8 have to look.

9    Q.    Tell us more about the appropriate content

10 of the texts.  Was it sexual in nature?

11    A.    No, not to my memory it was not sexual in

12 nature.  Most of it was just trying to get her to

13 extra practice and asking how she was feeling,

14 which I don't think is appropriate.

15    Q.    Is it your testimony that prior to the

16 time that this texting came about the Diocese and

17 Bishop England were not aware of any complaints

18 that he had inappropriately touched some of the

19 students?

20    A.    Yes.

21    Q.    Did the texts include any content such as

22 if you have been drinking and need help, I'm happy

23 to come get you?

24    A.    I don't remember.  I would have to review

25 the texts.

1    Q.    Does that sound familiar to you?

2    A.    It is possible, but I don't know.  It

3  would be speculation on my part.  I would have to

4  review it to make sure.

5    Q.    Where would that information be?  It would

6  be maintained in the personnel file for McClellan;

7  is that correct?

8    A.    I don't know where it would be.  I would

9  have to see where it would be.  I'm not sure.

10    Q.    Does it seem like something that would be

11  significant enough that it should have been

12  maintained?

13        MR. DUKES:  Object to the form.

14    A.    It's something we probably have.  I don't

15  know 100 percent.

16    Q.    Let me back up one second and ask you a

17  couple of questions that I overlooked on the window

18  removal.

19        Do you have the date that they

20  were destroyed or taken to the dump?

21    A.    I don't recall the date, no.

22    Q.    Is there any document that you would have

23  that would be able to show us the date that they

24  would have been destroyed?

25    A.    I don't know if I would have a document.

1  I could find out from the company that removed the

2  windows.

3      Q.    Who was that company?

4      A.    Maner Construction.

5      Q.    Who in particular at Maner Construction

6  were you working with?

7      A.    I did not work with them.  Our director of

8  operations --

9      Q.    When I say "you" in this context, it's an

10 odd concept, but you're speaking globally.

11     A.    Michael Dennis is the person that worked

12 with them.

13     Q.    Did the school, the Diocese have any

14 discussions with Michael Dennis about them being

15 removed?

16     A.    Just that they needed to be removed.

17     Q.    Was he advised not to destroy them or to

18 destroy them?

19     A.    No, neither way.  Just to remove them.

20     Q.    So it was not blocked by the school, but

21 it wasn't encouraged by the school.  Is that your

22 testimony?

23     A.    That's correct.

24     Q.    We've already talked about the spoliation

25 letter.

1    McClellan had been there for several years

2  prior to being terminated; correct?

3    A.    I don't know how long he was employed.  He

4  was there for several years.  I mean he was

5  there when I got there.  I would say several would

6  be more than two.

7    Q.    Is a text violation considered a major

8  violation?

9    A.    It is a major violation of our child

10 protection policy.

11   Q.    Did the Diocese consider placing him in a

12 different position or a different school?

13   A.    No.  He was an assistant volleyball coach.

14   Q.    Do you know where he is now?

15   A.    I have no idea.

16   Q.    Did the Diocese reach out to any new

17 school he has been employed at since then or you

18 don't know?

19   A.    I don't know.

20   Q.    The next question I think you've answered,

21 No. 9, but let's just talk about it for a second to

22 make sure that we're on the same page.

23   A.    Yes, sir.

24   Q.    It reads:  Actions taken by any defendants

25 to address Nos. 7 and 8 above, which were the

1    history of staff that were accused of sexual

2    harassment before '98 or after '98, including, but

3    not limited to Scofield.  Let's still not talk

4    about Scofield yet so much.  We'll come back to him

5    in one second.

6            Is the only action that you've taken that

7    dealing with McClellan?

8        A.    Yes.

9        Q.    There was no other that you were aware of?

10       A.    Yes.

11       Q.    So if there were other events that did

12   take place at the school, they did not matriculate

13   down to giving knowledge to the Diocese or to

14   Bishop England?

15       A.    Could you rephrase?

16       Q.    I'll withdraw that.  Let's talk about

17   Scofield.

18       A.    Sure.

19       Q.    Tell me about what you understand Scofield

20   did that was wrong.

21       A.    Mr. Scofield videoed three -- five

22   students in the locker room.

23       Q.    Five that we know of; correct?

24       A.    Yes, five that we know of.

25       Q.    Whether he videotaped more we don't know;

1    it would be speculation?

2        A.    Yes.

3        Q.    Whether he watched them before he

4    videotaped we don't know; correct?

5        A.    We don't know.

6        Q.    But he certainly had access to the locker

7    room?

8        A.    His office was outside the varsity locker

9    room.

10       Q.    So if he wanted to look at the children in

11   various states of dress or undress or nudity, he

12   could have; you just don't know?

13       A.    I have no knowledge of that.

14       Q.    But he could have had he wanted to?

15             MR. DUKES:  Object to the form.

16       A.    His office was there where the window was,

17   so it's possible.

18       Q.    We've talked about the window, we've

19   talked about the type of blinds.  The opportunity

20   was there if he wanted to utilize it.

21             MR. DUKES:  Object to the form.

22       Q.    Correct?

23       A.    Yes.

24       Q.    So how did videotape them?  What did he

25   do?

1    A.    I don't know exactly how he did it.  It

2   would only be speculation from what came out of the

3   investigation from the police.

4    Q.    So when the Diocese learned of the video,

5   what investigation did they do to figure out how he

6   was able to do this undetected?

7    A.    As soon as we were made aware of that

8   information we contacted the police, and the police

9   came and they took the investigation from there.

10    Q.    Well, the police were able to determine or

11   to confirm that he did it; right?

12    A.    Yes.

13    Q.    And we knew that because it's on a

14   videotape?

15    A.    Yes.

16    Q.    So we knew somebody did it; right?

17    A.    Yes.

18    Q.    My question to you is what investigation

19   was done to determine how it was that he was able

20   to do this undetected?

21    A.    There was no actual investigation.

22   Mr. Scofield admitted to what he did.

23    Q.    What investigation was done to insure that

24   nobody else could ever do what he did?

25    A.    As soon as the incident happened we

1  boarded up the windows.

2      Q.    I understand that, but my question is what

3  investigation was done to make sure that nobody

4  else could do what he did?

5          MR. DUKES:  Object to the form.

6      A.    I guess I need clarification.  Do you mean

7  currently or in the past prior to Mr. Scofield?

8      Q.    Well, you previously testified in your

9  deposition as the principal I think you will recall

10  that the windows weren't boarded up because of

11  Scofield; they were boarded up because parents were

12  concerned and you wanted to alleviate that concern.

13     A.    Yes.

14     Q.    It wasn't because of Scofield or what he

15  had done?

16     A.    Well, Mr. Scofield's actions led to that

17  concern.

18     Q.    But it wasn't a concern of the school.  It

19  was a concern of the parents; correct?

20          MR. DUKES:  Object to the form.

21     A.    The parents were concerned, yes.

22     Q.    It wasn't a concern of the school.  It was

23  a concern of the parents; right?

24          MR. DUKES:  Object to the form.

25     A.    Well, his actions were a concern of the

1    school, yes.

2        Q.    I understand that, but the windows looking

3    from the coaches' office into the locker room,

4    those weren't a concern to the school.  They were a

5    concern to the parents; correct?

6            MR. DUKES:  Object to the form.

7    A.    Not necessarily, no.

8        Q.    So did the school have concerns then that

9    arose after Scofield used the windows?

10   A.    It would go back to our conversation

11   before that they were never utilized for anything.

12   They never led to any kind of reported incidents,

13   so they were not useful.

14       Q.    Fair enough.

15           So as I understand it, the school has

16   stated, the Diocese, the defendants have stated

17   that the purpose of the windows from the coaches'

18   office into the locker room were to allow the

19   school to monitor for such things as bullying,

20   harassment, fights, smoking; correct?

21   A.    Yes, sir.

22       Q.    We talked about the fact that there is an

23   element of invasion of privacy by being able to

24   look at the children in various states of dress or

25   undress, but the balance was safety; correct?

1       A.      Yes.

2       Q.      So the benefit of the safety in the

3   defendants' eyes, the church, the Diocese, the

4   Bishop England High School -- the balance of the

5   safety outweighed the privacy issue to the

6   children.

7               MR. DUKES:   Object to the form.

8       Q.      Correct?

9       A.      I was not involved in the discussion when

10  the windows were put in when the school was built.

11      Q.      I'm not asking that.

12      A.      I understand that.  So it would be

13  speculation on my part as to what any discussion of

14  that was, but safety was the reason the windows

15  were put in.

16      Q.      But now looking ahead from '98 until the

17  Scofield incident, I take it the school realized

18  that we're not getting the benefit of safety with

19  these windows because there are no incidents that

20  have ever taken place that have been utilized or

21  found by the windows?

22      A.      Yes.

23      Q.      But we do have privacy issues that we are

24  invading the privacy of the kids without the

25  benefit of safety.

1              MR. DUKES:  Object to the form.

2       Q.    Correct?

3       A.    As I mentioned before at the last

4  deposition, the blinds were always closed, so the

5  privacy issues were --

6       Q.    I think what you testified to in your

7  prior deposition was to your knowledge they were

8  always closed.

9       A.    To my knowledge they were always closed.

10      Q.    And you also testified in your prior

11 deposition at first that the windows, if they were

12 open, the students would know they were open.

13      A.    Yes.

14      Q.    Then I read to you if you recall the

15 deposition transcript of the engineer or of the

16 architect who testified that actually the way the

17 windows and the blinds were utilized someone in the

18 coaches' office could in fact look at the children

19 without the children knowing that they're being

20 looked at; correct?

21             MR. DUKES:  Object to the form.

22      A.    I don't remember that part.

23      Q.    I'm going to use this to refresh your

24 recollection.  I'm going to read verbatim from the

25 deposition where you made the same statement you

1   made just now.

2          Starting on Page 22, Line 23:  "I'm going

3   to read to you some testimony that was provided to

4   us from the deposition from LS3P."

5          Your response was:  "Okay."

6          Excuse me.  I said it wrong.  Going to

7   Page 87 -- this was 86, now 87 -- "I'm going to ask

8   you if you have any knowledge of this."

9          You said:  "Okay."

10         "I'm doing it for the purpose, number one,

11  to ask you questions; number two, so that you know

12  that when I asked you the question, I wasn't making

13  it up."  Mr. Dukes asked me to give him the page

14  number.  I gave him the page number, Page 154, and

15  then we went into the testimony.  I'll move to

16  where it directly hits it.

17         On Page 87 of your deposition, Line 19:

18  "To the extent that the context may not be obvious

19  I'm going to read with you and ask you questions on

20  Pages 154 and 155.  Okay?"

21         Your response was:  "Yes, sir."

22         Starting on Line 7:  "And they could be

23  used, couldn't they" -- this was the deposition of

24  the architect -- "and they could be used, couldn't

25  they, to lure a student into thinking nobody can

1  see me; the blinds are closed?"  I'm moving to Line

2  12.  I'm going to skip the objection.  "They could

3  have that effect, couldn't they?"

4          Response:  "Could, yes, sir."

5          This is Page 88, Line 10:  "Do you agree

6  with me that there is a place in the opening or

7  closure of blinds where it looks like from the

8  inside or from the other side of the blind -- I

9  don't know how you describe one side versus the

10  other, but from the dressing room side of the blind

11  where it can be seen it looks like it is a solid

12  bar to view, but in fact you can see out?  Do you

13  see that?"

14          Response:  "Yes, I see that."

15          Question:  "These blinds in this room, if

16  you would like to look at these, you'll see that

17  they're all three, the blinds, the three blinds are

18  all at three different levels of closure, which

19  changes the look from the other side of the blind,

20  doesn't it?"

21          "Yes, sir."

22          Now we're on Page 155:  "And do you

23  understand that a student can be misled to think

24  that I'm safe from uninvited viewing, that my

25  privacy is not going to be invaded because it looks

1  like the blinds are closed and my nudity is not

2  going to be exposed to persons who want to look at

3  me?  Do you understand that?"

4          "It is possible, yes, sir."

5     Q.    Do you remember that?

6          MR. DUKES:  I'm going to object to the

7  whole --

8          MR. SLOTCHIVER:  I'm reading a draft copy

9  of it.

10         MR. DUKES:  -- colloquy.  That doesn't fit

11 within the topic list that you asked the school to

12 present a witness on.

13         MR. SLOTCHIVER:  It does because it falls

14 back into his testimony on this particular topic.

15         MR. DUKES:  But you're asking him to

16 confirm what the architect said in his deposition.

17         MR. SLOTCHIVER:  It actually goes back to

18 his testimony earlier.

19         MR. DUKES:  But you don't get to

20 recross-examine him.

21         MR. SLOTCHIVER:  I'm not recrossing him.

22         MR. DUKES:  Yes, you are.

23         MR. SLOTCHIVER:  I'm not.

24    Q.    As to Jeffrey Scofield, you would admit

25 that he utilized the windows to view the children

1    and to record the children without the children

2    knowing they were being viewed; correct?

3        A.    Yes, sir.

4        Q.    And a mechanism was in place where that

5    could be done by him or others to view the children

6    without them knowing they're being viewed.

7            MR. DUKES:  Object to the form.

8        Q.    Correct?

9        A.    Apparently, yes.

10       Q.    So the purpose of the windows was to

11   create safety; right?  That was the purpose?

12       A.    Yes.

13       Q.    And we know they never developed or worked

14   along the way they were created; correct?

15           MR. DUKES:  Object to the form.

16       A.    As I mentioned before, I don't know if the

17   presence of the windows -- I don't know that.

18       Q.    That would be speculation?

19       A.    Yes.

20       Q.    So in 1999 after a year of having the

21   windows and having nothing found by use of the

22   windows that involved a safety violation was there

23   a reconsideration by the Diocese or Bishop England

24   about whether or not to even keep the windows?

25           MR. DUKES:  Object to the form.

1    A.    Can you rephrase that for me?

2    Q.    Sure.  The school was built in 1998;

3    correct?

4    A.    Yes.

5    Q.    And they implemented these viewing windows

6    for the purposes of monitoring safety?

7    A.    Yes.

8    Q.    In 1999 a year had gone by; correct?

9    A.    Yes.

10    Q.    During that year time period there had

11    been no successful determination or finding of

12    safety violations by use of those windows.  We

13    talked about that; correct?

14    A.    Yes.

15    Q.    Did the school or the Diocese or anybody

16    at that point discuss or reevaluate or consider

17    reevaluating whether or not the windows should be

18    taken out in light of the privacy issue versus

19    safety when there was no safety?

20         MR. DUKES:  Object to the form.

21    A.    Not to my knowledge.

22    Q.    How about in 2000?

23    A.    No.

24    Q.    How about 2001?

25    A.    Not to my knowledge.

```
 1              MR. DUKES:   Same objection.
 2       Q.    If I ask you the same question all the way
 3    through 2018, would it be the same answer?
 4       A.    Yes.
 5       Q.    In 2018 there was a new policy put into
 6    place; correct?
 7       A.    On July 17.
 8       Q.    Why?
 9       A.    It's a Diocesan policy that goes to all
10    Diocesan high schools.
11       Q.    Was it created in part because of what had
12    happened with Scofield?
13       A.    No, because Mr. Scofield had been in 2019.
14       Q.    So the Diocese was reconsidering how to
15    provide more safety to the children when they
16    developed this policy?
17       A.    All policies are designed for that, yes.
18       Q.    Does the Diocese ever revisit safety
19    policies to see if they need remodeling or
20    tweaking?
21       A.    Yes.
22       Q.    Changing?
23       A.    Yes.
24       Q.    How often does that happen?
25       A.    Yearly.
```

1    Q.    Yearly?

2    A.    Yearly.

3    Q.    How does a topic get on the revisiting

4 list?

5    A.    So as principals we can send in

6 information if there are issues or things that we

7 think we need to have a policy on, and then the

8 Diocese on their own would look at different

9 policies.

10    Q.    Is the attempt to say let's look at all

11 the policies we have and see if any of them need to

12 be reevaluated?

13    A.    We reevaluate every policy we have, yes.

14    Q.    When was the reevaluation done with

15 reference to utilization of the windows for safety

16 prior to 2018?

17    A.    There is no policy as far as use of the

18 windows.  The policy in 2018 was for when staff

19 members are going into the restrooms or the locker

20 rooms.

21    Q.    Right, but you have windows that were

22 created for the purpose of monitoring the locker

23 rooms for events such as safety, harassment,

24 bullying, smoking; correct?

25    A.    Yes.

1    Q.    That's what has been addressed throughout
2    this case; correct?
3    A.    Yes.
4    Q.    So when was that policy reevaluated?
5    A.    I don't know.  I mean I was not involved
6    in the policy creation in 2018.
7    Q.    I understand.  Was that policy ever
8    revisited after it was determined to build the
9    windows for this purpose?
10   A.    There were no policies as far as that
11   until 2018.
12   Q.    There was no written policy; correct?
13   A.    Yes.
14   Q.    But it was created for that purpose;
15   right?
16   A.    Yes.
17   Q.    The purpose of monitoring the children for
18   safety, bullying, harassment, smoking; correct?
19   A.    Yes.
20   Q.    When was that reevaluated?
21   A.    Never to my knowledge.
22   Q.    A moment ago you said that all policies
23   were reevaluated yearly.  That one got skipped
24   over; correct?
25   A.    As I said before, there was no written

1  policy until 2018.

2      Q.    I'm not asking about written policies.

3      A.    Those are the policies reviewed every

4  year, written policies in the faculty handbook.

5      Q.    So if it's not written, then it's not

6  reevaluated?

7      A.    No.

8            (Discussion off the record)

9      Q.    Would the monitoring of the windows fall

10 under the category of a safety guideline as opposed

11 to a policy?

12     A.    It would be speculation of where it would

13 go because there is no policy for it.

14     Q.    I did not say policy.

15     A.    You did say safety policy.

16     Q.    Then I didn't mean to.  What I meant to

17 say is -- I'll rephrase it -- was the monitoring of

18 the windows from the coaches' office into the

19 locker room, to monitor the children through the

20 windows, is that something that would fall under

21 the category of a safety guideline?

22           MR. DUKES:  Object to the form.

23     A.    Guidelines and policies are somewhat

24 similar in a sense because there is no written

25 policy, but it would be a safety issue, and that's

1  why the windows were put in, as we covered before.

2      Q.    So just to move on, that safety issue was

3  never reevaluated or revisited after the window was

4  built?

5      A.    That's correct.

6      Q.    And there was never any discussion about

7  the effectiveness of utilizing the windows for

8  monitoring or the ineffectiveness of having used

9  the windows to monitor for activity until I brought

10 it up in the deposition with you a few weeks ago.

11         MR. DUKES:  Object to the form.

12     Q.    Is that a fair statement?

13     A.    No.

14     Q.    Then when was there a discussion about the

15 effectiveness or ineffectiveness of those windows

16 being put into the school for safety purposes?

17         MR. DUKES:  Object to the form.

18     A.    So after Mr. Scofield did what he did and

19 the windows were boarded up the discussion was that

20 it did not as we talked about before bring about

21 any concerns or safety issues that were resolved

22 with the windows, so with the parents' concern

23 there was no sense in keeping them.

24     Q.    Who was involved in that discussion?

25     A.    I do not recall who was involved.

1      Q.     Were you involved?

2      A.     Yes.

3      Q.     You personally as the principal?

4      A.     Yes.

5      Q.     Was Ms. Tucker involved personally as the

6  vice principal?

7      A.     I don't recall.

8      Q.     Was somebody from the Diocese involved?

9      A.     I don't recall.

10     Q.     If that discussion had taken place five

11  years earlier, would it have been the same result?

12     A.     I don't know.  That would be speculation.

13     Q.     Well, let's say it differently.

14            Had that subject been broached five years

15  earlier to the Diocese or to Bishop England, would

16  your response about it not being effective and

17  there is no reason for it have been the same?

18            MR. DUKES:  Object to the form.

19     A.     Again, there was no discussion, so it

20  would be speculation on my end.

21     Q.     Did the facts surrounding it change?

22     A.     No.

23     Q.     So it would have been the same ineffective

24  tool if you had discussed it five years earlier?

25            MR. DUKES:  Object to the form.

1      A.    As we covered, it was never effective

2  concerning the issues.

3      Q.    But prior to 2018 at no time are you aware

4  of any time that anybody ever revisited the risk-

5  benefit, the risk-reward of having that window --

6      A.    Not to my knowledge.

7      Q.    -- versus the privacy rights of the

8  children?

9      A.    Not to my knowledge.

10     Q.    And it is the position of the Diocese that

11 the safety does outweigh privacy; correct?

12         MR. DUKES:  Object to the form.

13     A.    You're asking as the principal or are you

14 asking as everybody in the Diocese?

15     Q.    I'm asking as the 30(b)(6) designee.

16         MR. DUKES:  For Bishop England High

17 School.

18     Q.    Is it the position that the safety of the

19 children -- safety issues of the children by

20 implementing -- at least the thought process was

21 the safety of the children by putting in these

22 windows where the coaches or people in the coaches'

23 office could monitor the children or look at the

24 children in various states of dress or undress

25 outweighed the privacy to the children by being

1    looked at?

2            MR. DUKES:  Object to the form.

3    A.    I guess I'm still confused.  I don't

4    understand.  Can you rephrase the question?  I

5    guess I'm confused on what you're trying to ask me.

6    Q.    That's okay.  It's probably my fault.

7            Is it your position as the designee that

8    the safety element such as harassment, bullying,

9    smoking that were thought to benefit by having

10   these windows looking into the locker room from the

11   coaches' office where the children could be viewed

12   in various states of dress or undress or nudity

13   outweighed the privacy of the children --

14           MR. DUKES:  Object to the form.

15   Q.    -- who would be the ones being seen in

16   various states of dress or undress or nudity?

17           MR. DUKES:  Object to the form.

18   A.    Are you asking when they were put in in

19   1998?  Because that would be speculation on my

20   part.

21   Q.    It wouldn't be speculation on your part if

22   you're speaking on behalf of the school.

23   A.    But I was not privy to those

24   conversations.

25   Q.    But that's why I'm taking your deposition

1  as the person most knowledgeable.  You're not being

2  asked in your own independent capacity; you're

3  being asked as the designee today.

4      A.    I'm not aware of any discussions on that

5  point.  There is no record of any discussions

6  regarding that.

7      Q.    How often was Jeffrey Scofield present on

8  campus?

9      A.    As I mentioned before, he was a volunteer

10  and then he was a part-time employee and then he

11  became a full-time employee.  I was able to find

12  time sheets, not all of his time sheets, and I

13  provided them to Mr. Dukes yesterday afternoon that

14  would kind of say when he was there, but the

15  expectation would be he would be there every school

16  day.

17          MR. SLOTCHIVER:  We haven't seen those,

18  have we?

19          MR. DUKES:  They are going to be produced

20  whenever you stop and I can get back to my office.

21          MR. SLOTCHIVER:  I don't think that I

22  would have to revisit the deposition to ask you

23  questions about those.  If I do, I'm going to

24  reserve that right.

25          MR. DUKES:  You all requested Scofield's

1  personnel file by request for production.  The

2  deadline for responding is today, and you will get

3  them within the deadline.

4        MR. SLOTCHIVER:  But that's not why he's

5  here.  He's here today to talk about his presence

6  on campus, working on campus, stationed or assigned

7  an area near the locker rooms.  If he can't testify

8  to it because he relied on documents he provided to

9  you, then I'm reserving the right to come back if I

10  need to.

11        MR. DUKES:  I understand.

12        MR. SLOTCHIVER:  I don't think that will

13  happen, but it could.

14     Q.     How long was he a volunteer to your

15  recollection before he became an employee?

16     A.     I don't know.  I know when I first got

17  there, he was volunteering.

18     Q.     When he was a volunteer, where did he have

19  access to?

20     A.     He would have been mostly in the evenings

21  helping with sporting events.

22     Q.     So he had access to the locker rooms?

23     A.     I don't know if he had a key, but

24  potentially he would have access to the locker

25  rooms.

1      Q.    And access to the coaches' office?

2      A.    If he needed to go in there, yes, he would

3  have access to that.

4      Q.    Well, if he wanted to go in there, he

5  would have access to it?

6      A.    Yes.  I don't know if he had a key, but if

7  the coach let him in or --

8      Q.    When was it that he first would have

9  gotten a key to your knowledge?

10     A.    When he became a part-time employee in

11  2014.

12     Q.    In '14?

13     A.    Yes.

14     Q.    So he was there for five years prior to

15  being caught with the videotape?

16     A.    Yes.

17     Q.    Was he an odd guy?

18          MR. DUKES:  Object to the form.

19     A.    I'm not sure it's a relevant question.  He

20  was a nice enough young man.

21     Q.    Was he considered by most to be an odd

22  guy?

23          MR. DUKES:  Object to the form.

24     A.    I don't know.  I mean to me he was a nice

25  enough young man.

1      Q.    I hear you, but I've just heard the

2   depiction, and I'm just curious if that's a general

3   depiction of him that he was a little bit

4   different, a little bit odd.

5      A.    I don't know what other people think of

6   him.

7      Q.    Nobody had ever asked or made any comments

8   to the school or to you --

9      A.    Not to my knowledge.

10     Q.    -- to your knowledge about him being a

11  little bit different?

12           MR. DUKES:  Object to the form.

13     A.    Not my knowledge.

14     Q.    Did he have a station that he was assigned

15  to when he was a volunteer?

16     A.    Not as a volunteer, no.

17     Q.    How about as an employee?

18     A.    He would have worked out of the boys

19  basketball office, which was outside the varsity

20  locker room.

21     Q.    Is that one of the offices that had

22  windows looking into the locker room?

23     A.    Yes.

24     Q.    Is that the only locker room that he would

25  have worked out of or would he have worked out of

1  all the different locker rooms?

2     A.    That would be the main one.  I don't know

3  -- it would be speculation if he was in any of the

4  other ones.  If he was in Mr. Runey's office, my

5  assumption would be Mr. Runey would be there.

6     Q.    But that's just speculation?

7     A.    That is speculation, yes.

8     Q.    Is there a different key for each one of

9  the different locker rooms?

10    A.    No.

11    Q.    Is there a different key for each one of

12 the different coach's offices?

13    A.    I knew what you meant.  No.

14    Q.    So if he had one key, he could have

15 entered any of them?

16    A.    He could have, yes.

17    Q.    Let's move on to No. 12:  The number of

18 students for the relevant years that took PE at BE

19 and/or played sports at BE.  Okay?

20    A.    Okay.

21    Q.    I think the global big picture -- and

22 correct me if I'm wrong -- is that about 75 percent

23 of everybody at Bishop England participated in some

24 type of extracurricular athletic sporting event.

25    A.    Yes.

1      Q.      I think the other big picture is that

2   every student at Bishop England was required to get

3   a PE degree or credit?

4      A.      Yes.

5      Q.      Generally it was in 10th grade?

6      A.      Generally 10th grade, yes.

7      Q.      But if you went to BE and hadn't had it,

8   you would take it maybe in 11th or 12th grade?

9      A.      Yes.

10     Q.      Was that the policy back in 1998?

11     A.      I don't know.

12     Q.      Is it your understanding that the

13  statistic you've given us, the 75 percent, is a

14  long-standing percentage that goes back to '98?

15     A.      That would be traditional, yes.

16     Q.      So traditionally 75 percent of all people

17  in the student body would have participated in some

18  type of extracurricular athletic event?

19     A.      Yes.

20     Q.      And people that would participate in the

21  extracurricular athletic event would be people who

22  would routinely utilize the locker rooms; correct?

23     A.      Not all sports utilize the locker rooms.

24     Q.      What sports did not utilize the locker

25  rooms?

1      A.      Normally sports such as soccer because

2  they do not practice on campus; they practice away

3  would not use the lockers rooms.  Sports like golf

4  would not use the locker rooms.

5      Q.      Did they play soccer in their school

6  clothes?

7      A.      No.

8      Q.      Where would they change to get dressed to

9  go to soccer?

10     A.      From my understanding -- it would be

11 speculation because I've never seen it -- the kids

12 would change on the way to soccer.

13     Q.      You don't believe they would have used the

14 locker room at school before they went to the

15 soccer game?

16     A.      It is possible.

17     Q.      Otherwise they would be changing in a car;

18 correct?

19     A.      To my understanding that's what they do.

20     Q.      Changing in a car is actually not

21 appropriate; correct?

22             MR. DUKES:  Object to the form.

23     A.      I don't know.  I don't know what they had

24 on, how they changed.

25     Q.      Do soccer students generally play soccer

1  to your knowledge in jock straps or underwear?

2       MR. DUKES:  Object to the form.

3  A.    I have no idea.

4  Q.    If they wanted to be playing in jock

5  straps, in order to put them on they had to get

6  completely undressed; correct?

7  A.    Again, they should be undressed, but I

8  don't know what they wear.

9  Q.    So you don't know whether they used the

10 locker room or not; correct?

11 A.    Yes.

12 Q.    How many students took PE in 1998 at

13 Bishop England?

14 A.    I don't know that information.  We don't

15 have record of it.

16 Q.    How about 1999?

17 A.    I don't have record of that either.

18 Q.    If I move all the way up to 2018, do you

19 have a record of any of those years as to how many

20 students took PE?

21 A.    I can give you how many students took PE

22 this year, but I could go find it.

23 Q.    Are the classes generally the same size,

24 freshman, sophomore, junior, senior?

25 A.    No.  They vary.

1    Q.    Is it a large variance some years or is it

2  generally pretty consistent?

3    A.    Some years it's a large variance.

4    Q.    How many years back do you keep records as

5  to how many kids were taking PE in a given year?

6    A.    That information would be on their

7  transcript, which would take some time to find that

8  information.

9    Q.    You understand that's one of the topics

10 that we asked you to be able to cover today;

11 correct?

12   A.    Yes.

13   Q.    Is there a reason why you didn't take the

14 effort to be able to provide us with that answer?

15      MR. DUKES:  Object to the form.

16   A.    It would not be ready in time for the

17 deposition to give an answer.  It would take too

18 much time.

19   Q.    How long would it take?

20   A.    It would take a long time to go through

21 all the transcripts.

22   Q.    Would it take more than 40 hours?

23   A.    I don't know.  Yes.

24   Q.    More than 80?

25   A.    I don't know.

1    Q.    You understand we sent this letter which
2    I've attached as an exhibit to your deposition on
3    October 1.
4    A.    Yes.
5    Q.    Was any effort made to compile a list of
6    how many people took PE at Bishop England during
7    any given year between 1998 and the present?
8    A.    Besides just kind of an estimation, no.
9    Q.    So is the estimation 25 percent of the
10   students attending Bishop England in a given year?
11   A.    Yes.
12   Q.    How many students attended Bishop
13   England -- do you have that broken up from '98 to
14   the present?
15   A.    Yes.
16   Q.    Can you give that to me?
17   A.    Not off the top of my head, no.
18        MR. DUKES:  I will be giving it to you
19   this afternoon.
20        MR. SLOTCHIVER:  So that's included in the
21   documents.  Once again, I hope I don't need to come
22   back.  I don't think I will, but if I do, I'll come
23   back and ask you the question.
24        MR. DUKES:  Yes.
25   Q.    Just so I can try to think ahead and avoid

1   having to come back with you, will you be able to

2   say to me, for example, in 1998 there were 600

3   kids, so the estimate is that 150 took PE?

4       A.    I don't have it broken out that way.

5       Q.    How do you have it broken down?

6       A.    Just by grade level.

7             MR. DUKES:  Actually it's total students

8   per year, I think.

9       Q.    So if it's total students per year -- how

10  many kids this year, for example?

11      A.    723.

12      Q.    So based on this guesstimate I take it

13  that out of 723 students at school we could say 75

14  percent of them participate in sports?

15      A.    Yes.

16      Q.    And we could say approximately one-quarter

17  of that would take PE this year?

18      A.    That would be a good estimate, yes.  Some

19  of those kids would overlap.

20      Q.    Some would, and then you also have some

21  transfer kids.

22      A.    Yes.

23      Q.    So there could be more kids taking PE also

24  than just the quarterly percentage; correct?

25      A.    That's possible, yes.

1     Q.    And some kids play multiple sports --

2     A.    Yes.

3     Q.    -- which would put them in a locker room

4  even more often; correct?

5     A.    If they utilize it, yes.

6     Q.    You don't monitor the amount of kids that

7  utilize the locker room; correct?

8     A.    No, we don't count the number of kids

9  using the locker room.

10    Q.    You would agree that it would be typical

11 for kids playing most sports to utilize a locker

12 room; correct?

13    A.    Most students would, yes.

14    Q.    Do you have a copy of Scofield's

15 employment file?

16    A.    I provided it to Mr. Dukes.

17          MR. SLOTCHIVER:  Is that one of the things

18 that you will be sending to us today?

19          MR. DUKES:  Yes.

20    Q.    Do you recall any disciplinary incidents

21 that occurred with him other than what led to his

22 termination and arrest?

23    A.    Yes.

24    Q.    What other type of disciplinary problems

25 did you have with him?

1      A.     He had a Facebook post that was

2   inappropriate because he was the sports information

3   director for his duties that was a response to a

4   parent that was not our parent, a parent at

5   Academic Magnet, so he was given disciplinary

6   action for that.

7      Q.     What was the post?

8      A.     I don't recall the exact wording of the

9   post, but the parent complained about our students

10  being over near their cheering section, and

11  Mr. Scofield basically told her to stop

12  complaining.

13          MR. DUKES:  It's in the production that's

14  coming.

15     Q.     Is that a violation of your code of

16  conduct?

17     A.     As far as?

18     Q.     Well, for example, you told me that with

19  McClellan he was terminated because he was texting

20  with a student.

21     A.     Yes.

22     Q.     And you said that was a violation.

23     A.     Yes.

24     Q.     Was that a written violation, a written

25  code violation?

1    A.    Yes.  That's part of the policy.

2    Q.    Is there a policy about posting, for

3  example, what Scofield posted?

4    A.    There is a policy about use of social

5  media by faculty staff members.

6    Q.    So he violated that policy?

7    A.    Yes.

8    Q.    When was that?

9    A.    I don't remember the exact date.  I think

10 it was in 2018, but that would be speculation.  It

11 would have been football season in 2018 or 2017.  I

12 would have to go back and look.

13    Q.    Why was he not terminated for violating a

14 policy when McClellan was terminated for violating

15 a policy?

16    A.    It would have been the severity of it.

17 His post was not in connection with a student or a

18 child.  It was inappropriate.  It was not foul or

19 anything like that.

20    Q.    Are you the one that makes that

21 determination or somebody else?

22    A.    I make that determination.

23    Q.    So whether or not to terminate somebody

24 for a policy violation is the principal's call?

25    A.    In the end, yes.  I do talk to other

1   people to get perspective.

2       Q.      Does Bishop England or the defendants --

3   in your capacity are you aware of any witness who

4   can testify about assigned times that people have

5   for viewing in the locker rooms?

6       A.      There was never any assigned times.

7       Q.      Are you aware of any written documents

8   addressing when it was that people did monitor the

9   locker rooms?

10      A.      There were no written documents, no.

11      Q.      Are you aware of any rule providing

12  regulations as to how often they could or couldn't

13  or should monitor the children?

14      A.      There were no rules or regulations

15  regarding use of the windows.

16      Q.      Was there any method that the coaches or

17  teachers were instructed to use in determining when

18  or how or why to view the students other than for

19  purposes of monitoring safety issues such as

20  bullying, harassment, or smoking?

21      A.      No, there is no method.

22      Q.      In the same context were there any

23  training materials provided or utilized in order to

24  give guidance to people who would have access to

25  the coaches' offices as to how they should or when

1  they should monitor the children other than what

2  you've talked about with the safe haven program or

3  its predecessor?

4      A.    No.

5      Q.    Just a few more questions.  Are you okay

6  to go forward?

7      A.    Yes, sir.

8      Q.    We've talked about the fact that the

9  windows were installed in the coaches' offices for

10 purposes of monitoring for such behavior as

11 bullying, harassment, smoking; correct?

12     A.    Yes, sir.

13     Q.    How often were they monitored?

14     A.    Do you mean assigning a monitor or

15 monitored?

16     Q.    How often did the coaches in either of the

17 three coaches' offices or did people in either of

18 those offices monitor the children in the locker

19 room?

20     A.    Nobody was assigned to monitor the kids in

21 the locker room.

22     Q.    So there was no set rule as far as how

23 often you had to monitor?

24     A.    Yes.

25     Q.    How often did monitoring take place,

1    though?

2        A.    I don't know.  That would be speculation.

3        Q.    We know it was created for that purpose;

4    correct?

5        A.    Yes.

6        Q.    So we know that there was some instruction

7    that it was supposed to be used for that purpose;

8    correct?

9        A.    I don't know the instruction.  There is no

10   record of any instruction given that you need to

11   monitor the windows.

12       Q.    That was the purpose of it?

13       A.    That was the purpose of the windows, yes.

14       Q.    If they weren't monitored, then the whole

15   purpose of them would have failed; correct?

16            MR. DUKES:  Object to the form.

17       A.    As I said before, I don't know -- the

18   placement of the windows would have changed the

19   students' behavior.  Also if the coach is in the

20   office and they heard a disturbance, I mean --

21       Q.    I hear you, but just to be sure, whether

22   or not the placement of the windows changes the

23   behavior was not part of the study performed by

24   Bishop England or the Diocese; correct?

25       A.    I don't know of any study that was

1    performed as far as the use of windows.

2         Q.    Fair enough.

3               We do know that the official statement of

4    the defendants is that the windows were created for

5    the purpose of monitoring for such events as

6    bullying, harassment, smoking; correct?

7         A.    Yes.

8         Q.    We talked before -- and tell me if you

9    would disagree with this -- that you would not be

10   able to hear smoking; correct?

11        A.    You would not be able to hear smoking.

12        Q.    So the only way to monitor for smoking

13   would be to look and see if there is any smoking;

14   correct?

15        A.    Up until there were vapor sensors put in

16   the locker rooms, yes.

17        Q.    When were they put in the locker rooms?

18        A.    I would have to go back and look.  Maybe

19   2017 or 2018.

20        Q.    That was around the same time that you

21   changed the rules and the monitoring?

22        A.    2018 is when the new rule came in for

23   that, yes.

24        Q.    Or when a rule came out?

25        A.    Yes.

1    Q.    Just to make sure, we know why the windows

2  were built or installed.  We talked about that.  We

3  know the stated purpose; correct?

4    A.    Yes.

5    Q.    Do you agree that there was monitoring

6  done, but how much monitoring and how often is the

7  unknown?

8    A.    Yes, we wouldn't know if there was

9  monitoring done.  If the coach was in his office,

10 he or she would be able to hear anything, any

11 scuffle, that kind of stuff.

12   Q.    But not smoking?

13   A.    Not smoking.

14   Q.    So the purpose of the windows was to be

15 followed; correct?

16   A.    If there was an issue, yes.

17   Q.    Where does it say if there is an issue?

18   A.    There is no policy.

19   Q.    Did the coaches actually monitor the

20 children in the locker room?

21   A.    I don't know.

22   Q.    Well, if the purpose was for safety, how

23 would the school be insuring safety if they didn't

24 monitor for the purpose for which the windows were

25 installed?

1          MR. DUKES:  Object to the form.

2     A.    There was no designed or set policy to

3    monitor the windows or time frame, so I don't know

4    if they monitored the windows.

5     Q.    What steps have you taken, if any, to

6    determine how often the windows would have been

7    monitored since 1998 until they were boarded up?

8     A.    There was no record, so there was no other

9    way -- there was no monitoring record, so there is

10   nothing to look for.

11    Q.    We do know, for example, that Mr. Runey's

12   desk was placed up against the window; correct?

13    A.    Part of his desk, yes.

14    Q.    Where he would sit he would be looking

15   straight at the window?

16    A.    If he was using his computer, yes.

17    Q.    What did he say when you spoke to him,

18   Mr. Runey?

19    A.    He doesn't remember any issues in the

20   locker room.

21    Q.    You spoke to him we talked earlier about

22   his knowledge of incidents that occurred in the

23   locker room; correct?

24    A.    Yes.

25    Q.    Did you speak to him about how often he

1    would monitor the students?

2        A.    I did not, no.

3        Q.    So I think to sum it up, and I think I've

4    got it, the windows were created for the purposes

5    of monitoring the children in the locker room for

6    such things as harassment, bullying, smoking;

7    correct?

8        A.    Yes.

9        Q.    There were no official rules or policies

10   given to the different coaches or staff members as

11   to how or when or how often to monitor the children

12   in the locker room?

13       A.    Yes.

14       Q.    The availability of them monitoring the

15   children in the locker room was always present from

16   the time the window was created until it was

17   boarded up?

18       A.    Yes.

19       Q.    And there is no knowledge of any

20   complaints or comments to anybody at the school or

21   at the Diocese to your knowledge about the fact

22   that why are people looking at us through the

23   windows?

24       A.    No.

25       Q.    Nobody ever came forward and said we know

1  we're being looked at it or we've seen somebody

2  looking at us?

3      A.    No.

4      Q.    We also do know that Scofield did utilize

5  those very windows to film students --

6      A.    Yes.

7      Q.    -- in the locker room from the coaches'

8  office.

9      A.    Yes.

10     Q.    I think we talked before about the fact

11  that you weren't aware of what type of glass was in

12  the windows, whether it's single pane, double pane,

13  pressed, or anything like that?

14     A.    No.

15     Q.    So you don't know what the coaches would

16  necessarily be able to hear from their office into

17  the locker room; correct?

18     A.    Yes.

19     Q.    Is that correct?

20     A.    Yes.  I don't know.

21     Q.    And without having those windows we can't

22  run a test on it to determine it; correct?

23          MR. DUKES:  Object to the form.

24     A.    I guess, yes.

25     Q.    Was that part and parcel as to why you

1  implemented the new policy in 2018 where the

2  teachers would actually go into the locker rooms?

3      A.    As I said, I was not involved in the

4  creation of that policy.  That came from the

5  Diocese.

6      Q.    And was passed down to you?

7      A.    Yes.

8      Q.    You put forth what you were told to put

9  forth?

10     A.    Yes.

11     Q.    I'm not supposed to be asking you as a

12 principal, but that's your understanding, the

13 Diocese implemented the policy?

14     A.    At Bishop England High School as a

15 Diocesan high school we follow their policies.

16     Q.    Is it your opinion that the locker rooms

17 are safe today with the present policy in place and

18 without the viewing windows?

19     A.    Do you mean as an individual or me as a

20 school.

21     Q.    You as a school.

22     A.    We have policies in place to insure the

23 safety of our kids by a coach standing outside, so

24 there is safety there.

25     Q.    My question is -- and I know you answered

1  a little bit different than I asked you -- I

2  understand you have policies involved.  You

3  testified that you review policies on a yearly

4  basis; correct?

5      A.    Written policies, yes.

6      Q.    And some of those policies change --

7      A.    Yes.

8      Q.    -- because you learn that sometimes they

9  could be better or they're not necessary; correct?

10     A.    Yes.

11     Q.    My question to you is are the locker rooms

12 safe today with the present policy in place and

13 without the viewing windows?

14     A.    I would say the locker rooms are safe,

15 yes.

16     Q.    I understood what you said.  That's not my

17 question.

18     A.    Well, you asked if they were safe today,

19 and I said yes.

20     Q.    Are they safe today with the present

21 policy in place and without the viewing windows?

22     A.    The answer is the same.  You're saying are

23 they safe with these things, and they are safe.

24     Q.    With these things and without the viewing

25 windows?

```
1      A.    Yes.

2      Q.    So the answer to that question is yes?

3      A.    Yes, they are safe.

4      Q.    I didn't ask you if they're safe.

5      A.    Your question is are they safe today.

6      Q.    With two things, two categories, one with

7   the present policy in place and, two, without the

8   viewing windows.

9      A.    Yes.

10           MR. SLOTCHIVER:   I've not nothing further.

11           (The deposition concluded at 11:50 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   CERTIFICATE OF REPORTER
    STATE OF SOUTH CAROLINA
2   COUNTY OF CHARLESTON

3

4           I, Carol T. Lucic, Registered Professional
    Reporter and Notary Public for the State of South
5   Carolina at Large, do hereby certify that the
    witness in the foregoing deposition was by me duly
6   sworn to testify to the truth, the whole truth, and
    nothing but the truth in the within-entitled cause;
7   that said deposition was taken at the time and
    location therein stated; that the testimony of the
8   witness and all objections made at the time of the
    examination were recorded stenographically by me
9   and were thereafter transcribed by computer-aided
    transcription; that the foregoing is a full,
10  complete, and true record of the testimony of the
    witness and of all objections made at the time of
11  the examination; and that the witness was given an
    opportunity to read and correct said deposition and
12  to subscribe the same.

13

14          Should the signature of the witness not be
    affixed to the deposition, the witness shall not
    have availed himself/herself of the opportunity to
15  sign or the signature has been waived.

16

17          I further certify that I am neither
    related to nor counsel for any party to the cause
    pending or interested in the events thereof.
18

19          Witness my hand, I have hereunto affixed
    my official seal on November 4, 2021, at
20  Charleston, Charleston County, South Carolina.

21
                    Carol T. Lucic
22                  NCRA MERIT REPORTER
                    REGISTERED PROFESSIONAL REPORTER
23

24
    My Commission expires:  November 27, 2027.
25

# EXHIBIT 6



ROMAN CATHOLIC
# DIOCESE
## OF CHARLESTON
**OFFICE OF MEDIA RELATIONS**

# PRESS RELEASE
**FOR IMMEDIATE RELEASE**
Feb. 4, 2021

Contact: Maria Aselage, Director of Media Relations
(843) 513-7605 ~ maria@charlestondiocese.org

## Statement from the Roman Catholic Diocese of Charleston regarding the proposed class action lawsuit related to Bishop England High School

CHARLESTON, SC – The Roman Catholic Diocese of Charleston released the below statement related to the lawsuit filed today involving Bishop England High School. The statement should be attributed to Maria Aselage, spokesperson for the Roman Catholic Diocese of Charleston.

The Catholic Diocese of Charleston received the lawsuit involving Bishop England High School this morning. After reviewing it, we feel that the class action claims have absolutely no merit.

The windows between the athletic coaches' offices and the boys' and girls' locker rooms were included in the plans and installed in the building in the 1990's for safety reasons. Their purpose was to allow coaches to monitor for fights, bullying, smoking or any type of inappropriate activity that might occur within the locker rooms. The plaintiff's claim that the windows were installed for the sole purpose of exploiting students is simply ludicrous.

When school officials learned about a member of its athletic staff videotaping boys in the locker room in May 2019, they immediately contacted police and terminated the employee. Soon afterward, the windows were covered and were subsequently removed and replaced with a block wall.

Contrary to the claims in the lawsuit, the Catholic Diocese of Charleston takes protection of children very seriously. It mandates that every teacher, other employee, and volunteer who has regular access to children undergo a background screening, attend a child abuse prevention education program, and sign a code of conduct governing their interactions with minors. Additionally, Catholic school teachers and staff are required to attend boundary training.

### 



901 Orange Grove Rd. • Charleston, SC 29407 • (843) 513-7605 • www.charlestondiocese.org

# EXHIBIT 7

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                  CHARLESTON DIVISION

 3
     GARY NESTLER,                        : C/A NO.
 4   VIEWED STUDENT FEMALE 200,             2-21-cv-00613-RMG
     VIEWED STUDENT MALE 300,
 5   on behalf of themselves and
     all others similarly situated,    :
 6
                    Plaintiffs
 7
                vs.                      :
 8
     THE BISHOP OF CHARLESTON, a
 9   Corporation Sole, BISHOP ENGLAND  :
     HIGH SCHOOL, TORTFEASORS 1-10,
10   THE BISHOP OF CHARLESTON, in his
     official capacity, and
11   ROBERT GUGLIELMONE, individually, :

12                  Defendants
13   _____

     DEPONENT:  ERIC AICHELE
14
     DATE:  OCTOBER 13, 2021
15
     TIME:  9:00 a.m.
16
     LOCATION:  THE RICHTER FIRM, LLC
17
                622 JOHNNIE DODDS BOULEVARD
18
                MT. PLEASANT, SC
19
     REPORTED BY:  CAROL T. LUCIC, RPR, RMR
20

21
      CLARK BOLEN COURT REPORTING & VIDEO CONFERENCING
22
                  CHARLESTON, SC  29405
23
                    843-762-6294
24
               WWW.CLARK-ASSOCIATES.COM
25
```

```
 1              A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFFS:

 4              THE RICHTER FIRM, LLC

 5              BY:  LAWRENCE E. RICHTER, JR., ESQ.

 6                   622 JOHNNIE DODDS BOULEVARD

 7                   MT. PLEASANT, SC  29464

 8                        and

 9              SLOTCHIVER & SLOTCHIVER, LLP

10              BY:  DANIEL SCOTT SLOTCHIVER, ESQ.

11                   751 JOHNNIE DODDS BOULEVARD

12                   SUITE 100

13                   MT. PLEASANT, SC  29464

14                        and

15              BRENT SOUTHER HALVERSEN, LLC

16              BY:  BRENT S. HALVERSEN, ESQ.

17                   751 JOHNNIE DODDS BOULEVARD

18                   SUITE 200

19                   MT. PLEASANT, SC  29464

20

21

22

23

24

25
```

```
1   ON BEHALF OF THE DEFENDANTS:

2              TURNER PADGET

3              BY:  RICHARD S. DUKES, ESQ.

4                   40 CALHOUN STREET

5                   SUITE 200)

6                    CHARLESTON, SC  29401

7

8   ON BEHALF OF LS3P ASSOCIATES, LTD:

9              COPELAND, STAIR, KINGMA & LOVELL, LLP

10             BY:  KENT T. STAIR, ESQ.

11                  40 CALHOUN STREET, SUITE 400

12                  CHARLESTON, SC  29401

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          INDEX

2

3                       ERIC AICHELE

4                    OCTOBER 13, 2021

5

6    EXAMINATION                              PAGE

7    BY MR. RICHTER                           5, 122

8    BY MR. DUKES                             121

9

10   CERTIFICATE OF REPORTER                  124

11

12                        EXHIBITS

13   NO.                                      PAGE

14   1          Press release, 2/4/21         73

15   2          Partial first floor plan      81

16   3          Photograph                    104

17

18

19

20

21

22

23

24

25            (Exhibits attached.)
```

1                        ERIC AICHELE,

2    having been first duly sworn, was examined and

3    testified as follows:

4                        EXAMINATION

5    BY MR. RICHTER:

6        Q.    Would you state your full name, please.

7        A.    Eric Clifford Aichele.

8        Q.    How do you spell Aichele?

9        A.    A I C H E L E.

10       Q.    What is your address, please?

11       A.    133 North Shelmore Boulevard, Mount

12   Pleasant, South Carolina, 29464.

13       Q.    What is your phone number?

14       A.    Do you want all my phone numbers?

15       Q.    Yes, please.

16       A.    My office phone number is (843) 577-4444,

17   my home phone number is (843) 881-9441, and my cell

18   phone number is (843) 709-7386.

19       Q.    You and I are in a very select group now

20   that still has land lines in their home.

21             What is your date of birth, please?

22       A.    August 6, 1954.

23       Q.    Place of birth?

24       A.    Charleston, South Carolina.

25       Q.    Have you been here all your life?

1    A.    No.  I went off to college, and I lived

2  and worked in Savannah for a couple of years.  I

3  have been her for the last 40 years or more.

4    Q.    Are you married?

5    A.    No, I am not.

6    Q.    Have you ever been married?

7    A.    No.

8    Q.    Do you have children?

9    A.    No.

10   Q.    Thank you.

11         Would you walk us, please, through your

12  educational background?

13   A.    Starting at high school?

14   Q.    Yes.

15   A.    I graduated from First Baptist Church

16  School in Charleston in 1972.  I went to Clemson

17  University to study architecture for four years and

18  got a Bachelor of Science in architecture in 1976.

19  Then I went two additional years into 1978 and got

20  a Master of Architecture.

21   Q.    Is that the full extent then of your

22  degree history?

23   A.    Yes.

24   Q.    Thank you.

25         Do you have any military background?

1      A.     No, I do not.

2      Q.     Any criminal background?

3      A.     No.

4      Q.     Are you disabled in any way?

5      A.     No.

6      Q.     Do you have any history of litigation?

7 Have you been a party to any lawsuits?

8      A.     No.

9      Q.     Have you been a witness in lawsuits?

10     A.     No.

11     Q.     This is your first time?

12     A.     Yes.

13     Q.     Welcome aboard.

14            What we're going to do today I have to

15 explain to you.  This is a deposition, so you are

16 now a sworn testifying witness, which restricts you

17 a little bit.  It means that you can't speak about

18 your testimony if we take a break or something, and

19 if you do, we have a right to examine you on that.

20 If you speak to your attorney at that break about

21 your testimony, we have a right to inquire into

22 your otherwise privileged conversation.

23            Are you impaired in any way from going

24 forward with your deposition today?

25     A.     No.

1          (Discussion off the record.)

2      Q.    Did I ask you if you have any

3  disabilities?

4      A.    Yes, you did.

5      Q.    I'm sorry.  I am at a place in my life

6  where I repeat myself every now and then despite my

7  best efforts.

8          What is your employment history after you

9  were educated?

10     A.    I worked in Savannah for about two years

11 for a firm there called Lominack, Jewett, Spencer.

12     Q.    Was that an architectural firm?

13     A.    That was an architectural firm, yes.

14         I returned to Charleston in about 1980 and

15 worked for an architectural firm called Ehni

16 Associates for about four years, and then in 1984 I

17 joined LS3P and have been there ever since.

18     Q.    Do you have licensure as an architect?

19     A.    I do.

20     Q.    In what states?

21     A.    South Carolina.

22     Q.    Have you ever experienced any kind of

23 sanction, suspension, limitation, anything else

24 concerning your professional licensure?

25     A.    No.

1    Q.    Thank you.

2          Let me jump ahead to the Bishop England

3    High School matter.  I'll do this as an overview

4    first if you don't mind, and we'll break it down

5    some as we go along.

6          What was your involvement with -- we still

7    call it the new school -- Bishop England on Daniel

8    Island?

9    A.    I was the project manager for LS3P, which

10   meant that I oversaw the project in an oversight

11   way.  I was involved in the design.  I wasn't the

12   only designer.  I coordinated the in-house team.  I

13   had primary point of contact with the school at

14   that point.  I worked with project architects in

15   our firm at that time and other staff members to

16   produce the documents.

17   Q.    Who was your contact with the school?

18   A.    The school or the Diocese?

19   Q.    I'm going to ask you both of them.

20   A.    Well, at the beginning in the Diocese was

21   a gentleman named Tom Mahan, who I guess was

22   superintendent of education or some other title

23   with the Diocese, and then later on as we got

24   further into the design it was Nick Theos, who was

25   the principal of the school.  Those were probably

1   the two primary points of contact.  I mean there

2   were other people I'm sure that we talked to during

3   the course of the three-year process.

4       Q.    Was the architectural contract for Bishop

5   England High School bid or was that some selection

6   process by whoever is in charge of the Diocese?

7       A.    I would not call it a bid.  Architects

8   really aren't allowed to bid, but there is a

9   qualification process which the school sent out to

10  I can't tell you how many architects.  At one point

11  I read somewhere it was two and at another point I

12  read five, but we did interview for the work with

13  the planning committee of the Diocese and were

14  selected to do the work.

15      Q.    My memory is that you all worked on a

16  percentage basis, and I want to say it was 5.7

17  percent; is that correct?

18      A.    That's correct.

19      Q.    Thank you.

20            Let's go now to the Diocese.  Who was your

21  contact with the Diocese?

22      A.    That would have been Tom Mahan.

23      Q.    Well, with the school then.  Let me say it

24  that way.

25      A.    Our contact with the school would have

1    been primarily Nick Theos, the principal.

2        Q.    He was in place as principal at that time?

3        A.    Right.

4        Q.    Do you recall that the new school was

5    opened for students in the fall of 1998?

6        A.    Yes, sir.

7        Q.    Who is it that thought up the idea of

8    putting viewing windows between coach or staff

9    offices and the locker rooms where children would

10   be either fully clothed, partially clothed, or

11   completely nude?

12       A.    I do not know.  It was in the program that

13   was produced for the project, but I do not know

14   whether it was a request of the school or whether

15   it was a suggestion from our firm.  I just do not

16   know, and I cannot find any documentation that

17   tells me one way or the other.

18       Q.    Well, have you looked at the Diocese's

19   Answer in this matter?

20       A.    No.

21       Q.    They're kind enough to say that they

22   relied on the advice of professionals, and the

23   professionals they've identified as having relied

24   on were LS3P and Gulfstream Construction.

25            You were not aware of that before now?

1      A.    I have read that in one of the other

2  depositions, I think, so, yes, they should be able

3  to rely on our expertise and experience or whatever

4  they said.  That's what you hire an architect for.

5      Q.    But you're not admitting here sitting

6  today testifying under oath that it was LS3P who

7  recommended the inclusion of viewing windows?

8          MR. STAIR:  Object to the form.

9          MR. DUKES:  Same objection.

10     A.    As I said, I do not know where that

11  sentence in the program came from.

12     Q.    When you say "the program," would you

13  mind --

14     A.    When we start a project like this, we

15  develop what we call a program, educational

16  program, which is a listing of the requirements for

17  the school.

18     Q.    In house you do that?

19     A.    No.  It's generally with our clients as

20  well because we would not know all their specific

21  requirements unless we sat down and talked to them.

22  So that would have a listing of all of the spaces

23  that they need, the sizes approximately of those

24  spaces, and how many of those spaces, and then we

25  had what we call room data sheets, which elaborated

1   on the requirements for each of those spaces.  So

2   that's what we call a program.

3       Q.    Then the next thing ultimately that

4   happens -- maybe not the next thing that happens,

5   but ultimately the program is put in place and a

6   school is built?

7       A.    Right.  We would take that program and use

8   that as our guide for designing the building,

9   finishing up the design and working with the

10  contractor to get it built.

11      Q.    You alluded to this a moment ago.  I want

12  to see if I get some names from you of other

13  architects within LS3P who worked on, conceived and

14  produced the design for the school.

15      A.    Well, just looking at the drawings I can

16  see two other initials on the drawings.  Mark

17  Clancey would be probably described as our project

18  architect, and then there was another initial, SPV,

19  which I figured out was Steven Vinzani.  He was not

20  an architect.  He was a CAD technician, draftsman.

21  I do not remember at this point other people.  I'm

22  sure there were interior designers with our firm

23  and landscape architects.  The landscape architect

24  I did find was named Kyle Theodore.  She would have

25  worked on the project and specification writers,

1  you know, things like that.  So there were a

2  handful of people who worked on it.

3      Q.    Did you ultimately find yourself dealing

4  with Gulfstream Construction in actually

5  effectuating the building?

6      A.    Yes.

7      Q.    How did that go?

8      A.    It went just fine.

9      Q.    I would like to ask what position or

10  positions you hold within LS3P.

11      A.    I'm technically a vice-president, and I

12  head up the K-12 group of school design in the

13  Charleston office.

14      Q.    When you say "I'm technically a vice-

15  president" --

16      A.    I'm a vice-president of the firm.

17      Q.    What is LS3P?  An LLC, a corporation?

18  What is it?

19      A.    It's an LLC, I think.

20      Q.    What other persons are officers of LS3P?

21      A.    What other people --

22      Q.    If you're a vice-president, I'm assuming

23  there is a president.

24      A.    Right.  We have a president, a chairman of

25  the board, an executive committee that you would

1  have for a corporation like that.

2      Q.    Where can I go to see that sort of

3  corporate tree?

4      A.    I don't know if it's on our website or

5  not.

6      Q.    I'll look.

7      A.    I don't know if it's on there or not.

8      Q.    I'll look and see.  What I was going to

9  say is if it's okay with you all, I don't want to

10 spend time on something that we're not going to be

11 able to really wrap up today.  What I'll do is

12 look, and if I don't find it, is it all right with

13 you if I notify Kent Stair of that and ask him to

14 ask you to give him to give me that corporate tree?

15     A.    Sure.

16     Q.    Thank you.

17         MR. RICHTER:  Is that all right with you,

18 Kent?

19         MR. STAIR:  A shortcut would be to ask me

20 to give it to you, which I'm sure I can give you

21 some basic outline of who it is without involving

22 him, but we can let you know who those people are.

23         MR. RICHTER:  If it exists.

24         THE WITNESS:  I'm sure it exists somewhere

25 in our corporate structure, but I don't know if

1    it's published on the website.

2         MR. STAIR:  I haven't seen such a thing,

3    but we can tell you who the officers are.

4         Q.    Are you retired?

5         A.    No, I am not.

6         Q.    Where do you work from?

7         A.    Well, since COVID I have been working from

8    my home.  I go into the office once, maybe twice a

9    week for business reasons, but I work from home.

10        Q.    Do you travel in your job?

11        A.    Some, yes.

12        Q.    Inside the state?

13        A.    Yes.  For example, this Monday I traveled

14   to Hampton to investigate some schools that we're

15   working on there.

16        Q.    Welcome back.

17        A.    I travel.  We do work out of the

18   Charleston office primarily in the Lowcountry area.

19   We have other offices that are closer to Columbia

20   and other parts of the state.

21        Q.    So generally you can get home at night?

22        A.    Sure, yes.

23        Q.    How far is your home from where you're

24   sitting right now?

25        A.    Probably less than a mile.

1      Q.    You received much praise if you read

2   Mr. Attanasio's deposition.  Much deference was

3   given to you as being the best and the brightest

4   kind of thing, and I just wonder why you weren't

5   here before, why LS3P sent somebody who admits

6   under oath that he knows less than you and that

7   nobody knows more than you about the Bishop England

8   project.

9            MR. STAIR:  Object to the form.

10     A.    I do not know.

11     Q.    Well, how many schools first of all in

12  Charleston County have you or your firm been

13  involved in either the original planning process or

14  any renovation process or anything of that nature?

15     A.    For Charleston County?

16     Q.    Yes.

17     A.    Charleston County School District or just

18  schools in this area?

19     Q.    Well, first public schools of the

20  Charleston County School District.

21     A.    It goes back before my time to the

22  formation of the firm back in the 1960s, so I don't

23  really know, but I would say for the school

24  district probably 20 maybe I would think that we've

25  worked on.  Some of those would be renovations and

1    additions, and some would be new schools.  They're
2    not all new schools.
3        Q.    When LS3P drew in these viewing windows on
4    Bishop England's plans, why didn't they draw in
5    some warning to these children that if you are
6    naked, you can be seen naked because we have 4 foot
7    X 4 foot viewing windows on the other side of which
8    sits some staff member?
9            MR. STAIR:  Object to form.
10           MR. DUKES:  Same objection.
11       A.    I'm not aware of any requirement for a
12   warning sign such as that.  I think we would have
13   thought that it was pretty obvious, that you could
14   see that window.  Students walking by in those
15   locker rooms had to walk within a foot of those
16   windows to get in.  They could see the windows
17   there, and it seemed to us that it was pretty
18   obvious that they could be seen.
19       Q.    Are you saying that you then believed the
20   students consented to be looked at through these
21   windows?
22           MR. STAIR:  Object to form.
23           MR. DUKES:  Object to form.
24       A.    I don't know what the term "consent" means
25   other than I do believe they knew that they were

```
 1  being seen through those windows.
 2      Q.    Let me ask the question another way.  So
 3  what?
 4          MR. STAIR:  Object to form.
 5          MR. DUKES:  Object to form.
 6      A.    So what?
 7      Q.    That's right.  So what?
 8          MR. STAIR:  Object to form.
 9      A.    I'm not sure I understand that comment or
10  question.
11      Q.    Assume for the sake of this discussion
12  just for the moment at least that every student saw
13  the window from inside the locker room.  What is
14  the import or effect --
15      A.    Well --
16          MR. STAIR:  Let him finish his question,
17  let me object if I choose to do so, and then you
18  can answer.
19      Q.    A couple of things we can't do.  One is
20  talk over each other.  The second one is you can't
21  nod or gesture.  You're being recorded a couple of
22  ways here.  Go ahead.
23          MR. STAIR:  Object to form.
24          MR. DUKES:  Same objection.
25      A.    Could you ask the question again at this
```

1  point?

2          (The court reporter read the pending

3  question.)

4      A.    I would think they would know as they

5  walked by there that they are being supervised.

6      Q.    Supervised?

7      A.    Right.

8      Q.    How?

9      A.    By the potential of a coach in that locker

10 room seeing activity going on in the locker room.

11     Q.    I don't understand your response.  I'm

12 sorry.  What I'm trying to understand is whether

13 you're saying therefore it's the student's

14 responsibility that they were viewed naked in the

15 Bishop England's dressing room.

16         MR. STAIR:  Object to form.

17     A.    No, I'm not saying it was their

18 responsibility, but I am saying that in my opinion

19 they would have known that that was going on, there

20 was a potential for them to be seen.

21     Q.    That's what I asked you a while ago.  So

22 what?  What does that mean?

23         MR. STAIR:  Object to form.

24         MR. DUKES:  Same objection.

25     A.    That if they knew that they were being

1  viewed, they would be reluctant to get into a

2  fight, cause some trouble, do anything in that

3  locker room that they weren't supposed to be doing.

4      Q.    In the locker room one of the things they

5  are supposed to be doing is taking their clothes

6  off and putting their athletic clothes on, isn't

7  it?

8      A.    True.

9      Q.    When they finish sweating or running the

10 five miles or whatever they had to do, they would

11 come back and get in the shower and clean their

12 bodies; correct?

13          MR. STAIR:  Object to form.

14          MR. DUKES:  Object to form.

15     A.    I assume so.

16     Q.    Well, that's why you put showers in that

17 locker room, isn't it?

18     A.    Right.

19     Q.    And you built them to a particular ratio

20 of how many people would go through there and how

21 many shower heads you needed?

22     A.    That's correct.

23     Q.    You did five on a pole for the girls and

24 six on a pole for the boys, didn't you?

25     A.    I assume that is what is shown.  I haven't

1    looked at the number of shower heads, but we did

2    have pole showers that had multiple heads on them.

3         Q.    I still don't understand.  So they do

4    that, come in, take their clothes off, put their

5    gym clothes on or their athletic clothes on, go do

6    their athletic activity, come back, bathe, dry off,

7    and somehow you seem to be indicating that some

8    message to them is imparted while they undertake

9    those activities that somebody is on the other side

10   of the window looking at you.  Isn't that what you

11   said?

12             MR. STAIR:  Object to form.

13             MR. DUKES:  Object to form.

14   A.    I think it's just if I went in that locker

15   room, walked right by the coach's office and turned

16   the corner and saw a window from the coach's office

17   into that room, I would know that I am being

18   supervised by someone in that office.

19   Q.    Do you remember how the locker rooms are

20   configured?

21   A.    Yes, I do.

22   Q.    You've gone back, have you, and checked on

23   that before coming here today?

24   A.    I looked at the drawings, yes.  I have

25   been not been back in the school.

1       Q.    I didn't mean that, but you did refresh

2    your recollection about how the thing is laid out?

3       A.    Yes, I did.

4       Q.    Do you remember that there is a wall that

5    goes down the middle of the dressing room with

6    lockers on the left side of both walls going down,

7    and then on the other side through a door there is

8    an opening that is built into the wall -- two of

9    them actually.  The children who have to urinate go

10   through that and find themselves a urinal if it's a

11   male or a toilet and whatever, male or female, and

12   they may also use the basins that are there, might

13   they not?

14          MR. DUKES:  Object to form.

15          MR. STAIR:  Object to form.

16      A.    That's correct, yes.

17      Q.    Can you tell me, please, where they keep

18   their towel to utilize the showers that LS3P

19   designed for that or the Diocese required that you

20   put in --

21      A.    I would have no idea.

22          MR. STAIR:  Let him finish the question.

23   Pause enough to let me object to the form, which I

24   do in this case.  Let's do it that way.

25          MR. DUKES:  Same objection.

1    A.    There are lockers in there that they could

2  keep their towel in the locker, but I don't know

3  where else they would keep it.

4    Q.    There are hooks in the locker to hang

5  things on; right?

6    A.    That's correct.

7    Q.    One of those things could be a towel?

8    A.    That's correct.

9    Q.    I've used a lot of locker rooms, and that

10 happens to be something that I know what they look

11 like on the inside.

12        What I'm trying to do ultimately is ask

13 you what makes it all right for somebody to be

14 looking at naked children, adults looking at naked

15 children.

16        MR. DUKES:  Object to form.

17        MR. STAIR:  Object to form.

18    A.    I think the safety and security

19 considerations override the ability to be able to

20 see someone in a locker room.

21    Q.    Do you know that Bishop England

22 representatives or the Diocese's representatives --

23 we refer to them as the Diocese defendant so you

24 can understand as we talk through this -- are you

25 aware that they've testified that they never looked

1   through those windows?

2          MR. STAIR:  Object to form.

3   A.     I am not aware of that.

4   Q.     Assuming that you were aware of that --

5   I'm representing to you that they so testified --

6   what is your reaction to that?

7          MR. STAIR:  Object to form.

8          MR. DUKES:  Object to form.

9   A.     I don't really have much of a reaction.  I

10  mean the windows were put there for supervision of

11  the locker rooms.  If they did not use them, that's

12  certainly their prerogative to not use the windows.

13  Q.     Who determined that that is why the

14  windows were placed where they are?

15         MR. STAIR:  Object to form.

16  A.     Well, between the school reviewing our

17  plans and us showing them options it would have

18  been a team effort to say here is how we're going

19  to lay out the locker rooms and here is where the

20  coach's office is going to be and there would be a

21  window here looking into the locker area.

22  Q.     And the school would either say oh, no,

23  don't do that, or okay, that looks good to me?

24  A.     That's correct.

25  Q.     And that's what happened?

1      A.    As best as I can recall.

2      Q.    I understand.  But you don't remember the

3 person or people from the school, the Diocese

4 defendants who actually said that looks great; fire

5 away?

6      A.    I do not remember exactly.  At that point

7 in the design we probably would have been working

8 more with the school as opposed to the Diocese and

9 the staff at the school.  It would have been led by

10 Mr. Theos, and I don't know who was in charge of

11 athletics at the school.  I don't remember who was

12 in charge of athletics at the school at that point

13 in time.

14     Q.    Do you make a practice of looking at naked

15 children?

16     A.    No.

17           MR. STAIR:  Object to form.

18           MR. DUKES:  Object to form.

19     Q.    Why not?

20           MR. STAIR:  Object to form.

21     A.    I see no reason to and have no desire to.

22     Q.    I'm not suggesting otherwise.  I'm just

23 asking you the question because I don't know

24 anybody until I met these characters from the

25 Diocese and in the high school who would admit that

1  they look at naked children.

2          MR. STAIR:  Object to the form if that was

3  a question.

4          MR. DUKES:  Object to form.

5          MR. RICHTER:  I'm making it a question.

6          MR. STAIR:  Then I object to the form of

7  it.

8      A.    I do not.

9      Q.    You're in charge of time.  If you need

10 anything or if it's time for a comfort break or

11 whatever, all you've got to do is say so.

12     A.    Sure.

13     Q.    Generally we break every hour, hour and 10

14 minutes or so for just a short break, five, ten

15 minutes.  We're not there yet.  I'm just

16 reminding myself to tell you that.

17          So as to the windows, what did you

18 professionally and LS3P professionally as well seek

19 to accomplish by the placement of the windows?

20          MR. STAIR:  Object to form.

21          MR. DUKES:  Same objection.

22     Q.    I refer to them as a viewing window.  We

23 did that with Mr. Attanasio.

24          MR. STAIR:  Object to form.

25          MR. DUKES:  Same objection.

1     A.     What did we attempt to accomplish?

2     Q.     Yes.

3     A.     We attempted to provide a way to supervise

4  those locker rooms during the use of the building.

5     Q.     Are you aware that all across the country

6  persons who have used viewing windows, schools who

7  have used viewing windows have been made to pay

8  very substantial sums for invading the privacy of

9  the persons they looked at?

10          MR. DUKES:  Object to form.

11          MR. STAIR:  Object to form.

12    A.     No, I'm not.

13    Q.     Who did the work to determine the view

14  corridors created by each of these windows placed

15  in each of the three locker rooms at Bishop England

16  High School?

17          MR. STAIR:  Object to form.

18          MR. DUKES:  Same objection.

19    A.     I'm not sure there was anything other than

20  just simply locating the window at the end of the

21  long corridor, and that's pretty much it.

22    Q.     I understand.  So I take it from your

23  response that nobody turned their attention to does

24  this give us a view of a shower, does this give us

25  a view of a toilet, does this give us a view of a

1   basin, that sort of thing?

2       A.    I think when we laid it out, we would have

3   looked and seen that you could not see directly

4   into the shower or into the toilet areas.

5       Q.    That's what I'm asking.  Who did that?

6       A.    I guess the design team as a team looked

7   at it that way.

8       Q.    But not you?

9       A.    I would have been involved in the

10  decision, yes.

11      Q.    I would like to digress just for a moment

12  to ask you how it is that LS3P designated the

13  person who came to be deposed as what we call a

14  30(b)(6) witness most knowledgeable about a series

15  of subject areas -- how does that happen at LS3P?

16          MR. DUKES:  Object to form.

17          MR. STAIR:  Object to form.

18      A.    I do not know.

19      Q.    You've never been designated as a witness?

20      A.    No.

21      Q.    You have been there now 40 years?

22      A.    37.

23      Q.    37.  That's right.  Your friend testified

24  to 37 and said he had been there 35, and he

25  repeatedly said that you were the repository of the

1  knowledge.  He said it in a very nice way about

2  you, but what I'm trying to understand is was this

3  some scheme that was cooked up by some legal team

4  to send somebody else to testify other than the

5  person they're required to send, the person most

6  knowledgeable?

7          MR. DUKES:  Object to form.

8          MR. STAIR:  Object to the form of that

9  question.

10     A.    I do not know the reason.

11     Q.    Who represents you here today?

12     A.    Mr. Stair.

13     Q.    Do you know that Mr. Stair and the

14  witness, Mr. Attanasio, both were found to have

15  violated the federal rules by a federal judge and

16  had to come back as a sanction and sit again for a

17  deposition?

18     A.    Yes.

19          MR. STAIR:  Object to form.

20     Q.    Does that impress you?

21          MR. STAIR:  Object to form.

22          MR. DUKES:  Object to form.

23     A.    I did see where he was required to come

24  back and that there were some court documents that

25  resulted in his second deposition.

1    Q.    You didn't see that Judge Gergel's order

2    found that both the witness and Mr. Stair, his

3    lawyer, had specifically violated the federal rules

4    that control the procedure that we're going through

5    with you now and made them come back?

6              MR. STAIR:  Object to form.

7              MR. DUKES:  Object to form.

8    A.    I'm not sure I understood or read what

9    Judge Gergel may have written, but I did see where

10   he was required to come back.

11   Q.    Well, when we take a break, I'll get a

12   copy of the order for you and put it in this record

13   and make it available to you.

14             Let's talk about the fact that these

15   children almost universally would have been under

16   18 years of age.  In other words, they would all

17   have been minors, the people who were viewed in the

18   dressing rooms.  Do you understand that?

19   A.    Yes.

20   Q.    I will represent to you that the law is

21   that a minor cannot consent, cannot enter into a

22   contract and give consent, so they couldn't say

23   it's okay to look at me, but the guardian or parent

24   of that person could act for them.  So if you had

25   two children, one was 20 and one was 16, the 20

1  year old makes his own call, although within your

2  family you may still be accustomed to directing his

3  activities, but the 16 year old doesn't make the

4  call for the 16 year old.  Are you clear about

5  that?

6          MR. STAIR:  Object to form.

7          MR. DUKES:  Object to form.

8   A.    I don't know the legal terms there, but if

9  you say so, I will believe you.

10  Q.    Thank you.

11         That being the case, what did you do about

12  telling the parents of these children or the person

13  who paid a very healthy tuition to send these

14  children to this school every year -- what did you

15  tell them about the fact that these children were

16  going to be watched naked?

17         MR. DUKES:  Object to form.

18         MR. STAIR:  Object to form.

19  A.    Neither I nor LS3P would have said

20  anything to the parents.  We don't have contact

21  with parents of the school.

22  Q.    Well, there is nothing prohibiting you

23  from having contact with parents of children at the

24  school, is there?

25         MR. STAIR:  Object to form.

1     A.     Not that I'm aware of.

2     Q.     And there wasn't back at the time that

3   this happened?

4          MR. STAIR:  Object to form.

5          MR. DUKES:  Same objection.

6     A.     No.

7     Q.     Let's go on.

8          Did you write to the school, you as

9   LS3P -- sometimes it's you personally and sometimes

10   it's LS3P.  I realize who you work for and who

11   you're representing here today in this

12   proceeding -- first of all, did you and secondly

13   did anyone else to your knowledge at LS3P make any

14   suggestion that signage should be posted warning

15   persons that they could be seen in all states of

16   dress or nudity through these windows?

17          MR. STAIR:  Object to form.

18          MR. DUKES:  Object to form.

19     A.     I did not, and I don't know that anyone

20   else at our firm would have written such a letter

21   or instructions to the school.

22     Q.     Can you tell me why that would be that you

23   didn't post signage?

24          MR. STAIR:  Object to form.

25     A.     I'm not aware of any such signage that I

1 have ever seen in any kind of building, and I know

2 of no code requirement that requires that kind of

3 signage, so it's just not something that I've ever

4 heard of anyone doing.

5   Q.   Do you think there is any moral code that

6 requires that you notify first the children at

7 least who are going to be viewed in all states of

8 nudity -- let me stop there.  That's the question.

9        MR. DUKES:  Object to form.

10        MR. STAIR:  Object to form.

11   A.   I don't know that I understand exactly

12 what the term is that you're saying, a moral code.

13 Is there a moral code?  I don't know of any moral

14 codes.

15   Q.   Are you testifying under oath here today

16 that you don't have any moral code?

17        MR. STAIR:  Object to form.

18        MR. DUKES:  Object to form.

19   A.   No, I'm not.  I'm just saying I'm not

20 aware of written moral codes that say what you're

21 suggesting, that we have a moral code to notify the

22 children.

23   Q.   I didn't use the word "written."

24   A.   Okay.

25   Q.   I just asked if you agreed that there is a

1  moral code by which we live and hope to find our

2  salvation.

3         MR. STAIR:  Object to the form of the

4  question.

5         MR. DUKES:  Object to form.

6  A.    Sure.  I have morals, yes.

7  Q.    But in this instance no moral code induced

8  you or persuaded you in any way or anybody on the

9  LS3P team to notify the children that they could be

10 viewed fully nude?

11        MR. DUKES:  Object to form.

12        MR. STAIR:  Object to form.

13 A.    That is correct.

14 Q.    Now I'm going to ask the same questions

15 about their parents.

16        Did anybody at LS3P notify the parents

17 ever that their children could be seen nude through

18 these windows?

19        MR. STAIR:  Object to form.

20        MR. DUKES:  Object to form.

21 A.    Not that I'm aware of.

22 Q.    Who could see them?

23        MR. STAIR:  Object to form.

24 A.    I would imagine the coaches in those

25 locker rooms could see them, and they could also

1    see them when they were in the locker room with the

2    students.

3        Q.    Is that what the coaches did, they go in

4    the locker room with the students?

5            MR. STAIR:  Object to the form.

6        A.    I would assume that they would have

7    because during a basketball game or something the

8    coaches go in the locker loom with the students.

9    At the end of the game they go in the locker room

10   with students, so...

11       Q.    Sometimes they don't use the nicest words

12   when they go in the locker rooms.

13       A.    I played junior varsity basketball, and

14   coaches were in the locker room with us.

15       Q.    Did you hear the kind of language I

16   referred to directed at you?

17           MR. STAIR:  Not at First Baptist.

18       A.    It was a Baptist school, so...

19       Q.    Let's go forward then.  I would like to

20   ask you about tuition payers.  Tuition in round

21   numbers -- it has increased over the years, but at

22   Bishop England in round numbers $10,000 is what we

23   call the Catholic tuition.  It's not based on

24   Catholicism; it's based on the parish relationship,

25   and for non-Catholics it's about $14,000 again in

1    round numbers.

2          LS3P didn't notify any of the tuition

3    payers either, did they, that the children were

4    being viewed nude and that their tuition is what

5    enabled the children to be there to get looked at?

6          MR. STAIR:  Object to the form.

7    A.    No, we did not notify tuition payers.

8    Q.    At the last LS3P deposition we took I

9    asked the deponent if he was proud of having a part

10   in putting those windows through which children

11   were viewed in various states of nudity, and he

12   said no.  I want to ask you that same question.

13   Are you proud of that?

14         MR. STAIR:  Object to the form.

15         MR. DUKES:  Object to form.

16   A.    I'm not proud of the fact that the windows

17   that we put in there for the supervision and

18   security reasons were used for unintended purposes

19   by an individual who should not have been doing

20   that.

21   Q.    What do you know about the intended

22   purpose of the guy sitting on this side of the

23   window while the children are changing their

24   clothing just on the other side of it?

25         MR. STAIR:  Object to the form.

1          MR. DUKES:  Object to the form.

2     A.    The intended purpose was to supervise the

3   locker rooms.

4     Q.    That's not my question.  The question is

5   what do you know about the guy sitting on this side

6   looking in at the students nude?  You don't know

7   what is in his mind, do you?

8          MR. DUKES:  Object to the form.

9          MR. STAIR:  Object to the form.

10    A.    I do not know.  I don't even know who

11  those individuals would have been.

12    Q.    We know this, who the persons are that

13  created the mechanism for persons to look at naked

14  children at Bishop England High School, and one of

15  those persons is you.

16         MR. STAIR:  Object to form.

17         MR. DUKES:  Object to form.

18    A.    We designed the windows for supervision

19  reasons.

20    Q.    What compelled that?  What was the need

21  for windows looking into locker rooms for

22  supervision reasons?

23         MR. STAIR:  Object to form.

24    A.    It's my understanding that locker rooms

25  are places that you need to supervise to make sure

1   that bullying doesn't take place, fights don't

2   break out, vandalism doesn't occur, things such as

3   that. Schools generally do not like to have spaces

4   that students are in where they are not supervised

5   by an adult.

6      Q.    The bathrooms are in the same category,

7   aren't they?

8      A.    I would not say that bathrooms are

9   supervised.

10      Q.    Why not?

11      A.    Because there are codes in the plumbing

12   code and other general guidelines that say you

13   should not watch children at a toilet or a urinal.

14      Q.    Why not?

15      A.    Just for privacy reasons for the kids.

16      Q.    How does the bathroom where someone is

17   urinating differ from the locker room where

18   somebody is completely nude and may walk across to

19   the urinals and urinate and walk right back twice

20   passing the windows?

21         MR. DUKES:  Object to the form.

22         MR. STAIR:  Object to the form.

23      A.    I can't answer that question. I do know

24   that plumbing codes say that you should not be able

25   from a public area to see someone at a urinal or a

1    toilet, and the reason I understand the privacy

2    concerns was as I read the code is that individuals

3    need privacy to urinate or whatever, and they don't

4    want somebody staring at them.  Some people have

5    problems with performing that activity.

6        Q.    Do the students who urinate, flush it,

7    wash their hands, go back to the locker, get a

8    towel, and dry their hands fully nude for all of

9    those activities -- do they differ in some way from

10   what you just described?

11           MR. DUKES:  Object to the form.

12           MR. STAIR:  Object to the form.

13       A.    I can't answer that question.  I really

14   don't know how they're different.

15       Q.    What you're testifying to, is it not, is

16   the party line.  Isn't that what you're saying?

17           MR. DUKES:  Object to the form.

18           MR. STAIR:  Object to the form.

19       A.    No.

20       Q.    Who did you discuss your testimony here

21   with not only today, but who have you discussed

22   your testimony with prior to appearing at this

23   deposition?

24       A.    Mr. Stair.

25       Q.    Who else?

1      A.    Our in-house attorney, John Works.  I did

2  discuss it with Roger Attanasio.  That's all.

3      Q.    Did he tell you he said he wasn't proud of

4  that window or those windows?

5      A.    I believe I read it in his deposition.

6      Q.    But he didn't mention that to you?

7          MR. STAIR:  Object to the form.

8      A.    No.

9      Q.    Having read it in his deposition, did you

10  ask him why are you not proud of having had a hand

11  in the creation of those windows?

12          MR. STAIR:  Object to form.

13          MR. DUKES:  Object to form.

14      A.    I did not discuss that with him.

15      Q.    Can you tell me what kind of glass was in

16  those windows?

17      A.    Single pane glass as far as I can tell.  I

18  mean it would not have been insulated glass because

19  it's an interior window and probably had some sort

20  of resistant to breakage.

21      Q.    Do you know the thickness of it?

22      A.    Not off the top of my head.

23      Q.    I understand what your profession is and I

24  understand what you do, but let me ask do you have

25  any expertise concerning the transmission of sound

1  through, first, various thicknesses of a glass pane

2  and, secondly -- well, that first.

3      A.    I don't really have any expertise in

4  transmission of sound through glass.  We do

5  sometimes hire acoustical engineers to help us with

6  that.

7      Q.    But that's not you?

8      A.    We would hire someone to do that.

9      Q.    You all didn't do that in this case?

10     A.    Not that I can recall.

11     Q.    What do you know about the windows being

12 destroyed in the face of us writing them what is

13 called a spoliation letter saying don't destroy the

14 windows?

15           MR. DUKES:  Object to the form.

16           MR. STAIR:  Object to the form.

17     A.    I've seen the photos that I guess you took

18 with the windows covered over.

19     Q.    Covered over with what?

20     A.    It looked like from the photos it was

21 plywood.

22     Q.    Do you know that Bishop England, the

23 Diocese, these defendants, were notified to

24 preserve that evidence?

25           MR. DUKES:  Object to form.

1         MR. STAIR:  Object to the form.

2    A.    I do not know that.

3    Q.    Are you familiar with the term

4    "spoliation"?

5    A.    No, I'm not.

6    Q.    Quickly what it means is if you have some

7    evidence, I may write you a letter saying you've

8    got evidence which is involved in this litigation.

9    Don't destroy it, don't alter it, keep it safe,

10   don't do anything with it.  If you do, there may be

11   consequences.  That's what a spoliation letter is

12   just so you know what the term refers to.

13        MR. DUKES:  Let's take just a five or

14   ten-minute break.

15        (Brief recess)

16   Q.    Mr. Aichele, did you have occasion to

17   speak with anybody concerning your testimony during

18   the break?

19   A.    I did not.

20   Q.    Thank you.

21        I was talking to you a little while before

22   we broke about who was sitting on the viewing side

23   of any one of those three windows, and I think I

24   used the example of the athletic director whose

25   name is Runey.

1          You don't know who was sitting on the
2    viewing side, do you?
3       A.    I do not know the individuals.  I mean
4    they were designed as coaches' offices, so it would
5    be coaches or athletic directors is who the intent
6    was.
7       Q.    Whose intent was that?
8       A.    The school and ours was to provide an
9    office where the coaches and athletic directors
10   could have a place to touch down and also monitor
11   and supervise the locker rooms.
12      Q.    How do you know that?
13      A.    How do I know --
14      Q.    What you just said.  You said it was the
15   school's and mine.
16      A.    From the program that we worked out
17   together with the school it says to provide windows
18   for supervision of the locker rooms.
19      Q.    Did you, LS3P, provide us a copy of that
20   program?
21          MR. STAIR:  Object to the form.
22      A.    I don't believe we had a copy of the
23   program, but I believe the school did.
24      Q.    Did have a copy or did provide it?
25      A.    Both.

1    Q.    And you think it says what you just
2  testified to?
3    A.    I read it in the last week when the
4  information was shared, and I'm pretty sure that's
5  what it says.
6    Q.    Where did you get it from if you don't
7  have one, LS3P doesn't have it?
8    A.    I did not have one, so the only version
9  that I've seen is what the school has made
10  available.
11    Q.    Let me break my question down.
12          Who did you get it from?
13    A.    From the information that was shared with
14  you and from Bishop England -- from the school.  I
15  guess it's what they had in their files.
16    Q.    My question again was the word "who."
17  That requires a name.
18          Who did you get it from?  Somebody put it
19  in your hand, didn't they?
20    A.    No.  I've only seen electronic copies of
21  it that was distributed.
22    Q.    That's fine.  Who did you get it from?
23    A.    I believe that came from Mr. Stair's
24  office.
25    Q.    I think we established a while ago that

1  you don't have any idea when the windows were

2  used to view students and when they were not

3  because you weren't there.

4       A.     That is correct.

5       Q.     What is the reason that you put a window

6  on the door of the coach's office or Mr. Runey's

7  office in the example that we've used, which is

8  behind on a hallway, a corridor behind the person

9  sitting looking through the viewing window?  Why

10 did you put a window out there?

11      A.     Well, when I saw that in the photographs

12 that you took, I guess, I went back and I checked

13 our construction documents and the information

14 provided by the school, and that window in the door

15 was not included in our construction documents.  So

16 I do not know anything about how that window got

17 added.

18      Q.     But is it your testimony that LS3P didn't

19 design that?

20      A.     To the best of my knowledge I can find

21 nothing that says that it was included in our

22 construction drawings, and I actually even looked

23 at the information that the school made available

24 for -- the information the contractor gave them at

25 the end of the job called the project record

1  documents, and in there it does not show a window

2  either.

3      Q.    Who provides that project engineering --

4      A.    The project record documents.  At the end

5  of the construction phase the contractor pulls

6  together all of his submittals and information that

7  he used to build the school and gives that to the

8  owner for maintenance and operation purposes so

9  he'll know I've got this kind of roof on the

10  building, I've got this kind of doors and that kind

11  of stuff.

12     Q.    You said there was no mention of the

13  hallway, if I can say it that way, the hallway door

14  to the coach's office or to Mr. Runey's office in

15  our example -- you said there is no record that you

16  could find in LS3P materials at least that there

17  was such a window in the door?

18     A.    That is correct.

19     Q.    You know that there is?

20     A.    I've seen the photos of it, yes.

21     Q.    Do you also know that someone walking down

22  the hall could look through that window right

23  across the top at the back of Mr. Runey's head

24  right above it and look right straight in to your

25  two sons -- we used this as an example a while ago,

1  an 18 and 16 year old, for example -- and watch

2  them take their clothes off, put the equipment on,

3  do whatever they had to do for the athletic

4  practice or whatever, and come back and do it in

5  reverse order?  Anybody walking down the hall could

6  do that.  Do you agree with that or not?

7          MR. STAIR:  Object to form.

8          MR. DUKES:  Object to form.

9      A.    Like I said, the only knowledge I have of

10 those windows are the photos that I think you took,

11 and the photos that I saw showed that they had

12 blinds on those windows in the doors.  So I don't

13 know if it's possible to look through that window

14 or not if the blinds are drawn.

15     Q.    I'm not asking you if the blinds are

16 drawn.  I'm asking you first generically, and then

17 I'll ask you about the blinds being drawn.

18          Generically is there anything prohibiting

19 someone walking down the hall from looking through

20 that window assuming that it is not covered and

21 blocked up or darkened?

22     A.    No.

23          MR. STAIR:  Let him finish, let me object,

24 and then answer the question.  I object.

25          MR. DUKES:  Object to the form.

1      A.    Yes, you could walk down the hall and see

2  in that window.  I don't know how much you could

3  actually see all the way through.  I've never

4  looked through it all the way across the office and

5  what might have been blocking your view inside the

6  office.

7      Q.    Let me take the example just a little

8  further.

9            Assume that Mr. Runey is sitting there

10  looking as you've characterized it for safety

11  purposes at these naked children in the dressing

12  room.  There is a knock on the door, and he says

13  it's not locked; come on in.  Let's assume it's

14  you, and you're a cake delivery guy is an example I

15  used with someone else.  It's his birthday, and

16  your next task on your list was to deliver Runey's

17  birthday cake.  That's why you're there.  You walk

18  in, and there are naked children in front of a

19  window.

20            Do you think that the children are

21  entitled to know that this cake delivery man may

22  look at them naked?

23            MR. DUKES:  Object to the form.

24            MR. STAIR:  Object to the form.

25      A.    I don't know if they could see it or not.

1    If the blinds in the windows to the locker room

2    were closed, you would not be able to see into the

3    locker room.

4        Q.    You would not be able to view the

5    children --

6        A.    Right.

7        Q.    -- if the blinds were closed?

8        A.    Right.

9        Q.    But you said the purpose was to view the

10   children in the locker room.

11       A.    It was to view the locker room.

12       Q.    Well, how do you view the locker room

13   without viewing the children who are in the locker

14   room?

15       A.    Because there are times when the locker

16   room would be empty.

17       Q.    And times when it would be full of

18   children?

19       A.    Yes.  There would be times when it would

20   be empty as well, and the coaches would want to

21   supervise them to make sure there is nobody in

22   there when they should not be in there.

23       Q.    I don't know what you mean.  How does that

24   supervise children?

25       A.    Supervising the room so they can monitor

1    the space.

2        Q.    So it's not supervising the children

3    anymore; now it's supervising the room.

4            MR. STAIR:  Object to the form.

5        A.    It's both.

6        Q.    How come you didn't say that earlier?

7            MR. STAIR:  Object to the form.

8            MR. DUKES:  Same objection.

9        A.    It didn't occur to me.

10       Q.    Well, take your cake delivery man hat off

11   and put on the hat of the maintenance person at the

12   school who is there to fix a light fixture that's

13   not appropriately functioning.  You come, and Runey

14   is sitting there looking at naked children in the

15   locker room.  What prevents you from looking at

16   those naked children in the locker room?

17           MR. DUKES:  Object to the form.

18           MR. STAIR:  Object to the form.

19       A.    If the blinds are open, nothing.

20       Q.    If the blinds are not open, there is no

21   reason to have the window, is there?

22           MR. DUKES:  Object to the form.

23           MR. STAIR:  Object to the form.

24       A.    If the blinds are shut, not open, then

25   you're not able to monitor the locker room.

1    Q.    So why have the windows?

2    A.    Because there may be times when you do

3    want to monitor the locker room and you could open

4    the blinds.

5    Q.    After you leave fixing the light fixture

6    in the room and either looking through the open

7    window that Runey is looking through or not the

8    fire marshal from the City of Charleston comes down

9    as he has a right and an obligation to do, and he

10   walks through this office.  What precludes him from

11   looking at those naked children?

12        MR. DUKES:  Object to the form.

13        MR. STAIR:  Object to the form.

14   A.    The only thing that would preclude that

15   would be the blinds.

16   Q.    If they were closed?

17   A.    Correct.

18   Q.    Did you or didn't you say that would

19   defeat the viewing or monitoring I think was the

20   word you used ability that a plate glass window

21   would provide?

22   A.    When they're closed, you would not be able

23   to see into the locker room.

24   Q.    Let's assume that they're open for a

25   minute, and three boys who were bad boys come back

1    from their workout or practice or whatever it was

2    and all three head to the shower.  That's on the

3    other side of the wall I described as dividing the

4    two halves of the locker room facility, isn't it?

5        A.    Correct.

6        Q.    You said that you can't see on that side

7    because I asked you about toilets and basins and

8    showers and all that.  I just want to make sure you

9    remember your testimony, that you do recall it.

10       A.    Correct.

11       Q.    These three bad boys get out of the

12   shower, and there is a nice boy who gets out of the

13   shower at the same time.  He happens to be the boy

14   that they bully, and so they grab him and they put

15   a towel around his head and bully him to do

16   whatever they want to do to him on that side of the

17   wall, which you said can't be seen.

18           Then what good is a viewing window in

19   terms of preventing that kind of activity?

20           MR. DUKES:  Object to form.

21       A.    I would think that the coaches, those

22   supervising the locker room would be able to see

23   people going into the entrance of that shower room,

24   and they could potentially hear activities or

25   things and see things before they got to the actual

1  hidden areas, which are the showers and toilets.

2     Q.    These people have already been to the

3  shower let's assume and they've come out, all now

4  four people in my example, one a good child, the

5  other three problems, and let's assume that they

6  follow up with the same activity I described to you

7  a moment ago, but they push this kid into a toilet

8  area.

9       Do the toilet areas have doors on them?

10    A.    I do not believe they do.

11    Q.    So do any of the toilets in that locker

12  room facility/locker room dressing room -- I don't

13  know which goes first and which goes second, but

14  locker room/dressing room/bathroom facility, do any

15  of the toilets, the commode areas -- they're

16  individual, aren't they?

17    A.    That's correct.

18    Q.    There are several of them, aren't three?

19    A.    Yes.   There is a group of individual

20  toilets with partitions around them.

21    Q.    Around them, but no doors, so that you

22  can't defecate in the privacy of having a door to

23  keep people from viewing you while you defecate?

24  Is that what you all designed?

25       MR. DUKES:  Object to the form.

1              MR. STAIR:  Object to the form.

2      A.    No.  My recollection is that the toilet

3  stalls have doors on them.

4      Q.    Certainly they do.  I thought you just

5  said a moment ago that they didn't.

6      A.    The entrance to the area where all the

7  toilets are if I recall correctly is a cased

8  opening, an opening that does not have a door into

9  the toilet room.

10     Q.    There are two entrances like that.

11 Remember I described this to you when we first

12 started talking about this?  Cased you called it.

13 Is that the proper terminology?  I'm sorry.  I

14 didn't know that term.

15             When you step through that cased opening,

16 you're in the toilet facility, the basin facility,

17 the shower facility, and I don't know what else is

18 over there.  The disabled bathroom facility s over

19 there as well; right?

20     A.    That sounds correct.

21     Q.    Now you say those toilet facilities where

22 someone goes to defecate in fact do have a door on

23 them.  Isn't that your testimony?

24     A.    The toilet stalls would have doors on

25 them, yes.

1    Q.    The doors open inward, don't they?

2         MR. DUKES:  Object to form.

3    A.    Some may open out for handicapped access.

4    Some would open in.  Typically in a stall they open

5    in.

6    Q.    Typically they open in.  Let's leave the

7    handicapped off for a moment.

8         In addition to the handicapped toilet area

9    there is also a handicapped shower, isn't there,

10   right next to that toilet facility?

11   A.    I don't recall.

12   Q.    I'm just trying to understand how does the

13   coach or Runey, the athletic director in the

14   example I have been using -- how does he see what

15   is going on behind that wall from his work station

16   sitting in front of the plate glass windows looking

17   at the students change clothes?

18        MR. STAIR:  Object to form.

19        MR. DUKES:  Object to form.

20   A.    He cannot see into those rooms, but in the

21   instance you described if three bad guys grabbed a

22   student and pushed them in there, I would think he

23   would be able to see that.

24   Q.    How could he see it?  Would the wall not

25   block his view?

1          MR. DUKES:  Object to the form.

2          MR. STAIR:  Object to the form.

3     A.     As I said, if the activity that you

4  described is they left the shower and they were

5  pushing somebody into that room, the coaches would

6  be able to see the activity out in the locker room,

7  but not in the --

8     Q.     They never go into the locker room area in

9  the example I gave you.  They step out of the

10 shower, which is blocked from view pursuant to your

11 earlier sworn testimony through the viewing

12 windows.  Isn't that what you said?

13    A.     I did.

14    Q.     Well, that hasn't changed.  I didn't say

15 they came back into the locker room half of the

16 facility.  They come out of the shower, which is

17 clearly by your testimony not viewable through the

18 viewing windows, and they jump the little boy, who

19 they bully.  Bully I guess is the right word to

20 use.

21          I'm just asking that student who gets

22 jumped when he steps out of his shower stall, what

23 good does a viewing window do him?

24          MR. DUKES:  Object to the form.

25          MR. STAIR:  Object to the form.

1    A.    The viewing window would not allow that

2  area to be seen, that is correct.

3    Q.    That's right.

4          You mentioned a number of things that were

5  security issues as you put it.  Bishop England has

6  written about this.  I guess you've read all the

7  stuff that they've written concerning their

8  concerns about their structure and so forth.

9          MR. DUKES:  Object to form.

10          MR. STAIR:  Object to form.

11    A.    I've not read that document.

12    Q.    Thank you.

13          Well, let me ask you this.  Let me tell

14  you this first.  I'll represent this to you, and I

15  will be glad to show you documents if you want to

16  see it.  Bishop England wrote through Ms. Aselage,

17  their communications director or public -- I don't

18  know what her title is.

19          MR. DUKES:  Director of media relations.

20    Q.    The director of media relations,

21  Ms. Aselage, she wrote that they wanted to look out

22  for things like bullying, I think.  I don't

23  remember what else, but the third thing that she

24  wrote about with her name on the byline was

25  smoking.

1          You've got part of the dressing room that

2     you can't see or half of the overall facility, the

3     bathing half of the overall facility you can't see

4     through the viewing window pursuant to your

5     testimony.  Can you hear smoking?

6          MR. DUKES:  Object to the form.

7          MR. STAIR:  Object to the form.

8     A.     Not that I'm aware of, no.

9     Q.     Well then, what good is a viewing window

10    in terms of detecting smoking first in the area

11    that we're describing where the toilets and the

12    basins and the showers are -- what good is the

13    viewing window for detecting smoking in those

14    areas?

15         MR. STAIR:  Object to the form.

16         MR. DUKES:  Same objection.

17    A.     I have not seen the document that you

18    referenced that the school public relations person

19    put out, but I would imagine the viewing window

20    would allow you to see smoke if it went from space

21    to space.  You would then know that there is

22    smoking going on.

23    Q.     The same thing with vapes?

24    A.     Correct.  I don't know much about vapes,

25    but I assume they produce similar smoke.

1    Q.    But they're standing in front of the

2  basins smoking, which cannot be seen through the

3  viewing window.  That's the example I'm giving you.

4  They went there because they couldn't be seen

5  through the viewing window perhaps.  I just asked

6  what good the viewing window is in detecting the

7  smoking violator.

8           MR. DUKES:  Object to the form.

9           MR. STAIR:  Object to the form.

10   A.    I think the viewing window would allow you

11  to see smoke.

12   Q.    In front of the basins?

13           MR. STAIR:  Object to the form.

14   A.    Smoke doesn't stay in one space.  It goes

15  throughout, and depending upon how that locker room

16  is ventilated, it would draw the smoke from those

17  areas into a system that evaporates it out.

18   Q.    And you think that from the front of the

19  basin area someone could take a puff from a

20  cigarette, and the system which you designed, you

21  and your team -- I didn't mean to individualize it

22  to you, but you and your team designed would

23  somehow draw that mouthful of smoke when it was

24  exhaled over to the side where the lockers are,

25  which could be viewed by the coach looking through

1  the viewing window, Mr. Runey in this example

2  looking through the viewing window?  Is that what

3  you're saying?

4         MR. DUKES:  Object to the form.

5         MR. STAIR:  Object to form.

6  A.    I am saying that the exhaust system and

7  ventilation system which would likely be in a

8  locker room would pick up that smoke and draw it

9  into the area where it could be viewed.

10  Q.    How long is it before that mouthful of

11  smoke that is exhaled dissipates?

12         MR. STAIR:  Object to form.

13         MR. DUKES:  Object to form.

14  A.    I have no idea.

15  Q.    How long would it take that mouthful of

16  smoke to be drawn from in front of the middle of

17  the sinks down to one of the openings that we

18  described a moment ago, the cased openings, and

19  into the dressing room/locker room part of the

20  facility?

21         MR. STAIR:  Object to form.

22         MR. DUKES:  Object to form.

23  A.    I do not know that.  That would be

24  something that a mechanical engineer would probably

25  be able to answer.  I'm not a mechanical engineer.

1    Q.    Do you know of a mechanical engineer in
2  the world who will say that what you just said is
3  believable?
4          MR. DUKES:  Object to the form.
5          MR. STAIR: Object to the form.
6    A.    I believe I do.
7    Q.    Give me his name.
8    A.    The engineer who worked on the school was
9  named Dan Ryder with Buford, Goff & Associates.
10   Q.    And you think that he'll testify that a
11 mouthful of smoke exhaled in front of the basins
12 that we have been talking about will be visible to
13 a viewing coach or a voyeur long enough that it
14 would come around into the locker room itself not
15 dissipated and be visible to the naked eye?
16         MR. STAIR:  Object to form.
17         MR. DUKES:  Object to form.
18   A.    It would depend on where those exhaust
19 vents are.
20   Q.    Where are they?  You drew them.
21         MR. STAIR:  Object to the form.
22   A.    The mechanical engineer designed them.  I
23 would have to look at the drawings.  They are in
24 the actual toilet room or in the locker room.  I
25 suspect that there are exhaust vents in the locker

1  rooms because there are smells that need to be

2  exhausted from a locker room.

3     Q.    As from a toilet room?

4     A.    As from a toilet room.

5     Q.    So you suspect that there are such vents

6  on both sides?

7     A.    I suspect, but I do not know for sure on

8  this school.

9     Q.    What is the limit on how many people a day

10 such as you the cake delivery man, you the light

11 bulb maintenance person -- I forget the other

12 examples I used -- the fire marshal, or you the

13 electrician who comes to fix a switch plate on the

14 wall -- what is the limit on how many people can

15 come in that office while children are changing

16 their clothes per day?

17        MR. DUKES:  Object to the form.

18    A.    I don't know that there is a limit.

19    Q.    Why not?

20        MR. STAIR:  Object to form.

21        MR. DUKES:  Object to form.

22    A.    I don't know.  I mean I don't control the

23 visitors to that school.

24    Q.    I understand.

25        I meant to ask you this earlier.  You

1   indicated you are not married and don't have

2   children in your own personal life.  Do you have

3   siblings?

4        A.    I do.

5        Q.    Do your siblings have children?

6        A.    They do.

7        Q.    Where are your siblings?

8        A.    Three live here in Charleston and one

9   lives in North Augusta.

10       Q.    What are the last names of your siblings?

11       A.    Momeier, Wilson, and Jamme.

12       Q.    How do you spell Jamme?

13       A.    J A M M E.

14       Q.    Do all of them have children?

15       A.    No.  Only one does.

16       Q.    Which one is that?

17       A.    Wilson.

18       Q.    How many children does that individual

19   have?

20       A.    She has a son and a daughter.

21       Q.    How old are they, do you know?

22       A.    They are in their 30s, I believe.

23       Q.    Now?

24       A.    Yes, now.

25       Q.    Just tell me what you think.  What do you

1  think their pleasure would be concerning someone

2  looking at their children naked?

3          MR. STAIR:  Object to the form.

4          MR. DUKES:  Object to the form.

5  A.    I think they would understand that when

6  you go into a locker room to change, that locker

7  room could be supervised, and there could be

8  coaches or athletic department officials in there

9  with their children.

10  Q.    Because they read it on a sign?

11  A.    No.

12  Q.    Because a blind was open when they somehow

13  went into the dressing room?

14  A.    Possibly.

15  Q.    Not because the school ever told them

16  that?

17  A.    I don't know what the school tells them.

18  Q.    I'll represent to you the school has never

19  told any person by any writing, parents in this

20  example that we're using, the tuition payers --

21  never told them that your children are going to be

22  looked at nude.

23          MR. STAIR:  Object to the form.

24          MR. DUKES:  Object to the form.

25          MR. STAIR:  If that was a question, I

1  object to the form of it.

2      A.    I don't know what the school has notified

3  parents of the children.

4      Q.    Is that okay with you that the school

5  wouldn't notify your nephew's and niece's parents

6  that their children could be looked at nude if they

7  were Bishop England students?

8          MR. DUKES:  Object to form.

9          MR. STAIR:  Object to form.

10     A.    I would not expect a school to notify

11  parents that in a locker room they could be viewed

12  by coaches.

13     Q.    You would not expect a school to do that?

14     A.    Right.  I think it's a foregone conclusion

15  that locker rooms are places that coaches are in

16  with the students in some cases and could possibly

17  see them in other cases.

18     Q.    That being the case, why is it that all

19  across the nation places, schools among them, have

20  been made to compensate children who have had their

21  privacy invaded by persons viewing them nude?

22          MR. STAIR:  Object to the form.

23          MR. DUKES:  Object to the form.

24     A.    I do not know that.

25     Q.    You don't know that has happened or you

1   don't know --

2           MR. STAIR:  Let him finish his question so

3   I can object to it.  Are you finished?

4           MR. RICHTER:  No.

5   Q.    I think where I was in my question to you

6   without commenting on the fact that your lawyer has

7   already told us that he's going to object to the

8   question not knowing what the question is -- that's

9   what he got into trouble for previously in part,

10  but we'll see.

11          MR. STAIR:  Object to the statement.

12          (The court reporter read the pending

13  question.)

14          MR. STAIR:  Let him finish his question.

15  Did you finish your question?  I don't think you

16  did.

17          MR. RICHTER:  I think he understood.

18          MR. DUKES:  Object to the form.

19          MR. STAIR:  Between your question and his

20  answer I object to the form of it.

21  Q.    What do your siblings do in life?

22  A.    One is a real estate agent, one is

23  retired, and one works at a retirement home.

24  Q.    No one in the educational business?

25  A.    The one that is retired was in education.

1    Q.    What was his or her role?

2    A.    She was a special needs or special

3  education teacher.

4    Q.    In the public school system?

5    A.    Correct.

6    Q.    Here in Charleston County?

7    A.    No; North Augusta.  I'm not sure if that's

8  Aiken County or the county right next to Aiken.

9    Q.    When we started talking a little while

10  earlier about how many schools in Charleston County

11  you had done, I don't remember the number that you

12  said.  Do you recall?

13    A.    I believe that I responded that the firm

14  had probably done 20 or more.

15    Q.    So the firm believed it was a good idea to

16  view naked students.  Is that what you're saying?

17         MR. DUKES:  Object to the form.

18         MR. STAIR:  Object to the form.

19    A.    I don't know that the firm weighed in on

20  that decision, but I do know that the firm had

21  designed several locker rooms with view windows in

22  them.

23    Q.    One guy got detected viewing these

24  children -- actually making a recordation, a phone

25  record of these children in various states of

1  nudity or disrobed, and, of course, he got charged

2  with a criminal offense.

3        Are you aware that it's a criminal offense

4  to view children who are nude?

5        MR. STAIR:  Object to the form.

6        MR. DUKES:  Object to the form.

7  A.    I am not aware that it is a criminal

8  offense for coaches and other supervisors to

9  supervise kids in a locker room.

10  Q.    Are you aware that the guy who got busted

11  was an employee of the Bishop England High School

12  athletic department, an official in other words at

13  the school?

14  A.    Yes.  I read that he was the sports

15  information director or something to that effect.

16  Q.    What made his actions a criminal offense?

17        MR. STAIR:  Object to the form.

18        MR. DUKES:  Object to the form.

19  A.    I don't know that I fully understand

20  voyeurism.  I looked it up when I saw it in the

21  Complaint and his police record, and it said that

22  voyeurism is secretly viewing people for purposes

23  of sexual gratification.  So if that's what he was

24  charged with, then I guess that's why he was doing

25  it.  I do not know this individual or what his

1  motivations were.

2      Q.    Do you believe that there is a difference

3  between a coach entering a locker room or a school

4  official entering a locker room, a bathroom, and

5  the kids knowing that who are utilizing the

6  facility -- the kids knowing that as opposed to

7  when someone looks at them fully or at least

8  partially shaded by or blocked by a blind?

9      A.    I don't see where there would be a great

10  deal of difference.  If you could see the coach

11  when that coach is in the locker room with you and

12  you could see them through the blinds in their

13  office, you're still seeing the coach.

14      Q.    Now that you have knowledge because I'm

15  giving it to you sitting at this table this morning

16  that it has been found over and over again to be a

17  usurpation of privacy or an invasion of privacy to

18  view somebody or to try to view somebody by

19  planting a camera or looking with your eyes or

20  whatever your method was -- looking at somebody who

21  was nude or using a toilet let's say, do you intend

22  to notify whoever you have helped put a viewing

23  window in their facility -- do you intend to notify

24  them that they shouldn't be looking at children

25  through that window?

```
1                MR. STAIR:  Object to the form.
2                MR. DUKES:  Object to the form.
3      A.    Well, as you said, I was not aware that
4  there have been many instances of that being found,
5  so, no, I had not planned on notifying people that
6  locker room windows were problematic.
7      Q.    Well, now that you know it because I've
8  conveyed it to you here at this deposition -- now
9  that you know that -- you said you hadn't been
10 aware of it and you now are -- are you going to
11 notify anybody or any body as a corporate entity
12 kind of a body that they shouldn't look at children
13 through those windows?
14               MR. STAIR:  Object to the form.
15               MR. DUKES:  Object to the form.
16     A.    I would not know whether they would do
17 that or not.
18     Q.    It sounds like the one thing that we have
19 no dispute or factual dispute about is that LS3P
20 and Bishop England/the Diocese knew about the plan
21 for the school, although you can't remember who is
22 the person from whence the genesis of the plan
23 sprang, but you made it pretty clear I think and I
24 just want to make sure you agree with me -- I don't
25 want to misunderstand you -- that both LS3P and
```

1  Bishop England were knowledgeable about that as it

2  was effectuated.

3          MR. STAIR:  Object to the form.

4          MR. DUKES:  Object to the form.

5  A.    I would say yes, because we would have

6  reviewed the drawings and design with the school on

7  numerous occasions, and I would assume that the

8  locker room layouts were reviewed.

9  Q.    Have you ever seen a picture of these

10 windows in any kind of Bishop England or Diocesan

11 publication of any kind?

12         MR. DUKES:  Object to the form.

13 A.    No.

14 Q.    Are you aware that the Diocese has

15 accumulated and in many respects perfected the

16 skill of covering up and hiding activities that are

17 impermissible and that would make them liable?

18         MR. DUKES:  Object to the form.

19         MR. STAIR:  Object to the form.

20 A.    I am not aware of that.

21 Q.    Are you aware of the priest sex abuse

22 problem?  Not just priest.  I include everybody who

23 is in the clergy in the Roman Catholic church.

24         MR. STAIR:  Object to the form.

25         MR. DUKES:  Object to the form.

1      A.    Only to the extent I read in the

2  newspapers.

3      Q.    I'm not suggesting you have firsthand

4  personal knowledge.  I'm just asking if you're

5  aware of it.  I think it's hard for anybody not to

6  be aware of that now.

7            Did you see the other day that 260,000

8  French students were found to have been molested by

9  the clergy of the Roman Catholic church in France?

10           MR. STAIR:  Object to the form.

11           MR. DUKES:  Object to the form.

12     A.    I believe I did see something in the

13  newspaper about that in the last two weeks or so.

14     Q.    That's a great mark of distinction, isn't

15  it?

16           MR. STAIR:  Object to the form.

17           MR. DUKES:  Object to the form.

18           MR. RICHTER:  I'll withdraw the question.

19     Q.    I brought a magnifying glass.  I don't

20  know if you use these or not, but there will come a

21  day when you do.  My day has arrived.

22           MR. RICHTER:  Let me mark this, please, as

23  Plaintiff's No. 1 to this deposition.

24           (Deposition Exhibit No. 1 was marked.)

25     Q.    I'm going to hand you now what has been

1    marked Exhibit No. 1 to your deposition.  It bears

2    the heading Press Release, and it has the name

3    Maria Aselage, director of media relations on the

4    top line up there.  I'll ask you to take a minute

5    to review that, please, because I want to ask you a

6    question or two about it.

7            MR. STAIR:  Larry, we have not seen this

8    and were not notified about it in advance, so I

9    would like to step out and speak with the witness.

10           (Brief recess.)

11   Q.    Have you had an opportunity to discuss

12   Exhibit No. 1 with your lawyer?

13   A.    I have.

14   Q.    If you could fill me in on that

15   discussion, please.

16           MR. STAIR:  I object and instruct him not

17   to answer.

18   Q.    What that means is that he has instructed

19   you not to respond to my question so that we will

20   have to go before the Court as we did before, and

21   the judge will have to decide what to do about it.

22   It won't involve you.  You just were instructed to

23   do a thing and you did it because your counsel

24   instructed you, and you will be notified if we have

25   to come back or what we have to do about it.

```
 1            MR. STAIR:  Were we told this document was
 2   going to be discussed?  Have I missed that?
 3            MR. RICHTER:  No.  I was not aware that I
 4   had to tell you what documents would be discussed
 5   today.  Is there a rule --
 6            MR. STAIR:  I think there is a federal
 7   rule that says you have to notify the witness seven
 8   days in advance of the deposition of the documents
 9   to be discussed.
10            MR. RICHTER:  Or what?
11            MR. STAIR:  Or we get to talk about it and
12   have a privileged conversation.
13            MR. RICHTER:  You just did that.
14            MR. STAIR:  That's a privileged
15   conversation.
16            MR. RICHTER:  So it's not mandatory.
17            MR. STAIR:  But it's privileged if we go
18   out and talk about it in those circumstances.
19            MR. RICHTER:  Is that what the rule says?
20            MR. STAIR:  That's my interpretation.
21            MR. RICHTER:  Do you know what the rule
22   is?
23            MR. STAIR:  If you pull the rule up and
24   it's different than that, then we'll review the
25   objection, but that's the basis of the objection.
```

1          MR. RICHTER:  So you've instructed him not
2    to discuss that?
3          MR. STAIR:  No.  He can discuss the
4    document.  He cannot discuss the conversation we
5    had during the break that we just talked about.
6          MR. RICHTER:  I understand.
7    Q.    So having read this document do you
8    recognize what Bishop England has and the Diocese
9    to be inclusive has said about this litigation and
10   about detecting smoking?
11   A.    Yes.  I've read that in there.
12   Q.    It says within the locker rooms.
13         The toilet facility, is that part of the
14   locker room?
15   A.    I would consider the toilets and the
16   showers and the locker areas are all part of the
17   locker room.
18   Q.    Has anybody told you why a child's right
19   to privacy does not apply where the holy men of the
20   Diocese of Charleston are concerned?
21   A.    No.
22         MR. DUKES:  Object to the form.
23         MR. STAIR:  Object to the form.
24   Q.    Did you read in this statement where it
25   said:  After reviewing the lawsuit, quote, we feel

1  that the class action claims have absolutely no

2  merit, close quote?

3      A.    I see that.

4      Q.    Do you know that this lady has now

5  testified under oath differently than that?

6      A.    I do not.

7          MR. DUKES:  Object to form.

8      Q.    Do you have any understanding of how

9  frequently either fights, bullying, smoking, or any

10 type of inappropriate activity occurred within the

11 Bishop England locker rooms at the new school from

12 the first class in September 1998 through the year

13 2019?

14     A.    I do not have that knowledge.

15     Q.    Would it surprise you to learn that only

16 three reports exist concerning that?

17     A.    I don't know that that's a high or low

18 number quite frankly.

19     Q.    But none of them involved any of the

20 things that are reported here.  Inappropriate

21 activity certainly, except one such complaint

22 involved the theft of a wallet.  The second

23 involved photographing a child who has special

24 needs in a photograph which the school thought

25 showed the child naked.

1          MR. DUKES:  Object to the form.

2          MR. RICHTER:  Please don't interrupt.

3          MR. DUKES:  Please don't misstate the

4    record.

5          MR. RICHTER:  You're not allowed to have

6    speaking objections, Mr. Dukes, and I'm going to do

7    something about it.  We're going to have a day of

8    reckoning.

9    Q.    One involved the theft of a wallet, one

10   involved photographing a special needs child at the

11   school who the school people initially thought was

12   naked in the photograph and subsequently found I

13   think she was just wearing sort of skin-colored,

14   close-fitting something or other, and the third one

15   involved racial epitaphs being hurled and

16   photographs being taken.  Video being taken

17   actually.  Other than that, nothing in the locker

18   rooms or bathrooms for 21 years.  Are you aware of

19   that?

20         MR. STAIR:  Object to form.

21         MR. DUKES:  Object to form.

22   A.    The three reports that you just mentioned

23   are the only -- that's the first time I've heard of

24   that, so I'm not aware of any of the incidents that

25   you mentioned.  I would have no way of knowing

1    that.

2       Q.    The three we're talking about?

3       A.    Yes.

4       Q.    Do you know of any others?

5       A.    No.

6       Q.    And they haven't identified any others.

7    We've written them requiring that they do so, but

8    they haven't done that.

9             MR. DUKES:  Object to the form.

10      Q.    Did you drive here or walk here?

11      A.    I drove.

12      Q.    Are you a walker?

13      A.    I walk around the neighborhood, yes.

14      Q.    Did you have any hand or part in designing

15   viewing windows as we have been referring to for

16   Burke High School?

17      A.    No, I did not.

18      Q.    Did LS3P?

19      A.    No.

20      Q.    What about North Charleston High School?

21      A.    LS3P designed North Charleston High

22   School, but I would not have had any involvement

23   since it was before my time there.

24      Q.    So that was how long ago?

25      A.    I started in '84.  I think that school was

1   finishing up its construction when I first joined

2   the firm.

3        Q.    The same question as to Stall High School.

4        A.    LS3P did not have any involvement in Stall

5   High School.

6        Q.    West Ashley High School?

7        A.    We did design West Ashley High School.

8        Q.    Did you put viewing windows in West Ashley

9   High School?

10       A.    I believe so.

11       Q.    What hand did you have in that?

12       A.    I was the project manager on that project,

13  similar to the role I played at Bishop England.

14       Q.    We're going to see just how good your eyes

15  are.  Better than mine, I hope.  If you don't mind

16  telling us which one you prefer to try to work

17  from.

18       A.    I think this is a casework plan.  It's the

19  same drawing, but this is the actual floor plan of

20  the athletic part of the building.

21       Q.    The one that you're touching with your

22  right hand?

23       A.    Yes.

24       Q.    So does that mean that would be the best

25  one to work from?

1    A.    It would have more information on it
2  probably.
3            (Deposition Exhibit No. 2 was marked.)
4    Q.    The next topic I would like to broach with
5  you is what has been marked as Plaintiff's Exhibit
6  No. 2 to your deposition.  Can you tell us what
7  that is, please, first, just what it is, and then
8  we'll go into questions about it.
9    A.    It is a partial floor plan of the athletic
10  complex at Bishop England High School.
11    Q.    Does this floor plan show the locker rooms
12  that we have been discussing this morning?
13    A.    Yes, it does.
14    Q.    Does it show all of the locker rooms?
15    A.    Yes, it does.
16    Q.    Do you need a magnification device?
17    A.    I believe I can read it.
18    Q.    If I've got a red pen, I'll give you a red
19  pen.  Let me ask you, please, if you're familiar
20  enough with the structure that you can refer to it
21  this way.  Can you identify Mr. Runey's office?
22    A.    It's labeled here as AD office.
23    Q.    Can you hold that up so I can see or they
24  can see where you've marked.
25    A.    (Witness complies).

1      Q.    To the best of your knowledge is that an
2  accurate representation of where his office is?
3      A.    That's what it was labeled on our
4  drawings.  I do not know if that's where his office
5  actually is right now or not.
6      Q.    In any event, that is some staff person's
7  at Bishop England, their office?
8      A.    I assume so.  I haven't been in that
9  building in 15 years -- 20 years, so I don't know
10 how the spaces are being used.
11     Q.    Do you recognize the lockers going down
12 two walls in that locker room/dressing room area?
13     A.    I do.
14     Q.    Do you see a ventilation system?
15     A.    Not on this drawing.
16     Q.    The round entries are shower stalls,
17 aren't they?
18     A.    That is correct.
19     Q.    Do you see the corridor outside of --
20 we're assuming it's Mr. Runey's office -- outside
21 of that staff person's office?
22     A.    I do.
23     Q.    Do you know how many lockers are in there?
24     A.    Not off the top of my head because there
25 could be double stacked or multiple layer lockers.

1    I do not know.

2        Q.    I understand.  I haven't counted them, and

3    I don't know that I can separate them sizewise well

4    enough to give you an accurate count, but there are

5    several.

6        A.    Yes.

7        Q.    Do you recall whether those are double

8    lockers or single lockers?

9        A.    I do not recall.

10       Q.    Is it sometimes a mix, some singles and

11   some doubles?

12       A.    It's generally a mix, and varsity locker

13   rooms have larger lockers for things like football

14   equipment.  PE locker rooms have smaller lockers

15   for just PE use.

16       Q.    In this locker room do you see a viewing

17   window drawn in?

18       A.    Yes, I do.

19       Q.    That window adjoins the coach's or the

20   athletic director's office with the dressing room

21   itself, doesn't it?

22       A.    Yes.  In the locker room, yes.

23       Q.    The locker room, yes.  And that's what you

24   referred to as being the single glaze plate glass

25   window?

1    A.    To the best of my knowledge.

2    Q.    I understand.

3    A.    It should be a single glaze window.  There

4  is no need for it to be insulated on the inside of

5  a building.

6    Q.    I understand that, and I don't mean to

7  attach undue importance to you about that.  The

8  importance of the window is otherwise at least in

9  part.

10        First of all, are these plans as built?

11    A.    To the best of my knowledge.  I do not

12  know that I've ever seen a set of as-built plans.

13    Q.    For this building?

14    A.    For this building.

15    Q.    By "as built" I mean actually a

16  constructed rendition.  Is that what you mean?

17    A.    Yes.  As best I can tell these were the

18  plans that we used to build the building.

19    Q.    Can you identify let's say by making a

20  little star perhaps the two entrances through the

21  wall, the cased opening that you talked about

22  earlier, the two entrances to the

23  bathing/toilet/sink/shower facility?

24        MR. DUKES:  Object to the form.

25    Q.    Do you understand the question?

1      A.    Do you just want me to put a star where

2    the entrance is?

3      Q.    That's right from the locker portion of

4    the room to the shower/toilet/basins, that portion

5    of the room.

6      A.    (Witness complies.)

7            MR. DUKES:  Object to the form.

8      Q.    In the boys locker room does it show

9    urinals as well as commodes?

10     A.    It does.

11     Q.    I take it in the girls locker room it will

12   not show urinals?

13     A.    That is correct.

14     Q.    Can you tell from this at least

15   approximately how much distance there is from in

16   front of the basins or in front of the toilets --

17   what distance would be involved and the route it

18   would take that mouthful of smoke we talked about

19   earlier to make it into the big locker room so it

20   could be seen through the viewing window?

21     A.    I can't read the dimensions on here, but

22   it looks like that basin and toilet area is about

23   10 feet deep and then it goes about 2 feet before

24   you're in the actual locker/dressing room.

25     Q.    As to these individual toilet stalls,

1   commode stalls, is there an indication on these

2   plans that shows that each has a door and that the

3   door opens inward?

4       A.    No, not all of the doors open outward.

5       Q.    I said inward except for the disabled --

6       A.    The handicapped ones have doors that open

7   out, and all the other stall that I'm seeing here

8   have doors that open in.

9       Q.    And then separately the coaches or

10  athletic director have their own shower/toilet area

11  within their own offices --

12      A.    That is correct.

13      Q.    -- or accessible from within their own

14  offices?

15      A.    That is correct.

16      Q.    Thank you.

17            I would like to go out to the hallway,

18  please, so we don't have any misunderstanding about

19  what we've discussed, and in the hallway can you

20  see, please, the door that enters the athletic

21  director in this example, his office from the

22  corridor?

23      A.    Yes, you can see that door from the

24  corridor.

25      Q.    I just want to make sure we didn't

1   misunderstand each other.  When I was asking you

2   about somebody walking down the hall and being able

3   to look through the coach's door window through the

4   other window, the viewing window, into the locker

5   room -- did you understand that configuration?

6       A.    That's the door I understood you were

7   referring to.

8       Q.    That's the door that you say LS3P didn't

9   design with a window in it?

10      A.    That is correct.

11      Q.    Why would you design an office door in a

12  school that is not a door for medical treatment or

13  counseling, but rather is a coach's office or an

14  athletic director's office -- why would you not

15  design that with a window in it given concern to

16  the problem of a minor being alone in a closed room

17  with an adult at the school?

18          MR. STAIR:  Object to form.

19          MR. DUKES:  Object to form.

20      A.    It is not something that we routinely do,

21  put doors with windows into all offices.  It is

22  becoming more prevalent now, but 25 years ago I'm

23  not sure it was common practice.

24      Q.    You understand now the potential abuse

25  that can come out of that, do you not?

1    A.    I do.

2    Q.    Can you tell from these plans that you

3  have as Exhibit 2, this particular one plan -- can

4  you tell what sort of floor there is in the locker

5  rooms?

6    A.    I can see that it is a sloped floor to a

7  drain.  It does not tell me what the actual floor

8  material is.

9    Q.    Do you remember by chance?

10   A.    I remember seeing in the photos that you

11 took that it is a quarry tile.

12   Q.    Floor?

13   A.    Floor, yes.

14   Q.    And that is a thing that would drain and

15 can be scrubbed I take it?

16   A.    Yes.

17   Q.    Did you see the photograph that we took of

18 the vent in that locker room?

19   A.    I believe so.  I'm not sure I noticed

20 which vent you're talking about.

21   Q.    Up near the top.  I assume it was an air

22 vent.

23   A.    I may have seen that in the photos.  I

24 wasn't looking for that.

25   Q.    Is there any other device located within

1  these dressing rooms which would have enabled the

2  school authorities to utilize either sound

3  detection devices or surveillance devices by way of

4  camera or anything else?

5      A.    I'm not aware of any other types of

6  devices.

7      Q.    You all didn't spec them?

8      A.    I'm pretty sure that the camera system or

9  any kind of camera system for any room in the

10  school was not installed when the building was

11  built, and I don't know of a sound monitoring

12  device that was installed.

13      Q.    The Diocese defendants have actually

14  responded about that and said that over some period

15  of time there have been additions to camera

16  surveillance and that kind of thing.

17          Are you familiar with where the weight

18  room is?  Let me ask it that way.

19      A.    I'm not positive.  I will tell you this,

20  that the last time that I was at the school was

21  back in 1998 or so when we were getting ready to do

22  the auditorium, and I walked through what I thought

23  the weight room was that's shown on our plans, but

24  it had been converted and moved to someplace else.

25  So I'm pretty sure the weight room has been

1    relocated from where it was originally shown.

2        Q.    Do you know Monsignor Lawrence McInerny?

3        A.    I do not know him.

4        Q.    You haven't met him?

5        A.    I have not met him.

6        Q.    He was a principal there for a while at

7    Bishop England.

8        A.    No.  The only principal that I knew was

9    Nick Theos and his successor who came in while the

10   building was under construction.

11       Q.    The successor did.  Who was that?

12       A.    I believe I read in the correspondence

13   David Held.

14       Q.    I may be able to avoid using this, but I

15   have to check with somebody on my staff to see, so

16   I'll do this first and then duck out for just a

17   minute, and then I can give you a decent read on

18   where we are.

19             Are you aware of any project manuals or

20   guidelines, ASTM standards, planning or

21   construction guidelines which specify whether or

22   not it's appropriate to have windows in gymnasium

23   dressing rooms/locker rooms?

24       A.    I have seen the Office of School

25   Facilities guide that was a draft version about

1    this time.  We could not locate the final version,

2    and it's indicated that windows were not

3    recommended, but they were referring to exterior

4    windows.

5        Q.    Is that what it says, exterior windows?

6        A.    Everything in that section was dealing

7    with exterior windows.

8        Q.    What section is that?

9        A.    I forgot the number, but it's in that same

10   manual that just was referring to insulated glazing

11   in windows, shading coefficients, egress windows.

12   So it was referring to an exterior wall window.

13       Q.    And you extrapolate that not because it

14   said these comments refer to exterior windows only?

15       A.    It did not say that.

16       Q.    Thank you.

17            I'm trying to understand where you get in

18   and where you get out of these locker

19   rooms/dressing rooms.  How many doors are there in

20   and out of these dressing room facilities?

21       A.    There are two.

22       Q.    Where are they?

23       A.    One is up here near the AD office toilet,

24   and then one is down at the opposite end of the

25   space going out into a vestibule, the opposite ends

1    of the locker room.

2        Q.    Can you put just an X by each one of

3    those, please, instead of a star.

4        A.    (Witness complies)

5        Q.    Let me look at yours.  I want to put mine

6    in the same place.

7              So if there was an explosion or a fire

8    erupted, are these the two ways that the children

9    could get out?

10       A.    That is correct.

11             MR. DUKES:  Object to the form.

12       Q.    I wonder if it was possible for you to

13   have put a breaking device that you see on fire

14   extinguisher containers -- do you know what I'm

15   talking about? -- to break the glass.  You pull a

16   lever and get a device out of it to fight a fire.

17   Could that have been installed by these viewing

18   windows, the large ones, the 4 X 4s?

19             MR. DUKES:  Object to the form.

20             MR. STAIR:  Object to the form.

21       A.    I'm not sure I follow your question.  A

22   breaking device on it?

23       Q.    I don't know the evolution of this kind of

24   product, but I have seen I guess all my life or

25   much of my life a device mounted to the wall.  It

1  has an alarm switch, a fire alarm switch inside.

2  It has got a glass front on it, and there is a

3  hammer hanging by it.  Do you follow me?

4     A.    Yes.

5     Q.    You use the hammer and you break the

6  glass, and you can then trigger the alarm, but it

7  doesn't invite everybody walking by just to pull

8  the alarm.  I just wonder if that sort of mechanism

9  was considered as to these viewing windows in the

10 sense that if a fire breaks out blocking one of the

11 doors, that would leave only one door for what

12 looks like a lot of people to try to get out of,

13 but if the viewing window was broken out, it would

14 provide another egress method for the students who

15 were exposed to the danger of the fire that has

16 broken out.  That's what I'm asking.

17        MR. DUKES:  Object to the form.

18        MR. STAIR:  Object to form.

19    A.    I've never seen a device where you would

20 break a window, an interior window, to climb

21 through to get out.  The Building Codes require two

22 means of egress a certain distance from each other,

23 and so the design that we had had them as far apart

24 as they could be so that if a fire broke out at one

25 end, you could go out the other end.

1    Q.    Out of one egress?

2    A.    If a fire blocked one of them, then you

3    would egress out through the other end.

4    Q.    So you're suggesting it would be a bad

5    idea to have the ability to egress through the

6    viewing window?

7         MR. DUKES:  Object to the form.

8    A.    I would because the section in that

9    guideline that you referenced earlier or that I

10   referenced earlier from OSF had quite a bit of

11   information if I remember about sill heights and

12   being able to climb out of a window for an

13   emergency egress, and for certain age children it

14   had to be so high, so I would not think that

15   egressing through a window like that would be

16   preferred to just egressing through a door.

17   Q.    It would be preferred to just burning up

18   on the spot, wouldn't it?

19   A.    Well, you have two ways out of that locker

20   room.

21   Q.    In the example that we're dealing with one

22   of them is engulfed with the fire or explosion that

23   erupts, so now you only have one way, and it looks

24   like there must be -- I don't know -- maybe 80

25   lockers in here.  I haven't counted them.  I'm just

1  eyeballing them.

2    A.    All I can tell you is the Building Codes

3  would require two means of egress.  You size the

4  width of those doors that are exiting out based on

5  the number of occupants, and so I feel fairly

6  confident that those doors were sized for the

7  number of people in that room.

8    Q.    I'm sorry, but I can't look at it and tell

9  how big they are.  Can you tell by looking at this

10  how big they are?

11    A.    I would say just offhand looking at them

12  that they're 3 foot doors, 3 foot wide doors.

13    Q.    Is that different than what you have in

14  your home?

15    A.    In some cases, yes.  I mean bathroom doors

16  in a home are going to be 2 foot 4 or so.  Some

17  doors in homes are 2 feet 8.  3 foot is a fairly

18  standard door width in commercial construction.

19    Q.    In commercial construction.  How big is

20  this one right over here?

21    A.    I can't tell if it's 3 foot or 2 foot 8.

22  I would have to measure it.  It's not 2 foot 4.  I

23  don't know.  I would have to measure it and see.

24    Q.    Let's move on then.

25          Other than the single manual you have

1  referenced which you can't find the current copy

2  of, have you looked at any other materials in

3  preparation for your testimony today?

4      A.    I'm trying to remember.  I looked at the

5  Charleston County School District's website where

6  they post plans of their schools to see if this was

7  a common practice to put windows into locker rooms.

8      Q.    Whose website?

9      A.    Charleston County School District.  I was

10 just curious to see if there were other schools

11 that had that.  Many of the ones you mentioned do.

12     Q.    Let me pursue that for a minute separate

13 from Bishop England High School.  We went through

14 the listing a while ago when you almost entirely

15 said it was not you all work's.  One case, West

16 Ashley, I think you said was you all's work.

17          I want to make sure we're clear on this.

18 I think I then asked you specifically about the

19 Bishop England thing and then maybe about the

20 public schools.  The people on both sides, LS3P

21 people on one side, the school people or Diocese

22 people on the other side, and you answered I think

23 to say, yeah, we get together and we look at this.

24 Here is a round of drawings which is a step better

25 than the first round or however you characterize

1  it, and it sounded like you all sat down together

2  and looked at that, whoever was the owner of the

3  school and you all were doing the architectural

4  work.  Am I understanding that correct?

5      A.    That's correct.  That would be a standard

6  procedure during the design phase.

7      Q.    I asked the witness who preceded you in

8  this matter if I come in and write you all a check

9  and say I want you to design a house for me, four

10 bedrooms, four bathrooms, a weight room, and

11 whatever else I want, and I'm funny about one

12 thing; I want oval shaped windows, all my windows

13 to be oval -- you may have read that in the

14 deposition.

15     A.    I did.

16     Q.    I think you would have read if you recall

17 it, his response was, look, you're writing the

18 check.  It's your house, not LS3P's house, and so

19 yes is the answer.  I can specify what I want as

20 long as it's not something that's prohibited.

21         Is that also your testimony?

22         MR. DUKES:  Object to form.

23         MR. STAIR:  Object to form.

24     A.    That is correct.

25     Q.    I want to close this circle.

1              You get together to do that.  You come out

2    with what you now can work with, and out of it

3    comes a plan which may get on the next review

4    revised by the owner, may not, but assuming it's

5    not prohibited as a fire hazard or a load bearing

6    violation or anything like that, you are at the

7    beck and call, are you not, of me, the consumer who

8    has hired you?

9              MR. DUKES:  Object to the form.

10             MR. STAIR:  Object to the form.

11   Q.    Or is it more joint than that?

12   A.    It would be more joint than that.  It's

13   not do what I say only.  We would give advice and

14   guidance.

15   Q.    Each brings something to the table.  I'm

16   trying to close this out.  Each brings something to

17   the table.  I bring the check and my own ideas, but

18   I'm not an architect, so I might want an

19   uninterrupted 40-foot span in my den, and you all

20   might say there are load considerations about that.

21             Having both of us then exchanged it and

22   planned it and conceived it in a workable way,

23   that's how we get to the end product with the

24   drawings, isn't it?

25             MR. DUKES:  Object to the form.

1     A.    That's correct.

2     Q.    I'm sorry.  I don't know the terminology

3 that you all utilize I'm sure as you don't know our

4 legal terminology we utilize.

5          I can't quote your exact response, and I

6 don't want to misunderstand it.  Did you say that

7 you went to the school board to see if viewing

8 windows had been utilized before and you went to

9 the Diocese to see if they utilized viewing windows

10 before?

11          MR. STAIR:  Object to the form.

12          MR. DUKES:  Object to the form.

13    Q.    I'm asking about when you came to the

14 Bishop England project.

15    A.    Would I have what?

16    Q.    I thought you said that you went to either

17 see the Diocese if we were talking about Bishop

18 England or you went to see the school board people

19 -- you said you went to the website.  Do you

20 remember that?

21    A.    I do.

22    Q.    I'm sorry, but I either didn't understand

23 what you said or I missed what you said.  Would you

24 mind saying what you did again?

25          MR. DUKES:  Object to the form.

1    A.    I routinely visit the Charleston County

2  School District's website to find plans for

3  buildings we are working on.  For example, Burke

4  High School we did not design, but we did do a

5  modification to it, so I have to go on their

6  website to find the drawings for that, and when I

7  was looking at those, since this case became public

8  knowledge, I just started looking to see if there

9  were other schools on the school district's website

10 that had these sort of windows.

11   Q.    I understand.  We read cases and statutory

12 authorities that preceded whatever this case might

13 be at any time.  I think that's what I hear you

14 describing.

15   A.    That's correct.  Case studies.

16   Q.    Case studies.  There you go.

17        (Brief recess)

18        MR. RICHTER:  I've taken care of this file

19 folder that I have, so I don't have to do that now.

20 I'm in the wind-up mode.  I think I can do this in

21 just five or so minutes.

22   Q.    I want to go back in time, please, a

23 little bit.

24        As I understood you, and I clarified this

25 a moment ago, West Ashley was the only LS3P

1  project -- I called out the names of schools, and

2  that was the only one I think you said was LS3P.

3      A.    I don't remember exactly all the ones you

4  called out, but West Ashley was on that list, yes.

5      Q.    I can call it back up if you want to go

6  over the list again, but I'm certain you said as to

7  all the others that was not you all; it was

8  somebody else.

9      A.    I remember you mentioned Stall, which was

10 not ours; Burke, which was not ours.

11     Q.    North Charleston High School.

12     A.    North Charleston was ours.

13     Q.    And West Ashley was yours?

14     A.    Yes.

15     Q.    Do you remember the years for those two?

16     A.    North Charleston, as I said, was finishing

17 construction when I joined the firm in '84, so I

18 would say sometime in the early '80s for North

19 Charleston.  West Ashley started design in 1996, I

20 believe.

21     Q.    You talked about going to a website and

22 looking around at the various schools from what I

23 understood you to be saying.

24     A.    That's correct.

25     Q.    Can you tell me if the schools that you

1  all did, North Charleston, Bishop England, West

2  Ashley, were those the first times -- and then I'm

3  going to ask you which one was the first time --

4  that you all drew in these viewing windows?

5          MR. STAIR:  Object to the form.

6          MR. DUKES:  Same objection.

7      A.    I'm pretty sure that we had done it twice

8  before that on other schools not in Charleston

9  County necessarily.

10     Q.    Where were those, do you know?

11     A.    Battery Creek High School in Beaufort

12  County and Stratford High School in Berkeley

13  County.

14     Q.    Do you happen to remember the dates of

15  those?

16     A.    Battery Creek would have been in the late

17  '80s and Stratford was before my time, but it was

18  probably in the late '70s or maybe early '80s.

19     Q.    Did you say as to Bishop England that the

20  blinds were spec'd or not?

21     A.    I don't believe you asked me that.  I did

22  check the specification.  The blinds were

23  specified.

24     Q.    By you all?

25     A.    They were in our contract documents.

1    Q.    When you all say specify or spec'd, does

2    that mean the type of blind, the color of blind,

3    the size of blind, all of that sort of stuff?

4    A.    Yes.  It may not say the size because they

5    would probably have just been field measured.

6    Q.    I guess you all use an actual item number,

7    XYZ 422 --

8    A.    Right.

9    Q.    -- and now you know there is no doubt

10   about what you all are talking about.

11   A.    Right.  We have a specific specification

12   section for blinds.

13   Q.    Why did you spec the blinds?

14   A.    It's fairly typical for schools to -- I

15   shouldn't say typical.  It is common practice for

16   schools to have blinds included in the construction

17   contract.

18   Q.    But as to viewing windows designed, as you

19   said, or intended, as you said you were told

20   actually for safety purposes, did those have blinds

21   typically on them?

22   A.    I do not know.  I really do not know.

23   Q.    Let's just take West Ashley for an

24   example.  To the extent that you all drew it the

25   way that you drew it and it had some viewing

1  windows capability, did those also have blinds on

2  them, do you remember?

3      A.    I do not remember.

4      Q.    I'm sorry to say I've lost track of how

5  much time has gone by between events.  I think

6  those schools were around the same time as Bishop

7  England was.  I mean they're that old now.  It

8  doesn't seem like it.  I think of them as new

9  schools.

10     A.    If I remember correctly for West Ashley we

11 started the design as we finished the design on

12 Bishop England.

13     Q.    So contemporaneous to some extent at

14 least.

15     A.    Correct.

16     Q.    We have toured some county schools, and we

17 made photographs of all of the schools as we went

18 along.  This one is going to be marked 3 to your

19 deposition.

20          (Deposition Exhibit No. 3 was marked.)

21     Q.    I'm going to hand you a document that has

22 been marked Exhibit No. 3 to your deposition, which

23 I'll tell you is a photocopy of an actual

24 photograph that we took on our tour of these

25 schools I was just telling you about.  Mr. Dukes

1  was there and somebody from our side was there as

2  well.

3          Can you recognize this as being a shot of

4  the windows looking into a locker room at West

5  Ashley High School?

6     A.    I do not know whether this is West Ashley

7  High School or not.

8     Q.    Your memory just fails you about that?

9     A.    Yes.  I have not been at that school in

10  probably 20 years -- 15 years.

11    Q.    These windows, as you can see on Exhibit

12  3, have been covered or at least partly covered.

13  Do you see that?

14    A.    It looks like there is some sort of paper

15  or something on the inside of the office.

16    Q.    Which would prevent somebody from looking

17  through those windows, wouldn't it?

18          MR. DUKES:  Object to the form.

19    A.    It would block your view for the lower

20  part, but if you stood up, you could see out of the

21  top.

22    Q.    Unless the top were covered also you could

23  see through any uncovered part.  I would agree with

24  you.

25          Are you aware that the windows that you

1  designed and charged for and put in the schools so

2  that children can be viewed nude are in cases

3  modified by being covered up so that the viewing of

4  the children is inhibited?

5          MR. STAIR:  Object to the form.

6          MR. DUKES:  Object to the form.

7      A.    I am not aware of what happens to the

8  buildings after we finish them.  I mean you're

9  telling me this is a photo of West Ashley High

10 School.  I don't recognize it, quite frankly, but

11 it may be.

12     Q.    Well, we have them of a lot of places.

13 There is no point in us going through each one.  I

14 just wondered if you were willing to acknowledge

15 that covering up a viewing window seems to say that

16 somebody says this is not a very good idea.

17         MR. DUKES:  Object to the form.

18         MR. STAIR:  Object to the form.

19     A.    I don't know why the windows would have

20 been covered other than to block the view into --

21     Q.    Into the dressing rooms?

22     A.    Part of the view into the dressing room.

23 In that instance you could certainly see into the

24 locker room if you stood up or walk by that window.

25     Q.    When this guy got busted as a voyeur at

```
 1   Bishop England -- his name is --
 2           MR. DUKES:  Jeffrey Scofield.
 3      Q.    -- we notified the school, and Rich and I
 4   went out there and we took photographs.  You said
 5   you looked at actually some of those.  Where did
 6   you get them?
 7           MR. STAIR:  Object to the form.
 8      A.    The photos?  I believe Mr. Stair's office
 9   sent them to me.
10      Q.    Where did he get them, do you know?
11           MR. STAIR:  Object to the form.
12      A.    I do not.
13      Q.    Have you communicated with Mr. Dukes about
14   this matter?
15      A.    No.  I have not talked to Mr. Dukes or
16   communicated with him directly at all.
17      Q.    What does that mean, "directly"?  Did you
18   talk to somebody else representing the Diocese?
19      A.    No.
20      Q.    Have you considered the possibility that
21   these children who you earlier in this deposition
22   said, well, they saw the window -- do you remember
23   that testimony?
24      A.    I do.
25      Q.    Have you considered the possibility that
```

1   these children, their guard perhaps was let down or

2   lessened by the fact that blinds were put on the

3   windows?

4           MR. DUKES:  Object to the form.

5           MR. STAIR:  Object to the form.

6   A.     I don't know whether their guard would

7   have been less down or not, quite frankly.  I mean

8   they still knew that the windows were there and

9   there was a possibility that an administrator or

10  coach was in those offices.

11  Q.     Or a pizza delivery man.  Do you agree

12  with that?

13          MR. DUKES:  Object to the form.

14          MR. STAIR:  Object to the form.

15  A.     I don't know how the school monitors

16  visitors to their athletic complex.

17  Q.     Or a fire marshal from the town, the city

18  in this case.

19          MR. DUKES:  Object to the form.

20  Q.     Do you agree with that?

21  A.     There could be a fire marshal coming to

22  the building.

23  Q.     There could be any endless number of

24  people who come in there.  Every day the cleanup

25  people come in to clean up, don't they?

1      A.      I don't know.  I imagine they have a

2  regular cleaning schedule.  I would think that the

3  cleaning crew would come in after school hours.

4      Q.      Well, what would the cleaning crew do if

5  somebody got sick and vomited on the floor in the

6  coach's office?

7      A.      I would imagine they could be called in to

8  come clean it up.

9      Q.      Right away?

10     A.      Right.

11     Q.      So they could come in at any time?

12     A.      Correct.

13     Q.      If the blinds had not been installed as

14  you specified them to be, LS3P I understand in

15  conjunction with the Diocese; I'm not altering your

16  words in trying to frame this question, but if the

17  blinds had not been installed, do you agree that

18  the children would have been sort of more easily

19  aware of the fact that they could be viewed in all

20  states of clothing or disrobe through these

21  windows?

22          MR. STAIR:  Object to the form.

23          MR. DUKES:  Object to the form.

24     A.      I think you would have been able to see

25  the person if the blinds were not there who was in

1  the office.

2      Q.    Or persons?

3      A.    Correct.

4      Q.    Maybe even the people in the hall looking

5  through the coach's door?

6            MR. DUKES:  Object to the form.

7      A.    I don't know that you could see -- the

8  doors are on closers, so the doors should

9  automatically shut themselves whenever they're

10 opened.

11     Q.    Having mentioned again doors, I want to

12 ask you something about that, please.

13           Are there less intrusive ways I would like

14 to ask you of maintaining safety in a locker

15 room/dressing room facility other than the use of

16 these large type viewing windows?

17           MR. STAIR:  Object to the form.

18           MR. DUKES:  Object to the form.

19     A.    I'm not aware of any that would be less

20 intrusive.

21     Q.    We know your testimony as a professional,

22 you've got to look out for smoke coming from yet

23 another room even as little as a mouthful.  Do you

24 remember that?

25           MR. STAIR:  Object to the form.

```
 1              MR. DUKES:  Same objection.

 2      Q.     Do you head K through 12 school design for

 3  LS3P?

 4      A.     Not for the entire firm.  I head it for

 5  the Charleston office.

 6      Q.     Just for the Charleston office --

 7      A.     Right.

 8      Q.     -- which is the Coastal Region?  Is that a

 9  fair classification?

10      A.     Right.

11      Q.     Do you presently design schools with

12  viewing windows into locker rooms?

13      A.     I believe the last school that we did that

14  would have it was Wando High School, and that has

15  been 15 years ago.  I don't know that we've

16  designed a high school since then.

17      Q.     So in the last 15 years at least you feel

18  comfortable that you didn't?

19              MR. STAIR:  Object to the form.

20      A.     To the best of my knowledge I don't

21  believe we designed high schools in that period of

22  time.

23      Q.     Did you have anything to do with the

24  Charleston County School District stadium project?

25      A.     We did the District 4 stadium.
```

1    Q.    I should have said District 4.  It is

2 District 4.

3    A.    Correct.

4    Q.    So that's you all's project?

5    A.    That is correct.

6    Q.    Do you have viewing windows into the

7 locker rooms there where student users of those

8 locker rooms could be seen fully nude?

9          MR. DUKES:  Object to the form.

10   A.    I don't believe so.  I don't know how many

11 coaches' offices there were since it's a facility

12 used by four different schools, and I just don't

13 remember if there were windows there or not.

14   Q.    I can't argue that with you.  I don't

15 think there are viewing windows there, but I can't

16 testify to that, and I'm just asking for your best

17 knowledge anyway.

18          I would like to go to that photo that we

19 put in as No. 3 I think it is.  Is it No. 3 before

20 you?

21   A.    That's correct.

22   Q.    I wonder if you could look back at Exhibit

23 3, please.

24          As I understand it, you just didn't do the

25 windows; you all designed the school in its

1  entirety, didn't you?

2      A.    If this is West Ashley High School --

3      Q.    Assuming it's West Ashley, yes.

4      A.    -- we would have designed the entire

5  school if this is West Ashley.

6      Q.    I'm interested in that for a few reasons.

7  One is if you look through this window, the top

8  left quarter panel of this window, what is that

9  behind there?  It looks like another window to me.

10     A.    Correct.

11     Q.    Is that what it is?

12     A.    I do not know.

13     Q.    Well, what is on the right-hand side of

14 that subordinate rectangle?  Are those lockers on

15 the wall?

16     A.    Those are lockers to the right-hand side,

17 yes.

18     Q.    I would like to next ask you, please, to

19 look at the upper right-hand quadrant, and you will

20 see a photo of a portion of a door.  Do you see

21 that?

22     A.    I do.

23     Q.    It looks like that door has a viewing

24 window in it, doesn't it?

25     A.    Yes.

1    Q.    It looks like the viewing window is

2  covered over, doesn't it?

3    A.    I can't tell whether you're seeing the

4  wall behind there or it has been covered over

5  through the window.

6    Q.    Can you explain to me whether LS3P spec'd

7  a door with a viewing window in it from I assume

8  corridor is the proper reference to what is on the

9  other side of that office?

10    A.    If this is West Ashley High School, we

11  would have been the firm that specified that door.

12    Q.    But you said you didn't do that at Bishop

13  England.  You don't know where those windows came

14  from?

15        MR. STAIR:  Object to the form.

16    A.    That's my recollection.

17    Q.    Can you tell us where mirrors are in the

18  Bishop England locker rooms?

19    A.    Off the top of my head, no.  I think they

20  may be over the lavatories, but that's just where I

21  would think they would typically be.

22    Q.    Lavatories is a much more eloquent way of

23  describing it.  I couldn't get that word.

24        Do they have mirrors in the dressing rooms

25  at Bishop England?

1      A.    I do not know.

2      Q.    If there are such mirrors available and if

3  as you have testified earlier in part of your

4  testimony looking through the viewing window in

5  Runey's office you could see all the way down to

6  the shower -- do you recall that testimony?

7      A.    Right.

8      Q.    -- I wonder if there is any reflective

9  danger from a mirror in a dressing room whereby

10  someone who is viewing nude students could utilize

11  a reflective device like a mirror for the purpose

12  of viewing them.

13         MR. STAIR:  Object to the form.

14         MR. DUKES:  Object to the form.

15      A.    It would depend on where the mirrors are

16  located and the angles that you could see whether

17  it could be seen from what areas.  The lavatories

18  were in a separate area of the locker area, and I

19  don't recall if there were mirrors anywhere else in

20  that locker area, if there were even mirrors in the

21  locker area.

22      Q.    You said a moment ago you didn't know

23  whether they were even any in there.

24         Do you still think it's a good idea to put

25  these viewing windows such as we have been

1  discussing here today in offices of athletic staff

2  or other school staff to view students who change,

3  disrobe, in front of those windows?

4           MR. STAIR:  Object to the form.

5           MR. DUKES:  Object to the form.

6    A.    All I can say is it seems to me to have

7  been a fairly common practice going back to the

8  1970s and even to current schools that have been

9  built.  I would have to discuss it with my client

10  to understand their motivation and explain to them

11  what we have discussed today.

12   Q.    In an ongoing way that's what you would

13  intend to do?

14   A.    Correct.

15   Q.    I understand.  Let me see if I can help

16  you in that analysis a little bit by asking you

17  this question:  Do you remember when you used to be

18  in a department store perhaps and you needed to

19  urinate and you walked over to the restroom area

20  and it said colored on one door and white on the

21  other?  That went on for a long time, didn't it?

22           MR. STAIR:  Object to the form.

23           MR. DUKES:  Object to the form.

24   A.    I don't remember seeing signs like that.

25   Q.    You may be too young to have seen those.

1    I certainly remember them, and these fellows I

2    think remember them, too, and I'm confident the

3    jury will remember them.

4         Are you aware that that existed or not?

5    A.    I've seen photos of signage such as that.

6    Q.    That was a bad idea, wasn't it?

7         MR. DUKES:  Object to the form.

8         MR. STAIR:  Object to the form.

9    A.    Looking at it in today's light, yes.

10   Q.    What is it that made it a good idea

11   looking at it in the light of the time that those

12   signs were erected on the bathroom doors?

13        MR. DUKES:  Object to the form.

14        MR. STAIR:  Object to the form.

15   A.    I do not have any idea why it was a good

16   idea.

17   Q.    But you're not prepared to say it was

18   across the board wrong?

19        MR. STAIR:  Object to the form.

20        MR. DUKES:  Same objection.

21   A.    I have no real opinion on whether it was

22   wrong or right.  It was done for reasons that

23   predated my time, so I don't know.

24        (Brief recess)

25        MR. STAIR:  I want to make sure I did not

1  misunderstand it.  Exhibit 1 was a document that

2  neither the witness nor I had seen, and it was

3  posed to us without any indication or

4  identification it would be discussed, and so I

5  exercised my right under Rule 30.04 of the local

6  rules and went out and discussed it with the

7  witness, had a very brief discussion with him.  The

8  discussion was absolutely totally limited to that

9  document.  We came back, and, as I understood, the

10 question that I instructed him not to answer was to

11 reveal what had been discussed during that

12 conversation, which I suggest and indicate to be

13 attorney-client privilege, so I instructed him not

14 to answer as it relates to the privileged portion

15 of our conversation and then otherwise allowed him

16 to answer questions about the document.

17       Larry asked me did I have a case or

18 authority or anything, and I did not, but someone

19 in my office sent me a case.  It is one from Judge

20 Anderson.  I have not had a chance to review the

21 case, but it is Hoskins versus Snipes-King, No.

22 3:08-cv-02442-JFA, dated District Court July 6,

23 2009, in which I am told it stands for the

24 proposition that under the circumstances I've just

25 described the conversation that the witness and I

1  had were privileged and could not be delved into at

2  a deposition, and that is the basis of my

3  objection.  I really don't want to burden anyone's

4  time, mine, Larry's, the Court's, or anyone else

5  with a motion for protective order, but if you

6  insist, I will.

7          MR. RICHTER:  I'll read the case the first

8  thing.

9          MR. STAIR:  Read the case and then let me

10  know.

11          MR. SLOTCHIVER:  In that case was that a

12  party or a witness?

13          MR. STAIR:  I don't know.  In any event,

14  my point is that the only objection I have is to

15  your inquiring as to what he and I discussed in a

16  privileged communication about that document, and

17  that's the instruction.  Otherwise you can and did

18  talk to him about it.

19          MR. SLOTCHIVER:  Can you email that to us

20  so we can take a quick look at it?

21          MR. STAIR:  I don't have a copy sent to

22  me.

23          MR. RICHTER:  Just send the cite.

24          MR. STAIR:  Let me know because I really

25  prefer not to take anybody's time to have an

```
1   unnecessary motion for a protective order, but this

2   is a privileged conversation and it was all simply

3   about that document and nothing more.

4          MR. RICHTER:  Thank you.  Was there

5   something else you wanted --

6          MR. STAIR:  No.  I just wanted to have

7   that discussion outside the witness' presence, but

8   you wanted to have it in it, and that's fine.

9          MR. RICHTER:  Just on the theory that I

10  didn't want him to be excluded from anything.

11         MR. STAIR:  That's fine with me.

12         MR. RICHTER:  He didn't volunteer I guess

13  to visit with us today.  We're getting very close

14  to being able to quit.

15     Q.    Let me go back, please.  If you know this,

16  when was the Charleston County School District 4

17  stadium complex built?

18     A.    It was finished up I believe two summers

19  ago.

20     Q.    That's what I thought.  Just very

21  recently.

22          You didn't come in filling in for somebody

23  or following some architectural firm; you all were

24  in from the beginning to the end?

25     A.    It was a design/build contract, and we
```

1  were working with a contractor who hired us to

2  design it.

3      Q.    I haven't been there, but I'm told it's

4  very pretty and impressive to see four schools use

5  one facility like that.

6          MR. RICHTER:  I think with that we can say

7  thank you, sir.

8          MR. DUKES:  I have a couple of questions.

9                    EXAMINATION

10 BY MR. DUKES:

11     Q.    Looking at the picture that Mr. Richter

12 showed you that's Exhibit 3, I think, showing the

13 office door outside of the windows looking into the

14 locker room, it appears to have a window in the

15 door.  Do you see that?

16     A.    I do.

17     Q.    I believe you said you looked at the

18 pictures Mr. Richter took at Bishop England, one of

19 which showed a window in the coach's office door at

20 that facility; correct?

21     A.    Correct.

22     Q.    Having windows in those doors in an office

23 or a school is perfectly appropriate; right?

24     A.    Yes.  We typically put windows -- I

25 wouldn't say always, but we will routinely put

1    windows in coach's offices or other offices, yes.

2         MR. DUKES:  Thanks.

3         MR. RICHTER:  I want to follow up on

4    Mr. Dukes' question.

5                   EXAMINATION

6    BY MR. RICHTER:

7    Q.    He used the words "perfectly appropriate."

8    Those were Mr. Dukes' words, not yours.  He posed

9    his question to you using those words.  I want to

10   follow that up, please, by asking you if it's

11   perfectly appropriate to locate a window to a

12   coach's office on a hallway or a corridor where

13   anybody who is a student or staff person or

14   contract person working on something for the

15   school, anything like that, where there is general

16   passage by that door with a full ability to look

17   through that window and in Bishop England's case

18   all the way through to the locker room itself.

19        MR. STAIR:  Object to the form.

20        MR. DUKES:  Object to the form.

21   A.    Based on the information that I have that

22   we did not put those windows in those doors, and I

23   do not know why or why we would not have, I would

24   think that if you thought it could be seen through

25   that window, you would not want to have the window

1    in there, but I do not know for sure when those

2    windows were installed.

3            MR. RICHTER:  I think that's all I needed.

4    Thank you, sir.

5            MR. STAIR:  We'll read and sign unless I

6    tell you otherwise.  Send it to me, then I'll get

7    it to him, and we'll get that done.

8            (The deposition concluded at 12:50 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  CERTIFICATE OF REPORTER
   STATE OF SOUTH CAROLINA
2  COUNTY OF CHARLESTON

3

4          I, Carol T. Lucic, Registered Professional
   Reporter and Notary Public for the State of South
5  Carolina at Large, do hereby certify that the
   witness in the foregoing deposition was by me duly
6  sworn to testify to the truth, the whole truth, and
   nothing but the truth in the within-entitled cause;
7  that said deposition was taken at the time and
   location therein stated; that the testimony of the
8  witness and all objections made at the time of the
   examination were recorded stenographically by me
9  and were thereafter transcribed by computer-aided
   transcription; that the foregoing is a full,
10 complete, and true record of the testimony of the
   witness and of all objections made at the time of
11 the examination; and that the witness was given an
   opportunity to read and correct said deposition and
12 to subscribe the same.

13

14         Should the signature of the witness not be
   affixed to the deposition, the witness shall not
   have availed himself/herself of the opportunity to
15 sign or the signature has been waived.

16

17         I further certify that I am neither
   related to nor counsel for any party to the cause
   pending or interested in the events thereof.
18

19         Witness my hand, I have hereunto affixed
   my official seal on October 15, 2021, at
20 Charleston, Charleston County, South Carolina.

21

                         Carol T. Lucic
22                       NCRA MERIT REPORTER
                         REGISTERED PROFESSIONAL REPORTER
23

24
   My Commission expires:  November 27, 2027.
25

# EXHIBIT 8

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

C/A No.: 2:21-cv-00613-RMG

| | |
|---|---|
| Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually,<br><br>Defendants. | **DEFENDANT BISHOP ENGLAND HIGH SCHOOL'S ANSWERS TO PLAINTIFFS' FIRST INTERROGATORIES** |

By way of general objection to Plaintiff's discovery requests, Bishop England High School is an operation and ministry of Bishop of Charleston, a Corporation Sole, and has no separate existence from the Corporation Sole. Subject to and without waiving the stated objections, Defendant answers Plaintiffs' First Interrogatories as follows:

**ANSWERS TO PLAINTIFFS' FIRST INTERROGATORIES**

1. Whose idea was it to install the windows between the coach's or athletic department offices and the various locker rooms/dressing rooms at Bishop England High School (BEHS), and any other window capable of being used to view less than fully clothed persons when the school was constructed on Daniel Island?

**ANSWER:**

**The Diocese relied on the expertise of architects, builders, and others for the design and construction of the building and the installation of certain measures to ensure the safety**

of students.    The architects were LS3P; the primary contractor was Gulf Stream Construction.

2.    Are there, or have there ever been, security cameras located in any of the BEHS bathrooms, changing rooms, or locker rooms since 1998? If yes, please state when the cameras were installed, who had/has custody over the films, whose responsibility it was/is to monitor the films, who was/is responsible for maintenance of the cameras.

ANSWER:

   No.

3.    Are there, or have there ever been, security cameras located in any interior room or hallway at BEHS that is not in the bathrooms, changing rooms, or locker rooms since 1998? If yes, please state when the cameras were installed, who had/has custody over the films, whose responsibility it was/is to monitor the films, and who was/is responsible for maintenance of the cameras.

ANSWER:

   The school has 47 cameras located in common areas of the school, outside, hallways, and gymnasium.  Installation of the cameras happened over time, from 2014 to 2020.  The video from the cameras remains on the DVR for seven days, and it is accessible to the school's administration and IT staff.  The live video from the cameras is available to administrative staff. Some camera feeds are shown in the main office for security reasons related to allowing visitors entrance to the school campus. The school's Director of Operations and Maintenance Director are responsible for the maintenance and upkeep of the cameras and DVRs as well as for the ordering of new cameras when deemed necessary.

2

**JA881**

4.    Please state what surveillance BEHS does of its students that does not occur in the bathrooms, changing rooms, or locker rooms for security and safety of its students.

**ANSWER:**

**This Defendant objects to Interrogatory No. 4 as not related to any claim or defense involved in the case; not related in any way to issues of class certification; and disproportionate to the needs of the case. In addition, Interrogatory 4 seeks production of information that is totally irrelevant to the case. Subject to the stated objection, students and visitors are monitored by teachers and staff during school hours and during school-sponsored activities such as sports or clubs. Additionally, all classroom doors have windows so that an observer can see what is happening inside.**

5.    As to the viewing windows at issue in this case, whose decision was it to cover over or alter the windows in any way?

**ANSWER:**

**BEHS administrators in consultation with the Superintendent of Education for the Diocese and other Diocesan officials.**

6.    How many students using the subject BEHS locker/dressing rooms were recorded either by video, motion picture or still photographs?

**ANSWER:**

**Defendant is aware of 5 boys who were photographed while changing clothes in the locker room. Two were initially identified by the Charleston Police Department in May, 2019. The Attorney General's Office found additional photographs or videos with another 3 boys pictured.**

**JA882**

7.    Did you disclose to parents and/or students how many victims were viewed and recorded while using the subject locker/dressing rooms? If so, how many victims did you disclose were viewed and recorded?

**ANSWER:**

**The parents of the boys who were photographed were notified.  All parents / guardians were notified that 5 boys had been photographed.**

8.    Please state all disciplinary infractions that have occurred in any of the dressing rooms and/or locker rooms from 1998 to date, stating the type of infraction, how it was discovered, whom the infraction was reported to, and the disposition of the infraction.

**ANSWER:**

**The Diocese is attempting to compile the information requested and will supplement if any information or documents are found.**

9.    Please state all disciplinary infractions that have occurred in any of the bathroom facilities from 1998 to date, stating the type of infraction, how it was discovered, whom the infraction was reported to, and the disposition of the infraction.

**ANSWER:**

**The Diocese is attempting to compile the information requested and will supplement if any information or documents are found.**

10.    For Interrogatories #8 and #9, were these incidents reported to the appropriate BEHS authority, Diocesan authority, or police/law enforcement/or government agency?

**ANSWER:**

**The Diocese is attempting to compile the information requested and will supplement if any information or documents are found.**

4

**JA883**

11.    Whose responsibility was it to monitor activity through the windows at BEHS from 1998 to the present? Has this position remained the same since 1998?

**ANSWER:**

**The windows into the boys' locker room were in the Athletic Director's office and the boys' basketball office. Jack Cantey occupied the AD's office for the first year and Paul Runey has occupied the office since. Paul Runey was in the boys' basketball office for the first year with Bill Runey, and it was occupied by the boys' basketball coach after the first year. The window in the girls' locker room is in the girls' PE teacher's office. Amelia Dawley, DeLane Neuroth, and Janel Swanson have been the girls' PE teachers since we moved to the Daniel Island campus.**

**There was no active monitoring responsibility for the adults in the offices, but they would intercede if there was an issue like bullying, fighting, or other discipline issues.**

12.    How were the persons who were to have access to viewing through the subject windows trained?

**ANSWER:**

**All employees of BEHS are required to undergo background checks and to go through Safe Environment Training. In addition, the school conducts in service programs from time to time to emphasize safety of students.**

13.    What records are kept memorializing periods of viewing activity through the subject windows?

**ANSWER:**

**Student discipline records are kept for one year after graduation date and then destroyed. There are no records of when the windows were monitored.**

5

**JA884**

14.     Please describe, including by name, date, location, and total earnings, every gambling event or activity engaged in by or for the benefit of BEHS or any of its affiliated entities for the time period of 1998 to date.

**ANSWER:**

**This Defendant objects to Interrogatory No. 14 as not related to any claim or defense involved in the case; not related in any way to issues of class certification; and disproportionate to the needs of the case. In addition, Interrogatory 14 seeks production of information that is totally irrelevant to the case. Subject to the stated objection, games of chance have been prohibited as fundraisers for decades.**

15.     To the extent respondent hereto claims that acts described in response to the preceding interrogatory were not illegal acts, please state with specificity the reason or reasons for such claim or claims.

**ANSWER:**

**Not applicable.**

16.     State the total amount of tuition that was paid per year to BEHS for the time period beginning with the 1998-1999 school year through the 2018-2019 school year.

**ANSWER:**

**The Diocese is attempting to compile that information and will supplement.**

17.     State with specificity what changes or modifications, if any, have been made to the windows that are the subject of this litigation, at BEHS during the years 1998 through 2021.

**ANSWER:**

6

**JA885**

**The windows were covered with plywood initially.  As announced to parents, the windows have since been bricked.**

18.    State who made the decisions to alter the windows referenced above.

**ANSWER:**

**The school's administration in consultation with the Catholic Schools' Office and other offices in the Diocese of Charleston made the decision to alter the windows.**

19.    Who performed the modification work, if any, as to the subject windows and give the specific dates and costs of any such work, alteration, or modification of the subject windows?

**ANSWER:**

**Maner Construction removed and blocked in the window openings in July 2020 as a service to the school.**

20.    Please name each person who was enrolled at BEHS during the years 1998 through 2019 and for each please state the address at the time during which he/she was a student there, the last known address, email address, and telephone number (cell phone and land line).

**ANSWER:**

**This Defendant objects to Interrogatory No. 9 as not related in any way to issues of class certification; and disproportionate to the needs of the case.  This Defendant is aware of several thousand, perhaps as many as 7,500, who have attended the school at some time between 1998 and 2021.**

21.    Identify each BEHS tuition payor (person or entity) from 1998 th:ough 2019, and for each tuition payor provide the name, address, email address, phone number, amount of tuition paid, and whose tuition was paid for.

7

**JA886**

**ANSWER:**

**This Defendant objects to Interrogatory No. 21 as not related in any way to issues of class certification; and disproportionate to the needs of the case. This Defendant is aware of several thousand, perhaps as many as 7,500, who have attended the school at some time between 1998 and 2021 and some or all would have had at least one parent or guardian who paid their tuition.**

22.    Please provide the names, addresses, phone numbers, and email addresses of all persons serving on any governing or advisory board and/or any building committee of BEHS during any portion of the years 1995-2021.

**ANSWER:**

**The Diocese is compiling the information to respond to Interrogatory No. 22 and will supplement.**

23.    Please state the names and class years of each student who was not required to take the course known commonly as Physical Education during the period 1998 through 2019.

**ANSWER:**

**This Defendant objects to Interrogatory No. 23 as not related in any way to issues of class certification; and disproportionate to the needs of the case. Furthermore, this Defendant points out that conducting the inquiry called for by Plaintiffs would entail precisely the sort of individual examination that will defeat class certification.**

24.    Please state the names of all BEHS students who you claim were not viewed by any school personnel or other person through the viewing windows, or any of them, during the period 1998 through 2019, while such students were partially or fully nude.

**ANSWER:**

8

**JA887**

This Defendant objects to Interrogatory No. 24 as not related in any way to issues of class certification; and disproportionate to the needs of the case. Furthermore, this Defendant points out that conducting the inquiry called for by Plaintiffs would entail precisely the sort of individual examination that will defeat class certification.

25.    Please state the source and amount of any revenue received by BEHS during the years 1998 to date.

**ANSWER:**

This Defendant objects to Interrogatory No. 25 as not related in any way to issues of class certification; and disproportionate to the needs of the case.

**TURNER, PADGET, GRAHAM & LANEY, P.A.**

By:    _s/Richard S. Dukes, Jr._

July 12, 2021

Richard S. Dukes, Jr., Federal ID No.: 7340
40 Calhoun Street, Suite 200
Charleston, South Carolina 29401
Phone: (843) 576-2810
Fax: (843) 577-1646
Email: rdukes@turnerpadget.com

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Megan Ashley Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

9

**ATTORNEYS FOR DIOCESE DEFENDANTS**

# EXHIBIT 9

```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF SOUTH CAROLINA
 2                      CHARLESTON DIVISION

 3                  C/A: 2:21-cv-00613-RMG

 4   GARY NESTLER,
     VIEWED STUDENT FEMALE 200,
 5   VIEWED STUDENT MALE 300,
     ON BEHALF OF THEMSELVES AND ALL
 6   OTHERS SIMILARLY SITUATED,

 7             Plaintiffs,

 8   vs.

 9   THE BISHOP OF CHARLESTON, A
     CORPORATION SOLE, BISHOP ENGLAND
10   HIGH SCHOOL, TORTFEASORS 1-10, THE
     BISHOP OF THE DIOCESE OF CHARLESTON,
11   IN HIS OFFICIAL CAPACITY, AND
     ROBERT GUGLIELMONE, INDIVIDUALLY,

12

13             Defendants.

14

15

16

17             CONTINUATION OF DEPOSITION OF
                     MARIA ASELAGE
18

19

20

21   DATE:          December 1, 2021

22   TIME:          11:00 a.m. - 12:50 p.m.

23   LOCATION:      Slotchiver & Slotchiver, LLP
                    751 Johnnie Dodds Blvd., Suite 100
24                  Mount Pleasant, South Carolina

25   REPORTED BY:   Lorraine B. Whiteley
```

```
 1          This transcript may not be reproduced, emailed to

 2     another party or transcribed in any form or by any means,

 3     electronic, mechanical, photocopying, recording or

 4     otherwise, without the prior written permission of the

 5     Court Reporter.

 6

 7                    A-P-P-E-A-R-A-N-C-E-S

 8   For the Plaintiffs:

 9          By:  Daniel S. Slotchiver, Esquire
                 SLOTCHIVER & SLOTCHIVER
10               751 Johnnie Dodds Boulevard, Suite 100
                 Mt. Pleasant, SC  29464
11               (843) 577-6531
                 dan@slotchiverlaw.com
12
                 Brent S. Halversen, Esquire
13               HALVERSEN & HALVERSEN
                 751 Johnnie Dodds Boulevard, Suite 200
14               Mt. Pleasant, SC  29464
                 (843) 284-5790
15               brent@halversenlaw.com

16               Lawrence E. Richter, Jr., Esquire
                 THE RICHTER FIRM, LLC
17               622 Johnnie Dodds Boulevard
                 Mt. Pleasant, SC  29464
18               (843) 849-6000
                 lrichter@richterfirm.com
19

20   For the Defendants:

21          By:  Richard S. Dukes, Jr., Esquire
                 TURNER PADGET GRAHAM & LANEY, P.A.
22               40 Calhoun Street, Suite 200
                 Charleston, SC  29401
23               (843) 576-2800
                 rdukes@turnerpadget.com

24

25   (APPEARANCES CONTINUE, NEXT PAGE.)
```

```
 1                A-P-P-E-A-R-A-N-C-E-S (Continued)

 2    On Behalf of the Witness:

 3         By:  A. Peter Shahid, Jr., Esquire
                SHAHID LAW OFFICE, LLC
 4              89 Broad Street
                Charleston, SC  29401
 5              (843) 853-4500
                peter@shahidlawoffice.com
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    INDEX TO EXAMINATIONS

2    MARIA ASELAGE, sworn                              Page

3         Examination by Mr. Slotchiver                   6

4         Certificate of Reporter                        93

5         Attestation Page                               94

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        EXHIBIT INDEX

 2    Plaintiffs':

 3    Exhibit 1-C  E-Mail Chain Topped by E-Mail Dated        54
                   02/04/21 From Rickey Dennis to Maria
 4                 Aselage Re: Lawsuit (1 Page)

 5    Exhibit 2-C  Compilation of E-Mails (5 Pages)           60

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      PROCEEDINGS

 2                      = = = = = =

 3        (MARIA ASELAGE, having been first duly sworn as

 4    hereinbelow certified, testifies as follows:)

 5                      = = = = = =

 6                  E-X-A-M-I-N-A-T-I-O-N

 7    BY MR. SLOTCHIVER:

 8        Q    Ms. Aselage, this is our third time for your

 9    deposition in this case; correct?

10        A    Yes.

11        Q    All right.  I'm happy to go over the rules

12    with you again, if you'd like me to.  Why don't I do a

13    brief version?

14        A    Yes.

15        Q    And you'll let me know if you have any

16    questions?

17        A    Okay.

18        Q    Okay.  I want you to try to answer every

19    question I give you, to the best of your ability.  Okay?

20        A    Okay.

21        Q    I'm going to ask that you answer orally.  If

22    you nod your head or if you say "uh-huh" or "huh-uh," the

23    court reporter cannot take it down accurately,

24    necessarily, so we want to avoid that and have an

25    accurate transcript.  Okay?
```

```
 1          A      Yes.
 2          Q      If at any point you need a break, let me
 3     know; I'll be happy to give you a break.
 4          A      Thank you.
 5          Q      You cannot consult with your attorney or
 6     anybody about the deposition once we start --
 7          A      Okay.
 8          Q      -- until it's over.
 9          A      Yes, sir.
10          Q      Okay?  And I'm assuming, but tell me if I'm
11     wrong, that there's no reason why today is not as good as
12     any day, to give your deposition?
13          A      This day is fine.
14          Q      You're not upset, or you don't have any --
15     you had a good night's sleep?
16          A      I did.
17          Q      You're ready to go?
18          A      I -- I am.
19          Q      Okay.  You got hydrated?
20          A      I'm ready.
21          Q      Okay.  Fair enough.
22                 Let me start by asking you, because it is our
23     third time and because we have had issues that have come
24     up as far as information that you were not willing to
25     talk about or instructed not to talk about, is there
```

```
1   anything, before we get -- or as we're getting started,

2   is there anything today pertaining to this case,

3   pertaining to your involvement in this matter, your work

4   with the Diocese, your knowledge of what has happened, is

5   there anything at all that you are not going to be

6   talking about with us, if we ask you to talk about?

7              MR. DUKES:  I'll just object to the form.

8              MR. SHAHID:  Go ahead.

9              THE DEPONENT:  Okay.

10       A    Can you repeat the question one more time?

11  BY MR. SLOTCHIVER:

12       Q    Sure.

13            I want to make sure that this is -- I'm

14  hoping this is our last time to convene.

15       A    Yes.

16       Q    And my question to you is, is there anything

17  that you are not prepared to discuss today regarding this

18  case?

19       A    I'm prepared to discuss things regarding this

20  case.

21       Q    Okay.  So any -- there's no topic that is off

22  topic unless you attorney instructs you not to answer;

23  correct?

24       A    That's correct.

25       Q    And coming into this today, is it fair to say
```

1    that as far as you're concerned, you're willing to

2    discuss any and all topics that I ask you about?

3         A     Regarding this case; yes.

4         Q     When you say "regarding this case" --

5         A     That was in your question; wasn't it?

6         Q     When you asked me to repeat it.  But I want

7    to make sure when you're saying "regarding this case" --

8         A     I'm willing to answer your questions.

9         Q     Okay.  Fair enough.

10              My understanding from our prior depositions

11   has been that you really had a very minimal role with

12   reference to your involvement; that you spoke to some

13   people and they told you, basically, what they wanted to

14   convey in a press release, and that's what you conveyed?

15        A     Yes.

16        Q     Okay.  What I found, however, in reviewing

17   the stacks of documents which are four or five inches

18   high here -- this isn't everything -- is that your name

19   is on a whole lot more documents than I anticipated it

20   would be in.  Okay?  Would you agree with that?

21              I'll ask it differently.

22              You would agree that you've been involved in

23   e-mail after e-mail after e-mail and discussion after

24   discussion after discussion, with numerous people

25   involved in this matter?

```
 1          A     Yes.

 2          Q     Okay.  Included in those numerous people

 3    would have been Ms. Fowler?

 4          A     Yes.

 5          Q     The General Counsel.  Mr. Acquilano.  Michael

 6    Molony.  Correct?

 7          A     Yes.

 8          Q     Ray Stukes?

 9          A     Yes.

10          Q     I'm not going to ask you about your

11    conversations with your counsel.  Different parents?

12          A     Yes.

13          Q     The Vicar General?

14          A     Yes.

15          Q     Okay.  And they've relied on you -- and

16    you've also been charged with responsibilities of

17    contacting some of the different people that have

18    contacted the Diocese, including the different press

19    correspondents?

20          A     Yes.

21          Q     Okay.  How many hours do you believe,

22    excluding the deposition, that you have put into this

23    matter?

24          A     Fifty or 60.

25          Q     Okay.  One of the things I wanted to start
```

1   with that might be helpful and move this matter along is,

2   can you tell me about the miscellaneous conversations, to

3   the best of your recollection, that you've had with

4   Ms. Fowler?

5        A    Can you -- we -- let's start the day of the

6   press conference.

7        Q    Okay.

8        A    I think that's a good place to start.

9        Q    Sure.

10       A    We talked -- when we learned about the press

11  conference, that's when I started making phone calls to

12  Ms. Fowler.  And we started our conversations then on how

13  to respond.

14       Q    Before the press conference?

15       A    I may have -- I don't recall calling her

16  before the press conference.  Maybe when it started.

17  Maybe before.  I don't recall exactly my first phone call

18  to her.

19       Q    Had you seen or did you know anything about

20  the lawsuit, prior to the press conference?

21       A    I received a phone call from a reporter at

22  Channel 2.  I can't remember her name.

23       Q    Okay.

24       A    Basically, asking me if I knew about the

25  press conference or the lawsuit.

```
 1          Q      Okay.

 2          A      And I said, no; I don't know anything about

 3     it.

 4          Q      Did that reporter tell you anything about the

 5     substance of the lawsuit, the general nature of the

 6     allegations?

 7          A      I believe she just said the general nature.

 8     I don't recall exactly what it was.

 9          Q      All right.

10          A      But I believe it was the general nature.

11          Q      Was your direct contact with the Diocese,

12     then, Elaine Fowler?

13          A      I believe -- I -- I'm not sure if it was her

14     or not, at that point.

15          Q      But you did speak to her?

16          A      I did.

17          Q      Okay.  And when you spoke to her, did you

18     discuss the nature of the allegations as they related to

19     the windows looking into the locker room?

20          A      I just -- don't recall exactly when I talked

21     to her or what I said to her.  But I do recall watching

22     the press conference streaming on line.

23          Q      Okay.  All right.  You were not present at

24     the press conference?

25          A      No.
```

1          Q      Okay.  Who were you with when you watched it?

2          A      I was with nobody.

3          Q      Okay.  And what did you do after you saw the

4    press conference?  What -- let me back it up.  Were you

5    surprised at what you learned at the press conference?

6          A      I was -- yes.

7          Q      Was it scary, what you learned at the press

8    conference, the allegations that were being made?

9                 MR. DUKES:  Object to the form.

10         A      I wouldn't call it "scary."  I'd call it I

11   was just surprised.

12   BY MR. SLOTCHIVER:

13         Q      Were you surprised that allegations were

14   being made, or were you surprised that there were windows

15   looking into the locker room?

16         A      I was surprised allegations were being made.

17         Q      Were you not surprised at the fact that there

18   were windows looking from the different coaches' offices,

19   into the locker rooms?

20         A      I knew there were windows.

21         Q      How did you know there were windows?

22         A      Based on what happened with Mr. Scofield.

23         Q      Okay.  So you knew there were windows looking

24   into the locker room, from the coaches' office?

25         A      Based on my previous knowledge.

1          Q     Okay.  Had you had any discussions about

2     those windows and the fact that teachers or coaches or

3     persons inside the coaches' office could have a view of

4     the children?  Had you had any conversations with anybody

5     from the Diocese regarding those windows, prior to the

6     press conference?

7          A     Yes.

8          Q     Okay.  And who would you have spoken with?

9          A     Patrick Finneran.  Mary Anne Tucker.  Elaine

10    Fowler.  Michael Acquilano.

11         Q     And I apologize; I know the answer and I just

12    don't remember it.  Michael Acquilano; what is his role

13    again?

14         A     He is the Secretariat of Communications.

15         Q     And just to be on the same page, Elaine

16    Fowler was the General Counsel for the Diocese?

17         A     Yes.

18         Q     And Tucker; she is the vice principal of the

19    school?

20         A     Yes.

21         Q     Okay.  And Finneran; he's the Principal?

22         A     Yes.

23         Q     Okay.  So those conversations with each of

24    these people all took place prior to the filing of this

25    lawsuit and the press release?

```
 1        A      Yes.

 2        Q      Okay.  What conversations did you have with

 3   Elaine Fowler about the windows?

 4        A      Before the press conference?

 5        Q      Yes.  I'm sorry.  Thank you.

 6        A      We discussed -- I spoke with her when

 7   Mr. Scofield was arrested.

 8        Q      Okay.

 9        A      Or after Mister -- or the day that

10   Mr. Scofield was arrested.

11        Q      All right.  Prior to that, did you know

12   anything about the windows?

13        A      No.

14        Q      All right.  Did you and her discuss the fact

15   that it gave unfettered access to whoever was inside the

16   coaches' office --

17        A      No.

18        Q      -- to look at the children?

19        A      No.

20               MR. DUKES:  Object to the form.

21   BY MR. SLOTCHIVER:

22        Q      Okay.  Did you have that discussion with

23   Ms. Tucker?

24        A      I don't recall.  I don't believe so.

25        Q      How about Mr. Finneran?
```

1          A     I don't recall.  I don't believe so.

2          Q     Did anybody, to your knowledge, at any point

3    prior to the press conference that was had on this

4    matter, ever express to you concern about the fact that

5    there were windows that allowed people in the coaches'

6    offices to look at the children?

7          A     No.

8          Q     Okay.  And you'd never been in the locker

9    room; correct?

10         A     No.

11         Q     And you still haven't been in the locker room

12   while the windows were present, allowing people to look

13   from the coaches' office into the locker room; is that

14   correct?

15         A     That's correct.

16         Q     Okay.  The allegations with Scofield were a

17   little bit different because, there, he had used a video

18   recording to capture the children in the locker room;

19   correct?

20         A     Yes.

21         Q     But he had used the video recording,

22   utilizing those windows; correct?

23         A     Yes.

24         Q     All right.  So when the lawsuit -- when the

25   press conference came up that you watched, you would have

```
 1    seen the -- you would have heard the allegations that

 2    those windows were used, or could have been used -- were

 3    available -- for people to view children without the

 4    children knowing that they're being viewed?

 5              MR. DUKES:  Object to the form.

 6              MR. SHAHID:  Object to form.

 7    BY MR. SLOTCHIVER:

 8         Q    Correct?

 9         A    Yes.

10         Q    All right.  Prior to that press conference,

11    did you know that those windows could in fact be used to

12    view the children, without the children knowing that

13    they're being viewed?

14              MR. SHAHID:  Object to form.

15              MR. DUKES:  Same objection.

16         A    No.

17    BY MR. SLOTCHIVER:

18         Q    Did you know there were blinds in the

19    windows?

20         A    No.

21         Q    Okay.  So the press conference is the first

22    time that you ever learned there were blinds in the

23    windows?

24         A    Yes.

25         Q    All right.  So the press conference, you saw
```

1    a giant blow-up photograph that was used demonstratively,

2    that's been seen over and over in the lawsuit, that

3    allows you to see the desk -- of Mr. Runey, I believe;

4    correct?

5          A    I -- I don't --

6          Q    You don't know who it --

7          A    I --

8          Q    -- belongs to?

9          A    I don't know it belongs to.

10         Q    All right.  But you remember the picture?

11   There's a desk, and on the other side of the desk --

12         A    I mean I vaguely recall it; yes.

13         Q    And there's a big window with the blinds?

14         A    Yes.  Yes.

15         Q    Okay.  And you were able to see -- with the

16   blinds open, you were able to see that you could see into

17   the locker room?

18         A    I don't recall that.  I -- I don't recall.

19         Q    Okay.

20         A    I mean that press conference was --

21         Q    How about since the conference?  Are you

22   familiar with the picture that allows you to see --

23         A    No.

24         Q    All right.  Do you have any knowledge, any

25   independent knowledge, whether or not -- or did you have

```
 1    any discussions with anybody, about the fact that you can

 2    manipulate those blinds so that you can see the

 3    children --

 4         A    No.

 5         Q    -- in the locker room?

 6         A    No.

 7         Q    All right.  But you are aware of the fact

 8    that the windows were created and installed for the

 9    purposes of monitoring the children in the locker room

10    for behavior such as hazing, harassment, bullying and

11    smoking; correct?

12         A    Yes.

13         Q    So, certainly, you knew that one of the

14    purposes of the creation of the windows was for the very

15    purpose of looking through those windows, into the locker

16    room?

17              MR. DUKES:  Object to the form.

18    BY MR. SLOTCHIVER:

19         Q    Correct?

20              MR. SHAHID:  Object to form.

21         A    Yes.

22    BY MR. SLOTCHIVER:

23         Q    Okay.  Let's go back to Elaine Fowler.  So

24    your first discussion with her would have been on the day

25    of the press conference -- before the press conference,
```

```
 1    you believe.  Did you speak to her after the press
 2    conference?
 3         A     Yes.
 4         Q     All right.  And what was that conversation?
 5         A     We discussed that the press -- that I recall,
 6    that the press conference had happened and that I was
 7    gonna work on a statement.
 8         Q     Okay.  Did you --
 9               MR. RICHTER:  I'm sorry; I missed that
10    answer.
11               THE DEPONENT:  I'm sorry.  That I was gonna
12    work on a statement.
13               MR. RICHTER:  Thank you.
14               THE DEPONENT:  You're welcome.
15    BY MR. SLOTCHIVER:
16         Q     Did you explain to her what you had learned
17    and gleaned from the press conference?
18               MR. DUKES:  Object to the form.
19         A     I don't recall specifically what I told her.
20    BY MR. SLOTCHIVER:
21         Q     Do you know if she watched the press
22    conference?
23         A     I don't know.
24         Q     All right.  Well, if you don't know if she
25    watched the press conference, would you at least agree
```

1    with me that in order to discuss with her that you're

2    going to work on a statement, that you had to have

3    discussed the facts of the press conference?

4         A    Yes.

5         Q    Okay.  And it's not -- it's a memory test, to

6    the point that you can remember.

7         A    I know.

8         Q    But it's not trick questions.  I'm just

9    trying to understand what you know.

10        A    I understand.

11        Q    Okay.

12             So I'm assuming that one -- would you agree

13   with me that one of the things that stood out to you was

14   learning about the blinds, that you weren't aware of

15   before; correct?

16             MR. SHAHID:  Object to the form.

17             MR. DUKES:  Same objection.

18        A    I wouldn't say it "stood out" to me.  I just

19   learned of it.

20   BY MR. SLOTCHIVER:

21        Q    Was it surprising to you to learn that blinds

22   were in the windows, that could be manipulated so that

23   children could, unknowingly, be seen in various states of

24   dress and undress?

25        A    I didn't feel anything.  I just heard the

1    facts of what was reported.

2        Q    You were -- you had no feeling, positive or

3    negative, about that allegation?

4        A    The allegation that there were blinds?

5        Q    That there were blinds that were utilized to

6    surreptitiously look at children that didn't know they

7    were being looked at?

8            MR. SHAHID:  Object to the form.

9            MR. DUKES:  Same objection.

10   BY MR. SLOTCHIVER:

11       Q    Did that no give you any -- as a human being,

12   it gave you no concern?

13       A    It gave me concern.

14       Q    Okay.  And what was that concern?

15       A    That it -- well, that the windows were there,

16   and that there was always the possibility that someone

17   could be viewed.

18       Q    Without knowing they're being viewed?

19       A    Yes.

20       Q    Okay.  Okay.  And was that concern further

21   heightened when you learned from the school, as per the

22   press release, that the windows were actually created for

23   the very purpose of viewing into the locker room?

24       A    I -- I learned that the purpose was to view

25   into the locker room to monitor for bullying and fights.

```
1              Q     All right.  And were the words that were used
2       in the press conference, were they randomly chosen or
3       were they specifically chosen?
4              A     I can't speak as to what words were chosen to
5       be used in the press conference.
6              Q     Okay.  Well, there's a certainly a difference
7       in the word "monitor" and "react;" correct?
8              A     "Monitor" and "react?"
9              Q     Yes.
10             A     Yes.
11             Q     Okay.  So if they -- if the blinds were used
12      to react to bullying, to react to hazing, to react to
13      smoking, that's different than to monitor for bullying,
14      for hazing, for smoking; correct?
15             A     Correct.
16             Q     All right.  And "react" would be if you hear
17      an event, or if an event occurs that you learn about
18      somehow, you can look at the windows and react to it;
19      "monitor" is to monitor to make sure it's not happening?
20             A     Yes.
21             Q     Okay.  As time progressed with Ms. Fowler,
22      tell me about the other involvement you had directly with
23      her.  I know that you stated that you were charged with
24      creating a press release; right?
25             A     Correct.
```

```
 1          Q     And I believe you previously testified that

 2    you worked with her and Michael Acquilano in creating the

 3    press release and getting approval; correct?

 4          A     Yes.

 5          Q     And, ultimately, you went to the Vicar

 6    General for the final approval?

 7          A     Yes.

 8          Q     Okay.  So did she discuss what she wanted to

 9    be in the press release or were you charged with just

10    creating the whole thing?

11          A     If I recall -- what I recall --

12          Q     Sure.

13          A     I wrote the first draft.  And I believe --

14    and then I sent it to her, to review.

15          Q     I've seen copies of the drafts.  What I

16    haven't seen is e-mailed back and forth saying why don't

17    we change this word or this and change this word or that?

18          A     We did that on the phone.

19          Q     Okay.  How much involvement did Elaine Fowler

20    have in the creation of the press release?

21          A     She, again, reviewed my first draft, and

22    then -- I believe there were three drafts I gave you.

23    Right?

24          Q     Right.

25          A     So she had a say in all three of those
```

1    drafts.

2        Q    Okay.  Did you -- I'm just trying to

3    understand the nature of it.  Did you and she get on the

4    same page before you went to Michael Acquilano or were

5    you all working together at the same time?

6        A    So looking back after reviewing my e-mails a

7    little bit more in depth, I believe Michael was in -- out

8    of town that day, at another appointment.  So I don't

9    recall that he was involved in the actual writing of the

10   press release.

11       Q    All right.  So it was really you and the

12   General Counsel?

13       A    Correct.

14       Q    All right.  And one of the words that -- I

15   think you testified before, tell me if I'm wrong, that

16   you have no personal -- that you were not interjecting

17   any personal opinions in the press release; you were

18   merely releasing information on behalf of the Diocese?

19       A    When the press release was sent, I was doing

20   that; yes.

21       Q    In the creation of the press release, also;

22   correct?

23       A    I created the first draft of the press

24   release.

25       Q    I know you created it.

```
1         A      Uh-huh.

2         Q      We talked about that.

3         A      Yes.

4         Q      But you had -- if I recall correctly, you had

5     no -- you never had --

6         A      No.

7         Q      You had no knowledge as to whether or not the

8     policies that were being implemented were proper or

9     improper; correct?

10        A      Correct.

11               MR. SHAHID:  Object to form.

12               MR. DUKES:  Object to form.

13   BY MR. SLOTCHIVER:

14        Q      Okay.  And we've been through this before:

15    When they object to form, you can still answer the

16    question.

17        A      I understand.

18        Q      Okay.  Good.  I just want to make sure.

19        A      I understand.

20        Q      I know you're not a professional deponent,

21    although we've been here a few times.

22               And would it be fair to say that the

23    statements in the press release were, in fact, the

24    statements of the Roman Catholic Diocese of Charleston,

25    as written --
```

1      A      The press release --

2      Q      -- by you?

3      A      The press release that we sent was the

4   statement from the Diocese of Charleston.

5      Q      Okay.  And I think we'd already talked about

6   the statement that there was no merit to it.  That's not

7   your opinion; correct?  You don't have an opinion?

8      A      I'm the spokesperson for the Diocese.

9      Q      Right.  You're not interjecting your own

10   opinion about whether or not it has merit or not, or

11   whether it's ludicrous or not.  You're just a spokes --

12      A      Those are words that I wrote.

13      Q      I understand.

14      A      Okay.

15      Q      But those are words that you wrote on behalf

16   of the Diocese?

17      A      Yes.

18      Q      And that you spoke to Elaine Fowler about and

19   you exchanged, back and forth, thoughts and ideas and

20   words?

21      A      Yes.

22      Q      And then you made alterations to it?

23      A      Yes.

24      Q      Okay.  Did you and Ms. Fowler ever discuss in

25   detail the portion of the press release that released to

```
 1        -- I'll read it -- when school officials learned about a

 2        member of the athletic staff videotaping boys in the

 3        locker room in May of 2019, they immediately contacted

 4        police and terminated the employee -- I'm giving you

 5        background; the section I'm asking about is the next one.

 6        Soon afterwards, the windows were covered.  They were

 7        subsequently removed and replaced with a brick wall.

 8                Did you ever discuss with Ms. Fowler why it

 9        was that the windows were covered and replaced with a

10        brick wall?

11        A     Not that I recall.

12        Q     Did you discuss with anybody why the windows

13        were covered up and replaced?

14        A     Not that I recall.

15        Q     Not with Mr. Acquilano, Ms. Tucker,

16        Mr. Finneran?

17        A     Not that I recall.

18        Q     It wasn't relevant to your writing the press

19        release?

20        A     I wrote what I knew occurred.

21        Q     As a fact?

22        A     As a fact.

23        Q     Okay.  Why was the word "safety" included in

24        the press release?

25        A     May I look at to where you're referring to?
```

```
 1              MR. SLOTCHIVER:  The temperature is going to

 2       alter, off and on.

 3              THE DEPONENT:  Yeah.  I'm sorry.  I get cold

 4       easily.

 5              MR. SLOTCHIVER:  We can adjust it.  I know

 6       it's going to get a little cooler, but I hope it won't go

 7       too much.  Hold on one second; I'll adjust it.

 8          (Off the record.)

 9   BY MR. SLOTCHIVER:

10       Q    The paragraph, the windows between where the

11   coaches' office and the boys' and girls' lockers rooms

12   were included in the plans and installed in the building

13   in the 1990s "for safety reasons."

14       A    Going back to watching for bullying and

15   threatened -- or anything -- threatening behavior in the

16   locker room.

17       Q    Smoking?  All of those things that --

18       A    Correct.  Yes.

19       Q    Okay.  Did you have any discussions with

20   Mr. Finneran, Ms. Tucker, Ms. Fowler, Mr. Acquilano or

21   anybody, about how many prior incidents had occurred in

22   the locker room?

23       A    No.

24       Q    You never at any time said, hey, guys, we

25   need to figure out -- if this was created for safety
```

1    reasons, we need to figure out how many times we've had a

2    safety event?

3          A    No.

4          Q    That never became something relevant to you

5    to try to figure out or discuss with anybody?

6          A    No.

7          Q    So you wrote a statement saying that this was

8    ludicrous, despite the fact that you never dug to the

9    very first level to find out if there had ever been a

10   safety event?

11         A    Yes.

12         Q    Do you have any idea, as we stand here today,

13   how many safety events have occurred in that locker room?

14         A    No.

15         Q    You would agree with me that looking at

16   people without them knowing they're being looked at, in

17   various states of dress, is a privacy issue; correct?

18         A    Yes.

19              MR. DUKES:  Object to the form.

20   BY MR. SLOTCHIVER:

21         Q    Okay.  And I don't think anybody's disputing

22   that it's a privacy issue.

23              MR. DUKES:  Object to the form.

24   BY MR. SLOTCHIVER:

25         Q    Is it fair to say that -- is it -- I'll ask

```
1     it differently.  Is it your understanding that the reason
2     that's been given to you by the Diocese is, safety?
3          A     Yes.
4          Q     All right.  So safety issues override privacy
5     because you're providing a safe environment for the
6     children?
7          A     Yes.
8                MR. SHAHID:  Object to the form.
9  BY MR. SLOTCHIVER:
10         Q     Okay.  Who in particular has discussed that
11    with you?
12         A     I don't recall exactly who told that to me.
13         Q     Who's the world of people that it could have
14    them?
15         A     It could have been Elaine Fowler.  It could
16    have been Patrick Finneran.  It could have been -- and
17    you're talking when I wrote the press release?
18         Q     When you wrote the press release; yes.
19         A     Well, that day, the only person I recall
20    talking to was Elaine Fowler.
21         Q     Okay.  And did you -- being that you don't
22    know how many safety events occurred, did you just take
23    it for granted that there must have been safety events
24    because, otherwise, why in the world would you invade
25    their privacy?
```

```
1                    MR. DUKES:  Object to the form.
2                    MR. SHAHID:  Object to form.
3          A     That it was safety events; correct.
4    BY MR. SLOTCHIVER:
5          Q     Okay.  And when we say -- just to go one step
6    further with the safety events, was it your
7    understanding, then, that whatever safety events occurred
8    would have been detected by the use of the very windows
9    that were put in there for the purposes of monitoring for
10   safety events:  Bullying, harassment, hazing, smoking?
11         A     Yes.
12         Q     Okay.  Would you have drafted the same press
13   release that you drafted if you known that there has
14   never, not once, been a safety event -- bullying,
15   harassment, smoking or anything like that -- that's ever
16   been gleaned by use of monitoring those windows into the
17   locker room?
18                   MR. SHAHID:  Object to the form.
19                   MR. DUKES:  Object to the form.
20         A     I don't know I can say -- I don't -- I
21   don't -- it's hard to play the what-if game or to assume
22   what-if, I think.
23   BY MR. SLOTCHIVER:
24         Q     Well, I'm not assuming.
25         A     Okay.
```

```
1              Q       I'm giving you facts.

2              A       Okay.

3              Q       If you had been told by Ms. Fowler that there

4       has never once, in the history of the school, been a

5       safety event that was gleaned by use of those windows,

6       ever, by monitoring the children through the windows for

7       events such as safety -- harassment, hazing, bullying,

8       smoking -- if she had told you that, would you have used

9       the same words that you used in this press release?

10                     MR. DUKES:  Object to the form.

11                     MR. SHAHID:  Object to the form.

12             A       I believe that the windows were put in to

13      monitor for possible safety issues.

14      BY MR. SLOTCHIVER:

15             Q       All right.  I understand that.

16             A       Okay.

17             Q       That's not my question.

18             A       Okay.

19             Q       You also stated in your statement that it's

20      ludicrous, the lawsuit; correct?

21             A       Correct.

22             Q       All right.  And you stated in your statement

23      that you believe that this lawsuit has no merit; correct?

24             A       Yes.

25             Q       And this is information that you stated,
```

1   having conversed with Ms. Fowler; correct?

2       A    Yes.

3       Q    All right.  So my question to you was, if you

4   had known that there never had been, since 1998 when that

5   school was built, a single safety event that the school

6   is aware of that has taken place in the locker room that

7   meets this criteria of bullying, harassment, hazing or

8   smoking, that was captured by use of monitoring through

9   those windows, would you have written the same thing that

10  you wrote?

11          MR. DUKES:  Object to the form.

12          MR. SHAHID:  Object to the form.

13      A    No.

14  BY MR. SLOTCHIVER:

15      Q    Okay.  I don't think it will make a

16  difference, but I will represent to you that there have

17  been three events, based on discovery we've received,

18  that happened in the locker room.  One was stealing a

19  wallet and one was some videotape of some child with some

20  learning problems, between '98 and the time that the

21  windows were taken down, none of which were captured by

22  use of the windows.

23          MR. DUKES:  Object to the form.

24  BY MR. SLOTCHIVER:

25      Q    Okay?  All of which were independently

1    learned or had nothing to do with the window.  Would that

2    change your position at all, or is your position still

3    the same as you applied -- as you stated a moment ago,

4    which was you had written -- you would have written it

5    differently?

6         A    I may have written it differently.

7         Q    Okay.  Well, you certainly wouldn't have said

8    that the windows were there for safety, if you knew that

9    the safety wasn't afforded?

10              MR. DUKES:  Object to the form.

11              MR. SHAHID:  Object to form.

12        A    I was told that the windows were put in for

13   safety reasons, to monitor.

14   BY MR. SLOTCHIVER:

15        Q    Did they ever discuss with you that between

16   1998 and the time that this event occurred -- that the

17   Scofield event occurred -- that nobody had ever

18   reevaluated whether or not the windows were really a good

19   idea?

20        A    No.

21              MR. DUKES:  Object to the form.

22              MR. SHAHID:  Object to form.

23   BY MR. SLOTCHIVER:

24        Q    Okay.  Did you discuss with anybody, studies

25   that have been undertaken or knowledge that had been

1    gleaned prior to the Scofield event, about whether or

2    not -- and the key word is "prior" to the Scofield event.

3         A     Uh-huh.

4         Q     Is whether or not any other school, that the

5    Diocese was aware of, had windows from a coaches' office,

6    looking into the locker room?

7         A     Can you repeat that question one more time?

8         Q     Yes.  Did you discuss -- or did you have

9    knowledge from having discussions with anybody from the

10   Diocese, understanding your primary people are the ones

11   that we discussed, Finneran and Elaine Fowler and

12   Ms. Tucker and Acquilano and the Vicar General --

13        A     Uh-huh.

14        Q     But even if we go beyond that, had you had

15   any discussions with anybody from the Diocese about

16   knowledge they had which existed prior to the Scofield

17   event --

18        A     No.

19        Q     Let me finish.  I know you want to make an

20   assumption.

21        A     Okay.

22        Q     That existed -- I know we -- I just want to

23   make sure we have a clear record.

24        A     I understand.

25        Q     That existed prior to the Scofield event,

1    about having studied -- or knowledge about other schools

2    that may have had windows looking into the locker room?

3          A     No.

4          Q     Okay.  Now I know that -- we'll come to it in

5    a few minutes.  I know that since this event took place

6    and since Scofield took place, they've learned about

7    other schools that have windows; correct?

8          A     Yes.

9          Q     And, actually, would it be fair to say that

10   that knowledge actually didn't take place after Scofield;

11   it really didn't take place until after the lawsuit was

12   filed?

13         A     Yes.

14         Q     Correct?

15         A     Yes.

16         Q     Okay.  And that's some of the e-mails that

17   we've seen.  I think one of them was Rich Dukes writing

18   we can now go on the offensive; I've found some other

19   schools that have windows?

20         A     Yes.

21         Q     All right.  Is it your knowledge, from having

22   spoken to the various people about the windows at the

23   other schools that are contained in your e-mails -- that

24   will come to in a few minutes -- that all of that

25   knowledge was gleaned after the press conference took

```
 1    place?

 2          A     Yes.

 3          Q     Okay.  And do you have any knowledge as to

 4    whether or not -- that you've ascertained in any way

 5    whatsoever, as to whether or not any of those schools

 6    have an active policy that the coaches, or the people in

 7    the coaches' office, were supposed to use those windows

 8    to monitor the children?

 9          A     No.

10          Q     Okay.  Have you ever learned, or chatted with

11    anybody, about who was authorized to monitor those

12    windows?

13          A     No.

14          Q     Or who was instructed to monitor those

15    windows?

16          A     No.

17          Q     Or what rules or regulations were set forth

18    for the monitoring of those windows?

19          A     No.

20          Q     Other than the discussion with Elaine Fowler

21    about the press conference, have you had any other

22    discussions with her regarding this lawsuit?

23          A     In general or --

24          Q     In general, about the matters related to this

25    lawsuit?
```

```
 1          A     Yes.

 2          Q     What other discussions have you had with her?

 3          A     I re -- the day of the press conference, we

 4   talked --

 5          Q     Okay.

 6          A     -- that I recall.  And then we had meetings

 7   regarding the lawsuit.

 8          Q     When was the last meeting you had regarding

 9   the lawsuit?

10          A     I believe it was late May.

11          Q     Okay.  And what would happen at those

12   meetings?  What would you discuss?

13          A     We would discuss the -- the meetings that I

14   recall, we discussed the possible -- having a possible

15   press conference.

16          Q     Okay.  We'll come back to that in a few

17   minutes.

18          A     I understand.

19          Q     Okay.  Ultimately, it was decided not to have

20   a press conference; correct?

21          A     Correct.

22          Q     But you did outline what the press conference

23   was going to --

24          A     Correct.

25          Q     Okay.  Why did you decide not to have a press
```

1     conference?

2          A     I made the point that we just didn't want to

3     start the conversation again in the public.

4          Q     Okay.  Okay.  Contrary to the old statement

5     that all non-publicity is still publicity?

6          A     I just made the decision --

7          Q     Yeah.

8          A     -- we didn't want to start the conversation

9     again.

10         Q     Okay.  Fair enough.  And they agreed with

11    you?

12         A     That's what I recommended; yes.

13         Q     Okay.  Have you had any more -- any

14    discussions with Ms. Fowler about strategy and how we

15    defend this in the public eye?

16         A     No, not that I recall.

17         Q     You did have a discussion with her at one

18    point about Michael Maloney; correct?

19         A     We had a discussion with Michael Maloney, I

20    think in one of those meetings.

21         Q     Okay.  And his role was to get in there for

22    purposes of assisting with PR?

23         A     Yes.

24         Q     Did he get involved?

25         A     No.

```
 1          Q     How come?

 2          A     He just decided he didn't want to get

 3    involved.

 4          Q     Okay.  How about Ms. Tucker; have you

 5    continued to have conversations with her about the

 6    lawsuit?

 7          A     No.

 8          Q     I know that you spoke to Ms. Fowler about the

 9    lawsuit, and I believe you said that -- or about the

10    press release, and you even said Mr. Acquilano wasn't

11    around that weekend.  What did you --

12          A     It was that day.

13          Q     That day.  What did you speak to Ms. Tucker

14    about, regarding the lawsuit?

15          A     I never -- I don't recall having a

16    conversation with Ms. Tucker about the lawsuit.

17          Q     Okay.

18          A     Not a phone conversation.

19          Q     Did you have a non-phone conversation?

20          A     I believe there's an e-mail about letters to

21    parents -- I believe.  Those were the -- those were

22    the -- the -- the --

23          Q     I saw some --

24          A     -- communications --

25          Q     -- of those.
```

1          A     Yeah.  Those were the communication I had

2     with Mr. Finneran and Ms. Tucker.

3          Q     Okay.  All right.  Fair enough.  And how

4     about Mr. Dukes?

5          A     I had con -- I had e-mail exchanges with him,

6     and, also, a meeting with him.

7          Q     Okay.

8          A     I think two meetings with him.

9          Q     All right.  When were those meetings?

10         A     In May, if I recall.  I believe it was may.

11         Q     You've had no other meetings with Mr. Dukes

12    since May?

13         A     No.

14               MR. RICHTER:  May of what year?

15               THE DEPONENT:  This year.

16    BY MR. SLOTCHIVER:

17         Q     Okay.  And what were those -- and I know this

18    is -- there's no privilege and so it is what it is.  I'm

19    just going to ask you about what those conversations were

20    about.  Were they strategy conversations?

21         A     Yes.

22         Q     Okay.  And who called for those meetings?

23         A     I think -- oh.  I don't recall exactly who

24    called for them.

25         Q     Okay.  Who was present?

1      A      It was Rich Dukes, Elaine Fowler, Michael

2   Acquilano and me.

3      Q      Okay.  Were they live or Zoom?

4      A      They were live.

5      Q      Okay.  All right.  And what did you guys

6   discuss at those meetings?

7      A      The first meeting in May, we discussed the

8   possibility of having a press conference.

9      Q      All right.

10     A      And then the second meeting, we discussed

11  further details about the press conference -- the

12  possible press conference.

13     Q      Okay.  We'll come back to those in a few

14  minutes on your -- on some of the e-mails.

15             Any other conversations you've had with

16  Mr. Dukes about this case?

17     A      Not that I recall.

18     Q      Other than pleasantries?  Okay.  How about

19  Monsignor Harris?

20     A      Not that I recall.

21     Q      I know you had a conversation where you had

22  him -- where you sent him a copy of the press release and

23  he approved it; correct?

24     A      He approved it verbally, on the phone.

25     Q      Okay.  You read it to him?

1     A     I believe I e-mailed to him -- or read it to

2     him.  I can't recall.

3     Q     Okay.  Other than that, have you had any

4     conversations with him about this?

5     A     Not that I recall.

6     Q     Okay.

7           What do you know about Mr. Glick?

8     A     Mister who?

9     Q     Glick.

10    A     Oh.  Myles Glick?

11    Q     Yes.

12    A     He's an architect, and we talked about having

13    him speak at the press conference.

14    Q     Have you ever met him before?

15    A     No.

16    Q     Okay.  Have you spoken to him at all?

17    A     No.

18    Q     Okay.  What did you understand that he would

19    bring to the table, Mr. Glick?

20    A     His architectural experience.

21    Q     Did you understand that Mr. Glick had built

22    high schools with windows looking into the locker rooms?

23    A     I recall he was an architect that built high

24    schools -- or schools.

25    Q     Okay.  Are you familiar with the fact that

```
 1    he -- that there was an assertion that he claimed that
 2    windows are no longer used in schools?
 3           A     No.
 4           Q     You never spoke to him, to know what he would
 5    say or wouldn't say; is that correct?
 6           A     That's correct.
 7           Q     Okay.  Who told you what he was going to say?
 8           A     Mr. Dukes.
 9           Q     Okay.  Do you know if -- do you know whether
10    or not windows are currently being utilized in schools
11    that are being built, to view from the coaches' offices
12    into the locker rooms?
13           A     No.
14           Q     You haven't spent any time investigating
15    that?
16           A     No.
17           Q     Okay.
18                 I'm going to ask you some questions, and
19    let's see if you can tell me the answers, to the best of
20    your ability.  And we might have covered some of this a
21    little bit; if we have, this will move quickly.
22                 Do you know why the windows were installed in
23    the locker rooms at Bishop England High School, to begin
24    with --
25           A     No.
```

1         Q      -- looking from the coaches' office into the

2    children's rooms?

3         A      No.

4         Q      Okay.  Do you know who made the decision to

5    install those windows?

6         A      No.

7         Q      Are you aware of any safety precautions that

8    could have been used to prevent someone from looking

9    through those windows and seeing children who were naked

10   or partially clothed?

11        A      No.

12               MR. DUKES:  Object to form.

13   BY MR. SLOTCHIVER:

14        Q      Have you looked into that issue?

15        A      No.

16        Q      Have you discussed that issue with anybody?

17        A      I don't believe so.

18        Q      Okay.  Have you had any discussions with

19   anybody from the Diocese -- and, if so, I'll ask you

20   who -- about why the parents had never been informed --

21   parents of the students of the school had never been

22   informed that there were windows that allowed persons in

23   the coaches' locker room to view their children, nude or

24   partially nude --

25        A      No.

1          Q       -- in various states of dress?

2                  MR. DUKES:  Object to form.

3                  MR. SHAHID:   Object to the form.

4          A       No.

5    BY MR. SLOTCHIVER:

6          Q       Okay.  That's never come up?

7          A       No.

8          Q       Okay.  Have you had any discussions with

9    anybody at the Diocese about whether or not the students

10   were even aware of the fact that the windows allowed them

11   to be looked at while they were in various states of

12   dress or undress?

13         A       No.

14                 MR. DUKES:  Object to the form.

15   BY MR. SLOTCHIVER:

16         Q       Do you know the Bishop?

17         A       Yes.

18         Q       Do you know him personally?

19         A       Yes.

20         Q       Okay.  How do you know him?

21         A       Through my association with the Diocese.

22         Q       Okay.  Are you aware of the allegation that

23   he sought to alter truth and or impede and/or to avoid

24   and cover up the Diocese's actions related to sexual

25   and/or other abuse of children and acted inappropriately,

1    illegally and conspiratorially, to the detriment of the

2    Plaintiffs in this lawsuit and for the benefit of the

3    Diocese?

4                MR. DUKES:  Object to the form.

5                MR. SHAHID:  Object to form.

6        A     No.

7  BY MR. SLOTCHIVER:

8        Q     Okay.  Tell me -- I believe we'll move on a

9    little bit.  One of the areas that you I think were

10   charged with, was dealing with the press; correct?

11       A     Yes.

12       Q     Did you do your -- when you received

13   questions from the press, I'm assuming some of them would

14   say, give me a press release?

15       A     Yes.

16       Q     And can you please do that as soon as you

17   can?

18       A     Yes.

19       Q     And other ones would say, can you answer

20   these questions for me?

21       A     Yes.

22       Q     Was that something that you were charged

23   independently with doing or did you have to run that

24   through Elaine Fowler before you could respond?

25       A     I would -- in this case, I ran everything

1  through Elaine Fowler regarding the press statement, and

2  that's all we released.

3      Q    Okay.  Was there a reason why you would not

4  answer individual questions?

5      A    We chose just to release the press statement.

6      Q    All right.  Would you at least discuss

7  individual questions with Elaine Fowler, to determine if

8  you should or shouldn't answer those questions?

9      A    Not that I recall; no.

10     Q    All right.  Was it important for the Diocese

11  to respond to the public so they could know what's going

12  on?

13     A    Yes.

14     Q    All right.  I'm assuming you would have

15  received communications from various press agencies, some

16  which were top-shelf and some which were bottom-shelf?

17  Is that a fair statement?

18     A    Yes.

19     Q    Okay.

20     A    I mean I don't know what you classify

21  top-shelf and bottom-shelf.

22     Q    Well, you know --

23     A    All reporters are important.

24     Q    I'm not suggesting that some aren't.  But

25  some of them are from more -- are from more

```
 1    distinguished, reputable news agencies that have been

 2    around for a long time and others are from the new --

 3    whether they're self-related or small, new agencies that

 4    want to create --

 5         A    Yes.

 6         Q    -- an image for themselves; right?

 7         A    Yes.

 8         Q    All right.

 9              MR. DUKES:  Dan doesn't like Fox News.

10              MR. SLOTCHIVER:  Well, I don't know what --

11              THE DEPONENT:  These are your words.

12    BY MR. SLOTCHIVER:

13         Q    Post and Courier; is that a long-standing

14    newspaper?

15         A    Yes.

16         Q    Okay.  Reputable?

17         A    Yes.

18         Q    Well-received in the --

19         A    Yes.

20         Q    -- charleston community?

21              MR. DUKES:  Especially for wrapping fish.

22    BY MR. SLOTCHIVER:

23         Q    And probably the only --

24         A    Well, the only newspaper, big-time newspaper,

25    in the Lowcountry.
```

```
 1          Q     Okay.  So if you want to get information out,

 2     that's probably the best source to go to?

 3          A     Yes.

 4          Q     All right.  Did you receive -- do you

 5     remember getting questions from the Post and Courier?

 6          A     Yes.

 7          Q     Did you answer those questions?

 8          A     No.

 9          Q     Okay.  Were those the same questions I asked

10     you just a moment ago?

11          A     I believe so.

12          Q     Okay.  Is there a reason why these -- none of

13     the answers to these questions were given in the press

14     release?

15          A     We chose just to release the press release.

16          Q     Okay.  So you wanted to spin it the way you

17     wanted to spin it?

18          A     We wanted to send out our press release.

19          Q     Right.  And you wanted to use words like

20     "meritless" and "ludicrous" as opposed to answering

21     questions from a reputable newspaper?

22          A     We chose --

23                MR. DUKES:  Object to the form.

24     BY MR. SLOTCHIVER:

25          Q     Let me show you a copy of what I'm referring
```

```
1      to.

2                  MADAM COURT REPORTER:  Are we marking this,

3      sir?

4                  MR. SLOTCHIVER:  We're going to; yeah.

5      BY MR. SLOTCHIVER:

6          Q     Do you see these questions that I've handed

7      you?

8          A     Yes.

9          Q     All right.  Have you seen these before?

10         A     Yes.

11         Q     Okay.  And these are the questions that you

12     have not answered; correct?

13         A     That I did not answer to the Post and

14     Courier.

15         Q     Correct.  Did you answer those to anybody?

16         A     No.

17         Q     Okay.  Did you dig into these questions?

18         A     No.

19         Q     All right.  Did you consider -- did you

20     discuss with Ms. Fowler, maybe we should respond to this?

21         A     I don't recall.

22         Q     Do you see, looking at the questions, why

23     they are pretty significant questions --

24                 MR. DUKES:  Object to the form.

25     BY MR. SLOTCHIVER:
```

```
 1          Q     -- about the facts in this case?
 2                MR. DUKES:  Object to the form.
 3   BY MR. SLOTCHIVER:
 4          Q     I'm asking -- I understand your lawyer's
 5   going to object to the form.
 6          A     I understand.
 7          Q     I get it.  I'm just asking you --
 8          A     Well, I guess "significant" is your word.
 9          Q     Okay.  Well, do you not consider these to be
10   significant issues -- your words?
11          A     They're -- they're questions that a reporter
12   would ask a PR person.
13          Q     Do you believe they are non-biased, neutral
14   questions?
15                MR. DUKES:  Object to the form.
16                MR. SHAHID:  Object to form.
17          A     Again, they are questions that a reporter
18   would ask to a PR person.
19   BY MR. SLOTCHIVER:
20          Q     Do they suggest answers?
21          A     Do they -- they -- he wants answers; yes.
22          Q     Do they suggest answers?  The way they're
23   written, do they suggest what the answer is?
24          A     I don't believe so.
25          Q     Okay.  Did you ever get an answer to these
```

1    questions from the Diocese?

2         A     No, not that I recall.

3         Q     Have you ever discussed with Elaine Fowler,

4    or anybody at the Diocese, the subject matter contained

5    in question number one?

6         A     Not that I recall.

7         Q     And I'm not talking only doing a press

8    release; I'm talking about even when you're getting ready

9    for your own press release.

10        A     Oh.  I don't recall asking the -- asking for

11   specifics about these questions.

12        Q     How about generally?  Do you have a general

13   answer from the Diocese about these questions?  We can

14   start with number one.

15        A     Okay.  Again, I don't know who made the

16   decision to install them.

17        Q     I understand that.  My question to you,

18   though, was, did you ever discuss with anybody at the

19   Diocese the nature of the questions contained in one

20   through four of this document?

21             MR. SLOTCHIVER:  Let's mark this as No. 1 so

22   we can -- it will be earlier.

23             (Off the record discussion about how the exhibits

24   for this deposition will be numbered.)

25             (E-Mail Chain topped by E-Mail dated 02/04/21 from

1    Rickey Dennis to Maria Aselage re: Lawsuit (1 page),

2    Plaintiffs' Exhibit No. 1-C is marked for identification

3    and made part of this deposition.)

4        A    So I believe we talked in one of the meetings

5    about the decision to install the windows were part of

6    the architectural plans back in the '90s, but I don't

7    recall or remember discussing who.

8  BY MR. SLOTCHIVER:

9        Q    Well, what about the fact that there was --

10   what about the fact of whether or not there were safety

11   precautions that could have prevented someone from using

12   the windows to view naked or partially-naked youths?  Did

13   you discuss that at any point?

14       A    I don't recall.

15       Q    How about prior to the press conference you

16   were going to have; did you ever discussed the fact that

17   we need to be ready to answer these questions because

18   they're going to be coming at us?

19       A    We didn't get that far in our discussion.

20       Q    Well, you would agree with me that when you

21   have a press conference, you can anticipate having people

22   ask you questions; correct?

23       A    Yes.

24       Q    And would it be fair to say that these types

25   of questions that had already been put forth to you are

1    the type of questions that you could have anticipated

2    coming at you if you had a press release?

3        A    We could have.  But we never got that far in

4    our discussions, about the press conference.

5        Q    I understand you never got as far as to have

6    the press conference.  But is one of the reasons you

7    didn't have the press conference, because you didn't want

8    to answer these questions?

9        A    No.

10       Q    Okay.  Do you consider yourself -- and I

11   think I know the answer -- more of a press consultant

12   than a news reporter?

13       A    Yes.

14       Q    Okay.  You were a news reporter, at one

15   point?

16       A    I was.

17       Q    All right.  If you were a news reporter,

18   these are the types of questions you would have asked;

19   correct?

20       A    Possibly.

21       Q    Okay.  Because they go to the heart of the

22   matter; correct?

23            MR. DUKES:  Object to the form.

24            MR. SHAHID:  Object to form.

25   BY MR. SLOTCHIVER:

```
 1          Q      They go to the heart of the lawsuit; don't

 2     they?

 3               MR. DUKES:  Object to the form.

 4    BY MR. SLOTCHIVER:

 5          Q      I know they can object.  You can still answer

 6     the question.

 7          A      I understand.

 8          Q      Okay.  I'm --

 9          A      I -- I hear you.

10          Q      I mean they go to the heart of the lawsuit.

11     The lawsuit is you have windows that allowed the school

12     to look at children naked for purported safety reasons.

13     Are there other ways it could have been done, number one?

14     Number two, were the parents even aware?  Number three --

15     I'm making a short version -- were the students aware?

16     Number four -- well, number four's a little bit

17     different.  But one, two and three go to the heart of the

18     matter; don't they?

19          A      Yes.

20               MR. DUKES:  Object to the form.

21    BY MR. SLOTCHIVER:

22          Q      Okay.  And these are questions that you

23     haven't, even as we sit here today, ever gotten an answer

24     from the Diocese on; correct?

25          A      I don't recall.
```

```
1           Q     Okay.

2           A     I mean I've never discussed these questions,

3      that I recall, with anybody at the Diocese.

4           Q     Okay.  So when you're charged with being --

5      are you still working for the Diocese today?

6           A     Yes.

7           Q     Is it still your job to be their press -- PR

8      person?

9           A     Yes.

10          Q     Okay.  Is that a let's try to find a way to

11     win at all costs as opposed to let's find a way to tell

12     the public what happened?

13               MR. DUKES:  Object to the form.

14               MR. SHAHID:  Object to form.

15     BY MR. SLOTCHIVER:

16          Q     Is that part of your charge?

17          A     My charge is to speak on behalf of the

18     Diocese.

19          Q     To speak in a manner that benefits them, or

20     to speak in a manner that publicly tells the public

21     what's going on?

22               MR. DUKES:  Object to the form.

23               MR. SHAHID:  Object to form.

24          A     I think a little bit of both.

25     BY MR. SLOTCHIVER:
```

```
1          Q      Okay.  Were these issues contained in this
2    exhibit which we're marking in the deposition, where they
3    reviewed prior to -- oh.  They would come after --
4    obviously, after the lawsuit; correct?  The questions
5    can --
6          A      February 4th, 1:38 p.m.
7          Q      All right.  Was that before or after the
8    press release?
9          A      After.
10                No.  That was after the press conference,
11   before the press release.
12         Q      Okay.  So the press release says the Catholic
13   Diocese of Charleston received a lawsuit involving Bishop
14   England High School this morning.  After we -- after
15   reviewing it, we feel the class action claims have
16   absolutely no merit.
17                That would have been after you received this
18   e-mail?
19         A      Uh-huh.
20         Q      Okay.
21         A      Yes.
22         Q      So I take it when you say "after reviewing
23   it," you're referring to the lawsuit itself, not the
24   numerous questions that came in from the press?
25         A      Yes.
```

1          Q     Okay.  If the Diocese had reviewed the

2     questions that have been posed, primarily one through

3     three on this exhibit, would you agree with me that their

4     answer about the case having absolutely no merit and

5     being ludicrous might have been different?

6                    MR. DUKES:  Object to the form.

7                    MR. SHAHID:  Object to?

8          A     I don't know.

9     BY MR. SLOTCHIVER:

10         Q     Okay.  Fair enough.

11               Who is Gregory Carney?

12         A     Gregory Carney?

13         Q     Gregory Carney.

14         A     I don't know him, personally.  But he just

15     sent that e-mail.

16         Q     Right.  And the e-mail -- let me give you a

17     packet of e-mails from Gregory Carney and ask you what

18     you know about them.

19         A     Sure.

20         Q     We'll mark this together as Exhibit 2-C.

21         (Compilation of E-Mails (5 pages), Plaintiffs'

22     Exhibit No. 2-C is marked for identification and made

23     part of this deposition.)

24         (Off the record discussion about passing exhibits

25     around.)

```
 1   BY MR. SLOTCHIVER:

 2        Q     So who is Gregory Carney?

 3        A     He sent an e-mail to the Diocese.

 4        Q     Did you find that e-mail to be concerning?

 5        A     I was forwarded it by Mr. Runyon -- Mr. Ryan,

 6   rather -- and he asked for assistance in responding.

 7        Q     Okay.  And did you assist him in responding?

 8        A     I did.

 9        Q     Okay.  And what did you do to assist him in

10   responding to this?

11        A     I drafted the response below.

12        Q     The one that starts with Dear Mr. Carney?

13        A     Correct.

14        Q     Okay.  Was this response approved before it

15   went out?

16        A     Yes.

17        Q     Okay.  Was this your response or the

18   Diocese's response?

19        A     This was -- I wrote it.

20        Q     I know you wrote it.

21        A     Uh-huh.

22        Q     But is it your response or the Diocese's

23   response?  Were you speaking on behalf of Maria --

24        A     I was write --

25        Q     -- or were you speaking on behalf of the
```

```
 1    Diocese?

 2         A     I wrote this for Mr. Ryan to send.

 3         Q     All right.  Did you and he go back and forth

 4    and make changes to it?

 5         A     Not that I recall.

 6         Q     Okay.  So he approved it?

 7         A     He sent it.

 8         Q     Okay.  Did you answer all of the questions of

 9    Mr. Carney?

10         A     No.

11         Q     Okay.  All right.  Let's take this second

12    paragraph in Mr. Carney's letter, in the packet.  This is

13    an e-mail written on Friday, February 4th, 2020, at 11:22

14    p.m.

15         A     Uh-huh.

16         Q     Mr. Finneran, given the environment -- or,

17    excuse me.  Given the environment and heightened scrutiny

18    of members of our faith, not to mention the Virtus

19    training required, please help me understand why there

20    were windows installed at a vantage point that would

21    allow the unsuspected, unscrutinized and uninformed

22    viewing of minor students as they disrobed.

23               Was that answer addressed?

24         A     No.

25         Q     Okay.  Do you have any idea, from the school,
```

```
 1     why that actually took place?  If you were told today,

 2     answer it on our behalf, how would you answer it?

 3                MR. DUKES:  Object to the form.

 4                MR. SHAHID:  Form.

 5         A     So you're saying if I had to answer it today?

 6   BY MR. SLOTCHIVER:

 7         Q     Yeah.  If this -- based on the knowledge you

 8     have from --

 9         A     It was --

10         Q     -- from -- let me just finish.

11         A     Of course.

12         Q     I just want to make sure we're on the same

13     page.

14         A     Of course.

15         Q     Based on the knowledge you now have, having

16     spoken to the various people we've talked about --

17     Ms. Fowler, Ms. Tucker, Mr. Finneran, the Vicar General,

18     Mr. Acquilano, I think that's it, perhaps Mr. Duke, but I

19     don't think so on this one -- how would you -- do you

20     have enough knowledge to answer that question?

21         A     I would answer that it was installed for

22     safety reasons.

23         Q     Okay.  But now that you've learned that it

24     really didn't create any safety because they never found

25     anybody, through those windows, that violated any safety
```

1    issues -- in other words -- we talked about that earlier;

2    correct?

3         A     Uh-huh.

4         Q     And just to be clear, we talked about the

5    fact that there's not a single incident that was found,

6    based on the discovery we've been provided --

7         A     Uh-huh.

8         Q     -- wherein they found a safety issue by use

9    of those windows, would you still answer it the same way?

10              MR. DUKES:  Object to the form.

11              MR. SHAHID:  Object to form.

12        A     Yes; I think so.  Because again, they were

13   installed for safety reasons.

14   BY MR. SLOTCHIVER:

15        Q     Fair enough.  So back in 1998, they were

16   installed for safety reasons?

17        A     Correct.

18        Q     Okay.  And do you not think he's asking you

19   why it is that they're still there, that they were still

20   there in 2019?

21              MR. DUKES:  Object to the form.

22        A     He's -- he's asking why they're still there

23   in 2019.

24   BY MR. SLOTCHIVER:

25        Q     Well, let's go to the next sentence.  Maybe

```
1       that --

2              A      Okay.

3              Q      Maybe that's where he does.

4              A      Okay.

5              Q      Furthermore, please explain why the potential

6       threat to my children wasn't mitigated prior to the

7       exposure of the Scofield incident.

8                     So Scofield happened in 2019; right?

9              A      Correct.

10             Q      So between 1998, when the school was built in

11      the windows were installed, and 2019 --

12             A      Uh-huh.

13             Q      -- can you answer -- how would you answer, on

14      behalf of the school, as to why they didn't change the

15      windows?  And let me represent to you that that means in

16      2000 -- 1999, 2000, 2001, all the way up until 2019,

17      every one of those years, nothing took place.  Why wasn't

18      it mitigated?  Why was it not mitigated prior to the

19      Scofield incident?

20                    MR. DUKES:  Object to the form.

21                    MR. SHAHID:  Object to form.

22      BY MR. SLOTCHIVER:

23             Q      How would you answer that, based on what you

24      know from your conversations with the people we

25      discussed --
```

```
 1                    MR. DUKES:  Object to the form.
 2     BY MR. SLOTCHIVER:
 3          Q     -- with the Diocese?
 4          A     I don't know if I would change anything.  I
 5     don't -- I don't know.
 6          Q     So you would still say that it wasn't
 7     mitigated because it was safety?
 8                    MR. DUKES:  Object to the form.
 9     BY MR. SLOTCHIVER:
10          Q     Let's back it up and maybe make it easier.
11     Okay?  So -- and I guess kind of --
12          A     Yeah.
13          Q     Okay?
14          A     Thank you.
15          Q     So we know in 1998, the school was built;
16     correct?
17          A     Uh-huh.
18          Q     And it was built with these windows allowing
19     people to view from the coaches' office into the locker
20     room; correct?  Right?
21          A      It was built for safety reasons, for folks to
22     look into the locker room.
23          Q     Right.  So they could monitor the children in
24     the locker room?
25          A     Correct.
```

```
 1            Q      All right.  And taking my representation to
 2      you that there has never been an event found, utilizing
 3      those windows, taking that for granted and as being
 4      truthful --
 5            A      Uh-huh.
 6            Q      So you could say relying on that fact in
 7      giving this answer, we know that in 1999, a year later,
 8      they're invading the privacy of the children.  We've
 9      talked about that.  By using those windows, you are
10      invading privacy.  We talked --
11                   MR. DUKES:  Objection to the form.
12      BY MR. SLOTCHIVER:
13            Q      -- about that; correct?
14                   MR. SHAHID:  Object to the form.
15      BY MR. SLOTCHIVER:
16            Q      Do you remember earlier testifying that
17      looking at children through windows when they don't know
18      they're being looked at and they're --
19            A      Yes.
20            Q      -- in partial or full nudity, that is an
21      invasion of privacy?
22            A      Yes.
23            Q      Okay.  So we know that in 1998, when they
24      were installed, the idea of safety trumped privacy;
25      correct?
```

```
 1                    MR. DUKES:  Object to the form.

 2                    MR. SHAHID:  Object to form.

 3          A     Yes.

 4   BY MR. SLOTCHIVER:

 5          Q     Okay.  And we know that at the end of the

 6     first calendar year, there had been no safety events,

 7     but, yet, the privacy was still being invaded; correct?

 8                    MR. DUKES:  Object to the form.

 9   BY MR. SLOTCHIVER:

10          Q     Okay.  And the same thing true in 1999, 2000,

11     2001, all the way up until the windows were blocked;

12     correct?

13          A     Yes.

14                    MR. DUKES:  Object to the form.

15                    MR. SHAHID:  Object to form.

16   BY MR. SLOTCHIVER:

17          Q     Okay.  At what point is it that it's no

18     longer about safety?

19          A     I can't make that call.

20          Q     Okay.

21          A     I'm not a decision-maker.

22          Q     Fair enough.  Okay.

23                When the question came by Mr. Carney about

24     mitigating -- you understand what "mitigate" means;

25     correct?
```

```
1          A      Uh-huh.  Uh-huh.

2          Q      Okay.  How would you respond to that, if you

3     were charged with responding to it, based on the

4     knowledge that you have from talking to these various

5     people, while you know that, in a 20-year period, there

6     was no safety event but there was invasion of privacy

7     every year?

8                 MR. DUKES:  Object to the form.

9                 MR. SHAHID:  Object to form.

10         A      But there could have been --

11    BY MR. SLOTCHIVER:

12         Q      Of course, now.  But "could have been" is

13    speculation; correct?

14         A      There could have been issues in the future.

15         Q      All right.  So would it be the school's

16    position then, from your conversations with the various

17    people, that the idea that perhaps there will be a safety

18    issue in the future justifies a present violation of

19    privacy?

20         A      I never --

21                MR. DUKES:  Object to the form.

22         A      I never talked to school officials about

23    that.

24    BY MR. SLOTCHIVER:

25         Q      Okay.
```

```
 1          A      Specifically.

 2          Q      Okay.  Well, what --

 3          A      So you're asking me to speak on behalf of the

 4     school officials.

 5          Q      I am.  But I'm asking you -- I'm asking you

 6     to give how you would have responded to his concern about

 7     mitigation.

 8          A      Uh-huh.

 9                 MR. DUKES:  Object to the form.

10     BY MR. SLOTCHIVER:

11          Q      Okay?  Based on your conversations with

12     Ms. Fowler, Mr. Finneran, Ms. Tucker, Mr. Acquilano, the

13     Vicar General, those people --

14          A      Uh-huh.

15          Q      How would you respond, if you are allowed to

16     respond, to the mitigation?  How would you have done

17     that?

18                 MR. DUKES:  Object to the form.

19          A      I don't know.  I mean I'd have to sit down

20     and think about it.

21     BY MR. SLOTCHIVER:

22          Q      Okay.  As we go further down that paragraph,

23     he says, "As you know" -- do you see that part?

24          A      Uh-huh.

25          Q      As you know, I have three daughters that have
```

1    attended BE, previously and currently, and all were

2    required to participate in physical education, and all

3    three have participated in sports activities.  This means

4    all three were potentially exposed to would-be predators,

5    intentional or unintentional, as a direct result of your

6    failure to protect them.

7              Would you agree with me, that all three of

8    his children were in fact exposed -- potentially

9    exposed -- to would-be predators, intentional or

10   unintentional?

11             MR. DUKES:  Object to the form.

12             MR. SHAHID:  Object to form.

13   BY MR. SLOTCHIVER:

14        Q    As a result of these windows that allowed

15   people in the coaches' office to look at the children?

16             MR. DUKES:  Object to form.

17        A    Potentially; yes.

18   BY MR. SLOTCHIVER:

19        Q    "Potentially," meaning that if they happened

20   to be in the locker room that time the windows were

21   viewed?

22             MR. DUKES:  Object to the form.

23        A    Potentially.

24   BY MR. SLOTCHIVER:

25        Q    Is that what you mean by "potentially?"  That

```
1        if there happened to be persons that were in the locker

2        room at the time that the viewer was monitoring?

3             A      Yes.

4             Q      Okay.  Do you have any knowledge as to what

5        percentage of students at Bishop England at any given

6        time utilized the locker room?

7             A      No.

8             Q      Okay.  And I don't mean at any particular

9        moment, referring to any particular year.  For example,

10       just by -- to make sure we're on the same page, if we

11       know that basketball players use the locker room, the

12       question is, how many -- what percentage of the students

13       play basketball?

14            A      Right.

15            Q      And if we add that to all of the different

16       students that used and participated in sports at the

17       school, that's what I mean by the percentage.

18            A      Uh-huh.

19            Q      Okay?  So would it surprise you to learn that

20       over 50 percent of the students participate in sports,

21       that happen to use the locker room?

22                   MR. DUKES:  Object to the form.

23                   MR. SHAHID:  Object to form.

24            A      No.

25       BY MR. SLOTCHIVER:
```

```
 1              Q      Okay.  Would that make you potentially --
 2     would you -- what if it was 75 percent?
 3              A      It 75 percent.
 4              Q      Okay.  So when you say "potentially," it's
 5     because we can't -- because there's no video, we can't
 6     say clearly that it was in fact monitored.  But we can
 7     agree that 75 percent of them certainly were susceptible
 8     to being monitored?
 9                     MR. SHAHID:  Object to form.
10                     MR. DUKES:  Object to the form.
11              A      Yes.
12     BY MR. SLOTCHIVER:
13              Q      Okay.
14                     Are you okay right now?
15              A      I'm okay.
16              Q      Do you want a break?
17              A      I would love a little bit more water, if
18     that's possible.  I'm going to finish this off and get a
19     little bit more.
20              Q      Sure.  Sure.
21              A      Thank you.
22              (Brief break in place; off the record.)
23     BY MR. SLOTCHIVER:
24              Q      Did you have any discussions with any of
25     those people that we've listed repeatedly, about the fact
```

```
1     that children from other schools that play sports at

2     Bishop England also utilize that locker room?

3          A     No.

4          Q     Did it never come up, that those people also

5     were, potentially, viewed?

6          A     No.

7                MR. DUKES:  Object to the form.

8     BY MR. SLOTCHIVER:

9          Q     Had you ever considered that?

10               MR. DUKES:  Object to the form.

11         A     After the lawsuit; yes.

12    BY MR. SLOTCHIVER:

13         Q     All right.  Did you have discussions after

14    the lawsuit about the fact that children from other

15    schools --

16         A     No.

17         Q     -- could have used it?

18         A     No.

19         Q     Okay.  All right.  Well, who made the

20    decision that Mr. Carney would not get a full response to

21    his requests?

22         A     I wrote the draft.

23         Q     I understand you wrote the draft.  But who

24    made the decision that he would not get an answer to his

25    questions -- a full answer to his questions?
```

1        A    I wrote the draft.  I believe Michael

2    Acquilano reviewed it.

3        Q    Right.

4        A    And then Mr. Ryan reviewed it, and then the

5    e-mail was sent.

6        Q    Okay.  Who made the decision that he would

7    not get a full answer --

8             MR. DUKES:  Object to the form.

9             MR. SHAHID:  Object to form.

10   BY MR. SLOTCHIVER:

11       Q    -- to his questions?

12       A    I would think all three of us, because we all

13   collaborated on the e-mail.

14       Q    Why did you not answer his questions in full?

15       A    Because we wanted to only respond to what was

16   in the statement.  That was our public statement.

17       Q    Did Andy Savage have anything to do with the

18   fact that you were hesitant to --

19       A    No.

20       Q    -- elaborate more?

21       A    No.

22       Q    Okay.  Did you see his next response?

23       A    Yes.

24       Q    Okay.  Let's go through that.

25       A    Sure.

1        Q      This is his e-mail --

2        A      Okay.  I'm aware of this.

3        Q      -- from February -- it should be the last

4    page, I believe.

5        A      Is this --

6        Q      February 5th?

7        A      February 5th, at -- oh.  I got it.

8        Q      7:01 p.m.?

9        A      Yep.  I got it.

10       Q      Mr. Ryan, thank you for the response.  The

11   larger question is, why weren't the windows removed or

12   covered prior to the incident?

13              We discussed that, correct, to your

14   knowledge?  Is that right?

15       A      Yes.

16       Q      Okay.  He says, if not mistaken, Mr. Finneran

17   talked about these concerns previously.  I'm sure that,

18   along the way, others have seen this as a potential

19   threat, given the very nature involved.

20              Was there any discussion with any of the

21   people that we discussed earlier, about the fact that

22   they've seen this is a potential threat?

23       A      Not that I recall.

24       Q      Okay.  Was there any discussion about the

25   fact that there's been enough litigation with the

```
 1      Diocese, we should have paid attention to this and not

 2      put ourselves in this position?

 3                    MR. DUKES:  Object to the form.

 4                    MR. SHAHID:  Object to form.

 5           A     Not that I recall.

 6      BY MR. SLOTCHIVER:

 7           Q     He says here, on the second paragraph, there

 8      have been multiple civil and criminal cases involved in

 9      the Catholic Church.  There's a comma there.

10                    But you would agree with that statement so

11      far; correct?

12           A     Yes.

13           Q     All right.  And schools, which is why the

14      Virtus program is mandatory.

15                    Is that why the Virtus program was mandatory,

16      to your knowledge?  Because of all the problems and

17      incidents that have happened or been --

18                    MR. DUKES:  Object --

19      BY MR. SLOTCHIVER:

20           Q     Been alleged?

21                    MR. SHAHID:  Object to the form.

22           A     The Virtus --

23                    THE DEPONENT:  I'm sorry.

24                    MR. DUKES:  Okay.

25           A     The Virtus program was started in the early
```

1    2000s, in response to -- I believe it was the Charter for

2    the Protection of Children and Young People in 2002.

3    That was part of that, if I remember correctly.

4  BY MR. SLOTCHIVER:

5        Q    Okay.  So you would agree with me that the

6    Virtus program is -- that it was created, as he stated,

7    because there have been problems --

8        A    Yes.

9        Q    -- with children?

10       A    Yes.

11       Q    Correct?  Okay.  He says, yet, situations

12   like these repeat themselves.

13            And they do; correct?

14            MR. DUKES:  Object to the form.

15            MR. SHAHID:  Object to form.

16       A    Yes.

17  BY MR. SLOTCHIVER:

18       Q    He says, this was totally preventable.

19            And I'm assuming what he's referring to is

20   the viewing of children through windows, without the

21   children knowing that they're being viewed.  It was

22   preventable; correct?

23            MR. DUKES:  Object to the form.

24       A    Again, the windows were installed for safety

25   reasons.

```
 1   BY MR. SLOTCHIVER:

 2         Q     Back in 1998?

 3         A     Correct.

 4         Q     Twenty-something years ago?

 5         A     I understand.

 6         Q     Okay.

 7         A     But again, it goes back to looking towards

 8   the future, of what could happen in the future in regards

 9   to safety.

10         Q     I believe you stated this was your own

11   particular thought process, not that of the school.  Have

12   you changed your mind on this, about looking at the

13   future?

14               MR. DUKES:  Object to the form.

15         A     That was -- well, you're right.  That was

16   my -- that was my thought.

17   BY MR. SLOTCHIVER:

18         Q     All right.  And what I'm asking you about is

19   the conversations and knowledge you've gleaned from

20   talking to Ms. Fowler, Ms. Tucker, Mr. Finneran,

21   Mr. Acquilano and the Vicar General.

22         A     Uh-huh.

23         Q     Okay.  So would you agree with me that the

24   viewing of children an invasion of their privacy was, in

25   fact, completely preventable:  Just take out the windows?
```

```
 1                    MR. DUKES:  Object to the form.

 2          A     Yes.

 3   BY MR. SLOTCHIVER:

 4          Q     Okay.  Are you familiar that after the

 5    windows came out, there has been no increase in events

 6    that have taken place at the school in the locker room,

 7    related to hazing, bullying or harassment?

 8          A     No.

 9                    MR. DUKES:  Object to the form.

10   BY MR. SLOTCHIVER:

11          Q     Okay.  He says -- I'm going to ask if you

12    have any knowledge about this.  He says, again, if the

13    windows were specifically addressed previously, who made

14    the final decision not to mitigate the threat and why?

15                    Do you know the answer to that?

16          A     No.

17          Q     Are you familiar with the fact that the

18    testimony is that the windows and their install -- the

19    windows being set up the way they were, was not

20    considered to be a policy of the school?

21          A     I'm not familiar with that.

22                    MR. SHAHID:  Object to the form.

23   BY MR. SLOTCHIVER:

24          Q     Are you familiar with the fact that policies

25    of the school are generally reviewed on a yearly basis?
```

```
 1          A      No.

 2          Q      Okay.  Would it surprise you to learn that

 3     because this was not a, quote-unquote, policy of the

 4     school, that nobody ever reviewed whether or not these

 5     windows that invaded privacy should be changed?

 6                 MR. DUKES:  Object to the form.

 7          A      Would it surprise me?  I mean the school

 8     didn't review the policies.  I can't speak on behalf of

 9     the school.

10     BY MR. SLOTCHIVER:

11          Q      It's not a policy.

12          A      Or the school made this decision.  I'm sorry;

13     I'm trying to follow all this.

14     BY MR. SLOTCHIVER:

15          Q      Did nobody, out of that cast of people we've

16     spoken about, ever discuss with you the fact that we

17     never even thought twice about the windows after they

18     were installed?  We never paid attention to what events

19     occurred?

20          A      No.  No one ever discussed that with me.

21          Q      But they all knew it was an invasion of

22     privacy --

23                 MR. DUKES:  Object to the form.

24                 MR. SHAHID:  Object to form.

25     BY MR. SLOTCHIVER:
```

```
 1            Q      -- and for safety reasons?
 2            A      I can't speak of what they thought.  Because
 3       you're saying they thought it was an invasion of privacy;
 4       right?
 5            Q      Did you not discuss with them the fact that
 6       it was an invasion of privacy and why would you invade
 7       privacy, and they said because of safety reasons?
 8            A      I hear you.  Yes.
 9            Q      You did discuss it with them?
10            A      I discussed them -- not the whole invasion of
11       privacy, but that the windows were installed for safety
12       reasons.
13            Q      Okay.  And you discussed the fact that you're
14       looking at naked children for safety reasons?
15                   MR. DUKES:  Object to the form.
16            A      I didn't discuss that we were looking at
17       naked children.  I discussed that the windows were
18       installed for safety reasons.
19       BY MR. SLOTCHIVER:
20            Q      Nobody ever got -- I believe we've covered
21       this in the last deposition.
22            A      Sure.
23            Q      Nobody's ever denied the fact that they were
24       monitoring the children and looking at the children.
25       They deny that it's an actionable cause of action?
```

```
1          A     Yes.

2                MR. DUKES:  Object to the form.

3    BY MR. SLOTCHIVER:

4          Q     Is that correct?

5          A     Yes.

6          Q     Okay.

7                MR. SHAHID:  Dan, I suggest that we go to one

8    o'clock, because I have a two o'clock hearing.

9                MR. SLOTCHIVER:  Sure.

10         (Off the record discussion.)

11   BY MR. SLOTCHIVER:

12         Q     Whose decision was it not to go beyond the

13   press release in responding to the press questions or the

14   public's questions or the parents' questions?

15         A     My decision.

16         Q     Okay.  And why was that?

17         A     Because we -- because I believe you always

18   just want to state what has already been stated publicly

19   in an e-mail following up to anything.

20         Q     But this is a big news story; isn't it?

21               MR. DUKES:  Object to the form.

22               MR. SHAHID:  Object to form.

23   BY MR. SLOTCHIVER:

24         Q     The allegations are pretty significant;

25   aren't they?
```

1              MR. DUKES:  Object to form.

2         A     They're -- they're allegations; yes.

3    BY MR. SLOTCHIVER:

4         Q     I mean they're -- they're actually -- the

5    lawsuit is allegations.  But the fact that the students

6    are being looked at is a fact; correct?

7         A     Yes.

8         Q     They are being monitored, in the locker room,

9    in various states of dress and undress.  That's a fact;

10   correct?

11             MR. DUKES:  Object to the form.

12   BY MR. SLOTCHIVER:

13        Q     That's not an allegation; correct?

14        A     Yes.

15        Q     Okay.  Does it matter if the person asking

16   the question was from the media -- as opposed to a

17   lawyer, as opposed to a parent -- in making a decision on

18   how to respond?

19             MR. DUKES:  Object to the form.

20        A     No.

21   BY MR. SLOTCHIVER:

22        Q     Whose idea was it to start looking to see

23   what other schools had done?

24        A     I believe that was Mr. Dukes's.

25        Q     Okay.  And whose idea was it to start

1    researching window standard angles?

2         A     I believe that was Mr. Dukes's.

3         Q     To your knowledge, all of these were done

4    after the lawsuit was initiated, as opposed to prior to

5    or during the construction phase?

6         A     Yes.

7         Q     Okay.  Are you aware of any of the

8    conversations with anybody, of any effort between 1998

9    and 2019 to when the Scofield event became public, to

10   evaluate or reevaluate whether or not these windows were

11   a good idea?

12        A     No.

13        Q     What role did Mr. Acquilano play in all of

14   this preparation and response, press release or

15   conversations with you?

16        A     Again, as I said, he was in -- I believe he

17   was in Columbia that day, and he was tied up in other

18   meetings, that I recall.

19        Q     He was in your meetings in May; correct?

20        A     He was; yes.  I'm talking about the day of

21   the press conference.

22        Q     Okay.  Tell me about other conversations you

23   had with Mr. Acquilano.  We haven't talked about him.

24        A     Okay.  What's your question?  I'm sorry.

25        Q     Tell me about the conversations --

```
 1          A     Oh.

 2          Q     -- you've had with him.

 3          A     We had conversations.  We had meetings,

 4   regarding the meeting I told you -- those two meetings in

 5   May.  And we -- gosh -- discussed, I think, other times,

 6   about certain things.  I don't recall, specifically.

 7          Q     Okay.

 8          A     I know -- I know we talked about deciding who

 9   was going to contact who regarding the press conference,

10   and checking to see what schools had windows.

11          Q     Why was that so important, to know what

12   schools had windows?

13          A     I think it was important to show that Bishop

14   England wasn't the only school that had windows in the

15   locker room.

16          Q     But none of that knowledge was known at the

17   time they built the school; correct?

18                MR. DUKES:  Object to the form.

19          A     I don't know --

20                MR. SHAHID:  Same.

21          A     -- what they knew when they built the school.

22   That was --

23   BY MR. SLOTCHIVER:

24          Q     Well, I believe you testified earlier today

25   that you're not aware of anybody looking to see what
```

1    other schools had windows in the locker rooms --

2         A     I don't --

3         Q     Until after the lawsuit was filed --

4         A     Correct.

5         Q     Correct?

6         A     Correct.

7         Q     Okay.  So why was it so important, to your

8    knowledge, to look, after the lawsuit was filed, in order

9    to see if anybody else had done what we did, in order to

10   justify what we did?

11        A     I -- if I recall, Mr. Richter made a

12   statement at the press conference saying that he didn't

13   know of any schools in South Carolina that had windows in

14   the locker room.

15        Q     Did a lot have windows in the locker room?

16        A     Did who?

17        Q     Were there a lot of schools with windows in

18   the locker room?

19        A     There were several.

20        Q     Several, out of how many?

21        A     Oh, I don't know out of how many, of all the

22   schools.  I can't give you a percentage.

23        Q     Have you seen any literature to support that?

24        (Off the record.)

25   BY MR. SLOTCHIVER:

```
 1        Q    Did the school feel like they were -- or the
 2   people you spoke to, feel like they were -- that what
 3   they had done was justified, based on the fact that a few
 4   other schools also seemed to have windows?
 5              MR. DUKES:  Object to the form.
 6              MR. SHAHID:  Object to form.
 7        A    I think it was more just communicating that
 8   we -- that Bishop England was not the only school that
 9   had windows.
10   BY MR. SLOTCHIVER:
11        Q    Okay.  And, once again, are you aware of any
12   other school in the state or the country, that you know
13   of based on your conversations with anybody or your
14   independent knowledge, where they had a policy in place
15   for the staff in the coaches' office to look at the
16   children through blinds, where the children would not
17   know they were being looked at?
18        A    I don't --
19              MR. DUKES:  Object to the form.
20        A    I don't know of any policy.
21   BY MR. SLOTCHIVER:
22        Q    So that's a difference; right?  I mean having
23   a window in a locker room where the kids can see you and
24   you can see them, is quite different than having a window
25   in a locker room with the blind, where the kids don't
```

1    know they can be seen?

2              MR. DUKES:  Object to the form.

3              MR. SHAHID:   Form.

4    BY MR. SLOTCHIVER:

5         Q    You would agree with me, there's a

6    difference; correct?

7         A    Yes.

8         Q    Okay.  At least if there was a window -- I'm

9    not saying it's right or wrong.  But if there's a window

10   without a blind, the kid would at least know he's being

11   looked at?

12             MR. DUKES:  Object to the form.

13   BY MR. SLOTCHIVER:

14        Q    Right?

15             MR. SHAHID:  Object to form.

16        A    Yes.

17   BY MR. SLOTCHIVER:

18        Q    Then the kid would have an opportunity, if he

19   wants to, to go change in the toilet stall, or she can

20   change in the toilet stall?

21        A    That would be the child's decision.

22        Q    Okay.  But without knowing they're being

23   looked at, they wouldn't know they're being looked at,

24   and, therefore, they wouldn't make that informed decision

25   because they don't -- they're not getting -- they don't

```
 1    have informed knowledge that they're being looked at;

 2    correct?

 3         A     That's the --

 4               MR. DUKES:  Object to the form.

 5         A     -- the child's decision; yes.

 6    BY MR. SLOTCHIVER:

 7         Q     But the child can't make a decision if they

 8    don't know they're being looked at; correct?

 9         A     Correct.

10         Q     Okay.  And the parents can't guide their

11    children, if the parents don't know their children are

12    being looked at?

13               MR. DUKES:  Object to the form.

14    BY MR. SLOTCHIVER:

15         Q     Correct?

16         A     Correct.

17         Q     Okay.

18               Can you understand why this would be

19    frustrating to people?

20               MR. DUKES:  Object to the form.

21               MR. SHAHID:  Object to form.

22         A     I can't speak on behalf of other people.

23    BY MR. SLOTCHIVER:

24         Q     Okay.  If you learned that when you went to a

25    clothing store, that security guards were watching you
```

```
1    get dressed and undressed without you knowing you're

2    being watched getting undressed and dressed, would you be

3    happy about that?

4         A    No.

5              MR. DUKES:  Object to the form.

6    BY MR. SLOTCHIVER:

7         Q    Okay.  And if they said we did it for safety

8    reasons to make sure you weren't going to steal the

9    clothing, would you be happy about that?

10        A    No.

11             MR. DUKES:  Object to the form.

12   BY MR. SLOTCHIVER:

13        Q    All right.  And if you saw a sign in the

14   locker room saying, so you know, we may be filming you so

15   beware before you get undressed, you may be watched, then

16   you could make an informed decision if you want to get

17   dressed or undressed; correct?

18        A    Yes.

19             MR. DUKES:  Object to the form.

20   BY MR. SLOTCHIVER:

21        Q    Okay.  So you see the difference?

22        A    Yes.

23        Q    Okay.

24             MR. SLOTCHIVER:  Let's take a quick break.

25             THE DEPONENT:  Okay.
```

1          MR. SLOTCHIVER:  All right?  We've been going

2     about an hour and a half.

3          (At this point there is a break in the deposition.)

4     BY MR. SLOTCHIVER:

5          Q     All right.  Ms. Aselage, have you understood

6     all the questions I've asked you today?

7          A     Yes.

8          Q     Okay.  Have you answered them all truthfully,

9     to the best of your ability?

10          A     Yes.

11          Q     Okay.  Thank you very much.  Round three as

12     over.  I don't want a round four.

13          A     Neither do I.  May I say that?

14          Q     And thank you very much.

15          A     So we're done?

16          Q     We're done. Thank you.

17          (The deponent was explained her right to read and

18     sign the transcript of the deposition and chose to

19     exercise that right.)

20          (The deposition concludes at 12:50 p.m.)

21

22

23

24

25

```
 1                 CERTIFICATE OF REPORTER

 2         I, Lorraine B. Whiteley, Court Reporter and Notary

 3   Public in and for the state of South Carolina, do hereby

 4   certify that the aforementioned deposition of MARIA

 5   ASELAGE was recorded by me and transcribed through

 6   computer-aided transcription by me to the best of my

 7   ability.

 8         I FURTHER CERTIFY that the foregoing transcript is

 9   a true and correct transcript of the testimony given by

10   the said deponent at the time and place specified.

11         I FURTHER CERTIFY that I am neither attorney nor

12   counsel for, nor related to nor employed by any of the

13   parties to the action in which this deposition is taken,

14   neither am I financially interested in this action.

15         IN WITNESS WHEREOF, I have set my hand and seal

16   this 5th day of December 2021.

17

18

19

20

21

22

23
     _____
24   Lorraine B. Whiteley
     Notary Public for South Carolina
25   Commission Expires:  4/7/2027
```

```
 1                    A-T-T-E-S-T-A-T-I-O-N

 2   In Re:  GARY NESTLER, ET AL. v. THE BISHOP OF CHARLESTON, A
         CORPORATION SOLE, ET AL.
 3

 4   Case No.:  2:21-cv-00613-RMG

 5   Deposition of:  MARIA ASELAGE

 6   Date Taken:  December 1, 2021

 7   Taken Before:  LORRAINE B. WHITELEY

 8   Attorneys:  DANIEL S. SLOTCHIVER; BRENT S. HALVERSEN;
         LAWRENCE E. RICHTER, JR.; RICHARD S. DUKES, JR.; A. PETER
 9       SHAHID, JR.

10        Having read my deposition, no changes are
     necessary: _____
11

12        Having read my deposition, I make the following
     changes:
13

14   Page ____ Line ____ Correction _____

15   Page ____ Line ____ Correction _____

16   Page ____ Line ____ Correction _____

17   Page ____ Line ____ Correction _____

18   Page ____ Line ____ Correction _____

19   Page ____ Line ____ Correction _____

20   Page ____ Line ____ Correction _____

21   Page ____ Line ____ Correction _____

22   Page ____ Line ____ Correction _____

23        Sworn to and subscribed before me this ____ day
     of _____, 2021.  my commission expires _____.
24

25        Signed: _____
```

# EXHIBIT 10

**United States District Court**
**District of South Carolina**
**Charleston Division**

| | |
|---|---|
| Gary Nestler,<br>Viewed Student Female 200,<br>Viewed Student Male 300,<br>on behalf of themselves and all others<br>similarly situated,<br><br>           Plaintiffs,<br><br>    vs.<br><br>The Bishop of Charleston, a Corporation<br>Sole, Bishop England High School,<br>Tortfeasors 1-10, The Bishop of the Diocese<br>of Charleston, in his official capacity, and<br>Robert Guglielmone, individually,<br><br>        Defendants. | C/A: 2-21-cv-00613-RMG<br><br><br>PLAINTIFFS' FIRST SET OF<br>REQUESTS FOR ADMISSION TO<br>BISHOP ENGLAND HIGH SCHOOL |

To: Richard Dukes, Megan Rushton, and Carmelo Sammataro, Attorneys for Defendant Bishop England High School

By and through their undersigned counsel, Plaintiffs, pursuant to Rule 36 of the Federal Rules of Civil Procedure, serve the following Requests for Admission on Defendant Bishop England High School, to be answered within 30 days from service hereof pursuant to the requirements of such rules.

## Requests for Admission

1. Admit that at least a thousand female students used the Bishop England locker room to change for PE classes from the years 1998-2019.

2. Admit that at least a thousand male students used the Bishop England locker room to change for PE classes from the years 1998-2019.

3. Admit that surveillance signs and plywooding/bricking up the viewing windows shows, by Defendants own conduct, that there were alternatives to monitoring student safety in the locker rooms.

4.  Admit that your attorney did not send you a preservation of evidence letter that he drafted.

5.  Admit that you did not preserve the evidence of the windows and the window coverings.

THE RICHTER FIRM, LLC

s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (SC Bar No. 4724)
Anna E. Richter (SC Bar No. 100787)
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC  29464
Phone: 843-849-6000
LRichter@RichterFirm.com
Anna@RichterFirm.com

-AND-

Carl L. Solomon (SC Bar No. 7306)
Solomon Law Group, LLC
P.O. Box 1866
Columbia, SC  29202
Phone: 803-391-3120
carl@solomonlawsc.com

-AND-

Daniel Scott Slotchiver (SC Bar No. 15129)
Stephen Slotchiver (SC Bar No. 65477)
Slotchiver & Slotchiver LLP
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com

-AND-

Brent S. Halversen (SC Bar No. 76495)
Brent Souther Halversen, LLC
751 Johnnie Dodds Blvd, Suite 200

Page **2** of **3**

**JA987**

Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com

*Attorneys for Plaintiffs*

September 21, 2021
Mount Pleasant, South Carolina

**JA988**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

**CIVIL ACTION NO.: 2:21-CV-613-RMG**

| | |
|---|---|
| Gary Nestler,<br>Viewed Student Female 200,<br>Viewed Student Male 300,<br>on behalf of themselves and all others<br>similarly situated,<br>　　　　　　　Plaintiffs,<br><br>-vs-<br><br>The Bishop of Charleston, a Corporation<br>Sole, Bishop England High School,<br>Tortfeasors 1-10, The Bishop of the Diocese<br>of Charleston, in his official capacity, and<br>Robert Guglielmone, individually,<br>　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CERTIFICATE OF SERVICE**

I DO HEREBY certify that on this date I have served the Plaintiffs' First Set of Requests for Admission to Defendant Bishop England High School, Plaintiffs' Third Set of Requests for Production to Defendants, Plaintiffs' Second Set of Interrogatories to Defendant Bishop England High School, and Plaintiffs' Second Set of Interrogatories to Defendant the Bishop of the Diocese of Charleston, in His Official Capacity via email and US Mail to counsel for the Defendants at the addresses indicated as follows:

**VIA EMAIL AND US MAIL**
Richard S. Dukes, Jr.
Turner Padget Graham & Laney, PA
40 Calhoun St., Ste. 200
Charleston, SC  29401

**VIA EMAIL**
Carmelo Barone Sammataro
Turner Padget Graham & Laney, PA
P.O. Box 1473
Columbia, SC 29202

**JA989**

**VIA EMAIL**

Megan Ashley Rushton
Turner Padget Graham & Laney, PA
P.O. Box 1509
Greenville, SC 29602

Michelle Stith

September 21, 2021
Mt. Pleasant, South Carolina

# EXHIBIT 11 – PART 1

200049



*"Academic Excellence in a Caring Environment"*

**Faculty Handbook**
**2018-19**

**Bishop England High School**
**1915-2018**



0

200050



Patrick Finneran
*Principal*

Father Bryan Babick
*Chaplain*

Mary Anne B. Tucker
*Associate Principal*

Nancy Heath
*Academic Dean*

Michael Darnell
*Director of Operations, Assistant Director of Athletics*

Kit Brownell
*Director of Admissions and Student Relations*

Julie Rosebrock
*Dean of Students*

Lisa Gastaldi
*Director of Counseling*

Paul Runey
*Director of Athletics*

Phone: (843) 849-9599
Fax: (843) 849-7849
*www.behs.com*

1

402001

BEHS_000495

**JA993**

200051

## TABLE OF CONTENTS

Mission, Philosophy, Parameters & Beliefs.................................................................... 4

Objectives, Graduate Profile, & Forward...................................................................... 5

Catholicity.......................................................................................................... 6-7

Academic Policies.................................................................................................. 8

Placement............................................................................................................9

Academic Levels: Honors/AP................................................................................... 10
          Academic I (AI)........................................................................... 11
          Academic II (AII).......................................................................... 12

Accommodations................................................................................................ 13-14

Guidelines for Teaching Options Students.................................................................... 15

Grade Reporting & Procedures............................................................................... 16-19
          Old SCUGP.................................................................................. 20
          New SCUGP.................................................................................. 21
          BEHS GPA scale............................................................................. 22

Academic Integrity............................................................................................. 22-23

Internet & Computer Technology............................................................................ 23-31
          Acceptable Use........................................................................... 24-26
          BYOD's.................................................................................... 26-27
          Social Media.............................................................................. 27-30
          Privacy Policy............................................................................ 30-31
          Cell Phone Policy.......................................................................... 31
          Wearable Technology.......................................................................31

Copyright Guidelines........................................................................................... 32

Community Service............................................................................................. 32
Disciplinary Policies & Procedures........................................................................... 33

Student Attendance Policies & Procedures................................................................ 33-36

Teacher Responsibilities
          Homeroom Teachers......................................................................... 36
          Classroom Teachers......................................................................... 36
          Study Halls............................................................................... 36-37
          Teacher Attendance/Absences............................................................... 37
          Communication Responsibilities............................................................. 38

Attire for Teachers/Staff.................................................................................... 38-39

Supervision of Students/Duty Procedures................................................................. 39-41

Field Trips/Off-Campus Activities.......................................................................... 41-43

Building Maintenance......................................................................................... 43-44

General Policies and Procedures............................................................................ 44-45

Daily Bell Schedules.......................................................................................... 46-47

2

402002

BEHS_000496

**JA994**

200052

Class Rotation Schedule—Fall........................................................................ 48
              Spring........................................................................ 49
              Spring Exam Schedule........................................................ 50

Emergency Drills—Unauthorized Intruder....................................................... 50
              Tornado Drills................................................................ 50
              Fire Drills.................................................................. 51-53

Academic Calendar – Fall........................................................................ 54
              Spring........................................................................ 55

Signature Form.................................................................................... 56

402003

3

BEHS_000497

**JA995**

200053

## MISSION STATEMENT

As an institution of the Catholic Church, it is the mission of Bishop England High School to foster a faith community characterized by the Gospel message of mutual respect and charity. The School endeavors to promote the spiritual, intellectual, and physical growth of the individual through the combined efforts of parents/guardians and faculty by establishing the best possible environment for learning: a climate of safety, trust, respect for the individual, and an appreciation for the acquisition of learning.

## PHILOSOPHY

The Bishop England High School community believes that all individuals have the right to a true education, one that directs them to attain ultimate happiness with God in heaven. This education should also lead individuals to pursue the good of the societies to which they belong and to share responsibilities within those societies.

The faculty and staff at Bishop England, together with parents and guardians, encourage young people to develop the entire personas so that they may recognize these responsibilities, acquire the knowledge and skills needed to communicate ideas easily, and work effectively for the common good.

Finally, Bishop England High School is committed to fostering a safe and structured environment of trust, mutual respect, and life-long learning for all members of its community.

## INSTITUTIONAL PARAMETERS

The School Board and Administration perceive the following to be irrevocable parameters for the educational mission and function of Bishop England High School:
- Bishop England is a Catholic coeducational institution that operates under the jurisdiction of the Diocese of Charleston.
- Bishop England gives priority to serving the needs of graduates from diocesan grade schools.
- All curricular and co-curricular activities at Bishop England High School are rooted in the faith tradition and teachings of the Roman Catholic Church.
- Bishop England High School takes a zero-tolerance stance regarding racial and ethnic prejudice.

## EDUCATIONAL BELIEFS

We at Bishop England High School value:
- The Catholic faith
- Community service that is rooted in that faith
- The individual as a child of God whose spirit, mind and body must be nurtured at every level
- The rights and responsibilities of those adults who guide and teach our students
- Trust, respect and learning in a safe educational environment.

4

402004

BEHS_000498

**JA996**

200054

## INSTRUCTIONAL OBJECTIVES

The following objectives have been established to guide teachers in fulfilling the mission and philosophy of Bishop England High School:

- To teach Catholic doctrine and establish the Word of God as the basis for a sound Catholic education
- To provide meaningful experiences within our community of faith
- To provide a curriculum that adequately meets the needs and interests of a diverse student population
- To provide each student with opportunities for intellectual development and academic stimulation so that he/she can function at his/her highest level of potential
- To develop within all students a true sense of values and high ideals, which will serve them well in future years
- To teach students how to think creatively and intuitively so they will know and appreciate the pleasure of learning
- To teach students to think logically and critically so that they will be able to explore alternative possibilities and make sound judgments
- To teach students to appreciate cultures which may be different from their own

## GRADUATE PROFILE

Upon graduation for Bishop England High School, students should be:

- Able to make life decisions based upon solid Judeo-Christian beliefs
- Open, receptive and enthusiastic about their future lives
- Respectful to selves and others: honorable, caring and generous
- Intellectually well-rounded

## FOREWORD

Bishop England High School is a Roman Catholic co-educational secondary school operated under the auspices of the Diocese of Charleston, South Carolina. Serving the metropolitan area of Charleston since 1915, Bishop England is committed to Catholicism, scholarship, self-discipline, good citizenship and physical fitness.

The mission of Catholic education is to prepare the whole student for the totality of life. In order to fulfill that mission, it is necessary to become familiar with the rules, regulations and procedures that guide us to these ends. This faculty handbook is designed to serve as a supplement to the student handbook by detailing procedures that pertain directly to faculty responsibilities.

Teachers are responsible for following and enforcing school policies and procedures as described in the faculty and student handbooks. These documents are considered to be extensions of the teacher contract and serve as a basis for continued employment.

Teachers and counselors are considered ministers of the church; therefore, they are obligated to respect and promote the Catholic mission and identity of the school.

402005

5

BEHS_000499

**JA997**

200055

## SUPPORTING THE CATHOLICITY OF THE SCHOOL

**In teaching a class**: A teacher should never offer an opinion or stance that is contrary to Catholic Church teachings. Debates about the right to life or homosexuality/gay marriage should not be permitted in the classroom. If current political topics are not related to the content of a course, discussion of these topics would be an inappropriate digression from the standards that need to be taught in the course. When questions or discussions are taking place that are relevant to course content, it is okay to present two sides of an issue in terms of facts. For example, in US Government, a teacher may teach the rationale for the decision in Roe v. Wade, drawing from the majority opinion written in the case. The rationale for the dissenting opinion should be addressed as well. Teachers are expected to take a lesson like this one step further and reiterate the Church's position on the sanctity of life. Another topic that often comes up in science classes is the issue of evolution. While many Protestant sects believe in a literal interpretation of the Bible's account of creation, the Catholic Church accepts the scientific evidence for the theory of evolution and sees no conflict with faith.

If a teacher is not sure of the Church's position on a topic, he or she should consult a member of the Theology Department or the school chaplain.

**Counseling**: It is important to treat all students with love and respect, as all are children of God, regardless of their sexual orientation. However, a counselor should not condone any student behavior that is contrary to the teachings of the Church. At the same time, counselors are not expected to condemn students with preaching or harsh words when students confide in them.

**Personal Lifestyle**: All staff members must not exhibit any type of behavior or lifestyle that conflicts with church teachings. Likewise, public statements in support of abortion rights or gay marriage should not be made. Employees of Bishop England High School should avoid taking stands on controversial issues on social media.

Below is the relevant paragraph from the teacher contract, Part 3- "Duties"

> *Teacher understands that a fundamental mission of the School is the intellectual and spiritual development of students according to the teachings of Jesus Christ and the Roman Catholic Church. In furtherance of that mission, all teachers and administrators employed by the School, regardless of whether they are members of the Catholic Church, are by virtue of such employment actively engaged in pastoral ministry and the formation of God's people by personal witness. Therefore, Teacher acknowledges and agrees that he or she will at all times publicly speak and act in accordance with the mission and teachings of the Roman Catholic Church, as set forth in Sacred Scripture and the Catechism of the Catholic Church (which is incorporated by reference as an integral part of this Contract). The Catechism of the Catholic Church can be accessed at: http://vatican.va/archive/ENG0015/_INDEX.HTM. Teacher acknowledges that complying with such requirement is a material condition of his or her employment by the School, is one of Teacher's essential job functions and is a Bona Fide Occupational Qualification, as defined and permitted by Title VII of the 1964 Civil Rights Act.*

402006                                                                                    6

BEHS_000500

**JA998**

200056

**Mass and Prayers:** About three-fourths of the student body are non-Catholic, and several faculty and staff members are also non-Catholic. Questions often arise concerning the Mass and the differences between various Protestant sects and the Catholic Church.

- **Mass:** The Mass or Celebration of the Holy Eucharist is the central liturgical ritual in the Catholic Church where the Eucharist (Communion) is consecrated. The Church describes the Mass as "the source and summit of the Christian life". The Church teaches that through consecration by a priest, acting in the "person of Christ", the sacrificial bread and wine become the Body and Blood of Christ. All students and staff members are expected to attend all-school Masses, except for the person who oversees the main office. Mass is also offered at lunch in our chapel most weekdays. The celebrant is almost always our Chaplain, Father Babick. The chapel cannot accommodate the entire student body so Mass at lunch, though well attended, is voluntary, and non-Catholics are welcome to attend.

- **Communion:** Non-Catholic Christians generally do not believe that during communion the bread and wine become the real Body and Blood of Christ. In most Protestant churches, the bread and wine, or juice, symbolize the body and blood of Christ. In a Catholic Mass, the priest or extraordinary minister of the Eucharist distributes the Eucharist and says, "The Body of Christ." The recipient must respond with, "Amen." This "Amen" states that there is absolute belief about the Eucharist being the Body, Blood, Soul, and Divinity of Jesus, as well as acknowledging full communion with all that the Catholic Church teaches and believes. It would not be respectful to ask someone of another faith to make this statement of belief. Non-Catholics at BEHS are invited to go up to the Extraordinary Minister of the Eucharist for a "blessing" at the time of communion. To receive a blessing, one would cross his or her arms over the chest. The tradition of getting this blessing from an Extraordinary Minister of the Eucharist was established several years ago.

- **The Lord's Prayer:** "For thine is the kingdom...." is not part of the Catholic prayer because it is not from scripture. There is a similar line that is said after the priest says, "Deliver us Lord, we pray, from every evil, graciously grant peace in our days, that by the help of your mercy, we may be always free from sin and safe from all distress, as we await the blessed hope and the coming of our Savior, Jesus Christ." The priest and laity end with, "For the kingdom, the power and the glory are yours, now and forever. Amen." The ending is considered a "doxology", but not part of the actual prayer.

- **The Hail Mary:** The first part of the "Hail Mary" is scriptural, and the second part asks for the intercession of the most important saint, Mary, to intercede on our behalf. Catholics do not believe that Mary is to be worshipped but was chosen by God to be the Mother of Jesus Christ and thus has a special status among the saints.

- The Rosary: The purpose of the rosary is to prayerfully meditate on its mysteries which focus on the life and ministry of Jesus Christ while repeating the prayers of the Hail Mary, the Our Father, and the Glory Be to the Father. Repetition is used to achieve concentration and focus. The rosary has been a powerful source of inspiration and consolation for many centuries.

BEHS_000501

**JA999**

200057

## ACADEMIC POLICIES

**Course Expectations:** At the start of each academic year, teachers submit course expectations to their respective chairs. Upon approval of the chair, such written communication is conveyed to students and parents. These expectations should include a course syllabus, grading policies, process for making up work, specific requirements, and other information pertaining to the class.

**Instructional Techniques:** Realizing that students demonstrate a wide range of preferred learning styles, teachers should utilize a variety of instructional strategies, including explanations, examples, definitions, demonstrations, modeling, lecture, simulation, problem solving and guided inquiry.

**Testing Policies:** Teachers should design fair tests that emphasize critical thinking skills and utilize varied assessment strategies. Identical tests should not be given to different classes. At least three days' notice must be given to students before the administration of a test (ex: a Friday test should be announced no later than the previous Tuesday; a Wednesday test should be announced no later than the previous Friday). Students should not be expected to take more than three tests in a given day or to have a combination of more than two tests and/or outside essays, papers, or projects. Teachers are encouraged to be flexible when assigning tests if, in their judgment, their test creates a significant academic burden to the students. Quizzes are considered routine instructional activities that do not require the rescheduling of a test.

**Homework:** Research indicates that the following guidelines should be considered when assigning homework:

1. Assignments must be communicated clearly to the students.
2. Homework must be meaningful and relevant to course objectives. It should consist of activities that are best completed outside of the classroom setting.
3. A primary function of homework is to serve as a tool for reinforcing and enhancing instruction.
4. Homework must never be assigned as punishment (ex. "The entire class must write a 500-word essay on classroom behavior").
5. Students must be held accountable for assignments and feedback should be provided to the students in a timely manner.

**Make-Up Tests/Quizzes:** Teachers are not permitted to give make-up tests/quizzes during class instruction. Students should be in a secure and controlled environment (cell phone and book bag not accessible to the testing student), preferably in the presence of a classroom teacher, so that it is impossible to have an integrity violation when they make up tests and quizzes. Students should not be given a test or quiz that is identical to the one given to the class. Students should not be left unsupervised in the hall while the class is going over a test that a student missed.

**Outside Classes:** Class should not be conducted outside of the building unless learning objectives are clearly tied to the environment outdoors. Should it be necessary to conduct class outside, the teacher must inform the academic dean. If a class is being conducted in a different location other than the assigned classroom, teachers are to post a sign on the classroom door to notify office monitors.

402008

8

BEHS 000502

**JA1000**

200058

## PLACEMENT PROCEDURES

**Levels of Instruction:** Students who are working toward a high school diploma are placed in one of three academic levels for each course they take: Honors/AP, Academic I (AI), or Academic II (AII).

**Options Program:** The options program is designed to provide an inclusive educational experience for students with moderate developmental or intellectual disabilities. In most cases, students accepted into the options program will not be eligible to receive a high school diploma.

**New Students:** Except for students applying for the options program, incoming ninth graders are placed in a level for each course by a placement committee comprised of the freshmen/sophomore counselors, the director of admissions, and the academic dean.

**Placement of Options Students:** The director of the options program will determine academic placement based on the individual curricular needs of the students enrolled in the program.

**Placement of Returning Students:** Teachers are given the primary responsibility for recommending academic placement; however, level changes require consultation with the department chair and/or student's counselor. Most changes are made during the course request period in early spring and reviewed in late spring each year. Care must be taken to convey realistic, nonjudgmental placement information to students and their parents/guardians.

If a teacher believes that a student has been placed in the wrong level for a course after the school year is under way, the following process will be used.

- Before filling out a level change form, teachers should consult their department chair if they believe a level change may be warranted.
- The teacher will need to meet with the student's counselor to determine if the change is feasible and warranted, and the teacher must fill out a form requesting a level change. Forms can be found in the Counseling Office. The teacher will need to provide some information about the student's performance, effort, and perceived abilities as well as standardized test scores. Once a final decision is made, the counselor will place a copy of the request form in the student's file and submit a copy to the academic dean.
- If a change is approved, the student's parent and teacher will be asked to sign an approval form, which is to be returned to the counselor.
- The student's counselor will notify the appropriate teachers and the registrar of the change.

Note that when a student moves from a higher level to a lower one, the student's grades must be adjusted. This policy applies when moving from a higher level to a lower level (Honors/AP to AI or AI to AII) and also applies when there is a change in a world language to a lower level (i.e. level II to level I) or a change from a higher level of math to a lower level (i.e. Geometry to Algebra I). **The teacher who receives the new student** will need to add 10 points to each test, quiz, or other assignment, excluding homework or minor classwork. A form will be provided by the counselor to remind the new teacher to adjust the grades according to the policy.

The last date on which any student can drop or add a course is ten school days into the semester; however, a student may drop a course and add a study hall without penalty until **September 17.** Beyond that date, a student who wishes to drop an academic class may withdraw with a "WF" (Withdrawn - Failing) for all subsequent marking periods. The "WF" classification *equates numerically to a 50%.* (It is a requirement that underclassmen be enrolled in at least six academic classes each semester; seniors must be enrolled in at least five academic classes each semester.) Changes in academic level must take place by **September 12** for first semester courses; by **October 12** for year-long courses; and by **February 4** for second semester courses.

The next 3 pages outline the features of each instructional level: Honors/AP, Academic I, and Academic II.

402009

9

BEHS_000503

**JA1001**

200059

## ACADEMIC LEVEL DISTINCTIONS

**Three Academic Levels:** Teachers should use the following guidelines to develop teaching strategies and testing policies.

| HONORS/AP ADVANCED PLACEMENT (AP) |
|---|

### TESTING

- Tests/quizzes can cover a relatively large amount of material; for example, a test might cover 2 to 4 chapters or 2 to 4 weeks of material. A test might cover multiple concepts.

- Review of test material can be more independent with very limited review during class time.

- Tests should be very challenging, but students should always be able to complete the test within the class period.  (If the teacher has difficulty completing his/her own test within 20 to 25 minutes, the test is probably too long for the students.)

- Students should do a significant amount of writing to answer free-response style questions.

- Free response items should frequently require students to analyze, evaluate, synthesize, and hypothesize; for example, a student may be asked to support the view that Germany was not the aggressor in WWI. Students may be asked to graph a higher degree polynomial showing intercepts and key points plotted.

- Multiple choice and true/false items should require an understanding of material and the ability to apply concepts as opposed to just recalling and regurgitating facts.

### PACE

- Students should be expected to learn at a fast pace; for example, students should not have to be re-taught information/concepts that were previously covered. They can review independently.

- Frequently, more than one new concept can be introduced in a single class period.

- Students can be introduced to new material before completing the test on the previous unit.

### INDEPENDENT WORK

- Students can be expected to work independently; for example, students may have to read a chapter with no guided reading questions. In math or science, a student could be required to complete a multi-step process to solve a word problem without teacher assistance. Students can be expected to complete homework that is not directly addressed in class.

- Students can be expected to do research assignments without extensive guidance from the teacher.

***Quantity of work is NOT what distinguishes Honors/AP. Quality work and high-level thinking should be the focus of this level of instruction.***

402010

10

BEHS_000504

**JA1002**

200060

# ACADEMIC LEVEL DISTINCTIONS

### ACADEMIC I
### (AI)

#### TESTING

- Tests/quizzes can cover a large amount of material provided that there is thorough review; for example, tests may cover 1 to 3 weeks of material depending on the subject. A difficult math concept may need to be broken down into 2 tests.

- While quizzes may not require much review (a small portion of a class period), tests covering multiple chapters or several weeks of material should involve extensive review (a whole class period or most of one). Teachers should be cautious about going on to new material before testing on the previous unit.

- While students will need practice preparing for higher level thinking prior to high stakes testing, tests should always include questions that go beyond simple recall. Students should be asked to compare and contrast, to explain or describe, instead of just listing facts.

- Students should be required to do some writing regularly on tests. Free response items should always be part of an exam.

- Multiple choice and true/false items should challenge students with regard to understanding the material. In constructing questions, teachers should avoid using verbatim wording from class notes and the text.

#### PACE

- The learning process should be moderately paced. Rather than reiterating information, teachers should go over concepts, ask 2 or 3 review questions to see if the class is on track and then move on.

- Students will need some review for every quiz and test; for example, students may need a whole class period or most of one to review for a major test.

#### INDEPENDENT WORK

- Students generally need to have some teacher guidance for work done outside of class; for example, reading assignments may need guided reading questions.

- Students need clear direction for research assignment components; for example, prior to the students handing in a rough draft, the teacher may need to give significant feedback on the student's thesis statement and paper outline.

BEHS_000505

**JA1003**

200061

## ACADEMIC LEVEL DISTINCTIONS

### ACADEMIC II
### (AII)

#### TESTING

- Tests/quizzes may need to assess small amounts of material; students need to be quizzed more frequently. A test may need to be limited to one chapter, part of a chapter/ concept, or 1 to 2 weeks of material.

- Tests/quizzes require extensive review and repetition; for example, students may be required to do a review sheet in class with teacher supervision followed by more practice quizzing or review games.

- Students need lots of practice in class applying concepts and using higher level analytical skills before high stakes testing. Some questions might ask students to explain a process or concept very briefly or to fill out a chart comparing.

- Students need plenty of supervised practice in preparing for a discussion question on a test. Teachers may need to give the students the topic in advance and have them prepare an outline in class to learn before the test.

- Multiple-choice items need to be constructed so that wrong answers are more blatantly incorrect. False statements need to be obviously false without being totally ridiculous or silly; for example, a student may need to recognize that George Washington was not the "Father of the Constitution" as opposed to recognizing that George Washington was not the King of England in the 18th century.

#### PACE

- Pace needs to be relatively slow.

- Lengthy and repetitive review is often necessary; for example, a test unit may need to be reviewed for one class period, or more, in a variety of ways.

#### INDEPENDENT WORK

- Students need to be monitored carefully when they are required to take notes in class.

- Students will do less independent work than in higher levels. They should receive very clear written and oral instructions for each assignment. Guided reading questions should not require complicated inference.

- Research assignments need extensive teacher guidance and supervision; for example, the teacher might take the whole class to the computer lab to show students how to access important information.

*Be positive! Let your students know that they can achieve and that AII is a college preparatory level. Find out what your students can do successfully and push them to achieve their potential.

402012

12

BEHS_000506

**JA1004**

200062

### STUDENTS WITH SPECIAL NEEDS

### ACCOMMODATIONS AND ACADEMIC SUPPORT PROGRAM: POLICIES AND PROCEDURES

**Purpose:**  The purpose of the Accommodations and Academic Support Program is to assist students with diagnosed learning differences achieve success in their academic courses. The program provides students with basic strategies, academic skills, and knowledge necessary for them to realize their full potential and become independent, lifelong learners. The services of the Academic Support Program are designed to provide a supportive, challenging environment to students with unique learning differences. Course instruction incorporates techniques and study skills that help students utilize individual strengths to enhance academic performance. Bishop England High School is dedicated to ensuring that all programs and services of the school are accessible by providing reasonable and effective accommodations, which promote success and independence in each student.

**Accommodations**:  Accommodations and services are provided for students with documented disabilities on a case-by-case basis. The following are examples of the accommodations that may be coordinated when appropriate: preferential seating, extended time for tests, copies of class notes, use of a calculator, or large print testing. To be eligible for accommodations, students must provide documentation from a licensed clinician that states the specific diagnosis. Recommendations by the clinician regarding the impact of the disability on academic tasks as well as appropriate accommodations will be taken into consideration. The Academic Support Coordinator will determine if a student qualifies for accommodations. Then the student's counselor and the Academic Support Coordinator will meet with the parents and teachers to discuss the *Accommodations and Academic Support Plan*.  A written copy of the support plan will be provided to the student's teachers at the beginning of each semester. Throughout the year, the student's counselor will monitor the plan and any concerns that arise from students, teachers, or parents.

**Universal Design:** All students can achieve academic success when provided with a caring, respectful, and nurturing environment. It is our job as educators to provide an appropriate, accessible environment that challenges students to strive for personal excellence.  As the number of individuals being diagnosed with learning disabilities has increased, so have the understanding and utilization of academic strategies for accommodation.  There are a number of things teachers can do to make a course more accessible to all students, including those with learning disabilities. Utilizing these strategies is part of a process called universal design. Universal design offers the following suggestions:

- Clearly display course assignments and due dates at least a week in advance. Remind students daily of upcoming events.  Offer timelines for long-term projects.
- Provide printed materials to students that accompany class lectures and discussions.
- Use multi-modal methods to present classroom material in order to address a variety of learning styles and strengths.  Provide important information in both oral and written formats.
- When teaching a lesson, state objectives, review previous lessons, and summarize periodically.
- Read aloud what you write on the board or present on a projected visual.
- Keep instructions brief and uncomplicated.
- Allow time for clarification of directions and essential information.
- Provide study guides or review sheets.
- Be flexible in the administration of tests. Allow students to answer questions directly on the test.  Provide sufficient space for student answers. Offer the use of scratch paper.
- Offer preferential seating, note-taking assistance, and alternate forms of handouts.

402013

13

BEHS  000507

**JA1005**

200063

**Shared Responsibility Agreement:** Bishop England High School is dedicated to ensuring that all programs and services of the school are accessible by providing reasonable and effective accommodations, which promote success and independence in each student. In order for students to benefit from these services, a shared responsibility between students, parents, and teachers must be adopted.   The use of accommodations alone does not guarantee a student's success with the academic demands of Bishop England High School.

**Student Responsibilities**
- Attend school regularly.
- Follow behavior guidelines expected of all Bishop England High School students.
- Complete and submit all assignments within the time limits set by the classroom teacher.
- Study adequately for tests and quizzes.
- Follow the Academic Integrity Code found in the BEHS handbook.
- Attend extra help sessions as needed.
- Be an active self-advocate with teachers and/or his or her counselor.

**Parent Responsibilities**
- Take an active role in your child's education, such as attending parent/teacher conferences.
- Provide a quiet, distraction-free area for studying.
- Adhere to recommendations from doctors regarding the use of medication, if applicable.
- Reinforce study strategies recommended by teachers and school staff.
- Monitor your child's grades and homework completion.
- Communicate frequently with teachers to promote the success of your child.
- Encourage the student to be a self-advocate concerning his or her needs and concerns.

**School Responsibilities**
- Develop an *Accommodations and Academic Support Plan* for eligible students.
- Provide support and accommodations to enhance student learning.
- Be available for extra help.
- Guide the student towards the development of good study and organizational skills.
- Communicate regularly with parents and other teachers to promote the success of the student.

**\*Note that certain accommodations cannot be provided in the classroom unless there is a documented need for the accommodation. The student's support plan will indicate whether such accommodations are warranted. The following accommodations require specific documentation: extended testing time, oral testing, computer use for extended responses, and calculator use beyond what other students are allowed.**

402014

14

BEHS 000508

**JA1006**

**OPTIONS PROGRAM**
**POLICIES AND PROCEDURES**

200064

**Purpose:** It is the mission of Bishop England High School to foster a learning community characterized by mutual respect and charity. The school endeavors to promote the intellectual, physical, and spiritual growth of individual students through the combined efforts of faculty and families by establishing the best possible environment for learning. Building upon this mission, the Options Program supports the belief that students with intellectual disabilities, like all students, deserve the opportunity to maximize their academic, social, and spiritual potential. The vision at Bishop England is that students from a wide range of cognitive abilities will continue to learn and advance if provided a rich, rewarding learning environment. The Options Program provides students an opportunity for inclusion in regular classes where everyone is enriched by the experience. The program is unique because the curriculum focuses mainly on academic rather than vocational content, providing students with the confidence and skills to succeed in life after high school. In addition to the expectation of continual academic progress, students are encouraged to have central roles in athletic, social, religious, and service activities. Most students of the program receive a "Certificate of Achievement" upon completion of the program.

**Student Success Plans:** Individualized educational plans are developed for each student based on information gathered from formal testing, previous academic achievement, and anecdotal records. Each student's plan includes a narrative of present levels of performance; academic goals and objectives; and a description of necessary accommodations and modifications to the curriculum. At the beginning of each year/semester, all of the student's teachers will receive a copy of the *Student Success Plan.* The plan should be used as a guide when designing instruction.

**Best Practices:** All students can achieve academic success when provided with a caring, respectful, and nurturing environment. It is our job as educators to provide an appropriate, accessible environment that challenges students to strive for personal excellence. The main goal of inclusion for our students with intellectual disabilities is not to keep up, but to *keep going.*

- Maintain high expectations for learning and behavior. Communicate expectations. Be consistent.
- Lead by example. Model appropriate interactions, compassion, and acceptance for other students.
- Communicate regularly with Options staff (upcoming assignments, schedule changes, questions)
- Post grades and assignments on a regular basis. Consider including participation/behavior grades.
- Include the student as a part of daily classroom instruction, discussions, and activities.
- Recognize each student's unique abilities and needs. What works for one may not work for all.
- Break down assignments into smaller parts. Give fewer/simpler questions or problems, etc.
- Design assignments/tests around the 5-7 key concepts of a unit. Reduce the amount of information assessed.
- Maintain the integrity of the curriculum. Reduce the density; simplify vocabulary.
- Include separate assignments and class rosters for substitutes. Assign class leader(s) to help.
- Facilitate organization: printed agendas, peer/teacher assistance with writing down assignments.
- Consider alternate forms of testing – interviews, projects, open notes tests, etc.
- Provide study guides, guided notes, graphic organizers, and/or copies of simplified notes.
- Use homework for preview of vocabulary or to reinforce basic concepts of the day's lesson.
- Keep instructions short, simple, and clear. For classroom routines, peer support is encouraged.
- Ask open-ended questions to develop expressive language skills. Give students time to respond.
- Remain positive and supportive in times of frustration. Make rules clear and concise.
- Keep to routines as much as possible; inform student of changes in routine/schedule

BEHS  000509

**JA1007**

200065

## GRADE REPORTING AND PROCEDURES

**Grade Records:** Teachers will maintain current grades within the Teacher Portal of the Rediker system. Teachers are expected to post grades on-line a minimum of once a week. Grades for individual assignments, such as quizzes, or tests, should be posted no later than one week from their date of completion (Ex. – a test given on Thursday, September 3, should be posted for viewing by no later than Thursday, September 10). Teachers must **also keep a hard copy of all grades**. Teachers are expected to have a minimum of nine grades per quarter for each class, including major and minor grades such as quizzes and homework.

**Extra Credit:** Academic performance is the sole criterion for determining grades. "Extra credit" may not be used as an incentive for encouraging students to participate in other activities such as selling candy, attending athletic events, or other school functions.

**Make-Up Work:** The teacher will determine dates by which make-up work must be completed. If a student does not make up the missed work by the assigned date, the teacher is to record a zero for all work not completed, unless there are extenuating circumstances. Those assignments that have missing grades should have "MI" recorded in place of the grade until the work has been made up. While "MI" counts into the average as a zero, it is extremely important to signal parents and students which work is still missing and to encourage work to be made up promptly.

**Incomplete Grades:** Only in extraordinary circumstances, such as serious illness, should a teacher assign an incomplete grade on a report card. A grade of incomplete should not be recorded for a student who has failed to meet deadlines without a valid excuse. Incompletes for quarter grades must be rectified within two weeks of the end of the quarter, unless there are extenuating circumstances, in which case the teacher is to notify the academic dean of the circumstances and the plan to get the student's assessments completed.

**Progress Reports:** Midway through each quarter, parents will be emailed an alert to check the progress of their students in the online grade program. Prior to this progress report alert," teachers will be required sign a form verifying that grades are posted up to date. They will submit this form to their respective department chair.

**Quarterly Grades:** Bishop England issues grades quarterly. Students must earn at least 70% to avoid retaking the class or having to take another class in its place. If a quarter average comes out as 69, the teacher must change the quarter grade to 70 by the date that quarter grades are to be finalized. No student may fail a quarter with a 69. Teachers may not give grades below 60% for the first quarter of a yearlong course. There are no minimum quarter grades for semester courses. Teachers are to provide multiple and varied methods for assessing student progress. Report cards will be mailed to students and their parents only after each semester ends. Once each quarter ends, the marking column for the previous quarter will not be accessible to teachers to change grades or rectify incompletes unless over-ride privileges are requested by email from the academic dean.

**Semester Grades:** Semester grades are based on a computation of the first quarter grade (40%), the second quarter grade (40%) and the semester exam (20%). {(Q1x2) + (Q2x2) + semester exam} divided by 5. Any semester average of 69 must be changed to 70 before report cards are generated.

**Yearly Grades:** Yearly grades are determined by the average of the two semester grades. Teachers must change any year averages from 69 to 70.

\*Note that an exam grade of 69 does not have to be changed to 70. **No marking column grade may be over 100, including exam grades.**

402016

16

BEHS_000510

**JA1008**

200066

**Exams:** Courses in all three academic levels require a midterm and/or final exam unless the academic dean has approved exempting all passing students from taking an exam in a given course. With the exception of those qualifying for exemptions, all students will take examinations at the end of each semester. The only accepted excuses for not taking an exam at the scheduled time are personal illness (doctor's note required) or an extraordinary family situation as determined by the academic dean, who must approve all changes in exam schedules. A student without an excused absence who fails to take an exam at the scheduled time will receive a grade of zero on that exam. If a student misses a make-up exam, a doctor's note is required in order to reschedule; the student receives a zero if no doctor's note is presented.

Exams are structured to fill a two-hour period, and students may not be dismissed until the bell rings for the exam period to end. Exams and answer keys should always be kept under lock and key so that students cannot see the exam questions prior to the exam. If an exam session ends, and one or more students have not finished the exam, the teacher should allow the student(s) 15 minutes after the bell. Once all exams have been graded and recorded at the end of the school year, teachers must give their graded exams and copies of answer keys to their respective department chairs for storage until the next school year, at which point they should be shredded. Midterm exams should be kept by individual teachers until the end of the next semester. In classes that culminate in a semester exam, teachers are to avoid testing and major assignments the last 2 class days of each semester. These days should be used to review for exams.

**Exemptions from Exams:** In courses that require semester exams, seniors may exempt a midterm and/or final exam if the average of the 2 quarters of the semester is 90 or above. For all other students in yearlong courses, students must have a yearly average of 90 or above to be exempted. Note the formula to determine a cumulative yearly average: {(Q3+Q4)/2, rounded+(Semester 1 average)}/2. For semester courses, students must have a semester average of 90 or above to be exempted. Students who are to exempt the exam are to remain under the teacher's supervision throughout the exam review. **For students who exempt the midterm or final, put an "X" in the exam grade column in the grade portal in lieu of a grade.**

**Extended time accommodation:** If a student's accommodation plan requires extended time for testing, the teacher must make sure that the student knows the plan to arrive early or stay after the exam to receive the time and a half that is standard for most extended time accommodations.

**Promotion Standards:** A student who earns less than 70% in five or more classes may not be invited to return to BEHS. A student with a good discipline record who earns less than 70% in three or four classes will be invited back but may be required to repeat the academic year. A student who earns less than 70 in English or a required math class must attend summer school.

**Summer school for course failures:** Students who earn a final grade that is below 70% in a required core course will be required to attend summer school if the course is a prerequisite for the next level. They will need to meet with their counselor to determine approved options. The course should be retaken during the summer and finished prior to the next school year. Only four units of credit toward a diploma may be earned in summer school. Credit will not be given for tutoring, for courses taken at a non-accredited school, or for new courses (except for driver's education or approved online options). Both the failing grade and the new grade will remain on the student's transcript. Credit for a summer school course will not be awarded if the student earns less than 70.

**Retaking a course for which a credit was earned:** If a student receives a Carnegie unit prior to his or her 9th grade year, he or she may opt to retake the course at BEHS. In this case, the student must forfeit his or her earned credit, which means that the student is required to attend summer school if he or she earns less than 70 in the retake. In addition, the course taken in middle school will not appear on the transcript if retaken in high school. For state scholarship eligibility under SCUGP, a student is not permitted to retake a course if the student earned a 70 or better at BEHS.

402017

17

BEHS_000511

**JA1009**

**Dual Credits/Enrichment Courses**: With the permission of the administration, students may be allowed to take courses at a local college for dual credit or online courses for enrichment. Students may not take a course for dual credit if that course is offered at BEHS or if the course is in lieu of a required credit. Approval for any dual credit or enrichment course is determined on an individual basis. Grades from no more than four dual credit or enrichment courses will be included on a student's BEHS transcript. These grades are NOT included when calculating the BEHS valedictorian and salutatorian. If a student earns less than 70 percent in a dual credit/enrichment course, the student will NOT be awarded the credit in the course.

**Rank in class**: Bishop England ranks students based on the South Carolina Uniform Grading Policy (SCUGP) 9th, 10th, 11th, and 12th grades at the end of each school year. SCUGP rank is provided to in-state colleges on the transcript. Valedictorian and salutatorian are determined by the BE GPA scale.

**Seniors failing a class**: Any senior who fails a class for the first semester will lose his/her FREE period privileges and be placed in a study hall. These privileges MAY be reinstated at the counselor's discretion upon demonstration of significant academic progress (as noted on the third quarter report card). It is the responsibility of the student to request the academic review at the end of the third quarter. If a student is failing a class (even if the class is not required for graduation) at the end of third quarter, the student will lose his/her free period for the remainder of the school year. Failing any class could jeopardize college admissions as well as SC Educational Lottery Scholarships.

**Honor Roll**: The honor roll is composed of students with a quarterly average of 90 or better. The list of eligible students will be provided by the Counseling Department.

**National Honor Society**: The National Honor Society is the leader among organizations and societies that promote appropriate recognition for students who reflect outstanding accomplishments in the areas of scholarship, character, leadership, and service. To be eligible for membership in the Father O'Brien Chapter of the National Honor Society as a sophomore or junior, a student must have a BEHS cumulative grade point average of at least 4.5 since grade nine and must have attended Bishop England at least one semester. Additionally, the student must meet the character and leadership qualities as determined by the faculty selection committee. It is highly recommended for the student to be involved in several different activities to meet the leadership requirement. Students must also have a minimum of 16 service hours by the end of second quarter to be considered for membership in the NHS. Some service opportunities are listed on the bulletin board at the end of the Theology wing.

**Cumulative GPA** – Bishop England High School uses two cumulative GPA's to be reported on the student's transcripts at the end of each school year.

The first is based on the SCUGP which is considered in awarding Palmetto Fellows, LIFE, and HOPE scholarships. Under South Carolina state guidelines, the cumulative GPA reported on the final transcripts is calculated using the SCUGP 10-point scale found in this handbook. This 10-point SCUGP is in the process of being transitioned to full use in the following manner:

    a) Class of 2019 is a ratio of 1:3.
    b) Class of 2020 is the first class to have fully-implemented the SCUGP 10-point scale in calculating the cumulative GPA for the final transcripts.

The second GPA is the Bishop England High School GPA based on the grading scale listed on page 17.

**SOUTH CAROLINA UNIFORM GRADING POLICY (SCUGP)**: Starting with the 2016-17 school year, SCUGP was changed to a 10-point scale, with ten points for each letter grade, which makes it mostly in line with the BEHS grading scale. However, unlike the BEHS scale, the SCUGP has a "D" associated with the range of grades from 60 to 69. "D" is considered passing in all public schools in the state; however, Bishop England only awards credit if a student has earned at least a 70 cumulative average. The BEHS grading scale does not include a "D."

402018

18

BEHS_000512

**JA1010**

**Most in-state colleges use SCUGP to evaluate BE students for college admission.** The following facts describe how SCUGP applies to courses taken at BEHS.

200068

Below are other features of the SCUGP.

- AP Courses are assigned the SCUGP AP GPA.
- Honors English, social studies, science, and math courses are always assigned the SCUGP Honors GPA. Only the third and fourth year Honors courses in world languages are assigned the SCUGP Honors GPA. Advanced Fine Arts courses are assigned the Honors GPA.
- ALL theology courses are assigned the SCUGP College Prep GPA.
- Courses taken on the AI and AII level are assigned the SCUGP College Prep GPA.
- Unless designated as Honors courses, middle school courses that count as high school credits are assigned the SCUGP College Prep GPA and appear on the high school transcript unless they are retaken in high school, in which case they are removed from the transcript.
- Courses re-taken in summer school are assigned the SCUGP College Prep GPA.
- Dual credit courses are assigned the SCUGP AP GPA.
- <u>Any student who repeats a year of high school is ineligible to receive education lottery money from the state of South Carolina.</u>

*Note that when placing students in a level, the primary concern is that students are prepared for the challenges they will face in college.

**The following chart applied to all courses taken through August 15, 2016.

402019

19

BEHS_000513

**JA1011**

200069

| South Carolina Uniform Grading Scale Conversions | | | | |
|---|---|---|---|---|
| Numerical Average | Letter Grade | College Prep | Honors | AP/IB/ Dual Credit |
| 100 | A | 4.875 | 5.375 | 5.875 |
| 99 | A | 4.750 | 5.250 | 5.750 |
| 98 | A | 4.625 | 5.125 | 5.625 |
| 97 | A | 4.500 | 5.000 | 5.500 |
| 96 | A | 4.375 | 4.875 | 5.375 |
| 95 | A | 4.250 | 4.750 | 5.250 |
| 94 | A | 4.125 | 4.625 | 5.125 |
| 93 | A | 4.000 | 4.500 | 5.000 |
| 92 | B | 3.875 | 4.375 | 4.875 |
| 91 | B | 3.750 | 4.250 | 4.750 |
| 90 | B | 3.625 | 4.125 | 4.625 |
| 89 | B | 3.500 | 4.000 | 4.500 |
| 88 | B | 3.375 | 3.875 | 4.375 |
| 87 | B | 3.250 | 3.750 | 4.250 |
| 86 | B | 3.125 | 3.625 | 4.125 |
| 85 | B | 3.000 | 3.500 | 4.000 |
| 84 | C | 2.875 | 3.375 | 3.875 |
| 83 | C | 2.750 | 3.250 | 3.750 |
| 82 | C | 2.625 | 3.125 | 3.625 |
| 81 | C | 2.500 | 3.000 | 3.500 |
| 80 | C | 2.375 | 2.875 | 3.375 |
| 79 | C | 2.250 | 2.750 | 3.250 |
| 78 | C | 2.125 | 2.625 | 3.125 |
| 77 | C | 2.000 | 2.500 | 3.000 |
| 76 | D | 1.875 | 2.375 | 2.875 |
| 75 | D | 1.750 | 2.250 | 2.750 |
| 74 | D | 1.625 | 2.125 | 2.625 |
| 73 | D | 1.500 | 2.000 | 2.500 |
| 72 | D | 1.375 | 1.875 | 2.375 |
| 71 | D | 1.250 | 1.750 | 2.250 |
| 70 | D | 1.125 | 1.625 | 2.125 |
| 69 | F | 1.000 | 1.500 | 2.000 |
| 68 | F | 0.875 | 1.375 | 1.875 |
| 67 | F | 0.750 | 1.250 | 1.750 |
| 66 | F | 0.625 | 1.125 | 1.625 |
| 65 | F | 0.500 | 1.000 | 1.500 |
| 64 | F | 0.375 | 0.875 | 1.375 |
| 63 | F | 0.250 | 0.750 | 1.250 |
| 62 | F | 0.125 | 0.625 | 1.125 |
| 0–61 | F | 0.000 | 0.000 | 0.000 |
| 61 | FA | 0.000 | 0.000 | 0.000 |
| 61 | WF | 0.000 | 0.000 | 0.000 |
| — | WP | 0.000 | 0.000 | 0.000 |

*On the next page is the SCUGP table that is used as of August 2016.

402020

BEHS 000514

**JA1012**

## 10 Point Grading Scale

200070

| South Carolina Uniform Grading Scale Conversions | | | | |
|---|---|---|---|---|
| | | | | |
| 100 | A | 5.000 | 5.500 | 6.000 |
| 99 | A | 4.900 | 5.400 | 5.900 |
| 98 | A | 4.800 | 5.300 | 5.800 |
| 97 | A | 4.700 | 5.200 | 5.700 |
| 96 | A | 4.600 | 5.100 | 5.600 |
| 95 | A | 4.500 | 5.000 | 5.500 |
| 94 | A | 4.400 | 4.900 | 5.400 |
| 93 | A | 4.300 | 4.800 | 5.300 |
| 92 | A | 4.200 | 4.700 | 5.200 |
| 91 | A | 4.100 | 4.600 | 5.100 |
| 90 | A | 4.000 | 4.500 | 5.000 |
| 79 | C | 2.900 | 3.400 | 3.900 |
| 78 | C | 2.800 | 3.300 | 3.800 |
| 77 | C | 2.700 | 3.200 | 3.700 |
| 76 | C | 2.600 | 3.100 | 3.600 |
| 75 | C | 2.500 | 3.000 | 3.500 |
| 74 | C | 2.400 | 2.900 | 3.400 |
| 73 | C | 2.300 | 2.800 | 3.300 |
| 72 | C | 2.200 | 2.700 | 3.200 |
| 71 | C | 2.100 | 2.600 | 3.100 |
| 70 | C | 2.000 | 2.500 | 3.000 |
| 59 | F | 0.900 | 1.400 | 1.900 |
| 58 | F | 0.800 | 1.300 | 1.800 |
| 57 | F | 0.700 | 1.200 | 1.700 |
| 56 | F | 0.600 | 1.100 | 1.600 |
| 55 | F | 0.500 | 1.000 | 1.500 |
| 54 | F | 0.400 | 0.900 | 1.400 |
| 53 | F | 0.300 | 0.800 | 1.300 |
| 52 | F | 0.200 | 0.700 | 1.200 |
| 51 | F | 0.100 | 0.600 | 1.100 |

402021

21

BEHS 000515

**JA1013**

200071

**BEHS Grading Scale:** Grade point averages are based on a quality point system that weights grades according to academic level.

| GPA System of BEHS | | | | |
|---|---|---|---|---|
| | AP | Honors | AI | AII |
| 90-100 .............. A ................. 6.5 ............... 5.5 ............... 4.5 ................. 3.5 | | | | |
| 85-89 ................ B+ ................. 6.0 ............... 5.0 ............... 4.0 ................. 3.0 | | | | |
| 80-84 ................ B ................. 5.5 ............... 4.5 ............... 3.5 ................. 2.5 | | | | |
| 75-79 ................ C ................. 5.0 ............... 4.0 ............... 3.0 ................. 2.0 | | | | |
| 70-74 ............. C- ................. 4.5 ............... 3.5 ............... 2.5 ................. 1.5 | | | | |
| Under 70 .......... F ................. 0.0 ............... 0.0 ............... 0.0 ................. 0.0 | | | | |

### ACADEMIC INTEGRITY

Issues of academic integrity touch at the core of our mission to foster personal responsibility and high moral standards. Therefore, they will be handled firmly regardless of the type of assignment or test. Violations of academic integrity include cheating and plagiarism. Cheating is defined as the giving or receiving of unauthorized assistance from any verbal or written source. Plagiarism occurs when a student intentionally or unintentionally fails to acknowledge all materials quoted, paraphrased, or summarized from any published or unpublished work. These definitions encompass, but are not limited to the following infractions:

- Possession of unauthorized materials during a test or quiz
- Unauthorized use of an electronic portable device during an exam, test, or quiz
- Unauthorized communication of information about the contents of a quiz, lab report, test, or any other graded assignment
- Copying of assignments
- Failure to document any words or ideas that originate somewhere other than with the student (whether intentional or not). Any infraction that falls into the following categories is considered plagiarism:
  - Verbatim plagiarism – word for word copying
  - Mosaic plagiarism – pulling bits and pieces from a work and changing a few words
  - Inadequate paraphrase – failure to adequately put the ideas of the passage into student's own words
  - Uncited paraphrase or quotation
- Using material from another student's work
- Inaccuracies in citing sources for a research assignment. (For example, giving an incorrect page number or not making clear what information or words came from a specific source)
- Misquoting a source used in a research assignment
- Other unauthorized procedures as determined by the classroom teacher
- Intentionally downloading material to claim as a student's own work.

(Note that submitting an assignment that was previously been turned in to a previous class as though it were a new assignment is a Type II offense. Students will be permitted to resubmit the paper with a late penalty.)

402022

22

BEHS 000516

**JA1014**

200072

The severity of an offense is based upon the academic weight given to the assignment. Assignments classified as minor count for less than 10% of the quarter grade. Those labeled as major count for 10% or more of the quarter grade. The reporting and follow-up procedures for all offenses are as follows:

- The teacher will submit a detailed report to the Dean of Students. (**Academic Integrity Report available under "Forms" on-line.**)
- The Dean of Students will meet individually with both the teacher and student and, if necessary, consult with the Faculty Council.
- The Dean of Students will notify the parent/guardian of the infraction.
- A record of the incident will be kept in a separate file and destroyed after the student graduates.
- Periodic reports will be made to the principal.

**Consequences for Cheating and Plagiarism:**

**1st Offense:**    Minor Assignment -A grade of 0 on the assignment; (Type II offense)

**1st Offense:**    Major Assignment - A grade of 0 on the assignment; (Type III offense)

**2nd Offense:**    Up to 3-day suspension and possible expulsion. (Type III or IV offense)

**3rd Offense:**    Expulsion (Type IV offense)

**Note:**

- If a student is found to have plagiarized an assignment after a grade has been assigned, the grade will be changed to zero.
- Once a student has been inducted into the National Honor Society, violations of the academic integrity policy may result in dismissal from that organization.

**Out-of-Class Papers:** In an effort to prevent violations of the academic integrity code, Bishop England subscribes to a plagiarism prevention program called *Turnitin.* When teachers assign papers of any length to be written outside of class, **they must require their students to electronically submit their work to *Turnitin.com.***

**INTERNET AND TECHNOLOGY**

The Bishop England High School Internet and Computer Technology Policy is in the Student/Parent Handbook. The following documents are included in the school's comprehensive policy. Teachers should direct students to the website for any technology-related forms. They are located under "Policies" on the main website page.

- Acceptable Use Policy
- BYOD Policy and Agreement (Bring Your Own Device) **No student may use a portable electronic device until he/she has met with the IT Assistant and submitted the proper signed agreement.** Students will receive a sticker for the device so that teachers can determine that students have registered their devices. Teachers are to report any student without a sticker to the IT Assistant. Once the IT Assistant has the serial number of a device, inappropriate Internet activity can be matched with students who may be violating the school's policies.
- Social Media Policy
- Privacy Policy
- Media Release Agreement

402023

23

BEHS 000517

**JA1015**

200073

## Acceptable Use Policy for Technology

Bishop England High School strongly believes in the educational value of electronic services and recognizes their potential to support its curriculum and student learning by facilitating resource sharing, innovation, and communication. By deploying a filtering system, BE will make every effort to protect students and teachers from any misuses or abuses as a result of their experience with an information service. This policy places BE in compliance with CIPA (Children's Internet Protection Act).

**Email help@behs.com for technology support.**

Students will be expected to abide by the following rules of network etiquette whether they are using school computers or their own portable device.

**Network Guidelines for Students**

1. **Personal Safety**

   a. Student will not post personal contact information about himself, herself, or other people without the permission of one's parents and teacher. Personal contact information includes but is not limited to one's personal photo, address or telephone number. (Safety violation)
   b. Student will not agree to meet with someone he or she has met online without parent's approval. (Safety violation)
   c. Student will promptly disclose to the teacher or other school employee any message student receives that is inappropriate. (Safety violation)

2. **Illegal Activities**

   a. Student will not attempt to gain unauthorized access to Bishop England's school network resources or to any other computer system to go beyond authorized access. This includes attempting to log in through another person's account or access another person's files. These actions are illegal, even if only for the purposes of "browsing." (Theft)
   b. Student will not make deliberate attempts to disrupt the computer system or destroy data by spreading computer viruses or by any other means. These actions are illegal. (Vandalism)
   c. Student will not use Bishop England's school network to engage in any other illegal act, such as arranging for a drug sale or the purchase of alcohol, engaging in criminal gang activity, or threatening the safety of a person. (Drug and safety violation)
   d. Student will not read, move, rename, edit, delete, or in any way alter the files that have been created or organized by others. (Vandalism)
   e. Student will not install software on any BE computers or on the BE network without direct supervision of BE staff. (Vandalism)
   f. Student will not alter hardware or software setups on any BE computer resources. (Vandalism)

3. **Plagiarism and Copyright Infringement**

   a. Student will not plagiarize works that he or she finds on the Internet or on the computers at school. Plagiarism is taking the ideas or writings of others and presenting them as if they were one's own. (Theft)
   b. Student will respect the rights of copyright owners. Copyright infringement occurs when someone inappropriately reproduces a work or image that is protected by a copyright. If a work contains language that specifies appropriate use of that work, the student will follow the expressed requirements. If the student is unsure whether or not he or she can use a work, the

402024                                                                                                    24

**JA1016**

200074

student will request permission from the copyright owner. If the student is confused about copyright law, he or she will ask a teacher or librarian to answer any questions. (Theft)

4. **Security**

    a. Student is responsible for his or her individual account and should take all reasonable precautions to prevent others from being able to use that account. (Safety violation)

    b. Student will immediately notify a teacher or an administrator if he or she has identified a possible security problem with the network or peripheral computers. Student will not go looking for these security problems, because this may be construed as an illegal attempt to gain access. (Safety violation/theft)

    c. Student will take all precautions to avoid the spread of computer viruses. (Vandalism)

    d. Student will not attach non-BE computer equipment or peripherals to the BE network or its infrastructure. This is not to include data storage devices such as USB drives, flash drives, floppy disks, or CDs. (Safety)

5. **Inappropriate Language**

    a. Restrictions against inappropriate language apply to public messages, private messages, and material created for assignments or to be posted on web pages. (Derogatory statements/disruption of education)

    b. Student will not use obscene, profane, lewd, vulgar, rude, inflammatory, threatening, or disrespectful language. (Derogatory statement/sexual harassment)

    c. Student will not engage in personal attacks, including prejudicial or discriminatory attacks. (Derogatory statements/disruption of education)

    d. Student will not harass another person. Harassment is persistently acting in a manner that distresses or annoys another person. If the student is told by a person to stop sending them messages, the student will stop. (Disrespecting others' rights/disruption of education)

    e. Student will not knowingly or recklessly post false or defamatory information about a person or organization. (Derogatory statements/disruption of education)

6. **Respect for Privacy**

    a. Student will not repost a message that was sent to the student privately without permission of the person who sent the message. (Disrespecting others' rights)

    b. Student will not post private information about another person. (Disrespecting others' rights)

    c. No device, personal or otherwise, may be used to record, store, or transmit any type of image, sound, or video from Bishop England, except for approved projects with the express permission of the teacher. (Disrespecting others' rights)

7. **Respecting Resource Limits**

    a. Student will use the technology at school only for educational and career development activities.

    b. Student will not post chain letters or engage in "spamming." Spamming is sending an annoying or unnecessary message to a large number of people. (Disruption of education)

    c. Student will not download or use games, pictures, video, music, instant messaging, e-mail, or file sharing applications, programs, executables, or anything else unless he or she has direct authorization from a teacher, it is legal for the student to have the files, and it is in support of a classroom assignment. (Disruption of education)

402025

25

BEHS 000519

**JA1017**

200075

    d. Student understands that BE personnel may monitor and access any equipment connected to BE network resources and student computer activity. BE personnel may delete any files that are not for a classroom assignment. (Security)

**8. Inappropriate Access to Material**

    a. Student will not use school network resources to access or store material that is profane or obscene (pornography), that advocates illegal acts, or that advocates violence or discrimination toward other people. (Disruption of education/safety violation)

    b. If student mistakenly accesses inappropriate information, the student will immediately *tell a* teacher or an administrator and will not attempt to access the inappropriate information again. (Failure to comply with directives)

    c. Parents will instruct the student if there is additional material that they think would be inappropriate for the student to access. BE fully expects that the student will follow his or her parent's instructions in this matter. (Respect for others violation)

    d. Student understands that Internet access is provided for support of classroom assignments, and the student will not attempt to surf anonymously or modify the computer in any way to allow access to websites or applications that are not authorized to use. (Disruption of education).

DISCLAIMER: Bishop England makes no warranties of any kind, whether expressed or implied, for the service it is providing. Bishop England will not be responsible for any damages suffered. This includes loss of data resulting from delays, non-deliveries, mis-deliveries, or service interruptions caused by its own negligence or errors or omissions. Use of any information obtained via the Internet is at your own risk. Bishop England specifically denies responsibility for the accuracy or quality of information obtained through the Internet.

BISHOP ENGLAND HIGH SCHOOL RESERVES THE RIGHT TO DENY ACCESS TO ANY USER IF IT IS DETERMINED THAT THE USER IS ENGAGED IN UNAUTHORIZED OR INAPPROPRIATE ACTIVITY OR IS VIOLATING THIS CODE OF CONDUCT.

Any violation of the contract will result in disciplinary action, depending upon the nature of the offense.

### Bring Your Own Device Policy (BYOD's) for Students

Students may use portable electronic devices at school once they and their parents have signed an acceptable use agreement, which can be found on the school website under "Policies." Once the agreement has been returned with the appropriate signatures to the IT Assistant, teachers and staff will be able to verify that fact by observing the sticker to be placed on all student devices that have been registered.

**BYOD Agreement:**

**Introduction**

    The introduction of the Bring Your Own Device (BYOD) pilot program has warranted some changes in the Bishop England Acceptable Use Policy. These changes are necessary to take advantage of the learning potential this program offers. The Acceptable Use Policy is designed to set a framework for responsible and ethical use of technology, protecting the privacy and ensuring the safety of our students and teachers. It requires that this form be reviewed, signed and returned to the IT Assistant. The

402026

26

BEHS 000520

**JA1018**

200076

Acceptable Use Policy applies to all technology resources brought onto campus. Once a student's device has been registered and the form signed, the student's device will have an identifying sticker. Any student using his or her own device without the school sticker should not be permitted to use the device in class until it has been registered.

**Definitions**
BYOD is an acronym for Bring Your Own Device. Students will be allowed to bring in their own devices to be used in selected classrooms under the direct supervision of their teacher. For BYOD, a "device" is a privately-owned laptop, tablet computing device, netbook, notebook, e-Reader. For the purposes of this program, the term "device" also includes any similar product owned by Bishop England and provided for student use.

**Access**
Wireless connection to the Internet using the BE-GUEST **does not** include access to Bishop England network resources, such as file shares or printers. Any and all access through the wireless network may be monitored and/or recorded for the purposes of network security and student safety.

**Guidelines**
    a.  In order to utilize Bishop England services (specifically Internet access) and participate in the BYOD program, students and a parent or legal guardian must review and sign the Acceptable Use Policy. This will be considered a legally binding agreement.
    b.  The student is fully responsible, at all times, for the personally owned device brought to school. Bishop England is not liable for any loss/damage/theft of a personally owned device.
    c.  The student is responsible for the condition of the device brought to school, including updates, antivirus software, and repair.
    d.  Personal devices should be charged and recharged outside of school, unless specific permission is granted. Personal devices should be capable of lasting a full day without recharging.
    e.  Device use is limited exclusively to classrooms participating in the BYOD Pilot Program. Outside these classrooms all electronic devices should be turned off and should not be visible.
    f.  Students may not use any device or service for non-educational purposes during school hours, unless granted permission by the Office of Student Life
    g.  No device, personal or otherwise, may be used to record, store, or transmit any type of image, sound, or video from Bishop England, except for approved projects with the express permission of the teacher.
    h.  If reasonable belief exists that the student has violated the terms of this agreement, or other school policy, the student's device may be inspected and/or confiscated. Subsequent or additional disciplinary action involving misuse of technology may extend to loss of technology privileges or further action as determined by the Office of Student Life.

**BEHS Social Media Policy**

All faculty and staff members should be familiar with the school's social media policy as it applies to both students and staff.

**Expanding Our World and Protecting Our Values**
As an organization with a commitment to quality of education and the safety of our students, as well as the preservation of our outstanding reputation as a school, the standards for appropriate online communication at Bishop England High School are necessarily high. While we respect the right of students, employees, alumni, and other members of our community to utilize the variety of social media options available, we must insist that the following standards be met by our students and faculty at all times, as well as by alumni and all other users who participate in BEHS-sponsored sites.

402027

27

BEHS 000521

**JA1019**

200077

**BEHS Social Media Comments and Participation Policy**

Comments to BEHS-sponsored sites, such as its Website via blogs, online forums, etc., or social media sites, are welcome and encouraged, and we look forward to hearing from you. To promote respectful discussion within this forum, we request that you be courteous and productive and avoid comments that are profane, obscene, offensive, sexually explicit, inappropriate, inflammatory or otherwise objectionable. Blogs often foster debate of an issue; users are to engage in such exchanges with mutual respect for others' opinions.

For the privacy of users and their families, please assume that all postings to BEHS-sponsored sites will be publicly available on the Internet, and therefore, publicly accessible without limitation or protection of any kind. Please consider how much personal information to share, with the understanding that this information may be linked to your name and published on the Internet.

By posting a comment or other material to BEHS-sponsored sites as outlined above, users give BEHS the irrevocable right and license to exercise all copyright, publicity, and moral rights with respect to any content you provide, which includes using your submission for any purpose in any form and on any media, including but not limited to: displaying, modifying, reproducing, distributing, creating other works from, and publishing your submission. BEHS reserves the right to review all comments before they are posted, and to edit them to preserve readability for other users.

BEHS further reserves the right to reject or remove comments for any reason, including but not limited to our belief that the comments violate this Comment Policy. The school has the sole right to determine if comments violate the Policy. Any submissions that fail to follow this Policy in any way or are otherwise irrelevant will be removed.

We also reserve the right to amend this Policy from time to time in our judgment to address issues that may arise and changes in our operations or the law.

In posting material on BEHS-sponsored sites, you agree not to:
- Post material that BEHS determines is threatening, harassing, illegal, obscene, defamatory, slanderous, or hostile towards any individual or entity.
- Post phone numbers, email addresses or other confidential information of students, faculty, or any other person other than yourself. If you choose to post your own contact information for any reason, please be aware that the information will be available to the public and is, therefore, subject to misuse.
- Post material that infringes on the rights of BEHS or any individual or entity, including privacy, intellectual property or publication rights.
- Post material that promotes or advertises a commercial product or solicits business or membership or financial or other support in any business, group or organization except those which are officially sponsored by BEHS, except in designated areas specifically marked for this purpose.
- Post chain letters, post the same comment multiple times, or otherwise distribute "spam" via the BEHS-sponsored site.
- Allow any other individual or entity to use your identification for posting or viewing comments.
- Post comments under multiple names or using another person's name.

BEHS reserves the right to do any or all of the following:
- Ban future posts from people who repeatedly violate this Policy. We may affect such bans by refusing posts from specific email addresses or IP addresses, or through other means as necessary.
- Remove or edit comments at any time, whether or not they violate this Policy.

402028

28

BEHS 000522

**JA1020**

# EXHIBIT 11 – PART 2

200078

User agrees to indemnify and hold harmless Bishop England High School, its affiliates, directors, employees, successors and assigns against any damages, losses, liabilities, judgments, causes of action, costs or expenses (including reasonable attorneys' fees and costs) arising out of any claim by a third party relating to any material the user has posted on BEHS-sponsored sites. By posting a comment or material of any kind on a BEHS-sponsored site, the user hereby agrees to the Policy set forth above.

**Faculty Use of Social Networking Sites**
BEHS respects the right of employees to use social media and networking sites, as well as personal websites and blogs, but it is important that employees' personal use of these sites does not damage the School's reputation, its employees, or its students or their families. Employees should exercise care in setting appropriate boundaries between their personal and public online behavior, understanding that what is private in the digital world often has the possibility of becoming public, even without their knowledge or consent. The School strongly encourages all employees to carefully review the privacy settings on any social media and networking sites they use and exercise care and good judgment when posting content and information on such sites <u>and to avoid making controversial and provocative political statements, particularly in support or opposition to office-holders. As a representative of Bishop England High School, it is essential not to post pictures that glorify substance abuse or sexually explicit content.</u>

When using a social media site, an employee may not include current students as "friends," "followers," or any other similar terminology used by various sites. If an employee maintains or participates in a BE-sponsored online community that extends to persons who are parents, alums, or other constituents, s/he must exercise good judgment about any content that is shared on the site. Additionally, employees should adhere to the following guidelines, which are consistent with the School's workplace standards on harassment, student relationships, conduct, professional communication, and confidentiality:
- An employee should not make statements that would violate any of the School's policies, including its policies concerning discrimination or harassment.
- The employee must uphold the School's value of respect for the individual and avoid making defamatory statements about the School, its employees, its students, or their families.
- An employee may not disclose any confidential information of the School or confidential information obtained during the course of his/her employment, about any individuals or organizations, including students and/or their families.
- An employee should never post pictures of students on social media.

If the School believes that an employee's activity on a social networking site, blog, or personal website may violate the School's policies, the School may request that the employee cease such activity. Depending on the severity of the incident, the employee may be subject to disciplinary action.

**Creating and Maintaining Official Bishop England Social Networking Sites**
All "official" Bishop England social networking sites must be approved by the principal and should adhere to the following standards:
- Logos and graphics used on the site must be consistent with the branding standards and usage guidelines of the School.
- Sites that accept comments or postings by anyone other than the site administrator must be diligently monitored to ensure that information displayed fits within BE guidelines and is appropriate to the subject matter of the page.
- Students should not be expected to utilize the site as the only source of important information since student access to social networking sites is restricted on the BE network.

402029

BEHS 000523

**JA1022**

200079

### Student Use of Social Media

First and foremost, students are encouraged to always exercise the utmost caution when participating in any form of social media or online communications, both within the BEHS community and beyond.

Students who participate in online interactions must remember that their posts reflect on the entire Bishop England High School community and, as such, are subject to the same behavioral standards set forth in the Student Code of Conduct.

In addition to the regulations found in the Student Handbook, students are expected to abide by the following:

- To protect the privacy of BE students and faculty, students may not, under any circumstances, create digital video recordings of BEHS community members either on campus or at off-campus BEHS events for online publication or distribution.
- Students may not use social media sites to publish disparaging or harassing remarks about BEHS community members; athletic or academic contest rivals, etc.
- Students who choose to post editorial content to websites or other forms of online media must ensure that their submission does not reflect poorly upon the school.

Failure to abide by this Policy, as with other policies at BEHS, may result in disciplinary action as described in the Student Handbook, or as determined by the administration.

### BEHS PRIVACY POLICY

This statement is available for parents and students to read on our website. For your information, it is reprinted below.

### Use of Links

Throughout our Web pages, we provide links to other servers, which may contain information of interest to our readers. We take no responsibility for, and exercise no control over, the organizations, views, or accuracy of the information contained on other servers.

### Use of Text and Images

Where text or images are posted on our site with the permission of the original copyright holder, a copyright statement appears at the bottom of the page.

### Accessibility

This Web site is designed to be accessible to visitors with disabilities, and to comply with federal guidelines concerning accessibility.

### Web Site Privacy Policy

We have created this statement to demonstrate our firm commitment to your privacy. We do not collect personally identifying information about you when you visit our site, unless you choose to provide such information to us. Providing such information is strictly voluntary. This policy is your guide to how we will handle information we learn about you from your visit to our Web site.

402030

30

BEHS 000524

**JA1023**

200080

- **Reading or Downloading**
  We collect and store only the following information about you: the name of the domain from which you access the Internet (for example, aol.com, if you are connecting from an America Online account, or behs.com if you are connecting from Bishop England's domain), the date and time you access our site, and the Internet address of the Web site from which you linked to our site. We use the information we collect to measure the number of visitors to the different sections of our site, and to help us make our site more useful to visitors.

- **Sending us an Email**
  You also may decide to send us personally identifying information, for example, in an electronic mail message containing a question or comment, or by filling out a Web form that provides us this information. We use personally identifying information from email primarily to respond to your requests. We may forward your email to other employees who are better able to answer your questions.

  We may also use your email to contact you in the future about our programs that may be of interest. We want to be very clear: We will not obtain personally identifying information about you when you visit our site, unless you choose to provide such information to us. Providing such information is strictly voluntary. Except as might be required by law, we do not share any information we receive with any outside parties. If you sign up for one of our email lists, we will only send you the kinds of information you have requested. We won't share your name or email address with any outside parties.

- **Students and Privacy**
  For students who visit our site, special rules apply. We do not request personal information about students, such as first and last name or street address and city. When students send email to us, their online contact information (email address) is not used to re-contact them and is not maintained in retrievable for mass mailings to students.


### CELL PHONE POLICY FOR STUDENTS

Students are not permitted to use their cell phones from the time they arrive on campus until the dismissal bell. Phones should be turned off during this time. When a student is permitted to leave a class to use the restroom, students should leave their cell phones in the classroom.


### POLICY ON WEARABLE TECHNOLOGY

Students may not wear smart electronic devices that connect to the internet or use Bluetooth technology during any type of assessment unless specified by a teacher for a particular class; this prohibition includes but is not limited to:
- devices such as activity trackers such as Fitbits
- smart watches and digital eyewear.

Of course, an EXCEPTION will be made if the wearable technology is medically necessary due to a health condition (such as impaired hearing or a need to monitor blood sugar) if medical documentation is provided to the school nurse.

402031

31

**JA1024**

200081

## COPYRIGHT GUIDELINES

Bishop England High School adheres to the provisions of U.S. copyright law regarding the reproduction and performance of copyrighted works.

**Fair Use Guidelines:** Before reproducing any work, faculty and staff should follow the fair use guidelines outlined in Title 17, Section 107 of the U.S. Code, which requires consideration of the following factors:

*(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;*

*(2) the nature of the copyrighted work;*

*(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and*

*(4) the effect of the use upon the potential market for or value of the copyrighted work.*

Because these are loose guidelines, they should be used on a case-by-case basis. According to the U.S. Copyright Office, "The distinction between what is fair use and what is infringement in a particular case will not always be clear or easily defined. There is no specific number of words, lines, or notes that may safely be taken without permission." There are, however, a number of fair use evaluators that faculty and staff can use to help:

Fair Use Checklist - http://www.mcc.commnet.edu/copyright.php#4
Fair Use Analysis - http://www.lib.purdue.edu/uco/CopyrightBasics/fair_use.html#analysis
ALA Fair Use Evaluator - http://librarycopyright.net/resources/fairuse/

**Digital Copies:** Fair Use also governs the copying of non-digital recordings to digital format. Teachers should evaluate the making of a digital copy using the four factors above and, if necessary, get written permission from the copyright holder before copying from non-digital to digital format. In addition, steps should be taken to ensure that digital recordings are protected from public access.

**Public Performance Guidelines:** Before showing videos or performing a work in class, faculty and staff should ensure that they are meeting the provisions of Title 17, Section 110 of the U.S. Code. Key provisions of the section require that:
- The performance or display be directly related to the curriculum;
- The school informs students that materials used in connection with the course could be subject to copyright protection;
- The school takes steps to ensure that digitally transmitted works cannot be retained by students for longer than the class period or retransmitted to others.

**Copyright Questions:** You can access the U.S. Copyright Office Circular 92 regarding Title 17 of the U.S. Code online: http://www.copyright.gov/title17/92chap1.html. The BEHS Library also has additional information about copyright issues and requirements.

## COMMUNITY SERVICE

As an institution of the Catholic Church, Bishop England High School is ever mindful of our Lord's admonition, "as you did it the one of the least of these brethren, you did it to me" (Matthew 25:40). Therefore, the school strongly encourages the students to live out the demands of their faith in works of mercy, service, and charity.

While community service is not a part of the grading system of theology courses, throughout the school year, students are to be encouraged and given opportunities to participate individually in community service through various groups and clubs at Bishop England High School. Club moderators must accompany students to any community service opportunities sponsored or organized by the club.

402032

32

BEHS 000526

**JA1025**

Approved outside groups will be encouraged to send information and requests that will be posted on the service project bulletin board. These requests and all relevant information for service opportunities will be posted by the Director of Campus Ministry.

200082

## DISCIPLINARY POLICIES & PROCEDURES

Teachers will maintain an appropriate level of discipline through the use of positive classroom management. Keeping students on task with meaningful instructional activities is the most effective way of assuring proper behavior. Teachers will handle problems according to the policies published in the student handbook within the following guidelines:

1. Any form of corporal punishment is prohibited at Bishop England High School.
2. Discipline measures will not be directed toward an entire group. (The entire class is not to be assigned a 500-word essay on the importance of turning in homework.)
3. Teachers are encouraged to handle minor discipline problems at the classroom level. Teachers should communicate with parents in an effort to curb inappropriate classroom behaviors. All efforts to curb inappropriate behavior must be documented, including communications to parents.
4. Detentions are issued only after other preventative measures have failed. They are not substitutes for sound classroom management.
5. Teachers are to handle discipline problems at the lowest possible level. When giving a teacher assigned detention, teachers should give students a 24-hour notice. For serious offenses or if the student's misbehavior is habitual, the disciplinarians may assist in dealing with significant problems.

**Lunch detentions:** Teachers may assign a student lunch detention in lieu of writing up a discipline referral. Teachers should use the forms provided by the school. Copies can be obtained from the main office. The form can also be found under "Staff Resources" on the school's website.

## STUDENT ATTENDANCE POLICIES & PROCEDURES

**Student Attendance and Extra Curricular Activities:** Except in cases of school-sponsored activities, a student must be present for at least four class periods in order to participate in extra-curricular activities.

**Campus Arrival:** When a student arrives on campus, it is expected that he/she will enter one of the buildings immediately. Students may not enter the grounds and then leave campus without first receiving permission from the main office. Since homerooms are opened and supervised beginning at 8:00, students on campus are encouraged to report to homeroom at that time. Parents dropping off students for morning arrival after 7:30 a.m. or picking up students for afternoon dismissal before 3:30 p.m. MUST use the carpool line (football field side of the school). Students who are waiting for rides after school may NOT be in any area of the campus after 4:00 except for the commons or courtyard areas unless accompanied by BEHS staff member.

**General Procedures Regarding Absence from School:**
- A parent/guardian is to notify the school on the day of a student's absence by calling the attendance office (849-9599, ext. 128) between the hours of 7:30 a.m. and 9:00 a.m. Should direct verbal contact not be made, the student must present a note signed by the parent/guardian to the main office authorizing the absence on the day he/she returns to school. An email or fax from a parent/guardian is acceptable **only** when accompanied by direct contact.

A parent/guardian note, email, or fax authorizing an absence must contain the following:

402033

33

BEHS_000527

**JA1026**

1. Date of the absence(s).
2. Time of arrival if the absence resulted in a tardy.
3. Telephone number of the parent/guardian.

200083

- If a student will miss school due to an anticipated absence, a note authorizing the absence and signed by a parent/guardian may be sent to the office in advance to make the school aware of the upcoming absence.

- Once a student has missed **ten** school days, he/she will be required to present a doctor's note, in addition to the parent note for any further absences. If a doctor's note is not presented, the absence will be considered unexcused. Students are required to get an admit slip if they are on the ten-day list. Teachers must sign green or red admit slips for all students on the ten-day list. Teachers must assign zeroes for any graded work missed during this unexcused absence just as if the student cut class. The academic dean may deny a student the opportunity to attend a field trip or other off campus event during school time, including athletic events, if the student has already missed ten or more days of school and/or is failing a required course.

- Seniors who have missed ten days without doctor's notes will lose their free period privilege for the remainder of the school year and must report to an assigned study hall.

**College Visits:** Sophomores, juniors, and seniors will be allowed to miss two extra days for college visits, provided that the student submits to the Main Office official documentation from the college verifying the student's visit to the college. In the event that additional days are needed for college visits, approval must be received in advance from the Director of Counseling. Students who are planning to miss school are strongly encouraged to notify their teachers in advance so that arrangements can be made promptly to make up any work that will be missed.

**College Representatives on Campus:** Students are not permitted to miss class to visit with a college representative unless they have signed up via Naviance prior to the day of the visit. Students must have the "college representative pass" signed by the teacher or teachers who will be affected by the visit.

**Unexcused Absences:** An "unexcused" absence occurs under one of the following conditions: (a) The student has been absent from school in excess of 10 days without presenting a doctor's note or getting approval for a college visit. (b) The student cut class--did not report to a class or school without a parent's knowledge and written permission. (c) The student missed class time because he/she was tardy and did not present a valid note.

Use the following guidelines when a student has an unexcused absence.
- Students are not allowed to complete academic work that is due during the time of the unexcused absence prior to or after an unexcused absence.
- Work completed, performed, or exhibited on the day of the unexcused absence will be assigned a grade of zero. THERE IS TO BE NO FORM OF "ADDITIONAL WORK" (EXTRA CREDIT, EXTRA TESTS, ETC.) TO COMPENSATE FOR THE GRADE OF ZERO.
- Long-term work due on the day of an unexcused absence must receive a late penalty of not less than 10%. (It is not acceptable for the work to be turned in by someone else during the timeframe of the unexcused absence.)
- Any "non-credit" materials (handouts, worksheets, study guides, etc.) provided to other students during the timeframe of the unexcused absence will be provided to the student upon return to school. These are to be provided for information only. There is no obligation on the teacher's part to check or review them.
- In the case of extended science labs or any other projects where multiple class periods are utilized, if a student has an unexcused absence which forces him/her to miss one or more of those periods, the student should receive a zero for that portion of the project not completed. In addition, if the unexcused absence prevents the student from completing the lab or project safely and adequately because of insufficient preparation, he/she will receive a zero for the entire lab or project.

402034

34

BEHS 000528

**JA1027**

- In the case of group projects, the student's grade will be reduced according to the aforementioned guidelines, but his/her absence should have no impact on the other students in the group.

**Illness:** During the school day, students who are too ill to remain in class may request a note from the teacher to report to the office. The school may allow students to drive home only if the parent/guardian gives verbal approval to a school official. The school reserves the right to require that a parent/guardian come to sign an ill student out of school.

**Medical Appointments:** Any student requesting an excused absence or early dismissal for a medical appointment must present a dated note signed by a parent or guardian to the school office before the school day begins. The note must specify the time to be dismissed and a parent contact number. In order for the absence to be medically excused, a doctor's note must be presented to the office by the next school day with the date and time the student left the office.

**Cut Days:** Bishop England High School does not authorize "cut days."

**Suspensions:** Students may be subject to in-school or out-of-school suspension, depending on the severity of the offense. In the case of ISS, teachers are responsible for providing work for the student to complete over the course of their suspension. If the student misses school for an out-of-school suspension, the absence is not considered "unexcused." It is a school-mandated absence. Students are permitted to make up the work they missed just as if they missed school due to illness. However, teachers are not obligated to hold extra help sessions for students who missed class due to suspension. For graded work during the suspension period, the maximum grade that can be attained on this missed work is 70% of the grade earned.

**Early Dismissal:** With the exception of medical appointments/medical emergencies and school-sponsored activities, all requests for early dismissals must be made by the parent/guardian in writing. For all early dismissals, students and parents/guardians must adhere to these procedures:
- Students must sign out before leaving campus and sign back in at the office if they return to school that day.
- Students are responsible for completing any work assigned while away from class for an excused early dismissal. Students with unexcused early dismissals are subject to the same academic and disciplinary penalties listed under unexcused absences.

**Make-Up Work:** Teachers are not permitted to allow students to make up tests, quizzes or other graded assignments if a student's absence from class is unexcused. There are 2 situations in which a student will be unexcused: a) cutting class or b) absences exceeded the 10-day limit yet no doctor's note was presented and no approval given by the administration for the absence.

**Missed Classes Due to School-Sponsored Activities:** Students who miss class for school-sponsored activities accept the responsibility of making up work based on reasonable teacher expectations. When a student is to miss classes due to a school-sponsored academic activity, a parent/guardian must sign a field trip permission slip. This permission slip will indicate that parents/guardians are aware of the following:
- The educational purpose of the activity
- The amount of school to be missed
- The mode of transportation
- Appropriate dress
- The number of chaperones

**Tardies:** Students who are not in their respective homerooms by 8:10am are tardy. These students must report to the office and present a note from the parent/guardian on the next school day. The note must contain the date of the tardiness, arrival time at school, and a parent contact number. If a student is tardy to a class or study hall, other than homeroom, the teacher is not to send the student to the main office for a tardy slip; however, the teacher may take disciplinary action with a referral or a lunch detention.

402035

35

BEHS 000529

**JA1028**

If a student is tardy more than six times, a conference will be scheduled with the student and he/she will be placed on a tardy contract by the Dean of Students. The contract must be signed by parent/guardian. Policy reminders will be sent to students who accumulate four non-medical tardies. If a senior accumulates 10 tardies, he/she will lose his/her free period privilege for a period of 6 weeks. At the end of that time, the student must see his or her disciplinarian to apply for reinstatement of the free period. The free period will be reinstated if the student has not had any additional tardies in violation of the tardy contract that was previously arranged.

200085

## TEACHER RESPONSIBILITIES

**Homeroom Teachers**
1. Homeroom teachers are required to be in their rooms or at the entrance of their rooms by 8:00 am each day. Homeroom teachers are encouraged to monitor the hallway immediately outside of their respective rooms. Homeroom folders containing messages and announcements for students should be picked up in the main office prior to 8:00 am. Homeroom teachers are responsible for recording the daily attendance at the start of each school day - indicating absences and tardies in the online teacher gradebook in Rediker by the end of the homeroom.
2. Homeroom teachers should take several minutes each morning to verify that each student is in accordance with the dress code (i.e.: males are properly shaven, no excessive jewelry is being worn, shirts are tucked in, etc). Homeroom teacher are the first line of defense for such offenses and should be diligent with the enforcement of the dress code.
3. Homeroom teachers should make every effort to keep students informed about special events and schedules and to be a resource of information for their students. They should also provide a welcoming atmosphere that inspires students to feel pride in our school and to respect one another at all times.

**Classroom Teachers**
1. Teachers are expected to take roll in each class in the online teacher gradebook in Rediker within the first 15 minutes of the period.
2. If a student becomes ill, the teacher will send that student, along with an accompanying note, to the main office.
3. Students may only make up work in those situations in which the absence is excused.

**Study Hall Teachers**
Teachers must record attendance online within the first 15 minutes of the period and must maintain a quiet environment that encourages students to complete assignments or study for classes. Study halls should adhere to the following guidelines that promote an appropriate academic environment that is conducive to learning:
1. Students must do academic work throughout the period (no calculator games or sleeping).
2. Students should not be allowed to communicate with each other in a way that detracts from the educational environment.
3. All testing should be carefully monitored to ensure academic integrity.
4. Only those students who present a completed permission form from a **subject area teacher** may leave the study hall.
5. Any student who has been permitted to leave study hall must be required to return to study hall before the end of the period. Study hall proctors are expected to collect permission forms upon the student's return to study hall and to make sure the time of departure is noted by a member of our staff.
6. Students who have signed a BYOD agreement and who elect to bring their device to study hall may only use it for academic purposes.

*Please note that homeroom teachers and substitute teachers are not authorized to sign permission forms to leave study hall. Subject teachers should not sign permission forms to go to the library unless the student has work for class that can only be completed in the library, such as research or work involving a computer.*

402036

36

BFHS 000530

**JA1029**

200086

## TEACHER ATTENDANCE/ABSENCES

**Teacher Sign-In:** Faculty and staff must sign in at the main office each morning prior to 8:00.

**Contract Terms:** Faculty members employed on a full-time basis are entitled to a total of 8 days leave per school year. Unused leave days cannot be accrued. Absence in excess of the aforementioned 8 days shall be penalized at the rate of actual pro-rated salary. Per contract, the minimum length of the school day for teachers is from 8:00 A.M. until 3:15 P.M. Teachers are expected to be available in their classrooms after hours at least one day a week to provide individual academic help and at other times, as needed by the students or the school.

**Teacher Absence from School:** Teacher attendance and in-house substitution records are maintained under the direction of the principal. Teachers must sign out in the office whenever they leave the building during the school day prior to 3:15. No teacher may leave campus for the day any earlier than 1:15 *unless a leave form has been submitted.* In the event of an anticipated absence, teachers are to submit "request for substitute" form to the principal (found online under "staff only"). Each absence from school is recorded in the main office on an attendance form using one of the following categories:

**Sick Leave** - Unavoidable absence due to personal or family illness is automatically approved.
**Personal Leave** – The principal must approve personal leave days. Ordinarily, personal leave is not granted if it interferes with in-service or faculty meetings.
**Professional Leave** – Teachers may take leave for professional development. The principal must approve such leave. Professional leave does not count against allotted leave time. Teachers are expected to maintain records for all professional growth activity.

**Arranging for Class Coverage:** It is imperative that teachers notify the class-coverage coordinator in advance when anticipated absences mean that coverage will be needed. For an anticipated absence, the teacher must fill out the sub request form that is available in the mail room and online under "Staff Resources." When possible, the teacher must also leave his or her sub folder on Ms. Ryan's desk in the main office. If class coverage is to be done in-house, the folder should be left in the classroom. The sub folder should include the assignments to be completed, the location of any handouts or tests to be given and an **updated hard copy seating chart** for each class, including homeroom. Note that substitute teachers must **send a student each period to the office with attendance information. Please list the names of two reliable students for each class, particularly students who are able to help any inclusion students in the class, including homeroom.** The following procedures are to be followed when a teacher has an unanticipated absence:

1. If the teacher realizes before 10:00 P.M. that coverage will be needed the next day, he/she should contact Ms. Ryan on her home phone (843-849-1262) or if there is no answer on the home phone, try the cell number (843-670-8406). Teachers may also call Ms. Ryan any time after 6:00 A.M.
2. Should a teacher not be able to speak to Ms. Ryan, he/she should leave a message on her cell phone and a message on extension 125. **Do NOT** email Ms. Ryan because it might not be checked in time to get a substitute.
3. The teacher should note any duties that need coverage when calling in that day.
4. Teachers should have their sub folders visible in their classrooms to access seating charts and other information that is needed aside from lesson plans that will need to be sent in. If handouts need to be copied, please arrange for a colleague to do that task.

**Assignments:** When absent for any reason, teachers must leave quality assignments. When an absence is anticipated, a teacher must leave his or her sub folder on Ms. Ryan's desk with information about where the lesson plans are or the plans themselves. In planning work for classes, the following guidelines apply:

1. The assignment is written, encompasses meaningful material, and is designed to last the entire period.
2. The assignment is due at the end of class.
3. Students are held accountable for the assigned material.

**\*Please note that it is the teacher's responsibility to find a replacement for any duties when school leave is anticipated. Substitute teachers should never be asked to fulfill these duties.**

402037

37

BEHS_000531

**JA1030**

**Emergency Lesson Plans:** All teachers must have an emergency lesson plan for each class that can be easily accessed by the department chair or Academic Dean. Emergency plans should only be used if the teacher is unable to send in a lesson plan due to extraordinary circumstances.

**In-House Class Coverage:** Whenever possible, the school will utilize outside substitutes to cover classes. However, there will be times when we are forced to delegate teachers to cover classes at a stipend of $10.00 per class. This service accrues and is paid at the end of each semester.  Immediately upon arriving at school, teachers are to check mailboxes for possible duty assignments. It is an expectation that teachers who are assigned classes to cover will accept the responsibility.

200087

## COMMUNICATION RESPONSIBILITIES

**Parent Conferences:** Teachers are required to be available in designated areas from 1:00 to 4:00 on parent conference days. If a student in danger of not passing the marking column or the year with a failing or barely passing average or is having a serious problem and his/her parent or guardian does not initiate contact with a teacher as of the day of parent conferences, the teacher must contact the parent and confirm that the parent knows of the student's status and the appropriate means for remediation (such as after school help or tutoring).

**Electronic Mail:**  Teachers must check their voice mail and e-mail daily.  Prompt responses are an expectation.

**School Mailbox:**  Teachers should check their mailboxes before homeroom, at lunch, and at the end of the school day.  Students are not allowed in the mailroom.

**Communication with Students:** In the interest of maintaining appropriate boundaries between faculty and staff and individual students, it is important to avoid private conversations on cell phones and through electronic communication. If a teacher needs to contact a student by email or receives a question from a student by email, the teacher's response must either include the parent or copy bishops@behs.com. Emails that are sent to bishops@behs.com can be accessed by the administrative team at any time. If there is an off-campus event and a legitimate reason to contact a student by cell phone, another faculty member should be part of the text. Remind.com is a preferred means of communication. At no time should a teacher communicate through social media with students who attend Bishop England High School, nor should they be friends on Facebook with a current student or allow a student to see their Instagram posts.

## ATTIRE

Teachers and staff are to present a professional appearance in terms of dress and grooming.  At no time should teachers and staff wear attire prohibited to students during TAG days.  Dress for faculty is as follows:

**Men:**  Acceptable dress would include a tucked-in shirt and tie during the months when male students are required to wear ties or collared, tucked-in shirts when ties are not required for male students, as well as professional trousers and shoes, not athletic wear. Men who teach primarily in the gym area only are required to wear a collared shirt or a department approved t-shirt.  Shorts, warm-ups, and tennis shoes are acceptable for men who teach in the gym. On Mass days, all male faculty must wear a tie.

**Women:**  *Acceptable dress would include only professionally styled pants or dresses/skirts of appropriate length (close to knees), over the waist blouses and tops, tasteful necklines, and sandals or other appropriately styled shoes, not rubber flip flops or athletic shoes. Unacceptable dress would include shorts, mini-skirts, tank tops, midriff-baring tops or tops that expose cleavage. Women who teach primarily in the gym area only are required to wear a collared shirt or a department approved t-shirt.  Shorts, warm-ups, and tennis shoes are acceptable for women who teach in the gym.* On Mass days, all female faculty must wear clothing that is dressy professional.

402038

38

BEHS 000532

**JA1031**

**TAG Days:** When the student body is permitted to have a TAG day, faculty and staff are invited to dress down on the same days. Otherwise, teachers must follow the attire guidelines on the previous page when students are present. Teachers should not wear any clothing that is prohibited for the students on student TAG days.

200088

## SUPERVISION OF STUDENTS

**Campus Supervision:** *Teachers are to supervise students both within and outside of the classroom. This responsibility extends to any Bishop England sanctioned event.* Teachers are expected to hold students accountable for minor infractions of any school policy (dress code violations, gum chewing, eating in non-designated areas). The disciplinarians handle major infractions. Students are not permitted in classrooms or department offices, the counseling suite, or athletic offices when they are unsupervised.

**Non-Instructional Duties:** Teachers are assigned various duties, such as parking lot, lunch, and detention duty on a rotating basis. The assignment of duties represents a high level of professional and legal responsibility for a teacher to be present and accountable whenever students are charged to his/her supervision. Teachers are personally responsible for finding replacements whenever unforeseen circumstances would prevent their being present for assigned duties. Teachers absent from school should include the name of their replacement with their lesson plans. Any changes in duties due to unforeseen circumstances must be cleared with Ms. Tucker.

**Instructions for each supervisory duty: (See specific "Duty Assignments" on-line, "Staff Only.")**

**Detention**

- Detention will be held in room **238A** from 3:00 to 4:00.
- Students who are late should be sent to the main office.
- Students should remain in proper uniform.
- Moderators should verify roll and provide a written assignment (not homework) designed to last the entire period.
- Other teachers may sign students out after 3:10 as long as they are having the students do non-academic work for the teacher such as cleaning boards, etc. The students should be signed back into the detention room by 3:55.
- The verified roll should be placed in Ms. Rosebrock's box as soon as detention ends.

**Parking Lot Duty (Morning)**

- Teachers should be at their posts from 7:45 until 8:10.
- Teachers are expected to monitor student behavior, paying particular attention to assure that students are driving properly, enter the building as soon as arriving on campus, and are in proper uniform as soon as they arrive on campus.
- The morning supervisor should circulate throughout the primary student parking lot from 7:45 to 8:10.

**Parking Lot Duty (Afternoon)**

- The afternoon supervisor is on duty from 2:50 to 3:05.
- Parking lot supervisors are expected to monitor student behavior, paying particular attention to assure students are driving properly, not lingering in or around their cars, and that they are in proper uniform until they leave campus.

402039

39

BEHS 000533

**JA1032**

**Lunch Duty**                                                                       200089

- Lunch duty teachers should be at their posts from 11:50 until 12:20 except for teachers with duty at the concessions line. Teachers who are assigned to concessions must be at their posts as close to 11:40 as possible and remain there until there are no students in line or until about 12:05.
- Teachers are to monitor behavior by circulating among the students.
- Teachers should assure that students pick up after themselves and remove all trash from their immediate vicinity.
- The monitor on the first floor of "A" Building should insure that students are not loitering in the halls and that students are not eating in "A" building unless the students are in a teacher's classroom with the teacher present. Students are allowed to go to lockers during the first 5 minutes of lunch and the last 5 minutes. After the first five minutes of lunch, the first-floor teacher on duty must close the center hallway doors to the stairs and open the doors just before the students are permitted to enter building the last five minutes of lunch. Teachers who are assigned to this duty must also monitor the seniors eating lunch across the street in Etiwan Park. Those students should not be using the trash cans in the park – they must bring their trash back to campus and use a BEHS trash can.
- In the courtyard, students are not permitted to sit on the center oval around the statue, nor are they to sit in the pine straw around the trees.
- In the library, students are not permitted to eat. Students are allowed to work with partners or in small groups, as long as they are actually working and not disturbing others.
- In the Commons, the person on the football stadium side must help the teacher covering concessions to insure students are not taking items for which they have not paid. Until there is only one lunch line, the teacher on the faculty lot side of the Commons should be circulating throughout both sides of the Commons area. Both teachers assigned to the Commons must remain there until the bell rings to end the lunch period.
- During special schedules, there is no change in lunch duty assignments.
- In the event of extreme cold, wet grounds, or rain, one of the two assigned to the courtyard should report to the gym.

**Assemblies:** Unless instructed otherwise, students sit by assigned homerooms during Mass and other assemblies. Teachers must attend any assembly that involves students who would normally be under their supervision. Some assemblies only involve one grade level (such as graduation and class ring orders, prayer services, etc.); the only reason a teacher should not attend would be if other students would be left unsupervised in the classroom. Teachers must sit or stand behind or above their students in order to insure students behave appropriately. Every faculty member must attend all-school assemblies, including liturgies.

**Food and Beverages:** Students may drink water throughout the campus. Drinking other types of beverages and consuming any food is generally restricted to the gym area or outside. Any eating in classrooms must be requires the presence of a member of the staff, and the room must be left clean. This policy applies to all students, including seniors on free period.

**Hall Passes:** Any student who is permitted to be out of the classroom must have a hall pass with his/her name, time, date, destination, and teacher signature. Teachers should use the school generated hall passes found in the office.

**\*Teachers, coaches, and club moderators are reminded that when supervising a school-sponsored activity outside of normal school hours, the teacher is responsible for all students until they leave the site of the activity.**

<u>Policy for Monitoring School Restrooms and Locker Rooms</u>

<u>During the school day in Diocese of Charleston schools, faculty/staff members should not be using restrooms while students are also present in the restrooms. However, the Diocese also recognizes that in order for schools to provide an environment that is as safe as possible, restrooms and locker rooms must be monitored for inappropriate student activity. Therefore, the following protocol will be followed:</u>

402040                                                                             40

BEHS 000534

**JA1033**

200090

• Restrooms will be monitored using the following guidelines:

    a. Multiple times a day, including lunch periods, two female employees and two male employees will be assigned to check all restrooms.

    b. These employees should walk together into all of the school's appropriate gender restrooms to look for such things as: smoke rising from stalls, group activities that could be bullying tactics, inappropriate language or discussions, etc.

    c. This should take no more than 10 seconds/restroom providing everything is quiet.

    d. This should be done multiple times a day, and the monitors should record, on a form provided by the administration, the times they monitored and what their findings were. They should vary the times each day. The forms should be submitted to the school's safe-environment coordinator at the end of the day for filing.

    e. At no time should they open stall doors or enter stalls.

    f. Should they witness possible inappropriate behavior, they should announce their presence and instruct students to leave the restroom immediately.

    g. They (the monitors) should leave the restroom immediately after their announcement and wait in the hallway for all students to exit. They should also notify the appropriate administrator or disciplinarian that they are bringing the students to them for next steps.

• Coaches and PE teachers also should exercise due diligence when their players/students are using the locker rooms.

    a. As players/students are preparing for class or practice, the teacher/coach (it is always preferable to have at least two of the same sex available) may open the locker room door, without entering, and announce that students have _____ seconds to finish and exit. The teacher/coach should ALWAYS be immediately outside the locker room door.

    b. The same would be true after class or practice – students/players should be given a reasonable amount of time to change out of practice clothes. The teacher/coach should open the locker room door, without entering, and announce that students have _____ seconds to finish and exit. The teacher/coach should ALWAYS be immediately outside the locker room door in order to be able to listen for any inappropriate behavior.

    c. Students/players should NEVER be in the locker room unless a teacher/coach (it is always preferable to have at least two of the same sex available) is outside the door so that should a situation arise (perhaps a scuffle, an argument, a fight) the teacher/coach should immediately call for help, have students/players exit the locker room, and turn the situation over to the appropriate

Approved by the Vicar General of the Diocese of Charleston on July 19, 2018

### FIELD TRIPS /OFF-CAMPUS EVENTS

Field trips are subject to the approval of the academic dean; approval forms can be found in the "Staff Resources" section of our website. Field trips must represent a meaningful supplement to the course curriculum, and approval must be secured at least two weeks prior to the trip. A maximum of one approved field trip is permitted for any single course. Field trips may not be scheduled during the week ending a quarter and should be avoided in both December and May. Each student must return a parent signed copy of the Diocesan-generated permission form before leaving for a field trip. Permission forms signed by parents are required for other off-campus events such as National Honor Society conventions, Model UN, and Youth in Government. (**"Forms" are located on-line under Staff Resources.**)

### Checklist for Planning Field Trips

    1. Fill out the form to gain administrative approval from the Academic Dean. Submit list of students with the approval form or very soon afterward (at least two weeks before the date of the field trip), if the students are going to miss classes. Students who will miss class must be approved to attend field trips in most situations; therefore, teachers should wait to give out permission slips to only those students who have been approved. The list of students should be sent electronically to the Academic Dean a couple of weeks in advance of the trip.

402041

41

BEHS 000535

**JA1034**

2. Finalize transportation arrangements. If a BE bus is needed, get approval from the athletic director, based on availability. (See transportation policy information if using other means.) Note that drivers must have the following items on file with the Director of Operations:

    a. Driver's license

200091

    b. Proof of insurance
    c. Background screening form
    d. VIRTUS certificate
    e. Driver information sheet
    f. Adult hold harmless form.

Send field trip permission forms to parents/guardians of students involved in the field trip. Once the forms are returned to the lead teacher, copies of the forms must be made. The lead teacher must take one copy with him/her and leave the other copy in the mailbox of the teacher at school. Once the trip is over, one copy of the forms must be given to the Director of Operations; discard the extra copy. Clip together and label them with the date of the trip and the name of the teacher who was in charge. (These forms are kept for 2 years.)

3. All chaperones must have a Safe Haven training certificate and background screening form submitted to the Director of Operations prior to the trip. (Note that this rule applies to all volunteers on campus who may be helping out with the music, drama, or sports programs.)

4. All teachers and other chaperones who are attending the field trip must sign the adult-hold-harmless agreement. Once signatures are obtained, clip together and label with date of the field trip and the name of the teacher in charge and submit to the director of operations.

5. All volunteers on campus or chaperoning field trips must sign the Code of Conduct for Volunteers under "Forms" on-line. Turn in to the Director of Operations.

### OVERNIGHT TRIPS

Diocese of Charleston Policy on Overnight Domestic and International Field Trips The following policies shall apply to trips outside school led by faculty numbers or staff members of schools in the Diocese of Charleston.

1. Any faculty member who intends to sponsor or coordinate a trip for students and/or others for any school in the Diocese of Charleston must meet with the associate principal of the school to discuss the trip plan and receive permission to move forward.

2. Regardless of the number of student participants, there must be two female chaperones (the faculty sponsor may be one of these) to supervise the female students on the trip; likewise there must be two male chaperones (the faculty may be one of these) to supervise the male students. All chaperones MUST be cleared through the Diocese of Charleston Office of Child Protection including a background screen and Safe Haven training.

3. With the "Field Trip Permission" form, the trip should have a specific itinerary and have a specified educational value. (See the sample itinerary under "Staff Resources" on our website.

4. The sponsor of the trip must collect a signed "Field Trip Permission" form from each student participating in the trip, and a signed "Guidelines Agreement".

5. The participants on the trip will be limited to students currently enrolled at the school or to newly graduated students of a diocesan-owned high school (for trips happening in the summer immediately following graduation) and their parents as determined by the Principal.

42

402042

BEHS 000536

**JA1035**

200092

6. For international trips: at least one parent of each participant is required to attend both the initial informational meeting at the school and the final informational meeting at the school. The final informational meeting must be held two weeks prior to the trip departure.

7. Any parents actually taking part in the trip must adhere to the Diocese of Charleston Code of Conduct for Employees and Volunteers. This includes NOT using or abusing alcohol in the presence of the students.

8. The faculty sponsor must act responsibly throughout the planning, coordinating, and implementing of this trip consistent with the policies and procedures of the Diocese of Charleston regarding the mission of Catholic education.

9. The faculty/staff sponsor and others will not condone the use of alcohol or drugs on the trip, and they must not allow or condone any sexual activity by the participants of the trip. .

10. Any violation of this policy by a faculty member shall constitute just cause and grounds for disciplinary action, up to and including dismissal from the Diocesan school.

11. A violation of these policies by a student will constitute just cause and grounds for disciplinary action including but not limited to: a. Being sent home at the parents' expense b. Dismissal from the Diocesan school.

Approved by the Vicar General of the Diocese of Charleston on July 19, 2018

**BUILDING MAINTENANCE**

**Heating and Cooling:** Teachers should turn up A/C thermostats to 76 degrees or turn off heat before leaving for the day.

**Reducing Energy Consumption:** During the cooling season, close the blinds as much as possible. During the heating season, open the blinds as much as possible. Turn off lights and other electrical equipment when leaving a room. Classroom doors should remain closed in order to conserve energy and reduce distractions. Classroom doors must also be locked at all times for security reasons.

**Requests for Maintenance: Email Bill Collier (bcollier@behs.com)**

**Wall Hangings:** Permanent wall hangings are allowed but should only be attached by the maintenance department. Lightweight hangings (such as posters) should only be attached using double-sided stickers available from the office.

**GENERAL POLICIES & PROCEDURES**

**Accessing Student Records:** Teachers may access student academic records in the Counseling office provided that they fill out the yellow form located inside the records room. Teachers must observe strict confidentiality with regard to student records.

**Announcements:** A staff member must approve any announcement made on the intercom. Individual announcements may not be read for more than two consecutive days. Multiple announcements directed to the same group should be combined into one announcement before submission to the office. All-school announcements intended for individual classes are never appropriate.

**Coastal Burglar Alarm System:** Coastal protects the campus. Teachers are not to share their codes with any person or leave the written codes in unsecured locations. Teachers needing instruction in the use of the system should make an appointment with the Director of Operations at least one week before the date of intended use.

402043

43

BEHS 000537

**JA1036**

**Calendar Information and Facility Usage:** All athletic, co-curricular, and extra-curricular activities must be placed on the school calendar. Athletic events and extra-curricular events are to be reported to the Director of Operations. BEHS activities have priority over other events. A staff member must be present whenever the facility is in use. Note that reservations for facility usage must be completed on-line ("Staff Resources" section) to enable everyone on staff to check availability when scheduling.

**Classroom Computers:** Teachers should never access their grades online when students can view other students' grades. During testing, teachers should not use their classroom computers, other than recording attendance information, because some students are distracted by the sound of word processing. In addition, teachers should be vigilant in monitoring tests/quizzes to ensure academic integrity. Students are not permitted to use classroom computers when a teacher is not present.

**Co-Curricular Activities:** Staff members are encouraged to attend as many co-curricular activities as possible. Staff members and their immediate families may attend any regularly scheduled (non-playoff) home athletic contest or Bishop England hosted event at no charge. Moderators of co-curricular activities are responsible for the direct supervision of students participating in such activities.

**Films in Class:** Teachers may show students films or parts of films if they are tied to the educational objectives of their course; however, if a film is rated "R," the teacher must have parents sign a form granting permission for their child to view the film and get approval from the principal or academic dean to show the film.

**Fundraising:** The Dean of Students must approve all school fundraising activities before such activities may be placed on the school calendar. Teachers and staff are not permitted to raise money in their classes or in homerooms without the approval of the associate principal.

**Gymnasium:** Physical education teachers, coaches, and others who secure permission to use the gym from the Athletic Director must insure that clean, appropriate footwear is used.

**Handling of Money:** All money collected while conducting school business must be turned in immediately to the business office. All monetary donations must also be turned in to the business office.

**Keys:** Teachers are not to loan, make duplicates, or identify keys in any way. Should keys be lost, immediately contact the Director of Operations.

**Language:** As role models in a Catholic School, teachers must remain cognizant of the fact that all behavior, including language, may impact our students. Therefore, the use of profanity or other inappropriate language at school or at any school function is not tolerated.

**Meetings, Faculty and Departmental:** Although limited in frequency, certain after school meetings are essential. Only the administration may excuse a teacher from such meetings.

**Parking:** Teachers must park in their assigned places.

**Performing Arts Center:** In order for a teacher to use the PAC for a meeting or other event, he or she must email the Director of Operations. Students are not to be in the theater portion of the center without permission. Classrooms in this building are to be accessed from the outside.

**Photos of Students:** Teachers will be notified of any restrictions on photographs of students with regard to posting on the web, taking pictures for the yearbook, the BE-Hive, or other publications or videos. Teachers must be very careful not to use unauthorized photographs of students.

**Psychological and Academic Evaluations for Students:** Teachers should never complete a psychological evaluation unless it is given to the teacher by the student's guidance counselor. Students and parents who request completion of these forms should be asked to contact the counselor. Teachers are not permitted to fill out any type of ratings concerning student behavior or academic abilities/performance.

**Purchases:** All requests for the purchase of supplemental classroom materials must be handled through the department chair.

**School Security/Safety:** Teachers must read the entire safety manual that is available online.

**School Seal:** The school seal may not be used in anyway (on clothing, stationary, etc.) without the expressed consent of the principal or associate principal.

200093

402044

44

BEHS 000538

**JA1037**

**Smoking:** Tobacco use by faculty on campus is restricted to the outside of the building. Tobacco may not be used in the presence of students.

**Spiritual Life:** Bishop England High School is a community of faith and offers many opportunities for teachers and students to involve themselves in the spiritual life of the school. Teachers should speak with the chaplain or the chair of the Theology Department in order to gain more insight on how they might contribute to such programs.

**Supplies:** Basic supplies are available through department chairs. Department chairs may get certain basic supplies through the main office, such as dry erase board markers and erasers. Other supplies must come out of the department's budget.

**Technology Support:** Faculty and staff who need repairs or other support in the use of technology must email help@behs.com

**DAILY BELL SCHEDULE**

The regular school day begins at 8:05 AM and ends at 2:50 PM. It is divided into time blocks as detailed below. Because special events necessitate amending the normal schedule, classes may be conducted according to one of the following bell schedules:

**\*Announcements will be made during the 6th time block.**

402045                                                                                              45

BEHS_000539

**JA1038**

200095

### Regular school day (Schedule 1)

| | |
|---|---|
| 8:05 | Warning Bell |
| 8:10 - 8:20 | Homeroom |
| 8:25 - 9:10 | 1st time block |
| 9:15 - 10:00 | 2nd time block |
| 10:05 - 10:50 | 3rd time block |
| 10:55 - 11:40 | 4th time block |
| 11:40 - 12:15 | Lunch |
| 12:20 - 1:05 | 5th time block |
| 1:10 - 2:00 | 6th time block |
| 2:05 - 2:50 | 7th time block |

### Half day (Schedule 2)

| | |
|---|---|
| 8:05 | Warning Bell |
| 8:10- 8:20 | Homeroom |
| 8:25 - 8:50 | 1st time block |
| 8:55 - 9:20 | 2nd time block |
| 9:25 - 9:50 | 3rd time block |
| 9:55 - 10:20 | 4th time block |
| 10:25-10:50 | 5th time block |
| 10:55 -11:25 | 6th time block |
| 11:30 -11:55 | 7th time block |

### All school Mass (Schedule 3)

| | |
|---|---|
| 8:05 | Warning Bell |
| 8:10 - 8:20 | Homeroom |
| 8:25-9:00 | 1st time block |
| 9:05-9:40 | 2nd time block |
| 9:45-10:25 | 3rd time block |
| 10:30-10:40 | HR's called to Mass |
| 10:45-11:40 | Mass |
| 11:40-12:15 | Lunch |
| 12:20-12:55 | 4th time block |
| 1:00-1:35 | 5th time block |
| 1:40-2:15 | 6th time block |
| 2:20-2:50 | 7th time block |

### All school assembly (Schedule 4)

| | |
|---|---|
| 8:05 | Warning Bell |
| 8:10 - 8:20 | Homeroom |
| 8:25-9:00 | 1st time block |
| 9:05-9:40 | 2nd time block |
| 9:45-10:20 | 3rd time block |
| 10:25 – 11:00 | 4th time block |
| 11:05 - 11:40 | 5th time block |
| 11:40-12:15 | Lunch |
| 12:20 - 1:05 | 6th time block |
| 1:10 – 1:50 | 7th time block |
| 1:55 – 2:05 | Report to gym |
| 2:10 | Assembly |

### Late start schedule (Schedule 5)

| | |
|---|---|
| 10:05 | Warning Bell |
| 10:10 – 10:20 | Homeroom |
| 10:25 – 10:50 | 1st time block (25 minutes) |
| 10:55 – 11:20 | 2nd time block (25 minutes) |
| 11:25 – 11:50 | 3rd time block (25 minutes) |
| 11:50 – 12:30 | Lunch |
| 12:30 – 1:00 | 4th time block (30 minutes) |
| 1:05 – 1:35 | 5th time block (30 minutes) |
| 1:40 – 2:15 | 6th time block (30 minutes plus 5 for announcements) |
| 2:20 – 2:50 | 7th time block (30 minutes) |

### Exam schedule

| | |
|---|---|
| 8:00 | Teachers open classrooms |
| 8:05 | Warning Bell |
| 8:10 | Tardy Bell |
| 8:25 – 10:25 | 1st exam of the day |
| 10:55 | Teachers open classrooms |
| 11:05 | Warning Bell |
| 11:10 – 1:10 | 2nd exam of the day |

*First semester exams begin
  with first period.

*Second semester exams begin
  with 7th period

46

402046

BEHS_000540

## JA1039

2:10 ........................... Office closes

200096

### Schedule for Rotation of Classes – FALL 2018

| Aug 16 – Aug 17 Schedule 1 | Aug 20-24 Schedule 1 | Aug 27 – 31 Schedule 2 | Sept 4- Sept 7 Schedule 3 | Sept 10 – Sept 14 Schedule 4 |
|---|---|---|---|---|

402047

47

BEHS 000541

**JA1040**

200097

|  |  |  |  |  |
|---|---|---|---|---|
| HR - 8:10 - 8:20<br>1st - 8:25 - 9:10<br>2nd - 9:15 - 10:00<br>3rd - 10:05 - 10:50<br>4th - 10:55 - 11:40<br>5th - 12:20 - 1:05<br>6th - 1:10 - 2:00<br>7th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>1st - 8:25 - 9:10<br>2nd - 9:15 - 10:00<br>3rd - 10:05 - 10:50<br>4th - 10:55 - 11:40<br>5th - 12:20 - 1:05<br>6th - 1:10 - 2:00<br>7th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>2nd - 8:25 - 9:10<br>3rd - 9:15 - 10:00<br>4th - 10:05 - 10:50<br>5th - 10:55 - 11:40<br>6th - 12:20 - 1:05<br>7th - 1:10 - 2:00<br>1st - 2:05 - 2:50 | HR - 8:10 - 8:20<br>3rd - 8:25 - 9:10<br>4th - 9:15 - 10:00<br>5th - 10:05 - 10:50<br>6th - 10:55 - 11:40<br>7th - 12:20 - 1:05<br>1st - 1:10 - 2:00<br>2nd - 2:05 - 2:50 | HR - 8:10 - 8:20<br>4th - 8:25 - 9:10<br>5th - 9:15 - 10:00<br>6th - 10:05 - 10:50<br>7th - 10:55 - 11:40<br>1st - 12:20 - 1:05<br>2nd - 1:10 - 2:00<br>3rd - 2:05 - 2:50 |

| Sept 17- Sept 21<br>Schedule 5 | Sept 24- Sept 28<br>Schedule 6 | Oct 1- Oct 5<br>Schedule 7 | Oct 9- Oct 12<br>Schedule 1 | Oct 15- Oct 19<br>Schedule 2 |
|---|---|---|---|---|
| HR - 8:10 - 8:20<br>5th - 8:25 - 9:10<br>6th - 9:15 - 10:00<br>7th - 10:05 - 10:50<br>1st - 10:55 - 11:40<br>2nd - 12:20 - 1:05<br>3rd - 1:10 - 2:00<br>4th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>6th - 8:25 - 9:10<br>7th - 9:15 - 10:00<br>1st - 10:05 - 10:50<br>2nd - 10:55 - 11:40<br>3rd - 12:20 - 1:05<br>4th - 1:10 - 2:00<br>5th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>7th - 8:25 - 9:10<br>1st - 9:15 - 10:00<br>2nd - 10:05 - 10:50<br>3rd - 10:55 - 11:40<br>4th - 12:20 - 1:05<br>5th - 1:10 - 2:00<br>6th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>1st - 8:25 - 9:10<br>2nd - 9:15 - 10:00<br>3rd - 10:05 - 10:50<br>4th - 10:55 - 11:40<br>5th - 12:20 - 1:05<br>6th - 1:10 - 2:00<br>7th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>2nd - 8:25 - 9:10<br>3rd - 9:15 - 10:00<br>4th - 10:05 - 10:50<br>5th - 10:55 - 11:40<br>6th - 12:20 - 1:05<br>7th - 1:10 - 2:00<br>1st - 2:05 - 2:50 |

| Oct 22 - Oct 26<br>Schedule 3 | Oct 29 - Nov 2<br>Schedule 4 | Nov 5 - Nov 9<br>Schedule 5 | Nov 12 - Nov 16<br>Schedule 6 | Nov 19 - Nov 20<br>Schedule 7 |
|---|---|---|---|---|
| HR - 8:10 - 8:20<br>3rd - 8:25 - 9:10<br>4th - 9:15 - 10:00<br>5th - 10:05 - 10:50<br>6th - 10:55 - 11:40<br>7th - 12:20 - 1:05<br>1st - 1:10 - 2:00<br>2nd - 2:05 - 2:50 | HR - 8:10 - 8:20<br>4th - 8:25 - 9:10<br>5th - 9:15 - 10:00<br>6th - 10:05 - 10:50<br>7th - 10:55 - 11:40<br>1st - 12:20 - 1:05<br>2nd - 1:10 - 2:00<br>3rd - 2:05 - 2:50 | HR - 8:10 - 8:20<br>5th - 8:25 - 9:10<br>6th - 9:15 - 10:00<br>7th - 10:05 - 10:50<br>1st - 10:55 - 11:40<br>2nd - 12:20 - 1:05<br>3rd - 1:10 - 2:00<br>4th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>6th - 8:25 - 9:10<br>7th - 9:15 - 10:00<br>1st - 10:05 - 10:50<br>2nd - 10:55 - 11:40<br>3rd - 12:20 - 1:05<br>4th - 1:10 - 2:00<br>5th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>7th - 8:25 - 9:10<br>1st - 9:15 - 10:00<br>2nd - 10:05 - 10:50<br>3rd - 10:55 - 11:40<br>4th - 12:20 - 1:05<br>5th - 1:10 - 2:00<br>6th - 2:05 - 2:50 |

| Nov 26 - Nov 30<br>Schedule 1 | Dec 3 - Dec 7<br>Schedule 2 | Dec 10 - Dec 12<br>Schedule 3 | Dec 13 - Dec 20<br>Semester exams |  |
|---|---|---|---|---|
| HR - 8:10 - 8:20<br>1st - 8:25 - 9:10<br>2nd - 9:15 - 10:00<br>3rd - 10:05 - 10:50<br>4th - 10:55 - 11:40<br>5th - 12:20 - 1:05<br>6th - 1:10 - 2:00<br>7th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>2nd - 8:25 - 9:10<br>3rd - 9:15 - 10:00<br>4th - 10:05 - 10:50<br>5th - 10:55 - 11:40<br>6th - 12:20 - 1:05<br>7th - 1:10 - 2:00<br>1st - 2:05 - 2:50 | HR - 8:10 - 8:20<br>3rd - 8:25 - 9:10<br>4th - 9:15 - 10:00<br>5th - 10:05 - 10:50<br>6th - 10:55 - 11:40<br>7th - 12:20 - 1:05<br>1st - 1:10 - 2:00<br>2nd - 2:05 - 2:50 | Dec 13 - 1st<br>Dec 14 - 2nd & 3rd<br>Dec.17 - 4th & 5th<br>Dec.18 - 6th<br>Dec 19 - 7th |  |

**Schedule for Rotation of Classes – SPRING 2019**

| Jan 3 - Jan 4<br>Schedule 4 | Jan 7 - Jan 11<br>Schedule 5 | Jan 14 - Jan 18<br>Schedule 6 | Jan 22 - Jan 25<br>Schedule 7 | Jan 28 - Feb 1<br>Schedule 1 |
|---|---|---|---|---|

402048

48

BEHS_000542

**JA1041**

200098

**Row 1**

| | | | | |
|---|---|---|---|---|
| HR - 8:10 - 8:20<br>4th - 8:25 - 9:10<br>5th - 9:15 - 10:00<br>6th - 10:05 - 10:50<br>7th - 10:55 - 11:40<br>1st - 12:20 - 1:05<br>2nd - 1:10 - 2:00<br>3rd - 2:05 - 2:50 | HR - 8:10 - 8:20<br>5th - 8:25 - 9:10<br>6th - 9:15 - 10:00<br>7th - 10:05 - 10:50<br>1st - 10:55 - 11:40<br>2nd - 12:20 - 1:05<br>3rd - 1:10 - 2:00<br>4th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>6th - 8:25 - 9:10<br>7th - 9:15 - 10:00<br>1st - 10:05 - 10:50<br>2nd - 10:55 - 11:40<br>3rd - 12:20 - 1:05<br>4th - 1:10 - 2:00<br>5th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>7th - 8:25 - 9:10<br>1st - 9:15 - 10:00<br>2nd - 10:05 - 10:50<br>3rd - 10:55 - 11:40<br>4th - 12:20 - 1:05<br>5th - 1:10 - 2:00<br>6th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>1st - 8:25 - 9:10<br>2nd - 9:15 - 10:00<br>3rd - 10:05 - 10:50<br>4th - 10:55 - 11:40<br>5th - 12:20 - 1:05<br>6th - 1:10 - 2:00<br>7th - 2:05 - 2:50 |

**Row 2**

| Feb 4 – Feb 8<br>Schedule 2 | Feb 11 – Feb 15<br>Schedule 3 | Feb 19 – Feb 22<br>Schedule 4 | Feb 25 – Mar 1<br>Schedule 5 | Mar 4 – Mar 6<br>Schedule 6 |
|---|---|---|---|---|
| HR - 8:10 - 8:20<br>2nd - 8:25 - 9:10<br>3rd - 9:15 - 10:00<br>4th - 10:05 - 10:50<br>5th - 10:55 - 11:40<br>6th - 12:20 - 1:05<br>7th - 1:10 - 2:00<br>1st - 2:05 - 2:50 | HR - 8:10 - 8:20<br>3rd - 8:25 - 9:10<br>4th - 9:15 - 10:00<br>5th - 10:05 - 10:50<br>6th - 10:55 - 11:40<br>7th - 12:20 - 1:05<br>1st - 1:10 - 2:00<br>2nd - 2:05 - 2:50 | HR - 8:10 - 8:20<br>4th - 8:25 - 9:10<br>5th - 9:15 - 10:00<br>6th - 10:05 - 10:50<br>7th - 10:55 - 11:40<br>1st - 12:20 - 1:05<br>2nd - 1:10 - 2:00<br>3rd - 2:05 - 2:50 | HR - 8:10 - 8:20<br>5th - 8:25 - 9:10<br>6th - 9:15 - 10:00<br>7th - 10:05 - 10:50<br>1st - 10:55 - 11:40<br>2nd - 12:20 - 1:05<br>3rd - 1:10 - 2:00<br>4th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>6th - 8:25 - 9:10<br>7th - 9:15 –10:00<br>1st - 10:05 - 10:50<br>2nd - 10:55 - 11:40<br>3rd - 12:20 - 1:05<br>4th - 1:10 - 2:00<br>5th - 2:05 - 2:50 |

**Row 3**

| Mar 11 – Mar 15<br>Schedule 7 | Mar 18 – Mar 22<br>Schedule 1 | Mar 25 – Mar 29<br>Schedule 2 | Apr 1 – Apr 5<br>Schedule 3 | Apr 8 – Apr 12<br>Schedule 4 |
|---|---|---|---|---|
| HR - 8:10 - 8:20<br>7th - 8:25 - 9:10<br>1st - 9:15 - 10:00<br>2nd - 10:05 - 10:50<br>3rd - 10:55 - 11:40<br>4th - 12:20 - 1:05<br>5th - 1:10 - 2:00<br>6th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>1st - 8:25 - 9:10<br>2nd - 9:15 - 10:00<br>3rd - 10:05 - 10:50<br>4th - 10:55 - 11:40<br>5th - 12:20 - 1:05<br>6th - 1:10 - 2:00<br>7th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>2nd - 8:25 - 9:10<br>3rd - 9:15 - 10:00<br>4th - 10:05 - 10:50<br>5th - 10:55 - 11:40<br>6th - 12:20 - 1:05<br>7th - 1:10 - 2:00<br>1st - 2:05 - 2:50 | HR - 8:10 - 8:20<br>3rd - 8:25 - 9:10<br>4th - 9:15 - 10:00<br>5th - 10:05 - 10:50<br>6th - 10:55 - 11:40<br>7th - 12:20 - 1:05<br>1st - 1:10 - 2:00<br>2nd - 2:05 - 2:50 | HR - 8:10 - 8:20<br>4th - 8:25 - 9:10<br>5th - 9:15 - 10:00<br>6th - 10:05 - 10:50<br>7th - 10:55 - 11:40<br>1st - 12:20 - 1:05<br>2nd - 1:10 - 2:00<br>3rd - 2:05 - 2:50 |

**Row 4**

| Apr 15 – Apr 17<br>Schedule 5 | Apr 29 – May 3<br>Schedule 6 | May 6 – May 10<br>Schedule 7 | May 13 – May 17<br>Schedule 1 | May 20 – May 22<br>Schedule 2 |
|---|---|---|---|---|
| HR - 8:10 - 8:20<br>5th - 8:25 - 9:10<br>6th - 9:15 - 10:00<br>7th - 10:05 - 10:50<br>1st - 10:55 - 11:40<br>2nd - 12:20 - 1:05<br>3rd - 1:10 - 2:00<br>4th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>6th - 8:25 - 9:10<br>7th - 9:15 –10:00<br>1st - 10:05 - 10:50<br>2nd - 10:55 - 11:40<br>3rd - 12:20 - 1:05<br>4th - 1:10 - 2:00<br>5th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>7th - 8:25 - 9:10<br>1st - 9:15 - 10:00<br>2nd - 10:05 - 10:50<br>3rd - 10:55 - 11:40<br>4th - 12:20 - 1:05<br>5th - 1:10 - 2:00<br>6th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>1st - 8:25 - 9:10<br>2nd - 9:15 - 10:00<br>3rd - 10:05 - 10:50<br>4th - 10:55 - 11:40<br>5th - 12:20 - 1:05<br>6th - 1:10 - 2:00<br>7th - 2:05 - 2:50 | HR - 8:10 - 8:20<br>2nd - 8:25 - 9:10<br>3rd - 9:15 - 10:00<br>4th - 10:05 - 10:50<br>5th - 10:55 - 11:40<br>6th - 12:20 - 1:05<br>7th - 1:10 - 2:00<br>1st - 2:05 - 2:50 |

402049

BFHS 000543

**JA1042**

200099

---

**Spring Exams**

May 23 – 7th
May 24 – 6th & 5th
May 28 – 4th and 3rd
May 29 – 2nd & 1st

---

### EMERGENCY DRILLS

Each classroom must have fire/tornado drill instructions and the emergency code sheet posted. It is imperative that all staff members become familiar with procedures for each type of drill and treat them in a serious manner. Teachers are expected to support administrative decisions and confidentiality and to supervise students in a calm, professional manner at all times.

**Unauthorized Intruder:**  If there is an unauthorized person on-campus that poses a threat to safety, an announcement will be made to alert teachers to a possible threat.

- Immediately lock the door and <u>cover the window, placing the green side out if all students are present.</u>
- Move students to an area of the room that is the farthest distance from the door and await additional instructions.
- Students may not leave their classrooms for any reason during a lockdown.
- Students in the Commons area should be brought to the male and female locker rooms by the PE staff.
- Students in hallways or elsewhere outside of a classroom must go to the nearest classroom or supervised area.

**Tornado Drill Procedures:**
- Announcement will be made
- Take your grade book and a writing utensil
- Close classroom door.
- Lead class to safety area.
- NO TALKING:  Silence will allow everyone to hear emergency instructions.
- Wait for instructions.

**Safety Areas:**

**A Building**

Directions: Line up students in main hall in crouched position facing lockers.  Stay on your respective floor. (Students cover head with textbook).

**B Building**

Directions: STAY IN CLASSROOM.  Go to interior wall side of room (Away from windows).  Crouch and cover head with textbook.  Avoid any area that may have falling objects.

50

402050

BEHS 000544

**JA1043**

200100

**Gym**

Directions:  Go to nearest hall.  Line up students along walls in crouched position, facing walls, and covering heads.

**D Building**

Directions:  Go to the innermost wall crouch and cover heads.

**Fire Drills:** Fire drills must occur regularly throughout the year.

**General Guidelines:**
1. Ask students to proceed single file—quietly.
2. Close the windows, turn off lights and projectors, and close the classroom door.
3. Take roll.
4. Return to building when the bell rings.

**Directions for Each Section and Room**

**1A West**

**A101**
**A102**
**A103**
**A104**

**Directions:** Turn right out of room and proceed out of Exit A. Line up in the grassy area adjacent to the parking lot.

**1A Midwest**

| | |
|---|---|
| **A107** | **A115** |
| **A112** | **A118** |
| **A113** | **A128** |
| **A114** | |

**Directions:** Turn into hallway toward Exit B. Line up in grassy area adjacent to parking lot.

**1A Central**

| | | | |
|---|---|---|---|
| **A121** | **A126** | **A140** | **A145** |
| **A122** | **A127** | **A142** | |
| **A123** | **A138** | **A143** | |
| **A124** | **A139** | **A144** | |

51

402051

BEHS_000545

**JA1044**

200101

**Directions**: Proceed into foyer and out of Exit C. turn toward stadium and line up in grassy area adjacent to parking lot.

**1A Midwest**

A134        A160
A154
A155

**Directions:** Proceed out of Exit E. turn toward faculty parking lot and line up in grassy area adjacent to parking lot.

**1A East**
A156    A166
A157    A167
**Directions:** Proceed out of Exit F. Turn toward faculty parking lot and line up in grassy area adjacent to parking lot.

**Laboratories**

B103    B108
B105    B110

Directions: Proceed out of emergency door in room and line up in the grassy area between the two parking lots.

**2A West**

A201    A211    A214
A202    A212    A217
A203    A213
A208    A216

**Directions**: Proceed down west staircase out of Exit A and line up in grassy area adjacent to parking lot.

**2A Central**

A218    A230
A223    A234
A224    A235
A229    A240

**Directions**: Proceed down central staircase into foyer. Turn right and go out of Exit D.

- Western rooms: Turn left on sidewalk. Go toward stadium and line up pas the end of the main building.
- Eastern rooms: Turn right on sidewalk. Go toward faculty parking lot and line up past the end of the main building.

52

402052

200102

**2A East**

A236  A246
A237  A251
A238  A252
A242  A253

**Directions**: Proceed down East staircase out of Exit F. Turn into faculty parking lot and line up in grassy area adjacent to parking lot.

**2B**

B206
B207
Library

**Directions:** Proceed down science wing staircase out of Exit H. Turn into faculty parking lot and line up in grassy areas between the two parking lots.

**West Gym**

C101
C106
C108

**Directions**: Exit through safety door to grassy area to line up.

**West Gym**

Girls' Locker Rooms

**Directions**: Proceed through Exit K toward stadium and line up in grassy area.

**Gym/East Gym**

Gym Floor
Boys' Locker Rooms
C169
C164

**Directions**: Proceed through Exit I onto grassy area and line up.

**Performing Arts Center**

D108
D109
Theatre

**Directions**: Exit through exterior door and line up in grassy area.

53

402053

BEHS_000547

**JA1046**

200103

## Bishop England High School
### 2018-19 Academic Calendar
### Summer Events and First Semester

as of 5-30-18

### SUMMER EVENTS

| | |
|---|---|
| July 24-26 | Summer Prep Session |
| July 24 | Students pick up orientation packets that include schedules, etc. 1:00 to 4:00 pm/Tours available for new students |
| July 26 | Used book/uniform sale, 9:00 am (online bookstore accessible) |

### QUARTER 1

| | |
|---|---|
| August 10 | New faculty/staff in-service, 9:00 to 3:30 pm |
| | Department Chairpersons meeting, 12:30 pm |
| August 10 | **FRESHMAN** Retreat, 9:00 to 1:30 pm |
| August 13-15 | Faculty/staff in-service days, 9:00 to 3:00 pm |
| August 14 | 7:00 pm, New Family Informational Session for those who have not had another student attend BE within the past three years |
| August 16 | Orientation: 9th and 10th grades, 8:10 to 12:15 |
| August 17 | Orientation: 11th and 12th grades, 8:10 to 12:00 |
| August 20 | First full day of classes |
| August 29 | Freshman/Naviance Night hosted by Counseling Dept., 6:30 pm |
| August 30 | Paid TAG Day #1 |
| August 31 | Last day to drop a course and add another course |
| September 3 | LABOR DAY – No school |
| September 5 | Parent Visitation Night, 7:00 pm |
| September 12 | LATE ARRIVAL: Students-2 hour delay, first bell 10:05; Faculty/Staff-8:00 am |
| September 17 | Mid-quarter progress report alert for Quarter 1; Deadline to drop a year-round class and add a study hall **OR** change a level in a first semester class |
| September 19 | Senior Night/Financial Aid Night hosted by Counseling Dept., 6:30 pm |
| September 20 | Red Cross Blood Drive #1 |
| September 21 | John England Day/Green TAG Day |
| October 1-5 | Spirit Week TAG Days/Homecoming on Friday with a Green TAG Day |
| October 7 | Buddy Walk |
| October 8 | COLUMBUS DAY – No School |
| October 9 | Buddy Walk TAG Day |
| October 10 | PSAT testing for 9th, 10th, and 11th grades/**SENIOR** Retreat |
| October 12 | Quarter 1 ends/Deadline for level changes in year-long classes |

### QUARTER 2

| | |
|---|---|
| October 15 | First day of Quarter 2 |
| October 16 | Quarter 1 grades online |
| October 17 | LATE ARRIVAL: Students-2 hour delay, first bell 10:05; Faculty/Staff-8:00 am |
| October 19 | Half day for students, noon dismissal/Parent-Teacher Conferences, 1:00 to 4:00 pm, no appt. needed |
| October 23 | Spirit Week Class Winner – TAG Day |
| October 29 | Open House for prospective families, 7:00 pm; Activities Fair sat 6:00 pm |
| October 30 | Quarter 1 Honor Roll TAG Day |
| November 1 | All School Mass at 10:30 am-Alumni Memorial Mass |
| November 7 | Paid TAG Day #2 |
| November 7 | LATE ARRIVAL: Students-2 hour delay, first bell 10:05; Faculty/Staff-8:00 am |
| November 9 | Mid-quarter progress report alert for Quarter 2 |
| November 9-10 | Fall drama production, 7:00 pm in the PAC |
| November 13 | Fall Art Exhibit, 4:30-5:30 pm |
| November 15 | Bishops Boutique |
| November 19 | Seniors order graduation materials, second period of the day in the PAC |
| November 20 | NHS College Rivalry TAG Day |
| November 20 | Juniors order class rings |
| November 21-25 | THANKSGIVING HOLIDAY – No School |
| November 28 | Registration deadline for Placement Test |
| November 29 | Red Cross Blood Drive #2 |
| December 5 | Canned Food TAG Day (bring in 5 cans) |
| December 7 | Advent Choral Concert, 7:00 pm in PAC |
| December 12 | Quarter 2 ends/DISMISSAL at noon |
| December 13-19 | Semester 1 exams |
| December 20 | CHRISTMAS HOLIDAY begins |

### MID-TERM EXAM WEEK

| | |
|---|---|
| December 13 | Exam for period 1 |
| December 14 | Exams for period 2 and 3 |
| December 17 | Exams for periods 4 and 5 |
| December 18 | Exam for period 6 |
| December 19 | Exam for period 7 |

All School Mass days will be determined by our Chaplain over the summer and announced at the start of the school year.

<u>NOTE:</u> The Christmas holiday will begin later than usual this year. Be sure NOT to schedule any family vacation

54

402054

BEHS_000548

**JA1047**

200104

## Bishop England High School
### 2018-19 Academic Calendar
### Second Semester

### QUARTER 3

| | |
|---|---|
| January 3 | Students resume school/Quarter 3 begins |
| January 3 | Quarter 2 and first semester averages online |
| January 9 | First semester report cards mailed/CSMC Money Drive TAG Day for homerooms which met goal |
| January 9 | LATE ARRIVAL: Students-2 hour delay, first bell 10:05; Faculty/Staff-8:00 am |
| January 11 | Half day for students, noon dismissal/Parent-Teacher Conferences, 1:00 to 4:00 pm, no appt. needed |
| January 12 | Placement Test – Pool 1, 8:00 am |
| January 16 | Last day to drop a second semester class and add another semester class (per BEHS guidelines) |
| January 16 | Case Study Night hosted by Counseling Dept., 6:30 pm |
| January 17 | Quarter 2 Honor Roll TAG Day |
| January 19 | Winter Semi-formal, 8:00-11:00 pm |
| January 21 | MLK JR. DAY – No school |
| January 24 | Red Cross Blood Drive #3 |
| January 25 | Re-enrollment of current students begins |
| January 27-Feb 1 | Catholic Schools Week begins |
| January 27 | Ring Mass, Christ Our King Church, 3:00 pm |
| February 2 | 2019 Bishop England Gala |
| February 4 | Mid-quarter progress report alert for Quarter 3; Deadline to drop a semester 2 course and add a study hall OR deadline for level changes in a semester 2 course |
| February 8 | JUNIOR Retreat |
| February 11 | Course selection assemblies |
| February 13 | LATE ARRIVAL: Students-2 hour delay, first bell 10:05; Faculty/Staff-8:00 am |
| February 18 | PRESIDENTS' DAY – No School |
| February 28 | Red TAG Day, American Heart Association |
| March 6 | Ash Wednesday – Mass, 10:30 am / Quarter 3 ends |
| March 7-8 | NO School/Teacher Diocesan In-Service |

### QUARTER 4

| | |
|---|---|
| March 11 | Quarter 4 begins |
| March 12 | Quarter 3 averages online/Paid TAG Day # 3 |
| March 13 | LATE ARRIVAL: Students-2 hour delay, first bell 10:05; Faculty/Staff-8:00 am |
| March 15 | Half day for students, noon dismissal/Parent-Teacher Conferences, 1-4, no appt. necessary |
| March 15-16 | Spring Drama Production |
| March 19 | SOPHOMORE Retreat |
| March 20 | Career Day |
| March 21 | Quarter 3 Honor Roll TAG Day |
| March 28 | Red Cross Blood Drive #4 |
| April 3 | Mid-quarter progress report alert for Quarter 4 |
| April 8 | Key Club vs Faculty Basketball Game/Green TAG Day |
| April 11 | Spring Art Exhibit, 4:30 to 5:30 pm |
| April 16 | Paid TAG Day #4 |
| April 18 | EASTER HOLIDAY begins on Holy Thursday |
| April 29 | Students resume classes |
| May 2 | Academic Awards Night, 7:00 pm in PAC |
| May 6-17 | Advanced Placement Exams |
| May 15 | Paid TAG Day #5 |
| May 17 | Spring Choral Concert, 7:00 pm in PAC |
| May 18 | Junior/Senior Prom, 8:00 to 11:00 pm |
| May 20 | Review day for seniors |
| May 21 | Review day |
| May 22 | Senior Awards/Seniors dismissed early Review day for underclassmen |
| May 24 | Senior Boat Cruise |
| May 27 | Memorial Day (No school) |
| May 29 | Baccalaureate Mass, 7:00 |

### FINAL EXAM WEEK

| | |
|---|---|
| May 23 | Exams for period 7 |
| May 24 | Exams for periods 6 and 5 |
| May 28 | Exams for periods 4 and 3 |
| May 29 | Exam for period 2 and 1 |
| May 30-31 | Teacher workdays, 9:00-3:00 |
| June 1 | Graduation, 10:00 am at McAlister Field House at the Citadel |

55

402055

BEHS_000549

**JA1048**

200105

## SIGNATURE FORM, 2018-2019

I, _____, have read the
(Print full name)

FACULTY HANDBOOK and agree to abide by all policies

contained within the handbook because it is part of my contract with

Bishop England High School.

Signature: _____ Date:_____

**Please print this form and put in Rosie Ryan's box by the end of the first full day of school. This form must be placed in each teacher/counselor's personnel file.**

402056

BEHS 000550

# EXHIBIT 12

In the Matter of:

# TUITION PAYER 100, VIEWED STUDENT FEMALE 200, VIEWED STUDENT MALE 300, ET AL

vs.

# THE BISHOP OF CHARLESTON, A CORPORATION SOLE, BISHOP ENGLAND HIGH SCHOOL, ET AL

---

## Nathaniel Pearson

October 25, 2021

---



UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION


30(b)(6) DEPOSITION OF NORTH CHARLESTON HIGH SCHOOL


TUITION PAYER 100, VIEWED STUDENT FEMALE 200,
VIEWED STUDENT MALE 300, ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED,

      Plaintiffs,

    vs.        C/A: 2-21-cv-00613-RMG

THE BISHOP OF CHARLESTON, A CORPORATION SOLE, BISHOP
ENGLAND HIGH SCHOOL, TORTFEASORS 1-10, THE BISHOP OF
THE DIOCESE OF CHARLESTON, IN HIS OFFICIAL CAPACITY,
AND ROBERT GUGLIELMONE, INDIVIDUALLY,

      Defendants.
_____

DEPONENT:   NATHANIEL PEARSON

DATE:      October 25, 2021

TIME:      8:10 AM

LOCATION:   CHARLESTON COUNTY SCHOOL DISTRICT
           75 Calhoun Street
           Charleston, SC  29401


REPORTED BY:  NANCY ENNIS TIERNEY, CSR (IL)

Nathaniel Pearson - 10/25/2021

```
                                                      Page 2
 1
                   A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4               BRENT SOUTHER HALVERSEN, LLC
                 BY: BRENT S. HALVERSEN
 5               751 Johnnie Dodds Boulevard, Suite 200
                 Mt. Pleasant, SC  29464
 6               (843) 284-5790
                 Brent@halversenlaw.com
 7                  - and -
                 THE RICHTER FIRM, LLC
 8               BY: ANNA E. RICHTER
                 622 Johnnie Dodds Boulevard
 9               Mt. Pleasant, SC  29464
                 (843) 849-6000
10               Anna@richterfirm.com
11
      FOR THE DEFENDANT BISHOP ENGLAND HIGH SCHOOL:
12
                 TURNER PADGET
13               BY: RICHARD S. DUKES
                 40 Calhoun Street, Suite 200
14               Charleston, SC  29401
                 (843) 576-2810
15               Rdukes@turnerpadget.com
16
      FOR THE DEPONENT:
17
                 CHARLESTON COUNTY SCHOOL DISTRICT
18               OFFICE OF GENERAL COUNSEL
                 BY: MERCEDES L. PINCKNEY REESE, L.L.M.
19               75 Calhoun Street
                 Charleston, SC  29401
20               (843) 937-6515
                 mercedes_pinckneyre@charleston.k12.sc.us
21
22
23
24
25
```

Spectrum Court Reporting and Legal Video
843.849.0133

Nathaniel Pearson - 10/25/2021

Page 3

1
                    I N D E X
2
                                              Page
3
     Witness Sworn                              4
4
     EXAMINATION
5    By Mr. Halversen                           4
     By Mr. Dukes                              18
6

7    Certificate of Reporter                   20

8

9

10

11                  E X H I B I T S

12

13              No exhibits were marked.

14

15

16

17

18

19

20

21

22

23

24

25

Spectrum Court Reporting and Legal Video
              843.849.0133

11543177-542b-469e-8557-5255a1ed19c2

**JA1055**

USCA4 Appeal: 22-1750    Doc: 19-2    Filed: 10/07/2022    Pg: 492 of 546

Page 4

1              NATHANIEL PEARSON, having been first duly

2     sworn, testified as hereinafter set forth.

3                    EXAMINATION

4     BY MR. HALVERSEN:

5        Q.  Good morning, Mr. Pearson.  I introduced myself

6     before.  My name is Brent Halversen.  I'm one of the

7     attorneys that represents the plaintiffs that have filed

8     an action against Bishop England for the viewing windows

9     which you have probably heard of by now.

10       **A.  Yes.**

11       Q.  Have you ever had your deposition taken before?

12       **A.  Yes, I have.**

13       Q.  Okay.  So you basically know how it goes.  We're

14    not going to be long.  I just have a limited amount of

15    questions.

16              After I'm done Mr. Dukes, who represents

17    Bishop England, may have some questions for you.  He may

18    not, I don't know, but that's it.  If you want to take a

19    break, we can take a break, but this really is going to

20    be, I anticipate, probably pretty quick, okay?

21       **A.  Yes, sir.**

22       Q.  Okay.  So could you please state your full name

23    for the record?

24       **A.  Nathaniel William Pearson.**

25       Q.  And what is your current position?

11543177-542b-469e-8557-5255a1ed19c2

**JA1056**

Nathaniel Pearson - 10/25/2021

Page 5

1    **A.  Assistant principal at North Charleston High**
2    **School.**
3        Q.  And how long have you been the principal at North
4    Charleston?
5    **A.  Assistant principal.  I have been there -- this**
6    **is my fifth year.**
7        Q.  So you started around 2017 or 2016?
8    **A.  Around that time, yes, as assistant principal.**
9        Q.  As assistant?
10   **A.  As assistant, yes.**
11       Q.  And when did you become the principal?
12   **A.  I'm not the principal; assistant principal.**
13       Q.  Oh, okay.  You're the assistant principal?
14   **A.  Yes.  I'm the assistant principal, correct.  I'm**
15   **not the principal.**
16       Q.  Have you been in that capacity the whole time?
17   **A.  I was now -- I was the athletic director before,**
18   **and then a PE teacher, also, at North Charleston High**
19   **School.  I've been there 14 years.**
20       Q.  Oh, okay.  So you have been the assistant since
21   2016?
22   **A.  Yes.**
23       Q.  But you've been there 14 years?
24   **A.  Correct.**
25       Q.  Let's just go back from the beginning so I'm

Spectrum Court Reporting and Legal Video
843.849.0133

11543177-542b-469e-8557-5255a1ed19c2

Nathaniel Pearson - 10/25/2021

Page 6

1  clear.  So around what year did you start?

2  **A.  2008-2009 is my year as a PE teacher there.**

3  Q.  And did you teach girls' and boys' PE?

4  **A.  Correct, yes.**

5  Q.  And then after 2009, what was your position?

6  **A.  That fall year I transitioned into the athletic**

7  **director.**

8  Q.  2009 until about when?

9  **A.  I would say '10-11 athletic director, and I was**

10 **there for seven years.**

11 Q.  This is not a memory contest, just the best you

12 can recall, telling the truth, obviously.

13 **A.  Yes.**

14 Q.  And then you were in that position for about how

15 long?

16 **A.  About seven years.**

17 Q.  So around 2017, 2018?

18 **A.  Yeah, right before I transitioned over, yes.**

19 Q.  And then assistant?

20 **A.  And then assistant, correct.**

21 Q.  Okay.  So we sent what is called a 30(b)(6)

22 Notice to CCSD for your school as to persons who can

23 testify as to when were the windows in each of the

24 locker rooms covered up.

25          Do you have any information about that

11543177-542b-469e-8557-5255a1ed19c2

**JA1058**

Nathaniel Pearson - 10/25/2021

Page 7

1   subject?

2      **A.  Yes, I do.**

3      Q.  Okay.  When were the locker rooms' viewing

4   windows covered up at North Charleston?

5      **A.  So I'll say the locker room that -- actually, my**

6   **office I was in didn't have a window covering, or maybe**

7   **it had just paper up, newspaper.**

8            **So I came in in 2008-'09.  I put like, I**

9   **would say, a cloth blind up within that window, viewing**

10  **window on my side.**

11     Q.  Okay.

12     **A.  On the girls', on the left of me --**

13     Q.  Let me just stop you right there.  We will go

14  through each of them.

15     **A.  Okay.**

16     Q.  But the first one you referenced, there was

17  newspaper up on it?

18     **A.  Yeah, to my recollection.**

19     Q.  I will represent to you we did a visit to your

20  school, and there was newspaper on I believe it was the

21  first -- we can show you a picture of it, but there

22  was -- it looked like kind of yellowy newspaper, like it

23  had been there awhile, and there was a date on it, and

24  it said something 2009.  Is that about --

25     **A.  That would be the girls' side, the left-hand**

Nathaniel Pearson - 10/25/2021

Page 8

1    side, and I would say yes.

2       Q.   To the best of your recollection, has that

3    newspaper been covering up that window since that time?

4       A.   Correct, yes.

5       Q.   Okay.  So you were there about that time.  Do you

6    have any information as to why it was covered up at that

7    point?

8       A.   That was Ms. Mulvey (phonetic).  Leslie Mulvey

9    was the PE teacher at the time, and she had that covered

10   up for the sheer fact of -- she was the cross-country

11   coach, but she would also shower.  There is restrooms

12   and there is showers within the coaching staff area.

13           So she realized that to shower, prepare in

14   the morning, being herself as a female, get ready in the

15   morning, so she didn't want anyone to be able to view

16   her from a locker room into that area.

17      Q.   Okay.  And that was the reason why she put it up?

18      A.   Correct, yes.

19      Q.   And then there was -- did you say that you

20   installed some kind of drapery in that window?

21      A.   So I installed -- it might have had newspaper.  I

22   installed just -- I didn't want to put any holes in the

23   ceiling.  I just -- like a sheet to cover the window.

24      Q.   Was it paper or --

25      A.   It was a cloth sheet.

Nathaniel Pearson - 10/25/2021

Page 9

1      Q.   Cloth sheet.  Okay.  And why did you put that up?

2      **A.   So, again, for security reasons, to be able to**

3      **visually go in and see if any kids were changing or**

4      **fighting in there, but also to provide privacy for my**

5      **area as well, too.**

6      Q.   Were you able to ensure safety in the locker room

7      with that setup?

8      **A.   Yes, I would say I was able to, yeah.**

9      Q.   If you were in your office -- did you utilize

10     that office at the time?

11     **A.   I would initially utilize it sometimes if I'd go**

12     **in there and take roll real quick and then check to see**

13     **if the kids are out of the locker room, quick check,**

14     **out, good, go out to the gymnasium.  Because, again,**

15     **supervision was important to have sufficient both in the**

16     **locker room but also out in the gymnasium as well, too.**

17     Q.   So if you wanted -- at the time, if you wanted to

18     check on the kids in the locker room, what would you do?

19     **A.   If I was directly out in the gymnasium itself, I**

20     **would use the door.  Now, it got to a point where kids**

21     **would get smart and they'd have some -- at points, if**

22     **they were smoking, or doing whatever, I could easily**

23     **stop it from happening.**

24            **But you could still go into the actual**

25     **locker room from the gym area to observe, to see if**

Spectrum Court Reporting and Legal Video
843.849.0133

11543177-542b-469e-8557-5255a1ed19c2

**JA1061**

Nathaniel Pearson - 10/25/2021

Page 10

1    **everyone is clear, call everyone out, sweep them out and**

2    **then come back out.**

3        Q.  And you were able to do that with having the

4    windows completely obscured?

5        **A.  Correct, yes.**

6        Q.  So that was 2008-2009 time frame.  And is that,

7    the condition of those windows, the same it is today as

8    it was then?

9        **A.  To my knowledge, yes.**

10       Q.  So I stopped you before.  You were going on to

11   the next one, the next locker room, so please begin

12   where I left off.

13       **A.  That would be -- yeah.  So as you walk in the**

14   **gymnasium, to the right was my locker room.  That was**

15   **the boys' JV locker room.**

16            **If you were walking to the left, that would**

17   **be the girls' JV locker room.  That's where Ms. Mulvey**

18   **was.  That's where the yellowish paper was on there that**

19   **was -- you couldn't remove it.  It was stuck on there,**

20   **no visibility.**

21            **And then on the far right side, over to the**

22   **varsity locker room furthest from us, was the right side**

23   **boys' side.  That didn't have visibility until Coach**

24   **Brown came in in 2011, I would say, when he began**

25   **coaching.**

Nathaniel Pearson - 10/25/2021

Page 11

1              And then he put -- he wanted to have a dry
2    erase board inside of the locker room set up, and the
3    only place they could fit a six foot by four foot dry
4    erase board was in that window site.  That's when it was
5    covered up.
6        Q.   Okay.  And is Coach Brown still there?
7        A.   No, he's not.
8        Q.   How long was he there for?
9        A.   He was there for about five seasons, six seasons.
10   So we've had -- he retired, resigned or transferred jobs
11   ending of last season.
12       Q.   And that dry erase board is still in that same
13   position, correct?
14       A.   Yes.
15       Q.   And who is utilizing that office now?
16       A.   Now it's Tony Eady.
17       Q.   And what does he teach?
18       A.   He is a student concern specialist and a security
19   guard within the building, and then he's head basketball
20   coach.
21       Q.   And whether it was Coach Brown or Coach Eady,
22   were they still able to ensure the safety of the
23   students in the locker room even with having that
24   viewing window completely obscured with the white board?
25       A.   Yes, they could.

Spectrum Court Reporting and Legal Video
843.849.0133

11543177-542b-469e-8557-5255a1ed19c2

**JA1063**

Nathaniel Pearson - 10/25/2021

Page 12

1    Q.  And did they use a similar method, as you just

2    testified to, to monitoring students?

3    **A.  Yes.**

4    Q.  And then is that -- have we covered all of the --

5    **A.  There is one on the far left-hand side.  That's**

6    **the varsity girls' locker room.  To my knowledge -- I**

7    **haven't been there that often.  I can't remember what it**

8    **has.  I don't know if you have images of it.  I can't**

9    **remember what's actually in that area covering up.  I**

10   **don't know.**

11   Q.  All right.  Do you think there might be another

12   one but --

13   **A.  I don't clearly remember a clear visibility when**

14   **I went -- if I go in there to see Coach Weed, I think it**

15   **is blocked with something.**

16   Q.  But as you sit here today you can't recall, for

17   instance, the other -- the white board through the

18   coaches were, that office, do you know who the coach is

19   in that?

20   **A.  That's Eady.  The one with the white board in**

21   **front of it?**

22   Q.  Right.

23   **A.  That's Mr. Eady right now.  That's his office,**

24   **his area.**

25   Q.  But there might have been a third?

Spectrum Court Reporting and Legal Video
843.849.0133

11543177-542b-469e-8557-5255a1ed19c2

**JA1064**

Nathaniel Pearson - 10/25/2021

Page 13

1    A.  There was -- the far left corner, that's the

2    girls' varsity.  That's where Coach Weed was.  She

3    resigned.  We have a new coach in there.  I don't know

4    her name.

5           But I'm not quite sure the visibility and if

6    that window is covered up.  I'm pretty sure it probably

7    is, but I could be wrong.  I don't know.  I can't --

8    Q.  Take a look at this, and we can read it for the

9    record, which ones.  It's our photographer's photos DFC

10   (phonetic), underscore, 4443 and DFC, underscore, 4444.

11   Just take a look at that, those two right there.

12          Does that look familiar?

13   A.  That looks new, because that right there I think

14   is where the water key (phonetic) is.  So that is

15   probably the girls' side, because that thing opens up.

16   That's where you shot the water to the gymnasium right

17   there.  So that was Mulvey's.  That's the locker room

18   setting right there.

19          Scroll down a little bit.  Well, back up so

20   I can see.  That's the gym door.  So that is paper

21   covering, so that must be the girls' locker room side.

22   The smart board is on the ground.  I'm guessing it's

23   probably that one right there.

24   Q.  And you're referring to forty-four or thirty --

25   what's that?

11543177-542b-469e-8557-5255a1ed19c2

**JA1065**

Nathaniel Pearson - 10/25/2021

Page 14

1      A.   4438.   So DFC, underscore, 4438 I think is the

2   girls' locker room.

3      Q.   So are we talking about the third locker room

4   now?

5      A.   I believe so.

6      Q.   Okay.

7      A.   So that was covered up, yeah.

8      Q.   So that was covered?

9      A.   And I'm not sure which -- that looks new to me.

10  I don't even know which one that is.

11     Q.   The white and baby blue construction paper

12  looking stuff?

13     A.   Yeah.

14     Q.   Okay.  So it sounds like you don't really have

15  any knowledge about that one.

16     A.   No.

17     Q.   One of the offices, I can't remember if it's

18  Coach Brown's old office or if it's your old office, it

19  looked like there was maybe servers in there or

20  computers.  It looked like it was being used for storage

21  more than an active office.

22          Do you know which office that was off the

23  top of your head?

24     A.   No.  For storage?  If anything, I would probably

25  say it's the one closer to the girls' with the paper

Nathaniel Pearson - 10/25/2021

Page 15

1   that's done up, because that right now is where Mr.

2   Panara (phonetic) has the referees change for basketball

3   games, and that's the one that has the older newspaper.

4   That's where -- the last couple of years, that's where

5   he had them change at.  I'm assuming it's that.  I'm not

6   quite sure.  I haven't been --

7      Q.  It sounds like you're not sure, but I was

8   wondering whether they were actively using these

9   offices.  It just didn't seem from --

10     A.  Our PE teachers are actively using them, yes, and

11  then our coaches are actively using the offices as well,

12  too.

13     Q.  Okay.  Another question we had, which we put in

14  our Notice, is whether there were blinds that were there

15  at one point in time.

16         Do you have any knowledge about that?

17     A.  The only knowledge, I think I remember seeing, is

18  I think there was casings in my office that used to be

19  there, but I didn't feel like going out and buying, when

20  I took over, all that stuff and putting it up there.  I

21  just used a sheet.

22     Q.  Were there blinds already there?

23     A.  No.

24     Q.  So at some point, before you were there, they

25  were there?

11543177-542b-469e-8557-5255a1ed19c2

**JA1067**

Nathaniel Pearson - 10/25/2021

Page 16

1    **A.   Possibly could be, yes.**

2    Q.   You never recall seeing blinds in any of the

3    locker rooms in North Charleston?

4    **A.   No.**

5    Q.   In any of the locker rooms at North Charleston

6    High School, is it possible to view the students in the

7    locker rooms without them being aware that they are

8    being watched?

9    **A.   Yes.**

10   Q.   And where is that?

11   **A.   My old office with -- I guess where you had the**

12   **sheet.**

13   Q.   Okay.  But the sheet obscured the window,

14   correct?

15   **A.   Correct, yes.**

16   Q.   So if you were in -- if a student was in there,

17   you weren't able to monitor them without them knowing,

18   correct?

19        MR. DUKES:  Object to the form.

20   **A.   What was that?**

21   Q.   (BY MR. HALVERSEN):  It's just a legal objection.

22   **A.   Okay.  So I could, and I used it maybe once or**

23   **twice, because we had kids who would be smoking in the**

24   **bathroom.**

25        **So when I opened the door -- if I opened the**

Spectrum Court Reporting and Legal Video
843.849.0133

11543177-542b-469e-8557-5255a1ed19c2

**JA1068**

Nathaniel Pearson - 10/25/2021

Page 17

1  **door, give somebody a call who could say, hey, put it**

2  **out, whatever it is.  So I used it two or three times to**

3  **quickly look in there to see if it was in there from the**

4  **window to see if they were truly smoking or not.**

5     Q.  Right.  But in that event, they would actually

6  see you?

7     **A.  They could see, yes.**

8     Q.  Correct.

9     **A.  Definitely.**

10     Q.  So my question was a little bit different.

11         My question was, is it possible at these

12  locker rooms at North Charleston High School at any

13  point in time to look at them without them knowing that

14  you're looking?  Do you understand the difference?

15     **A.  Yeah.  If you were sneaky about it, just that**

16  **one.**

17     Q.  Which one?

18     **A.  My old office, if you're sneaky about it, I**

19  **guess.**

20     Q.  How?

21     **A.  To peer a little bit, I guess.**

22     Q.  Other than that?

23     **A.  Yeah, no.**

24     Q.  And you wouldn't be able to monitor the locker

25  room just by doing that, would you?

11543177-542b-469e-8557-5255a1ed19c2

**JA1069**

Nathaniel Pearson - 10/25/2021

Page 18

1    **A.  No.**

2              MR. HALVERSEN:  Okay.  That's all the

3    questions I have for you.  Mr. Dukes may have some

4    questions.

5                    EXAMINATION

6    BY MR. DUKES:

7    Q.  I'm Richard Dukes.  I represent Bishop England.

8              When you put the sheet up over the window,

9    you did that because you wanted privacy, not to ensure

10   the students had privacy, correct?

11   **A.  Well, it was both, in a sense.**

12   Q.  Do you have any problem with there being a window

13   looking into the locker room?

14   **A.  A problem with there being a window?  I mean, it**

15   **really would be on a standpoint of safety, if the school**

16   **or the principal could sort of visualize.**

17             **And that's the biggest thing, is why it was**

18   **in there, for, really, PE teachers to make sure that**

19   **they supervise.  Because when it happens, they're liable**

20   **because that's their realm.  So they're liable for**

21   **anything that happens.**

22   Q.  And supervising the students while they are in

23   the locker room is important, right?

24   **A.  Correct, yes.**

25             MR. DUKES:  That's all I have for you.

Spectrum Court Reporting and Legal Video
843.849.0133

11543177-542b-469e-8557-5255a1ed19c2

**JA1070**

Nathaniel Pearson - 10/25/2021

Page 19

1   Thank you.

2               MR. HALVERSEN:  Thank you.  That's it.

3               THE WITNESS:  All right.  Thank you so much

4               (The deposition was concluded at 8:29 a.m.)

5                     -   -   -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Spectrum Court Reporting and Legal Video
843.849.0133

11543177-542b-469e-8557-5255a1ed19c2

**JA1071**

Nathaniel Pearson - 10/25/2021

Page 20

```
 1   STATE OF SOUTH CAROLINA  )
                              )
 2                            )
     COUNTY OF CHARLESTON     )
 3
         I, Nancy Ennis Tierney, Certified Shorthand Reporter
 4   and Notary Public for the State of South Carolina at
     Large, do hereby certify that the witness in the
 5   foregoing deposition was by me duly sworn to testify to
     the truth, the whole truth and nothing but the truth in
 6   the within-entitled cause; that said deposition was
     taken at the time and location therein stated; that the
 7   testimony of the witness and all objections made at the
     time of the examination were recorded stenographically
 8   by me and were thereafter transcribed by computer-aided
     transcription; that the foregoing is a full, complete
 9   and true record of the testimony of the witness and of
     all objections made at the time of the examination; and
10   that the witness was given an opportunity to read and
     correct said deposition and to subscribe the same.
11
         Should the signature of the witness not be affixed to
12   the deposition, the witness shall not have availed
     himself/herself of the opportunity to sign or the
13   signature has been waived.

14       I further certify that I am neither related to nor
     counsel for any party to the cause pending or interested
15   in the events thereof.

16       Witness my hand, I have hereunto affixed my official
     seal this 6th day of November, 2021, at Charleston,
17   Charleston County, South Carolina.

18

19

20

21

22

23
         _____
24       Nancy Ennis Tierney, CSR (IL)
         My Commission Expires:
25       June 12, 2024
```

Spectrum Court Reporting and Legal Video
843.849.0133

**JA1072**

11543177-542b-469e-8557-5255a1ed19c2

# EXHIBIT 13

In the Matter of:

## TUITION PAYER  100, VIEWED STUDENT FEMALE 200, VIEWED STUDENT MALE 300, ET AL

vs.

## THE BISHOP OF CHARLESTON, A CORPORATION SOLE, BISHOP ENGLAND HIGH SCHOOL, ET AL

---

**Jeremy J. Carrick**

October 25, 2021

---



Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

30(b)(6) DEPOSITION OF R.B. STALL HIGH SCHOOL

TUITION PAYER 100, VIEWED STUDENT FEMALE 200,
VIEWED STUDENT MALE 300, ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED,

      Plaintiffs,

    vs.        C/A: 2-21-cv-00613-RMG

THE BISHOP OF CHARLESTON, A CORPORATION SOLE, BISHOP
ENGLAND HIGH SCHOOL, TORTFEASORS 1-10, THE BISHOP OF
THE DIOCESE OF CHARLESTON, IN HIS OFFICIAL CAPACITY,
AND ROBERT GUGLIELMONE, INDIVIDUALLY,

      Defendants.

_____

DEPONENT:   JEREMY JOSEPH CARRICK

DATE:       October 25, 2021

TIME:       8:35 AM

LOCATION:   CHARLESTON COUNTY SCHOOL DISTRICT
           75 Calhoun Street
           Charleston, SC  29401

REPORTED BY:  NANCY ENNIS TIERNEY, CSR (IL)

86d93f4c-77f6-4167-a0f1-03f8ecb82019

Jeremy J. Carrick - 10/25/2021

Page 2

```
 1                  A P P E A R A N C E S
 2
 3     FOR THE PLAINTIFFS:
 4               BRENT SOUTHER HALVERSEN, LLC
                 BY: BRENT S. HALVERSEN
 5               751 Johnnie Dodds Boulevard, Suite 200
                 Mt. Pleasant, SC  29464
 6               (843) 284-5790
                 Brent@halversenlaw.com
 7                  - and -
                 THE RICHTER FIRM, LLC
 8               BY: ANNA E. RICHTER
                 622 Johnnie Dodds Boulevard
 9               Mt. Pleasant, SC  29464
                 (843) 849-6000
10               Anna@richterfirm.com
11
       FOR THE DEFENDANT BISHOP ENGLAND HIGH SCHOOL:
12
                 TURNER PADGET
13               BY: RICHARD S. DUKES
                 40 Calhoun Street, Suite 200
14               Charleston, SC  29401
                 (843) 576-2810
15               Rdukes@turnerpadget.com
16
       FOR THE DEPONENT:
17
                 CHARLESTON COUNTY SCHOOL DISTRICT
18               OFFICE OF GENERAL COUNSEL
                 BY: MERCEDES L. PINCKNEY REESE, L.L.M.
19               75 Calhoun Street
                 Charleston, SC  29401
20               (843) 937-6515
                 mercedes_pinckneyre@charleston.k12.sc.us
21
22
23
24
25
```

Jeremy J. Carrick - 10/25/2021

Page 3

1
                    I N D E X
2
                                              Page
3
     Witness Sworn                              4
4
     EXAMINATION
5    By Mr. Halversen                           4
     By Mr. Dukes                              20
6    By Mr. Halversen                          20
     By Mr. Dukes                              21
7

8    Certificate of Reporter                   22

9

10

11

12                 E X H I B I T S

13

14        No exhibits were marked.

15
16

17

18

19

20

21

22

23

24

25

Spectrum Court Reporting and Legal Video
             843.849.0133

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1077**

Jeremy J. Carrick - 10/25/2021

Page 4

1              JEREMY JOSEPH CARRICK, having been first

2    duly sworn, testified as hereinafter set forth.

3                    EXAMINATION

4    BY MR. HALVERSEN:

5        Q.  Could you please state your full name for the

6    record?

7        **A.  Jeremy Carrick, Jeremy Joseph Carrick.**

8        Q.  How do you spell your last name?

9        **A.  C-a-r-r-i-c-k.**

10       Q.  Have you ever had your deposition taken before?

11       **A.  Yes.**

12       Q.  Okay.  So you know how it goes.  Just, you know,

13   we have a limited amount of questions, so you're not

14   going to be here that long.  If you do want to take a

15   break, you can take a break, but, again, I don't think

16   this is going to go very long.

17              What is your position with R.B. Stall?

18       **A.  I'm the principal at R.B. Stall High School.**

19       Q.  And how long have you been in that position?

20       **A.  Five years.**

21       Q.  So approximately 2016 is when you started?  Is

22   that fair?

23       **A.  When I started as principal?  I was employed**

24   **there prior to that as an assistant principal role since**

25   **2011.**

**JA1078**

Jeremy J. Carrick - 10/25/2021

Page 5

1    Q.  Did you work at R.B. Stall before 2011?

2    **A.  No.**

3    Q.  Okay.  So we sent a Notice to CCSD with various

4    categories.  Have you seen the Notice?

5    **A.  Yes.**

6    Q.  Okay.  And there was three topic areas.

7         Are you the person with the most knowledge

8    at R.B. Stall as to those categories?

9    **A.  Yes.**

10    Q.  So we'll look at the first one.  The first one is

11    persons who can testify as to when it was when the

12    girls' coaches' office was obscured with paper and who

13    made the decision.

14         Do you know the answer to that question?

15    **A.  The best knowledge of it, in terms of who is**

16    **staffed at my school currently, but it has been obscured**

17    **as long as my current staff can remember.**

18         **And there has been turnover in that, PE**

19    **teachers and athletic directors for us, but it has been**

20    **obscured as long as anyone could remember.**

21    Q.  Okay.  So it sounds like you did a little bit of

22    an investigation and talked to staff members at your

23    school in responding to this request for information?

24    **A.  Correct.**

25    Q.  And of the staff members, what was your oldest

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1079**

Jeremy J. Carrick - 10/25/2021

Page 6

1   tenured staff member at R.B. Stall that you consulted

2   for your investigation?

3       A.   Bobby Smith.

4       Q.   And how long has Mr. Smith worked at R.B. Stall?

5       A.   He's worked at R.B. Stall prior to the location

6   at that building.  So he was in the role of a social

7   studies teacher prior to me getting there, but after my

8   tenure he had switched from a social studies teacher to

9   an athletic director, which would have more knowledge of

10  locker rooms than a social studies teacher.

11      Q.   Okay.  How old is the school, the building?

12      A.   The school was opened in 2010.

13      Q.   So as far as Mr. -- as far back as Mr. Smith

14  could remember, at that location those windows were

15  always obscured?

16      A.   Uh-huh, prior to him even becoming athletic

17  director, yes.

18      Q.   So based on that information -- well, that would

19  be about the same time that you started as the assistant

20  principal, correct?

21      A.   He became athletic director a couple of years

22  after I was assistant principal.

23      Q.   Okay.

24      A.   So I was in the assistant principal role prior to

25  him becoming the athletic director.  He was a social

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1080**

Jeremy J. Carrick - 10/25/2021

Page 7

1  **studies teacher when I was hired to R.B. Stall High**

2  **School, and we had a different athletic director and a**

3  **different principal at that time.**

4      Q.  Would it be fair to say then that those windows

5  have been obscured since the building was built,

6  basically?

7      A.  **Approximately.**

8      Q.  Okay.  Did you have any understanding, either

9  personally or based on your investigation, as to why

10  those windows were obscured?

11     A.  **Yes.**

12     Q.  Why was that?

13     A.  **So the explanation for our window obscurement was**

14  **that those offices, one male and one female, functioned**

15  **as coaches' offices in certain instances.**

16              **And with our girls' athletic teams, there**

17  **are instances where males serve on the coaching staff,**

18  **and that is not reciprocal.  None of my male sports have**

19  **females operating in the coaching staff.**

20     Q.  Understood.  So the reason why, based on your

21  investigation, it was implemented is because there would

22  be a different member of the sex of the coaching staff

23  in the office that overlooked the small female locker

24  room?

25     A.  **Correct.**

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1081**

Jeremy J. Carrick - 10/25/2021

Page 8

1    Q.  That's accurate?

2    **A.  Uh-huh.**

3    Q.  Okay.  Has there ever been a point in time where

4    since you've been at R.B. Stall, either as the assistant

5    or the principal, that there was a female coach in that

6    locker room, in that office?

7    **A.  In the female coach's office?**

8    Q.  Yes, sir.

9    **A.  Has there ever been a time when there was a**

10   **female in the female coach's office?**

11   Q.  Yes.

12   **A.  That's correct.**

13   Q.  Okay.  But they still kept the windows obscured

14   even though there was a female coach in that office?

15   **A.  Yeah.  There never would be a male coach assigned**

16   **to that office.  But when a female coach may have a male**

17   **assistant coach, they might meet in that office, or get**

18   **ready for practice, or grab a bag of basketballs out of**

19   **that office.**

20           **So they may enter that office as a part of**

21   **their coaching duties or gathering equipment, but a male**

22   **was never assigned to that office, but they may sit with**

23   **the female coach.**

24   Q.  Okay.  Do you have any reason -- I mean, based on

25   your investigation -- this all sounds like it was based

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1082**

Jeremy J. Carrick - 10/25/2021

Page 9

1  on your investigation rather than your personal

2  knowledge?  Is that accurate?

3     **A.  Correct.**

4     Q.  And in that investigation, it sounds like the

5  reason why the windows were obscured is because there

6  could be different sexes of coaches coming into that

7  office?  Is that accurate?

8     **A.  Correct.**

9     Q.  But notwithstanding that, there have been female

10 coaches that have been assigned to that coaching office

11 since you started?

12    **A.  Uh-huh.**

13    Q.  Yes?

14    **A.  Correct, exclusively, I would say, as an**

15 **assignment.  It is the female coach's office.  So our**

16 **female PE teachers, that is their desk.  Their desk and**

17 **whatnot is in there.  Never has a male been assigned**

18 **there as a location.**

19    Q.  And, to the best of your understanding, those

20 windows have always stayed obscured since the school was

21 built?

22    **A.  Yes.**

23    Q.  Okay.  Now, that is the girls'.  I think we had a

24 question about the number of lockers in that locker

25 room.

Spectrum Court Reporting and Legal Video
843.849.0133

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1083**

Jeremy J. Carrick - 10/25/2021

Page 10

1              Do you have an understanding of how many

2    lockers are in that?

3        A.   It's approximately 400 lockers in the girls',

4    what we would call the girls' PE locker room.

5        Q.   And there is a viewing window within the door,

6    and then there is also a sidelight that goes from the

7    floor to the ceiling.  Do you recall that?

8        A.   Yes.

9        Q.   And they are both obscured, correct?

10       A.   Yes.

11       Q.   Okay.  Now, moving to -- there is almost a mirror

12   image, it seems like, of the girls' configuration of the

13   locker rooms as the boys'.  Is that accurate?

14       A.   Yes.

15       Q.   In terms of the setup of the locker room?

16       A.   Correct.

17       Q.   But there is no obscurement of those of that

18   locker room, correct?

19       A.   Correct.

20       Q.   And has there ever been any consideration of

21   obscuring them, or have they ever been obscured, those

22   viewing windows for the boys?

23       A.   Those have never been obscured.

24       Q.   Can you tell me how many lockers are visible from

25   the boys' coaching office into the locker room of the

Spectrum Court Reporting and Legal Video
843.849.0133

86d93f4c-77f6-4167-a0f1-03f8ecb82019

JA1084

Jeremy J. Carrick - 10/25/2021

Page 11

1    400 that are also there?

2      **A.  It's about 60 from the boys' that are visible**

3    **from that window and sidelight.**

4      Q.  And how did you make that determination?

5      **A.  Just the vantage point from there, looking at the**

6    **one wall of lockers and the -- well, two, really, walls**

7    **of lockers that are visible from that window from my**

8    **perspective.**

9      Q.  Like a line of sight?

10     **A.  Correct.**

11     Q.  Well, first I should have asked you about the

12   girls' locker room.

13          Do the students in that locker room have a

14   reasonable expectation of privacy?

15          MR. DUKES:  Object to form.

16     Q.  (BY MR. HALVERSEN):  You can answer.  He's just

17   asserting a legal objection.

18     **A.  Ask the question again.**

19     Q.  Do the girls in that locker room have a

20   reasonable expectation of privacy?

21          MR. DUKES:  Object to form.

22     **A.  Yes.**

23     Q.  (BY MR. HALVERSEN):  And so I would ask you --

24   well, for the girls, has -- to your knowledge, has there

25   ever been any kind of safety incident in the girls'

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1085**

Jeremy J. Carrick - 10/25/2021

Page 12

1   locker room since you have been either the assistant or

2   the principal?

3       A.  Yes.

4       Q.  What kind of incident?

5       A.  **Infrequently in the past there have been**

6   **altercations, like a physical fight, you know, in the**

7   **girls' locker room.**

8       Q.  Were the coaches in the girls' office able to

9   intercede into those situations notwithstanding that the

10  viewing window and the sidelight are obscured?

11      A.  **Yes.**

12      Q.  Other than those kind of incidents, has there

13  ever been an incident other than that?

14      A.  **No.**

15      Q.  Not that you're aware of?

16      A.  **No, not to my knowledge.**

17      Q.  So let's now go over to the boys', which we

18  started discussing.  The kind of -- I will call it

19  parallel locker room, because it seems like it's the

20  same configuration, same colors.

21      A.  **Generally.**

22      Q.  That locker room, would you say that the boys

23  have a reasonable expectation of privacy in that locker

24  room?

25              MR. DUKES:  Object to the form.

Spectrum Court Reporting and Legal Video
843.849.0133

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1086**

Jeremy J. Carrick - 10/25/2021

Page 13

1    **A.  Yes.**

2        Q.  (BY MR. HALVERSEN):  And has there ever been,

3    with respect to the boys' locker room, any kind of

4    safety issue or disciplinary issue that, since you've

5    been there either as assistant or principal, that has

6    occurred in that boys' locker room?

7            And I'm specifically talking about the one

8    we are talking about right now.

9    **A.  The boys' locker room?  I have had, you know,**

10   **altercations that would have happened, and one other**

11   **safety incident that did occur there with a student that**

12   **was concerned about harm, self-harm in the boys' PE**

13   **locker room, one instance.**

14       Q.  So we can refer to these as the PE locker rooms?

15   **A.  Yes, sir.**

16       Q.  It's not the varsity football?

17   **A.  On the boys' side we'll have three locker room**

18   **areas, what we would call like the JV locker room, the**

19   **varsity locker room, and then the PE locker room is the**

20   **one that has the door access.**

21       Q.  And we've been just talking about the PE?

22   **A.  Just the PE one.**

23       Q.  And so the altercations that have happened since

24   you've been there in the boys' PE locker room, were the

25   coaches able to intercede when that altercation was

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1087**

Jeremy J. Carrick - 10/25/2021

Page 14

1  still going on or after it concluded?  Do you have any

2  knowledge about that?

3      A.  There is probably multiple over the ten years,

4  also infrequently.  But, yes, you know, definitely

5  interceding during the altercations.

6      Q.  And the one incident, it seemed like you were

7  referring to maybe some kind of suicide attempt or --

8      A.  Uh-huh.

9      Q.  Yes?

10     A.  Yes, sir.

11     Q.  And did that -- what were the circumstances?  And

12  I'm not asking for the person's name.  I'm just kind of

13  trying to get a feeling of what happened so we know what

14  the incident was.

15           Can you give us any more detail about what

16  actually happened?

17     A.  Yeah.  We had a student, and it was in the

18  dressing time at the end of a PE class, who put his belt

19  around his neck, and then like stood next to a locker,

20  but that was observed by the PE teacher, and he was

21  taken to a counselor and then taken home by the parent

22  that day.

23     Q.  Do you know when that event occurred?

24     A.  It was -- I do not know the year; greater than

25  four years ago.

Spectrum Court Reporting and Legal Video
843.849.0133

**JA1088**

86d93f4c-77f6-4167-a0f1-03f8ecb82019

Jeremy J. Carrick - 10/25/2021

Page 15

1    Q.  Were there other students that were in the locker

2    room at the time?

3    **A.  Yes.**

4    Q.  Do you know exactly how the coach learned about

5    the incident, whether it was from someone coming and

6    telling him about it or through him actually physically

7    observing it?

8    **A.  I don't recall specifically.**

9    Q.  Okay.  In the boys' PE locker room, same locker

10   room we are talking about now, do the boys in that

11   locker room, are they aware that they can be seen while

12   they are changing in that locker room?

13   **A.  Yes.**

14   Q.  And would it be fair to say that that would be

15   limited to the 60 or so lockers that are within the line

16   of sight of the coach's office through the viewing

17   window or the sidelight?

18   **A.  Yes.**

19   Q.  In that locker room, is it possible to view the

20   students without them knowing that they are being

21   viewed?

22   **A.  No.**

23   Q.  In the girls' PE locker room, is the school still

24   able to ensure the safety of its students even though

25   those windows are obscured?

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1089**

Jeremy J. Carrick - 10/25/2021

1    **A.  Yes.**

2    Q.  So we also in the Notice asked about the other

3    two locker rooms, and you referred to them before.   I

4    think you said they were the varsity and junior varsity

5    locker rooms?

6    **A.  Correct, on the boys' side.**

7    Q.  Do you know how many locker rooms are in -- or

8    how many lockers are in those locker rooms?

9    **A.  I wrote it down so I would remember.**

10   Q.  Okay.  Thank you.

11   **A.  Well, we consider the boys' varsity has 48**

12   **lockers, and our boys' JV has 59 lockers.**

13   Q.  And those locker rooms have no viewing windows,

14   correct?

15   **A.  Correct.**

16   Q.  And those are used by -- is that just a boys' --

17   are those just boys' locker rooms?

18   **A.  Those are just boys'.**

19   Q.  And what sports is it, just football, or other

20   sports use them?

21   **A.  They've been used for football in the fall,**

22   **they've been used for basketball in the winter, and**

23   **they've been used for soccer in the spring.**

24         **Also, to a lesser extent, cross-country.**

25   **Those athletes would use those, but those are much**

Spectrum Court Reporting and Legal Video
843.849.0133

**JA1090**

Jeremy J. Carrick - 10/25/2021

Page 17

1    smaller numbers.  The three that I first listed are the

2    predominant uses.

3        Q.  Is it fair to say that those locker rooms are

4    larger than the PE locker rooms?

5        A.  Varsity is considerably larger.  I wouldn't be

6    able to say for JV.  It may be comparable square footage

7    space.  It doesn't feel significantly different.  But I

8    would say the varsity locker room does feel a lot more

9    spacious.

10       Q.  But it has significantly less lockers than the

11   PE?

12       A.  Correct.

13       Q.  And I assume that's because more kids use PE --

14   have to do PE as opposed to the varsity sports?  Is

15   that --

16       A.  No, no.  I would say more because the PE locker

17   room and the lockers assigned there would need to be

18   utilized four blocks of the day.  So every locker will

19   be for a unique individual student, not 400 used at the

20   same time.

21            But half of the PE classes for four blocks

22   of the day would necessitate the large number of lockers

23   in a similar square footage.

24       Q.  Oh, okay.  Well, that was very edifying, so thank

25   you for that.

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1091**

Jeremy J. Carrick - 10/25/2021

Page 18

1          So it sounds then -- so every student is

2     assigned a locker at the school in the PE or --

3     **A.  No.**

4     Q.  Okay.  But not everybody obviously is using --

5     from what you're telling me, not everyone is using the

6     PE locker room lockers at the same time?

7     **A.  Correct.**

8     Q.  Only certain blocks throughout the day?

9     **A.  Correct.  In the building design, they would have**

10    **it available so that every individual student could be**

11    **issued locks, and we have in the past issued a lock and**

12    **a locker to each PE student, but currently that is not**

13    **the practice right now.**

14    Q.  So is it fair to say, then, at any given time

15    that that block, say, is being utilized for PE, do you

16    have a feeling of how many students are actually in

17    those locker rooms?

18    **A.  Probably about 50 males and 50 females,**

19    **approximately.**

20    Q.  So it's not as if they are body to body in there,

21    because only approximately 50 divided by 400 are being

22    used at any given time?

23    **A.  Correct.**

24    Q.  And is it fair to say that they are interspersed

25    in the locker room?  In other words, they could be -- at

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1092**

Jeremy J. Carrick - 10/25/2021

1  any given time, those students can be scattered

2  throughout the locker room?  They are not all on one

3  side or --

4      **A.  Correct.**

5      Q.  Is that a fair characterization?

6      **A.  Yes.**

7      Q.  Of the junior varsity and the varsity locker

8  rooms -- let me just back up.

9          The PE locker rooms are only used for

10  changing, correct?

11      **A.  Correct.**

12      Q.  And so --

13      **A.  I will edit that a little bit.  Also for securing**

14  **belongings.**

15      Q.  So students can go --

16      **A.  So a student can go in there to lock up their**

17  **backpack in a locker.**

18      Q.  The JV and the varsity locker rooms that don't

19  have viewing windows, are the staff members or faculty

20  still able to ensure the safety of those students inside

21  those locker rooms without having those viewing windows?

22      **A.  Yes.**

23      Q.  What is the total enrollment at R.B. Stall?

24      **A.  Our 45-day count was 1,675.**

25          MR. HALVERSEN:  That's all the questions I

86d93f4c-77f6-4167-a0f1-03f8ecb82019

Jeremy J. Carrick - 10/25/2021

Page 20

1   have for you.  Mr. Dukes may have some follow-up

2   questions.

3                    EXAMINATION

4   BY MR. DUKES:

5      Q.  Good morning.

6      **A.  Good morning.**

7      Q.  In the JV and varsity boys' locker rooms, how are

8   the coaches or staff, how do they supervise the students

9   when they are in there?

10     **A.  That would just be through periodic kind of**

11  **walk-through.**

12     Q.  So just walking in.  Do they have to knock and

13  announce or just walk in?

14     **A.  Walk in.**

15          MR. DUKES:  That's all I have for you.

16  Thanks.

17                 FURTHER EXAMINATION

18  BY MR. HALVERSEN:

19     Q.  Just one follow-up on that before we're done.

20          You said that they don't announce

21  themselves.  Do you have a personal knowledge as to

22  whether each varsity coach has that practice or doesn't

23  have that practice?

24     **A.  Not personal knowledge.**

25          MR. HALVERSEN:  Okay.  That's all the

Spectrum Court Reporting and Legal Video
843.849.0133

86d93f4c-77f6-4167-a0f1-03f8ecb82019

**JA1094**

Jeremy J. Carrick - 10/25/2021

Page 21

1    questions I've got.

2              FURTHER EXAMINATION

3    BY MR. DUKES:

4      Q.  You would agree with me that it's important for

5    coaches and staff to be able to supervise the students

6    while they are in the locker rooms, right?

7      **A.  Correct.**

8      Q.  And you testified that you believe that the

9    students have a reasonable expectation of privacy.

10             That yields somewhat to the duty of adults

11   to supervise them, doesn't it?

12     **A.  Agree.**

13             MR. DUKES:  Okay.  Thank you.

14             MR. HALVERSEN:  That's all the questions we

15   have for you.

16             (The deposition was concluded at 8:57 a.m.)

17                     -   -   -

18

19

20

21

22

23

24

25

Jeremy J. Carrick - 10/25/2021

Page 22

```
1   STATE OF SOUTH CAROLINA  )
                             )
2                            )
    COUNTY OF CHARLESTON     )
3
        I, Nancy Ennis Tierney, Certified Shorthand Reporter
4   and Notary Public for the State of South Carolina at
    Large, do hereby certify that the witness in the
5   foregoing deposition was by me duly sworn to testify to
    the truth, the whole truth and nothing but the truth in
6   the within-entitled cause; that said deposition was
    taken at the time and location therein stated; that the
7   testimony of the witness and all objections made at the
    time of the examination were recorded stenographically
8   by me and were thereafter transcribed by computer-aided
    transcription; that the foregoing is a full, complete
9   and true record of the testimony of the witness and of
    all objections made at the time of the examination; and
10  that the witness was given an opportunity to read and
    correct said deposition and to subscribe the same.
11
        Should the signature of the witness not be affixed to
12  the deposition, the witness shall not have availed
    himself/herself of the opportunity to sign or the
13  signature has been waived.

14      I further certify that I am neither related to nor
    counsel for any party to the cause pending or interested
15  in the events thereof.

16      Witness my hand, I have hereunto affixed my official
    seal this 6th day of November, 2021, at Charleston,
17  Charleston County, South Carolina.

18

19

20

21

22

23
                    _____
24                  Nancy Ennis Tierney, CSR (IL)
                    My Commission Expires:
25                  June 12, 2024
```

Spectrum Court Reporting and Legal Video
843.849.0133

**JA1096**

# EXHIBIT 14

In the Matter of:

# TUITION PAYER 100, VIEWED STUDENT FEMALE 200, VIEWED STUDENT MALE 300, ET AL

vs.

# THE BISHOP OF CHARLESTON, A CORPORATION SOLE, BISHOP ENGLAND HIGH SCHOOL, ET AL

---

**Deon Richardson**

October 25, 2021

---



UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION


30(b)(6) DEPOSITION OF BURKE HIGH SCHOOL


TUITION PAYER 100, VIEWED STUDENT FEMALE 200,
VIEWED STUDENT MALE 300, ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED,

     Plaintiffs,

    vs.        C/A: 2-21-cv-00613-RMG

THE BISHOP OF CHARLESTON, A CORPORATION SOLE, BISHOP
ENGLAND HIGH SCHOOL, TORTFEASORS 1-10, THE BISHOP OF
THE DIOCESE OF CHARLESTON, IN HIS OFFICIAL CAPACITY,
AND ROBERT GUGLIELMONE, INDIVIDUALLY,

     Defendants.

_____

DEPONENT:  DEON RICHARDSON

DATE:     October 25, 2021

TIME:     9:01 AM

LOCATION:  CHARLESTON COUNTY SCHOOL DISTRICT
           75 Calhoun Street
           Charleston, SC  29401


REPORTED BY:  NANCY ENNIS TIERNEY, CSR (IL)

e29ccb1d-6b6c-4c17-885e-3056bd30efa7

Deon Richardson - 10/25/2021

```
                                              Page 2
 1
                 A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4              BRENT SOUTHER HALVERSEN, LLC
                BY: BRENT S. HALVERSEN
 5              751 Johnnie Dodds Boulevard, Suite 200
                Mt. Pleasant, SC  29464
 6              (843) 284-5790
                Brent@halversenlaw.com
 7                 - and -
                THE RICHTER FIRM, LLC
 8              BY: ANNA E. RICHTER
                622 Johnnie Dodds Boulevard
 9              Mt. Pleasant, SC  29464
                (843) 849-6000
10              Anna@richterfirm.com
11
      FOR THE DEFENDANT BISHOP ENGLAND HIGH SCHOOL:
12
                TURNER PADGET
13              BY: RICHARD S. DUKES
                40 Calhoun Street, Suite 200
14              Charleston, SC  29401
                (843) 576-2810
15              Rdukes@turnerpadget.com
16
      FOR THE DEPONENT:
17
                CHARLESTON COUNTY SCHOOL DISTRICT
18              OFFICE OF GENERAL COUNSEL
                BY: MERCEDES L. PINCKNEY REESE, L.L.M.
19              75 Calhoun Street
                Charleston, SC  29401
20              (843) 937-6515
                mercedes_pinckneyre@charleston.k12.sc.us
21
22
23
24
25
```

Spectrum Court Reporting and Legal Video
843.849.0133

e29ccb1d-6b6c-4c17-885e-3056bd30efa7

**JA1100**

USCA4 Appeal: 22-1750    Doc: 19-2    Filed: 10/07/2022    Pg: 537 of 546

Deon Richardson - 10/25/2021

1
                    I N D E X
2
                                              Page
3
   Witness Sworn                                4
4
   EXAMINATION
5  By Mr. Halversen                             4
   By Mr. Dukes                                10
6

7
   Certificate of Reporter                     12
8

9

10

11
                  E X H I B I T S
12

13
        No exhibits were marked.
14

15

16

17

18

19

20

21

22

23

24

25

e29ccb1d-6b6c-4c17-885e-3056bd30efa7

**JA1101**

Deon Richardson - 10/25/2021

Page 4

1              DEON RICHARDSON, having been first duly

2    sworn, testified as hereinafter set forth.

3                        EXAMINATION

4    BY MR. HALVERSEN:

5    Q.  Your name is Deon Richardson?

6    **A.  Yes.**

7    Q.  So I just introduced myself.  My name is Brent

8    Halversen.  I'm one of the attorneys representing the

9    plaintiffs in this case where we have filed a lawsuit

10   against Bishop England for the viewing windows that they

11   have in their school.  You may know something about it

12   or heard something about it.  So we have some questions

13   for you and all the other schools that we are talking to

14   this morning.

15              Again, I don't think we will be here that

16   long.  If you want to take a break, though, if you need

17   to go to the bathroom, need to make a phone call,

18   anything, I will be happy to accommodate you, okay?

19   **A.  Okay.**

20   Q.  And another thing, have you ever had your

21   deposition taken before?

22   **A.  No, sir.**

23   Q.  Okay.  So basically it's -- this lady here is

24   here to take your statements down, and so if there is

25   any question I say that you don't understand, I can

Spectrum Court Reporting and Legal Video
843.849.0133

e29ccb1d-6b6c-4c17-885e-3056bd30efa7

**JA1102**

Deon Richardson - 10/25/2021

Page 5

1   repeat it.

2       **A.  Okay.**

3       Q.  This isn't a memory contest at all, because you

4   could ask me what I had for dinner last night and I'm

5   not sure I could tell you.  But the point of it is you

6   say to the best of your recollection under oath.

7       **A.  Right.**

8       Q.  So that's sort of the thing.  You know, we're not

9   holding you to -- you don't have to tell us something if

10  you don't know it.  If you don't know it, that's the

11  answer.  There is no trick questions.  We're just here

12  to find out what you know.

13      **A.  All right.**

14      Q.  So what is your position with Burke High School?

15      **A.  PE teacher, athletic director, and also the boys'**

16  **basketball coach.**

17      Q.  Okay.  So you have a lot going on there.  PE

18  teacher and what else?

19      **A.  Athletic director.**

20      Q.  AD.

21      **A.  And boys' basketball coach.**

22      Q.  When did you start working for Burke?

23      **A.  Started working at Burke in 2010.**

24      Q.  Do you know how old the building is, the Burke

25  building?

e29ccb1d-6b6c-4c17-885e-3056bd30efa7

**JA1103**

Deon Richardson - 10/25/2021

Page 6

1    **A.   The new building?  To my knowledge, I believe the**
2    **new building was constructed in 2000, 2001.**

3    Q.   So I've never been there.  So 2000, the new
4    building.

5         Is that where the athletic facilities are?

6    **A.   Yes.  And when I say the new building, I mean the**
7    **entire school.**

8    Q.   So was it all redone?  Not sure?

9    **A.   I'm not sure.**

10   Q.   Okay.  So the new building, though, is that the
11   whole school?

12   **A.   To my knowledge, yes, the whole school.**

13   Q.   So you started in 2010?

14   **A.   Uh-huh.**

15   Q.   And what did you start -- when was your role in
16   2010?

17   **A.   PE teacher and boys' basketball coach.**

18   Q.   So it sounds like you've been doing that since
19   then?

20   **A.   Yes.**

21   Q.   And then athletic department head, when did you
22   take that on?

23   **A.   2018.**

24   Q.   And you're still in that role today?

25   **A.   Yes.**

e29ccb1d-6b6c-4c17-885e-3056bd30efa7

**JA1104**

Deon Richardson - 10/25/2021

Page 7

1    Q.  Okay.  So we sent a Notice to your school, and we

2    asked for a person who can testify as to when the

3    retractable monolithic screens were installed in the

4    locker rooms.

5          Do you have any knowledge about the answer

6    to that question?

7    **A.  I don't.  I just know those screens were there**

8    **before I got there.**

9    Q.  And that was before 2010?

10   **A.  Yes.**

11   Q.  Is it possible to still ensure the safety of the

12   students in those locker rooms with having those screens

13   fully drawn down?

14   **A.  Yes.  We tend to do active supervision, not just**

15   **sitting in the office.  We walk in and out and monitor**

16   **the hallways.  So it is -- you're able to supervise the**

17   **kids without sitting in the office looking through the**

18   **windows.**

19   Q.  Okay.  And when you go in the locker rooms, do

20   you announce yourself before you go in?

21   **A.  On occasion some coaches do, some don't.  I knock**

22   **on the door and usually tell the guys, hey, I'm coming**

23   **in, let's get out of here.**

24   Q.  Are you able to -- well, let me back up.

25          Are you aware of any kind of, since you've

e29ccb1d-6b6c-4c17-885e-3056bd30efa7

**JA1105**

Deon Richardson - 10/25/2021

Page 8

1  been there, of any kind of safety issues that have

2  happened in the locker rooms?

3      A.   No.  Outside of the normal boys horseplaying, no

4  real safety issues.

5      Q.   And are the coaches in the coaches' offices able

6  to intercede into the locker rooms if they become aware

7  of a fight --

8      A.   Yes.

9      Q.   -- or bullying?

10     A.   Yes.

11     Q.   That has happened?

12     A.   Yes.

13     Q.   Okay.  Without the need to pull open the screen?

14     A.   Without the need to pull open the screen, yes.

15  The coaches have keys to the locker room.  And if

16  something is going on, usually a kid will say it or you

17  just hear the commotion, and the coaches go in.

18     Q.   At your school, do the staff or coaches monitor

19  the kids through those windows without them knowing?

20     A.   The guys know that the coaches can see in the

21  locker rooms.  And usually the blinds are down unless

22  there is a lot of commotion going on and a coach will

23  pull it up real quick.

24          But, like I said, the coaches are usually in

25  the hallway, because we are using three different locker

e29ccb1d-6b6c-4c17-885e-3056bd30efa7

**JA1106**

Deon Richardson - 10/25/2021

Page 9

1    rooms.  And one of the locker rooms they can't get in.

2    They can't view inside of that locker room because -- in

3    my office, and I'm the only one to have a key.  So we

4    are doing, again, active supervision being in the

5    hallway.

6        Q.  And not through using the windows?

7        A.  Not through using the windows.

8        Q.  I should have asked you this in the beginning,

9    but what is the configuration of the locker rooms?

10               Are there separate PE locker rooms and a

11   varsity boys locker room and JV?

12       A.  So right now we have three locker rooms.  There's

13   a PE locker room, and then there's a JV locker room, and

14   then there's a varsity locker room.  The varsity locker

15   room is connected to my office.  We only have -- who is

16   down in that locker room?  I believe it's a few seniors,

17   seniors and freshman down in there.  And then it's

18   juniors and sophomores in the JV locker room.

19               And then in the PE locker room, because of

20   COVID guidelines and having the kids spaced out, we put

21   some other kids -- a few others in the PE locker room,

22   and the football coach is able to look in the PE locker

23   room and the JV locker room with the blinds.  But,

24   again, he's out in the hallway along with the other

25   coaches doing active supervision, and one coach is

JA1107

Deon Richardson - 10/25/2021

Page 10

1    standing down at the varsity locker room on that side.

2            On the girls' side it's the same thing, but

3    the girls' locker room, the volleyball coach usually

4    stands outside.  When we have basketball, the boys'

5    coach, he's never -- their locker room, where the girls

6    get dressed, is not even able to be viewed because that

7    office is used by Service Solutions, and the blind is

8    always down in there, and we don't have keys to that.

9            So the girls get dressed down in there.

10   Same thing with cheerleading and volleyball, they all

11   use the varsity girls' locker room for changing.  No

12   coach has access to that office down there.

13       Q.  Do you know what the enrollment is at Burke?

14       A.  Our enrollment right now -- I'm going off of my

15   45 ADM, which is the last time we had realignment, it

16   was 327.

17       Q.  327 students?

18       A.  Yes.

19       Q.  That's all the questions I have for you.  Mr.

20   Dukes, who represents BE, may have some follow-up

21   questions for you.

22       A.  Okay.

23                      EXAMINATION

24   BY MR. DUKES:

25       Q.  You'll agree with me that it's important for

e29ccb1d-6b6c-4c17-885e-3056bd30efa7

**JA1108**

Deon Richardson - 10/25/2021

Page 11

1   adults to be able to supervise the students while they

2   are in the locker room?

3       **A.   It is important, active supervision, yes.**

4           MR. DUKES:  Okay.  That's all I have for

5   you.  Thanks.

6           MR. HALVERSEN:  Thank you.  We are done.

7           (The deposition was concluded at 9:11 a.m.)

8                   -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Spectrum Court Reporting and Legal Video
843.849.0133

e29ccb1d-6b6c-4c17-885e-3056bd30efa7

**JA1109**

Deon Richardson - 10/25/2021

Page 12

```
 1   STATE OF SOUTH CAROLINA  )
                              )
 2                            )
     COUNTY OF CHARLESTON     )
 3
         I, Nancy Ennis Tierney, Certified Shorthand Reporter
 4   and Notary Public for the State of South Carolina at
     Large, do hereby certify that the witness in the
 5   foregoing deposition was by me duly sworn to testify to
     the truth, the whole truth and nothing but the truth in
 6   the within-entitled cause; that said deposition was
     taken at the time and location therein stated; that the
 7   testimony of the witness and all objections made at the
     time of the examination were recorded stenographically
 8   by me and were thereafter transcribed by computer-aided
     transcription; that the foregoing is a full, complete
 9   and true record of the testimony of the witness and of
     all objections made at the time of the examination; and
10   that the witness was given an opportunity to read and
     correct said deposition and to subscribe the same.
11
         Should the signature of the witness not be affixed to
12   the deposition, the witness shall not have availed
     himself/herself of the opportunity to sign or the
13   signature has been waived.

14       I further certify that I am neither related to nor
     counsel for any party to the cause pending or interested
15   in the events thereof.

16       Witness my hand, I have hereunto affixed my official
     seal this 6th day of November, 2021, at Charleston,
17   Charleston County, South Carolina.

18

19

20

21

22

23
             _____
24           Nancy Ennis Tierney, CSR (IL)
             My Commission Expires:
25           June 12, 2024
```

Spectrum Court Reporting and Legal Video
843.849.0133

**JA1110**

e29ccb1d-6b6c-4c17-885e-3056bd30efa7