**CASE NO. 22-1750**

**IN THE**

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

GARY NESTLER, on behalf of themselves and all others similarly situated;VIEWED STUDENT FEMALE 200, on behalf of themselves and all others similarly situated; VIEWED STUDENT MALE 300, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

v.

HE  BISHOP OF CHARLESTON, a Corporation Sole; BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS, 1 - 10; THE  BISHOP OF THE DIOCESE OF CHARLESTON, in his official capacity; ROBERT GUGLIELMONE, individually,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA AT ABINGDON

**JOINT APPENDIX - VOLUME III OF III**
**(Pages 1111 - 1659)**

David K. Lietz
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
5335 Wisconsin Avenue NW, Suite 440
Washington, D.C. 20015-2052
866-252-0878
dlietz@milberg.com

Lawrence E. Richter, Jr.
RICHTER FIRM, LLC
622 Johnnie Dodds Boulevard
Mt. Pleasant, SC 29464
843-849-6000
lrichter@richterfirm.com

*Counsel for Plaintiffs-Appellants*          *Counsel for Plaintiffs-Appellants*

Additional Counsel Listed on Inside Cover

Richard S. Dukes, Jr.
TURNER, PADGET, GRAHAM & LANEY, PA
P. O. Box 22129
Charleston, SC 29413
843-576-2810
rdukes@turnerpadget.com

Carmelo B. Sammataro
TURNER, PADGET, GRAHAM & LANEY, PA
1901 Main Street, 17th Floor
Columbia, SC 29201
803-227-4253
ssammataro@turnerpadget.com

*Counsel for Defendants-Appellees*

## **TABLE OF CONTENTS**

## **VOLUME I OF III**

Page

District Court Docket Sheet [2:21-cv-00613-RMG] .................................................. 1

Notice of Removal
    Filed March 3, 2021 [ECF1] ................................................................ 19

Defendants' Rule 26.01 Disclosures
    Filed March 3, 2021 [ECF2] ................................................................ 24

Answer of Defendants
    Filed March 4, 2021 [ECF4] ................................................................ 27

Plaintiffs' Answer to Interrogatories
    Filed March 17, 2021 [ECF5] .............................................................. 44

Defendants' Rule 26.03 Disclosures
    Filed June 7, 2021 [ECF15] ................................................................ 48

Amended Consolidated Class Action Complaint
    Filed August 13, 2021 [ECF35] ........................................................... 60

Answer of Defendants to Amended Complaint
    Filed August 26, 2021 [ECF36] ........................................................... 87

Plaintiffs' Motion for Class Certification with Exhibits
    Filed December 13, 2021 [ECF67] ...................................................... 104

       Ex. 1:    Transcript of Mary Anne Tucker Deposition
               taken on 10/5/2021 [ECF67-1] ............................... 139

       Ex. 2:    Transcript of Roger M. Attanasio Deposition
               taken on 8/20/ 2021 [ECF67-2] ............................. 231

       Ex. 3:    Transcript of Patrick Finneran Deposition
               taken on 10/5/2021 [ECF67-3] ............................... 451

i

## **VOLUME II OF III**

Ex. 4:     Transcript of Amanda Salas, M.D. Deposition
           taken on 11/10/2021 [ECF67-4] ................................................. 573

Ex. 5:     Transcript of Patrick Finneran Deposition
           taken on 10/22/2021 [ECF67-5] ................................................. 668

Ex. 6:     Diocese of Charleston Media Statement
           dated 2/4/2021 [ECF67-6] ........................................................ 752

Ex. 7:     Transcript of Eric Aichele Deposition
           taken on 10/13/2021 [ECF67-7] ................................................. 754

Ex. 8:     Defendant Bishop England High School's Answers
           to Plaintiffs' First Interrogatories [ECF67-8] ............................ 879

Ex. 9:     Transcript of Continuation of Maria Aselage Deposition
           taken on 12/1/2021 [ECF67-9] ................................................... 890

Ex. 10:    Plaintiffs' First Set of Requests for Admission to
           Bishop England High School [ECF67-10] ................................. 985

Ex. 11, Part 1:  Bishop England High School Faculty Handbook
                 2019-19 [ECF67-11] ......................................................... 991

Ex. 11, Part 2:  Bishop England High School Faculty Handbook
                 2019-19 [ECF67-12] ....................................................... 1021

Ex. 12:    Transcript of Nathaniel Person Deposition
           taken on 10/25/2021 [ECF67-13] ............................................ 1051

Ex. 13:    Transcript of Jeremy J. Carrick Deposition
           taken on 10/25/2021 [ECF67-14] ............................................ 1073

Ex. 14:    Transcript of Deon Richardson Deposition
           taken on 10/25/2021 [ECF67-15] ............................................ 1097

## <u>VOLUME III OF III</u>

Ex. 15:  Transcript of Maria Y. Williams Deposition
taken on 10/25/2021 [ECF67-16] ................................................ 1111

Ex. 16:  Defendant Bishop England High School's Supplemental
Answers to Plaintiffs' First Interrogatories [ECF67-17] .......... 1128

Ex. 17:  Transcript of Male Student Deposition
taken on 10/4/2021 [ECF67-18] ................................................ 1133

Ex. 18:  Transcript of Female Student Deposition
taken on 10/4/2021 [ECF67-19] ................................................ 1174

Ex. 19:  Bishop England High School Website [ECF67-20] ................. 1229

Ex. 20:  Transcript of Gary Nestler Deposition
taken on 10/1/2021 [ECF67-21] ................................................ 1236

Ex. 21:  Statement of Qualifications of Proposed Class Counsel
[ECF67-22] .................................................................................. 1329

Defendants' Opposition to Plaintiffs'
Motion for Class Certification with Exhibits
Filed January 19, 2022 [ECF75] .................................................... 1335

Ex. 1:  LS3P Locker Room Design Drawing [ECF75-1] ..................... 1362

Ex. 2:  Amanda Salas, M.D. Deposition Excerpts [ECF75-2] ............. 1363

Ex. 3:  Glick Report [ECF75-3] .......................................................... 1374

Ex. 4:  Runyon Report [ECF75-4] ....................................................... 1379

Ex. 5:  Male Student Deposition Excerpts [ECF75-5] ......................... 1392

Ex. 6:  Female Student Deposition Excerpts [ECF75-6] ...................... 1404

Ex. 7:  Eric Aichele Deposition Excerpts [ECF75-7] ........................... 1414

Ex. 8:    Gary Nestler Deposition Excerpts [ECF75-8] .......................... 1425

Ex. 9:    Mary Anne Tucker Deposition Excerpt [ECF75-9].................. 1431

Ex. 10:   Patrick Finneran Deposition Excerpts [ECF75-10] ................. 1434

Ex. 11:   Roger M. Attanasio Deposition Vol. II Excerpts
          [ECF75-11]................................................................... 1438

Ex. 12:   Bigelow v. Syneos Health, LLC (Decision) [ECF75-12]......... 1447

Plaintiffs' Reply to Defendants' Objection to
Plaintiff' Motion for Class Certification
       Filed January 26, 2022 [ECF78].................................................... 1454

Defendants' Surreply Regarding Class Certification
       Filed February 1, 2022 [ECF83].................................................... 1469

Order and Opinion (Denying Motion for Class Certification)
       Entered March 24, 2022 [ECF84] ................................................. 1471

Defendants' Motion for Summary Judgment
       Filed April 8, 2022 [ECF85].......................................................... 1491

Plaintiffs' Motion for Reconsideration Pursuant to Fed. R. Civ. P. 59(e)
       Filed April 21, 2022 [ECF88]........................................................ 1493

Plaintiffs' Motion to Certify Question to The
Supreme Court of South Carolina with Attachment and Exhibit
       Filed April 21, 2022 [ECF89] .......................................................1513

       Att. 1:   Plaintiffs' Memorandum in Support of Their
                 Motion to Certify Question to The Supreme Court
                 of South Carolina [ECF89-1].................................... 1516

       Ex. A:    Transcript of Record dated June 9, 2020 [ECF89-2]............... 1528

Response by Defendants in Opposition to Plaintiffs'
Motion for Reconsideration Pursuant to Fed. R. Civ. P. 59(e)
       Filed May 4, 2022 [ECF90]........................................................... 1546

Response by Defendants in Opposition to Plaintiffs' Motion
to Certify Question to The Supreme Court of South Carolina
Filed May 4, 2022 [ECF91] ............................................................ 1556

Plaintiffs' Reply Memorandum in Support of Their Motion
to Certify Question to The Supreme Court of South Carolina
Filed May 11, 2022 [ECF92] .......................................................... 1560

Plaintiffs' Reply to Response in Opposition ([ECF 90) to
Motion for Reconsideration Pursuant to Fed. R. Civ. P. 59(e)
Filed May 11, 2022 [ECF93] .......................................................... 1564

Order (Denying Motion to Reconsider and Motion to Certify Question)
Entered May 24, 2022 [ECF95] ...................................................... 1570

Plaintiffs' Response and Memorandum in Opposition to
Defendants' Motion for Summary Judgment with Exhibits
Filed 2022.06.06 [ECF98] ............................................................. 1574

    Ex. 1:   Press Release from the Diocese of Charleston 2/4/21
             [ECF98-1] ............................................................... 1584

    Ex. 2:   Patrick Finneran Deposition Excerpt [ECF98-2] .................... 1586

    Ex. 3:   Defendant Bishop England High School's Answers to
             Plaintiffs' First Interrogatories [ECF98-3] ............................. 1590

    Ex. 4:   Photograph of Athletic Directo/Coach Runey's Office
             Desk Arrangement and the Window Looking directly
             into a Locker Room [ECF98-4] ................................................. 1601

    Ex. 5:   Transcript of Record dated June 9, 2020 [ECF98-5] ................ 1603

    Ex. 6:   Spoliation Notice [ECF98-6] .................................................... 1621

    Ex. 7:   Patrick Finneran Deposition Excerpts [ECF98-7] ................... 1625

    Ex. 8:   Diocese Defendants' Responses to
             Plaintiffs' First Requests for Production [ECF98-8] ................ 1640

Ex. 9:     Transcript of Amanda Salas, M.D. Deposition
           taken on 11/10/2021 [ECF98-9]
           *(To Avoid Duplication Deposition Located at JA Pg. 573)*

Defendants' Reply in Support of
Their Motion for Summary Judgment
       Filed June 13, 2022 [ECF99].......................................................... 1652

Order (Granting Defendant's Motion for Summary Judgment)
       Entered June 17, 2022 [ECF100].................................................... 1654

Notice of Appeal
       Filed July 12, 2022 [ECF101] ....................................................... 1657

# EXHIBIT 15

In the Matter of:

# TUITION PAYER  100, VIEWED STUDENT FEMALE 200, VIEWED STUDENT MALE 300, ET AL

vs.

# THE BISHOP OF CHARLESTON, A CORPORATION SOLE, BISHOP ENGLAND HIGH SCHOOL, ET AL

---

**Maria Y. Williams**

October 25, 2021

---



UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION


30(b)(6) DEPOSITION OF WEST ASHLEY HIGH SCHOOL


TUITION PAYER 100, VIEWED STUDENT FEMALE 200,
VIEWED STUDENT MALE 300, ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED,

     Plaintiffs,

   vs.         C/A: 2-21-cv-00613-RMG

THE BISHOP OF CHARLESTON, A CORPORATION SOLE, BISHOP
ENGLAND HIGH SCHOOL, TORTFEASORS 1-10, THE BISHOP OF
THE DIOCESE OF CHARLESTON, IN HIS OFFICIAL CAPACITY,
AND ROBERT GUGLIELMONE, INDIVIDUALLY,

     Defendants.

_____

DEPONENT:   MARIA YVETTE WILLIAMS

DATE:       October 25, 2021

TIME:       10:00 AM

LOCATION:   CHARLESTON COUNTY SCHOOL DISTRICT
            75 Calhoun Street
            Charleston, SC  29401


REPORTED BY:  NANCY ENNIS TIERNEY, CSR (IL)

894d79df-1df6-436d-9c48-278022560bd0

Maria Y. Williams - 10/25/2021

Page 2

```
 1
                 A P P E A R A N C E S
 2
 3     FOR THE PLAINTIFFS:
 4                BRENT SOUTHER HALVERSEN, LLC
                  BY: BRENT S. HALVERSEN
 5                751 Johnnie Dodds Boulevard, Suite 200
                  Mt. Pleasant, SC  29464
 6                (843) 284-5790
                  Brent@halversenlaw.com
 7                    - and -
                  THE RICHTER FIRM, LLC
 8                BY: ANNA E. RICHTER
                  622 Johnnie Dodds Boulevard
 9                Mt. Pleasant, SC  29464
                  (843) 849-6000
10                Anna@richterfirm.com
11
       FOR THE DEFENDANT BISHOP ENGLAND HIGH SCHOOL:
12
                  TURNER PADGET
13                BY: RICHARD S. DUKES
                  40 Calhoun Street, Suite 200
14                Charleston, SC  29401
                  (843) 576-2810
15                Rdukes@turnerpadget.com
16
       FOR THE DEPONENT:
17
                  CHARLESTON COUNTY SCHOOL DISTRICT
18                OFFICE OF GENERAL COUNSEL
                  BY: MERCEDES L. PINCKNEY REESE, L.L.M.
19                75 Calhoun Street
                  Charleston, SC  29401
20                (843) 937-6515
                  mercedes_pinckneyre@charleston.k12.sc.us
21
22
23
24
25
```

Spectrum Court Reporting and Legal Video
843.849.0133

894d79df-1df6-436d-9c48-278022560bd0

**JA1114**

Maria Y. Williams - 10/25/2021

Page 3

1
              I N D E X
2
                                      Page
3
   Witness Sworn                       4
4
   EXAMINATION
5  By Mr. Halversen                    4
   By Mr. Dukes                       13
6
7  Certificate of Reporter            15
8

9

10

11          E X H I B I T S

12

13      No exhibits were marked.

14

15

16

17

18

19

20

21

22

23

24

25

Spectrum Court Reporting and Legal Video
          843.849.0133

894d79df-1df6-436d-9c48-278022560bd0

JA1115

Maria Y. Williams - 10/25/2021

Page 4

1              MARIA YVETTE WILLIAMS, having been first

2    duly sworn, testified as hereinafter set forth.

3                    EXAMINATION

4    BY MR. HALVERSEN:

5       Q.  Good morning, Ms. Williams.

6       **A.  Good morning.**

7       Q.  I just introduced myself.  My name is Brent

8    Halversen, and I, along with Anna Richter here,

9    represent the plaintiffs in this lawsuit that has been

10   filed against Bishop England.

11              Have you ever had your deposition taken

12   before?

13      **A.  No, sir.**

14      Q.  So basically it's just like we are in court,

15   except we're not.  So this court reporter here is taking

16   down what you're saying, and you have taken an oath to

17   tell the truth.

18              If you don't understand my question, I will

19   be happy to rephrase it.  If you want to take a break,

20   you can take a break, although I think we're going to be

21   done probably in 20 or so minutes.  So we're going to be

22   pretty quick, based on all the previous depositions.

23   They were all pretty quick.

24              Do you have any questions for me?

25      **A.  No, sir.**

894d79df-1df6-436d-9c48-278022560bd0

**JA1116**

Maria Y. Williams - 10/25/2021

1     Q.  Okay.  Could you please state your full name for

2   the record?

3     **A.  Maria Yvette Williams.**

4     Q.  And you work for West Ashley High School?

5     **A.  Yes, sir.**

6     Q.  What is your position there?

7     **A.  Social studies teacher.**

8     Q.  And how long have you been in that position?

9     **A.  Since the school opened.**

10    Q.  When was that?

11    **A.  In 2000.**

12    Q.  The year 2000?

13    **A.  Yes.  Well, I have been in that district.  I have**

14  **taught at St. Andrews and Middleton, and then they**

15  **combined.  So I've been over there since really '87.**

16    Q.  Oh, wow.  Okay.

17    **A.  Yeah.  And then they combined and made West**

18  **Ashley High.**

19    Q.  And when did West Ashley High open?

20    **A.  We moved into the building in 2000.**

21    Q.  In 2000.  Okay.  And you have been there

22  continuously ever since?

23    **A.  Yes, sir.**

24    Q.  And in the same role, as a social studies

25  teacher?

Spectrum Court Reporting and Legal Video
843.849.0133

894d79df-1df6-436d-9c48-278022560bd0

**JA1117**

Maria Y. Williams - 10/25/2021

Page 6

1     **A.  Yes.**

2     Q.  And have you been a coach or a PE teacher?

3     **A.  Coach.**

4     Q.  What do you coach?

5     **A.  Basketball.**

6     Q.  Boys and girls?

7     **A.  Just girls.**

8     Q.  Just girls' basketball.

9           And you've coached basketball since then

10    or --

11    **A.  Yes.**

12    Q.  The whole time?

13    **A.  Yes.  Well, not there, not there, because I've**

14    **been at James Island prior.  I didn't get to West**

15    **Ashley -- I didn't coach at West Ashley until '04.**

16    Q.  Okay.  So you started coaching at West Ashley in

17    2004?

18    **A.  Right.**

19    Q.  But you have been there since 2000 teaching

20    social studies?

21    **A.  Yes.**

22    Q.  Got you.  So we sent a Notice that had a list of

23    topic areas, and you were designated the person that

24    would have the most knowledge of these topic areas.

25          Have you had a chance to look at those topic

894d79df-1df6-436d-9c48-278022560bd0

**JA1118**

Maria Y. Williams - 10/25/2021

1    areas?

2      **A.  Yes.**

3      Q.  And I will just read the first one, which is

4    persons who can testify as to when any or all of the

5    locker rooms were covered up.

6              What knowledge do you have on that subject?

7      **A.  I could only speak on my office, the girls'**

8    **basketball locker room.  I don't know about the PE rooms**

9    **and stuff, only that.**

10     Q.  What about the girls' locker room?

11     **A.  For basketball, the girls' basketball?  Yeah,**

12   **that's what I'm talking about.**

13     Q.  Well, actually let's just back up so we have an

14   understanding of what we're talking about.

15             So there is the PE locker rooms?

16     **A.  Yes.**

17     Q.  And then are there varsity or junior varsity or

18   just varsity?  I'm not sure.

19     **A.  Both.**

20     Q.  There is both?

21     **A.  Yeah.**

22     Q.  Are the varsity locker rooms bigger or are they

23   the same?

24     **A.  Compared to --**

25     Q.  Each other.

Maria Y. Williams - 10/25/2021

1      **A.   -- the PE locker rooms?**

2      Q.   Sure.

3      **A.   No.**

4      Q.   The PEs are bigger?

5      **A.   Yes.**

6      Q.   Okay.   And is it -- the PE locker rooms are on

7   one side of the basketball court, and then is the

8   varsity and JV locker rooms on the other side of the

9   court?

10     **A.   No.**

11     Q.   No?   Where are they located?

12     **A.   On the same side, according to how our gyn is set**

13  **up.   You have boys on one said and then the girls on the**

14  **other.**

15     Q.   Okay.   I'm with you.   So the girls'-- you're

16  familiar with the girls' locker room obviously.

17          Have you ever been into the boys' locker

18  rooms?

19     **A.   Huh-huh, to the door, to the door, and I yell**

20  **coach.**

21     Q.   Do you know anybody that would know whether the

22  locker -- whether the viewing windows in the boys'

23  locker room were ever covered up or obscured?

24     **A.   You would have to -- you would have to ask the**

25  **coach that, the former couch that was there.   I don't**

894d79df-1df6-436d-9c48-278022560bd0

**JA1120**

Maria Y. Williams - 10/25/2021

Page 9

1    know.  Because, like I say, me and my staff, we didn't

2    go there.

3        Q.  I understand.

4        A.  So I don't know what they did over on that side.

5        Q.  Who is the current coach over there?

6        A.  I couldn't tell you.

7        Q.  Okay.

8        A.  I'm just -- since retiring from it, I've stepped

9    away from it, so I'm just strictly on teaching.  And

10   once my job is done in the day --

11       Q.  You're out of there?

12       A.  -- I'm out the door.

13       Q.  I got you.  Fair enough.

14           So I think you were saying the girls' locker

15   rooms, they have had -- or correct me if I'm wrong.

16   There is some obscurement or covering of these windows?

17   Yes?

18       A.  Yes.

19       Q.  And how long has that condition been that way?

20       A.  Ever since I took over.

21       Q.  So that would be 2004?

22       A.  Uh-huh.

23       Q.  It looks like in some of those areas on the

24   girls' side there was like a retractable monolithic

25   screen you could pull down.

Spectrum Court Reporting and Legal Video
843.849.0133

Maria Y. Williams - 10/25/2021

Page 10

1          Has that always been there or -- no?

2    A.  No.

3    Q.  Do you know what I'm talking about?

4    A.  Yeah, because we have them in the classroom; but

5  no.

6    Q.  You don't know when that was installed?

7    A.  I don't know.  I don't know if they just

8  installed that.  Like I said, I haven't been -- since

9  leaving I have not been -- I haven't even been in that

10  locker room since leaving.

11    Q.  When did you leave?

12    A.  About three years ago when I retired, so I don't

13  know what's in there now.

14    Q.  2018 or so you left?

15    A.  Uh-huh.

16    Q.  And are you teaching now?

17    A.  Uh-huh.

18    Q.  Where are you now?

19    A.  I'm still there.

20    Q.  Oh, okay.  You said you retired.

21    A.  No, basketball, coaching.

22    Q.  You're done with coaching?

23    A.  Coaching, done with coaching.  Yeah, I still

24  teach.

25    Q.  I understand.  One of our topic areas is persons

Maria Y. Williams - 10/25/2021

Page 11

1  who can testify as to why some locker rooms in the

2  girls' varsity are covered and others are not covered.

3            Are there some on the girls' side that

4  aren't covered?

5    **A.  I don't know.  The only thing I can attest to is**

6  **the girls' basketball locker room, that's it, and the**

7  **office.  So you have varsity here.  Well, we divided it.**

8            **So you have a varsity side, and then it's**

9  **the office, my office where me and my coaches would be,**

10 **and then on the other side is the JV.  We covered our**

11 **windows.  We kept our windows covered.  So I don't know**

12 **what anybody else did.**

13   Q.  And from what you said, it was always covered

14 since you were there?

15   **A.  Yes, sir.**

16   Q.  And when you were there, were you still able to

17 ensure the safety of the students in the locker room

18 even though the windows were covered?

19   **A.  Uh-huh.**

20   Q.  Yes?

21   **A.  Yes.  Sorry.**

22   Q.  And did you have any incidents or disciplinary

23 issues while you were there in the locker rooms that you

24 recall?

25   **A.  No.**

894d79df-1df6-436d-9c48-278022560bd0

**JA1123**

Maria Y. Williams - 10/25/2021

Page 12

1    Q.  They were good girls?

2    **A.  They were girls, you know, teenagers.  But, I**

3    **mean, as incidents for like fighting, incoming -- no,**

4    **not like that.  I mean, whatever incidents we had, we**

5    **would take it to the court, sat around, talk about it,**

6    **whatever we needed to do.**

7              **I mean, really, our locker room was just**

8    **basically come in and change for practice, change for**

9    **the game and we're out.**

10   Q.  Do you agree with me that students in the locker

11   rooms have a reasonable expectation to privacy?

12             MR. DUKES:  Object to the form.

13   **A.  Yeah.**

14   Q.  (BY MR. HALVERSEN):  Just to clarify what you

15   told us before, you didn't cover those windows, they

16   were already covered when you got there?

17   **A.  No.  My assistant coach would make sure they are**

18   **covered.  I would tell them, look, we need to -- when it**

19   **was our time for the locker room, the season started, we**

20   **made sure we covered.  So I would say, hey, get the**

21   **windows covered.**

22   Q.  Oh.

23   **A.  So I don't know what the other girls' coaches**

24   **did, anybody did in the girls' locker room.  I can only**

25   **say this, because that was my level of comfort, go ahead**

894d79df-1df6-436d-9c48-278022560bd0

**JA1124**

Maria Y. Williams - 10/25/2021

Page 13

1    and cover them.

2        Q.  And so you made sure that they were covered?  Is

3    that what you're saying?

4        A.  Yes.

5        Q.  Why was that?

6        A.  Privacy.

7        Q.  In your locker room, because that's the one you

8    were telling me you were familiar with, was it possible

9    to view the students, the girls in that locker room

10   without them knowing?

11       A.  No.

12       Q.  Thank you, Ms. Williams.  That's all I have for

13   you.  Mr. Dukes may have some questions for you.

14       A.  Oh, okay.

15                      EXAMINATION

16   BY MR. DUKES:

17       Q.  How many students would be in the locker room at

18   any given time when they were changing clothes?

19       A.  Well, the team had a team of 13.  Some would

20   change right there in the locker room and some would go

21   in the shower area, because we had a shower area.  And

22   then some would just go out in the bathroom to change.

23   Just their personal -- some of them, I guess, didn't

24   feel comfortable undressing in front of each other so

25   they just -- but it would depend on the time frame for

894d79df-1df6-436d-9c48-278022560bd0

JA1125

Maria Y. Williams - 10/25/2021

Page 14

1    practice.

2            Some would get there early, change, go out

3    on the floor, others would come in.  So as long as they

4    were on the floor by a certain time, I was fine with

5    that.

6        Q.  You know, I think that's all I have for you.

7        A.  Okay.

8            MR. DUKES:  Thank you for coming.

9            MS. RICHTER:  Thank you.

10           (The deposition was concluded at 10:09 a.m.)

11                        -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Spectrum Court Reporting and Legal Video
843.849.0133

894d79df-1df6-436d-9c48-278022560bd0

**JA1126**

Maria Y. Williams - 10/25/2021

Page 15

```
1    STATE OF SOUTH CAROLINA  )
                              )
2                            )
     COUNTY OF CHARLESTON     )
3
         I, Nancy Ennis Tierney, Certified Shorthand Reporter
4    and Notary Public for the State of South Carolina at
     Large, do hereby certify that the witness in the
5    foregoing deposition was by me duly sworn to testify to
     the truth, the whole truth and nothing but the truth in
6    the within-entitled cause; that said deposition was
     taken at the time and location therein stated; that the
7    testimony of the witness and all objections made at the
     time of the examination were recorded stenographically
8    by me and were thereafter transcribed by computer-aided
     transcription; that the foregoing is a full, complete
9    and true record of the testimony of the witness and of
     all objections made at the time of the examination; and
10   that the witness was given an opportunity to read and
     correct said deposition and to subscribe the same.
11
         Should the signature of the witness not be affixed to
12   the deposition, the witness shall not have availed
     himself/herself of the opportunity to sign or the
13   signature has been waived.

14       I further certify that I am neither related to nor
     counsel for any party to the cause pending or interested
15   in the events thereof.

16       Witness my hand, I have hereunto affixed my official
     seal this 6th day of November, 2021, at Charleston,
17   Charleston County, South Carolina.

18

19

20

21

22

23
                     _____
24                   Nancy Ennis Tierney, CSR (IL)
                     My Commission Expires:
25                   June 12, 2024
```

Spectrum Court Reporting and Legal Video
843.849.0133

894d79df-1df6-436d-9c48-278022560bd0

**JA1127**

USCA4 Appeal: 22-1750    Doc: 19-3    Filed: 10/07/2022    Pg: 26 of 557

# EXHIBIT 16

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

**C/A No.: 2:21-cv-00613-RMG**

| | |
|---|---|
| Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually,<br><br>Defendants. | **DEFENDANT BISHOP ENGLAND HIGH SCHOOL'S SUPPLEMENTAL ANSWERS TO PLAINTIFFS' FIRST INTERROGATORIES** |

By way of general objection to Plaintiff's discovery requests, Bishop England High School is an operation and ministry of Bishop of Charleston, a Corporation Sole, and has no separate existence from the Corporation Sole. Subject to and without waiving the stated objections, said Defendant supplements its answers Plaintiffs' First Interrogatories as follows:

**SUPPLEMENTAL ANSWERS TO PLAINTIFFS' FIRST INTERROGATORIES**

8.      Please state all disciplinary infractions that have occurred in any of the dressing rooms and/or locker rooms from 1998 to date, stating the type of infraction, how it was discovered, whom the infraction was reported to, and the disposition of the infraction.

**SUPPLEMENTAL ANSWER:**

Pursuant to Rule 33(d), Plaintiff is referred to the incident reports that have been produced.

**JA1129**

9.    Please state all disciplinary infractions that have occurred in any of the bathroom facilities from 1998 to date, stating the type of infraction, how it was discovered, whom the infraction was reported to, and the disposition of the infraction.

**SUPPLEMENTAL ANSWER:**

**Pursuant to Rule 33(d), Plaintiff is referred to the incident reports that have been produced.**

10.    For Interrogatories #8 and #9, were these incidents reported to the appropriate BEHS authority, Diocesan authority, or police/law enforcement/or government agency?

**SUPPLEMENTAL ANSWER:**

**Yes.**

14.    Please describe, including by name, date, location, and total earnings, every gambling event or activity engaged in by or for the benefit of BEHS or any of its affiliated entities for the time period of 1998 to date.

**SUPPLEMENTAL ANSWER:**

**Subject to and without waiving the previously-stated objections,**

**The Triple B Club for Bishop England High School is a registered 501(c)(3) entity that operates as a booster organization.  The Club is separately incorporated and is independent from the Diocese or Bishop England High School, who exercise no supervision or control over the Club.  The Club has employed a number of fundraising techniques to facilitate donations to Bishop England High School, including a raffle.  In accordance with Diocesan policy prohibiting games of chance, BEHS students are not permitted to sell Club raffle tickets and tickets are not sold on Diocesan property.**

2

**JA1130**

15.    To the extent respondent hereto claims that acts described in response to the preceding

interrogatory were not illegal acts, please state with specificity the reason or reasons for such claim

or claims.

**SUPPLEMENTAL ANSWER:**

**Defendant objects to Interrogatory No. 15 because BEHS cannot provide a legal**

**opinion regarding The Triple B Club's compliance with state or federal law.**

16.    State the total amount of tuition that was paid per year to BEHS for the time period

beginning with the 1998-1999 school year through the 2018-2019 school year.

**SUPPLEMENTAL ANSWER:**

| 1998-99 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 |
|---|---|---|---|---|
| $3,449,850 | 3,754,970 | 8,884,050 | $4,235,500 | $4,386,900 |
| 2003-2004 | 2004-2005 | 2005-2006 | 2006-2007 | 2007-2008 |
| 4,596,000 | $4,813,950 | $5,120,150 | $5,254,820 | $5,529,800 |
| 2008-2009 | 2009-2010 | 2010-2011 | 2011-2012 | 2012-2013 |
| $5,746,260 | $5,746,260 | $5,159,300 | $5,667,924 | $5,913,767 |
| 2013-2014 | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 |
| $6,097,390 | $6,704,000 | $7,000,000 | $7,025,400 | $6,959,400 |
| 2018-02019 | | | | |
| $7,476,000 | | | | |

20.    Please name each person who was enrolled at BEHS during the years 1998 through 2019

and for each please state the address at the time during which he/she was a student there, the last

known address, email address, and telephone number (cell phone and land line).

**SUPPLEMENTAL ANSWER:**

**Subject to BEHS's previously stated objection, the annual enrollment for BEHS was**

**as follows:**

3

**JA1131**

| 1998 – 892 | 1999 - 892 | 2000 – 883 | 2001 – 910 | 2002 – 896 |
|------------|------------|------------|------------|------------|
| 2003 – 872 | 2004 – 861 | 2005 – 860 | 2007 – 838 | 2008 – 832 |
| 2009 – 817 | 2010 – 729 | 2011 – 677 | 2012 – 669 | 2013 – 677 |
| 2014 – 715 | 2015 - 728 | 2016 – 700 | 2017 – 670 | 2018 – 684 |
| 2019 – 675 | 2020 - 685 |            |            |            |

**TURNER, PADGET, GRAHAM & LANEY, P.A.**

By:    *s/Richard S. Dukes, Jr.*

Richard S. Dukes, Jr., Federal ID No.:  7340
40 Calhoun Street, Suite 200
Charleston, South Carolina 29401
Phone: (843) 576-2810
Fax: (843) 577-1646
Email:  rdukes@turnerpadget.com

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Megan Ashley Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

**ATTORNEYS FOR DIOCESE DEFENDANTS**

October 22, 2021
Charleston, South Carolina

4

**JA1132**

# EXHIBIT 17

========================================================================

# Deposition of:

# Male Student

========================================================================

### Gary Nestler, et al
### v.
### The Bishop of Charleston, a Corporation Sole, Bishop England High School, et al

### Case #: 2:21-cv-00613-RMG

### October 4, 2021

========================================================================



## Magnolia Reporting, LLC
P.O. Box 61011
North Charleston, SC 29419
(843) 303-9141
www.MagnoliaReporting.com



**JA1134**

Male Student - 10/4/2021

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Gary Nestler, Viewed        CASE NO. 2:21-cv-00613-RMG
Student Female 200,
Viewed Student Male
300, on behalf of
themselves and all
others similarly
situated,

        Plaintiff(s),

        -vs-

The Bishop of Charleston,
a Corporation Sole,
Bishop England High School,
Tortfeasors 1-10, The Bishop
of the Diocese of Charleston,
in his official capacity, and
Robert Guglielmone, individually,

        Defendant(s).
**************************************************

DEPOSITION OF:        MALE STUDENT

DATE TAKEN:           MONDAY, OCTOBER 4, 2021

TIME:                 1:58 P.M.

PLACE:                TURNER PADGET GRAHAM LANEY, PA
                      40 Calhoun Street, Ste. 200
                      Charleston, SC  29401

REPORTED BY:          Nicole D. White
                      Certified Court Reporter
                      Notary Public

MAGNOLIA REPORTING, LLC   (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 2

```
 1   A P P E A R A N C E S
 2
     REPRESENTING THE PLAINTIFF:
 3        By:  CARL L. SOLOMON, ESQUIRE
          Solomon Law Group, LLC
 4        P.O. Box 1806
          Columbia, SC  29202
 5        (803) 391-3120
          Carl@solomonlawsc.com
 6   and
          By:  LAWRENCE E. RICHTER, JR., ESQUIRE
 7        The Richter Firm, LLC
          622 Johnnie Dodds Blvd.
 8        Mount Pleasant, SC  29464
          (843) 849-6000
 9        LRichter@richterfirm.com
     and
10        By:  BRENT HALVERSEN, ESQUIRE
          Halversen & Halversen
11        751 Johnnie Dodds Blvd., Ste. 200
          Mount Pleasant, SC  29464
12        (843) 284-5790
          Brent@Halversenlaw.com
13
14   REPRESENTING THE DEFENDANT:
          By:  RICHARD S. DUKES, JR., ESQUIRE
15        Turner Padget Graham & Laney, P.A.
          40 Calhoun Street, Suite 200
16        Charleston, SC  29401
          (843) 576-2810
17        Rdukes@turnerpadget.com
18
19
20
21
22
23
24
25
```

MAGNOLIA REPORTING, LLC   (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

1                          I N D E X

2

TESTIMONY OF MALE STUDENT

3

          By Mr. Dukes............................04

4

5    CERTIFICATE OF REPORTER.......................37

6    ERRATA SHEET..................................38

7

8

                       E X H I B I T S

9

          (No exhibits were marked or offered.)

10

11

12                        STIPULATIONS

13        It is hereby stipulated and agreed by and

14   between the parties hereto, through their

15   respective counsel, that the reading and signing

16   of the transcript is reserved by the Deponent.

17

18

19

20

21

22

23

24

25

Electronically signed by Nicole White (301-070-154-1752)            de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1137

Male Student - 10/4/2021

Page 4

1           (MALE STUDENT, having been first duly

2    sworn, testified as follows:)

3                    E-X-A-M-I-N-A-T-I-O-N

4    BY MR. DUKES:

5           Q.  Good afternoon, Tomas.

6           A.  Good afternoon.

7           Q.  I'm Richard Dukes.  I'm the lawyer

8    representing the Diocese in the case you brought.

9           A.  Uh-huh.

10          Q.  I know you heard -- listened in on

11   when I deposed your sister and it will go more or

12   less the same.

13          A.  (Indicating).

14          Q.  There are a few rules that I'm

15   required to tell you about.  First, that if you

16   don't understand one of my questions, you have to

17   ask me to clarify.

18          A.  (Indicating).

19          Q.  Back in the old days when these two

20   started practicing, the witness could turn to the

21   lawyer and say, what's he asking me, and then the

22   lawyer would explain it and they put a stop to

23   that.

24                  MR. RICHTER:  If we explain

25       something, though, listen closely.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 5

1  BY MR. DUKES:

2        Q.  Another rule is that now that your

3  deposition has started, if we take a break, you

4  can't talk to anybody about the substance of your

5  testimony and I can ask you about that.

6        A.  (Indicating).

7        Q.  Our court reporter would appreciate it

8  if you'd answer my questions out loud and it

9  didn't seem like your sister and I had a problem

10  with talking over each other, but she would also

11  appreciate it if you would let me finish asking

12  my question and then I'll let you finish

13  answering my question.

14        A.  Okay.

15        Q.  If you don't understand one of my

16  questions, just let me know and I'll rephrase.

17        A.  (Indicating).

18        Q.  Tell me, where do you live now?

19        A.  154 Sancho (ph) Drive.

20        Q.  And where is that?

21        A.  It's Daniel Island, more or less.  St.

22  Thomas Island, technically.

23              MR. RICHTER:  Rich, I'm sorry, I

24        know I stepped out.  Did you tell him about

25        him controlling breaks and if he needs

Electronically signed by Nicole White (301-070-154-1752)

**JA1139**

Male Student - 10/4/2021

Page 6

```
 1          anything and that sort of stuff?
 2                    MR. DUKES:  Yeah.
 3                    MR. RICHTER:  The reason I do
 4          this is because that includes lunch.  If
 5          somebody is hungry, for example, if the
 6          witness is hungry, it's on Rich to bring
 7          lunch in for all of us.
 8                    MR. DUKES:  Unfortunately,
 9          Hall's Chophouse is not open for lunch.
10   BY MR. DUKES:
11          Q.  Do you live alone or do you live with
12   somebody?
13          A.  With my parents.
14          Q.  Are you in school?
15          A.  No, sir.
16          Q.  Are you working?
17          A.  I am.
18          Q.  Where are you working?
19          A.  At the Charleston County Registrar of
20   Deeds as well as the Charleston Bike Taxi.
21          Q.  What do you do for the Registrar of
22   Deeds other than register deeds?
23          A.  As well as I prep satisfactions of
24   mortgages, as well as assignments of rents and
25   assignment of mortgages.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 7

```
 1          Q.   Okay.  And how often do you drive for
 2     the Bike Taxi?
 3          A.   I bike two to three shifts, which can
 4     be seven to eight hours each.  Two to three
 5     shifts a week.
 6          Q.   Is your job at the Registrar of Deeds
 7     part time?
 8          A.   Full time.
 9          Q.   Okay.  Did you graduate from college?
10          A.   Yes.
11          Q.   And where did you graduate?
12          A.   College of Charleston.
13          Q.   What year did you graduate?
14          A.   May of 2021.
15          Q.   Oh, so recent graduate?
16          A.   Yes.
17          Q.   What's your degree in?
18          A.   Political science and Spanish.
19          Q.   When did you attend Bishop England
20     High School?
21          A.   2012 to 2016.
22          Q.   And I assume you graduated from there?
23          A.   Yes.
24          Q.   Did you ever encounter a man named
25     Jeffrey Scofield?
```

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1141

Male Student - 10/4/2021

Page 8

1          A.   Yes.

2          Q.   Tell me about that.

3          A.   He would sub in when there was no

4    other subs available and if it was a last-minute

5    thing.  He worked in the office doing work there

6    and he also did things with sports.

7          Q.   Did he ever have any -- did you play

8    sports?

9          A.   I did, my freshman year.

10         Q.   And what did you play?

11         A.   Soccer.

12         Q.   Did you ever take P.E., physical

13   education?

14         A.   I did, as it was mandatory for every

15   student.

16         Q.   That's your sophomore year?

17         A.   Yes, sir.

18         Q.   Have you ever filed suit against

19   anybody other than this one?

20         A.   No.

21         Q.   What about, have you ever been sued?

22         A.   No.

23         Q.   Have you ever been arrested?

24         A.   No.

25         Q.   Have you ever been charged with a

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1142

Male Student - 10/4/2021

Page 9

1   crime?

2           A.   Nope.

3           Q.   Are you on any sort of medication that

4   would affect your memory today?

5           A.   No.

6           Q.   Did you -- I'm gonna turn to talking

7   for a little bit about the locker rooms at Bishop

8   England.

9           A.   Okay.

10          Q.   When you played soccer, did you ever

11  change clothes in the locker room?

12          A.   No.

13          Q.   What about when you took physical

14  education?

15          A.   Yes.

16          Q.   How often did you do that?

17          A.   Every day we had P.E., we had to

18  change.

19          Q.   And as I recall, one class rotates off

20  of a schedule each week?

21          A.   Yes.

22          Q.   Was anyone else present when you

23  changed clothes in the locker room?

24          A.   Yes, my fellow classmates.

25          Q.   Was anybody next to you?

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1143

Male Student - 10/4/2021

Page 10
 1          A.   Yes, my classmates.
 2          Q.   How many people would have been in
 3   there?
 4          A.   Fifteen to twenty.
 5          Q.   Did you ever see anybody holding a
 6   cell phone in the locker room?
 7          A.   Yes.
 8          Q.   How often was that?
 9          A.   Scarce.
10          Q.   Why is that?
11          A.   Because B.E. did not allow cell
12   phones.
13          Q.   Did anybody ever take a picture in the
14   locker room?
15          A.   No.
16          Q.   Did you notice the windows that are in
17   the locker room?
18          A.   Yes.
19          Q.   Describe them for me, please.
20          A.   I can't tell you the size.  I don't
21   remember the dimensions by fact, but it was a
22   window that went from one office into the locker
23   room with blinds, like the blinds that are in
24   this office.
25          Q.   Uh-huh.  Did you ever see the blinds

Electronically signed by Nicole White (301-070-154-1752)                                    de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1144**

Male Student - 10/4/2021

Page 11

```
 1   open?
 2          A.  No.
 3          Q.  Did you ever go in the coaches' office
 4   on the other side?
 5          A.  No.
 6          Q.  Did you ever see anyone inside the
 7   office looking into the locker room?
 8          A.  At times.
 9          Q.  And who did you see?
10          A.  But not often.  Kenny or Rooney (ph).
11   It was Rooney's office.
12          Q.  And that's Coach Cantey?
13          A.  Yes.
14          Q.  The football coach?
15          A.  Yes.
16          Q.  How did you see him, were the blinds
17   open?
18          A.  I could see the -- I could see that
19   the light was on in the office.  And when I would
20   leave the locker room, I would see someone was in
21   the office.
22          Q.  So you didn't see them looking into
23   the office from the locker room?
24          A.  No.
25          Q.  Did you ever see anybody else in one
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)          de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1145**

Male Student - 10/4/2021

Page 12

1  of the two offices on the boys' side?

2         A.  No.

3         Q.  Did you ever go on the girls' side,

4  the other side of the gym?

5         A.  No.

6         Q.  When you saw either Coach Cantey or

7  Coach Rooney sitting in the coaches' office, were

8  you walking down the hall and looking in the

9  window that's in the door?

10        A.  The door would be open if I were to

11 have seen them.

12        Q.  Okay.  Did the door stay open when you

13 were in the office?

14        A.  Well, the door was majority --

15 majority of the time it was open when closed into

16 the office.

17        Q.  Okay.  Did you ever see anyone in the

18 office with the door closed?

19        A.  Very scarcely or scarcely.

20        Q.  And from the hallway, did you ever --

21 was there ever a time when you could look into

22 the locker room from the hall through the

23 coaches' doorway?

24        A.  I never did, so I wouldn't know.

25        Q.  Did you ever see anybody else in the

Electronically signed by Nicole White (301-070-154-1752)                                              de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1146**

Male Student - 10/4/2021

Page 13

1    coaches' offices other than Rooney and Cantey?

2         A.   Maybe after school some of the

3    football players or the basketball players, but

4    during P.E., no.

5         Q.   Did you ever observe somebody staring

6    through the window in the door to the coaches'

7    office?

8         A.   Can you repeat the question?

9         Q.   Sure.  Did you ever see somebody

10   staring into the coaches' office from the hallway

11   with you being in the locker room?

12        A.   No.

13        Q.   Did you ever complain to anybody about

14   the presence of the windows in the locker room?

15        A.   No.

16        Q.   And the windows were open and obvious,

17   would you agree with me?

18        A.   The windows, what do you mean by,

19   "open and obvious"?

20        Q.   You could see if they were there?

21        A.   Yeah.

22        Q.   And it was obvious that they were

23   windows?

24        A.   Yeah.

25        Q.   And it was obvious that the windows

Electronically signed by Nicole White (301-070-154-1752)            de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1147

Male Student - 10/4/2021

Page 14

1    were opening into or from the coaches' office,
2    right?
3            A.   Yeah, into the locker room.
4            Q.   And it's not like these windows were a
5    two-way mirror where if you were looking at it
6    from the locker room, if it would reflect back at
7    you, but somebody on the other side could look
8    in?
9            A.   No.
10           Q.   And it wasn't concealed in any way,
11   was it?
12           A.   Concealed by which means?
13           Q.   It was hidden?
14           A.   No, it was not hidden, in plain sight.
15           Q.   Will you agree with me that given that
16   teenagers -- almost every teenager had a cell
17   phone at the -- when you were a student at B.E.
18   by that time?
19           A.   Yes.
20           Q.   And at any time they could have --
21   somebody else, some other student could have
22   taken a picture of people in the locker room?
23           A.   Possibility, yes.
24           Q.   When was the first time you expressed
25   concern that there were windows in the locker

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1148**

Male Student - 10/4/2021

Page 15

1    rooms?

2         A.   When I heard about -- when I heard

3    about the Jeff Scofield incident.

4         Q.   What did you hear about it?

5         A.   My mother sent me a text because --

6    she sent me a text with the Live News, Live 5

7    News of the article of Jeff Scofield recording or

8    having footage of boys changing in the locker

9    room.

10        Q.   Has anyone ever informed you that you

11   were photographed by any person, not just

12   Scofield, when you were changing clothes in the

13   locker room?

14        A.   No, no one has informed me.

15        Q.   What did you do when your mother told

16   you about Jeffrey Scofield's arrest?

17        A.   I mean, I texted her back, but I had

18   emotions going through my head.

19        Q.   What were those emotions?

20        A.   Frustration, anxiety, feeling upset

21   for the kids who were -- who were known that they

22   were photographed or videotaped.

23        Q.   Okay.  What about the people who

24   weren't photographed?

25        A.   I felt bad for them, as well.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

JA1149

Male Student - 10/4/2021

Page 16

1        Q.   Why?

2        A.   Because they are living in a world of

3    they don't know, which, in some cases, can be

4    worse than knowing.

5        Q.   But you also don't know whether

6    anybody else ever took a photograph in the locker

7    room, a student?

8        A.   I do not.

9        Q.   Does that give you anxiety?

10       A.   That a student --

11       Q.   Uh-huh.

12       A.   -- videotaped or take a photo?

13       Q.   Uh-huh.

14       A.   Yeah, it gives me anxiety.

15       Q.   Okay.  What are you afraid of?

16       A.   My videos -- photos of me or videos of

17   me being leaked of me, as well as students and my

18   fellow classmates, because as I can see, it was

19   something that was -- that happened when I was

20   there or after my fact.  I mean, graduating.

21       Q.   And do you know what happened to

22   Scofield's computer and phone and iPad?

23       A.   I do.  Well, I -- from what I heard

24   from the news, that's all I know.

25       Q.   Okay.  It's been taken by the attorney

Electronically signed by Nicole White (301-070-154-1752)

de262aec-92dd-4ce0-a28d-13eabf9d3026

Male Student - 10/4/2021

Page 17

1   general's office?

2           A.   Uh-huh.

3           Q.   And it's locked down, nothing that's

4   on it will ever appear.

5           A.   But we don't know if it's been on the

6   dark web.

7           Q.   Okay.

8           A.   Prior to him being convicted.

9           Q.   How would you find out?

10          A.   I would have -- I wouldn't.

11          Q.   Why did you decide to file this

12  lawsuit?

13          A.   Because it was imperative that people

14  like me and my fellow classmates have someone

15  stand up for actions like this that happen quite

16  often, as we can see, in environments that it

17  shouldn't, like private institutions where we

18  confide our trust and especially religious

19  institutions where we pay a good sum of money to

20  go.

21          Q.   Are you aware if other schools have

22  similar windows in the locker room?

23          A.   I'm not aware.

24          Q.   What do you want to accomplish with

25  this lawsuit?

Electronically signed by Nicole White (301-070-154-1752)            de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1151**

Male Student - 10/4/2021

Page 18

 1          A.  I want things like this to never
 2  happen again.  I think I have had damages done to
 3  me and I'm sure my fellow classmates have had
 4  damages done to them mentally and maybe
 5  physically for all, I can't speak on behalf of
 6  them.
 7          Q.  How have you been injured?
 8              MR. SOLOMON:  I don't know if he
 9      was finished, Rich.
10  BY MR. DUKES:
11          Q.  I'm sorry.
12          A.  Would you want me to finish what I was
13  saying first?
14          Q.  Yeah, please.
15          A.  So I was saying just that they have
16  mentally and physically probably been damaged and
17  yeah, I think that's it.  I think that's where I
18  was going with that.
19          Q.  So you think that all the other
20  students at the school would have been damaged by
21  the fact that there was a window in the locker
22  room?
23          A.  I can't speak for all, but I can speak
24  for -- yeah, the majority, I'm sure.
25          Q.  Why do you say that?  Have you talked

Electronically signed by Nicole White (301-070-154-1752)                                    de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1152**

Male Student - 10/4/2021

Page 19

1    to other people you've gone to school with?

2            A.   I've spoken to a handful.

3            Q.   Who are those?

4            A.   Some of my friends.

5            Q.   Yeah.  Who are they?

6            A.   Harrison Killgo (ph) is one of them.

7            Q.   Uh-huh.

8            A.   And that's all I have off the top of

9    my head.

10           Q.   And what does Harrison say about the

11   lawsuit?

12           A.   He doesn't know about the lawsuit.

13   Well, I've talked about the lawsuit maybe a

14   little, but not much about the lawsuit.  I don't

15   think it's really about the lawsuit.  We talked

16   about the Jeff Scofield incident.

17           Q.   And what did y'all say?

18           A.   No.  When the thing happened, I

19   reached out to him or he reached out to me and

20   we've talked about it, saying that it's messed up

21   and that the windows should have never been there

22   to begin with because people were -- have the

23   ability -- staff had the ability to monitor what

24   we were doing and that's a problem in and of

25   itself.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                                de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1153

Male Student - 10/4/2021

Page 20

```
 1          Q.  You don't think the staff should be
 2    able to monitor what the students are doing?
 3          A.  Not in the locker room, no.
 4          Q.  Even if they're fighting or bullying
 5    or smoking?
 6          A.  At that point, someone can step out
 7    and say and call for help, if needed.  There just
 8    shouldn't be a window there.
 9          Q.  Do you know whether there's a window
10    there or not now?
11          A.  There's not, from what I've been told.
12          Q.  How did you come to file this lawsuit?
13          A.  My mother spoke to the Richters or the
14    Richters spoke to my mom.  They asked to meet my
15    mom, and from there, they had a meeting, and then
16    my mother reached out to me and said that they
17    were looking -- that they would like to speak to
18    me, and then I spoke with them, and they informed
19    me, and from there, came.
20          Q.  I'm not asking you anything your
21    lawyers told you.
22          A.  Uh-huh.
23          Q.  So what did your mother talk to The
24    Richter Firm about?
25          A.  Just about the whole incident.  She
```

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1154**

Male Student - 10/4/2021

Page 21

1    didn't really inform me much, just if I was
2    willing to meet with the lawyers.
3           Q.   How did the Richters find your mother?
4           A.   Most likely, after her -- after she
5    was in the incident with Bishop England.
6           Q.   And that's when she got fired?
7           A.   Are you talking about the incident?
8           Q.   Yeah.
9           A.   That I'm referring to?
10          Q.   Yeah.
11          A.   Yes.
12          Q.   When she posted some -- reposted some
13   information favorable to abortion rights?
14          A.   Sure.
15          Q.   Okay.  Do you know what happened in
16   her case that she brought?
17          A.   Yes.
18          Q.   What happened?
19          A.   She shared something that had to deal
20   with rights of -- with regarding people taking
21   stances for human rights and she was fired
22   because it went against what the school taught or
23   what they said they taught.
24          Q.   And she brought a lawsuit over that,
25   right?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 22

```
 1        A.  Yeah.
 2        Q.  And what happened with that lawsuit?
 3        A.  She lost.
 4        Q.  Did The Richter Firm contact your
 5   mother while the case was going on or was it
 6   after she lost?
 7        A.  After, after it was dismissed.
 8        Q.  Did you do any investigation regarding
 9   the windows prior to filing your complaint?
10        A.  What are you -- could you clarify what
11   you mean by investigation?
12        Q.  Did you research anything?
13        A.  I'm not sure what there would be to
14   research about if there was a window there, and
15   that's all there was to it, and I was a part of
16   it.
17        Q.  Do you know who designed the window?
18        A.  An architect.
19        Q.  Do you know why they designed the
20   offices to have windows in the locker room?
21        A.  I'm sure they talked with B.E. about
22   it, Bishop England, and the Diocese of
23   Charleston.  I'm sure they didn't just do it by
24   themselves.
25        Q.  Have you talked to any other -- the
```

Electronically signed by Nicole White (301-070-154-1752)

**JA1156**

de262aec-92dd-4ce0-a28d-13eabf9d3026

Male Student - 10/4/2021

Page 23

1    alumni of the school or students about the case?

2         A.   No.

3         Q.   Have you talked to any parents of B.E.

4    students about the lockers in the locker room or

5    the windows in the locker room?

6         A.   No.

7         Q.   When's the last time you went in one

8    of those locker rooms?

9         A.   In Bishop England --

10        Q.   Uh-huh.

11        A.   -- in particular?  Ever since I've

12   graduated, I have not gone back.

13        Q.   Have you ever exchanged e-mails or

14   text messages with anybody about this lawsuit

15   other than your attorneys?

16        A.   No.

17        Q.   Have you received any communication

18   from the school regarding the lawsuit?

19        A.   Nope.  Never an apology or anything

20   either.

21        Q.   Have you ever posted on any social

22   media about your lawsuit?

23        A.   No.

24        Q.   What about posting about the situation

25   at B.E. back in 2019?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 24

1          A.   No, I have not.

2          Q.   How did Bishop Guglielmone injure you?

3          A.   He's responsible.  He's just -- like I

4    work at the Register of Deeds, and if something

5    were to happen, the elected official who's my

6    boss, if I were to mess up bad, who's gonna be

7    put on the news, it would be him.  So he's in the

8    same boat.  He's the person in charge and my

9    attorneys are the ones who are in charge of

10   bringing the lawsuit against the people in

11   charge.

12         Q.   How do you think that all of the

13   people who have attended B.E. and people who have

14   changed clothes in the locker room are -- have

15   been injured?

16         A.   I can't speak for everyone.  I'm not

17   gonna generalize everyone's emotions because

18   people feel and think differently.  However, I

19   can speak that it has -- it has definitely been a

20   negative impact on my life, and I'm certain

21   that it's been a negative impact on a lot of

22   theirs, and I don't want to get into things that

23   could injure them worse than what they've already

24   suffered.

25         Q.   Well, it can't happen again.  Windows

Electronically signed by Nicole White (301-070-154-1752)          de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1158**

Male Student - 10/4/2021

Page 25

1   aren't there.
2           A.  But it can happen -- what do you mean?
3           Q.  The windows aren't there.
4           A.  Yes, and...
5           Q.  So why worry about something that
6   can't happen?
7           A.  It can happen again.  Another building
8   can be constructed and there can be windows there
9   or they can go to another -- they can play
10  another college sport, another sport when they're
11  older and something like that could happen again.
12          Q.  So you think, in your opinion, you
13  should never have windows in a locker room?
14          A.  No, never.
15          Q.  But you don't have a degree in
16  architecture, do you?
17          A.  No, but I've been to -- I've played
18  college soccer and I've played in various,
19  multiple locker rooms across the country and I've
20  never seen a window in there.
21          Q.  But you would have been there in the
22  visiting team's locker room, right?
23          A.  Yep.
24          Q.  And there was a coach in the room with
25  you?

Electronically signed by Nicole White (301-070-154-1752)          de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1159**

Male Student - 10/4/2021

Page 26

 1           A.  No, not when I was changing.  The
 2   coaches step out.
 3           Q.  When did you -- did you meet with
 4   Dr. Solis (ph) from Beaufort?
 5           A.  Yes, on Zoom.
 6           Q.  On Zoom?  And what did y'all talk
 7   about?
 8           A.  We talked about how it affected --
 9   well, what I thought about it and how it affected
10   me mentally.
11           Q.  When did you see her or see her over
12   Zoom?
13           A.  I'd like to say two to three weeks
14   ago.
15           Q.  Up until that time, how had the fact
16   that Jeffrey Scofield had photographed other
17   people, how had that impacted your life?
18           A.  Because at that -- when I found out,
19   it impacted me because it took away a lot of my
20   innocence at a young age and something that many
21   people go their whole lives without being taken.
22   It forced me to grow up.  And I'm not -- it's not
23   only me that I'm speaking for.  I'm speaking for
24   the people who have not -- my fellow classmates
25   who don't have the courage or the stamina to

Electronically signed by Nicole White (301-070-154-1752)                de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1160**

Male Student - 10/4/2021

Page 27

1  stand up for themselves.

2       Q.  And you think all of the people who

3  attended Bishop England over the last nearly

4  30 years lack the courage to stand up for

5  themselves?

6       A.  Again, I can't speak for every single

7  individual.

8       Q.  Has anyone reached out to you to say

9  thank you for bringing this lawsuit?

10      A.  No, because I've not spoken to many

11 others, as I do not want my name to be

12 publicized.

13      Q.  Are you anxious that one of your

14 fellow students might have photographed you in

15 the locker room?

16      A.  Yes.

17      Q.  But you hadn't sued them?

18      A.  I also don't know if they -- if

19 they've done it or not.  I'm not gonna sue on the

20 fact of me not knowing.

21      Q.  Okay.  You don't know whether anybody

22 took a picture of you in the locker room, do you?

23      A.  To my knowledge, I do not.

24      Q.  What do you understand are your duties

25 as a class representative?

Electronically signed by Nicole White (301-070-154-1752)                de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1161

Male Student - 10/4/2021

Page 28

```
 1          A.  Could you rephrase that?
 2          Q.  Yeah.  What's your job?
 3          A.  In this lawsuit?
 4          Q.  Uh-huh.
 5          A.  My job's to speak for my fellow
 6   classmates.
 7          Q.  And what -- what are you seeking to
 8   get for them?
 9          A.  Compensation.
10          Q.  Okay.
11          A.  For damages and loss.  For their
12   damages.
13          Q.  Okay.  And you'll agree with me that
14   every student is impacted in a different way by
15   an event like this?
16          A.  Yes.
17          Q.  Some may not be affected at all?
18          A.  That's an opinion.
19          Q.  Okay.  But you don't know?
20          A.  No.
21          Q.  Do you understand that you have to put
22   the interests of the other people who have
23   attended Bishop England over the years, their
24   interests have to go in front of your own; do you
25   understand that?
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1162**

Male Student - 10/4/2021

Page 29

1          A.  My interests goes hand in hand with
2     theirs.
3          Q.  Well, you couldn't settle this case
4     without letting everybody in the class know?
5          A.  Yes, but they also couldn't settle the
6     case if no one stepped up.
7          Q.  What's your involvement in preparing
8     the complaint?
9          A.  I've spoken with my lawyers, I've met
10    with them.
11         Q.  And I don't want to know anything
12    about what happened in those meetings.
13         A.  Uh-huh.
14         Q.  I'm not entitled to know that.  Did
15    you review the complaints before they got filed?
16         A.  Yes.
17         Q.  Did you make any --
18         A.  For the most part.
19         Q.  Did you make any notes and I'm not
20    asking whether you communicated with your
21    lawyers?
22         A.  Uh-huh.
23         Q.  Did you make any -- think of anything
24    that needed to be corrected?
25         A.  No, I did not.

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1163**

Male Student - 10/4/2021

Page 30

```
1         Q.  So as I understand it, The Richter
2    Firm reached out to your mother to see if she had
3    any children who would be interested in filing
4    the lawsuit?
5                   MR. SOLOMON:  Object to the
6         form.
7    BY MR. DUKES:
8         Q.  Right?
9         A.  Yes.
10        Q.  And your mother put The Richter Firm
11   in touch with you, correct?
12        A.  Yes.  She asked me if I was willing.
13        Q.  What else did you and your mother talk
14   about in connection with filing this lawsuit?
15        A.  She explains the case -- she explained
16   what -- about the Jeff Scofield incident, which
17   we talked about again, and then she told me if
18   I'm willing -- if I'm willing to go on and talk
19   about it or join the case and part of this class,
20   of the students.
21        Q.  Do you know whether The Richter Firm
22   reached out to any other students, former
23   students?
24        A.  They have told me that they have.
25        Q.  Other than today, when was the first
```

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1164**

Male Student - 10/4/2021

Page 31

1   time that you met Carl Solomon, the lawyer

2   sitting next to you?

3           A.   About a week ago.

4           Q.   What about Dan Slotchiver?

5           A.   A week ago.

6           Q.   Mr. Halversen here?

7           A.   A week ago.

8           Q.   Prior to the lawsuit, had you met any

9   of them?

10          A.   Sorry.  I met him about like a few

11  months ago.  Sorry, my bad.

12          Q.   Prior to filing the lawsuit, had you

13  met with Mr. Solomon or Mr. Slotchiver or

14  Mr. Halversen?

15          A.   No, I had not.

16          Q.   Do you know of any other -- well, you

17  never complained about the presence of windows in

18  the locker room to someone at Bishop England,

19  right?

20          A.   No.  I knew they were there, but I

21  never connected the dots that someone would be

22  videotaping me as the blinds were closed or the

23  possibility that someone would be videotaping me.

24          Q.   Do you know anybody who got

25  photographed covertly in the locker rooms?

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1165

Male Student - 10/4/2021

Page 32

1          A.   No, that's not public knowledge, to my
2     knowledge.
3          Q.   So you're suing because of something
4     that might have happened, but you don't know
5     whether it did or not?
6          A.   I think that's worse than knowing.
7          Q.   What did you do to prepare for this
8     deposition?
9          A.   I met with my lawyers.
10         Q.   Do you know of any parents who were
11    aware of the windows in the locker room?
12         A.   No.
13         Q.   What about other students?
14         A.   The students that were there, that
15    were part of the school that change in front of
16    the -- that changed in P.E., I'm sure they know
17    about the windows being there.
18         Q.   Because they were obvious, right?
19         A.   Yeah.  Yes, sir.
20         Q.   You couldn't miss them?
21         A.   Huh-uh.  No, sir.
22         Q.   And at least you knew that the
23    coaches' offices were on the other side of that
24    window, right?
25         A.   As well as my fellow classmates.

Electronically signed by Nicole White (301-070-154-1752)                de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1166

Male Student - 10/4/2021

Page 33

```
 1          Q.  Okay.  While you were at Bishop
 2   England, are you satisfied with the education you
 3   received?
 4          A.  Yes.
 5          Q.  And you took classes in regular
 6   classrooms which seems like an alien concept
 7   today.  Teachers were there?
 8          A.  Yes.
 9          Q.  Lights were on, computers worked?
10          A.  Yes.
11          Q.  Do you know any of -- any students or
12   parents who didn't pay tuition?
13          A.  Yes.
14          Q.  Okay.  Who didn't?
15          A.  If you had -- if you -- I think there
16   was scarce scholarships.  I didn't know many
17   people who were on academic scholarships as well
18   as if you were a student of a teacher there.
19          Q.  Okay.  Do you know of any -- any
20   students who didn't play athletics?
21          A.  Yes.
22          Q.  And how many people didn't play
23   athletics, because I know that Bishop England has
24   a very high percentage?
25          A.  Yes, sir.
```

Electronically signed by Nicole White (301-070-154-1752)                                    de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1167

Male Student - 10/4/2021

Page 34

```
 1                    MR. RICHTER:  Has a high what?
 2   BY MR. DUKES:
 3         Q.  Percentage of students who
 4   participated in athletics.
 5         A.  I would say -- like you said, I think
 6   a majority, but I can't tell you a percentage or
 7   a number off the top of my head of how many did
 8   not.
 9         Q.  How many people came into Bishop
10   England for the first time as a junior?
11         A.  Was not often.  Not that often.  Not
12   that many.  Was not many.
13         Q.  Okay.  And over the years, there are
14   people who never did physical education class,
15   right?
16         A.  It was mandatory.
17         Q.  But if you came in as a junior, you
18   missed it?
19         A.  You had to have done it elsewhere, but
20   you could not graduate without doing physical
21   education.
22         Q.  Right.
23         A.  So you either did it at a different
24   school or you had to have done it -- there were
25   juniors who did the physical education if they
```

Electronically signed by Nicole White (301-070-154-1752)          de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1168**

Male Student - 10/4/2021

Page 35

1   did not do it elsewhere.

2           Q.   Okay.  Do you know of anybody who did

3   not change clothes in the locker room?

4           A.   No, I do not.

5           Q.   Are you aware of anybody who opted to

6   change clothes in one of the school bathrooms?

7           A.   I do not know of anyone.

8           Q.   And not every one of these students

9   who changed clothes in the locker room got

10  photographed by someone, right?

11          A.   Sorry, can you repeat your question?

12          Q.   Yeah.  Not every student who changed

13  clothes in the locker rooms got photographed?

14          A.   I can't speak to that.  I don't know

15  if I got videotaped or photographed and I can't

16  tell you if somebody else did or not.

17          Q.   But nobody has told you you were

18  photographed, right?

19          A.   No, I was told --

20          Q.   Law enforcement hadn't told you?

21          A.   No, but that doesn't mean it's not on

22  the dark web, as I said before, or if someone

23  else contains that information that they have not

24  publicly shared and keeping it for themselves.

25          Q.   So what do you want out of this

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

JA1169

Male Student - 10/4/2021

Page 36

1    lawsuit, money?

2            A.  I would leave that up to a jury to

3    decide.  That's not for me to decide, but I think

4    that would be -- that would help.

5            Q.  Okay.  What else?

6            A.  An apology would help, as well.  But

7    again, that's for a jury to decide.

8                    MR. DUKES:  All righty, Tomas, I

9        think that's all I have for you.

10                    THE DEPONENT:  Awesome.

11                    MR. DUKES:  Mr. Solomon might

12        have a question or two.

13                    (Whereupon, there was a short

14        break in the proceedings.)

15                    MR. SOLOMON:  No questions.

16                    MR. DUKES:  Okay, we're done.

17        (This deposition concluded at 2:38 p.m.)

18

19                    (Signature reserved.)

20

21

22

23

24

25

Electronically signed by Nicole White (301-070-154-1752)                    de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1170**

Male Student - 10/4/2021

Page 37

```
 1              C E R T I F I C A T E

 2

 3   STATE OF SOUTH CAROLINA   )

 4   COUNTY OF BERKELEY        )

 5

 6              I, Nicole D. White, Certified Court

 7   Reporter and Notary Public, State of South

 8   Carolina at Large, certify that I was authorized

 9   to and did stenographically report the foregoing

10   deposition of Male Student; and that the

11   transcript is a true record of the testimony given

12   by the witness, and was sworn as such.

13              I further certify that I am not a

14   relative, employee, attorney or counsel of any of

15   the parties, nor am I a relative or employee of

16   any of the parties' attorney or counsel connected

17   with the action, nor am I financially interested

18   in the action.

19              WITNESS MY HAND AND OFFICIAL SEAL this

20   13th day of October 2021.

21

22                          _____

                            Nicole D. White

23                          Notary Public in and for the

                            State of South Carolina

24

25   My Commission expires September 8, 2027
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 38

```
 1                E R R A T A    S H E E T
 2
    RE:  Nestler, et al -vs- The Bishop of Charleston,
 3  et al
 4  DEPOSITION OF:  Male Student
 5          Please read this original deposition with
 6  care, and if you find any corrections or changes
 7  you wish made, list them by page and line number
 8  below.  DO NOT WRITE IN THE DEPOSITION ITSELF.
 9  Return the deposition to this office after it is
10  signed.  We would appreciate your prompt attention
11  to this matter.
12          To assist you in making any such
13  corrections, please use the form below.  If
14  supplemental or additional pages are necessary,
15  please furnish same and attach them to this errata
16  sheet.
17  Page _____ Line _____ Should read:_____
18  _____
19  Reason for change: _____
20  Page _____ Line _____ Should read:_____
21  _____
22  Reason for change: _____
23  Page _____ Line _____ Should read:_____
24  _____
25  Reason for change: _____
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 39

1    Page _____ Line _____ Should read:_____
2    _____
3    Reason for change: _____
4    Page _____ Line _____ Should read:_____
5    _____
6    Reason for change: _____
7    Page _____ Line _____ Should read:_____
8    _____
9    Reason for change: _____
10   Page _____ Line _____ Should read:_____
11   _____
12   Reason for change: _____
13
14                _____
15                            Signature
16
17        SUBSCRIBED and SWORN TO before me this
18   _____ day of _____ 2021.
19
20                _____
21                         NOTARY PUBLIC
22
23   My Commission expires:_____
24
25

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)            de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1173**

# EXHIBIT 18

==================================================================

# Deposition of:

# Female Student

==================================================================

**Gary Nestler, et al**
**v.**
**The Bishop of Charleston, a Corporation Sole, Bishop England High School, et al**

**Case #: 2:21-cv-00613-RMG**

**October 4, 2021**

==================================================================



**Magnolia Reporting, LLC**
P.O. Box 61011
North Charleston, SC 29419
(843) 303-9141
www.MagnoliaReporting.com



**JA1175**

Female Student - 10/4/2021

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Gary Nestler, Viewed        CASE NO. 2:21-cv-00613-RMG
Student Female 200,
Viewed Student Male
300, on behalf of
themselves and all
others similarly
situated,

          Plaintiff(s),

          -vs-

The Bishop of Charleston,
a Corporation Sole,
Bishop England High School,
Tortfeasors 1-10, The Bishop
of the Diocese of Charleston,
in his official capacity, and
Robert Guglielmone, individually,

          Defendant(s).
**************************************************

DEPOSITION
VIA ZOOM OF:          FEMALE STUDENT

DATE TAKEN:           MONDAY, OCTOBER 4, 2021

TIME:                 12:04 P.M.

PLACE:                TURNER PADGET GRAHAM LANEY, PA
                      40 Calhoun Street, Ste. 200
                      Charleston, SC  29401

REPORTED BY:          Nicole D. White
                      Certified Court Reporter
                      Notary Public

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

```
Page 2
  1    A P P E A R A N C E S
  2
       REPRESENTING THE PLAINTIFF:
  3           (Via Zoom)
              By:  CARL L. SOLOMON, ESQUIRE
  4           Solomon Law Group, LLC
              P.O. Box 1806
  5           Columbia, SC  29202
              (803) 391-3120
  6           Carl@solomonlawsc.com
       and
  7           (Via Zoom)
              By:  BRENT HALVERSEN, ESQUIRE
  8           Halversen & Halversen
              751 Johnnie Dodds Blvd., Ste. 200
  9           Mount Pleasant, SC  29464
              (843) 284-5790
 10           Brent@Halversenlaw.com
       and
 11           (Via Zoom)
              BY:  ANNA RICHTER, ESQUIRE
 12           The Richter Firm, LLC
              622 Johnnie Dodds Blvd.
 13           Mount Pleasant, SC  29464
              (843) 849-6000
 14           ARichter@richterfirm.com
 15
       REPRESENTING THE DEFENDANT:
 16           By:  RICHARD S. DUKES, JR., ESQUIRE
              Turner Padget Graham & Laney, P.A.
 17           40 Calhoun Street, Suite 200
              Charleston, SC  29401
 18           (843) 576-2810
              Rdukes@turnerpadget.com
 19
 20    Also Present:
              (Via Zoom)
 21           Male Student
 22
 23
 24
 25
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

JA1177

Female Student - 10/4/2021

Page 3

1                    I N D E X

2

3  EXAMINATION                                    PG

4        By Mr. Dukes...........................04

5        By Mr. Solomon........................49

6

7  Certificate of Reporter.......................51

8  Errata Sheet..................................52

9

10

11

12

13                  E X H I B I T S

14

15      (No exhibits were offered or marked.)

16

17

18                   STIPULATIONS

19      It is hereby stipulated and agreed by and

20  between the parties hereto, through their

21  respective counsel, that the reading and signing

22  of the transcript is reserved by the Deponent.

23

24

25

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                          6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1178

Female Student - 10/4/2021

Page 4

 1                     (Whereupon, all counsel

 2          stipulated to the swearing of the witness

 3          remotely.)

 4                     (FEMALE STUDENT, having been

 5          first duly sworn, testified as follows:)

 6                    E-X-A-M-I-N-A-T-I-O-N

 7     BY MR. DUKES:

 8          Q.  Good morning, Ms. Cox, my name is

 9     Richard Dukes and I represent the defendants in

10     this -- the case that you brought against the

11     Diocese of Charleston and Bishop England High

12     School.

13               Before we begin, there are a few rules

14     that we have to go over that are a little bit

15     different since we're on Zoom.  But one thing is

16     you're not allowed to communicate with your

17     lawyers or with anybody else during the course of

18     your deposition.  No texting, no instant

19     messaging or WhatsApping with anybody.  I realize

20     we're talking to you from Spain.  So you're not

21     gonna be stepping out of the room to talk to your

22     lawyers or anything.

23               Now that we've commenced your

24     deposition, off-the-record conversations between

25     you and anybody are privileged and I can ask you

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1179**

Female Student - 10/4/2021

Page 5

1    about them, okay?

2             A.   Right.  Yes.

3             Q.   If you don't understand one of my

4    questions and I know we might have

5    telecommunication problems, hopefully not, but it

6    may happen.  Let me know, please, and I'll

7    clarify or restate the question.

8             A.   Yes, sir.

9             Q.   Our court reporter is taking down

10   everything we say and it will be helpful if you

11   would let me finish my question before you start

12   to answer and I'll let you finish your answer

13   before I ask you another question.

14            A.   Okay.

15            Q.   And finally, again, because our court

16   reporter is taking everything down, please try to

17   avoid answering with a nod of the head or saying,

18   "uh-huh" or "huh-uh".

19            A.   Right.

20            Q.   That makes it difficult for her.  So I

21   mentioned that we're talking to you from Spain.

22   Where in Spain are you living?

23            A.   I live in Pamplona, Spain.  It's in

24   the northern part.

25            Q.   And are you studying there or in

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 6

1   college?

2       A.  Yes, sir.  I'm in my second year of

3   college.

4       Q.  Where do you attend college?

5       A.  University of Navarra.

6       Q.  Just as a matter of interest, how are

7   the COVID precautions in Spain right now?

8       A.  They're great.  A lot of things have

9   been uplifted.

10      Q.  Okay.  What is your major?

11      A.  International relations.

12      Q.  And do you plan to spend all -- your

13  whole college at the University of Navarra?

14      A.  Yes.

15      Q.  When did you attend Bishop England?

16      A.  2016, my freshman year through 2019,

17  my junior year.

18      Q.  And where did you go for your senior

19  year?

20      A.  I left and I went to Argentina to

21  study.

22      Q.  Argentina's where your mother's from?

23      A.  Yes, sir.

24      Q.  While you were at Bishop England, did

25  you take physical education classes?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 7

 1          A.   Yes.

 2          Q.   Did you play sports?

 3          A.   Yes.

 4          Q.   What sports did you play?

 5          A.   Cheerleading, soccer, and tennis.

 6          Q.   And when did you take P.E.?

 7          A.   My sophomore year.

 8          Q.   Did you ever encounter a man named

 9   Jeffrey Scofield?

10          A.   Yes.

11          Q.   Tell me about that, please.

12          A.   He would come into the classrooms to

13   fix the computers or the smart boards and I also

14   saw him throughout the hallways and in the

15   office.

16          Q.   In the school's main office?

17          A.   Yes.

18          Q.   I'm gonna ask you now a series of

19   questions about the locker rooms at Bishop

20   England.  You changed clothes in the locker room?

21          A.   Yes.

22          Q.   How often did that happen?

23          A.   More times than I can count.

24          Q.   Was there ever a time when you were

25   alone in the locker room when you were changing

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1182**

Female Student - 10/4/2021

Page 8

```
 1   clothes?
 2          A.   Yes.
 3          Q.   How often did you -- how often did
 4   that happen?
 5          A.   More times than I can count.
 6          Q.   How about how many times were you in
 7   the locker room changing clothes with other
 8   people present?
 9          A.   More times than I can count.
10          Q.   And these were presumably only
11   students and only females, right?
12          A.   Yes.
13          Q.   How many people -- when others were in
14   the locker room with you while you changed
15   clothes, how many people would there normally be?
16          A.   The amount that would be, I would say
17   20, over 20.
18          Q.   Was anybody standing next to you while
19   you changed clothes, using the next locker?
20          A.   Yes.
21          Q.   And how often?
22          A.   More times than I can count.
23          Q.   At the time -- when you were in the
24   locker room, did you have a cell phone in your --
25          A.   Yes.
```

MAGNOLIA REPORTING, LLC   (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 9

1          Q.  Did it -- did almost everybody else,
2    to your knowledge, have cell phones in their
3    backpack or in their book bag?
4          A.  Yes.
5          Q.  Did you see the window into the girls'
6    locker room at any time when you were in there?
7          A.  Yes.
8          Q.  It wasn't a two-way mirror or
9    something?  I mean, you saw it was there, right?
10         A.  Yes.
11         Q.  Could you see inside the coaches'
12   office on the other side of the window?
13         A.  I don't remember.
14         Q.  Were there blinds on the window?
15         A.  Yes.
16         Q.  Were they open or closed?
17         A.  Closed.
18         Q.  Did you ever see the blinds open?
19         A.  I don't remember.
20         Q.  Did you ever see anybody in the
21   coaches' office from the locker room?
22         A.  Yes.
23         Q.  When was that?
24         A.  I'm sorry, could you repeat the
25   question?

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1184**

Female Student - 10/4/2021

Page 10

1          Q.   Sure.  Did you ever, when you were
2     standing in the locker room, do you remember ever
3     seeing someone in the coaches' office?
4          A.   From the locker room?
5          Q.   Yes.
6          A.   Not that I remember.
7          Q.   Did you ever go into the coaches'
8     office for a meeting?
9          A.   Yes.
10         Q.   And how often did you go into that
11    coaches' office on the girls' side?
12         A.   I don't remember.
13         Q.   Was it more than five?
14         A.   Yes.
15         Q.   Who would you meet with in the
16    coaches' office?
17         A.   Coach Swanson.
18         Q.   And what did Coach Swanson coach, what
19    sports?
20         A.   Volleyball, female P.E. class, and
21    that's all that I know that she coached.
22         Q.   And what did you meet with her about?
23         A.   We would talk and she would help me
24    and about gym.
25         Q.   What did you need help with?

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1185**

Female Student - 10/4/2021

Page 11

1          A.  If I had a headache, she would give me
2    essential oils or we were -- we had a good
3    relationship, so we would just talk.
4          Q.  Did you ever complain to anybody that
5    there was a window looking into the room?
6          A.  Could you specify that "anybody"?
7          Q.  To Principal Finneran, to Assistant
8    Principal Tucker, to anyone at Bishop England?
9          A.  No.
10         Q.  Did you tell your mother about the
11   window in the locker room?
12         A.  No.
13         Q.  And your mother taught Spanish at
14   Bishop England, correct?
15         A.  Yes.
16         Q.  Did you ever complain to anyone at
17   Bishop England that there were other people in
18   the locker room while you were changing clothes?
19         A.  No.
20         Q.  Did it seem perfectly ordinary for
21   there to be other people in the locker room with
22   you while you were changing clothes?
23         A.  Yes.
24         Q.  I presume that you never complained
25   that there was somebody lurking in the coaches'

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1186

Female Student - 10/4/2021

Page 12

1   office while you were changing clothes since you

2   never saw anybody; is that right?

3           A.  Yes.

4           Q.  And you never observed anybody looking

5   through the window while you were changing

6   clothes, correct?

7           A.  No.

8           Q.  You did not see anybody?

9           A.  No.

10          Q.  Given that you were in the locker room

11  changing clothes with a bunch of other teenagers,

12  as we sit here today, are you concerned that

13  anybody else, any other students may have taken

14  pictures while you were changing clothes?

15          A.  It's a possibility.

16          Q.  I know, but are you concerned about

17  that?

18          A.  No.

19          Q.  Why not?

20          A.  They were all my age, teenage

21  adolescent girls at the time.

22          Q.  Are you worried that one of those

23  fellow students might post something on social

24  media about you?

25          A.  Yes.

Electronically signed by Nicole White (301-070-154-1752)          6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1187

Female Student - 10/4/2021

Page 13

1          Q.  Why does that concern you?

2          A.  I would not like pictures of me that I

3     did not know were taken to be posted on social

4     media.

5          Q.  Okay.  Are you aware of anybody ever

6     having taken pictures of you and put them on

7     social media, in the locker rooms?

8          A.  No.

9          Q.  Did you ever see anybody pull their

10    cell phone out and take a picture in the locker

11    room?

12         A.  No.

13         Q.  Did anybody pull their phone out and

14    make a phone call that you saw?

15         A.  No.

16         Q.  Have you ever made a phone call from

17    the locker room?

18         A.  No.

19         Q.  Was the first time you expressed

20    having some anxiety about there being a window in

21    the locker room when you saw the psychiatrist

22    retained by your lawyer?

23         A.  I'm sorry, could you repeat the

24    question?

25         Q.  Yeah.  When was the first time you

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

Female Student - 10/4/2021

Page 14

1  told somebody you had some concern or anxiety

2  about there being a window in the locker room?

3        A.  I do not recall specifically going to

4  a therapist about the window in the locker room.

5        Q.  Okay.  Did you tell anybody else you

6  were concerned about there being a window in the

7  locker room?

8        A.  I'm pretty sure you already asked me

9  that and I responded to no, I did not consult any

10  administrator in the school about the window.

11       Q.  Okay.  Since 2019, during your senior

12  year in Argentina or after, have you told anybody

13  that you were concerned about there being a

14  window in the locker room, anybody at all?

15       A.  Concerning the administration of

16  Bishop England?

17       Q.  Well, the fact that there was a window

18  in the locker room, yeah.

19       A.  I have told friends and family members

20  about the incident of Jeffrey Scofield.

21       Q.  Okay.  Did you ever see Jeffrey

22  Scofield on the girls' side of the gym?

23       A.  I saw Jeffrey Scofield in the gym.

24       Q.  In the gym?

25       A.  (Indicating).

Electronically signed by Nicole White (301-070-154-1752)    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1189

Female Student - 10/4/2021

Page 15

1       Q.  But not back in the locker rooms,
2  right?
3       A.  Are you asking inside the locker room?
4       Q.  Or in the hallway outside on the
5  girls' side of the locker rooms?
6       A.  I do not remember.
7       Q.  Do you know what Jeffrey Scofield did
8  in his employment?
9       A.  His specific job?
10      Q.  Yes.
11      A.  No.
12      Q.  But you do know that he worked for the
13  athletic department, right?
14      A.  From my recollection, I mostly
15  remember him being an IT guy.
16      Q.  When did you first learn about
17  Mr. Scofield taking pictures on the boys' side of
18  the locker room?
19      A.  About May of 2019.
20      Q.  And how did you learn about it?
21      A.  I'm sorry?
22      Q.  How did you learn about it?
23      A.  It was a huge ordeal going throughout
24  the school.  I learned about it through friends.
25      Q.  Which friends?

Electronically signed by Nicole White (301-070-154-1752)                6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1190**

Female Student - 10/4/2021

Page 16

1        A.    I'm not sure who specifically.

2        Q.    And what did your friends tell you?

3        A.    That a girl in the grade above me had

4    found pictures taken on the iPad, the school iPad

5    that Jeffrey Scofield had owned and he took

6    pictures.

7        Q.    Okay.  Do you know whether he took

8    pictures of any girls?

9        A.    I'm not sure.

10        Q.    Has anyone alerted you that somebody

11    had taken pictures of you?

12        A.    As of this moment, no.

13        Q.    Do you know what happened to the iPad

14    and to Scofield's phone and computer?

15        A.    No.

16        Q.    Would it give you any comfort to know

17    that the South Carolina Attorney General's Office

18    has sequestered all those devices?

19        A.    It doesn't comfort me.  He still took

20    them and he had them.

21        Q.    Right.  But he doesn't have them

22    anymore and he doesn't have access --

23        A.    He shouldn't have had them -- I'm

24    sorry.

25        Q.    And he doesn't have access to them

Electronically signed by Nicole White (301-070-154-1752)          6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1191

Female Student - 10/4/2021

Page 17

1  anymore?

2        A.  He should not have had them in the

3  first place.

4        Q.  True, but there's no danger that

5  anything Jeffrey Scofield took a picture of would

6  wind up in the public.

7              MR. SOLOMON:  Object to the

8        form.

9  BY MR. DUKES:

10        Q.  You can answer.

11        A.  To my concern, he should not have had

12  them in the first place.  That should not have

13  been an accessible thing to have in the first

14  place.

15        Q.  And he got fired immediately and he

16  got arrested?

17              MR. SOLOMON:  Same objection.

18        Rich, I'm not sure that was a question.

19  BY MR. DUKES:

20        Q.  You're aware that as soon as the fact

21  that he had taken pictures of boys in the locker

22  room became known, Scofield was fired and handed

23  over to the police, right?

24        A.  I'm not sure.  I was not following the

25  case completely in that moment of 2019.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 18

```
 1        Q.  Okay.  But you know he got arrested,
 2  right?
 3        A.  Yes.
 4        Q.  And you know he got fired, right?
 5        A.  Yes.
 6        Q.  When did you decide to file this
 7  lawsuit?
 8        A.  I specifically did not file the
 9  lawsuit.
10        Q.  But you're a plaintiff.  Your name is
11  on the caption.  They're suing on behalf of
12  yourself and on behalf of all other females.
13        A.  About January of 2020.
14        Q.  Okay.  And what led up to your
15  deciding to file this lawsuit?
16             MR. SOLOMON:  Rich, I'm going to
17         obviously let her start answering, but to
18         the extent it calls for any attorney/client
19         privilege, I will stop things at that point.
20  BY MR. DUKES:
21        Q.  Okay.  And I'm not asking for anything
22  you talked to your lawyers about, just why did
23  you decide to file this lawsuit?
24        A.  To stand up and give a voice for those
25  who were wrongfully abused in the locker rooms.
```

Electronically signed by Nicole White (301-070-154-1752)

6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

Female Student - 10/4/2021

Page 19

 1        Q.  But you're not aware of any female who
 2   was photographed by anybody, right?
 3        A.  As of this moment in time, no.
 4        Q.  Well, do you think that somebody took
 5   pictures of girls in the locker room?
 6        A.  It could be a possibility.
 7        Q.  Okay.  But it could also be a
 8   possibility that somebody falls down the stairs
 9   at Bishop England.  Are you standing up for all
10   the people who might fall down the stairs, as
11   well?
12        A.  I think that's a wrong example to use.
13   Falling down the stairs in comparison to underage
14   boys getting pictures taken of.
15        Q.  Well, you realize you're not suing on
16   behalf of underage boys, right?
17        A.  Yes.
18        Q.  So who is it that you're suing on
19   behalf of?
20        A.  On behalf of my student body, to stand
21   up for a wrong situation that was committed in
22   the school of Bishop England.
23        Q.  And the wrong situation is Jeffrey
24   Scofield taking pictures?
25        A.  Yes.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 20

 1          Q.  Would you agree with me that anybody

 2    who was not photographed while in the locker

 3    rooms, would not have any cause of action to

 4    bring, right?

 5                    MR. SOLOMON:  Object to the

 6          form.

 7    BY MR. DUKES:

 8          Q.  You can answer.

 9          A.  No.

10          Q.  Why?  Why do you think that?

11          A.  It could have been anyone.

12          Q.  Okay.  But it wasn't.

13                    MR. SOLOMON:  Object to the

14          form.

15                    THE DEPONENT:  It still could

16          have been.  Just because it wasn't, doesn't

17          mean it couldn't have been anyone that was

18          in those locker rooms.

19    BY MR. DUKES:

20          Q.  Right about that time, your mother got

21    terminated at Bishop England, didn't she?

22          A.  Yes.

23          Q.  Do you know what happened with that?

24          A.  No.

25          Q.  Do you know why she was terminated?

Electronically signed by Nicole White (301-070-154-1752)                          6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1195**

Female Student - 10/4/2021

Page 21

1        A.  Yes.

2        Q.  Why was that?

3        A.  Because she reposted a video on

4  Facebook about abortion.

5        Q.  Do you know that she filed a lawsuit

6  against Bishop England?

7        A.  Yes.

8        Q.  Do you know what the result of that

9  was?

10       A.  Yes.

11       Q.  And what was the result?

12       A.  Bishop England won in their case.

13       Q.  Did your mother's treatment at Bishop

14  England factor into your decision to file this

15  lawsuit at all?

16       A.  No.

17       Q.  Did you discuss filing this lawsuit

18  with your mother?

19       A.  Yes.

20       Q.  And tell me about your conversations

21  with her.

22       A.  It wasn't a conversation, mostly.  It

23  was just I'm going to do this and it was a

24  statement.  I'm going to do this and that's all.

25       Q.  Okay.  Other than your lawyers, who

Electronically signed by Nicole White (301-070-154-1752)       6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

Female Student - 10/4/2021

Page 22

```
 1   did you consult with about filing a lawsuit?
 2         A.   My brother, Tomas.
 3         Q.   So you're telling me that the two of
 4   you cooked up this idea to file a lawsuit?
 5         A.   No.
 6              MR. SOLOMON:   Object to the
 7         form.
 8   BY MR. DUKES:
 9         Q.   Well, how did y'all decide to file the
10   lawsuit you filed?
11         A.   I individually decided, as well as my
12   brother who individually decided, and we had a
13   discussion about it and that's all.
14         Q.   Did you sign a contingency fee
15   agreement with these lawyers?
16         A.   I'm not sure what that is.
17         Q.   Did you sign an agreement hiring these
18   lawyers to represent you?
19         A.   I'm not sure.
20         Q.   Have you signed any piece of paper
21   with -- in this lawsuit having to do with this
22   lawsuit?
23         A.   I believe so.
24         Q.   Who did -- with whom did you sign that
25   agreement, which lawyer?
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1197**

Female Student - 10/4/2021

Page 23

1      A.   The Richter Firm.

2      Q.   How did you find the Richter Firm?

3      A.   The Richter Firm found me.

4      Q.   Okay.  How did they find you?

5      A.   They got in touch with my parents, who

6   gave them my phone number and e-mail, and they

7   got in touch with me asking if I would like to be

8   a part of this case, and I agreed.

9      Q.   And when did they get in touch with

10  you about that?

11     A.   About January of 2020.

12     Q.   Prior to January of 2020, had you had

13  any contact with the Richter Firm?

14     A.   No.

15     Q.   What about, have you had any

16  contact -- prior to filing this lawsuit, had you

17  had any contact with a lawyer named Dan

18  Slotchiver?

19     A.   No.

20     Q.   What about Mr. Solomon whose smiling

21  face is on the screen?

22     A.   No.

23     Q.   What about Brent Halversen?

24     A.   No.

25     Q.   Do you know who Mr. Slotchiver,

Electronically signed by Nicole White (301-070-154-1752)          6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1198

Female Student - 10/4/2021

Page 24

1    Mr. Solomon, and Mr. Halversen are?

2         A.  No.

3         Q.  What is it that you want to accomplish

4    with this lawsuit?

5         A.  I want all corresponding factors to be

6    held accountable for what happened in May of

7    2019.

8         Q.  Okay.  So what -- you want other

9    people to be held accountable for what Jeffrey

10   Scofield may have done or did?

11        A.  No, I want to represent my student

12   body council and me, as well, in making sure that

13   what happened never happens again.

14        Q.  Well, it can't happen again, can it?

15   The windows are -- the windows are no longer in

16   the locker room.

17        A.  I don't know that.

18        Q.  Since leaving Bishop England, have you

19   been on the campus at all?

20        A.  No.

21        Q.  Did you do any investigation on your

22   own to determine whether to file this lawsuit?

23        A.  No.

24        Q.  Have you ever talked to any parents of

25   Bishop England students about the locker rooms?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 25

1          A.  I don't remember.
2          Q.  Did you ever send a letter or an
3   e-mail or a text message to a B.E. -- Bishop
4   England parent about the conditions in the locker
5   room?
6          A.  No.
7          Q.  Did you ever complain to Bishop
8   England about the locker rooms?
9          A.  No.
10         Q.  Have you ever posted on social media
11  about Bishop England and the locker rooms?
12         A.  No.
13         Q.  Why do you believe you were -- you're
14  entitled to any money?
15         A.  I don't.
16         Q.  Why not?
17         A.  I'm not sure if I'm entitled to any
18  money.  That's not why I'm here.
19         Q.  Okay.  What -- explain to me again
20  exactly why you are here.
21         A.  I'm here to stand up for my student
22  body council and raise a voice for those who are
23  not brave enough to do it and to put down my foot
24  and make sure this never happens again.
25         Q.  Okay.  That's all?  That's the only

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1200**

Female Student - 10/4/2021

Page 26
 1    reason you're involved in this lawsuit?
 2          A.   Yes.
 3          Q.   Who do you want -- specifically, who
 4    do you want held accountable?
 5          A.   Jeffrey Scofield and Bishop England as
 6    a whole.
 7          Q.   Why do you think Bishop England as a
 8    whole should be held accountable to you, who left
 9    after your junior year?
10          A.   I don't think the windows should have
11    been there in the first place.
12          Q.   Do you know who designed it?
13          A.   No.
14          Q.   Do you know that Bishop England hired
15    architects to design the building as it was
16    built?
17          A.   I knew about architects.
18          Q.   Okay.  What architects do you know
19    about?
20          A.   I don't know any specific architects,
21    but isn't every building built by an architect?
22          Q.   Yeah.  Most of them, the ones that are
23    built well are.
24               How have you been harmed personally?
25          A.   Harmed personally?  Can you specify

Electronically signed by Nicole White (301-070-154-1752)                                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1201**

Female Student - 10/4/2021

Page 27

1    the question?

2         Q.   How has Sophia Cox been injured?

3         A.   Physically, emotionally?

4         Q.   Yes, physically, emotionally.

5         A.   In my years at Bishop England?

6         Q.   By Jeffrey Scofield taking pictures of

7    boys in the locker room, how have you been

8    harmed?

9              MR. SOLOMON:  Object to the

10        form.

11             THE DEPONENT:  It makes me

12        anxious and it makes me mistrust a lot more

13        things.  I'm not as naive as I used to be.

14        I think mentally, it's harmed me.

15   BY MR. DUKES:

16        Q.   And how has the fact that there were

17   windows from the coaches' office into the locker

18   room, whether they were used as a window or not,

19   harmed you?

20        A.   It makes me feel not as comfortable to

21   be as open and naive as I once was.

22        Q.   Isn't that also the process of growing

23   up?

24        A.   I think there's other ways to grow up

25   than to be put in that position.

Electronically signed by Nicole White (301-070-154-1752)                6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1202

Female Student - 10/4/2021

Page 28

1        Q.  Would you agree with me that other

2   students have reacted to the presence of windows

3   in the locker room differently than you?

4        A.  As human beings, I think everyone

5   reacts differently to different situations.

6        Q.  And no one student would react the

7   same way, right?

8        A.  I'm not sure.  You would have to ask

9   other students that.

10       Q.  Okay.  Would it surprise you if some

11  students don't -- are not impacted at all by the

12  fact that there were windows in the locker room?

13       A.  Yes.

14       Q.  Why would that surprise you?

15       A.  Because those windows were taken

16  advantage of when photos of students were

17  released.

18       Q.  I don't believe the pictures were ever

19  released, Ms. Cox.

20            MR. SOLOMON:  Object to form.

21            THE DEPONENT:  Well, the

22       information that the pictures were taken in

23       the first place, photos were released.

24  BY MR. DUKES:

25       Q.  But in order to determine whether any

Electronically signed by Nicole White (301-070-154-1752)

**JA1203**

Female Student - 10/4/2021

Page 29

1   student -- any student other than you is anxious
2   or upset because they're not as naive as they
3   once were, you'd have to ask them; is that
4   correct?
5                   MR. SOLOMON:  Object to the
6        form.
7                   THE DEPONENT:  I guess you would
8        have to ask each individual student how they
9        feel.
10  BY MR. DUKES:
11       Q.  And what about the people who attended
12  Bishop England before Jeffrey Scofield ever set
13  foot on the campus?
14       A.  What about them?
15       Q.  Do you think they -- you'd have to ask
16  each one of them whether they have been harmed in
17  some way?
18       A.  I'm not sure how long Jeffrey Scofield
19  was working at the school, so I'm not sure.  I
20  guess -- I guess you would have to ask them how
21  they were affected.
22       Q.  I believe he started in 2014.  I think
23  I'm correct on that.
24       A.  2016 was my freshman year.
25       Q.  Okay.  But you'll agree with me, to

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 30
1    find out if anybody who attended Bishop England
2    prior to 2014 is concerned about the fact that
3    there used to be windows in the locker rooms,
4    you'd have to ask them, right?
5           A.   I'm sorry, could you repeat the
6    question?
7           Q.   Sure.   In order to find out if anybody
8    who attended school at Bishop England prior to
9    2014 when Jeffrey Scofield started work, to find
10   out whether those alumni are somehow anxious or
11   upset about the existence of windows in the
12   locker room, you'd have to ask every one of them,
13   wouldn't you?
14          A.   If you want their honest opinion, yes.
15          Q.   And not everybody who over the 30 --
16   nearly 30 years that Bishop England's been on
17   Daniel Island, not everybody's affected the same
18   way by the fact that there are windows in the
19   locker rooms, right?
20          A.   I think everyone's entitled to their
21   own emotions, but when a huge event happens, it
22   can impact each person, and as a whole, it has
23   impacted all of them.
24          Q.   How has it impacted all of them?
25          A.   Because you trust that you're in your

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1205**

Female Student - 10/4/2021

1   school and that you're in a safe environment to

2   keep you safe and then out of nowhere, you

3   receive this information that completely tears

4   down all of that trust and innocence and safety

5   you thought you once had.

6           Q.   Do you know why those windows were put

7   in the locker rooms by the architect?

8           A.   No.

9           Q.   Do you know that they were put into

10  the locker rooms as a safety feature?

11          A.   I suppose so.

12          Q.   I want to turn now, Sophia, to

13  Dr. Solis, the psychiatrist.  Did you meet with

14  her in person or by Zoom?

15          A.   By Zoom.

16          Q.   And when did you meet with Dr. Solis?

17          A.   I'm not sure the specific date.

18          Q.   Did you see Dr. Solis on your own or

19  were you put in touch with her by your lawyers?

20          A.   I was put in touch with her by my

21  lawyers, but we had a meeting alone.

22          Q.   Okay.  But you didn't seek out

23  psychiatric or psychological treatment on your

24  own, did you?

25          A.   I did.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 32

1          Q.   Who did you see?

2          A.   I have an individual therapist.

3          Q.   Who was that?

4          A.   Emily Evans.

5          Q.   Is Emily Evans in Charleston?

6          A.   Yes.

7          Q.   Do you know where she practices?

8          A.   On Daniel Island.

9          Q.   Do you know the name of her practice

10    group?

11         A.   I'm not sure.

12         Q.   When did you first treat with Emily

13    Evans?

14         A.   Freshman year.

15         Q.   2016?

16         A.   Yes.

17         Q.   What did you see Ms. Evans for?

18         A.   For anxiety and depression.

19         Q.   What was causing you -- causing you to

20    be anxious and depressed?

21         A.   Mostly the workload, the pressure of

22    Bishop England, and the social hierarchy in

23    Bishop England, as well.

24         Q.   Did you like going to Bishop England?

25         A.   Depended on the day, but mostly no.

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1207

Female Student - 10/4/2021

Page 33

1        Q.  Where would you have preferred to
2    attend high school?
3        A.  I guess Wando High School.
4        Q.  Would it surprise you to know that
5    Wando High School also has windows from coaches'
6    offices into the locker rooms?
7        A.  Yes.
8        Q.  Have you ever played sports at Wando?
9        A.  No.
10       Q.  What about at Stall High School?
11       A.  No.
12       Q.  What about Burke High School?
13       A.  No.
14       Q.  What about North Charleston High
15    School?
16       A.  No.
17       Q.  Have you ever been in the locker rooms
18    at any of the high schools in Berkeley County,
19    Hanahan and Ashley Ridge?
20       A.  In the locker rooms, no.
21       Q.  Yes.  What about Ashley Ridge or Cane
22    Bay or Stratford?
23       A.  No.
24       Q.  Would it trouble you to know that all
25    of those schools have windows from coaches'

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 34

1    offices into the locker rooms?

2          A.   Yes.

3          Q.   How long did you treat with Emily

4    Evans?

5          A.   Until I went -- I left for Argentina.

6          Q.   I'm gonna stand up so our lights come

7    back on, so I'm not sitting in the dark.

8               Did you and Ms. -- did Ms. Evans help

9    with your anxiety and depression?

10         A.   Yes.

11         Q.   And you left -- you left Bishop

12   England to go to Argentina in 2019; is that

13   correct?

14         A.   Yes.

15         Q.   Did you treat with Ms. Evans after

16   Jeffrey Scofield's misdeeds were revealed?

17         A.   Yes.

18         Q.   Did you discuss Scofield with

19   Ms. Evans?

20         A.   Yes.

21         Q.   What did you talk about with Ms. Evans

22   about Jeffrey Scofield?

23         A.   How horrible the incident was, how at

24   such a prestigious school like Bishop England,

25   how it's incredible that that was able to happen,

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1209**

Female Student - 10/4/2021

Page 35

1   and how saddening an event that was.

2           Q.  And what did Ms. Evans tell you?

3           A.  Just to stay calm and that I'm almost

4   done with the year and that -- and as much as I

5   know I wasn't in the pictures, as of now that I

6   know and -- yeah, just that.  I was almost done

7   with the year, so it was okay.

8           Q.  Okay.  And that's because you weren't

9   in any of the pictures?

10          A.  Not that I know of.

11          Q.  And nobody's provided you with

12  information saying you were photographed by

13  someone, right?

14          A.  No.

15          Q.  Nobody's told you that?

16          A.  No.

17          Q.  And throughout -- from 2016

18  through 2019, you were aware that those windows

19  were in the locker rooms, right?

20          A.  Yes.

21          Q.  They were obvious, I mean, you

22  couldn't miss them, correct?

23          A.  Yes.  Yes.

24          Q.  Did you ever refuse to change clothes

25  in the locker rooms because those windows were

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1210**

Female Student - 10/4/2021

Page 36

1    there?

2          A.  No.

3          Q.  Did you ever look through the window

4    into the coaches' office and see a window in the

5    door to the coaches' office?

6          A.  From the locker room point of view, it

7    was hard to see into the office.

8          Q.  Why is that?

9          A.  Because it was dark inside the office.

10         Q.  And the blinds were down, right?

11         A.  I never tried to look.

12         Q.  During the time you were at Bishop

13   England, did you walk down that hallway that is

14   outside of the coaches' office and outside of the

15   locker room?

16         A.  Yes.

17         Q.  Did you ever notice a sign that said

18   "Warning, you are under surveillance after this

19   point"?

20         A.  No.

21         Q.  Did you ever look through the window

22   into the coaches' office from the hallway?

23         A.  No.  They were always closed.

24         Q.  The doors or the windows?

25         A.  Both.

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1211**

Female Student - 10/4/2021

1          Q.  So there were blinds on the window
2    that is in the door, as well?
3          A.  The door going into the office?
4          Q.  Yes.
5          A.  From what I remember, yes.
6          Q.  And those blinds were always closed?
7          A.  If the door was closed.
8          Q.  When you met with your coach, was --
9    with Coach Swanson, was the door open or closed?
10         A.  Open.
11         Q.  And were the blinds looking into the
12   locker room open or closed?
13         A.  Closed.
14         Q.  Did you ever see those blinds in the
15   window in the coaches' office open?
16         A.  Not from what I recall.
17         Q.  You have filed an action as a
18   potential class action.  Do you understand what a
19   class action is?
20         A.  Somewhat.
21         Q.  What do you understand?
22         A.  That it's the representation of the
23   whole student council, student body.
24         Q.  Every student who's ever gone to
25   Bishop England since it moved to Daniel Island in

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 38
 1   1998?
 2          A.   I'm not sure.
 3          Q.   Do you understand what's required of
 4   you?
 5          A.   In what context?
 6          Q.   What's required of you as a
 7   representative of a class?
 8          A.   No.  I'm confused about the question.
 9          Q.   Okay.  Do you know what your
10   responsibility is, if you are authorized to bring
11   a class -- to represent the class of students?
12          A.   Yes.
13          Q.   Okay.  What is that responsibility?
14          A.   To stand up for what's right and...
15      (Whereupon, there were technical difficulties.)
16               MR. SOLOMON:  Rich, she is
17        frozen or I am.
18               MR. DUKES:  I see that.
19   BY MR. DUKES:
20          Q.   Sophia, can you hear us?
21          A.   Yes, now I can hear you.  Sorry about
22   that.
23          Q.   It's okay.  You froze up on us for a
24   minute.
25          A.   Yeah.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 39

1          Q.  Do you understand that you have to put
2     the interests of your -- the class you represent
3     and want to represent ahead of your own
4     interests?
5          A.  Yes.  I think I'm also part of that
6     student body council, so it is an equal interest,
7     as well.
8          Q.  Do you understand that there may be
9     financial obligations placed on you?
10               MR. SOLOMON:  Object to the
11        form.
12    BY MR. DUKES:
13          Q.  You can answer.
14          A.  I'm not sure.
15          Q.  I mean, if all of your lawyers were
16    eaten by a swarm of great white shakes at the
17    beach one day, you would still have to go on with
18    this lawsuit, you couldn't just drop it; do you
19    understand that?
20          A.  Yes.
21          Q.  And would you be able to -- would you
22    be in a position to support that lawsuit
23    financially?
24               MR. SOLOMON:  Object to the
25        form.

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1214

Female Student - 10/4/2021

Page 40

 1                    THE DEPONENT:  Yes.

 2   BY MR. DUKES:

 3        Q.  You have that kind of means?  You

 4   could pay lawyers to represent you and the class?

 5                    MR. SOLOMON:  Rich, paying

 6           lawyers and other things, this is getting a

 7           bit far afield.

 8                    MR. DUKES:  It goes to her

 9           adequacy as a class representative, Carl.

10                    MR. SOLOMON:  Rich, I don't know

11           the last time either of us has seen any

12           class rep. pay lawyers to represent them.  I

13           think you're being a little bit disingenuous

14           with that.

15                    MR. DUKES:  I was asking her if

16           you and Larry and Dan and Brent got eaten by

17           a shark, if she could afford to pay a lawyer

18           to represent the class going forward after

19           that tragic event.

20                    MR. SOLOMON:  That implies that

21           she has to come out of pocket to pay a

22           lawyer and you're very well aware that most

23           people on contingencies and the court

24           addresses fees to their successor.  Object

25           to the form of that question.

Electronically signed by Nicole White (301-070-154-1752)                6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1215

Female Student - 10/4/2021

```
                                             Page 41
 1   BY MR. DUKES:
 2           Q.  Sophia, did you read the complaint
 3   before filing?
 4           A.  The complaint?
 5           Q.  Yes.
 6           A.  Yes.
 7           Q.  Did you understand what it said?
 8           A.  About this lawsuit?
 9           Q.  Yes.
10           A.  Yes.
11           Q.  Okay.  What did it say, in your own
12   words?
13           A.  That the windows -- easy accessibility
14   to those windows should not have been made
15   available and what happened with Jeffrey Scofield
16   should not have happened.
17           Q.  Did you make any comments on any
18   drafts of the complaint?
19           A.  No.
20                   MR. SOLOMON:  To the extent
21           that you're asking about things that would
22           clearly be within attorney/client
23           privilege, if we conveyed something to her
24           and she's speaking back to us, that's
25           clearly covered.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 42

```
 1   BY MR. DUKES:
 2        Q.  I'm not asking you if you told your
 3   lawyers anything.  Did you make any notes on the
 4   complaint?
 5        A.  Not that I remember.
 6        Q.  Did you look at the complaint before
 7   or after it got filed?
 8        A.  I don't remember.
 9        Q.  Do you know of any other alumni or
10   students who have gotten in touch with a lawyer?
11        A.  No.
12        Q.  How about any parents?
13        A.  No.
14        Q.  Did your mother talk to you about her
15   and your father being a plaintiff in this
16   lawsuit?
17        A.  No.
18        Q.  Why isn't she a party to this lawsuit?
19        A.  I don't know.
20        Q.  Why do you think you can fairly and
21   adequately represent the interests of thousands
22   of former students?
23        A.  I think I'm going to do as best as I
24   can to represent those that aren't brave enough
25   to have their own voice.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 43

1          Q.  Do you know of any parents who are
2     aware of these windows in the locker rooms?
3          A.  Specifically, no.
4          Q.  Did any parent coach any of your teams
5     or serve as assistant coach of any of your teams?
6          A.  Yes.
7          Q.  And who were those?
8          A.  For the tennis team, it was Jim
9     Greenhill.  For the cheerleading team, it was
10    Blair -- I don't recall her last name.  She
11    worked with Ms. Condon, who was a math teacher at
12    the school.
13         Q.  And did --
14         A.  And -- yes.
15         Q.  Did your cheerleading coach, Blair,
16    ever go into the locker room while you were
17    there?
18         A.  The cheerleaders would not change in
19    the locker room.
20         Q.  Okay.  You would put on your uniform
21    at home?
22         A.  We would change in the school
23    bathrooms.
24         Q.  Why is that?
25         A.  Some did not feel comfortable in the

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 44

1  locker room and others was when there were other
2  teams changing in there.
3         Q.  Who didn't feel comfortable changing
4  clothes in the locker rooms?
5         A.  Some of the girls on the cheerleading
6  team.
7         Q.  Which ones?
8         A.  I don't remember specifically.
9         Q.  But it was not you, right?
10        A.  At that moment in time, no.
11        Q.  What were the girls who were -- who
12 were -- excuse me.  Were not comfortable with the
13 locker rooms?  What made them uncomfortable?
14        A.  The fact that there were so many
15 people changing in the locker rooms and just it
16 wasn't an attractive place to be in.
17        Q.  Why was it not an attractive place to
18 be in?
19        A.  It was gross.  There were many people
20 in and out of there all the time.
21        Q.  When you were at Bishop England, you
22 got an education, didn't you?
23        A.  Yes.
24        Q.  And I dare say you got a good
25 education, correct?

Electronically signed by Nicole White (301-070-154-1752)            6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1219**

Female Student - 10/4/2021

Page 45

1           A.   Yes.
2           Q.   And you took classes and played sports
3    on school facilities, right?
4           A.   Yes.
5           Q.   And you had teachers in all your
6    classes in person every day, right?
7           A.   Yes.
8           Q.   And there were computers and lights,
9    smart boards, supplies, all of that was provided,
10   right?
11          A.   Yes.
12          Q.   Do you know of any students who opted
13   out of physical education class?
14          A.   To my knowledge, that was not a
15   choice.
16          Q.   What about people who didn't play
17   sports at all?
18          A.   What about them?
19          Q.   Are you aware of anybody who didn't
20   play sports?
21          A.   Yes.
22          Q.   Are you aware of anybody who never
23   changed clothes in the locker room?
24          A.   No.
25          Q.   Are you aware of any female student

Electronically signed by Nicole White (301-070-154-1752)     6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1220**

Female Student - 10/4/2021

Page 46

1    who was photographed in the locker rooms while

2    she changed clothes?

3              A.  As of this moment, I am not aware.

4              Q.  What did you do to prepare for this

5    deposition?

6              A.  I had a meeting with my lawyers.

7              Q.  And I don't want to know what you

8    talked with your lawyers about, I'm not entitled

9    to know that, but how long did that meeting last?

10             A.  About an hour and a half.

11             Q.  Was that a Zoom meeting or in person?

12             A.  Zoom.

13             Q.  There are a couple of standard

14   questions that I have to ask you.  Have you ever

15   been arrested?

16             A.  No.

17             Q.  Have you ever been charged with a

18   crime?

19             A.  No.

20             Q.  Have you taken any medications that --

21   that might affect your memory today?

22             A.  No.

23             Q.  Okay.  Are you taking any medications

24   at all?

25             A.  No.

Electronically signed by Nicole White (301-070-154-1752)                                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1221

Female Student - 10/4/2021

Page 47

1          Q.  Did your psychologist, Ms. Evans,
2     arrange for you to be prescribed any medications?
3          A.  Yes.
4          Q.  And what medications did you take?
5          A.  It was a depression medication, but I
6     don't remember the name of it.
7          Q.  Who was the prescribing physician?
8          A.  Parkwood Pediatric.
9          Q.  And was that on Daniel Island, as
10    well?
11         A.  Yes.
12         Q.  Are you still taking antidepressants?
13         A.  No.
14         Q.  When did you stop?
15         A.  In July, I believe, of 2019.
16         Q.  And why did you feel that getting off
17    the meds. was appropriate?
18         A.  They weren't as -- they weren't
19    helping me.
20         Q.  Do you still struggle with depression?
21         A.  On and off.
22         Q.  Are you seeing a psychologist now?
23         A.  No.
24         Q.  What about a psychiatrist, are you
25    seeing one of those?

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1222**

Female Student - 10/4/2021

Page 48

```
 1          A.  No.
 2                  MR. DUKES:  Sophia, I think
 3         that's all I've got for you.  Your lawyers
 4         may have some questions for you, but I
 5         appreciate your time.
 6                  THE DEPONENT:  All right.  Thank
 7         you.
 8                  MR. SOLOMON:  All right.  Since
 9         we've been going about an hour or a little
10         better, can we take a two-minute break and
11         let us huddle up and get right back with
12         you?
13                  MR. DUKES:  Okay.
14                  (Whereupon, there was a short
15         break in the proceedings.)
16  BY MR. DUKES:
17          Q.  Sophia, while we were on our break,
18  did you talk to anybody?
19          A.  No, there's nobody in my house.
20          Q.  Did you communicate with anyone by
21  text or instant messaging or any other way?
22          A.  No.
23                  MR. DUKES:  Okay.  That's all I
24         have for you and Mr. Solomon may have a few
25         questions.  I don't know.
```

Electronically signed by Nicole White (301-070-154-1752)

JA1223

6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

Female Student - 10/4/2021

Page 49

```
 1                 E-X-A-M-I-N-A-T-I-O-N
 2   BY MR. SOLOMON:
 3        Q.  Sophia, Mr. Dukes asked you various
 4   questions.  I want to just touch on a couple, if
 5   we may.  One, he asked you whether or not you
 6   felt like you were entitled to money.  Is that
 7   something you're gonna leave up to a jury and the
 8   court?
 9               MR. DUKES:  Object to the form.
10               THE DEPONENT:  No, the money
11      isn't my concern at all.
12   BY MR. SOLOMON:
13        Q.  All right.  Would you agree that you
14   don't have to ask every individual student to
15   determine to know that they didn't give their
16   consent to be viewed by adults?
17        A.  Yes.
18        Q.  And did you have any reason to suspect
19   adults were viewing you or could view you while
20   you were changing clothes?
21        A.  No.
22        Q.  All right.  And you wouldn't have to
23   ask every student that went to Bishop England to
24   know that viewing students by adults would be
25   wrong, would you?
```

Electronically signed by Nicole White (301-070-154-1752)

**JA1224**

6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

Female Student - 10/4/2021

Page 50

```
 1                 MR. DUKES:  Object to the form.

 2                 THE DEPONENT:  No, I would not

 3      have to ask every student.

 4                 MR. SOLOMON:  Okay.  No further

 5      questions.

 6                 MR. DUKES:  Nothing more from

 7      me, Sophia.  Thank you.

 8                 THE DEPONENT:  Great.  Thank you

 9      so much.

10                 MR. SOLOMON:  Take care.  We'll

11      read and sign.

12                 MR. DUKES:  Okay.

13       (This deposition concluded at 1:15 p.m.)

14

15                 (Signature reserved.)

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by Nicole White (301-070-154-1752)    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1225

Page 51

1          C E R T I F I C A T E

2

3    STATE OF SOUTH CAROLINA   )

4    COUNTY OF BERKELEY        )

5

6          I, Nicole D. White, Certified Court

7    Reporter and Notary Public, State of South

8    Carolina at Large, certify that I was authorized

9    to and did stenographically report the foregoing

10   deposition of Female Student; and that the

11   transcript is a true record of the testimony given

12   by the witness, and was sworn as such.

13          I further certify that I am not a

14   relative, employee, attorney or counsel of any of

15   the parties, nor am I a relative or employee of

16   any of the parties' attorney or counsel connected

17   with the action, nor am I financially interested

18   in the action.

19          WITNESS MY HAND AND OFFICIAL SEAL this

20   13th day of October 2021.

21

22   _____
     Nicole D. White
23   Notary Public in and for the
     State of South Carolina
24

25   My Commission expires September 8, 2027

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 52

```
 1              E R R A T A   S H E E T

 2

    RE:  Nestler, et al -vs- The Bishop of Charleston,
 3  et al

 4  DEPOSITION OF:  Female Student

 5         Please read this original deposition with

 6  care, and if you find any corrections or changes

 7  you wish made, list them by page and line number

 8  below.  DO NOT WRITE IN THE DEPOSITION ITSELF.

 9  Return the deposition to this office after it is

10  signed.  We would appreciate your prompt attention

11  to this matter.

12         To assist you in making any such

13  corrections, please use the form below.  If

14  supplemental or additional pages are necessary,

15  please furnish same and attach them to this errata

16  sheet.

17  Page _____ Line _____ Should read:_____

18  _____

19  Reason for change: _____

20  Page _____ Line _____ Should read:_____

21  _____

22  Reason for change: _____

23  Page _____ Line _____ Should read:_____

24  _____

25  Reason for change: _____
```

Electronically signed by Nicole White (301-070-154-1752)          6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

**JA1227**

Female Student - 10/4/2021

Page 53

1   Page _____ Line _____ Should read:_____

2   _____

3   Reason for change: _____

4   Page _____ Line _____ Should read:_____

5   _____

6   Reason for change: _____

7   Page _____ Line _____ Should read:_____

8   _____

9   Reason for change: _____

10  Page _____ Line _____ Should read:_____

11  _____

12  Reason for change: _____

13

14                  _____

15                          Signature

16

17      SUBSCRIBED and SWORN TO before me this

18  _____ day of _____ 2021.

19

20          _____

21                      NOTARY PUBLIC

22

23  My Commission expires:_____

24

25

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

# EXHIBIT 19





# BISHOP ENGLAND HIGH SCHOOL
A CATHOLIC EDUCATION TRADITION SINCE 1915

STUDENTS    PARENTS    FACULTY

ABOUT ▾    ADMISSIONS ▾    STUDENT LIFE ▾    ACADEMICS ▾    ATHLETICS ▾    CAMPUS MINISTRY ▾    ARTS ▾    COUNSELIN

## ABOUT US

Bishop England High School, established on September 22, 1915, is a member of the Catholic Diocese of Charleston, serving grades 9 through 12. We are tasked with bringing forth a more caring society, and helping to form morally, intellectually, and physically sound young people in a Catholic environment.



Welcome from Principal

BE By the Numbers

Sisters of Charity of Our Lady of Mercy

Contact

Our Sto

Employ

Faculty,

Directio



https://web.archive.org/web/20180414093500/https://www.behs.com/about/    NEWS

6/8/2020    Bishop England High School

http://behs.com/apps/pages/index.jsp?uREC_ID=229732&type=d    Go    JUN JUL AUG

7 captures    ◀ 23 ▶
23 Jul 2014 - 29 Jan 2019    2013 2014 2015

Enjoy your summer... Please picture is coming. Reserve the right.    Staff Log-in    Search Text 🔍    Google Translate ▼

# BISHOP ENGLAND HIGH SCHOOL

| Home | About Us | Admissions | Academics | Students | Parents | Activities | Relations | Contact Us |

## Child Protection Services

**The Charter for the Protection of Children and Young People**

"Let there no doubt or confusion on anyone's part: For us, your bishops, our obligation to protect children and young people and to prevent sexual abuse flows from the mission and example given to us by Jesus Christ himself, in whose name we serve."

In addressing the crisis experienced by the Church in the United States in 2002, the United States Conference of Catholic Bishops met to decide how best to deal with the scandal that had erupted in the Church with the allegations of Child Sexual Abuse.

Two crucial decisions came from the Bishops at that conference:

- They accepted their culpability in some of the past mistakes that were made,
- They wanted to assure everyone that this kind of situation would never be allowed to happen again.

And so was born the Charter for the Protection of Children and Young People. The Charter is a promise from the Catholic Bishops in America that they would do all in their power to assure parents and the community at large. that even though mistakes were made, the future of the Church in America would embrace the safety of its children as a focal point of its mission.

The Charter implements the mandates, which if followed, will protect the children in our care. The Charter contains 17 Articles, when embraced, will seriously curb the possibility of child sexual abuse happening in our parishes and schools.

With 17 Articles, the focus of the Charter is:

- To Promote Healing and Reconciliation with Victims/Survivors of Sexual Abuse of Minors
- To Guarantee an Effective Response to Allegations of Sexual Abuse of Minors
- To Ensure the Accountability of Our Procedures
- To Protect the Faithful in the future

http://sccatholic.org/child-protection-services/charter
http://sccatholic.org/child-protection-services?rm=h

**Files:**

📄 Charter-for-the-Protection-of-Children-and-Young-People-revised-2011.pdf
📄 Teaching Touching Saftey Opt-Out.pdf

BISHOP ENGLAND HIGH SCHOOL        Fostering a faith community characterized by the Gospel message of mutual respect and charity.

**JA1231**

6/8/2020                                    Bishop England High School



| http://www.behs.com/ | Go |
|---|---|

**240 captures**
7 Oct 1999 - 22 Oct 2019

MAY **JUN** JUL
◄ **24** ►
**2002** 2003 **2004**

# BISHOP ENGLAND
## HIGH SCHOOL

- Academics
- Staff
- Athletics
- Students
- Alumni
- Information
- Merchandise

## Academic Excellence in a Caring Environment

### Summer Reading List 2003
#### Track Team Fund Raiser: Battling Bishop Afghan

**JA1232**

BISHOP ENGLAND HIGH SCHOOL
A CATHOLIC EDUCATION TRADITION SINCE 1915
(HTTPS://WWW.BEHS.COM/)

(HTTPS://WWW.BEHS.COM/)

STUDENTS (HTTPS://WWW.BEHS.COM/STUDENTS/)    PARENTS (HTTPS://WWW.BEHS.COM/PARENTS/)

FACULTY & STAFF (HTTPS://WWW.BEHS.COM/FACULTY-STAFF-DIRECTORY/)    ALUMNI (/ALUMNI)

## Privacy Policy

Bishop England High School respects and is committed to protecting your privacy.

**Use of Personal Information:** We do not collect any personal information unless you voluntarily provide it by sending us e-mail, participating in a survey, or completing an on-line form. Personal information submitted will not be transferred to any non-affiliated third parties.

**Log Files:** Like most website servers we automatically receive and record information on our server logs from your browser including your IP address, cookie information and the page(s) you visited. This information is anonymous and cannot be directly linked to individual users. We use this information to analyze web traffic and make decisions about how to make it easier for people to find and navigate our website.

**Links:** This website may contain links to other sites. Please be aware that we are not responsible for the privacy practices of such other sites. We encourage our users to be aware when they leave our site and to read the privacy statements of each and every website that collects personally identifiable information. This privacy statement applies solely to information collected by this website.

**Security:** Your payment and personal information is always safe. Our Secure Sockets Layer (SSL) software is the industry standard and among the best software available today for secure commerce transactions. It encrypts all of your personal information, including credit card number, name, and address, so that it cannot be read over the internet. Under no circumstances are credit card numbers permanently stored on our website servers.

**Contact Information:** If users have any questions regarding our privacy policy, please contact:

(/#facebook)    (/#twitter)    (/#email)

(https://www.addtoany.com/share#url=https%3A%2F%2Fwww.behs.com%2policy%2F&title=Privacy%20Policy)

STAY CONNECTED WITH BISHOP ENGLAND ONLINE

f (https://www.facebook.com/BishopEngland)
(https://www.instagram.com/bishopenglandhighschool/)
in (https://www.linkedin.com/school/bishop-england-high-school/)
(https://twitter.com/battlingbishops?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor)
(https://www.youtube.com/channel/UCnItOzl0POmlUAmloUgAyQA)
●● (https://www.flickr.com/photos/besports)

**JA1233**

ADDRESS

Bishop England High School
363 Seven Farms Drive
Charleston, SC 29492

CONTACT

Phone: 843-849-9599
Fax: 843-849-7849

QUICK LINKS

Privacy Policy (https://www.behs.com/privacy-policy/)
Directions (https://www.behs.com/about/directions/)
Reserve the Performing Arts Center (mailto:mdarnell@behs.com)
Staff Resources (https://www.behs.com/staff-resources/)
Contact (https://www.behs.com/about/contact/)

© 2020 Bishop England High School. All Rights Reserved

6/8/2020                                                                BEHS: Our Mission

http://www.behs.com/index.php?id=1          Go    APR  JUN  AUG

18 captures                                        ◀ 05 ▶
3 Dec 2003 - 6 Aug 2007                             2003 2004 2005

Login
**Net Classroom**
Faculty Access

# Bishop England High School

## Our Mission

**Academics**
- Our Mission
- Application Process
- Graduation Requirements
- Academic Courses
- Financial Information
- School Calendar
- Summer Reading List

**Athletics**
- BESports.net

**Staff**
- Staff List

**Students**
- Library
- Student Organizations
- College Rep Schedule

**Alumni**
- Photos
- Alumni News
- Reunions
- Find/Add an Alumnus

**Information**
- Contact Information
- Map & Directions
- Giving Opportunities
- School History

**Merchandise**
- Shirts
- Battling Bishop
- Gracious Goodness
- Other Items
- Order Form

As an institution of the Catholic Church, it is the mission of Bishop England High School to foster a faith community characterized by the Gospel message of mutual respect and charity. The school endeavors to promote the spiritual, intellectual, and physical growth of the individual through the combined efforts of parents/guardians and faculty by establishing the best possible environment for learning: a climate of safety, trust, and respect for the individual and an appreciation for the acquisition of learning.

*- adapted from BEHS Faculty Handbook, revised, July 2000*

**JA1235**

# EXHIBIT 20

=========================================================================

# Deposition of:

# Gary Nestler

=========================================================================

**Gary Nestler, et al**
**v.**
**The Bishiop of Charleston, a Corporation Sole, Bishop**
**England High School, et al**

**Case #:  2:21-cv-00613-RMG**

**October 1, 2021**

=========================================================================



## Magnolia Reporting, LLC

P.O. Box 61011
North Charleston, SC  29419
(843) 303-9141
www.MagnoliaReporting.com



**JA1237**

Gary Nestler - 10/1/2021

Page 1

```
                        UNITED STATES DISTRICT COURT
                        DISTRICT OF SOUTH CAROLINA
                            CHARLESTON DIVISION


Gary Nestler, Viewed      CASE NO. 2:21-cv-00613-RMG
Student Female 200,
Viewed Student Male
300, on behalf of
themselves and all
others similarly
situated,

        Plaintiff(s),

        -vs-

The Bishop of Charleston,
a Corporation Sole,
Bishop England High School,
Tortfeasors 1-10, The Bishop
of the Diocese of Charleston,
in his official capacity, and
Robert Guglielmone, individually,

        Defendant(s).
****************************************************

DEPOSITION OF:     GARY NESTLER

DATE TAKEN:        FRIDAY, OCTOBER 1, 2021

TIME:              10:07 A.M.

PLACE:             TURNER PADGET GRAHAM LANEY, PA
                   40 Calhoun Street, Ste. 200
                   Charleston, SC  29401


REPORTED BY:       Nicole D. White
                   Certified Court Reporter
                   Notary Public
```

MAGNOLIA REPORTING, LLC   (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                26b6666c-261a-4ba4-b508-8389585e85f9

JA1238

Gary Nestler - 10/1/2021

```
                                                          Page 2
 1   A P P E A R A N C E S
 2
     REPRESENTING THE PLAINTIFF:
 3          By:   DANIEL S. SLOTCHIVER, ESQUIRE
            Slotchiver & Slotchiver, LLP
 4          751 Johnnie Dodds Blvd., Ste. 100
            Mount Pleasant, SC  29464
 5          (843) 577-6531
            Dan@Slotchiverlaw.com
 6   and
            By:  LAWRENCE E. RICHTER, JR., ESQUIRE
 7          The Richter Firm, LLC
            622 Johnnie Dodds Blvd.
 8          Mount Pleasant, SC  29464
            (843) 849-6000
 9          LRichter@richterfirm.com
     and
10          By:  BRENT HALVERSEN, ESQUIRE
            Halversen & Halversen
11          751 Johnnie Dodds Blvd., Ste. 200
            Mount Pleasant, SC  29464
12          (843) 284-5790
            Brent@Halversenlaw.com
13
14   REPRESENTING THE DEFENDANT:
            By:  RICHARD S. DUKES, JR., ESQUIRE
15          Turner Padget Graham & Laney, P.A.
            40 Calhoun Street, Suite 200
16          Charleston, SC  29401
            (843) 576-2810
17          Rdukes@turnerpadget.com
18
19
20
21
22
23
24
25
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)          26b6666c-261a-4ba4-b508-8389585e85f9

**JA1239**

Gary Nestler - 10/1/2021

Page 3

1                   I N D E X

2

3    Testimony of Gary Nestler

4    Examination by Mr. Dukes......................04

5    Examination by Mr. Slotchiver.................72

6

7    CERTIFICATE...................................89

8    ERRATA SHEET..................................90

9

10

11               INDEX OF EXHIBITS

12

13        (No exhibits were offered or marked.)

14

15

16                  STIPULATIONS

17        It is hereby stipulated and agreed by and

18    between the parties hereto, through their

19    respective counsel, that the reading and signing

20    of the transcript is reserved by the Deponent.

21

22

23

24

25

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1240**

Gary Nestler - 10/1/2021

Page 4

```
 1           (GARY NESTLER, having been first duly
 2     sworn, testified as follows:)
 3                    E-X-A-M-I-N-A-T-I-O-N
 4     BY MR. DUKES:
 5           Q.  Good morning, Mr. Nestler.
 6           A.  Good morning, sir.
 7           Q.  I'm Richard Dukes.  We just met.  I'm
 8     the lawyer representing the defendants in the
 9     case you've brought that's styled Nestler versus
10     Bishop England High School, the Bishop of
11     Charleston and Bishop Guglielmone.
12              We're here to take your deposition
13     today.  Have you ever been deposed before?
14           A.  Yes, sir.
15           Q.  When?
16           A.  Don't recall the exact dates.
17           Q.  Okay.  Was it in a lawsuit in which
18     you were a party?
19           A.  Yes, sir.
20           Q.  What kind of case was it?
21           A.  Traffic accident.
22           Q.  Okay.  We'll come to that.  There are
23     a few rules I have to explain to you.
24           A.  Yes, sir.
25           Q.  The rules require me -- the Rules of
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 5

1    Civil Procedure require me to tell you these
2    things.
3            Now that your deposition has
4    commenced, you can't talk to your lawyers about
5    the substance of your testimony.  In fact, you
6    can't talk to anybody about the substance of your
7    testimony until we're done.
8            If you do talk to either of your
9    lawyers or to anybody else, I can ask you about
10   that.  The only thing you're allowed to talk to
11   your lawyers about that would remain under the
12   privilege is a discussion of whether to invoke a
13   privilege.  That's never been an issue in my
14   depositions.  I don't anticipate it coming up.
15           If you don't understand one of my
16   questions, you have to ask me to clarify.  You
17   can't turn to your lawyer and ask, "What's he
18   asking me?"
19       A.  Yes, sir.
20       Q.  Our court reporter would appreciate it
21   if you answered my questions out loud and rather
22   than an "uh-huh" or "huh-uh" or a head nod.  I'll
23   remind you if that happens, because it does.
24       A.  Yes, sir.
25       Q.  The other thing our court reporter

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1242**

Gary Nestler - 10/1/2021

Page 6

1   would appreciate is if we tried not to talk over

2   each other.  If you'll let me finish my question,

3   I'll let you finish your answer.

4           A.  Thank you.

5           Q.  If at any time during your deposition

6   you want to go back and clarify something you had

7   answered earlier, feel free to do so, just tell

8   me.

9           A.  Yes, sir.

10          Q.  I don't anticipate this taking a long

11  time.  Typically the bar lawyers like to take a

12  break every hour and we'll try to do that.  If

13  you need to take a break, please let me know and

14  we'll do that.

15          A.  Thank you.

16          Q.  Are you under any -- on any

17  medications that will affect your memory today?

18          A.  No, sir.

19          Q.  What do you do for a living?

20          A.  I work for a software company.

21          Q.  Is that IBM?

22          A.  No, sir.

23          Q.  Okay.  Who is that?

24          A.  Priority 5 Holdings.

25          Q.  And what does Priority 5 Holdings do?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1243**

Gary Nestler - 10/1/2021

Page 7

1          A.   They sell software.

2          Q.   What kind of software?

3          A.   Anti-terrorism software.

4          Q.   How is it -- I mean, explain the

5    anti-terrorism software business to me and how

6    your software -- the software you sell works.

7          A.   The software that we sell is

8    considered a common operating picture.  It takes

9    the spare data sources from different agencies,

10   users, both public and private, and brings it

11   together and allows for the users to see in one

12   piece of glass what's going on and gives them

13   situational awareness, allows them to manage

14   consequences of what's happening and then allows

15   them to form their decisions with the facts that

16   they're gleaning from the data.

17         Q.   Who are your customers?

18         A.   Both public and private sector.

19         Q.   Okay.  So government?

20         A.   Yes, sir.

21         Q.   And who in the private sector would be

22   your customers?

23         A.   You have just normal industry such as

24   Amtrak.

25         Q.   Okay.

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1244**

Gary Nestler - 10/1/2021

Page 8

1        A.   And then others who --
2        Q.   Which pretends to be a
3   non-governmental entity.
4        A.   Okay.
5        Q.   Who else?
6        A.   I'd have to provide you with a list of
7   private organizations, but we need to get
8   permission to do that.
9        Q.   What do you do for Priority Software?
10       A.   I'm a senior vice president.
11       Q.   And it's Priority 5 --
12       A.   Holdings.
13       Q.   -- Holdings.  Okay.
14            MR. SLOTCHIVER:  And Rich, if I
15       could just add one thing if you don't mind.
16       I'm not testifying, but I know the
17       deposition today is limited to class
18       certification.  Certainly I'm gonna give you
19       a lot of latitude with it, but in case
20       something comes up, I just wanted to state
21       in advance that we'll raise that issue if it
22       comes if up if we believe it to be
23       problematic.  I'm not waiving it by not
24       asserting it now.  I'm hoping I don't ever
25       have to assert it.  But if I do, I wanted

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1245**

Gary Nestler - 10/1/2021

Page 9

1          the record to reflect that I'm reserving

2          that right.

3                    MR. DUKES:  Okay.  If it becomes

4          an issue, we'll deal with that.

5                    MR. SLOTCHIVER:  Perfect.

6     BY MR. DUKES:

7          Q.  Walk me through your educational

8     background, please.

9          A.  High school, college.

10         Q.  Where did you go to college?

11         A.  Northeastern University.

12         Q.  In Boston?

13         A.  Yes, sir.

14         Q.  Okay.  What was your degree in?

15         A.  Organization, communications is the

16    major.  Biology and chemistry as a minor.

17         Q.  Okay.  Did you have any postgraduate

18    education?

19         A.  Yes, I have.

20         Q.  And what's that?

21         A.  I've had two universities.  One is

22    Pacific College with health and sciences in New

23    York.  And then the Medical University of South

24    Carolina in Charleston.

25         Q.  Okay.  What degrees did you earn?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 10

1          A.   The Medical University of South
2     Carolina was a doctorate in healthcare
3     administration, policy, and leadership.
4          Q.   Ph.D.?
5          A.   It's called a doctorate of healthcare
6     administration and policy, correct.
7          Q.   And what about at Pacific College?
8          A.   That was a position with the diplomat
9     of traditional Chinese medicine.
10         Q.   Walk me through your work history,
11    please.
12         A.   Bay Drug was the first.
13         Q.   What did you do for Bay Drug?
14         A.   Delivered pharmaceuticals.
15         Q.   Okay.  What kind of pharmaceuticals
16    did you deliver?
17         A.   My father owned a drugstore.
18         Q.   Okay.  What -- and I guess let's
19    qualify it to after you completed your education.
20         A.   High school education or college?
21         Q.   College.
22         A.   Summit Office Supply.
23         Q.   Okay.  When was that?
24         A.   The year I graduated college.
25         Q.   Which was when?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1247**

Gary Nestler - 10/1/2021

Page 11

1          A.  1979.  Oh, no, '83.  Sorry, 1983, I
2     believe.
3          Q.  Okay.  And what did you do for Summit
4     Office Supply?
5          A.  Sales.
6          Q.  Where was your next place of
7     employment?
8          A.  Microcomputer Publishing Center.
9          Q.  What did you do for them?
10         A.  Computer graphics and sales.
11         Q.  Okay.  And when did you work for
12    Microcomputer?
13         A.  I'd have to look at my CV.  I don't
14    recall the years.
15         Q.  Okay.  Where did you go to work next?
16         A.  Landmark Press Publishing.
17         Q.  And what did you do for them?
18         A.  Sales and marketing.
19         Q.  What sorts of materials did Landmark
20    Press publish?
21         A.  Legal briefs, bounded books,
22    invitations, events, collateral material for
23    marketing.
24         Q.  How long did you work for Landmark
25    Press?

Electronically signed by Nicole White (301-070-154-1752)          26b6666c-261a-4ba4-b508-8389585e85f9

**JA1248**

Gary Nestler - 10/1/2021

Page 12

1        A.   I'd have to look at the dates.

2        Q.   More than a year, more than two years?

3        A.   Yes, sir.  More than two years.

4        Q.   Where did you go to work next?

5        A.   D.F. White.

6        Q.   What did you do for E.F. (sic) White?

7        A.   Delta, D as in delta.

8        Q.   Oh.

9        A.   Sales, marketing, and management.

10       Q.   What did D.F. White do?

11       A.   Printing.

12       Q.   Okay.  How long did you work there?

13       A.   I'd have to look at my resume.

14       Q.   Was it more than a couple years, five

15  years, 10 years?

16       A.   Not long.  Not more than five years.

17  Less than five years.

18       Q.   Do you know about what year you worked

19  for D.F.?

20       A.   I do not.

21       Q.   Where was your next place of

22  employment?

23       A.   I believe the next place of employment

24  was at The Medical University of South Carolina.

25       Q.   What did you do for the Medical

Electronically signed by Nicole White (301-070-154-1752)                     26b6666c-261a-4ba4-b508-8389585e85f9

**JA1249**

Gary Nestler - 10/1/2021

Page 13

1    University?

2         A.   I was the director of integrative

3    medicine.

4         Q.   What is integrative medicine?

5         A.   Integrative medicine is considered a

6    combination of conventional allopathic medicine

7    along with non-conventional methods, such as

8    acupuncture, nutraceuticals, herbal medicines.

9         Q.   What qualified you to do that?  You've

10   been in the printing business for a while and

11   sales.

12        A.   Uh-huh.

13        Q.   Why did you go into integrative

14   medicine?

15        A.   Why did I go into integrative

16   medicine?

17        Q.   Uh-huh.

18        A.   Because I sought therapies for

19   migraine headaches while I was working.

20        Q.   Okay.  Were you a migraine sufferer?

21        A.   No, sir.

22        Q.   Okay.  What triggered your interest in

23   providing relief for migraines?

24        A.   To relieve my migraine headaches.

25        Q.   I must have misunderstood you.  I

Electronically signed by Nicole White (301-070-154-1752)                26b6666c-261a-4ba4-b508-8389585e85f9

**JA1250**

Gary Nestler - 10/1/2021

Page 14

1  thought you said you didn't suffer from
2  migraines?
3        A.  I did not suffer from migraines.  I
4  had migraine headaches.
5        Q.  Okay.  How long did you stay at MUSC?
6        A.  From 1998 through 2003, I believe.
7        Q.  Okay.  Why did you leave MUSC?
8        A.  I chose to not continue the practice
9  of medicine as a result of 9/11.
10        Q.  Why is that?  How did that impact your
11  career decision?
12        A.  I was previously from New York City
13  where I lived and my neighbors all perished in
14  the event of 9/11.
15        Q.  And were you practicing medicine at
16  USC?
17        A.  I was not practicing medicine at USC.
18        Q.  What did you do as director of
19  integrative medicine?
20        A.  At MUSC.
21        Q.  Yeah.
22        A.  I was practicing medicine.
23        Q.  Okay.  Did you have a license?
24        A.  Yes, I did.
25        Q.  What license did you hold?

Electronically signed by Nicole White (301-070-154-1752)          26b6666c-261a-4ba4-b508-8389585e85f9

**JA1251**

Gary Nestler - 10/1/2021

Page 15

1        A.   I held a license through the medical
2    board of South Carolina as an acupuncturist.
3        Q.   Do acupuncturists practice medicine?
4        A.   Yes, they do.
5        Q.   What are you -- when you practice
6    medicine, what were you allowed to do?
7        A.   Would you clarify?
8        Q.   Could you write prescriptions?
9        A.   No, sir.
10       Q.   Could you prescribe therapies?
11       A.   Yes, sir.
12       Q.   What kind of therapies could you
13   prescribe?
14       A.   Integrative medical therapies.
15       Q.   And what are those?
16       A.   Acupuncture, nutraceutical medicine,
17   massage therapy, chiropractic care.
18       Q.   After you'd finished your tenure at
19   MUSC, where did you go to work?
20       A.   I started a small consulting firm.
21       Q.   What was that consulting firm called?
22       A.   The Canary Group.
23       Q.   McNair Group?
24       A.   The Canary Group.
25       Q.   The Canary Group.  I'm sorry.

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

JA1252

Gary Nestler - 10/1/2021

```
                                              Page 16
 1          A.   That's okay.
 2          Q.   I'm hard of hearing.
 3          A.   I'll speak up.  I apologize.
 4          Q.   What kind of consulting did The Canary
 5     Group do?
 6          A.   Crisis and emergency management
 7     consulting.
 8          Q.   How big a company was The Canary
 9     Group?
10          A.   It was a sole proprietor.
11          Q.   Is it still operating?
12          A.   No, sir.
13          Q.   When did it shut down?
14          A.   I'd have to look at the date.
15          Q.   Was it before 2005, before 2010?
16          A.   Certainly before 2010.
17          Q.   Do you know how long you worked, you
18     operated The Canary Group?
19          A.   I'd have to look at my resume.
20          Q.   How many clients did you have with The
21     Canary Group?
22          A.   Approximately four.
23          Q.   Four?
24          A.   Uh-huh.
25          Q.   Which ones?  Who were they?
```

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1253**

Gary Nestler - 10/1/2021

Page 17

1          A.   Dollar Thrifty was one.

2          Q.   Uh-huh.

3          A.   And the other three were Charleston --

4    City of Charleston.

5          Q.   Okay.

6          A.   And the other two I don't recall their

7    names.

8          Q.   When you stopped doing crisis and

9    emergency management consulting with the Canary

10   Group, where did you go to work?

11         A.   University of North Carolina, Chapel

12   Hill.

13         Q.   What did you do at UNC?

14         A.   I taught undergraduate and graduate

15   students.

16         Q.   In what?

17         A.   Healthcare and terrorism.

18         Q.   What's the -- I mean, what was the

19   focus of that?

20         A.   The impact of terrorism on the

21   healthcare system of the United States.

22         Q.   I see.  And how long did you stay at

23   Chapel Hill?

24         A.   I'd have to check.

25         Q.   Five years?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1254**

Gary Nestler - 10/1/2021

Page 18

1          A.   Under five years.

2          Q.   How many classes did you teach at UNC?

3          A.   Per year?

4          Q.   Yeah.

5          A.   One.

6          Q.   Back when I was a history professor,

7    one calendar year I taught 51 semester hours.

8    Yes, it was brutal.

9          A.   Uh-huh.

10         Q.   When you left UNC, where did you go to

11   work?

12         A.   IBM.

13         Q.   And what did you do for IBM?

14         A.   I was an associate partner responsible

15   for their global public safety practice.

16         Q.   Okay.  What did the public safety

17   practice entail?

18         A.   Engaging with corporate as well as

19   clients of IBM focused on public safety.

20         Q.   Safety of IBM's facilities or safety

21   of the public at large, what are we talking

22   about?

23         A.   Both.

24         Q.   Okay.  And how did IBM's public safety

25   practice work to ensure the safety of the

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1255**

Gary Nestler - 10/1/2021

Page 19

1    community?

2          A.  I do not agree with the word that you

3    used, "ensure".  It had nothing to do with

4    ensuring safety.

5          Q.  Okay.  What did they do then?

6          A.  They provided software and hardware to

7    help agencies, communities, as well as their own

8    organization to provide methodologies in the

9    software to help senior level decision makers to

10   make decisions regarding public safety.

11         Q.  How long did you stay at IBM?

12         A.  Eight years.

13         Q.  Do you know what year you left IBM?

14         A.  Yes.

15         Q.  What year was that?

16         A.  2017.

17         Q.  Were you promoted beyond associate

18   partner?

19         A.  No, sir.

20         Q.  Okay.  Did you stay in the same job

21   with IBM the entire eight years?

22         A.  No, sir.

23         Q.  What else, what other positions did

24   you hold?

25         A.  Consultant, managing consultant,

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1256**

Gary Nestler - 10/1/2021

Page 20

1   senior managing consultant.
2          Q.  And what did you do as a senior
3   managing consultant?
4          A.  Same job I did as the associate
5   partner with subject matter expertise.
6          Q.  Okay.  Where did you go to work after
7   IBM?
8          A.  Priority 5 Holdings.
9          Q.  Are you the sole owner of Priority 5?
10         A.  No, sir.
11         Q.  Who else?  Who owns it?
12         A.  It's owned by shareholders.
13         Q.  Is it publicly traded?
14         A.  No, sir.
15         Q.  How many shareholders does it have?
16         A.  I do not know.
17         Q.  Are you a shareholder?
18         A.  Yes, sir.
19         Q.  What percentage ownership do you hold?
20         A.  I do not know percentage.
21         Q.  What does Priority 5 -- what's its
22   volume of business annually?
23         A.  I can't answer that.
24         Q.  Okay.  Do you know what its earnings
25   are?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 21

1          A.  I can't answer that.

2          Q.  You can't because you -- it's

3     confidential or you can't because you don't know?

4          A.  I can't because it's confidential.

5          Q.  Okay.  And do you hold any other jobs

6     other than Priority 5 Holdings?

7          A.  No, sir.

8          Q.  Have you ever been sued before?

9          A.  Other than the traffic accident you

10    referred to earlier, no, sir, I don't believe I

11    have.

12         Q.  Okay.  The records from the courthouse

13    indicate -- and this is just a name search --

14         A.  Uh-huh.

15         Q.  -- that a Gary Nestler sued a man

16    named Thomas Acreman (ph) in 2003.  Was that you?

17             MR. SLOTCHIVER:  Rich, I'm not

18        sure how -- if you can enlighten me how this

19        applies to the subject we're here for today.

20             MR. DUKES:  His adequacy as

21        class representative.

22    BY MR. DUKES:

23         Q.  Is that your lawsuit?

24         A.  I don't recall the person's name.

25         Q.  Okay.  Was it -- could that have been

Electronically signed by Nicole White (301-070-154-1752)          26b6666c-261a-4ba4-b508-8389585e85f9

JA1258

Gary Nestler - 10/1/2021

Page 22

1    the car wreck case?

2           A.  Could it have been, I imagine so.

3           Q.  Okay.  Do you know what this 2003

4    lawsuit that ended in 2005 was about?

5           A.  I do not, sir.  I do not recall.

6           Q.  All right.  In 2006 a case, Gary S.

7    Nestler, plaintiff, et. al., versus Louise

8    Fraiser (ph), et. al., was filed.  What was that

9    case?

10          A.  I do not recall that.

11          Q.  You've had more than one foreclosure

12   action filed against you, haven't you?

13          A.  Yes.

14          Q.  Wells Fargo filed a foreclosure action

15   in 2009 -- in 2009 and Deutsche Bank filed one in

16   2012, correct?

17          A.  Yes.

18          Q.  What property were these banks

19   foreclosing on?

20          A.  What were the dates?

21          Q.  Wells Fargo filed suit in 2009.

22   September 11th, 2009.

23          A.  Okay.

24          Q.  What property were they foreclosing

25   on?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1259**

Gary Nestler - 10/1/2021

Page 23

```
 1          A.   I believe that was on the Isle of
 2   Palms.
 3          Q.   Your personal residence?
 4          A.   Yes, sir.
 5          Q.   And why were you not paying your
 6   mortgage?
 7          A.   There was an issue with the mortgage.
 8          Q.   What was that issue?
 9          A.   Who owned the mortgage.
10          Q.   Explain that to me, please.
11          A.   I don't think I can.
12          Q.   Why not?
13          A.   Because I didn't understand the
14   complexities of who owned the mortgage and it has
15   been resolved.
16          Q.   You understand that lenders sell
17   mortgages to either Fannie Mae or Freddie Mac or
18   to investment pools, just being securitized; did
19   you understand that?
20          A.   Do I understand that?
21          Q.   Yes.
22          A.   I do understand that.
23          Q.   Did you in 2009 when you stopped
24   paying on your mortgage?
25          A.   I did not.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                26b6666c-261a-4ba4-b508-8389585e85f9

**JA1260**

Gary Nestler - 10/1/2021

Page 24

1           Q.   How far in arrears were you?

2           A.   I do not recall.

3           Q.   How was that foreclosure action

4    resolved?

5           A.   Through mediation.

6           Q.   Okay.  Who was the mediator?

7           A.   I do not recall his name.

8           Q.   Who was your lawyer in that

9    foreclosure case?

10          A.   Justin Kahn, K-A-H-N.

11          Q.   Was the title insurer involved in that

12   case at all?

13          A.   I believe he was or they were.

14          Q.   Who was the title insurer?

15          A.   I do not recall.

16          Q.   In 2010 Signature Kitchens and Baths

17   of Charleston filed a lawsuit against you.  What

18   was that case about?

19          A.   I do not recall.

20          Q.   Was it a mechanics lien case?

21          A.   Again, I do not recall.

22          Q.   Deutsche Bank filed an action to

23   foreclose in 2012.  What property was that -- did

24   that involve?

25          A.   I believe it was the same case.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

Gary Nestler - 10/1/2021

Page 25

1          Q.  It was not a new foreclosure action?
2     I mean, it bears a 2012 case number, whereas the
3     Wells Fargo was a 2009 case number.
4          A.  (Indicating).
5          Q.  Why did Deutsche Bank foreclose on
6     you?
7          A.  I don't recall.
8          Q.  Were you in default on your mortgage a
9     second time?
10         A.  I don't believe so, sir.
11         Q.  Had you refinanced your Wells Fargo
12    mortgage with Deutsche Bank?
13         A.  No, sir.
14         Q.  What were the grounds for Deutsche
15    Bank to file a foreclosure action against you?
16         A.  I do not recall.
17         Q.  Who was your lawyer in that case?
18         A.  Justin Kahn.
19         Q.  Did you retain Mr. Kahn or did an
20    insurance carrier retain --
21         A.  I retained Mr. Kahn.
22         Q.  In 2014 C & T Foundation, LLC filed a
23    suit against you.  What was that case about?
24         A.  He refused to come back to our primary
25    residence now and repair the cement foundation

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

USCA4 Appeal: 22-1750    Doc: 19-3    Filed: 10/07/2022    Pg: 161 of 557

Page 26

1    that he poured.

2         Q.   Okay.  But why was C & T filing suit

3    against you?

4         A.   Because we did not pay him the

5    hold-back money.

6         Q.   What was the resolution of that case?

7         A.   I believe he paid us some money.

8         Q.   And in 2015 you and Julie Nestler --

9    is that your wife --

10        A.   Yes, sir.

11        Q.   -- filed a lawsuit against Joseph E.

12   Fields.  Actually filed separate lawsuits against

13   Joseph E. Fields.  Who was Joseph Fields?

14        A.   He was the gentleman who we were

15   involved in a car accident that hit us on 17 from

16   behind.

17        Q.   And that's the case in which you were

18   awarded something on the order of $7,000 in

19   damages?

20        A.   I believe so.

21        Q.   And who is your lawyer in that case?

22        A.   Dan Slotchiver.

23        Q.   Okay.  Any other lawsuits in counties

24   other than Charleston that you've been a party

25   to?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1263**

Gary Nestler - 10/1/2021

Page 27

1          A.  I do not recall that.

2          Q.  What is Gansevoort, LLC?

3          A.  Excuse me?

4          Q.  A company, an LLC that is associated,

5    I believe you're the registered agent for it.

6    Gansevoort, G-A-N-S-E-V-O-O-R-T, LLC?

7          A.  I do not know.

8          Q.  I noted that you have a pilot's

9    license; is that correct?

10         A.  No, sir.

11         Q.  You've served on a couple of boards in

12   town, haven't you?

13         A.  Yes, sir.

14         Q.  Which ones?

15         A.  Charleston Police Department.

16         Q.  Okay.  What did you do for the

17   Charleston Police Department?

18         A.  I was a board committee member and

19   then I became the board chair.

20         Q.  When were you the board chair?

21         A.  I'd have to look at the dates.

22         Q.  What -- it was a foundation, wasn't

23   it?

24         A.  It was the Charleston Police Fund.

25         Q.  What did the Police Fund do?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1264**

Gary Nestler - 10/1/2021

Page 28

1          A.   Raised money to provide for leadership
2     for police department -- for Charleston Police
3     Department, to acquire K9s for their service,
4     provide equipment for their police officers,
5     which included body cams, SWAT material and
6     vehicles.
7          Q.   Okay.  And are you still on the
8     Charleston Police Fund Board?
9          A.   No, sir.
10         Q.   When did you rotate off?
11         A.   I'd have to look at my resume.
12         Q.   You're on the board of Oceanside
13    Academy, too, aren't you?
14         A.   Yes, sir.
15         Q.   And Oceanside is experiencing its own
16    challenges right now?
17         A.   Yes, sir.
18         Q.   Explain to me what the dispute between
19    the chartering organization and Oceanside's
20    administration is?
21         A.   There was an --
22              MR. SLOTCHIVER:  Rich, how is
23        that related to this?
24              MR. DUKES:  Again, it goes to
25        his adequacy as a representative of the

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

**JA1265**

Gary Nestler - 10/1/2021

Page 29

1        class.
2                    MR. SLOTCHIVER:  A dispute
3        between Oceanside and the school board has
4        something to do with his adequacy as
5        representation?
6                    MR. DUKES:  Yeah.
7    BY MR. DUKES:
8        Q.  Please explain what's going on with
9    the chartering organization.
10       A.  The chartering organization has
11   accused the managing organization who manages
12   Oceanside of violating something called an EB5
13   rule, of which Oceanside has no part of.
14       Q.  I'm sorry?
15       A.  Of which Oceanside has no part of.
16       Q.  What is the Oceanside board's role in
17   the financial management of Oceanside?
18       A.  We govern and set policy.
19       Q.  Does that include paying a management
20   company?
21       A.  It includes paying a management
22   company.
23       Q.  Okay.  We're gonna turn now to your
24   suit against Bishop England and others.  Tell me,
25   sir, you've been on -- how long have you been on

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                                      26b6666c-261a-4ba4-b508-8389585e85f9

Gary Nestler - 10/1/2021

Page 30

1    the Oceanside board?

2         A.   I'd have to look.  A couple years.

3         Q.   Couple years?  Was it while your

4    daughter was a student at Oceanside?

5         A.   Yes, sir.

6         Q.   Is she still a student at Oceanside?

7         A.   No, sir.

8         Q.   Has she graduated?

9         A.   Yes, sir.

10        Q.   Where is she in college?

11        A.   In Florida.

12        Q.   Is she playing volleyball still?

13        A.   No, sir.

14        Q.   Did she play volleyball at Oceanside?

15        A.   She did not, sir.

16        Q.   When she was at Bishop England, she

17   was a volleyball player, right?

18        A.   Yes, sir.

19        Q.   What sport did she pursue at

20   Oceanside?

21        A.   Waterskiing.

22        Q.   Waterskiing doesn't seem to me to be a

23   big scholarship sport, is it?

24        A.   It depends on how you define "big".

25        Q.   Is she on a -- currently on a

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

1    waterskiing scholarship?

2           A.   No, sir.

3           Q.   Does she ski for the school in

4    Florida?

5           A.   She does not.

6           Q.   What school in Florida is she

7    attending?

8           A.   Lynn University.

9           Q.   Where is that?

10          A.   In Boca Raton.

11          Q.   Tell me in your opinion, what is it

12   that schools do?

13          A.   Educate children.

14          Q.   Did your daughter receive an education

15   when she attended Bishop England?

16          A.   Yes.

17          Q.   She had teachers?

18          A.   Yes, she had teachers.

19          Q.   And those teachers have to be paid?

20          A.   Yes, I imagine they have to be paid.

21          Q.   And she was attending school in person

22   in the school facilities --

23          A.   Yes.

24          Q.   -- correct?  When did she leave Bishop

25   England?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

Gary Nestler - 10/1/2021

Page 32

1         A.  I'd have to look.

2         Q.  I believe it was middle of the year in
3    her sophomore year.

4         A.  Okay.

5         Q.  Do you know what year that would have
6    been?

7         A.  We'd have to go backwards since she
8    just graduated this past June.

9         Q.  She graduated June of 2021?

10         A.  No, January of '20 -- yeah,
11    January 2021.

12         Q.  January?

13         A.  Excuse me, June of 2021.

14         Q.  Okay.  So her sophomore year would
15    have been what, 2018?

16         A.  Again, I defer to a calendar.

17         Q.  Okay.  Did you pay tuition to Bishop
18    England?

19         A.  Yes.

20         Q.  Was your wife also in the -- required
21    to, not so much guarantee, but you and your wife
22    were both obligated to pay tuition, were you not?

23         A.  We're married, yes, sir.

24         Q.  She's not a party to this case?

25         A.  No, sir.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 33

```
 1          Q.  Why not?
 2          A.  Because I'm the party to the case.
 3          Q.  When did you decide to file this
 4    lawsuit?
 5               MR. SLOTCHIVER:  To the extent
 6        that this calls for any attorney/client
 7        privileged communications, I'm going to
 8        instruct you not to answer.
 9               THE DEPONENT:  Okay.
10    BY MR. DUKES:
11          Q.  When did you decide to file?  I'm not
12    asking for any communications you had with any of
13    these lawyers.
14          A.  I can't answer.
15          Q.  What are you seeking in filing this
16    lawsuit?
17               MR. SLOTCHIVER:  Same thing, to
18        the extent that it deals with any attorney/
19        client communications between you and your
20        counsel, it's a privilege and you're
21        instructed not to answer.
22               THE DEPONENT:  I can't answer.
23    BY MR. DUKES:
24          Q.  Are you following your counsel?
25          A.  No, sir.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

**JA1270**

Gary Nestler - 10/1/2021

Page 34

1          Q.  Then why can't you answer that
2    question?
3          A.  Let me rephrase it.  I am following
4    the advice of counsel.
5                    MR. DUKES:  Okay.  We'll deal
6        with that.
7    BY MR. DUKES:
8          Q.  How did you find all of these lawyers
9    who are enrolled as counsel for the class?
10          A.  Excuse me?
11          Q.  How did you find all the lawyers?  You
12    got Mr. Slotchiver that you have a pre-existing
13    relationship?
14          A.  Uh-huh.
15          Q.  Mr. Richter's involved,
16    Mr. Halversen's involved, and Carl Solomon from
17    Columbia is involved.  How did that team come to
18    be put together?
19                    MR. SLOTCHIVER:  And to the
20        extent that this is invading attorney/client
21        privileged communications, I'm going to
22        instruct you not to answer.
23    BY MR. DUKES:
24          Q.  And you're gonna follow your lawyer's
25    instructions on that?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

JA1271

Gary Nestler - 10/1/2021

Page 35

```
 1          A.  Yes, sir.
 2          Q.  What investigation did you perform
 3   regarding each of the defendants in this lawsuit?
 4          A.  I can't answer that question.
 5          Q.  Why not?
 6          A.  Because that's privileged
 7   conversations I've had with my attorneys.
 8          Q.  Your lawyer's not asserted a
 9   privilege.
10               MR. SLOTCHIVER:  Can you ask the
11          question again, please?
12   BY MR. DUKES:
13          Q.  Yeah.  What investigation did you
14   do -- you --
15          A.  Oh, I'm sorry, go ahead.
16          Q.  -- you do prior to filing this
17   lawsuit?
18               MR. SLOTCHIVER:  Same thing.  To
19          the extent you can answer this question
20          without invading attorney/client privilege,
21          you're welcome to answer the question.  Just
22          don't talk about communications you've had
23          with counsel.
24               THE DEPONENT:  I've done no
25          investigations.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 36

1   BY MR. DUKES:

2        Q.   None at all?  Never gone into a high

3   school locker room?

4        A.   No, sir.

5        Q.   What is your complaint about Bishop

6   Guglielmone?  Why are you suing him?

7        A.   Remind me who that person is and his

8   name again, please.

9        Q.   Bishop Robert Guglielmone.  He's the

10  Bishop of Charleston.

11       A.   Uh-huh.

12       Q.   Why are you suing him?

13       A.   And who is he, again?

14       Q.   He is the Bishop of Charleston.

15       A.   Okay.  As I understand it, that he is

16  connected with Bishop England or the leader of

17  the archdiocese or whatever you said the proper

18  term is, and that he is a party to what has gone

19  on at Bishop England.

20       Q.   How is he a party to what's gone on at

21  Bishop England?

22       A.   Because he's part of the leadership.

23       Q.   What is your knowledge of his role in

24  the leadership of Bishop England?

25                   MR. SLOTCHIVER:  And to the

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1273**

Gary Nestler - 10/1/2021

Page 37

```
 1        extent that it has to deal with attorney/
 2        client communications, I'm going to instruct
 3        you not to answer.  To the extent you can
 4        answer the question outside of that, feel
 5        free to answer the question and please do
 6        answer the question.
 7                    THE DEPONENT:  As I understand
 8        it, he oversees the schools, Catholic
 9        schools.
10   BY MR. DUKES:
11        Q.  What has he done individually to harm
12   you?
13        A.  Individually to harm me?
14        Q.  Yes.
15        A.  I'm not sure I can answer that
16   question.
17        Q.  Okay.  Well, you've sued him in his
18   individual capacity.  Can you not identify
19   anything that you contend he's done wrong that
20   harmed you?
21                    MR. SLOTCHIVER:  And the same
22        instruction, to the extent you can answer
23        the question without invading the
24        attorney/client privilege, please do.
25                    THE DEPONENT:  I cannot answer
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

Gary Nestler - 10/1/2021

Page 38

```
 1      that question.
 2   BY MR. DUKES:
 3        Q.  Because your attorney instructed you
 4   not to answer it?
 5        A.  Again, I cannot answer the question.
 6        Q.  Are you following your attorney's
 7   instruction?
 8        A.  Yes, sir.
 9        Q.  Okay.  In your complaint, you identify
10   unnamed tortfeasors 1 through 10.  Who are they?
11        A.  I can't answer that question.
12        Q.  Why not?
13        A.  Because they're attorney/client
14   privilege.
15        Q.  Have you consulted with any other
16   members of your, I'm gonna call them parents,
17   other parents of Bishop England students about
18   this lawsuit?
19        A.  No, sir.
20        Q.  And I understand that people who pay
21   tuition may not always be parents, but it's just
22   easier rather than list everybody who might
23   possibly have paid tuition to Bishop England,
24   you've not communicated with any of them?
25        A.  No, sir.
```

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1275**

Gary Nestler - 10/1/2021

Page 39

 1                    MR. SLOTCHIVER:  Object to the
 2       form.
 3    BY MR. DUKES:
 4           Q.  Has anyone reached out to you?
 5           A.  No, sir.
 6           Q.  You've never been in the locker rooms
 7    at Bishop England, correct?
 8           A.  No, sir.
 9           Q.  Never coached a game?
10           A.  No, sir.
11           Q.  Have you ever sent a letter or an
12    e-mail to current or former Bishop England
13    parents about this lawsuit?
14           A.  No, sir.
15           Q.  Did you attend the press conference
16    that Mr. Richter gave when he filed this lawsuit?
17           A.  No, sir.
18           Q.  Do you -- are you on Facebook or
19    social media?
20           A.  I am.
21           Q.  Have you ever posted anything about
22    this, the Bishop England situation?
23           A.  No, sir.
24           Q.  Do you post comments on any other
25    blogs or on a Twitter page or other social media?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1276**

Gary Nestler - 10/1/2021

Page 40

1          A.   I do.

2          Q.   What do you typically post about?

3          A.   I don't typically post anything.

4          Q.   You're a ghost, I think is what the

5     kids call it?

6          A.   No, sir.

7          Q.   Do you post any content on social

8     media at all?

9          A.   Rarely.

10         Q.   Okay.  Have you talked to anybody at

11    Bishop England, current or former students, about

12    the locker rooms?

13         A.   No, sir.

14         Q.   Can you describe the locker rooms at

15    Bishop England for me?

16         A.   No, sir.

17         Q.   What -- explain to me the facts that

18    Bishop England promised a certain education.

19    What education did Bishop England promise?

20         A.   High school education.

21         Q.   And they provided that to your

22    daughter when she attended there, right?

23         A.   They provided a high school education.

24         Q.   What education was not delivered as

25    promised?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 41

1          A.  I'm not sure I can answer that
2     question.
3          Q.  Was your daughter's education at B.E.
4     somehow objectionable or she didn't get a good
5     education?
6          A.  Could you re-ask the question?
7          Q.  Yeah.  What is the problem with the
8     education that Bishop England provided your
9     daughter in the year and a half she attended?
10         A.  I don't think it's a problem with her
11    education.
12         Q.  Okay.  Why did she move to Oceanside?
13         A.  Because of the lack of a safe
14    environment being provided to her.
15         Q.  Explain that to me.
16         A.  She did not feel safe.
17         Q.  Why is that?
18         A.  You'd have to ask her directly.
19         Q.  Did you alert Bishop England, anyone
20    at Bishop England that your daughter felt unsafe?
21         A.  Yes, sir.
22         Q.  Who?
23         A.  Maryann Tucker, Patrick Finneran.
24         Q.  And what did you tell them was unsafe
25    about the school?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

JA1278

Gary Nestler - 10/1/2021

Page 42

1         A.  I alerted them that my daughter did
2    not feel safe in the school.
3         Q.  Okay.  Was she being bullied, was --
4    what did she feel unsafe about?
5         A.  Re-ask that question, I'm sorry.
6         Q.  What did she feel unsafe about?
7         A.  She felt unsafe about being in the
8    presence of a volleyball coach.
9         Q.  Jim McClellan?
10        A.  Yes, sir.
11        Q.  Okay.  She didn't like her coach.  Was
12   he the head coach or --
13                  MR. SLOTCHIVER:  Object to the
14        form.
15                  THE DEPONENT:  Would you re-ask
16        the question?
17   BY MR. DUKES:
18        Q.  Was Jim McClellan the head coach or
19   assistant coach?
20        A.  I believe he was the assistant.  I
21   think he was her head coach, but the assistant
22   coach.
23        Q.  Okay.  How was he her head coach, but
24   an assistant coach?
25        A.  You have a varsity and a junior

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 43

1    varsity.

2          Q.   And your daughter was on the JV team?

3          A.   I believe so.

4          Q.   Why did your daughter not feel safe in

5    the presence of Jim McClellan?

6          A.   Because he continued to make rude and

7    sexual comments and touch the girls

8    inappropriately, touched my daughter

9    inappropriately.

10         Q.   Okay.  How long after McClellan --

11   well, when did your daughter report that

12   McClellan had engaged in inappropriate -- in some

13   -- what she considered inappropriate conduct to

14   you?

15         A.   Don't recall it.

16         Q.   How long did you wait to report it to

17   Bishop England?

18         A.   Pretty immediate.

19         Q.   What was the result of your complaint?

20         A.   Could you ask the question again?

21         Q.   Yeah.  What happened after you went to

22   Maryann Tucker and Patrick Finneran to complain

23   about Jim McClellan, what happened?

24         A.   Nothing.

25         Q.   And did you complain about McClellan

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1280**

Gary Nestler - 10/1/2021

Page 44

1    before or after you transferred your daughter to

2    Oceanside?

3            A.   Before.

4            Q.   How long before?

5            A.   I can't tell you that.

6            Q.   Was it in the same semester?

7            A.   I would have to look at a calendar.

8            Q.   To your knowledge, has your daughter

9    ever been covertly photographed in the locker

10   rooms?

11           A.   I don't know that.

12           Q.   Did you confront Coach McClellan?

13           A.   Yes.

14           Q.   When was that?

15           A.   Excuse me, re-ask that question again.

16           Q.   Did you confront your daughter's

17   volleyball coach directly?

18           A.   I don't think I'd use the word,

19   "confront".

20           Q.   Did you talk to him?

21           A.   Yes.

22           Q.   When did you talk to him?

23           A.   After I spoke with Ms. Tucker.

24           Q.   And well, what did Ms. Tucker tell you

25   when you talked to her?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1281**

Gary Nestler - 10/1/2021

Page 45

```
 1          A.  That she was going to handle it.
 2          Q.  Did she say how she was going to
 3   handle it?
 4          A.  No, sir.
 5          Q.  Did she suggest to you that you should
 6   talk to Coach McClellan?
 7          A.  I don't recall that.
 8          Q.  Okay.  What did you say when you
 9   talked to Jim McClellan?
10          A.  I don't recall exactly what I said.
11          Q.  Do you recall generally what you said?
12          A.  I do not.
13          Q.  Tell me about your conversations with
14   Patrick Finneran.
15          A.  It was the same as with Ms. Tucker,
16   because they were both in her office together.
17          Q.  Did you make an appointment to see
18   them?
19          A.  I did.
20          Q.  Were they receptive to your complaints
21   about Coach McClellan?
22          A.  Would you repeat the question?
23          Q.  Were they receptive?
24          A.  What do you mean by, "receptive"?
25          Q.  Did they ask questions, did they try
```

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1282**

Gary Nestler - 10/1/2021

Page 46

1   to find out what was going on, what your

2   complaint was?

3           A.  Yes, they did try to find that out.

4           Q.  Okay.  And did you tell them

5   everything you knew?

6           A.  Yes, sir.

7           Q.  Did they followup with you about what

8   had gone -- what their action was in result -- in

9   reaction to your complaint?

10          A.  I believe they did.

11          Q.  Okay.  What did they tell you?

12          A.  They were gonna handle it internally.

13          Q.  Why is it that you believe that you're

14  entitled to a complete refund of all tuition you

15  paid to Bishop England?

16              MR. SLOTCHIVER:  And once again,

17      to the extent that this deals with

18      attorney/client communications, I'm gonna

19      instruct you not to answer.  To the extent

20      you can answer it outside of that, please

21      feel free.

22              THE DEPONENT:  I cannot answer

23      that.

24  BY MR. DUKES:

25          Q.  Because your attorney just instructed

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1283**

Gary Nestler - 10/1/2021

Page 47

1    you not to?

2            A.   I cannot answer that question.

3            Q.   How have you been damaged by the

4    conduct of Bishop England High School?

5            A.   How have I been damaged?

6            Q.   Yes.

7            A.   I cannot answer that question.

8            Q.   Why not?

9            A.   Because that's client/attorney

10   privilege.

11               MR. SLOTCHIVER:  You can talk

12       about damages.  I don't think that falls

13       within that.

14               THE DEPONENT:  Okay.  I would

15       say that how I was damaged, obviously,

16       economically.

17   BY MR. DUKES:

18           Q.   You paid tuition?

19           A.   Right.

20           Q.   Your daughter got an education?

21           A.   Right.

22           Q.   That's what you paid for?

23           A.   No, sir.

24           Q.   What did you pay for?

25           A.   For my daughter to get an education in

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 48

1   a safe environment.  That's why we picked Bishop
2   England.
3         Q.  And the safe environment was she
4   didn't get along with her volleyball coach?
5         A.  No, sir.
6         Q.  What representation did anybody make
7   regarding the safety of Bishop England High
8   School?
9         A.  Could you ask the question again?
10        Q.  Did anybody tell you Bishop England
11   was safe?
12        A.  Yes.
13        Q.  Who?
14        A.  Maryann Tucker, Patrick Finneran and I
15   unfortunately forgot the name of the registrar of
16   the school.
17        Q.  And was that before your daughter
18   enrolled or after?
19        A.  That was before.
20        Q.  Okay.  When did that take place?
21        A.  I'd have to look at the calendar.
22        Q.  Was it when she was in eighth grade?
23        A.  I do not recall.  I'll have to look at
24   the calendar.
25        Q.  What did they tell you?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)        26b6666c-261a-4ba4-b508-8389585e85f9

**JA1285**

Gary Nestler - 10/1/2021

Page 49

1          A.   That you're coming to Bishop England
2    not only for the education, but we provide a safe
3    environment and you can see that throughout.
4          Q.   And Jim McClellan is the only part of
5    Bishop England that you consider to be not safe?
6          A.   No, sir.
7          Q.   What else?
8          A.   There were some girls that were
9    bullying her.
10          Q.   Okay.  Where were they bullying her?
11          A.   Throughout the school.
12          Q.   Did you report that?
13          A.   Yes, sir.
14          Q.   And when did you report it?
15          A.   I do not remember.
16          Q.   Was it at the same time you complained
17    about Jim McClellan?
18          A.   No, sir.
19          Q.   No?
20          A.   I don't believe so.
21          Q.   Okay.  Who did you complain to about
22    bullying?
23          A.   Maryann Tucker, Patrick Finneran and
24    Cindy Baggett (ph).
25          Q.   Did you identify the girls who were

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)          26b6666c-261a-4ba4-b508-8389585e85f9

**JA1286**

Gary Nestler - 10/1/2021

Page 50

1    bullying your daughter?

2          A.   Yes, sir.

3          Q.   Who were they?

4          A.   I do not recall.

5          Q.   What were they doing?

6          A.   Calling her names and basically

7    bullying.

8          Q.   Okay.  What action, if any, did the

9    school take?

10         A.   None.

11         Q.   Why not?

12         A.   Can't answer that question.

13         Q.   Your daughter had some behavior issues

14   at the school, didn't she?

15         A.   Excuse me?

16         Q.   Your daughter had some behavior

17   issues.

18         A.   I'm not aware of that.

19         Q.   Tell me how your daughter has been

20   impacted by Jeffrey Scofield's arrest?

21              MR. SLOTCHIVER:  Rich, how does

22        that apply to the certification?  His

23        daughter's not involved in this.  His

24        daughter is not being listed as a class

25        representative.  His daughter's not making a

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1287**

Gary Nestler - 10/1/2021

Page 51

1          complaint about the windows on behalf of the
2          parents.  How does this affect --
3                    MR. DUKES:  It's gonna go to
4          commonality.  It also will go to the
5          adequacy of him as a representative of the
6          class.
7                    MR. SLOTCHIVER:  His daughter's
8          not a listed party in the lawsuit.  There is
9          a class representatives who have been put
10         forth.  The court's gonna have to determine
11         the adequacy of the class representatives.
12         You're asking him now about his daughter.
13         You can -- at that point you could ask any
14         random parent who has a kid at Bishop
15         England about their child and claim the same
16         thing.  I don't believe that's what he's
17         here for.  He's here for the certification
18         of the tuition paying class.
19                   MR. DUKES:  Okay.  So is it your
20         position that discovery is limited to issues
21         of class certification?
22                   MR. SLOTCHIVER:  At this point.
23                   MR. DUKES:  Okay.  Both sides?
24                   MR. SLOTCHIVER:  It's been the
25         mechanism that we've been working under.

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1288**

Gary Nestler - 10/1/2021

Page 52

```
 1                    MR. DUKES:  Okay.  Duly noted.
 2        It's a little bit after 11.  Why don't we
 3        take a quick break?
 4                    THE DEPONENT:  Okay.
 5                    MR. DUKES:  Not long.
 6                    (Whereupon, there was a short
 7        break in the proceedings.)
 8   BY MR. DUKES:
 9        Q.  Explain to me, Mr. Nestler, how all
10   parents were injured in a similar fashion, all
11   people who paid tuition were injured in a similar
12   fashion to you?
13        A.  I can't speak to others, only myself.
14        Q.  Why do you claim that all parents are
15   entitled to a refund of all the tuition they
16   paid?
17        A.  Because if they have the same view of
18   the way I view it, then they should be entitled
19   to the same.
20        Q.  Okay.  So anybody whose kid was
21   bullied should get a full refund of their
22   tuition?
23                    MR. SLOTCHIVER:  That's not what
24        this case is about.  It's not what the
25        testimony reflects.
```

Electronically signed by Nicole White (301-070-154-1752)    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1289**

Gary Nestler - 10/1/2021

Page 53

1            MR. DUKES:  Don't do speaking
2      objections anymore, Dan.
3            MR. SLOTCHIVER:  All right.
4      Object to the form.
5            MR. DUKES:  Object to the form.
6  BY MR. DUKES:
7      Q.  Well, how were the people in the class
8  you purport to represent injured?
9      A.  The same way that I feel that I was
10  injured.
11     Q.  That their kids weren't provided a
12  safe environment to go to school?
13     A.  That is correct.
14     Q.  Okay.  And your daughter was bullied
15  by other girls, by other teenage girls and have
16  issues with her volleyball coach, correct?
17     A.  That is a correct statement.
18     Q.  Okay.  So how were the basketball
19  players impacted by Jim McClellan?
20     A.  I can't say that they were impacted by
21  Jim McClellan.
22     Q.  And how were the parents who didn't
23  have kids on the volleyball team impacted by Jim
24  McClellan's actions?
25     A.  Again, it's not about Jim McClellan.

Electronically signed by Nicole White (301-070-154-1752)          26b6666c-261a-4ba4-b508-8389585e85f9

**JA1290**

Gary Nestler - 10/1/2021

Page 54

1     Q.  Okay.  Well, you identified for me the

2 safety issues that your daughter experienced and

3 why she didn't feel safe at Bishop England High

4 School and it was Jim McClellan, her volleyball

5 coach, and the fact that she was bullied by other

6 students.

7              MR. SLOTCHIVER:  Object to form.

8              THE DEPONENT:  That wasn't the

9     only reasons.

10 BY MR. DUKES:

11     Q.  Okay.  Well, tell me all of them.

12 What safety issues --

13     A.  My daughter was also a student.  As

14 you know, she was a student there.

15     Q.  Right.

16     A.  And part of her curriculum in playing

17 volleyball is they had to go into the locker

18 rooms and change.

19     Q.  Right.

20     A.  So because of what we now understand

21 the case to be, is that there was a window or

22 several windows that allowed for teachers or

23 coaches or whomever to look through where my

24 child was changing.

25     Q.  Okay.

Electronically signed by Nicole White (301-070-154-1752)     26b6666c-261a-4ba4-b508-8389585e85f9

**JA1291**

Gary Nestler - 10/1/2021

Page 55

1          A.   And that is not safe.

2          Q.   Why not?

3          A.   Because if my daughter is changing and

4    she's getting into her clothes, she has to take

5    off her uniform and change into her volleyball.

6          Q.   You already testified that to your

7    knowledge, your daughter was never

8    surreptitiously or covertly photographed in the

9    locker room, was she?

10         A.   Excuse me?

11         Q.   You've already testified that to your

12   knowledge, your daughter was never photographed

13   or videoed while she was changing clothes in the

14   locker room, correct?

15              MR. SLOTCHIVER:   Object to the

16      form.

17              THE DEPONENT:   Covertly

18      photographed?

19   BY MR. DUKES:

20         Q.   Yes.

21         A.   I -- how would I absolutely,

22   positively, unequivocally know that she's been

23   photographed?

24         Q.   You've never been told that she was

25   photographed?  Nobody's ever provided you with a

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1292**

Gary Nestler - 10/1/2021

Page 56

1    photograph taken of your daughter while she was

2    taking -- changing her clothes?

3           A.  She changed in the locker room in

4    which I'm to understand now, given what I've read

5    about and the full knowledge of what I

6    understand, was that she changed in the very

7    locker room that had a window there.

8           Q.  Okay.

9           A.  That was able to be viewed, not only

10   by coaches and staff, but other people as they're

11   walking through the hallways.

12          Q.  But you've never been in those

13   hallways?

14          A.  I've been in the hallways.

15          Q.  Okay.  Have you ever looked through

16   the window in the coaches' office?

17          A.  No, sir.

18          Q.  You understand that windows in the

19   coaches' offices from the -- in the door, are a

20   safety mechanism, just as the windows --

21              MR. RICHTER:  I'm sorry.  I

22       couldn't understand.

23   BY MR. DUKES:

24          Q.  The windows in the door are a safety

25   precaution, correct?

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1293**

Gary Nestler - 10/1/2021

Page 57

1          A.  I don't know how you classify windows
2     in a door as a safety precaution.
3          Q.  Do you know who designed Bishop
4     England High School?
5          A.  No.
6          Q.  Who decided to put the windows in the
7     locker room and why?
8          A.  I do not.
9          Q.  Are you aware of any other high
10    schools just in the tri-county area that have
11    windows in the locker rooms?
12         A.  Again, this has nothing -- the answer
13    is no.
14         Q.  So you can't tell me how you believe
15    other parents were injured by some conduct at
16    Bishop England, correct?
17         A.  No, you'd have to ask those other
18    parents.
19         Q.  What do you understand your duties as
20    a class representative to be?
21         A.  I've discussed that with my attorney,
22    so I can't answer that.
23              MR. SLOTCHIVER:  What was the
24         question, again, Rich?
25              MR. DUKES:  What do you

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 58

1      understand your duties as a class

2      representative are?

3                    MR. SLOTCHIVER:  You can answer

4      to the extent that you can.  It's not a

5      privileged communication.  So if you

6      understand your duties, please tell him.

7      I'm not instructing you not to answer.

8                    THE DEPONENT:  Okay.  As I

9      understand it, I'm bringing forth this

10     lawsuit because I had an expectation that

11     Bishop England supplied me with or provided

12     my daughter with education in a safe

13     environment and that's not the case, so I

14     brought that forth to basically say I've got

15     an issue with it.  That's my understanding.

16  BY MR. DUKES:

17     Q.  Do you understand that you are now

18  required to put the interests of the other class

19  members, the people you seek to represent, ahead

20  of your own interests?

21     A.  Do I understand that?

22     Q.  Yeah.

23     A.  Is that a condition?  Does that --

24  help me understand what that means.

25     Q.  Well, for example, you could not

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1295**

Gary Nestler - 10/1/2021

Page 59

1    settle your case without notifying everybody in

2    the class that you were doing it.

3              A.   Okay.

4              Q.   And they could come in and complain

5    about it.

6              A.   Okay.

7              Q.   Do you understand what a fiduciary

8    duty is?

9              A.   Please describe that for me.

10             Q.   Well, it's a duty to put other peoples

11   interests ahead of your own?

12             A.   Okay.

13             Q.   And you understand you have to do that

14   with your -- with the class you are purporting to

15   represent?

16             A.   If that's the way you're defining it.

17             Q.   Do you understand what's required of

18   you in this case as a class representative?

19             A.   Please go ahead and tell me.

20             Q.   Well, if all of your lawyers were to

21   be killed in a tragic hot air balloon accident

22   and the very idea of these three guys and Carl

23   Solomon in the basket of a hot air balloon is

24   somewhat amusing to me, but if they were all

25   suddenly killed in a horrible hot air balloon

Electronically signed by Nicole White (301-070-154-1752)                                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1296**

Gary Nestler - 10/1/2021

Page 60

1    accident, you'd be required to continue plowing

2    ahead with this case.  You couldn't just drop it.

3          A.  Okay.

4          Q.  Do you have the financial wherewithal

5    to do that?

6          A.  Yes.

7          Q.  Okay.  If your attorneys could no

8    longer pay the expenses, whether it's expert

9    witnesses or for discovery or court costs or

10   court reporters, could you pay those?

11         A.  I believe that's client/attorney

12   privilege.

13         Q.  In my scenario your attorneys are

14   dead. (Indicating).  You would have to pay those

15   expenses going forward?

16         A.  Okay.

17         Q.  And you could do that?  Did you read

18   the complaints before you -- the complaint before

19   you filed them?

20         A.  Yes.

21         Q.  Okay.  Attached to the complaint is a

22   document that is -- top of it says the

23   instruction, but it's the Latin term for it is

24   Crimens Sollisollicitions.  Are you familiar with

25   that document?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 61

1            A.  You can show it to me.

2            Q.  While I'm looking for it, you

3     understand that the windows looking into the

4     locker room had blinds on them, right?

5            A.  I understand that.

6            Q.  And that those blinds were closed?

7            A.  No, sir.

8            Q.  Do you have any information indicating

9     when the blinds were open?

10           A.  I do not.

11           Q.  I can't seem to find that document.  I

12    apologize.  Do you know anything about this

13    document called the instruction?

14           A.  Again, you'd have to show it to me.

15           Q.  Okay.  What was your input in deciding

16    what claims to pursue on behalf of a class?

17           A.  Again, that's client/attorney

18    privilege.

19           Q.  You're refusing to answer my question?

20                MR. SLOTCHIVER:  He can answer

21        to the extent -- I'm not gonna instruct him

22        not to answer.  To the extent that he knows

23        the answer, he can answer.

24    BY MR. DUKES:

25           Q.  Okay.  Do you know what claims you're

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)           26b6666c-261a-4ba4-b508-8389585e85f9

Gary Nestler - 10/1/2021

Page 62

1    pursuing?

2          A.   Conversations I've had with my

3    attorneys.

4                MR. SLOTCHIVER:  You can answer

5        to the extent that you know.

6                THE DEPONENT:  Yes.

7    BY MR. DUKES:

8          Q.   Okay.  What claims are those?

9          A.   To get my money back.

10         Q.   Okay.

11         A.   Plus whatever damages there are.

12         Q.   Well, what damages have you sustained?

13         A.   Again, client/attorney privilege.

14         Q.   So you can't -- you won't identify how

15   you've been damaged?

16         A.   At this time, it's client/attorney

17   privilege.

18               MR. SLOTCHIVER:  To the extent

19        that he can answer the question, he can

20        answer the question.

21   BY MR. DUKES:

22         Q.   Are you gonna answer my question?

23         A.   No, sir.

24         Q.   All right.

25               MR. SLOTCHIVER:  Hold on.  I'm

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1299**

Gary Nestler - 10/1/2021

Page 63

1          gonna instruct him.  To the extent that you
2          can answer the question about your damages,
3          what you understand, I'm going to ask you to
4          answer them.
5                    THE DEPONENT:  Okay.  My refund
6          of the money that I've paid.
7    BY MR. DUKES:
8          Q.  Uh-huh.
9          A.  Plus what I would consider damages to
10   the emotional duress that was caused not only on
11   my daughter, but myself and my wife.
12         Q.  Okay.  What emotional duress have you
13   experienced?
14         A.  As a father, very difficult to even
15   comprehend that a school that ensured you of the
16   safe environment, would allow for adults to
17   continuously, throughout the years, look into a
18   locker room.
19         Q.  Do you have anybody -- any evidence
20   that anyone other than Jeffrey Scofield looked
21   into those locker rooms?
22         A.  Do I personally?
23         Q.  Yes.
24         A.  I do not.
25         Q.  What emotional duress has your

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

**JA1300**

Gary Nestler - 10/1/2021

Page 64

1    daughter experienced?

2          A.   May I go back?

3          Q.   Yes.

4          A.   Jim McClellan was in the locker rooms.

5          Q.   In the girls locker room?

6          A.   And had stated -- excuse me, in the

7    office and had stated that he also was looking

8    through those windows.

9          Q.   When did he say that?

10          A.   Last week.

11          Q.   At his deposition?

12          A.   Yes, sir.

13          Q.   Are you aware that the testimony in

14    this case is that those windows were installed as

15    a safety mechanism to ensure student safety?

16          A.   I was made aware of that.

17          Q.   Okay.  And you'll agree with me that

18    the school should take steps to prevent fights or

19    smoking or bullying or misconduct in the locker

20    rooms while the students are in there, right?

21          A.   I believe that that's what a school

22    should do.

23          Q.   Okay.  How many times have you

24    communicated with Larry Richter?

25                    MR. SLOTCHIVER:  That's an

Electronically signed by Nicole White (301-070-154-1752)                26b6666c-261a-4ba4-b508-8389585e85f9

JA1301

Gary Nestler - 10/1/2021

Page 65

1          attorney/client communication.

2                    THE DEPONENT:  Correct.  Excuse

3          me, that is an attorney/client privilege.

4     BY MR. DUKES:

5          Q.  Okay.  Have you ever communicated with

6     Carl Solomon?

7                    MR. SLOTCHIVER:  Same thing.

8          You're asking him for --

9                    MR. DUKES:  I'm asking how many

10          times, not the content.  I don't want to

11          know what you talked about.

12                    THE DEPONENT:  That is an

13          attorney/client privilege.

14     BY MR. DUKES:

15          Q.  You believe that?

16          A.  I do.

17          Q.  Okay.  How about with Mr. Slotchiver?

18          A.  Again, attorney/client privilege.

19          Q.  Mr. Halversen?

20          A.  Attorney/client privilege.

21          Q.  Are you aware of any other parents or

22     student who have talked with these lawyers about

23     suing Bishop England?

24          A.  I am not.

25          Q.  Why do you think you can fairly and

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1302**

Gary Nestler - 10/1/2021

Page 66

1    adequately represent the interests of a thousand
2    or so other people who have paid tuition at
3    Bishop England?
4          A.  Because I believe what was done to my
5    daughter and what they allowed to continue to
6    have happen at school.
7          Q.  Are you aware of anybody who paid
8    tuition to Bishop England who thinks you're just
9    wrong?
10         A.  Okay.
11              MR. SLOTCHIVER:  Rich, if I --
12   BY MR. DUKES:
13         Q.  Are you aware of anyone?
14         A.  No.
15              MR. SLOTCHIVER:  If I may, I
16         want to go back to the question you asked a
17         minute ago.  You asked him how many times he
18         communicated with the different counsel.
19              MR. DUKES:  Uh-huh.
20              MR. SLOTCHIVER:  I'm okay with
21         him answering that question.  I was to ask
22         him to go ahead and answer the question as
23         it pertains to this case.
24   BY MR. DUKES:
25         Q.  Okay.  So how many times?  I'm not

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1303**

Gary Nestler - 10/1/2021

Page 67

1    asking about the content of your discussions.

2            A.   Uh-huh.

3            Q.   How many times have you talked with

4    Larry Richter?

5            A.   Several.

6                    MR. SLOTCHIVER:   And this is

7         regarding this case?

8    BY MR. DUKES:

9            Q.   Regarding this case.

10           A.   Several.

11           Q.   More than ten, more than 15?

12           A.   More than ten.

13           Q.   How about Carl Solomon?

14           A.   Once.

15           Q.   And just about this case, Dan

16   Slotchiver?  I know he's represented you in other

17   cases.

18           A.   Same.  Not once.  More than ten.

19           Q.   What about Brent Halversen?

20           A.   Three.

21           Q.   How many times have you talked to Anna

22   Richter?

23           A.   More than ten.

24           Q.   How many times have you talked to

25   Dan's brother, Steve?

Electronically signed by Nicole White (301-070-154-1752)          26b6666c-261a-4ba4-b508-8389585e85f9

**JA1304**

Gary Nestler - 10/1/2021

Page 68

```
 1          A.   About this case?
 2          Q.   Yeah.
 3          A.   None.
 4          Q.   None?  Okay.  Did you go to the
 5     lawyers with an interest in filing the suit?
 6               MR. SLOTCHIVER:  I don't want to
 7          interrupt, but I'm not sure how that doesn't
 8          invade the attorney/client privilege.
 9          Communications we've had.  So I've opened it
10          to how many times he's talked to us, but
11          you're asking now about the communication.
12     BY MR. DUKES:
13          Q.   Okay.  For yourself, what do you want
14     out of this lawsuit?
15          A.   Resolution.
16          Q.   And what resolution do you want?
17          A.   For those who committed what I would
18     say is egregious, to face whatever penalties, if
19     you will, and then for the school to provide me
20     with financial compensation for my tuition plus
21     what I would think is my duress and my family's
22     duress.
23          Q.   Okay.  Have you had to see a
24     psychiatrist or psychologist about this duress?
25          A.   No.
```

Electronically signed by Nicole White (301-070-154-1752)                          26b6666c-261a-4ba4-b508-8389585e85f9

**JA1305**

Gary Nestler - 10/1/2021

Page 69

```
 1        Q.  Has your daughter had to see a
 2  psychiatrist?
 3              MR. SLOTCHIVER:  She's not
 4        involved in this case.
 5              MR. DUKES:  He just claimed that
 6        his damages were because of the duress his
 7        daughter has experienced.
 8              MR. SLOTCHIVER:  The only
 9        damages he's claiming today in his capacity
10        is for himself.
11              MR. DUKES:  Okay.  You're
12        instructing him not to answer that question?
13              MR. SLOTCHIVER:  Regarding his
14        daughter?
15              MR. DUKES:  Yes.
16              MR. SLOTCHIVER:  Yes.
17  BY MR. DUKES:
18        Q.  Are you gonna follow your attorney's
19  instruction?
20        A.  Yes.
21        Q.  All right.  What parents were aware of
22  the four-foot windows in the locker rooms?
23        A.  I can't answer that question.
24        Q.  You don't know?
25        A.  No, sir.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)     26b6666c-261a-4ba4-b508-8389585e85f9

Gary Nestler - 10/1/2021

Page 70

1           Q.  Do you know what students saw the
2    windows and knew they were there?
3           A.  No, sir.
4           Q.  Have you ever been accused of sexual
5    harassment or sexual abuse?
6           A.  No, sir.
7           Q.  By anyone?
8           A.  No, sir.
9           Q.  What members of the class you purport
10   to represent had students who entered Bishop
11   England in their junior year?
12          A.  I do not know.
13          Q.  Or after their sophomore?
14          A.  I do not know.
15          Q.  You understand that physical education
16   is required of sophomores, right?
17          A.  I do not know.
18          Q.  Are you aware of any class -- members
19   of your purported class who received tuition
20   assistance or scholarships?
21          A.  I do not know.
22          Q.  Do you know of anyone who didn't pay
23   tuition?
24          A.  I do not know.
25          Q.  Are you aware of any parents whose

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1307**

Gary Nestler - 10/1/2021

Page 71

1    children did not change clothes in the locker
2    rooms at all?
3         A.  No, I do not know.
4              MR. RICHTER:  Y'all know that
5         don't you?  I think we've had written
6         discovery about some of that.  I'm not sure
7         what the result was.
8              THE DEPONENT:  May I ask, go
9         back for a second?
10             MR. DUKES:  Huh.
11             THE DEPONENT:  You mentioned
12        something, may I go back?
13             MR. DUKES:  Sure.
14             THE DEPONENT:  You mentioned
15        something, physical education, yes, my
16        daughter participated in physical education
17        and that also was a time that she was in the
18        locker room.
19   BY MR. DUKES:
20        Q.  But are you aware of anybody whose
21   children did not?
22        A.  I am not.
23             MR. DUKES:  Since your attorneys
24        have said that the deposition is limited to
25        issues regarding class certification, I

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1308**

Gary Nestler - 10/1/2021

Page 72

1          think I'm done, so they may want to ask you

2          some questions.

3                    MR. RICHTER:  Let's take a break

4          before.

5                    (Whereupon, there was a short

6          break in the proceedings.)

7                    E-X-A-M-I-N-A-T-I-O-N

8    BY MR. SLOTCHIVER:

9          Q.  Dr. Nestler, I'd like to ask you a few

10   follow-up questions to get a little more

11   clarity --

12         A.  Sure.

13         Q.  -- about your testimony.  You were

14   asked by Mr. Dukes about the interactions in the

15   locker room that your daughter -- or that you're

16   aware of that have affected the basis for your

17   filing this claim.

18         A.  Uh-huh.

19         Q.  And you had talked about the fact that

20   your daughter would have gone into the locker

21   room as result of her involvement as a volleyball

22   player?

23         A.  And physical education.

24         Q.  And then you talked about P.E.

25   afterwards, correct?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 73

1          A.   Uh-huh.
2          Q.   And is it your understanding that the
3    locker rooms were also a very large integral part
4    of the school?  They would have been used by all
5    students?
6          A.   Absolutely.
7          Q.   That would have any kind of sports or
8    P.E. requirements?
9          A.   Yes.
10         Q.   And would those locker rooms also have
11   been used by other schools that would come for
12   the purposes of playing sports or using the
13   facilities at the school?
14         A.   Yes.
15         Q.   You talked about the fact that you, as
16   the class representative, are aware of the fact
17   that the locker rooms, all of them, I believe,
18   had windows in them, correct?
19         A.   Yes.
20         Q.   And is it your understanding those
21   windows were approximately four foot by four
22   feet?
23         A.   Yes.
24         Q.   You've seen photographs of the
25   windows?

Electronically signed by Nicole White (301-070-154-1752)     26b6666c-261a-4ba4-b508-8389585e85f9

**JA1310**

Gary Nestler - 10/1/2021

Page 74

1          A.  Yes.
2          Q.  You aware of the fact that the windows
3     were desk height?
4          A.  Yes, sir.
5          Q.  So that someone sitting at a desk such
6     as, I believe the one you would have seen,
7     correct me if I'm wrong, would have been
8     Mr. Roony's (ph) office window?
9          A.  Yes.
10         Q.  And it would be effectuated so he
11    could sit at his desk and look straight ahead and
12    see the window?
13         A.  Correct.
14         Q.  I believe you testified there were
15    blinds, that you're aware of the fact that there
16    were blinds on the window?
17         A.  Yes.
18         Q.  And you're familiar with the -- with
19    -- Mr. Dukes asked you about the architecture
20    firm.  Are you familiar that -- with the fact
21    that LS3P, the architectural firm, admitted that
22    the windows were -- that the windows were in the
23    locker room, looking from the coaches' office
24    into the locker room where you could see the
25    students?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 75

1          A.  Yes, sir.  I believe so.

2          Q.  When you contracted with Bishop

3    England -- well, when all parents contract with

4    Bishop England, as the class rep., are you aware

5    of any parent who contracted with LS3P in making

6    their decision to go to Bishop England?

7          A.  No.

8          Q.  Are you familiar with the testimony

9    that LS3P admitted that the way the windows were

10   situated, the type of windows and blinds that

11   were used on the windows, afforded the equivalent

12   of a peep hole into the locker room?

13         A.  Yeah.

14              MR. DUKES:  Object to the form.

15       That's not what they said.

16   BY MR. SLOTCHIVER:

17         Q.  And are you familiar with the fact

18   that the type of blinds afforded the ability of

19   people in the coaches' office, who ever that

20   might be, to look at the students in the locker

21   room without the students knowing that they're

22   being looked at?

23              MR. DUKES:  Object to form.

24              THE DEPONENT:  Yes.

25   BY MR. SLOTCHIVER:

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 76

1          Q.  Mr. Dukes asked you a question about
2     what knowledge you had.  I'd like to read to you
3     a paragraph from the answer to the lawsuit that
4     you filed.  It's paragraph 84.  The Diocese
5     admits -- "The Diocese admits only that Bishop
6     England High School charges tuition for the
7     educational services it provides to students.
8     The Diocese and Bishop England High School strive
9     to provide its students with an excellent
10     education and to support concepts of Catholic
11     teaching on morality and respect for all
12     individuals."
13          A.  Uh-huh.
14          Q.  Do you believe that you or any of the
15     other punitive class members were provided with a
16     moral environment wherein the school was built
17     and utilized in a way where the coaches or other
18     staff members or people in the coaches' office
19     could look at the students while they were in
20     various stages of dress or undress, including
21     nudity?
22               MR. DUKES:  Object to the form.
23               THE DEPONENT:  Could you repeat
24        that question again?
25               MR. SLOTCHIVER:  Would you

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

JA1313

Gary Nestler - 10/1/2021

Page 77

```
 1        please repeat it?
 2                    THE DEPONENT:  Sorry, ma'am.
 3                    MR. DUKES:  Yeah, because we
 4        know you couldn't repeat it.  It went on for
 5        a paragraph and a half.
 6                    MR. SLOTCHIVER:  No comment.
 7                    (Whereupon, there was a read
 8        back in the proceedings.)
 9                    THE DEPONENT:  All right.
10        That's a lot.  One more time, please.
11                    MR. DUKES:  And I'll object to
12        the form again.
13                    THE DEPONENT:  One more time,
14        please.  I'm sorry.
15   BY MR. SLOTCHIVER:
16        Q.  Well, I'll ask it differently.
17   Relying on what the school represented they would
18   provide to you, which was a moral, safe,
19   respectable environment, do you believe that you
20   had -- that you got the bargain of what you paid
21   for?
22        A.  No.
23                    MR. DUKES:  Object to the form.
24   BY MR. SLOTCHIVER:
25        Q.  Let me finish the question.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

Gary Nestler - 10/1/2021

Page 78

1          A.   Sorry.

2          Q.   As it relates to not the education?

3          A.   Correct.

4          Q.   The teaching part?

5          A.   Correct.

6          Q.   But as it relates to the environment

7     in so much as there was a window that allowed

8     various people, who ever was in the coaches'

9     office, to look at the students in various states

10    of dress or undress?

11              MR. DUKES:  Object to the form.

12              THE DEPONENT:  Right.  I do not

13         believe that I was provided with an

14         environment that was consistent with the way

15         they spoke to us when we first looked at the

16         school.

17    BY MR. SLOTCHIVER:

18         Q.   And I'm not talking about you, I'm

19    talking about everybody.

20         A.   Everybody.

21         Q.   All parents?

22         A.   All parents.

23         Q.   Do you believe that having a window in

24    the locker room allowing people in the coaches'

25    office to look at the children in various stages

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1315**

Gary Nestler - 10/1/2021

Page 79

1    of dress or undress, is that a safe

2    environment?

3            A.   No.

4                    MR. DUKES:   Object to form.

5    BY MR. SLOTCHIVER:

6            Q.   Is that a moral environment?

7            A.   No.

8                    MR. DUKES:   Object to form.

9    BY MR. SLOTCHIVER:

10           Q.   Is that a dignified environment?

11           A.   No.

12                   MR. DUKES:   Objection to form.

13   BY MR. SLOTCHIVER:

14           Q.   Is that a respectful environment to

15   the students?

16                   MR. DUKES:   Object to form.

17                   THE DEPONENT:   Absolutely not.

18   BY MR. SLOTCHIVER:

19           Q.   Does that provide privacy to the

20   students?

21           A.   It does not.

22                   MR. DUKES:   Object to the form.

23   BY MR. SLOTCHIVER:

24           Q.   Mr. Dukes asked you if you thought

25   that a school had a duty to create a safe

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 80

1    environment?

2         A.   Yes.

3         Q.   And I believe the words he used were

4    as it related to bullying or smoking.

5         A.   The school has a responsibility to

6    provide a safe environment.

7         Q.   On behalf of the parents, do you

8    believe that providing a viewing window into the

9    locker room where the students could be seen and

10   were seen without knowing that they were seen, is

11   that a safe environment?

12                    MR. DUKES:   Object to the form.

13                    THE DEPONENT:   It's not only not

14        safe, it's reprehensible behavior.   It's

15        disgusting, it's despicable, and it goes

16        against the grain of what we were told, what

17        the teachings, and morality, and the policy

18        of the Catholic church.

19   BY MR. SLOTCHIVER:

20        Q.   And when you say what you were told,

21   are you referring to yourself or are you

22   referring to every single person that went to

23   that school?

24        A.   Every single person to that school

25   were told the same thing.   When we interviewed

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)    26b6666c-261a-4ba4-b508-8389585e85f9

Gary Nestler - 10/1/2021

Page 81

1    with the school, that's exactly what they came

2    out with.  Which is this is the conduct, this is

3    what you are to expect.

4          Q.  Did anybody ever advise or are you

5    aware of the school ever advising yourself or

6    anybody about the fact that the school would be

7    monitoring the children in the locker room

8    through windows without the children knowing that

9    they're being monitored?

10         A.  Never.

11              MR. DUKES:  Object to the form.

12   BY MR. SLOTCHIVER:

13         Q.  Are you aware of any signs in the

14   locker room warning the students that you may be

15   monitored and looked at in various states of

16   dress or undress?

17         A.  No.

18         Q.  Let me finish.

19         A.  Sorry.

20         Q.  Without any notes?

21              MR. DUKES:  Object to the form.

22              THE DEPONENT:  No, I was not

23         aware of any signs in the locker room or

24         anywhere for that fact of the matter, in the

25         school.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

**JA1318**

Gary Nestler - 10/1/2021

Page 82

1    BY MR. SLOTCHIVER:
2         Q.   So speaking on behalf of the parents,
3    is it your understanding that no parents were
4    given any notice of the fact that there would be
5    viewing of the children in the locker room?
6                   MR. DUKES:  Object to the form.
7                   THE DEPONENT:  Speaking on
8         behalf of all the parents, that is correct.
9                   May I trouble you for a cup of
10        water?
11                  MR. DUKES:  Sure.
12                  THE DEPONENT:  Thanks.
13   BY MR. SLOTCHIVER:
14        Q.   I'm gonna read to you another part of
15   the answer provided to us by the Diocese and
16   Bishop England High School.  "The Diocese and
17   Bishop England High School strive to provide a
18   safe, moral, and nurturing educational
19   environment based on the teachings of the
20   Catholic church."
21                  On behalf of the parents, the tuition
22   paying class, are you aware that any teachings of
23   the Catholic church that advocates or supports
24   looking at young children nude --
25                  MR. DUKES:  Object to the form.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

Gary Nestler - 10/1/2021

Page 83

1   BY MR. SLOTCHIVER:

2        Q.  -- or in various states of dress in a

3   locker room without advising them that you're

4   going to look at them?

5        A.  No, sir.

6                  MR. DUKES:  Object to the form.

7   BY MR. SLOTCHIVER:

8        Q.  Paragraph 8, "The Diocese admits only

9   that Bishop England was designed with the safety

10  of students and visitors in mind and that the

11  locker room windows were a safety feature to

12  allow adults to monitor the changing area for

13  bullying, fighting, or other misbehavior."

14              Are you aware of how many incidents we

15  have been advised of by Bishop England High

16  School of safety events that occurred in the

17  locker room since the inception of the Daniel

18  Island campus of the Bishop England school?

19                  MR. DUKES:  Object to the form.

20                  THE DEPONENT:  Yes.

21  BY MR. SLOTCHIVER:

22        Q.  How many are there?

23        A.  Three.

24        Q.  On behalf of the parents and the

25  tuition paying class, do you believe that it's

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 84

1  reasonable -- do you believe that the requirement

2  to provide safety must be reasonable in nature?

3                    MR. DUKES:  Object to the form.

4                    THE DEPONENT:  I'm sorry, Dan,

5        repeat, excuse me.

6  BY MR. SLOTCHIVER:

7        Q.  On behalf of the tuition paying class,

8  do you believe that any safety features put in

9  place must be reasonable?

10                    MR. DUKES:  Object to the form.

11                    THE DEPONENT:  Yes.

12                    MR. DUKES:  What does that have

13       to do with class certification?

14                    MR. RICHTER:  What was the

15       question?  I couldn't --

16                    MR. SLOTCHIVER:  What does it

17       have to do with class certification?

18                    MR. DUKES:  Yes.

19                    MR. SLOTCHIVER:  Class

20       certification, he's the parent, he's got to

21       support the view of the parents in light of

22       what was presented to them, which was

23       windows looking into the locker room,

24       looking at the children that are not safe.

25                    MR. DUKES:  Okay.  It goes to

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)          26b6666c-261a-4ba4-b508-8389585e85f9

**JA1321**

Gary Nestler - 10/1/2021

Page 85

```
 1        the merits, Dan, not to the issues of --
 2                 MR. SLOTCHIVER:  Of all -- but
 3        that's why I asked of all the parents who
 4        were similarly situated in so much they had
 5        the right to rely upon safety, so I believe
 6        it does go to that issue.
 7                 MR. DUKES:  I disagree with you.
 8                 MR. SLOTCHIVER:  Okay.
 9                 MR. RICHTER:  Well, the judge
10        will decide.
11  BY MR. SLOTCHIVER:
12        Q.  Had you been told that people at the
13  Bishop England High School who had access into
14  the coaches' office, who ever they were --
15        A.  Uh-huh.
16        Q.  -- would have the opportunity and
17  would, in fact, view students in the locker room
18  in various states of dress --
19        A.  No.
20        Q.  -- all the way to nudity, would you
21  have sent your child to that school?
22        A.  Absolutely not.
23        Q.  Would any of the parents that you are
24  standing to support in this tuition paying class,
25  have sent their children to that school if they
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 86

1   had known --
2                    MR. DUKES:  Object to the form.
3   BY MR. SLOTCHIVER:
4        Q.  -- that their children would be
5   objectified or viewed?
6        A.  One hundred percent not.
7                    MR. DUKES:  Object to the form.
8   BY MR. SLOTCHIVER:
9        Q.  And would you have ever paid a dollar
10  to have that invasion of privacy extended to your
11  child?
12       A.  Unequivocally not.
13                   MR. DUKES:  Object to the form.
14  BY MR. SLOTCHIVER:
15       Q.  Were there other options that were
16  available for high schools where you would not
17  have had to pay money and put your child in an
18  environment where her privacy was invaded?
19                   MR. DUKES:  Object to the form.
20                   THE DEPONENT:  Yes.
21                   MR. SLOTCHIVER:  Just give us
22       one more moment, okay.  See if we can wrap
23       this up.
24                   (Whereupon, there was a short
25       break in the proceedings.)

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1323**

Gary Nestler - 10/1/2021

Page 87

1              MR. SLOTCHIVER:  I've got no
2      further questions to ask.  I'm happy if you
3      want to spend five minutes and go through
4      the six or seven items we objected to, to
5      see if we can work them out.  But if not, we
6      can just file a motion and read the
7      transcript and see if we need to reconvene.
8              MR. DUKES:  It would probably be
9      easier just to file a motion and go from the
10     transcript.
11             MR. SLOTCHIVER:  I haven't
12     looked at the rule.  Maybe you know it off
13     hand.  Is it five business days or is it
14     five days?
15             MR. DUKES:  Deadlines, I always
16     go to look it up.  I've learned not to trust
17     my memory on that, so I always go look it
18     up.
19             MR. SLOTCHIVER:  I was gonna see
20     if we could agree to it, I'd agree to it,
21     but if not, with the federal court, we can't
22     alter it anyhow.  Yeah.  Thank you.  I've
23     got nothing further.
24             MR. DUKES:  Thank you very much.
25             MR. SLOTCHIVER:  You have the

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1324**

Gary Nestler - 10/1/2021

Page 88

1    right to read and sign.  I generally tell

2    people that are answering simplistic

3    questions to waive it, but because of some

4    of the terminology you used throughout your

5    deposition, I would say that you want to

6    read and sign.

7              THE DEPONENT:  Okay.

8              MR. SLOTCHIVER:  Okay.

9    (This deposition concluded at 12:05 a.m.)

10

11            (Signature reserved.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 89

1              C E R T I F I C A T E

2

3    STATE OF SOUTH CAROLINA   )

4    COUNTY OF BERKELEY        )

5

6              I, Nicole D. White, Certified Court

7    Reporter and Notary Public, State of South

8    Carolina at Large, certify that I was authorized

9    to and did stenographically report the foregoing

10   deposition of Gary Nestler; and that the

11   transcript is a true record of the testimony given

12   by the witness, and was sworn as such.

13             I further certify that I am not a

14   relative, employee, attorney or counsel of any of

15   the parties, nor am I a relative or employee of

16   any of the parties' attorney or counsel connected

17   with the action, nor am I financially interested

18   in the action.

19             WITNESS MY HAND AND OFFICIAL SEAL this

20   1st day of October 2021.

21

22                   _____
                     Nicole D. White
23                   Notary Public in and for the
                     State of South Carolina
24

25   My Commission expires September 8, 2027

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 90

1              E R R A T A   S H E E T

2

RE:  Nestler, et al -vs- The Bishop of Charleston,
3  a Corporation Sole, Bishop England High School, et
al

4

5  DEPOSITION OF:  Gary Nestler

6          Please read this original deposition with

7  care, and if you find any corrections or changes

8  you wish made, list them by page and line number

9  below.  DO NOT WRITE IN THE DEPOSITION ITSELF.

10  Return the deposition to this office after it is

11  signed.  We would appreciate your prompt attention

12  to this matter.

13          To assist you in making any such

14  corrections, please use the form below.  If

15  supplemental or additional pages are necessary,

16  please furnish same and attach them to this errata

17  sheet.

18  Page _____ Line _____ Should read:_____

19  _____

20  Reason for change: _____

21  Page _____ Line _____ Should read:_____

22  _____

23  Reason for change: _____

24  Page _____ Line _____ Should read:_____

25  _____

Electronically signed by Nicole White (301-070-154-1752)    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1327**

Gary Nestler - 10/1/2021

Page 91

1    Reason for change: _____

2    Page _____ Line _____ Should read:_____

3    _____

4    Reason for change: _____

5    Page _____ Line _____ Should read:_____

6    _____

7    Reason for change: _____

8    Page _____ Line _____ Should read:_____

9    _____

10   Reason for change: _____

11   Page _____ Line _____ Should read:_____

12   _____

13   Reason for change: _____

14

15                   _____

16                            Signature

17

18        SUBSCRIBED and SWORN TO before me this

19   _____ day of _____ 2021.

20

21            _____

22                        NOTARY PUBLIC

23

24   My Commission expires:_____

25

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1328**

# EXHIBIT 21

**United States District Court**
**District of South Carolina**
**Charleston Division**

| | |
|---|---|
| Gary Nestler,<br>Viewed Student Female 200,<br>Viewed Student Male 300,<br>on behalf of themselves and all others<br>similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br><br><br><br>The Bishop of Charleston, a Corporation<br>Sole, Bishop England High School,<br>Tortfeasors 1-10, The Bishop of the Diocese<br>of Charleston, in his official capacity, and<br>Robert Guglielmone, individually,<br><br>        Defendants. | C/A: 2-21-cv-00613-RMG |

_____

## STATEMENT OF QUALIFICATIONS OF PROPOSED CLASS COUNSEL

### 1. LAWRENCE E. RICHTER, JR.

He is an attorney for the Plaintiffs in the above referenced captioned case. He was born in Charleston, South Carolina on November 2, 1946 into the Roman Catholic Diocese of Charleston, received twelve years of parochial school education within the Charleston area, and graduated from Bishop England High School in 1964. He did his undergraduate work and obtained an AB in English from the University of North Carolina at Chapel Hill in 1968. Thereafter he entered the University of South Carolina School of Law in the fall of 1968 and received his juris doctorate from that institution in June of 1971. He was admitted to the South Carolina Bar on the 21st day of September 1971 and has been a member in good standing thereof since that date. He is licensed to practice in all South Carolina trial level and appellate courts, as well as the United States District Court of South Carolina, and the United States Fourth Circuit Court of Appeals, and has been admitted also to multiple federal district and appellate courts around the country on a *pro hac vice* basis.  In addition, he is a member of the United States Supreme Court Bar.

Throughout his fifty years of practice he has functioned in various capacities. In the private practice of law he has been almost exclusively a trial lawyer representing plaintiffs in complex litigation. He is a retired South Carolina circuit court judge and has resumed private practice until he fully retires. He has a small plaintiffs' firm and handle a small number of cases.

He has spent a substantial portion of his working life in public service including serving as a Municipal Judge, Family Court Judge, Circuit Court Judge, and has sat on the South Carolina Supreme Court as Acting Associate Justice on several occasions. He was appointed by the Federal Judiciary as a member of the plaintiffs' steering committee for the U.S. Air Charlotte crash in the 1990s. In fact, he has served in all three branches of government as a member of the South Carolina Senate, the judicial branch as set forth above, and as Chairman of the Medical Examiner Commission and a member of the Charleston Aviation Authority in the executive branch.

He is rated AV by his peers through the Martindale Hubbell rating service and has no record whatsoever of any sanction in any capacity throughout his entire career. He has much experience litigating against the Diocese of Charleston, a defendant in the case at bar, but not only that Diocese. In fact, he has conducted litigation inside and outside of South Carolina in various states. Specifically, he has been involved in a number of class action matters ranging from representing individual claimants to seeking the certification of classes. He is firmly committed to battling perpetrators of sexual abuse upon children, particularly, and has done so in many cases. The Diocesan Defendants herein are well familiar with his abilities as an advocate for these victims and have virtually uniformly sought to keep him out of cases against this Diocese. One previous class action matter was successfully concluded against some or all of the Diocesan Defendants during the approximate timeframe of 2007 to 2009.

## 2. CARL L. SOLOMON

He is an attorney for the Plaintiffs in the above captioned case. He was born in Sumter, South Carolina on August 22, 1969. He did his undergraduate work and obtained a B.S. in Economics from Florida State University in Tallahassee in 1991. Thereafter he entered the University of South Carolina in Columbia, South Carolina and received his J.D. from that institution in 1994. He was admitted to the South Carolina Bar on the 3rd day of January 1995 and has been a member in good standing thereof since that date. He is licensed to practice in all South Carolina trial level and appellate courts, as well as the United States District Court of South Carolina, and the United States Fourth Circuit Court of Appeals. He is currently involved in multi district litigation matters (In Re: National Prescription Opiate Litigation, In Re: Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation, In Re: Aqueous Film-Forming Foams Products Liability Litigation) in multiple federal district courts around the country.

Throughout his years of practice, he has functioned in various capacities. In the private practice of law, he has been almost exclusively a trial lawyer representing plaintiffs in complex litigation. He has served the legal community in many capacities

including President of the South Carolina Bar (2010–2011); Board of Governor's South Carolina Bar (2006 - 2012); Pro Bono Criminal Domestic Violence Prosecutor for the South Carolina Attorney General's Office; City of Columbia Municipal Judge (2011 –2015); and National College of Advocacy Board of Directors (Co-Chair 2019-2021).

He was appointed as a member of the plaintiffs' steering/executive committee for In Re: Graniteville Train Derailment and In Re: Aqueous Film-Forming Foams Products Liability Litigation. He has also been involved in several high-profile matters in South Carolina including Johnson v. Collins (Video Poker Litigation) and the Charleston Sofa Super Store Fire Litigation. He was recently appointed Interim Co-Lead Counsel in consolidated actions Doe v. Roper St. Francis Healthcare and Tortfeasors 1-10, 2021-CP1000245 matter, the Doe #2 v. Roper St. Francis Healthcare and Tortfeasors 1-10, 2021-CP1001668 matter, and the Frederick et al. v. Roper St. Francis Healthcare, 2021-CP-10-00756 matter with the Prevost v. Roper St. Francis Healthcare, 2021-CP1001754. All pending in the Court of Common Pleas, Charleston County.

He is rated AV by his peers through the Martindale Hubbell and is listed in Super Lawyers, Multi-Million Dollar Advocates and Best Lawyers in America, among others.

### 3. DANIEL S. SLOTCHIVER

He is an attorney for the Plaintiffs in the above referenced captioned case. He was born in Charleston, South Carolina on December 2, 1964. After graduation from Porter Gaud High School in Charleston SC, he did his undergraduate work and obtained a Bachelor of Arts degree from Tulane University in 1987. Thereafter he entered the Whittier College School of Law in the fall of 1987 and received his Juris Doctorate from that institution in May of 1990. He was admitted to the South Carolina Bar November of 1990 and has been a member in good standing thereof since that date. He is rated AV by his peers through the Martindale Hubbell rating service and has no record whatsoever of any sanction in any capacity throughout his entire career.He is licensed to practice in all South Carolina trial level Courts, as well as the United States District Court of South Carolina, and has been admitted outside of South Carolina on a pro hac vice basis.

Throughout his thirty-one years of practice he has functioned in various capacities. In the private practice of law he has been almost exclusively a trial lawyer representing plaintiffs in litigation. He has and/or in involved in a number of class action matters ranging from representing individual claimants to seeking class certification, including a resolved construction matter and a pending data breach class action for which he is included as interim co-lead counsel. He is a also a former Prosecutor for the Isle of Palms municipal court and a Partner in Slotchiver & Slotchiver LLP

**JA1332**

### 4. STEPHEN M. SLOTCHIVER

He is an attorney for the Plaintiffs in the above referenced captioned case. He was born in Charleston, South Carolina on March 14, 1967. He graduated from Porter Gaud High School in 1985. He did his undergraduate work and obtained a Bachelor of Arts degree from University of Miami in 1989. Thereafter he entered the Whittier College School of Law in the fall of 1989 and received his Juris Doctorate from that institution in May of 1992. He was admitted to the South Carolina Bar in November of 1992, and has been a member in good standing thereof since that date. While continuing to practice law for Slotchiver & Slotchiver, LLP, he entered Villanova University Law School and received his Masters of Law in Taxation in December of 1994. He is rated AV by his peers through the Martindale Hubbell rating service and has no record whatsoever of any sanction in any capacity throughout his entire career. He is licensed to practice in all South Carolina trial level Courts, as well as the United States District Court of South Carolina.

Throughout his twenty-nine years of practice he has functioned in various capacities. In the private practice of law he has a strong emphasis in estate litigation and tax controversy matters. He is a Partner in Slotchiver & Slotchiver LLP.

### 5. BRENT S. HALVERSEN

He is an attorney for the Plaintiffs in the above referenced captioned case. He was born in Hagerstown, Maryland on December 14, 1974 into the Roman Catholic Archdiocese of Baltimore and thereafter received four years of parochial school education from St. Mary Catholic School, and graduated from Mercersburg Academy in 1992. He did his undergraduate work and obtained an B.A. in Philosophy from Vanderbilt University in Nashville, Tennessee in 1997. Thereafter he entered Loyola University New Orleans, Louisiana and received his J.D. from that institution in 2001. He is admitted to the South Carolina and Florida Bars and is licensed to practice in the United States District Courts for the Middle and Southern Districts of Florida and the United States District and Bankruptcy Courts of South Carolina.

Mr. Halversen began his legal career in West Palm Beach, Florida at the law firms of Broad and Cassel, Fowler White Boggs Banker and Wicker Smith O'Hara & Ford, focusing on corporate defense of tort and commercial litigation, including appellate defense of nationwide class action case matters. In 2008, Mr. Halversen relocated to Mount Pleasant, South Carolina and formed his own firm with his wife Stirling Halversen, Halversen & Halversen, LLC. Stirling Halversen presently serves as Assistant Corporation Counsel for the City of Charleston. Mr. Halversen practices primarily in business and municipal litigation and presently serves as the City Attorney for the Isle of Palms.

### 6. ANNA E. RICHTER

Anna E. Richter was born and raised in Mt. Pleasant, SC. She graduated from Bishop England High School and then attended the University of South Carolina where she earned a BA in Political Science and a minor in Southern Studies. After college, Anna returned home to Charleston where she attended the Charleston School of Law, graduating in 2011. After completing law school, Anna served as judicial law clerk to the Honorable Diane Shafer Goodstein in the First Judicial Circuit. She then joined the First Circuit Solicitor's Office as the sole juvenile prosecutor for Orangeburg and Calhoun counties, practicing in family court and also managing juvenile diversionary programs including Juvenile Drug Court and Arbitration.

Upon departing the Orangeburg/Calhoun office of the First Circuit Solicitor's Office, Anna then transferred to the Dorchester office of the First Circuit Solicitor's Office where she prosecuted a General Sessions docket, primarily domestic violence and special victim offenses. Anna also took on the task of prosecuting magistrate level domestic violence offenses, and ran Domestic Violence court in Dorchester County Magistrate Court. While in the First Circuit, Anna also served as second chair in the prosecution of former Speaker of the SC House of Representatives in the public corruption probe under Solicitor David Pascoe. After several years in the First Circuit, Anna joined the Ninth Circuit Solicitor's Office where she ran DV Court at the magistrate level, as well as prosecuted a General Sessions docket. She has gained substantial trial experience while at the Solicitor's offices in both the First and Ninth Circuits, and prosecuted an array of offenses ranging from misdemeanors to felonies, including Violent and Serious crimes. While in the Charleston Solicitor's Office, Anna also served as the co-facilitator for the Ninth Judicial Circuit's Domestic Violence Fatality Review Team, and was a member of the Domestic Violence Coordinating Committee.

In 2019 Anna moved into private practice, where she has gained experience in complex civil litigation. The Town of Mount Pleasant Council unanimously appointed Anna to serve a two-year term as a Judge of the Municipal Court of Mount Pleasant on December 8, 2020.

She was admitted to the South Carolina Bar in November of 2012 and is also licensed to practice in the United States District Court of South Carolina. She practices with The Richter Firm, LLC working primarily complex civil cases including child sex abuse and professional negligence claims for Plaintiffs.

**JA1334**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRCIT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

**CIVIL ACTION NUMBER: 2:21-cv-613-RMG**

|  |  |  |
|---|---|---|
| Gary Nestler, *et al*, | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | **DEFENDANTS' OPPOSITION TO** |
| The Bishop of Charleston, a Corporation | ) | **PLAINTIFFS' MOTION FOR CLASS** |
| Sole, *et al*, | ) | **CERTIFICATION** |
|  | ) | |
| Defendants. | ) | |
|  | ) | |
|  | ) | |

Defendants oppose Plaintiffs' Motion for Class Certification [Dkt. 67]. Plaintiffs have failed to establish through admissible evidence the requirements mandated pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3). As such, the motion for class certification must be denied.

## STANDARD OF REVIEW

Actual, not presumed, conformance with Rule 23(a) remains indispensable, and the required rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim.[1] A court is required to consider as much of the merits as may be necessary to determine whether a putative class of plaintiffs meets the certification requirements of Rule 23.[2] In short, the Court <u>may not</u> take the allegations made in support of class certification as true. In *Wal-Mart*, the Supreme Court expressly rejected that rationale, and stated that the language relied upon by

---

[1] *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-52 (2011).
[2] *Comcast v. Behrend*, 133 S.Ct. 1426, 1433 (2013). "A district court must definitively determine that the requirements of Rule 23 have been satisfied, even if that determination requires the court to resolve an important merits issue." *EQT Prod. Co. v. Adair*, 764 F.3d 347, (4th Cir. Va. 2014).

Plaintiffs "is the purest dictum and is contradicted by our other cases."[3]  Actual, not presumed

compliance with Rule 23(a) and 23(b)(3) is indispensable.[4]

## BACKGROUND and LACK OF ANY ACTIONABLE CLAIMS

The Plaintiffs' case involves entirely speculative claims of possible improper use of

windows from three coaches' offices looking into the locker areas of three locker rooms at Bishop

England High School.[5]  The design drawings make clear that someone in the office could not see

the showers, could not see the bathroom areas, and had a very limited view of one of the sinks

outside the bathroom area.[6]  Because there is not a shred of evidence that either student-plaintiff

was actually illicitly recorded changing clothes – neither is among the five boys identified by the

South Carolina Attorney General's Internet Crimes Against Children Task Force as having been

surreptitiously recorded changing clothes in the locker room by Jeffrey Scofield in 2019 –

Plaintiffs' claims are entirely "what might have happened" or "what could have happened" as

opposed to what did happen.  As Plaintiffs' psychiatrist described it, the situation is like driving

across a bridge that later collapses and you realize you could have been killed, though you were

not.  She said the possibility that the student-plaintiffs could have been photographed, even though

they were not, still impacts them.[7]

The United States Supreme Court held that plaintiffs in a very similar situation had no legal

standing to sue in *TransUnion LLC v. Ramirez*, and used the following example:

> Suppose that a woman drives home from work a quarter mile ahead of a reckless
> driver who is dangerously swerving across lanes. The reckless driver has exposed

---

[3] *Wal-Mart*, 131 S. Ct. at 2552; s*ee also EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).
[4] *EQT Prod. Co.*, 764 F.3d at 362 *quoting Gen. Tel. Co. of Sw v. Falcon*, 457 U.S.147, 160 (1982).
[5] The student-plaintiffs allege three causes of action:  Wrongful Intrusion into Private Affairs (Count I); Negligent Hiring, Supervision, and Retention (Count V); and Negligence (Count VI)
[6] *See* LS3P locker room design drawing, ***Exhibit 1***
[7] *Amanda Salas deposition*, 82:11 – 84:18, ***Exhibit 2***.

the woman to a risk of future harm, but the risk does not materialize and the woman makes it home safely. As counsel for TransUnion stated, that would ordinarily be cause for celebration, not a lawsuit. *Id.,* at 8. But if the reckless driver crashes into the woman's car, the situation would be different, and (assuming a cause of action) the woman could sue the driver for damages.[8]

In essence, these Plaintiffs allege that there should essentially be strict liability based on the mere existence of windows into the locker rooms regardless of whether they were used or misused at any point in the past.[9]  At a very granular level, these Plaintiffs have no actual claim for which relief may be granted, and certainly cannot represent any sort of class.  They have no concrete harm that grants them standing, nor can they prove that *every* member of the class has standing.[10]  There is no basis for recovery for "but, I could have been killed," or "I am afraid I might have been photographed."  These student-plaintiffs cannot present any admissible evidence that they *were* photographed or videoed by anyone.

Moreover, the design feature of a coaches' office with a window into the locker room space is quite common, and in some states, is required.  Defendants' expert witnesses, Myles Glick (architect)[11] and Lee Runyon (requirements of school construction)[12] have opined that having windows looking in the locker room was entirely consistent with the standard of care for the construction of schools at the time Bishop England was designed and constructed.

Surveillance of the locker room and the installation of security windows in the coaches or PE teacher's office (Rooms #C121, C144, and C149), are "standard of care for architects and school districts.  As architects, student safety and security are a priority.  View windows provide the necessary security/supervision for locker

---

[8] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2211 (2021)
[9] *See Male Student Deposition*, 10: 16 – 12: 3; 13:9 – 14:3; 15: 10 – 14; 16: 5 – 8; 32: 3 - 6  **Exhibit 5**; *Female Student Deposition* 7:20 – 9:19; 12:4-9; 16:10-13; 20: 15-18; 35: 8 - 16, **Exhibit 6.**
[10] *TransUnion*, at 2206.  In the majority opinion, Justice Kavanaugh quotes then-Judge Barrett, "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions."  *Quoting Cassilas v. Madison Ave. Assocs.* 926 F.3d 329, 332 (7th Cir. 2019).
[11] *Glick Report*, **Exhibit 3**.
[12] *Runyon Report*, **Exhibit 4**.

rooms in high schools in the Low Country and across the United States. The design and installation of the view windows at Bishop England High School, as shown on the architect's plans dated October 26, 1996, meets the standard of care within a high degree of architectural certainty.[13]

Lee Runyon opined:

Given the information I have independently reviewed, it is my professional conclusion that the locker room areas of Bishop England High School as originally constructed inclusive of internal office spaces with internal windows were in accord with the operational requirements of schools, consistent with best practices for student safety and supervision and in common with numerous other facilities at fellow high schools constructed in the 1990s. The design afforded staff and students the opportunity to be mutually aware of their presence for supervision and safety. It afforded the staff the ability to conduct administrative duties and class / team responsibilities while simultaneously supervising students. It provided students restroom facility in which to conduct hygiene related activities in private stalls not visible from the administrative office. The school clearly expresses in numerous ways, both written and in action, that student safety and supervision are paramount as evidenced in the Faculty Handbook and written communication for Physical Education Classes distributed by teachers to parents at the start of each academic semester. It is my professional conclusion that Bishop England High School's Locker Room Facility as originally constructed met all the required needs for student safety, supervision, and educational purposes in accordance with the school's established mission.[14]

Eric Aichele, the architect who designed Bishop England High School, testified that every high school he designed from the 1970s until the last high school he designed, Wando High School in 2004, contained exactly the same design feature.[15] The architecture firm that designed Bishop England, LS3P, testified that such windows in the locker rooms of schools was very common and were designed for security purposes.[16] There are at least fifteen schools in the Charleston,

---

[13] *Glick Report*, p. 4.
[14] *Runyon Report*, p. 12-13.
[15] *Aichele deposition*, 38: 2 – 39: 5; 52: 2 – 4; 68: 13 – 14, 19 – 22; 96: 4 -11; 101: 25 – 102: 13; 115: 24 – 116: 11. **Exhibit 7**.
[16] *LS3P 30(b)(6) deposition, session 2*, 129: 11 – 20; 136: 8 – 11; 152: 22 – 153: 8; 156: 21 – 22; 161: 25 – 162: 4, **Exhibit 11**.

Berkeley, and Dorchester District 2 school districts that have coaches' offices with windows opening to the locker rooms.[17]

Importantly, for an action to lie under South Carolina law based upon invasion of privacy or wrongful intrusion into private affairs, plaintiffs must be able to show that the intrusion was substantial and unreasonable enough to be legally cognizable – that there was a blatant and shocking disregard of plaintiffs' rights and serious mental injury as the result thereof.[18] The determination of whether the locker room windows themselves were such a blatant and shocking disregard for the rights of students is a question of law for the court.[19] A design feature that is both quite common in high schools and that meets the applicable standard of care simply cannot be a legally cognizable intrusion on private affairs.

Plaintiffs' reliance on *Brannum v. Overton County Sch. Bd.* and other public school cases is entirely misplaced.[20] First, *Brannum* was a 28 U.S.C. §1983 and Fourth Amendment challenge to a public middle school's installation of a video surveillance system in locker rooms and a claim of qualified immunity by school administrators. Male school administrators, acting under color of state law, had accessed videos of female students changing in the locker rooms. The Sixth Circuit held that the <u>public</u> school officials violated the students' Fourth Amendment right to shield their naked bodies from being seen. The Court analyzed the reasonableness of the video search under *Terry v. Ohio* and concluded the Fourth Amendment prohibited the video surveillance system

---

[17] These are:  <u>CCSD</u> – Burke H.S., North Charleston H.S., Wando H.S., West Ashley H.S., Stall H.S., District 4 Stadium; <u>BCSD</u> – Timberland H.S., Cross H.S., Goose Creek H.S., Cane Bay H.S., Fort Dorchester H.S., Stratford H.S., Hanahan H.S.;  <u>DD2</u> – Summerville H.S., Ashley Ridge H.S., Dubose Middle School, Oakbrook Middle School, River Oaks Middle School.
[18] *See Snakenberg v. Hartford Casualty Ins. Co.* 299 S.C. 164, 171-2, 383 S.E.2d 2, 12-13 (Ct. App. 1989); *citing Meetze v. Associated Press*, 230 S.C. 330, 95 S.E.2d 606 (1956) *and Rycroft v. Gaddy*, 281 S.C. 119, 314 S.E.2d 39 (Ct. App. 1984).
[19] *Meetze v. Associated Press*, *supra.*
[20] *Brannum v. Overton County Sch. Bd.*, 516 F.3d 489 (6th Cir. 2008).

installed (apparently after the school was built) by the public school district and videotaping students without their knowledge.  However, the Court did acknowledge that "students have a less robust expectation of privacy than is afforded the general population," and that "this expectation may be even less for student athletes in locker rooms, which the [Supreme] Court has previously observed are places not notable for the privacy they afford."[21]

Obviously, Bishop England is not a state actor and the Fourth Amendment does not apply in any respect to the school; nor were any coaches or school officials alleged to have been acting under color of state law.[22]  Second, there is no evidence before the court that there was some covert videotaping system in the locker rooms that allowed males to observe girls or females to observe boys – only the existence of coaches' offices with windows that afforded potential visual access – if the blinds were opened – to the changing area of the locker room, which *was* the standard of care for school construction.[23]  In short, Plaintiff's reliance on cases involving public schools and video surveillance systems is completely inapposite.

The Male Student attended Bishop England High School from 2012 until graduating 2016.[24]  He said he was aware of the presence of the locker room windows while he was a student and knew that the locker room windows were present.  He said he knew the coaches' office was on the other side of the window and that he could tell when the lights were on in the office and

---

[21] *Brannum v. Overton County Sch. Bd.*, 516 F.3d at 496, *quoting Veronia Sch. Dist. 47J v. Acton*, 517 U.S. 646, (1995).

[22] *See e.g. U.S. v. Jacobsen*, 466 U.S. 109, 114 (1984)(where searches are conducted by private parties, whether reasonable or unreasonable, they do not violate the Fourth Amendment); *U.S. v. Jarrett*, 338 F.3d 339 (4th Cir. 2003).

[23] Both students, the principal, and the associate principal all testified that the blinds were never open.  Aside from speculation and hypotheticals, there is no evidence in the record to the contrary.

[24] Male Student was born February 15, 1998, and turned 18 on February 15, 2016.

6

**JA1340**

when a coach occupied the office.[25]  The statutory period of limitations begins to run when a person could or should have known, through the exercise of reasonable diligence, that a cause of action might exist in his or her favor, rather than when a person obtains actual knowledge of either the potential claim or of the facts giving rise thereto.[26]  The South Carolina Supreme Court has interpreted the "exercise of reasonable diligence" to mean that the Male Student was required to "act with some promptness" when on notice of a potential claim.[27]  "Moreover, the fact that the injured party may not comprehend the full extent of the damage is immaterial."[28]  It takes very little to start the clock.  Objectively, the statute of limitations has run on any claim he might have had relating to the locker rooms.  So too would the claims of any student who walked in the locker rooms and recognized that there were obvious windows overlooking the changing areas in the locker rooms prior to three years before this suit was filed.

Finally, the parent-plaintiff, Gary Nestler.[29]  The sole basis for his claim appears to be that the locker room window designed by a professional architect in a building that had to have been inspected by various government regulators before opening was not a safe environment in his opinion.  He contends, without any basis whatsoever, that he is entitled to a refund of the tuition he paid for his daughter's education because he does not consider Bishop England to be a safe educational environment.[30]  Nestler testified his daughter complained about, and he reported to the

---

[25] *Male Student Deposition*, *supra* **Exhibit 5**.

[26] *Id.* at 525-26, 787 S.E.2d at 489-90 (citations and quotations omitted); see also S.C. Code Ann. § 15-3-535 (2005) ("[A]ll actions initiated under Section 15-3-530(5) must be commenced within three years after the person knew or by the exercise of reasonable diligence should have known that he had a cause of action.").

[27] *Dean v. Ruscon Corp.*, 321 S.C. 360, 363-64, 468 S.E.2d 645, 647 (1996).

[28] *Id.*

[29] Nestler alleges causes of action for Negligence (Count II); Unjust Enrichment (Count III); Breach of Warranty (Count IV); and Negligent Hiring, Supervision, and Retention (Count V).

[30] *Nestler Deposition* 41:13 – 16; 53: 11 – 13; 54: 13 – 55: 5.  **Exhibit 8**.

school that, she was bullied by other girls and had difficulties with her volleyball coach. There is no evidence that she ever complained about there being a window in the girl's locker room.[31] Yet, he now claims the locker room windows rendered the school an "unsafe environment," though there is not a shred of evidence that the daughter was unjustifiably or improperly seen changing clothes in the girls' locker room. Nestler's opinion is without *any* evidentiary foundation and is contrary to the testimony of the architect who designed the school, who said the windows were a common safety and supervision feature.[32] The school's Principal and Associate Principal likewise testified that the school environment was safe for the students.[33] Nowhere is there any provision for tuition refunds based upon a parent's self-serving opinions about the school facilities and no principle of law commands that the tuition he paid be refunded now. Rather, Nestler sent his daughter to school and she received the education he paid for while she was there.

Nestler's complaint is akin to the following: A homeopathic healthcare worker comes forward years after her daughter completed high school and demands a refund of her tuition. She says she is entitled to this because she considers the stairwells of the building to be too narrow for safety and that, had there been a fire in the school, and had her daughter been upstairs, the daughter could have been killed trying to get out. This, even though the building was designed by a professional architect; that the school had received a Certificate of Occupancy; that the building complied with all applicable building codes; and *there was no fire and no students were harmed*. His allegations are utterly frivolous and non-compensable.

---

[31] *Id.* 42: 7 – 12; 49: 4 - 13.
[32] *Aichele Deposition supra.* **Exhibit 7**
[33] *Mary Anne Tucker Deposition 52: 7 - 19* **Exhibit 9**; *Patrick Finneran Deposition* 63: 16 – 19; 85: 24 - 25 ***Exhibit 10***.

In short, none of the Plaintiffs have asserted legally cognizable claims for relief and they have no standing to assert individual claims or on behalf of anyone else.  For that reason, Plaintiffs' Motion for Class Certification must be denied.

## ARGUMENT REGARDING CLASS CERTIFICATION

Class action jurisprudence has undergone a dramatic change in recent years.  The United States Supreme Court has reinvigorated the responsibility of the trial courts in delving into putative class actions and has mandated that courts take an aggressive role in weeding out cases that should not be treated on a class-wide basis.  The Supreme Court has made abundantly clear that Rule 23 does not set forth a mere pleading standard to be given deference.  The old plaintiff-friendly view of class certification no longer holds sway.  Rather, a party seeking class certification must do more than merely plead compliance with Rule 23.  Plaintiffs must present admissible evidence and affirmatively *prove* each required element of class certification.[34]  Plaintiffs cannot satisfy this burden with conclusory allegations or boiler plate memoranda laden with self-serving conclusions.[35]  It is well-settled that a class representative must be part of the class and must possess the same injury as the class members.[36]

To succeed on a request for certification, Plaintiffs must *prove* by a preponderance of evidence that they have complied with the requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation.  Only if Plaintiffs have proven each element of Rule 23(a) may the Court turn to Rule 23(b)(3)'s more onerous requirements that Plaintiffs also *prove*

---

[34] *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).
[35] *Wheeler v. Anchor Cont'l, Inc.*, 80 F.R.D. 93, 96 (D.S.C. 1978) *quoting Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312 (4th Cir. 1978).
[36] *Gen. Tel. Co. of Sw v. Falcon*, 457 U.S. at 156-57.

**JA1343**

that common issues predominate over individual issues.[37]  As the Supreme Court has emphasized repeatedly, especially with *Wal-Mart Stores v. Dukes* and *Comcast v. Behrend*, the requirements set forth in Rule 23(a) and 23(b) afford procedural safeguards in requiring the courts to take a "close look" at whether common questions predominate over individual ones.[38]  The basic gist of *Comcast* is this: The Supreme Court meant what it said in *Wal-Mart* about lower courts habitually applying Rule 23 too broadly and that class actions are meant to be the exception, **not the rule.** The Court held that class certification should be reserved for **<u>rare</u>** "exception[s] to the usual rule that litigation is conducted by and on behalf of the individual named parties only."[39]  The Supreme Court has thus made it crystal clear that each element of Rule 23(a) and 23(b) must be proved by the Plaintiffs by a preponderance of the evidence and that the courts must analyze those claims and that evidence rigorously.

Additionally, even if Plaintiffs can meet the threshold burden of Rule 23(a), they still must satisfy the stringent requirements of Rule 23(b)(3) that (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) that class treatment is superior to other available methods for the fair and efficient adjudication of the controversy.[40]  The predominance requirement is more stringent that the commonality requirement of Rule 23(a).[41]  Rule 23(b)(3)'s predominance requires that Plaintiffs establish that their proposed classes are sufficiently cohesive to warrant adjudication by representation.[42]

---

[37] *See Comcast*, 133 S.Ct. at 1432 and *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-624, (1997).
[38] *Comcast,* 133 S. Ct. at 1432.
[39] *Id.* at 1432.
[40] Fed. R. Civ. P. 23(b)(3); *Gariety v. Grant Thornton LLP*, 368 F.3d 356, 362 (4th Cir. 2004),
[41] *Thorn*, 445 F.3d at 164, n.4
[42] *EQT Prod. Co.*, 764 F.3d at 358; *Gariety*, 368 F.3d at 362 *quoting Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).

**JA1344**

Class certification may be precluded where there are individual questions as to elements of a claim or a defense.[43]  In addition, individual proof of liability or individual proof of damages, where essential to liability, may defeat predominance.[44]

It is important to note that Plaintiffs' frequent reliance on testimony by the Diocese's press liaison, Maria Aselage, is both inadmissible and irrelevant to class certification.  As the record reflects, Aselage is not an employee of the Diocese, but is an independent contractor, whose job it is to provide statements by Diocesan officials in response to press inquiries or regarding matters appearing in the news media. (See ECF 51).  She can only provide approved statements to the media, and she has no authority to make legally significant admissions on its behalf.  Further, the opinions Plaintiffs' counsel attempted to elicit from Aselage are without any evidentiary foundation and are entirely inadmissible.  Likewise, the use of Aselage's responses to hypothetical questions is simply improper for class determination – she has neither the expertise, nor the first-hand knowledge to provide any meaningful testimony regarding the proposed classes or their compliance with Rule 23(a) and 23(b)(3).  As such, the excerpts of her deposition submitted by Plaintiffs should be disregarded entirely as they do not support any issue related to class certification.

### A.    Ascertainability of the Classes

While ascertainability does not appear in the text of Rule 23, it remains an essential prerequisite to class certification.  As the Fourth Circuit held:  "however phrased, the requirement is the same.  A class cannot be certified unless a court can readily identify the class members in

---

[43] *Gariety*, 368 F.3d at 362-63; *Gunnells v. Healthplan Servs. Inc.*, 348 F.3d 417, 434 (4th Cir. 2003).

[44] *Broussard v. Meineke Disc. Muffler Shops, Inc.* 155 F.3d 331, 342-43 (4th Cir. 1998).

11

**JA1345**

reference to objective criteria."[45]  A class will fail to satisfy the Rule 23 requirements where it is impossible to identify class members without an individualized inquiry.[46]  Plaintiffs bear the burden of establishing ascertainability.[47]  Plaintiffs have completely failed to establish that the class can even be determined.

In this case, Plaintiffs have sought certification of the following classes:

*Viewed class* – all those persons, or such persons' personal representatives, heirs or assigns wherever located, who have or in the future may have any claim against Defendants The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, the Bishop of the Diocese of Charleston in his official capacity, and Robert Guglielmone, individually, arising out of, based upon, or in any way related to, or involving injuries or damages claimed as a result of Jeffrey Scofield or any other Bishop England High School employee or agent monitoring, watching, viewing, spying, prying, besetting, photographing or videotaping them, or other such similar type conduct, through the viewing windows of the coaches' or other BEHS officials' offices into the locker rooms while attending Bishop England High School from 1998 through 2019.

*Tuition class* – all those persons, or such persons' personal representatives, heirs or assigns wherever located, who have or in the future may have any claim against Defendants The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, the Bishop of the Diocese of Charleston in his official capacity, and Robert Guglielmone, individually, arising out of, based upon, or in any way related to, or involving claims for reimbursement of tuition paid to Defendants as a result of Jeffrey Scofield or any other Bishop England High School employee or agent monitoring, watching, viewing, spying, prying, besetting, photographing or videotaping them, or other such similar type conduct, through the viewing windows of the coaches' or other BEHS officials' offices into the locker rooms while attending Bishop England High School from 1998 through 2019.

---

[45] *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 645 (4th Cir. 2019) *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014).  *See also, Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-94 (3d Cir. 2012); *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007); *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*, 471 F.3d 24, 44-45 (2d Cir. 2006).
[46] *See Marcus*, 687 F.3d at 593; *see also Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 579-80 (1st Cir. 1986)
[47] *See e.g. Riffle v. Convergent Outsourcing, Inc.*, 311 F.R.D. 677, 681 (M.D. Fla. 2015); *Piotrowski v. Wells Fargo Bank, N.A.* 2015 U.S. Dist. LEXIS 98688, *20 (D. Md. July 29, 2015)(denying certification where "Plaintiffs have provided no evidence that a class could be ascertained.").

Plaintiffs' proposed classes are quintessential "fail-safe" or merits-based classes. That is, they are entirely too broad to determine – using the objective criteria required – who is and is not included in the classes. Fail-safe classes are improper because, either the class members win, in which case they are entitled to relief, or by virtue of losing, they are not in the class at all and, therefore, are not bound by any judgment.[48] An impermissible fail-safe class is one that is defined so that whether a person qualifies as a member [of the class] depends on whether the person has a valid claim on the merits.[49] Nearly every circuit court of appeals that has addressed the issue has found that fail-safe classes are improper.[50] As was the case in *Bigelow v. Syneos Health*, where the court struck plaintiffs' class allegations from the complaint, the class definition in this case turns entirely on whether each class member has a valid claim.[51] That is simply impermissible under the law.

---

[48] *Bigelow v. Syneos Health, LLC*, 2020 U.S. Dist. LEXIS 155791, *10-12 (E.D.N.C. August 27, 2020) *citing Randleman v. Fidelity Nat. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) and summarizing authority regarding the impermissibility of fail-safe classes (decision attached as **Exhibit 12**).

[49] *Bais Yaakov of Spring Valley v. ACT, Inc.*, 328 F.R.D. 6, 13 (D. Mass. 2018).

[50] *Bigelow v. Syneos Health*, at *11 *citing* See, e.g. *Orduno v. Pietrzak*, 932 F.3d 710, 716-17 (8th Cir. 2019); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1276-77 (11th Cir. 2019); *McCaster v. Darden Rests., Inc.*, 845 F.3d 794,799-800 (7th Cir. 2017); *Torres v. Mercer Canyons. Inc.*, 835 F.3d 1125, 1138 n.7 (9th Cir. 2016); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 22 & n.19 (1st Cir. 2015); *Byrd v. Aaron's. Inc.*, 784 F.3d 154, 167 (3d Cir. 2015); *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011); In *Bigelow,* the district court also noted that, "numerous treatises discuss the impermissibility of fail-safe classes. See, e.g., 7A Wright & Miller, Fed. Prac. & Proc. § 1760 & n.14.55 (discussing how the Third Circuit and "[o]ther courts... have ruled that requiring fail-safe classes for certification is improper"); Herr, Annotated Manual for Complex Litig. § 21.222 ("The order defining the class should avoid ... terms that depend on resolution of the merits."); 1 Rubenstein, Newberg on Class Actions § 3:6 ("Class definitions that require a court to decide the merits of prospective individual class members' claims to determine class membership—sometimes referred to as 'fail-safe' classes—may also [*12] run afoul of the definiteness requirement."".

[51] *Bigelow*, at *12-13.

Additionally, class definitions that are too vague, too broad, or too subjective (as are the classes proposed by Plaintiffs here) cannot satisfy the ascertainability requirement for certification.[52]  Where there are no objective boundaries to the proposed classes, then Plaintiffs cannot meet the ascertainability requirement.[53]  The proposed class of former students would appear to include so many variations that ascertainability is impossible – those students who went in the locker room and were well aware that coaches' offices were just outside; those students who knew the coaches were charged with monitoring the locker rooms and simply did not care; those students who did care and did not change clothes in the locker area; those who showered and changed in the shower area; those students who used the restrooms, but did not change clothes in the locker area; and on and on and on.  The same holds true for the tuition class.  Plaintiffs' incredibly broad definition cannot meet the ascertainability test under Rule 23.

It is worthy of note that the named plaintiffs may not even be members of the class they propose.  The student-plaintiffs testified they both were aware of the coaches' office windows and both testified they only saw the blinds closed.  Neither ever saw an adult leering into the locker room.   By their own proposed class definition, the two students would not be in the class.  Likewise, and irrespective of the failure of his claims entirely, Gary Nestler adduced no evidence that his daughter was ever spied on, photographed or videotaped while in the locker room.  So, he is not a member of his own class either.

---

[52] *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015)
[53] *Brecher v. Republic of Argentina*, 802 F.3d 303, 305 (2d Cir. 2015)(the use of objective criteria cannot alone determine ascertainability when those criteria, taken together, do not establish the definite boundaries of a readily identifiable class).

14

**JA1348**

B.     **Adequacy of Representation**

Rule 23(a)(4) mandates that Plaintiffs prove that they will be adequate representatives of the class. Adequacy is a constitutional prerequisite to class certification and due process concerns regarding adequacy of representation have been characterized as the single most important feature of class action litigation.[54]  Notwithstanding Plaintiffs' *counsels'* assertions that *they* are adequate representatives, as lawyers for the class, that is not the proper factor for consideration.  Rather, the Court must apply the required rigorous analysis to determine, for example, if the plaintiffs have sufficient knowledge and understanding of the case to be able to control the litigation, and, importantly, that the Plaintiffs must establish that they, *and not the lawyers*, are directing and managing the suit.[55]  The Plaintiffs must prove that they are willing and able to take an active role and protect the interests of the absentee class members.[56]  After *Wal-Mart* and *Comcast*, "plaintiffs must produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are themselves – *not the lawyers* – actually directing the litigation."[57]

As discussed above, none of the named plaintiffs has any justiciable claim.  Without any admissible evidence of some concrete harm that was caused by conduct of the Defendants, the student-plaintiffs have no standing and can assert no claim individually.  Gary Nestler's entirely self-serving and baseless opinions regarding the safety of the school environment likewise fail to meet muster.  He has no real claim for a complete refund of the tuition he paid, and neither do the

---

[54] *See* Linda S. Mullinax, Taking Adequacy Seriously:  The Inadequate Assessment of Adequacy in Litigation and Settlement Class Actions, 57 Vand. L. Rev. 1687, 1696 (2004).

[55] *See e.g. In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 143 (S.D. Tex. 2014).

[56] *Id.  See also Shiring v. Tier Technologies, Inc.,* 244 F.R.D. 307, 315 (E.D. Va. 2007); *Black v. Rhone-Poulenc, Inc.,* 173 F.R.D. 156, 162 (S.D. W. Va. 1996); *and Berger v. Compaq Computer Corp.,* 257 F.3d 475, 479 (5th Cir. 2001) ("The adequacy requirement mandates an inquiry into . . . the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees[.]").

[57] *In re Kosmos Energy*, 299 F.R.D. at 144, *citing Berger v. Compaq*, 257 F.3d at 484.

15

**JA1349**

class of similarly situated individuals he seeks to represent.  It is axiomatic that, in the absence of a personal claim, they cannot represent a class of other individuals for any reason.

Further, both students appear to have been <u>recruited</u> by opposing counsel to be plaintiffs in this action and clearly are not the driving force behind this lawsuit:

<u>Female Student</u>

Q:    How did you find the Richter Firm?

A:    The Richter Firm found me.

Q:    Okay.  How did they find you?

A:    They got in touch with my parents, who gave them my phone number and e-mail, and they got in touch with me asking if I would like to be part of this case, and I agreed.

Q:    And when did they get in touch with you about that?

A:    About January of 2020.

Q:    Prior to January of 2020, had you had any contact with the Richter Firm?

A:    No.[58]

<u>Male Student</u>

Q:    How did you come to file this lawsuit?

A:    My mother spoke to the Richters or the Richters spoke to my mom.  They asked to meet my mom, and from there, they had a meeting, and then my mother reached out to me and said they were looking – that they would like to speak to me, and then I spoke with them, and they informed me, and from there, came.

Q:    What did your mother talk to the Richter firm about?

A:    Just about the whole incident.  She didn't really inform me much, just if I was willing to meet with the lawyers.

Q:    How did the Richters find your mother?

A:    Most likely, after her – after she was in the incident with Bishop England.

Q:    And that's when she got fired?[59]

---

[58] Female student deposition, 23: 3 – 14, ***Exhibit 6***.
[59] Male student deposition, 20: 12 – 18; 20: 22 – 21: 5, ***Exhibit 5***

**JA1350**

Clearly, the two students were approached by Counsel and were subjected to classic barratry after their mother's employment discrimination case against the Diocese and Bishop England was dismissed – their true motives must come under some question. Further, Female Student in in college in Spain – how much true direction can a college student studying abroad be expected to give the lawyers? Rather, it is more likely that the student-plaintiffs are free riders on this entrepreneurial lawsuit that is really being directed by the lawyers.

Nestler refused to answer any questions regarding how he came to file suit.

Given these facts, the Plaintiffs have not made the required evidentiary showing that they are adequate representatives.

**C.     Plaintiffs have failed to establish Commonality or Typicality.**

The commonality and typicality requirements of Rule 23(a)(3) have tended to overlap, and serve as a "guidepost for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."[60] The inquiry really is whether the questions will generate common answers for the entire class.[61] A common question is one that can be resolved for each class member in a single hearing. By contrast, a question is not common, if its answer turns on consideration of the

---

[60] *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 157 n.13 (1982); *Kidwell v. Transp. Comm'n Int'l Union*, 946 F.2d 283, 305 (4th Cir. 1991).

[61] *Wal-Mart*, 564 U.S. at 351. *See also Ferrenas v. American Airlines, Inc.*, 946 F.3d 178 (3d Cir. 2019)(reversing class certification where "It is not clear how those questions can generate common answers apt to drive the resolution of the action)(cleaned up). Posing generically common questions does not suffice; courts focus instead on common answers. "What matters to class certification . . . is not the raising of common 'questions'— even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551. "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*.

individual circumstances of each class member.[62]  Common questions are not enough where the

answer may be different for each class member and will determine whether the person is, or is not,

in the class.[63]  Rather, what the court looks for is a common issue, the resolution of which will

advance the litigation.[64]  "Class certification is only proper when a determinative critical issue

overshadows all other issues."[65]

> 1. **Because the Court will be required to conduct individualized inquiries of each and every member of the putative class to determine when the applicable statute of limitations began to run, class certification is inappropriate.**

As noted above, at the very least, Male Student's claims, to the extent he has any, are barred

by the applicable statute of limitations.  Stale claims present substantial obstacles to predominance

and therefore are largely unsuitable for class treatment.  That is because the question of when a

statute-of-limitations period starts "focuses on the contents of the plaintiff's mind, [which] is not

readily susceptible to class-wide determination."[66]  As a result, "the record must affirmatively

reveal that resolution of the statute of limitations defense on its merits may be accomplished on a

class-wide basis."  The burden of proving that matter lies squarely with Plaintiffs as the movants—

and not with Defendants.[67]  "[W]hen the defendant's affirmative defenses (such as . . . the statute

of limitations) may depend on facts peculiar to each plaintiff's case, class certification is

erroneous."[68]

---

[62] *Thorn v. Jefferson-Pilot Life Ins. Co.,* 445 F.3d 311, 319 (4th Cir. 2006) (citing 7A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1763 (3d ed. 2005)).
[63] *Paulino v. Dollar Gen. Corp.*, 2014 U.S. Dist. LEXIS 64233, *14 (N.D. W. Va. May 9, 2014).
[64] *Parks Auto. Group, Inc. v. Gen. Motors Corp.*, 237 F.R.D. 567, 570 (D.S.C. 2006); *Stott v. Haworth*, 916 F.2d 134 (4th Cir. 1990) (stating that there must be "commonality . . . between the claims of each plaintiff that would propel [the] case through class treatment . . . .").
[65] *Id.* at 145.
[66] *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 320 (4th Cir. 2006).
[67] *Id*. at 321-322.
[68] *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998).

**JA1352**

Plaintiffs with untimely claims must rely on an "accrual" or "discovery" rule, which delays the beginning of their limitations period. Under the South Carolina discovery rule, the limitations period begins when a party "knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct."[69] The test objectively gauges whether a person would have been "on notice . . . that some claim against another party might exist." *Id.*

Courts have found that this test is subjective and defies class wide adjudication. The Fourth Circuit in particular has consistently adhered to that view. For example, in *Thorn*, the Fourth Circuit noted that "[e]xamination of whether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it."[70] In *Broussard*, the Fourth Circuit reversed an order granting class certification because, among other flaws, evidence about each class member's knowledge was "critical" to whether that person's claims were "time-barred by [the] three year statute of limitations[.]"[71]

Determining whether the statute of limitations bars any particular class member's claim will surely depend on facts peculiar to each class member, an individual inquiry that renders certification improper. Plaintiffs urge that the Court focus solely on the actions of the Defendants. However, the Court cannot ignore such critical issues as what each class member knew and when they knew it. A plaintiff's knowledge normally requires individual evidence and that element

---

[69] *Martin v. Companion HealthCare Corp.*, 593 S.E.2d 624, 627 (S.C. Ct. App. 2004).
[70] *Thorn*, 445 F.3d at 320.
[71] *Broussard,* 155 F.3d at 342.

19

**JA1353**

alone will defeat class certification.[72]  The Fourth Circuit has held that it is reversible error for a court to fail to consider plaintiff-focused issues such as their individual knowledge. [73]

### 2.    Plaintiffs have failed to prove that there is a reliable model for determining class-wide damages.

Plaintiffs must demonstrate "through evidentiary proof" that their "damages are capable of measurement on a class-wide basis." [74]  Without that, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."[75]  "Mere assurance" that a reliable methodology exists is "insufficient[.]"[76]  In Plaintiffs' motions, no class-wide means of measuring damages is offered—much less supported through evidentiary proof.  Rather the psychologist retained by Plaintiffs testified that, while each student may be affected in some way by the revelation that Jeffrey Scofield photographed five boys in 2019, each student would be affected differently.[77]  Plaintiffs merely repeat the elements of each claim – including resulting damage from whatever wrong they allege.  Plaintiffs are silent on how those damages can be calculated generally. [78]  Because Plaintiffs have failed to present a reliable class-wide model for damages, the Court should deny class certification for that reason alone.

---

[72] *EQT Products v. Adair*, 764 F.3d at 369; *citing  Thorn v. Jefferson-Pilot*, 445 F.3d at 321.

[73] *EQT Products*, 764 F.3d at 369 (District court erred in failing to give any consideration to the individual evidence of each class member's knowledge in finding the statute of limitations was tolled by defendants' engaging in fraudulent concealment).

[74] *Comcast*, 133 S. Ct. at 1432-33; *see also Bright v. Asset Acceptance, LLC*, 292 F.R.D. 190, 202-03 (D.N.J. 2013) ("[A] plaintiff seeking class certification must present evidence of a reliable methodology for calculating damages on a class-wide basis.").

[75] *Comcast*, 133 S. Ct. at 1433.

[76] *Bright*, 292 F.R.D. at 202-03.

[77] *Salas deposition*, 67: 20 – 68: 10; 76: 15 – 77: 5; 78:23 – 79: 5 ***Exhibit 2***.

[78] *See, e.g.*, *Bright*, 292 F.R.D. at 202-03 (denying class certification because, among other defects, plaintiff "provided no model for calculating actual damages on a class-wide basis").

**JA1354**

Plaintiffs' omission is not surprising, for there is no reliable class-wide model for damages and they *cannot* establish such a model. Each class member's loss would have to be figured separately, based on all sorts of overlapping variables – and importantly some, nearly all, members of the putative class have suffered no damage at all.

Because Plaintiffs simply cannot establish by the requisite proof the element of commonality, whether as to the applicability of the statute of limitations, or establishing some common answer to the question of damages, the motion for class certification must be denied.

### D.  Plaintiffs Cannot Establish the Requisite Numerosity.

The only evidence is that Jeffrey Scofield took photographs of five boys in 2019. None of those boys is involved in this action. Neither student-plaintiff could testify that they had been photographed in the locker rooms by anyone. Plaintiffs have adduced no evidence of the number of people who are in the respective proposed classes, as those classes are now defined. Rather, Plaintiffs are attempting to lump together every student who ever set foot in the locker rooms between 1998 and 2019 and every person who paid tuition during the class period – that simply cannot suffice to establish numerosity.

### E.  Plaintiffs have Failed to Establish Either Rule 23(b)(3) Requirement.

Plaintiffs have adduced not a shred of admissible evidence that they have satisfied their heavy burden to establish that their claims – Wrongful Intrusion into Private Affairs, Negligent Hiring, Supervision and Retention, and general Negligence for the student class; Breach of Warranty, Unjust Enrichment, Negligent Hiring, Supervision and Retention, and Negligence for the parent class – are in any way amenable to class-wide, common proof.[79] The predominance

---

[79] *EQT Prod. Co.*, 764 F.3d at 366; *also Brown v. Electrolux Home Prods., Inc.* 817 F.3d 1225, 1234 (11th Cir. 2016).

inquiry requires that the Court examine the parties' claims and defenses and their elements and then determine whether those elements require common or individualized proof.[80] The inquiry is qualitative and not quantitative and should focus on the issues that will likely dominate at trial.[81] Courts must analyze and take into account Defendants' affirmative defenses and whether there are claimant-specific defenses (the statute of limitations, knowledge, lack of reliance, lack of causation for example) may predominate over common ones.[82]

### 1. Plaintiffs have not established the required element of predominance.

As is discussed above, Rule 23(b)(3)'s predominance requirement further mandates that Plaintiffs show how they would prove causation and damages with common proof – which they have not done – and failing that, individual issues will predominate and defeat class certification.[83] There is simply no class-wide proof that all parents and tuition-payers suffered a common injury due to the conduct of these Defendants. Likewise, there is no class-wide proof that all students were harmed in the same manner by the ability of an adult to monitor the locker rooms at the high school for misconduct.

In this case, the class members' claims can *only* be proved by individualized evidence and Defendants' would necessarily present particularized defenses to each claim. That, standing alone, defeats certification.

---

[80] *See Brown v. Electrolux*, 817 F.3d at 1234. *Cited with approval Naparella v. Pella Corp.*, 2016 U.S. Dist. LEXIS 72442, at *39-41 (D.S.C. June 3, 2016)(Norton, J.) *and Romig v. Pella Corp*., 2016 U.S. Dist. LEXIS 72437 (D.S.C. June 3, 2016)(Norton, J.).

[81] *See e.g. Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014); *Harnish v. Widener Univ. Sch. Of Law*, 833 F.3d 298, 304-05 (3d Cir. 2016).

[82] *Stuart v. Global Tel *Link*, 956 F.3d 555 (8th Cir. 2020); *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240 (5th Cir. 2020. *See also Gariety v. Grant Thorton*, 368 F.3d at 362 (Proof of reliance is generally individualized to each plaintiff).

[83] *Comcast*, 569 U.S. at 37

**Gary Nestler and the proposed parent class.**

Nestler's daughter attended Bishop England for all of her freshman year and one semester of her sophomore year – between August, 2017 and January, 2019. Nestler claims that he was promised that his daughter would be educated in a safe, nurturing environment when she was still in eighth grade and prior to her enrollment at Bishop England. Plaintiffs have presented no evidence that the parents of every aspirant to attend Bishop England received or relied on any such statements, or that either the warranty claim (to the extent such a statement can even be construed as an oral warranty) or unjust enrichment claim can be determined for the entire class with common proof. Rather, individual questions of whether such a statement was made; whether any parent relied exclusively on such a statement; and whether there existed of any sort of oral contract between the school and each parent will be overwhelmed by individualized evidence from every single parent who sent a child to Bishop England over the past 20 years. Likewise, each parent's particular knowledge of the locker rooms and the windows and whether any parent other than Nestler believes those windows are patently unsafe will necessitate testimony from thousands of individual parents. These highly individualized elements of proof will be required to establish the essential elements of a breach of warranty claim for each and every member of the proposed class.

So too with Nestler's claims for negligent hiring and general negligence. There is no basis for, and zero class-wide common evidence of, any negligence in hiring or retaining every single Bishop England employee for more than two decades. Rather, trial of these claims would require deeply individualized inquiries into every employee ever to set foot on Bishop England's campus to determine the elements of both negligent hiring, retention, and supervision, and general negligence – what duty did the school owe in each particular employee's individual circumstances

and how did the school breach any duty to anyone?  The claims also bring forward individualized affirmative defenses – the school's lack of any prior knowledge of some dangerous condition; individual parents' knowledge of the windows and condonation of their children changing clothes there; whether any parent agrees with LS3P and defense experts regarding the need for a school to provide a mechanism deter bullying or fighting and the appropriate method for doing so.    The answer to the questions presented under the employment and negligence claims, dating back to 1998 cannot be answered with class-wide proof.

### The former students and the "viewed" class.

As with Gary Nestler, the myriad of individual issues of fact, the elements of the causes of action, and the affirmative defenses applicable to the claims of thousands of students, alumni, and former students, completely overwhelms and subsumes any class-wide treatment of their claims. The privacy claims alone would require massive individualized evidence regarding whether any child over the last 20 years actually had his or her privacy invaded unjustifiably.  Whether any student suffered *any* injury at any time will completely depend on individualized evidence. Likewise, as Dr. Salas admitted, the extent of any impact on any former student will be entirely individualized.  Whether any student's injury was proximately caused by Bishop England will depend entirely on individualized proof.  Whether the school's actions were reasonable at the time will depend on individualized evidence.  The student-plaintiffs have not established their burden under Rule 23(b)(3) that common proof will establish the required elements of their claims and damages.

The student-plaintiffs' wide-ranging employment-related claims implicate everyone who ever worked at Bishop England and demand individual inquiries both regarding every student who attended the school and entered the locker rooms, but also every employee who may have entered

the coaches' offices.  The trial will require thousands of former students and likely hundreds of employees to testify regarding these claims and will raise affirmative defenses, that while generally common, rely on individual proof.

**2.  Plaintiffs likewise fail to show superiority of the class device.**

Rule 23(b)(3) also requires a determination by the Court that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.[84]  Courts must inquire into four areas to determine superiority:

(a) The class members' interest in individually controlling the prosecution of separate actions;

(b) The extent and nature of any litigation concerning the controversy begun by class members;

(c) The desirability of concentrating the litigation of claims in the particular forum; and

(d) The likely difficulties in managing a class action.[85]

In particular, the "individual interest" inquiry militates against a finding of superiority.  The inquiry turns on the cost of litigation the class members' claims, and the complexity of the issues surrounding those claims.  If individual lawsuits are worth enough on their own, then a class action normally will not be superior to individual litigation.[86]  Individuals who can prove they actually were photographed or videotaped and damaged for whom the statute of limitations may not have run should have sufficient individual interest to pursue their own claims.  There is no impediment to their pursuing their own claims, and there is little benefit to them from participating in a class

---

[84] Fed. R. Civ. P. 23(b)(3).
[85] *Id.*
[86] *See e.g. Castano v. Amer. Tobacco Co.* 84 F.3d 734, 748 (5th Cir. 1996)(no superiority where individual damage claims are high).

**JA1359**

action.    Conversely, a class action cannot be superior where all, or nearly all, members of the proposed class have no injury and no damages whatsoever.  At that point, the class members are little more than free riders on entrepreneurial litigation – litigation where they would not, and could not, prevail on their own.

A second factor that militates against class treatment is the utter and complete unmanageability of any trial(s). As noted above regarding predominance – virtually every former student will have to establish that they were injured as a result of some specific conduct by a specific employee of Bishop England dating back to 1998.  The court would have to conduct numerous trials within a trial:  were you a student? is your claim time-barred? were you viewed illicitly and without reason? did you suffer mental harm as a result? and innumerable other individualized inquiries.   The school would necessarily assert appropriate affirmative defenses to each claim, and each would require its own evidence and testimony.

In short, Plaintiffs have failed to present any evidence that establishes that the proposed classes satisfy the stringent requirements of Rule 23(b)(3).  There is, quite simply, nothing supporting either predominance or superiority.  Rather, all the evidence is that the proposed classes will create an unwieldy, inefficient, quagmire of individualized issues, both regarding the claims of each member of the proposed classes and the various defenses that will be asserted.  In short, neither Rule 23(b)(3) condition has been met and these claims simply cannot be treated on a class-wide basis.

## CONCLUSION

As supported above, Plaintiffs have failed to meet their burden of demonstrating that their purported classes satisfy the requirements of Rule 23(a) and Rule 23(b)(3), Fed. R. Civ. P., and in

fact, Plaintiffs cannot do so.  Accordingly, Plaintiffs' Motion for Class Certification must be denied

in full

Respectfully submitted,

**TURNER PADGET GRAHAM LANEY, PA**

_s/Richard S. Dukes, Jr._
Richard S. Dukes, Jr., Federal ID No. 7340
40 Calhoun Street, Suite 200
Charleston, SC 29401
Phone: (843) 576-2810
Email: RDukes@turnerpadget.com

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Megan Ashley Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

**ATTORNEYS FOR DIOCESE DEFENDANTS**

January 19, 2022

**JA1361**

# EXHIBIT 1



BISHOP ENGLAND
HIGH SCHOOL
CHARLESTON, SOUTH CAROLINA

PARTIAL 1ST
FLOOR PLAN
AREA C

A103

29 OCT 96

EXHIBIT 2

=======================================================================

# Deposition of:

# Amanda Salas, MD

=======================================================================

**Gary Nestler, et al**
**v.**
**The Bishop of Charleston, a Corporation Sole, Bishop**
**England High School, et al**

**Case #: 2:21-cv-00613-RMG**

**November 10, 2021**

=======================================================================



**Magnolia Reporting, LLC**
P.O. Box 61011
North Charleston, SC  29419
(843) 303-9141
www.MagnoliaReporting.com



**JA1363**

Amanda Salas, MD - 11/10/2021

Page 67

```
 1    what they're provided with to change, undress,
 2    disrobe, utilize the facilities for toileting and
 3    showering, however normal use of a locker room
 4    would be perceived, that having the transparent
 5    window where people have access to and I
 6    understand that it was by the design of the
 7    building, was in place to prevent conflict
 8    between students or --
 9            Q.  Fights and bullying?
10            A.  -- fights and bullying, I think
11    smoking or something.
12            Q.  Hazing.
13            A.  But all of that, the nature of that
14    transparency into the privacy, once you have
15    somebody who rises to the occasion to recognize
16    that is not safe and they utilize it, what may
17    have been benign is now very malignant.  So that
18    makes it very concrete for the person who would
19    have been the student in the locker room.
20                They may have not thought about it,
21    because you don't know what you don't know.  And
22    it may have been tolerated, because people didn't
23    go against it.  It was there for the construct of
24    the building and forward.  But the nature of how
25    that affects an individual, it's gonna affect
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA1364**

Amanda Salas, MD - 11/10/2021

```
                                              Page 68
 1   individuals differently, but they're gonna be
 2   affected.
 3        Q.  Okay.  So every student who is --
 4   every Bishop England alumnus who has since
 5   learned that Jeffrey Scofield did bad things
 6   would be affected by that differently, correct?
 7             MR. RICHTER:  Object to the -- I
 8        object to the form of the question.
 9             THE DEPONENT:  That's a fair
10        assessment, yes.
11   BY MR. DUKES:
12        Q.  Okay.  What -- in your opinions you
13   say that the windows in the locker rooms -- and
14   have you ever seen the design drawings of that?
15        A.  I don't think I've seen the design
16   drawing.  There was a picture of the window --
17        Q.  Uh-huh.
18        A.  -- in the --
19             MR. RICHTER:  Complaint.
20             THE DEPONENT:  Complaint.  Thank
21        you.
22   BY MR. DUKES:
23        Q.  And you didn't read the deposition of
24   Ken Richardson, did you --
25        A.  No.
```

Electronically signed by Nicole White (301-070-154-1752)            aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA1365**

Amanda Salas, MD - 11/10/2021

```
                                            Page 76
 1          Q.  Okay.  Have you interviewed anybody
 2     who was unaware that the windows were there?
 3          A.  No.
 4          Q.  Have you interviewed anybody who was
 5     unaware that there was a coaches' office on the
 6     other side?
 7          A.  No.
 8          Q.  When both female student and male
 9     student were enrolled at Bishop England, did
10     they express that they were embarrassed or
11     uncomfortable changing clothes in the locker room
12     with everybody else?
13          A.  They did not share that information
14     with me.
15          Q.  Okay.  Can we agree that every
16     teenager will have a different level of comfort
17     changing clothes in a locker room?
18                  MR. RICHTER:  Object to the
19          form.
20     BY MR. DUKES:
21          Q.  You'd have to ask each one of them,
22     right?
23          A.  If you want to understand how somebody
24     feels when they're undressing, you would have to
25     ask that individual.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 77

1        Q.  You can't just make generalizations?

2        A.  Some people may feel so comfortable

3   undressing that they make other people feel

4   uncomfortable and there can be pathology related

5   to that, as well.

6        Q.  Okay.  And in your experience in this

7   -- in that respect, boys are different than

8   girls?

9        A.  You know, I don't want to align with

10  one gender or another, but yes, I think that

11  that's thought that boys are different than

12  girls.

13       Q.  That a boy might be less insecure

14  about changing clothes in a locker room than

15  perhaps a girl?

16       A.  I guess that can go either way.

17  People are gonna be different and I don't know

18  that this falls along solely gender lines.

19       Q.  Okay.

20       A.  But I think it's fair to say that -- I

21  know from when I was a kid, as girls going over

22  spending the night at somebody else's house we'd

23  sleep in the bed with each other, didn't think

24  anything about it, but brothers were not doing

25  the same thing.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 78

```
 1          Q.  Okay.  What is the basis for your
 2    opinion that every student who has changed
 3    clothes in the locker room at Bishop England is
 4    expected to be impacted by the fact that there
 5    was a window there?
 6          A.  That this is -- this is a sensitive
 7    situation.  This is disrobing, this is
 8    undressing, that there's a lot of structure that
 9    goes into Bishop England and as female student
10    conveyed more so than male student, the
11    perception is is that you're gonna go into the
12    mold and this is how you're gonna be.
13          Q.  Okay.  But that's just an atmosphere
14    that she perceived at Bishop England, no matter
15    what it was?
16                    MR. RICHTER:  Object to the
17          form of the question.
18                    THE DEPONENT:  That's how she
19          described it to me, so that is her
20          perception.  And that's her perception.
21    BY MR. DUKES:
22          Q.  But other students are gonna have
23    entirely different perceptions, right?
24                    MR. RICHTER:  Object.  It's
25          calling for speculation.  Object to the
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 79

```
 1        form of the question.
 2                    THE DEPONENT:  Other students
 3        are not gonna have had the same experience
 4        as the female student that has been
 5        interviewed.  But clearly, from what she
 6        told me, this is something that was talked
 7        about at mass amongst who ever she was with.
 8        I'm assuming other girls.  And it became a
 9        big deal.  And to me, when I -- I see also
10        in the discovery or not discovery, that
11        would have been the exhibit of the
12        complaint, a letter that came, I believe it
13        was from the principal, that this has
14        happened and we offer counseling services,
15        whether it's through the pastoral
16        counseling, whether it's professional
17        services, it seems to be well recognized
18        that this is impacting.  This does impact
19        other people.
20   BY MR. DUKES:
21        Q.  Okay.  But you didn't learn that until
22   after you had prepared your report, right?
23        A.  Right.  Which --
24        Q.  So that, the complaint and its
25   exhibits did not go into forming your opinion?
```

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA1369**

Amanda Salas, MD - 11/10/2021

Page 82

1          interviewed these two students and the idea
2          that that was an opportunity and it was an
3          opportunity that someone did have light shed
4          on the fact that they utilized it, it's
5          expected that that would give you some kind
6          of pause and psychological component to fit
7          into an individual's life like that could
8          have been me.
9     BY MR. DUKES:
10         Q.  But you have --
11         A.  It's kind of an idea of if I'm driving
12    across a bridge and the bridge collapses, but I
13    made it across the bridge, but the car behind me
14    almost didn't, and the car behind it didn't, I
15    might go on and be okay until I learned, wow, do
16    you realize just how close that was on that day
17    to ending my life.  And it's a moment where you
18    take pause.
19              And some people may take pause and
20    think about it, reconcile whatever the issue is,
21    and they may not rise to the threshold of coming
22    into a psychiatrist's office or a counselor's
23    office or they may not even go to their pastor
24    about it.  And there are other people who have
25    different psychological structure, different life

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 83

1    experiences.
2              But this was a high school experience.
3    This high school's kind of a key component in
4    childhood develop.  And the idea that a person
5    who has been in that situation would be affected
6    and it would be negative on their psyche,
7    that's as -- that's as obvious in the world of
8    psychiatry as I'm not gonna find an article that
9    says it's this obvious, because you're also not
10   gonna find an article that says something along
11   the lines of people get pregnant by having
12   intercourse.  It's known.  It's like this is --
13   this is so obvious that the idea of a window
14   being present, I am following procedures and if I
15   don't follow the procedures, I can be disciplined
16   whether however that is.  I don't want to go on
17   that path, but you could be reprimanded for not
18   following the procedure.
19             But that is something that upon
20   learning, wow, I was in that space that was
21   utilized just as it was when I was in it, it's
22   going to have that kind of impact in someone's
23   psyche.  But the degree and the nature and what
24   one person experiences versus another, that's not
25   necessarily the same.

Electronically signed by Nicole White (301-070-154-1752)                    aa647e05-6f8e-45f4-b4bc-c57c7ea5582e

**JA1371**

Amanda Salas, MD - 11/10/2021

Page 84

```
 1        Q.   Okay.  So, and I like your analogy of
 2   driving across the bridge that then collapses.
 3        A.   We'll try to work with it then.
 4        Q.   That is the realization, oh, my, I
 5   could have been killed?
 6        A.   Yes.
 7        Q.   But you weren't?
 8        A.   Yes.
 9        Q.   And it's the same thing here, right?
10   I could have been photographed, I could have been
11   seen, but as far as I know, I wasn't?
12        A.   Well --
13             MR. RICHTER:  Object to the form
14        of the question.
15   BY MR. DUKES:
16        Q.   Correct?
17        A.   As far as I know, they weren't and it
18   still impacts them, yes.
19             MR. DUKES:  I think that's all I
20        have for you, ma'am.  Thank you.
21             THE DEPONENT:  Okay.  Can we
22        take a break?
23             (Whereupon, there was a short
24        break in the proceedings.)
25             E-X-A-M-I-N-A-T-I-O-N
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Amanda Salas, MD - 11/10/2021

Page 91

1              C E R T I F I C A T E

2

3    STATE OF SOUTH CAROLINA   )

4    COUNTY OF BERKELEY        )

5

6          I, Nicole D. White, Certified Court

7    Reporter and Notary Public, State of South

8    Carolina at Large, certify that I was authorized

9    to and did stenographically report the foregoing

10   deposition of Amanda Salas, M.D.; and that the

11   transcript is a true record of the testimony given

12   by the witness, and was sworn as such.

13          I further certify that I am not a

14   relative, employee, attorney or counsel of any of

15   the parties, nor am I a relative or employee of

16   any of the parties' attorney or counsel connected

17   with the action, nor am I financially interested

18   in the action.

19          WITNESS MY HAND AND OFFICIAL SEAL this

20   20th day of November 2021.

21

22   _____

     Nicole D. White

23   Notary Public in and for the
     State of South Carolina

24

25   My Commission expires September 8, 2027


MAGNOLIA REPORTING, LLC   (843) 303-9141
www.MagnoliaReporting.com

# EXHIBIT 3

---

## Myles Glick Architect LLC

66 Rebellion Road, Charleston, SC 29407

mylesglickarchitectllc@live.com

---

October 25, 2021

Myles Glick Architect, LLC
66 Rebellion Road
Charleston, South Carolina 29407

Richard S. Dukes Jr. Attorney
Turner Padget
P.O. Box 221291
Charleston, SC29413
rdukes@turnerpadget.com

Re: Report of Findings-Bishop England High School Coaches' Office Windows
    Bishop England High School
    Daniel Island, South Carolina

Dear Mr. Dukes,

I appreciate the opportunity to present this report to you regarding the analysis of the design and installation of a window in the coaches' offices in the boys and girls locker rooms (Rooms # C 121, C 144 and C149). My scope of work was to conduct an investigation to determine if the design and installation of a window in the coaches' offices violated any standard of care. The methodology was to collect data, research the issues, visit the site and draw conclusions.

### A.  Methodology / Basis of Opinion

The investigation included the review of the architect's building program (BE 003117) (page 67), plans and specifications. A site visit (10/15/2021) was also conducted at Bishop England High School. In addition, the investigation included a review information gathered regarding other high schools in the Charleston County School District, the Berkeley County School District and the Dorchester II School District.

Research was also conducted nationwide to determine if view windows in coaches' offices were a standard of care. A review of the School Design Standards for the Albuquerque Public Schools indicates on page 115, "Provide a private office with windows to view traffic in and out of the locker room area.  In addition, the Guidelines for School Facilities in Virginia's Public Schools indicates on page 19, "Staff offices should be provided with the following. A view window from the male office to the male

**JA1374**

dressing room and a view window from the female office to the female dressing area. The design of the room should be configured to restrict line of sight when office door is open."

Industry design standards were also reviewed. The school design guidelines stated in GearBoss in the Wenger High School Planning Guide indicates the following regarding school security. On page 8, "Staff offices: Locations should be situated around the facility in areas of high visibility to enforce security and oversight". On page 12, "windowed doors and windowed walls greatly increase ability to monitor spaces and movement within the facility" and on page 13, Athletic offices serve many functions beyond providing a place for administrative work and meetings. They should be placed in proximity to student areas to allow coaches to connect to their teams."

In addition, the following expert reports and deposition was reviewed.

Amanda B. Salas, MD
Consulting Forensic Psychiatrist
32 Newpoint Road
Beaufort, SC 29907

Kendrick E. Richardson, M.S., P.E.
Engineering Expert, Inc.
3 Gamecock Avenue, Suite 301
Charleston, SC 29407

Deposition of Roger M. Attanasio
30 (b) (6) LS3P
Deposition taken August 20, 2021

Deposition of Eric Aichele
Deposition taken October 13, 2021

## B. Introduction

Bishop England High School was built in approximately 1997/1998 on Daniel Island, South Carolina. The architect's plans dated October 26,1996 by LS3P Architects of Charleston, SC shows a window in one wall of the coaches' offices facing into the locker room (sheet A-103) (Rooms # C 121, C 144 and C149).

There was a 4' x 4' (approximately) window in the three coaches' offices looking into the locker room.  The purpose of the view windows is for general supervision of the locker rooms. They were removed at the time of my site visit on October 15, 2021. The openings have concrete block filling in the location of the previous view window. The views are into an area where lockers are located and not into any shower areas or wet areas. The shower areas contain an area for showering, undressing and dressing per the

**JA1375**

architectural plans. These areas are surrounded by privacy curtains and are approximately 18 and 28 feet from the coaches' view windows. The shower areas are not in the direct line of sight. The entrance door into the coaches' offices have key locks and a view window with a blind located in the upper third of the door. The windows are eighteen inches square. The purpose of the door view windows is for security in order to allow views into the coaches' offices.

## C.  Findings

A review of High Schools in three School Districts in the Low Country indicates the following.

| School District / School | View Window in Office |
|---|---|
| **Charleston County School District** | |
| West Ashley High School | Yes |
| Burke High School Wando High School | Yes |
| Stall High School | Yes |
| North Charleston High School | Yes |
| D-4 Stadium | Yes |
| | |
| **Berkeley County School District** | |
| Cane Bay High School | Yes |
| Goose Creek High School | Yes |
| Stratford High School | Yes |
| Stratford High School | Yes |
| Timberland High School | Yes |
| Hanahan High School | Yes |
| Berkeley High School | Yes |
| | |
| **Dorchester School District II** | |
| Summerville High School | Yes |
| Ashley Ridge High School | Yes |
| Dubose Middle School | Yes |
| Oakbrook Middle School | Yes |
| River Oaks Middle School | Yes |

## D.  Discussion

Parents and students have a reasonable expectation that schools are safe. The method of security in a high school locker room is the placement of a window in a coaches' or PE teacher's offices looking into the respective locker rooms. Typically, some types of

**JA1376**

blinds are in the window to provide privacy for the coach or PE teacher when talking to other students and for the general supervision of the locker room. Blinds can be opened for eyes on the potential events without having the need for the view windows to be always unobstructed. The view window is installed and placed in the office wall to address security concerns that include theft, bullying, fights, harassment, drugs and possibly fire arms.

The layout of the shower area and the location of the shower area allows privacy for the individual. The location of the showers at Bishop England School cannot be seen from the view windows.

There are two levels of security. The view window provides general supervision. Based on activities/disturbances, specific supervision can take place which is a hands-on approach by the supervisor entering the locker room and dealing with the situation observed.

## E. Conclusions

Surveillance of the locker room and the installation of security windows in the coaches or PE teacher's offices (Rooms # C 121, C 144 and C149), are "standard of care" for architects and school districts. As architects, student safety and security are a priority. View windows provide the necessary security/supervision for locker rooms in high schools in the Low Country and across the United States. The design and installation of the view windows at Bishop England High School, as shown on the architect's plans dated October 26, 1996, meets the standard of care within a high degree of architectural certainty.

This report is based on information known at the time of this report and if new information is discovered or provided, this report of findings may be revised. Because the observations are limited, there is no claim either stated or implied that all conditions were reviewed or observed. If you have any questions on any items included in this report, please do not hesitate to call.

Sincerely,

*Myles Glick*

Myles Glick, AIA LEED AP

Attachment: Photographs from Site Visit 10/15/2021

     Myles Glick Resume
     Myles Glick Rate Sheet 2021
     GearBoss in the Wenger High School Planning Guide
     School Design Standards for the Albuquerque Public Schools
     Guidelines for School Facilities in Virginia's Public Schools

EXHIBIT 4



# **Bishop England High School**

10.20.21

—

William L. Runyon III
Runyon Educational Consulting
2062 Syreford Court
Charleston, South Carolina 29414

## Overview

This report contains my professional background information, experiences over thirty years in educational settings as a teacher, coach and school administrator and professional recommendations based upon research and experiences relating to student safety involving specifically school locker rooms.

## Goals

1. To establish professional knowledge, training, experience and credibility in order to support my findings.
2. To evaluate the reasonable design of the Bishop England High School Locker Room Facility.

## Professional Experience

I began my professional career as an educator and coach in 1988 while an undergraduate student at The College of Charleston majoring in Physical Education and Health with a concentration in Teacher Certification.  During the course of my undergraduate years (1988 - 1992) I served professionally as follows:

- Student Director of Intramurals (The College of Charleston) - Responsibilities included departmental staffing, program scheduling, facility coordination, facility renovation in the F. Mitchell Johnson Center's indoor courts, weightroom, locker rooms and outdoor facilities used in coordination with Charleston County Parks and Recreation and The City of Charleston's Parks & Recreation.
- Summer Camp Counselor (The College of Charleston, The Citadel, Bishop England High School) - Responsibilities included instruction, supervision and operations of basketball day camps and overnight stay camps.
- Assistant Basketball Coach (Bishop England High School) - Responsibilities included student-athlete supervision, player development, scouting and coaching in practices and games for the Junior Varsity and Varsity.

Upon graduation from The College of Charleston with South Carolina Teacher Licensure (#168545) in Physical Education and Health, later adding Emergency Certification in Math Grades 9-12 (1998), I served as a Physical Education Teacher, Math Teacher, Basketball Coach, Football Coach, Soccer Coach and Track and Field Coach at the following South Carolina Public High Schools:

- R.B. Stall High School (1992 - 93, 1998 - 2002) - Responsibilities included Junior Varsity Boys Basketball Head Coach (1992-93). Varsity Basketball Head Coach (1998 - 2002), Varsity Track and Field Coach (1998 - 2002), Physical Education Teacher, Health Teacher, Math Teacher and Science Teacher. These duties required me to safely supervise students and student-athletes in instructional settings (classrooms, indoor / outdoor facilities, locker rooms) and competitive settings while delivering South Carolina approved curriculum and coaching student-athletes in conjunction with the regulations of The South Carolina High School League and its governing National Federation in the school's facilities, as well as school facilities for Away Games and events.
- Cross High School (1993 - 1994) - Responsibilities included Head Varsity Boys Basketball Coach, Assistant Varsity Football Coach and Physical Education and Health Teacher. These duties required me to safely supervise students and student-athletes in instructional settings (classrooms, indoor / outdoor facilities, locker rooms) and competitive settings while delivering South Carolina approved curriculum and coaching student-athletes in conjunction with the regulations of The South Carolina High School League and its governing National Federation, as well as school facilities for Away Games and events.
- Garrett Academy of Technology (1994 - 1998) - Responsibilities included Head Varsity Boys Basketball Coach, Assistant Varsity Football Coach and Physical Education and Health Teacher. These duties required me to safely supervise students and student-athletes in instructional settings (classrooms, indoor / outdoor facilities, locker rooms) and competitive settings while delivering South Carolina approved curriculum and coaching student-athletes in conjunction with the regulations of The South Carolina High School League and its governing National Federation, as well as school facilities for Away Games and events.

During the course of my tenure as a high school teacher and coach (1988 - 2002) I had the privilege to supervise student-athletes before, during and following competition in the competitive and locker room areas of the following schools:

- Academic Magnet High School
- North Charleston High School
- Garrett High School / Garrett Academy of Technology
- R.B. Stall High School
- Wando High School
- Lincoln High School
- Middleton High School
- St. Andrew's High School
- West Ashley High School
- Baptist Hill High School
- St. John's High School

- James Island High School
- Burke High School
- Ft. Dorchester High School
- Summerville High School
- Cross High School
- Stratford High School
- Goose Creek High School
- Hanahan High School
- Cainhoy High School
- Berkeley High School
- St. Stephen's High School
- Macedonia High School
- Timberland High School
- St. George High School
- Harleyville - Ridgeville High School
- Beaufort High School
- Hilton Head High School
- Battery Creek High School
- Allendale - Fairfax High School
- Wade Hampton High School
- Colleton County High School
- Bishop England High School (former)
- Bishop England High School (current)
- Pinewood Prep High School
- First Baptist High School
- Porter Gaud High School
- Evangel Christian High School
- Northwood Academy
- Holly Hill - Roberts High School
- Swansea High School
- Denmark - Olar High School
- Branchville High School
- East Clarendon High School
- Scott's Branch High School
- Loris High School
- Camden High School
- Manning High School
- Newberry High School
- Socastee High School
- Mullins High School
- Georgetown High School

- Choppee High School
- Andrews High School
- Kingstree High School
- Waccamaw High School
- Myrtle Beach High School
- North Myrtle Beach High School
- Aynor High School
- Cardinal Newman High School
- Irmo High School
- Lexington High School
- Orangeburg - Wilkinson High School

## Administrative Experience

In 2002, while a Graduate Student in the School of Administrative Leadership at Charleston Southern University, I began my transition to Secondary School Administration. This portion of my career spanned eighteen years as follows:

- Wando High School (2002 - 2003) - Responsibilities as an Administrative Assistant at Wando High School included teaching Math, Personal Health, SAT Prep, BSAP Prep and providing administrative support relative to Student Attendance, Level 1 and 2 Discipline and facility renovation and initial construction.
- Colleton County High School (2003 - 2009) - Responsibilities as Assistant and Associate Principal included annual hiring, oversight and evaluation of 150 employees, 1,500 students and student-athletes, facility use, student discipline, student safety, budget, facility renovation and initial construction. As well, I supported all curriculum and academic initiatives inclusive of Regular Education, Career and Technical Education and Exceptional Education.
- Thunderbolt Career and Technology Center (2009 - 2010) - Responsibilities as Director included annual hiring, oversight and evaluation of 30 employees, 750 students and student-athletes, facility use, student discipline, student safety, budget, facility renovation and initial construction. As well, I supported all curriculum and academic initiatives inclusive of Regular Education, Career and Technical Education and Exceptional Education.
- St. John's High School (2010 - 2014) - Responsibilities as Principal included annual hiring, oversight and evaluation of 40 employees, 300 students and student-athletes, facility use, student discipline, student safety, budget, facility renovation and initial construction. As well, I supported all curriculum and academic initiatives inclusive of Regular Education, Career and Technical Education and Exceptional Education.
- West Ashley High School (2014 - 2019) - Responsibilities as Principal included annual hiring, oversight and evaluation of 30 employees, 750 students and

student-athletes, facility use, student discipline, student safety, budget, facility renovation and initial construction.  As well, I supported all curriculum and academic initiatives inclusive of Regular Education, Career and Technical Education and Exceptional Education.
- The Cooper River Center for Advanced Studies (2019 - 2020) - Responsibilities as Director included initial construction, budget oversight, student recruitment and staffing for the school that opened in Fall, 2020..  As well, I supported all curriculum and academic initiatives inclusive of Regular Education, Career and Technical Education and Exceptional Education.

During the course of my Administrative Tenure in Secondary Education Leadership, I additionally had the opportunity to study school innovation, curriculum planning, school safety and implementation of best practices as follows:

- SCASA Summer Leadership (2003 - 2016)
- Harvard Institute of Educational Leadership (2012 - 2014)
- High Schools That Works National Conference (2012 - 2016)

During the course of my Administrative Tenure in Secondary Education Leadership, I additionally had the opportunity to evaluate schools and conduct site visits as follows:

- Swansea High School
- Nations Ford High School
- Dorchester Career School
- Cane Bay High School
- Ashley Ridge High School
- Blythewood High School
- Laurinburg Institute of Technology
- York Comprehensive High School
- Pickens County Career Center
- Dutch Fork High School
- Lexington Technology Center
- Anderson Career Center
- Lexington Two Innovation Center
- Lexington Five Center for Advanced Technical Studies
- Horry County Early College High School
- Horry County Academy for the Arts, Science & Technology
- Trident Technical College
- The College of Charleston
- The Citadel
- Charleston Southern University
- Clemson University
- The University of South Carolina

- The University of Alabama
- The University of North Carolina - Chapel Hill
- Metropolitan Nashville Public Schools of Innovation

During the course of my Administrative Tenure in Secondary Education Leadership, I additionally had the opportunity to study school innovation, curriculum planning, school safety and implementation of best practices as it relates to initial construction and renovation of facilities as follows:

- Construction Design and Planning of Wando High School (2001 - 2003)
- Construction Design and Planning of Colleton County High School (2007 - 2010)
- Construction Design and Planning of St. John's High School Weight room (2012)
- Renovation Design and Planning of West Ashley High School (2016 - 2019)
- Construction Design and Planning of The Cooper River Center for Advanced Studies (2017 - 2020)
- Construction Design and Planning of The West Ashley Center for Advanced Studies (2017 - 2020)

**Experience Summary**

During the course of my professional career (1988 - 2020), I held the responsibilities as outlined above to safely conduct teaching, coaching and administrative duties in accessible locker room facilities for an estimated 52,000 students ranging in age from 7-21 and countless numbers of adults. I conducted my work in coaching in the locker room facilities of at least 62 high schools and 6 colleges and universities. Finally, I participated as the lead educational expert on the initial construction or renovation of locker room facilities that presently exist in operation on the campuses of 6 different South Carolina High Schools and Career Centers after studying the best construction and safe operational implementation practices found in place at 24 currently operational school facilities and taught by leading educational experts from Harvard, Charleston Southern University, The College of Charleston and offered in conference by Southern Regional Education Board (SREB) and The South Carolina Secondary Schools Association (SCASA) and The South Carolina High School League (SCHSL).

**Professional Trainings**

Southern Regional Education Board (SREB)

South Carolina Association of Secondary Administrators (SCASA)

National Federation of High School Athletics (NFHS)

South Carolina High School League (SCHSL)

## Lockerroom Facilities

### I.   Student Supervision

An important responsibility of all educators and coaches is the direct supervision of the students placed in the care of the school that employs them as professionals.  It is incumbent upon the school to provide the educator with the necessary tools and time to complete both administrative and instructional tasks related to their responsibilities.  Specifically as relates to this case, the school must provide the educators working in Physical Education and Athletics with office spaces in proximity to their student gathering areas in order to allow the educators to maintain either a direct line of sight or hearing for supervision of students in locker rooms, classrooms, gymnasiums and outdoor areas. Although not oversighted by The South Carolina Office of School Facilities, the Diocese of Charleston has consistently constructed and maintained facilities in alignment with this office's annual recommendations.

Consistently throughout numerous facilities I have referenced above, locker rooms have been put in place as required by State Educational Regulations and in accord with State and Federal Law in order to provide students an area to change in to proper clothing for participation in Physical Education and Athletic Events, secure storage areas for their belongings, meeting areas for instruction and restroom and showering facilities for health and hygiene.  The Educators working in these areas should ensure that direct supervision by the responsible adult is provided.  These procedures related to locker room office spaces can often include, but are not limited to:

- Time limits for locker room use.
- Instructor location while students are present in the area (ex. In an office with doors open or blinds that can be opened to permit direct view of the locker room).
- Door locking procedures.

The school often emphasizes to staff to consistently supervise students in all areas to ensure safety and prevent prohibited acts and activities.  These procedures related to locker room office spaces can often include, but are not limited to Requirements related to unobstructed windows in internal offices that afford views into locker room spaces

**JA1386**

The school establishes a Student Code of Conduct in accordance with State and Federal Laws inclusive of defined violations and progressive discipline and annually reviews this with students.  Staff are expected to establish class rules and procedures in conjunction with the Student Code of Conduct and to report students to administration for violations.  Common violations frequently documented in school locker room areas that supervising staff often report due to their direct supervision include, but are not limited to:

- Harassment
- Bullying
- Horse Play
- Fighting
- Physical Assault
- Larceny
- Sexual Acts (Consentual)
- Sexual Acts (Non-Consentual)
- Drug Possession
- Drug Distribution
- Possession of Weapons (Guns, Knives, etc.)

The schools typically require staff to annually complete training involving student supervision and harassment as a part of their compliance.  These trainings provide all employees a clear understanding that office spaces should be inclusive of two way windows to allow others to see and hear. Any conduct violations committed by staff in violation of this training are serious and often viewed as grounds for employee discipline, termination and legal sanction.

During my thirty years of service as a Physical Education Teacher, Coach and Administrator, I have experienced multiple safety violations by students and non-students in gymnasium and locker room areas.  For example:

- In 1992 while teaching at R.B. Stall High School, I was on duty in the Boy's Locker Room Area while PE students prepared for class.  Two boys got into a serious fight.  Because I was in close proximity, injuries were minor.
- In 1994 while coaching at Cross High School, non-students came on campus after school, entered the gymnasium and attacked several basketball players. One non-student brandished a pistol and fired it several times across the gymnasium.  As my office was internal to the locker room and included a window, I was able to gather players in the locker room, lock the door from the inside and call authorities while maintaining supervision of all players in my charge.
- In 1997 while teaching at Garrett Academy, a male student dropped a large knife from his pants while changing after class while I was on duty in the

Locker Room Area.  Because I was in proximity, I saw this occur and safely secured the weapon and it's possessor.

- In 2000 while teaching at R.B. Stall High School, I was on duty in the Boy's Locker Room Area and witnessed a student run out of the Boy's Locker Room, dropping a loaded pistol as he ran from his waistband.  I was able to safely secure the weapon and identify the student.

These events were consistent with actions of students and staff while under my administrative supervision as a principal in Colleton and Charleston County School Districts. Thus, I am extremely experienced with the aforementioned supervision violations that occur on campuses and the paramount importance for proper adult supervision in locker room areas.

## II.    Student Safety

Locker rooms typically are viewed as safe areas for students and staff within school safety planning due to the following:

- Single points of entrance that can be secured.
- No external windows.
- Load bearing walls.
- Internal water supply and bathroom facilities.
- Internal office spaces inclusive of phones, computers and internet.

During instances of hazardous weather or security breaches involving lockdowns, students and staff are to use these areas to shelter in place until it is safe to return to outer areas. Given that sheltering in place can last for extended periods of time, it is critical that office areas have doors and windows internal to the locker room so that staff and students can mutually see and hear each other.

## III.    Student Instruction

Locker room areas are often instructional gathering points for teams prior to, during and after athletic events.  Typically, educators use these areas to provide student-athletes instruction though lessons taught verbally and visually using technology and wipe boards.  Training staff often conduct injury assessments, and administer assistance in these areas to student-athletes.  Given space, internal offices provide points of access for phone communication, technology connection and first aid treatment areas while maintaining sight lines for supervision during instructional times and while students are changing clothes. Like traditional academic classrooms, educators should never leave students unsupervised by an adult while under the care of the school.

**JA1388**

## Conclusion

In the era of the 1990s, school construction and renovation became laser focused on student safety and supervision due to horrific On-Campus tragedies such as Columbine High School in Colorado. Educators and architects were charged by stakeholders to make certain facilities afforded safe zones, while also allowing for supervision of all students at all times while on campus. When the facility here in question was constructed (1998), it is evident the stakeholders were consistent with these expectations due to the design employed, found in similar South Carolina Schools built in this era by other Design Teams separate and apart from The Diocese of Charleston and LS3P.

I have had numerous opportunities since 1998 to enter the Bishop England Locker Room areas as a coach. After careful review of the floor plan, statements provided in deposition by representatives of LS3P, the Constitution of The SCHSL, the "Guidelines for School Construction" published by The South Carolina Office of School Facilities and best professional practices for safety and supervision of high school locker rooms recommended by The National Federation of High Schools and the National Education Association, I have rendered the following conclusions germaine to the locker room facilities of Bishop England High School:

- The Design Team inclusive of architects, engineers, principal and athletic staff created a safe, secure locker room space for Physical Education Students and Student-Athletes to use for changing clothes, securing belongings and accessing restroom and shower facilities.
- The 2018- 2019 Faculty Handbook outlines specific Locker Room Operational procedures for Physical Educators and Coaches to employ in order to properly supervise students in this area and afford them privacy.
- The School, at additional construction expense specifically for student safety and supervision, invested in internal Administrative Office windows, with blinds, to allow staff the ability to hear and possibly view student behaviors in the locker room. These windows were built in plain sight of those who entered the locker room prior to facility use and blinds were maintained in a closed position to further respect students.
- The students in the changing area were not in plain sight from hallways through additional door windows given narrow dimensions, observation angles and changing locations.

It should be understood that locker rooms consistently include the following components:

- Temporary Lockers capable of safely securing belongings.
- Changing Benches in proximity to lockers.
- Toilet Facilities.
- Shower Facilities.

It has been my professional observation as an educator over the past thirty years, that **students use all four areas to change clothes**. Although Showers are often required in the construction of locker rooms, students **very rarely** use them for this purpose, but rather for changing areas that afford more privacy.  I have had student-athletes do so of their own choice in this very locker room.  I have also witnessed this strategy in use by my own students in Physical Education Classes. Further, I have witnessed the most modest students choose to change in locker room bathroom stalls that afforded them seclusion and privacy from anyone else. These student choices are common in most school populations with similar aged clientele.

According to the National Federation of High School  (NFHS), "As is reflected in the court cases and administrative agency complaints filed each year, unsupervised or inadequately supervised locker rooms have become 'ground zero' for a disproportionately high percentage of the physical injuries and other forms of harm suffered by student-athletes."  The NFHS asserts that, "No single strategy could be employed by athletic programs to more effectively improve safety than ensuring that locker rooms are always supervised in a manner so that an adult can instantly respond to any incident that occurs."

Given the information I have independently reviewed, it is my professional conclusion that the locker room areas of Bishop England High School as originally constructed inclusive of internal office spaces with internal windows were in accord with the operational requirements of schools, consistent with best practices for student safety and supervision and in common with numerous other facilities at fellow high schools constructed in South Carolina in the 1990s. The design afforded staff and students the opportunity to be mutually aware of their presence for supervision and safety.  It afforded the staff the ability to conduct administrative duties and class / team responsibilities while simultaneously supervising students. It provided students restroom facilities in which to conduct hygiene related activities in private stalls not visible from the Administrative Office.  The school clearly expresses in numerous ways, both written and in action, that student safety and supervision are paramount as evidenced in the Faculty Handbook and written communication for Physical Education Classes distributed by teachers to parents at the start of each academic semester.  It is my professional conclusion that Bishop

England High School's Locker Room Facility as originally constructed met all the required needs for student safety, supervision and educational purposes in accordance with the school's established mission.

EXHIBIT 5

==============================================================

# Deposition of:

# Male Student

==============================================================

**Gary Nestler, et al**
**v.**
**The Bishop of Charleston, a Corporation Sole, Bishop**
**England High School, et al**

**Case #: 2:21-cv-00613-RMG**

**October 4, 2021**

==============================================================



**Magnolia Reporting, LLC**
P.O. Box 61011
North Charleston, SC  29419
(843) 303-9141
www.MagnoliaReporting.com



**JA1392**

Male Student - 10/4/2021

```
Page 10
 1          A.  Yes, my classmates.
 2          Q.  How many people would have been in
 3  there?
 4          A.  Fifteen to twenty.
 5          Q.  Did you ever see anybody holding a
 6  cell phone in the locker room?
 7          A.  Yes.
 8          Q.  How often was that?
 9          A.  Scarce.
10          Q.  Why is that?
11          A.  Because B.E. did not allow cell
12  phones.
13          Q.  Did anybody ever take a picture in the
14  locker room?
15          A.  No.
16          Q.  Did you notice the windows that are in
17  the locker room?
18          A.  Yes.
19          Q.  Describe them for me, please.
20          A.  I can't tell you the size.  I don't
21  remember the dimensions by fact, but it was a
22  window that went from one office into the locker
23  room with blinds, like the blinds that are in
24  this office.
25          Q.  Uh-huh.  Did you ever see the blinds
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)          de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1393**

Male Student - 10/4/2021

Page 11

1   open?

2          A.  No.

3          Q.  Did you ever go in the coaches' office

4   on the other side?

5          A.  No.

6          Q.  Did you ever see anyone inside the

7   office looking into the locker room?

8          A.  At times.

9          Q.  And who did you see?

10         A.  But not often.  Kenny or Rooney (ph).

11  It was Rooney's office.

12         Q.  And that's Coach Cantey?

13         A.  Yes.

14         Q.  The football coach?

15         A.  Yes.

16         Q.  How did you see him, were the blinds

17  open?

18         A.  I could see the -- I could see that

19  the light was on in the office.  And when I would

20  leave the locker room, I would see someone was in

21  the office.

22         Q.  So you didn't see them looking into

23  the office from the locker room?

24         A.  No.

25         Q.  Did you ever see anybody else in one

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 12
1    of the two offices on the boys' side?
2          A.  No.
3          Q.  Did you ever go on the girls' side,
4    the other side of the gym?
5          A.  No.
6          Q.  When you saw either Coach Cantey or
7    Coach Rooney sitting in the coaches' office, were
8    you walking down the hall and looking in the
9    window that's in the door?
10          A.  The door would be open if I were to
11    have seen them.
12          Q.  Okay.  Did the door stay open when you
13    were in the office?
14          A.  Well, the door was majority --
15    majority of the time it was open when closed into
16    the office.
17          Q.  Okay.  Did you ever see anyone in the
18    office with the door closed?
19          A.  Very scarcely or scarcely.
20          Q.  And from the hallway, did you ever --
21    was there ever a time when you could look into
22    the locker room from the hall through the
23    coaches' doorway?
24          A.  I never did, so I wouldn't know.
25          Q.  Did you ever see anybody else in the

Electronically signed by Nicole White (301-070-154-1752)          de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1395**

Male Student - 10/4/2021

Page 13

1    coaches' offices other than Rooney and Cantey?

2           A.  Maybe after school some of the

3    football players or the basketball players, but

4    during P.E., no.

5           Q.  Did you ever observe somebody staring

6    through the window in the door to the coaches'

7    office?

8           A.  Can you repeat the question?

9           Q.  Sure.  Did you ever see somebody

10   staring into the coaches' office from the hallway

11   with you being in the locker room?

12          A.  No.

13          Q.  Did you ever complain to anybody about

14   the presence of the windows in the locker room?

15          A.  No.

16          Q.  And the windows were open and obvious,

17   would you agree with me?

18          A.  The windows, what do you mean by,

19   "open and obvious"?

20          Q.  You could see if they were there?

21          A.  Yeah.

22          Q.  And it was obvious that they were

23   windows?

24          A.  Yeah.

25          Q.  And it was obvious that the windows

Electronically signed by Nicole White (301-070-154-1752)

**JA1396**

de262aec-92dd-4ce0-a28d-13eabf9d3026

Male Student - 10/4/2021

Page 14

1    were opening into or from the coaches' office,

2    right?

3          A.  Yeah, into the locker room.

4          Q.  And it's not like these windows were a

5    two-way mirror where if you were looking at it

6    from the locker room, if it would reflect back at

7    you, but somebody on the other side could look

8    in?

9          A.  No.

10         Q.  And it wasn't concealed in any way,

11   was it?

12         A.  Concealed by which means?

13         Q.  It was hidden?

14         A.  No, it was not hidden, in plain sight.

15         Q.  Will you agree with me that given that

16   teenagers -- almost every teenager had a cell

17   phone at the -- when you were a student at B.E.

18   by that time?

19         A.  Yes.

20         Q.  And at any time they could have --

21   somebody else, some other student could have

22   taken a picture of people in the locker room?

23         A.  Possibility, yes.

24         Q.  When was the first time you expressed

25   concern that there were windows in the locker

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

```
                                               Page 15
 1    rooms?
 2          A.   When I heard about -- when I heard
 3    about the Jeff Scofield incident.
 4          Q.   What did you hear about it?
 5          A.   My mother sent me a text because --
 6    she sent me a text with the Live News, Live 5
 7    News of the article of Jeff Scofield recording or
 8    having footage of boys changing in the locker
 9    room.
10          Q.   Has anyone ever informed you that you
11    were photographed by any person, not just
12    Scofield, when you were changing clothes in the
13    locker room?
14          A.   No, no one has informed me.
15          Q.   What did you do when your mother told
16    you about Jeffrey Scofield's arrest?
17          A.   I mean, I texted her back, but I had
18    emotions going through my head.
19          Q.   What were those emotions?
20          A.   Frustration, anxiety, feeling upset
21    for the kids who were -- who were known that they
22    were photographed or videotaped.
23          Q.   Okay.  What about the people who
24    weren't photographed?
25          A.   I felt bad for them, as well.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 16

```
 1        Q.  Why?
 2        A.  Because they are living in a world of
 3   they don't know, which, in some cases, can be
 4   worse than knowing.
 5        Q.  But you also don't know whether
 6   anybody else ever took a photograph in the locker
 7   room, a student?
 8        A.  I do not.
 9        Q.  Does that give you anxiety?
10        A.  That a student --
11        Q.  Uh-huh.
12        A.  -- videotaped or take a photo?
13        Q.  Uh-huh.
14        A.  Yeah, it gives me anxiety.
15        Q.  Okay.  What are you afraid of?
16        A.  My videos -- photos of me or videos of
17   me being leaked of me, as well as students and my
18   fellow classmates, because as I can see, it was
19   something that was -- that happened when I was
20   there or after my fact.  I mean, graduating.
21        Q.  And do you know what happened to
22   Scofield's computer and phone and iPad?
23        A.  I do.  Well, I -- from what I heard
24   from the news, that's all I know.
25        Q.  Okay.  It's been taken by the attorney
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 20

```
 1          Q.  You don't think the staff should be
 2    able to monitor what the students are doing?
 3          A.  Not in the locker room, no.
 4          Q.  Even if they're fighting or bullying
 5    or smoking?
 6          A.  At that point, someone can step out
 7    and say and call for help, if needed.  There just
 8    shouldn't be a window there.
 9          Q.  Do you know whether there's a window
10    there or not now?
11          A.  There's not, from what I've been told.
12          Q.  How did you come to file this lawsuit?
13          A.  My mother spoke to the Richters or the
14    Richters spoke to my mom.  They asked to meet my
15    mom, and from there, they had a meeting, and then
16    my mother reached out to me and said that they
17    were looking -- that they would like to speak to
18    me, and then I spoke with them, and they informed
19    me, and from there, came.
20          Q.  I'm not asking you anything your
21    lawyers told you.
22          A.  Uh-huh.
23          Q.  So what did your mother talk to The
24    Richter Firm about?
25          A.  Just about the whole incident.  She
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

Page 21

1    didn't really inform me much, just if I was

2    willing to meet with the lawyers.

3        Q.  How did the Richters find your mother?

4        A.  Most likely, after her -- after she

5    was in the incident with Bishop England.

6        Q.  And that's when she got fired?

7        A.  Are you talking about the incident?

8        Q.  Yeah.

9        A.  That I'm referring to?

10        Q.  Yeah.

11        A.  Yes.

12        Q.  When she posted some -- reposted some

13    information favorable to abortion rights?

14        A.  Sure.

15        Q.  Okay.  Do you know what happened in

16    her case that she brought?

17        A.  Yes.

18        Q.  What happened?

19        A.  She shared something that had to deal

20    with rights of -- with regarding people taking

21    stances for human rights and she was fired

22    because it went against what the school taught or

23    what they said they taught.

24        Q.  And she brought a lawsuit over that,

25    right?

MAGNOLIA REPORTING, LLC   (843) 303-9141
www.MagnoliaReporting.com

Male Student - 10/4/2021

```
Page 32
 1        A.  No, that's not public knowledge, to my
 2   knowledge.
 3        Q.  So you're suing because of something
 4   that might have happened, but you don't know
 5   whether it did or not?
 6        A.  I think that's worse than knowing.
 7        Q.  What did you do to prepare for this
 8   deposition?
 9        A.  I met with my lawyers.
10        Q.  Do you know of any parents who were
11   aware of the windows in the locker room?
12        A.  No.
13        Q.  What about other students?
14        A.  The students that were there, that
15   were part of the school that change in front of
16   the -- that changed in P.E., I'm sure they know
17   about the windows being there.
18        Q.  Because they were obvious, right?
19        A.  Yeah.  Yes, sir.
20        Q.  You couldn't miss them?
21        A.  Huh-uh.  No, sir.
22        Q.  And at least you knew that the
23   coaches' offices were on the other side of that
24   window, right?
25        A.  As well as my fellow classmates.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                de262aec-92dd-4ce0-a28d-13eabf9d3026

**JA1402**

Male Student - 10/4/2021

```
                                                        Page 37
 1                    C E R T I F I C A T E

 2

 3      STATE OF SOUTH CAROLINA   )

 4      COUNTY OF BERKELEY        )

 5

 6            I, Nicole D. White, Certified Court

 7      Reporter and Notary Public, State of South

 8      Carolina at Large, certify that I was authorized

 9      to and did stenographically report the foregoing

10      deposition of Male Student; and that the

11      transcript is a true record of the testimony given

12      by the witness, and was sworn as such.

13            I further certify that I am not a

14      relative, employee, attorney or counsel of any of

15      the parties, nor am I a relative or employee of

16      any of the parties' attorney or counsel connected

17      with the action, nor am I financially interested

18      in the action.

19            WITNESS MY HAND AND OFFICIAL SEAL this

20      13th day of October 2021.

21

22      _____
        Nicole D. White
23      Notary Public in and for the
        State of South Carolina
24

25      My Commission expires September 8, 2027
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

EXHIBIT 6

===============================================================

# Deposition of:

# Female Student

===============================================================

**Gary Nestler, et al**
**v.**
**The Bishop of Charleston, a Corporation Sole, Bishop England High School, et al**

**Case #:  2:21-cv-00613-RMG**

**October 4, 2021**

===============================================================



**Magnolia Reporting, LLC**
P.O. Box 61011
North Charleston, SC  29419
(843) 303-9141
www.MagnoliaReporting.com



Female Student - 10/4/2021

Page 7

1        A.   Yes.

2        Q.   Did you play sports?

3        A.   Yes.

4        Q.   What sports did you play?

5        A.   Cheerleading, soccer, and tennis.

6        Q.   And when did you take P.E.?

7        A.   My sophomore year.

8        Q.   Did you ever encounter a man named

9    Jeffrey Scofield?

10       A.   Yes.

11       Q.   Tell me about that, please.

12       A.   He would come into the classrooms to

13   fix the computers or the smart boards and I also

14   saw him throughout the hallways and in the

15   office.

16       Q.   In the school's main office?

17       A.   Yes.

18       Q.   I'm gonna ask you now a series of

19   questions about the locker rooms at Bishop

20   England.  You changed clothes in the locker room?

21       A.   Yes.

22       Q.   How often did that happen?

23       A.   More times than I can count.

24       Q.   Was there ever a time when you were

25   alone in the locker room when you were changing

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 8

```
 1   clothes?
 2           A.  Yes.
 3           Q.  How often did you -- how often did
 4   that happen?
 5           A.  More times than I can count.
 6           Q.  How about how many times were you in
 7   the locker room changing clothes with other
 8   people present?
 9           A.  More times than I can count.
10           Q.  And these were presumably only
11   students and only females, right?
12           A.  Yes.
13           Q.  How many people -- when others were in
14   the locker room with you while you changed
15   clothes, how many people would there normally be?
16           A.  The amount that would be, I would say
17   20, over 20.
18           Q.  Was anybody standing next to you while
19   you changed clothes, using the next locker?
20           A.  Yes.
21           Q.  And how often?
22           A.  More times than I can count.
23           Q.  At the time -- when you were in the
24   locker room, did you have a cell phone in your --
25           A.  Yes.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

Female Student - 10/4/2021

Page 9

1          Q.  Did it -- did almost everybody else,
2    to your knowledge, have cell phones in their
3    backpack or in their book bag?
4          A.  Yes.
5          Q.  Did you see the window into the girls'
6    locker room at any time when you were in there?
7          A.  Yes.
8          Q.  It wasn't a two-way mirror or
9    something?  I mean, you saw it was there, right?
10         A.  Yes.
11         Q.  Could you see inside the coaches'
12    office on the other side of the window?
13         A.  I don't remember.
14         Q.  Were there blinds on the window?
15         A.  Yes.
16         Q.  Were they open or closed?
17         A.  Closed.
18         Q.  Did you ever see the blinds open?
19         A.  I don't remember.
20         Q.  Did you ever see anybody in the
21    coaches' office from the locker room?
22         A.  Yes.
23         Q.  When was that?
24         A.  I'm sorry, could you repeat the
25    question?

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 12

1    office while you were changing clothes since you
2    never saw anybody; is that right?
3            A.  Yes.
4            Q.  And you never observed anybody looking
5    through the window while you were changing
6    clothes, correct?
7            A.  No.
8            Q.  You did not see anybody?
9            A.  No.
10           Q.  Given that you were in the locker room
11   changing clothes with a bunch of other teenagers,
12   as we sit here today, are you concerned that
13   anybody else, any other students may have taken
14   pictures while you were changing clothes?
15           A.  It's a possibility.
16           Q.  I know, but are you concerned about
17   that?
18           A.  No.
19           Q.  Why not?
20           A.  They were all my age, teenage
21   adolescent girls at the time.
22           Q.  Are you worried that one of those
23   fellow students might post something on social
24   media about you?
25           A.  Yes.

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

```
Page 16
 1          A.  I'm not sure who specifically.
 2          Q.  And what did your friends tell you?
 3          A.  That a girl in the grade above me had
 4    found pictures taken on the iPad, the school iPad
 5    that Jeffrey Scofield had owned and he took
 6    pictures.
 7          Q.  Okay.  Do you know whether he took
 8    pictures of any girls?
 9          A.  I'm not sure.
10          Q.  Has anyone alerted you that somebody
11    had taken pictures of you?
12          A.  As of this moment, no.
13          Q.  Do you know what happened to the iPad
14    and to Scofield's phone and computer?
15          A.  No.
16          Q.  Would it give you any comfort to know
17    that the South Carolina Attorney General's Office
18    has sequestered all those devices?
19          A.  It doesn't comfort me.  He still took
20    them and he had them.
21          Q.  Right.  But he doesn't have them
22    anymore and he doesn't have access --
23          A.  He shouldn't have had them -- I'm
24    sorry.
25          Q.  And he doesn't have access to them
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

```
Page 20
 1          Q.  Would you agree with me that anybody
 2     who was not photographed while in the locker
 3     rooms, would not have any cause of action to
 4     bring, right?
 5                    MR. SOLOMON:  Object to the
 6          form.
 7     BY MR. DUKES:
 8          Q.  You can answer.
 9          A.  No.
10          Q.  Why?  Why do you think that?
11          A.  It could have been anyone.
12          Q.  Okay.  But it wasn't.
13                    MR. SOLOMON:  Object to the
14          form.
15                    THE DEPONENT:  It still could
16          have been.  Just because it wasn't, doesn't
17          mean it couldn't have been anyone that was
18          in those locker rooms.
19     BY MR. DUKES:
20          Q.  Right about that time, your mother got
21     terminated at Bishop England, didn't she?
22          A.  Yes.
23          Q.  Do you know what happened with that?
24          A.  No.
25          Q.  Do you know why she was terminated?
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

```
                                              Page 23
 1          A.   The Richter Firm.
 2          Q.   How did you find the Richter Firm?
 3          A.   The Richter Firm found me.
 4          Q.   Okay.  How did they find you?
 5          A.   They got in touch with my parents, who
 6    gave them my phone number and e-mail, and they
 7    got in touch with me asking if I would like to be
 8    a part of this case, and I agreed.
 9          Q.   And when did they get in touch with
10    you about that?
11          A.   About January of 2020.
12          Q.   Prior to January of 2020, had you had
13    any contact with the Richter Firm?
14          A.   No.
15          Q.   What about, have you had any
16    contact -- prior to filing this lawsuit, had you
17    had any contact with a lawyer named Dan
18    Slotchiver?
19          A.   No.
20          Q.   What about Mr. Solomon whose smiling
21    face is on the screen?
22          A.   No.
23          Q.   What about Brent Halversen?
24          A.   No.
25          Q.   Do you know who Mr. Slotchiver,
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Female Student - 10/4/2021

Page 35

1   and how saddening an event that was.

2          Q.  And what did Ms. Evans tell you?

3          A.  Just to stay calm and that I'm almost

4   done with the year and that -- and as much as I

5   know I wasn't in the pictures, as of now that I

6   know and -- yeah, just that.  I was almost done

7   with the year, so it was okay.

8          Q.  Okay.  And that's because you weren't

9   in any of the pictures?

10         A.  Not that I know of.

11         Q.  And nobody's provided you with

12  information saying you were photographed by

13  someone, right?

14         A.  No.

15         Q.  Nobody's told you that?

16         A.  No.

17         Q.  And throughout -- from 2016

18  through 2019, you were aware that those windows

19  were in the locker rooms, right?

20         A.  Yes.

21         Q.  They were obvious, I mean, you

22  couldn't miss them, correct?

23         A.  Yes.  Yes.

24         Q.  Did you ever refuse to change clothes

25  in the locker rooms because those windows were

Electronically signed by Nicole White (301-070-154-1752)                    6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1412

Female Student - 10/4/2021

```
                                                     Page 51
 1                  C E R T I F I C A T E

 2

 3   STATE OF SOUTH CAROLINA   )

 4   COUNTY OF BERKELEY        )

 5

 6           I, Nicole D. White, Certified Court

 7   Reporter and Notary Public, State of South

 8   Carolina at Large, certify that I was authorized

 9   to and did stenographically report the foregoing

10   deposition of Female Student; and that the

11   transcript is a true record of the testimony given

12   by the witness, and was sworn as such.

13           I further certify that I am not a

14   relative, employee, attorney or counsel of any of

15   the parties, nor am I a relative or employee of

16   any of the parties' attorney or counsel connected

17   with the action, nor am I financially interested

18   in the action.

19           WITNESS MY HAND AND OFFICIAL SEAL this

20   13th day of October 2021.

21

22   _____

23   Nicole D. White
     Notary Public in and for the
     State of South Carolina
24

25   My Commission expires September 8, 2027
```

MAGNOLIA REPORTING, LLC   (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)        6d7e7641-dd4c-4f50-b9b1-94a80b01fa8d

JA1413

EXHIBIT 7

```
 1              UNITED STATES DISTRICT COURT
               DISTRICT OF SOUTH CAROLINA
 2                  CHARLESTON DIVISION

 3
    GARY NESTLER,                      : C/A NO.
 4  VIEWED STUDENT FEMALE 200,           2-21-cv-00613-RMG
    VIEWED STUDENT MALE 300,
 5  on behalf of themselves and
    all others similarly situated,    :
 6
                    Plaintiffs
 7
            vs.                        :
 8
    THE BISHOP OF CHARLESTON, a
 9  Corporation Sole, BISHOP ENGLAND  :
    HIGH SCHOOL, TORTFEASORS 1-10,
10  THE BISHOP OF CHARLESTON, in his
    official capacity, and
11  ROBERT GUGLIELMONE, individually, :

12                  Defendants
    _____
13
    DEPONENT:  ERIC AICHELE
14
    DATE:  OCTOBER 13, 2021
15
    TIME:  9:00 a.m.
16
    LOCATION:  THE RICHTER FIRM, LLC
17
               622 JOHNNIE DODDS BOULEVARD
18
               MT. PLEASANT, SC
19
    REPORTED BY:  CAROL T. LUCIC, RPR, RMR
20

21
     CLARK BOLEN COURT REPORTING & VIDEO CONFERENCING
22
                 CHARLESTON, SC  29405
23
                    843-762-6294
24
                WWW.CLARK-ASSOCIATES.COM
25
```

```
 1              MR. DUKES:  Object to the form.
 2      A.    The intended purpose was to supervise the
 3  locker rooms.
 4      Q.    That's not my question.  The question is
 5  what do you know about the guy sitting on this side
 6  looking in at the students nude?  You don't know
 7  what is in his mind, do you?
 8              MR. DUKES:  Object to the form.
 9              MR. STAIR:  Object to the form.
10      A.    I do not know.  I don't even know who
11  those individuals would have been.
12      Q.    We know this, who the persons are that
13  created the mechanism for persons to look at naked
14  children at Bishop England High School, and one of
15  those persons is you.
16              MR. STAIR:  Object to form.
17              MR. DUKES:  Object to form.
18      A.    We designed the windows for supervision
19  reasons.
20      Q.    What compelled that?  What was the need
21  for windows looking into locker rooms for
22  supervision reasons?
23              MR. STAIR:  Object to form.
24      A.    It's my understanding that locker rooms
25  are places that you need to supervise to make sure
```

Deposition of Eric Aichele                                                    39

1    that bullying doesn't take place, fights don't

2    break out, vandalism doesn't occur, things such as

3    that.  Schools generally do not like to have spaces

4    that students are in where they are not supervised

5    by an adult.

6        Q.    The bathrooms are in the same category,

7    aren't they?

8        A.    I would not say that bathrooms are

9    supervised.

10       Q.    Why not?

11       A.    Because there are codes in the plumbing

12   code and other general guidelines that say you

13   should not watch children at a toilet or a urinal.

14       Q.    Why not?

15       A.    Just for privacy reasons for the kids.

16       Q.    How does the bathroom where someone is

17   urinating differ from the locker room where

18   somebody is completely nude and may walk across to

19   the urinals and urinate and walk right back twice

20   passing the windows?

21           MR. DUKES:  Object to the form.

22           MR. STAIR:  Object to the form.

23       A.    I can't answer that question.  I do know

24   that plumbing codes say that you should not be able

25   from a public area to see someone at a urinal or a

Deposition of Eric Aichele                                              52

1      Q.    So why have the windows?

2      A.    Because there may be times when you do

3  want to monitor the locker room and you could open

4  the blinds.

5      Q.    After you leave fixing the light fixture

6  in the room and either looking through the open

7  window that Runey is looking through or not the

8  fire marshal from the City of Charleston comes down

9  as he has a right and an obligation to do, and he

10 walks through this office.  What precludes him from

11 looking at those naked children?

12           MR. DUKES:  Object to the form.

13           MR. STAIR:  Object to the form.

14     A.    The only thing that would preclude that

15 would be the blinds.

16     Q.    If they were closed?

17     A.    Correct.

18     Q.    Did you or didn't you say that would

19 defeat the viewing or monitoring I think was the

20 word you used ability that a plate glass window

21 would provide?

22     A.    When they're closed, you would not be able

23 to see into the locker room.

24     Q.    Let's assume that they're open for a

25 minute, and three boys who were bad boys come back

Deposition of Eric Aichele                                              68

1      Q.    What was his or her role?

2      A.    She was a special needs or special

3   education teacher.

4      Q.    In the public school system?

5      A.    Correct.

6      Q.    Here in Charleston County?

7      A.    No; North Augusta.  I'm not sure if that's

8   Aiken County or the county right next to Aiken.

9      Q.    When we started talking a little while

10  earlier about how many schools in Charleston County

11  you had done, I don't remember the number that you

12  said.  Do you recall?

13     A.    I believe that I responded that the firm

14  had probably done 20 or more.

15     Q.    So the firm believed it was a good idea to

16  view naked students.  Is that what you're saying?

17           MR. DUKES:  Object to the form.

18           MR. STAIR:  Object to the form.

19     A.    I don't know that the firm weighed in on

20  that decision, but I do know that the firm had

21  designed several locker rooms with view windows in

22  them.

23     Q.    One guy got detected viewing these

24  children -- actually making a recordation, a phone

25  record of these children in various states of

1    referenced which you can't find the current copy

2    of, have you looked at any other materials in

3    preparation for your testimony today?

4        A.    I'm trying to remember.  I looked at the

5    Charleston County School District's website where

6    they post plans of their schools to see if this was

7    a common practice to put windows into locker rooms.

8        Q.    Whose website?

9        A.    Charleston County School District.  I was

10   just curious to see if there were other schools

11   that had that.  Many of the ones you mentioned do.

12       Q.    Let me pursue that for a minute separate

13   from Bishop England High School.  We went through

14   the listing a while ago when you almost entirely

15   said it was not you all work's.  One case, West

16   Ashley, I think you said was you all's work.

17          I want to make sure we're clear on this.

18   I think I then asked you specifically about the

19   Bishop England thing and then maybe about the

20   public schools.  The people on both sides, LS3P

21   people on one side, the school people or Diocese

22   people on the other side, and you answered I think

23   to say, yeah, we get together and we look at this.

24   Here is a round of drawings which is a step better

25   than the first round or however you characterize

1  project -- I called out the names of schools, and

2  that was the only one I think you said was LS3P.

3      A.    I don't remember exactly all the ones you

4  called out, but West Ashley was on that list, yes.

5      Q.    I can call it back up if you want to go

6  over the list again, but I'm certain you said as to

7  all the others that was not you all; it was

8  somebody else.

9      A.    I remember you mentioned Stall, which was

10 not ours; Burke, which was not ours.

11     Q.    North Charleston High School.

12     A.    North Charleston was ours.

13     Q.    And West Ashley was yours?

14     A.    Yes.

15     Q.    Do you remember the years for those two?

16     A.    North Charleston, as I said, was finishing

17 construction when I joined the firm in '84, so I

18 would say sometime in the early '80s for North

19 Charleston.  West Ashley started design in 1996, I

20 believe.

21     Q.    You talked about going to a website and

22 looking around at the various schools from what I

23 understood you to be saying.

24     A.    That's correct.

25     Q.    Can you tell me if the schools that you

Deposition of Eric Aichele                                                    102

1    all did, North Charleston, Bishop England, West

2    Ashley, were those the first times -- and then I'm

3    going to ask you which one was the first time --

4    that you all drew in these viewing windows?

5              MR. STAIR:  Object to the form.

6              MR. DUKES:  Same objection.

7         A.    I'm pretty sure that we had done it twice

8    before that on other schools not in Charleston

9    County necessarily.

10        Q.    Where were those, do you know?

11        A.    Battery Creek High School in Beaufort

12   County and Stratford High School in Berkeley

13   County.

14        Q.    Do you happen to remember the dates of

15   those?

16        A.    Battery Creek would have been in the late

17   '80s and Stratford was before my time, but it was

18   probably in the late '70s or maybe early '80s.

19        Q.    Did you say as to Bishop England that the

20   blinds were spec'd or not?

21        A.    I don't believe you asked me that.  I did

22   check the specification.  The blinds were

23   specified.

24        Q.    By you all?

25        A.    They were in our contract documents.

Deposition of Eric Aichele                                                    115

1      A.     I do not know.

2      Q.     If there are such mirrors available and if

3  as you have testified earlier in part of your

4  testimony looking through the viewing window in

5  Runey's office you could see all the way down to

6  the shower -- do you recall that testimony?

7      A.     Right.

8      Q.     -- I wonder if there is any reflective

9  danger from a mirror in a dressing room whereby

10 someone who is viewing nude students could utilize

11 a reflective device like a mirror for the purpose

12 of viewing them.

13          MR. STAIR:  Object to the form.

14          MR. DUKES:  Object to the form.

15     A.     It would depend on where the mirrors are

16 located and the angles that you could see whether

17 it could be seen from what areas.  The lavatories

18 were in a separate area of the locker area, and I

19 don't recall if there were mirrors anywhere else in

20 that locker area, if there were even mirrors in the

21 locker area.

22     Q.     You said a moment ago you didn't know

23 whether they were even any in there.

24          Do you still think it's a good idea to put

25 these viewing windows such as we have been

Deposition of Eric Aichele                                    116

1  discussing here today in offices of athletic staff

2  or other school staff to view students who change,

3  disrobe, in front of those windows?

4           MR. STAIR:  Object to the form.

5           MR. DUKES:  Object to the form.

6      A.    All I can say is it seems to me to have

7  been a fairly common practice going back to the

8  1970s and even to current schools that have been

9  built.  I would have to discuss it with my client

10 to understand their motivation and explain to them

11 what we have discussed today.

12     Q.    In an ongoing way that's what you would

13 intend to do?

14     A.    Correct.

15     Q.    I understand.  Let me see if I can help

16 you in that analysis a little bit by asking you

17 this question:  Do you remember when you used to be

18 in a department store perhaps and you needed to

19 urinate and you walked over to the restroom area

20 and it said colored on one door and white on the

21 other?  That went on for a long time, didn't it?

22          MR. STAIR:  Object to the form.

23          MR. DUKES:  Object to the form.

24     A.    I don't remember seeing signs like that.

25     Q.    You may be too young to have seen those.

```
1    CERTIFICATE OF REPORTER
     STATE OF SOUTH CAROLINA
2    COUNTY OF CHARLESTON

3

4           I, Carol T. Lucic, Registered Professional
     Reporter and Notary Public for the State of South
5    Carolina at Large, do hereby certify that the
     witness in the foregoing deposition was by me duly
6    sworn to testify to the truth, the whole truth, and
     nothing but the truth in the within-entitled cause;
7    that said deposition was taken at the time and
     location therein stated; that the testimony of the
8    witness and all objections made at the time of the
     examination were recorded stenographically by me
9    and were thereafter transcribed by computer-aided
     transcription; that the foregoing is a full,
10   complete, and true record of the testimony of the
     witness and of all objections made at the time of
11   the examination; and that the witness was given an
     opportunity to read and correct said deposition and
12   to subscribe the same.

13

14          Should the signature of the witness not be
     affixed to the deposition, the witness shall not
     have availed himself/herself of the opportunity to
15   sign or the signature has been waived.

16

17          I further certify that I am neither
     related to nor counsel for any party to the cause
     pending or interested in the events thereof.
18

19          Witness my hand, I have hereunto affixed
     my official seal on October 15, 2021, at
20   Charleston, Charleston County, South Carolina.

21

                       Carol T. Lucic
22                     NCRA MERIT REPORTER
                       REGISTERED PROFESSIONAL REPORTER
23

24
     My Commission expires:  November 27, 2027.
25
```



EXHIBIT 8

==================================================================

# Deposition of:

# Gary Nestler

==================================================================

## Gary Nestler, et al
## v.
## The Bishiop of Charleston, a Corporation Sole, Bishop
## England High School, et al

## Case #:  2:21-cv-00613-RMG

## October 1, 2021

==================================================================



## Magnolia Reporting, LLC
P.O. Box 61011
North Charleston, SC  29419
(843) 303-9141
www.MagnoliaReporting.com



**JA1425**

Gary Nestler - 10/1/2021

```
                                                    Page 41
 1          A.  I'm not sure I can answer that
 2   question.
 3          Q.  Was your daughter's education at B.E.
 4   somehow objectionable or she didn't get a good
 5   education?
 6          A.  Could you re-ask the question?
 7          Q.  Yeah.  What is the problem with the
 8   education that Bishop England provided your
 9   daughter in the year and a half she attended?
10          A.  I don't think it's a problem with her
11   education.
12          Q.  Okay.  Why did she move to Oceanside?
13          A.  Because of the lack of a safe
14   environment being provided to her.
15          Q.  Explain that to me.
16          A.  She did not feel safe.
17          Q.  Why is that?
18          A.  You'd have to ask her directly.
19          Q.  Did you alert Bishop England, anyone
20   at Bishop England that your daughter felt unsafe?
21          A.  Yes, sir.
22          Q.  Who?
23          A.  Maryann Tucker, Patrick Finneran.
24          Q.  And what did you tell them was unsafe
25   about the school?
```

Electronically signed by Nicole White (301-070-154-1752)        26b6666c-261a-4ba4-b508-8389585e85f9

**JA1426**

Gary Nestler - 10/1/2021

Page 53

```
1              MR. DUKES:  Don't do speaking
2        objections anymore, Dan.
3              MR. SLOTCHIVER:  All right.
4        Object to the form.
5              MR. DUKES:  Object to the form.
6   BY MR. DUKES:
7        Q.  Well, how were the people in the class
8   you purport to represent injured?
9        A.  The same way that I feel that I was
10  injured.
11       Q.  That their kids weren't provided a
12  safe environment to go to school?
13       A.  That is correct.
14       Q.  Okay.  And your daughter was bullied
15  by other girls, by other teenage girls and have
16  issues with her volleyball coach, correct?
17       A.  That is a correct statement.
18       Q.  Okay.  So how were the basketball
19  players impacted by Jim McClellan?
20       A.  I can't say that they were impacted by
21  Jim McClellan.
22       Q.  And how were the parents who didn't
23  have kids on the volleyball team impacted by Jim
24  McClellan's actions?
25       A.  Again, it's not about Jim McClellan.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

```
                                                    Page 54
  1          Q.  Okay.  Well, you identified for me the
  2    safety issues that your daughter experienced and
  3    why she didn't feel safe at Bishop England High
  4    School and it was Jim McClellan, her volleyball
  5    coach, and the fact that she was bullied by other
  6    students.
  7                   MR. SLOTCHIVER:  Object to form.
  8                   THE DEPONENT:  That wasn't the
  9        only reasons.
 10    BY MR. DUKES:
 11          Q.  Okay.  Well, tell me all of them.
 12    What safety issues --
 13          A.  My daughter was also a student.  As
 14    you know, she was a student there.
 15          Q.  Right.
 16          A.  And part of her curriculum in playing
 17    volleyball is they had to go into the locker
 18    rooms and change.
 19          Q.  Right.
 20          A.  So because of what we now understand
 21    the case to be, is that there was a window or
 22    several windows that allowed for teachers or
 23    coaches or whomever to look through where my
 24    child was changing.
 25          Q.  Okay.
```

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 55

```
 1          A.   And that is not safe.
 2          Q.   Why not?
 3          A.   Because if my daughter is changing and
 4  she's getting into her clothes, she has to take
 5  off her uniform and change into her volleyball.
 6          Q.   You already testified that to your
 7  knowledge, your daughter was never
 8  surreptitiously or covertly photographed in the
 9  locker room, was she?
10          A.   Excuse me?
11          Q.   You've already testified that to your
12  knowledge, your daughter was never photographed
13  or videoed while she was changing clothes in the
14  locker room, correct?
15               MR. SLOTCHIVER:   Object to the
16      form.
17               THE DEPONENT:   Covertly
18      photographed?
19  BY MR. DUKES:
20          Q.   Yes.
21          A.   I -- how would I absolutely,
22  positively, unequivocally know that she's been
23  photographed?
24          Q.   You've never been told that she was
25  photographed?   Nobody's ever provided you with a
```

MAGNOLIA REPORTING, LLC   (843) 303-9141
www.MagnoliaReporting.com

Gary Nestler - 10/1/2021

Page 89

1                    C E R T I F I C A T E

2

3    STATE OF SOUTH CAROLINA    )

4    COUNTY OF BERKELEY         )

5

6           I, Nicole D. White, Certified Court

7    Reporter and Notary Public, State of South

8    Carolina at Large, certify that I was authorized

9    to and did stenographically report the foregoing

10   deposition of Gary Nestler; and that the

11   transcript is a true record of the testimony given

12   by the witness, and was sworn as such.

13           I further certify that I am not a

14   relative, employee, attorney or counsel of any of

15   the parties, nor am I a relative or employee of

16   any of the parties' attorney or counsel connected

17   with the action, nor am I financially interested

18   in the action.

19           WITNESS MY HAND AND OFFICIAL SEAL this

20   1st day of October 2021.

21

22                    _____
                      Nicole D. White
23                    Notary Public in and for the
                      State of South Carolina
24

25   My Commission expires September 8, 2027

MAGNOLIA REPORTING, LLC  (843) 303-9141
www.MagnoliaReporting.com

Electronically signed by Nicole White (301-070-154-1752)                    26b6666c-261a-4ba4-b508-8389585e85f9

**JA1430**

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
 2                  CHARLESTON DIVISION

 3
             DEPOSITION OF MARY ANNE TUCKER
 4
                     OCTOBER 5, 2021
 5

 6  GARY NESTLER, VIEWED STUDENT FEMALE 200, VIEWED
    STUDENT MALE 300, on behalf of themselves and all
 7  others similarly situated,

 8            Plaintiffs,

 9   vs.                    CASE NO. 2:21-cv-0613-RMG

10  THE BISHOP OF CHARLESTON, A CORPORATION SOLE;
    BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS 1-10; THE
11  BISHOP OF THE DIOCESE OF CHARLESTON, in his
    official capacity; and ROBERT GUGLIELMONE,
12  Individually,

13            Defendants.
    _____
14

15  TIME:           12:51 PM

16
    LOCATION:       THE RICHTER LAW FIRM
17                  MOUNT PLEASANT, SOUTH CAROLINA

18

19

20  REPORTED BY:    RONDA K. BLANTON, RPR
                    CLARK & ASSOCIATES, INC.
21                  CHARLESTON, SC 29422
                    843-762-6294
22                  WWW.CLARK-ASSOCIATES.COM

23

24

25
```

Deposition of Mary Anne Tucker                                    52

1    restroom, why is that different from seeing

2    people in the locker room?

3         A.  I don't know.

4         Q.  Do you think it's a safe environment for

5    children to have to change before a viewing

6    window?

7         A.  I think that having the viewing windows

8    there in case of a situation that was a fight,

9    something like that, that's where there's safety

10   in having those windows there.

11        Q.  Are you today -- is Bishop England, not

12   you -- but as Bishop England today protecting the

13   students and providing them a safe place to be?

14        A.  Yes.  We do everything that we can to

15   provide them a safe place to be.

16        Q.  And while the windows were in place, was

17   Bishop England providing the students a safe

18   place to be?

19        A.  Yes.

20        Q.  Then why did you change them?

21        A.  Because once we found out about the

22   Jeffrey Scofield issue, we determined that those

23   windows were not the -- were not necessary and

24   needed to be covered up.

25        Q.  Were not necessary?

1    CERTIFICATE OF REPORTER
     STATE OF SOUTH CAROLINA
2    COUNTY OF HORRY

3         I, Ronda K. Blanton, a Registered
     Professional Reporter and Notary Public for the
4    State of South Carolina at Large, do hereby
     certify that the witness in the foregoing
5    deposition was by me duly sworn to testify to the
     truth, the whole truth, and nothing but the truth
6    in the within-entitled cause; that said
     deposition was taken at the time and location
7    therein stated; that the testimony of the witness
     and all objections made at the time of the
8    examination were recorded stenographically by me
     and were thereafter transcribed by computer-aided
9    transcription; that the foregoing is a full,
     complete, and true record of the testimony of the
10   witness and of all objections made at the time of
     the examination; and that the witness was given
11   an opportunity to read and correct said
     deposition and to subscribe the same.
12        Should the signature of the witness not be
     affixed to the deposition, the witness shall not
13   have availed himself/herself of the opportunity
     to sign or the signature has been waived.
14        I further certify that I am neither related
     to nor counsel for any party to the cause pending
15   or interested in the events thereof.
          Witness my hand, I have hereunto affixed my
16   official seal on October 15, 2021, at Myrtle
     Beach, Horry County, South Carolina.

17

18

19

20                    Ronda K. Blanton
                      NCRA REGISTERED PROFESSIONAL
21                    REPORTER, RPR
                      Notary Public,
22                    State of South Carolina at Large
                      My Commission expires:
23                    May 15, 2028.

24

25

Deposition of Patrick Finneran                                    EXHIBIT 10          1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
 2                    CHARLESTON DIVISION

 3
                DEPOSITION OF PATRICK FINNERAN
 4
                      OCTOBER 5, 2021
 5

 6   GARY NESTLER, VIEWED STUDENT FEMALE 200, VIEWED
     STUDENT MALE 300, on behalf of themselves and all
 7   others similarly situated,

 8            Plaintiffs,

 9    vs.                   CASE NO. 2:21-cv-0613-RMG

10   THE BISHOP OF CHARLESTON, A CORPORATION SOLE;
     BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS 1-10; THE
11   BISHOP OF THE DIOCESE OF CHARLESTON, in his
     official capacity; and ROBERT GUGLIELMONE,
12   Individually,

13            Defendants.
     _____
14

15   TIME:          9:10 AM

16
     LOCATION:      THE RICHTER LAW FIRM
17                  MOUNT PLEASANT, SOUTH CAROLINA

18

19

20   REPORTED BY:   RONDA K. BLANTON, RPR
                    CLARK & ASSOCIATES, INC.
21                  CHARLESTON, SC 29422
                    843-762-6294
22                  WWW.CLARK-ASSOCIATES.COM

23

24

25
```

**Deposition of Patrick Finneran**                                          **63**

1  Morals.

2         Q.  And in a nurturing environment?

3         A.  Yes, sir.

4         Q.  Would you agree with me that if they are

5  viewed without knowing, they're being viewed in

6  the locker room, that that's not a safe

7  environment for them?

8              MR. DUKES:  Object to the form.

9         A.  I don't know if necessarily it's -- it's

10  the environment if one person does something.

11        Q.  I'm not talking one person.  If they can

12  be viewed by numerous people without knowing

13  they're being viewed, would you agree with me

14  that that's not a safe environment?

15             MR. DUKES:  Object to the form.

16        A.  I think our school is a very safe

17  environment, as you mentioned before, about only

18  so many instances in the locker room.  So I would

19  say it's a safe environment.

20        Q.  With the amount of reported -- that

21  wasn't my question though.

22             My question is:  If students in a locker

23  room in various states of dress and undress can

24  be viewed without knowing they're being viewed

25  and they're minors, would you agree with me

1        A.  Not that I recall.

2        Q.  Were there any letters or communications

3   or announcements provided to the parents or

4   students giving them notice that the students

5   could be monitored in the locker rooms?

6        A.  Not that I remember, no.

7        Q.  Anything preventing the school from

8   putting a warning or a notice or sending

9   communication to the parents saying, "Hey, one of

10  the things you need to know of is that if there's

11  an incident in the locker room that we hear or

12  that gives us some concern, we reserve the right

13  and we may enter the locker room or look through

14  a window in the locker room and see your

15  children; and they may or may not be dressed"?

16       A.  So your question is anything preventing

17  us from saying that?

18       Q.  In saying that or having done that.

19            MR. DUKES:  Object to the form.

20       A.  No.  There's nothing to prevent us from

21  informing the parents that there are windows.

22       Q.  Do you believe that the students are

23  safe now in the locker rooms?

24       A.  I mean, I -- they were safe before.  So

25  I don't know if that safety's changed.

```
1   CERTIFICATE OF REPORTER
    STATE OF SOUTH CAROLINA
2   COUNTY OF HORRY

3        I, Ronda K. Blanton, a Registered
    Professional Reporter and Notary Public for the
4   State of South Carolina at Large, do hereby
    certify that the witness in the foregoing
5   deposition was by me duly sworn to testify to the
    truth, the whole truth, and nothing but the truth
6   in the within-entitled cause; that said
    deposition was taken at the time and location
7   therein stated; that the testimony of the witness
    and all objections made at the time of the
8   examination were recorded stenographically by me
    and were thereafter transcribed by computer-aided
9   transcription; that the foregoing is a full,
    complete, and true record of the testimony of the
10  witness and of all objections made at the time of
    the examination; and that the witness was given
11  an opportunity to read and correct said
    deposition and to subscribe the same.
12       Should the signature of the witness not be
    affixed to the deposition, the witness shall not
13  have availed himself/herself of the opportunity
    to sign or the signature has been waived.
14       I further certify that I am neither related
    to nor counsel for any party to the cause pending
15  or interested in the events thereof.
         Witness my hand, I have hereunto affixed my
16  official seal on October 15, 2021, at Myrtle
    Beach, Horry County, South Carolina.
17

18

19

20             Ronda K. Blanton
               NCRA REGISTERED PROFESSIONAL
21             REPORTER, RPR
               Notary Public,
22             State of South Carolina at Large
               My Commission expires:
23             May 15, 2028.

24

25
```

Deposition of Roger M. Attanasio 30(b)(6) LS3P Architects Vol. II

EXHIBIT 11

79

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE STATE OF SOUTH CAROLINA
 2                    CHARLESTON DIVISION

 3
               DEPOSITION OF ROGER M. ATTANASIO
 4                 30(b)(6) LS3P ARCHITECTS
                          VOLUME 2
 5
                       AUGUST 20, 2021
 6

 7  GARY NESTLER, VIEWED STUDENT FEMALE 200, VIEWED
    STUDENT MALE 300, on behalf of themselves and all
 8  others similarly situated,

 9            Plaintiffs,

10   vs.                      CASE NO. 2:21-cv-0613-RMG

11  THE BISHOP OF CHARLESTON, A CORPORATION SOLE;
    BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS 1-10; THE
12  BISHOP OF THE DIOCESE OF CHARLESTON, in his
    official capacity; and ROBERT GUGLIELMONE,
13  Individually,

14            Defendants.
    _____
15

16  TIME:            9:44 AM

17
    LOCATION:        RICHTER LAW FIRM
18                   MOUNT PLEASANT, SOUTH CAROLINA

19

20  REPORTED BY:     RONDA K. BLANTON, RPR
                     CLARK & ASSOCIATES, INC.
21                   CHARLESTON, SC 29422
                     843-762-6294
22                   WWW.CLARK-ASSOCIATES.COM

23

24

25
```

1    Q.  Just so you can know where the case goes

2  and how it flows.

3              MR. STAIR:  Object to the form.

4    Q.  So your response as a 30(b)(6)

5  representative to the question whose idea was it

6  to put the window in -- windows plural in -- what

7  is your answer to that?

8    A.  I do not know.

9    Q.  And you've told us everything that

10  you've done to determine that; is that correct?

11    A.  Well, I have looked at how many other

12  schools have windows between locker rooms and

13  coach's offices because I've been doing this for

14  35 years; and I recall the majority of those

15  locations have a window for security reasons.

16    Q.  Majority of which locations?

17    A.  Locker rooms and coach's office adjacent

18  to those lockers rooms.

19    Q.  And you said for security purposes?

20    A.  Yes, sir.

21    Q.  And what is -- did those windows that

22  you're referring to -- you used the word

23  "majority."  Do those windows that you're

24  referring to have blinds on them?

25    A.  Sometimes, yes, sir.

Deposition of Roger M. Attanasio 30(b)(6) LS3P Architects Vol. II

136

1    which had a similar condition, yes, sir.

2         Q.   Had a similar viewing condition?

3         A.   Yes, sir.

4         Q.   What school is that?

5         A.   Fort Mill High School, I believe.

6         Q.   And when did you learn of those windows

7    in Fort Mill High School?

8         A.   Well, I can't say for sure because I

9    didn't go into Fort Mill; but, again, I've been

10   doing this for 35 years, and schools are designed

11   with the viewing window for security purposes.

12        Q.   Who told you that?

13        A.   It's just what we do.  I mean, I -- I've

14   been on construction administration facilities

15   from middle schools and high schools where that

16   is a component of the design.

17        Q.   It was here, wasn't it?

18        A.   It was.

19        Q.   And y'all made it up; and you put it in

20   the plans, didn't you?

21        A.   Yes, sir.

22        Q.   You thought it up; correct?  You, LS3P,

23   thought it up?

24             MR. STAIR:  Object to the form.

25        A.   I don't know if that particular item was

```
 1                    MR. DUKES:  Simply stating that I
 2   object to the form of the question.
 3                    MR. RICHTER:  Correct.
 4                    MR. DUKES:  Yeah.
 5        A.  You're going to have to repeat the
 6   question again.  I'm sorry.  I got distracted by
 7   your comment.
 8        Q.  Question that I asked was this:  "What
 9   are the blinds intended to impart to the
10   students?"
11                    MR. DUKES:  Object to the form.
12                    MR. STAIR:  Object to the form.
13        A.  Limiting view.
14        Q.  So what are the students, then, to
15   believe when they go into the dressing room as
16   they must do for the PE transition that you've
17   talked about earlier?  What are the students to
18   understand by the fact that the blinds appear
19   closed?
20                    MR. STAIR:  Object to the form.
21                    MR. DUKES:  Object to the form.
22        A.  Our intent for the window was to allow a
23   supervisor to attempt to break up an activity
24   that was not supposed to occur in the dressing
25   room between students.
```

Deposition of Roger M. Attanasio 30(b)(6) LS3P Architects Vol. II

153

1          I would think that the window would let
2     the students know that I shouldn't be doing
3     anything other than changing clothes, getting to
4     class, and come back and change my clothes, get
5     back in my street clothes, and go.  No horseplay.
6     The window was supposed to, maybe, give somebody
7     a -- an idea that I shouldn't -- shouldn't do
8     horseplay in this space.
9          Q.  We're talking about the blind right now.
10    I asked you what the blinds were designed to say
11    to the students or impart to the students.
12         A.  I don't -- I don't know if the -- I
13    don't know if there's an intent for what a
14    student should say about blinds.  I don't -- I
15    don't recall.  I don't know how to answer that
16    question.
17         Q.  Well, what are blinds for?
18         A.  Limiting view.  Protecting from sun.
19         Q.  Or obstructing view; correct?
20         A.  Could be.
21         Q.  You are not certain that blinds are
22    intended to obstruct view?
23         A.  They could be used for that, yes, sir.
24              MR. DUKES:  Object to the form.
25         Q.  I just asked if you are saying that you

1    please.

2    BY MR. RICHTER:

3        Q.   During this break did you discuss your

4    testimony with anyone?

5        A.   No.

6        Q.   Thank you.

7            I want to try to close -- start to say

8    close this blind discussion.  I didn't mean to

9    make a play on words.

10           I'd like to try to close some circles

11   with you, please.  We can tell better where we

12   are and what we need to do, make a reasonable

13   prediction.

14           Now, I'd like to clarify this, if we

15   can, if you can for us, please.  Why do -- you

16   said some schools have windows.  Some don't have

17   windows similar to the kind of thing that existed

18   at Bishop England.  I take it that's what you

19   mean.

20           Is that what you mean?

21       A.   I said all the schools that I've been

22   involved with have the window.

23       Q.   All the schools that you've been

24   involved with have windows.  Okay.  And do they

25   all have blinds?

1    of the dinner, or whatever we're invited for, we

2    bring with us our two children, both sophomores

3    in high school at Bishop England High School, and

4    their two friends who are all having a sleep-over

5    at our house, and those two are juniors at Bishop

6    England High School.

7            Now we got four children present.  Do

8    you agree with that?

9        A.  Yes, sir.

10       Q.  And all four of them go into the

11   bathroom at the same time.  Do you need a window

12   to see what they're doing in there?

13           MR. STAIR:  Object to the form.

14           MR. DUKES:  Object to the form.

15       A.  I don't believe so.

16       Q.  Then why do you need one at Bishop

17   England High School?

18           MR. STAIR:  Object to the form.

19           MR. DUKES:  Same objection.

20       A.  I don't have a window into the bathroom

21   at the Bishop England High School.

22       Q.  You have a window into an area where

23   someone's nude body may be exposed, don't you?

24           MR. DUKES:  Object to the form.

25       A.  I have a window that allows viewing of

1  activities that could be detrimental to the

2  students, and we're trying -- the window's there

3  for security to try and prevent those unwanted

4  activities.

5      Q.  And how many unwanted activities have

6  there been in the 21 years since Bishop England

7  opened its doors?

8              MR. DUKES:  Object to the form.

9              MR. STAIR:  Object to the form.

10     A.  According to you, none.

11     Q.  Whatever your source of information is,

12  you could have learned it from the Pope in Rome

13  as far as I'm concerned.  How many are there?

14             MR. DUKES:  Object to the form.

15             MR. STAIR:  Object to the form.

16     A.  I am not aware of any.  I have not

17  searched for any.  One could argue the window has

18  prevented it from occurring.

19     Q.  One could argue that there had been none

20  because Bishop England either hasn't made any

21  record of any because they haven't occurred or

22  because the records are so horrible as to what

23  does occur in that bathroom.

24             MR. DUKES:  Object to the form.

25     Q.  That dressing room that they don't want

```
 1    CERTIFICATE OF REPORTER
      STATE OF SOUTH CAROLINA
 2    COUNTY OF HORRY

 3         I, Ronda K. Blanton, a Registered
      Professional Reporter and Notary Public for the
 4    State of South Carolina at Large, do hereby
      certify that the witness in the foregoing
 5    deposition was by me duly sworn to testify to the
      truth, the whole truth, and nothing but the truth
 6    in the within-entitled cause; that said
      deposition was taken at the time and location
 7    therein stated; that the testimony of the witness
      and all objections made at the time of the
 8    examination were recorded stenographically by me
      and were thereafter transcribed by computer-aided
 9    transcription; that the foregoing is a full,
      complete, and true record of the testimony of the
10    witness and of all objections made at the time of
      the examination; and that the witness was given
11    an opportunity to read and correct said
      deposition and to subscribe the same.
12         Should the signature of the witness not be
      affixed to the deposition, the witness shall not
13    have availed himself/herself of the opportunity
      to sign or the signature has been waived.
14         I further certify that I am neither related
      to nor counsel for any party to the cause pending
15    or interested in the events thereof.
           Witness my hand, I have hereunto affixed my
16    official seal on August 30, 2021, at Myrtle
      Beach, Horry County, South Carolina.
17

18

19

20                   Ronda K. Blanton
                     NCRA REGISTERED PROFESSIONAL
21                   REPORTER, RPR
                     Notary Public,
22                   State of South Carolina at Large
                     My Commission expires:
23                   May 15, 2028.

24

25
```



## *Bigelow v. Syneos Health, LLC*

United States District Court for the Eastern District of North Carolina, Western Division

August 27, 2020, Decided; August 27, 2020, Filed

No. 5:20-CV-28-D

**Reporter**

2020 U.S. Dist. LEXIS 155791 *; 2020 WL 5078770

ANDREA BIGELOW, individually and on behalf of all others similarly situated, Plaintiff, v. SYNEOS HEALTH, LLC, Defendant.

### Core Terms

fail-safe, motion to dismiss, class action, promotion, retaliation, employees, quotation, certification, futile, employment action, alleges, merits, amend

**Counsel:** **[\*1]** For Andrea Bigelow, on her own behalf and on behalf of those similarly situated, Plaintiff: Alexander Thomas Harne, LEAD ATTORNEY, Richard Celler Legal, P.A., Davie, FL; Edward Hallett Maginnis, Maginnis Law, PLLC, Raleigh, NC; Noah E. Storch, Ricahrd Celler Legal, P.A., Davie, FL.

For Syneos Health, LLC, Defendant: Joshua Wallace Dixon, LEAD ATTORNEY, Gordon & Rees, Charleston, SC.

**Judges:** JAMES C. DEVER III, United States District Judge.

**Opinion by:** JAMES C. DEVER III

### Opinion

**ORDER**

On October 7, 2019, Andrea Bigelow ("plaintiff or "Bigelow") filed a class action complaint in the United States District Court for the Middle District of Florida against Syneos Health, LLC ("defendant" or "Syneos"), alleging both interference and retaliation in violation of the Family Medical Leave Act ("FMLA"), *29 U.S.C. § 2601* et seq., and its implementing regulations [D.E. 1]. On January 23, 2020, the Middle District of Florida transferred the action to this district [D.E. 17]. On February 7, 2020, Syneos filed a partial motion to dismiss and to strike the class claims and a supporting memorandum [D.E. 20,21]. On March 13, 2020, Bigelow moved for leave to file an amended complaint and filed a supporting memorandum [D.E. 24,25]. On March 26, 2020, **[\*2]** Syneos responded in opposition [D.E. 26]. As explained below, the court grants Syneos's partial motion to dismiss, dismisses Bigelow's FMLA interference claim, strikes Bigelow's class claims, and denies as futile Bigelow's motion to amend.

I.

Bigelow is a resident of St. Johns County, Florida. See Compl. [D.E. 1] ¶ 11. Bigelow telecommutes from her home in St. Johns County for her job as a Clinical Operations Lead at

Syneos. See id. at ¶¶ 10-11. Syneos is a "biopharmaceutical solutions organization" that employs 22,000 employees globally. W. at ¶¶ 8-9

Rich Dukes

Pg: 345 of 557    Filed: 10/07/2022    Doc: 19-3    USCA4 Appeal: 22-1750

2020 U.S. Dist. LEXIS 155791, *2

(quotation omitted). Bigelow has worked for Syneos since July 10, 2017, and reports to Syneos's headquarters in North Carolina. See id. at ¶¶ 10-11.

From April 1, 2019, through May 29, 2019, Bigelow used FMLA leave due to the birth of her child. See id. at 114. At the end of her FMLA leave, Bigelow "returned to work without consequence at that time, and commenced her job duties and responsibilities without issue." Id. at ¶ 15. In August 2019, Bigelow "discovered that [Syneos] promoted one of her male peers, who had not recently utilized FMLA, into a position of Senior Clinical Operations Lead." W. at ¶ 16. She believes that she was as qualified, if [*3] not more qualified, than this peer. See id. at ¶ 17. On August 30, 2019, Syneos management told Bigelow that, per company policy, employees are ineligible for promotions that occur during their FMLA leave. Id. at ¶ 19. According to Bigelow, Syneos management "corroborated that [Syneos] uniformly and negatively considered its employees' use of FMLA leave in making promotion decisions, pay decisions, and/or taking adverse employment actions against with regard to its employees." Id. at ¶ 20.

On September 9, 2019, Bigelow emailed Syneos management and asked management to describe other factors besides FMLA leave that led to her failure to receive a promotion. See id. at ¶24. On September 13, 2019, Bigelow and Syneos management met for a second time. See id. at ¶25. Syneos management confirmed Syneos's policy concerning FMLA leave and promotion. See id. at ¶ 26. Bigelow notified Syneos management "that it was illegal for management to use her FMLA against her as part of the promotion process." Id. at ¶27. On September 27, 2019, the Syneos's Human Resources Manager confirmed this policy. See id. at ¶ 28. On October 7, 2019, Bigelow filed suit. See id.

Bigelow makes two claims under the FMLA [*4] and asserts them as part of a proposed class action. First, Bigelow alleges FMLA interference because

Syneos negatively considered her FMLA leave in an employment decision. See id. at ¶¶ 43-48. Second, Bigelow alleges FMLA retaliation because Syneos considered her FMLA leave when it failed to promote her. See id. at ¶¶ 49-55. Bigelow seeks, inter alia, class certification, compensatory damages, liquidated damages, interest, reasonable attorneys' fees, and costs. See id. at 9.

## II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677-80, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554-63, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30, 132 S. Ct. 1327, 182 L. Ed. 2d 296 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013V abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678-79. Rather, a plaintiffs factual allegations must "nudge[ ] [her] claims," [*5] Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678-79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de

Rich Dukes

2020 U.S. Dist. LEXIS 155791, *5

*Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)*; see *Fed. R. Civ. P. 10(c)*; *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)*; *Thompson v. Greene*, 427 F.3d 263, 268 (4th Cir. 2005)*. A court may also consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity." *Goines, 822 F.3d at 166*. Additionally, a court may take judicial notice of public records without converting the motion to dismiss into a motion for summary judgment. *See, e.g., Fed. R. Evid. 201*; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*; *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)*.

"The FMLA provides covered employees with two types of rights and protections." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006)*. First, the FMLA contains prescriptive protections that "set substantive floors for conduct by employers, and creating entitlements for employees." *Id.* (alteration and quotation omitted). For example, under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" for, inter alia, "the birth of a son or daughter of the employee and in order to care for such son or daughter." *29 U.S.C. § 2612(a)(1)*. Second, the FMLA "contains proscriptive provisions that protect employees from discrimination or retaliation for exercising their substantive rights." *Yashenko, 446 F.3d at 546*. [*6] Within its proscriptive provisions, the FMLA distinguishes between interference claims and retaliation claims. *See id. at 546-51*. Interference claims stem from *section 2615(a)(1)*, which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *29 U.S.C. § 2615(a)(1)*; see *29 C.F.R. § 825.220(c)*. Retaliation claims, by contrast, originate from *section 2615(a)(2)*, which states that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual

for opposing any practice made unlawful by this subchapter." *29 U.S.C. § 2615(a)(2)*. Specifically, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." *29 C.F.R. § 825.220(c)*.

"To make out an 'interference' claim under the FMLA, an employee must thus demonstrate that (1) [s]he is entitled to an FMLA benefit; (2) [her] employer interfered with the provision of that benefit; and (3) that interference caused harm." *Adams v Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015)*; see *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81,89, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002)*; cf, e.g., *Corbett v. Richmond Metro. Transp. Auth*, 203 F. Supp. 3d 699, 709 (E.D. Va. 2016)* (delineating a five-part test). "When the eligible employee returns from leave, he or she must 'be restored by the employer to the position of employment held by the employee when the leave commenced,' [*7] or 'be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" *Anderson v. Sch. Bd. of Gloucester Cty., Virginia*, No. 3:18CV745, 2020 U.S. Dist. LEXIS 94645, 2020 WL 2832475, at *29 (E.D. Va. May 29, 2020)* (unpublished) (quoting *29 U.S.C. §§ 2614(a)(1)(A)* and *2614(a)(1)(B)*).

As for the first factor, the parties agree that Bigelow was entitled to FMLA leave. In fact, Bigelow received FMLA leave from April 1, 2019, through May 28, 2019, "returned to work without consequence at that time, and commenced her job duties and responsibilities without issue." Compl. at ¶¶ 14, 15. As for the second factor, Bigelow has not plausibly alleged that Syneos "interfered with the provision of that [FMLA leave] benefit." *Adams, 789 F.3d at 427*; *Corbett, 203 F. Supp. 3d at 709-10*. Syneos cannot interfere with Bigelow's FMLA leave if she has taken the FMLA leave that she was entitled to take. *See Anderson, 2020 U.S. Dist. LEXIS 94645, 2020 WL 2832475, at *29*; *Downs v. Winchester Med. Ctr.*, 21 F. Supp. 3d 615, 619 (W.D. Va. 2014)*; see also *Seeger v. Cincinnati Bell*

Rich Dukes

**JA1449**

2020 U.S. Dist. LEXIS 155791, *7

Filed: 10/07/2022    Pg: 348 of 557    Doc: 19-3    USCA4 Appeal: 22-1750

*Tel. Co., LLC, 681 F.3d 274, 283 (6th Cir. 2012)*; *Campbell v. Costco Wholesale Corp., No. 3:12-CV-00306, 2013 U.S. Dist. LEXIS 131316, 2013 WL 5164635, at \*5 (M.D. Tenn. Sept. 12, 2013)* (unpublished).

As for the third factor, Bigelow has not plausibly alleged that she suffered harm from Syneos's interference, even assuming such interference occurred. See Compl. at ¶¶ 8-34. Syneos restored Bigelow to the same position that she held when the leave commenced: Clinical [*8] Operations Lead. See *29 U.S.C. § 2614(a)(1)(A)*. Any harm that Bigelow suffered came after her leave, not before it Thus, the proper claim to remedy Bigelow's alleged harm concerning the promotion is not an FMLA interference claim, but an FMLA retaliation claim. See, e.g., *Conoshenti v. Pub. Serv. Elec.&GasCo., 364 F.3d 135, 146 n.9 (3d Cir. 2004)*, modified by *Erdman v. Nationwide Ins. Co., 582 F.3d 500 (3d Cir. 2009)*; *Dotson v. Pfizer, Inc., 558 F.3d 284,294-95 (4th Cir. 2009)*; *Sumner v. Mary Washington Healthcare Physicians, No. 3:15-CV-42, 2015 WL 3444885, at \*6 (E.D. Va. May 28, 2015)* (unpublished); *Downs, 21 F. Supp. 3d at 617-18*. Accordingly, Bigelow has not plausibly alleged an FMLA interference claim. Thus, the court dismisses count one.

**III.**

Syneos has moved to strike Bigelow's class action claims in count one (i.e., FMLA interference) and two (i.e., FMLA retaliation). See [D.E. 20]. The court has dismissed count one for failure to state a claim under *Rule 12(b)(6)*. Thus, the court analyzes the class action claims concerning count two.

*Federal Rule of Civil Procedure 12(f)* allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Fed. R. Civ. P. 12(f)*. *Federal Rule of Civil Procedure 23(c)(1)(A)* provides that "[a]t an early practicable time after a person sues or is sued as a class representative, the

court must determine by order whether to certify the action as a class action." *Fed. R. Civ. P. 23(c)(1)(A)*. "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly [*9] encompassed within the named plaintiffs claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the [class] certification question." *Gen. Tel. Co of Sw. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*.

Generally, when viewing *Rule 12(f)* and *Rule 23* in tandem, courts rarely make a class determination at the pleading stage. See, e.g., *Williams v. Potomac Family Dining Grp. Operating Co., LLC, No. GJH-19-1780, 2019 U.S. Dist. LEXIS 181604, 2019 WL 5309628, at \*5 (D. Md. Oct 21, 2019)* (unpublished); see, e.g., *Letart v. Union Carbide Corp., No. 2:19-CV-00877, 2020 U.S. Dist. LEXIS 97542, 2020 WL 2949781, at \*2 (S.D. W. Va. June 3, 2020)* (unpublished); *Alig v. Quicken Loans Inc., No. 5:12-CV-114, 2015 U.S. Dist. LEXIS 194450, 2015 WL 13636655, at \*3 (N.D. W. Va. Oct. 15, 2015)* (unpublished). However, "amotion to dismiss a complaint's class allegations should be granted when it is clear from the face of the complaint that the plaintiff cannot and could not meet *Rule 23*'s requirements for certification because the plaintiff has failed to properly allege facts sufficient to make out a class or could establish no facts to make out a class." *William, 2019 U.S. Dist. LEXIS 181604, 2019 WL 5309628, at \*5* (alteration and quotation omitted). Although a plaintiff retains the burden of proving class certification, a court analyzes a pre-discovery challenge to class certification under "the familiar standard of review for motions to dismiss under *Rule 12(b)(6)*." Id.

Syneos seeks to strike the class claims and argues that Bigelow improperly [*10] alleges a "fail-safe" class. See [D.E. 21] 9-11; [D.E. 26] 6-7. A fail-safe class is one that "is defined so that whether a person qualifies as a member [of the class] depends on whether the person has a valid claim." *EOT Prod. Co. v. Adair, 764 F.3d 347, 360 n.9 (4th Cir.*

Rich Dukes

**JA1450**

2020 U.S. Dist. LEXIS 155791, *10

*2014)* (quoting *Messner v. Northshore Univ. HealthSvs., 669 F.3d 802, 825 (7th Cir. 2012)).*

Fail-safe classes are considered improper for two reasons. First, in a fail-safe class, "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner, 669 F.3d at 825.* Hence, fail-safe classes "fail to provide the resolution of the claims of all class members that is envisioned in class action litigation." *Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 538 (6th Cir. 2012).*

Second, fail-safe classes do not comply with *Rule 23.* See *Fed. R. Civ. P. 23.* Specifically, *Rule 23* requires that members of a proposed class be readily identifiable, a principle called "ascertainability." *Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 655 (4th Cir. 2019).* "Under this principle,... a class cannot be certified unless a court can readily identify the class members in reference to objective criteria." Id. (quotations omitted). In certifying a class, however, a court may not "conduct a preliminary inquiry into the merits of a suit." *Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 177, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974).* Specifically, "class litigation should not move forward when a court cannot identify class members without 'extensive and individualized fact-finding or mini-trials.'" **[*11]** *Krakauer, 925 F.3d at 658.* (quoting *EOT Prod. Co., 764 F.3d at 358*). Because a fail-safe class requires a court to inquire into the merits of the underlying case to identify the members of the class, fail-safe class definitions violate these principles. See, e.g., *Chado v. Nat'l Auto Inspections, LLC, No. JKB-17-2945, 2019 U.S. Dist. LEXIS 75392, 2019 WL 1981042, at *4, (D. Md. May 3, 2019)* (unpublished).

Although the Supreme Court has not addressed the fail-safe class question, nearly every circuit court of appeals to address the question considers fail-safe classes improper. See, e.g. *Orduno v. Pietrzak, 932 F.3d 710, 716-17 (8th Cir. 2019); Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1276-77 (11th Cir. 2019); McCaster v. Darden Rests., Inc., 845 F.3d*

*794,799-800 (7th Cir. 2017);*[1] *Torres v. Mercer Canyons, Inc., 835 F.3d 1125, 1138 n.7 (9th Cir. 2016); In re Nexium Antitrust Litig., 777 F.3d 9, 22 & n.19 (1st Cir. 2015); Byrd v. Aaron's, Inc. 784 F.3d 154, 167 (3d Cir. 2015); Randleman v. Fidelity Nat'l Title Ins. Co., 646 F.3d 347, 352 (6th Cir. 2011);* but see *In re Rodriguez, 695 F.3d 360, 370 (5th Cir. 2012)* ("our precedent rejects the fail-safe class prohibition"). Additionally, numerous treatises discuss the impermissibility of fail-safe classes. See, e.g., 7A Wright & Miller, Fed. Prac. & Proc. § 1760 & n.14.55 (discussing how the Third Circuit and "[o]ther courts... have ruled that requiring fail-safe classes for certification is improper"); Herr, Annotated Manual for Complex Litig. § 21.222 ("The order defining the class should avoid ... terms that depend on resolution of the merits."); 1 Rubenstein, Newberg on Class Actions § 3:6 ("Class definitions that require a court to decide the merits of prospective individual class members' claims to determine class membership—sometimes referred to as 'fail-safe' classes—may also **[*12]** run afoul of the definiteness requirement.").

Bigelow's proposed class is an impermissible fail-safe class. Bigelow frames her proposed class as:

> Any and all employees who worked for Defendant during the relevant limitations period who were denied promotions, pay increases, and/or suffered any adverse employment action, as a result of her/his/their prior or anticipated use of protected FMLA leave during her/his/their employment.

Compl. at ¶ 3. This class definition turns on whether the employee has a valid claim, and "[t]hat

_____

[1] The *McCaster* court addressed a fail-safe class in the employment context. In *McCaster*, the Seventh Circuit held that a class definition that "sought to represent a class of '[a]ll persons separated from hourly employment with [Darden] in Illinois between December 11, 2003, and the conclusion of this action[ ] who were subject to Darden's Vacation Policy . . . and who did not receive all earned vacation pay benefits'" was impermissible because the class definition "plainly turn[ed] on whether the former employee ha[d] a valid claim." *845 F.3d at 799.*

Pg: 349 of 557    Filed: 10/07/2022    Doc: 19-3    USCA4 Appeal: 22-1750

**JA1451**

2020 U.S. Dist. LEXIS 155791, *12

is a classic fail-safe class." *McCaster, 845 F.3d at 799*. To illustrate, if plaintiff fails to prove (1) that a particular employee experienced adverse promotion, pay, or employment actions or (2) that Syneos took such actions because the employee used or planned to use FMLA leave, then Syneos is entitled to a judgment in its favor with respect to that employee. Cf. Compl. at 13. The court, however, could not enter a judgment against that particular employee because that employee would no longer fit the class definition. See *McCaster, 845 F.3d at 799*; *Young, 693 F.3d at 538*; *Messner, 669 F.3d at 825*; *Genenbacher v. Century Tel Fiber Co. II, 244 F.R.D. 485,487-88 (C'D. El. 2007)*. Bigelow's fail-safe class defines itself based on legal conclusions and impermissibly [*13] constitutes "a class that cannot be defined until the case is resolved on its merits." *Young, 693 F.3d at 538*; see *Willrinson v. Greater Dayton Reg'l Transit Auth., No. 3:1 1-CV-247, 2017 U.S. Dist. LEXIS 131643, 2017 WL 3578702, at *7 (S.D. Ohio Aug. 17, 2017)* (unpublished). A fail-safe class action leaves a defendant in a "heads, I win ... tails, I can sue again" situation, contravening the truism that class actions should "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)* (emphasis added). Accordingly, the court strikes Bigelow's class action claim in count two.

IV.

Bigelow has moved for leave to file an amended complaint. See [D.E. 24]. *Federal Rule of Civil Procedure 15* states that "[a] party may amend its pleading once as a matter of course." *Fed. R. Civ. P. 15(a)(1)*. "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." *Fed. R. Civ. P. 15(a)(2)*. "[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat*

*Foods Co., 785 F.2d 503, 509 (4th Cir. 1986)*; see *Foman v. Davis 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*. "A proposed amendment is... futile if the claim it presents would not survive a motion to dismiss." *Save Our Sound OBX Inc. v. N Carolina Dep't of Transp., 914 F.3d 213, 228 (4th Cir. 2019)*; see *Perkins v. United States, 55 F.3d 910, 917 (4th Cir. 1995)*.

Bigelow's proposed amended [*14] complaint is futile. It adds nothing material to the court's analysis concerning either the FMLA interference claim or the class action claim. Instead, Bigelow has proposed only minor changes such as alleging that "Plaintiff did not, in fact, return to work without consequence from her FMLA leave," including a citation to *29 C.F.R. § 825.220(c)*, and asserting that "Defendant utilizes the taking of and/or FMLA leave as a negative factor in employment actions " Am. Compl. [D.E. 24-1] ¶¶ 29, 30, 33. As for whether Bigelow returned to work without consequence, the court has considered that issue in ruling on the motion to dismiss. As for *29 C.F.R. § 825.220(c)*, the court has considered the regulation in its ruling. As discussed, the regulation informs Bigelow's FMLA retaliation claim, not her FMLA interference claim. See, e.g., *Seeger, 681 F.3d at 283*; *Conoshenti, 364 F.3d at 146 n.9*; *Downs, 21 F. Supp. 3d at 617-18*. As for whether Syneos considers FMLA as a negative factor, the court has already assumed the veracity of this allegation and considered it in ruling on the motion to dismiss. Accordingly, the court denies Bigelow's motion to amend as futile.

V.

In sum, the court GRANTS defendant's partial motion to dismiss, DISMISSES WITH PREJUDICE plaintiffs FMLA interference claim, STRIKES [*15] WITHOUT PREJUDICE plaintiff's class claims [D.E. 20], and DENIES as futile plaintiffs motion to amend [D.E. 24].

SO ORDERED. This 27 day of August.

/s/ James C. Dever III

Rich Dukes

2020 U.S. Dist. LEXIS 155791, *15

JAMES C. DEVER III

United States District Judge

---

**End of Document**

USCA4 Appeal: 22-1750    Doc: 19-3    Filed: 10/07/2022    Pg: 351 of 557

**JA1453**

**United States District Court**
**District of South Carolina**
**Charleston Division**

| | |
|---|---|
| Gary Nestler,<br>Viewed Student Female 200,<br>Viewed Student Male 300,<br>on behalf of themselves and all others<br>similarly situated,<br>           Plaintiffs,<br><br><br><br>   vs.<br><br>The Bishop of Charleston, a Corporation<br>Sole, Bishop England High School,<br>Tortfeasors 1-10, The Bishop of the Diocese<br>of Charleston, in his official capacity, and<br>Robert Guglielmone, individually,<br><br>        Defendants. | C/A: 2-21-cv-00613-RMG<br><br><br><br><br>**PLAINTIFFS' REPLY TO**<br>**DEFENDANTS' OBJECTION TO**<br>**PLAINTIFF' MOTION FOR CLASS**<br>**CERTIFICATION** |

Come now Plaintiffs by and through their undersigned attorneys, and file this their Reply to Defendants' Objection to Plaintiffs' Motion for Class Certification, and state the following in response thereto:

    **I.    Defendants argue that the Plaintiffs lack standing.**

Plaintiffs' standing is based upon established caselaw and they need not show they were actually filmed to establish an injury in fact. Defendants cite to U.S. Supreme Court case of TransUnion LLC v. Ramirez 141 S. Ct. 2190 (2021) as "a very similar situation" to the plaintiffs in TransUnion. However, TransUnion is factually distinguishable as a data breach case where the mere risk of future harm from inaccurate credit reporting alerts in class members' credit files did not constitute a sufficiently concrete injury, and that the risk of future harm was too remote. *Here* Plaintiffs allege they were *already* harmed by having their privacy rights actually invaded- an

Page **1** of **15**

**JA1454**

injury in fact under state law. The school has admitted to the blanket monitoring of their students in the locker rooms. The school also conceded, in Principal Finneran's testimony, that the monitoring of the students when they were unaware would constitute an invasion of privacy and is thus is not a safe, moral or nurturing environment. In TransUnion, the Supreme Court distinguished the risk of future harm (as alleged in TransUnion) from traditional types of torts (as alleged here) where there is concrete injury in fact. The TransUnion Court expressly declared that the tort of intrusion upon seclusion is a concrete injury in fact. Id. at 2204.

Plaintiffs allege wrongful intrusion into private affairs, an invasion of privacy tort. This cause of action has been provided in South Carolina law for at least sixty years is and defined as, "**the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities**. Meetze v. Associated Press, 230 S.C. 330, 335, 95 S.E.2d 606, 608 (1956)(Emphasis added); Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P., 385 S.C. 452, 458, 684 S.E.2d 756, 759 (2009)("[t]he common law right of privacy provides protection against four distinct categories of invasion: (1) intrusion upon a plaintiff's seclusion or solitude, or into his private affairs"). South Carolina law holds that if the Plaintiff proves the four elements of the tort, "**the fact of damage is established as a matter of law. The amount of damage is then to be assessed by the trier of fact.**" Snakenberg v. Hartford Cas. Ins. Co., 299 S.C. 164, 172, 383 S.E.2d 2, 6 (Ct. App. 1989)(Emphasis added).

Testimony cited in Plaintiffs' Motion establishes that Defendants were viewing the children through the coaches'/school officials' offices directly into the changing rooms[1] in the

---

[1] Defendants argue they were not viewing children into the bathroom areas adjacent to the changing rooms because there was no direct line of sight from the coaches' offices into the bathroom areas, suggesting the school was respecting privacy in the bathroom areas but ignoring the children's privacy expectation in the directly viewable changing rooms. The fact that certain areas of the locker room the school recognizes are private- where the children are naked- and that there are other areas where the children are naked where there is no privacy interest to be protected are logically incongruent. Moreover, courts have held that persons are entitled to a reasonable expectation

name of safety- it was conceded and admitted. These windows exposed every single student in the locker room to unreasonable and intrusive observation. (Exhibit #1 to Amended Complaint).

Under <u>Snakenburg</u>, "An intrusion may consist of watching, spying, prying, besetting, overhearing, or other similar conduct." <u>Id</u>. The Defendants repeatedly argue in their Objection (without legal citation) that the Plaintiffs needed -and failed to show- that students were actually viewed, or alternatively, photographed or videotaped while changing in order to have a claim against Defendants. Such arguments have consistently been refused by Courts across the country when considering invasion of privacy claims[2].

The LS3P architect, Attansio, conceded that the viewing windows equipped *with* blinds *operated as a peephole*. There is no requirement that Plaintiffs prove the tortfeasor's actual act of invading someone's privacy. If this were so, it would disembowel the tort as it would be nearly impossible to redress the tortfeasor's actions because of the activity's inherently clandestine nature. South Carolina Courts held in <u>Snakenburg,</u> "the fact of damage is established as a matter of law" once the elements of the tort are met. "[T]he '[f]act of damage pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury and relate to the appropriate measure of individual relief.' <u>Tillman v. Highland Indus., Inc.</u>, No. 4:19-CV-02563-SAL, 2021 WL 4483035, at *12 (D.S.C. 2021). [A]s long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied. <u>In re Nexium Antitrust Litig.</u>, 777 F.3d 9, 32 (1st Cir. 2015).

The second prong is established because the changing rooms were private. All deposed conceded that students should have a reasonable expectation of privacy in the Bishop England

---

of privacy outside of toilet stalls. *See*, e.g. <u>Soliman v. Kushner Companies, Inc.</u>, 433 N.J. Super. 153, 162, 77 A.3d 1214, 1220 (App. Div. 2013).
[2] See Footnote 4 in Plaintiffs' Motion for Certification for citations of authority.

locker rooms. The third prong under <u>Snakenburg</u> requires that the harm complained of be substantial and unreasonable, rather than a mere annoyance. Even the Defendant's media spokesperson, Ms. Aselage, testified that she would not want to be viewed while naked and unaware to merely ease safety concerns, and presumably nor would anyone else. (Dep. M. Aselage, Vol, III, P. 89, L. 8 – P. 91, L. 22).[3] Principal Finneran testified that the if the students were viewed by school staff without their knowledge, it would not be a safe environment. Under South Carolina law, wrongful intrusion into one's private activities is an invasion of privacy tort that is committed in such a manner, "[a]s to outrage **or** cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. <u>Meetze v. Associated Press</u>, 230 S.C. 330, 335, 95 S.E.2d 606, 608 (1956)(Emphasis added). Plaintiffs' expert psychiatrist Dr. Salas testified that the invasion of privacy on the students caused harmful class-wide mental effects.

As to the final prong under <u>Snakenburg</u>, intentionality, the standard is simply, "that the actor acted willingly (volition) and that he knew or should have known the result would follow from his act. Neither deliberation nor purpose nor motive nor malice are necessary elements of intent." <u>Snakenberg</u>, 383 S.E.2d at 7. There is no question as to whether Defendants' actions were intentional. Testimony cited in the Plaintiffs' Motion makes it clear that the Defendants purposefully installed and used the windows and blinds to monitor the children while undressing in the changing areas of the locker rooms, without consideration for students' privacy interests.[4]

**II.    Defendants argue that Aselage's testimony is inadmissible and should not**

---

[3] Some states, such as Florida, have enacted criminal statutes for viewing persons in dressing rooms where there is a reasonable expectation of privacy. Importantly, the statute makes no distinction between visual observation and video recordation: Fla. Stat. Ann. §877.26:   Direct observation, videotaping, or visual surveillance of customers in merchant's dressing room, etc., prohibited; penalties.— (1)    It is unlawful for any merchant to directly observe or make use of video cameras or other visual surveillance devices to observe or record customers in the merchant's dressing room, fitting room, changing room, or restroom when such room provides a reasonable expectation of privacy.
[4] The school did however, as mentioned in Plaintiffs' Motion, institute a policy of knocking on bathroom doors in the 2018-2019 school year, an acknowledgment by the Defendants of the children's right to privacy and that safety can be ensured without school personnel monitoring children nude or partially nude.

**be considered.**

Aselage's testimony is admissible under F.R.E 801(d)(2) as party admissions. Ms. Aselage testified she had no personal knowledge about allegations of the lawsuit. (Dep. M. Aselage, Vol. I, P. 26, L. 4-7). Further, Aselage testified that the secretary of communication, Michael Aquilano, and the Diocese General Counsel, Elaine Fowler, gave her the content with which to prepare the media statement which stated the purpose of the windows. (Dep. M. Aselage, P. 28, L. 18-23). Aselage represented to this Court that during her contractual obligations, she was in direct contact with the Diocese's General Counsel, Elaine Fowler, and other high-ranking administrators of the Diocese to prepare for external communications with secular media and the parents of Bishop England students. (Aselage Motion for Protection, Dkt. No. 43). With that background in mind, Ms. Aslage's third deposition was taken on December 1, 2021 after her motions for protective order were denied by the Court. At the deposition, Aselage repeatedly answered that *the source of her knowledge and testimony came exclusively from statements and communications made by Diocese officials / employees*[5]. Accordingly, the content of her testimony being a direct account from the Diocese constitute admissions of a party under F.R.E 801(d)(2) and thus is admissible testimony for the Court and, ultimately, a jury to consider.

### III. Defendants argue the Brannum case is not applicable because there is no Fourth Amendment application to Bishop England as a non-public school.

Plaintiffs' citation and reliance on Brannum is solely confined to that Court's interpretation

---

[5] The explanation that the windows were for safety came from the Diocese: "Is it your understanding that the reason that's been given to you by the Diocese is, safety? A. Yes."(Dep. M. Aselage, Vol. III, P. 30, L. 15 -P. 31, L. 7). Aselage was told the windows were installed was for safety and monitoring. (Dep. M. Aselage, Vol. III, P. 35, L. 7-13)(Emphasis added). All the persons Aselage spoke with prior to the filing of the lawsuit were Diocese employees. (Dep. M. Aselage, Vol. III P. 14, L. 1 - P. 15, L. 1). The knowledge Aselage has about the windows being installed for safety was through speaking to Ms. Fowler, Ms. Tucker, Mr. Finneran, the Vicar General, and Mr. Aquilano)(Dep. M. Aselage, Vol. III P. 63, L. 15-22). The testimony from Aselage that the children's privacy being invaded was completely preventable- was from knowledge gleaned from talking to Ms. Fowler, Ms. Tucker, Mr. Finneran, Mr. Acquilano and the Vicar General. (Dep. M. Aselage, Vol. III, P. 79, L. 18- P. 80, L. 2).

of children's expectations of privacy in a locker room setting. Plaintiffs cite <u>Brannum</u> as authority that there is a reasonable expectation of privacy for children in a locker room setting. Any considerations of the Fourth Amendment, or state action, which Defendants misconstrue to be Plaintiffs' intention in implementing the citation, are irrelevant to whether a student has a reasonable expectation of privacy in a locker room setting.

The Defendants' own reference and comparison to other *public* schools in the area that have viewing windows in their locker rooms underscores that there is no distinction between privacy expectations at private versus public school locker rooms. Moreover, under South Carolina law, there is nothing required in proving the tort of invasion of privacy under South Carolina law that would call into question the status of the school as being public or private as a relevant factor to decide whether elements of the tort of invasion of privacy are met. As set forth above, the Plaintiffs have met the elements of the invasion of privacy tort under <u>Snakenburg</u> and have met the elements on a class-wide basis because all students that attended Bishop England that were required to use the locker rooms to disrobe and change clothes. The fact that the viewing occurred in a private versus public school setting does not change the privacy expectations of the students in the locker room The Defendants conceded in their testimony that Bishop England students had reasonable expectation of privacy in their locker rooms.

**IV.    Defendants argue Class members cannot be identified.**

Defendants assert that the Plaintiffs have proposed a "fail-safe" class. A 'fail-safe' class is a class that cannot be defined until the case is resolved on its merits." <u>Young v. Nationwide Mut. Ins. Co.</u>, 693 F.3d 532, 538 (6th Cir. 2012). To the contrary, the Plaintiffs' Class is objectively definable as all students that attended Bishop England during the relevant time frame. The case does not need to be litigated first in order to determine whom was affected- all students were

exposed to the same harm. This was alleged in the Complaint. The U.S. Supreme Court has held that: "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof. [citation omitted]. When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members [citation omitted]. Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453–54, 136 S. Ct. 1036, 1045, 194 L. Ed. 2d 124 (2016).

Applying this law to the facts of this case, it is indisputable that common to all class members is the fact that students were being monitored while they were changing clothes. The monitoring of the students was done surreptitiously. Because all students were exposed to the same harm, adjudication by representation is preferable as the issue of unwanted exposure is common to all students that attended Bishop England High School from 1998 through 2019. "A single common question will suffice [citation omitted] but it must be of such a nature that its determination "will resolve an issue that is central to the validity of each one of the claims in one stroke." EQT Prod. Co. v. Adair, 764 F.3d 347, 360 (4th Cir. 2014). All students used the same locker rooms, and all had their privacy invaded the same way, without any safety justification, causing outrage as well as mental harm to a person of ordinary sensibilities as testified to by Dr. Salas. The only question to be resolved is the amount of damages to be assessed by the trier of fact. "Rule 23(b)(3) is normally satisfied where there is an essential common factual link, such as standardized documents and practices, even though the nature and amount of damages may differ

among class members." <u>In re TD Bank, N.A. Debit Card Overdraft Fee Litig.</u>, 325 F.R.D. 136, 154 (D.S.C. 2018).

> **V.    Defendants argue Plaintiffs need necessity of proof that parents relied on safety representations which entails individualized determinations of reliance.**

Representations made to parents on a uniform and class-wide basis do not require individualized showings of reliance. Defendants have admitted that parents of the Bishop England students were never told their children were being monitored. Indeed, Bishop England advertised and held itself out to the Tuition Class payers as a moral, caring and safe environment and that it would, "seriously curb the possibility of child sexual abuse happening in our parishes and schools." (*See* Plaintiff's Motion, Exhibit #19). The Principal conceded that it was not a safe or nurturing place when children were observed nude without their knowledge. Because *safety* is what the school represented to every parent, including Nestler, it is not necessary to make individual inquires for a class-wide determination that the representation was made and relied upon. See, <u>e.g</u>, <u>Moyle v. Liberty Mut. Ret. Ben. Plan</u>, 823 F.3d 948, 964–65 (9th Cir. 2016), as amended on denial of reh'g and reh'g en banc (Aug. 18, 2016)("[w]here the defendant's representations were allegedly made on a uniform and classwide basis, individual issues of reliance do not preclude class certification. *See Hanon v. Dataproducts Corp*., 976 F.2d 497, 509 (9th Cir.1992) ("We emphasize that the defense of non-reliance is not a basis for denial of class certification.")).

> **VI.    Defendants argue that Plaintiffs have proposed no reliable model for determining class-wide damages.**

At the class certification stage, all that is required is a showing under F. R. Civ. P. 23 for numerosity, commonality, typicality and adequacy as well as one of the Rule 23(b) factors, and not a showing that, "damages are capable of measurement on a class-wide basis," as stated on page

20 of the Defendants' Objection.[6] The Plaintiffs assert they have made the requisite showing in

their Motion. As to the Rule 23(b)(3) predominance test, the Plaintiffs have shown that the use of

the windows operated on a class wide basis, and the invasion of privacy claim makes the matter

susceptible to a class wide determination as "the fact of damage is established as a matter of law,"

under Snakenburg.

    Dr. Salas has given a medical opinion that, "Every student who was subjected to undressing

before the viewing windows is expected to be impacted," and have a psychological damage. This

is consistent with the tort under Snakenburg that, "*the damage consists of the unwanted exposure

resulting from the intrusion.*" It should be noted that claims of invasion of privacy and sexual

exploitation have been dealt with on a class-wide basis, with simple models for determination of

damages. For example, the Court in In re USC Student Health Ctr. Litig., No.

218CV04940SVWGJS, 2019 WL 3315281, at *1 (C.D. Cal. June 12, 2019) granted settlement

approval of $215 million for of a class of 4,000 to 17,000 women, whose identities were

ascertainable through USC's records or through self-identification for a physician's alleged sexual

misconduct toward female patients at the USC student health center. In submitting the case for

approval, the Plaintiffs proposed a three-tiered system for the class members to decide how to

---

[6] *See* Comcast Corp. v. Behrend, 569 U.S. 27, 41, 133 S. Ct. 1426, 1436, 185 L. Ed. 2d 515 (2013)(Ginsburg and
Breyer, JJ., dissenting opinion)("While the Court's decision to review the merits of the District Court's certification
order is both unwise and unfair to respondents, the opinion breaks no new ground on the standard for certifying a
class action under Federal Rule of Civil Procedure 23(b)(3). In particular, the decision should not be read to require,
as a prerequisite to certification, that damages attributable to a classwide injury be measurable " 'on a class-wide
basis.' "). Parker v. Asbestos Processing, LLC, No. 0:11-CV-01800-JFA, 2015 WL 127930, at *14 (D.S.C. 2015)(
"[t]he Defendants read too much into the Comcast decision. It does not stand for the proposition that all of the
Plaintiffs' damages must be calculated on a class-wide basis. It merely indicates that the "methodology" for
measuring and quantifying damages be the same for all class members so as to satisfy the predominance
requirement. Comcast, 133 S.Ct. at 1433.Here, the methodology for both actual damages and, assuming the
fiduciary duty claim is viable, disgorgement, is the same for all class members. The mathematical computation of
the actual damages, of course, is different. And, the Fourth Circuit has made it clear that Rule 23 "explicitly
envisions class actions with … individual damage determinations.").

select their compensation while simultaneously affording the class members their privacy. The Settlement's claims process was simple by design—no action for Tier 1, a simple claim form for those to tell their story in Tier 2, and a simple claim form and provide an interview for Tier 3 to be evaluated by a Special Master in conjunction with expert review. In re USC Student Health Ctr. Litig., Case 2:18-cv-04258-SVW-GJS, Dkt.# 67 (C.D. Cal. June 12, 2019). In re USC Student Health Ctr. Litig. demonstrates that there are methodologies which provide victims of torts compensation that have an inherently psychological component of damage.

### VII.    Defendants argue that the statute of limitations defense would require individualized inquiry.

Plaintiffs and Class Members could not be aware they were being monitored through the windows[7] until it was brought to light in May of 2019 that the windows were not only be used to monitor[8] them (see Finneran letter to parents), but also used by school employee Scofield for his own perverted ends. Accordingly, the date of the letter to parents, May 7, 2019, is the date students, parents and the greater school community were put on actual and/or constructive notice the of their possible cause of action.  The standard as to when the limitations period begins to run is objective rather than subjective. Therefore, the statutory period of limitations begins to run when a person could or should have known, through the exercise of reasonable diligence, that a cause of action might exist in his or her favor. See Allwin v. Russ Cooper Assocs., Inc., 426 S.C. 1, 13, 825 S.E.2d 707, 713 (Ct. App. 2019). Defendants further assert that the discovery rule is not applicable on a class-wide basis. However, the discovery rule is an objective standard and can be applied on a class-wide basis. See In re TD Bank, N.A. Debit Card Overdraft Fee Litig., 325 F.R.D. 136, 172 (D.S.C. 2018)("[t]o the extent the discovery rule applies, an objective standard ("reasonably ought

---

[7] It is the Defendants themselves that have asserted that the blinds were always closed. (Dep. M.A. Tucker, P. 26, L. 22 - P. 27, L. 13; Dep. P. Finneran, P. 19, L. 10-11).
[8] See Finneran letter to parents dated May 7, 2019, Exhibit #3 to Amended Complaint.

to have been discovered") can be utilized to determine when class members had constructive knowledge, if not actual knowledge, that a cause of action had accrued.").

**VIII.    The Defendants argue the standard of care for construction of schools.**

On October, 28, 2021, Defendants disclosed two (2) experts: Myles Glick and William L. "Lee" Runyon, III. (See Dkt #49). The filing and attachments, however, are flawed and fail to comply with the Court's Scheduling Order requiring identification and disclosure of expert reports, as well as the requirements of Fed.R.Civ.P 26(a)(2)(B).  Specifically, Defendants failed to disclose the report of Myles Glick in a timely manner. Defendants did file, as Dkt# 49-1, a 41 page exhibit including a cover page entitled "Bishop England Site Visit 10/15/20, Myles Glick, AIA LEED AP" followed by 40 pages of photographs of the BEHS gym/locker room area. Defendants did not comply with Rule 26(a)(2)(B) by failing to disclose all required and aforementioned information other than the name and rate of compensation of the purported expert.[9]

While the Defendants have attempted to "back door" the report into the record by filing the same as an exhibit to Defendants' Opposition to Plaintiffs' Motion for Class Certification (See ECF 75-3), this is procedurally improper and is violative of the Court's Order and Federal Rules of Civil Procedure. Accordingly, Defendants' expert Myles Glick should be disregarded and stricken. Notwithstanding the procedural deficiency of the Glick report, and without waiving Plaintiffs' aforementioned position, Glick' report fails substantively. Expert testimony must be reliable in order to be admitted into evidence under Rule 702, Fed.R.Evid. Defendants' experts

---

[9] Defendants failed to disclose to Plaintiffs as required by the Courts' Order and Rule 26 "a complete statement of all opinions the witness will express and the basis and reasons for them", "the facts or data considered by the witness in forming them", "any exhibits that will be used to summarize or support them", "the witness's qualifications, including a list of all publications authored in the previous 10 years", and "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition". Failed to provide the School Design Standards for the Albuquerque Public Schools and the Guidelines for School Facilities in Virginia's Public Schools, as cited on page 1 of Glick's report. Defendant's further failed to provide Glick's qualifications and publications from the last 10 years, as well as all other cases in which Glick has testified as an expert at trial or deposition in the last 4 years, all as required by the rules.

cannot satisfy this basic reliability requirement. Defendants' experts point to no study, research, or publication they have either conducted or relied upon which show any form of proven or trusted analysis pertaining to viewing windows in schools. Further, Glick's expert report fails the analysis set forth in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 2790, 125 L. Ed. 2d 469 (1993). Daubert sets forth five factors concerning reliability: (1) whether a theory or technique relied on by the expert can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publications; (3) the known or potential rate of error; (4) whether there are standards controlling the operation of the theory or technique; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community. See Daubert, 509 U.S. at 592-594.

Glick is presumably a licensed and credentialed architect, however Plaintiffs were not provided with information regarding Glick's background, education, or credentials. According to the report of Myles Glick, he "conduct[ed] an investigation to determine if the design and installation of a window in the coaches' offices violate any standard of care."[10] Noticeably absent are any AIA[11] design standards for school construction, nor any ASTM building or construction standard for school construction. Instead, Glick relies upon the "School Design Standards for the Albuquerque Public Schools", the "Guidelines for School Facilities in Virginia's Public Schools", and the school design guidelines as stated in "GearBoss"[12], which appears to be a document generated from the internet.[13] There is no indication the documents Glick bases his support on

---

[10] See Report of Myles Glick, p.1.
[11] The American Institute of Architects prides itself in "the power of design," for school safety. See https://p2a.co/nqJI4o9.
[12] According to their website, GearBoss is a company that "will help you with all aspects of your athletic program. From lockers, to storage, to equipment transport and fund-raising solutions, GearBoss products save you time, space, and effort. They're flexible and customizable." http://www.gearboss.com/about.php.
[13] See Report of Myles Glick, p. 1-2.

have been peer reviewed or widely accepted by design professionals and thus these documents are unreliable. Further, Glick provides no basis or reliable methodology for how the tri-county area high schools named in his report were chosen, whether there are standards controlling, or the potential rate of error. Glick fails to address Defendants' use of the windows with blinds, and in particular, the type of blinds utilized, such blinds at issue in this case which enable the student to be monitored without their awareness. Among other reasons, the failure of Glick's report to even acknowledge this variable, renders the report unreliable. Essentially, Glick's states that some other schools have viewing windows from coaches' offices into their locker rooms. No expert opinion is needed for that. *See* Nease v. Ford Motor Co., 848 F.3d 219, 229 (4th Cir. 2017); Funderburk v. South Carolina Electric & Gas Company, 395 F.Supp.3d 695, 706 (D.S.C. 2019) citing Oglesby, 190 F.3d at 250 ("With respect to reliability, the district court must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods.'").

Glick does not acknowledge that the viewing windows were situated directly in front of the lockers *where the children were made to undress* nor that the blinds were maneuverable by controls located inside the coaches' offices, thus allowing secretive use and access by whomever was in the office. In Plaintiffs' Motion, there was much deposition testimony that it could appear to the children that the blinds were closed; however, whomever was on the other side of the blinds could still view the children based on the positioning of the blinds, again rending Glick's report unreliable under a *Daubert* analysis and in light of the requirements of Rule 702, Fed.R.Evid.

Additionally, Defendants' other expert, Lee Runyon, possesses no specialized knowledge, skill, training, or education that would qualify him as an "expert" under Rule 702. None is stated. Further, his report is not "the product of reliable principles and methods" that have been reliably

applied to the facts of the case, as required by Rule 702. Mr. Runyon's opinions, as alluded to in his own report, are nothing more than his own personal lay impressions of publicly accessible records and internet searches. *See* Free v. Bondo-Mar-Hyde Corp., 25 F. App'x 170, 172 (4th Cir. 2002) (Court affirming exclusion of expert opinions that were based on his assumptions of what caused the can to explode rather than on scientific, technical, or other specialized knowledge.); *See also* Oglesby, 190 F.3d at 250 (stating a reliable expert opinion cannot be based on belief or speculation, but inferences must be derived using scientific or other valid methods). Mr. Runyon simply does not have any expertise to offer concerning the viewing windows and blinds. Accordingly, Mr. Runyon is not offering an "expert" opinion but rather an opinion of a lay witness. See Kennedy v. Joy Technologies, Inc., 269 F. Appx. 302, 312 (4th Cir. 2008) (affirming exclusion of expert report that lacked any specific gloss, expertise, or specialized analysis). Mr. Runyon's report is therefore unreliable as well. It is not the result of any specialized knowledge. It contains no recognized method of testing his theories, and there are legitimate concerns as to the accuracy and reliability of Mr. Runyon's opinion. *See* Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 200 (4th Cir. 2001) (affirming exclusion of expert when opinions amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method). *See also* In re Titanium Dioxide Antitrust Litig., No. CIV.A. RDB-10-0318, 2013 WL 1855980, at *7 (D. Md. 2013) ("[e]xpert testimony is inadmissible when it addresses lay matters which [the trier of fact] is capable of understanding without the expert's help")(citation omitted). The expert report of Lee Runyon also substantively fails under a Daubert evaluation and is thus unreliable pursuant to Rule 702. One of the "goals" stated in Mr. Runyon's report is "[to] evaluate the reasonable design of the Bishop England High School Locker Room Facility." This goal in and of itself proves that the

report is unreliable, as Mr. Runyon has already arrived at his conclusion before conducting *any*

analysis. His report is inherently unreliable.

**IX.    The negligent hiring claim is not susceptible to class-wide treatment.**

Plaintiffs concede, and withdraw their Motion for Class Certification as to the cause of

action for Negligent Hiring.

**X.    Defendants argue the Plaintiffs cannot establish adequacy of representation because of barratry.**

The argument of barratry is both baseless and offensive and Plaintiffs vehemently deny it.

Regardless, the allegation is not a basis to deny class classification.

Respectfully submitted,


s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (Fed. Bar: 3460)
THE RICHTER FIRM, LLC
622Johnnie Dodds Blvd.
Mt. Pleasant, SC  29464
Phone: 843-849-6000
LRichter@RichterFirm.com

s/Carl L. Solomon
Carl L. Solomon (Fed. Bar: 6684)
Solomon Law Group, LLC
P.O. Box 1866
Columbia, SC  29202
Phone: 803-391-3120
carl@solomonlawsc.com


s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (Fed. Bar: 6106)
Stephen Slotchiver (Fed. Bar: 6648)
Anna E. Richter (Fed. Bar: 13333)
Slotchiver & Slotchiver LLP
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com
arichter@slotchiverlaw.com

s/Brent S. Halversen
Brent S. Halversen (Fed. Bar: 10474)
Brent Souther Halversen, LLC

751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com


*Attorneys for Plaintiffs*

January 26, 2022
Mount Pleasant, South Carolina

**JA1468**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRCIT OF SOUTH CAROLINA
CHARLESTON DIVISION**

**CIVIL ACTION NUMBER: 2:21-cv-613-RMG**

|  |  |  |
|---|---|---|
| Gary Nestler, *et al*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| The Bishop of Charleston, a Corporation | ) | **DEFENDANTS' SURREPLY REGARDING** |
| Sole, *et al*, | ) | **CLASS CERTIFICATION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Defendants submit this proposed surreply regarding Plaintiffs' Motion for Class Certification limited to Plaintiffs' argument regarding Defendants' experts, architect, Myles Glick, and William Runyon [ECF 78, at 12-15]. Both Glick and Runyon were retained as experts to opine with regard to the **merits** of Plaintiffs' claims. While their opinions undermine the Plaintiffs' claims, neither expert was specifically retained as an expert on class certification issues.

Plaintiffs noticed the depositions of each expert for November 9, 2021, but declined to proceed on the basis that Defendants' expert disclosures did not satisfy Fed. R. Civ. P. 26(a)(2)(B) and Fed. R. Evid. 702. *See Transcript,* **Exhibit A**). Defendants' counsel requested an explanation of precisely in what manner the disclosures were deficient, but Plaintiffs declined. Defendants once again attempted to confer on this issue via letter dated November 9, 2021, once again requesting an explanation of how Plaintiffs contend the disclosures were deficient. Plaintiffs' counsel did not respond. (*Correspondence to Dan Slotchiver,* **Exhibit B**). Finally, on January 5, 2022, upon realizing that Glick's entire report had inadvertently not been previously exchanged,

Defendants' counsel forwarded the full report to Plaintiffs (*Correspondence to Slotchiver, **Exhibit C***).

      Plaintiffs neglected to bring this matter to the attention of Defendants or file a timely motion with the Court.  Further, they have had ample notice of Mr. Glick's report and cannot establish any prejudice resulting from the late disclosure of the full extent of Mr. Glick's opinions. As such Plaintiffs' contentions and argument on this issue have nothing to do with the issue of class certification and should be disregarded.

                      Respectfully submitted,

                      **TURNER PADGET GRAHAM LANEY, PA**

                      *s/Richard S. Dukes, Jr.*
                      Richard S. Dukes, Jr., Federal ID No. 7340
                      40 Calhoun Street, Suite 200
                      Charleston, SC 29401
                      Phone: (843) 576-2810
                      Email: RDukes@turnerpadget.com

                      Carmelo Barone Sammataro, Federal ID No.: 9174
                      P.O. Box 1473
                      Columbia, SC 29202
                      Phone: (803) 254-2200
                      Fax: (803) 799-3957
                      Email: ssammataro@turnerpadget.com

                      Megan Ashley Rushton, Federal ID No.: 13303
                      P.O. Box 1509
                      Greenville, SC 29602
                      Phone: (864) 552-4691
                      Email: mrushton@turnerpadget.com

                      **ATTORNEYS FOR DIOCESE DEFENDANTS**

February 1, 2022

2

**JA1470**

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 2:21-613-RMG |
| v. | ) ) ) | **ORDER AND OPINION** |
| The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Before the Court is Plaintiffs' motion for class certification (Dkt. No. 67). For the reasons set forth below, the Court denies Plaintiffs' motion.

### Facts

Plaintiffs bring this putative class action alleging that, from roughly 1989 through 2019, students at Bishop England High School ("BEHS") were made to disrobe in locker rooms which contained coaches' offices with "large glass window[s]" whereby BEHS employees, agents, and/or others may have viewed students.

Per the Amended Complaint, around May 1, 2019, Defendants learned that BEHS employee Jeffrey Alan Scofield had "surreptitiously filmed students while they used a BEHS locker room, through the window viewing the locker room, and had stored the recordings on an electronic device believed to be a computer belonging to BEHS." Defendants reported Scofield to law enforcement authorities. The City of Charleston Police Department arrested Scofield on

**JA1471**

charges of voyeurism. Scofield subsequently pled guilty to the charges in the Berkely County Court of General Sessions. *See* (Dkt. No. 35). Plaintiffs initiated this action.

Plaintiffs propose two putative classes—a "Tuition Class" and a "Viewed Class."

The *Tuition Class*[] consists of all those persons, or such persons' personal representatives, heirs or assigns, wherever located, who claims or in the future may have any claim against Defendants The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, arising out of, based upon, or in any way related to, or involving claims for reimbursement of tuition paid to Defendants as a result of Jeffrey Scofield or any other Bishop England High School employee or agent monitoring, watching, viewing, spying, prying, besetting, photographing or videotaping them, or other such similar type conduct, through the viewing windows of the coaches' office into the locker rooms while attending Bishop England High School from 1998 through 2019.

The *Viewed Class*[] consists of all those persons, or such persons' personal representatives, heirs or assigns, wherever located, who have or in the future may have any claim against Defendants The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, arising out of, based upon, or in any way related to, or involving injuries or damages claimed as a result of Jeffrey Scofield or any other Bishop England High School employee or agent monitoring, watching, viewing, spying, prying, besetting, photographing or videotaping them, or other such similar type conduct, through the viewing windows of the coaches' or other BEHS officials' offices into the locker rooms while attending Bishop England High School from 1998 at least through 2019.

(Dkt. No. 67 at 34-35).

As to the Tuition Class, Plaintiffs bring claims for: (1) Negligence, (2) Unjust Enrichment, (3) Breach of Warranty, and (4) Negligent Hiring, Supervision and Retention. As to the Viewed Class, Plaintiffs bring claims for: (1) Wrongful Intrusion into Private Affairs, (2) Negligence, and (3) Negligent Hiring, Supervision and Retention. (Dkt. No. 35 at 16-27).

JA1472

On December 13, 2021, Plaintiffs moved for class certification. (Dkt. No. 67). Defendants oppose. (Dkt. No. 75).  Plaintiffs filed a reply. (Dkt. No. 78).[1] Defendants filed a surreply. (Dkt. No. 83).

Plaintiffs' motion is fully briefed and ripe for disposition.

**Legal Standard**

Rule 23(a) of the Federal Rules of Civil Procedure identifies the prerequisites for a class action as follows:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see generally Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 133 S.Ct. 1184, 1191, 185 L.Ed.2d 308 (2013); *Gray v. Hearst Commc'ns, Inc.*, 444 Fed. Appx. 698, 700 (4th Cir. 2011); *Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir. 2009); *Thorn v. Jefferson–Pilot Life Ins. Co.*, 445 F.3d 311, 339 (4th Cir. 2006). These four prerequisites for class certification under Rule 23(a) are commonly referred to as numerosity, commonality, typicality, and adequacy of representation.

In addition to the requirements of Rule 23(a), Plaintiffs must also meet the requirements for maintenance of a class action imposed by Rule 23(b)(3)—namely, that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently

---

[1] In their reply, "Plaintiffs concede, and withdraw their Motion for Class Certification as to the cause of action for Negligent Hiring." (Dkt. No. 78 at 15).

3

**JA1473**

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Factors pertinent to a determination whether the "predominance" and "superiority" requirements have been satisfied include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Certification is only proper if the Court, after conducting a "rigorous analysis," is satisfied that the prerequisites of Rule 23 have been satisfied. *See id.* at 350–51, 131 S.Ct. 2541. "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* at 351, 131 S.Ct. 2541. However, "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage,'" and "the merits of a claim may be considered only when 'relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Brown v. Nucor Corp.*, 785 F.3d 895, 903 (4th Cir. 2015) (quoting *Amgen Inc*, 568 U.S. at 466). "Plaintiffs bear the burden of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden." *Thorn v. Jefferson–Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006) (quoting *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004)) (internal quotation marks and modifications omitted).

4

**JA1474**

In addition to the two-step framework expressly laid out in Rule 23, the Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). Other circuits have described this rule as an "ascertainability" requirement. *Id.* "However phrased, the requirement is the same. A class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.*

In *EQT Production Co.*, the Fourth Circuit vacated the class certification decision of the district court and remanded the case for reconsideration of the ascertainability issues, concluding that the district court had previously "failed to rigorously analyze whether the administrative burden of identifying class members ... would render class proceedings too onerous." 764 F.3d at 358. The Fourth Circuit explained "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.* (citing *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012); *Crosby v. Soc. Sec. Admin. of U.S.*, 796 F.2d 576, 579–80 (1st Cir. 1986)). Specifically, although "plaintiffs need not be able to identify every class member at the time of certification[,] ... '[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* (quoting *Marcus*, 687 F.3d at 593). *EQT Production Co.* has come to stand for the proposition that the goal of the "readily identifiable" requirement is "to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *EQT Prod. Co.*, 764 F.3d at 358). Moreover, courts have further expounded that a "plaintiff cannot merely identify a mass of data which could aid the process of identifying

5

**JA1475**

class members[,] ... the Plaintiff must also provide an efficient method of using this information." *Spotswood v. Hertz Corp.*, No. RDB-16-1200, 2019 WL 498822, at *6 (D. Md. Feb. 7, 2019).

### Rule 23's Requirements as Considered in this Action

**1. Ascertainability**

**a. Fail-Safe Classes**

A fail-safe class is one that "is defined so that whether a person qualifies as a member [of the class] depends on whether the person has a valid claim." *Bigelow v. Syneos Health, LLC*, No. 5:20-CV-28-D, 2020 WL 5078770, at *4 (E.D.N.C. Aug. 27, 2020) (citing *EQT Production Co.*, 764 F.3d at 360 n.9); *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 825 (7th Cir. 2012). Fail-safe classes are considered improper for two reasons. First, in a fail-safe class, "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825. Hence, fail-safe classes "fail to provide the resolution of the claims of all class members that is envisioned in class action litigation." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). Second, fail-safe classes do not comply with Rule 23. Specifically, Rule 23 requires—as noted above—that members of a proposed class be ascertainable. *Krakauer*, 925 F.3d at 655. In certifying a class, however, a court may not "conduct a preliminary inquiry into the merits of a suit." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974). But "class litigation should not move forward when a court cannot identify class members without 'extensive and individualized fact-finding or mini-trials.'" *Krakauer*, 925 F.3d at 658. (quoting *EQT Prod. Co.*, 764 F.3d at 358). Because a fail-safe class requires a court to inquire into the merits of the underlying case to identify the members of the class, fail-safe class definitions violate these principles. *See, e.g., Chado v. Nat'l Auto Inspections, LLC*, No. JKB-17-2945, 2019 WL 1981042, at *4, (D. Md. May 3, 2019).

6

**JA1476**

### b. South Carolina Tort for Wrongful Intrusion into Private Affairs

The cause of action for wrongful intrusion into private affairs consists of (1) an intentional (2) intrusion, (3) which is substantial and unreasonable, (4) into that which is private. *Snakenberg v. Hartford Cas.*, 299 S.C. 164, 171-72 (Ct. App. 1989). Damages "consist[] of the unwanted exposure resulting from intrusion." *Id.* at 172. Where "a plaintiff bases an action for invasion of privacy on 'intrusion,' bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." *O'Shea v. Lesser*, 308 S.C. 10, 17-18 (1992) (citing *Rycroft v. Gaddy*, 281 S.C. 119 (Ct. App. 1984)).

### c. Plaintiffs' Proposed Classes Are Not Ascertainable

Defendants argue that Plaintiffs' proposed classes are not ascertainable. Defendants argue that Plaintiffs' proposed classes are impermissible "fail-safe" classes or otherwise "too vague, too broad, or too subjective" to satisfy the ascertainability requirement. (Dkt. No. 75 at 13-14). Namely, Defendants argue that Plaintiffs' proposed classes cannot be defined with objective criteria as only those individuals who were viewed or who paid tuition for children who were viewed would be part of the classes. *See* (*id.* at 13).

Plaintiffs argue the proposed classes are ascertainable because they are "objectively defined as all students that attended Bishop England [from 1998 through 2019]." (Dkt. No. 78 at 6-7). To support this conclusion, Plaintiffs argue that the tort of wrongful intrusion into private affairs does not require proof of actual viewing. (Dkt. No. 67 at 25 & n.4) (string citing various cases from outside of South Carolina to this effect)[2]; *e.g.*, *Friedman v. Martinez*, 242 N.J. 449

---

[2] As to the Viewed Class, Plaintiffs do not discuss their negligence claim in either their opening memorandum or reply. *See* (Dkt. No. 67 at 2) (noting only that Plaintiffs bring negligence claims); (Dkt. No. 78). Presumably, because a class member would not be able to establish a negligence

### JA1477

(2020) (holding that, under New Jersey law, and pursuant to Restatement (Second) of Torts §

652B, "a victim does not have to present evidence that she was secretly recorded to bring a cause

of action for intrusion onto seclusion" as "[t]he harm occurs when the electronic invasion of

privacy takes place"); *Koeppel v. Speirs*, 808 N.W.2d 177, 182 (Iowa 2011) (noting that courts

"across the nation are divided on the question whether a person can intrude without actually

viewing or recording the victim"); *Id.* (finding that under Iowa law the tort does not require proof

of actual viewing, adopting the reasoning set forth in *Hamberger v. Eastman*, 106 N.H. 107 (1964)

and further reasoning that "Restatement (Second) of Torts [§ 652B illus. 3, at 379] make[s] no

suggestion that the intrusion into solitude or seclusion requires someone to actually see or hear the

private information"). "Applying this law to the facts of the case," Plaintiffs argue, "it is

indisputable that . . . all students that attended [BEHS] from 1998 through 2019," are necessarily

class members, thus rendering the proposed classes objectively definable. (Dkt. No. 78 at 7).

     The Court finds that Plaintiffs' proposed classes are not ascertainable. Plaintiffs misstate

the law in South Carolina as to the tort of intrusion into private affairs. Plaintiffs ignore that South

Carolina is not a Restatement district for this tort, *Snakenberg*, 299 S.C. at 170-71; Eli A. Meltz,

---

claim without proof that she was in fact harmed—i.e., viewed—the analysis described herein
applies equally to the Viewed Class's negligence claim. Further, the same analysis would apply
to the claims of the Tuition Class, all of which turn on a child being "viewed." *See, e.g.*, (Dkt. No.
35 ¶ 115) (Defendants negligent because they "directed, allowed, and/or encouraged adult athletic
officials or others, including all their agents, employees, and/or servants, to observe, watch,
monitor, spy, or otherwise view the VIEWED CLASS members in the subject locker rooms (male
and female)"); (*Id.* ¶ 81) (Defendants negligent toward Tuition Class "by designing, constructing,
and maintaining the BEHS locker rooms and athletic offices in a way that adult athletic officials
or their other agents, employees, and/or servants and others would have unfettered, open, and
intrusive view of the student s while they engaged in private activities such as dressing, undressing,
being nude, disrobing, showering and drying, and an opportunity for actors and perpetrators to
derive sexual pleasure from such observation and recorded material"); (*Id.* ¶¶ 86-87) (Defendants
liable for unjust enrichment as to Tuition Class because "Defendants failed to take adequate steps
to prevent students from being viewed"); (*Id.* ¶¶ 94-95, 97) (same regarding warranty claim of
Tuition Class—"Defendants granted access to BEHS to Scofiled including . . . viewing rooms").

No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion, 83 Fordham L. Rev. 3431, 3450 (2015), and that, to the contrary, South Carolina law explicitly requires that information about the victim be acquired by the defendant for the tort to be actionable. *Compare Snakenberg*, 299 at 171 ("[T]he damage consists of the unwanted *exposure resulting* from the intrusion.") (emphasis added); *Id.* (noting that "[a]n intrusion may consist of *watching, spying, prying, besetting, overhearing*, or other similar conduct"—implicitly requiring a defendant actually view the plaintiff) (emphasis added); *Meltz*, 83 Fordham L. Rev. at 3450 ("South Carolina's formulation of the cause of action indicates that, unlike section 652B, information must be acquired about the plaintiff to be actionable: the damage is from the unwanted exposure arising from the intrusion and *not from the intrusive act itself*, as the Restatement indicates.") (emphasis added); *O'Shea*, 308 S.C. at 17-18 (implicitly acknowledging information must be obtained about the plaintiff because, where "a plaintiff bases an action for invasion of privacy on 'intrusion,' *bringing forth no evidence of public disclosure* [of the information], it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom") (emphasis added) *with Koeppel*, 808 N.W.2d at 182, 184 (holding that under Iowa law an intrusion can occur without actually viewing or recording the victim). Given the above, Plaintiffs' proposed classes will not be defined "until the case is resolved on the merits," *Bigelow*, 2020 WL 5078770, at * 5, because only if a putative class member can show that he, she, or her child was viewed in the locker rooms will that individual be known to be part of one of the putative classes, *Melton ex rel. Dutton v. Carolina Power & Light Co.*, 283 F.R.D. 280, 288 (D.S.C. 2012) (noting that fail-safe classes "require[] a court to rule on the merits of the claim at the class certification stage in order to tell who was included in the class" and that "[s]uch a class definition is improper because a class member either wins or, by virtue of losing,

**JA1479**

is defined out of the class and is therefore not bound by the judgment.") (citing *Messner*, 669 F.3d

at 826).[3]    Accordingly, the proposed classes are unascertainable and cannot be certified.  *See*

*Krakauer*, 925 F.3d at 658.

### 2. Standing

Assuming for argument's sake that Plaintiffs' proposed classes were ascertainable, the

Court considers whether Plaintiffs' named representatives have constitutional standing.

The Supreme Court has made clear that "named plaintiffs who represent a class 'must

allege and show that they personally have been injured, not that injury has been suffered by other,

unidentified members of the class to which they belong and which they purport to represent.'" *Doe*

*v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011) (citing *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S.

26, 40 n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).  Without a sufficient allegation of harm to

the named plaintiff in particular, plaintiffs cannot meet their burden of establishing standing. *Id.*;

---

[3] In *Bigelow*, the proposed class was "Any and all employees who worked for Defendant during
the relevant limitations period who were denied promotions, pay increases, and/or suffered any
adverse employment action, as a result of her/his/their prior or anticipated use of protected FMLA
leave during her/his/their employment."  The Court found that:

> This class definition turns on whether the employee has a valid claim, and "[t]hat
> is a classic fail-safe class." To illustrate, if plaintiff fails to prove (1) that a particular
> employee experienced adverse promotion, pay, or employment actions or (2) that
> Syneos took such actions because the employee used or planned to use FMLA
> leave, then Syneos is entitled to a judgment in its favor with respect to that
> employee. The court, however, could not enter a judgment against that particular
> employee because that employee would no longer fit the class definition. Bigelow's
> fail-safe class defines itself based on legal conclusions and impermissibly
> constitutes "a class that cannot be defined until the case is resolved on its merits."
> A fail-safe class action leaves a defendant in a "heads, I win ... tails, I can sue again"
> situation, contravening the truism that class actions should "resolve an issue that is
> central to the validity of each one of the claims in one stroke."

*Bigelow v. Syneos Health, LLC*, No. 5:20-CV-28-D, 2020 WL 5078770, at *5 (E.D.N.C. Aug. 27,
2020) (internal citations omitted).

## JA1480

*see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) (no standing for 6,332 class members whose credit reporting files contained inaccurate information but were not disseminated to third parties—"[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to third parties, causes no concrete harm"); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (noting that, "[t]o have standing, a plaintiff must show "injury in fact," causation, and redressability); *Id.* ("Injury in fact" is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'").

Defendants argue that neither Viewed Student Female 200, Viewed Male Student 300, nor Nestler are adequate class representative because all lack standing to prosecute this lawsuit. (Dkt. No. 75 at 2, 15) ("Because there is not a shred of evidence that either student-plaintiff was actually illicitly recorded changing clothes—neither is among the five boys identified by the South Carolina Attorney General's Internet Crimes Against Children Task Force as having been surreptitiously recorded changing clothes in the locker room by Jeffrey Scofield in 2019—Plaintiff's claims are entirely 'what might have happened' or 'what could have happened' as opposed to what did happen."). Plaintiffs, by contrast, argue that all elements of the tort of intrusion into private affairs are satisfied and further argue that Defendants have "admitted to the blanket monitoring of their students in the locker room. The school also conceded . . . in Principal Finneran's testimony, that the monitoring of the students when they were unaware would constitute an invasion of privacy and is thus . . . not a safe, moral or nurturing environment." (Dkt. No. 78 at 2); (Dkt. No. 67 at 4-5, 6) (stating that Defendants have "admitted to installing the viewing windows for monitoring the students for 'safety reasons' without the use of video cameras") (citing the testimony of Roger Attansio, one of the architects of BEHS who testified, in response to Plaintiff's question that

11

**JA1481**

windows in the locker rooms act as "peepholes" "I don't know that I would say it's like a peephole. I guess one could make that argument, yes sir"); (*Id.* at 9) (arguing Defendants have "admitted to actually using" the windows because Maria Aselage, a spokesperson for the Diocese, released a press statement indicating the windows "were included in the plans and installed in the building in the 1990's for safety reasons").

Here, both Viewed Student Female 200 and Viewed Male Student 300 testified that, to their knowledge, they were not viewed by anyone through the windows in the locker rooms of BEHS. *See, e.g*, Viewed Male Student 300 Deposition, (Dkt. No. 75-5 at 10:13-15) ("Q: Did anybody ever take a picture in the locker room? A: No."); (*Id.* at 10:25-11:2) ("Q: Did you ever see the blinds open? A: No."); (*Id.* at 11:22-24) ("Q: So you didn't see [people in the coaches' office when] looking into the office from the locker room? A: No."); (*Id.* at 15:10-14) (testifying that "no one has informed" deponent that he was "photographed by any person, not just Scofield" while changing clothes in the locker room); (Dkt. No. 67-18 at 32:3-6) ("Q: So you're suing because of something that might have happened, but you don't know whether it did or not? A: [Yes,] I think that's worse than knowing."); Viewed Student Female 200 Deposition, (Dkt. No. 75-6 at 9:5-19) (testifying deponent saw blinds on the windows, that the blinds were "closed" and that she could not remember if she "ever s[aw] the blinds open"); (*Id.* at 12:4-9) ("Q: And you never observed anybody looking through the window while you were changing clothes, correct? A: No. Q: You did not see anybody? A: No."); (*Id.* at 16:10-12) ("Q: Has anyone alerted you that somebody had taken pictures of you? A: As of this moment, no."). Defendants further point out that Plaintiff's expert psychologist testified as follows regarding the harm allegedly suffered by the named viewed plaintiffs:

> It's kind of an idea of if I'm driving across a bridge and the bridge collapses, but I made it across the bridge, but the car behind me almost didn't, and the car behind

12

**JA1482**

> it didn't, I might go on and be okay until I learned, wow, do you realize just how close that was on that day to ending my life. And it's a moment when you take a pause.

Amanda Salas, MD Deposition, (Dkt. No. 75-2 at 82:11-18). As to Gary Nestler, the named plaintiff for the Tuition Class, Nestler testified that his daughter was bullied at BEHS, (Dkt. No. 75-8 at 53:14-17), that Nestler was harmed because he felt his daughter did not receive a "safe" education due to the windows in the locker rooms at BEHS, (*Id.* at 53:7-13), but that Nestler did not know if his daughter had ever been photographed or videoed, (*Id.* at 55:3-23).

In their motion for class certification, Plaintiffs cite *Snakenberg v. Hartford Cas Ins. Co.*, 299 S.C. 164 (Ct. App. 1989) and assert it stands for the proposition that "[a]ll Plaintiffs need to prove in this case is the four elements of the invasion of privacy tort, and then, 'the fact of damage is established as a matter of law.'" (Dkt. No. 67 at 24). Plaintiffs continue that, because "their privacy was invaded by the use of the viewing portals," and because "it is <u>not</u> necessary for the Class Representatives to 'prove' that they were actually viewed or monitored," the class representatives are adequate and class certification appropriate. (*Id.* at 24-25 & n.4) (string citing cases such as *Koeppel* and *Friedman* which do not require that a victim show she was viewed to state a claim).

The Court finds that Plaintiffs' class representatives lack Article III standing and are inadequate class representatives. As noted above, *Snakenberg* does require that an individual show she was viewed to bring an intrusion of privacy claim. And, as also detailed *supra*, neither Viewed Student Female 200 nor Viewed Male Student 300 testified to having been viewed by anyone and are thus not even members of Plaintiffs' proposed classes. Nor did Nestler testify that his daughter had been viewed. As such, none of these individuals suffered an "intrusion" under *Snakenberg*,

**JA1483**

299 S.C. at 171, or an otherwise concrete harm which would confer Article III standing. *See TransUnion*, 141 S. Ct. at 2200 ("No concrete harm, no standing.").

Because the Court finds there are fatal flaws in Plaintiffs' class definitions and that Plaintiffs' named representatives lack standing, Plaintiffs' motion for class certification should be denied. Nevertheless, because deficient class definitions can be modified—though Plaintiffs do not seek leave to amend should the Court deny their motion—the Court will continue with its class certification analysis, focusing on predominance and superiority.

### 3. Rule 23(b)(3)

#### a. Plaintiffs Fail to Demonstrate Predominance

Rule 23(b)(3) was added as part of the 1966 rule amendments. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). It was "designed to secure judgments binding all class members save those who affirmatively elected to be excluded" in situations where certification is "convenient and desirable." *Id.* at 614–15 (citing advisory committee's note to 1946 amendment). The rule provides that if the requirements of Rule 23(a) are satisfied, the action may be maintained as a class action when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Thus, the two requirements—predominance and superiority.

The two requirements serve two purposes. "The predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Thorn*, 445 F.3d at 319 (citing *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004)); *see also Amchem*, 521 U.S. at 615 (noting the Advisory Committee sought to cover cases that would achieve "uniformity of decisions as to persons similarly situated, without sacrificing procedural

14

**JA1484**

fairness or bringing about other undesirable results"). "The superiority requirement ensures that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" *Thorn*, 445 F.3d at 319 (citing Fed. R. Civ. P. 23(b)(3)). And Rule 23 itself sets forth several factors the court should consider in deciding whether the putative class action meets the two requirements: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

The "predominance requirement is 'far more demanding' than Rule 23(a)'s commonality requirement." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 459 (4th Cir. 2013) (Niemeyer, Jr. concurring in part and dissenting in part) (citing *Amchem*, 521 U.S. at 623). The United States Supreme Court has stated that "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The Fourth Circuit has similarly noted that "[t]he application of Rule 23 often turns on the cause of action." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019).

If "[a] cause of action [ ] includes a fact-bound element or a claim-specific affirmative defense [, it] may be less susceptible to class treatment than one that does not." *Id.* The focus of the predominance analysis being "common proof," with the "availability of such proof turn[ing] on what exactly needs to be proven." *Id.*; *see also Case v. French Quarter III, LLC*, No. 2:12-cv-2518, 2015 WL 12851717, at *6 (D.S.C. July 27, 2015) ("In mass tort cases, common issues of law and fact have been held to predominate 'where the same evidence would *resolve* the question

of liability for all class members.") (emphasis added); *Farrar & Farrar Dairy, Inc. v. Miller-St. Naziane, Inc.*, 254 F.R.D. 68, 72 (E.D.N.C. 2008) ("[A] court must ensure that class certification in a mass tort case really does foster [justice and judicial efficiency]."). Where a plaintiff "must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, the common issues do not predominate." *Case*, 2015 WL 12851717, at *6 (internal quotation omitted).

Relying on their erroneous interpretation of *Snakenberg*, Plaintiffs argue that predominance is met here because "the issue of unwanted . . . exposure is common to all students that attended [BEHS] from 1998 to 2019. All students used the locker rooms, and all had their privacy invaded," leaving the "only question to be resolved . . . the amount of damages to be assessed by the trier of fact." (Dkt. No. 67 at 32).

The Court concludes that questions of individual proof and damages will predominate over common issues of the litigation. *See Case*, 2015 WL 12851717, at *6. As noted above, to state plausible causes of action, especially as to invasion of privacy, factual questions would need to be resolved for each individual class member. These include whether a class member or a class member's child was in-fact viewed and the unique "shame, humiliation, and emotional distress suffered by the [class member]" in order to calculate damages. *Snakenberg*, 299 S.C. at 171-72; *see* (Dkt. No. 75 at 24) ("The privacy claims alone would require massive individualized evidence regarding whether any child over the last 20 years actually had his or her privacy invaded unjustifiably. Whether any student suffered any injury at any time will completely depend on individualized evidence. Likewise, as Dr. Salas admitted, the extent of any impact on any former student will be entirely individualized."); *see also* (*id.* at 23) (noting, as to the proposed parent class, that Nestler claims he was promised his daughter would be "educated in a safe, nurturing

16

**JA1486**

environment" but that Plaintiffs have "presented no evidence that the parents of every aspirant to attend Bishop England received or relied on any such statements, or that either the warranty claim . . . or unjust enrichment claim can be determined for the entire class with common proof"); (Dkt. No. 67 at 26) (citing to screenshots of BEHS's website for the proposition that BEHS held itself out to the Tuition Class "as a moral, caring and safe environment to send one's child or children" and that it would "seriously curb the possibility of sexual abuse happening in our parishes"); (Dkt. No. 78 at 8) (arguing that is not necessary to "make individual inquires for a class-wide determination that the representation was relied on", citing to *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 964 (9th Cir. 2016), *as amended on denial of reh'g and reh'g en banc* (Aug. 18, 2016) for the proposition "[w]here the defendant's representations were allegedly made on a uniform and classwide basis, individual issue of reliance do not preclude class certification," but citing no testimony or evidence *here* as to classwide or uniform representations); (Dkt. No. 67-21 at 48:10-16) (testifying three employees of BEHS told Nestler the school was "safe").  Stated simply, Plaintiffs cannot establish predominance as individual issues will predominate over common issues of the litigation. *See Kline v. Security Guards, Inc.*, 196 F.R.D. 261, 268, 272 (E.D. Pa. 2000) (denying plaintiffs' motion for class certification for lack of, inter alia, ascertainability and predominance because the pertinent tort—violation of the Wiretap Act—required individualized determinations as to each class members reasonable expectation of privacy and "[t]hese factors are likely to be markedly different for members of the putative class. For instance, a class member who had a conversation while other people were nearby, such as during the start of the work shift, would not have nearly the objective expectation of privacy as would a member who was alone in the entranceway and quietly conducting union business on the telephone. The multitude of individual inquiries simply to determine class membership is inapposite to the

17

**JA1487**

expected efficiencies of a class action"); (*Id.*) ("Plaintiffs in this case maintain that Defendants engaged in a common course of conduct [the installation of cameras and a microphone near an employee entrance and payphone] to violate the Wiretap Act. They assert that the alleged constant audio surveillance is a common question to all, as are questions relating to their claims of conspiracy and negligent supervision. However, the complaint is based upon allegations of individual violations, each of which turns on individual circumstances. Without an objectively reasonable expectation of privacy, conversations made by a particular class member will not be protected oral communications under the Act.").

### b. Plaintiffs Fail to Demonstrate Superiority

Superiority requires that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority "'depends greatly on the circumstances surrounding each case,'" and "'[t]he rule requires the court to find that the objectives of the class-action procedure really will be achieved in the particular case.'" *Stillmock v. Weis Markets, Inc.*, 385 Fed. Appx. 267, 274 (4th Cir. 2010). When making this determination, the Court should "not contemplate the possibility that no action at all might be superior to a class action.'" *Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 425 (E.D. Va. 2016) (quoting *Brown v. Cameron–Brown Co.*, 92 F.R.D. 32, 49 (E.D. Va. 1981)). Factors the court should consider include: "(A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing the class action." Fed. R. Civ. P. 23 (b) (3) (A)-(D). Ultimately, "[t]he goal is to

18

**JA1488**

ensure that class certification occurs only when economy and efficiency are reasonably likely to result." *Ganesh, L.L.C. v. Comput. Learning Ctrs.*, Inc., 183 F.R.D. 487, 491 (E.D. Va. 1998).

Here, Plaintiffs do not address superiority. *See* (Dkt. No. 67 at 33-34) (discussing predominance and arguing that "Plaintiffs must satisfy [only] one of the Rule 23(b) factors"). *Contra, e.g., Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) ("To be sure, Rule 23(b)(3) class actions must meet predominance and superiority requirements not imposed on other kinds of class actions."); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) ("Rule 23(b)(3) has two components: predominance and superiority.").

The Court finds that the superiority requirement is not met. As Defendants correctly argue, to the extent individuals believe they were filmed or photographed, such individuals may bring individual lawsuit to vindicate those rights. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) (no superiority where individual damage claims are high). Further, as discussed above, because Plaintiffs' claims turn on individual questions as to each class member, the difficulties in managing this case as a class action would be great. *See* (Dkt. No. 75 at 26) (noting the Court would have to "conduct numerous trials within a trial: were you a student? is your claim time-barred? were you viewed illicitly and without reason? did you suffer mental harm as a result?"); *O'Shea v. Lesser*, 308 S.C. 10, 17-18 (1992) (Where "a plaintiff bases an action for invasion of privacy on 'intrusion,' bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom."); § 4:64. Overview, 2 Newberg on Class Actions § 4:64 (5th ed.) (superiority often met in two situations, either where "many individuals have small damage claims" and where, absent a class suit, "it is unlikely that any of the claims will be accorded relief" or where the legal system is "flooded by particular types of claims"); *Amchem*

**JA1489**

*Products, Inc.*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (citation omitted); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 860, 119 S. Ct. 2295, 144 L. Ed. 2d 715, 43 Fed. R. Serv. 3d 691 (1999) ("One great advantage of class action treatment of mass tort cases is the opportunity to save the enormous transaction costs of piecemeal litigation.").

**Conclusion**

For the reasons stated above, the Court **DENIES** Plaintiffs' motion for class certification (Dkt. No. 67).

**AND IT SO ORDERED**.


s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge


March 24, 2022
Charleston, South Carolina

**JA1490**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRCIT OF SOUTH CAROLINA
CHARLESTON DIVISION**

**CIVIL ACTION NUMBER: 2:21-cv-613-RMG**

|  |  |  |
|---|---|---|
| Gary Nestler, *et al,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANTS' MOTION FOR SUMMARY** |
| The Bishop of Charleston, a Corporation Sole, *et al,* | ) | **JUDGMENT** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Based upon the Court's Order denying class certification [Dkt. 84], and the determination that Plaintiffs do not have constitutional standing to assert the claims alleged in the Amended Complaint [ECF 35][ Order, pp. 12-14], Defendants move for summary judgment as to all claims. As the Court determined, none of the Plaintiffs have established "a concrete harm that would confer Article III standing." [*Id. citing TransUnion, LLC v. Ramirez,* 141 S.Ct. 2190, 2200 (2021).

In accordance with Local Civil Rule 7.04, DSC, a full explanation of the motion is contained with this motion and the referenced Order of the Court such that a memorandum or affidavit would serve no useful purpose.

Respectfully submitted,

**TURNER PADGET GRAHAM LANEY, PA**

*s/Richard S. Dukes, Jr.*
Richard S. Dukes, Jr., Federal ID No. 7340
40 Calhoun Street, Suite 200
Charleston, SC 29401
Phone: (843) 576-2810
Email: RDukes@turnerpadget.com

1

**JA1491**

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Megan Ashley Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

**ATTORNEYS FOR DIOCESE DEFENDANTS**

April 8, 2022

**United States District Court**
**District of South Carolina**
**Charleston Division**

| | | |
|---|---|---|
| Gary Nestler, | ) | C/A: 2-21-cv-00613-RMG |
| Viewed Student Female 200, | ) | |
| Viewed Student Male 300, | ) | |
| on behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | **PLAINTIFFS' MOTION FOR** |
| | ) | **RECONSIDERATION PURSUANT TO** |
| | ) | **FED. R. CIV. P. 59(e)** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| | ) | |
| The Bishop of Charleston, a Corporation | ) | |
| Sole, Bishop England High School, | ) | |
| Tortfeasors 1-10, The Bishop of the Diocese | ) | |
| of Charleston, in his official capacity, and | ) | |
| Robert Guglielmone, individually, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Come now Plaintiffs by and through their undersigned attorneys, and file this their Motion

for Reconsideration of the Court's March 24, 2022 denial of the Plaintiffs' Motion for Class

Certification. Plaintiffs file this motion with the utmost respect for this Court, however, humbly

and confidently submit that the Court's denial of its motion for class certification was a manifest

error of law for the reasons set forth herein.

     I.     **Standard Applicable to Motion.**

The purpose of a motion to alter or amend a judgment under Fed.R.Civ.P. 59(e) is to

"correct manifest errors of law or fact or to present newly discovered evidence." *Ruscavage v.*

*Zuratt*, 831 F. Supp. 417, 418 (E.D. Pa. 1993). Granting such a motion means that a court must

1

**JA1493**

find that it overlooked "matters or controlling decisions" which, if it had considered such issues, "would have mandated a different result." *Eisert v. Town of Hempstead*, 918 F. Supp. 601, 606 (E.D.N.Y. 1996). Here, the basis of the Court's denial of its motion for class certification was based upon an erroneous reading of South Carolina law articulating the tort of invasion of privacy – intrusion into private affairs. The Court overlooked the South Carolina Supreme Court's decision in *O'Shea v. Lesser*, 308 S.C. 10, 17–18, 416 S.E.2d 629, 633 (1992), where the court affirmed that under South Carolina law that "actual viewing" is not necessary to satisfy the "intrusion" element of the intrusion into private affairs tort. Had the Court relied upon that binding South Carolina precedent that does not require "actual viewing," all of the requirements for class certification would have been met as the Court's denial of three of the four class certification requirements that the Court held weren't satisfied was predicated on an "actual viewing" standard.

## II.    Had the Court Determined "Actual Viewing" is Not Required under the Intrusion Tort, the Plaintiffs would have met the Ascertainability Requirement.

The lynchpin of three of the bases upon which the Court denied the motion for class certification is a single legal question – whether under South Carolina law, the tort of wrongful intrusion into private affairs requires proof of actual viewing. This legal question is central to the Court's ascertainability (ECF 84 at 7), constitutional standing (*Id*. at 13), and predominance (*Id*. at 16) analyses, all of which rest upon the Court's conclusion that proof of actual viewing is required in order to establish the intrusion tort.

South Carolina case law is scant when it comes to this question. The broad invasion of privacy tort was first recognized in South Carolina in *Holloman v. Life Ins. Co. of Virginia*, 192 S.C. 454, 7 S.E.2d 169 (1940). In *Holloman*, the South Carolina Supreme Court stated:

> The right of privacy is one which was not definitely recognized by the law until comparatively recent times. But we find ourselves in agreement with a number of

authorities to the effect that the violation of such a right is under certain
circumstances a tort which would entitle the injured person to recover damages.
But the right of privacy is correctly defined in 21 R.C.L. 1196 as "the right to be
let alone; the right of a person to be free from unwarranted publicity". Or more
specifically but less accurately, "the right to live without one's name, picture or
statue, or that of a relative, made public against his will".

*Holloman*, 7 S.E.2d at 171. Notably, this plain language from *Holloman* strongly suggests that the

initial recognition in South Carolina of the broader tort of invasion of privacy only included one

of the "sub-torts" – the "public disclosure of private affairs" tort.

Further recognition and expansion of the invasion of privacy tort by the Supreme Court of

South Carolina came in *Meetze v. Associated Press*, 230 S.C. 330, 335, 95 S.E.2d 606, 608 (1956),

where the court stated:

The 'right of privacy' has been defined as the right of an individual to be let alone,
to live a life of seclusion, to be free from unwarranted publicity. 77 C.J.S., Right of
Privacy, § 1; 41 Am.Jur., Privacy, Section 2. The following has been suggested as
a fairly comprehensive definition of what constitutes an actionable invasion of the
right of privacy: 'The unwarranted appropriation or exploitation of one's
personality, the publicizing of one's private affairs with which the public has no
legitimate concern, or the wrongful intrusion into one's private activities, in such
manner as to outrage or cause mental suffering, shame, or humiliation to a person
of ordinary sensibilities.' 41 Am.Jur., Privacy, Section 2; *Continental Optical Co.
v. Reed*, 119 Ind.App. 643, 86 N.E.2d 306, 14 A.L.R.2d 743; *Smith v. Doss*, 251
Ala. 250, 37 So.2d 118. The existence of a legal right of privacy is recognized by
the American Law Institute in the following language: 'A person who unreasonably
and seriously interferes with another's interests in not having his affairs known to
others or his likeness exhibited to the public is liable to the other.' 4 Restatement,
Torts, Section 867.

*Meetze* is thus the first South Carolina case that recognized three separate sub-torts under the

broader invasion of privacy tort – unwanted appropriation, public disclosure, and intrusion.

Notably, in adopting this formulation of the invasion of privacy tort, the South Carolina Supreme

Court relied upon the original Restatement of Torts, demonstrating that South Carolina generally

looks with favor upon the Restatement formulations of the law.

3

**JA1495**

The South Carolina Court of Appeals provided additional refinement. Relying upon *Meetze*, two 1984 Court of Appeals' decisions in *Rycroft v. Gaddy*, 281 S.C. 119, 124–25, 314 S.E.2d 39, 43 (Ct. App. 1984) and *Corder v. Champion Rd. Mach. Int'l Corp*., 283 S.C. 520, 525, 324 S.E.2d 79, 82 (Ct. App. 1984) articulated the invasion of privacy tort this way:

> In order to state a cause of action for this tort the plaintiff must allege: (1) the unwarranted appropriation or exploitation of his personality; or (2) the publicizing of his private affairs with which the public has no legitimate concern; or (3) the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.

*Rycroft* and *Corder* made plain that there are three separate "sub-torts" (or "complex of several torts," as this Court wrote in *Shorter v. Retail Credit Co*., 251 F. Supp. 329, 330 (D.S.C. 1966)) under the broader tort of invasion of privacy, just as the South Carolina Supreme Court in *Meetze* recognized. This formulation of the invasion of privacy tort was also used in *Wright v. Sparrow*, 298 S.C. 469, 471, 381 S.E.2d 503, 505 (Ct. App. 1989).

The Court of Appeals in *Rycroft* went on to set forth the required elements of the intrusion into private affairs claim. The *Rycroft* court held that:

> When a plaintiff bases an action for invasion of privacy on "intrusion" alone, bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom. *Shorter v. Retail Credit Co*., 251 F. Supp. 329 (D.S.C.1966).

*Rycroft*, 281 S.C. at 124–25, 314 S.E.2d at 43. The *Rycroft* court's statement "bringing forth no evidence of public disclosure" is a recognition that "public disclosure" is not a necessary element of the intrusion tort, if a plaintiff can show "a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." This tracks in complete harmony with the Second Restatement of Torts § 652(B), which does not require acquisition of information for the intrusion tort. *See* Restatement (Second) of Torts § 652B cmt. a

4

**JA1496**

(1977) (explaining that the form of invasion of privacy covered by intrusion upon seclusion —consists solely of an intentional interference with the plaintiff's seclusion and does not depend on publicity given to the plaintiff's private affairs).

The 1989 Court of Appeals decision in *Snakenberg v. Hartford Cas. Ins. Co*., 299 S.C. 164, 171, 383 S.E.2d 2, 6 (Ct. App. 1989) is the next case where South Carolina courts examined the intrusion into private affairs claim. *Snakenberg* is an "actual viewing" case, where the plaintiff concealed a video tape camera and recorder in a dressing room and was filming and recording teenage girls changing from swimsuit to swimsuit. *Snakenberg*, 299 S.C. at 167, 383 S.E.2d at 4. As an "actual viewing" case, there was no reason for the *Snakenberg* court to consider the question of whether or not "actual viewing" is a required element of the intrusion tort. Nevertheless, the *Snakenberg* court undertook the task of examining the "nature and scope" of the intrusion tort. *Id.*, 299 S.C. at 171, 383 S.E.2d at 6. As part of this examination, the *Snakenberg* court – without citation to any legal authority – defined the "intrusion" element of the wrongful intrusion into private affairs tort as follows:

> (1) Intrusion. An intrusion may consist of watching, spying, prying, besetting, overhearing, or other similar conduct. Whether there is an intrusion is to be decided on the facts of each case.

*Id*. This definition of the intrusion element was interpreted by this Court to mean that "actual viewing" is required to satisfy this element of the tort.

But *Snakenberg* isn't the last or the most authoritative word on this issue. Instead, in *O'Shea v. Lesser*, 308 S.C. 10, 17–18, 416 S.E.2d 629, 633 (1992), the South Carolina Supreme Court expressly relied upon the language in *Rycroft*, and established under South Carolina law that "actual viewing" is not necessary to satisfy the "intrusion" element of the intrusion into private affairs tort. A close reading of *O'Shea* bears this out. *O'Shea* involved a dispute between

5

**JA1497**

residential property neighbors over construction of an open outdoor deck. After the deck was

constructed, the neighbors who built the deck:

> can see around appellant's patio wall into a portion of appellant's home from the
> end of their addition. Appellant asserts that as a result of the Lessers' ability to see
> into her house, she has been forced to change her lifestyle to avoid being watched
> by the Lessers.

*O'Shea*, 308 S.C. at 13–14, 416 S.E.2d at 631. "Can see," and the "ability to see" into the

neighboring house establishes that the intrusion claim asserted wasn't about "actual viewing," but

rather was about the "ability to see."

While the South Carolina Supreme Court in *O'Shea* ultimately ruled against the appellant,

it did not do so because the court found that actual viewing was required:

> Appellant asserts that the master-in-equity erred in finding that appellant suffered
> no damages even though (1) the Lessers ***can see*** into her home, thereby allegedly
> invading her right to privacy, and (2) the improvements to the Lessers' residence
> allegedly diminish her right to a view. We disagree.
>
> > This Court has defined invasion of privacy as:
> >
> > > The unwarranted appropriation or exploitation of one's
> > > personality, the publicizing of one's private affairs with
> > > which the public has no legitimate concern, or the wrongful
> > > intrusion into one's private activities, in such manner as to
> > > outrage or cause mental suffering, shame, or humiliation to
> > > a person of ordinary sensibilities.
>
> *Meetze v. The Associated Press*, 230 S.C. 330, 95 S.E.2d 606 (1956). Where, as
> here, a plaintiff bases an action for invasion of privacy on "intrusion," bringing
> forth no evidence of public disclosure, it is incumbent upon him to show a blatant
> and shocking disregard of his rights, and serious mental or physical injury or
> humiliation to himself resulting therefrom. *Rycroft v. Gaddy*, 281 S.C. 119, 314
> S.E.2d 39 (Ct.App.1984).
>
> The fact that the Lessers ***can see*** into a portion of appellant's home is not so blatant
> or shocking as to constitute an invasion of appellant's right to privacy. People who
> live in organized communities must of necessity suffer some inconvenience and
> annoyance from their neighbors and must submit to annoyances which are the
> consequence of the reasonable use of property by others. *Winget v. Winn Dixie
> Stores, Inc.*, 242 S.C. 152, 130 S.E.2d 363 (1963).

**JA1498**

*O'Shea*, 308 S.C. at 17–18, 416 S.E.2d at 633 (emphasis added). Thus, the South Carolina Supreme Court's last pronouncement on the intrusion element of this tort (which postdates *Snakenberg*) is that it is possible to satisfy the intrusion element with the mere ability to see ("can see"), not actual viewing, if the plaintiff shows it is so "blatant or shocking" as to constitute an invasion of the right to privacy. *Id*.

In *O'Shea*, the court didn't find that the mere ability to see was blatant or shocking enough, and chalked it up to "inconvenience and annoyance from the neighbors." However, that doesn't negate the proposition that the South Carolina Supreme Court's formulation of the intrusion element plainly contemplates satisfaction of the intrusion element by the mere "ability to see," if the ability to see is so blatant and shocking as to constitute an invasion of privacy.

The case before this Court presents just such a "blatant and shocking" situation, and is a far cry from the mere inconvenience of having one's neighbors potentially peering into one's windows (a situation easily rectified by putting up window treatments). Here, the undisputed facts demonstrate not only that Defendants "can see" or were able to see Plaintiffs and every other student- in spite of the use of window treatments-but actually "did see" numerous students that were "actually viewed" by Scofield. That is a textbook definition of "blatant and shocking."

There is no case law authority negating this plain language in *O'Shea*. Instead, the only authority that reverts to the *Snakenberg* formulation of the intrusion element is a law student Note. Eli A. Meltz, No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion, 83 Fordham L. Rev. 3431 (2015). While the Meltz Note is a fine piece of legal scholarship, it ignores *O'Shea* entirely, and focuses exclusively upon *Snakenberg's* definition of the intrusion element (a definition which, again, is seemingly plucked out of thin air by the South

**JA1499**

Carolina Court of Appeals, as there is no authority cited). The Meltz note is simply wrong that South Carolina's formulation of the intrusion into private affairs cause of action differs from intrusion under the Restatement (Second) of Torts, § 652B, which does not require acquisition of information to recover.[1]  Tellingly, the Second Restatement's formulation of this element (noting that it does not depend on publicity) tracks with the language in *Rycroft*.

What is plain from the language of *O'Shea* and *Rycroft* is that contrary to the conclusion of the Meltz note, South Carolina law is, and always has been, in accord with section 652B of the Second Restatement of Torts, which doesn't require acquisition of information ("actual viewing") to recover. See ECF 67, Page 25, n.4 (citing cases from jurisdictions that have expressly adopted section 652B and that hold that a plaintiff need not show actual viewing); *Phillips v. Smalley Maint. Servs., Inc*., 435 So. 2d 705, 709 (Ala. 1983) (holding that "acquisition of information from a plaintiff is not a requisite element of a § 652B cause of action"). There is also nothing to suggest that the law in South Carolina is any different on this point than the law in those jurisdictions that expressly adopted the Second Restatement construction. South Carolina's division of the invasion of privacy tort into a "complex" of three separate torts mirrors the Second Restatement's division of the invasion of privacy tort into 4 separate torts (three of which are the same as in South Carolina). *Compare* Restatement (Second) of Torts, § 652B (intrusion upon seclusion), § 652C (appropriation of name or likeness), and § 652D (publicity given to private life) with Corder, 283 S.C. at 525, 324 S.E.2d at 82 (recognizing torts of 1) the unwarranted appropriation or exploitation of his personality; or (2) the publicizing of his private affairs with which the public has no legitimate concern; or (3) the wrongful intrusion into one's private activities.

---

[1] Moreover, a law student note, however expertly written, cannot be the authoritative statement of South Carolina law on the intrusion element.

**JA1500**

Also, section 652B of the Second Restatement defines the intrusion tort in this way:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977). South Carolina defines the same tort this way:

> The . . . the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

*Meetze*, 230 S.C. at 335, 95 S.E.2d at 608. There is no question that the Second Restatement and South Carolina are talking about the same tort. Given *O'Shea* and *Rycroft*, there is equally no question that South Carolina already interprets the identical tort in the same manner, and that "actual viewing" is not required.

The language of the South Carolina Supreme Court's ruling in *O'Shea* and the *Rycroft* decision is unambiguous. As the South Carolina Supreme Court's last pronouncement on this element of the tort (which postdates *Snakenberg*), <u>it is</u> possible to satisfy the intrusion element merely with the mere ability to see ("can see") and not "actual viewing."

It is undisputable that with the blinds closed (as Defendants testified to), the use of the windows operated as a peep hole per the architect's admission. Further, the Defendants conceded wholesale monitoring (quite arguably "actual viewing") of the students through the use of the blind covered windows since the school was built in 1998. The Defendants also *were able to see* their students in a private place that had a legitimate expectation of privacy.

Since "actual viewing" is not required under *O'Shea*, all that is left for Plaintiffs to demonstrate is, "a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom," under *O'Shea* 308 at 17–18, 416 S.E.2d at 633.

9

**JA1501**

Although the Court in its Order did not address or analyze whether the Defendants' ability to see unclothed children without their awareness is "so blatant or shocking as to constitute an invasion of privacy," (the first prong) nor whether a "serious mental or physical injury or humiliation to himself resulting therefrom," (the second prong) occurred, the Plaintiffs have proffered evidence to the Court in the form of the Defendants' own admissions that such activity *does* constitute an invasion of privacy. (*See* (Dkt. No. 78 at 2); (Dkt. No. 67 at 4-5, 6). That fact alone establishes the "blatant and shocking" first prong. It is also important to note that the windows were utterly useless. Here, the Court's Order is entirely silent on the Defendant's main justification for the use of the windows: safety. The Plaintiffs unassailable evidence proffered to the Court demonstrated that the Defendants failed to present any indica (let alone a compelling evidentiary showing) that overriding safety concerns warranted the use of the windows and its attendant violation of the children's right to privacy. Defendant advanced no justification for the monitoring of the children, because there is none. In fact, there never was any justification for the windows, because the students are being protected today without the use of the viewing windows. This reality makes the use of the windows even more "blatant or shocking as to constitute an invasion of privacy."

The second prong a "serious mental or physical injury or humiliation to himself resulting therefrom," is satisfied with the humiliation both Plaintiffs testified to. Dr. Salas also testified to the mental harm. The Defendants actually acknowledge this second prong of harm in their response brief.[2] To be blunt and not pejorative, is it not offensive to common sensibilities that the onus is on the Plaintiffs to prove (through "actual viewing") what is inherently an impossible task ? It is

---

[2] Dkt #75, P. 5, ¶1. Defendants misquote the standard to omit that a mere "humiliation" qualifies and instead represent to the Court that a "serious mental injury" is required.

**JA1502**

an impossible task to prove that each Bishop England student was "actually viewed," other than through the evidentiary admissions of the school officials that the students were monitored in the locker rooms[3]. Behind that pragmatic impossibility is the prescient logic of why Courts across the country, and indeed the *O'Shea* court itself, have declined to hold a Plaintiff to the standard of "actual viewing," or "actual listening," as cited[4] in the numerous jurisdictions in Plaintiffs motion for class certification. These courts hold that "actual viewing," or "actual listening," is not a required element under the tort because the tort is meant to protect the Plaintiffs' after the fact mental well-being in an area cloaked with privacy and seclusion. These cases expressly state that an intrusion occurs when the invasion *could have* intruded privacy. *See*, *e.g. Koeppel v. Speirs*, 808 N.W.2d 177, 182–85 (Iowa 2011)(" if the fact finder finds from the evidence that the device could have intruded into the privacy of the plaintiff, the element of intrusion is satisfied."); *Harkey v. Abate*, 131 Mich.App. 177, 346 N.W.2d 74, 76 (1983) ("In our opinion, the installation of the hidden viewing devices alone constitutes an interference with that privacy which a reasonable person would find highly offensive. And though the absence of proof that the devices were utilized is relevant to the question of damages, it is not fatal to plaintiff's case."); *Hamberger v. Eastman*, 106 N.H. 107, 206 A.2d 239 (1964)(court held the plaintiffs were not required to prove the defendant actually overheard or viewed the activities in a secluded place to show an intrusion occurred. Instead, it found an intrusion occurs when the defendant performs an act that had the potential to impair a person's peace of mind and comfort associated with the expectation of privacy).

Had the Court not interpreted South Carolina law as requiring "actual viewing" to establish the tort of intrusion into private affairs, the proposed class of students that were capable of being

---

[3] The Order is silent on addressing these admissions as proof of "actual viewing."
[4] See Footnote 4 to Plaintiffs' Motion for Class Certification.

**JA1503**

seen is easily ascertainable (i.e. all students that attended Bishop England High School during the relevant time periods, as set forth in the Plaintiffs' class certification motion).

### III.    Had the Court Determined "Actual Viewing" is Not Required under the Intrusion Tort, the Plaintiffs Meet the Standing Requirement.

The Court rooted its opinion that Plaintiffs have no constitutional standing likewise on the grounds that they were not "actually viewed," and suffered no harm or injury. In this vein, the Court noted:

> Defendants further point out that Plaintiff's expert psychologist testified as follows regarding the harm allegedly suffered by the named viewed plaintiffs:
>
> It's kind of an idea of if I'm driving across a bridge and the bridge collapses, but I made it across the bridge, but the car behind me almost didn't, and the car behind it didn't, I might go on and be okay until I learned, wow, do you realize just how close that was on that day to ending my life. And it's a moment when you take a pause.

Amanda Salas, MD Deposition, (Dkt. No. 75-2 at 82:11-18).

However, the Defendants failed to quote Dr. Salas' immediately following sentences in her testimony. Dr. Salas went on state, and quite clearly, that although some children would not be affected, it is <u>obvious</u> that others <u>would be negatively affected</u>:

> And some people may take pause and think about it, reconcile whatever the issue is, and they may not rise to the threshold of coming into a psychiatrist's office or a counselor's office or they may not even go to their pastor about it. And there are other people who have different psychological structure, different life experiences. But this was a high school experience. This high school's kind of a key component in childhood develop [sic]. And the idea that a person who has been in that situation would be affected and it would be negative on their psyche, that's as -- that's as obvious in the world of psychiatry as I'm not gonna find an article that says it's this obvious, because you're also not gonna find an article that says something along the lines of people get pregnant by having intercourse. It's known.

Amanda Salas, MD Deposition, (Dkt. No. 75-2 at 82:19- P. 83: L.12).

**JA1504**

Clearly, Dr. Salas' testimony is that some children will have negative psychological affects due to the Defendants actions. This testimony is proof in and of itself that "actual viewing" is not a precursor to sustaining damages, and is another reason why jurisdictions have allowed the intrusion tort without a proof of viewing[5]. Dr. Salas' testimony also directly establishes an injury in fact to the Plaintiffs, specifically traceable to the Defendants' actions. Dr. Salas' opinions were uncontroverted and unchallenged by any other medical physician giving a different opinion to the contrary. It is here that *Snakenburg's* near strict liability analysis of liability to import damages is consistent with the goals of Plaintiff's proposed class certification of all students at Bishop England that were exposed to the same harm:

> In an action for wrongful intrusion into private affairs, **the damage consists of the unwanted exposure** resulting from the intrusion. Thus, if the plaintiff proves the four elements needed to establish his cause of action, **the fact of damage is established as a matter of law**. The amount of damage is then to be assessed by the trier of fact. In assessing the damage, the trier of fact may consider the shame, humiliation, and emotional distress suffered by the plaintiff as compensable elements of damage.

*Snakenberg v. Hartford Cas. Ins. Co.*, 299 S.C. 164, 171–72, 383 S.E.2d 2, 6 (Ct. App. 1989) (Emphasis added).

Here, *Snakenburg* is consistent with the notion that damages are essentially presumed if the act is committed[6] and that "the damage consists of the unwanted exposure." Put a different way, if it was South Carolina law that "actual viewing" was required, *Snakenburg* would not set forth that damages were established automatically as a matter of law. To the contrary, *Snakenburg* would require proof of "actual damages," which it does not. Actual damages are awarded to a litigant in compensation for his actual loss or injury. *Austin v. Specialty Transp. Servs., Inc.*, 358

---

[5] *See also* deposition of Male Student 300, "Because they are living in a world of they don't know, which, in some cases, can be worse than knowing." (Dep. Male Student, P. 15, L. 15- P. 16, L. 4, Exhibit #17).
[6] Compare to the Defendant's use of the bridge analogy where there is no injury for a third party's tort because of 'what might have happened' or 'what could have happened' as stated in Page 11 of Order.

**JA1505**

S.C. 298, 311, 594 S.E.2d 867, 874 (Ct. App. 2004). In contradistinction, South Carolina law

regarding nominal damages is consistent with *Snakenburg's* treatment of presumed damages:

> The law presumes the existence of at least nominal damages for the violation or
> infringement of a legal right. *Id.* The fact that substantial damages either were not
> discovered or did not occur until sometime later is of no consequence. *Id.* The act
> that is the basis for the action cannot be legally separated from its consequences
> and successive actions may not be brought as the damages develop. *Id.; see
> also Land v. Neill Pontiac, Incorporated,* 6 N.C.App. 197, 169 S.E.2d 537 (1969)
> (the cause of action for negligent injury accrues at the time of the invasion of the
> right and nominal damages, at least, naturally flow from such invasion)

*Grooms v. Med. Soc. of S.C.,* 298 S.C. 399, 402–03, 380 S.E.2d 855, 857 (Ct. App. 1989)

\*\*\*

> "It follows that a cause of action for damages is not on the one hand the damage
> suffered by plaintiff, nor on the other hand the mere evidentiary facts showing the
> defendant's wrong; but it is the wrong itself done by defendant to plaintiff, that is,
> the breach of duty by the defendant to the plaintiff, **whether it is the duty arising
> out of a contract or of tort. Every violation of a legal right imports damage
> and authorizes the maintenance of an action and the recovery of at least
> nominal damages, regardless of whether any actual damage has been
> sustained**."

*Livingston v. Sims,* 197 S.C. 458, 15 S.E.2d 770, 772 (1941)(emphasis added) *overruled on other
grounds* by *Santee Portland Cement Co. v. Daniel Int'l Corp.,* 299 S.C. 269, 384 S.E.2d 693
(1989). See also*, Gordon v. Rothberg,* 213 S.C. 492, 504, 50 S.E.2d 202, 208 (1948)("Where, as
in this case, the legal rights of the respondent had been invaded, the law presumes that he
suffered some actual damages, and it was therefore not improper for the trial judge to direct a
verdict for such form of damages against the appellants, leaving the amount thereof to be
determined by the jury.")

South Carolina law's treatment of nominal damages is on point with the United States Supreme

Court's recent affirmation that nominal damages provide redressability for Article III standing

under the United States Constitution: "The law tolerates no farther inquiry than whether there has

been the violation of a right." [citation omitted] When a right is violated, that violation "imports

damage in the nature of it" and "the party injured is entitled to a verdict for nominal

damages." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800, 209 L. Ed. 2d 94 (2021). "[f]or the

purpose of Article III standing, nominal damages provide the necessary redress for a completed

14

**JA1506**

violation of a legal right." *Uzuegbunam* 141 S. Ct. at 802. Accordingly, Plaintiffs have established

standing as they have brought forth testimony of their injuries consistent with the types of damages

alleged for invasion of privacy when they were not "actually viewed."

IV.     **Had the Court Determined "Actual Viewing" is Not Required under the Intrusion Tort, the Plaintiffs Meet the Predominance Requirement.**

As the Court correctly notes, predominance is established when the liability is common to

all. *Case v. French Quarter III, LLC*, No. 2:12-cv-2518, 2015 WL 12851717, at *6 (D.S.C. July

27, 2015) ("In mass tort cases, common issues of law and fact have been held to predominate

'where the same evidence would *resolve* the question of liability for all class members."). This

Court states on Page 16 of its Order that:

> As noted above, to state plausible causes of action, especially as to invasion of privacy, factual questions would need to be resolved for each individual class member. These include whether a class member or a class member's child was in-fact viewed and the unique "shame, humiliation, and emotional distress suffered by the [class member]" in order to calculate damages.

Order, Dkt # 84, P. 16, ¶2.

As noted above, proof of actual viewing is not required under *O'Shea*, and the evidence

proffered to the Court that the students right to privacy was invaded without any justification

resolves liability as to all class members, as damages are "established as a matter of law" under

*Snakenburg*. Accordingly, the Court's concern as stated on Page 16 of its Order that, "Whether

any student suffered any injury at any time will completely depend on individualized evidence,"

is eliminated *a priori* as damages are established to all those who were able to be viewed in the

locker rooms.

The only remaining task then under *Snakenburg* is to assess the shame, humiliation, and

emotional distress suffered by the plaintiff." *Snakenberg*, 299 S.C. at 171–72. Simply because

individualized determination of damages may be needed does not defeat predominance. *See e.g.*

**JA1507**

*Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir.2001) (affirming district court's determination that common issues predominated because "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue"); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir.1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."). Although the Defendants caused psychological damages, they should be no less approachable to quantification and assessment as physical damages. Physical damages and manifestations can be just as myriad and particularized as psychological damages. Such differences that "go primarily to damages . . . cannot destroy predominance." *Ambriz v. Coca Cola Co.*, No. 14-CV-00715-SVW, 2015 WL 12683823, at *4 (C.D. Cal. Mar. 11, 2015). Thus, issues common to the class predominate.

With regard to the Court's determination that predominance is not met with regard to the tuition class, the statement by the Court that Plaintiffs have "presented no evidence that the parents of every aspirant to attend Bishop England received or relied on any such statements, or that either the warranty claim…or unjust enrichment claim can be determined for the entire class with common proof"; (Dkt. No. 67 at 26) gives insufficient weight to our history as a people and to Plaintiffs' earlier requests for student/tuition payer identification. However, the opening line of the Amended Complaint states "Plaintiffs…bring this action in their individual capacities and on behalf of the class…" in all its allegations. (ECF 35 at 1). It is inescapable that just a few years ago on the streets of the various towns and cities of South Carolina, in the department stores, for example, the water fountains and restroom signs read "WHITE" or "WHITE ONLY" and "COLORED" or "COLORED ONLY." Those signs, just like the statements published by Bishop England High School were published not only to the people in the department store, both black

16

**JA1508**

and white, but to the world, as were the online statements by Bishop England that it was a "moral, caring and safe environment to send one's child or children." Clearly, everybody in the proposed class can rely on that statement by the Defendant Bishop England High School/the Diocese Defendants as being made and held out to the entire Tuition Class just as all people of color could understand that they had been required to drink only from a certain water fountain, whether they saw the sign while shopping in the store or only standing outside on the public sidewalk looking through the store's plate glass window, thirsty or not; the store said it to the world and should be held fully responsible, and BEHS said it offered a "climate of safety, trust, and respect for the individual" to the world and must be held fully responsible for that.

Equally certainly, all Dow implant victims did not have to appear pre-class certification and testify about their reliance on any Defendant's statement that the implants were safe; nor did the cigarette smokers in the tobacco litigation. The nefarious, misleading, and grossly untrue published statements by BEHS are not made acceptable because they were ostensibly made by holy men and women who ran the high school and the holy men who run the Diocese. Interestingly here, Bishop England has in written discovery said that perhaps 7,500 students appeared before these windows and could have been viewed over the years and the Court in the initial hearing in this matter refused to require the Defendants to provide the Plaintiffs the identifying information in its possession of all of the students who attended the high school during the twenty-one years of viewing activity in question and would not even require that the Diocese provide a statement of which students they contended had not been viewed; this while limiting the number of depositions re: the class certification, Rule 23 issues. Predominance is established on this issue as well.

**JA1509**

**V.     Under the Facts of this Case Superiority is Met.**

Finally, had the Court determined that "actual viewing" is not required, class-wide treatment of Plaintiffs claims is the perfect vessel to manage thousands of identical claims, which damages can be addressed in sub-classes or matrices of recognizable damage claims. Collective action is plainly superior in cases involving victims of assault or abuse often do not wish to subject themselves to litigation, whether to avoid making their experience public, having to testify about it, or having to confront their abuser in court. *See, e.g.*, *Doe v. Roman Catholic Diocese of Covington*, No. 03-CI- 00181, 2006 WL 250694, at *5 (Ky. Cir. Ct. Jan. 31, 2016). And as the Court correctly notes, superiority often is met in two situations, either where "many individuals have small damage claims" and where, absent a class suit, "it is unlikely that any of the claims will be accorded relief." The certification of this class in this case would facilitate a procedural avenue to rectify a wrong to which all students have damages established as a matter of law under *Snakenburg*. If not for the procedural vehicle of the class action, the thousands of students that were violated would not realistically have the "maintenance of an action and the recovery of at least nominal damages, regardless of whether any actual damage has been sustained." *Livingston*, 197 S.C. at 458. *See also*, *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 861 (6th Cir.2013)(stating that "class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery").

WHEREFORE, Plaintiffs respectfully request that this Court reconsider and vacate its denial of Plaintiffs' Motion for Class Certification, and grant Plaintiffs' Motion for Class Certification, for the reasons stated herein and in Plaintiffs' class certification motion.

**JA1510**

Respectfully submitted,

THE RICHTER FIRM, LLC

s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (Fed. Bar: 3460)
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC 29464
Phone: 843-849-6000
LRichter@RichterFirm.com
Anna@RichterFirm.com

-AND-

s/Carl L. Solomon
Carl L. Solomon (Fed. Bar: 6684)
Solomon Law Group, LLC
P.O. Box 1866
Columbia, SC 29202
Phone: 803-391-3120
carl@solomonlawsc.com

-AND-

s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (Fed. Bar: 6106)
Stephen Slotchiver (Fed. Bar: 6648)
Anna E. Richter (Fed. Bar: 13333)
Slotchiver & Slotchiver LLP
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com

-AND-

s/Brent S. Halversen
Brent S. Halversen (Fed. Bar: 10474)
Brent Souther Halversen, LLC
751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com

-AND-

19

**JA1511**

David K. Lietz (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

*Attorneys for Plaintiffs*

**JA1512**

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| | ) | Civil Action No. 2:21-613-RMG |
| Plaintiffs, | ) ) | |
| v. | ) ) | **PLAINTIFFS' MOTION TO CERTIFY QUESTION TO THE** |
| The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, | ) ) ) ) ) ) ) | **SUPREME COURT OF SOUTH CAROLINA** |
| Defendants. | ) ) ) | |

**TO: ATTORNEYS FOR THE DEFENDANT, AND TO THE ABOVE-NAMED DEFENDANTS:**

**YOU WILL PLEASE TAKE NOTICE** that the undersigned, as attorneys for the

Plaintiffs Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of

themselves and all others similarly situated, will move before the Honorable Richard Mark Gergel,

Judge of the U.S. District Court for the District of South Carolina, Charleston Division, for an

Order certifying a question to the Supreme Court of South Carolina. The question is set forth in

the accompanying Memorandum.

This Motion is made pursuant to pursuant to Rule 244 of the South Carolina Rules of

Appellate Procedure and will be supplemented and supported by such affidavits, depositions,

discovery responses, memoranda of law, and such other documents as appropriate.

**JA1513**

Respectfully submitted,

THE RICHTER FIRM, LLC

s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (Fed. Bar: 3460)
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC 29464
Phone: 843-849-6000
LRichter@RichterFirm.com

-AND-

s/Carl L. Solomon
Carl L. Solomon (Fed. Bar: 6684)
Solomon Law Group, LLC
P.O. Box 1866
Columbia, SC 29202
Phone: 803-391-3120
carl@solomonlawsc.com

-AND-

s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (Fed. Bar: 6106)
Stephen Slotchiver (Fed. Bar: 6648)
Anna E. Richter (Fed. Bar: 13333)
Slotchiver & Slotchiver LLP
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com
arichter@slotchiverlaw.com

-AND-

s/Brent S. Halversen
Brent S. Halversen (Fed. Bar: 10474)
Brent Souther Halversen, LLC
751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com

-AND-

**JA1514**

David K. Lietz (pro hac vice forthcoming)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| | ) | Civil Action No. 2:21-613-RMG |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO CERTIFY QUESTION TO THE SUPREME COURT OF SOUTH CAROLINA** |
| The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated, submit the following Memorandum in support of their Motion to Certify a question to the Supreme Court of South Carolina, pursuant to pursuant to Rule 244 of the South Carolina Rules of Appellate Procedure.

<u>**ARGUMENT**</u>

This lawsuit and this legal issue arise out of an egregious set of circumstances whereby current and past Bishop England High School (hereinafter, "BEHS") students were made and required to disrobe, partially or fully, in each of three dressing room / locker rooms, thereby exposing themselves in the locker rooms controlled by Defendants. Each of the locker rooms (boys and girls) were subject to viewing through a large 4' by 4' plate glass window, positioned at desktop height, while students were using the dressing room / locker room facilities at BEHS since

1

**JA1516**

the opening of the school building on Daniel Island in the City of Charleston (approximately September 1, 1998) until May of 2019. The windows were covered with blinds that could be and were controlled and/or manipulated from within the viewing rooms; of course, without warning or knowledge to students or tuition payers. (Amended Complaint, ¶ 16). Plaintiffs allege that BEHS students, who are children using the locker rooms, had a reasonable expectation of privacy in the locker rooms, were unaware that they were being viewed, and that there was no legitimate purpose for use of the windows (Amended Complaint, ¶¶ 5, 16, 17, 18, 55, 68-73, 115-120, ECF 35).

There is evidence of which this Court may take judicial notice that numerous students were actually video recorded while at BEHS via the windows described above. *See* Transcript of Record, State of South Carolina v. Jeffrey Alan Scofield, Case No. 2019-GS-08-01294 (General Sessions Court, Berkeley County, South Carolina June 9, 2020) at pages 8-9.[1] After the window and viewing information became public as a result of a Defendant employee voyeur, Jeffrey Scofield, Defendants covered the windows with plywood within a matter of hours, this after being in place and surreptitiously used to view nude and/or partially nude children for more than twenty years. (Amended Complaint, ¶ 17). At some point, and in the face of written notification not to allow or take part in the spoliation of the subject windows, evidence, the Defendants removed them and threw them away, the temporary plywood coverings were removed and the viewing portals were permanently bricked in with cement blocks and painted to match the existing walls. (Dep. Mary Tucker, P. 30, L. 18 -P. 31, L. 19, Exhibit #1).

The school's use of the viewing windows to monitor students in the locker rooms invaded

---

[1] The transcript from the Scofield sentencing hearing is attached hereto as Exhibit A, and is made part of the record for purposes of this motion.

**JA1517**

their privacy. The use of the viewing windows was common to all students that attended Bishop England High School since 1998 when the school was constructed. All students had to use the locker rooms. Physical Education was a core curriculum requirement for all. All students had a reasonable expectation of privacy in the locker rooms. The students' privacy was violated through the use of the windows. There were no safety concerns at Bishop England- ever- to warrant the installation of the windows or their use. Further, as learned through discovery, there were never any incidents of safety captured through the monitoring of the children, from the time of installation of the windows through the removal. Even if the windows were justified at the time of the installation- which is denied- the decades long "monitoring" of naked children, under the guise of "safety" is blatant, shocking, disgusting, and reprehensible; particularly so in light of the Defendants' long history of acts of child sex abuse and coverup of same for decades.

Plaintiffs moved for class certification December 13, 2021. ECF 67. The Plaintiffs' Motion for Class Certification (ECF 67), attached all of the supporting evidence and documentation (ECF Nos. 67-1, 67-2, 67-3, 67-4, 67-5. 67-6, 67-7, 67-8, 67-9, 67-10, 67-11, and 67-1), and Plaintiffs' Reply to Defendants' Objection to the Motion for Class Certification (ECF 78) are incorporated herein by reference, and are hereby made part of the record in this request for certification.

On March 24, 2022, this Court denied the Plaintiffs' Motion for Class Certification, holding that no class was due to be certified because: A) the class wasn't ascertainable, B) the Plaintiffs' lacked standing; C) the Plaintiffs failed to demonstrate predominance, and D) the Plaintiffs failed to demonstrate superiority. See generally ECF 84. The Court's Order denying certification is also made part of the record in this request for certification.

The lynchpin of three of the bases upon which the Court denied the motion for class certification is a single legal question – whether under South Carolina law, the tort of wrongful

**JA1518**

intrusion into private affairs requires proof of actual viewing. This legal question is central to the

Court's ascertainability (ECF 84 at 7), constitutional standing (*Id*. at 13), and predominance (*Id*.

at 16) analyses, all of which rest upon the Court's conclusion that proof of actual viewing is

required in order to establish the intrusion tort.

South Carolina case law is scant when it comes to this question. The broad invasion of

privacy tort was first recognized in South Carolina in *Holloman v. Life Ins. Co. of Virginia*, 192

S.C. 454, 7 S.E.2d 169 (1940). In *Holloman*, the South Carolina Supreme Court stated:

> The right of privacy is one which was not definitely recognized by the law until
> comparatively recent times. But we find ourselves in agreement with a number of
> authorities to the effect that the violation of such a right is under certain
> circumstances a tort which would entitle the injured person to recover damages.
> But the right of privacy is correctly defined in 21 R.C.L. 1196 as "the right to be
> let alone; the right of a person to be free from unwarranted publicity". Or more
> specifically but less accurately, "the right to live without one's name, picture or
> statue, or that of a relative, made public against his will".

*Holloman*, 7 S.E.2d at 171. Notably, this plain language from *Holloman* strongly suggests that the

initial recognition in South Carolina of the broader tort of invasion of privacy only included one

of the "sub-torts" – the "public disclosure of private affairs" tort.

Further recognition and expansion of the invasion of privacy tort by the Supreme Court of

South Carolina came in *Meetze v. Associated Press*, 230 S.C. 330, 335, 95 S.E.2d 606, 608 (1956),

where the court stated:

> The 'right of privacy' has been defined as the right of an individual to be let alone,
> to live a life of seclusion, to be free from unwarranted publicity. 77 C.J.S., Right of
> Privacy, § 1; 41 Am.Jur., Privacy, Section 2. The following has been suggested as
> a fairly comprehensive definition of what constitutes an actionable invasion of the
> right of privacy: 'The unwarranted appropriation or exploitation of one's
> personality, the publicizing of one's private affairs with which the public has no
> legitimate concern, or the wrongful intrusion into one's private activities, in such
> manner as to outrage or cause mental suffering, shame, or humiliation to a person
> of ordinary sensibilities.' 41 Am.Jur., Privacy, Section 2; *Continental Optical Co.
> v. Reed*, 119 Ind.App. 643, 86 N.E.2d 306, 14 A.L.R.2d 743; *Smith v. Doss*, 251
> Ala. 250, 37 So.2d 118. The existence of a legal right of privacy is recognized by

4

**JA1519**

the American Law Institute in the following language: 'A person who unreasonably
and seriously interferes with another's interests in not having his affairs known to
others or his likeness exhibited to the public is liable to the other.' 4 Restatement,
Torts, Section 867.

*Meetze* is thus the first South Carolina case that recognized three separate sub-torts under the

broader invasion of privacy tort – unwanted appropriation, public disclosure, and intrusion.

Notably, in adopting this formulation of the invasion of privacy tort, the South Carolina Supreme

Court relied upon the original Restatement of Torts, demonstrating that South Carolina generally

looks with favor upon the Restatement formulations of the law.

The South Carolina Court of Appeals provided additional refinement. Relying upon

*Meetze*, two 1984 Court of Appeals' decisions in *Rycroft v. Gaddy*, 281 S.C. 119, 124–25, 314

S.E.2d 39, 43 (Ct. App. 1984) and *Corder v. Champion Rd. Mach. Int'l Corp*., 283 S.C. 520, 525,

324 S.E.2d 79, 82 (Ct. App. 1984) articulated the invasion of privacy tort this way:

In order to state a cause of action for this tort the plaintiff must allege: (1) the
unwarranted appropriation or exploitation of his personality; or (2) the publicizing
of his private affairs with which the public has no legitimate concern; or (3) the
wrongful intrusion into one's private activities in such a manner as to outrage or
cause mental suffering, shame or humiliation to a person of ordinary sensibilities.

*Rycroft* and *Corder* made plain that there are three separate "sub-torts" (or "complex of several

torts," as this Court wrote in *Shorter v. Retail Credit Co*., 251 F. Supp. 329, 330 (D.S.C. 1966))

under the broader tort of invasion of privacy, just as the South Carolina Supreme Court in *Meetze*

recognized. This formulation of the invasion of privacy tort was also used in *Wright v. Sparrow*,

298 S.C. 469, 471, 381 S.E.2d 503, 505 (Ct. App. 1989).

The Court of Appeals in *Rycroft* went on to set forth the required elements of the intrusion

into private affairs claim. The *Rycroft* court held that:

When a plaintiff bases an action for invasion of privacy on "intrusion" alone,
bringing forth no evidence of public disclosure, it is incumbent upon him to show
a blatant and shocking disregard of his rights, and serious mental or physical injury

5

**JA1520**

or humiliation to himself resulting therefrom. *Shorter v. Retail Credit Co*., 251 F. Supp. 329 (D.S.C.1966).

*Rycroft*, 281 S.C. at 124–25, 314 S.E.2d at 43. The *Rycroft* court's statement "bringing forth no evidence of public disclosure" is a recognition that "public disclosure" is not a necessary element of the intrusion tort, if a plaintiff can show "a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." This tracks in complete harmony with the Second Restatement of Torts § 652(B), which does not require acquisition of information for the intrusion tort. *See* Restatement (Second) of Torts § 652B cmt. a (1977) (explaining that the form of invasion of privacy covered by intrusion upon seclusion —consists solely of an intentional interference with the plaintiff's seclusion and does not depend on publicity given to the plaintiff's private affairs).

The 1989 Court of Appeals decision in *Snakenberg v. Hartford Cas. Ins. Co*., 299 S.C. 164, 171, 383 S.E.2d 2, 6 (Ct. App. 1989) is the next case where South Carolina courts examined the intrusion into private affairs claim. *Snakenberg* is an "actual viewing" case, where the plaintiff concealed a video tape camera and recorder in a dressing room and was filming and recording teenage girls changing from swimsuit to swimsuit. *Snakenberg*, 299 S.C. at 167, 383 S.E.2d at 4. As an "actual viewing" case, there was no reason for the *Snakenberg* court to consider the question of whether or not "actual viewing" is a required element of the intrusion tort. Nevertheless, the *Snakenberg* court undertook the task of examining the "nature and scope" of the intrusion tort. *Id*., 299 S.C. at 171, 383 S.E.2d at 6. As part of this examination, the *Snakenberg* court – without citation to any legal authority – defined the "intrusion" element of the wrongful intrusion into private affairs tort as follows:

> (1) Intrusion. An intrusion may consist of watching, spying, prying, besetting, overhearing, or other similar conduct. Whether there is an intrusion is to be decided on the facts of each case.

**JA1521**

*Id*.  This definition of the intrusion element was interpreted by this Court to mean that "actual viewing" is required to satisfy this element of the tort.

But *Snakenberg* isn't the last or the most authoritative word on this issue. Instead, in *O'Shea v. Lesser*, 308 S.C. 10, 17–18, 416 S.E.2d 629, 633 (1992), the South Carolina Supreme Court expressly relied upon the language in *Rycroft*, and established under South Carolina law that "actual viewing" is <u>not</u> necessary to satisfy the "intrusion" element of the intrusion into private affairs tort.  A close reading of *O'Shea* bears this out. *O'Shea* involved a dispute between residential property neighbors over construction of an open outdoor deck. After the deck was constructed, the neighbors who built the deck:

> can see around appellant's patio wall into a portion of appellant's home from the end of their addition. Appellant asserts that as a result of the Lessers' ability to see into her house, she has been forced to change her lifestyle to avoid being watched by the Lessers.

*O'Shea*, 308 S.C. at 13–14, 416 S.E.2d at 631. "Can see," and the "ability to see" into the neighboring house establishes that the intrusion claim asserted wasn't about "actual viewing," but rather was about the "ability to see."

While the South Carolina Supreme Court in *O'Shea* ultimately ruled against the appellant, it did not do so because the court found that actual viewing was required:

> Appellant asserts that the master-in-equity erred in finding that appellant suffered no damages even though (1) the Lessers ***can see*** into her home, thereby allegedly invading her right to privacy, and (2) the improvements to the Lessers' residence allegedly diminish her right to a view. We disagree.
>
> > This Court has defined invasion of privacy as:
> >
> > > The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such manner as to

**JA1522**

> outrage or cause mental suffering, shame, or humiliation to
> a person of ordinary sensibilities.
>
> *Meetze v. The Associated Press*, 230 S.C. 330, 95 S.E.2d 606 (1956). Where, as here, a plaintiff bases an action for invasion of privacy on "intrusion," bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom. *Rycroft v. Gaddy*, 281 S.C. 119, 314 S.E.2d 39 (Ct.App.1984).
>
> The fact that the Lessers **can see** into a portion of appellant's home is not so blatant or shocking as to constitute an invasion of appellant's right to privacy. People who live in organized communities must of necessity suffer some inconvenience and annoyance from their neighbors and must submit to annoyances which are the consequence of the reasonable use of property by others. *Winget v. Winn Dixie Stores, Inc.*, 242 S.C. 152, 130 S.E.2d 363 (1963).

*O'Shea*, 308 S.C. at 17–18, 416 S.E.2d at 633 (emphasis added). Thus, the South Carolina Supreme Court's last pronouncement on the intrusion element of this tort (which postdates *Snakenberg*) is that it is possible to satisfy the intrusion element with the mere ability to see ("can see"), <u>not actual viewing</u>, if the plaintiff shows it is so "blatant or shocking" as to constitute an invasion of the right to privacy. *Id.*

In *O'Shea*, the court didn't find that the mere ability to see was blatant or shocking enough, and chalked it up to "inconvenience and annoyance from the neighbors." However, that doesn't negate the proposition that the South Carolina Supreme Court's formulation of the intrusion element plainly contemplates satisfaction of the intrusion element by the mere "ability to see," if the ability to see is so blatant and shocking as to constitute an invasion of privacy.

The case before this Court presents just such a "blatant and shocking" situation, and is a far cry from the mere inconvenience of having one's neighbors potentially peering into one's windows (a situation easily rectified by putting up window treatments). Here, the undisputed facts demonstrate not only that Defendants "can see" or were able to see Plaintiffs and every other

**JA1523**

student-in spite of the use of window treatments- but actually "did see" numerous students that were "actually viewed" by Scofield.  That is a textbook definition of "blatant and shocking."

There is no case law authority negating this plain language in *O'Shea*. Instead, the only authority that reverts to the *Snakenberg* formulation of the intrusion element is a law student Note. Eli A. Meltz, No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion, 83 Fordham L. Rev. 3431 (2015). While the Meltz Note is a fine piece of legal scholarship, it ignores *O'Shea* entirely, and focuses exclusively upon *Snakenberg's* definition of the intrusion element (a definition which, again, is seemingly plucked out of thin air by the South Carolina Court of Appeals, as there is no authority cited). The Meltz note is simply wrong that South Carolina's formulation of the intrusion into private affairs cause of action differs from intrusion under the Restatement (Second) of Torts, § 652B, which does not require acquisition of information to recover.[2]  Tellingly, the Second Restatement's formulation of this element (noting that it does not depend on publicity) tracks with the language in *Rycroft*.

What is plain from the language of *O'Shea* and *Rycroft* is that contrary to the conclusion of the Meltz note, South Carolina law is, and always has been, in accord with section 652B of the Second Restatement of Torts, which doesn't require acquisition of information ("actual viewing") to recover. See ECF 67, Page 25, n.4 (citing cases from jurisdictions that have expressly adopted section 652B and that hold that a plaintiff need not show actual viewing); *Phillips v. Smalley Maint. Servs., Inc*., 435 So. 2d 705, 709 (Ala. 1983) (holding that "acquisition of information from a plaintiff is not a requisite element of a § 652B cause of action").There is also nothing to suggest that the law in South Carolina is any different on this point than the law in those jurisdictions that

---

[2] Moreover, a law student note, however artfully written, cannot be the authoritative statement of South Carolina law on the intrusion element.

**JA1524**

expressly adopted the Second Restatement construction. South Carolina's division of the invasion of privacy tort into a "complex" of three separate torts mirrors the Second Restatement's division of the invasion of privacy tort into 4 separate torts (three of which are the same as in South Carolina). *Compare* Restatement (Second) of Torts, § 652B (intrusion upon seclusion), § 652C (appropriation of name or likeness), and § 652D (publicity given to private life) with Corder, 283 S.C. at 525, 324 S.E.2d at 82 (recognizing torts of 1) the unwarranted appropriation or exploitation of his personality; or (2) the publicizing of his private affairs with which the public has no legitimate concern; or (3) the wrongful intrusion into one's private activities.

Also, section 652B of the Second Restatement defines the intrusion tort in this way:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977). South Carolina defines the same tort this way:

> The . . . the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

*Meetze*, 230 S.C. at 335, 95 S.E.2d at 608. There is no question that the Second Restatement and South Carolina are talking about the same tort. Given *O'Shea* and *Rycroft*, there is equally no question that South Carolina already interprets the identical tort in the same manner, and that "actual viewing" is not required.

While the language of the South Carolina Supreme Court's ruling in *O'Shea* and the *Rycroft* decision is unambiguous, the Court of Appeals decision in *Snakenberg* muddies the waters sufficiently to warrant certification. Given the critical importance of this single legal issue to three issues relating to class certification (ascertainability, standing, and predominance), and the broader

**JA1525**

need for the Supreme Court of South Carolina to definitively articulate the elements of the tort of intrusion into private affairs, this Court should certify this question.

## CONCLUSION

For the reasons set forth above, and based on the arguments submitted in briefing the motion for class certification (ECF 67), which are incorporated herein, Plaintiffs hereby request that the following question be certified to the Supreme Court of South Carolina:

Under South Carolina law, does the tort of intrusion upon seclusion require acquisition of information, or actual viewing, to be actionable, if the plaintiff shows the intrusive act is so blatant or shocking as to constitute an invasion of appellant's right to privacy?

Respectfully submitted,

THE RICHTER FIRM, LLC

s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (Fed. Bar: 3460)
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC 29464
Phone: 843-849-6000
LRichter@RichterFirm.com

-AND-

s/Carl L. Solomon
Carl L. Solomon (Fed. Bar: 6684)
Solomon Law Group, LLC
P.O. Box 1866
Columbia, SC 29202
Phone: 803-391-3120
carl@solomonlawsc.com

-AND-

s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (Fed. Bar: 6106)
Stephen Slotchiver (Fed. Bar: 6648)
Anna E. Richter (Fed. Bar: 13333)
Slotchiver & Slotchiver LLP

11

**JA1526**

751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com
arichter@slotchiverlaw.com

-AND-

s/Brent S. Halversen
Brent S. Halversen (Fed. Bar: 10474)
Brent Souther Halversen, LLC
751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com

-AND-

David K. Lietz (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

*Attorneys for Plaintiffs*

**JA1527**

# EXHIBIT A

1

```
 1   STATE OF SOUTH CAROLINA   ) GENERAL SESSIONS COURT
                               )
 2   COUNTY OF BERKELEY        ) CASE NO. 2019-GS-08-01294

 3   STATE OF SOUTH            )
     CAROLINA,                 )
 4                             ) Transcript of Record
             Plaintiff,        )
 5                             )
     vs.                       )
 6                             ) Date:  June 9, 2020
     JEFFREY ALAN SCOFIELD,    )
 7                             )
             Defendant.        )
 8    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

 9

10
     B E F O R E:
11
             The Honorable Roger M. Young
12

13

14

15

16

17

18

19

20    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

21

22                   Denise J. Lauder, RPR

23                   Ninth Judicial Circuit

24

25
```

**JA1529**

2

```
 1                    A P P E A R A N C E S

 2

 3    REPRESENTING THE PLAINTIFF:

 4          DAVID COLLIER, ASSISTANT ATTORNEY GENERAL

 5          Attorney General's Office

 6          1801 Main Street

 7          Columbia, SC 29201-2409

 8

 9    REPRESENTING THE DEFENDANT:

10          DEBRA LITTLEFIELD, PUBLIC DEFENDER

11          Berkeley County Public Defender's Office

12          219 North Highway 52

13          Suite E

14          Moncks Corner, SC 29461

15

16

17

18

19

20

21

22

23

24

25
```

**JA1530**

```
 1                           INDEX
 2                                      Page No.
 3    PROCEEDINGS.......................... 4
 4    REPORTER'S CERTIFICATE............... 17
 5
 6
 7
 8
 9                    INDEX OF EXHIBITS
10
11              (No exhibits were offered or
12    marked for identification.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    (The following proceedings were had
 2       June 9, 2020, via the Virtual Courtroom, Berkeley
 3       County General Sessions Court, Judge Young, State
 4       v. Scofield, 2:28 p.m.)
 5                    THE COURT:  Mr. Scofield.  Where is
 6       Mr. Scofield?
 7                    MS. LITTLEJOHN:  He's in BCPD.
 8                    THE COURT:  All right.  Is that him
 9       with the Berkeley PD Probook?
10                    MS. LITTLEJOHN:  It is, Your Honor.
11                    THE COURT:  Are you Alan -- Jeffrey
12       Alan Scofield?
13                    THE DEFENDANT:  Yes, sir.
14                    THE COURT:  All right.  Mr. Scofield,
15       I'm told that you want to plead guilty to
16       voyeurism.  Communicating obscene messages to
17       another person without consent is what is on the
18       sentencing sheet.  Is that the formal name for
19       voyeurism?
20                    MR. COLLIER:  No, Your Honor.  There
21       might be a typo on the sentence sheet.
22                    THE COURT:  Okay.
23                    MR. COLLIER:  It's the correct -- it's
24       the correct statute number, Your Honor, but I
25       inadvertently put the incorrect name of the crime.
```

**JA1532**

5

1    If it's okay with Debbie, if you could cross

2    through communicating obscene messages to another

3    person and write voyeurism.  I think that would

4    solve the problem.

5            MS. LITTLEJOHN:  I'm fine with that.

6            MR. COLLIER:  It's the correct CDR code

7    as well, Judge.

8                    EXAMINATION

9    BY THE COURT:

10        Q.    Okay.  So you want to plead guilty to

11   voyeurism, 0 to 3 years?  Mr. Scofield?

12        A.    Yes, sir.

13        Q.    All right.  Well, we normally do these

14   in the courtroom and we are not in the courtroom as

15   you can tell, so in order for me to take your plea,

16   you have to give up your right to have this done in

17   the courtroom.  Are you all right with that?

18        A.    I am.

19        Q.    Now, we normally -- again, your lawyer

20   would be there beside you, but she is participating

21   on video.  Raise your hand, Mrs. Littlejohn.

22            Do you see her there?

23        A.    I do.

24        Q.    If you need to talk with her during

25   this process, you just raise your hand and get my

**JA1533**

1  attention and we will let her call you and you can

2  arrange to talk with her more privately.  Okay?

3          A.   Okay.

4          Q.   Okay.  Well, in the meantime, you have

5  to give up your right to a jury trial.  When you

6  give up your right to a jury trial by pleading

7  guilty.  If you want a trial, stop me and we will

8  arrange that for you.

9              State then has to present enough

10  evidence to convince 12 jurors that you are guilty

11  beyond a reasonable doubt.  All 12 have to agree

12  that you are guilty in order to convict you, and if

13  convicted, you would have the right to appeal.

14              You could challenge the State's

15  evidence and put up evidence of your own; testify

16  if you want.  If you don't want to testify, the

17  judge would tell the jury not to hold that against

18  you while deliberating.  Do you understand those

19  rights?

20          A.   I do.

21          Q.   Do you want to give those rights up and

22  plead guilty?

23          A.   Yes.

24          Q.   Are you pleading guilty to this charge

25  because you are guilty of it?

**JA1534**

```
 1          A.    Yes.
 2          Q.    Are you under the influence of drugs or
 3   alcohol today?
 4          A.    No.
 5          Q.    Do you need any more time with your
 6   lawyer?
 7          A.    No.
 8          Q.    Are you satisfied with her
 9   representation?
10          A.    Yes.
11          Q.    Anybody promise you anything or
12   threaten you to plead guilty, other than they are
13   dropping another count of voyeurism?
14          A.    No.
15          Q.    How old are you?
16          A.    Thirty-three.
17          Q.    How far did you get in school?
18          A.    I have a master's.
19          Q.    And do you have a job?
20          A.    Not currently.
21          Q.    Did you have a job?
22          A.    I did.
23          Q.    What did you do?
24          A.    I was the sports information director
25   at Bishop England High School for five years.
```

**JA1535**

```
 1          Q.   Are you married?
 2          A.   No.
 3          Q.   Do you have children?
 4          A.   No, I do not.
 5               THE COURT:  Ms. Littlejohn, does he
 6     understand what he's doing?
 7               MS. LITTLEJOHN:  Absolutely, Your
 8     Honor.
 9               THE COURT:  All right.  I find that his
10     plea is freely, voluntarily, and intelligently
11     made.  What would the State like to tell me about
12     this case?
13               MR. COLLIER:  Thank you, Your Honor.
14     David Collier for the attorney general's office.
15               I would like to add that voyeurism is a
16     mandatory sex offender registry charge.
17               Your Honor, in the spring of 2019,
18     several students at Bishop England High School,
19     which is on Daniel Island in Berkeley County, were
20     using a school-owned iPad to record an athletic
21     event.  Apparently this iPad was shared among the
22     students and staff for this type of purpose.
23               The students at some point looked
24     through the camera roll on the iPad and found
25     several videos of boys who attended Bishop England
```

**JA1536**

1  High School changing clothes in the boy's locker.
2  In the video the boys were never fully nude, but
3  they were in their boxer shorts.
4            On the camera roll of the iPad, the
5  students also found nude photos of the defendant
6  Jeffrey Alan Scofield.  Mr. Scofield was then an
7  employee of Bishop England and served as attendance
8  clerk and also assisted in the athletic department.
9            The students quickly turned the iPad in
10 to the school administrators and the administrators
11 contacted the City of Charleston Police Department.
12           Mr. Scofield was interviewed by the
13 City of Charleston investigators, and he confessed
14 to placing the iPad in a window that faced the
15 boy's locker room and to secretly making the videos
16 of the boys while they changed clothes.
17           With the assistance from homeland
18 security investigations, a forensic examination was
19 conducted on the school iPad and on Mr. Scofield's
20 personal iPhone.  Those examinations led to the
21 identification of five victims in the locker room
22 videos.
23           The boys were never nude in those
24 videos, but they were changing their clothes with
25 towels and in their underwear.  The defendant was

**JA1537**

1    arrested after the interview.  And after he was

2    arrested, Investigator Brittany Harwell with the

3    City of Charleston secured a search warrant to look

4    for additional electronic devices at Mr. Scofield's

5    home.

6                Investigator Harwell is a member of the

7    attorney general's Internet Crimes Against Children

8    Task Force.  Ms. Harwell seized five electronic

9    devices which were then forensically examined by

10   chief forensic investigator Chris Bobar with the

11   attorney general's Internet Crimes Against Children

12   unit, but, Your Honor, Investigator Bobar did not

13   find any additional files of interest in the case

14   on those devices.

15               These are the facts from the State,

16   Your Honor, and the defendant does not have a

17   record.

18               THE COURT:  All right.  And what is

19   your recommendation?

20               MR. COLLIER:  No recommendation.

21               THE COURT:  Ms. Littlejohn.

22               MS. LITTLEFIELD:  Yes, Your Honor.  As

23   you heard Mr. Scofield is 33 years of age and

24   attorney general's office is actually prohibited

25   from giving a recommendation.

**JA1538**

1              This is a case we referenced to you
2     several weeks ago.  Mr. Scofield fully cooperated.
3     He handed over everything that there was, and you
4     heard that the AG's office thinks there was nothing
5     additional found.
6              When we were preparing for cases to
7     come in, I said -- he, David Collier of the
8     attorney general office called and said, what do
9     you want to do with Mr. Scofield?  Just kind of a
10    little bit of a risk thing to do.  I said, why not?
11    Let's go ahead and do him.
12             And I asked him about it.  I said, you
13    will have to come into our office because you're
14    allowed to have certain things.  And so you can see
15    he's here in the public defender's office.  Took a
16    while to get him into the office.
17             He has always been very cooperative
18    with our office.  He was cooperative with the
19    police.  He was cooperative with the attorney
20    general's office, et cetera.  During the day he
21    helps his sister.  She has lost both of her legs to
22    diabetes and he helps her out a lot.
23             So, Your Honor, we would just ask for a
24    probationary sentence.  He does know he will be
25    very, very limited because being on the sex

**JA1539**

1  offender registry, and I know the Court is very

2  much aware of how much that limits him.

3           This is a major embarrassment to him.

4  He had great potential and now he's having to

5  figure out what to do with his life at middle age

6  if you will, 33.

7           THE COURT:  All right.  Well, before I

8  hear from Mr. Scofield, were there members of the

9  victims' families that wanted to be heard or

10  they're just listening in?

11           MR. COLLIER:  Your Honor, they are just

12  listening.

13           THE COURT:  Okay.  All right.  Well,

14  Mr. Scofield, what would you like to tell me?

15           THE DEFENDANT:  I would like to say

16  that I was just, obviously -- well, obviously, but

17  I was going through different things at that time

18  and really -- really where these thoughts came from

19  to do this was -- was not something that I -- have

20  even been able to figure out until now.

21           I didn't have these thoughts three

22  months before this happened or three years before

23  this happened.  I can tell you that when I started

24  having thoughts about doing this, that I would have

25  these arguments in my head with myself because I

**JA1540**

1    knew how wrong it was.

2            And I wish I could have had the courage

3    or trust in someone to go to someone about the

4    thoughts I was having because I probably could have

5    stopped this from happening, but I was obviously

6    embarrassed about telling somebody about these

7    types of things.

8            And, honestly, I think that's why in my

9    interview with the detective at the end I told him

10   I was relieved and not take part -- telling him

11   that was -- fact that I was finally able to tell

12   somebody kind of what I was battling for those few

13   weeks or months or so in my head.

14            I can honestly say ever since I was --

15   I got that out that I haven't had any thoughts

16   anymore close to that sense, nor do I plan to have

17   them in the future.  I'm just really embarrassed

18   and ashamed for any type of embarrassment I brought

19   on to the victims in this case.  Just really,

20   really hope to find a way to move forward from here

21   on out.

22            THE COURT:  All right.  Well, here's

23   what I'm going to do.  I will give you a

24   probationary sentence and order you to undergo

25   mental health counseling.

1              If you are not being prosecuted for

2     your sexual orientation, I mean, it sounds to me

3     like if you're interested in taking pictures of

4     boys, you might very well be gay.  Whether or not

5     you have come to that, I don't know, but what you

6     are prosecuted for is taking pictures of young

7     people who they don't give their consent and that's

8     against the law.  That is something that you need

9     help with.

10             The State's not prosecuting you because

11    you may or may not be gay.  They are prosecuting

12    you for taking pictures of a sexual nature with

13    people that do not give their consent.

14             So that's the thing that needs to be

15    addressed by you in my opinion.  And so I will give

16    you two years in the Department of Corrections,

17    suspended upon you successfully completing 18

18    months of probation.

19             And while you are on probation I want

20    you to get some mental health counselling so that

21    you can talk to somebody about -- when you say

22    you're having -- you were -- you had some thoughts,

23    I assume that you were talking about photographing

24    people.

25             And that is something that is clearly

**JA1542**

1   unacceptable behavior, especially people without

2   their consent.

3                And if they're under age and of a

4   sexual nature, that is something that you need to

5   learn to do something about and control if you got

6   these urges again.

7                The other thing, you know, that's --

8   you are going to have to work your way through

9   whatever issues you have in life, just like

10  everybody else does, but it's the taking pictures

11  of an unauthorized nature and having to deal with

12  those thoughts that obviously you had struggles

13  overcoming.  That's what I need you to get help on.

14               MS. LITTLEJOHN:  Where do they go to

15  report for probation?

16               PROBATION AGENT:  Report immediately to

17  our office, 109 West Main, Moncks Corner.

18               THE COURT:  Yeah.  Where are you at

19  now?

20               MS. LITTLEJOHN:  He's at our office.

21               PROBATION AGENT:  We are five minutes

22  away.

23               THE COURT:  When you hang up here, you

24  come over to the probation office to see Mr. Davis

25  and get signed up for probation.

**JA1543**

```
 1              MS. LITTLEJOHN:  The old one, the
 2   satellite or the main courthouse?
 3              PROBATION AGENT:  109 North Main,
 4   health department.
 5              THE COURT:  Over across from the
 6   Subway.
 7              PROBATION AGENT:  Yes.
 8              THE COURT:  Do you know where he's
 9   talking about?  Somebody there can tell you where
10   he's at.
11              THE DEFENDANT:  Okay.
12              THE COURT:  Good luck.
13              MS. LITTLEJOHN:  Thank you.
14              MR. COLLIER:  Your Honor, just one
15   thing further from the State.  We would ask that
16   during the term of probation that he be prohibited
17   from contacting the victims or their families.
18              THE COURT:  Okay.
19              MS. LITTLEJOHN:  That's no problem.
20              THE COURT:  Okay.  No contact with
21   victims or family members of the victim.
22              (These proceedings were concluded at
23   2:42 p.m.)
24
25
```

**JA1544**

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, Carol Denise Lauder, Registered

 4   Professional Reporter and Notary Public for the

 5   State of South Carolina at Large, do hereby certify

 6   that the foregoing transcript is a true, accurate,

 7   and complete record.

 8          I further certify that I am neither related

 9   to nor counsel for any party to the cause pending

10   or interested in the events thereof.

11          Witness my hand, I have hereunto affixed my

12   official seal this 5th day of June, 2021, at

13   Charleston, Charleston County, South Carolina.

14

15

16

17                        S/Carol Denise Lauder
                          Carol Denise Lauder
18                        Registered Professional
                          Reporter, CP
19                        My Commission expires
                          February 27, 2028
20

21

22

23

24

25
```

**JA1545**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRCIT OF SOUTH CAROLINA
CHARLESTON DIVISION**

**CIVIL ACTION NUMBER: 2:21-cv-613-RMG**

|  |  |  |
|---|---|---|
| Gary Nestler, *et al*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **RESPONSE BY DEFENDANTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION PURSUANT TO FED. R. CIV. P. 59(e)** |
| | ) | |
| The Bishop of Charleston, a Corporation Sole, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Defendants Bishop of Charleston, a Corporation Sole, *et al.*, hereby respond in opposition to Plaintiffs' motion for reconsideration pursuant to Fed. R. Civ. P. 59(e). (Dkt. No. 88).  For the reasons stated herein, Plaintiffs' motion should be denied.

**BACKGROUND**

The Court's Order and Opinion denying Plaintiffs' motion for class certification sets forth a clear and concise recitation of the facts and procedural posture of the case, which need not be repeated. (*See* Dkt. No. 84 at 1-3). Following denial of the class certification motion, Plaintiffs moved for reconsideration pursuant to Fed. R. Civ. P. 59(e). (Dkt. No. 88). The gravamen of Plaintiffs' eighteen-page supporting memorandum is simple:  that the Court misunderstood and misapplied South Carolina law construing the tort of invasion of privacy. In reality, however, it is Plaintiffs' reading of the law that is incorrect, and their motion is nothing more than disagreement with the result. Inasmuch as the Court correctly held that South Carolina law "explicitly requires that information about the victim be acquired by the defendant for the tort to be actionable. . . .,"

it necessarily follows that Plaintiffs' motion to reconsider should be denied. (Dkt. No. 84 at 9) (citations omitted).  But that is not the end of the matter.  The Court's Order and Opinion set forth additional fatal flaws that doomed Plaintiffs' quest for class certification, such as Plaintiffs' failure to demonstrate constitutional standing to sue and to establish both predominance and superiority for purposes of Fed. R. Civ. P. 23(b).  These mandatory components of class certification are not even addressed in Plaintiffs' motion for reconsideration and serve as an additional basis for the Court to deny rehearing.

## LEGAL STANDARD

Relief pursuant to Federal Rule of Civil Procedure 59(e) is available only in exceptional circumstances "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Addahoumi v. Pastides*, 2018 U.S. Dist. LEXIS 77151 (D.S.C. May 8, 2018) (quoting *Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002) (additional citation omitted). Moreover, "[r]elief under Rule 59(e) is 'an extraordinary remedy which should be used sparingly.' *Id.* (internal marks omitted). 'Mere disagreement does not support a Rule 59(e) motion.'" *Id.* (citations omitted). The decision to deny review of a prior order pursuant to Rule 59(e) rests within the sound discretion of the district court, and such a motion "should not be used as a 'vehicle for rearguing the law, raising new arguments, or petitioning a court to change its mind.'" *Bowen v. Adidas Am.*, 2021 U.S. Dist. LEXIS 157856 (D.S.C. Aug. 20, 2021)

## ARGUMENT

The Court's Order and Opinion correctly determined that Plaintiffs' attempts to certify a class failed in every respect. Most importantly, the Court concluded that South Carolina law on the tort of invasion of privacy requires proof that prospective class members were actually viewed

2

**JA1547**

in the Bishop England locker rooms. (Dkt. No. 84 at 9).  Without such a showing, the Court

concluded, Plaintiffs failed to demonstrate that the putative class members were ascertainable, that

the proposed class representatives had standing or were adequate to pursue the class-related claims,

or that they met any of the remaining requirements imposed pursuant to Fed. R. Civ. P. 23.  (*See*

*Id.* at 9-20). In light of the most recent pronouncements on the tort of invasion of privacy, the

Court's determinations are correct and militate against rehearing.

I.     **THE COURT CORRECTLY DETERMINED PLAINTIFFS FAILED TO DEMONSTRATE ASCERTAINABILITY OR STANDING.**

Plaintiffs' initial framing of the putative classes in this case implicitly recognized that

actual viewing is required to prevail upon the tort of invasion of privacy. (*See* Dkt. No. 84 at 2)

(quoting Dkt. No. 67 at 34-35) (defining the tuition and *viewed* classes as "all those" who may

have a claim arising out of being subjected to "monitoring, watching, viewing, spying, prying,

besetting, photographing or videotaping. . . .").  While they took a different tack in pursuit of class

certification and rehearing – that actual viewing is not required – the Court correctly found this

evidence is a mandatory element of their invasion of privacy claim.

a.     **South Carolina Law Requires "Actual Viewing" In Order To Prevail On A Claim For Invasion of Privacy.**

The issue of whether an "actual viewing" constitutes an essential element of the tort of

invasion of privacy is a key aspect of the Court's analysis of the issues of ascertainability and

standing.  Plaintiffs argue the Court got it wrong.  Not so.  The Court correctly interpreted the

leading South Carolina case on this issue, *Snakenberg v. Hartford Casualty Ins. Co.*, 299 S.C. 164,

383 S.E.2d 2 (Ct. App. 1989), to find that "South Carolina law explicitly requires that information

about the victim be acquired by the defendant for the tort to be actionable." (Dkt. No. 84 at 9)

(quoting *Snakenberg*, 299 S.C. at 117 (noting that "[a]n intrusion may consist of *watching, spying,*

*prying, besetting, overhearing*, or other similar conduct" – implicitly requiring the defendant in this particular case to have viewed the plaintiff) (emphasis supplied)).  Stated differently, Plaintiffs' attempt at class certification fails because they cannot demonstrate the putative class representatives or class members were "actually viewed".

As noted by the Court, South Carolina has never adopted Restatement (Second) of Torts §652B.  (Dkt. No. 84 at 8) (citing *Snakenberg*, 299 S.C. at 170-171) (additional citation omitted). Indeed, the tort was recognized as a matter of common law evolution even though "the common law of privacy remains largely undeveloped in South Carolina." *Snakenberg*, 299 S.C. at 170. What is clear, however, is that one of the required elements is intrusion, which can consist of "watching, spying, prying, besetting, overhearing, or other similar conduct," the presence of which is "decided on the facts of each case." *Id.* at 171. Indeed, Plaintiffs framed their putative classes in this manner, taking the position that liability as to both classes depended upon actual "monitoring, watching, viewing, spying, prying, besetting, photographing or videotaping" of students.  (Dkt. No. 67 at 33-34) The Court was absolutely correct that the type of conduct enumerated in *Snakenberg* (and asserted by Plaintiffs in their class certification motion) requires an overt and intentional act by the wrongdoer – in this case, actually viewing the putative class members through the locker room window.[1]

The cases relied upon by Plaintiffs do nothing to change this requirement, and rehearing should be denied.

    **b.**    **The Cases Cited By Plaintiffs Are Distinguishable.**

---

[1] The *Snakenberg* Court defined an actionable intentional act as:  (1) it is done willingly; (2) and either (2) the actor desires the result of his conduct whatever the likelihood of that result happening; or (3) the actor knows or ought to know the result will follow from his conduct whatever his desire may be as to that result.  *Id*. at 172.  Under *Snakenberg's* intent requirement there would necessarily be an actual invasion of privacy as opposed to a possible or conceptual intrusion.

**JA1549**

The additional cased cited by Plaintiffs in support of rehearing do not support their assertion that actual viewing is not required in order to prevail on a claim for invasion of privacy. For example, the precise question before the court in *Holloman v. Life Ins. Co. of Virginia*, 192 S.C. 454, 7 S.E.2d 169 (S.C. 1940), was whether "the invasion of privacy by a commercial use of plaintiff's name against her consent entitle[d her] to damages." *Id.*, 192 S.C. at 458, 7 S.E.2d at 171. The court addressed the state of the law on the right of privacy and noted the issue is correctly defined as "the right to be let alone; the right of a person to be free from unwarranted publicity." *Id.* (citation omitted). The court did ***not*** address invasion of privacy in the context of this case – the possibility (but not the actuality) of being observed in a locker room – or whether the invasion of privacy tort requires that a plaintiff must be 'actually viewed' in a state of undress to pursue her claim.  Instead, the issue was whether a plaintiff should be compensated when an insurance company issues a policy in her name, against her wishes, and for commercial gain.  The case certainly does not recognize "[t]he broad invasion of privacy tort" as contemplated by Plaintiffs. (Dkt. No. 88 at 2).

In *Meetze v. Associated Press*, 230 S.C. 330, 95 S.E.2d 606 (1956), the court expounded upon and formally recognized the tort of invasion of privacy – albeit in a much different context than that presented in this case. Plaintiffs in *Meetze* brought suit for invasion of privacy following news accounts surrounding the birth of their child when his mother was only 12 years old. While the Court cited 4 Restatement of, Torts, Section 867[2], it also relied on the holding by the South Carolina Court of Appeals in *Holloman*. It also recognized that "[t]he right of privacy is not an

---

[2] "A person who unreasonably and seriously interferes with another's interests in not having his affairs known to others or his likeness exhibited to the public is liable to the other." 4 Restatement, Torts, Section 867 *quoted by Meetze v. Associated Press*, 230 S.C. at  335, 95 S.E.2d at 608.

**JA1550**

absolute right." *Meetze*, 230 S.C. at 337, 95 S.E.2d at 609. Rather, the right to privacy must sometimes yield to competing societal interests, such as freedom of speech and freedom of the press. *Id.* The case does not stand for the proposition, urged by Plaintiffs, that South Carolina generally favors adoption of the Restatement to set judicial precedent.[3] Nor does *Meetze* stand for the proposition that a plaintiff need not demonstrate she was viewed in a state of undress in order to proceed on her claim for invasion of privacy.

Plaintiffs' reliance on *Rycroft v. Gaddy*, 281 S.C. 119, 314 S.E.2d 39 (Ct. App. 1984), fares no better. The *Rycroft* Court, relying on *Meetze*, recognized three distinct causes of action under the tort of invasion of privacy: "(1) wrongful appropriation of personality; (2) publicizing of private affairs of no legitimate public concern; and (3) wrongful intrusion into private affairs." *Id.*, 281 S.C. at 123, 314 S.E.2d at 42. The cause of action at issue in the case, however, was plaintiff's claim for public disclosure of his private banking information. The court rejected plaintiff's contention that such disclosure supported a claim for wrongful intrusion. If anything, the *Rycroft* case stands for the proposition that one's privacy interests in his banking information must yield to a validly issued subpoena and the absolute privilege and immunity that attach to communications in judicial proceedings. *Id.*, 281 S.C. at 124, 314 S.E.2d at 43 (citation omitted). Plaintiffs are simply wrong in their reading of the case. It is correct that 'public disclosure' is a required element of a cause of action for publicizing one's private affairs, though limited to instances in which the public has no legitimate concern. Under *Rycroft*, a wrongful intrusion claim may lie without evidence of public disclosure. Without such evidence, however, the court concluded that a wrongful intrusion plaintiff is subjected to a higher threshold of establishing "a

---

[3] As the Court observed, "Plaintiffs ignore that South Carolina is not a Restatement district for this tort. . . ." (Dkt. No. 84 at 8) (citation omitted).

blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." *Id.* It cannot be read, however, to obviate the requirement that actual viewing is required to proceed with an invasion of privacy claim under the facts of this case.

Plaintiffs again miss the mark in citing *Shorter v. Retail Credit Co.*, 251 F.Supp. 329 (D.S.C. Mar. 16, 1966). That case addressed plaintiffs' claim that they sustained embarrassment when defendant's agent came onto their property and asked questions of the wife, but it does not speak to the 'actually viewed' issue. Similarly, *Wright v. Sparrow*, 298 S.C. 469, 381 S.E.2d 503 (Ct. App. 1989), is unavailing. That case recites the three causes of action for the tort of invasion of privacy but it only addressed a claim that defendant publicized plaintiff's private affairs with which the public had no legitimate concern. It did not address a claim for wrongful intrusion or analyze the burden of proof for such a claim.

Plaintiffs simply mis-read *O'Shea v. Lesser*, 308 S.C. 10, 416 S.E.2d 629 (1992). In that case, respondents obtained permission to make certain improvements to their home. Appellant alleged those improvements provided respondents with a view into her home, thereby forcing her to change her lifestyle. She unsuccessfully pursued various causes of action and injunctive relief requiring respondents to remove the renovations. On appeal, she challenged the master-in-equity's findings that she sustained no damages even though she asserted that her neighbors' ability to see into her home constituted an invasion of privacy. 308 S.C. at 17.

Plaintiffs rely on *O'Shea* for the proposition that it holds that "'actual viewing' is <u>not</u> necessary to satisfy the 'intrusion' element of the intrusion into private affairs tort." (ECF 88 at 5) (emphasis in the original). This reading is in direct contravention of this Court's correct analysis. (*See* Dkt. No. 84 at 9) (noting the implicit recognition by the *O'Shea* Court that "information must be obtained about the plaintiff"). *O'Shea* was all about one's ability to *view* something the plaintiff

didn't want her neighbors to see. Contrary to Plaintiffs' interpretation, the court reiterated the

holding in *Rycroft*; that in the absence of evidence of public disclosure, the tort of invasion of

privacy based upon intrusion requires plaintiff to show "a blatant and shocking disregard of his

rights, and serious mental or physical injury or humiliation to himself resulting therefrom."

*O'Shea*, 308 S.C. at 17-18, 416 S.E.2d at 633 (citing *Rycroft*, 281 S.C. at _____, 314 S.E.2d at

_____). The holding of the *O'Shea* Court does not support Plaintiffs' proposition that they are

relieved of their burden to demonstrate they were actually and intentionally viewed.  It's not so

much whether there was a situation in which a person could have been viewed[4].  Rather, the Court

recognized the reality of the rights to privacy in the context of close quarters, and the *O'Shea* Court

affirmed the judgment for the defendant.

The Court correctly applied South Carolina law to determine that Plaintiffs' failure to

adduce evidence that Viewed Student Female 200, Viewed Male Student 300, or Nestler's claims

arise out of an actual viewing through the locker room window is fatal to class certification.  As a

result, the Court's ruling should stand, and Plaintiffs' motion for reconsideration should be denied.

## II.    ADDITIONAL GROUNDS SUPPORT DENIAL OF PLAINTIFFS' MOTION FOR REHEARING.

Plaintiffs' motion for rehearing relies exclusively on the argument that had the Court

employed the legal standard they contend is correct – that actual viewing is not required – Plaintiffs

would have met their burden of establishing ascertainability, standing, predominance, and

superiority.  What Plaintiffs fail to address in their briefing is that, even assuming (without

---

[4] Once again, this Court noted this distinction in its Order and Opinion denying class certification. *See* ECF 84 at 9 (quoting *O'Shea*, 308S.C. at 17-18 (implicitly acknowledging information must be obtained about the plaintiff because, where "a plaintiff bases an action for invasion of privacy on 'intrusion,' *bringing forth no evidence of public disclosure* [of the information], it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom") (emphasis supplied by the Court).

**JA1553**

conceding) that actual viewing is not required, class certification remained inappropriate given the Court's determination that "questions or individual proof and damages will predominate over common issues of the litigation."  (Dkt. No. 84 at 16) ("These include whether a class member or a class member's child was in-fact viewed *and* the unique 'shame, humiliation, and emotional distress suffered by the [class member]' in order to calculate damages.") (citation omitted). In addition, the Court aptly recognized that "because Plaintiffs' claims turn on individual questions as to each class member, the difficulties in managing this case as a class action would be great." (*Id.* at 19).

Clearly, the Court's decision denying class certification turned on issues separate and apart from its analysis of whether actual viewing is required.  As noted in the preceding paragraph, the Court also determined that Plaintiffs failed to satisfy mandatory elements of the Fed. R. Civ. P. 23(b) analysis regarding predominance and superiority.  *See* Dkt. No. 84 at 4 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to provide that there are *in fact* sufficient numerous parties, common questions of law or fact, etc.").  Plaintiffs have failed to address why the Court's analysis was wrong, and rehearing should be denied.

## CONCLUSION

For the reasons stated herein, Defendants respectfully submit that Plaintiffs have failed to demonstrate that the Court's Order and Opinion (Dkt. No. 84) contains any manifest error of law requiring correction.  Accordingly, Plaintiffs' Motion for Reconsideration Pursuant to Fed. R. Civ. P. 59(e) should be denied.

Respectfully submitted,

9

**JA1554**

**TURNER PADGET GRAHAM LANEY, PA**

*s/Richard S. Dukes, Jr.*
Richard S. Dukes, Jr., Federal ID No. 7340
40 Calhoun Street, Suite 200
Charleston, SC 29401
Phone: (843) 576-2810
Email: RDukes@turnerpadget.com

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Megan Ashley Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

May 4, 2022                              **ATTORNEYS FOR DIOCESE DEFENDANTS**
–

**JA1555**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRCIT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

**CIVIL ACTION NUMBER: 2:21-cv-613-RMG**

| | |
|---|---|
| Gary Nestler, *et al*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **RESPONSE BY DEFENDANTS IN** |
| v. ) | **OPPOSITION TO PLAINTIFFS' MOTION** |
| ) | **TO CERTIFY QUESTION TO THE** |
| The Bishop of Charleston, a Corporation ) | **SUPREME COURT OF** |
| Sole, *et al,* ) | **SOUTH CAROLINA** |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

Defendants Bishop of Charleston, a Corporation Sole, *et al.*, hereby respond in opposition to Plaintiffs' motion for to certify question to the Supreme Court of South Carolina. (Dkt. No. 89). For the reasons stated herein, Plaintiffs' motion should be denied.

## **BACKGROUND**

The Court's Order and Opinion denying Plaintiffs' motion for class certification sets forth a clear and concise recitation of the facts and procedural posture of the case, which need not be repeated. (*See* Dkt. No. 84 at 1-3). Following denial of the class certification motion, Plaintiffs moved for reconsideration pursuant to Fed. R. Civ. P. 59(e) (Dkt. No. 88)[1], as well as a motion to certify question to the Supreme Court of South Carolina (Dkt. No. 89). Both motions raise essentially the same argument: the Court misunderstood and misapplied South Carolina law construing the tort of invasion of privacy. Specifically, Plaintiffs dispute that South Carolina law

---

[1] Defendants filed a response in opposition to Plaintiffs' motion for reconsideration. (Dkt. No. ???). As the issues in both motions are essentially identical, Defendants incorporate their response in opposition to Plaintiffs' motion for rehearing herein by reference.

1

**JA1556**

"explicitly requires that information about the victim be acquired by the defendant for the tort to be actionable. . . ." (Dkt. No. 84 at 9) (citations omitted). As a result of their fundamental misunderstanding of South Carolina law, Plaintiffs move this Court to certify the following question: "Under South Carolina law, does the tort of intrusion upon seclusion require acquisition of information, or actual viewing, to be actionable, [sic] the plaintiff shows the intrusive act is so blatant or shocking as to constitute an invasion of appellant's right to privacy?" (Dkt. No. 89-1 at 11). Inasmuch as South Carolina is clear on this question, and because Plaintiffs' request comes too late, Plaintiffs' motion to certify should be denied.

## **ARGUMENT**

As noted in its response in opposition to Plaintiffs' motion for reconsideration (Dkt. No. 88), this Court correctly determined that South Carolina requires actual viewing before Plaintiffs can proceed on their claim for invasion of privacy. *See* Dkt. No. 84 at 8-9 ("South Carolina law explicitly requires that information about the victim be acquired by the defendant for the tort to be actionable.") (Citations omitted). Where, as here, state law is sufficiently clear and unambiguous, certification is not appropriate. *See Kirven v. cent. States Health & Life Co.*, 2013 U.S. Dist. LEXIS 15101 (D.S.C. Feb. 5, 2013) ("Certification of a question of state law is appropriate when the federal tribunal is required to address a novel issue of local law which is determinative in the case before it."); *Wellin v. Wellin*, 135 F.Supp.3d 502, 517 (D.S.C. Sept. 30, 2015) (noting that "certification should only be used when available state law is 'clearly insufficient.') (quoting *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994). Because the law on this issue is clear, certification is unnecessary and inappropriate. *Kelaher, Connell & Conner, P.C. v. Auto-Owners Ins. Co.*, 440 F.3d 520, 523 n. 1 (D.S.C. Feb. 24, 2020) (assuming the sufficiency of state law, the court should

"take care not to burden [its] state counterparts with [an] unnecessary certification request []." )

(quoting *Boyter v. Commission of Internal Rev. Serv.*, 668 F.2d 1382, 1385 n. 5 (4th Cir. 1981).

Even if certification were appropriate, Plaintiffs' motion comes too late. As a court in this District has previously determined, a certification request is untimely when it is made after the court has ruled. *See Winfrey v. Am. Fire & Cas. Ins. Co.*, 2018 U.S. Dist. LEXIS 130648, *9 (D.S.C. Aug. 3, 2018) (recognizing that plaintiff's request for certification of legal questions to the South Carolina Supreme Court, which was made after the court issued its ruling, was untimely) (citing Rule 244 SCACR ("The Supreme Court in its discretion may answer questions of law certified to it by an federal court of the United States . . . if there are involved in any proceeding before that court questions of law of this state which may be determinative of the cause *then pending* in the certifying court." (emphasis supplied)).

As noted, the Court was aware of Plaintiffs' argument and engaged in a well-reasoned analysis of applicable South Carolina law in rejecting Plaintiffs' position that an actual viewing is not required.  It was not until after the Court ruled against Plaintiffs that they suggested certification of the question. Plaintiffs untimely certification request therefor amounts to nothing more than mere disagreement with the Court's Order and Opinion, and their motion to certify should be denied.

## <u>CONCLUSION</u>

For the reasons stated herein, Defendants respectfully submit that Plaintiffs have failed to demonstrate any justification for submission of a certified question to the South Carolina Supreme Court in this case. Accordingly, Plaintiffs' motion to certify (Dkt. No. 89) should be denied.

**[Signature page to follow.]**

3

**JA1558**

Respectfully submitted,

**TURNER PADGET GRAHAM LANEY, PA**

*s/Richard S. Dukes, Jr.*
Richard S. Dukes, Jr., Federal ID No. 7340
40 Calhoun Street, Suite 200
Charleston, SC 29401
Phone: (843) 576-2810
Email: RDukes@turnerpadget.com

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Megan Ashley Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

May 4, 2022                    **ATTORNEYS FOR DIOCESE DEFENDANTS**

4

**JA1559**

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated, ) ) ) ) ) | |
| Plaintiffs, ) ) | Civil Action No. 2:21-613-RMG |
| v. ) ) ) ) | **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO CERTIFY QUESTION TO THE SUPREME COURT OF SOUTH CAROLINA** |
| The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually, ) ) ) ) ) ) ) | |
| Defendants. ) | |

Plaintiffs Gary Nestler, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated, submit the following Reply Memorandum in further support of their Motion to Certify a question to the Supreme Court of South Carolina, pursuant to pursuant to Rule 244 of the South Carolina Rules of Appellate Procedure.

Plaintiffs seek to certify the following question: under South Carolina law, does the tort of intrusion upon seclusion require acquisition of information, or actual viewing, to be actionable, if the plaintiff shows the intrusive act is so blatant or shocking as to constitute an invasion of appellant's right to privacy?

Defendants incorrectly contend that Plaintiffs' motion to certify this important question "comes too late," because the certification request was made "after the court has ruled." ECF 91

**JA1560**

at 3. Defendants rely upon *Winfrey v. Am. Fire & Cas. Ins. Co*., No. CV 3:16-3275-MBS, 2018 WL 3688483, at *4 (D.S.C. Aug. 3, 2018) in support of this erroneous contention.

    *Winfrey* does not support Defendants' argument. In *Winfrey*, the "ruling" in question was a ruling on a case dispositive motion – a motion to dismiss. The *Winfrey* court's "ruling" was therefore a Dismissal Order that served as a final judgment, and the Winfrey plaintiff was seeking relief from that judgment pursuant to Rules 59(e) and 60(b)(5). A final judgment obviously serves to end a case, that cause is no longer pending, and Rule 244 of the South Carolina Rules of Appellate Procedure doesn't apply.

    But here, the Court's ruling is on a class certification motion, which is not a case-dispositive motion. This matter is therefore a "cause *then pending*," and within the ambit of Rule 244. Not only that, but the Federal Rules of Civil Procedure make plain that a ruling on a class certification motion is not part of any final judgment of the "cause," by allowing for an interlocutory appeal of a class certification ruling under Rule 23(f).

    *Winfrey* doesn't stand for the blanket rule that moving to certify a question is untimely after any ruling by the court. Rather, *Winfrey* is plainly a case that forecloses the possibility of a collateral attack on a final judgment by way of an untimely certified question. That isn't the case here, where class certification is still very much a live issue in this case, and the "cause" is still pending before this Court.

    Plaintiffs' well-reasoned argument for certification demonstrates that state law is not clear and unambiguous on this question, or that it is actually clear and unambiguous in a way that favors Plaintiffs (i.e., South Carolina law is clear that actual viewing is not required for the tort of intrusion upon seclusion). For these reasons, certification to the South Carolina Supreme Court is appropriate and necessary.

2

**JA1561**

Respectfully submitted,

**THE RICHTER FIRM, LLC**

s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (Fed. Bar: 3460)
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC 29464
Phone: 843-849-6000
LRichter@RichterFirm.com

-AND-

s/Carl L. Solomon
Carl L. Solomon (Fed. Bar: 6684)
**Solomon Law Group, LLC**
P.O. Box 1866
Columbia, SC 29202
Phone: 803-391-3120
carl@solomonlawsc.com

-AND-

s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (Fed. Bar: 6106)
Stephen Slotchiver (Fed. Bar: 6648)
Anna E. Richter (Fed. Bar: 13333)
**Slotchiver & Slotchiver LLP**
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com
arichter@slotchiverlaw.com

-AND-

s/Brent S. Halversen
Brent S. Halversen (Fed. Bar: 10474)
**Brent Souther Halversen, LLC**
751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com

3

**JA1562**

-AND-

David K. Lietz (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

*Attorneys for Plaintiffs*

**JA1563**

**United States District Court**
**District of South Carolina**
**Charleston Division**

| | |
|---|---|
| Tuition Payer 100, | )     C/A: 2-21-cv-00613-RMG |
| Viewed Student Female 200, | ) |
| Viewed Student Male 300, | ) |
| on behalf of themselves and all others | ) |
| similarly situated, | ) |
| | ) |
| Plaintiffs, | ) |
| | )     **PLAINTIFFS' REPLY TO RESPONSE** |
| | )     **IN OPPOSITION (ECF 90) TO** |
| | )     **MOTION FOR RECONSIDERATION** |
| | )     <u>**PURSUANT TO FED. R. CIV. P. 59(e)**</u> |
| vs. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| The Bishop of Charleston, a Corporation | ) |
| Sole, Bishop England High School, | ) |
| Tortfeasors 1-10, The Bishop of the Diocese | ) |
| of Charleston, in his official capacity, and | ) |
| Robert Guglielmone, individually, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Come now Plaintiffs by and through their undersigned attorneys, and file this Reply to

Defendants' Response in Opposition to the Motion for Reconsideration of the Court's March 24,

2022 denial of the Plaintiffs' Motion for Class Certification.

The primary issue facing the Court in this motion is whether under South Carolina law, the

tort of wrongful intrusion into private affairs requires proof of actual viewing. However, Plaintiffs

remind the Court that the Defendants themselves have acknowledged that:

A.    The purpose of the viewing windows was to monitor, view, the Bishop England

High School students during their use of the locker/dressing room facilities. (*See* Exhibit 1 – Press

1

**JA1564**

Release from the Diocese of Charleston 2.4.21)

B.     The foregoing was accomplished at least by faculty, staff, and employees of Defendants. (*See* Exhibit 2 – Finneran Depo 10.5.21 P. 60, L 24 – P. 61, L. – 2)

C.     Defendants estimate as many as 7500 student locker/dressing room users may have been so viewed. (*See* Exhibit 3 – BEHS Discovery Responses)

D.     Numerous students  were actually video recorded while at BEHS via the viewing windows. (*See* Transcript of Record, State of South Carolina v. Jeffrey Alan Scofield, Case No. 2019-GS-08-01294 (General Sessions Court, Berkeley County, South Carolina June 9, 2020) at pages 8-9.

E.     All of this occurred with no viewing/monitoring promulgated policy, directives, or accountability whatsoever. (*See* Exhibit 4 - Finneran Depo Testimony 30(b)(6) Depo Testimony of Finneran 10.22.21 P. 51, L 21 –25, P. 52, L. 7-21, and P. 78, L. 9-13)

F.     Counsellors would be available to students/facility users right away and even on an ongoing basis (See Exhibit 5 - Finneran correspondence)

This egregious misconduct – misconduct that Defendants themselves acknowledge – forms the backdrop for the Court's consideration of the instant motion.

**1.  *Snakenberg* is Not the Controlling Authority.**

Defendants' first argument is that the Court of Appeals decision in *Snakenberg v. Hartford Cas. Ins. Co.*, 299 S.C. 164, 171, 383 S.E.2d 2, 6 (Ct. App. 1989) is the controlling authority on the question of whether actual viewing is required for the tort of intrusion into private affairs. As Plaintiffs show the Court in their motion, *O'Shea v. Lesser*, 308 S.C. 10, 17–18, 416 S.E.2d 629, 633 (1992) is actually the controlling case, and established under South Carolina law that "actual viewing" is <u>not</u> necessary to satisfy the "intrusion" element of the intrusion into private affairs tort.

**JA1565**

In their opposition, Defendants have no answer for the plain language of the *O'Shea* case: if a person "can see" into a neighbor's window, that satisfies the intrusion element of the tort where the plaintiff shows "a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." *O'Shea*, 308 S.C. at 17-18, 416 S.E.2d at 633. There is no "implicit recognition" by the *O'Shea* court that "information must be obtained about the plaintiff when the <u>explicit</u> language of O'Shea says "can see." Defendants' unsupported assertion that "[i]t's not so much whether there was a situation in which a person could have been viewed" (ECF 90 at 8) doesn't qualify as any kind of reasoned analysis that would negate the plain language ("can see") of *O'Shea*.

Defendants also inexplicably highlight the phrase "bringing forth no evidence of public disclosure," as if this somehow creates a requirement of actual viewing. ECF 90 at 8, n.4. Again, the Plaintiffs' claims here do not involve the public disclosure invasion of privacy sub-tort. Plaintiffs also don't allege public disclosure in connection with the intrusion into private affairs tort. However, the very language quoted by Defendants demonstrates that isn't fatal to the intrusion into private affairs claim. The proper way to read the *O'Shea* language quoted in Footnote 4 is a plaintiff basing an action for invasion of privacy "on intrusion" must show "a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom," when there is no evidence of public disclosure brought forth. That language doesn't stand for the proposition that actual viewing is required in any way.

The ascertainability, standing, and predominance analysis all hinge upon the question of whether actual viewing is required for the intrusion into private affairs tort. Defendants fail to make a compelling showing that the Court did not commit a manifest error of law in overlooking

3

**JA1566**

the significance of the plain language of *O'Shea*. *Snakenberg* is not the controlling authority, and neither is the law review note relied upon by the Court.

### 2. Plaintiffs Demonstrated That There are No Additional Predominance or Superiority Issues.

Contrary to what Defendants argue, there are no remaining predominance or superiority issues that would serve to defeat class certification. Defendants argue that "individual proof and damages will predominate over common issues of the litigation." However, the "individual proof" that the Court referenced relates to the actual viewing, which isn't a requirement under South Carolina law.

As for damages, in addition to the arguments advanced by Plaintiffs in their motion (at pages 15-17), *Snakenberg* states the following:

> if the plaintiff proves the four elements needed to establish his cause of action, the fact of damage is established as a matter of law. The amount of damage is then to be assessed by the trier of fact. In assessing the damage, the trier of fact may consider the shame, humiliation, and emotional distress suffered by the plaintiff as compensable elements of damage.

*Snakenberg*, 299 S.C. at 172, 383 S.E.2d at 6. Establishing "damages as a matter of law" can be fairly read as the Court of Appeals recognizing the availability of nominal damages for the intrusion into private affairs tort. Nominal damages are not subject to individualized proof and thus would not defeat predominance. And, pertinent to the standing questions this Court faces here, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 209 L. Ed. 2d 94 (2021), holds that nominal damages are sufficient to imbue one with Article III standing.

With regard to superiority, Defendants simply ignore the persuasive arguments made in Plaintiffs' motion. Class adjudication is superior because no one would be able to bring these claims by himself or herself, as damages are too small (if nominal damages are all that are available). *See Livingston v. Sims*, 197 S.C. 458, 15 S.E.2d 770, 772 (1941).

4

**JA1567**

For these reasons, and those set out more fully in Plaintiffs' motion, the Court should reconsider its ruling on class certification, and certify the proposed classes here.

Respectfully submitted,

THE RICHTER FIRM, LLC

s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (Fed. Bar: 3460)
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC 29464
Phone: 843-849-6000
LRichter@RichterFirm.com
Anna@RichterFirm.com

-AND-

s/Carl L. Solomon
Carl L. Solomon (Fed. Bar: 6684)
Solomon Law Group, LLC
P.O. Box 1866
Columbia, SC 29202
Phone: 803-391-3120
carl@solomonlawsc.com

-AND-

s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (Fed. Bar: 6106)
Stephen Slotchiver (Fed. Bar: 6648)
Anna E. Richter (Fed. Bar: 13333)
Slotchiver & Slotchiver LLP
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com

-AND-

s/Brent S. Halversen
Brent S. Halversen (Fed. Bar: 10474)
Brent Souther Halversen, LLC
751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464

5

**JA1568**

Phone: 843-284-5790
brent@halversenlaw.com

-AND-

David K. Lietz (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

*Attorneys for Plaintiffs*

**JA1569**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| Gary Nestler, *et al.*, | ) | Civil Action No. 2:21-cv-613-RMG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| The Bishop of Charleston, a Corporation | ) | **ORDER** |
| Sole, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Before the Court is Plaintiffs' motion for reconsideration and Plaintiffs' motion to certify question to the Supreme Court of South Carolina. For the reasons set forth below, the Court denies Plaintiffs' motions.

### I.    Background

On March 24, 2022, the Court denied Plaintiffs' motion for class certification. (Dkt. No. 84) (the "Prior Order").

On April 21, 2022, Plaintiffs moved for reconsideration of the Prior Order. (Dkt. Nos. 88, 93). Plaintiffs also moved for the Court to certify a question to the South Carolina Supreme Court. (Dkt. Nos. 89, 92). Defendants oppose both motions. (Dkt. Nos. 90, 91).

### II.    Legal Standard

Federal Rule of Civil Procedure 59(e) permits a district court to alter, amend, or vacate a prior judgment. Rule 59(e) permits a court to amend a judgment in three situations: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial [or summary judgment]; or (3) to correct a clear error of law or prevent manifest injustice." *Zinkand v. Brown,* 478 F.3d 634, 637 (4th Cir.2007) (citations omitted). Courts are

**JA1570**

reluctant to grant such a motion, because "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir.1998) (quoting 11 Charles Alan Wright, et al., *Federal Practice and Procedure* § 2801.1, at 124 (2d ed.1995)). Although "there are 'circumstances when a motion to reconsider may perform a valuable function,' ... it [is] improper to use such a motion to 'ask the Court to rethink what the Court ha[s] already thought through—rightly or wrongly.'" *Potter v. Potter,* 199 F.R.D. 550, 552 (D. Md.2001) (quoting *Above the Belt, Inc. v. Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983)).

### III.    Discussion

In its Prior Order, the Court denied Plaintiffs' motion for class certification on the basis that the proposed classes were fail-safe classes and not ascertainable, that the named Plaintiffs lacked standing, and that neither predominance nor superiority were met.  Central to these findings was the Court's holding that the tort of wrongful intrusion into private affairs required actual viewing. *Snakenberg v. Hartford Cas.*, 299 S.C. 164, 171-72 (Ct. App. 1989) (The cause of action for wrongful intrusion into private affairs consists of (1) an intentional (2) intrusion, (3) which is substantial and unreasonable, (4) into that which is private.); *Id.* at 172 (Damages "consist[] of the unwanted *exposure* resulting form intrusion.") (emphasis added); Prior Order, (Dkt. No. 84 at 9) (holding that "South Carolina law explicitly requires that information about the victim be acquired by the defendant for the tort to be actionable"); *O'Shea v. Lesser*, 308 S.C. 10, 17-18 (1992) (Where "a plaintiff bases an action for invasion of privacy on 'intrusion,' bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom.") (*citing Rycroft v. Gaddy*, 281 S.C. 119 (Ct. App. 1984)).  Plaintiff argues this holding was a clear error of law. (Dkt. No. 88 at 2, 5-7).  Plaintiff states that *O'Shea s*tands for the proposition that

2

**JA1571**

"actual viewing" is not necessary to satisfy the elements of the tort for wrongful intrusion into private affairs.

In *O'Shea*, respondents obtained permission to make certain improvements to their home. Appellant argued those improvements provided respondents with a view into her home, thereby forcing her to change her lifestyle. Appellant brought claims for breach of contract, fraud, breach of contract accompanied by a fraudulent act, and negligence. *Id.* 14. The master-in-equity, after dismissing all claims but breach of contract, found for respondents. On appeal, appellant challenged, inter alia, the master-in-equity's finding that she sustained no damages even though she asserted that her neighbors' ability to see into her home constituted an invasion of privacy. *Id.* at 17.

The court affirmed the master-in-equity's finding regarding damages. The court reiterated *Rycroft*'s holding that, in the absence of *public disclosure*, the tort of intrusion requires plaintiff to show a "blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." *Id.* at 17-18 (noting "the fact that the Lessers can see into a portion of appellant's home is not so blatant or shocking as to constitute an invasion of privacy") (citing *Rycroft*, 281 S.C. 119 (Ct. App. 1984)).

The Court denies Plaintiff's motion for reconsideration. As shown above, *O'Shea* did not modify the elements of the tort of intrusion. To the contrary, *O'Shea* reaffirmed those elements by citing *Rycroft* with approval, bolstering this Court's finding that the tort of intrusion requires proof of actual viewing. *O'Shea*, 308 S.C. at 17-18 (acknowledging information must be obtained about the plaintiff because, where "a plaintiff bases an action for invasion of privacy on 'intrusion,' bringing forth no evidence of public disclosure [of the information], it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or

3

**JA1572**

humiliation to himself resulting therefrom") (*citing Rycroft*, 281 S.C. at 124-25). Plaintiffs' argument that *O'Shea* somehow modified the tort of intrusion, (Dkt. No. 88 at 6-7) (arguing that the use of the phrases "can see" and "ability to see" imply "it is possible to satisfy the intrusion element with the mere ability to see [], not actual viewing") (emphasis removed), is contrary to the plain language of that decision.

Accordingly, the Court denies Plaintiffs' motion for reconsideration. Further, given this finding, the Court declines to certify a question to the South Carolina Supreme Court regarding the elements of the tort of intrusion.

**IV.    Conclusion**

For the reasons stated above, Plaintiffs' motion for reconsideration (Dkt. No. 88) and Plaintiff's motion to certify question (Dkt. No. 89) are **DENIED**.

**AND IT IS SO ORDERED**.

s/ Richard M. Gergel
Richard M. Gergel
United States District Judge

May 24, 2022
Charleston, South Carolina

4

**JA1573**

**United States District Court**
**District of South Carolina**
**Charleston Division**

| | |
|---|---|
| Gary Nestler,<br>Viewed Student Female 200,<br>Viewed Student Male 300,<br>on behalf of themselves and all others<br>similarly situated,<br><br>        Plaintiffs,<br><br><br><br>   vs.<br><br><br><br><br>The Bishop of Charleston, a Corporation<br>Sole, Bishop England High School,<br>Tortfeasors 1-10, The Bishop of the Diocese<br>of Charleston, in his official capacity, and<br>Robert Guglielmone, individually,<br><br>        Defendants. | C/A: 2-21-cv-00613-RMG<br><br><br><br><br><br><br>**PLAINTIFFS' RESPONSE**<br>**AND MEMORANDUM**<br>**IN OPPOSITION TO**<br>**DEFENDANTS' MOTION FOR**<br>**SUMMARY JUDGMENT** |

Come now Plaintiffs, by and through their undersigned counsel, and file this Response in Opposition to Defendants' Motion for Summary Judgment (ECF #85), and memorandum in support of such opposition.

In the shortest statement possible, Defendants have moved based on this Court's Order denying class certification (ECF #84) and declining to certify a question as to South Carolina law to the South Carolina Supreme Court (ECF #95). In issuing such Order this Honorable Court placed much reliance on *Snakenberg v. Hartford Cas. Ins. Co.*, 299 S.C. 164, 171, 383 S.E.2d 2, 6 (Ct. App. 1989) and *O'Shea v. Lesser*, 308 S.C. 10, 17-18, 416 S.E.2d 629, 633 (1992). We

1

**JA1574**

believe that the Court erroneously construed those opinions, and perhaps others, and has now been

asked to grant relief in terms of across-the-board summary judgment grant to Defendants based

squarely on such flawed reasoning as articulated in its earlier determinations referenced above.

See ECF#84 and ECF#95.

The posture of the case does not support a grant of summary judgment to the Defendants.

One reason for this is that the Plaintiffs, the injured parties, clearly enjoy standing and are properly

before this Court. In addition, the true posture of the underlying matter is that it has only been

partially developed because Plaintiffs have been restricted in the amount of discovery and the

discoverable issues the Court allowed. Only ten depositions have been allowed and the limitation

imposed by this Court was to issues of class certification only, even though Defendants seem to

now wish to spill over into what they perceive as deficiencies in proof overall as to the merits of

the various causes of action, which Plaintiffs, again, have not been allowed to examine into by

discovery tools. For this Court to grant such relief would be a manifest injustice.

The standards to be applied to a motion for summary judgment, granting the opposing

parties, the Plaintiffs, the benefit of all reasonable inferences and conclusions which could be

drawn, mandate Plaintiffs sought relief.

Although a large number of Plaintiffs have been overreached and had their rights invaded,

thousands of whom were victimized as minors; and the adult tuition paying Plaintiffs had hidden

from them the existence of the four foot by four foot viewing windows which the high school had

installed and utilized, and this is not contested, for a period of twenty-one years, for the purpose

of viewing, monitoring, students while they were in various stages of nudity and conducting highly

personal and private matters, as would be expected in a locker/dressing room. We urge the Court

most sincerely to critically review the status of the record, even so scantily yet developed as was

2

**JA1575**

possible under the restrictions imposed limiting discovery only to issues of class certification. The Court's burden is recognized as lessened when one considers that the Defendants themselves have acknowledged certain critical aspects of Plaintiffs' claims. We have said to the Court previously and do so again herein, and we earnestly urge that the Court take the time to reflect through a few salient points. The fact is that the Defendants themselves have acknowledged a number of things, including:

A.     That the viewing windows were for the purpose of monitoring, viewing Bishop England High School students during their use of locker rooms/dressing room facilities. *See* **Exhibit 1** – Press Release from the Diocese of Charleston 2.4.21.

B.     That the foregoing viewing was accomplished at least by faculty, staff, and employees of Defendants. *See* **Exhibit 2** – Finneran Depo 10.5.21 P. 60, L. 24-P. 61, L. 2.

C.     The Defendants themselves estimate that as many as 7,500 student locker/dressing room users may have been viewed over the period of existence of the windows. *See* **Exhibit 3** – BEHS's Answers to Plaintiffs' First Set of Interrogatories, specifically number 20. *See* also **Exhibit 4** – Photograph of Athletic Director/Coach Runey's office desk arrangement and the window looking directly into a locker room.

D.     Numerous students were actually video recorded while at BEHS by way of the viewing windows. *See* **Exhibit 5** - Transcript of Record, State of South Carolina v. Jeffrey Alan Scofield, Case No. 2019-GS-08-01294 (General Sessions Court, Berkeley County, South Carolina June 9, 2020) at pages 8-9. These recordations were left by the viewer on a BEHS iPad and were ultimately discovered by BEHS students who were using the device in relation to an athletic competition viewing. Interestingly, the students happened upon other disgusting nude images which had been left on the electronic device. Certainly this is evidence as to degree of impact on

3

**JA1576**

students who were required to disrobe, etc. while viewable through the viewing windows. The images were left on a BEHS iPad viewable by whomsoever was a subsequent user of the device. Another way of saying the same thing is that such invasive images were indiscriminately left for viewing, copying, or display without limitation, and it happened. That is significantly impactful to all victims, nobody could possibly disagree with or justify this a contrary conclusion; a jury won't and Plaintiffs are absolutely entitled to the reasonable inferences which could be drawn from these facts.

E.      All of this unbelievably intrusive, demeaning and demented viewing was of students in a gymnasium locker rooms/dressing rooms over a period of twenty-one years. All students were mandated to take physical education as part of the core curriculum at Bishop England High School, so they could count on being in front of these windows. And all of the activity was criminal including the conspiracy to enter into the window viewing of private, personal, nude acts by the students, and the nondisclosure of such acts, the coverup, for twenty-one years, and the intentional destruction of evidence, in the possession of the Defendants, who had been specifically instructed to preserve the same. *See* **Exhibit 6** - Spoliation notice and **Exhibit 7** - Finneran Depo 10.5.21 P. 15, L. 10-P. 17, L. 13; P. 96, L. 17-P.105, L. 22.

F.      Plaintiffs' expert Dr. Amanda Salas is a board-certified psychiatrist who personally interviewed and evaluated Class Representatives Viewed Female Student 200 and Viewed Male Student 300. She has offered her medical opinion that the Class Representatives suffered a negative psychological impact upon learning that they could have been viewed while undressing. In addition, the viewing of highly personal and private activities of the student users was inescapably offensive and all who learned that they had been exposed to the possibility of such viewing would be impacted.  Dr. Salas' fuller stated opinion is reprinted here, below:

4

**JA1577**

Proffered Professional Opinions

The transparent viewing windows into the dressing rooms at Bishop
England are a breach of privacy that was not known, recognized,
appreciated, or expected by the interviewed users of these facilities.
Undressing can be uncomfortable and may be associated with
embarrassment. Shame, fear, and nervousness are feelings that one
may experience with the process of undressing. The perception of
privacy invasion surrounding an undressing experience can bring up
these feelings.

Each of the interviewed class representatives articulated an
expectation of privacy and respect for their personal space within
the Bishop England changing rooms. Upon learning of the natures
and risks associated with the viewing window, the interviewed class
representatives experienced a negative shift in their emotional state.
Both described concerns related to the possibility of having been
viewed, photographed, videoed, or made an unknown victim to
one's voyeuristic sexual pleasures. Both expressed concern of not
knowing, and not being able to know within a degree of certainty,
the extent of personal violation to which they were subjected when
utilizing the dressing rooms at Bishop England High School.
Although neither were aware of having been photographed or
recorded from the viewing windows, each expressed thoughts of
worry as to whether they may face future embarrassment or
humiliation from what could have been photographed or recorded
during their use of the changing facilities at Bishop England High
School.

Every student who was subjected to undressing before the viewing
windows is expected to be impacted. Those persons can have a range
of emotions and psychological impacts by having been exposed to
the viewing windows, whether exposed by perception or reality. The
degree by which an individual is affected hinges on factors unique
to each. Impact by the invasion of privacy to which students were
subjected while in the dressing rooms at Bishop England High
School is clearly directed to the negative.

The opinions included in this report are my professional medical
opinions offered to a reasonable degree of medical certainty based
on the available information. I reserve the right to supplement this
opinion should additional information come forth.

Dr. Salas Report (Dkt. #41-1).

    G.    The Defendants' acts didn't happen one day. They happened every school day for

5

**JA1578**

twenty-one years! That conduct is reprehensible and significant and demented, *ab initio,* and the idea that no oversight by Bishop England High School or other Diocesan officials in the form of mandated methods or controls of viewing, mandated documentation of time, place and specific viewers, none of which was required by any of the Defendants, shows just what can and will very easily lead a jury to conclude that these are activities of renegades, not well reasoned adults, and the jury may with these facts and others that it will see during a merits presentation conclude that the facts go together to prove the elements of the causes of action upon which Plaintiffs have sued and may award substantial damages to Plaintiffs even including, at least as to the tort claims, an award of punitive damages, this because the activity is so egregious that a jury may very well want to speak loudly to cause such activity to stop and never be engaged in again.

The foregoing is not even to mention the egregious nature of secreting this activity from the tuition paying parents, guardians, etc. for the referenced twenty-one year period. *See* **Exhibit 8** – Diocese Defendants' Responses to Plaintiffs' First Requests for Production, specifically numbers 6 and 7, where Plaintiffs asked Defendants to produce any writings notifying the tuition payers of this practice; and, of course, Defendants objected and never produced any such writings.

Defendants argue that the Court of Appeals decision in *Snakenberg v. Hartford Cas. Ins. Co.*, 299 S.C. 164, 171, 383 S.E.2d 2, 6 (Ct. App. 1989) is the controlling authority on the question of whether actual viewing is required for the tort of intrusion into private affairs. As Plaintiffs have previously shown this Court, and now do so again, *O'Shea v. Lesser*, 308 S.C. 10, 17–18, 416 S.E.2d 629, 633 (1992) is actually the controlling authority, and established under South Carolina law that "actual viewing" is <u>not</u> necessary to satisfy the "intrusion" element of the intrusion into private affairs tort.

6

**JA1579**

In their opposition, Defendants have no answer for the plain language of the *O'Shea* case: if a person "can see" into a neighbor's window, that satisfies the intrusion element of the tort where the plaintiff shows "a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." *O'Shea*, 308 S.C. at 17-18, 416 S.E.2d at 633. There is no "implicit recognition" by the *O'Shea* court that "information must be obtained about the plaintiff when the <u>explicit</u> language of O'Shea says "can see." Defendants' unsupported assertion that "[i]t's not so much whether there was a situation in which a person could have been viewed" (ECF 90 at 8), doesn't qualify as any kind of reasoned analysis that would negate the plain language ("can see") of *O'Shea*. By the very nature of the activities Defendants engaged in, its duration, its unbridled execution, its coverup and nondisclosure, the Defendants have put themselves outside the law, they have engaged in criminal activities and have given the populace in general sound reasons to condemn the acts and the actors. And the thousands who did not agree to pose partially or fully nude before salivating viewers were all impacted significantly for their entire lifetimes. No objective mind, and no jury collectively possessed of such minds, could ever condone Defendants' intrusion into the victims' private affairs; and no jury can possibly undermine the degree of impact on the victims. Dr. Salas has given a medical opinion that, "Every student who was subjected to undressing before the viewing windows is expected to be impacted." *See* Dr. Salas Report (Dkt. #41-1). Dr. Salas also testified at her deposition that every alumnus of BEHS will be impacted, but that they all will be affected differently. *See* **Exhibit 9**, Dep. A. Salas, P. 67, L. 24 – P. P. 68, L. 10. It is criminal activity, and it cannot be justified.

Defendants also inexplicably highlight the phrase "bringing forth no evidence of public disclosure," as if this somehow creates a requirement of actual viewing. ECF 90 at 8, n.4. Again, the Plaintiffs' claims here do not involve the public disclosure invasion of privacy sub-tort.

**JA1580**

Plaintiffs also don't allege public disclosure in connection with the intrusion into private affairs tort. However, the very language quoted by Defendants demonstrates that isn't fatal to the intrusion into private affairs claim - but please recall that images were left on the BEHS device used by the person capturing the images, and other people came upon them – fellow students who, thank God, were honorable. Who can possibly argue in good faith that a shocking and blatant disregard of plaintiffs', the victims, rights has not occurred, or that "serious mental or physical injury or humiliation" results therefrom? The proper way to read the *O'Shea* language quoted in Footnote 4 is a plaintiff basing an action for invasion of privacy "on intrusion" must show "a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." Such language doesn't stand for the proposition that actual viewing is required in any way.

As for damages, in addition to the arguments advanced by Plaintiffs in their motion for reconsideration (ECF #88 at pages 15-17), *Snakenberg* states the following:

> if the plaintiff proves the four elements needed to establish his cause of action, the fact of damage is established as a matter of law. The amount of damage is then to be assessed by the trier of fact. In assessing the damage, the trier of fact may consider the shame, humiliation, and emotional distress suffered by the plaintiff as compensable elements of damage.

*Snakenberg*, 299 S.C. at 172, 383 S.E.2d at 6. Establishing "damages as a matter of law" can be fairly read as the Court of Appeals recognizing the availability of nominal damages for the intrusion into private affairs tort. Nominal damages are not subject to individualized proof and thus would not defeat predominance. And, pertinent to the standing questions this Court faces here, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 209 L. Ed. 2d 94 (2021), holds that nominal damages are sufficient to imbue one with Article III standing.

**JA1581**

## **CONCLUSION**

This is no case for summary judgment. In addition, our South Carolina Supreme Court exists in part for the purpose of answering questions certified to it. If this Honorable Court still has any uncertainty about South Carolina law, then it is error not to seek from, and allow that authority to declare the South Carolina law. Such rises even to the level of an error of law and an abuse of discretion by this Honorable Court.

We respectfully and humbly beseech this Court not to leave these Plaintiffs with no remedy and we urge the Court to please reconsider the controlling authorities we have mentioned herein. They are compelling.

Respectfully submitted,

THE RICHTER FIRM, LLC

s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (Fed. Bar: 3460)
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC 29464
Phone: 843-849-6000
LRichter@RichterFirm.com
Anna@RichterFirm.com

-AND-

s/Carl L. Solomon
Carl L. Solomon (Fed. Bar: 6684)
Solomon Law Group, LLC
P.O. Box 1866
Columbia, SC 29202
Phone: 803-391-3120
carl@solomonlawsc.com

-AND-

s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (Fed. Bar: 6106)
Stephen Slotchiver (Fed. Bar: 6648)

9

**JA1582**

Anna E. Richter (Fed. Bar: 13333)
Slotchiver & Slotchiver LLP
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com
arichter@slotchiverlaw.com


-AND-

s/Brent S. Halversen
Brent S. Halversen (Fed. Bar: 10474)
Brent Souther Halversen, LLC
751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com

-AND-

David K. Lietz (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

*Attorneys for Plaintiffs*

June 6, 2022

10

**JA1583**

# EXHIBIT 1



## ROMAN CATHOLIC
# DIOCESE OF CHARLESTON
**OFFICE OF MEDIA RELATIONS**

# PRESS RELEASE
**FOR IMMEDIATE RELEASE**
Feb. 4, 2021

Contact: Maria Aselage, Director of Media Relations
(843) 513-7605 ~ maria@charlestondiocese.org

### Statement from the Roman Catholic Diocese of Charleston regarding the proposed class action lawsuit related to Bishop England High School

CHARLESTON, SC – The Roman Catholic Diocese of Charleston released the below statement related to the lawsuit filed today involving Bishop England High School. The statement should be attributed to Maria Aselage, spokesperson for the Roman Catholic Diocese of Charleston.

The Catholic Diocese of Charleston received the lawsuit involving Bishop England High School this morning. After reviewing it, we feel that the class action claims have absolutely no merit.

The windows between the athletic coaches' offices and the boys' and girls' locker rooms were included in the plans and installed in the building in the 1990's for safety reasons. Their purpose was to allow coaches to monitor for fights, bullying, smoking or any type of inappropriate activity that might occur within the locker rooms. The plaintiff's claim that the windows were installed for the sole purpose of exploiting students is simply ludicrous.

When school officials learned about a member of its athletic staff videotaping boys in the locker room in May 2019, they immediately contacted police and terminated the employee. Soon afterward, the windows were covered and were subsequently removed and replaced with a block wall.

Contrary to the claims in the lawsuit, the Catholic Diocese of Charleston takes protection of children very seriously. It mandates that every teacher, other employee, and volunteer who has regular access to children undergo a background screening, attend a child abuse prevention education program, and sign a code of conduct governing their interactions with minors. Additionally, Catholic school teachers and staff are required to attend boundary training.

### ###



901 Orange Grove Rd. • Charleston, SC 29407 • (843) 513-7605 • www.charlestondiocese.org

**JA1585**

# EXHIBIT 2

Deposition of Patrick Finneran                                                    1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
 2                    CHARLESTON DIVISION

 3
                DEPOSITION OF PATRICK FINNERAN
 4
                      OCTOBER 5, 2021
 5

 6   GARY NESTLER, VIEWED STUDENT FEMALE 200, VIEWED
     STUDENT MALE 300, on behalf of themselves and all
 7   others similarly situated,

 8            Plaintiffs,

 9    vs.                 CASE NO. 2:21-cv-0613-RMG

10   THE BISHOP OF CHARLESTON, A CORPORATION SOLE;
     BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS 1-10; THE
11   BISHOP OF THE DIOCESE OF CHARLESTON, in his
     official capacity; and ROBERT GUGLIELMONE,
12   Individually,

13            Defendants.
     _____
14

15   TIME:          9:10 AM

16
     LOCATION:      THE RICHTER LAW FIRM
17                  MOUNT PLEASANT, SOUTH CAROLINA

18

19

20   REPORTED BY:   RONDA K. BLANTON, RPR
                    CLARK & ASSOCIATES, INC.
21                  CHARLESTON, SC 29422
                    843-762-6294
22                  WWW.CLARK-ASSOCIATES.COM

23

24

25
```

Deposition of Patrick Finneran                                    60

```
 1   with the school would have access --
 2       Q.  In sports.  Sorry.  Maybe I misspoke.  I
 3   meant people who were involved in the athletic
 4   programs who were students who were playing a
 5   sport of some sort, they would be the ones who
 6   would regularly use the locker rooms.
 7       A.  Yes.
 8       Q.  And in addition to those people, it
 9   would be anybody who was involved in physical ed?
10       A.  Yes.
11       Q.  And physical ed would be students who --
12   who were -- would be all students who are
13   required to have a physical ed degree or physical
14   ed class before they graduated Bishop England?
15       A.  Yes, sir.
16       Q.  So if I was to transfer to Bishop
17   England in my junior year and if I had not had a
18   PE class, would I be required to take PE in my
19   junior year?
20       A.  Yes.
21       Q.  Same for --
22       A.  Junior or senior year.
23       Q.  Junior or senior year.  Okay.
24           Were teachers instructed per -- what I
25   believe the handbook suggests, that part of their
```

Deposition of Patrick Finneran                                    61

1    job was to monitor the locker rooms?

2        A.  The -- the PE teachers, yes.

3        Q.  And was there a log kept as to when they

4    would do it or how often they would do it or the

5    hours they would do it?

6        A.  No, sir.

7        Q.  Do you know if they did it?

8        A.  If they did it?

9        Q.  Yes, sir.

10       A.  No.  I'm not --

11       Q.  Was that something that was in place

12   from the time that you came to the school all the

13   way through present?

14       A.  Yes.

15       Q.  And was it successful?

16       A.  I mean --

17           MR. DUKES:  Object to the form.

18       Q.  You've got three incidents in the time

19   that you've been at the school for eight years;

20   correct?

21       A.  Yes.

22       Q.  One of them was shoplifting of a wallet,

23   and two of them were videos taken; correct?

24       A.  Yes.

25       Q.  That's all the incidents you have?

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

### C/A No.: 2:21-cv-00613-RMG

| | |
|---|---|
| Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated,<br><br>  Plaintiffs,<br><br>  vs.<br><br>The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually,<br><br>  Defendants. | **DEFENDANT BISHOP ENGLAND HIGH SCHOOL'S ANSWERS TO PLAINTIFFS' FIRST INTERROGATORIES** |

By way of general objection to Plaintiff's discovery requests, Bishop England High School is an operation and ministry of Bishop of Charleston, a Corporation Sole, and has no separate existence from the Corporation Sole. Subject to and without waiving the stated objections, Defendant answers Plaintiffs' First Interrogatories as follows:

### ANSWERS TO PLAINTIFFS' FIRST INTERROGATORIES

1.    Whose idea was it to install the windows between the coach's or athletic department offices and the various locker rooms/dressing rooms at Bishop England High School (BEHS), and any other window capable of being used to view less than fully clothed persons when the school was constructed on Daniel Island?

**ANSWER:**

  **The Diocese relied on the expertise of architects, builders, and others for the design and construction of the building and the installation of certain measures to ensure the safety**

**of students.   The architects were LS3P; the primary contractor was Gulf Stream Construction.**

2.      Are there, or have there ever been, security cameras located in any of the BEHS bathrooms, changing rooms, or locker rooms since 1998? If yes, please state when the cameras were installed, who had/has custody over the films, whose responsibility it was/is to monitor the films, who was/is responsible for maintenance of the cameras.

**ANSWER:**

**No.**

3.      Are there, or have there ever been, security cameras located in any interior room or hallway at BEHS that is not in the bathrooms, changing rooms, or locker rooms since 1998? If yes, please state when the cameras were installed, who had/has custody over the films, whose responsibility it was/is to monitor the films, and who was/is responsible for maintenance of the cameras.

**ANSWER:**

**The school has 47 cameras located in common areas of the school, outside, hallways, and gymnasium.  Installation of the cameras happened over time, from 2014 to 2020.  The video from the cameras remains on the DVR for seven days, and it is accessible to the school's administration and IT staff.  The live video from the cameras is available to administrative staff. Some camera feeds are shown in the main office for security reasons related to allowing visitors entrance to the school campus. The school's Director of Operations and Maintenance Director are responsible for the maintenance and upkeep of the cameras and DVRs as well as for the ordering of new cameras when deemed necessary.**

2

4.    Please state what surveillance BEHS does of its students that does not occur in the bathrooms, changing rooms, or locker rooms for security and safety of its students.

**ANSWER:**

**This Defendant objects to Interrogatory No. 4 as not related to any claim or defense involved in the case; not related in any way to issues of class certification; and disproportionate to the needs of the case. In addition, Interrogatory 4 seeks production of information that is totally irrelevant to the case. Subject to the stated objection, students and visitors are monitored by teachers and staff during school hours and during school-sponsored activities such as sports or clubs. Additionally, all classroom doors have windows so that an observer can see what is happening inside.**

5.    As to the viewing windows at issue in this case, whose decision was it to cover over or alter the windows in any way?

**ANSWER:**

**BEHS administrators in consultation with the Superintendent of Education for the Diocese and other Diocesan officials.**

6.    How many students using the subject BEHS locker/dressing rooms were recorded either by video, motion picture or still photographs?

**ANSWER:**

**Defendant is aware of 5 boys who were photographed while changing clothes in the locker room. Two were initially identified by the Charleston Police Department in May, 2019. The Attorney General's Office found additional photographs or videos with another 3 boys pictured.**

**JA1593**

7.      Did you disclose to parents and/or students how many victims were viewed and recorded while using the subject locker/dressing rooms? If so, how many victims did you disclose were viewed and recorded?

**ANSWER:**

**The parents of the boys who were photographed were notified.   All parents / guardians were notified that 5 boys had been photographed.**

8.      Please state all disciplinary infractions that have occurred in any of the dressing rooms and/or locker rooms from 1998 to date, stating the type of infraction, how it was discovered, whom the infraction was reported to, and the disposition of the infraction.

**ANSWER:**

**The Diocese is attempting to compile the information requested and will supplement if any information or documents are found.**

9.      Please state all disciplinary infractions that have occurred in any of the bathroom facilities from 1998 to date, stating the type of infraction, how it was discovered, whom the infraction was reported to, and the disposition of the infraction.

**ANSWER:**

**The Diocese is attempting to compile the information requested and will supplement if any information or documents are found.**

10.     For Interrogatories #8 and #9, were these incidents reported to the appropriate BEHS authority, Diocesan authority, or police/law enforcement/or government agency?

**ANSWER:**

**The Diocese is attempting to compile the information requested and will supplement if any information or documents are found.**

4

**JA1594**

11.    Whose responsibility was it to monitor activity through the windows at BEHS from 1998 to the present? Has this position remained the same since 1998?

**ANSWER:**

**The windows into the boys' locker room were in the Athletic Director's office and the boys' basketball office. Jack Cantey occupied the AD's office for the first year and Paul Runey has occupied the office since. Paul Runey was in the boys' basketball office for the first year with Bill Runey, and it was occupied by the boys' basketball coach after the first year. The window in the girls' locker room is in the girls' PE teacher's office. Amelia Dawley, DeLane Neuroth, and Janel Swanson have been the girls' PE teachers since we moved to the Daniel Island campus.**

**There was no active monitoring responsibility for the adults in the offices, but they would intercede if there was an issue like bullying, fighting, or other discipline issues.**

12.    How were the persons who were to have access to viewing through the subject windows trained?

**ANSWER:**

**All employees of BEHS are required to undergo background checks and to go through Safe Environment Training. In addition, the school conducts in service programs from time to time to emphasize safety of students.**

13.    What records are kept memorializing periods of viewing activity through the subject windows?

**ANSWER:**

**Student discipline records are kept for one year after graduation date and then destroyed. There are no records of when the windows were monitored.**

5

**JA1595**

14.    Please describe, including by name, date, location, and total earnings, every gambling event or activity engaged in by or for the benefit of BEHS or any of its affiliated entities for the time period of 1998 to date.

**ANSWER:**

**This Defendant objects to Interrogatory No. 14 as not related to any claim or defense involved in the case; not related in any way to issues of class certification; and disproportionate to the needs of the case. In addition, Interrogatory 14 seeks production of information that is totally irrelevant to the case. Subject to the stated objection, games of chance have been prohibited as fundraisers for decades.**

15.    To the extent respondent hereto claims that acts described in response to the preceding interrogatory were not illegal acts, please state with specificity the reason or reasons for such claim or claims.

**ANSWER:**

**Not applicable.**

16.    State the total amount of tuition that was paid per year to BEHS for the time period beginning with the 1998-1999 school year through the 2018-2019 school year.

**ANSWER:**

**The Diocese is attempting to compile that information and will supplement.**

17.    State with specificity what changes or modifications, if any, have been made to the windows that are the subject of this litigation, at BEHS during the years 1998 through 2021.

**ANSWER:**

6

**JA1596**

**The windows were covered with plywood initially. As announced to parents, the windows have since been bricked.**

18.    State who made the decisions to alter the windows referenced above.

**ANSWER:**

**The school's administration in consultation with the Catholic Schools' Office and other offices in the Diocese of Charleston made the decision to alter the windows.**

19.    Who performed the modification work, if any, as to the subject windows and give the specific dates and costs of any such work, alteration, or modification of the subject windows?

**ANSWER:**

**Maner Construction removed and blocked in the window openings in July 2020 as a service to the school.**

20.    Please name each person who was enrolled at BEHS during the years 1998 through 2019 and for each please state the address at the time during which he/she was a student there, the last known address, email address, and telephone number (cell phone and land line).

**ANSWER:**

**This Defendant objects to Interrogatory No. 9 as not related in any way to issues of class certification; and disproportionate to the needs of the case. This Defendant is aware of several thousand, perhaps as many as 7,500, who have attended the school at some time between 1998 and 2021.**

21.    Identify each BEHS tuition payor (person or entity) from 1998 th:ough 2019, and for each tuition payor provide the name, address, email address, phone number, amount of tuition paid, and whose tuition was paid for.

**JA1597**

**ANSWER:**

**This Defendant objects to Interrogatory No. 21 as not related in any way to issues of class certification; and disproportionate to the needs of the case. This Defendant is aware of several thousand, perhaps as many as 7,500, who have attended the school at some time between 1998 and 2021 and some or all would have had at least one parent or guardian who paid their tuition.**

22.    Please provide the names, addresses, phone numbers, and email addresses of all persons serving on any governing or advisory board and/or any building committee of BEHS during any portion of the years 1995-2021.

**ANSWER:**

**The Diocese is compiling the information to respond to Interrogatory No. 22 and will supplement.**

23.    Please state the names and class years of each student who was not required to take the course known commonly as Physical Education during the period 1998 through 2019.

**ANSWER:**

**This Defendant objects to Interrogatory No. 23 as not related in any way to issues of class certification; and disproportionate to the needs of the case. Furthermore, this Defendant points out that conducting the inquiry called for by Plaintiffs would entail precisely the sort of individual examination that will defeat class certification.**

24.    Please state the names of all BEHS students who you claim were not viewed by any school personnel or other person through the viewing windows, or any of them, during the period 1998 through 2019, while such students were partially or fully nude.

**ANSWER:**

This Defendant objects to Interrogatory No. 24 as not related in any way to issues of class certification; and disproportionate to the needs of the case. Furthermore, this Defendant points out that conducting the inquiry called for by Plaintiffs would entail precisely the sort of individual examination that will defeat class certification.

25.     Please state the source and amount of any revenue received by BEHS during the years 1998 to date.

**ANSWER:**

This Defendant objects to Interrogatory No. 25 as not related in any way to issues of class certification; and disproportionate to the needs of the case.


                                          **TURNER, PADGET, GRAHAM & LANEY, P.A.**


                              By:    *s/Richard S. Dukes, Jr.*
July 12, 2021                 Richard S. Dukes, Jr., Federal ID No.: 7340
                              40 Calhoun Street, Suite 200
                              Charleston, South Carolina 29401
                              Phone: (843) 576-2810
                              Fax: (843) 577-1646
                              Email: rdukes@turnerpadget.com

                              Carmelo Barone Sammataro, Federal ID No.: 9174
                              P.O. Box 1473
                              Columbia, SC 29202
                              Phone: (803) 254-2200
                              Fax: (803) 799-3957
                              Email: ssammataro@turnerpadget.com

                              Megan Ashley Rushton, Federal ID No.: 13303
                              P.O. Box 1509
                              Greenville, SC 29602
                              Phone: (864) 552-4691
                              Email: mrushton@turnerpadget.com

                                          9

_____

**ATTORNEYS FOR DIOCESE DEFENDANTS**

10

**JA1600**

# EXHIBIT 4



# EXHIBIT 5

1

```
 1  STATE OF SOUTH CAROLINA   ) GENERAL SESSIONS COURT
                              )
 2  COUNTY OF BERKELEY        ) CASE NO. 2019-GS-08-01294

 3   STATE OF SOUTH           )
     CAROLINA,                )
 4                            ) Transcript of Record
             Plaintiff,       )
 5                            )
     vs.                      )
 6                            ) Date:  June 9, 2020
     JEFFREY ALAN SCOFIELD,   )
 7                            )
             Defendant.       )
 8       *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

 9

10

     B E F O R E:
11

             The Honorable Roger M. Young
12

13

14

15

16

17

18

19

20       *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

21

22                       Denise J. Lauder, RPR

23                       Ninth Judicial Circuit

24

25
```

**JA1604**

```
1                    A P P E A R A N C E S

2

3    REPRESENTING THE PLAINTIFF:

4           DAVID COLLIER, ASSISTANT ATTORNEY GENERAL

5           Attorney General's Office

6           1801 Main Street

7           Columbia, SC 29201-2409

8

9    REPRESENTING THE DEFENDANT:

10          DEBRA LITTLEFIELD, PUBLIC DEFENDER

11          Berkeley County Public Defender's Office

12          219 North Highway 52

13          Suite E

14          Moncks Corner, SC 29461

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         INDEX
 2                                       Page No.
 3     PROCEEDINGS.......................... 4
 4     REPORTER'S CERTIFICATE............... 17
 5
 6
 7
 8
 9                  INDEX OF EXHIBITS
10
11               (No exhibits were offered or
12     marked for identification.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

 1                  (The following proceedings were had

 2      June 9, 2020, via the Virtual Courtroom, Berkeley

 3      County General Sessions Court, Judge Young, State

 4      v. Scofield, 2:28 p.m.)

 5                  THE COURT:  Mr. Scofield.  Where is

 6      Mr. Scofield?

 7                  MS. LITTLEJOHN:  He's in BCPD.

 8                  THE COURT:  All right.  Is that him

 9      with the Berkeley PD Probook?

10                  MS. LITTLEJOHN:  It is, Your Honor.

11                  THE COURT:  Are you Alan -- Jeffrey

12      Alan Scofield?

13                  THE DEFENDANT:  Yes, sir.

14                  THE COURT:  All right.  Mr. Scofield,

15      I'm told that you want to plead guilty to

16      voyeurism.  Communicating obscene messages to

17      another person without consent is what is on the

18      sentencing sheet.  Is that the formal name for

19      voyeurism?

20                  MR. COLLIER:  No, Your Honor.  There

21      might be a typo on the sentence sheet.

22                  THE COURT:  Okay.

23                  MR. COLLIER:  It's the correct -- it's

24      the correct statute number, Your Honor, but I

25      inadvertently put the incorrect name of the crime.

**JA1607**

1  If it's okay with Debbie, if you could cross

2  through communicating obscene messages to another

3  person and write voyeurism.  I think that would

4  solve the problem.

5           MS. LITTLEJOHN:  I'm fine with that.

6           MR. COLLIER:  It's the correct CDR code

7  as well, Judge.

8                   EXAMINATION

9  BY THE COURT:

10      Q.   Okay.  So you want to plead guilty to

11  voyeurism, 0 to 3 years?  Mr. Scofield?

12      A.   Yes, sir.

13      Q.   All right.  Well, we normally do these

14  in the courtroom and we are not in the courtroom as

15  you can tell, so in order for me to take your plea,

16  you have to give up your right to have this done in

17  the courtroom.  Are you all right with that?

18      A.   I am.

19      Q.   Now, we normally -- again, your lawyer

20  would be there beside you, but she is participating

21  on video.  Raise your hand, Mrs. Littlejohn.

22           Do you see her there?

23      A.   I do.

24      Q.   If you need to talk with her during

25  this process, you just raise your hand and get my

**JA1608**

1    attention and we will let her call you and you can

2    arrange to talk with her more privately.  Okay?

3          A.   Okay.

4          Q.   Okay.  Well, in the meantime, you have

5    to give up your right to a jury trial.  When you

6    give up your right to a jury trial by pleading

7    guilty.  If you want a trial, stop me and we will

8    arrange that for you.

9               State then has to present enough

10   evidence to convince 12 jurors that you are guilty

11   beyond a reasonable doubt.  All 12 have to agree

12   that you are guilty in order to convict you, and if

13   convicted, you would have the right to appeal.

14              You could challenge the State's

15   evidence and put up evidence of your own; testify

16   if you want.  If you don't want to testify, the

17   judge would tell the jury not to hold that against

18   you while deliberating.  Do you understand those

19   rights?

20         A.   I do.

21         Q.   Do you want to give those rights up and

22   plead guilty?

23         A.   Yes.

24         Q.   Are you pleading guilty to this charge

25   because you are guilty of it?

**JA1609**

```
 1          A.    Yes.
 2          Q.    Are you under the influence of drugs or
 3   alcohol today?
 4          A.    No.
 5          Q.    Do you need any more time with your
 6   lawyer?
 7          A.    No.
 8          Q.    Are you satisfied with her
 9   representation?
10          A.    Yes.
11          Q.    Anybody promise you anything or
12   threaten you to plead guilty, other than they are
13   dropping another count of voyeurism?
14          A.    No.
15          Q.    How old are you?
16          A.    Thirty-three.
17          Q.    How far did you get in school?
18          A.    I have a master's.
19          Q.    And do you have a job?
20          A.    Not currently.
21          Q.    Did you have a job?
22          A.    I did.
23          Q.    What did you do?
24          A.    I was the sports information director
25   at Bishop England High School for five years.
```

**JA1610**

1           Q.    Are you married?

2           A.    No.

3           Q.    Do you have children?

4           A.    No, I do not.

5                 THE COURT:  Ms. Littlejohn, does he

6       understand what he's doing?

7                 MS. LITTLEJOHN:  Absolutely, Your

8       Honor.

9                 THE COURT:  All right.  I find that his

10      plea is freely, voluntarily, and intelligently

11      made.  What would the State like to tell me about

12      this case?

13                MR. COLLIER:  Thank you, Your Honor.

14      David Collier for the attorney general's office.

15                I would like to add that voyeurism is a

16      mandatory sex offender registry charge.

17                Your Honor, in the spring of 2019,

18      several students at Bishop England High School,

19      which is on Daniel Island in Berkeley County, were

20      using a school-owned iPad to record an athletic

21      event.  Apparently this iPad was shared among the

22      students and staff for this type of purpose.

23                The students at some point looked

24      through the camera roll on the iPad and found

25      several videos of boys who attended Bishop England

**JA1611**

1    High School changing clothes in the boy's locker.

2    In the video the boys were never fully nude, but

3    they were in their boxer shorts.

4                On the camera roll of the iPad, the

5    students also found nude photos of the defendant

6    Jeffrey Alan Scofield.  Mr. Scofield was then an

7    employee of Bishop England and served as attendance

8    clerk and also assisted in the athletic department.

9                The students quickly turned the iPad in

10   to the school administrators and the administrators

11   contacted the City of Charleston Police Department.

12               Mr. Scofield was interviewed by the

13   City of Charleston investigators, and he confessed

14   to placing the iPad in a window that faced the

15   boy's locker room and to secretly making the videos

16   of the boys while they changed clothes.

17               With the assistance from homeland

18   security investigations, a forensic examination was

19   conducted on the school iPad and on Mr. Scofield's

20   personal iPhone.  Those examinations led to the

21   identification of five victims in the locker room

22   videos.

23               The boys were never nude in those

24   videos, but they were changing their clothes with

25   towels and in their underwear.  The defendant was

**JA1612**

1   arrested after the interview.  And after he was
2   arrested, Investigator Brittany Harwell with the
3   City of Charleston secured a search warrant to look
4   for additional electronic devices at Mr. Scofield's
5   home.
6           Investigator Harwell is a member of the
7   attorney general's Internet Crimes Against Children
8   Task Force.  Ms. Harwell seized five electronic
9   devices which were then forensically examined by
10  chief forensic investigator Chris Bobar with the
11  attorney general's Internet Crimes Against Children
12  unit, but, Your Honor, Investigator Bobar did not
13  find any additional files of interest in the case
14  on those devices.
15          These are the facts from the State,
16  Your Honor, and the defendant does not have a
17  record.
18          THE COURT:  All right.  And what is
19  your recommendation?
20          MR. COLLIER:  No recommendation.
21          THE COURT:  Ms. Littlejohn.
22          MS. LITTLEFIELD:  Yes, Your Honor.  As
23  you heard Mr. Scofield is 33 years of age and
24  attorney general's office is actually prohibited
25  from giving a recommendation.

**JA1613**

1            This is a case we referenced to you
2    several weeks ago.  Mr. Scofield fully cooperated.
3    He handed over everything that there was, and you
4    heard that the AG's office thinks there was nothing
5    additional found.
6            When we were preparing for cases to
7    come in, I said -- he, David Collier of the
8    attorney general office called and said, what do
9    you want to do with Mr. Scofield?  Just kind of a
10   little bit of a risk thing to do.  I said, why not?
11   Let's go ahead and do him.
12            And I asked him about it.  I said, you
13   will have to come into our office because you're
14   allowed to have certain things.  And so you can see
15   he's here in the public defender's office.  Took a
16   while to get him into the office.
17            He has always been very cooperative
18   with our office.  He was cooperative with the
19   police.  He was cooperative with the attorney
20   general's office, et cetera.  During the day he
21   helps his sister.  She has lost both of her legs to
22   diabetes and he helps her out a lot.
23            So, Your Honor, we would just ask for a
24   probationary sentence.  He does know he will be
25   very, very limited because being on the sex

**JA1614**

1    offender registry, and I know the Court is very
2    much aware of how much that limits him.
3             This is a major embarrassment to him.
4    He had great potential and now he's having to
5    figure out what to do with his life at middle age
6    if you will, 33.
7             THE COURT:  All right.  Well, before I
8    hear from Mr. Scofield, were there members of the
9    victims' families that wanted to be heard or
10   they're just listening in?
11            MR. COLLIER:  Your Honor, they are just
12   listening.
13            THE COURT:  Okay.  All right.  Well,
14   Mr. Scofield, what would you like to tell me?
15            THE DEFENDANT:  I would like to say
16   that I was just, obviously -- well, obviously, but
17   I was going through different things at that time
18   and really -- really where these thoughts came from
19   to do this was -- was not something that I -- have
20   even been able to figure out until now.
21            I didn't have these thoughts three
22   months before this happened or three years before
23   this happened.  I can tell you that when I started
24   having thoughts about doing this, that I would have
25   these arguments in my head with myself because I

**JA1615**

1    knew how wrong it was.

2              And I wish I could have had the courage

3    or trust in someone to go to someone about the

4    thoughts I was having because I probably could have

5    stopped this from happening, but I was obviously

6    embarrassed about telling somebody about these

7    types of things.

8              And, honestly, I think that's why in my

9    interview with the detective at the end I told him

10   I was relieved and not take part -- telling him

11   that was -- fact that I was finally able to tell

12   somebody kind of what I was battling for those few

13   weeks or months or so in my head.

14             I can honestly say ever since I was --

15   I got that out that I haven't had any thoughts

16   anymore close to that sense, nor do I plan to have

17   them in the future.  I'm just really embarrassed

18   and ashamed for any type of embarrassment I brought

19   on to the victims in this case.  Just really,

20   really hope to find a way to move forward from here

21   on out.

22             THE COURT:  All right.  Well, here's

23   what I'm going to do.  I will give you a

24   probationary sentence and order you to undergo

25   mental health counseling.

**JA1616**

 1              If you are not being prosecuted for

 2    your sexual orientation, I mean, it sounds to me

 3    like if you're interested in taking pictures of

 4    boys, you might very well be gay.  Whether or not

 5    you have come to that, I don't know, but what you

 6    are prosecuted for is taking pictures of young

 7    people who they don't give their consent and that's

 8    against the law.  That is something that you need

 9    help with.

10              The State's not prosecuting you because

11    you may or may not be gay.  They are prosecuting

12    you for taking pictures of a sexual nature with

13    people that do not give their consent.

14              So that's the thing that needs to be

15    addressed by you in my opinion.  And so I will give

16    you two years in the Department of Corrections,

17    suspended upon you successfully completing 18

18    months of probation.

19              And while you are on probation I want

20    you to get some mental health counselling so that

21    you can talk to somebody about -- when you say

22    you're having -- you were -- you had some thoughts,

23    I assume that you were talking about photographing

24    people.

25              And that is something that is clearly

**JA1617**

1   unacceptable behavior, especially people without
2   their consent.
3               And if they're under age and of a
4   sexual nature, that is something that you need to
5   learn to do something about and control if you got
6   these urges again.
7               The other thing, you know, that's --
8   you are going to have to work your way through
9   whatever issues you have in life, just like
10  everybody else does, but it's the taking pictures
11  of an unauthorized nature and having to deal with
12  those thoughts that obviously you had struggles
13  overcoming.  That's what I need you to get help on.
14              MS. LITTLEJOHN:  Where do they go to
15  report for probation?
16              PROBATION AGENT:  Report immediately to
17  our office, 109 West Main, Moncks Corner.
18              THE COURT:  Yeah.  Where are you at
19  now?
20              MS. LITTLEJOHN:  He's at our office.
21              PROBATION AGENT:  We are five minutes
22  away.
23              THE COURT:  When you hang up here, you
24  come over to the probation office to see Mr. Davis
25  and get signed up for probation.

**JA1618**

1            MS. LITTLEJOHN:  The old one, the
2    satellite or the main courthouse?
3            PROBATION AGENT:  109 North Main,
4    health department.
5            THE COURT:  Over across from the
6    Subway.
7            PROBATION AGENT:  Yes.
8            THE COURT:  Do you know where he's
9    talking about?  Somebody there can tell you where
10   he's at.
11           THE DEFENDANT:  Okay.
12           THE COURT:  Good luck.
13           MS. LITTLEJOHN:  Thank you.
14           MR. COLLIER:  Your Honor, just one
15   thing further from the State.  We would ask that
16   during the term of probation that he be prohibited
17   from contacting the victims or their families.
18           THE COURT:  Okay.
19           MS. LITTLEJOHN:  That's no problem.
20           THE COURT:  Okay.  No contact with
21   victims or family members of the victim.
22           (These proceedings were concluded at
23   2:42 p.m.)
24
25

**JA1619**

```
 1                    CERTIFICATE OF REPORTER

 2

 3        I, Carol Denise Lauder, Registered

 4   Professional Reporter and Notary Public for the

 5   State of South Carolina at Large, do hereby certify

 6   that the foregoing transcript is a true, accurate,

 7   and complete record.

 8        I further certify that I am neither related

 9   to nor counsel for any party to the cause pending

10   or interested in the events thereof.

11        Witness my hand, I have hereunto affixed my

12   official seal this 5th day of June, 2021, at

13   Charleston, Charleston County, South Carolina.

14

15

16

17                        S/Carol Denise Lauder
                          Carol Denise Lauder
18                        Registered Professional
                          Reporter, CP
19                        My Commission expires
                          February 27, 2028
20

21

22

23

24

25
```

**JA1620**

# EXHIBIT 6

## THE RICHTER FIRM, LLC
### *Attorneys & Counselors at Law*
622 Johnnie Dodds Boulevard
Mount Pleasant, South Carolina 29464

Lawrence E. Richter, Jr.

Jennifer S. Ivey*

Telephone: (843) 849-6000
Telefax: (843) 881-1400

*Also licensed in FL

May 7, 2019

Via Email: pfinneran@behs.com
Bishop England High School
Attn: Patrick Finneran, Principal
363 Seven Farms Drive
Daniel Island, SC 29492

Via Email: jsmith@catholic-doc.org
The Most Reverend Robert E. Guglielmone
Diocese of Charleston
901 Orange Grove Rd
Charleston, SC 29407

Re:     Spoliation of Evidence re: Jeffrey Alan Scofield

Dear Principal Finneran and Bishop Guglielmone,

Please be advised that The Richter Firm, LLC has been retained by a known victim and potential victims in regards to the predatory and intrusive behavior by Jeffrey Alan Scofield and/or potentially others employed by Bishop England High School and the Diocese. During the pendency of this matter, or until further notice, or upon order of the Court, you, your agents, your employees, and anyone else within your knowledge or control must take reasonable steps to preserve every document, data, or tangible thing in your possession, custody or control, containing information that is relevant to, or may reasonably lead to the discovery of information relevant to, the subject matter involved in the potential litigation.

The documents, data, and tangible things subject to this notice include, but are not limited to, the following:

(a)     Documents, data, and tangible things evidencing the child sex abuse, voyeurism, and any and all other illegal acts of Jeffrey Alan Scofield and/or other employees, or agents of the Diocese who have committed similar acts in, on, or around Diocese facilities or involving students of Diocesan schools, including but not limited to, schools and facilities that are specifically designed and configured to provide viewing areas of less than fully-clothed minors;

**JA1622**

(b)    Documents, data, and tangible things evidencing the design and configuration of Diocese schools and facilities that provide areas to view less than fully-clothed minors;

(c)    Documents, data, and tangible things evidencing past allegations of child sex abuse, voyeurism, and any and all other illegal acts by other coaches, employees, or agents of the Diocese in, on, or around Diocese schools and facilities and/or involving students of Diocesan schools, including, but not limited to, Diocese schools and facilities that are specifically designed and configured to provide areas to view of less than fully-clothed minors, such as the subject locker rooms at Bishop England High School;

(d)    Documents, data, and tangible things evidencing communications (internal or external) concerning the above described subject matter, including any potential defenses that may be asserted;

(e)    Documents, data, and tangible things evidencing policies and procedures governing retention of documents, data, or other matter collected, created, or assembled by you, your agent(s), your employee(s), or any known third party regarding the above described subject matter, including any potential defenses that may be asserted, including policies pertaining to litigation;

(f)    Documents, data, and tangible things evidencing or relating to destruction of records pertaining to any of the above described records, documents, or data;

(g)    Documents, data, and tangible things evidencing communications to preserve potentially relevant evidence concerning any claims relating to the above described subject matter, including any potential defenses that may be asserted.

For the purposes of this notice, "documents, data, and tangible things" includes, but is not limited to: records; files; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemails; E-mails; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; charts; digital or chemical process photographs; video; phonographic tape; or digital recordings or transcripts thereof; drafts; jottings; and notes. Information that serves to identify, locate, or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition.

This notice is issued as an alert to maintain and preserve the integrity of all documents, data, and tangible things identified herein and any other evidence that you reasonably anticipate may be subject to discovery under Rules 26-37, 45, and 56 of the South Carolina Rules of Civil Procedure should litigation ensue, specifically including drawings, plans, meeting notes, contracts and any matter whatsoever related in any way to the planning, design, or construction of Bishop England High School.

**JA1623**

Please be mindful of the consequences that result from a finding that evidence was despoiled, which can include, but are not limited to procedural bars to claim(s) or defense(s), spoliation instruction to the jury, and/or sanctions, and in doing so, take any and all appropriate steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, relocation, migration, theft, or negligent or intentional mishandling of such material that would make same incomplete or inaccessible. In considering these consequences, please also bear in mind the nature of the claims involved, who the victims are, who the perpetrator(s) are, and their relationships with the Diocese.

The Bishop and Diocese counsel of record known in other sex abuse matters now pending is copied on this correspondence so that it can be clear from the outset of this engagement of the potential issue of spoliation. Mr. Dukes, please heed the same directives detailed herein with respect to any documents, data, and tangible things you may possess relevant to the subject matter addressed herein and any potential defenses, as well as your ethical duties under Rule 3.4 of the Rules of Professional Conduct and/or otherwise.

To the extent that you, your employees, or your agents, including Mr. Dukes, are aware of any documents, data, tangible things relevant to the subject matter described herein that is in the possession or control of third parties, please immediately identify those parties to me so that we may take steps to alert those parties to preserve the evidence.

So as to afford me a more full and accurate understanding of the area in question, or scenes of the crimes, I would like to physically view and inspect live the area involved. I would appreciate you agreeing to such inspection at the earliest possible time. Please notify me right away when I may come. Of course, representatives of the FBI, the Charleston Police Department, and the Diocese of Charleston are welcome to attend.

Thank you for your immediate attention to this matter.

Very truly yours,

Lawrence E. Richter, Jr.

LER/jsi

cc: Richard S. Dukes, Jr., Esq. (Via Email: RDukes@TurnerPadget.com)

**JA1624**

# EXHIBIT 7

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION


DEPOSITION OF PATRICK FINNERAN

OCTOBER 5, 2021


GARY NESTLER, VIEWED STUDENT FEMALE 200, VIEWED
STUDENT MALE 300, on behalf of themselves and all
others similarly situated,

       Plaintiffs,

  vs.                  CASE NO. 2:21-cv-0613-RMG

THE BISHOP OF CHARLESTON, A CORPORATION SOLE;
BISHOP ENGLAND HIGH SCHOOL; TORTFEASORS 1-10; THE
BISHOP OF THE DIOCESE OF CHARLESTON, in his
official capacity; and ROBERT GUGLIELMONE,
Individually,

       Defendants.
_____


TIME:          9:10 AM


LOCATION:     THE RICHTER LAW FIRM
              MOUNT PLEASANT, SOUTH CAROLINA




REPORTED BY:   RONDA K. BLANTON, RPR
               CLARK & ASSOCIATES, INC.
               CHARLESTON, SC 29422
               843-762-6294
               WWW.CLARK-ASSOCIATES.COM

Page 15

1    about documents but not actually physically the

2    building itself.

3        Q.  So in one part of the letter, it talks

4    about the documents include the windows and

5    another part of the letter it doesn't include the

6    windows.  Is that where the hang-up is?  Trying

7    to reconcile the difference?

8        A.  Yes.

9        Q.  It doesn't mean that the document

10    doesn't -- okay.  Is there a reason why the

11    windows were altered despite having received this

12    letter?

13        A.  So at this time the windows were boarded

14    up because we had some concerns from parents; and

15    so after a year of them being boarded and having

16    the boards on the windows, we decided to go ahead

17    and brick them in because it was a -- somewhat of

18    an eyesore.

19        Q.  What parents gave you concerns?

20        A.  Just feedback that I get from parents.

21    I could not tell you their names at this point.

22        Q.  When did that feedback come in?

23        A.  After the original statement was made.

24        Q.  All right.  After which --

25        A.  The original statement -- not this one,

**JA1627**

Page 16

1    but a statement about Mr. Scofield's arrest.

2       Q.  So after Mr. Scofield's arrest took

3    place is when parents learned about the fact

4    there are windows in the coaches' office looking

5    into the locker rooms?

6              MR. DUKES:  Object to the form.

7       A.  I don't know if that's when they learned

8    about it, but there were some concerns about it

9    at that point.

10      Q.  Do you have knowledge that the parents

11   were aware of the fact windows were in the

12   coaches' office looking into the locker rooms

13   before that?

14      A.  I do not.

15      Q.  This isn't the only letter that you

16   received, which I'll call -- which is called a

17   spoliation letter.  You've received other

18   correspondence advising you not to destroy or

19   alter the windows; isn't that correct?

20      A.  I -- I don't remember.

21      Q.  I'll represent to you that in a -- in a

22   different meeting, there was communications given

23   between your lawyer --

24              MR. DUKES:  Object to the form.

25      Q.  -- and this is -- between your lawyer

**JA1628**

Page 17

1  and the counsel in this case addressing the fact

2  that he himself had written a letter --

3           MR. DUKES:  That's not what I said,

4  and that's --

5      Q.  -- advising not to alter.  Is that not

6  correct?

7           MR. DUKES:  I'm going to instruct

8  him not to answer that question because it's

9  covered by the attorney-client privilege.

10     Q.  Do you dispute having received any other

11  letters regarding not altering windows?

12     A.  I just don't recall.

13     Q.  Fair enough.

14           MR. SLOTCHIVER:  Let's mark this as

15  an exhibit, please.

16           (Exhibit No. 02 was marked for

17  identification.)

18     Q.  Was the decision to board up the windows

19  based solely on the parents' concerns?

20     A.  Yes.

21     Q.  It had nothing to do with meetings with

22  the superintendent?

23     A.  I mean, it -- it was probably part of

24  discussion with them, the concerns from parents.

25  We were not instructed to board the windows up,

**JA1629**

Page 96

1      Q.  You mentioned you did talk to a parent

2   from LS3P.  Who was that?

3      A.  I cannot remember.  I don't remember the

4   parent.  He just told me that's -- that's what he

5   did.  I don't remember his name.

6            MR. SLOTCHIVER:  Can we -- I know

7   it's part of the transcript; but just for clarity

8   can we admit this as an exhibit, please.

9            (Exhibit No. 06 was marked for

10   identification.)

11            MR. SLOTCHIVER:  Let's take a quick

12   break, and we're about done.

13    (A recess was taken 11:14 a.m. to 11:24 a.m.)

14   BY MR. SLOTCHIVER:

15      Q.  Mr. Finneran, thank you.  We're about

16   done.  Probably three minutes.

17            Where could I go to see the window and

18   blinds that were taken out of the school?

19      A.  I don't know.

20      Q.  Where would they have been -- were

21   they -- are they preserved in a storage facility

22   somewhere?

23      A.  I don't think so.

24      Q.  Well, was the evidence not saved?

25            MR. DUKES:  Object to the form.

**JA1630**

Page 97

1      A.  We saved the evidence that we had, yes.

2      Q.  So you would have -- I mean, knowing

3   that the window was part of the issue and having

4   received the spoliation letter, I'm assuming

5   somewhere you would have saved the windows and

6   the blinds; correct?

7      A.  Not that I know of, no.

8      Q.  Who made the decision not to save the

9   windows and the blinds that were in the coaches'

10  office looking into the locker rooms?

11     A.  The decision was to -- after boarding

12  them up after it happened was to brick them in.

13     Q.  I understand.

14         Who made the decision?  In light of the

15  spoliation letter, who made the decision not to

16  save them?

17     A.  There was no discussion about that.  So

18  the decision was to block them in.

19     Q.  I mean, we can, to some extent, you

20  know, look and understand some things; but we

21  don't have -- for example, do you have -- there's

22  nowhere that it's been saved?

23     A.  Not that I know of, no.

24     Q.  How -- what was the timeliness in

25  conjunction with the removing of the windows and

**JA1631**

Page 98

1    closing it up?  Not the boarding it up but the

2    closing them up.

3            When you actually took the windows and

4    the blinds out, what was the time between that

5    and when they would have been discarded?

6        A.  I don't know.  I mean, I don't know when

7    they were discarded.

8        Q.  Do you know if --

9        A.  I don't know that either.

10       Q.  Do you know who would know the answer to

11   whether or not they were discarded?

12       A.  I don't know.  We had a company come in

13   and replace the windows with block.

14       Q.  The company that came to replace the

15   window with blocks, that was a friend; correct?

16   Friend of the school?

17       A.  Well, he's a contractor, does work; but

18   his kids go to the school, yes.

19       Q.  Did he charge the school any money?

20       A.  He actually did, yes.

21       Q.  Do you have a copy of that paperwork

22   anywhere?

23       A.  I do not have it, no.

24       Q.  Who would have it?

25       A.  It would be with our bookkeeper.

**JA1632**

Page 99

1      Q.  So if we request it, you would have

2   saved that document?

3      A.  Yes.

4      Q.  Is it possible that the contractor --

5   who was the contractor, by the way?

6      A.  It's -- Mr. Dennis is -- is the

7   gentleman.  I cannot remember the name of his

8   company.

9      Q.  Is it possible that the company would

10  have preserved the windows and the blinds?

11     A.  I don't know.

12     Q.  Would you agree with me that the amount

13  of space taken to preserve the 4 x 4 windows and

14  the blinds would have been minimal?

15         MR. DUKES:  Object to the form.

16     A.  I don't know what space requirements

17  that you have as far as any warehouse for that

18  kind of stuff.

19     Q.  It's a 4 foot x 4 foot window; correct?

20     A.  I understand the size, yes.

21     Q.  There's three of them; correct?

22     A.  There were three of them, yes.

23     Q.  They purportedly could stack on top of

24  each other?

25     A.  You could, yes.

**JA1633**

Page 100

1      Q.  And then you had blinds in the windows

2  that are already in the windows; correct?

3      A.  I cannot remember where the blinds were

4  hung.  If they were inside, on the windows

5  themselves, or just inside the sill part of it.

6      Q.  Were they the same blinds from the time

7  you came to the school until the time the windows

8  came out?

9      A.  They haven't changed, no.  They were

10  still there.

11      Q.  Just to be clear, you don't know if the

12  windows or the glass was preserved.  But you can

13  try to find out; correct?

14      A.  I could ask, yes.

15      Q.  Would it have been -- in light of this

16  spoliation letter, would it have been the

17  instruction -- who would have had -- I'll ask it

18  differently because I'm jumping around.

19          Who made the decision to pull the

20  windows out?  Was that you, or was that the

21  Diocese?

22      A.  The request to take the windows out

23  would have been mine.

24      Q.  And who made the arrangements to pull

25  the windows out?

Page 101

1        A.  So our Director of Operations, Mike

2    Darnell, spoke with Mr. Dennis about arranging

3    that part of it.

4        Q.  When you receive -- well, let's go back

5    to the spoliation letter.

6            When you receive communications such as

7    this one, do you file it; or do you share it with

8    other people?

9        A.  So you --

10       Q.  Let's pull the exhibit.  I think it's

11   Exhibit No. 01.

12       A.  It's Exhibit No. 02.

13       Q.  I think it was copied to somebody else

14   also.

15       A.  It was copied to the Bishop.

16       Q.  So when you received it, did you

17   communicate with anybody about this?

18       A.  Yes.

19       Q.  Who would you have spoken to?

20       A.  I spoke to Miss Tucker, who's the

21   associate principal.

22       Q.  And what did you and she talk about?

23       A.  To save all the emails, documents, that

24   kind of stuff.

25       Q.  Did you -- I'm not asking what you spoke

**JA1635**

Page 102

1    to a lawyer about, but did you consult with a

2    lawyer about this letter?

3        A.  We would have had discussion about it,

4    yes.

5        Q.  When you say "we," you mean you and

6    Miss Tucker; or you and a lawyer would have had

7    discussions?

8        A.  Mr. Dukes and I would have had

9    discussions.

10       Q.  You certainly got the letter.  You

11   talked to Miss Tucker about the letter; correct?

12       A.  What -- I don't remember getting the

13   letter; but if I could have, if I did get the

14   letter, I'm assuming we did because it's

15   addressed to me.  Then, yes, I would have talked

16   to Miss Tucker.

17       Q.  So we may be able to ask Miss Tucker

18   about the conversations.  Maybe she'll know.

19       A.  She might remember, yes.

20       Q.  Did you understand that the letter

21   wasn't written that would -- I'll say it

22   differently.

23           You understand the letter was written to

24   you, not Miss Tucker; correct?

25       A.  Yes.

**JA1636**

Page 103

1        Q.  And it was written to you and not to

2    Mr. Dukes, your lawyer; correct?

3        A.  Yes.

4        Q.  And the duty has been set forth on you

5    as the principal; correct?

6        A.  I understand that, yes.

7        Q.  Did you make any efforts to protect the

8    window?  It sounds like you may have because you

9    said you don't know where it is, but did you make

10   any effort to protect the window or the blinds

11   and to preserve them?

12       A.  No, not that I -- no.  I don't know what

13   they did with the windows when they took them

14   out.

15       Q.  Do you understand that without that

16   evidence, that can affect our investigation

17   'cause we don't have the actual windows or the

18   actual blinds to look at?  You understand why

19   it's important?

20            MR. DUKES:  Object to the form.

21       A.  That -- but you already came and took

22   pictures of all those things.  You had the -- you

23   looked at all those when they were still in

24   there.

25       Q.  So did you believe that by the fact that

**JA1637**

Page 104

1    we went there, that eradicated this letter?

2       A.  No.

3       Q.  You understand without looking --

4    without being able to look at it and to see it

5    and to bring an expert to actually look at it, we

6    don't have the opportunity to have a full

7    investigation as much as we might have liked to

8    have had?

9              MR. DUKES:  Object to the form.

10      A.  I don't know the answer to that

11   question.  I don't do those things.

12      Q.  Not what you do.  Okay.

13           Were the windows single glass, double

14   glass, compressed glass?

15      A.  I don't know.  I -- truthfully, I don't

16   remember.

17      Q.  I mean, those are things that wouldn't

18   necessarily show up on a photograph; correct?

19      A.  They may.  I don't know.

20      Q.  Those are things that if we had an

21   opportunity to look at it, we could tell;

22   correct?

23              MR. DUKES:  Object to the form.

24      A.  I guess so, yes.  I don't know.

25      Q.  And the same thing with the blinds.  You

**JA1638**

Page 105

1    know, how -- were the blinds relatively new?

2    Were they old?  Were they beat up?  Did they

3    work?

4         A.  They worked, yes.

5         Q.  How do you know they worked?  Did you

6    ever use the blinds?

7         A.  I never used them, but they were closed.

8    So they had to work.

9         Q.  Well, they were closed.  And I believe

10   your testimony was whenever you were in the

11   office, they were closed; correct?

12        A.  Yes.

13        Q.  Were they closed, or did they appear to

14   be closed?

15              MR. DUKES:  Object to the form.

16        Q.  Could you distinguish those two things?

17        A.  Yes.  They were closed.

18        Q.  When you were in the locker room, were

19   they closed; or did they appear to be closed?

20        A.  I don't ever remember looking at them

21   from the locker room.

22        Q.  Fair enough.

23              Was it -- are you the one that was --

24   that collected faculty handbooks for us?

25        A.  With the assistance of Miss Tucker, yes,

**JA1639**

# EXHIBIT 8

## UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

### C/A No.: 2:21-cv-00613-RMG

| | |
|---|---|
| Tuition Payer 100, Viewed Student Female 200, Viewed Student Male 300, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        vs.<br>The Bishop of Charleston, a Corporation Sole, Bishop England High School, Tortfeasors 1-10, The Bishop of the Diocese of Charleston, in his official capacity, and Robert Guglielmone, individually,<br><br>        Defendants. | **DIOCESE DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION** |

Diocese Defendants, by and through undersigned counsel, respond to Plaintiffs' First Requests for Production as follows:

### RESPONSES TO REQUESTS FOR PRODUCTION

1.    Please produce all photographs, files, diagrams, documents, or other tangible items which any responding Defendant or Defendant's counsel may have, have control of, or have access to which relate to the matters alleged in the Complaint.

**RESPONSE:**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located.**

2.    Please produce all statements given by any witnesses which are in the possession of, or can be reasonably obtained by, any responding Defendant or his or its attorney(s), whether written, or

recorded, or on a tape recorder, or otherwise, which relate to the matters complained of in the Complaint herein or to the Defendant's Answers and defenses.

**RESPONSE:**

> **The Diocese has not located any statements that are responsive to this request.**

3.    Please produce all statements, memoranda, reports, affidavits, or other materials which in any other way might relate to the Plaintiffs claims or to any responding Defendant's defenses herein which are within possession or control or can be reasonably obtained by any responding Defendant or his or its attorney(s), whether written or recorded, or on a tape recorder or otherwise.

**RESPONSE:**

> **The Diocese objects to Request No. 3 to the extent Plaintiff seeks information that is beyond that which is required for the Court to determine issues related to class certification under Rule 23 Fed.R.Civ.P., and to the extent the Request not proportionate to the needs of the case. Subject to the stated objection, the Diocese has search available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located.**

4.    Please produce all correspondence between responding Defendant, the Diocese of Charleston, and/or higher offices within the Roman Catholic Church that relate in any way to the claims, defenses, or facts of this case.

**RESPONSE:**

> **The Diocese has produced copies of correspondence with Rome regarding the sale of the former Bishop England High School and the acquisition of property and construction of the new BEHS.**

**JA1642**

5.     Please produce any insurance policy that may provide coverage in any way relating to the claims, defenses, or facts of this case.

**RESPONSE:**

      **The Diocese will supplement to provide the Declarations Page of its policy.**

6.     Produce any and all documents by which parents, guardians, custodians, or tuition payers were informed that children would be viewed through the subject windows and may be seen in varying states of dress and nudity upon their enrollment as students at Bishop England High School (BEHS).

**RESPONSE:**

      **The Diocese objects to Request No. 6 to the extent Plaintiff seeks information that is beyond that which is required for the Court to determine issues related to class certification under Rule 23 Fed.R.Civ.P. and not proportionate to the needs of the case.**

7.     Produce any and all documents that parents, guardians, custodians, or tuition payers were required by any Defendant to sign before their children or the person(s) for whom they were paying tuition, notifying such person that each student would, upon becoming a student at BEHS, be subject to viewing by third parties while such students were in various states of dress and or nudity, from January 1, 1998 to date.

**RESPONSE:**

      **The Diocese objects to Request No. 7 to the extent Plaintiff seeks information that is beyond that which is required for the Court to determine issues related to class certification under Rule 23 Fed.R.Civ.P. The Diocese further objects to Request No. 7 to the extent it implies that anyone was authorized "to viewing by third parties while such students were in**

3

various states of dress and or nudity," because coaches and staff were only authorized to monitor the locker rooms for student safety.

8.      Produce copies of the Annual, Bi-Annual, or Semi-Annual Report of BEHS for the years 1998 to date.

**RESPONSE:**

**The Diocese is compiling documents responsive to Request No. 8 and will supplement.**

9.      Produce copies of any document in the possession or control of any Defendant herein or his, her or its agent or attorney, which document shows or in any way states the value of BEHS. This request includes but is in no way limited to financial statements, insurance applications, declaration pages, and policies.

**RESPONSE:**

**The Diocese objects to Request No. 9 to the extent Plaintiff seeks information that is beyond that which is required for the Court to determine issues related to class certification under Rule 23 Fed.R.Civ.P.**

10.     Produce any and all construction plans, or design documents for the viewing windows which are the subject of this action prepared by BEHS, LS3P, Gulf Stream Construction or any other design professional, engineer, or contractor.

**RESPONSE:**

**The Diocese has copies of the plans or design documents prepared by LS3P and will produce same.**

11.     Produce any correspondence regarding Number 10 by and between BEHS, LS3P and Gulf Stream Construction.

**RESPONSE:**

4

**JA1644**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located.**

12.    Produce any and all policies and procedures concerning safety at BEHS in effect from 1998 to the present.

**RESPONSE:**

**The Diocese has produced BEHS' Faculty Handbook and Student / Parent Handbook. The Policy on Protection of Children is available online. The Diocese continues its search and will supplement should any additional documents be located.**

13.    Produce any and all security or safety records from BEHS from 1998 to the present related to any incident in any locker room, adjacent office, or athletic personnel office containing a viewing window.

**RESPONSE:**

**The Diocese continues its search for documents responsive to Request No. 13 and will supplement should any documents be located.**

14.    Produce any and all documents concerning complaints by students, alumni or parents relating to the windows which are the subject of this action from 1998 to the present.

**RESPONSE:**

**The Diocese has not located any documents responsive to Request No. 14. The Diocese continues its search and will supplement should any responsive documents be located.**

15.    Produce any and all incident reports relating to violations of school safety, security, or privacy issues from 1998 to the present.

**RESPONSE:**

**JA1645**

**The Diocese continues its search for documents responsive to Request No. 15 and will supplement should any documents be located.**

16.    Produce the BEHS code of student conduct for each of the years from 1998 to the present.

**RESPONSE:**

**The Diocese continues its search for documents responsive to Request No. 16 and will supplement should any documents be located.**

17.    Produce any and all records from BEHS related to or concerning sexual exploitation of students by faculty members / teachers. You may substitute the victim names with pseudonyms so long as you send us the actual names of same under separate cover.

**RESPONSE:**

**The Diocese objects to Request No. 17 to the extent Plaintiff seeks information that is beyond that which is required for the Court to determine issues related to class certification under Rule 23 Fed.R.Civ.P. and that the Request is not proportionate to the needs of the case, nor does it relate to any claim or defense in this case.**

18.    Regarding Gulf Stream and/or any other general contractor, if there was such, produce a copy of the full contract with Gulf Stream Construction for the construction of the school including all supplemental, general, other conditions, addenda, modifications, and change orders.

**RESPONSE:**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located.**

19.    Produce a copy of the resume of the lead Gulf Stream Construction contractor, or any other lead contractor, that was involved in the design, drawing, and construction of BEHS.

6

**JA1646**

**RESPONSE:**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located.**

20.     Produce a copy of the Gulf Stream Construction compensation agreement and copies of any checks, wires, or any other forms of payment showing how Gulf Stream Construction was paid for the BEHS construction project and how much it was paid.

**RESPONSE:**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located.**

21.     Regarding LS3P and/or any other lead architectural firm, produce a copy of the contract with LS3P for the design/construction of the school including all supplemental, general, other conditions, addenda, modifications, and change orders.

**RESPONSE:**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located. The Diocese further refers to the documents produced by LS3P in response to Plaintiffs' subpoena.**

22.     Produce a copy of the resume of the lead architect at LS3P, or any other lead architect, that was involved in the design, drawing, and construction of BEHS.

**RESPONSE:**

7

**JA1647**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located. The Diocese further refers to the documents produced by LS3P in response to Plaintiffs' subpoena.**

23.    Produce a copy of the LS3P compensation agreement and copies of any checks, wires, or any other forms of payment showing how LS3P was paid for the BEHS construction project and how much it was paid.

**RESPONSE:**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located. The Diocese further refers to the documents produced by LS3P in response to Plaintiffs' subpoena.**

24.    Produce a copy of any and all permitting and design or any other approvals received from the City of Charleston or Berkeley County for the construction of BEHS on Daniel Island.

**RESPONSE:**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located. The Diocese further refers to the documents produced by LS3P in response to Plaintiffs' subpoena.**

25.    Produce a copy of all bids that were received for the construction of BEHS on Daniel Island.

**RESPONSE:**

**JA1648**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_0000588. The Diocese continues its search and will supplement should any additional documents be located. The Diocese further refers to the documents produced by LS3P in response to Plaintiffs' subpoena.**

26.    Produce a copy of the preservation letter sent to BEHS and/or the Diocese of Charleston by Richard Dukes, redacted so as not to include any strategy or attorney-client privileged material which Richard Dukes told Plaintiffs' counsel about during the 26(f) conference on May 25, 2021.

**RESPONSE:**

**The Diocese objects to Request 26 to the extent Plaintiffs seek production of any communication that is within the attorney-client privilege or work product doctrine. Subject to the stated objection, the preservation letter sent by Plaintiffs' counsel was forwarded to various diocesan officials who may possess documents that were the subject of counsel's preservation letter.**

27.    Please produce a copy of the reports for all disciplinary infractions that have occurred in the dressing rooms and/or locker rooms from 1998 to date as referenced in Interrogatory #8 to Defendant Bishop England High School.

**RESPONSE:**

**The Diocese continues its search for documents responsive to Request No. 13 and will supplement should any documents be located.**

28.    Please produce a copy of the reports for all disciplinary infractions that have occurred in the bathrooms from 1998 to date as referenced in Interrogatory #9 to Defendant Bishop England High School.

**RESPONSE:**

9

**JA1649**

**The Diocese continues its search for documents responsive to Request No. 13 and will supplement should any documents be located.**

29.    Please provide the building committee meeting minutes as referenced in Interrogatory #25 directed to Defendant The Bishop of Charleston, a Corporation Sole.

**RESPONSE:**

**The Diocese has searched available records and has located documents bates labeled BEHS_000001 through BEHS_000588. The Diocese continues its search and will supplement should any additional documents be located. The Diocese further refers to the documents produced by LS3P in response to Plaintiffs' subpoena.**

30.    Produce any documents, emails, or press releases that any of the Defendants sent to parents, students and/or the media alerting them about the 2019 Scofield incident.

**RESPONSE:**

**The letters sent to parents after the incident involving Jeffrey Scofield will be produced.**

**TURNER, PADGET, GRAHAM & LANEY, P.A.**

By:    *s/Richard S. Dukes, Jr.*

July 12, 2021

Richard S. Dukes, Jr., Federal ID No.:  7340
40 Calhoun Street, Suite 200
Charleston, South Carolina 29401
Phone: (843) 576-2810
Fax: (843) 577-1646
Email:  rdukes@turnerpadget.com

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

10

**JA1650**

Megan Ashley Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

**ATTORNEYS FOR DIOCESE DEFENDANTS**

**JA1651**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRCIT OF SOUTH CAROLINA
## CHARLESTON DIVISION

### CIVIL ACTION NUMBER: 2:21-cv-613-RMG

| | |
|---|---|
| Gary Nestler, *et al*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | **DEFENDANTS' REPLY IN SUPPORT OF** |
| The Bishop of Charleston, a Corporation ) | **THEIR MOTION FOR SUMMARY** |
| Sole, *et al,* ) | **JUDGMENT** |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

As the Court found and determined both in its Order denying class certification [Dkt. 84] and its Order denying reconsideration [Dkt. 95] the record before the Court reflects that *these* Plaintiffs in *this* case cannot prove the essential elements of the claims alleged in the Amended Complaint. By their own testimony, the Plaintiffs have shown they suffered no legally cognizable injury as a result of the matters alleged. By their own admission, Plaintiffs cannot establish any claim against any Defendant. The record clearly and unequivocally reflects that there remain no genuine issues of fact and Defendants are entitled to judgment as a matter of law on all claims. No additional discovery can change that – the Plaintiffs claims fail as a matter of law and should be dismissed.

Without a shred of evidence to support their meritless claims, summary judgment is appropriate and Plaintiffs' claims should be dismissed with prejudice.

Respectfully submitted,

**TURNER PADGET GRAHAM LANEY, PA**

*s/Richard S. Dukes, Jr.*
Richard S. Dukes, Jr., Federal ID No. 7340
40 Calhoun Street, Suite 200
Charleston, SC 29401
Phone: (843) 576-2810
Email: RDukes@turnerpadget.com

Carmelo Barone Sammataro, Federal ID No.: 9174
P.O. Box 1473
Columbia, SC 29202
Phone: (803) 254-2200
Fax: (803) 799-3957
Email: ssammataro@turnerpadget.com

Megan Ashley Rushton, Federal ID No.: 13303
P.O. Box 1509
Greenville, SC 29602
Phone: (864) 552-4691
Email: mrushton@turnerpadget.com

**ATTORNEYS FOR DIOCESE DEFENDANTS**

June 13, 2022

**JA1653**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Gary Nestler, *et al.*, | ) | Civil Action No. 2:21-cv-613-RMG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| The Bishop of Charleston, a Corporation Sole, *et al.*, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Before the Court is Defendants' motion for summary judgment (Dkt. No. 85). For the reasons set forth below, the Court grants Defendants' motion.

**I.     Background**

On March 24, 2022, the Court denied Plaintiffs' motion for class certification. (Dkt. No. 84) (the "Prior Order"). The Court found, inter alia, that each named plaintiff lacked standing to pursue their respective claims. (*Id.* at 12-14).

On May 24, 2022, the Court denied Plaintiffs' motions for reconsideration. (Dkt. No. 95).

Defendants move for summary judgment. (Dkt. Nos. 85, 99). Plaintiff opposes. (Dkt. No. 98).

Defendants' motion is fully briefed and ripe for disposition.

**II.     Legal Standard**

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure should be granted only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Facts are material where they "might affect the outcome" of the case, and a "genuine issue" exists where the evidence would allow a

1

**JA1654**

reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, the nonmoving party's evidence "is to believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

### III.    Discussion

In its Prior Order, the Court denied Plaintiffs' motion for class certification on the basis that the proposed classes were fail-safe classes and not ascertainable, that neither predominance nor superiority were met, and that the named Plaintiffs lacked standing.  The Court noted that crucial to all of Plaintiffs' claims was a finding that an individual was either viewed or had a child who was viewed while attending Bishop England High School during the applicable time period through a particular glass window in the locker rooms. (Dkt. No. 84 at 7 n.2) (noting that Plaintiffs' negligence, unjust enrichment, and warranty claims turned on a finding that an individual was viewed); (*Id.* at 9) (holding that South Carolina law explicitly required actual viewing to establish the tort of wrongful intrusion into private affairs); *Snakenberg v. Hartford Cas.*, 299 S.C. 164, 171-72 (Ct. App. 1989) (The cause of action for wrongful intrusion into private affairs consists of (1) an intentional (2) intrusion, (3) which is substantial and unreasonable, (4) into that which is private.); *Id.* at 172 (Damages "consist[] of the unwanted *exposure* resulting from intrusion.") (emphasis added); *O'Shea v. Lesser*, 308 S.C. 10, 17-18 (1992) (Where "a plaintiff bases an action for invasion of privacy on 'intrusion,' bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom.") (*citing Rycroft v. Gaddy*, 281 S.C. 119 (Ct. App. 1984)).  In the Prior Order, the Court noted that none of the named plaintiffs had put forth evidence of being viewed and thus lacked standing to pursue their claims. *See* (Dkt. No. 84 at 13-14) ("[A]s . . . detailed *supra*, neither Viewed Student Female 200 nor Viewed Male Student

2

**JA1655**

300 testified to having been viewed by anyone . . . . Nor did Nestler testify that his daughter had been viewed.").

The Court finds that Defendants are entitled to summary judgment. As established by the Prior Order, none of the named Plaintiffs can establish that they suffered a legally cognizable injury. (Dkt. No. 84 at 7 n.2, 12-13) (noting that testimony from the named plaintiffs established none had been viewed and that, therefore, "none of these individuals suffered an 'intrusion' under *Snakenberg*, or an otherwise concrete harm") (internal citation omitted). Accordingly, as Plaintiffs "[b]y their own admissions . . . cannot establish any claim against any Defendant," *see* (Dkt. No. 99 at 1), Defendants are entitled to judgment as a matter of law.

**IV.**     <u>**Conclusion**</u>

For the reasons stated above, Defendants' motion for summary judgment (Dkt. No. 85) is granted. The Clerk is directed to close this case.

        **AND IT IS SO ORDERED**.

<u>s/ Richard M. Gergel</u>
Richard M. Gergel
United States District Judge

June 17, 2022
Charleston, South Carolina

3

**JA1656**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Gary Nestler,<br>Viewed Student Female 200,<br>Viewed Student Male 300,<br>on behalf of themselves and all others<br>similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>The Bishop of Charleston, a Corporation<br>Sole, Bishop England High School,<br>Tortfeasors 1-10, The Bishop of the Diocese<br>of Charleston, in his official capacity, and<br>Robert Guglielmone, individually,<br><br>     Defendants. | Civil Action No. 2:21-cv-613-RMG<br><br><br><br><br><br><br><br><br><br><br>NOTICE OF APPEAL |

Notice is hereby given that Plaintiffs hereby appeal to the United States Court of Appeals for the Fourth Circuit from the District Court's Order/Judgment entered in this action on the 17th day of June, 2022 (ECF 100) as to all grounds upon which the Court granted relief in the form of summary judgment to the Defendants, and from all opinions and orders that merge therein.

THE RICHTER FIRM, LLC

s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr. (Fed. Bar: 3460)
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC 29464
Phone: 843-849-6000
LRichter@RichterFirm.com
Anna@RichterFirm.com

-AND-

s/Carl L. Solomon
Carl L. Solomon (Fed. Bar: 6684)
Solomon Law Group, LLC

**JA1657**

P.O. Box 1866
Columbia, SC 29202
Phone: 803-391-3120
carl@solomonlawsc.com

-AND-

s/Daniel Scott Slotchiver
Daniel Scott Slotchiver (Fed. Bar: 6106)
Stephen Slotchiver (Fed. Bar: 6648)
Anna E. Richter (Fed. Bar: 13333)
Slotchiver & Slotchiver LLP
751 Johnnie Dodds Blvd, Suite 100
Mt. Pleasant, South Carolina 29464
Phone: 843-577-6531
dan@slotchiverlaw.com
steve@slotchiverlaw.com
arichter@slotchiverlaw.com

-AND-

s/Brent S. Halversen
Brent S. Halversen (Fed. Bar: 10474)
Brent Souther Halversen, LLC
751 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, South Carolina 29464
Phone: 843-284-5790
brent@halversenlaw.com

-AND-

David K. Lietz (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

*Attorneys for Plaintiffs*

Dated: July 12, 2022

**JA1658**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Plaintiffs' Notice of Appeal* was served on the attorney(s) of record listed below by delivering a copy of the same via the CM/ECF electronic filing system and/or by U.S. mail, first class, postage prepaid to the following addresses:

Richard S. Dukes, Jr.
Turner Padget Graham & Laney, PA
P.O. Box 22129
Charleston, SC  29413
RDukes@turnerpadget.com

Carmelo Barone Sammataro
Turner Padget Graham & Laney, PA
P.O. Box 1473
Columbia, SC  29202
ssammataro@turnerpadget.com

Megan Ashley Rushton
Turner Padget Graham & Laney, PA
P.O. Box 1509
Greenville, SC  29062
mrushton@turnerpadget.com

*Attorneys for Defendants*

s/ Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr.

Dated: July 12, 2022
Mt. Pleasant, South Carolina

**JA1659**